## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| Sydney Dillard | ‖ | |
| Plaintiff, | ‖ | |
| v. | ‖ | Case No. 1:20-cv-7760 |
| DePaul University, | ‖ | Plaintiff Demands Trial by Jury |
| Defendants. | ‖ | |

## COMPLAINT

Plaintiff Sydney Dillard ("Dillard" or "Plaintiff"), by and through her attorneys, Gianna R. Scatchell, Esq. and Cass Thomas Casper, Esq. of DISPARTI LAW GROUP, P.A., states and alleges as follows for her Complaint against DePaul University ("DePaul" or "University") and alleges upon personal knowledge regarding himself and his own acts, and on belief, regarding all other matters:

## INTRODUCTION

1. This is an action for race and disability discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*

2. Plaintiff sues to enforce her federal and state law rights arising out of the Defendants' unlawful race and disability discrimination. Plaintiff seeks all remedies including lost wages and benefits, compensatory damages, and reasonable attorneys' fees and costs.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over DePaul because it committed the acts and omissions that are the subject of this litigation in Cook County, Illinois, which is in this district. e

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because such claim is so related to the federal claims in this action that it forms part of the same case or controversy under Article III of the United States Constitution.

5. This Court has personal jurisdiction over DePaul because, at all times relevant, DePaul has been headquartered in this judicial district, maintains offices in this judicial district, and conducts its principal business and operations in this judicial district.

6. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 in that DePaul's principal place of business and operation is in this judicial district, DePaul engaged in the unlawful employment practices in this judicial district, and all of the events or omissions giving rise to the claims occurred in this judicial district.

**ADMINISTRATIVE PREREQUISITES**

7. Plaintiff filed a charge of Discrimination against Defendant with the EEOC (Charge No. 440-2019-06844). A true and accurate copy of Plaintiff's Right to Sue letter is attached as Ex. 1.

8. Plaintiff commences this lawsuit within the 90-day period the EEOC right-to-sue notice.

**PARTIES**

9. Plaintiff, Sydney Dillard ("Dillard" or "Plaintiff") is an African American woman. She is a tenured Associate professor at DePaul University College, which is located in Chicago (Cook County), Illinois.

10. Defendant, DePaul University ("DePaul" or the "University") is a not–for–profit corporation and is the largest Catholic university in the United States. DePaul's principal place of business is in Chicago (Cook County), Illinois.

11. During her time at DePaul, Dillard was considered by her peers to be an accomplished and competent professional.

## FACTS RELEVANT TO ALL COUNTS

**12.** During her time at DePaul, Dillard was considered by her peers to be an accomplished and competent professional.

**13.** Plaintiff is the only African American female that is a tenured tracked faculty member in the College of Communication.

**14.** Plaintiff's employment was subject to a six-year probationary period before she could obtain tenure status.

**15.** Prior to DePaul's discriminatory conduct, Plaintiff performed her job duties satisfactorily. She was never written up and received positive feedback about her work.

**16.** While working for DePaul, Plaintiff was subjected to an ongoing hostile work environment in the following ways:

    **a.** Plaintiff was belittled, ostracized, and intimidated through microaggressions, causing her unnecessary stress and duress, which negatively affected her ability to work;

    **b.** Plaintiff was subjected to inequitable evaluations (e.g. non-African American professor received a review letter from personnel and Dean Salma Ghanem highlighting her perfect teaching scores and did not require her to complete an additional formal review), resulting in a more onerous workload;

    **c.** Plaintiff was singled out and subject to random, invasive office searches, personnel ignored her perfect teaching scores, causing her unnecessary stress and duress; and

    **d.** Plaintiff was singled out by having to teach in the modality (online v. face-to-face classes) where she had lower scores. Carolyn Bronstein, the Associate Dean in the

3

College of Communication, informed Plaintiff that no other faculty member was forced to teach one modality over another as a result of a personnel review.

17. Plaintiff's tenure-track evaluations were pervaded with irregularities and increased scrutiny, including, but not limited to at least five (5) formal reviews[1] before she could be tenured and promoted, which resulted in Plaintiff expending significant time and stress to prepare, organize materials, prep written persona statements, updating files, and interview for each review.

18. On belief, Plaintiff is the only faculty member in the College of Communication to face this many formal reviews.

19. The average faculty member has approximately three 30 formal reviews before becoming tenured and promoted.

20. In addition, while working for Defendant, Plaintiff was either prohibited or prevented from advancing to a tenured position, in one or more of the following ways:

    **a.** Non-African American employees similarly situated to Plaintiff were given one on one assistance and coaching regarding their performance on the path to, obtaining tenure, and Plaintiff was not.

    **b.** Non-African American employees were subjected to less stringent evaluations than Plaintiff.

    **c.** Plaintiff was required to teach more face-to-face instruction than any other employee in the College of Communication. This requirement prevented Plaintiff from putting time into research, a category employee was judged upon in the tenure process.

---

[1] Plaintiff's formal reviews occurred on or about November 9, 2013, March 23, 2015, March 3, 2017, March 9, 2018, November 16, 2018.

**d.** Plaintiff was admonished for low scores, while other non-African American employees with lower scores were not admonished.

**e.** Plaintiff was prohibited from becoming chair of a search committee on one occasion, which would have demonstrated her level of service to a committee, criteria for tenure. Instead, Plaintiff was made to co-chair the committee with a non-qualified employee, who was internationally born and a male.

**f.** Plaintiff was forced to be a co-chair of a search committee on another occasion, while another non-African American employee was not forced to be a co-chair but allowed to chair the committee alone.

**g.** Plaintiff was singled out and reviewed on her use of DePaul's "SharePoint" system, which was not a requirement for class instruction.

**h.** DePaul's EEO Office ignored Plaintiff's complaints of discrimination, thereby forcing her to continue to work in a racially hostile work environment.

**i.** In February 2019, DePaul failed to promote Plaintiff to Program Chair of the Public Relations and Advertising Program, despite the fact that she was qualified (she is a Ph.D. and had one year of leadership training) and was the *only* candidate for the position.

**j.** While Plaintiff failed to obtain the vote of her colleagues, the Dean of the Communications College takes such votes as a recommendation meaning that the faculty vote is not a mandatory prerequisite for receiving the promotion.

**21.** Also, Plaintiff was paid lower that other non-African American Assistant Professors, with less experience.

5

22. On or about November 2, 2018, Plaintiff put DePaul on notice that she was being paid less than her counterparts or other less-experienced professors and made an oral demand to be provided with retroactive pay.

23. On or about January 1, 2019, DePaul provided Plaintiff with a 2.9% raise without providing a reason for the proffered raise as is customary.

24. As a result of this pattern of discrimination DePaul, Plaintiff began suffering from debilitating medical conditions, including, but not limited to an aggravated seizure disorder, anxiety, and depression, all affecting her ability to work. Plaintiff had to take short term disability and seek medical accommodations because of the stress from the hostile work environment.

25. Similarly situated, non-African American employees were treated more favorably than Plaintiff, as they were not subjected to the conduct set forth herein.

26. As a result of DePaul's actions Plaintiff suffered lost wages and benefits, delayed career advancement, emotional distress damages, and attorney's fees.

**National Origin Discrimination/Harassment/Hostile Work Environment**

27. While working for DePaul, Plaintiff was subjected to an ongoing hostile work environment in the following ways:

    a. Non-American born employees similarly situated to Plaintiff were given one on one assistance and coaching regarding their performance on the path to obtaining tenure, and Plaintiff was not.

    b. Non-American born employees were subjected to less stringent evaluations than Plaintiff, allowing them to obtain tenure sooner than Plaintiff.

    c. Plaintiff was required to teach more face-to-face instruction than any other American born employee in the College of Communication. This requirement

prevented Plaintiff from putting time into research, a category employee was judged upon in the tenure process, thereby contributing to the denial of her tenure.

**d.** Plaintiff was admonished for low scores, while other non-American born employees with lower scores were not admonished.

**e.** Plaintiff was prohibited from becoming chair of a search committee on one occasion, which would have demonstrated her level of service to a committee, criteria for tenure. Instead, Plaintiff was made to co-chair the committee with a non-qualified, non-American born employee.

**f.** Plaintiff was singled out and reviewed on her use DePaul's "SharePoint" system, which was not a requirement for class instruction.

**g.** DePaul's EEO Office ignored Plaintiff's complaints of discrimination, thereby forcing her to continue to work in a hostile work environment and furthering the delay of her tenure appointment.

**h.** In February 2019, DePaul failed to promote Plaintiff to Program Chair of the Public Relations and Advertising Program, despite the fact that she was the

**Disability Discrimination and Failure to Accommodate**

24. Plaintiff is qualified individual with a disability under the ADA.

25. Plaintiff has a seizure disorder, which causes her to lose consciousness and substantially limits her in her ability to walk, talk, think, communicate, concentrate, and work, when activated.

26. Plaintiff also has clinical anxiety and depression, which substantially limits her in her ability to sleep, see, think, communicate, concentrate, and work.

27. Prior to DePaul's discriminatory conduct, Plaintiff performed her job duties satisfactorily. She was not written up or counseled regarding her performance.

7

28. While working for DePaul, Plaintiff was discriminated against based on her disability in the following ways:

    a.  DePaul delayed or failed to provide pertinent information to third parties regarding Plaintiff's application for short-term disability, which resulted in Plaintiff's denial of short-term disability.

    b.  Other, non-African American colleagues on short-term disability were provided with additional faculty support such as other professors taking over classes, substituting that professor's service responsibilities, food trains[2] of colleagues bringing him and his wife meals.

    c.  Plaintiff, by contrast, was not provided any support and her colleague, Maria DeMoya, offered to take over teaching Plaintiff's classes, but was denied.

    d.  DePaul encouraged Plaintiff to stop her tenure clock.

    e.  DePaul unreasonably delayed the confirmation of Plaintiff's teaching scheduled for Fall 2018, Spring 2019, Winter 2019, causing Plaintiff a more onerous workload.

    f.  DePaul failed to protect Plaintiff's private medical information from other employees.

    g.  DePaul attempted to coerce Plaintiff into not teaching classes, an action that would cause Plaintiff to lose wages.

    h.  DePaul attempted to force Plaintiff to work beyond the limitations set forth by her physician.

---

[2] Colleagues who schedule and organize home-made meal giving for other people.

29. During the weeks of September 24, 2018, October 1, 2018, October 8, 2018, and October 15, 2018, Plaintiff experienced dizziness, light-headedness, blurred vision, double vision, and migraines while teaching her face-to-face classes.

30. Plaintiff put DePaul on notice after each of these flare-ups.

31. On or about November 11, 2018, Defendant denied Plaintiff's request for accommodation despite knowing that Plaintiff had experienced seizures several times during her face-to-face classes.

32. On or about December 6, 2018, DePaul suggested that Plaintiff not teach winter intersession or summer courses, which is particularly harsh accommodation, since these two sessions are one of the only ways that a professor can get an increase in pay.

**Failure to Accommodate**

33. Plaintiff is a qualified individual with a disability under the ADA.

34. Plaintiff has a seizure disorder, which causes her to lose consciousness and substantially limits her in her ability to walk, talk, think, communicate, concentrate, and work, when activated.

35. Plaintiff also has clinical anxiety and depression, which substantially limits her in her ability to sleep, see, think, communicate, concentrate, and work.

36. DePaul is aware of Plaintiff's limitations through Plaintiff's applications for short-term disability, her verbal accommodations requests, complaints to EEO, and accommodations requests by her physician, beginning March of 2018, through at least March 7, 2019.

37. On June 6, 2018, Plaintiff made a request for a reasonable accommodation for additional time to prepare for her classes, and to teach her classes online for each session, as opposed to face to face for the Fall and Winter quarters, of 2018. Plaintiff explained that teaching face to face classes exacerbated her medical condition.

38. Plaintiff was not given additional time to prepare for her classes for the Fall and Winter 2019, which began September 2018 – November 2018.

39. Plaintiff was also required to teach face to face classes each session for the Fall and Winter 2019, which began September 2018 – November 2018.

### Unauthorized HIPAA Disclosure

40. On or about February 21, 2019, Plaintiff was informed that her medical and leave history was discussed in reviewing her qualifications.

41. On or about April 2019, Plaintiff was informed in a teaching, learning, and technology meeting that the DePaul email outlook system is not secure and that some people, particularly supervisors, are able to access faculty email information.

42. Plaintiff requested that DePaul's human resources' director, Gianna Bellavia, only discuss her medical information via phone.

43. On several occasions, on various dates, various individuals with access to Plaintiff's medical records ignored her requests for medical privacy and shared her medical information with other colleagues or over an unsecure email client.

### Denial of promotion

44. A Caucasian, male colleague told Plaintiff that Jim Motzer, a Caucasian male, would be a better candidate for the Program Chair position than Plaintiff, even though Motzer was not qualified for the position because he is not tenure or a tenure-track faculty member.

45. Without explanation, Dillard was not awarded the Program Chair despite that she was the well-qualified and the only candidate for the position.

46. On or about February 21, 2019, Plaintiff was further informed that there were no negative discussions about her qualifications for the position.

47. However, during the vote for Plaintiff to be promoted, several faculty members informed Plaintiff that they did not consider her presentation, leadership plan, or the answers to the questions and answers part of the meeting.

48. Instead, many of the players involved in the promotion made direct statements in an around the hiring process expressing concerns over Plaintiff's disability, including, discussing recent medical history, disability, and maternity leave.

49. Other faculty member confirmed that her disability and maternity leave were cited as the reasons why she was not promoted to Program Chair.

**DePaul's Double Standard in Tenure-Selecting Procedures**

50. On or about November 13, 2020, Plaintiff attended the tenure-faculty meeting to vote on the promotion of Kendra Knight ("Knight"), a Caucasian woman.

51. Inexplicably, DePaul conducted four (4) separate votes until the votes were unanimously in favor of Knight receiving a promotion because the faculty members involved did not want Knight to "think that she has enemies" and "there was no negative discussion about her qualifications."

52. This unprecedented 4-time voting process violated DePaul's Faculty Handbook, § 3.5.2 which states in summary below, and more fully as Exhibit 2:

   Likewise, no faculty member is permitted to add his or her vote or change his or her vote after votes have been tallied.

53. On or about November 15, 2020, DePaul's Personnel Committee asks for faculty input regarding the meeting surrounding Knight's promotion. This personnel document stated that during the meeting for Knight's promotion, there were only two votes that occurred because one of the votes suffered from a technical glitch.

54. On or about December 15, 2020, Paul Booth, the chair of DePaul's Personnel Committee requested that Plaintiff submit a signed statement attesting to the accuracy of the form regarding Knight's promotion.

55. Plaintiff refused to sign Knight's personnel document because it was inaccurate. Plaintiff further noted on the form that there were four separate votes instead of two and that Plaintiff did not feel comfortable signing a statement that the document was accurate.

**DePaul's Pattern and Practice of Racially Discriminatory Conduct.**

56. In 2012, when Plaintiff began teaching at DePaul, there was only one (1) tenured minority professor and four (4) minority professors that were tenured track.

57. Plaintiff is the last of the minority professors left at the College of Communications, specifically, two of the four minority professors were denied tenure and promotion, one of the minority professors was harassed and discriminated against and left DePaul.

58. On or about November 2, 2018, Nur Urysal, an assistant professor tried to disqualify another candidate for having a foreign accent.

59. On or about September 2019, and on belief, Latrina West-Shields, left her position at DePaul due to several complaints for racial discrimination.

60. Separate and apart from DePaul's racially discriminatory acts against Dillard as specified herein, DePaul has engaged in a pattern of racially discriminatory conduct toward minority staff, which produced at least three separate lawsuits against it including, *Terry Smith v. DePaul University*, *Sumi Cho v. DePaul University*, 1:18-cv-08012, and *Lisa Calvente v. DePaul University*, 1:20-cv-03366.

**COUNT I – Intentional Discrimination Based on Race in Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*.**

12

61. Plaintiff restates, realleges, and incorporates by reference all other Paragraphs of this Complaint as if fully stated herein.

62. Title VII of the Civil Rights Act of 1964 provides that "[it] shall be an unlawful employment practice for an employer - (1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . ." 42 U.S.C. 2000e-2(a)(1).

63. At all times, Defendant DePaul was motivated by racially discriminatory animus in its aforesaid actions, *to wit*, it intentionally discriminated against Plaintiff based on her race (African American).

64. At all times, Plaintiff met the legitimate expectations of her position and performed her job satisfactorily.

65. At all times, Plaintiff was fully qualified and the only candidate for the Program Chair position for which she applied.

66. A similarly situated Caucasian individuals, were less qualified for the full-time tenure position for which Plaintiff.

67. Defendant DePaul at no time gave a reason for Plaintiff's non-selection for the position or the increased scrutiny for tenure track.

68. Any reason that DePaul could give for Plaintiff's non-selection or more scrutinized selection process is a pretext for race discrimination based upon at least (i) direct statements referencing diversity surrounding the Program Chair promotion and also of full-time tenure position hiring process; (ii) irregularities in the process utilized during the full-time tenure position hiring process; (iii) Plaintiff's superior qualifications for both; and, (iv) rampant disparate treatment

of non-Caucasian faculty vis-a-vis Caucasian staff persons in the timeframe surrounding the hiring of the full-time tenure track position and Program Chair promotion.

69. At all times, the adverse actions taken by Defendant DePaul against Plaintiff was because of her membership in a protected group, *to wit*, that she identifies as African American.

70. The employment practices in which DePaul has engaged were intentional.

71. The employment practices in which DePaul has engaged were done with malice or reckless indifference to Plaintiff's rights.

72. That, as a result of Defendant DePaul' intentional race discrimination, Plaintiff has suffered damages, the failure to hire/promote her to the Program Chair position, increased requirements/scrutiny to be considered for the full-time tenure position, loss of salary and benefits (to include pay, retirement, insurance, and all other benefits and emoluments of employment), and substantial emotional distress in the form of anxiety, depression, embarrassment, reputational damage, and emotional pain and suffering.

WHEREFORE, based on the foregoing, Plaintiff respectfully requests that this Honorable Court enter Judgment in her favor, and against Defendant DePaul, and order Plaintiff made whole for all losses as a result of Defendant's unlawful discriminatory actions complained of herein, loss of pay and benefits, lost bonuses and raises, compensatory damages, and reasonable attorneys' fees and costs. Plaintiff additionally requests that this Court enter an order for such other relief as it deems just and proper.

## COUNT II – Disability Discrimination in Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq*.

73. Plaintiff restates, realleges, and incorporates by reference all other Paragraphs of this Complaint as if fully stated herein.

74. Plaintiff is a member of a protected and suspect classification: a person with a disability.

75. As outlined in the preceding paragraphs, Plaintiff is a "qualified individual with a disability" within the meaning of 42 U.S.C.A. § 12111(8) because she can, with reasonable accommodation, perform the true essential functions of the job that she held and seeks to hold in the employ of the Defendant.

76. During Plaintiff's employment, Defendant was on notice and at all times knew of Plaintiff's ADA-recognized disabilities.

77. Specifically, the Defendant violated the ADA in at least the following ways: it failed to engage in the required interactive process; scrutinized her work performance more harshly than other employees without disabilities; degraded and humiliated her in front of her peers; subjected Plaintiff to a hostile work environment not imposed upon non-disabled persons; exacerbated Plaintiff's anxiety; and caused Plaintiff emotional distress.

78. At all times, Defendant, developed a separate set of guidelines that were a pretext to subjecting Plaintiff to heightened scrutiny and denying her the promotion to Program Chair.

79. The discriminatory action of Defendant as set forth above, has caused and will continue to cause Plaintiff to suffer losses of earnings.

80. As a further proximate result of Defendant's unlawful and intentional discriminatory practices engaged in by the Defendant in violation of the ADA, Plaintiff has suffered damages, the failure to hire/promote her to the Program Chair position, increased requirements/scrutiny to be considered for the full-time tenure position, loss of salary and benefits (to include pay, retirement, insurance, and all other benefits and emoluments of employment), and substantial emotional distress in the form of anxiety, depression, embarrassment, reputational damage, and emotional pain and suffering.

WHEREFORE, based on the foregoing, Plaintiff respectfully requests that this Honorable Court enter Judgment in her favor, and against Defendant DePaul, and order Plaintiff made whole for all losses as a result of Defendant's unlawful discriminatory actions complained of herein, loss of pay and benefits, lost bonuses and raises, compensatory damages, and reasonable attorneys' fees and costs. Plaintiff additionally requests that this Court enter an order for such other relief as it deems just and proper.

### COUNT III – Title VII of the Civil Rights Act of 1964—42 U.S.C. §2000e (sex discrimination)

81. Plaintiff restates, realleges, and incorporates by reference all other Paragraphs of this Complaint as if fully stated herein.

82. DePaul has engaged in unlawful employment practices by discriminating against Plaintiff with respect to her compensation on the basis of her sex.

83. Plaintiff occupies a job similar to at least two higher–paid male law professors with respect to the skill, effort, and responsibilities of her job.

84. The employment practices in which DePaul has engaged were intentional.

85. The employment practices in which DePaul has engaged were done with malice or reckless indifference to Professor Dillard's rights.

86. The employment practices in which DePaul has engaged have caused Professor Dillard humiliation, distress, inconvenience, and loss of enjoyment of life.

### COUNT IV – Federal Equal Pay Act – 29 U.S.C. § 206, et seq.

87. Plaintiff restates, realleges, and incorporates by reference all other Paragraphs of this Complaint as if fully stated herein.

88. DePaul has violated the Equal Pay Act by paying Plaintiff wages at a rate less than the rate at which it pays similarly-situated male professors.

89. At all times relevant to this complaint, Plaintiff has performed work that is and was substantially similar to that of male professors at the Communications College considering the skills, effort, and responsibilities of the job. Similarly, Plaintiff has worked under conditions similar to male professors.

90. DePaul has paid Plaintiff at a lower rate than male professors.

91. As a result of the acts complained of above, DePaul has unlawfully withheld and is continuing to withhold the payment of wages due to Plaintiff.

<u>**COUNT V – Breach of Contract (DePaul Handbook)**</u>

92. Plaintiff restates, realleges, and incorporates by reference all other Paragraphs of this Complaint as if fully stated herein.

93. Through DePaul's Handbook and other practices referenced therein, DePaul defined the procedures and criteria for tenure and promotion, and thereby created the terms and conditions of an employment contract between it and Plaintiff.

94. By accepting her appointment as a tenure track faculty member at DePaul, Plaintiff and DePaul agreed that her applications for tenure and promotion were to be governed by the Handbook's tenure criteria and procedures.

95. The Handbook requires that a candidate for tenure and promotion be given fair consideration and evaluation in the areas of teaching, research, and service at all levels.

96. The Handbook further requires that tenure and promotion decisions not be based on racial discrimination or based on retaliation for complaining about racial discrimination.

97. The Handbook further requires that faculty cannot change their tenure vote recommendations.

98. In allowing four (4) separate votes for Knight's promotion, allowed her

99. In denying Plaintiff's promotion for Program Chair and more rigorous tenure-track evaluations, among the other allegations of misconduct alleged herein, (i) willfully distorting her record with respect to her teaching and (ii) failing to provide clear and consistent guidance concerning expectations for service during formal reviews.

100. Further, in denying Plaintiff's promotion for Program Chair and more rigorous tenure-track evaluations, among the other allegations of misconduct alleged herein, DePaul failed to treat Plaintiff in the same manner as similarly situated persons who did not complain about racial harassment within the College, and failed to treat her in the same manner as similarly situated persons who were not of mixed race.

101. DePaul's denial of Plaintiff's applications for tenure and promotion breached its contract with her.

102. As a result of DePaul's decision to deny Plaintiff's applications for tenure and promotion, Plaintiff has suffered damages including lost wages and benefits.

**COUNT VI – State Law Claim – Intrusion Upon Seclusion**

103. Plaintiff restates, realleges, and incorporates by reference all other Paragraphs of this Complaint as if fully stated herein.

104. Plaintiff had a legitimate expectation of privacy to her personally identifiable information ("PII") and was entitled to protection of this information against disclosure to unauthorized third parties.

105. Defendants owed a duty to its faculty, including Plaintiff to keep her PII confidential

106. Defendants failed to protect Plaintiff's PII stored within its personnel files and databases and released it to unauthorized third parties and over unencrypted email.

107. By way of Defendant's failure to protect the PII in its records, Defendant allowed or deliberately provided such information to and to examine Plaintiff's PII.

108. The unauthorized release to, custody of, and examination by of Plaintiff's PII – especially where the information includes, Plaintiff's medical records, full name, home address, biometric data, social security number, date of birth, cell phone number, height, weight, eye color, any combination of the data thereof is highly offensive to a reasonable person.

109. While Plaintiff was compelled to disclose her PII to Defendants as part of his employment, Defendants were, at all times, supposed to keep her PII confidential and protected from unauthorized disclosure.

110. By disclosing Plaintiff's personal information, Defendant created, or substantially created an intrusion upon her constitutional right to privacy, safety, and security.

111. Defendant acted with a knowing state of mind when they knowingly divulged Plaintiff's PII to other unauthorized individuals and submitted over unencrypted networks and had actual knowledge of their inadequate information security practices

112. As a direct and proximate cause of the Defendant's acts and omissions, the Plaintiff's PII was disclosed to third parties without authorization and submitted over unsecure network connections.

WHEREFORE, for the foregoing reasons, Plaintiff, Sydney Dillard requests that this Court enter judgment in her favor and against Defendant in an amount to be proved at trial, including compensatory, special, consequential damages, attorneys' fees, and for all such other relief to which she is entitled, and the Court deems just and proper

## COMMON PRAYER FOR RELIEF

WHEREFORE, Plaintiff, Sydney Dillard, prays that the Court grant the following relief:

**a)** Conduct a mediated settlement conference or to refer the case to its court-annexed mediation program to assist the parties to bring about a settlement of this case;

**b)** Award punitive damages in an amount sufficient to punish DePaul and to deter others from engaging in similar conduct;

**c)** Award Plaintiff for her past and future loss of wages and benefits, plus interest;

**d)** Award Plaintiff actual and compensatory damages to the extent permissible by law to compensate the Plaintiff for injuries and losses caused by Defendant DePaul' conduct;

**e)** Award Plaintiff prejudgment interest;

**f)** Award Plaintiff reasonable attorneys' fees and costs;

**g)** All other relief as the interests of justice require.

## JURY DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Respectfully submitted,

**Sydney Dillard**

*/s/ Gianna R. Scatchell*
*/s/ Cass T. Casper*

By:_____
          Cass T. Casper, Esq.
          Gianna R. Scatchell, Esq.
          Her Attorneys

*Cass T. Casper, Esq.*
DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 331
F: (312) 846-6363
E: ccasper@dispartilaw.com

*Gianna R. Scatchell, Esq.*
DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, Illinois 60601

P: (312) 506-5511 ext. 330
F: (312) 846-6363
E: gia@dispartilaw.com