**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SYDNEY DILLARD, | ) |
| | ) |
| | ) |
| Plaintiff, | ) Case No.: 1:20-cv-7760 |
| | ) |
| v. | ) Honorable John Robert Blakey |
| | ) Magistrate Judge Heather K. McShain |
| DEPAUL UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

---

**DR. DILLARD'S RESPONSE IN OPPOSITION TO DEPAUL'S MOTION**
**MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

## **TABLE OF CONTENTS**

I.      **INTRODUCTION**..................................................................................................... **1**

II.     **FACTUAL BACKGROUND**..................................................................................... **2**

III.    **LEGAL STANDARD** ................................................................................................**7**

IV.    **ARGUMENT**...............................................................................................................**8**

V.     **CONCLUSION**.........................................................................................................**32**

## TABLE OF AUTHORITIES

**Cases**                                                          **Page Numbers**

*Belour v. Adapt of Ill., Inc.*, 460 F.Supp.2d 867, 873 (N.D. Ill. 2006) ………..………………8

*Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir.1996) ………..…………26

*Boss v. Castro*, 816 F.3d 910 (7th Cir. 2016) ……………………….……………………………..20

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ………..……………………..25

*Calvente v. Ghanem et al* 1:2020cv03366    ……………………………………………24

*Cartwright v. Silver Cross Hosp.*, Case No. 15-cv-6759, 6-7 (N.D. Ill. Apr. 30, 2018)………..11

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)…………………………………………9

*Cho v. DePaul University*, 1:2018cv08012    ……………………………………………24

*Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115………………………….……………………..12-13

*Clemons v. Dart*, 168 F. Supp. 3d 1060 (N.D. Ill. 2016………………………………………21

*Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1269 (7th Cir.1991) …………………………..17

*EEOC v. RJB Props., Inc.*, 857 F. Supp. 2d 727, 739 (N.D. Ill. 2012) …………………………8

*E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 807–08 (7th Cir. 2005) ………..…………26-27

*Folkerson v. Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997) ………..……………..21

*Fox v. General Motors Corp., 247 F.3d 169,* 179 (2001) ………………………………………..30

*Freitag v. Ayers*, 468 F.3d 528, 539–40 (9th Cir. 2006), as amended (Nov. 3, 2006) …………21

*Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir.2000) ………………………………25

*Goswami v. DePaul Univ.,* No. 12–cv–7167, slip. op. at pages 2–3, 2015 WL 251304 at *1 (N.D. Ill. Jan. 20, 2015) ………………….……………………………….……………………….………8

*Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993)  …………………….…………13, 21, 30

*Heyne v. Caruso*, 69 F.3d 1475, 1480 (9th Cir. 1995) ……………………….………………23

*Hill v. DePaul University*, 1:2022cv06990……………………………………………………..24

*Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) ……………..10

*Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008)…………………….………………….8

*Jew v. University of Iowa*, 749 F. Supp. 946, 958-59 (S.D. Iowa 1990) ……………………..31, 32

*Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900–01, 2018 WL 2753066, *8 (7th Cir. June 8, 2018) …………………….…………………..………………………….…….17, 32

*Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir.2000) ……………………….…25

*Joll v. Valparaiso Community Schools*, 2020 WL 1316688, at *4 (7th Cir. 2020) ……………8

*Maertens v. JAC Prods. Inc.*, Civil Case No. 2:19-cv-12236, 10 (E.D. Mich. Jan. 14, 2021) ………………………………….…………………….………………………………26, 29

*MacVaugh v. County of Montgomery*, 301 F. Supp.3d 458, 46667……………………………19

*McDonnell Douglas v. Green*, 411 U.S. 792 (1973) ………………………………………10, 18

*Montague v. United States Postal Service* (5th Cir., June 28, 2023) ……………………………28

*Mawakana v. Bd. of Trs. of Univ. of D.C.,* 926 F.3d 859, 864–65 (D.C. Cir. 2019) …………..8

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)..16

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998)……………………..17

*Oross v. Kutztown Univ., Civil Action 21-5032*, 39 (E.D. Pa. Jul. 25, 2023) ………………25, 28

*Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016) ………………………10, 11

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 137-38 (2004) ………………………….12

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000)……………………..9

*Rodgers v. Western-Southern Life Ins. Co.*, 12 F. 3d 668 (7th Cir. 1993) …………………….17

*Pennsylvania State Police v. Suders*, 542 U.S. 129, 137-38 (2004) …………………………13

*Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020), reh'g denied (July 31, 2020) ………………………………………………………………………………10

*Samper v. Providence St. Vincent Med. Ctr.,* 675 F.3d 1233, (9th Cir. 2012) ………………..29

*Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) …………………………………17

*Spulak v. K Mart Corp.,* 894 F.2d 1150, 1156 (10th Cir. 1990) …………………….………23

*Strother v. Southern California Permanente Group*, 79 F.3d 859, 869 (9th Cir. 1996)……….16

*Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994) ……………………24

*Talanda v. KFC Nat'l Mgmt. Co.,* 140 F.3d 1090, 1095 (7th Cir. 1998) …………………………8

*Turner v. Hershey ChoDePaulate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006) ……………..………24

*Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) ……………………………………16

*US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002) ……………………………………………24

*Vande Zande v. State of Wisc. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir.1995) …………26, 28

*Waggoner v. Olin Corp.* 169 F.3d 481, 485 (7th Cir. 1999) …………………………………...30

*Webb v. Clyde L. Choate Mental Health and Dev. Ctr.*, 230 F.3d 991, 997 (7th Cir. 2000)……8

*Whitaker v. Wisconsin Dept. of Health Services*, 849 F.3d 681 (7th Cir. 2017) …………… 28

*Williams v. General Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999) ………….…………16

*US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002)……………………………………………..24

**Statutes**

42 U.S.C. §2000e "Title VII" ........................................................................................1, 10

Americans with Disabilities Act)…………….……….……….……….……….………24

**Other Authorities**

*Basow, S.A. and Silberg, N.T., Bennett, S.K., Student Perceptions of and Expectations for Male and Female Instructors: Evidence Relating to Questions of Gender Bias in Teaching Evaluations*, 74 J. of Educational Psychology 170–79 (1982) ……………………………………………..16

 *Martin, Elaine, Power and Authority in the Classroom: Sexist Stereotypes in Teaching Evaluations, Signs*, pp. 482–492, Spring 1984……………………………………………………16

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Sydney Dillard, | |
| Plaintiff, | |
| v. | Case No: 1-20-cv-7760 |
| DePaul University, | Judge Blakey |
| Defendant. | Jury Trial Demanded |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION AND MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY
JUDGMENT (DKTS.)**

Plaintiff, Sydney Dillard ("Dr. Dillard" or "Plaintiff"), by and through her undersigned counsel responds as follows to Defendant DePaul University's ("DePaul") Motion and Memorandum for Summary Judgment ("MSJ" or "Motion").

## I.      INTRODUCTION

Dr. Dillard, an African American woman with a disability, filed her charge of discrimination on June 26, 2018, under Title VII. Her claims, timely and substantial, include: 1) discriminatory terms and conditions of employment; 2) unfair rejection as PRAD chair; 3) unequal pay; 4) a persistent hostile work environment; and 5) failure to promote, coupled with pay discrimination and workplace hostility. These claims, detailed below, paint a clear picture of discrimination.

## II.      FACTUAL BACKGROUND

1

DePaul University is the largest Catholic institution in Chicago (DSOF ¶4; PSOF ¶2). DePaul is an Equal Opportunity Employer and maintains an Employee Handbook that sets forth its equal employment opportunity policy and relevant policies prohibiting discrimination based on race or disability. (DSOF ¶¶ 9, 77). At all times relevant, the various colleges operate under the overarching authority of Salma Ghanem, the University Provost (DSOF ¶7). Within the College of Communication, Alexandra Murphy serves as the Dean of the PRAD, endowed with substantial decision-making powers, including the authority to remove department chairs and influence promotion decisions, often based on faculty recommendations (DSOF ¶8). At DePaul, academic success is typically contingent on excellence in three key areas: research, teaching, and service (DSOF ¶¶13-14). These factors are the basis for any promotion as a DePaul professor. *Id.* Tenure-track faculty members are expected to spread their time between these categories. The career path for post-tenure academics is never straight and narrow.

Sydney Dillard is a fully tenured Associate professor at DePaul University in its College of Communications. (PSOF ¶¶ 1, 29). Dr. Dillard is the only African-American woman who is a tenured-tracked faculty member in DePaul's College of Communication. (PSOF ¶29). Defendant's racial and disability discrimination has thwarted Dr. Dillard's career trajectory. Specifically, while at DePaul, Plaintiff was not provided the same opportunities as other non-African American or non-disabled tenure-track faculty members were provided, which will continue to impact her future career in higher education (PSOF ¶¶19, 22, 24).

The evidence demonstrates a glaring absence of checks and balances in DePaul's management, particularly in handling issues pertaining to race and disability. (see below). Dr. Dillard endeavored to persevere despite these challenges, but the cumulative effect of such

2

disparities began to impact her health severely and caused the onset of her seizure disorder. (PSOF ¶¶80-81, 83).

Dr. Dillard was forced to teach face-to-face classes against her Neurologist's recommendation. (PSOF ¶¶85, 88). Dr. Dillard was forced to go on temporary disability when DePaul's accommodations went against her Doctor's orders. (PSOF ¶84; Exhibit G - Dr. Cristea Dep. p. 97)("See where it says 'Needs accommodations for work? See the 'needs' in all capitals? That implies to me that they weren't being followed, the fact that I highlighted it that way...''). Additionally, Dr. Dillard requested additional preparation time for course development and was given less time than her able-bodied counterparts when they received their teaching schedules approximately three months in advance. *Id.* While she was on leave, her short-term disability claim was denied based on DePaul's failure to supply a job description for her case, which resulted in Dr. Dillard being on unpaid leave. *Id.* Ultimately, she received back pay, but that does not underscore the additional stress she faced when DePaul refused to honor her neurologist's recommendation to teach online temporarily, which forced her to take leave and not be paid until she was back to work. (PSOF ¶ ¶84-85). Dr. Dillard's disability is life-long, and she has incurred and will continue to incur costs and experience lifelong limitations because of this disability. (PSOF ¶84).

Furthermore, the evaluation process has been applied less stringently to non-African American employees, evidenced by their faster attainment of tenure and the support provided to them. (PSOF ¶50) In contrast, despite Dr. Dillard's perfect scores and positive student feedback, she was not afforded the same level of assistance or recognition, raising serious questions about the equity of the evaluation system (PSOF ¶¶25 - 26,  30). She has undergone multiple formal and informal reviews that exceed the norm set out by the University's own policies. (PSOF ¶¶12, 16-

3

17) The implication of such a pattern is that it creates an environment where faculty from African American groups may be unfairly scrutinized and hindered in their career progression at DePaul University (PSOF ¶¶14, 16, 18-19, 50). Moreover, Dr. Dillard has observed differential treatment in evaluating faculty performances. (PSOF ¶18) This differential treatment extended to career advancement opportunities, where non-African American colleagues were afforded opportunities to lead and chair search committees—opportunities not extended to Dr. Dillard, despite similar qualifications and precedents within the University (PSOF ¶¶17-18).

At DePaul, tenure-track faculty are evaluated with terms ranging from unsatisfactory to excellent, and the College of Communication guidelines require annual formal evaluations if prior reviews raise concerns about a faculty member's reappointment. (PSOF ¶¶7-10, 13) Despite this, Dr. Dillard was subjected to an unusually high number of probationary reviews—four in total—creating a question of fact for a jury to determine whether a discriminatory slant in the application of the evaluation process exists. (PSOF ¶¶12, 14-15, 16). This is in stark contrast to the typical two formal pre-tenure reviews experienced by her peers (PSOF ¶¶14, 12, 15, 18-19).

Dr. Dillard's first formal review in 2013 showed strong support for her reappointment, with no indications of questionable reappointment. (PSOF ¶ 17). Nevertheless, she was required to undergo additional formal reviews, whereas similarly situated non-African American faculty members were not subjected to the same rigorous scrutiny, despite having areas identified for improvement in their own reviews and comparative evaluations. (PSOF ¶¶ 11, 12). This disparity highlights a troubling inconsistency that suggests an unequal application of the tenure and promotion process (PSOF ¶¶19-20, 24).

DePaul's College of Communication has fostered an environment where U.S. born African American women, like Dr. Dillard, are systematically disadvantaged, facing disparate treatment

4

and isolation (PSOF ¶¶18-19, 22, 24, 50). The University has repeatedly disregarded pleas for assistance from African American faculty members, showcasing a troubling trend of preferential treatment toward individuals not belonging to protected classes (PSOF ¶¶25-27, 49). Specifically, Dr. Dillard has voiced her concerns about this differential treatment, particularly in the context of teaching evaluations, where her achievements were frequently overlooked. *Id.* The impact of such an evaluation process, as described by Dr. Dillard, has been disproportionately burdensome for faculty of color, affecting not only their career trajectory but also their health and overall experience at DePaul University (PSOF ¶¶18, 27-28, 31-32, 50).

Dr. Dillard's experiences at DePaul are indicative of broader patterns of discrimination deeply embedded within the institution:

1. Racial Discrimination and Bias in Tenure and Promotion: The process for tenure and promotion within DePaul's College of Communication has demonstrated inconsistent application, with U.S. born African American women subjected to more stringent reviews and obstacles compared to their white counterparts. (PSOF ¶¶ 18-19, 22, 24, 50).

2. Impact on Career Advancement: The barriers erected by DePaul University have not only impeded Dr. Dillard's pursuit of tenure but have also broadly hindered her professional development and prospects within the academic community PSOF ¶¶18-19, 22, 24, 50).

3. Institutional Culture: DePaul's College of Communication has fostered an environment where U.S. born African American women, like Dr. Dillard, are systematically disadvantaged, facing disparate treatment and isolation. (PSOF ¶¶ 18, 25-27).

4. Failure to Address Concerns: The University has repeatedly disregarded pleas for assistance from African American faculty members, showcasing a troubling trend of preferential treatment toward individuals not belonging to protected classes (see below). The egregious

discrimination is further exemplified by the denial of Dr. Dillard's request to teach online courses temporarily, as medically advised due to her seizure disorder (see below). The pretext for this denial, ostensibly low teaching evaluations, lacks substantive justification and strongly suggests discriminatory motives. (DSOF ¶¶17, 40-41, 45).

Dr. Dillard became more vocal in her efforts to secure equal treatment for herself and her fellow employees (PSOF ¶¶25, 30, 31, 33, 36-48). Specifically, in June 2018 both Dr. Dillard and ███████ sent an anonymous email complaint to OIDE expressing concerns about "discrimination toward several members of the College of Communication's tenure-track faculty" who "are women, of color, and of U.S. origin." (PSOF ¶ 25). The letter noted that "the most disturbing component is the use of subjective performance evaluative criteria that has caused harm to the women who are tenure-track Latina and/or African-American faculty, of U.S. origin" and these criteria "have become a method of intimidation and, in many ways, reinforces the prejudices, unconscious or not, which Congress in Title VII sought to eradicate as a basis for employment and misuse." *Id*. OIDE responded to the anonymous email with follow-up questions, which Dr. Dillard responded to with answers, but OIDE did not perform a follow-up investigation. (PSOF ¶ 88). Drs. ███████ and Dillard met with Dr. Ghanem during a two-hour meeting to address the issues of racial discrimination that they faced in October 2018 (PSOF ¶¶ 36-48). Dr. Dillard also discussed the issues related to her disability with Dr. Ghanem. (PSOF ¶¶ 40). By the Fall of 2019, the DePaul University environment had further deteriorated, marked by a series of events related to race and gender discrimination, including a townhall where DePaul students, faculty, and staff confronted institutional racism (DSOF ¶30). Drs. Dillard and ███████ never had a meaningful follow-up conversation with Dr. Ghanem about how to rectify the racial disparities amongst the college. (PSOF ¶¶ 49, 51).

6

Dr. Dillard's response to these disparities initially involved attempts to persevere (PSOF ¶¶82-84). However, the cumulative impact on her health led to the onset of grand mal seizures (PSOF ¶80). Dr. Dillard then faced combined racial and disability discrimination. (DSOF ¶¶ 50, 51). Dr. Dillard also faced disability discrimination when DePaul arbitrarily denied her request to temporarily teach online courses, as medically advised due to her seizure disorder (PSOF ¶¶79, 85; DSOF ¶ 90). The pretext for this denial, her purported low teaching evaluations, lacks substantive justification and strongly suggests discriminatory motives. (DSOF ¶¶17, 40-41, 45). DePaul has provided no facts indicating that low teaching evaluations mandate face-to-face classroom teaching. I*d.*

Dr. Dillard's experiences at DePaul University, marked by racial and disability discrimination, represent a profound failure on the part of the institution to uphold the principles of equality, inclusivity, and fairness. (PSOF ¶¶31,34, 35, 49). The evidence presented demonstrates not only a violation of legal standards under the ADA and Title VII but also a breach of an academic institution's ethical and moral responsibilities. The evidence will show that the barriers erected by DePaul University not only impeded Dr. Dillard's pursuit of tenure but have also broadly hindered her professional development and prospects within the academic community (PSOF ¶87). Therefore, DePaul University's motion for summary judgment should be denied, allowing these critical issues to be fully examined and addressed in a trial setting.

## III.   LEGAL STANDARD

Summary judgment is a drastic remedy and is proper when the movant shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact affects the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material fact

exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). At summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a fact finder." See *Joll v. Valparaiso Community Schools*, 2020 WL 1316688, at \*4 (7th Cir. 2020). "Trials are stories, not syllogisms. Accordingly, the court must try to focus on the most persuasive story possible on the nonmovant's behalf when asking whether a verdict in her favor would be reasonable or could result only from irrational speculation." *Id.*

The Seventh Circuit Court of Appeals maintains the view that a heightened level of scrutiny should be applied on a motion for summary judgment in an employment discrimination case because issues of intent and credibility are generally involved. See, e.g., *Webb v. Clyde L. Choate Mental Health and Dev. Ctr.*, 230 F.3d 991, 997 (7th Cir. 2000); *Talanda v. KFC Nat'l Mgmt. Co.*, 140 F.3d 1090, 1095 (7th Cir. 1998); *EEOC v. RJB Props., Inc.*, 857 F. Supp. 2d 727, 739 (N.D. Ill. 2012). Plaintiff is not required to prove its case at summary judgment. Instead, she must come forward with some facts that could arguably entitle her to judgment. *Belour v. Adapt of Ill., Inc.*, 460 F.Supp.2d 867, 873 (N.D. Ill. 2006).

## IV. ARGUMENT

Federal civil rights laws apply to employment in the academy on the same terms that they apply to employment in any other sector of the economy. *Mawakana v. Bd. of Trs. of Univ. of D.C.*, 926 F.3d 859, 864–65 (D.C. Cir. 2019) (university not entitled to special deference where in a case where the fundamental question is whether it acted in good faith); *Goswami v. DePaul Univ.*, No. 12–cv–7167, slip. op. at pages 2–3, 2015 WL 251304 at \*1 (N.D. Ill. Jan. 20, 2015) (denying DePaul's motion for summary judgment in a tenure denial case).

DePaul, the movant, has the burden of establishing that there is no genuine dispute as to any material facts. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). DePaul has not met its burden. DePaul focuses on selecting discrete facts and characterizing them in its own favor. Contrary to DePaul's approach, "facts must be viewed in the light most favorable to and all reasonable inferences must be drawn in favor of the non-moving party." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017). The Court must not make credibility determinations, as these are the jury's province. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

Notwithstanding all of the foregoing, DePaul spends the majority of its brief arguing (i) that Dr. Dillard achieved tenure and was not damaged and (ii) dismissing the adverse employment actions against Dr. Dillard's as "workplace trivialities." (Dkt. 106 pp. 11, 13). Dr. Dillard does not ask the Court to re–evaluate her tenure file. Dr. Dillard asks the Court to review the record developed during discovery and determine whether a jury could find that DePaul—acted with discriminatory animus in connection with Dr. Dillard's race and disability. As the Court evaluates Dr. Dillard's claims, it must keep in mind that this evidence is admissible as part of the totality of circumstances and as circumstantial evidence supporting her claims of discrimination.

## A. PLAINTIFF'S TITLE VII CLAIMS ARE SUPPORTED BY A FACTUAL RECORD DEMONSTRATING THAT A REASONABLE JURY COULD FIND IN HER FAVOR

Dr. Dillard alleges that, in violation of Title VII, she was discriminated against because of her race, Black, and disability. (DSOF Tab B-2 Exhibit 1 – Second Amended Complaint). Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In discrimination cases, "[w]hen a defendant moves for summary judgment, the 'singular question' for the district court is whether the plaintiff has introduced evidence that would 'permit a reasonable factfinder to conclude that

the plaintiff's race, ethnicity, sex, religion, or other proscribed fact caused the discharge or other adverse employment action." *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020), reh'g denied (July 31, 2020) (citations omitted). Whether a plaintiff offers direct or circumstantial evidence of discrimination, the Seventh Circuit made clear in *Ortiz v. Werner Enters., Inc.* that "all evidence belongs in a single pile and must be evaluated as a whole." 834 F.3d 760, 766 (7th Cir. 2016). When reviewing the facts under the framework established by *Ortiz*, the evidence "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Id.* at 765.

One way of proving discrimination is the burden-shifting method of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Under that approach, a plaintiff must make a prima facie showing of discrimination by showing that: (1) she belongs to a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated employee outside the protected class received better treatment A plaintiff may provide either direct or indirect evidence of discrimination. *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (citations omitted). If the plaintiff makes that prima facie showing, the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show the motive was pretextual. Id. A plaintiff need not use the McDonnell Douglas framework. Id. Whether direct or indirect, all evidence "must be evaluated as a whole." Id. (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016)). The question is whether "the totality of the evidence shows discrimination, eschewing any framework or formula." *Id.* at 958.

Defendant claims that Dr. Dillard's Title VII claim is time-barred. It is undisputed that Dr. Dillard attained tenure. (DSOF ¶5). Dr. Dillard's allegations of discrete acts of racial

10

discrimination occurred within the limitations period, and her related hostile work environment claim demonstrate a sufficient connection between events within and without the period such that they form "a single course of conduct." *Cartwright v. Silver Cross Hosp.*, Case No. 15-cv-6759, 6-7 (N.D. Ill. Apr. 30, 2018). In assessing that nexus, courts examine similarities between the challenged employment actions, look for the involvement of similar personnel, and consider any gap in time between the alleged discriminatory acts. *Id.* at 8 (N.D. Ill. Apr. 30, 2018). Throughout her Second Amended Complaint, Dr. Dillard describes her experience with discrimination as applying differential treatment between non-African American professors and African American professors.

1. **DePaul's Motion Should be Denied Under *Ortiz.***

To oppose a summary judgment motion in a Title VII discrimination case, a plaintiff must present evidence that a reasonable factfinder could attribute the adverse employment action to a proscribed factor like race or disability. *Ortiz v. Werner Enters.*, 834 F.3d 760, 765-66 (7th Cir. 2016)). Under *Ortiz,* the legal standard is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiffs protected class caused the discharge or other adverse employment action. *Ortiz,* 834 F.3d at 765. "Few discrimination cases are so straightforward - indeed they are often factually complex and require sifting through ambiguous pieces of evidence." Judge Easterbrook noted. *Id.* at 765. If there is a "conflict on material issues, a trial is necessary." *Id.* at 766.

In this case, Dr. Dillard's experiences transcend mere workplace trivialities, as argued by the Defendant. Dr. Dillard has identified conflicts on material issues that must be weighed by a jury. Dr. Dillard established that Drs. Ghanem and Murphy were aware of her claims of discrimination, yet they did not take further action to investigate her concerns. Specifically, Dr.

Dillard addressed the disparities in teaching evaluations between African-Americans and non-African-Americans. (SOAF ¶29). The essence lies in what a reasonable jury could deduce when examining the entirety of the evidence (Ortiz, 834 F.3d at 765-66).

2. **DePaul's Motion Should be Denied Under *McDonnell-Douglas.***

Dr. Dillard can establish indirect discrimination via the McDonnell Douglas burden-shifting method. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Dr. Dillard demonstrates her prima facie case. She is unquestionably a member of a protected class, both as an African American and as an individual with a disability. She has consistently met her employer's expectations, as evidenced by her qualifications and performance. The adverse actions she faced include being unfairly passed over for the PRAD Program Chair position, going through additional formal and informal reviews for tenure, and receiving unequal pay compared to her peers. Each will be discussed in turn.

Defendants suggest that any discrimination against Dr. Dillard has been minimal and thus must be disregarded, ignoring that Title VII covers not just terms and conditions in the narrow sense, "but 'evinces a congressional intent to strike at the entire spectrum of disparate treatment . . . in employment.'" *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)("[T]he language of Title VII is not limited to "economic" or "tangible" discrimination. The phrase "terms, conditions, or privileges of employment" evinces a congressional intent "`to strike at the entire spectrum of disparate treatment of men and women'" in employment. (internal citations omitted).").

However, all that is required for an adverse action in disparate treatment cases is a showing that the action "materially affects the terms, conditions, or privileges of employment." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1126 (9th Cir. 2000) (holding that forcible relocation of

Chuang's laboratory was an adverse action). This is different from a tangible job action which requires an official act that consists of a significant change in employment status. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 137-38 (2004).

Accordingly, wage discrimination counts as an adverse action, since it is discrimination with respect to compensation. *See, e.g., Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) ("'The phrase "terms, conditions, or privileges of employment" evinces a congressional intent "to strike at the entire spectrum of disparate treatment of men and women" in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment." (citations omitted) a) Evaluations:

There are additional material disputes regarding the amount of formal and informal reviews that Dr. Dillard had to undergo before she achieved tenure. Evidence of such discriminatory behaviors is corroborated by similar experience of similarly situated colleagues at the CNM College. (Overlaying all of this evidence is also the negative or silent treatment from the top administrators constantly ignoring and disregarding Dr. Dillard's complaints for racial discrimination. Furthermore, similarly situated colleagues who were not African American or disabled were treated more favorably, indicating discriminatory practices. Thus, the reasons for subjecting Dr. Dillard to additional reviews and arbitrarily denying her promotions for career advancement are conflicting and pretextual.

**b) PRAD CHAIR:**

It is undisputed that Plaintiff: (1) belongs to a protected class, (2) applied for and was qualified for a leadership position for which the employer was seeking applicants, (3) despite being qualified, she was rejected, and (4) after her rejection, the former program chair who had stepped down was asked to serve another term. *McDonnell Douglas Corp. v. Green*, 411 U.S.792, 802

13

(1973). The PRAD chair position was a leadership position that would have allowed Dr. Dillard's career to advance into other administrative positions. (PSOF ¶¶56).

Additionally, a jury could easily find sufficient evidence of pretext because DePaul has failed to produce a legitimate, non-discriminatory reason why it deviated from the PRAD chair voting protocol. The then-current program-chair, ███████ announced she would not be seeking another term. (PSOF ¶¶ 54, 55, 62) The search committee opened the position up to faculty nominations. Dr. Dillard was the only person who accepted a nomination for the PRAD program chair position. (PSOF ¶ 56). She self-nominated herself and was also nominated by another colleague. *Id.* Dr. Dillard was qualified for the PRAD chair position. (PSOF ¶¶ 60, 63-64).

Dr. Murphy failed to report the inappropriate statements made about Dr. Dillard's disability (DSOF ¶67), and Dr. Murphy failed to escalate Dr. Dillard's concerns of racial discrimination. (PSOF ¶ 77). The faculty "feeling rushed' and "revamping" the position is not supported by fact. (PSOF ¶72). Dr. Murphy deviated from the proper protocol in the PRAD chair vote and her subsequent actions. (PSOF ¶¶ 57-59, 60-62, 65-66, 68, 74). The timeline never changed for voting on the PRAD chair, and the record is silent on whether faculty had complained in the past about feeling rushed. (PSOF ¶ 72). Dr. Murphy could have but chose not to overturn the PRAD chair vote. (PSOF ¶67) Next, Dr. Murphy testified that no additional meetings were discussed to "revamp" the position. (PSOF ¶67). Lastly, in recent years, the PRAD school enrollment was smaller than in the past, so the responsibilities would have decreased, not increased. (PSOF ¶ 89). The PRAD Program Chair position was open again, and Dr. Dillard was asked to apply for it. Dr. Dillard decided not to self-nominate for the position because she was never given a reason why her collogues originally voted her down for the position, and she felt too humiliated to run again. (PSOF ¶70). Dr. Murphy told her about another leadership position but then retracted that option

14

as the deadline had already passed. (PSOF ¶70). All of these facts, in the aggregate, are enough to create a genuine issue of fact on the question whether DePaul's proffered reasons are pretextual. *Koski v. Standex Intern. Corp.*, 307 F.3d 672, 676-77 (7th Cir. 2002).

c. **Evaluations:**

Dr. Dillard's evaluations throughout her tenure review process were inaccurate, applying differing standards when compared to similarly situated non-African American peers. (PSOF ¶¶ 14, 15-19, 23). Additionally, there appear to be several instances where a jury could conclude that Dr. Dillard's reviews were arguably inaccurate or at least seemed to apply a different standard for evaluating which put a negative spin on the facts (PSOF ¶22). *Goswami v. DePaul Univ.,* No. 12 C 7167, 13 (N.D. Ill. Jan. 20, 2015). For example, during her first formal review what is called the "First Probationary Review," Dr. Dillard was held to a standard of needing scores 4.0 or higher when her reviews noted "the college looks for ratings in the 4 range." (PSOF ¶¶18, 22). Prior to this review, the College of Communication expressly stated that language regarding the college means should not be included in the review. *Id.* Her scores being below the college mean were noted unfavorably four times in one review, though the same was not included for non-African Americans with consistent scores below 4.0. *Id.* Another example of the inaccuracy of Dr. Dillard's evaluations can be found in her fourth-year review in which another similarly situated, non-African American tenure-track faculty member received praise for receiving perfect scores of 5.0 on 12 teaching measures, while Dr. Dillard received no specific inclusion after receiving perfect scores of 5.0 on 65 teaching measures during her review. *Id.* Instead, Dr. Dillard was subjected to an additional formal review. *Id.*

If it seems inescapable that the plaintiff scored lower on numerical student evaluations, the legitimacy of those evaluations as a measure of teaching quality should be investigated. A growing

15

body of literature suggests that such numerical evaluation devices reflect societal prejudices, especially with regard to women. See, e.g., *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)("[t]ransfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions'"); *Strother v. Southern California Permanente Group*, 79 F.3d 859, 869 (9th Cir. 1996) (exclusion from meetings, denial of administrative support, and transfer of duties deemed adverse actions); *Martin, Elaine, Power and Authority in the Classroom: Sexist Stereotypes in Teaching Evaluations, Signs*, pp. 482–492, Spring 1984; *Basow, S.A. and Silberg, N.T., Bennett, S.K., Student Perceptions of and Expectations for Male and Female Instructors: Evidence Relating to Questions of Gender Bias in Teaching Evaluations*, 74 J. of Educational Psychology 170–79 (1982).

## B. DR. DILLARD ESTABLISHES A CLAIM FOR A HOSTILE WORK ENVIRONMENT - RACE, MAKING SUMMARY JUDGMENT INAPPROPRIATE

To demonstrate actionable workplace harassment, Dr. Dillard must show that she subjectively perceived the work environment to be hostile or abusive and that the harassment was sufficiently severe or pervasive that a reasonable person would perceive it as such, i.e., that it was objectively hostile or abusive. *E.g., Williams v. General Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999). To succeed on a claim for hostile environment, a plaintiff must demonstrate that: (1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66–72, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986); *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 900–01, 2018 WL 2753066, *8 (7th Cir. June 8, 2018).

Following *Rodgers v. Western-Southern Life Ins. Co.*, 12 F. 3d 668 (7th Cir. 1993), hostile work environment claims are analyzed under a two-step analysis: The existence of racial harassment in a hostile work environment involves an application of facts (the specific discriminatory conditions alleged by the plaintiff) to law (the standards governing the existence of racial harassment and hostile work environment discrimination) (*Daniels v. Essex Group, Inc.*, 937 F.2d 1264, 1269 (7th Cir.1991)). The impact of work behavior "often depends on a constellation of surrounding circumstances, expectations, and relationships." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81–82 (1998); *Harris v. Forklift Systems*, 510 U.S. 17, 23 (1993)(requiring a look at the totality of the circumstances in hostile work environment cases).

In assessing whether the workplace was objectively hostile, factors to be considered include the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating or merely an offensive utterance, and whether it unreasonably interfered with work performance. *Johnson*, 892 F.3d at 900–01, 2018 WL 2753066 at *8; *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). "Whether harassment was so severe or pervasive as to constitute a hostile work environment is generally a question of fact for the jury." *Id*. If a reasonable jury could find that the conduct was severe or pervasive, then the claim must go to trial. Even if individual acts of harassment do not create an actionable hostile work environment on their own, their accumulated effects may create one.

Defendants make a point that she has not been called any racially derogatory terms (to her face). A holistic analysis that considers the aggregate effect of all categories of unlawfully motivated harassment, whether it overtly referenced a protected trait (e.g., disability) or not, is required. *U.S. Equal Emp't Opportunity Comm'n v. Big Lots Stores, Inc.*, Civil Action No. 2:17-CV-73, 11 (N.D.W. Va. Sep. 27, 2018). DePaul fails to consider the totality of its conduct.

17

Defendant's position misconstrues Dr. Dillard's hostile environment claim and ignores that it is "abundantly clear that Title VII tolerates no racial discrimination, subtle or otherwise." *McDonnell Douglas Corp.*, 411 U.S. at 801. Dr. Ghanem, Dillard's supervisor, asked Dr. Dillard if she could touch her hair during a work meeting in front of her colleagues. Dr. Dillard was avoided and isolated by her colleagues after being excluded from an important program meeting discussion. Dillard observed Dr. Ghanem omit only African American tenure-track faculty from the college's farewell presentation and announcements. (DSOF ¶ 89). Dr. Dillard's competency and abilities were constantly questioned as opposed to her non-African American, non-disabled counterparts. When she requested disability accommodations for an international course she was teaching in China, Dr. Murphy, her supervisor falsely assumed and stated "she didn't speak mandarin before the seizures...I don't see how now, not speaking the language is a necessary accommodation." Dr. Dillard does speak Mandarin. Even after being employed for over six years, Dr. Dillard's procedural knowledge on hiring practices was questioned by colleagues with one year's experienced, until verified by her supervisor. (PSOF ¶89) When Dr. Dillard utilized one of her approved disability accommodations to remove herself during a meeting due to dizziness and overstimulation, she was subsequently described as "aggressive", "storming out," and "bully-like," by a colleague and leadership team members. (PSOF ¶76). Once Dr. Dillard developed the courage to speak up about her experiences, she submitted numerous official complaints of discrimination to her supervisors, OIDE, and DePaul's human resource department over the course of a year, which either went a) unanswered, b) uninvestigated, or c) questioned on how she "would like to proceed." Even though no one ever called Dr. Dillard are derogatory racial term to her face, it does not underscore the discriminatory behavior

that she felt as discrimination tends to be much more subtle in an academic setting such as a university. (PSOF ¶ 39). All are sufficient to create a triable issue for a jury on whether the harassment was severe or pervasive enough to constitute a hostile work environment. *Robinson v. Perales*, 894 F.3d 818, 828 (7th Cir. 2018). The conventional wisdom is that academic personnel are too sophisticated to make blatantly sexist or racist remarks. However, this view underestimates the insensitivity of at least some university teachers and administrators. *See, e.g., Jew v. University of Iowa*, 749 F. Supp. 946, 64 Ed. Law Rep. 84, 57 Fair Empl. Prac. Cas. (BNA) 647, 55 Empl. Prac. Dec. (CCH) ¶ 40443 (S.D. Iowa 1990).

Defendant does not dispute that Dr. Dillard subjectively perceived her workplace as hostile. Instead, DePaul focuses on whether the harassment was sufficiently severe or pervasive, arguing the harassment was inadequate to establish an objectively hostile work environment. (Dkt. 106 p. 11). Defendant's assertion is based entirely on a flawed legal assumption, i.e., that only incidents that involve overt racial references to Dr. Dillard's race or seizure disorder are relevant to the hostile work environment, and all other offensive, pervasive, severe, and humiliating harassment to which Dr. Dillard was subjected by her abuser should be ignored because those acts did not expressly reference her race or disability. *Id.* The federal courts have repeatedly found that far less significant harassment established an objectively hostile work environment. *See, e.g., MacVaugh v. County of Montgomery*, 301 F. Supp.3d 458, 46667 (E.D. Pa. 2018) (holding plaintiff's allegations of being chastised in meetings, criticized … and being falsely accused of sleeping on the job and fired in response to a request for leave sufficient to state hostile work environment claim).

Defendant's reliance on *Boss v. Castro*, 816 F.3d 910 (7th Cir. 2016), is inapposite due to glaring factual distinctions. In *Boss*, the plaintiff faced comparatively minor workplace issues,

such as being placed on a performance improvement plan, providing documentation for time off, and rescheduling a single day of telework. While he did receive an unfavorable performance review that lowered his rating from "highly successful" to "fully successful," this change bore no tangible job consequences. Furthermore, Boss failed to establish a causal link between these actions and his filing of an EEOC complaint, falling short on the element of causation. 816 F.3d at 919).

In contrast, Dr. Dillard's circumstances involve a markedly more severe set of challenges. She was not merely subjected to increased formal academic reviews but was also the sole professor rejected for a chair position at the College of CMN. (PSOF ¶¶ 7-10, 12, 22, 23, 26). Dr. Dillard also complained about poor treatment by faculty (related to her race and disability) to both Drs. Ghanem and Murphy, about which nothing was done. (PSOF ¶). Dr. Dillard was arbitrarily precluded from participating in the meeting discussion to "revamp" the PRAD position and was the only professor in the college of communication to be voted down. (PSOF ¶). Dr. Dillard was uncomfortable speaking about any issues she was experiencing given the culture of complacency that she experienced. (PSOF ¶). Dr. Dillard's onset of a seizure disorder and exacerbated symptoms including depression, dizziness, dislocated shoulders, light sensitivity, and anxiety among others, was caused the by Defendant's work environment. (PSOF ¶). These cumulative actions collectively create an environment that would deter any reasonable faculty from making a complaint in the first place. Furthermore, a reasonable jury could find that the Defendants subjected Dr. Dillard to a hostile work environment and failed to take prompt remedial actions. The gravity and frequency of the adverse actions taken against her far exceed the scope of what was at issue in the *Boss* case, making it an inappropriate precedent to rely upon in this context.

The Supreme Court has recognized that "[a] discriminatorily abusive work environment . . . can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers," *Harris*, 510 U.S. at 22. Here, the discrimination that Dr. Dillard faced has demoralized and negatively impacted her well-being. (PSOF ¶¶86-88). As set forth below, despite her successes through her own perseverance, a jury could find that Dr. Dillard has experienced a hostile work environment.

### 1. Defendants failed to take prompt remedial action.

Defendants can be held liable for harassment "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct." *Folkerson v. Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997). Further, "[T]he employer's corrective measures must be reasonably calculated to end the harassment; the reasonableness of the corrective action will depend on, inter alia, the employer's ability to stop the harassment and the promptness of the response." *Freitag v. Ayers*, 468 F.3d 528, 539–40 (9th Cir. 2006), as amended (Nov. 3, 2006) (internal quotation marks omitted). Effectiveness is measured not only by ending the current harassment but also by "deterring future harassment—by the same offender or others. If 1) no remedy is undertaken, or 2) the remedy attempted is ineffectual, liability will attach." *Fuller v. City of Oakland, Cal.,* 47 F.3d 1522, 1528–29 (9th Cir. 1995) (internal citation omitted).

Dr. Dillard, a qualified individual with an ADA-recognized disability (seizure disorder), has experienced a hostile work environment due to her seizure disorder, fulfilling the criteria set forth in *Clemons v. Dart*, 168 F. Supp. 3d 1060 (N.D. Ill. 2016). The unwelcome harassment she endured, based on her disability, was sufficiently severe to alter the conditions of her employment. Notably, comments like "does she even work here" when approaching 8 years of employment or

references to her frequent leaves are demonstrative of the hostility she faced. (DSOF ¶67). This hostile environment is a direct violation of the ADA's provisions and has significantly impacted Dr. Dillard's employment experience at DePaul University.

Throughout the relevant time period, Dr. Dillard consistently raised concerns about discrimination (racial and disability), bias, and the looming fear of retaliation. (PSOF ¶¶24, 25, 33, 37). Dr. Dillard has demonstrated that DePaul was well aware of her complaints of discrimination, as Drs. Ghanem and Murphy were privy to these concerns. (PSOF ¶¶ 28, 33, 35, 36-37, 39, 73-75, 77-78). Even though Dr. Dillard initially lodged an anonymous complaint, that alone do not absolve DePaul of its responsibility to address the ongoing allegations of discrimination. Any remedial actions undertaken by DePaul were both insufficient and frustratingly slow in their implementation, failing to meet the threshold of prompt, appropriate corrective action. (PSOF ¶¶ 27, 34, 38, 51, 77). When Dr. Dillard requested additional meetings for clarification on hiring processes and procedures, she was described as aggressive and bully-like in emails between non-black College of Communication leadership team members. (PSOF ¶76). None of the leadership within the CMN—including Dr. Murphy and Dr. DeMoya—took any training to handle complaints about discrimination and diversity. (PSOF ¶34). Notably, DePaul never explicitly condemned the accusations of racial discrimination, nor did it acknowledge them as improper, thereby conveying a response that could be construed as complicit at best. *Jew v. University of Iowa*, 749 F. Supp. 946, 959 (S.D. Iowa 1990). Consequently, there is no doubt that DePaul bore a duty to promptly implement corrective measures aimed at terminating the hostile environment. A reasonable jury could easily conclude that DePaul failed in fulfilling this duty. DePaul cannot credibly deny that it has long been aware of pervasive race-based issues within its ranks.

2. **Evidence of the broader culture and climate at DePaul is relevant circumstantial evidence supporting Dr. Dillard's claims.**

Evidence of the broader culture and climate at DePaul, and specific evidence of discrimination or retaliation against other DePaul employees/students, is relevant and admissible support for Dr. Dillard's claims that the Court must consider on summary judgment. The composition of the College of Communication's leadership further illustrates a concerning lack of diversity. None of the program chairs in the four key areas of the college are African American, a fact that is not only noteworthy but indicative of a broader pattern of exclusion at the leadership level within the College (PSOF ¶4). Evidence of discrimination of others can be admissible circumstantial evidence of discrimination. *See Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). "Recognizing that '[t]here will seldom be 'eyewitness' testimony as to the employer's mental processes,' the Supreme Court held that evidence of the employer's discriminatory attitude in general is relevant and admissible to prove race discrimination." *Heyne v. Caruso*, 69 F.3d 1475, 1480 (9th Cir. 1995) (citations omitted); see also *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1156 (10th Cir. 1990) ("As a general rule, the testimony of other employees about their treatment by the [employer] is relevant to the issue of the employer's discriminatory intent.").

Finally, there is admissible evidence of Defendants' discriminatory attitude in general and toward other employees. See *Heyne, 69 F.3d at 1480; Sprint/United Mgmt.*, 552 U.S. at 388. In addition to the broad culture and climate issue discussed here, this includes: (1) another employee's concerns about DePaul's discrimination and retaliation … Clearly, considering the above cumulatively, and from the perspective of a reasonable black woman, a jury could find a pervasive and escalating environment "making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994). Moreover, there have been various lawsuits filed against DePaul in the past

23

five (5) years alleging racial discrimination including: *Cho v. DePaul University*, 1:2018cv08012;

*Calvente v. Ghanem* et al 1:2020cv03366; *Hill v. DePaul University*, 1:2022cv06990.

## C. SUMMARY JUDGMENT IS INAPPROPRIATE AS TO DR. DILLARD'S DISABILITY CLAIM BECAUSE A RATIONAL JURY COULD CONCLUDE THAT THE DEFENDANTS DISCRIMINATED AGAINST HER BASED ON HER DISABILITY.

Dr. Dillard has asserted that DePaul University engaged in discriminatory behavior by failing to provide reasonable accommodations for her disability, a claim supported by the provisions of 42 U.S.C. § 12112(b)(5)(A) under the Americans with Disabilities Act (ADA). The ADA prohibits discrimination against "a qualified individual with a disability" as it applies to hiring and firing. 42 U.S.C. §1211(a). Prohibited discrimination also includes "not making reasonable accommodations." 42 U.S.C. §12112(b)(5)(A).

### 1. Plaintiff's Failure to Accommodate Claim Survives

Claims that allege a failure to accommodate necessarily involve direct evidence. To establish a failure to accommodate claim under the ADA, Dr. Dillard must demonstrate: (1) she is a person with a disability for purposes of the ADA; (2) DePaul is covered by the statute and had notice of her disability; (3) with reasonable accommodation, Dr. Dillard could perform the essential functions of the job at issue; and (4) DePaul has refused to make such an accommodation. § 12112(b)(5)(A); *US Airways, Inc. v. Barnett*, 535 U.S. 391 (2002).

It is well-established that "[w]hether a particular function is essential is a factual determination that must be made on a case-by-case basis [based upon] all relevant evidence." *Turner v. Hershey ChoDePaulate U.S.*, 440 F.3d 604, 612 (3d Cir. 2006) (citations omitted). This determination is highly fact-specific. Courts may consider the amount of time spent on a particular function; the employer's judgment; job descriptions; the consequences of not requiring the

employee to perform the particular function; and other factors. 29 C.F.R. § 1630.2(n)(3); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). The employer's judgment receives some weight in the analysis, but it is not absolutely determinative, especially when an employee puts forth competing evidence. This fact-specific inquiry is typically left for the jury to decide. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998); *Oross v. Kutztown Univ., Civil Action 21-5032*, 39 (E.D. Pa. Jul. 25, 2023).

2. **DePaul Failed the Interactive Process**

The ADA places an unequivocal obligation on employers to provide "reasonable accommodations" to employees with disabilities unless undue hardship can be proven (42 U.S.C. §12112(b)(5)(A). After an employee discloses a disability, the ADA obligates the employer to engage in an "interactive process" to determine appropriate accommodations. *Gile v. United Airlines, Inc.*, 213 F.3d 365, 373 (7th Cir.2000). Specifically, the employer must 'identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations. Reasonable accommodations may include "making existing facilities used by employees readily accessible to and usable by individuals with disabilities" (§ 12111(9)).

Importantly, the choice of a reasonable accommodation rests with the employer, and they are not obligated to provide the specific accommodation requested by the employee. *Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir.2000). However, an employer only violates the ADA if it fails to provide reasonable accommodations to known physical or mental limitations of a qualified individual with a disability. *Id.* The duty of reasonable accommodation requires the

25

employer to do what is necessary to enable the disabled worker to work in reasonable comfort. *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1137 (7th Cir.1996).

It is undisputed that Dr. Sydney Dillard meets the first two elements required for a failure to accommodate a claim under the Americans with Disabilities Act (ADA). Dr. Dillard possesses an ADA-recognized disability: she has a seizure disorder. (PSOF ¶79). Dr. Dillard's request for accommodations, including adjustments to her work environment and the option to teach online, shifted the burden to DePaul to demonstrate the unreasonableness or undue burden associated with such accommodations.

Defendant first argues that Dr. Dillard's claim fails because she could not perform the essential job functions of her position with or without accommodation. DePaul argues that teaching in person is an essential job function. Dkt. # at . To show that she is otherwise qualified for her position, Dr. Dillard must show that she could perform the essential functions of the job with or without an accommodation. A job function is essential if its removal would fundamentally alter the position." But here, Dr. Dillard's ability to teach online remained unimpaired, and she could perform all the essential functions of her job. Given her inability to drive and the risk of fainting during in-person classes, opting for online teaching emerges as the most logical and reasonable accommodation.

Pursuant to the United States Supreme Court in *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 400, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002), is that an employer must, at the very least, furnish an accommodation that effectively mitigates the limitations imposed by a disabled employee's condition. DePaul University's limited interactive process consisted primarily of offering options that did not address Dr. Dillard's core issues: her inability to commute and her susceptibility to fainting. None of the options provided were reasonable in light of her condition.

26

Dr. Dillard's doctor's note and explicit statements left no room for misunderstanding - she needed an accommodation to facilitate her access to her work. DePaul's failure to provide meaningful participation in the interactive process cannot be excused. *E.E.O.C. v. Sears, Roebuck & Co.,* 417 F.3d 789, 807–08 (7th Cir. 2005).

DePaul's assertion that its facilities were "readily accessible to and usable by" Dr. Dillard, despite being aware of her transportation challenges and health concerns, defies common sense and runs afoul of established legal precedent. *Vande Zande v. State of Wisc. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir.1995).

DePaul 's argument asserting the provision of reasonable accommodations falls short of addressing the essence of Dr. Dillard's needs. Instructing Dr. Dillard to take a short-term disability or reduce her courseload are not accommodating actions by DePaul. *Maertens v. JAC Prods. Inc.*, Civil Case No. 2:19-cv-12236, 10 (E.D. Mich. Jan. 14, 2021)(Merely telling Maertens to find another way to get to work is not an accommodating action by JAC."),

The Defendant bears the responsibility of presenting specific circumstances that convincingly demonstrate undue hardship in the particular situation. Here, the record is devoid of any undue hardship that Dr. Dillard's request for accommodation would cause. This is clearly evidenced by DePaul's pre-existing infrastructure for remote learning and teaching exclusively remote classes during the Covid-19 pandemic, which unequivocally showcases the feasibility of accommodating her needs. DePaul's approach to the interactive process, primarily consisting of offering alternative options that failed to align with Dr. Dillard's specific needs, falls short of the ADA's mandate for meaningful participation in this process. *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 807–08 (7th Cir. 2005). Tellingly, providing a panic button in a classroom does no good to someone who has already fainted – and failed to address the core issue: Dr. Dillard's

inability to commute due to her medical condition, having dizzy or fainting spells, or possibly a seizure. Dr. Dillard's doctor's note, in conjunction with her explicit statements, left no room for ambiguity or misinterpretation; she required an accommodation to teach online that would enable her to access her workplace effectively. The duty of reasonable accommodation squarely rests upon the employer, and DePaul's apparent reluctance to provide an accommodation that would have facilitated Dr. Dillard's ability to work comfortably is evident. *Vande Zande v. State of Wisc. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995).

Moreover, the Defendant's reliance on the argument that regular attendance at the job site is an essential function fails to apply universally to all positions and circumstances. *Whitaker v. Wisconsin Dept. of Health Services*, 849 F.3d 681 (7th Cir. 2017). For example, *Montague v. United States Postal Service* (5th Cir., June 28, 2023), the court reinforced the idea that while regular work attendance is often considered an essential function, it should be subject to an individualized assessment under the ADA. This ruling aligns with Dr. Dillard's argument that DePaul University failed to evaluate her unique circumstances on an individual basis, opting instead to deny her accommodation based on a generalized policy of teaching evaluations that were too low to teach online courses.

Dr. Dillard's request for a temporary transition to remote teaching should not be misconstrued as an abdication of her job responsibilities. Instead, it represents a reasonable adjustment necessitated by her management of a seizure disorder. DePaul University has failed to furnish any credible indication that temporarily allowing Dr. Dillard to teach her courses online was an infeasible proposition, given that the essential infrastructure was already in place. In *Oross v. Kutztown Univ.*, Civil Action 21-5032 (E.D. Pa. Jul. 25, 2023), the court found that teaching in person and conducting office hours in-person were not essential functions of the job. This

precedent is directly applicable to Dr. Dillard's case, as DePaul University has similarly failed to provide evidence that in-person teaching is an essential function of her role. Dr. Dillard, like Professor Oross, can fully perform the essential functions of her job remotely, as evidenced by her previous success in online teaching.

Dr. Dillard's is also factually similar to the case *Maertens v. JAC Products, Inc.* [E.D. Mich 2021], where an employee grappled with a medical condition that temporarily rendered him unable to commute to work. In both instances, a doctor's note substantiated the necessity for remote work as a reasonable accommodation, albeit for distinct periods. Notably, in *Maertens*, the employee initially sought permission to work remotely but faced resistance from the employer, akin to Dr. Dillard's initial request for accommodation in the form of temporary remote teaching due to her seizure disorder. Dr. Dillard's willingness to adapt and continue fulfilling her job responsibilities parallels the employee's commitment in *Maertens* to explore alternative ways to commute to work. The crux of the matter in both cases revolved around the feasibility of effectively performing the job remotely. The *Maertens* court denied summary judgment based on the competing testimonies and unclear job description. Dr. Dillard's case echoes this emphasis on the need for individual assessment, as she argues that DePaul University failed to comprehensively evaluate her unique circumstances, instead relying on a generalized policy to deny her accommodation. This Court should similarly consider the fact-specific nature of these cases and refrain from granting summary judgment prematurely.

Furthermore, the legal landscape has recognized the potential reasonableness of remote work as an accommodation even before the era of COVID-19. *See Samper v. Providence St. Vincent Med. Ctr.,* 675 F.3d 1233, (9th Cir. 2012) 1237-38 (collecting cases) ["regular attendance

is not necessary for all jobs"]; *Waggoner v. Olin Corp.* 169 F.3d 481, 485 (7th Cir. 1999) ("In some jobs . . . working at home for a time might be an option").

To establish a hostile work environment action under the ADA, Dr. Dillard must show that (1) she was disabled; (2) she was subject to unwelcome harassment based on his disability; (3) the harassment unreasonably interfered with her work performance and created a hostile work environment; and (4) DePaul knew or should have known about the harassment and failed to take corrective measures. In order to establish a hostile work environment, a workplace must have been "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).

Dr. Dillard proved by a preponderance of the direct evidence that a discriminatory motive, bias against her based on her disability, which was a motivating factor, played a significant role in the majority vote not to choose Dr. Dillard for PRAD Chair. Dr. Dillard presented testimony that the PRAD chair position is the type of position needed for career advancement in the academic setting. After choosing not to accept a nomination in 2019 when Dr. Dillard was denied, Dr. DeMoya stated that: "My thinking at the time was, well, I don't want this job and Sydney does, so why should I even go up. And I also thought if I am to stay at DePaul, it's going to make my progression towards full professor eventually better to have this in my record. So honestly, I felt that even though I still don't like the position, it's still a position I would rather not have, it was the best choice at the time to both serve the program and to serve my career progression." To illustrate, the current PRAD chair, Dr. Chu, decided to step down at the end of her term. Dr. Dillard was the only person that wanted to run for PRAD chair. Dr. Murphy further concluded that Dr. Dillard was qualified for the position and possessed the requisite leadership. There is evidence pointing to

discriminatory actions, such as derogatory comments regarding her work and her disability. These comments, such as "does she even work here" or "she was on leave more than she taught," not only reflect an insensitivity to her condition but also indicate a potential bias against her disability *Fox v. General Motors Corp., 247 F.3d 169,* 179 (2001) (concluding that harassment was attributable to plaintiff's and other disabled employees' medical conditions because the terms handicapped MF and hospital people "expressly referenced their disabilities and resulting medical restrictions"). Dr. Dillard perceived it as such. (PSOF ¶¶). The evidence makes clear that a reasonable jury could find that Dr. Dillard was harassed and that the harassment was because of and based upon her seizure disorder. Dr. Murphy further confirmed that Dr. Dillard was "absent" from campus (her disability leave). The evidence also shows bias based on Mr. Azarro's testimony that the PRAD chair is a "thankless job." DePaul, by contrast, has failed to provide evidence that if the discriminatory factor had been absent, Dr. Dillard would still have been voted down as PRAD chair. *Jew v. University of Iowa*, 749 F. Supp. 946, 960-61 (S.D. Iowa 1990).

The harassment was sufficiently severe and pervasive to adversely affect Dr. Dillard's health and well-being. Her neurologist also presented sufficient facts that her stressful work environment caused the onset of her seizure disorder. (PSOF ¶¶ 80-81, 83). Dr. Dillard made Dr. Ghanem aware of how stress exacerbated her condition (PSOF ¶¶81-82). Dr. Dillard presented credible testimony that she felt humiliated and ashamed because she was complaining about suffering from discrimination, yet DePaul's administration did nothing. The pervasiveness and severity are exacerbated because of the nature of Dr. Dillard's workplace, which necessitates interaction with colleagues throughout the University and with students from the program, the College and other divisions of the University. *Jew v. University of Iowa*, 749 F. Supp. 946, 958-59 (S.D. Iowa 1990).

Dr. Dillard establishes a triable issue of fact as to her hostile work environment claim based on her disability. That Dr. Dillard was able to continue performing her job well is not dispositive, as Defendant suggests. Interference with work performance is only one factor among many in the calculus. *Johnson*, 892 F.3d at 900–01, 2018 WL 2753066, at *8. Resilient employees who manage to perform well in trying circumstances may still prove a hostile environment claim. *Id.*

**EQUAL PAY ACT - PLAINTIFF WITHDRAWS THIS COUNT.**

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment should be denied in its entirety. DePaul has fallen far short of showing what is necessary to justify the drastic remedy they seek.

Respectfully submitted,

Dr. Sydney Dillard

Gianna Scatchell Basile (one of her attorneys)

### CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that she served the foregoing Plaintiff's Response to Defendant's Motion for Summary Judgment and Memorandum of Law in Support of their Motion for Summary Judgment on all counsel of record via this Court's CM/ECF filing system on December 26, 2023, and that all such counsels are registered e-filers.

s/ Gianna Scatchell Basile

32