**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SYDNEY DILLARD, | ) |
| | ) |
| | ) |
| Plaintiff, | ) Case No.: 1:20-cv-7760 |
| | ) |
| v. | ) Honorable John Robert Blakey |
| | ) Magistrate Judge Heather K. McShain |
| DEPAUL UNIVERSITY, | ) |
| | ) |
| Defendant. | ) |

**<u>Sydney Dillard's Statement of Material Facts Pursuant to Local Rule 56.1 of the United
States District Court for the Northern District of Illinois</u>**

Sydney Dillard ("Ms. Dillard") submits the following statement of material facts as to which she
states that (i) there is no genuine issue, and (ii) entitle her to a judgment as a matter of law:

**<u>About Dr. Dillard and Dr. Ghanem.</u>**

1. Dr. Dillard is an African American woman. (Ex. A - Dr. Dillard Dec. ¶1, copy attached
   as Ex. A.). Dr. Dillard is the only tenure-track, tenured African-American faculty
   member in the College of Communication (CMN) at DePaul University (Ex. C - Dr.
   Murphy Dep. 106:1-15).

2. CMN is comprised of 4 programs, with four program chairs that are non-African
   American including Media and Cinema Studies (white male), Journalism (white male),
   Communication Studies (white male), and Public Relations and Advertising
   (international female). All program chairs are non-African American. (Ex. A - Dillard
   Dec. ¶2). In the College of Communication, only people from protected classes have
   been denied tenure and promotion and they both identified as African American women
   *Id.* CMN has a history of denying tenure and promotion for African American women.
   (Ex. C - Dr. Murphy Dep. pp. 56-57); (Ex. D - Dr. Ghanem Dep. p. 21-22; 95 (█

1

███ denied). Given its historical treatment of people from protected classes, the College of Communication received an external petition calling for the end of systemic discriminatory behavior within the college toward Dr. Dillard and other faculty of color (Ex. A - Dr. Dillard Dec. ¶ 22; Tab 6 – Dillard_DePaul07885); (Exhibt C - Dr. Murphy 163:14-19); (Ex. D - Dr. Ghanem Dep. 119:7-13). Dr. Dillard's area of research are in Public Relations/Advertising and Health Communication.  Dillard's background and focus of studies, including her undergraduate degree in Advertising, Integrated Marketing Communication, Master's degree in Mass Communication and Media Arts, and Doctorate in Communication, were part of her narrative in the deposition (Ex. B - Dillard Dep. 392:22-24).

3. Dr. Ghanem Ghanem ("Dr. Ghanem") was the Dean of the College from August 2014 to October 2018 when she was appointed to acting provost. (Ex. D - Dr. Ghanem Dep.)

4. Alexandra Murphy ("Dr. Murphy") was a Professor in the College, was appointed to acting dean in October 2018. Dr. Murphy identifies as Caucasian and female (Ex. C - Dr. Murphy Dep.  107:1-10).

5. Maria DeMoya (Dr. DeMoya) was an Associate Professor in the College of Communication in the Public Relations and Advertising program.  She was appointed diversity advocate for the college from 2016 – 2020 (Ex. E - Dr. DeMoya Dep.  p. 9:13-14).

6. Dan Azzaro is a Professional Lecturer in the College of Communication in the Public Relations and Advertising program (Ex. F - Dr. Azzaro Dep.p. 6:1).

**The tenure and promotion process at DePaul.**

7.  During a candidate's probationary period, tenure-track faculty can be assessed on progress toward promotion and tenure by evaluating performance in the context of promotion and tenure standards and provided guidance and establish priorities for satisfying established criteria, with informal reviews occurring yearly and formal reviews occurring at least every two years. Each formal or informal evaluation shall result in a written recommendation to the dean for reappointment or termination (Ex. A - Dillard Dec. ¶ 25)(DSOF – Tab B-2, Ex. 140: Faculty Handbook 2010).

8.  During a candidate's probationary period and for formal reviews, tenure-track faculty in the College of Communication utilize the College of Communication Tenure and Promotion Guidelines so that there is a level of graduation of the different terms  (Ex. A - Dillard Dec. ¶ 23; Tab 1 - Dillard_DePaul3752); (Ex. C - Dr. Murphy Dep 54:5-8). The college uses the language of the guidelines to assess and to be consistent (Ex. C - Dr. Murphy Dep 54:5-8). Progress categories used to assess progress toward tenure include unsatisfactory, fair, very good, and excellent (Ex. C – Dr. Murphy Dep 54:8-9); (Ex. A – Dillard Dec. ¶ 31, Tab 1 - Dillard_DePaul3756).  June 25, 2015 College of Communication Tenure and Promotion Guidelines states "formal evaluations by the personnel committee shall be made annually if early evaluations make reappointment questionable" (Ex. A - Dillard Dec. ¶¶23, 31, Tab 1 - Dillard_DePaul3774). Additionally, the guidelines dictate that tenured faculty members are to vote separately on contract renewal and progress toward tenure in the areas of teaching, research, and service for formal review cases (Ex. A - Dillard Dec. ¶¶23, 31, Tab 1 - Dillard_DePaul3753-4).  During Dr. Dillard's first formal review, tenured faculty members did not vote separately on contract renewal and progress toward tenure and

only voted in favor (14-0) of her contract renewal (Ex. A - Dillard Dec. ¶¶23, 31, Tab 5 - Dillard_DePaul07690). In the first formal review, a faculty member can be considered to be making adequate progress toward tenure as long as all categories are ranked fair or above" (Ex. A - Dillard Dec. ¶¶23, 31, Tab 1 - Dillard_DePaul3753). During Dr. Dillard's first formal review, she was categorized as making "fair" progress towards tenure ¶¶23, 31,

9. For the purposes of teaching evaluation quantitative scores, faculty under formal review are rated by students on a 1-5 scale with 1 being the lowest and 5 being the highest possible score (Ex. A - Dillard Dec. ¶24).

10. College of Communication Tenure and Promotion Guidelines also dictates "faculty members must have the opportunity to develop strengths and skills as they progress toward tenure. Therefore, adequate progress toward tenure during the first formal review is not necessarily the same as what adequate progress toward tenure means in subsequent formal reviews leading up to and including the tenure review. By the time of the pre--tenure formal review, the faculty member should have at least one area ranked as excellent with the clear promise of moving at least one of the remaining areas to excellent within the time prior to tenure. No ranking should be below very good during this review. (Ex. A - Dillard Dec. ¶¶23, 31, Tabs 1-2).

11. Dr. Dillard informed various administrators at DePaul—on several occasions—that there were inconsistencies and subjective criteria in evaluating faculty, particularly affecting protected classes. (Ex. A – Dillard Dec. ¶26).

12. While it is typical for tenure-track faculty to receive two formal (in their 2nd and 4th year) pre-tenure reviews before receiving a tenure review (Ex. C - Dr. Murphy Dep. 43:19-

21;), Dr. Dillard was subjected to twice as many probationary reviews than typical, receiving a total of four, each occurring separately in 2013, 2015, 2017, and 2018 (Ex. A – Dillard Dec. ¶¶23, 27, 31, Tab 5 - Dillard_DePaul07690; Tab 15, Dillard_DePaul05344; Tab 16, Dillard_DePaul05202; Tab 9, Dillard_DePaul06223). Dr. Dillard was also subjected to two formal reviews, a probational review and tenure review, in the same year in 2018 (Ex. B – Dr. Dillard Dep 120:14; Tab 9, Dillard_DePaul0622). The formal review process has been found to be time-consuming and filled with technical errors (Ex. C - Dr. Murphy Dep.132:3-6); (Ex. E Dr. DeMoya 31:12). By 2018, DePaul was subjected Dr. Dillard to a total of five formal reviews and seven informal reviews (DSOF, Tab B-2, Exhibit 104).

13. Annual probationary reviews are conducted at least every two years (DSOF – Tab B-2, Ex. 140: Faculty Handbook 2010). From 2010 to 2015, formal reviews could take place more frequently than every two years "if early evaluations make reappointment questionable." *Id.* According to the 2010 faculty handbook, the purpose of tenure track probationary reviews also are: 1. To assess progress toward promotion and tenure by evaluating performance in the context of promotion and tenure standards and to provide guidance and establish priorities for satisfying established criteria and 2. *Id.* To determine whether reappointment for the next academic year is appropriate and desired DSOF – Tab B-2, Ex. 140: Faculty Handbook 2010).

14. Drs. Dillard and ███████ describe the formal review processes as time-consuming and inconsistent, with frequent changes in procedures and expectations, highlighting the need for a broader approach to systemic change. (Ex. A – Dillard Dec. ¶ 28; Tab 10 - Dillard_DePaul06428, 6438); (Ex. E - Dr. DeMoya Dep. 62:23-24; 63:1-5). Dr. Murphy

agreed the formal review process is time-consuming (Ex. C - Dr. Murphy Dep. 132:3-6).

15. Additionally, Dr. Dillard observed differential treatment in teaching assignments based on modality (online versus face-to-face), with her facing more stringent requirements compared to others (Tab B-2; Ex. 18). When asked about this differential treatment towards her, Dillard was told by leadership that they "cannot speak to the instances in which any other untenured faculty members under review may or may not have been recommended the same requirements..." (Ex. A – Dillard Dec. ¶ 28; Tab 11 - Dillard_DePaul07737). Both online and face-to-face teaching are required of faculty (Ex. B – Dr. Dillard Dep. 277:1-24).

16. Dr. Dillard discussed her concerns about differential treatment in the formal review process with Dr. Ghanem after being informed she would have to complete an additional formal review (Ex. A – Dr. Dillard Dec. ¶31) (DSOF Tab B-2 – Ex. 85 - Calvente-DePaul 0038835). Dr. Dillard discussed her experience with the teaching review process to Ghanem and expressed that she is held to different standards compared to other faculty. *Id.* Despite receiving perfect scores and award nominations, Dr. Dillard felt that her teaching skills were still being questioned. *Id.*

17. During Dr. Dillard's first formal review in 2013, Dr. Dillard did not receive any indication of "questionable reappointment" having received an overwhelming majority vote (7-0) in favor of contract renewal from the personnel review committee, unanimous support (14-0) in favor of reappointment from voting College of Communication faculty, and a Dean review letter supporting her reappointment (Ex. A – Dr. Dillard Dec. ¶31, Tab 5 - Dillard_DePaul07690). Personnel required an additional formal review to

be held in Winter 2015, expressing a need for improvement "to make satisfactory progress towards tenure" while involving no expression of questionable reappointment. Dr. Dillard's 2013 formal review also included a vote for contract renewal (reappointment), but did not include a vote for progress towards tenure as required by the College of Communication Tenure and Promotion Guidelines (Ex. A – Dr. Dillard Dec. ¶31, Tab 5 -Dillard_DePaul07690).

18. Non-African American employees were subjected to less stringent evaluations than Plaintiff, allowing them numerically fewer reviews that were less onerous and stressful, and provided a supportive workplace for advance. For example:

   a. Prior to Dr. Dillard's first formal review during a 2013 formal review of █████ ███ (Public Relations and Advertising tenure-track faculty member), she received at least 12 quantitative scores below 3.99 with four falling below 2.99 during her fourth year review (Ex. A – Dillard Dec. ¶ 29); (DSOF Tab B–2 – Ex. 85). Though being held to a higher standard during a pre-tenure/fourth review (Tab 1 – Dillard_DePaul3753), College of Communication voting faculty members added an addendum stating, "in the area of teaching, for all Personnel Committee documents, language regarding the College mean should not be included" (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 11, █████ Reviews - Dillard_DePaul05517). In her formal review, there was no reference or comparison of █████s scores to the college mean. *Id.* In Dr. Dillard's review, the college mean was mentioned in four separate instances (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 5 - Dillard 2013 Review - Dillard_DePaul07692).

b.  In 2013 first formal review, Dr. Dillard's teaching was labeled as "well below the College mean (e.g. quantitative responses in the 2s and low 3s when the College looks for ratings in the 4 range)," "still below the College mean, "either on par or above the College mean," and "still often rated below the College mean" *Id.*

c.  During a 2013 formal review of Dr. ███ ███ (Public Relations and Advertising tenure-track faculty member), the personnel committee and tenured faculty from the College of Communication concluded Dr. ███ was making "good/very good progress towards tenure in teaching" (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 11, ███ ███ 2013 Review - Dillard_DePaul05509). College of Communication Tenure and Promotion guidelines dictate that by the pre-tenure formal review (fourth year),"No ranking should be below very good during this review" (Tab 1 – Dillard_DePaul3753). Dr. ███ was ranked below the standard at good/very good in her teaching, but was not subjected to an additional formal review. (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 11).

d.  In 2013 formal reviews of her second quarter teaching, Dr. Dillard's quantitative measures were documented without including any of her quantitative scores and stated as "still below the College mean" (Ex. A - Dillard Dec. ¶ 30; Tab 5 - Dillard_DePaul07692) when 14 of 20 items were above 4.0 on the 5.0 scale. Dr. Dillard's scores on her teaching effectiveness for the second quarter teaching never fell below 3.0 in either PRAD 244 and PRAD 335, with Dr. Dillard receiving 4.0-4.99 on 34 of 40 teaching effectiveness items and 3.0-3.99 on 6 of 40 items (Dillard Dec. ¶ 30; Tab 4 - Dillard_DePaul06361).

e.   When referencing teaching evaluation quantitative scores in Dr. Dillard's first formal review, her scores of 2 and 3 were framed as "consistently scoring well below the College mean (e.g., quantitative responses in the 2s and low 3s when the College looks for ratings in the 4 range." (Dillard Dec. ¶ 30; Tab 5 - Dillard_DePaul07692), while Yeuseung ███ (non-African American), tenure-track faculty member's 2013 formal review listed her scores of 2 and 3  as "Overall quality of course, 2.29 and 2.21; overall teaching effectiveness, 2.46 and 2.07; increased my knowledge or skills, 2.25 and 2.64; used class time effectively, 3.29 and 2.43; instructor was clear on how assignments were to be evaluated, 3.17 and 2.43; the course followed a clear organizational structure, 3.83 and 3.07."  No reference to the college mean or her consistently falling below 4 on quantitative measures was made (Ex. A. ¶31, Tab 12 Dillard_DePaul05535).

f.   Additionally, in 2013 formal reviews of her second quarter teaching, another non-African American tenure-track faculty member's (Dr. ███) quantitative measures were documented in detail as "...teaching effectiveness and student engagement issues persisted: overall quality of course, 2.86 and 3.00; overall teaching effectiveness, 2.71 and 3.13; increased my knowledge or skills, 3.00 and 3.33. We do, however, see some mixed results with other questions: used class time effectively, 3.71 and 4.47; instructor was clear on how assignments were to be evaluated, 3.29 and 4.13; the course followed a clear organizational structure, 3.71 and 4.34" (Ex. A. ¶31, Tab 12 Dillard_DePaul05536). No reference was made about her scores falling below the college mean or below ratings in the "4 range"

of what the college "looks for" (Ex. A. ¶31, Tab 12 Dillard_DePaul05536) as opposed to Dr. Dillard. *Id.*

g. In 2013 formal reviews when referencing improvements in teaching, both Dr. Dillard and another non-African American tenure-track faculty member were noted to have made "noticeable progress during her second quarter" (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 5 - Dillard_DePaul07692; Tab 12 Dillard_DePaul05535-6). Similarly, both Dr. Dillard and another non-African American tenure-track faculty member (Dr. █████) were believed to "possess(es) many of the tools needed to succeed as a teacher: content knowledge, research expertise" (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 5 - Dillard_DePaul07694; Tab 12 Dillard_DePaul05535-6). Other tools needed to succeed as a teacher highlighted in Dr. Dillard's report were "openness to feedback, willingness to learn and change, and a desire to help students succeed" (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 5 - Dillard_DePaul07694), Dr. █████ was noted only for her "passion to shepherd students toward success" (Ex. A, ¶31, Tab 12 Dillard_DePaul05535-6).

h. In 2013 formal review, Dr. Dillard's teaching was defined as "not tenurable" in its present form, needing improvement to "make satisfactory progress toward tenure in this area," and making "fair progress toward tenure in the area of teaching." The review concluded "instead of waiting for the standard two-year review period, the Personnel Committee will meet with Sydney in Winter 2015 to review her progress in the area of teaching" (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 5, Dillard_DePaul07694). Comparatively, Dr. █████'s 2013 formal review noted, "The committee would like to see Yeuseung continue with all the aforementioned

10

development efforts and look forward to seeing substantial progress in the areas of teaching effectiveness and student engagement at the time of her next review" (Ex. A, ¶31, Tab 12 Dillard_DePaul05538 and making "satisfactory/good progress toward tenure". While Dr. Dillard was subsequently asked to improve and required an additional formal review, Dr. ███ was asked to improve and not required to return for an additional formal review outside of the typical tenure review schedule (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 5 - Dillard_DePaul07694; Tab 12 Dillard_DePaul05538.

i. The College of Communication Tenure and Promotion guidelines states "faculty member can be considered to be making adequate progress toward tenure as long as all categories are ranked fair or above" (Tab 1 - Dillard_DePaul3753) and while Dr. Dillard's teaching including qualitative, quantitative, and peer feedback minimally mirrored if not surpassed Dr. ███'s, Dr. Dillard was required to complete an additional formal review (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 5 - Dillard_DePaul07694).

j. During another second formal year review, a white-male tenure-track faculty member (Dr. Rutigliano)(Caucasian male) received scores below Probationary Review," Dr. Dillard was held to a standard of needing scores 4.0 or higher when her reviews noted "the college looks for ratings in the 4 range Probationary Review," Dr. Dillard was held to a standard of needing scores 4.0 or higher when her reviews noted "the college looks for ratings in the 4 range on  5 of 20 teaching effectiveness measures. He was also rated below 4.0 in 13 of 20 and below 3.5 in the remaining 7 measures (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 14,

Dillard_DePaul05529). The formal review highlighted several areas of improvement and urged him to "give serious attention to the negative feedback he has received and encourages him to continue working on the areas of course organization/structure, clarity and explicitness in assignment descriptions, laying out clear learning objectives, and being consistent in course framing and planning" (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 14, Dillard_DePaul05529). He was rated as "making satisfactory to good progress toward tenure in teaching" (Ex. A - Dr. Dillard Dec. ¶ 31, Tab 14, Dillard_DePaul05530). He was also asked to improve and not required to return for an additional formal review outside of the typical schedule. *Id.*

19. Non-African American employees were subjected to less stringent evaluations than Plaintiff, allowing them to obtain tenure and additional career advancement opportunities sooner than Plaintiff.

   a) Non-African American employees similarly situated to Plaintiff were given one-on-one assistance and coaching regarding their performance on the path to obtaining tenure, and Plaintiff was not. (Ex. B – Dr. Dillard Dep. 267:9-13). Jay Baglia (white, male) noting differences in support received (Ex. B – Dr. Dillard Dep. 26:13-24). Two former Caucasian men— █████████████ ██████████ they were subject to additional reviews, but given opportunities to meet with them regularly one on one and help guide them and steer them to become better and more prepared for tenure promotion. (Ex. B – Dr. Dillard Dep. 266:3-25, 267:1-3).

**20.** Effective July 1, 2015, the faculty handbook provided added clarity on the difference between the application of faculty voting for "progress toward tenure" and "reappointment," providing that the two are not synonymous. (Faculty handbook 2015).

**21.** Dr. Dillard's 2015 formal review included a voting category for retention (reappointment) and progress toward tenure (Ex. B – Dr. Dillard Dep. pp. 315-315, Ex. 32-33).

**22.** Dr. Dillard described inconsistencies in the application of evaluation criteria for faculty non-African Americans in the College of Communication. (Ex. A – Dillard Dec. ¶26). Dillard observed that ████, who had lower evaluation scores in some classes compared to Dillard, was not required to undergo an additional review for teaching effectiveness (Ex. B 273-275, 284:14, 286:17 292- 294, 362:15, 461:16). In contrast, Dillard's perfect scores and positive student feedback were often overlooked and not highlighted in personnel letters, suggesting less stringent evaluations for ████ (Ex. B – Dr. Dillard Dep. 273:1-24). She noted that commendations were given selectively, such as praising some faculty for perfect scores. During a fourth year formal review, Dr. ████s personnel letter highlights scores as "quite a few scoring at 5.0 on the 5-point scale (two 5s in Fall 2013, eight 5s in Spring 2014, and two 5s in Spring 2015)," while overlooking African Americans with much higher achievements such as Dillard's fourth year review which included no praise for perfect scores. For both's fourth year review of teaching effectiveness, Dr. Dillard's received at total of 65 perfect scores of 5.0 while Dr. ████ only received 12 perfect scores of 5.0 (Dillard_DePaul0583; Dillard Discovery Production 000440). Despite having received 65 perfect scores in her teaching evaluations scores, Dr. Dillard was recommended for retention, but to undergo an

additional formal review following her fourth year review (Dillard_DePaul05689▮). Dr.

▮ was not recommended for or subjected to an additional review.

23. Non-African American employees were offered career advancement opportunities that were not made available to Dr. Dillard, including search chair positions, allowing them to advance their careers and obtain promotions sooner than Plaintiff.

   a. Previously, Dr. ▮▮▮, a white male, was appointed to lead and chair a search committee seeking to hire two tenure-track faculty members, prior to his tenure and promotion (Ex. B – Dr. Dillard Dep. 54:10-11).

   b. Dr. Dillard's request to lead and chair a search committee seeking to hire two faculty prior to her tenure and promotion was denied. Despite the program chair noting having "precedent" for one search committee for two positions with only one chair that "went well" in previous instances, Dr. Dillard's was not appointed and was forced to co-chair with a non-qualified, non-African American male colleague, ▮▮▮, that had not completed his one-year probationary period or completed a formal review prior to being appointed into this leadership position (Dillard Dec. ¶18).

### Discrimination against Dr. Dillard at DePaul

24. Dillard attempted to bring attention to questionable interactions at DePaul, which she later believed to be race-based and ability-based (Ex. B – Dr. Dillard Dep. 86:1-87:10; DSOF Tab B-2 – Ex. 48-49). Individuals who created a hostile work environment for Dr. Dillard based on race, include ▮▮ ▮▮▮▮▮ ▮ (Ex. B – Dr. Dillard Dep. 309:15-24). Dillard also believed that employees in the EEO office, specifically Isabel Diaz and Barbara ▮▮▮, were part of the individuals

who discriminated against her or created a hostile work environment based on race (Ex. B – Dr. Dillard Dep. 329:20-22). Dillard confirms filing a charge of discrimination with the EEOC in August 2019, where she detailed being belittled, ostracized, and intimidated through microaggressions (Ex. B – Dr. Dillard Dep. 53:1-23, 74:1-75:13, 371:7-8). Dillard mentions her fear of retaliation if she made a public complaint about discrimination, and confirmed filing a complaint with the Equal Employment Opportunity Commission (Ex. B – Dr. Dillard Dep. 70:1-71:10).

25. In June 2018 Dr. Dillard emailed an anonymous formal complaint to DePaul's OIDE from depaulemployee@tutanota.com detailing some of her and ▮▮▮▮▮▮'s account of discrimination (DSOF Tab B-2 – Ex. 67). The anonymous email informed OIDE that it was a "formal complaint of discrimination" *Id.* The complaint received one follow up email from ▮▮▮▮▮▮, to which Dr. Dillard replied to with answers to questions posed (DSOF Tab B-2 – Ex. 75). No investigation was done after receiving Dr. Dillard's reply to ▮▮▮▮▮▮'s emailed questions from the anonymous email.

26. Dillard felt she was singled out and scrutinized differently for her use of the SharePoint system, a part of the ongoing hostile work environment based on race (Ex. B – Dr. Dillard Dep. 307:4-9). Dr. Dillard expressed her concerns with Dr. DeMoya, who confirmed another faculty member was aware that ▮▮▮▮ ▮▮▮▮ attempted to "derail" another one of Dillard's formal reviews (Dillard Discovery Production 002869).

27. DePaul's EEO office ignored Dr. Dillard's complaints of discrimination, forcing her to continue working in a racially hostile environment (Ex. B – Dr. Dillard Dep. 329:10-19).

**28.** Dr. Dillard was paid lower wages than other non-African-American assistant professors with less experience. (Dr. Ex. B – Dr. Dillard Dep. 241: 7). Dr. Dillard believes that race was a consideration in the people who voted no. (Ex. B – Dr. Dillard Dep. p. 165). Dr. Dillard believes that she is being treated differently than other non-African-American professors. (Ex. B – Dr. Dillard Dep. p. 225, 227: 6-11).

### Culture of Discrimination at DePaul

**29.** When Dr. Dillard began working at DePaul, she was one of five U.S. born minority women tenured/tenure track in the College of Communication, at all times relevant, Dr. Dillard is now the last one still employed. (Ex. A – Dr. Dillard Dec. ¶31; DSOF Tab B-2 – Ex. 85 - Calvente-DePaul 0038826).

**30.** DPUBLIC (DePaul University Black Leadership Coalition) is a university employee resource group of faculty and staff who identify as Black or of African descent which Dr. Dillard was an executive board member of DPUBLIC between and participated in the collection Black employee experiences at DePaul through the Black townhall meeting (Ex. B – Dr. Dillard Dep. Ex. 156 p. Dillard_DePaul08157). Dr. Dillard participated in DPUBLCs 2021 Black Townhall meeting that shed light on the shared experiences of DePaul University black faculty and staff through the culminating memo titled "Message to DePaul University from Faculty, Staff, and Students of African Descent" (Ex. B – Dr. Dillard Dep. Ex. 156 p. Dillard_DePaul08157). Dr. Murphy was not formally working with them on racial inequities (Ex. C - Dr. Murphy Dep. 150:1-24, 151:1-24).

**31.** The Depaulia is the student print newspaper at DePaul University, and Dr. Murphy was aware of an article written about the lawsuit involving the College of Communication (Ex. C - Dr. Murphy Dep. 151:1-24).

**32.** Diversity workshops are part of the DEI (Diversity, Equity, and Inclusion) action plan at the college level, with different types being offered, including mandatory ones for search committees and micro-trainings at faculty meetings (Ex. C - Dr. Murphy Dep. 125:1-24, 126:1-24).

**33.** Dr. Dillard documented her plight to her colleagues about diversity, equity, inclusion, and discrimination within DePaul by writing emails, engaging in voluntary regular diversity advocacy service, leading DPUBLC meetings with DePaul leadership (e.g. President, Provost, Associate Provost for DEI, and Office of Institutional Equity and Diversity), attending grievance meetings with DePaul EEO office, and drafting and reviewing complaint emails to no avail (Ex. B – Dr. Dillard Dep. Ex. 151 - Dillard_DePaul08182; Ex. 154, Ex. 156 p. Dillard_DePaul08157).

**34.** No one in College of Communication leadership took training to handle complaints about discrimination and diversity problem, including the dean Dr. Murphy (Dr. Demoya 133:2-21; Dr. Murphy 34: 22-24; Dr. Murphy 35: 4-7).

**35.** DePaul was on notice that its culture was anything but diverse, equitable, or inclusive. DePaul's response, if any, was lackluster (Ex. B – Dr. Dillard Dep. Ex. 156 p. Dillard_DePaul08157; Ex. D - Dr. Ghanem Dep. 119:7-13).

**An October 10, 2018 conversation between Dr. Dillard, ████████, and Dr. Ghanem.**

**36.** Dr. Dillard was not alone in voicing her concerns and frustrations as several other minority professors and students also expressed similar concerns to no avail. Maria

17

DeMoya also reported Dr. Dillard's claims of discrimination to Dr. Ghanem and Dr. Murphy. (Ex. E - Dr. DeMoya Dep. p. 77)("Yes. In Sydney's case, if I recall correctly, I just reported that I had a conversation with Dr. Ghanem and with Lexa"). Dillard collaborated with ███████ to write responses to certain questions about discrimination, indicating a shared experience of unfair treatment (Ex. B - Dillard Dep. 68:7-24).

37. Specifically, on or about October 28, 2018, Provost, Dr. Ghanem Ghanem had a two hour long meeting with Drs. Dillard and Calvente related to their ongoing concerns and reports of discrimination. Dr. Ghanem never reported the specific incidents of discrimination and instead generalized the incident to DePaul's EEO office. This Email downplayed the discrimination claims and provided little to no detail of each identified allegation (Ex B – Dr. Dillard Dep. 270:21–271:6; Ex. D - Dr. Ghanem Dep. 152:4–8; DSOF Tab B-2 – Ex. 85 - Calvente-DePaul 0038832).

38. Nothing was done to address Dr. Dillard's discrimination claims. (Dillard Dep. p. 133)("…there comes a point when if somebody tells you that you have a problem, you should at least double check that you don't. And the response that I had received talking to colleagues, officially and unofficially were things like well, no, don't worry, trust your colleagues, or you know, this is a process, or we have your best interest ... So I was frustrated about the fact that nobody was willing to stop and take a second look of our processes...That's why for me the ignorance was willful because there was no intent to review how we did things"). This lack of change led to another professor in the college of communication filing a lawsuit against DePaul University alleging such discriminatory practices. *Calvente v. DePaul*., Hill v. DePaul,

**39.** Dr. Dillard discusses perceived patterns of discrimination in the college, mentioning conversations with ▮▮ about experiences as women of color and US origin. She expresses concerns about inconsistency in their experiences compared to others in the program or college. (Ex. A – Dr. Dillard Dec. ¶31; (DSOF Tab B-2 – Ex. 85 - CONFIDENTIAL Calvente-DePaul 0038824-29). "No one ever openly discussed my race as a marker or, you know, deciding factor. But, you know, when it comes to race and marginalization and discrimination, that's one of my areas of expertise. And we all probably could agree that racism doesn't only function in overt spaces, you know, overt spaces. In short, a lot of times, people aren't aware that they are being discriminated against until it's too late. People aren't really forthright." (Ex. B – Dr. Dillard Dep. 328: 8-20).

**40.** Sydney compares her health-related experience and the lack of support she received to another faculty member's experience, highlighting a perceived disparity in support. Support (Ex. A – Dr. Dillard Dec. ¶31; DSOF Tab B-2 – Ex. 85 - Calvente-DePaul 0038829-0038830)

**41.** Both Drs. Dillard and Calvente express their belief that there is a pattern of bullying within the college, particularly towards faculty of color. (Ex. A – Dr. Dillard Dec. ¶31; DSOF Tab B-2 – Ex. 85 - Calvente-DePaul 0038841-44). They share experiences of differential treatment in faculty evaluations and departmental processes, including changes in procedures for cross-listing classes and unusual recommendations regarding service commitments. (Ex. A – Dr. Dillard Dec. ¶31; DSOF Tab B-2 – Ex. 85 - Calvente-DePaul 0038840-41).

**42.** Sydney and ▮▮▮ discuss apprehensions regarding the tenure and promotion (T&P) process at their college. They express fear that tenured faculty members may not support them, citing past instances where a black woman faculty member was denied tenure. (Ex. A – Dr. Dillard Dec. ¶31; DSOF Tab B-2 – Ex. 85 - Calvente-DePaul 0038840)

**43.** Dr. Dillard pointed out to Dr. Ghanem that no US-born minority has been promoted and tenured through the college, a statement Dr. Ghanem initially disputes but then accepts after clarification. (Dillard Discovery Production 002487). Dr. Ghanem claimed that Teresa [last name], a US-born minority had achieved tenure. Dr. Dillard clarified that Teresa joined the college already tenured and implied that there is a difference in the process. (Dillard Discovery Production 002487). Dr. Dillard observes that Noni, a tenure-track faculty member, was not included in the list of faculty farewells, which Dr. Ghanem acknowledges as her oversight in creating the slides. (Dillard Discovery Production 002487).

**44.** Dr. Ghanem confirmed that Drs. Calvente and Dillard approached her with concerns about ongoing marginalization, harassment, and discrimination. (Ex. D - Dr. Ghanem Dep. 10:9-11; 24:22-25:3). Ghanem also mentioned microaggressions felt during the meeting, which led her to contact Barbara ▮▮▮. These microaggressions were based on racial discrimination. (Ex. D - Dr. Ghanem Dep. 132:18-133:3). This was mentioned in an email thread where Liz Ortiz, the Vice-President of the Office of Institutional Diversity and Equity, and Craig Mousin, the University ombudsperson, were also discussed. (24:9-15). The meeting involved discussions where an email indicated a belief in a pattern of harassment, bullying, and marginalization of faculty. Ghanem was uncertain about the process to be followed in such cases and did not recall the exact time

when she communicated with Drs. Calvente and Dillard following the meeting. (Ex. D - Dr. Ghanem Dep. pp. 24:22-25:3).

45. In the same meeting, issues of diversity, equity, and inclusion were raised, specifically focusing on the development of pathways for diversity inclusion and retention of minority tenured/tenure-track faculty. Ghanem was asked for recommendations regarding these issues. p. 132:s 18-21 (132:18-21).

46. Dr. Ghanem expresses her intention to pay closer attention during her reviews and acknowledges the need for systematic changes to address cultural issues within the college. She seeks suggestions for genuine change and is open to training and committee formation but emphasizes the importance of changing perceptions and culture. Issues (Ex. A – Dr. Dillard Dec. ¶31; Tab 12 – CONFIDENTIAL Calvente-DePaul 0038845). Dr. Ghanem asks for Drs/ Dillard and Calvente help in addressing these issues. Dr. Ghanem emphasizes the need for more than policy development and seeks a genuine dialogue to make changes in the college. (Ex. A – Dr. Dillard Dec. ¶31; DSOF Tab B-2 – Ex. 85 - Calvente-DePaul 0038846).

47. Dr. Ghanem agrees that harassment and bullying claims should be pursued and discusses inconsistencies in processes that she can talk to people about. However, she clarifies that she cannot report back the details of these discussions. (Dillard Discovery Production 002487-002488).

48. OIDE is the organization tasked with investigating internal complaints of discrimination at DePaul. (Dillard Dec. ¶31). After ████████ told Dr. Ghanem that she wrote the letter on Dr. ████████'s behalf, Dr. Ghanem called Ms. ████████ at OIDE and left a

voice mail stating that Dr. Dillard and ███████ believed themselves to be victims of discrimination. (Ex. B – Dr. Dillard Dep. 272:15–273:4.) Then Dr. Ghanem ended the meeting. (*Id.* at 273:5–273:7.). Ghanem believed that both issues they discussed were addressed by Barbara ███████. (Ex. D - Dr. Ghanem Dep. 134:17-18).

49. Policy on Investigations: Dr. Ghanem states she cannot conduct an investigation without involving HR, in accordance with university policy. (Dillard Discovery Production 002486). Dr. Ghanem's participation in tenure meetings is limited to clarifying processes and observing for patterns or problematic statements. (Dillard Discovery Production 002486). She is willing to address issues if she finds objectionable terminology being used during meetings, but emphasizes her inability to lead an investigation without HR involvement. (Dillard Discovery Production 002486). Dr. Ghanem can have informal conversations with individuals, but these discussions will be confidential and not reported back. (Dillard Discovery Production 002486). Dr. Ghanem underlines the importance of maintaining confidentiality due to the sensitive nature of personnel issues. (Dillard Discovery Production 002486).

50. Dr. ███████ was a white tenure track professor in the College who was recommended for non–renewal in calendar year 2017, and whose contract Dr. Ghanem decided not to renew before Dr. applied for tenure. (Ex. D - Dr. Ghanem Dep. 143:22–144:2, 163:1–3).

51. After the October 10, 2018 meeting, ███████ and Dr. Ghanem never again had a meaningful conversation. (Ex. A - Dr. Dillard Dec. 51). Dr. Ghanem Emailed ███████ about the claims by Drs. Calvente and Dillard. (DSOF Tab B-2 – Ex. 84).

Ghanem was asked if she had scheduled another meeting to discuss these concerns further or if she was the appropriate person to look into these issues. She indicated that she did not believe she had a second meeting because she shifted roles. (Ex. D - Dr. Ghanem Dep. p. 24:4-11).

## PRAD CHAIR

**52.** The program chair position for PRAD (Public Relations and Advertising) at DePaul University is a significant time commitment. (Ex. C - Dr. Murphy Dep. 103:6-10). The PRAD chair position is a three-year term. *Id.*

**53.** In 2018, ▮▮▮ ▮ (Asian Female), the previous program chair was at the end of her three-year term and chose not to apply for another term (Ex. C - Dr. Murphy Dep. 103:16-24, 104:1-10; 119:1-24; DSOF Tab B-2, Ex. 108).

**54.** For chair, a call for nominations are made. Nominated candidates are announced. Each candidate provides a presentation about background, qualifications, and strategic direction if selected. Each candidate answers questions from all voting faculty members. Candidates leave the room while faculty discuss candidate qualifications. Faculty vote on candidate/s. Faculty present votes to Dean. Dean decides to accept or deny faculty vote recommendations. If no candidate is selected, an additional election/vote is to be held following the same procedure. (Ex. A - Dillard Dec. ¶ 7).

**55.** The PRAD Program Chair position that Dr. Dillard self-nominated for served as a stepping-stone for her to qualify for more advanced positions such as Associate Dean, Associate Provost, Dean, or Provost. For example, Dr. DeMoya accepted the Program Chair position after originally denying it when she realized she was not considered qualified for more advanced positions at other universities without it. (Ex. E - Dr.

DeMoya Dep. p. 129). ("thought that if I stay at DePaul, it's going to make my progression towards full professor eventually better to have this on my record. So honestly, I felt that even though I still don't like the position, it's still a position I would rather not have, it was the best choice at the time to both serve the program and to serve my career progression").

56. In 2018, Dr. Dillard was self-nominated and nominated by colleague Don Ingle for the PRAD chair position (Ex. B - Dillard Dep. 329:17-21). Before the committee voted, Dr. Dillard spoke about her experience in a leadership development program at the university during her presentation for the program chair position (Ex. C - Dr. Murphy Dep. 107:11-24).

57. The PRAD chair voting process was not explicitly detailed in the faculty handbook, but a separate document updated on March 8, 2016 and governed by the faculty handbook outlined the Program Chair duties, selection, and review process specifically for the College of Communication (Ex. C - Dr. Murphy Dep. 42:2-24, 43:1-5; Dillard_DePaul4059; Ex. D - Dr. Ghanem Dep. 73:3-6).

58. Dr. Murphy deviated from the "uniform standards and procedures" outlined in the Program Chair duties, selection, and review process document during its PRAD program chair election process. Id. Instead of voting on Dr. Dillard's qualifications, Dr. Murphy allowed he conversation among the voting members to focus on various personal matters about Dillard that did not include Dr. Dillard's qualifications or program chair duties, including discussions of Dr. Dillard's medical history (Ex. E - Dr. DeMoya Dep. p. 136) and perceived campus presence since Dr. Dillard had not been on campus due to her disability leave (Ex. 5 Murphy Dep pp.

90-96)("Q: Was there a job description or job duties list for that specific position? A: "Probably...I don't want to over-emphasize presence on campus as like the reason people voted against her because I really don't know"); (Ex. C - Dr. Murphy Dep. 40:1-15).

59. After sending Dr. Dillard out of the room to deliberate and vote based on her qualifications for the position, Dr. Murphy and the PRAD voting faculty members claimed that they had to revamp the position, but not before it voted Dr. Dillard's nomination down (Ex. E - Dr. DeMoya Dep. 41:15-1). Other than a strong preference for preference for candidates at the rank of associate or full professor, no other qualifications are noted in the Program Chair Duties, Selection, and Review Process document (Ghanem Dep. Ex. 12 - Dillard_DePaul4059). A majority of PRAD faculty voted against Dr. Dillard without articulating any qualifying reason for failing to promote her. Instead, the committee decided to "revamp" the role and kept the position vacant. Later, Dr. Murphy chose to accept the facu███████tion to appoint as interim chair. (DSOF - Tab B-2, Ex. 110). Dr. Murphy deviated from established protocol, which would have been to hold another election. Dr. Dillard was also ostracized when she was excluded from conversations to "revamp the program chair position," the even though she was part of the program faculty. Dr. Murphy admits she did not hold any other major meetings about revamping the program chair position (Ex. C - Dr. Murphy Dep.105:11-12) and did not specifically ask Dr. Dillard to be a part of the process to revamp (Ex. C - Dr. Murphy Dep. 105:14-20).

60. The duties of the program chair were primarily on-campus activities pre-Covid, as the culture at the time did not support remote participation (Ex. C - Dr. Murphy Dep.44:1-

15; 47:16-24, 48:1-5). Qualities such as being present, timely, responsive, and collaborative were mentioned as important for the program chair position, alongside considerations for the time commitment and responsibilities like hiring adjuncts (Ex. C - Dr. Murphy Dep. 36:1-24).

61. While other College of Communication programs, including PRAD, routinely voted for single candidate elections that included non-disabled and non-African Americans, Dr. Dillard was the first ever to be voted down in the College of Communication (Ex. C - Dr. Murphy Dep. 105:15-19; Ex. C - Dr. Murphy Dep. 5:22-23).. Dr. Murphy admitted since joining DePaul in 1998, she has never witnessed any other program chair candidates being voted down. Id.

62. Dr. Murphy usurped "the appointed ███ ██ to remain as program chair for one more year. (DSOF Tab B-2, Ex. 108 ). Dr. Murphy did not conduct a vote for the previous program chair to remain in position; it was a continuation without a formal voting process (Ex. C - Dr. Murphy Dep. 104:1-14).

63. Dr. Dillard was qualified for the program chair position. (Ex. C - Dr. Murphy Dep. p. 96; Ex. E - Dr. DeMoya Dep. 129:20-24). For instance, Dr. Dillard completed a yearlong leadership training, *Leading People at Depaul*, which was a qualification no other professor in the College of Communication had accomplished (Ex. B - Dr. Dillard Dep 220:12-15, Ex. 108). Dr. Murphy believed that Sydney Dillard met the minimum qualifications for the program chair position, which included being a tenure-track faculty member with tenure in the program area (Ex. C - Dr. Murphy Dep. 46:1-15). In fact, Dr. Dillard was more qualified than the non-disabled and non-African American

predecessor who was first appointed as interim program chair (Ex. A - Dr. Dillard Dec. ¶14).

64. Dr. Dillard contributed to the PRAD program through external grants to support her research and initiatives like the Summer BRAND Camp, which involved collaborations with various corporations and providing university exposure to students (Ex. C - Dr. Murphy Dep. 109:1-24). Sydney Dillard and another faculty member secured funding through an innovation fund (Ex. C - Dr. Murphy Dep.108:1-24).

65. In accordance with the Program Chair duties, selection, and review process document, PRAD voting members were informed in the Winter 2019 quarter of the upcoming PRAD program chair elections within normal timeline standards and were provided with a description of PRAD program chair duties. All voting members were also informed that nominated candidates would provide a presentation and answer questions at the program meeting (Ex. A – Dillard Dec. ¶ 17; Tab 1A Dillard Dec. Dillard_DePaul05374).

66. During the PRAD program election discussion, PRAD voting faculty discussed not knowing Dr. Dillard (Ex. F - Dr. Azarro Dep.16:14-16), feeling rushed (Ex. C - Dr. Murphy Dep. 85:11-14); (Ex. B. - Dillard Dep. 214:5), and not voting in Dr. Dillard (Ex. F - Dr. Azzaro Dep.23:10-11). Voting PRAD faculty member Dan Azzaro (Caucasian male) buttresses the differential treatment of Dr. Dillard and arbitrariness of the decision to vote down Dr. Dillard compared to her non-African American, non-disabled predecessor by noting how the faculty did not really "know" ▋▋ ▋▋ either Dr. Azzaro asked "why wouldn't we vote for Sydney as well?" (Ex. F - Dr. Azarro Dep. 15:2-3); (Ex. E - Dr. DeMoya Dep. pp. 132-9)("Sydney had difference experiences than

27

me in that sense, but I felt like I kept hitting a wall when I tried to talk about issues of diversity and inclusion.").

67. Although Dr. Murphy had the authority to reject the faculty's vote on the program chair , she chose not to, considering the majority's view and not wanting to set the candidate up for failure (Ex. C - Dr. Murphy Dep.41:11-22; 46:16-24, 47:1-15; 97)("halting the vote would have been unfair to Sydney Dillard" and "[she] didn't want to set somebody up for failure if you put them into a position where they don't have the confidence of the faculty.")

68. Dr. Dillard was never brought back into the meeting room to discuss the purported changes to the program chair position or to vote. (Ex. C - Dr. Murphy Dep.100; 105:1-15).

69. Because the Program Chair position is a prerequisite for advancing to positions with better pay and more prestige, the arbitrary denial significantly harmed Dr. Dillard's career advancements. (Ex. A – Dr. Dillard Dec. ¶ 3)

70. The PRAD Program Chair position was open again, and Dr. Dillard was asked to apply for it. Given that no one has provided her with the reasons for why she was voted down despite exceeding the qualifications required and it is a tough and thankless job according to Dr. Azzaro. (Ex. F - Dr. Azzaro Dep. p. 15, 23, 27-28. Additionally, Dr. Murphy approached Dr. Dillard recently and asked her if she would like to be nominated for the Interim Associate Provost of DEI position. (Ex. A - Dr. Dillard Dec. ¶ 15.) The deadline was overlooked by Dr. Murphy, and she then told Dr. Dillard that it was too late for her to apply. *Id.*

**71.** ███████ was non-qualified to serve as co-chair because he had not met his graduation deadline and was therefore at the rank of instructor, not tenure-track when he was appointed to co-chair a search committee with Dr. Dillard (Ex. A - Dillard Dec. ¶ 18; Ex. E – Dr. DeMoya Dep. pp. 126-127).

**72.** Dr. Murphy observed that there was a sense of urgency felt by faculty members regarding the selection process for the program chair, leading to discussions about rethinking the process (Ex. C - Dr. Murphy Dep. 35:1-15). The timeline for the PRAD chair vote was consistent with the timelines used in previous PRAD chair elections and in the elections for all other program chairs (Ex. A - Dr. Dillard Dec. ¶ 16; Ghanem Dep. Ex. 12, Dillard_DePaul4059).

**73.** Dr. Murphy was made aware of potential bias by Dr. Dillard and procedural problems regarding the search process, specifically about Dr. ███████'s misperception on whether the committee should see a report about the top candidates before it goes to the full faculty (Ex. C - Dr. Murphy Dep.115:1-24, 116:1-24). The procedural problems were discussed in a meeting with Sydney, Nur, Dr. Murphy, and ███████ (Ex. C - Dr. Murphy Dep. 116:1-24). Dr. Dillard raised concerns about Dr. ███████'s insubordination and defamation of Dr. Dillard's character in the context of the email exchanges and search committee incidents (Ex. C - Dr. Murphy Dep. 118:1-24, 119:1-24). When Dr. Dillard utilized one of her approved disability accommodations to remove herself due to dizziness and overstimulation during the meeting (Dillard_DePaul09250), her actions were labelled as storming out. (Ex. A – Dillard Dec. ¶ 19). Dr. Dillard emailed Dr. Murphy, detailing her discomfort with the hostile interaction, misrepresentation of her character, and unauthorized disclosure of her medical information to other committee

members (Ex. A - Dillard Dec. ¶¶ 19, 31, Tab 3 - Dillard_DePaul05910). Dr. ███

accused Dr. Dillard of denying her request to view the final search committee report

(Dillard Dec. ¶ 19), though Dr. Dillard agreed to unnecessarily share the

report and solicit feedback via a password protected shared document,   only

available   to   committee   members   including   ███   (Id.   at

Dillard_DePaul3334). Dr. Murphy confirmed Dr. Dillard's approach was in line with

search committee policies and asserted that there was no need for a formal report from

the search committee, as Dr. Dillard attempted to explain to Dr. ███ before being

accused of storming out (Ex. A - Dillard Dec. ¶¶ 19, 31, Tab 3 - Dillard_DePaul05912).

Dr. Murphy recalled Sydney expressing discomfort during the follow up meeting about

how the conversation unfolded (Ex. C - Dr. Murphy Dep.122:1-24).

74. After the vote, Dr. Murphy discussed the voting results with Sydney Dillard and had a
follow-up phone call a week later (Ex. C - Dr. Murphy Dep. 49:16-24; Ex. 17 of Murphy
Dep.). Dr. Murphy and Sydney Dillard discussed Sydney's development as a leader and
explored various leadership opportunities both within and outside the college (Ex. C -
Dr. Murphy Dep.  107:11-24).

75. Dr. Murphy denied that Dr. Dillard had complained to her about discrimination. (Ex. C
- Dr. Murphy Dep. p. 73)(Q: Have any faculty members come to you with any sort of
racial discrimination concerns? A: "To me directly, no"). Dr. Murphy later stated that
she was aware of Dr. Dillard's complaints of discrimination  and potential bias and
procedural problems during the advertising search committee meeting, particularly
about whether the committee would see a report on the top candidates before it was sent
to the full faculty (Id. at  115:1-24). Later, Dr. Murphy acknowledged that Dr. Dillard

met to discuss her "concerns." (Id. at 153-154)("Q: Do you see where she says that I have experienced instances of microaggression, social isolation and treatment unbecoming of the College...Is it still your testimony that Ms. Dillard never complained to you about feelings of being discriminated against?" A: "We did have the conversation, so I guess discrimination biases...so this came forward. I don't recall any conversation where she explicitly said that she felt discriminated against"); (DSOF Tab B-2; Ex. 35, 108, 110, 112 (the potential of an investigation)).

76. After requesting additional meetings for clarification on hiring processes and procedures, Dr. Dillard was described as aggressive and bully-like in emails between non-black College of Communication leadership team members including Dr. ██████ ██████ – Program Chair, Dr. ██████ – Media Engagement Lab Director, and Dr. Bronstein – Associate Dean, Dean Murphy, and Provost Ghanhem (Dillard Dec. ¶ 20; Tab 4 - Dillard_DePaul3332-35, Dillard_DePaul08355, Dillard_DePaul08277).

77. In May of 2019, Sydney Dillard emailed Dr. Murphy detailing instances of microaggressions, social isolation, and treatment unbecoming of the College of Communication, including concerns about limited career advancement and feeling program (Ex. C - Dr. Murphy Dep. 153-155; Ex. 15 Dr. Murphy Dep.). Dr. Dillard met with Dr. Murphy and discussed in-depth details of her complaint. However, Dr. Murphy never escalated Dr. Dillard's concerns to OIDE or the EEO office and opted only to discuss Dr. Dillard's complaint directly with Dillard (Ex. C - Dr. Murphy Dep.156:1-24).

78. Dr. Murphy acknowledged that Sydney Dillard raised questions about teaching evaluations and standards in an email thread (Ex. C - Dr. Murphy Dep. 149:1-24). An

email chain discussed teaching evaluations, including questions Sydney Dillard had about the calculation of means and standard deviations, and a teaching evaluation with a different instructor's name (Ex. C - Dr. Murphy Dep.149:1-24).

## Dr. Dillard's Disability

79. Sydney Dillard disclosed to Dr. Murphy that she has a neurological condition leading to seizures (Ex. C - Dr. Murphy Dep.40:16-24; 41:1-5). Sydney Dillard requested accommodations due to her condition and provided a doctor's note. DePaul provided a research assistant, a teaching assistant, and modifications in teaching courses and modalities (Ex. C - Dr. Murphy Dep. 44:16-24, 45:1-15). The accommodations provided went against her doctor's orders. (Ex. B - Dillard Dep Ex. pp. 103-106, Ex. 68).

80. The stress of her experience at DePaul made Dr. Dillard physically sick. She began to have grand mal seizures leading to numerous life-inhibiting experiences, including vestibular dysfunction, dislocated shoulders, generalized anxiety disorder, and depression (Ex. B - Dillard Dep. 102:1-103:10); (Ex. G - Dr. Cristea Dep. pp. 13-14).

81. Sydney shared with Dr. Ghanem that her health issues were exacerbated by stress at work and noted the lack of support from colleagues during her medical leave. Sydney discusses the impact of stress and challenges at work on her health, indicating a triggering effect while discussing these issues. (Ex. A – Dr. Dillard Dec. ¶31); (DSOF Tab B-2 – Ex. 85 - Calvente-DePaul 0038836-37). Dr. Dillard further expressed her fear for her future and the stress caused by her work environment, leading to sleeplessness and anxiety. (Ex. A – Dr. Dillard Dec. ¶31; DSOF Tab B-2 – Ex. 85 - CONFIDENTIAL Calvente-DePaul 0038839)

82. Sydney discusses challenges with HR regarding her medical leave and disability support, highlighting confusion and frustration with the process. (Ex. A – Dillard Dec. ¶31; DSOF Tab B-2 – Ex. 68, Ex. 85 - CONFIDENTIAL Calvente-DePaul 0038838-39, 43; (DSOF Tab B-2 – Ex. 68). Dr. Dillard also compared her treatment during sickness with that of a white male colleague, noting a stark difference in support received, suggesting racial discrimination (Ex. B – Dr. Dillard Dep. 100:5-24).

83. Dr. Dillard's neurologist is Dr. Cristea. Dr. Cristea testified that the onset of Dr. Dillard's seizure disorder and the continued grand mal seizures were attributed to the stress that she experienced from DePaul's ongoing discrimination. (Ex – G - Dr. Cristea Dep p. 32). Dr. Cristea refers to conversations he had with Dr. Dillard over multiple visits about her work issues. He recalls discussing her stress and anxiety, which were exacerbated by her work situation and were making her dizziness worse. *Id.*

84. Dr. Dillard was forced to temporary disability when DePaul's accommodations did not meet the needs of her disability. While she was on leave, her short-term disability claim was denied based on DePaul's failure to supply a job description for her case, which resulted in Dr. Dillard being on unpaid leave (Ex. A – Dillard Dec. ¶ 21). Appealing the matter with support, Dr. Dillard ultimately did not have the appeal overturned until after she returned back to work. *Id.* Dr. Dillard's disability is life-long, and she has incurred and will continue to incur costs and experience lifelong limitations because of this disability. (Ex. G – Dr. Cristea Dep.)

85. DePaul's disability accommodations, or lack thereof, showed a fundamental lack of understanding of what Dr. Dillard needed as accommodations. Dr. Dillard's neurologist indicated in his doctor's note that Dr. Dillard could work with restrictions, which

included teaching online courses. (DSOF Tab B-2 – Ex. 113); (Ex. G - Dr. Cristea Dep. p. 97)("See where it says 'Needs accommodations for work? See the 'needs' in all capitals? That implies to me that they weren't being followed, the fact that I highlighted it that way..."). Dr. Dillard was forced to teach face-to-face classes against her Neurologist's recommendation, which caused her to experience additional vestibular dysfunction, triggers, dizziness spells, and other life-impairing experiences. (DSOF Tab B-2 – Ex. 81; 113). Additionally, Dr. Dillard requested additional preparation time for course development and was given less time than her able-bodied counterparts when they received their teaching schedules approximately three months in advance *Id.* Lastly, she was encouraged to remove intersession teaching opportunities in exchange for preparation time as an accommodation after DePaul failed to provide an accommodation for more course preparation time *Id.*

86. Currently, Dr. Dillard continues to experience anxiety and uncertainty when she continues to be qualified but rejected for career advancement opportunities—most recently being denied for the Associate Dean for Student Affairs and Engagement position based on presumptions about her ability to work while being disabled and an African-American woman. (Dillard Dec. ¶30).

87. Dr. Cristea discusses his approach to treating patients with chronic diseases and how it applied to Dr. Dillard. He mentions that Dr. Dillard always wanted to work and was diligent in her career. He emphasizes the importance of allowing patients to live their lives within the limits of their restrictions, indicating that restrictions are not absolute but are tailored to each patient's situation. (Ex. G - Dr. Cristea Dep. 66 -69).

88. OIDE responded to the anonymous email with follow-up questions, which Dr. Dillard responded to, but OIDE did not perform a follow-up investigation. (DSOF Tab B-2 – Ex. 67).

89. There has been a significant decrease in student enrollment within the PRAD program (at least 20%) and the PRAD program further lost faculty lines due to significant enrollment decreases, with the greatest loss of students within PRAD. (Ex. A – Dillard Declaration ¶4).

Respectfully submitted,

By: /s/ *Gianna Scatchell Basile*, esq.
Plaintiff's Attorney

Gianna Scatchell Basile, Esq.
DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300
Chicago, Illinois 60601
(312) 506-5511 ext. 330
Gia@dispartilaw.com

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that she served this Plaintiff's Motion for Extension of Time to file Plaintiff's Expert Disclosures to all counsel-of-record via this Court's CM/ECF filing system on December 27, 2023, and that such counsels are registered efilers.

By: /s/ *Gianna Scatchell Basile*

# EXHIBIT B -

# DR. DILLARD DEPOSITION

Page 257

               IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                      EASTERN DIVISION

SYDNEY DILLARD,              )
                             )
            Plaintiff,       )
                             )
        vs.                  )    No. 1:20-CV-7760
                             )
DEPAUL UNIVERSITY,           )
                             )
            Defendant.       )


            The continued deposition of SYDNEY

DILLARD, PH.D., the Plaintiff herein, called as a

witness by the Defendant, pursuant to the Rules of

Civil Procedure for the United States District

Courts, taken remotely via Zoom videoconference

before Sheri L. Arendt, C.S.R., on Tuesday,

19th day of April, 2022, commencing at the hour of

10:00 a.m. o'clock.




Magna Legal Services Company
(866) 624-6221
www.MagnaLS.com, by:
Sheri L. Arendt, CSR



Page 258

```
 1   APPEARANCES:
 2      DISPARTI LAW GROUP
        121 West Wacker Drive, Suite 2300
 3      Chicago, Illinois 60601
        (312) 506-5511
 4      gia@dispartilaw.com, by:
 5         GIANNA SCATCHELL, ESQ.,
 6         appeared on behalf of the Plaintiff;
 7
        COZEN O'CONNOR
 8      123 North Wacker Drive, Suite 1800
        Chicago, Illinois 60606
 9      (312) 382-3100
        awermuth@cozen.com
10      brittanygreen@cozen.com, by:
11         ANNA WERMUTH, ESQ. and
           BRITTANY GREEN, ESQ.,
12
        appeared on behalf of the Defendant.
13
14
15         *  *  *  *
16
17
18
19
20
21
22
23
24
```

Page 259

```
 1                    INDEX
 2
 3   WITNESS:  SYDNEY DILLARD, PH.D.
 4
 5   EXAMINATION BY:              PAGE
 6   Ms. Wermuth              261
 7   Ms. Scatchell            390
 8   Ms. Wermuth              538
 9
10   EXHIBITS
     No. 145              262
11   No. 3                263
     No. 38               263
12   No. 30               280
     No. 24               283
13   No. 76               299
     No. 32               315
14   No. 33               315
     No. 42               316
15   No. 43               317
     No. 146              320
16   No. 36               320
     No. 40               321
17   No. 39               322
     No. 48               331
18   No. 49               332
     No. 67               333
19   No. 75               334
     No. 84               336
20   No. 85               337
     No. 97               340
21   No. 104              341
     No. 47               347
22   No. 2                353
     No. 50               358
23   No. 121              363
     No. 11               379
24   No. 147              386
```

Page 260

```
 1   No. 67               431
     No. 148              440
 2   No. 88               469
     No. 149              512
 3   No. 150              519
     No. 151              522
 4   No. 85               528
     No. 152              529
 5   No. 154              531
     No. 156              532
 6   No. 155              537
 7
 8
 9
10
11
12         *  *  *
13
14
15
16
```

```
17         MS. WERMUTH:  Let's go on the record.
18   Good morning, and thank you everybody for
19   returning.  We are here today to continue the
20   deposition of Dr. Sydney Dillard, case
21   No. 20-cv-7760.
22         Dr. Dillard, do you understand
23   that you are still under oath today?
24         THE WITNESS:  I do, yes.
```

Page 261

```
 1         SYDNEY DILLARD, PH.D.,
 2   called as a witness by the Defendant, having been
 3   previously duly sworn, was examined and testified
 4   further as follows:
 5         E X A M I N A T I O N (cont.)
 6         By Ms. Wermuth:
 7    Q    Okay.  Thank you.  Dr. Dillard,
 8   before we got on the record, you indicated that
 9   you have a bit of a cold or some sort of bug, and
10   that you are going to be taking cough medicine.
11   Have you taken any medicine in the last 24 hours
12   to treat your cold?
13    A    No.
14    Q    Okay.  And when you say you are going
15   to take cough medicine, when do you plan to do
16   that?
17    A    In less than a minute, once my
18   husband finishes making it for me.
19    Q    What sort of cough medicine is it,
20   what's the brand?
21    A    It's Theraflu.  Can you see that?
22   (Indicating.)  Theraflu Severe Cold Daytime.
23    Q    Do you have any reason to believe,
24   Dr. Dillard, that it will interfere with your
```



Page 262

1 ability to testify accurately and honestly today?
2    A    No, I don't believe it will.
3    Q    Okay.  Terrific, thank you.  Does
4 everybody now have the email with the attachment,
5 Exhibit 145?
6    A    Yes, I do.
7    Q    Dr. Dillard, I would like to mark
8 this officially now for the record as Exhibit 145.
9         (Exhibit No. 145 identified.)
10 BY MS. WERMUTH:
11   Q    Dr. Dillard, do you recognize this
12 letter?
13   A    Yes.  This, yes.
14   Q    Okay.  And this was the letter that
15 you received on or about September 26th, 2019, is
16 that right?
17   A    That's correct.
18   Q    This sets forth your accommodations
19 for the academic year 2019-2020?
20   A    That is correct.
21   Q    Thank you.  Dr. Dillard, do you still
22 have the exhibit binder in the box that we sent
23 you?
24   A    Yes, it's on the floor in the corner.

Page 263

1    Q    Do you want to go ahead and take that
2 binder out for us, please?
3    A    Sure.
4    Q    Thank you.  And if you would please
5 turn to Exhibit 3?
6         (Exhibit No. 3 identified.)
7    THE WITNESS:  It takes up a lot of
8 space.  Just one moment.
9 BY MS. WERMUTH:
10   Q    Sure.
11   A    You said what, Exhibit 3?
12   Q    Is that the EEOC charge that you
13 filed in connection with your lawsuit?
14   A    Yes.
15   Q    You filed it on August 13, 2019, is
16 that right?
17   A    Yes.
18   Q    Can you turn to Exhibit 38, please?
19   A    All right, Exhibit 38.
20         (Exhibit No. 38 identified.)
21 BY MS. WERMUTH:
22   Q    Do you recognize those documents?
23   A    It looks like it might be a 2017 W-2.
24   Q    So in Exhibit 38, I see W-2's from

Page 264

1 2017 through 2019.
2    A    Oh, okay.
3    Q    Or through 2020.  Do you see that?
4    A    I have to go backwards.  Yes, 2017
5 through 2020.  2020 is the last one.
6    Q    Thank you.  Those are your W-2's that
7 you produced to us, correct?
8    A    Correct.
9    MS. WERMUTH:  Okay.  Dr. Dillard,
10 Gia, I am assuming the 2021 has been issued at
11 this point since taxes were due yesterday.  So if
12 you have a minute, if you could please get us the
13 2021 W-2?
14   MS. SCATCHELL:  If I can.  Did you
15 guys file your taxes, Sydney, or did you get an
16 extension?
17   THE WITNESS:  I got an extension.  I
18 didn't file yet.
19   MS. WERMUTH:  I'm just asking for the
20 W-2.  I'm not asking for the tax return at this
21 point.
22   MS. SCATCHELL:  Okay.  Can you send
23 me the W-2 when you have a chance, Sydney?
24   THE WITNESS:  After the deposition or

Page 265

1 at this moment?
2    MS. SCATCHELL:  After the deposition
3 is fine.
4    THE WITNESS:  Okay.
5 BY MS. WERMUTH:
6    Q    Okay.  Dr. Dillard, could you please
7 turn to Exhibit 1?  And you may want to actually
8 remove that from the binder because we are going
9 to be looking at that in conjunction with some
10 other exhibits as well.  Okay?
11   A    Yes.  I have it out.
12   Q    Terrific.  Last week when we were in
13 deposition you indicated that this was the Second
14 Amended Complaint that you filed in this case,
15 correct?
16   A    I believe so, yes.
17   Q    Could you please turn to
18 Paragraph 25, which is on Page 5?
19   A    Yes.
20   Q    I'm sorry.  Wrong page.  Could you
21 turn to Page 7, Paragraph 31?
22   A    Okay.  I see it.
23   Q    Okay.  And Paragraph 31 states:
24 While working for DePaul, Plaintiff was subjected

MAGNA ◆
LEGAL SERVICES

Page 266

1   to an ongoing hostile work environment based on
2   her race in the following ways.  Do you see that?
3        A    Yes.
4        Q    Okay.  And then there are a series of
5   paragraphs sub-marked A through G.  Do you see
6   that?
7        A    I do.
8        Q    So let's start with subparagraph A.
9   You write that:  Non-minority employees similarly
10  situated to Plaintiff were given one-on-one
11  assistance and coaching regarding their
12  performance on the path to obtaining tenure, and
13  Plaintiff was not.
14             Could you tell me who those
15  non-minority employees are that you are referring
16  to in that paragraph?
17       A    Yes.  From my knowledge, Michael
18  Devlin and Lou.  I don't know Lou's last name.
19  Those are two ex-employees of DePaul that were
20  white men who had been requested to go -- I think
21  to go through an additional review perhaps.  But
22  in -- but they were given opportunities.  In fact,
23  I was told by one of them that several faculty
24  members, senior faculty members had offered to

Page 267

1   meet with them regularly one on one and help guide
2   them and steer them to become better and more
3   prepared for tenure promotion.
4        Q    Did you ask anyone to do that with
5   you?
6        A    Early in my career, during my first
7   year I did.  I asked Teresa Mastin to assist me.
8        Q    And did she?
9        A    She assisted me in terms of research,
10  yes, not in terms of teaching or service.  But in
11  terms of research, she did assist me.
12       Q    And is it your contention that Teresa
13  Mastin discriminated against you based on your
14  race?
15       A    I haven't thought about it.  She's
16  been gone since 2014.  So it was a long time ago.
17       Q    As you sit here today, you can't say
18  whether or not you are making allegations that
19  Teresa Mastin discriminated against you based on
20  your race?
21       A    I'm not sure at this moment.  I'd
22  have to think about it.  I never thought about
23  Teresa at that time because I hadn't even thought
24  about being discriminated against while she was

Page 268

1   there.  So I'd have to think about it more and
2   maybe think about her interactions with me to
3   decide if I think she was discriminating against
4   me in any way.
5        Q    You filed your lawsuit in April
6   of 2021, or this version of your lawsuit in April
7   of 2021; correct?
8        A    That's what it says, yes.  Yes.
9        Q    More than a year ago, correct?
10       A    We are in April now, so how is that
11  more than a year?
12       Q    It was filed -- this was your Second
13  Amended Complaint which was filed on April 7th of
14  2021.  Today is April 19th of 2022, correct?
15       A    Yes.  So a year and some days.
16       Q    Okay.  Did you ever ask anyone to
17  provide you with one-on-one assistance or coaching
18  regarding your teaching?
19       A    I did, yes.
20       Q    Who did you ask?
21       A    I asked ▮▮▮▮ ▮▮▮▮ when he was the
22  personnel chair.
23       Q    When did you ask ▮▮▮▮ ▮▮▮ to do
24  that?

Page 269

1        A    I think in 2017.  And he kept
2   avoiding me actually.  He eventually sat with me,
3   but he never helped me in terms of developing my
4   teaching.  He just told me that I had to go
5   through an additional review and what the
6   personnel committee suggested that I work on.
7        Q    So he gave you some feedback when you
8   met with him?
9        A    No, that's not feedback because all
10  of that information was already given to me.  So I
11  don't think that's substantial feedback.  If you
12  repeat what's already told, that's not important
13  feedback.
14       Q    And when did Michael Devlin -- and is
15  it Lou Rutigliano, does that sound right?
16       A    That might be right.  I'm sorry, I
17  don't know Lou's last name.
18       Q    When did Michael Devlin and Lou
19  receive the one-on-one coaching that you referred
20  to here?
21       A    Well, I had my first review in 2013,
22  so it must have been at least in 2014, so at least
23  2014.
24       Q    And they told you that at the time?



Page 270

1      A    Michael told me.  Lou did not tell
2  me. ▮▮▮  Calvente told me about Lou getting
3  support.
4      Q    You have no first-hand knowledge
5  about Lou getting support, correct?
6      A    Yes, you are correct.
7      Q    All right.  Paragraph -- subparagraph
8  B, non-minority employees were subjected to less
9  stringent evaluations than Plaintiff -- strike
10  that.  I'm sorry.
11           Did Lou, was he awarded
12  tenure?
13      A    I don't know.
14      Q    Michael Devlin, was he awarded
15  tenure?
16      A    I don't know.
17      Q    They have both moved on from the
18  University?
19      A    Yes, they are both gone.
20      Q    Do you know if either one of them --
21  there was a recommendation for non-renewal?
22      A    I don't know.  If you are asking
23  about tenure, I think Devlin, Mike Devlin received
24  tenure at whatever university he ended up going

Page 271

1  to.  I'm pretty certain he did.
2      Q    What about at DePaul?
3      A    He received a teaching award
4  actually.
5      Q    My question is -- and I'm sorry, I
6  wasn't clear.  Did Michael Devlin receive tenure
7  from DePaul?
8      A    I don't know.
9      Q    Did Lou, whoever Lou is, white male
10  Lou, did he receive tenure at DePaul?
11      A    I don't know.
12          MS. SCATCHELL:  Actually that's --
13          THE WITNESS:  I think the better
14  person to ask would be probably one of the deans
15  because they would be the ones to deal with
16  personnel.
17  BY MS. WERMUTH:
18      Q    I'm just asking you, Dr. Dillard.  If
19  you don't know, you can tell me you don't know.
20      A    I don't know.
21      Q    Non-minority employees were subjected
22  to less stringent evaluations than Plaintiff,
23  allowing them to obtain tenure sooner than
24  Plaintiff.  Who are you referring to in that

Page 272

1  paragraph?
2      A    I am referring to, for instance, one
3  of my colleagues, Rajul Jain to give you an
4  example of that.
5      Q    And you say that she obtained tenure
6  sooner than you.  Can you explain that to me?
7      A    Well, she obtained tenure a
8  year prior to me, even though her and I had went
9  to the -- started at the University at the same
10  time.  So when I was talking about less stringent
11  evaluations, you know, looking at the materials
12  that -- well, she sent me her materials after she
13  left the University, and I saw in her evaluations
14  that she had scores that were lower than mine in
15  numerous classes.  And when it was time for
16  personnel and faculty members to vote as well as
17  the dean to decide on whether to renew her
18  contract and to keep her and say she was making
19  progress towards tenure in the category of
20  teaching, she was not required to teach, to go
21  through an additional review even though my scores
22  might have been higher.  And also in some cases,
23  also, her perfect scores, like if she ever got
24  five out of five, those scores were highlighted

Page 273

1  and commended.  They were saying, oh, great job,
2  versus in the situations in which I would have
3  perfect scores and students really enjoyed my
4  coursework, those were overlooked and not even
5  included as a discussion point in the -- you know,
6  in our dean's letters.  So that's what I mean by
7  less stringent evaluations.  So she was able to go
8  up earlier.
9           And if that happens over time,
10  that's to me a sign, again, when you are going up
11  for tenure, that happens over time.  And so each
12  year if you are getting -- being evaluated more
13  harshly and others are given less stringent
14  evaluations, that gives them the opportunity to
15  move up quicker in their career.
16      Q    Okay.  So my question was:  Did
17  Dr. Jain obtain tenure sooner than you?
18      A    Yes.
19      Q    And you testified that she went up
20  one year prior to you, even though you started at
21  the same time, correct?
22      A    Yes, I believe that to be true.
23      Q    Okay.  Now, you started at the same
24  time, but you also paused your clock for one year;



Page 274

1 correct?
2     A     That is correct.
3     Q     Okay.
4     A     That still means I can go up early.
5     Q     That wasn't my question.  You paused
6 your clock for one year, correct?
7     A     Yes, I did.
8     Q     And so -- and Dr. Jain did not go up
9 early for tenure early, right?  She went forth on
10 the schedule set forth, the regular schedule set
11 forth in the handbook?
12     A     I don't know if she paused her clock
13 or not.  I don't know if she went up early or not.
14     Q     Okay.  So you say that she gave you
15 her reviews after she left.  So she's gone from
16 the University, is that correct?
17     A     She has left the University, yes.
18     Q     And she left back in 2018, is that
19 correct?
20     A     I don't exactly remember when she
21 left honestly.
22     Q     Okay.  And you said she gave you
23 information about her review.  How many reviews
24 did she give you?

Page 275

1     A     I can't tell you exactly how many.  I
2 mean, she must have gone through at least three,
3 so perhaps between one and three.
4     Q     Okay.  Did you produce everything to
5 us that she gave to you?
6     A     Yes, I did.
7     Q     Okay.  And are you -- is there a
8 particular review that you say she was subjected
9 to less stringent evaluations than you?  Is there
10 a particular review that you are referring to?
11     A     I'm sure if I had the reviews in
12 front of me, then I could pinpoint exactly where
13 they are.
14     Q     So if you look at Exhibit 1, which
15 you have in front of you, there is a footnote on
16 Page 4.  Do you see that?
17     A     Yes.
18     Q     Okay.  So and that footnote lays out
19 the dates on which you received your formal
20 reviews, is that correct?
21     A     Yes.  This appears to be accurate.
22     Q     So are you saying in this paragraph B
23 that Dr. Jain was evaluated differently in every
24 single -- strike that.

Page 276

1               I guess what I'm trying to
2 understand, are there particular reviews that you
3 contend -- of yours, as set forth in footnote one
4 that you contend were more stringent?
5     A     I would have to see the reviews to
6 point out the differences.  I can't necessarily
7 say which reviews of hers were different.  But I
8 did notice, in general, that there were some
9 discrepancies from what she gave me and what I saw
10 in my reviews.
11     Q     And in particular, you are talking
12 about scores on teaching evaluations?
13     A     I'm talking about the entire
14 document, not just scores, but the language that's
15 used.  For instance, for the example that I just
16 gave, like, commending someone for having perfect
17 scores and then deciding not to commend another
18 person for that; or having lower scores in some
19 form of teaching modality, for instance, teaching
20 online versus face to face.  So saying great job,
21 and then noticing, for instance, me having lower
22 scores in a face-to-face and then being forced to
23 teach more face to face versus someone else having
24 lower scores when they teach online and then them

Page 277

1 not being forced to teach in that modality.  So
2 different applications of criteria that is
3 subjectively being applied between different
4 candidates, with mine being more stringent.
5     Q     Is teaching online required of
6 faculty in the College of Communication?
7     A     Teaching is required of faculty.
8 Teaching online and in person are both required of
9 faculty if that's the courses that you are
10 required to teach.
11     Q     So my question is:  Is there a
12 requirement of the College faculty to teach
13 courses online?
14     A     There is a requirement to teach
15 online and face to face because online is still
16 teaching.  Teaching is teaching, and it really
17 doesn't matter the modality, doesn't change in the
18 amount of money that the University receives in
19 terms of tuition and costs.  It costs the same to
20 teach an online class as face-to-face.  So in
21 general, teaching online is required just like
22 face-to-face is required.
23     Q     Is it your testimony that every
24 single member in the College of Communication is



Page 278

1 required to teach an online course?
2 A Every faculty member is required to
3 teach whatever they are required to teach. I
4 don't understand your question. Are you saying
5 are we required to teach online? If that's what
6 we are given, yes.
7 Q If that's what you are assigned.
8 A If you are assigned to teach online,
9 yes, you are supposed to teach it unless you work
10 out something with your program chair or the dean.
11 You know, we have exceptions that can be made.
12 Q Okay. And so if we -- when you say
13 that you were subjected to more stringent
14 evaluations and required to teach face to face,
15 you are referring to your March 3rd, 2017 formal
16 review, is that correct?
17 A That particular review was the review
18 where that requirement was placed -- you know
19 what, it wasn't a requirement at first. It seemed
20 like it was a recommendation. However, it became
21 a requirement. It seemed to become a requirement.
22 As you can see, I think we have emails somewhere
23 in here in which I changed my teaching schedule to
24 consider the recommendation. And when I made

Page 279

1 those changes, I was -- it was recommended that I
2 continue to increase my face-to-face classes and
3 no longer teach online.
4 And then only after I did very
5 well in my face-to-face classes, which I have done
6 before, and after I complained about me being
7 treated differently and no one else having that
8 same requirement, then they changed it back.
9 They, being my colleagues, my program chair,
10 changed it back to not only face to face even
11 though I was forced to go through a review because
12 they were concerned, quote unquote, concerned
13 about my teaching in face-to-face classes.
14 Q Was it the March 3rd, 2017 formal
15 review that made the recommendation that you teach
16 more face-to-face courses?
17 A I would have to see them. I believe
18 so because 2017 is right before I went up for
19 tenure so -- let me look. Let me think. First
20 one, second one, go through another review, third
21 one. I think it was 2017 actually.
22 Q That's what I asked you. Was it --
23 A Oh, I'm sorry, I thought you said
24 2015. Yes, 2017.

Page 280

1 Q Could you please turn to Exhibit 30?
2 (Exhibit No. 30 identified.)
3 THE WITNESS: Keep this out?
4 BY MS. WERMUTH:
5 Q Yes, you can keep that out. That's
6 fine. And actually, keep that footnote one by you
7 in Exhibit 1, if you would.
8 A All right. I'm on 30.
9 Q Okay. So in footnote one, it
10 indicates that you had a teaching review -- or a
11 formal review on March 23 of 2015, and two years
12 later in March of 2017, right?
13 A I would say that's less than two
14 years, but I can see what you are trying to point
15 at.
16 Q If you can see Exhibit 30? Do you
17 have Exhibit 30 in front of you?
18 A Yes, I do.
19 Q And Exhibit 30, those are your
20 historical -- that's historical data related to
21 scores that you received on your teaching
22 evaluation, is that right?
23 A Yes, this is -- yes, I believe this
24 is historical data.

Page 281

1 Q Okay. And so if you look at the --
2 do you see how there are columns with terms, 2014
3 to '15, winter. Do you see that?
4 A Maybe further in. Let me see.
5 Q Page 583.
6 A Okay, yes. I see it.
7 Q Do you see up above there, those
8 columns, the first one is 2014 through 2015
9 winter?
10 A Yes, I do see that.
11 Q If you go four columns in to
12 2014-2015 spring, do you see that?
13 A Yes, I do.
14 Q Okay. And there is HTHC 520, do you
15 see that?
16 A Yes.
17 Q That's a graduate course that you
18 taught in the spring of 2015, is that right?
19 A That's correct.
20 Q Okay. And that was a face-to-face
21 class?
22 A I think, yes. I don't think -- I
23 think that class had four or five students in it.
24 I remember that.



7 (Pages 278 to 281)

Page 282

1    Q    You see your scores in that class for
2  that quarter?  There are a fair number of red or
3  sort of pink boxes that show low scores.  Do you
4  see that?
5    A    There are some.
6    Q    And if you go two columns in to
7  2014-2015 spring, PRAD 595, do you see that
8  column?
9    A    Yes, I do.
10    Q    That was another face-to-face course?
11    A    That was the same face-to-face course
12  that was cross-listed with five students.
13    Q    I see.  Okay.  Those scores relate to
14  the same course?
15    A    Yes.  Those scores relate to the same
16  class that was cross-listed across health
17  communications and public relations and
18  advertising that had five students in it.
19    Q    Okay.  And those spring 2015 courses
20  were courses that you taught after your March 25,
21  2015 review was given to you?
22    A    Well, actually, the review was on the
23  23rd.  And the class started probably during the
24  review or shortly after the review.

Page 283

1    Q    So the scores for this class were not
2  available to your peer reviewers for the 2015
3  review, is that correct?
4    A    No.  Yes, that would be correct.
5  These would not have been available.
6    Q    But they were available then for the
7  2017 review?
8    A    Yes, they would, um-hum.
9    Q    Thank you.  All right.  If you would
10  turn to Exhibit 24?
11    A    I'm there.
12        (Exhibit No. 24 identified.)
13  BY MS. WERMUTH:
14    Q    Do you recognize that document?
15    A    It looks like Rajul Jain's historical
16  report.
17    Q    Okay.  And do you -- this is
18  something she gave to you?
19    A    Yes, she gave this to me.
20    Q    Okay.  Do you normally, like, in
21  your -- do you have access to other faculty
22  members' evaluations?
23    A    Well, I do now, but at the time I
24  didn't.

Page 284

1    Q    And how is it that you have access to
2  that information now?
3    A    I had to request it from the program
4  chair.  But I'm -- as I plan and schedule courses
5  for the graduate program, I have to review
6  teaching effectiveness to see if certain faculty
7  members need any assistance in their teaching or
8  development so I can provide assistance or make
9  scheduling plans for the upcoming year.
10    Q    And so you produced to us dozens of
11  scores of faculty members from 2018 and 2019.  How
12  did you obtain those scores?  I know that this was
13  given to you by -- or Exhibit 24 was given to you
14  by Dr. Jain.  But how did you obtain the other
15  ones from 2018 and 2019?
16    A    What other ones?
17    Q    You produced to us OTE's from
18  numerous other faculty, dozens, from 2018, 2019
19  academic year.  How did you obtain those?
20    A    Can you show me where those are
21  because I don't see those?
22    Q    I don't have those marked as an
23  exhibit.  Those are in the production that you
24  sent to us.

Page 285

1    A    I need to see them.
2        MS. SCATCHELL:  Anna, do you have
3  page numbers?
4        MS. WERMUTH:  Yes, Brittany will get
5  those, and we will circle back on that question,
6  and you can tell me how you got those.  But I can
7  tell you right now that they are -- hang on just a
8  moment.  They include OTE's for ████ Willard,
9  David Brenders, Jean-Claude Teboul, Timothy Cole,
10  Carolyn Bronstein, David Morris, Leah Bryant, Dan
11  Makagon, Luiesela Alvaray.  I mean, there is
12  literally almost four-dozen individuals for whom
13  you produced to us OTE's from the 2018-2019
14  academic year.  So I would like to know how you
15  obtained that information.  So we'll get you the
16  Bates numbers.
17  BY MS. WERMUTH:
18    Q    Now, is this the Exhibit 24, the
19  information that you rely on to say that your
20  scores were better than her scores such that
21  she -- that you were subjected to greater
22  scrutiny?
23    A    I would have to take a look at all of
24  those that were submitted.  But this would be one



Page 286

1  of the examples of the teaching scores in which I
2  had better scores or had perfect scores and was
3  overlooked.  I think you are comparing different
4  years.  This says 2012.  And the one that we just
5  looked over I think said 2014 or '15.  So we are
6  looking not at apples to apples at this point I
7  don't think.
8      Q    Well, you see there are three pages
9  here, Dr. Dillard?
10     A    I see the second and third page,
11  okay.
12     Q    Okay.  And these are the pages that
13  you produced to us, correct?
14     A    Yes, I know I produced these.
15     Q    Okay.  All right.  Is there anyone --
16  going back to Exhibit 1, Paragraph 31(b), is there
17  anyone else in that paragraph other than Dr. Jain
18  that you are referring to there?
19     A    At the time, no.  She was the only
20  person that provided her reviews to me.
21     Q    Okay.  All right.  Paragraph 31(c)
22  you say that you were required to teach more
23  face-to-face instruction than any non-minority
24  employee in the College of Communication.  What

Page 287

1  period of time were you required to teach more
2  face face-to-face instruction than any
3  non-minority in the College of Communication?
4      A    That would be following my --
5  following the 2017 review.  So following that is
6  when they recommended that I change all my classes
7  to face to face, which I did.  And I started
8  designing my coursework to mirror that.  And,
9  yeah.
10     Q    So are you saying that for one
11  academic year, 2017-2018, you were required to
12  teach more face-to-face instruction than any
13  non-minority?
14     A    I'm sorry.  My computer went out for
15  a second there.
16     Q    So I'm asking, you said it was after
17  the 2017 review.  So for how many academic years
18  after the 2017 review were you required to teach
19  more face-to-face instruction than any
20  non-minority employee in the College?
21     A    I'm still not understanding.  How
22  long or when did it begin?
23     Q    Not when did it begin.  Here is the
24  question.  For how many years --

Page 288

1      A    For how many years.
2      Q    After -- let me finish because we are
3  going to clarify this.
4              For how many years after your
5  2017 review were you required to teach more
6  face-to-face instruction than non-minority
7  employees in the College?
8      A    I would say one quarter.  It wasn't
9  for a year.  They required it for the year.  But
10 after I complained about me being treated
11 differently and then applying different standards
12 to me, they flip-flopped and changed it back to
13 being able to teach more than just face to face.
14 So if you are looking for a timeframe, it wouldn't
15 be an entire year.  It would be for at least one
16 quarter that I was required to teach face to face.
17 However, they told me it would have to be for a
18 year.
19     Q    And what quarter then?  What quarter
20 were you required to teach more face-to-face
21 instruction than any other employee in the College
22 of Communication?
23     A    I would say that would be the fall
24 of 2017 at least.

Page 289

1      Q    And so if I were to pull schedules of
2  everyone who taught in 2017 in the College, I
3  would see that you had more face-to-face courses
4  than any other faculty member?  Is that what --
5      A    What you would see is that there are
6  probably some faculty that taught face to face,
7  but they weren't required in the same sense that I
8  was in review.  What you would find is that no
9  person who has gone through a review was required
10 to teach only face to face in the way that I was.
11     Q    Okay.  And you said you complained
12 about that requirement.  Who did you complain to?
13     A    I complained to ███ ███.  I
14 complained to Lexa Murphy or Alexandra Murphy.  I
15 complained to Salma Ghanem and to ███ ███.
16 Initially, I just tried to go along with it
17 because I'm, you know, a very cordial person, and
18 I thought what was happening to me at the time was
19 support.  But then later, like I said, after
20 running into these types of information, I
21 realized that it wasn't support, I was just being
22 given differential treatment.
23     Q    And so the people you complained to
24 were Dr. Murphy, Dr. ███, Dr. ███, and

MAGNA
LEGAL SERVICES

Page 290

1  Dr. Ghanem, is that right?  I just want to make
2  sure that I got that right.
3      A     For certain those who were on the
4  leadership team, yes.  I probably told Maria
5  DeMoya and colleagues, but those were the people
6  that I went to in their leadership capacity for
7  assistance, and Dr. Bronstein as well.
8      Q     Dr. Bronstein as well?
9      A     Yes.
10     Q     When you talked to those five
11 leadership folks, Dr. Murphy, Dr. ████, Dr. ████,
12 Dr. Ghanem, Dr. Bronstein, did you say:  I think
13 I'm being discriminated against based on my race?
14     A     No.  At the time -- I told you, at
15 the time I wasn't aware of what was exactly
16 happening.  It took me time to actually see that I
17 was being treated differently.
18     Q     Okay.
19     A     It wasn't necessarily right at that
20 moment that I said, oh, I'm being discriminated
21 against because at the time I was trying to do
22 what I thought was -- what they were saying was
23 supposed to help me develop as a faculty member.
24 But I did ask why was I being treated differently.

Page 291

1  I didn't say why am I being treated differently
2  because of my race or ethnicity or gender or
3  domestic status.  That's not what I said.  I just
4  said:  Why am I being treated differently in this
5  case?
6      Q     When you say "domestic status," what
7  are you referring to?
8      A     I am referring to being a US-born
9  minority.
10     Q     Your Complaint does not have any
11 allegation of national origin discrimination.
12     A     I would have to take a look at that
13 because I did tell my attorney at the time that
14 that was something that we should take into
15 consideration.
16     Q     Well --
17         MS. SCATCHELL:  I am going to object.
18         MS. WERMUTH:  I'm sorry?
19         MS. SCATCHELL:  I am going to object
20 to this line of questioning as it calls for a
21 legal conclusion.  You can answer.
22         MS. WERMUTH:  There is not a question
23 pending, but I will ask a new question.
24

Page 292

1  BY MS. WERMUTH:
2      Q     Did you review Exhibit 1 before it
3  was filed?
4      A     Exhibit 1, the one that we are
5  looking at, the Second Amended -- are you talking
6  about the Second Amended Complaint?
7      Q     Yes, Exhibit 1.  Did you review that
8  before it was filed in court?
9      A     I took a look at it, yes.
10     Q     Okay.  Going back to Exhibit 1,
11 Paragraph 31(d), I think we already talked about
12 this in connection with 31(b), but it says:
13 Plaintiff was admonished for low scores, while
14 non-minority employees with lower scores were not
15 admonished.  Are you talking there about Dr. Jain?
16     A     I'm talking about faculty members in
17 general because I talked to numerous faculty
18 members that were going through review, and this
19 included Maria DeMoya, Rajul, Yeuseung ████, later
20 Robin Hoecker, just a number, even Jill ████,
21 just a number of tenure-line faculty members about
22 their experiences.  And when I talked to them
23 about having lower scores, they all acknowledged
24 that they hadn't been required to teach another

Page 293

1  class even if their scores may or may not have
2  been below the College mean.
3         And again, I mean, the biggest
4  thing is about not having an actual standard set,
5  right.  So if there is no -- there is no rule that
6  says it needs to be above the mean or below the
7  mean that the colleague used.  We are changing
8  that now, right.  We are going to another review
9  of our team policies to be more strict because of
10 this type of situation.  But I was referring to
11 numerous faculty members who had explained to me
12 that they didn't -- they were not admonished even
13 if their scores were lower.
14     Q     Do you know if Maria DeMoya, Rajul
15 Jain, Dr. ████, Dr. Hoecker, or Dr. ████ had
16 scores lower than yours in face-to-face courses?
17     A     I can't remember off the top of my
18 head.  But when I talked to them in general, they
19 said when they had lower scores, they weren't
20 required to go through another review.
21     Q     Okay.  And by the way, the race of
22 Maria DeMoya is what?
23     A     I don't know what she considers
24 herself.  I know she was born in the Dominican

Page 294

1   Republic.
2       Q     She is not Caucasian?
3       A     I can't assume that she's Caucasian
4   because I know someone else who was born in Latin
5   America who identifies themselves as Caucasian. I
6   think that's a question for her.
7       Q     Well, you used the word "non-minority
8   employees." So you are identifying people that
9   you claim are not minorities. So I'm trying to
10  understand how you reach the conclusion that
11  Dr. DeMoya, Dr. Jain, Dr. ███, Dr. Hoecker, and
12  Dr. ████ are non-minority. So what's the basis
13  for your allegation?
14      A     And what's your question again? Do
15  you mind repeating that?
16      Q     Your allegation is you were
17  admonished for low scores while non-minority
18  employees with lower scores were not admonished.
19  I asked you to identify the non-minority employees
20  who were not admonished, and you identified four
21  or five individuals.
22      A     I gave you some examples, yes.
23      Q     Well, are there others? Because you
24  make this allegation, and I need to know who you

Page 295

1   are talking about.
2       A     Well --
3       Q     And I also need to understand the
4   basis of your allegation that the five people that
5   you named are non-minority.
6       A     Well, the basis for me when I was
7   putting this together were people that were not
8   considered US-born minorities. So for me, I'm
9   looking at that in reference to, for instance, I
10  think ███ Calvente, she considers herself -- I
11  didn't know that she did, but she considers
12  herself African-American. And so -- but she is US
13  born. She would be a non-minority -- I'm sorry,
14  she would be a minority employee in my perception.
15  And after talking to, say, Maria DeMoya, she has
16  also explained to me that when she came to the US,
17  she didn't even consider herself a minority. So
18  that's why I placed them in that category of
19  non-minority based off the conversations that I
20  had with them.
21      Q     And you indicated that these five
22  individuals were only examples. Are there other
23  individuals that you are referring to in
24  Paragraph 31(b)?

Page 296

1       A     I can't think of it off the top of my
2   head right now, but something might come to me
3   later.
4       Q     This is my only opportunity to depose
5   you.
6       A     Hold on one second.
7           MS. WERMUTH: Off the record, please.
8             (Discussion off the record.)
9           MS. WERMUTH: Back on the record.
10  BY MS. WERMUTH:
11      Q     Dr. Dillard, this is my only
12  opportunity to depose you. Can you be any more
13  clear about who you are referring to in
14  Paragraph 31(d) other than what we've already
15  discussed?
16      A     That's all I can remember at this
17  time. Perhaps if something comes up before the
18  end of the deposition, I'll be happy to include
19  it.
20      Q     Thank you. All right.
21  Paragraph 31(e), it says: Plaintiff requested to
22  be a chair of a search committee on one occasion
23  which would have demonstrated her level of service
24  to a committee and criteria for tenure. Instead,

Page 297

1   Plaintiff was forced to co-chair the committee
2   with a non-qualified employee. So when you write
3   that you requested to be chair of a search
4   committee on one occasion, what timeframe are you
5   referring to there?
6       A     I believe this was in 2018.
7       Q     In the summer?
8       A     Well, the communication went back and
9   forth early -- it might have been late spring all
10  the way to the summer.
11      Q     Okay. And you asked your program
12  chair, ████, if you could be the sole chair
13  of the committee, is that right?
14      A     I did request that I be the chair of
15  the committee. I didn't ask to be the sole chair,
16  I asked to be the chair. And then I was
17  informed that -- in fact, it was really
18  interesting because I even wasn't informed that
19  they had already decided who was going to be the
20  co-chairs. And I found out at a lunch when we
21  were going to celebrate Dr. DeMoya's tenure and
22  promotion and Dr. █████, ███ █████, a junior
23  faculty member who I was on the committee for that
24  hired, he informed me that he was going to be the

Page 298

1    chair of the committee. He didn't say co-chair I
2    don't think. He said chair. And I was kind of
3    taken back because I hadn't had or heard that
4    conversation. And then that -- I went back to
5    ▓▓▓ and asked her could I be the chair because
6    out of everyone at the University, at least in my
7    program that was tenure or tenure track, everyone
8    had had the opportunity to be the chair of a
9    committee or hold a leadership role. And any time
10   that I was asked to join, I was not given that
11   opportunity.
12              And yes, there was a
13   non-qualified employee because he hadn't even
14   become an assistant professor, and now he was
15   about to chair a committee while he wasn't even an
16   assistant professor yet, hadn't taken on that
17   title yet and hadn't even been at the University
18   for a year yet, but somehow rose to the position
19   of chair before even sitting on a committee to do
20   this type of work after I had been on at least
21   four different search committees as a member.
22       Q    And ▓▓▓ provided you with an
23   explanation for the decision to have the
24   co-chairs, is that right?

Page 299

1    A    I'm sure she did. I'd have to see
2    the email, but I'm pretty certain that she gave me
3    a reason. She didn't ignore me or anything, no.
4    I would have to look at the emails though.
5    Q    If you could turn to Exhibit 76. And
6    if you would like to go off the record, and read
7    it, we can go off the record, okay? Gia, is that
8    okay with you so that's fairly lengthy?
9              MS. SCATCHELL: Yes, I prefer that.
10   I didn't want to interrupt.
11             (Exhibit No. 76 identified.)
12             (Discussion off the record.)
13             MS. WERMUTH: Back on the record.
14   BY MS. WERMUTH:
15   Q    So that email trail begins with an
16   email from you to Dr. ▓▓▓, correct?
17   A    Yes.
18   Q    Okay. And that -- the first email is
19   dated June 19th -- I'm sorry, June 18th of 2018?
20   A    Yes, um-hum.
21   Q    Okay. So you reach out to her with
22   questions about the search committee for replacing
23   you say Yeuseung. Is that Yeuseung ▓▓▓?
24   A    Yes, yes. That was about me asking

Page 300

1    because I had already informed her that I was
2    interested in the position prior to.
3    Q    Okay. And as of this date, you had
4    been back to work for one week, correct?
5    A    I'd have to look at my return date.
6    But if you think that was the date, I will go
7    ahead and go along with it.
8    Q    Do you recall returning to work from
9    leave in June of 2018?
10   A    Yes, I do.
11   Q    Thank you. And she responded to you
12   about co-chairing with Dr. ▓▓▓, is that right?
13   A    She responded to me and said the
14   position hadn't been approved yet, and --
15   Q    Okay.
16   A    -- and we will be searching for two
17   positions. Oh, yes, yes, I would like to have you
18   and ▓▓▓ co-chair.
19   Q    Nothing had been approved yet?
20   A    The position had not been approved
21   yet.
22   Q    Okay. And then you responded by
23   letting her know you really wanted to chair it,
24   and you were in particular wanting that experience

Page 301

1    because you were submitting your tenure
2    application?
3    A    Yes. I was explaining to her that,
4    yes, I was going up for tenure soon, and I hadn't
5    had any leadership opportunities. I've always
6    only been asked to co-chair or be a member but
7    never lead in terms of hiring. And then I also
8    expressed concern that ▓▓▓ hadn't even --
9    Dr. ▓▓▓ hadn't even taught at the University or
10   been at the University for a year, so how could he
11   be prepared to do that. And then I also -- I
12   didn't say anything in here, but go ahead, yeah.
13   Q    And so she responded that this would
14   not negatively impact your tenure review?
15   A    From her perspective, yes.
16   Q    And it didn't -- you did get tenure
17   when you applied, right?
18   A    I did. But I didn't get leadership
19   positions, so, later on. But it did.
20   Q    It didn't impact your tenure
21   application was my question.
22   A    Oh, it did not impact my tenure
23   application.
24   Q    Right. Okay. Thank you. Going back

Page 302

1  to Exhibit 1.
2      A    Can I add one other thing as well
3  about this situation?
4      Q    I mean, there is no question pending
5  at this point in time.
6      A    Okay.  Maybe later.
7      Q    My time is limited.
8      A    That's understandable.  That's fine.
9  Let's go back to 1.
10     Q    I know your attorney is going to ask
11  you some questions, and you can share additional
12  information at that time.  Thank you.
13     A    Okay.
14     Q    Back to Exhibit 1, Paragraph 31, I
15  would like to go -- I would like to skip (f) for a
16  minute and go to (g).
17     A    Okay.
18     Q    You say:  Plaintiff was singled out
19  and reviewed on her use of DePaul's SharePoint
20  system which was not a requirement for class
21  instruction.  Do you see that?
22     A    I do see that, yes.
23     Q    Okay.  What is SharePoint?
24     A    Well, it is a software that we no

Page 303

1  longer use at DePaul.  But it was a software that
2  we used for uploading our dossiers for reviews,
3  for formal reviews, and also for, like, your
4  formal tenure review I guess to go up for tenure
5  and promotion.
6      Q    Okay.  So it was an electronic file
7  of your dossier?
8      A    Yes.  That's a good example or
9  explanation, yes.
10     Q    And so it was what all of your
11  reviewers would look at in analyzing your tenure
12  application or analyzing you for formal review, is
13  that right?
14     A    Yes, yes.  That was the system.  But
15  you know what, I don't know if they would use -- I
16  think they did get on SharePoint to see it.  I
17  wouldn't know because I wasn't on that side of
18  the -- you know, when you go through the review, I
19  don't exactly see what they see.  But I think that
20  that's how they would access it through
21  SharePoint.
22     Q    Right.  So the point is you are
23  submitting your materials so they can be reviewed,
24  correct?

Page 304

1      A    Yes, yes.  That's 100 percent true.
2      Q    Okay.  So it is important to have all
3  of your materials there so that folks can get an
4  accurate picture of your record?
5      A    I agree, it is very important to have
6  all your materials there and have a working system
7  as well, um-hum.
8      Q    Yes.  And the system didn't always
9  work well?
10     A    No, it did not.  Plenty of time it
11  would lose files and not allow you to upload stuff
12  and kick you out.  That's why we moved from that
13  system to the new system we have now, Interfolio.
14     Q    So it caused problems for a lot of
15  users, is that fair?
16     A    I would say it did cause problems for
17  some users.  I don't think to the extent of what I
18  experienced because my experience was beyond
19  SharePoint.  My experience went into other faculty
20  members admonishing me because of SharePoint and
21  making accusations against me.
22     Q    When did that happen?
23     A    I would say at least in 2017 and 2018
24  as well.  Even got to the point where someone said

Page 305

1  that I did something wrong.  Hai Tran, I shouldn't
2  say someone.  At the time, one of the personnel
3  chairs, Hai Tran, accused me of not putting
4  materials up properly.  And then I actually had to
5  go through and highlight in the forms that they
6  gave me where the forms were incorrect and how it
7  was impacting my submissions.  And the fact that I
8  had to delete everything and re-upload and delete
9  it again and re-upload, and it takes quite a bit
10  of time to put three, five, six years' worth of
11  work into a system that is not operating properly.
12     Q    And so is it your testimony that Hai
13  Tran gave you incorrect information about how to
14  submit this information because of your race?
15     A    I'm sorry?  I don't even know
16  where -- I don't understand what you are saying.
17  Did I say Hai Tran -- I'm sorry?  What?  Say that
18  again.
19     Q    You said Hai Tran gave you incorrect
20  information that required you to resubmit all your
21  materials, right?
22     A    Yes, he did.  I don't know if it was
23  Hai. ███████ sent it to me first.  And then I did
24  what ██████ told me to do based off of those forms.



13 (Pages 302 to 305)

Page 306

1  And then they switched chairs, and Hai became the
2  chair, and he just essentially kept what ███
3  told me to do.  And then I told him:  No, this is
4  still not right because you all are changing the
5  forms and not acknowledging that they are
6  changing.
7       Q    Okay.  And --
8       A    Are you saying did he do that because
9  of my race?  I don't know.  I can't speculate why
10 he did that.
11      Q    But your allegation is that this was
12 part of a hostile work environment based on your
13 race?
14      A    Yes, yes.  And I am saying that
15 because, for instance, in my review letter from
16 the dean, Salma Ghanem, she put a note in my
17 review letter saying not having my materials on
18 SharePoint in a timely manner detracts from a --
19 detracts from my record or something of that
20 nature.  I don't have it in front of me, but I
21 know she said something to that effect, and that's
22 where it became problematic because that's not a
23 requirement for class instruction, not to mention
24 the system has had many issues over the years.

Page 307

1       Q    Okay.  So I just want to be clear
2  here, Dr. Dillard, because you do say that you
3  were singled out and reviewed for your use of the
4  SharePoint system?
5       A    Yes.
6       Q    This was part an ongoing hostile work
7  environment based on your race?
8       A    Yes.
9       Q    I need to understand everyone that
10 you believe was subjecting you to a hostile work
11 environment based on your race.
12      A    In reference to SharePoint?
13      Q    Let's start there, yes.
14      A    Okay.  We can start with SharePoint.
15 I can start off by saying ███  ███  was one.
16 ███, Salma Ghanem, and I'm hesitant to say
17 ███ because he kind of stepped into that
18 role, and it was already -- things had already
19 happened before he did.  But he did try to tell me
20 that what I was doing was incorrect, so I would
21 actually have to roll him into that as well
22 because I'm pretty certain no one else in the
23 College received that type of feedback.  And like
24 I said, I spoke to many, many faculty members

Page 308

1  about their experience with SharePoint, and no one
2  else told me that they were set to the side and
3  told that what they did was wrong.  No one else
4  was told that they were disorganized and
5  unprepared.  No one else was -- the only person
6  that I knew had a point about the SharePoint
7  system was Maria DeMoya in her letter from Salma.
8  She put something in her letter about the
9  SharePoint system and it detracting from her
10 record.  So I would name those just to begin with.
11 I mean, off the top of my head, because each one
12 of those I had a particular experience in which I
13 was being scrutinized differently.
14           And even one of my colleagues,
15 Matt ███ and Paul Booth took me to the side
16 after the interaction and apologized for ███
17 Kessler's behavior and said:  I'm sorry that she
18 was treating you this way.  I don't know what
19 happened, but I want you to know that the way that
20 we are, you know, the majority of us don't feel
21 this particular way, and that what she is putting
22 you through is not normal.
23      Q    Okay.  So again, a lot of
24 information.  ███ Kessler, let's start there.

Page 309

1  When did ███ Kessler single you out and review
2  you based on your use of the SharePoint system?
3       A    She did it twice actually.  So I'm
4  glad you have this footnote because it helps me
5  remember the years.  But I believe it happened in
6  2017 and I think 2015.  I don't think she was on
7  the committee in 2018.  I think by that time they
8  had pulled her off of the committee before she
9  even finished her time as a committee member.
10      Q    Okay.  And those -- you are talking
11 about personnel committee member?
12      A    Yes, that's what I'm speaking about.
13      Q    Which are typically three-year terms?
14      A    They can be three years or more.
15 Depends on if they renew.
16      Q    Okay.  So tell me what she did in
17 2015.
18      A    I can't remember each interaction as
19 specifically as I think you are asking me for.
20 But I do remember sitting in the room, and the
21 conversation was pretty pleasant.  But then she
22 said:  I think there are some mistakes with your
23 SharePoint.  And I was a little confused, so she
24 pulled out her laptop and she said:  Look, I'm



14 (Pages 306 to 309)

Page 310

1 looking at these files, and I see that things are
2 missing. And I said: Are you sure? And she
3 said: Yes, and I think there's duplicates. And I
4 was, like: Well, there is something wrong there.
5 I don't believe that there should be anything
6 missing, and certainly shouldn't be any
7 duplicates. And she said: Yeah, well, I mean
8 this would be like an example of you needing to
9 work on your -- on your SharePoint submissions.
10         And this was interesting
11 because I had already gone through -- I had
12 already gone through a review before. And so I
13 didn't have any issues with SharePoint in
14 reference to me knowing what I put up there. I
15 mean, the system did some crazy things and was
16 deleting things back there. But in terms of me
17 knowing what I needed to put up there, I thought I
18 had that already down because I had already gone
19 through a review, and I put it up there.
20         So she brought it up. And
21 then I remember it became like back and forth, and
22 I felt like I was being persecuted. And I was,
23 like, I don't really know what you're talking
24 about. I would like to see the actual files. And

Page 311

1 at the time they closed the files, and so I wasn't
2 able to look at my portfolio which is interesting
3 because I know when you go up for tenure, you are
4 supposed to still have access to your portfolio
5 all the way until you are actually reviewed. So
6 in this particular case, I didn't even get access
7 to it. But you know, it's neither here nor there.
8 I was still unseasoned, so I didn't really know
9 expectations and whatnot.
10         And shortly after that, I had
11 a meeting with ████ -- was it ████? I don't
12 know if ████ was the chair at that time. You
13 have to forgive me. This was 2015. I have to
14 think about it. But anyway, that happened in that
15 meeting. And then I had -- I believe I had
16 another meeting in which she asked me to go in --
17 it might have been the same one, but she asked me
18 to go in and change all my files and then put --
19 she wanted me to write a separate note for each
20 folder explaining what was new and what wasn't.
21         Long story short. After
22 everything was said and done, it turns out that
23 the system, if you uploaded -- let's say I have
24 two separate files, one that says, you know, 2014

Page 312

1 whatever, a class that I taught in 2014 and
2 another file that said 2015, and it was a separate
3 class. When I uploaded the materials, if it had
4 the same title, so if I uploaded one that said
5 "syllabus" in one folder and something that said
6 "syllabus" in another folder, if they had the same
7 folder, title of the file, it would overwrite the
8 file that I uploaded. And I didn't know that at
9 the time. I was a little confused about it. And
10 you know, I don't think anybody knew that. That's
11 why after everything went bad, and we ended up
12 moving to the new portfolio system.
13         But long story short, she made
14 me change it. And then later she told me that I
15 was too organized, and that I was padding my
16 stats. And it was just really unusual because the
17 language that she used would always come out later
18 in training or like when I went through and
19 updated my CV for all of the service that I did.
20 And I am service oriented in a lot of the work
21 that I do. I work with a lot of marginalized
22 populations. She complained to me and said that I
23 was padding. I put quotes there, padding my
24 record. And I was confused because what does

Page 313

1 padding mean. And she's like: You are making it
2 seem like you are doing more than you are supposed
3 to do.
4     Q    I am going to interject because I
5 asked you about SharePoint.
6     A    And I was explaining that.
7     Q    What Dr. Kessler said to you in 2015
8 about SharePoint, and you are now talking about
9 padding your service record.
10     A    That's what she talked about as well.
11     Q    So okay. So I'm going to move to
12 strike the non-responsive, and let me make sure
13 that we are all talking about your 2015 review
14 here. Do I have this right, Dr. Dillard?
15     A    I told you from the very beginning, I
16 don't quite remember if it was 2015 or 2017
17 because those two -- that was around the time that
18 I had to go through numerous reviews. And when
19 you go through a review almost every year, they
20 start to kind of run together. So forgive me if I
21 don't remember exactly which one, but it was
22 either 2015 or 2017.
23     Q    Okay. I thought you had previously
24 testified that she twice in two reviews unfairly



Page 314

1  evaluated you on your use of SharePoint.  So I'm
2  trying to understand when those two occasions
3  were.
4       A     Well, I'd have to take a look at the
5  letter from the dean.  That would jog my memory,
6  or the personnel letter.  But I do know it was
7  either in 2015 or '17.
8       Q     In both?
9       A     I know it was more than one time that
10  she complained about my SharePoint submission.
11  She did it to me in person, and I don't remember
12  if it was two-thousand -- I don't think it was
13  2018.  It didn't happen in 2018.  It was either
14  '15 and '17.
15       MS. SCATCHELL:  I am going to object
16  to the extent that she already had testified that
17  she thought it was either 2015 or 2017.
18  BY MS. WERMUTH:
19       Q     So it wasn't both years?
20       A     It may have been both years.  I can't
21  remember when she rotated off of the personnel.  I
22  know it was before she was supposed to come off of
23  personnel.  And it was after I complained about
24  her treating me differently.  And so if it wasn't

Page 315

1  more than once, at two separate times, I know she
2  did it twice.
3       Q     Can you please look at Exhibit 32?
4            (Exhibit No. 32 identified.)
5       THE WITNESS:  At the bottom it says
6  0425.
7  BY MS. WERMUTH:
8       Q     Yes, that's your formal teaching
9  review for 2015?
10       A     Yes.
11       Q     And based on the first paragraph, you
12  were rated by the personnel committee as making
13  good to very good progress toward tenure in the
14  area of teaching.  Do you see that?
15       A     No, I don't see that.  Can you tell
16  me where?
17       Q     First paragraph.
18       A     I don't see that.  Okay, first
19  paragraph, I gotcha.  I see fair.  Halfway down, I
20  see:  Sydney is making good to very good progress
21  towards tenure.  All right.
22       Q     Go up please to Exhibit 33.
23            (Exhibit No. 33 identified.)
24

Page 316

1  BY MS. WERMUTH:
2       Q     That's Dr. Ghanem's annual letter
3  after the 2015 evaluation, correct?
4       A     Yes.  Yes, it is.
5       Q     And there is nothing in there, in
6  that letter about SharePoint, correct?
7       A     No, so that would make it 2017 that I
8  had that interaction.
9       Q     And then can you go to Exhibit 42,
10  please?
11       A     I'm there.
12            (Exhibit No. 42 identified.)
13  BY MS. WERMUTH:
14       Q     This is your March 3rd, 2017 formal
15  review, right?
16       A     Um-hum, yes.
17       Q     Okay.  And this is when you were
18  recommended to do more face-to-face teaching,
19  correct?
20       A     I'm fairly certain that's what it
21  was.  I would have to reread it.  At the end I
22  believe is when they said that.  But yes.  Yes, it
23  says -- I have to read it, seven pages.  My guess,
24  this is the document.

Page 317

1       MS. SCATCHELL:  Don't guess.  If you
2  want to go off the record and read it, I would --
3       THE WITNESS:  Yes, I would like to
4  read it.
5       MS. WERMUTH:  Okay.  Off the record.
6            (Discussion off the record.)
7  BY MS. WERMUTH:
8       Q     Back on the record.  Is that the
9  review in which you were recommended to do more
10  face-to-face teaching?
11       A     Yes.
12       Q     If you would turn to Exhibit 43.
13       A     I'm there.
14            (Exhibit No. 43 identified.)
15  BY MS. WERMUTH:
16       Q     That's Dean Ghanem's letter in 2017?
17       A     That's correct.
18       Q     Can you point out to me where she is
19  unfairly evaluating you on your use of SharePoint
20  in this letter?
21       A     I would say it is the last sentence
22  where she says:  I concur with the personnel
23  recommendations that you're focused on meeting the
24  deadlines for submitting your materials for review

MAGNA ▶
LEGAL SERVICES



Page 318

1  and improving your documentation. That's in
2  reference to SharePoint right there. Not meeting
3  deadlines causes an unnecessary burden on your
4  colleagues and detracts from your record.
5     Q    Okay. You did miss your deadline for
6  submitting your materials that cycle, correct?
7     A    Yes.
8     Q    And you started submitting your
9  materials on the day they were due, correct?
10    A    You mean uploading them on the day
11 that they are due?
12    Q    Yes.
13    A    I sure did, yes.
14    Q    Okay. And ████████ was the chair
15 of personnel at that time, is that right?
16    A    Yes, he was the chair.
17    Q    Okay. And he opened up SharePoint to
18 allow you additional time to finish submitting
19 your materials?
20    A    I believe he gave me 72 hours after
21 giving me -- yes, I think it was 72 hours perhaps.
22 It might have been 48, but I'd have to see that
23 email again.
24    Q    Okay. We can look at that email.

Page 319

1  While I'm finding it, do you know anyone else who
2  missed their deadline and was treated more
3  favorably?
4     A    I don't know who missed a deadline
5  and was treated more favorably. I do know that --
6  you know, I don't know anyone who was treated more
7  favorably.
8     Q    Okay. Were you going to add
9  something there?
10    A    I was going to say that I know that
11 Maria DeMoya missed the deadline with me. Not
12 with me, but she missed it as well.
13    Q    And were you both given additional
14 time to submit that material?
15    A    Yes. But I had received I believe a
16 different email initially. So when I reached out
17 to ████, I think he responded to me in a very
18 short way and then later responded to both me and
19 Maria with the same exact message.
20    Q    And do you believe that that is
21 evidence of discrimination?
22    A    I believe that that piqued my
23 interest as to me starting to notice a difference
24 in treatment. Because I know that no one held

Page 320

1  anyone accountable the years prior to when
2  SharePoint was acting -- you know, was not
3  operating properly. Everyone was given a lot more
4  leniency. But this particular year, then new
5  requirements and deadlines and more stringent
6  deadlines were being applied.
7     Q    So to be more stringent -- wait. My
8  question is: When you talk about others in years
9  prior, do you know of others in years prior who
10 missed a deadline for submitting their materials?
11    A    No, I don't know of any one who
12 missed their material deadline.
13    MS. WERMUTH: And I just emailed to
14 folks what I will mark as Exhibits 146.
15    (Exhibit No. 146 identified.)
16 BY MS. WERMUTH:
17    Q    I will -- when you get it, please let
18 me know, but I am going to show you a couple other
19 emails in the meantime. Can you look at
20 Exhibit 36?
21    (Exhibit No. 36 identified.)
22    THE WITNESS: Do you want me to find
23 the email that you just sent or in this folder?
24 BY MS. WERMUTH:

Page 321

1     Q    If you look at Exhibit 36 in the
2  folder, we will come back to my email in a moment.
3     A    Okay, got it. I'm there.
4     Q    Okay. That is the email that you got
5  in October of 2016 regarding your 2017 formal
6  review, is that right?
7     A    Yes. We get the same email each
8  year.
9     Q    Okay. And in the second paragraph it
10 reads: Preparation of materials, colon. All
11 review materials must be uploaded by Monday,
12 January 9th, 2017 by 11:59 p.m., exclamation
13 point. Do you see that?
14    A    I do see that.
15    Q    And the date and the time is bolded,
16 right?
17    A    Yes.
18    Q    Okay. And then the next sentence
19 reads: This is a hard deadline. Do you see that?
20    A    Yes.
21    Q    Now, if you would look at Exhibit 40?
22    (Exhibit No. 40 identified.)
23 BY MS. WERMUTH:
24    Q    And if you would look at the email

MAGNA
LEGAL SERVICES

Page 322

1  from ▓ to you, do you see it's dated January
2  10th, 2017.  Do you see that?
3      A    I do, yes.
4      Q    Okay.  So that was the day after your
5  materials were due, right?
6      A    Yes, that's true.
7      Q    Okay.  And so according to this
8  email, he was giving you an additional 72 hours to
9  complete --
10      A    He did, yes, 72 hours, um-hum.
11      Q    And if you go to Exhibit 39?
12           (Exhibit No. 39 identified.)
13      THE WITNESS:  Okay, I'm there.
14  BY MS. WERMUTH:
15      Q    Dr. ▓ sent Maria almost an
16  identical message that same day?
17      A    Um-hum.
18      Q    Yes?
19      A    Yes.
20      Q    Did you receive my email yet?
21      A    Let me look.
22      MS. SCATCHELL:  I did.
23      THE WITNESS:  146 on it, yes.  Let me
24  download and open it.  All right.  I have it.

Page 323

1  BY MS. WERMUTH:
2      Q    Now, is this the email that you said
3  that you received on January 10th, 2017 from
4  Dr. ▓?
5      A    You are saying is this the same one
6  we just looked at in the file folder?
7      Q    You testified earlier that you
8  received an email prior to getting the one that we
9  just looked at?
10      A    Yes.  Yes, I did.  I think he sent me
11  an email.
12      Q    All right.  Have you had a chance to
13  review this one?
14      A    Let me take a look at it if you don't
15  mind.
16      Q    Please.  Is this the email that you
17  say you were treated less favorably than Maria in
18  connection with?
19      A    No, this is not the same email.  It
20  was a different email.  It was very short, and it
21  said something like it's a firm deadline, which
22  is -- he said something like:  I need to review
23  the procedures or something to figure out how to
24  handle my requests.  So I don't think this is the

Page 324

1  same email.  I'd have to actually look.  I'm
2  pretty certain that this is not it, what you sent
3  me.  This thing right here, it looks like it's a
4  replica of the prior email.
5           (Audio distortion.)
6      THE REPORTER:  I'm sorry, the audio
7  was garbled, and your question didn't come
8  through.
9      MS. WERMUTH:  Sure.  I asked if this
10  email showed her response to it.
11      THE WITNESS:  This was a response to
12  his second email to me.  So he sent me something
13  earlier that day.  I think it might have been
14  around 1:00 or something in the afternoon.  And
15  then -- and I don't see that anywhere in here.
16  Maybe I can look at my email or something, but
17  this second email is my response to him after
18  that.
19  BY MS. WERMUTH:
20      Q    I see.
21      A    He sent me one, and then he sent me
22  and Maria one, and I responded to his second
23  email.
24      Q    Okay.  Let me ask you this question.

Page 325

1  So with respect to (g), 31(g) in your Complaint,
2  Exhibit 1, you identify Dr. Ghanem, ▓
3  ▓ as creating a hostile
4  work environment based on your race.  Setting
5  aside Paragraph 31(f) for the moment, I'm going to
6  come back to that.  With respect to all the other
7  paragraphs in 31 that we looked at, who else in
8  the College do you believe discriminated against
9  you based on your race or created a hostile work
10  environment based on your race?
11      A    You are speaking in reference to
12  SharePoint specifically or just general hostile
13  work environment?  I'm sorry, I missed --
14      Q    You answered the question with
15  respect to SharePoint.  I'm asking beyond
16  SharePoint and with respect to your allegations in
17  Paragraph 31, who in the College do you believe
18  was discriminating against you based on your race
19  and creating a hostile work environment based on
20  your race?
21      MS. SCATCHELL:  Objection, form.  You
22  can answer.
23      THE WITNESS:  At the moment, I mean,
24  I'd have to go through a list.  But I would have

**MAGNA**
LEGAL SERVICES



Page 326

1  to say all of the colleagues that I spoke with --
2  not all of them. The colleagues that I spoke with
3  that -- did I say Lexa Murphy? Did I include her?
4  BY MS. WERMUTH:
5      Q      You can include her if that's your
6  testimony.
7      A      I would include her. Hostile work
8  environment? I would also include ▮▮▮▮▮▮▮ I
9  think is her last name.
10     Q      She's not in the College.
11     A      You're interested only in the
12  College? Yeah, yeah, yeah. So only in the
13  College. ▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
16  ▮▮▮▮▮▮▮▮▮▮ hose are all I can think of off of
17  top of my head. There may be more.
18         MS. SCATCHELL: Anna, I want to make
19  sure we are complete and have an accurate record.
20  Initially, when she was testifying as to
21  Paragraph 31, she had mentioned Carolyn Bronstein.
22         THE WITNESS: Yes, thank you.
23         MS. WERMUTH: I'm sorry. If it's in
24  the record, that's fine; but, like, let's not, you

Page 327

1  know, coach the witness here.
2          MS. SCATCHELL: No, no. I wanted to
3  clarify your question because you said "is it your
4  testimony that," and you named a series of
5  individuals.
6          MS. WERMUTH: Okay. That's fine
7  then.
8  BY MS. WERMUTH:
9      Q      Okay. So Carolyn Bronstein. Anyone
10  else, Dr. Dillard, as you sit here?
11     A      Don Ingle, Jim Motzer. If any others
12  come to my mind, I'll try to let you know. That's
13  a long list of names though.
14  BY MS. WERMUTH:
15     Q      It is. So of all of those
16  individuals that you -- strike that.
17         Did Don Ingle nominate you for
18  the PRAD chair position in 2018?
19     A      No, he did not.
20     Q      Not that you are aware of?
21     A      Not that I am aware of, no.
22     Q      Got it. Of those individuals that
23  you named, did any one of them ever say anything
24  derogatory to you about your race specifically?

Page 328

1      A      Derogatory about my race?
2      Q      Correct.
3      A      How do you define derogatory?
4      Q      Let me ask you this: Did anyone
5  mention your race to you in connection with
6  evaluating your performance, evaluating your chair
7  nomination?
8      A      Oh, no, no. No one ever openly
9  discussed my race as a marker or, you know,
10  deciding factor. But, you know, when it comes to
11  race and marginalization and discrimination,
12  that's one of my areas of expertise. And we all
13  probably could agree that racism doesn't only
14  function in overt spaces, you know, overt spaces.
15  In short, a lot of times, people aren't aware that
16  they are being discriminated against until it's
17  too late. People aren't really forthright. For
18  instance, redlining, when African-Americans were
19  not allowed --
20     Q      Dr. Dillard, this goes so far beyond
21  my question.
22     A      I'm trying to explain.
23     Q      We're not talking about redlining
24  here. I'm sorry. I have very limited time,

Page 329

1  Dr. Dillard, to conclude your deposition. I
2  didn't ask you anything about redlining.
3          I asked you whether any of the
4  individuals you named specifically referenced your
5  race in connection with making decisions about
6  your employment.
7      A      Not overtly, no.
8      Q      Okay. 31(f).
9      A      I'm there.
10     Q      You write: DePaul's EEO office
11  ignored Plaintiff's complaints of discrimination
12  thereby forcing her to continue to work in a
13  racially hostile environment. Do you see that?
14     A      I do.
15     Q      It's your testimony that the
16  employees in the EEO office were part of the
17  individuals who discriminated against you or
18  created a hostile work environment based on race?
19     A      Yes, I think that's fair to say.
20  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
21  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
22     A      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮▮▮▮ believe is his last name I
24  think, and the ombudsman person whose name was

MAGNA ◗
LEGAL SERVICES

Page 330

1  Craig something.  I don't know his last name, and
2  perhaps even -- and Liz Ortiz because I believe
3  she was the one who received the Complaint and
4  didn't follow through with an actual investigation
5  because it was OIDE before it moved over to the HR
6  department.
7      Q    When you say "received an actual
8  Complaint," what day are you talking about, what
9  year?
10     A    I don't remember the day.  But in
11 two-thousand -- on or about 2017 or 2018, I put in
12 an anonymous complaint to the OIDE office about my
13 experiences and Dr. ███ Calvente's experiences,
14 and nothing came about from that complaint other
15 than I think there was one email response back
16 that asked for more details.  I provided more
17 details about the names and who to include.  And
18 no investigation that I am aware of was ever
19 opened because no one ever even followed up with
20 me about that complaint.  I think that would be an
21 example of how the EEO office or the OIDE office
22 continued to allow me to work in a very racially
23 hostile work environment.
24     Q    Okay.  So let's go to Exhibit 48

Page 331

1  please.
2           (Exhibit No. 48 identified.)
3           THE WITNESS:  I'm there.  It says
4  2907 at the bottom.
5  BY MS. WERMUTH:
6      Q    Yes, ma'am.  Do you recognize that
7  document?
8      A    Yes.  This was a document that I
9  brought to OIDE and was told that they could not
10 keep the document, but apparently they kept the
11 document.
12     Q    You prepared this document, is that
13 right?
14     A    I did, yes.
15     Q    Okay.  And you don't specifically say
16 or use the words "discrimination" or "hostile work
17 environment" in this document, is that right?
18     A    I'd have to review it to see if I say
19 that in this.
20         MS. WERMUTH:  Let's go off the record
21 and allow you that opportunity.
22         (Discussion off the record.)
23 BY MS. WERMUTH:
24     Q    Back on the record.  What's your

Page 332

1  answer?
2      A    I was saying I do not see any
3  reference to discrimination in this particular
4  document, no.
5      Q    And then can you look at Exhibit 49?
6      A    I'm there, yes.
7          (Exhibit No. 49 identified.)
8  BY MS. WERMUTH:
9      Q    And do you want to take a minute to
10 look at those emails?
11     A    Yes, if you give me a brief moment.
12         MS. WERMUTH:  Okay.  Off the record.
13         (Discussion off the record.)
14 BY MS. WERMUTH:
15     Q    Back on the record.  ███████████
16 reached out to you in connection with the material
17 that you left with the OIDE?
18     A    Yes.
19     Q    That we saw in Exhibit 48, right?
20     A    Yes.
21     Q    Okay.  And you responded to Barbara
22 ██████ telling her that you are not making
23 allegations of unfair treatment or filing a formal
24 Complaint at that time.  Do you see that?

Page 333

1      A    I do see that.
2      Q    Okay.  Now, you mentioned another
3  complaint.  Can you look at Exhibit 67?
4          (Exhibit No. 67 identified.)
5          THE WITNESS:  You said another
6  complaint?  This wasn't a complaint.
7  BY MS. WERMUTH:
8      Q    Fair enough.  It wasn't a complaint.
9  Thank you.  All right.  But you were testifying
10 before we looked at that about a complaint that
11 you said that to your knowledge no one followed
12 on?
13     A    Yes.
14     Q    I would like to direct your attention
15 to Exhibit 67, please.
16     A    Yes.
17     Q    Okay.  Do you recognize that
18 document?
19     A    Yes, I do.
20     Q    You prepared that document?
21     A    Alongside with ███ Calvente, yes.
22     Q    Is this the complaint that you said
23 no one followed up on?
24     A    I would have to read it more closely;

Page 334

1  but I mean, it looks like the one that I
2  submitted, yes. I would say that this is it, yes.
3      Q    Okay. And you submitted this
4  anonymously, correct?
5      A    I did.
6      Q    Okay. And then Barbara ███████ did
7  follow up, correct?
8      A    I don't remember who followed up. I
9  thought it might have been Liz Ortiz. Perhaps it
10  was Barbara ███████.
11     Q    Can you look at Exhibit 75?
12          (Exhibit No. 75 identified.)
13     THE WITNESS: Yes, I'm there. It
14  says 2974 at the bottom.
15  BY MS. WERMUTH:
16     Q    Yes. Do you want to take a moment to
17  read it?
18     A    No. I'm pretty certain that this is
19  the email exchange.
20     Q    Okay. And so Barbara ███████ then
21  did ask or sent an email back to the anonymous
22  writer to ask some additional questions about the
23  concerns, is that right?
24     A    Yes.

Page 335

1      Q    And again, in these submissions
2  you -- for example, in that first paragraph, you
3  say: Again, it has become clear that neither are
4  comfortable stepping forward. Do you see that?
5      A    You said in the first paragraph?
6      Q    Yes.
7      A    Yes, I see that.
8      Q    So you wrote back to Barbara ███████
9  that the individuals in question were you and
10  ███████, but that neither one was comfortable
11  stepping forward?
12     A    Yes.
13     Q    And so you don't know what, if
14  anything, Barbara ███████ did with that
15  information?
16     A    No. She never followed up with me
17  personally. I never received anything after this
18  email.
19     Q    Okay.
20     A    And I know I said discrimination in
21  this email, but I didn't understand what was the
22  cause or what causes the actual investigation.
23     Q    Okay. So then your next complaint
24  was actually referred to OIDE by Salma Ghanem, is

Page 336

1  that right?
2      A    Yes. After I went and complained
3  directly to my dean as well in person. So I did
4  come forward eventually, yes.
5      Q    Okay. So would you look at
6  Exhibit 84, please?
7          (Exhibit No. 84 identified.)
8      THE WITNESS: All right. I'm there.
9  BY MS. WERMUTH:
10     Q    Okay. And do you recognize that
11  email?
12     A    Yes. This was -- yes.
13     Q    Okay. So this is an email from Salma
14  Ghanem who is the dean in October of 2018, is that
15  right?
16     A    That is correct.
17     Q    Okay. And I'm sorry. To be clear,
18  she was the dean of the College of Communication,
19  right?
20     A    Yes.
21     Q    Okay. And so this is dated
22  Wednesday, October 10th, 2018 to Barbara ███████
23  with a copy to you and ███████, right?
24     A    That's correct.

Page 337

1      Q    And she on your behalf indicated that
2  the two of you had raised concerns about
3  harassment, bullying, and marginalization of
4  faculty of color in the College, is that right?
5      A    Yes.
6      Q    And this was after a two-hour,
7  two-and-a-half-hour meeting with Dr. Ghanem?
8      A    I would assume it was about two to
9  two and a half hours. It was a nice amount of
10  time, yes.
11     Q    And if you would look at Exhibit 85,
12  please.
13          (Exhibit No. 85 identified.)
14     THE WITNESS: Yes, I'm there.
15  BY MS. WERMUTH:
16     Q    Do you recognize that document?
17     A    These look likes the notes that I
18  took from that meeting.
19     Q    And how did you -- when did you
20  prepare these notes of that meeting?
21     A    I was taking notes at the actual
22  meeting. And then after the meeting, I cleaned
23  them up and you know, filled them in, just pieces
24  that I couldn't get all in there.

MAGNA
LEGAL SERVICES

Page 338

```
 1        Q     And how did you clean that up with
 2   pieces you couldn't get in there?  Did you have a
 3   recording that you referenced?
 4        A     No, there was no recording.  I've
 5   been doing transcription for quite some time now.
 6   I do a lot of interviews, in-depth interviews as a
 7   part of my research.  I've been doing this for
 8   quite some time, in-depth listening.
 9        Q     Did you spend close to 30 hours
10   editing this document?
11        A     I don't know how much time I spent
12   editing it.
13        Q     You produced metadata to us.  Do you
14   recall that?
15        A     I did, yes.
16        Q     And there is no reason to dispute the
17   metadata that you produced, is that right?
18        A     Yes.  There is no reason to dispute
19   it, no.
20        Q     Okay.  After --
21        MS. SCATCHELL:  I am just going to
22   object to that question to the extent that it
23   calls for her to be an expert in the area of
24   metadata.
```

Page 339

```
 1        THE WITNESS:  Well, yeah.  I don't
 2   know much about metadata, yeah.
 3   BY MS. WERMUTH:
 4        Q     Okay.  After Salma Ghanem submitted
 5   that Complaint to Barbara ██████ on your behalf,
 6   you did end up meeting with OIDE or EEO?
 7        A     OIDE had lost their, you know,
 8   investigative powers.  So I did meet with the EEO
 9   office.  I believe it was Barb ██████ and Isabel
10   Diaz that came to that follow-up meeting.
11        Q     Okay.  And that was just you with the
12   two of them, correct?
13        A     Yes.
14        Q     You did not meet with ██████
15   also present?
16        A     No, I did not.
17        Q     Okay.  Because she had accused you of
18   physically threatening her, is that right?
19        A     That's not right.  I did not show up
20   because her and I had different -- differing
21   opinions on how to move forward with our separate
22   grievances.
23        Q     But she did accuse you of physically
24   threatening her at that time?
```

Page 340

```
 1        A     I don't remember that.
 2        MS. SCATCHELL:  Objection,
 3   foundation.  You can answer.
 4        THE WITNESS:  I don't remember her
 5   accusing me of physically threatening her.  We
 6   just had a disagreement.
 7   BY MS. WERMUTH:
 8        Q     Okay.  And so if you told Maria
 9   DeMoya in a text message that she accused you of
10   physically threatening her in a text message, was
11   that false information?
12        A     That might be an overstatement, or
13   that was probably -- if I said that, that's
14   probably -- that was probably an overexaggeration
15   based off of emotion from that interaction.
16        Q     Can you please turn to Exhibit 97?
17        (Exhibit No. 97 identified.)
18        THE WITNESS:  I'm there.
19   BY MS. WERMUTH:
20        Q     Okay.  Do you see the top email from
21   you back to Ms. Diaz and Ms. ██████?
22        A     Yes.
23        Q     Okay.  And it's dated December 20th
24   of 2018.  Do you see that?
```

Page 341

```
 1        A     Um-hum.
 2        Q     Yes?
 3        A     Yes.  I'm sorry, yes.
 4        Q     Okay.  Was that during winter break?
 5   Was the school closed down for winter break?
 6        A     I don't know if the school was
 7   closed.  We do close for winter, so I mean, it
 8   could be.  I'd have to look at the school
 9   calendar.  But we do close right before Christmas.
10        Q     Okay.  And you were asking Ms. Ortiz
11   and Ms. ██████ for follow-up based on the
12   meeting that you had with the two of them last --
13   the week prior.  Do you see that?
14        A     Yes.  Because they said they were
15   going to get back to me, but they never did.  So I
16   was following up with them.  And they never gave
17   me a follow-up or a write-up or anything as
18   they -- as they told me they would do.
19        Q     Okay.  So if you look then at
20   Exhibit 104?
21        (Exhibit No. 104 identified.)
22        THE WITNESS:  Yes, I'm there.  It
23   says 2810 at the bottom.
24
```

MAGNA
LEGAL SERVICES

Page 342

1  BY MS. WERMUTH:
2      Q     Yes, ma'am, 2810 from your
3  production.  I say that because there is a 2810 in
4  our production as well.
5      A     Okay, that makes sense.
6      Q     That is an email from Ms. ████ to
7  you dated January 22, 2019; do you see that?
8      A     Yes, that's correct.
9      Q     And in that email she is following up
10 with you on your concerns that you had raised at
11 the end of the year prior?
12     A     She's following up, yes.
13     Q     Okay.  And you did not respond to
14 this email, is that right?
15     A     That's correct.  I did not.
16     Q     Okay.  Going back to Exhibit 1,
17 Page 3, Paragraph 18, some of these allegations
18 are duplicative of stuff we went through, but I
19 would like to point your attention to 18(c).
20     A     Yes.
21     Q     You said:  While working for DePaul,
22 Plaintiff was subjected to an ongoing hostile work
23 environment in the following ways.  Plaintiff was
24 singled out and subject to random and invasive

Page 343

1  office searches.  Do you see that?
2      A     I do see that.
3      Q     And you believe that -- strike that.
4            Tell me about these invasive
5  office searches.
6      A     Well, twice this has happened.  One
7  of which was very brief, but in 2017, early in
8  2017 after I had spoken to Dr. Ghanem about my
9  concerns about me going through additional reviews
10 and being treated differently or subject to
11 different criteria, I came into my office, and
12 someone had put an ombudsman pamphlet on my desk.
13 I never put it there.  My door is always locked.
14 I don't know how it got there.  Someone went into
15 my office and put that there which prompted me to
16 go see the ombudsman actually.  The second one --
17     Q     Can I stop you there for just a
18 moment?  Can we talk about that office search, and
19 then we can talk about the next one?
20     A     Yes.
21     Q     So with respect to that what you call
22 an office search, do you know if anyone searched
23 your office or do you know only that something
24 appeared in your office when it was locked?

Page 344

1      A     Well, I knew things were moved
2  around.  Things weren't in the exact same place
3  where they were.  And I know that there was a
4  pamphlet that was placed on my desk.
5      Q     What was moved around?
6      A     Just papers.
7      Q     Okay.  And do you have any belief as
8  to who entered your office?
9      A     I don't know who entered my office.
10 I just know that it did come shortly after I had
11 talked to Salma about my experiences.
12     Q     So you believe that the person who
13 entered your office did so to make your
14 environment hostile based on your race?
15     A     I would say I think whoever came into
16 the office might have thought that they were
17 trying to assist me by putting that on my desk.
18 But at the same time, entering someone's office
19 without their permission is also a very intrusive
20 and unsettling experience.  So yes, I do think
21 that that was racially motivated.
22     Q     But you don't know who did it?
23     A     No, I don't.
24     Q     Okay.  And what's the basis for your

Page 345

1  contention that it was racially motivated?
2      A     Because the pamphlet -- well, first
3  of all, no one else that I know of has had their
4  office entered.  And then the pamphlet was about
5  things of an ombudsman or ombudsperson, and
6  getting support when you can't get support within
7  your own college.  So it was someone that knew
8  that I felt I was being treated differently.  I
9  might not have said I was being discriminated
10 against because at the time I wasn't exactly sure
11 what was happening.  But whoever it was knew of my
12 situation and placed it and entered without my
13 permission and placed that on my desk.
14     Q     Now, you said it prompted you to go
15 talk to the ombudsperson, right?
16     A     Yes.  Because that was the second
17 time that I had someone tell me about the
18 ombudsperson -- no, or third time actually.  I
19 never knew who the ombudsperson was until a
20 colleague of mine brought it up, and I went to,
21 like, a panel discussion about microaggressions
22 towards minority faculty members, and they brought
23 up the ombudsperson there.  And then this was the
24 third time that I had it.

Page 346

1    Q    Okay.  So you went to see the
2  ombudsperson?
3    A    I did.
4    Q    And his name was Craig Mousin at the
5  time?
6    A    If you say that's his last name, yes.
7  I know his first name was ▇▇▇.
8    Q    And when you went to see him, you
9  explained to him your concerns about your 2017
10  review?
11    A    I explained to him everything that I
12  was experiencing at the time.
13    Q    And did you tell him that you
14  believed what you were experiencing was racially
15  motivated?
16    A    Actually, I -- I don't know if I told
17  him it was racially motivated.  I don't remember
18  if I thought it was racially motivated, but I do
19  remember him saying he was going to put me in
20  contact with other Black faculty members to assist
21  me through this difficult time.
22    Q    Did he do that?
23    A    No, he did not.
24    Q    He did not.  Did you follow up with

Page 347

1  him?
2    A    No.  I figured at that point that's
3  his job.  I don't -- you know, I didn't want to
4  cause any more trouble than I've already caused.
5  And to be honest, I didn't know that I trusted the
6  system to do what it was supposed to do at that
7  time.
8    Q    Okay.  What was the second invasive
9  office search that you believe was racially
10  motivated?
11    A    The second office search was -- I
12  think it was in October.  It was shortly after I
13  had my seizures and dislocated my shoulders.  I
14  hadn't been on campus, and I received an email
15  from ▇▇▇▇▇▇ who used to be the assistant
16  to the dean, and she was asking me to immediately
17  come to my office and remove a space heater and to
18  move I think my computer from on top of a rug that
19  I had in the office.
20    Q    Okay.  Can you look at Exhibit 47,
21  please?
22        (Exhibit No. 47 identified.)
23        THE WITNESS:  All right.  I'm there.
24  BY MS. WERMUTH:

Page 348

1    Q    Do you want to take a minute to read
2  those emails?  We can go off the record.
3    A    No, I'm fine.  I think I know exactly
4  what this is.
5    Q    Okay.  First of all, in October
6  of 2017 -- strike that.
7        The email chain starts with a
8  message from ▇▇▇▇▇▇t.  Do you see that?
9    A    It looks like it was from ▇▇▇ to
10  ▇▇▇▇▇▇
11    Q    ▇▇▇▇ to ▇▇▇▇▇▇▇▇?
12    A    Yes.
13    Q    And do you know who D▇▇▇▇▇ is?
14    A    No idea who she is.
15    Q    Do you know what her race is?
16    A    No.
17    Q    And you don't know what her job is?
18    A    No.
19    Q    And she says:  While performing
20  inspections, I noticed there is a space heater
21  behind the cabinet by the window in this office.
22  The occupant also has a fluffy throw rug under her
23  desk, and the computer tower is on it.  And so she
24  is asking to have those fire hazards removed.  Do

Page 349

1  you see that?
2    A    Yes.
3    Q    Okay.  Do you believe Donna Voight
4  was racially motivated in asking to have that
5  material removed?
6    A    I can't speculate whether she was
7  racially motivated.  But what I can speak to is
8  the history of these types of incidents happening
9  at DePaul.  People entering other people's office
10  and it being racially motivated, wouldn't be the
11  first time.
12    Q    In the College of Communication?
13    A    At the University.
14    Q    My question is the in the College of
15  Communication.
16    A    I don't know if there are others in
17  the College of Communication.  Maybe ▇▇ might
18  have said something, but I would have to talk to
19  her about it.
20    Q    Okay.  Do you have any reason to
21  believe that ▇▇▇▇▇▇▇▇▇ -- well, strike
22  that.
23        You were not on leave in
24  October of 2017, correct?

MAGNA ▶
LEGAL SERVICES

Page 350

1    A    No, I was not.
2    Q    Okay. And do you have any basis to
3 know whether or not ████████ was aware of
4 your seizure condition at the time?
5    A    I mean, she was assistant to the
6 dean, so it's possible that she informed her.
7    Q    But you don't know?
8    A    I don't know. I don't know one way
9 or the other.
10    Q    Okay. Going back to Exhibit 1,
11 Paragraph 18(d).
12       MS. SCATCHELL: Anna, we are at two
13 hours. How much longer do you have?
14       MS. WERMUTH: If I get quick answers,
15 I think I can be done in 30 minutes.
16       THE WITNESS: I can try to keep them
17 short and to the point.
18       MS. WERMUTH: Just answer the
19 question. Doesn't have to be short, just answer
20 the question at hand. Gia, I appreciate your
21 flexibility here. I think we've gone far afield
22 with redlining and the like. But if we can focus
23 on the questions, I think I can be done in
24 30 minutes I hope.

Page 351

1       MS. SCATCHELL: To the extent she
2 mentioned redlining, I think it was when you said
3 what kind of basis do you have for asserting race,
4 and I think she said it wasn't overt, and she was
5 providing context for you.
6       MS. WERMUTH: It wasn't my question.
7 My question was very direct: Has anyone made a
8 comment to you about your race, that was my
9 question, so -- but in any event, we don't need to
10 fight about it. I'm just saying, like you, I
11 would like to complete this deposition in short
12 order. So I'm doing my best to do that, and I
13 appreciate your flexibility.
14       MS. SCATCHELL: Well, I am going
15 to -- we've now exceeded the time, and I know the
16 tech issues weren't necessarily your fault, but it
17 was your law firm, and so I'm going to move to
18 object to it. But I will be as flexible as I can,
19 and I would appreciate the same courtesy on the
20 other side.
21       MS. WERMUTH: Of course, of course.
22 The only -- well, of course. And we can only --
23 look, if you'd rather stop now and have me go to
24 the judge, I can do that if that's your

Page 352

1 preference.
2       MS. SCATCHELL: I'm not looking to do
3 that. If we can wrap up in 30 minutes, that's
4 fine.
5       MS. WERMUTH: Okay, doing my best.
6 BY MS. WERMUTH:
7    Q    Okay. Dr. Dillard if you look at
8 18(b) in your Complaint?
9    A    Um-hum.
10    Q    You talk about being belittled,
11 ostracized and intimidated through
12 microaggressions. Do you see that?
13    A    Yes.
14    Q    If you look at Exhibit 3, do you
15 recognize that document?
16    A    I'm trying to get to it. We were
17 just in the 60's, so --
18    Q    Of course.
19    A    All right. I am at Exhibit 3.
20    Q    Okay. Do you recognize that
21 document?
22    A    This I think it's the first EEOC
23 Complaint, yes.
24    Q    I'm sorry, so sorry, I said Exhibit 3

Page 353

1 and I meant Exhibit 2. I'm so sorry.
2       (Exhibit No. 2 identified.)
3       THE WITNESS: This one says the
4 Plaintiff's Response to First Set of
5 Interrogatories. Is that what this is?
6 BY MS. WERMUTH:
7    Q    So do you remember working with
8 your lawyer to prepare these responses?
9    A    Yes, I do.
10    Q    If you go to page -- the last page.
11    A    The last page of the document?
12    Q    Actually Page 34 and 35.
13    A    I'm there.
14    Q    Is that your signature verifying
15 the -- that you swear under penalty of perjury
16 that you provided true and correct information
17 based on the best of your knowledge at the time?
18    A    Yes.
19    Q    Okay. And so when you helped prepare
20 these responses, you were working hard to be
21 honest and accurate, is that right?
22    A    That's correct.
23    Q    Okay. If you could go now to
24 Page 12?

**MAGNA**
LEGAL SERVICES

Page 354

1    A    All right.
2    Q    Okay.  And you see Item 4 where we
3  asked you to identify each instance of being
4  belittled, ostracized, and intimidated through
5  microaggression.  Do you see that?
6    A    I see that.
7    Q    Most of these we talked about.  So I
8  would like to draw your attention to Page 14.
9    A    Yes.
10    Q    And the third bullet point from the
11  bottom: On or about 9-21-18?
12    A    Yes.
13    Q    Tell me what that -- you say here
14  that that was -- you were ostracized in connection
15  with this incident.  Tell me, please, what
16  happened.
17    A    Okay.  So yes.  So at this particular
18  faculty meeting -- you want to read it or --
19    Q    I need to understand why you believe
20  that this incident was some sort of hostility
21  directed toward you based on your race?
22    A    Okay.  So this was -- there were a
23  myriad of things that happened at this particular,
24  this meeting.  But this particular item was about

Page 355

1  how Salma, or Dr. Ghanem, spent a substantial
2  amount of time talking about, you know, new people
3  that joined the College, new people that left, you
4  know, people that have left the College, giving
5  thanks to them and things of that nature.  And
6  this particular situation was Willona Olsen who
7  was a tenure-track African -- let me go back.  I'm
8  trying to get this to the point.
9    When I came to the University,
10  there were five African-Americans, US-born,
11  domestic African-American faculty members.  By the
12  time that this had come along, by 2018, there was
13  only one and -- well, six.  I think -- I don't
14  remember if ▮▮▮ was included in this.  No, she
15  was in the meeting with me.  So by that time it
16  was only two of us.  Started off with six, and now
17  there is two.  And rarely are people left off of
18  the list of good-bye's and hello's.  But what
19  happened with Nonni was very obvious to me where
20  she wasn't even included in the good-bye's.  And
21  she had contributed to the University and to our
22  College for many, many years teaching assessment
23  courses and a lot of different things.  But when
24  it came time to say good-bye, she wasn't even

Page 356

1  included.
2    And it always seems to be an
3  after-thought.  And I had to bring it to Salma's
4  attention to let her realize that we just lost a
5  senior-track faculty member.  You know, when you
6  hire someone for tenure, you are assuming that
7  they are going to be at the University for the
8  rest of their life, if you will.  But we had lost
9  her, and no one seemed to even care that she was
10  gone.  It's like once someone leaves, we just stop
11  talking about it.  And I've seen it happen with
12  ▮, ▮ Calvente.  And I've seen it happen with
13  ▮▮ ▮▮.  And I've seen it happen with Nonni,
14  all of which left under I don't think the best of
15  circumstances.  ▮▮ ▮▮ was denied tenure, and
16  ▮▮ Calvente was denied tenure, and Nonni wasn't
17  even able to go up for tenure.  She had been there
18  for quite some time and couldn't even go up for
19  tenure, or at least believed that she wasn't going
20  to receive it.
21    What was I -- the overall
22  point that I was trying to get at is that when you
23  have a space in which there are very few
24  minorities, when you lose one of those few, the

Page 357

1  impact is astronomical because the students don't
2  even have that interaction with people of color,
3  or even US-born minorities or domestic minorities.
4  And the fact that our dean could not acknowledge
5  or see that is problematic because everyone else
6  is acting like it's normal, it is normal to lose
7  people of color, and it's normal to lose women.
8  And that was very hurtful for me in that meeting
9  because I know how well, you know, she contributed
10  to the College.
11    And there were other things
12  that were happening that day including, you know,
13  my other colleague, a white male, Dave Baglia,
14  standing up and giving a long speech about how
15  great the College is.  And he was on short-term
16  disability, and how they gave him all those
17  different resources.
18    So that coupled with this
19  oversight, and when I brought it to Salma, she
20  said:  Oh, it wasn't me, it was someone else that
21  did it.  But I was like:  You have to take
22  responsibility that you are creating a culture in
23  which you erase certain groups and don't
24  acknowledge their existence.



Page 358

1  Q    You brought that to Salma's attention
2  in the October 10, 2018 meeting, correct?
3  A    I did, yes.
4  Q    According to your transcript-like
5  notes of that meeting, she in fact did take
6  responsibility and apologized for it, did she not?
7  A    She apologized for it, but she said
8  it was Sheena (phonetic) who was over the
9  PowerPoint.
10  Q    But if your notes say something
11  different, would you have reason to dispute that?
12  A    Apologizing to me is not the same as
13  apologizing to the rest of the College or
14  recognizing it for the culture.  I explained about
15  culture.  It is not necessarily about me; it is
16  about the type of culture that is created.  And to
17  even just explain it to me still is not sufficient
18  enough to remove the hostile work environment.
19  Q    Okay.  Can you look at Exhibit 50,
20  please?
21          (Exhibit No. 50 identified.)
22          THE WITNESS:  I'm there.
23  BY MS. WERMUTH:
24  Q    Is that the PowerPoint that you are

Page 359

1  referring to?
2  A    This is pretty long.  Let me take a
3  look really quickly.  Yes.  I would have -- it
4  says September 21, 2018, so yes.
5  Q    Okay.  And then if you would tell me
6  you said Jay Baglia got up and thanked folks for
7  helping him through a tough time?
8  A    He thanked the College for their
9  support, but yes.
10  Q    And you believe you did not get the
11  same level of support that he received from the
12  College?
13  A    Not to my knowledge, no.
14  Q    And what support did he get that you
15  didn't get?
16  A    So one thing that he talked about was
17  a food train where college -- where they offered
18  to drop off prepackaged meals for him and his wife
19  Alyssa.  He also talked about people taking over
20  his courses to teach his courses.  And he also
21  talked about them giving him an alternate to his
22  service of responsibilities, meaning someone else
23  would go to his meetings for him or in his stead
24  as he had positions on different committees

Page 360

1  throughout the University.
2  Q    And you actually told ███████ you
3  didn't want other people to take over your
4  classes, other faculty to take over your classes?
5  A    I told her that at first.  But as my
6  symptoms progressed and got worse, I did ask for
7  that, and she told me no.
8  Q    When was that?
9  A    This was in end of 2017 and 2018.  I
10  think it was in 2018 too, and I'm pretty sure
11  Maria DeMoya will corroborate that because Maria
12  offered to teach my classes.  And then later ████
13  ██ told me no, she couldn't.  And I told Maria,
14  I'm sorry, ████ said no.  But we'll figure
15  something out some way.  And so then what we ended
16  up doing was ████ added herself on as, like, the
17  grader for the courses or something of that
18  nature.  But she --
19  Q    That was winter quarter?  I'm sorry.
20  A    That was winter of 2018 I think -- I
21  think it was winter of 2018.
22  Q    So in winter of 2018, you asked ████
23  ██ if Maria DeMoya could take on teaching
24  responsibilities for your courses?

Page 361

1  A    If she could assist me in teaching my
2  courses.  Yes, I did.
3  Q    And is that documented anywhere or
4  was that a verbal request?
5  A    That was a verbal request.  I don't
6  think it was documented, but it was a verbal
7  request.
8  Q    And she told you no?
9  A    She told me no.  She told me no.  She
10  said:  At this point, unless you are on leave, you
11  can't have someone, like a substitute or
12  something, take over your courses.  It had
13  something to do with me not being on leave.  And
14  so -- go ahead.
15  Q    Do you recall was Jay Baglia on leave
16  when he had folks teach his classes?
17  A    I don't know his whole, you know,
18  leave situation.
19  Q    Okay.
20  A    I just know what he explained to us
21  in that meeting.
22  Q    Okay.  Going back to Exhibit 2 on
23  Page 15.
24  A    Do you want me to take this out?  Are

MAGNA
LEGAL SERVICES

Page 362

1 we going to be coming back to this multiple times?
2      Q    We are almost done, but you can take
3 it out if you want.
4      A    It makes it easier because we keep
5 going pretty far.  Okay.  I'm ready.
6      Q    Okay.  So the last bullet point on
7 Page 15 is blank.
8      A    Okay.
9      Q    But two bullet points above that
10 where you talk about a celebration for your
11 promotion.  Do you see that?
12      A    Yes, I do see that.
13      Q    Okay.  So you say that other
14 individuals, including ▮▮ ▮▮, Matt ▮▮,
15 Maria DeMoya, Rajul Jain all got celebrations when
16 they were promoted to tenure.  Do you see that?
17      A    Yes, and ▮▮▮.
18      Q    And ▮▮▮.  And who organized
19 those celebrations for each one of them?
20      A    I think it depended depending on who
21 was the person being celebrated.  So I think when
22 ▮▮ and Matt did it, it might have been Carolyn
23 Bronstein who put that together.  But for Maria
24 and Rajul, I'm pretty certain it was ▮▮▮.

Page 363

1 And then for Nur, I might have been on leave, but
2 I think Carolyn Bronstein might have took the lead
3 on that as well.
4      Q    You would have expected your chair at
5 the time, ▮▮▮, to do something for you?
6      A    Yes.  She offered, but she never did.
7      Q    Well, let's look at Exhibit 121.
8      A    Okay, it says 2540 at the bottom.
9          (Exhibit No. 121 identified.)
10 BY MS. WERMUTH:
11      Q    Yes.  Your production, 2540.
12      A    Yes, 2540.
13      Q    If you go to the first email on 2541,
14 that's an email from ▮▮ ▮▮ to you trying to
15 arrange for a celebration for you, right?
16      A    Um-hum.
17      Q    Yes?
18      A    Yes.  That was her asking:  Would we
19 like to have a celebration; and me responding:  I
20 don't feel comfortable having a celebration until
21 after I received tenure, and me telling her but
22 whatever you'd like to do is fine.
23      Q    You say:  I don't want to make a big
24 hoopla out of it?

Page 364

1      A    Yes, I did; meaning, I don't want to
2 do it before.
3      Q    Right.  She also asks you to send her
4 names of people to invite, right?
5      A    Where does it say that?  She said:
6 If you have people other -- from other areas you
7 would like to invite, please send the names along.
8 She is asking if I wanted to send other people
9 from outside of our program an invite.  And then
10 that was the end of that interaction.
11      Q    Right.  You never responded back to
12 her with additional names, right?
13      A    No, I did not.
14      Q    Okay.  You mentioned in your
15 Complaint, Exhibit 1, go back to that.
16      A    Exhibit 1, let me get back to that.
17 That's the Second Amended Complaint?
18      Q    Yes.
19      A    I'm there.
20      Q    In Paragraph 60, Paragraph 60
21 through 66 you talk about your participation in
22 Kendra Knight's tenure case, right?
23      A    Yes.
24      Q    Okay.  And you were in favor of

Page 365

1 Kendra Knight obtaining tenure, correct?
2      A    Yes, 100 percent, yes.
3      Q    Okay.  You are not comfortable with
4 the manner in which the votes were tallied more
5 than once, correct?
6      A    I was not comfortable with the -- not
7 the tally, but the fact that we revoted and broke
8 the Faculty Handbook rules, yes.
9      Q    And you sent a letter into the UBTP
10 telling them that you were not comfortable with
11 it, right?
12      A    I don't know if I used the term
13 "wasn't comfortable," but I explained that the
14 personnel letter said that -- like, they gave the
15 perception that it was only two votes that
16 happened when in actuality four votes happened.
17 And I thought that was problematic because the
18 votes from changed from all in favor except for
19 one person denied or voted against, and then we
20 voted again and I believe the vote moved to all in
21 favor and one abstention.  And then we voted
22 again, and it was another all in favor and one
23 abstention.  And this wasn't just votes that were
24 happening back to back.  What happened is we would

MAGNA
LEGAL SERVICES

Page 366

1 vote, people would talk, we'd vote and people
2 would talk, we would vote and then people would
3 talk. And then finally, in the end we voted and
4 then everyone was in agreement that she was
5 100 percent voted for.
6     And that to me was problematic
7 for me because I had only been in several other
8 votes like this, I think at least one, and I've
9 never seen anything like that happen. And the
10 term of -- you know, the concept of, oh, she's --
11 we don't want her to feel like she has enemies, or
12 you know, it just turned out to be something that
13 I never expected it to be like. When someone
14 voted against her, and there was a lot of coercion
15 that seemed to be happening in that room, and no
16 one seemed to have the guts to stand up about it.
17   Q   When you say "a lot of coercion," we
18 are talking about a one-vote difference. So it
19 went from -- who was coerced? One person was
20 coerced?
21   A   The thing is, I don't know because it
22 is anonymous, right? I don't know if it was
23 someone that voted no and then decided yes and
24 then later abstained. We don't know. But I would

Page 367

1 venture to assume whoever that person was who
2 voted no eventually turned their vote to yes after
3 the voting no and then abstaining and then turning
4 to a yes. And a lot of that had to lot to do with
5 the conversation I believe that was happening in
6 that room with people saying that we need to make
7 sure that we make this no longer anonymous. And
8 then they were saying things like: Well, this
9 must be someone who is new faculty member who was
10 just tenured because people who have been here
11 long enough would know not to do this type of
12 thing.
13     And it just got very -- I
14 think it was problematic. And at first I thought
15 it was fine, until I noticed that in the letter
16 they just acted like it didn't happen. And I just
17 could not stand there and let that happen,
18 especially after I went to double-check to make
19 sure what we were doing is fine. And I looked at
20 the Faculty Handbook, and I was like, oh, I can't
21 sign my name to something that I know is not in
22 step with what we were supposed to be doing.
23   Q   Okay. You were given a draft of that
24 letter before it was finalized, right?

Page 368

1   A   Yes. I was given a draft. All of us
2 were given a draft.
3   Q   And at that time you didn't raise any
4 concerns?
5   A   No, because I hadn't seen the Faculty
6 Handbook yet.
7   Q   So you did refuse to sign the
8 statement, and you notified the UBTP of the
9 rationale for not signing the statement, right?
10   A   Yes.
11   Q   And this was in the fall of 2020?
12   A   Fall of 2020? No, it had to be 2021.
13 No? Wait. Yes, fall of 2020. You are right,
14 right.
15   Q   That's what Paragraph 60 says, right,
16 in Exhibit 1?
17   A   I don't see it fall of 2020 in there.
18 You mean 65?
19   Q   60, on or about --
20   A   I'm sorry, I'm looking at 66. I'm
21 sorry, I am on the wrong page. Yes, 2020.
22   Q   This was the first tenure vote that
23 took place in the College after the start of the
24 pandemic, is that right?

Page 369

1   A   I don't know if I would say that
2 because we had another tenure vote the year prior
3 to in 2019 for ███████. So the pandemic started
4 in 2019. I wouldn't say this happened after the
5 pandemic.
6   Q   You are sure? Well, I think the news
7 cycle will make it clear when the pandemic
8 started.
9   A   Well, I know it started in '19
10 because they closed down my son's school in 2019,
11 and I was stuck at home with him for a good year.
12 So I'm pretty certain the pandemic happened in
13 2019.
14     MS. SCATCHELL: I think it may have
15 started in 2019, but to clarify, the lockdown
16 began in March of 2020. Right?
17     MS. WERMUTH: Yes. It was March
18 of 2020 when the city locked down. The school, my
19 daughter at her public school was sent home.
20 That's my understanding, but that's okay.
21     THE WITNESS: I see what you are
22 saying. Okay. If you are saying the vote -- we
23 had a vote the year prior to, and then we had this
24 vote as well.





Page 370

BY MS. WERMUTH:

1  Q    Okay. In November of 2019 when you
2  voted on ████'s case, that was an in-person
3  meeting, right?
4  A    Yes, it was.
5  Q    Okay. Can you look at paragraph --
6  by the way, by fall of 2020, you already had
7  tenure, that's why you were voting in the room,
8  right?
9  A    Yes. I voted at that time and for
10 ████ prior -- the year prior to.
11 Q    Okay. So the vote on Kendra didn't
12 have any impact on your tenure case?
13 A    No, it did not.
14 Q    Thank you. And can you look at
15 Paragraph 72 in your Complaint?
16 A    I'm there. This is on Page 13?
17 Q    Yes. You mentioned three lawsuits in
18 that paragraph. Do you see that?
19 A    Yes.
20 Q    ████████ was a faculty member in
21 the law school, is that right?
22 A    Yes, at DePaul University.
23 Q    The law school. And ████████ was

Page 371

1  also at DePaul, faculty in DePaul's law school, is
2  that right?
3  A    Correct.
4  Q    And ████ Calvente, her case is still
5  pending, is that right?
6  A    I don't know. But I mean, if you are
7  saying it is, then I believe you.
8  Q    Okay. So thank you. And up above in
9  Paragraph 70 you say that: On or about November
10 2nd, 2018, ████████, a non-minority assistant
11 professor, tried to disqualify another candidate
12 for having a foreign accent. Do you see that?
13 A    I do see that, yes.
14 Q    Why is that evidence of race
15 discrimination against you, a US-born
16 African-American?
17 A    Because it shows, again, the culture,
18 and that the ways in which people discriminate
19 against protected classes. All right. And so I
20 think if you can see that we start to build -- I
21 don't want to say "we," but the College of
22 Communication has built a history of ostracizing
23 protected classes. You can definitely see how
24 something that happened to me happened over time,

Page 372

1  you know, through whatever it was, through
2  evaluations that are being applied differently or
3  however you would like to define it. But I
4  included that because I tried to step in to stop
5  that from happening, and I was met with a lot of
6  animosity which I think also turned into some form
7  of retaliation because I was speaking out against
8  these types of injustices.
9  Q    To be clear, you have no claims of
10 retaliation in your lawsuit, correct?
11 A    I don't -- I don't know off the top
12 of my head. I'd have to see.
13 Q    Is ████ a foreign national?
14 A    I think that's something she would
15 have to answer.
16 Q    In your view, does ████ have an
17 accent?
18 A    I never noticed.
19 Q    And so as you sit here today, you
20 have no idea if ████ is US born or was born in
21 another country? That's your testimony, you don't
22 know?
23 A    I think -- I said I don't -- I never
24 thought about it. I think she might be from

Page 373

1  Turkey. But ████ and I don't talk very often. She
2  might be from Turkey, but I wouldn't assume that
3  she is foreign or international born, but I know
4  her family is from Turkey.
5  Q    And what exactly did she do in
6  November of 2018?
7  A    Well, she did a number of things.
8  Are you speaking to this particular incident,
9  No. 70?
10 Q    Yes.
11 A    Okay. I remember very distinctly we
12 were interviewing different candidates for the
13 position. I was co-chairing a position to fill
14 with ████████ as my co-chair who we had spoke
15 about earlier who actually wasn't even an
16 assistant professor when he was selected to be a
17 co-chair, not elected but selected.
18 Q    That's not my question. Try to focus
19 on my question.
20 A    You asked me what happened, and I'm
21 trying to give you the details of what happened
22 and who was there. She was there. ████, ████
23 ████████ was there, Robin Hoecker. I believe that's
24 all, Robin, ████, myself, and ████. We were

Page 374

1  reviewing candidates and did our interviews, and
2  there was one particular candidate that I believe
3  ███ really wanted to be on our top like three
4  list. But unfortunately, this particular
5  candidate had already acknowledged that she hasn't
6  taught any advertising courses and was not able to
7  teach advertising courses. And the position was
8  for someone to teach advertising. This particular
9  lady had I think health communication was her
10  area. And even though I thought she was a stellar
11  candidate, I knew she wasn't a fit for the
12  position because she just didn't have the
13  experience.
14       And ███ really, really wanted
15  her. And so she tried to disqualify another
16  candidate who we had already gone through the
17  review and looked at everyone's materials. But
18  this particular candidate, she was like, she being
19  ███, said: I think we need to look further into
20  her particular background. And I said: What do
21  you mean? And she said: Well, this --
22  students -- I've read that students are saying
23  that she's difficult to understand when she
24  speaks. And I said: What do you mean? And she

Page 375

1  said: Well, that's what the students said. And
2  I -- and that's when I realized she was trying to
3  disqualify this candidate and move them down. And
4  I said: Well, first, we can't use those types of
5  criteria for identifying if a candidate is
6  acceptable or not. And second of all, we had
7  already kind of concluded our discussions about
8  the candidates. But she was trying to reopen it
9  so that she could dig deeper into this one
10  person's criteria differently than everyone
11  else's.
12       And I said: If we are going
13  to do this, we are going to have to do this for
14  all of our candidates, look at all of the same
15  criteria again. And when I said that, she got
16  very, very upset. And she said: Fine, let's just
17  vote. And I said: Well, wait, we're not ready to
18  vote yet because everyone on the committee hasn't
19  spoken because Robin Hoecker hadn't had a chance
20  to speak. And I said: Robin, did you have
21  anything to add? Robin did have some things to
22  add. She added it, and we finished our
23  conversation and ended up voting.
24       And ███ was very upset about

Page 376

1  her not being able to move that candidate up. And
2  she was upset because I told her we are not going
3  to disqualify someone based off of the way they
4  speak.
5       Q    Okay. Did you offer that candidate a
6  position?
7       A    No. This person did not get offered
8  a position.
9       Q    Did you vote to offer that person a
10  position?
11      A    I don't think so. I think in the end
12  we -- after she came to the University and did the
13  interviews, she didn't even rise to the top of the
14  candidates.
15      Q    Okay.
16      A    It wasn't my first choice to begin
17  with, but she was better than the other
18  candidates, so it was based off of those criteria.
19      MS. WERMUTH: Understood. Gia, I
20  have three or four questions on damages, and then
21  I will pass the witness. Okay.
22  BY MS. WERMUTH:
23      Q    Dr. Dillard, for a period of time you
24  treated with a social worker, is that right?

Page 377

1       A    What do you mean "treated," like I
2  went to therapy?
3       Q    Yes.
4       A    Yes. Yes, I did.
5       Q    You sought treatment from a social
6  worker?
7       A    Okay, yeah. You said "treated," and
8  I was confused. Yes, I did.
9       Q    At some point in time you stopped
10  treating with her, right?
11      A    Yes. She -- I don't want to say she
12  retired, but she stopped seeing patients
13  altogether. She became a housewife.
14      Q    And after she left, you did not
15  continue with services with another therapist
16  thereafter, is that right?
17      A    No. Actually, it's not. I did go
18  see another therapist for a bit of time. But then
19  she moved her offices a couple more times.
20  Actually, I went to try to find more -- find a
21  replacement, and it took me a while to find a
22  replacement. I interviewed three or four
23  different therapists. And then I did see another
24  therapist for a short time. But she kept moving



Page 378

1  her office, and it became too much of a burden to
2  try to see her.
3      Q     And I'm sorry.  Who was the second
4  therapist that you saw?
5      A     I don't remember her name to be
6  honest.
7          MS. WERMUTH:  Gia, the only therapist
8  that was identified was Doctor -- or, I'm sorry, I
9  don't think she's a doctor.
10         THE WITNESS:  She is not a doctor,
11 Megan Mellee.
12         MS. WERMUTH:  You have got to let me
13 ask my questions and make my statements,
14 Dr. Dillard.  I have not been notified of any
15 other psychotherapist or social worker with whom
16 Dr. Dillard treated with after Megan Mellee.  So I
17 ask that I be provided with that information so I
18 can subpoena documents and get information about
19 ongoing treatment that Dr. Dillard has testified
20 to today.
21         MS. SCATCHELL:  Okay.  This is the
22 first that I'm hearing of this doctor, so I will
23 definitely find out.
24         THE WITNESS:  I'm sorry about that.

Page 379

1  I hadn't seen her for a very long time, and it
2  slipped my mind.
3  BY MS. WERMUTH:
4      Q     Okay.  So now, can you turn to
5  exhibit -- by the way, you stopped seeing Megan
6  Mellee, and you stopped seeing her in -- your
7  final session was January 10 of 2017.  Does that
8  sound accurate to you?
9      A     I don't remember, but if that's what
10 her records say.  I trust that her records are
11 true.
12     Q     If you would turn to Exhibit 11,
13 quickly, so we can take a look together and if you
14 can go to the very last page?
15         (Exhibit No. 11 identified.)
16         THE WITNESS:  All right.  I am on the
17 last page, it says 1-10-2019.
18 BY MS. WERMUTH:
19     Q     Does that refresh --
20     A     Yes, that refresh my memory, yes,
21 that would be our last day.
22     Q     Okay.  Can you turn to -- I'm sorry.
23 Go back to Exhibit 2 which are your Answers to
24 Interrogatories.

Page 380

1      A     Okay.
2      Q     And if you go to Page 31?
3      A     I'm there.
4      Q     In Paragraph 18 we ask you to
5  identify your damages.  Do you see that?
6      A     Yes.
7      Q     So could you turn to the next page?
8  I have just a couple of quick questions.
9      A     Of course.
10     Q     First, Roman numeral (i), you say you
11 have lost wages from failure to promote for three
12 years, approximately $150,000.  So is this failure
13 to promote to PRAD chair?
14     A     Yes, yes.
15     Q     And how do you derive $150,000?
16         MS. SCATCHELL:  I am going to object
17 to the extent that it calls for a legal
18 conclusion.
19         THE WITNESS:  I'm sorry.  You cut
20 out.
21         MS. SCATCHELL:  I am going to object
22 to the extent it calls for a legal conclusion, but
23 you can answer.
24         THE WITNESS:  And your question was

Page 381

1  about how did I arrive at that number?  Is that
2  what you are asking, Anna?
3  BY MS. WERMUTH:
4      Q     Yes.
5      A     Essentially, I was thinking through
6  the lost opportunities that happened to me along
7  the way during my time at DePaul.  For example, I
8  looked at similarly situated schools, that, you
9  know, have about the same size student body with
10 similar tuition costs, private institutions, and
11 looked at what a program chair generally would be
12 paid or program director generally would be paid
13 in terms of their salary, and that was the average
14 salary of that person.
15         And I know that at the
16 University we don't necessarily have raises to
17 this extent.  However, it's about being able to
18 move forward in your career.  And I know that once
19 I was -- once I was adversely affected and wasn't
20 able to move up in my career or advance my career,
21 that I automatically was starting to lose money
22 over time.  That includes my salary as being --
23 you know, moving into a position as a program
24 chair.  And I will just stop there because I know

Page 382

1   you said you have other questions, so go ahead.
2       Q    I want a full answer to the question
3   as to how you got $150,000 from the denial of the
4   PRAD chair position.
5       A    That's what the average pay is for a
6   person in a similarly situated position at
7   comparable universities.
8       Q    Just so I'm clear, the average pay of
9   someone in a program chair position at a
10  comparable university is $150,000 a year?
11      A    Yes.
12      Q    Okay.  So you -- are you saying that
13  you should get $450,000 because it says for three
14  years?  I am confused.  Are you saying the denial
15  of the promotion equals $150,000 or $450,000?
16      A    I'm saying it compounds over time.
17  So even if I were to be given let's say 450 or
18  whatever the number you just said, $450,000, that
19  puts me below the lifetime development of my
20  career because once you -- go ahead.  You are
21  shaking your head.
22      Q    You said: Lost wages from failure to
23  promote Plaintiff for three years is approximately
24  $150,000.  So --

Page 383

1       A    Yes.
2       Q    So my understanding was that was
3   $150,000 for the three years.  But you just
4   testified that you looked at comparable colleges,
5   and you saw individuals earning $150,000 a year
6   who held this position.  So I'm confused as to how
7   you are calculating this amount.
8       A    The three years is because I know at
9   DePaul the position is generally held for three
10  years.
11      Q    Right.
12      A    It could be longer than that.  Could
13  be six years, doesn't have to be only three years.
14      Q    Are you saying it is $150,000 for the
15  three years or it is $150,000 per year for each of
16  the three years?  I don't understand your damages.
17      A    Oh, I see what you are saying.  You
18  are saying is it per year or for all three years
19  put together?
20           MS. SCATCHELL:  I am going to make
21  the same objection, but you can answer.
22           THE WITNESS:  Now you have got me a
23  little bit confused when you said that.  I would
24  say it's -- actually, this to me is per year.

Page 384

1   Yes, per year.
2   BY MS. WERMUTH:
3       Q    So you are actually asking for three
4   times the amount that you have listed here?
5       A    Isn't it totaled somewhere?
6           MS. SCATCHELL:  Same objection.
7           THE WITNESS:  Yes.
8   BY MS. WERMUTH:
9       Q    And what schools did you look at?
10  Tell me.
11      A    I don't remember off the top of my
12  head.
13      Q    Did you save your research?
14      A    I'm sure I could do the research
15  again.
16      Q    That's not my question.  My
17  question --
18      A    No, I didn't save the research.
19      Q    Did you give your lawyer the
20  research?
21      A    Well, I gave it to my previous lawyer
22  because I came up with this number in tandem with
23  my previous counsel.  I haven't had this
24  conversation with Gianna just yet.

Page 385

1           MS. WERMUTH:  Okay.  Can we take a
2   break?  I think I'm done.  I just want to have,
3   like, a two-second conversation with my
4   co-counsel.
5           MS. SCATCHELL:  Sure, sounds good.
6   How long is this break?
7           MS. WERMUTH:  Do you want to take a
8   lunch break?
9           MS. SCATCHELL:  Sydney, how are you
10  feeling?
11          THE WITNESS:  I'm okay.  I'm just
12  wondering how long we have because I do teach
13  tonight at 5:45.  I want to make sure we will be
14  able to get out in time for me to prep for that.
15          MS. SCATCHELL:  If we cut it too
16  close, would you have any objection to me
17  finishing up Ms. Dillard's deposition by doing an
18  affidavit?
19          MS. WERMUTH:  Look, you can do any of
20  it by affidavit.  I don't really control that.  If
21  you want to do all of her, it's your call, Gia,
22  whatever you want to do.
23          MS. SCATCHELL:  Well, I would like to
24  redirect her on some of these things.  Let's take

Page 386

1  say a half hour break. Is that okay, Sydney?
2       THE WITNESS: That's fine.
3       MS. SCATCHELL: Perfect.
4       MS. WERMUTH: Thanks, everybody.
5       MS. SCATCHELL: Back on at 1:15?
6       MS. WERMUTH: Sure.
7            (Lunch recess taken.)
8       MS. WERMUTH: Right before we
9  reconvene, I sent an email with Exhibit 147. Do
10 folks have that? Can you hear me?
11           (Exhibit No. 147 identified.)
12      MS. SCATCHELL: I have it, yes.
13      THE WITNESS: Yes.
14 BY MS. WERMUTH:
15      Q     I shared with you Exhibit 147. We
16 were talking earlier today about the SharePoint
17 issue where you and Maria both timely failed to
18 submit your materials in January of 2017. And you
19 indicated that you got an email that was harsh
20 from ▮▮▮▮▮ that Maria did not get. Is this
21 the email that you are referring to in
22 Exhibit 147?
23      A     Yes, that's the email.
24      Q     And if you can turn to Exhibit 125?

Page 387

1            (Exhibit No. 125 identified.)
2       THE WITNESS: Are you still --
3  BY MS. WERMUTH:
4       Q     I'm done with that one.
5       A     My cough medicine is starting to wear
6  off.
7       Q     I'm sorry.
8       A     You said 125, okay. I'm there.
9       Q     Okay. That is a set of emails that
10 you produced to us, and it looks like it starts
11 with an email from you to Lexa Murphy on May 1st,
12 2019. Do you see that?
13      A     Yes, I do.
14      Q     And in the email it looks like the
15 two of you had scheduled a meeting for that day,
16 is that right? You write: I just wanted to
17 provide you a quick overview of some of the
18 concerns that I am hoping to raise at our upcoming
19 faculty climate meeting. Do you see that?
20      A     Yes, I see that. I see that.
21      Q     Okay. And so the two of you were
22 planning to meet on that day, May 1st, 2019, is
23 that right?
24      A     I don't remember what day we were

Page 388

1  planning on meeting. But yes, I think so. This
2  might have been the one where I met with her over
3  the phone or something. But yes, go ahead.
4       Q     Okay. And you had raised a series of
5  concerns that are bullet pointed. Those concerns
6  are primarily your concerns about how you were
7  treated, is that right?
8       A     Can I read over this?
9       Q     Of course. We can do it on or off,
10 whatever your choice is.
11      A     Okay. What was the question?
12      Q     The two of you met, and you discussed
13 those concerns; correct?
14      A     Yes, I think we did. I just think it
15 happened over the phone. We were supposed to meet
16 face to face, and it might have been over the
17 phone. I believe we did meet. I've had a lot of
18 meetings with Lexa, yes.
19      Q     The two of you did discuss the items
20 that you set forth in your email?
21      A     Honestly, I can't -- it's really
22 difficult for me to remember if we had this
23 conversation or not because I had a longer email
24 where I listed some details of things I'd like to

Page 389

1  discuss with her, and I had a conversation with
2  her about it. This one says considering -- I'd
3  like to continue the conversation that Salma and I
4  began last year. And Selma and I had that
5  conversation with Lexa -- not Lexa, ▮▮▮ there.
6  So I can't wholeheartedly say that I remember us
7  having this conversation. I would have to think
8  more about it. But I think we did. I really do
9  think we had a conversation about this.
10      Q     Okay. And then after this, whether
11 you had the conversation or not, you notified her
12 that you had been selected for this Women in
13 Education Leadership Program at Harvard, right?
14      A     Yes, I did. I let her know that I
15 had applied, and I was selected.
16      Q     And she expressed happiness for you,
17 yes?
18      A     She did, yes.
19      Q     And she said that she would reach out
20 to academic affairs to inquire about funding for
21 your participation, correct?
22      A     Yes, because I think two faculty
23 members had gone to a similar program, and I think
24 academic affairs provided funding, and she was

MAGNA
LEGAL SERVICES

Page 390

1 going to look at that.
2 Q And you did get funding for that?
3 A Yes. I didn't end up going because
4 of COVID; but yes, they did approve it.
5 MS. WERMUTH: Okay. I have no
6 further questions at this time. I'm going to
7 black for my screen for a few minutes, I'm still
8 here.
9 MS. SCATCHELL: Okay.
10 E X A M I N A T I O N
11 By Ms. Scatchell:
12 Q Do you prefer to be Dr. Dillard on
13 the record or Sydney?
14 A You can call me Sydney.
15 Q Sydney, when you first began your
16 deposition, you started talking about a little bit
17 of your background, where you went to college and
18 pursued your Ph.D. Could you tell me what the
19 focus of your college major was?
20 A For my Ph.D. or all of my degrees?
21 Q Both.
22 A My undergraduate degree was in
23 advertising, integrated marketing communication,
24 and journalism. It's why I teach in PR and

Page 391

1 advertising at DePaul. My master's was in media
2 technology and society, so I looked at how media
3 influences people's perception. And then finally,
4 my Ph.D. was a general communications degree, but
5 my focus was in technology, society, and Critical
6 Race Theory, and health communication.
7 And so I've spent a
8 significant amount of time in my career focused on
9 understanding power dynamic, understanding the
10 interplay of culture, agency, and structure and
11 how those three items shape and control and can
12 also be manipulated by people in their own
13 agencies or by their own internal drivers or
14 factors. And a lot of my focus is how the power
15 dynamics play out in structural inequities.
16 Q Okay. And could you expand a little
17 bit more on what you studied or what Critical Race
18 Theory is?
19 A Yes. Yes. Critical Race Theory is
20 the study of the systemic marginalization of
21 certain groups of people based off of their race.
22 We all know that -- most people can agree that
23 race is a socially constructed marker or
24 descriptor. I mean, there might be, you know,

Page 392

1 visual differences or small differences based off
2 of people's genetic code. But in actuality, a lot
3 of the experiences that people or particular
4 groups have, you know, we're talking people of
5 color, comes from a socially constructed marker
6 that is intangible. It's not something that you
7 can necessarily put your finger on. But we still
8 use it daily.
9 And you know, history has
10 shown us that based off of these visual cues and
11 these verbal markers, that certain groups are
12 ostracized and treated less than. And
13 unfortunately, historically, that has been the
14 case for descendants of slaves here in the United
15 States. So that's what a portion of my research
16 focuses on: How people of this particular group
17 and other marginalized groups encounter the
18 structures that shape their experiences and cause,
19 you know, long-term effects including
20 socioeconomic instability and health inequities
21 and lack of ability to move forward in, you know,
22 develop a fulfilling life.
23 So without going into, you
24 know, a whole lecture because I could lecture

Page 393

1 about this all day, but without going into too
2 much of that, that's an overview of what my area
3 of expertise is, particularly in regards to
4 Critical Race Theory.
5 Q And you identify as a female,
6 correct?
7 A I do.
8 Q And also as an African-American
9 woman?
10 A Yes, and a descendant of slaves.
11 Q Okay, great. And then so Critical
12 Race Theory, is that -- would you describe that as
13 a mainstream type of position or more of a
14 controversial position?
15 MS. WERMUTH: Object to form,
16 leading. Thank you. Also relevance.
17 THE WITNESS: It clearly is not
18 mainstream. I would say it is ancillary, but it
19 is getting a lot of popularity. When I was
20 studying it back in, you know, when I went to get
21 my Ph.D. in 2008, so that was almost, you know,
22 more than 10, 15 years ago, this was considered a
23 very small group of people and thought leaders.
24 But now it's very prevalent now, and you're seeing

MAGNA
LEGAL SERVICES

Page 394

1  things like discussions at the elementary school
2  level, at the primary school level in which there
3  are discussions about what should and shouldn't be
4  included in the history books and how that, you
5  know, plays out in young children's mind.
6            There is legislation banning
7  the discussion of Critical Race Theory.  And it
8  certainly is something that's controversial
9  because what it does, it shines light on the ways
10 in which particular groups use their markers,
11 their race as a way to subjugate and minimize
12 other groups.
13 BY MS. SCATCHELL:
14     Q      And you spoke a lot about the culture
15 at DePaul.  Could you expand on what you meant by
16 that?
17     A      Well, of course.  I mean, it's really
18 interesting and, you know, out of all of the
19 things that we talked about, one of the things
20 I've always tried to do as a professor and as, you
21 know, a Black woman is shed light on the
22 inconsistencies that we constantly experience.  So
23 culture to me is about how the University presents
24 itself and the College of Communication, how we

Page 395

1  present ourselves versus what are the practices
2  that we are implementing on a regular basis.  So
3  culture, meaning, do you create a welcoming space?
4  Are you open to looking -- I mean, willing to
5  change with the times?  Are you willing to
6  acknowledge that we've had a long history of
7  particular groups and particular people leading?
8  And when we start to see that there is other
9  voices and other faces, are we trying to be
10 inclusive?
11           And at DePaul we have a
12 mission, right?  We have a very specific mission.
13 We have a nonprofit organization and private
14 institution.  And we have Vincentian values where
15 we are trying to focus on diversity and
16 inclusiveness, opening up opportunities for
17 first-generation, low-income students and things
18 like that.  But at the same time we have this
19 tension that I've seen develop over the years at
20 the College of Communication in which we don't
21 necessarily practice what we preach.
22           And that's exactly why we see
23 things happening in my case that are focused on,
24 you know, setting a hard line of we're not -- I'm

Page 396

1  not going to go any further than this.  Even
2  though it's much easier to go along with the grain
3  and also -- I mean, without going into much
4  detail, knowing that when you go against the grain
5  too much or so much, that you get ostracized.  So
6  a good example of that is like ███ Calvente.
7  I've said since day one she was very, very
8  outspoken about the very nature and culture of the
9  College.  She has been very outspoken about it.
10 And me, I've been somewhat outspoken, but I only
11 do it in the ways that I think are in alignment
12 with my beliefs as a researcher.
13           I really do believe with the
14 culture-centered approach, you need to modify the
15 structures internally.  You can't yell at the
16 structures and expect them to change.  Everyone
17 needs to be on the same page about the change that
18 needs to happen in order for you to be -- for us
19 to flourish, for us to create a very, truly
20 inclusive space in which, you know, there is not
21 only one tenure track or tenured faculty member
22 that is a person of color and US born or
23 descendant of slaves.  We have to create a culture
24 where we are aware that there are things that

Page 397

1  might not be overt but covertly are pushing people
2  to the margins and not allowing their voices to be
3  heard and not allowing them to have a seat at the
4  table.
5      Q      Could I stop you for one second just
6  to ask you what you mean by changing it from,
7  like, the internal structure out?
8            MS. WERMUTH:  Hang on.  I'm just
9  going to object based on relevance.  You may
10 proceed.
11           THE WITNESS:  Okay.  Can you repeat
12 the question, Sheri?  I'm sorry.
13           MS. SCATCHELL:  You said:  Don't yell
14 at the structure, change from the inside out.
15           THE WITNESS:  Oh, yes, don't yell at
16 the structure, change it inside out.
17 BY MS. SCATCHELL:
18     Q      Actually, let me back you up for one
19 second.  What you just testified to was your
20 approach of how you believe that the culture of
21 DePaul could be enhanced to be more inclusive?
22     A      Yes, yes.
23     Q      Okay.
24     A      That's one of the reasons I haven't



Page 398

1   left the University. I have had that question
2   asked of me on numerous occasions by numerous
3   faculty members and colleagues: Why haven't you
4   left? I have a pretty strong record, and I could
5   leave the University. I have had some offers from
6   other universities, but I haven't taken them
7   because I do believe that they do have the
8   propensity to change. And among other things --
9       Q    Real quickly, who asked you why you
10  were still here at the University?
11      A    Actually, I --
12          MS. WERMUTH: Object to form,
13  misstates her testimony. Go ahead.
14          THE WITNESS: Actually, when I was --
15  when we were doing the mediation session between
16  DePaul and myself before, Gianna, you were my
17  attorney, when I had my previous attorney, that
18  was one of the topics that came up in DePaul's, at
19  least from my memory, in DePaul's response. And
20  even at that meeting --
21          MS. WERMUTH: I'm going to have to
22  move -- I'm sorry. I have to interject. Those
23  are privileged. Mediation communications are
24  privileged under Federal Rules of the Evidence

Page 399

1   408, so I object to this being in the record.
2           THE WITNESS: Does that mean I
3   can't --
4           MS. SCATCHELL: You can answer it in
5   the context -- if you -- you can't discuss what
6   happened at the mediation, but if it happened
7   outside the mediation, that's what you are able to
8   discuss.
9           THE WITNESS: What if it was in their
10  response, DePaul's response? It was in their
11  letter.
12          MS. SCATCHELL: I will get to that.
13  We will just go -- yeah, we will just go to that.
14          THE WITNESS: Well, the point being,
15  I have been asked why I haven't left. And I
16  really do believe that you can change it
17  internally because it is a matter of just a shared
18  identity and a shared understanding of what the
19  space should look like. And I have seen some
20  movement, and I've seen some involvement in some
21  of my colleagues at DePaul. But at the same time,
22  I've been met with lots and lots of animosity or
23  met with I guess fear, I would say fear that this
24  could be a different future, a future which the

Page 400

1   majority is not considered the majority, but the
2   majority is now a part of a more inclusive space.
3   BY MS. SCATCHELL:
4       Q    Let me stop you really quick. What
5   do you mean by "inclusive"?
6       A    I mean including voices that have not
7   been there in the spaces of leadership. So I've
8   always tried to strive for more, better.
9   Unfortunately, it's just the nature of the academy
10  as of right now. I mean, in advertising
11  specifically and even in the communications field,
12  there are very, very few people of color. There's
13  even fewer African-Americans of color. And the
14  attrition rate of African-Americans specifically
15  at DePaul is alarmingly high when you are a
16  faculty member. Faculty members leave. Black
17  faculty members leave more often than you would
18  expect. And it happens, I don't know, ten fold
19  within our College.
20          That being said, it is about
21  creating the space where people acknowledge and
22  value opinions that are outside of the norm or
23  outside of their own. And that's always what I've
24  been pushing for since I've been at DePaul is to

Page 401

1   try to get us to practice what we preach: Bridge,
2   theory, to practice. I've even written works
3   about bridging theories to practice because that
4   is a very hard leap. It sounds good in nature,
5   but it is a hard leap. But you have to make
6   decisions like not giving positions to people
7   simply because you feel like you are like that
8   person. It really should be based off of
9   qualifications and based off of not just fit but
10  also strategic direction of the University and our
11  College.
12      Q    Okay. And you had just testified as
13  to a high attrition rate among was it
14  African-Americans or people of color?
15      A    I don't know about people of color,
16  but I do know attrition rate among African-
17  Americans is pretty high.
18          MS. WERMUTH: Objection, relevance.
19
20  BY MS. SCATCHELL:
21      Q    Do you have any examples of that?
22      A    Well, I mean the biggest example
23  that's most relevant to our case right now is the
24  number of African-Americans that have come and



Page 402

1 gone or never been in the College. So I've been
2 at DePaul since 2012. My entire time here we have
3 never had a person -- let's just start with the
4 Black man, a domestic Black man or even a US-born
5 domestic Latina, Latino, or Latinx man. We've
6 never had one until -- no, we still don't have
7 one. I was about to say we have Seyi, but Seyi
8 was born in Africa, and so his experience there is
9 very different from a person born in the US.
10 That's the reason why we have those protected
11 classes I believe. And the same thing goes for
12 African-American women, right. So when I came to
13 DePaul, we had ███ ███ there, she was
14 African-American.
15 BY MS. SCATCHELL:
16 Q Who is she?
17 A She was a journalism professor,
18 tenure-track journalism professor and the first
19 and only person that I know that went up for
20 tenure in the College and was denied tenure and
21 left the University. And there was a big to-do
22 about it. In fact, we changed our teaching,
23 T & P, tenure and promotion guidelines, for the
24 College after her interaction because she was

Page 403

1 getting mixed information about whether she was
2 qualified for tenure or not.
3 MS. WERMUTH: Move to strike based on
4 foundation.
5 MS. SCATCHELL: Based on what?
6 MS. WERMUTH: Foundation.
7 MS. SCATCHELL: First of all, listen.
8 I gave you a lot of latitude in the scope of the
9 deposition. I would appreciate it if you could do
10 that with mine. We both know that a relevance
11 objection as noted is not enough to actually move
12 to strike anything. As long as it's not
13 privileged or harassing, it is able to come into
14 the record.
15 MS. WERMUTH: Okay, but I have to
16 preserve my objection. So I am trying, but it's
17 hard to get my objection in because there is
18 talking over each other. So I have an ongoing --
19 well, first of all, that was foundation, which is
20 not relevance. So now she's testifying about what
21 someone else was told without identifying how she
22 knows that information, where she obtained that
23 information. And so I think foundation is an
24 absolute reason to object and strike.

Page 404

1 MS. SCATCHELL: Well, I think -- hold
2 on one second, Sydney. The biggest thing is I
3 asked one question, and that was her answer, and I
4 wasn't even given a chance to lay the foundation.
5 So if given the opportunity, I will be happy to do
6 so.
7 BY MS. SCATCHELL:
8 Q Sydney, who is ███ -- how do you say
9 her last name, ███?
10 A ███, yes.
11 Q Who is she?
12 A She was a tenure-track faculty member
13 in the College of Communication. She was
14 African-American.
15 Q Do you know her?
16 A I do know her, yes.
17 Q Okay. And she --
18 A She -- when I came to the University,
19 she was still here.
20 Q Okay. And she was a professor for
21 journalism. Is that in the College of
22 Communication?
23 A Yes, that's one of the programs in
24 our College.

Page 405

1 Q Okay. And you said she was an
2 African-American woman?
3 A Yes.
4 Q Okay. And she was up for tenure you
5 said?
6 A Yes. She went up for tenure, and she
7 was denied tenure.
8 Q How do you know this?
9 A She told me, and I was there when it
10 happened. Like, I was --
11 Q When she was denied?
12 A Not in the room when they denied her.
13 But they had denied her, and we had faculty
14 meetings afterwards. And she went around and told
15 people that she was denied. And I talked to her
16 personally as well.
17 Q And when you said there was a big
18 to-do about her denial of tenure, what happened?
19 A Well, the issue was, we used to have
20 categories for what's considered like in making
21 great progress towards tenure or you're not. We
22 used to have categories of very good -- excellent,
23 very good, good, fair, and unsatisfactory. It was
24 like a five-point scale. When you went through

MAGNA
LEGAL SERVICES

Page 406

1   your reviews, you would have to -- they would have
2   to vote on which category you -- your progress
3   was.
4           And apparently, from what she
5   told me, there were -- there was a strong split
6   between faculty on how well she should have been
7   labeled.  She had been told years prior to that
8   that she was making progress towards tenure, good
9   progress towards tenure.  And then when she went
10  up for tenure, there was some contention on
11  whether or how well she did, and they voted on
12  those categories and whatnot.  In the end, she was
13  denied.  And the following year --
14      Q    She told you that?
15      A    She told me that, yes.  She told me
16  that personally.
17      Q    Okay.
18      A    And the years following that, the
19  ones who were still at the University, the rest of
20  us, the tenure-line and tenured faculty members,
21  we started having a broader conversation about
22  whether we needed to remove those or change those
23  subjective markers because no one else prior to
24  her had had these issues going up for tenure.  And

Page 407

1   the --
2           MS. WERMUTH:  Objection.  Again,
3   foundation.  To sit -- to make broad statements
4   that no one before her has had, you know, concerns
5   about or has been evaluated under these prior -- I
6   mean, these are very broad statements with no
7   foundation.
8           THE WITNESS:  So --
9           MS. SCATCHELL:  I can lay the
10  foundation if we get there.  Okay.
11          So Sydney, I think the easiest
12  way to do this to avoid this objection from
13  happening and avoid your testimony being
14  interrupted on a continual basis because I feel
15  like it's going to ruin the crux of what we're
16  looking for, is, one, I will note a continuing
17  objection to the foundation as to my client's
18  testimony.  And I will ask you more questions to
19  draw out particular parts about what you know and
20  what your experience and your opinion is, so this
21  way we won't have the foundation issue.  Okay?
22          THE WITNESS:  Okay.
23  BY MS. SCATCHELL:
24      Q    Okay.  So when you -- were you

Page 408

1   involved in the actual rewriting of the T & P
2   policy?
3       A    I was involved in the discussion
4   about the T & P policy.  It was open to all
5   tenure-line faculty members to discuss and provide
6   feedback, but I didn't have anything to do with
7   the rewrite.  I think we probably had a task force
8   or committee that did the rewrite specifically.
9       Q    Do you remember who else was
10  participating in that discussion for the T & P
11  rewrite?
12      A    Oh, yes.  It was open to everybody,
13  but I do remember specifically ██ Calvente
14  having some concerns, voicing concerns, Maria
15  DeMoya, myself.  I believe Jill ██ had
16  something to say as well.  And those are the --
17  the thing is, at the time, I was a junior faculty
18  member, so the junior faculty members meet up and
19  try to talk about our concerns and respond to it
20  separately.
21          In terms of the tenured
22  faculty, I don't remember everyone that was
23  included, but I think Daniel Makagon had something
24  to say as well as ██ ██.  There might have

Page 409

1   been more.
2       Q    This was after ██ ██ had left
3   the University?
4       A    Yes, this was shortly after.
5       Q    And what were the issues that were,
6   if you remember, that were discussed as to what
7   needed to change for the T & P policy?
8       A    I believe the removal of the -- of
9   one of the criteria.  It was, like, let me see,
10  excellent, very good, fair.  Oh, so I think we had
11  excellent, very good, good, fair, and
12  unsatisfactory.  I think those might have been the
13  five categories.  I think ██ ██ was judged as
14  good in one or two of her categories.  But I know
15  that when you go up for tenure, you need to be
16  excellent.  I mean, this is a new rule.  The rules
17  have changed.  So I can't quite remember what all
18  the different rules were, but I know that she was
19  rated as good in one of her categories.  And she
20  said:  If I am rated as good, I don't understand
21  how that means I'm unsatisfactory.  Because it was
22  kind of -- it was contradictory to tell someone
23  they were good but not good enough to be tenured.
24  You know what I mean?  So I believe in the end we

Page 410

1 removed the good category. We had excellent, very
2 good, fair, and unsatisfactory, among other
3 things. There was a much larger conversation, but
4 that was the beginning of the conversation was
5 about changing those categories.
6     Q    Were there any other African-American
7 female professors at the College of Communication?
8     A    Since I began there, yes. I was
9 going through the list. There was ███ ███.
10 She left or was denied tenure and left.
11     Q    Let me ask you a different way. Who
12 is Nonni Olsen?
13     A    Willona Olson. She was also a
14 tenure-track faculty member African-American in
15 the College. She was there when I got there.
16     Q    Do you know her?
17     A    I do know her, yes.
18     Q    Okay.
19     A    I don't know how long she had been
20 there, but she might have been there for a year or
21 two.
22     Q    Is she still there now?
23     A    No. She did not stay. She had been
24 at the University for two years, but she -- from

Page 411

1 what I heard, because I talked to her directly,
2 she told me that she had to leave because she felt
3 like she was being treated differently. She had
4 applied for, like, a personal leave at some point
5 because she had, like, lost her father. He was a
6 very well-known, like, pastor in Chicago. And so
7 she needed to take some time to grieve. And she
8 was -- she told me she felt ostracized because she
9 had applied, but her personal leave was denied.
10 And she saw other people take personal leave, and
11 they weren't denied. And eventually, she said she
12 felt like she got pushed out, and she left the
13 University as well. I think that was maybe the
14 year before she went up for tenure, maybe two
15 years before she was supposed to go up for tenure,
16 she decided she couldn't handle it and left.
17     MS. WERMUTH: Objection.
18 BY MS. SCATCHELL:
19     Q    That was based on a conversation that
20 you had with her, correct?
21     A    Yes.
22     Q    And she told you she couldn't handle
23 it, correct?
24     A    She did, yes. And she told me to be

Page 412

1 careful.
2     Q    And what do you think that that
3 meant?
4     A    At the time, I honestly didn't quite
5 know what it meant. This was literally around the
6 time that ███ Calvente told me to stay away from
7 her.
8     Q    We will get to that.
9     A    Okay. I had only been at the
10 University two to three years, and I was still
11 trying to understand the culture and ins and outs.
12 But she told me to be careful, and I took that as,
13 you know, just be careful in who you associate
14 with. That was what I took it as. But now, you
15 know, years later after seeing all of these small
16 microaggressions and macroaggressions over time
17 compounding, I have a much better understanding of
18 what she was trying to elucidate back then.
19     Q    Which was what?
20     A    Which was that this College, this
21 University is not a space that is welcoming for
22 African-Americans.
23     Q    And who is Teresa Mastin?
24     A    Yes, I know Teresa Mastin as well,

Page 413

1 literally saw her a month ago and chatted with
2 her.
3     Q    Who is she?
4     A    So Teresa Mastin was a tenured
5 faculty member in the College of Communication, in
6 my program, the public relations and advertising
7 program.
8     Q    And what's her nationality?
9     A    She is African-American as well,
10 descendant of sharecroppers. Go ahead.
11     Q    Is she currently at the University?
12     A    No, she left as well.
13     Q    Did she tell you why she left?
14     A    She told me that she was over -- she
15 told me she was overworked and that some of the
16 opportunities at the University were too limiting
17 for her career and the direction that she wanted
18 to go. But she also told me that she eventually
19 wanted to end up back where she came from. I
20 think she's from Michigan. Or her home, I think
21 her home might have been Michigan or that's where
22 her family is. She also wanted to go there. But
23 she said that the expectations at the University
24 were not in line with what she had expected.

MAGNA ►
LEGAL SERVICES

Page 414

1       Q    Did she expand on that?
2       A    No, not very much, no.
3       Q    Okay. And do you have any idea what
4 she was referring to when she said that?
5       MS. WERMUTH: Objection, calls for
6 speculation. She just testified --
7       MS. SCATCHELL: If you know.
8       MS. WERMUTH: She just testified she
9 didn't expand on it. Calls for speculation.
10       THE WITNESS: Does that mean I can't
11 answer?
12       MS. SCATCHELL: You can answer.
13       THE WITNESS: Okay. I can speculate
14 that she knew that the College was going down a
15 path that wasn't very good for people of color,
16 specifically Black women. Plus, she wanted to
17 move into the diversity, equity, and inclusion
18 space, and there was not very much room to grow
19 here at the University for that type of work. So
20 I know that she left the University and went to
21 Northwestern which is literally down the street,
22 and she became like the DEI director of their,
23 like, medical school I believe.
24

Page 415

1 BY MS. SCATCHELL:
2       Q    Diversity, equality, and inclusion?
3       A    Diversion, equity, and inclusion,
4 yes, at the medical school there, and took on more
5 initiatives year. And then she left there and
6 went back to Michigan. I don't know which
7 university. I think it was she was at the
8 University of Michigan, and now she is like the
9 dean of the school. So once she left the
10 University, she was able to expand with her
11 career.
12       Q    And then who is ▮▮ Calvente?
13       A    ▮▮ Calvente is -- was a faculty
14 member in the College of Communication. I believe
15 she was in the performance studies area, and I --
16 go ahead.
17       Q    Is she a woman?
18       A    I believe she identifies as a woman.
19       Q    And what is her ethnicity?
20       A    I didn't know for certain until we
21 had this conversation, but I believe she
22 identifies as African-American and maybe Latina.
23 I think she's Vietnamese and Puerto Rican.
24       Q    Okay. She is still a professor at

Page 416

1 the University?
2       A    Unfortunately, no.
3       Q    Do you know what happened to her?
4       A    Yes, I do. She was denied tenure I
5 believe in 2019.
6       Q    And how do you know this?
7       A    I went up for tenure with her. And
8 she told me everything that -- at least everything
9 that I know that happened to her. And her and I
10 had -- have had long discussions about experiences
11 we've both experienced in the College and even put
12 in complaints together.
13       Q    Okay. We will get into those in a
14 bit. When you stated that -- you mentioned
15 something about microaggressions and
16 macroaggressions. Can you tell me what a
17 macroaggressions is?
18       A    Yes. You said micro or macro? I
19 didn't hear you.
20       Q    Macro.
21       A    Macroaggressions I believe are like
22 overt signs that you are not wanted or needed.
23 For instance, a macroaggression would be a space
24 in which let's say someone applies for a position

Page 417

1 and without reason or, you know -- without reason,
2 you deny that person just based off of their
3 markers and come up with unexplainable reasons as
4 to why or I would say unqualified reasons as to
5 why this person is not worthy of a position. That
6 would be a macroaggression.
7       Q    Okay. And what about a
8 microaggression, how is that different?
9       A    Microaggressions are a lot more
10 covert. They happen in daily conversation when
11 someone makes a small joke about a group or a
12 certain type of person, especially if they are
13 like within a particular protected class. An
14 example would be, you know, saying that someone --
15 making the joke about a particular group or
16 laughing. Or I'll give you an example, perfect
17 example. I haven't told too many people about
18 this, but a microaggression would be something
19 like my dean asking can she touch my hair, which
20 has happened to me.
21       Q    Got it. And who did that?
22       A    Salma Ghanem.
23       Q    And when did she ask you that?
24       A    This was years ago, probably like in

Page 418

1  2013 or '14.
2      Q      Okay.  And was anybody else present
3  for that conversation?
4      A      Yes.  We were at the -- at a faculty
5  meeting.  To be honest, in full transparency, I
6  didn't think anything negative about it when it
7  happened because I always thought of Salma as --
8  you know, her and I were cordial.  Certain people
9  I don't mind asking me those types of things, you
10  know.  So I didn't take it as a microaggression,
11  but that would be an example of a microaggression.
12      Q      But now as you look back -- let me
13  back up.
14              Fair to say that
15  microaggressions probably happen more often than a
16  macroaggression?
17      A   Yes.
18          MS. WERMUTH:  Objection, leading.
19          THE WITNESS:  Microaggressions happen
20  way more often, simply the nature of the academy.
21  I mean, just in society in general, right.  So I
22  will give you a very quick example.  Let's talk
23  about say George Floyd.  Let's of people wouldn't
24  have realized that police brutality was really,

Page 419

1  really happening amongst African-Americans until
2  someone actually took out a phone and recorded the
3  things that were happening.  Right?  So if you
4  don't see it happening regularly, you'd think that
5  it's not happening, but it is.  So same thing with
6  microaggressions.  They are small, and they are
7  happening all the time, and they compound over
8  time.
9  BY MS. SCATCHELL:
10      Q      Okay.  So when Salma Ghanem had
11  initially asked you that, you didn't find it
12  offensive at the time because this was going back
13  when you were first starting at the University?
14      A      Well, yeah.  And I just felt like she
15  probably had very little interactions with people
16  of color or a Black woman, and a Black woman in
17  her natural hair, you know.  I don't think I've
18  ever in my life seen another, like, a person who
19  is not Black be asked, oh, can I touch your hair
20  just to see what it feels like?  And I've had that
21  experience throughout my life, even when I spent
22  some time overseas.  People ask to touch my hair
23  all the time.  I've gotten use to that.  But it is
24  frowned upon.  And really, in this day and age

Page 420

1  right now it is considered a microaggression.
2  Lots of things that were acceptable ten years ago
3  are not acceptable now by society.
4      Q      So you said that ██ Calvente and
5  you had made complaints together.  What were those
6  complaints?
7      A      It is a very long list.  But -- so, I
8  mean, we complained to Salma together.
9      Q      Let's just take it -- let's just make
10  it -- like, each Complaint we will make a separate
11  thing, and we'll come back and talk about each
12  one.  So you complained to Salma?
13      A   Yes.
14      Q      Do you remember when that was,
15  approximately?
16      A      This was October, November of 2018.
17      Q      And then when else did you complain
18  with ██ Calvente?
19      A      And I believed we complained to Maria
20  DeMoya as our diversity advocate.
21      Q      Do you remember when that was?
22      A      We complained to her multiple times
23  to be honest.  I couldn't pinpoint exactly when it
24  was, but it was in 2018, 2019 we both met with

Page 421

1  her.  I don't know if it was -- I think we started
2  talking in 2017 as well.
3      Q      And then when else did you complain
4  with ██ Calvente?
5      A      Yes, and then also the anonymous
6  complaint to OIDE, that was both ██ and I who
7  did that as well.
8      Q      And why did you make the Complaint
9  anonymously?
10      A      Well, to be truthfully honest, I had
11  seen how the University responds to complaints
12  made against them, discrimination complaints made
13  against them.  Right?
14      Q      And how is that?
15      A      For instance, I saw a couple of
16  things.  I saw ██ at one point, ██ Calvente,
17  she had put a Complaint in before me, and I
18  remember her telling me that they tried to fire
19  her, not "they" being the University but the
20  personnel committee who has no firing power.  She
21  told me they sent her an email telling her, you
22  know, you are fired.  And I was like, whoa, wait,
23  what?  And she put in the Complaint.  And in the
24  end, nothing came about it because Salma at the

MAGNA
LEGAL SERVICES

Page 422

1  time overturned the personnel committee's request
2  to not reappoint her. So that was an example.
3            And I know she put in a
4  Complaint then, but there was nothing to show
5  because there were no actual, quote unquote,
6  damages. She still had her job. So I saw that
7  with her.
8            I saw ████████ when he
9  became the director -- not director, co-chair of
10 DPUBLIC, the DePaul Black Leadership Coalition.
11 It is an employee resource group. I saw him speak
12 out against the University, and then I also saw
13 him sue the University because they started
14 retaliating against him. I saw the same thing
15 happen to ██████ who was also a law professor at
16 the University who spoke out about discrimination
17 and gender inequities and pay inequities and
18 things like that, and same thing happened to her.
19 She was demoted and removed from committees and
20 not even considered to sit on certain committees
21 and things of that nature.
22           I saw it happen to one of my
23 colleagues. She was a staff member. Her name was
24 Latrina West-Shield. She put in a complaint about

Page 423

1  how she was being treated, discriminated against
2  between her and couple other people, but I know
3  for certain it was Gina. And I don't know Gina's
4  last name. It starts with a C-H. I don't know
5  her last name unfortunately. I know she also left
6  the University, a staff member. She was one of
7  the only Black staff members. We had three, and
8  now we have two.
9            And she had been at the
10 University for 16 years, and she told me that she
11 put in a Complaint, and they tried to separate her
12 from the offender, but in the end, it became too
13 much for her to bear, and so she left the
14 University too. So I've seen retaliation
15 happening over and over and over during my time,
16 and I'm really --
17           MS. WERMUTH: If you are going to
18 interject, I am going to interject because your
19 question was: Why did you file a Complaint
20 anonymously? What we got was hearsay. We've got
21 speculation about, you know, so-and-so filed a
22 Complaint. We have -- you know, we don't even
23 know to whom the Complaint was made. We just have
24 these vague assertions about so-and-so filed a

Page 424

1  Complaint, and they were retaliated against.
2  There is no evidence to support any of these vague
3  allegations. We don't know who the
4  decision-makers are that are supposedly doing
5  this. We don't know if they are the same
6  decision-makers involved in Dr. Dillard's case.
7  We are now just in a world where none of this is
8  relevant, and it's all speculative. And I can
9  tell you right now, ███ Calvente did not get an
10 email from the personnel committee saying you are
11 fired. It didn't happen. So I don't know what we
12 are doing here, but whatever it is, it lacks
13 foundation. It is hearsay. It is not relevant.
14           MS. SCATCHELL: Well, I'm trying to
15 tailor it in. So you had your time, now is my
16 time.
17           MS. WERMUTH: I know, but --
18           MS. SCATCHELL: I gave you --
19           MS. WERMUTH: The problem is I can't
20 object in advance, Gia, because you ask a
21 question, and then we go into this. I have to --
22 you know, at the risk of not interrupting
23 Dr. Dillard, I have to make my statements after
24 the fact.

Page 425

1            MS. SCATCHELL: Okay. So Sydney,
2  what we are going to do is I am going to try to
3  tailor more focused questions. So this way, like
4  I said, we can avoid this dance that we are having
5  because I really don't like to get into arguments
6  with Counsel on the record. And I just want to
7  make sure that we get your story out correctly.
8  So what we are going to do is we are going to
9  take -- okay. I have noted all the different
10 people that you mentioned, you know, that you've
11 felt were retaliating against you. We will come
12 back to that.
13 BY MS. SCATCHELL:
14   Q    What we going to go back to is the
15 question of what made you want to write a
16 Complaint anonymously?
17   A    There is no space for having an open
18 discussion. We began this old discussion about
19 culture. And the culture that I have seen at the
20 University in the College of Communication has
21 been one that retaliates against voices of
22 dissension or voices that air grievances. This
23 includes the people that I already talked about
24 and I -- I, unfortunately, I felt scared. I felt

Page 426

1  very, very scared to put something out there with
2  my name on it in fear of me being retaliated
3  against as well. And so the University had
4  different ways to put in complaints or to air your
5  grievances.
6      Q    What are those different ways?
7          MS. WERMUTH: Let me object. I am
8  going to object. There is no allegation of
9  retaliation in the EEOC charge or the Complaint.
10 This is totally irrelevant.
11         MS. SCATCHELL: That's not the
12 question I asked her. I asked her why she wrote
13 it anonymously, and it is relevant because I am
14 asking her why or what her motivation was for not
15 putting her name on that email, which I think is
16 fair game for being relevant and tied to why we
17 are here today. She said she felt it was a
18 culture of retaliation. I don't see how that's
19 not relevant here. Go ahead.
20         THE WITNESS: I forgot the question,
21 I'm sorry.
22 BY MS. SCATCHELL:
23     Q    I don't actually think there was a
24 question pending. You said there were different

Page 427

1  ways you could complain?
2      A    Yes.
3      Q    These would be complaints for some
4  sort of discrimination, correct?
5      A    Complaints for discrimination or
6  retaliation, yes.
7      Q    And what are the Complaint mechanisms
8  that DePaul uses?
9      A    Well, at the time they used to have
10 an OIDE website where you could click a link and
11 type in an anonymous -- or click in and fill out
12 like a form and submit it, but the form required
13 that you put your information in. And then --
14     Q    Wait. What was that information that
15 they required?
16     A    Details about the complaint like who,
17 what, when, where, why, those types of questions.
18     Q    Okay.
19     A    The other way that I remember was
20 they had a hotline that you could call in and air
21 or submit your grievances that way. And I believe
22 there used to be a line at the bottom of the OIDE
23 website where you could click it, and you could
24 email if you had any complaints or a

Page 428

1  discrimination complaint or something you could
2  email it in. And the other one was you could tell
3  your manager or someone who is a leadership person
4  in leadership position.
5      Q    So when you made the anonymous
6  complaint, which one of these four mechanisms did
7  you use?
8      A    I used the email mechanism. I didn't
9  feel comfortable with the form that they had
10 because you had to disclose information like maybe
11 your return contact information or something like
12 that. I didn't feel comfortable with the online
13 or phone call in because you can't -- unless you
14 block your phone number, they would know it was
15 still me if I were to call in and put in a
16 complaint. I wasn't comfortable talking to my
17 manager at the time. And then the other one was
18 email. And I didn't feel comfortable emailing
19 from own personal email either because everyone
20 knows what my email is. And so --
21     Q    Sorry. Who is your direct
22 supervisor?
23     A    Now it is Lexa Murphy.
24     Q    No. Then?

Page 429

1      A    Then it was Salma Ghanem.
2      Q    And what was her position as your
3  supervisor?
4      A    She was the dean of the College of
5  Communication.
6      Q    Is she still there at DePaul?
7      A    Yes. She is now the -- I don't know
8  if she is the interim or she became the provost of
9  the University.
10     Q    And how long has that been?
11     A    She got that position in 2018, I
12 believe in the fall of 2018, maybe around November
13 when other allegations about another provost
14 shortly after when he -- other allegations about
15 his behavior and discrimination surfaced.
16     Q    Okay. And then now who is your
17 next -- or who is her successor? You said Lexa
18 Murphy?
19     A    Lexa Murphy is the acting dean or
20 interim dean right now. But we're currently going
21 through a process in which my college is asking
22 for her to be promoted to become the dean without
23 following the general process of doing a national
24 search to fulfill the position. So right now in



Page 430

1  some people's view, we are trying to usurp our
2  normal processes to keep her in that position,
3  and --
4          (Audio distortion.)
5          MS. SCATCHELL:  Wait.  I can't hear
6  you.
7          THE REPORTER:  Your audio dropped
8  off, Dr. Dillard.  I'm sorry.  This is where we
9  lost your answer:  "So right now in some people's
10  view, we are trying to usurp our normal processes
11  to keep her in that position, and --"
12          THE WITNESS:  And then I said:  I
13  think she's done a pretty good job as a dean for
14  the small amount of time that she had been in
15  there.  That's all I said.
16  BY MS. SCATCHELL:
17      Q    So now, let's see here, you had --
18  okay.  Let's go back to you made an anonymous
19  complaint.
20          And I'm looking for what
21  exhibit that was.  Anna, do you have the exhibit
22  offhand?
23          MS. WERMUTH:  June 2018 anonymous
24  complaint?

Page 431

1          MS. SCATCHELL:  Yes.
2          MS. WERMUTH:  I believe it is
3  Exhibit 67, the one we examined her on.
4          MS. SCATCHELL:  You examined her on,
5  yes.
6          MS. WERMUTH:  Yes.
7          MS. SCATCHELL:  Okay.
8  BY MS. SCATCHELL:
9      Q    Could you go to Exhibit 67, please?
10      A    I have it.
11          (Exhibit No. 67 identified.)
12          THE WITNESS:  2914 at the bottom?
13  BY MS. WERMUTH:
14      Q    Yes, that's the one.  Did you author
15  this letter?
16      A    I authored it in conjunction with
17  ███ Calvente.  I wrote it, and she gave me
18  feedback on changes to make as well.
19      Q    Okay.  Who are the other faculty
20  members that you indicate in the first paragraph
21  that you communicated with that do not feel
22  comfortable stepping forward?
23      A    That, I was referencing myself and
24  ███ Calvente.

Page 432

1      Q    Okay.  Would Maria DeMoya fall into
2  that category?
3          MS. WERMUTH:  Objection, relevance.
4          THE WITNESS:  I can't speculate she
5  would fall into that category, but I do know --
6  here is the thing.  She was a diversity advocate.
7  So she had to step forward as a part of her job.
8  She was supposed to step forward and bring out
9  concerns.  But I do think that it took a bit of
10  time for her to feel comfortable doing that --
11          MS. WERMUTH:  Objection.
12          THE WITNESS:  -- and to have that
13  conversation about what was happening before we
14  came to her in her official role as a diversity
15  advocate.
16          MS. WERMUTH:  I am going to object to
17  speculation and foundation, the testimony laking
18  foundation and speculation.
19          MS. SCATCHELL:  Your objection is
20  noted.  Okay.
21  BY MS. SCATCHELL:
22      Q    Where you say in the third paragraph
23  that the most disturbing component is the use of
24  subjective performance criteria that has caused

Page 433

1  harm to the women who are tenure-track Latina
2  and/or African-American?
3      A    Yes.
4      Q    Could you go into what you believe
5  those subjective performance criteria are?
6      A    It is a number of things.  It is
7  applying all of the T & P, College of
8  Communication tenure and promotion guidelines
9  differently.  An example of that would be noting
10  that some people have scores that are below the
11  College mean, but only focusing on those who are
12  Latina or African-American faculty members and
13  highlighting those discrepancies among that group,
14  but then say among their white counterpart or male
15  counterpart not highlighting that and not
16  requiring them to go through additional reviews.
17          And the same thing goes beyond
18  the scores.  It also is about pulling out specific
19  subjective or qualitative responses that students
20  might post on their evaluations and using that as
21  in my opinion ammunition to continue to ostracize
22  and treat someone unfairly.  That's what I meant
23  when I said "subjective performance criteria."
24      Q    Okay.  And then --

Page 434

1      A      It's about how a person feels about
2  another group.
3      Q      Okay.  And then those situations
4  would also be in the bullet points that you
5  outline?
6      A      You said those -- I didn't quite hear
7  what you said.
8      Q      Oh, the bullet points that -- you
9  know, there are four bullet points.  Would those
10  also be considered what you were referring to as
11  subjective performance criteria?
12      A      Um-hum.
13      Q      And then on the next page, the
14  discriminatory acts in the College of
15  Communication, do you see that part?
16      A      I think, yes, yes.  I see that.  That
17  would be included as well because all of it
18  determines your development and your career.
19      Q      So now let me -- we'll take these
20  discriminatory acts one at a time.  Where you say
21  that: Racial epithets directed verbally toward
22  either of them, what were you referring to with
23  that statement?
24      A      So, this one was specifically about

Page 435

1  ▉.  I believe she told me that someone had made
2  a joke using the word "nigger" as the punch line
3  for it.  I was not there to hear that, but she did
4  tell me that, and she did add that line.  That
5  would be an example of a racial epithet.
6          But I also put in there
7  dismissal of concerns of discriminatory actions.
8  That would be the fact that we've talked to
9  people -- it's hard to explain.  The University
10  has a tendency to make it seem like, oh, if you
11  didn't -- it's not clear of what is considered a
12  Complaint, right.  So if you say to your
13  supervisor, hey, there are some issues that are
14  happening here, that in my opinion, that's a red
15  flag.  If I were in a leadership role, that would
16  be a red flag, and I would look into it, not
17  necessarily open an official Complaint, but it
18  requires that you be proactive rather than
19  reactive.  And in these instances, as we've
20  already seen, I tried to give the University, you
21  know, forewarning that something is happening.  I
22  tried to say:  Look, there is something happening
23  here.  Look at my experience.  Look at what is
24  happening with these women and people of color and

Page 436

1  descendants of slaves that are leaving the
2  University.  Look at how domestic minorities are
3  being treated, and I'm trying to do it without
4  saying this is a discriminatory space or this is a
5  place where people of color are not welcome.  I'm
6  trying my hardest to do that without necessarily
7  saying it.  But no matter how much you try, they
8  don't take it seriously until you say this is
9  discrimination.  And then even when you say this
10  is discrimination, you don't even get a response,
11  you know.  You get -- you know, you get like half
12  effort and not a full-on investigation to see if
13  things should be changed.
14          And I'm not going to go on too
15  much longer, but you will see other things where
16  after only a national push to acknowledge that
17  racism is real, then you start seeing things like
18  let's have an anti-racism book club, let's have
19  listening tours.  Right?  But this is a long time
20  coming, and I've been trying my hardest to give my
21  colleagues in the College and the University the
22  opportunity to be better, to live the truth of the
23  Vincentian value.  I've tried that.  That's what I
24  was trying to say here, and in an anonymous

Page 437

1  attempt.
2      Q      And you had briefly touched on what
3  follow-up action resulted from that.  Could you
4  refresh my memory because I just want to make sure
5  that I have it right.
6          MS. WERMUTH:  Objection, asked and
7  answered.
8          MS. SCATCHELL:  I actually really
9  don't remember, so that's why I'm asking.
10          THE WITNESS:  So yeah, I mean, long
11  story short, and Anna opened up that file already,
12  but the response was the University, Barbara
13  ▉ responded to the email asking more
14  details about who did what, when, where, and why.
15  There was a form you used to be able to fill out,
16  and that was the end of that.  And because it was
17  anonymous, I expected the University to reach out
18  to me and say at least to me or ▉ because we
19  did eventually name ourselves, at least reach out
20  to me and say, you know, Sydney, what has your
21  experience been?  Do you have any complaints?  Do
22  you have some concerns, something?  But nothing
23  ever came about it.  Even though prior to this
24  anonymous email I had already let them know that

MAGNA ▶
LEGAL SERVICES

Page 438

1  something is happening here.  I didn't say it was
2  discrimination.  I said:  Something is happening
3  here.  Nothing happened.  Then I say
4  discrimination is happening here, nothing
5  happened.  The only time that the University
6  reached back out to me was when it came from the
7  dean of the College, when Salma gave a very short
8  message and email saying there have been concerns
9  of discrimination, even though our conversation,
10  as we said, was two hours long and she told me
11  specifically that every instance that we brought
12  up needed to be investigated.  She said that was
13  the rule that the University was supposed to do.
14  BY MS. SCATCHELL:
15      Q     We will get into that.
16      A     Go ahead.
17      Q     We will get into that.  Now, when you
18  stated you are the only -- back to the first page.
19  The only two faculty with -- in the protected
20  category within the College, is that an accurate
21  statement that you guys were the only two
22  minorities or US-born minorities within the
23  College of Communication?
24      A     That were up for tenure at this time.

Page 439

1  We had plenty of people within that category, but
2  they are not tenure track.  They have lower job
3  titles.
4      Q     Okay.  Okay.
5      A     Which fits the bill of racism.  You
6  keep people of color in lesser positions that have
7  less power.
8          MS. WERMUTH:  Objection.  There is no
9  evidence that --
10         MS. SCATCHELL:  In your opinion.
11         MS. WERMUTH:  Hang on.
12             -- that any one of those
13  individuals who is in a non-tenure track position
14  applied for a tenure-track position at DePaul
15  University.  We are getting really far afield here
16  with lots of speculation and broad, wide-ranging
17  assertions that aren't supported by the evidence
18  in the record.
19  BY MS. SCATCHELL:
20      Q     Okay.  Give me one second.  What
21  exhibit did we leave off on, 147?
22         THE REPORTER:  Yes, 147 was the last
23  one marked.
24         MS. SCATCHELL:  Perfect, I will mark

Page 440

1  148, and I will send it right now.
2             (Exhibit No. 148 identified.)
3          THE WITNESS:  I have it.
4  BY MS. SCATCHELL:
5      Q     Do you recognize this document?
6      A     Personnel Committee Support Needs for
7  the Faculty Review Process, yes.
8      Q     Okay.  What is this document?
9      A     This is the file that we're supposed
10  to use on personnel for reviewing faculty members.
11  And it tells you like things about how SharePoint
12  is supposed to be used and, like, putting things
13  in order, and it just goes through the flow of how
14  to run a personnel review, formal review.
15      Q     Do you see the part where it says:
16  Because storage space is limited?  This is on
17  Page 4, Paragraph 4.
18      A     You said Page 4, okay.  I am on
19  Page 4:  Because storage, okay.
20      Q     So this is another -- so when
21  somebody is applying for a tenure position, they
22  have to upload several different documents to
23  SharePoint unless it's audio or video or
24  PowerPoint?

Page 441

1      A     Yes, yes.
2      Q     Okay.  And did they indicate, like,
3  where, you know -- or did they provide you with
4  where these multimedia files should be hosted or
5  did you need to do that on your own?
6      A     I think you have to do it on your
7  own.  What's weird is sometimes they would have
8  student workers that would be putting it up for
9  you as well.  There was a lot of -- a lot of
10  unclarity of where things need -- you know, how
11  this process was supposed to go.
12      Q     Okay.  But --
13      A     Yeah.  Sometimes you would have to
14  host it on your own.
15      Q     And then the paragraph above it says:
16  However, there is some housekeeping we will ask
17  you to complete by date XX.  Do you see that?
18      A     Yes.
19      Q     What does that mean?
20         MS. WERMUTH:  I will object based on
21  foundation.  I don't know that we've established
22  when this document was created, by whom it was
23  created, to whom it was distributed.
24         MS. SCATCHELL:  You produced it.

MAGNA
LEGAL SERVICES

Page 442

1  MS. WERMUTH: That doesn't mean that
2  this witness, Dr. Dillard --
3  MS. SCATCHELL: She said she saw the
4  document and is aware of the document, and it is
5  the guidelines that the personnel committee used
6  to evaluate staff members.
7  MS. WERMUTH: Okay. But she hasn't
8  established --
9  MS. SCATCHELL: She knows what the
10  document is.
11  MS. WERMUTH: The date of the file,
12  who delivered it to her. There is no foundation.
13  BY MS. SCATCHELL:
14  Q  Sydney, can you do me a huge favor
15  and tell me what date you see at the bottom of the
16  page?
17  A  Dated 3-12-2015, updated 3-12-2015.
18  Q  Do you have any reason to believe
19  that that date is not a true and accurate date for
20  this document to be circulated or published?
21  A  No, I have no reason to believe that.
22  MS. WERMUTH: You haven't established
23  that it was circulated. There are initials next
24  to that date. This could be a draft. This was

Page 443

1  potentially in ESI. I'm just trying to make sure
2  I understand how it is --
3  BY MS. SCATCHELL:
4  Q  Did you receive a copy of this,
5  Sydney?
6  A  I've seen this before. This is one
7  of the documents that I was explaining about that
8  they kept changing the details on, and SDR is
9  about Shena Ramsay. She is the assistant dean in
10  the College. So I know who created this document
11  and who updated the document as well.
12  Q  And if you have seen a copy of it
13  before, fair to say that the document was
14  published, correct?
15  A  Yes, it is published.
16  Q  Okay. Great. Is there more updated
17  copy than this one if you know?
18  A  I think there should be, yes. This
19  has to be an outdated copy because it says Dropbox
20  and SharePoint, and we don't use SharePoint, we
21  use Interfolio. I'm fairly certain that there
22  should be an updated. I don't think I have it
23  anywhere in my files, but I think there should be
24  one. Steven Awalt, he is not in our College

Page 444

1  anymore. He's left. There is a lot of outdated
2  information in there.
3  Q  Where it says this whole thing about
4  these housekeeping matters and the date XX, do you
5  recall if there was any follow-up with when these
6  housekeeping matters were supposed to be updated?
7  MS. WERMUTH: Objection, form,
8  misstates the record.
9  THE WITNESS: No, I never received
10  any update about this. I mean, that's why this
11  whole situation was so interesting because it
12  was -- it used to be kind of very fluid, if you
13  will. No one was really that strict about it
14  until my particular case.
15  BY MS. SCATCHELL:
16  Q  You mean nobody meaning that was
17  going up for tenure or reviewing somebody's tenure
18  file?
19  A  Yes.
20  MS. WERMUTH: Objection, foundation.
21  You've got to let the question get finished being
22  asked so I can object. Foundation. I don't know
23  how you can testify to how other cases were
24  handled or not handled when you were not part of

Page 445

1  the personnel committee.
2  THE WITNESS: From the ones that I
3  saw, no one else. And the people that I spoke to,
4  and I've spoken to a lot of faculty members in the
5  College, no one else had this same situation. And
6  it did not become an issue until the year that I
7  went up for my review, and this became a very hot
8  button topic.
9  Am I supposed to be waiting
10  for you to finish your question or wait for Anna
11  to object.
12  MS. SCATCHELL: She should not be
13  objecting to every question, but wait until I
14  finish my question. And if she is going to
15  object, she will make it known.
16  THE WITNESS: Okay, I will wait until
17  she objects and then move on. Gotcha.
18  BY MS. SCATCHELL:
19  Q  When somebody is going up for a
20  review for tenure, could you explain how much --
21  like, what goes into that up for review process?
22  What information is included?
23  MS. WERMUTH: Objection to form.
24  THE WITNESS: So when you go through



Page 446

1  the review process, I mean, you are supposed to
2  have -- it's supposed to get easier over time
3  because you are building the case every two years
4  if you follow the normal experience which is two
5  years, two, four and your sixth year you have a
6  final review.  It is supposed to build itself over
7  time where you are supposed to post your materials
8  in the second year and post your materials in the
9  fourth year, and so by the sixth year you only
10 have two years of material to upload to Interfolio
11 or SharePoint.
12 BY MS. SCATCHELL:
13     Q     And what would those include?
14     A     Those would include your teaching,
15 research, and service contribution to the
16 University.  So teaching being, it can include
17 anything honestly.  It doesn't -- there are no
18 specific requirements.  It can include your
19 syllabus.  You can include your -- you know, if
20 you wanted to put like notes or even assignments
21 that you've given to your students, the gamut is
22 pretty wide.  It is up to you of what you would
23 like to include that you think represents your
24 teaching.

Page 447

1          Same thing for research.
2  They'd like for you to have all of your published
3  work in there.  And if you have work that might be
4  being published soon, you can have like a letter
5  from the editor saying when it will be published,
6  or that it's been accepted after being blind
7  reviewed.
8          And then for your service,
9  which you are supposed to get a letter from your
10 committee chair, whoever is the leader of your
11 committee, to write about your experiences and
12 what contribution you made on your -- in terms of
13 service, whether it be in the University or
14 outside of the University assessing to your
15 contribution.
16     Q     Okay.  And then have you published
17 any articles?
18     A     I have, yes, multiple.
19     Q     How many?
20     A     I'm sorry?  You cut out.  What did
21 you say?
22     Q     How many?
23     A     How many?  I think I've published at
24 least 11 articles.

Page 448

1      Q     Were they peer reviewed?
2      A     Majority of them were.  I think at
3  least nine or ten of them were peer reviewed.
4      Q     Okay.  Okay.  And let's talk about
5  the service component of your time at DePaul.
6      A     Okay.
7      Q     Did you ever lead any program-seeking
8  grants?
9      A     Yes.
10     Q     What was it?
11     A     Well, I've done -- I've probably done
12 the most grant work in the College most likely.  I
13 don't think anyone else has really done as much
14 grant work as me.  But I would say the most recent
15 one that a lot of -- not most, most recent one was
16 $150,000 from the Indiana Department of -- the
17 Health Department.  But the one that I'm pretty
18 certain that you are talking about is --
19     Q     Wait.  Really quick, what happened
20 with that $150,000 grant?
21     A     That was $115,000.
22     Q     Oh, okay.
23     A     And that one, if I said $150,000, I
24 meant $115,000.  And that was a grant to engage

Page 449

1  with ethnic minorities in Lake County and Porter
2  County, Indiana to increase the vaccination uptake
3  at a mass vaccination clinic.  And so this was in
4  the wake of the COVID and coronavirus, and we were
5  trying to get people to get vaccinated.  And I was
6  the PI on that, partnered with FEMA, the Indiana
7  Department of Health, Gary, the mayor of Gary, and
8  a couple other major nonprofit and government
9  organizations.
10     Q     Okay.  And is that currently still
11 going on right now or is that finished?
12     A     No, that one is finished.
13     Q     Okay.  And then have you had any
14 other -- have you sought any other grants?
15     A     I mean, I don't want to go through
16 them all.  But, I mean, at the same time, I had
17 another grant that was running simultaneously with
18 the EOOR, which is operation, engage, education,
19 and register.  We are talking about people getting
20 vaccinated.  My other grant, that was $40,000, and
21 that was focused on understanding of vaccination
22 hesitation, so trying to understand what are some
23 of the reasons why people are not willing to get
24 vaccinated during the pandemic.  And that -- we

**MAGNA**
LEGAL SERVICES

Page 450

1  call that Project Hope. That was for about
2  $40,000. I partnered with Purdue University for
3  that one and the Indiana Minority Health
4  Coalition.
5      Q    And anything else?
6      A    Yes. And so before that, I received
7  a grant. I co-PI'd a grant with Dr. ████ and
8  one of our colleagues, Ken Krimstein and Marshall
9  Goldman, and we got 163 -- I a little over
10 $163,000. It was an Academic Growth and
11 Innovation Fund grant to focus on developing our
12 program, the PR and advertising program. So I --
13 we created a new creative minor. I started BRAND
14 summer program which is called Building Resources
15 for Advertising Needs and Diversity that focuses
16 on -- it's like a summer enrichment program for
17 high school students to increase diversity in
18 advertising, supporting funding for our new media
19 engagement research lab where we got to -- we
20 purchased -- it was seed money to develop a new
21 lab. So we bought technology, Google glasses, eye
22 tracking software, biometrics, lots of different
23 things, and we tried to create a certificate for
24 the graduate program which didn't quite work out,

Page 451

1  but we did get a lot of -- a lot of useful
2  information on developing our curriculum for the
3  PR and advertising program. So yeah, really proud
4  of that one. It was hard work, but it worked
5  really well.
6      Q    Okay. Was there something that you
7  got grant money for a computer lab?
8      A    Yes, that was the media engagement
9  lab, the media lab.
10     Q    And what is currently happening with
11 that lab right now?
12     A    Now, my co-PI, he left the
13 University.
14     Q    Who was that?
15     A    His name was ████ ████.
16     Q    Okay.
17     A    And I really enjoyed working with
18 him. And but he -- he need a bit of direction
19 because I don't think he ever managed that much
20 funds. It was a good time. Media lab has all of
21 the technology that we purchased on its behalf.
22 And a new faculty member, Tony Deng, he works in
23 the lab quite a bit. And the University and the
24 College decided to allow Dr. ████ to be the

Page 452

1  director of the lab, and so I've kind of washed my
2  hands of it at this moment.
3      Q    Was that by choice or --
4      A    Well, it was by choice, but it was
5  actually due to the hostile work environment. At
6  one point Nur refused to meet with me in a
7  meeting. And they kept making decisions about the
8  ME lab without me even though I was the one that
9  provided the funding for the lab.
10     Q    And what do you mean they were making
11 decisions without you?
12     A    They were deciding on how to design
13 the lab, like developing relationships with
14 outside -- I -- I'm going to say "they" because I
15 don't think Nur was doing that much of that. I
16 think ████ was doing more of that. They, the
17 College of Communication was -- to be frank, I
18 think Nur was more focused on getting the title as
19 the director of ME lab. And ████ told me about
20 that. And I said: We can all work together on
21 this. And I know she was going up for tenure, and
22 maybe that was why she was motivated to try to do
23 that. But I had shown a great interest in
24 developing the ME lab and all of the programs that

Page 453

1  we had developed for PR and advertising. But I
2  was really ostracized to the point where I just
3  told me dean: You know, it's fine. I'm going
4  through a lot of health issues. I don't want to
5  argue or cause any additional stress, though I
6  think my record has shown that I am dedicated and
7  I am seeking to develop a better University for
8  our students.
9      Q    Got it. Was there any other --
10     MS. WERMUTH: I'm sorry. I am moving
11 to strike the testimony that lacks foundation and
12 was speculative. Again, I couldn't have
13 anticipated.
14     MS. SCATCHELL: What was speculative
15 and what was lacking foundation? I asked her if
16 she was seeking any grants.
17     MS. WERMUTH: I know, and that's
18 exactly right. You asked her if she goes on to
19 receive any grants, and she believes that Nur
20 wanted the title of the lab because she was going
21 up for tenure. That's all speculation and --
22     MS. SCATCHELL: My next question --
23 I'm not done. My next question to her was:
24 Sydney, what was -- because she said I didn't have

MAGNA
LEGAL SERVICES

Page 454

1　anything to do with it.  And I said:  Was that by
2　choice? -
3　　　　　MS. WERMUTH:  And she's speculating
4　about other people's motivations that she laid no
5　foundation for.  So I just moved to strike it.  We
6　can move on.
7　　　　　MS. SCATCHELL:  We are not going to
8　move on.  She felt Nur was ostracizing her because
9　she refused to meet with her.
10　　　　MS. WERMUTH:  No.  What she said was
11　Nur wanted the title because she was going up for
12　tenure.
13　　　　MS. SCATCHELL:  She said that
14　afterwards.
15　　　　MS. WERMUTH:  Whatever.  I move to
16　strike it.
17　　　　MS. SCATCHELL:  Okay.  Your objection
18　is noted.
19　　　　THE WITNESS:  It is making me very
20　uncomfortable that Anna keeps yelling.
21　　　　MS. WERMUTH:  Let me just state for
22　the record that I was being interrupted by
23　Counsel.
24　　　　MS. SCATCHELL:  Let me just state for

Page 455

1　the record that your objection upon objection upon
2　objection is becoming a bit obstructionist.  Okay.
3　　　　　MS. WERMUTH:  I disagree, but we can
4　move on.
5　　　　　MS. SCATCHELL:  Actually, let's take
6　a five-minute break.
7　　　　　MS. WERMUTH:  Okay.
8　　　　　(Recess taken.)
9　BY MS. SCATCHELL:
10　　Q　All right.  Let's go with you had
11　previously testified that ███ Calvente had told
12　you not to associate with her.  Am I saying that
13　correctly?
14　　A　In general, yes.  I think her exact
15　words were:  You might want to stay away from me.
16　　Q　Where was this at?
17　　A　We were at an alumni -- College of
18　Communication alumni gathering.
19　　Q　Was anybody else there?
20　　A　Yes, several faculty member.
21　　Q　That overheard the conversation?
22　　A　No, I don't think anyone overheard
23　that.
24　　Q　Do you remember what time period that

Page 456

1　was?
2　　A　That is a tough one.  That was years
3　ago.
4　　Q　Was it before tenure or after tenure?
5　　A　Before.  It could have been like as
6　early as, like, 2014-ish.  Yeah, it was a while
7　back.  I'd have to think really hard.
8　　Q　And what did she say to you, and what
9　did you say to her?
10　　A　I hadn't seen it because there --
11　that was, like, when I first was getting to know
12　her.  I didn't know her very well at the time.  So
13　we were at the -- whatever it was, I don't
14　remember the timeframe, but I know it was shortly
15　after the -- she told me they were trying to fire
16　her.  That's what she said.  And so I was -- her
17　and I hadn't really had any conversations.  I went
18　up to her and said:  ███, how's it going?  Nice
19　to see you; me trying to make friends with my
20　colleagues.  And she said:  You might not want to
21　be seen with me right now.  And I was like:  Why,
22　what's going on?  And she gave me her paper from
23　her personnel -- it was like -- it was either like
24　an email or a -- but it was like an explanation

Page 457

1　telling her that she is fired or they don't want
2　her here anymore or voted -- it was something
3　very, very negative.
4　　　　　And at the time, again, I
5　didn't quite understand the nuances of what was
6　happening.  And I looked at it, and I was like:
7　What is this?  And she said:  Yeah, they're trying
8　to get rid of me, so you might not want to be
9　anywhere near me because I don't want anything
10　that's happening to me to rub off on you.  And to
11　be honest, I didn't want that to rub off on me
12　either.  So after that, I kind of distanced myself
13　from ███, and I didn't really talk to her very
14　much again until her, me, and Maria ran into each
15　other at the microaggression discussion about
16　faculty of color and microaggressions that was put
17　on by -- I don't know who put it on.  It could
18　have been OIDE to be honest.
19　　Q　And what year was that?
20　　A　When her and I and Maria met again?
21　　Q　Yes.
22　　A　I think that was 2017.  I believe
23　that was 2017.
24　　Q　And what happened during your

MAGNA ▶
LEGAL SERVICES

Page 458

1　conversation at the microaggression meeting?
2　　　A　What happened is they were talking
3　about what microaggressions were.
4　　　Q　And who is this?
5　　　A　They being the organization that put
6　it on.  I would assume that it was OIDE, but I
7　can't -- you know, I go to a lot of meetings, so I
8　don't remember who it was.  But I know it was
9　about microaggressions, but I went because I kept
10　having a lot of these experiences, and no one
11　around me was having these experiences.  And I
12　hadn't even talked to Maria DeMoya at the time
13　because I don't think Maria was -- or she had just
14　gotten into the role of diversity advocate.  Prior
15　to, Teresa Mastin was the advocate, and I didn't
16　talk to her because I didn't know what was
17　happening.
18　　　　　So anyway, when I got there,
19　they were talking about these microaggressions,
20　and I remember raising my hand and talking very,
21　you know, shortly about something that I
22　experienced.  And I saw ███ raise her hand, and
23　she talked about what happened to her.  And Maria
24　raised her hand and said something about what had

Page 459

1　happened to her.  And I was like in awe.  And I
2　said:  I guess I'm not alone in what's happening
3　to me.  Apparently, this is pretty common.
4　　　Q　Do you remember what you raised your
5　hand about?
6　　　A　What I raised my hand about wasn't
7　necessarily about discrimination against me
8　because of my race.  I -- well, was it?  Honestly,
9　I don't remember what I raised my hand about,
10　honestly.  It was about something -- about
11　something that happened at DePaul.  I think it was
12　about more so about me having to go through an
13　additional review or something like that.
14　　　Q　The additional review that you
15　believe that you should not have went through,
16　right?
17　　　A　Yes.
18　　　Q　Okay.  And okay.  Do you remember
19　what -- do you remember what happened or what you,
20　Maria DeMoya, and ███ Calvente talked about at
21　the meeting?
22　　　A　Yes.  So after the meeting was done,
23　we pretty much were walking and talking together,
24　and we were surprised because all of us were

Page 460

1　having similar experiences here and there and,
2　like, pieces here and bits there.  And so I
3　remember us saying:  Let's meet again and talk
4　about what's happening here.  And that's really
5　what started to get me to think about what was
6　happening to me.  Even though I didn't have any
7　evidence, I mean, I felt like something was
8　happening to me.  I was -- you know, I ended up
9　getting sick and all these different things, but I
10　couldn't pinpoint it because everything is so
11　closed.  They make sure that information about
12　other people's reviews, though they should be
13　confidential, like, I agree they should be
14　confidential, they also keep it very hush in terms
15　of how people are being treated, what type of
16　recommendations are being placed upon others,
17　those types of things.
18　　　Q　Okay.  And when you say that you
19　didn't have any evidence, do you mean, like, you
20　didn't have any overt evidence, or what do you
21　mean?
22　　　A　Yes, overt evidence.  I'm the kind of
23　person that likes to give people the benefit of
24　the doubt.  I don't like to assume the worst.  But

Page 461

1　once I believe or I see something to be truthfully
2　and honestly there, or these are facts to support
3　it, then I will go ahead and move forward with it.
4　And for quite some time, I only had speculations
5　in my mind, and I only had what I was feeling.
6　And I know that when it comes to discrimination, I
7　mean, I know what I know in terms of me being a
8　critical race theorist, but I also know the
9　structure doesn't acknowledge these types of
10　engagements or these types of interactions unless
11　you can prove it through some tangible way.  And I
12　couldn't prove it, I just knew what was happening
13　to me.
14　　　　　But like I said, it took me
15　some time in talking to other people and hearing
16　about their experiences.  And when Rajul Jain let
17　me see her evaluation and I saw that they were
18　saying perfect stores, awesome, move on to the
19　next step, and for me they glossed over it and
20　didn't say anything, or, oh, you need to do this,
21　or they focused on a class that only had five
22　students in it and assumed that I am the worst
23　teacher that needs to be reviewed an additional
24　time, that's when it becomes clear, oh, there is

MAGNA
LEGAL SERVICES

Page 462

1 some differences that are being applied to me.
2 Q Now, what classes have you taught at
3 DePaul?
4 A I taught a lot of different classes.
5 You want me to go through like all of them or --
6 Q Are they listed in your CV?
7 A Yes, they are listed in my CV.
8 Q Just in the interest of time, we
9 won't go through them. But you have taught
10 several different classes?
11 A Oh, yes. I've taught at least a good
12 ten different classes at the University.
13 Q Has race ever come up in any of these
14 classes?
15 A You mean as a topic for the class?
16 Q Yes.
17 A Oh, yes, yes. One of the classes
18 that we just went over with Anna when I had the
19 lowest scores, that class that had maybe five
20 students in it. That class was a class focused on
21 race, and it was about action -- or what do you
22 call it, healthcare campaigns and community
23 action. We talk a lot about race because race is
24 a huge factor in health inequities.

Page 463

1 Q Okay. Do you remember what the
2 racial demographic was of those five students?
3 A Well, none of them were of color that
4 I can remember.
5 Q And when you said you were getting
6 bad reviews from that class, do you remember what
7 the nature of the reviews were about?
8 A Yes. Actually, and this is the part
9 that I guess caused me so much stress is because
10 that particular class I sat and talked to Carolyn
11 Bronstein about that class while it was happening
12 because there were a lot of moving pieces that had
13 nothing to do with me. It was my first year
14 working with the Steans Center which is an
15 on-campus organization that helps faculty members
16 connect with nonprofit organizations to utilize
17 them in the learning experiences for their
18 students. And so they connected me within the
19 organization that I had never worked with before.
20 Now, me, personally, I do a
21 lot of community work, so I know how to build
22 those relationships, but I also know that it takes
23 lots and lots of time and effort to build those
24 relationships. But I was also new to the

Page 464

1 University, and all of my relationships were in
2 Indiana, and I wanted to make sure that the
3 students got involved in Chicago organizations and
4 Chicago downtown. And what ended up happening in
5 that classroom was beyond my control. My
6 community partner that the University connected me
7 with kept pushing back the date for when they were
8 supposed to meet the students. They changed the
9 assignments that they were supposed to do. In
10 fact, I -- and I had this conversation with
11 Carolyn because I expected her to have a voice in
12 the room when they did the vote about my teaching
13 where my community organization also -- and these
14 are graduate students mind you. We were working
15 with -- what do you call it -- inmates, prisoners,
16 and they were -- they would write letters about
17 things they would like to see changed and talk
18 about their health and things like that.
19 So I was having the students
20 do in-depth analyses about their lived experiences
21 and how they could develop health programs for
22 that group. And my community partner, they were
23 supposed to go to the location and meet with the
24 community partner on an individual basis and share

Page 465

1 some of their interactions. But when they got
2 there, my community partner was having them do
3 things like make copies on the copy machine and
4 menial tasks like filing and things like that
5 which is not what we had already agreed on.
6 So at the end of the quarter,
7 the students were very, very upset. And I will be
8 honest, I was upset too. And the students were
9 not happy about their interactions. They were,
10 like, the dates kept changing. We didn't know
11 when the deadline was, so on and so forth, a lot
12 of things that were out of my control.
13 And then after that, I never
14 worked with the Steans Center again. And from
15 then on, I only built my own relationships with
16 outside organizations because I couldn't afford to
17 have that type of interaction again.
18 MS. SCATCHELL: Okay. Great. Hang
19 on. Can we go off the record for one second?
20 MS. WERMUTH: Sure.
21 (Discussion off the record.)
22 BY MS. SCATCHELL:
23 Q You had previously testified that
24 there were five people and that you spoke about



Page 466

1    race. Were there any other classes that you spoke
2    about race or structural inequalities in?
3         A    Yes. Let me see my CV for a second.
4         MS. WERMUTH:  I am just going to
5    interpose a relevancy objection. Thank you.
6         THE WITNESS:  Some of the classes
7    that I speak about racial inequality, Discover
8    Chicago, both the LSP 110 and HON, which is the
9    honors class, Healthy Chicago 2.0. As you can
10   imagine in Chicago, we have a long history of
11   issues in reference to racism. That's why I was
12   bringing up the concept of redlining and how lack
13   of access to resources trickles down. Racism
14   trickles down into the structures that shape our
15   experiences. And so in those particular classes,
16   I talk about that.
17        In Communication, Ethics, and
18   Law I talk about race there. Advertising and
19   Health Promotions at the undergraduate level, and,
20   like, Advertising and Health Campaigns at the
21   graduate level, I talk about it in those courses
22   as well as Healthcare Campaigns and Community
23   Action as well.
24        So I would say that a good 60

Page 467

1    to 70 percent of my classes have some sort of
2    discussion. Oh, of course, and African-American
3    Health. I have a class that I taught called
4    African-American Health which also engages with
5    discussions of marginalization and racism.
6    BY MS. SCATCHELL:
7         Q    And have you been teaching those
8    classes throughout your time at DePaul?
9         A    Yes, I have.
10        Q    And so let's see. Were there any
11   classes that you were teaching before you went up
12   for tenure that you spoke about race with?
13        A    Yes. I mean, essentially, all of
14   those classes that I just named, those were all
15   taught prior to me going up for tenure.
16        Q    Okay. Was there ever a time period
17   where you felt like you didn't want to, quote
18   unquote, rock the boat in terms of race?
19        A    Yes.
20        MS. WERMUTH:  I am going to object to
21   the question on relevance grounds.
22        MS. SCATCHELL:  Okay. For the
23   record, the Rules of Evidence, Federal Rules of
24   Evidence, for depositions do not allow you to make

Page 468

1    objections based on the manner of taking an
2    objection, okay? You will always have those
3    preserved, such as relevance, competence, and
4    materiality that will not be waived by your
5    failure to object during the deposition.
6    Therefore, your objections to relevance are not
7    only unnecessary, but they are also inappropriate.
8    And, you know, I'm saying this with sincerity
9    here. My client says she is already feeling
10   uncomfortable by the way that you are interacting.
11   So I am going to ask you to please wait and hold
12   your relevance objections.
13        Could you please read back the
14   question?
15        (Record read as follows:
16        "Q. Okay. Was there ever a
17        time period where you felt
18        like you didn't want to,
19        quote unquote, rock the boat
20        in terms of race?
21        "A. Yes.")
22        THE WITNESS:  I was going to say yes,
23   in fact, once I realized that not only were my
24   colleagues uncomfortable about having these

Page 469

1    conversations and engaging with these types of
2    interactions, I also realized very quickly that
3    the students weren't comfortable as well. So if
4    you were to track the trajectory of my teaching
5    and the courses that I taught, you will notice
6    that I had more highly focused on race -- I mean,
7    classes that were more focused on race early in my
8    career. And then, eventually, I tried to focus on
9    the classes that I thought would alleviate that
10   unnecessary burden because, I mean, there have
11   been studies that show that students, just in
12   general, are more likely to rate a faculty member
13   as less competent and unprepared and all these
14   other kind of, you know, descriptors, just based
15   on not only their race, race is included, but
16   based off of their age, based off of way that they
17   speak, based off of their gender, even in sexual
18   orientation as well. So with that being said, I
19   did start to taper off from teaching issues of
20   race over time because of this.
21   BY MS. SCATCHELL:
22        Q    Okay. I am going to draw your
23   attention to Exhibit 88.
24        (Exhibit No. 88 identified.)

MAGNA
LEGAL SERVICES

Page 470

1           THE WITNESS: Is this in the binder?
2 BY MS. SCATCHELL:
3     Q    Yes.
4     A    Okay, I'm here. There is a 703 at
5 the bottom?
6     Q    Yes. What is the search committee?
7           MS. WERMUTH: Wait I'm sorry. I am
8 going to make an objection. Is this an exhibit
9 that we had entered into evidence?
10           MS. SCATCHELL: Yes, it is Exhibit 88
11 from your binder.
12           MS. WERMUTH: Hang on one second,
13 Gia. Was it entered into evidence? That's my
14 question. I don't think it was, and my -- I told
15 you I might not be putting all of the exhibits
16 into evidence, and I also asked you not to look at
17 the binder between depositions.
18           MS. SCATCHELL: I didn't.
19           MS. WERMUTH: Okay.
20           MS. SCATCHELL: I am looking at it
21 right now.
22           MS. WERMUTH: Let me finish. But
23 what -- if you are going through the binder, I
24 think that is inappropriate. I asked you to

Page 471

1 maintain, you know -- I mean, I thought our
2 agreement was I would send them to you in advance
3 for ease of reference, but not that you just had
4 license to use our documents. So I am going to
5 lodge that objection, you know. This was not
6 entered into evidence. What I had said at the end
7 of the last deposition was that we would -- I
8 think maybe at the beginning of the deposition was
9 that we would be collecting the binders for that
10 very reason. We would be sending messengers to
11 collect the binders. So you know, I think this is
12 inconsistent with our agreement.
13           That being said, it is a
14 document that your client has produced, so I note
15 my objection, and I think it is inconsistent with
16 what we agreed on. But I'm not going to call the
17 Court. If you are going to ask you a question,
18 that's fine. But I just think it is inappropriate
19 to do that.
20           MS. SCATCHELL: Okay. You asked me
21 not to look at in between depositions, and I did
22 not. Okay. I think that the entire position that
23 you have had on this about it being some sort of
24 big secret is inconsistent with the fact that

Page 472

1 these documents were produced by either you or
2 produced by me. And if you want to make an
3 objection, I will make objection to the document
4 dump of documents that you submitted to us on
5 April 8th and I believe on April 11th which were
6 about 3,000 pages of documents that, you know,
7 when I told you months ago my April and May were
8 very busy, and we would not have time to go
9 through them in great detail. So if you want to
10 make objections --
11           MS. WERMUTH: Okay. That's fine.
12 Here is my point on that. I spent months trying
13 to get you -- if we are going to throw, like,
14 barbs here, the production was based on our
15 inability to get your engagement on the ESI. It
16 happened the way it happened because in our --
17 like, I think there is a pretty clear record that
18 you weren't engaging on the ESI discussion. But I
19 hear you. And like I said, I am stating my
20 objection. I didn't say it was a big secret. I
21 think it was inappropriate to look at the
22 documents we compiled for purposes of conducting
23 your own examination. But as I said, you know, I
24 am stating it for the record. And we can move on,

Page 473

1 and you can ask your questions.
2 BY MS. SCATCHELL:
3     Q    Great. Please look at Exhibit 88.
4     A    I'm there.
5     Q    Okay. And what is the search
6 committee?
7     A    So looking at this document, November
8 2nd, this is a search committee that we were
9 putting together to hire two new advertising
10 professors I think. So the search committee
11 consisted of myself, ███████, █████████, and
12 Robin Hoecker. And we were hiring professors for
13 the advertising -- in our PR and advertising
14 program.
15     Q    Okay. And what was your concern with
16 the hiring process?
17     A    Well, my concern was that ██████
18 who was relatively new to the University, I think
19 she had only been there for a year, maybe two at
20 the max. But she literally had only been at the
21 University for a year, and she was, I don't want
22 to say attacking because it wasn't quite
23 attacking. But she -- I already gave the example
24 of her trying to disqualify a candidate for having

MAGNA ▶
LEGAL SERVICES

Page 474

1  an accent. But then when we came back together
2  again to vote on the candidates, we were all in
3  agreement. Everyone on the committee, we were all
4  in agreement. Robin and ███ and me were in the
5  meeting together. Like, we were all there. Nur
6  wasn't there; she was on the computer. And so as
7  I was closing the meeting, I explained to everyone
8  that we need to -- I was going to put together or
9  ███ and I because we were co-chairs, and ███ had
10 never done this before and he hadn't been on the
11 committee before, so he didn't really quite know
12 how to close out the search.
13         And I explained to her, to
14 everyone, that we needed to -- ███ and I were
15 going to do, like, a final report that lays out
16 who the candidates were, you know, what were their
17 defining markers, you know, and all of the reasons
18 that we decided to disqualify candidates. It was
19 just like a formal paperwork that you have to
20 submit to show that we went through whatever
21 process for hiring.
22         And Nur got very upset with me
23 because she was, like, I want to see the document
24 before you submit it. And I said: We're not

Page 475

1  submitting it. She's like: I want to see it
2  before we give it to the faculty members. And I
3  was trying to explain to her: This is not a
4  document that goes in front of the faculty
5  members. It is literally a document that we give
6  to the dean that just says who our candidates
7  were, what were their describers.
8         And ███ and I took notes at
9  the beginning, and we knew what needed to be said.
10 We had already talked about it. And she is like:
11 I want it right now. And so she started to yell
12 at me on the computer, on the computer. So then I
13 suggested: Well, how about this, why don't we do
14 a Google Doc? I can -- we can write it on a
15 Google Doc and share it, and then you can see it
16 before we submit it to the dean. And she said:
17 No, I want to be able to write it, and I need to
18 be able to see it. And I said: That's not what
19 we need to do. Like, it's really not something
20 that requires everybody's input.
21         And so she really got upset,
22 and she wasn't listening to what I was saying.
23 And then I started getting dizzy. I was triggered
24 because she was yelling, and she was doing all

Page 476

1  these unnecessary things. And I think honestly it
2  might have been just some bad interaction that
3  continued from the previous meeting in which I
4  told her that we are not going to disqualify a
5  candidate based off of their accent. So I think
6  that that probably seeped over into the next
7  meeting. And I said: You know what, I can't do
8  this right now, and I walked out because I
9  couldn't get her to understand what was going on.
10 So as soon as I left, I sat down in my office and
11 I turned off the lights because I was triggered.
12 And the lights were just -- I was afraid that I
13 was about to have a seizure, so I waited for a
14 second until like my -- I got my bearings, and
15 then I called ███ and I said to her exactly
16 what happened. And ███ was like: Let's have a
17 meeting, you know, let's have a meeting. And I
18 said: That would be really helpful because I
19 think she's really confused. She, being Nur, was
20 really confused about what was required of us
21 because I know that she had never really -- I
22 mean, she chaired a committee or co-chaired. I
23 think she chaired a committee, but that wasn't
24 hiring a senior track faculty member. It was

Page 477

1  hiring a full-time faculty member, and it's a very
2  different process.
3         So I sent her an email because
4  the interaction was not positive. It was very,
5  very direct, and it was uncordial. And I'm always
6  trying to be a cordial person. And I think that's
7  why it escalated, because I was not going where
8  she wanted to go with it. And so then, this is
9  how this email came about. So I, you know, I
10 emailed her to ask her to have a meeting. I tried
11 to express to her that I thought there was a
12 misunderstanding. She accused me of being --
13 storming out, of being aggressive, and all these
14 other things. Of course, all these tropes about
15 African-American women, just because I am direct
16 doesn't mean that I am angry or aggressive, but
17 that's how she perceived me to be.
18         And then we ended up having a
19 meeting. Now, I asked the co-chair and the other
20 member that was there, committee member to come.
21 And I found out later they were asked not to come
22 even though I know that they were there, and they
23 would have been able to speak to what happened in
24 that meeting. But they were asked either by ███

MAGNA
LEGAL SERVICES

Page 478

1    ███ or Lexa Murphy not to come.
2             So we had a meeting with Nur
3    and myself, and Lexa. And Lexa explained -- Nur
4    tried to bring out the Faculty Handbook or
5    something, and tried to say, well, Sydney didn't
6    do this or that or that. I didn't even come with
7    any of that. All I came with was let's talk about
8    what the procedure is. And I have always said
9    that, what is the procedure? Let's make sure we
10   follow procedure.
11            So at the end of the meeting,
12   she started crying. And then, eventually, when
13   she got ahold of herself, Lexa explained to her
14   that what I was trying to do was in line with what
15   the position -- what I was supposed to be doing.
16   So the form that I was trying to fill out that was
17   the final -- whatever the paperwork was was
18   exactly what I was saying it was. It was not
19   something for the College to see. But because she
20   wasn't listening and she accused me of all these
21   different things, we didn't even get there.
22            Now, mind you, in all of this,
23   I am trying to stay professional and trying not to
24   get sick and keep my stress levels down. But I

Page 479

1    ended up getting very, very sick and dizzy that
2    day to the point that I got on the wrong train on
3    the way home that day. I got on the wrong train,
4    didn't even realize I was on the wrong train until
5    I was way somewhere where I wasn't supposed to be.
6    So -- and I think I told Maria that too. And so
7    my husband had to drive all the way out to
8    somewhere else to come pick me up because of this
9    unnecessary triggering experience at the
10   University that is simply based off of I believe
11   my gender and my race and my national origin
12   simply because I was doing my job.
13            And in the end, nothing came
14   about it because what I was doing was right, and I
15   was not trying to belittle or do anything to that
16   effect.
17   Q    Did you escalate this to anybody
18   above the search committee?
19   A    I escalated it to Lexa because I felt
20   Lexa needed to be a mediator there because Nur
21   would not listen to me. And if you look at the
22   emails, she said things to me that were
23   outrageous. Like, she said I stormed out and I
24   wasn't listening and all these different things.

Page 480

1    And that wasn't even the case. And then I later
2    find out that when I disclosed that I was having a
3    triggering experience, they shared my health
4    information with everyone.
5    Q    Who is they?
6    A    Might have been ███  ███ or Lexa
7    Murphy. I specifically removed ███ and Robin
8    from the interaction -- I mean, from the email
9    initially. Yes. I think -- let me look at it.
10   Yes. I initially removed others from the email
11   because I didn't want them to know. But I wanted
12   Nur to know that it was not me doing whatever she
13   thought it was, that I was having a triggering
14   experience. And they went on, they being either
15   ███ or Lexa, I don't remember who, and looped in
16   Robin, yes, looped in Robin and ███. So now they
17   got to see all of my, you know, personal health
18   information. And it's fine. At this point, it's
19   whatever. Lots of people heard I had seizures.
20   But I really didn't want anyone to know that I had
21   a disability at that time. And I wrote to Lexa
22   about it, and I explained how difficult it made it
23   for me.
24   Q    And what did Lexa do?

Page 481

1    A    She apologized on behalf of them.
2    And she said: I'm sorry for what just transpired.
3    She had the meeting with me and Nur to discuss
4    what happened. She explained to Nur that what I
5    was telling her was in line with what all of the
6    committees have done previously. And it turns out
7    that Nur was really -- I think she was most
8    concerned because she was going up for tenure
9    soon, honestly. And she thought that I was going
10   to somehow hurt her tenure case by not letting --
11   Q    That's your opinion?
12   A    That's my opinion. I think that's
13   what it was. Maybe it was that, but I know she
14   had a bias towards me. She didn't hear what I
15   wanted to say, and she assumed that I was
16   aggressive which is clearly a trope that is used
17   to define African-American women when they are
18   direct.
19   Q    Okay. And when you had previously
20   testified about diversity, equity and inclusion,
21   what is inclusion?
22   A    Inclusion is the inclusion of
23   different ways of thinking and different
24   experiences. So inclusion has a lot more to do

MAGNA ◆
LEGAL SERVICES

Page 482

1   with -- well, I guess inclusion and diversity go
2   hand in hand actually.  Diversity is about having
3   different voices.  And inclusion is about taking
4   the steps to make sure those choices are included
5   and heard, and those voices are not just heard but
6   have an impact on the decision.
7      Q    Okay.  And based on what your
8   definition that you just explained of what
9   inclusion is, do you feel DePaul's College of
10  Communication is an inclusive space?
11     A    I think they want to be, but they are
12  not.  I think they don't know what it looks like
13  to have an inclusive space because we've never had
14  it before.  If you look at the history in terms of
15  ethnic minorities, US-born or domestic minorities,
16  we have a long history of not including people
17  from those groups.  And it has seeped into the
18  daily experiences, so it is really difficult for
19  them to imagine a space that is inclusive.
20     Q    Okay.  Is there a difference between
21  domestic minorities and US-born minorities or
22  wait -- no, same thing?
23     A    Um-hum.
24     Q    Foreign-born minorities and

Page 483

1   domestic-born minorities.
2        MS. WERMUTH:  Objection to form and
3   foundation.
4        THE WITNESS:  Yes, there is a major
5   difference.  I mean, you have to think about it in
6   reference to your upbringing.  If you are born and
7   raised in an entirely different country in which
8   you are not a minority, and a majority of the time
9   when someone transitions to the United States,
10  they are born in a place where they are not a
11  minority, and they are not used to being
12  marginalized -- they might have been marginalized,
13  but it was based off of socioeconomic status or
14  lineage or something like that, but it's not quite
15  the same as being a US domestic minority where you
16  are raised in that culture or atmosphere.  And
17  that plays out in the experiences that you have
18  for faculty members.
19        Let's be -- I mean, let's take
20  an example.  Like, March DeMoya gave me a very
21  good example when we talk about our experiences
22  because she is now considered a Latinx or Latina
23  person of color.  And she said in her country,
24  there is no difference, we are all the same.  She

Page 484

1   didn't think of herself as Latin until she came to
2   the United States and they said you need to put
3   yourself in this box.  And once she puts herself
4   in this box, she takes on all these roles.  But
5   the understanding of how those roles impact her
6   daily experiences, she's still learning that now,
7   and she's been in the US now for 15 or 20 years.
8   She's been here for however long she's been, but
9   she wasn't raised in it.
10        And she gave me an example of
11  the green card.  When you go to the University as
12  a foreign-born international person of color or
13  minority, when you come to the United States, you
14  are still trying to get these things, right.  And
15  the University, unfortunately, the institution is
16  aware of that.  And that also plays out into the
17  experiences and the decisions that they make,
18  right?  They are less likely to rock the boat
19  because they might not even be aware or acutely
20  aware of the struggles of people of color because
21  they haven't had to live through it as long as a
22  person of color who is born here.
23        Or they are less likely to
24  rock the boat for other reasons, because they want

Page 485

1   to get their green card eventually and stay here
2   in the United States and have a lifelong
3   experience here.
4        These are things that I have
5   learned over the years after engaging with
6   international people of color.  And the University
7   likes to group them all together and say "person
8   of color" or say "minority" as if the experiences
9   are the same.  And the truth of the matter is
10  these are particularly different experiences.
11  That's why there is a protected class for
12  nationality.  That's why there is a protected
13  class for race, you know, gender, and all these
14  different things because they are not the same.
15  And the fact that the University sometimes doesn't
16  understand those nuances is why you see these
17  problems.  That's why we have so many
18  international and foreign-born faculty members of
19  color in our college, but we have so few domestic
20  faculty members of color.
21        To this day, I'm still
22  thinking hard, I think I might be the only
23  faculty -- domestic faculty member of color in the
24  College of Communication.  We just hired a Black

MAGNA
LEGAL SERVICES

Page 486

1  guy, but he's from Africa.  And, of course, he
2  looks great on paper and he looks great in the
3  pictures, but his experience in reference to US
4  experiences, limited.
5  BY MS. SCATCHELL:
6      Q      Would you consider yourself a race of
7  color?
8      A      Yes, I do.
9      Q      You touched on your medical
10  disability.  So I'm going to go shift gears
11  quickly towards that.  So you had previously
12  testified that you have a seizure disorder,
13  correct?
14      A      I couldn't hear you.  You said I
15  testified that I have a seizure disorder?
16      Q      Yes.
17      A      Yes.
18      Q      And that it's exacerbated by certain
19  triggers you said?
20      A      Yes.
21      Q      Okay.  And you applied for disability
22  or temporary disability with DePaul, correct?
23      A      Yes, I did.
24      Q      And it initially was rejected,

Page 487

1  correct?
2      A      It was.  The wasn't accepted or --
3  the appeal didn't go through until after I came
4  back from work, so the entire time that I was on
5  short-term disability -- or actually, not on
6  short-term disability, I was fighting for my
7  access to resources.  So I wasn't really able to
8  get as much time as I needed to recuperate and,
9  you know, go to therapy and all the other stuff
10  that goes along with that.
11      Q      Were you being paid during the time
12  that you were off work?
13      A      No, I was not paid at all.
14      Q      And how long were you off work for?
15      A      I think eight to ten weeks.  I can't
16  remember.  It was for the spring quarter.
17      Q      And then ultimately they -- you
18  received your -- you appealed your short-term
19  disability?
20      A      Yes.  Once I returned back to work,
21  then they back-paid me, but they couldn't -- they
22  can't back-pay the stress and anguish that goes
23  along with trying to fight a case on your own that
24  the University probably could have avoided.

Page 488

1      Q      Okay.  And what is your understanding
2  that the University could have done better to get
3  it granted the first time around?
4      A      I think one of the biggest -- there
5  were two issues that I remember seeing in my
6  denial letter, one of them was about missing
7  health information.  Although, that I believe
8  might have been on the insurance company, so
9  Liberty Mutual, they were supposed to get all of
10  my health information which they never did.  So in
11  the end, I actually had to go to each one of my
12  healthcare providers and get all of my medical
13  records.  You know, this is hundreds and hundreds
14  of pages of work.  I had to scan them and put them
15  in my appeal and add them.  That was on them.
16              But on the other side, when
17  they denied it, they said they denied it because
18  of the job title, the job description because the
19  University initially didn't even give a job
20  description to Liberty Mutual about the essential
21  functions of my position.  And then they later
22  gave a job description, but it was a description
23  for someone who was an adjunct instructor which is
24  not the same as me.  An adjunct instructor is a

Page 489

1  person that works on an annual basis for the
2  University.
3              And I remember distinctly
4  Salma asking me to write a job description for my
5  appeal for the University because they said they
6  didn't have anything on file to provide to
7  substantiate what my substantial functions were of
8  my job.
9              The main point being when they
10  did supply, they supplied the wrong job
11  description.  They supplied a job description for
12  somebody who is only supposed to be at the
13  University for one year which, I mean, it is kind
14  of serendipitous because they kept me on a
15  one-year contract almost every year when I had to
16  go through all of those reviews.
17      Q      Okay.  Are you aware of anybody else
18  that didn't have a job description or had a job
19  description that was inaccurate you could say?
20      A      No.  I mean, honestly, I didn't get
21  to talk to too many people about it.  I did know
22  that Jill ████ and Jay Baglia were both on leave
23  around the same team as me for different reasons,
24  medical reasons.  But I never heard anything from

Page 490

1  them that they didn't have a job description for
2  their leave.
3      Q    Okay.  And you previously testified
4  that you have your seizures at night, correct, for
5  the most part?
6      A    For the most part, the major ones
7  that I have had have been at night.
8      Q    Okay.  And what is a grand mal
9  seizure in your opinion?
10     A    It is the worst type of seizure that
11 you can have.  It is the kind that can actually
12 kill you.  In fact, I have a friend of mine whose
13 son passed away two to three months after I had my
14 seizures.  Because I didn't really know much about
15 seizures until I had them, but what happens is the
16 electrical electrodes in your brain are misfiring.
17 They are sending off the wrong signals, or they
18 are sending them too quickly or too slowly, and
19 your body clenches up very tightly, the
20 tightest -- it's almost like, like if you
21 were getting shocked by like shock therapy.  You
22 are shaking and shaking.  You are not breathing
23 for at least a minute.  You're foaming at the
24 mouth, all things that happened to me.  If you

Page 491

1  happen to have your tongue out, you can bite your
2  tongue off if it happens.  Luckily, my tongue
3  wasn't out.  You lose all functions of your body
4  including potentially urinating on yourself, and
5  you lose consciousness.  And for me, all of that
6  happened except for the biting of the tongue and
7  the urination.
8          And then what ended up
9  resulting from my grand mal seizures were other
10 side effects that I am still dealing with to this
11 day, one of them being with my shoulders because
12 my shoulders dislocated multiple times while
13 having my seizures.  Never had any shoulder
14 problems in my entire life, and I chipped a bone
15 in one of my shoulders as well.  And I -- you
16 know, grand mal seizures can result in needing
17 vestibular therapy and other physical therapy just
18 so that you can function in your day-to-day life
19 again.
20     Q    And how long have you been on seizure
21 medication?
22     A    Since 2017, since I had the first
23 seizure.
24     Q    And the whole purpose of the seizure

Page 492

1  medication is to control or prevent a seizure,
2  correct?
3      A    Yes, yes.
4      Q    Okay.  And when you first went on
5  medication for your seizures, did your doctor have
6  to adjust your medication at all?
7      A    Yes, he had to adjust it multiple
8  times.
9      Q    Okay.  And do they have like a word
10 for that?
11     A    Titrate.
12     Q    And what is the program chair
13 position?
14     A    The program chair position is a
15 position in which -- it's the person who directs
16 the strategic direction of whatever the program
17 is.  So for instance, the PR and advertising
18 program, they manage the course scheduling.  They
19 manage the faculty members.  They do the hiring of
20 the adjuncts.  They work directly with them to do
21 the training of the adjunct, strategic initiative.
22 Essentially, they oversee the program and lead it
23 in its development.
24     Q    Okay.  And did you ever apply for

Page 493

1  that position?
2      A    I did, yes.
3      Q    And what happened?
4      A    What happened was I self-nominated.
5  I self-nominated.  We, being the public relations
6  and advertising program, we had a meeting to go
7  through the process of selecting the program
8  chair.  I gave a speech and a discussion about
9  what my goals would be as a program chair because
10 I had just finished an entire year of training at
11 Leading People at DePaul on how to be a good
12 leader so I could transition.  I knew that was the
13 direction that I wanted to go with my career.  And
14 so I was trying to prepare for that.  That's why I
15 asked Salma to recommend me for the Leading People
16 at DePaul program.  It's also why I applied for
17 the Harvard Institute and got into that because I
18 always wanted to work in that space to help
19 develop.
20         So at the meeting I did my
21 speech and I talked about my goals.  We did a
22 question-and-answer session where I was asked many
23 questions by my colleagues about what my
24 expectations would be.  There were I think at



Page 494

1    least four or people that were nominated for the
2    position, but all of them dropped out of the
3    nomination or refused to do the nomination
4    including I think ████ ██████, Maria DeMoya, Matt
5    ████. I think those were the other people, and
6    maybe ████████. So I finished the discussion.
7    And previously, what I've always seen or what I've
8    seen is that the person leaves, they have a little
9    short discussion, no more than say three to five
10   minutes, we vote and go back in. Congratulations,
11   you are the new chair.
12       Q    It's what you previously testified
13   about earlier in the deposition?
14       A    Yes.
15       Q    And okay. And then now, my next
16   question is: When you were denied that position,
17   who ended up taking over the position?
18       A    So they didn't quite follow the
19   rules.
20       Q    What do you mean?
21       A    Well, the rules, there is a -- I
22   don't have the form in front of me, but there
23   is -- there was an election-like policy for
24   program chairs. And the rule is if you -- let's

Page 495

1    say you go through the process, you make your
2    recommendation based off of the vote to the dean,
3    and the dean chooses to accept the vote or deny
4    the votes and do whatever he or she feels is best
5    for the College or for the program. And if not,
6    then they are supposed to restart the process
7    again seeking nominations again and to fill the
8    position and go through that whole process again.
9    And if not, we are supposed to do an external
10   search for someone else to fill that position if
11   we can't find anyone internally that needs to do
12   it.
13            In our particular case,
14   instead of going through that route, our dean,
15   Lexa Murphy decided to reappoint ████ ██ as the
16   interim program chair until they figured out what
17   the next steps were going to be after they denied
18   me the position. And so a year went by, and then
19   they opened up nominations again, and this time
20   Maria DeMoya accepted the nomination. And by that
21   time, they had now created an entirely new process
22   for selecting a program chair because the process
23   that I went through apparently didn't work
24   properly. So they created a new process, and then

Page 496

1    Maria DeMoya was selected as the program chair a
2    year later.
3        Q    And what was different about this
4    process?
5        A    Well, this new process added new
6    elements, meaning the person who was -- anyone who
7    was in the candidate pool needed to think design
8    like a statement about what their goals were,
9    things like that. And then they were to seek
10   feedback from faculty members, program faculty
11   members anonymously, and then, you know, they meet
12   in person and do the whole question-and-answer
13   session. And then we vote, and then it was given
14   to the dean, and the dean decides to accept or
15   reject the vote.
16       Q    Would you say you were the most
17   qualified candidate?
18       A    Yes, I would.
19       Q    What is your basis for that?
20       A    Well, I think it is a number of
21   reasons. Besides the fact that I had done a
22   year's worth of leadership training for such a
23   position at the University supported by my
24   previous dean, besides that, I was the only

Page 497

1    candidate. There was no one else that was willing
2    to do the job. And I'm not saying that I should
3    have gotten the position by default. However, I
4    do remember when ████ ██ who was at the time the
5    program chair who was stepping down, I remember
6    when she applied for the position, she was much
7    earlier in her -- not much earlier, but she was
8    earlier in her tenure and promotion process. She
9    hadn't even gotten the level of support that I had
10   received from the dean or the College when she
11   went up for that position, at least I don't think
12   so. I don't think so.
13           And for me, I had already
14   gotten the majority of faculty votes saying that I
15   am tenurable, and I should be promoted. And I got
16   the letter of support from my dean about my, you
17   know, tenurability and all that stuff. I had
18   shown support for my colleagues and my program
19   throughout my time. I served graciously both in
20   the College and outside the University. Like I
21   said, I brought in funding, largest funding that
22   the College probably had seen in quite some time
23   to develop the new media engagement lab. I had
24   done so many different things that I thought my

MAGNA
LEGAL SERVICES

Page 498

1   record showed my commitment to the development of
2   the program, but they couldn't see past that. I
3   mean, they could only see what they wanted to see.
4   And I believe that was my race and my disability
5   and my gender.
6       Q     And somebody said something during
7   the evaluation --
8       A     Yes.
9       Q     -- about your gender or your
10  disability. What was that?
11      A     That was the most disheartening part
12  because after everything that had happened, after
13  standing outside the office, you know, the room,
14  the conference room for over an hour wondering why
15  are they having such a long conversation, I've
16  never seen this happen for anybody, and I go back
17  to my office, I find out that the whole
18  conversation somehow wasn't about me, but somehow
19  I got voted down. It just didn't make sense
20  because everyone said my qualifications weren't
21  being discussed in that meeting.
22          And you know, after going from
23  person to person, I later found out that Eva
24  ██████████ brings up my disability, and says

Page 499

1   things like: Oh, well, how long has she been
2   here? What, she's been here for maybe three,
3   three years or so, three or four years, and of
4   those years, two or three of those she was on
5   leave the entire time, that kind of conversation.
6   Wasn't she on leave for some kind of sickness or
7   disability? Those types of things. You know, has
8   she -- I don't even know her. These were all
9   conversations that were being had. And people
10  told me that this happened.
11          And I just was in awe because
12  I never expected me giving so much of my time and
13  effort to the University would go unaccounted for
14  by my own colleagues who I put a lot of effort
15  into and supported.
16          MS. WERMUTH: Can we take a quick
17  bathroom break?
18          MS. SCATCHELL: Sure. When do you
19  want to come back, ten minutes?
20          MS. WERMUTH: I don't even need ten
21  minutes. But Gia, could I chat with you for two
22  seconds? Can I call your cell? Five minutes
23  should be fine.
24          MS. SCATCHELL: Okay. Great.

Page 500

1          (Recess taken.)
2   BY MS. SCATCHELL:
3       Q     Okay. You had previously testified
4   that you were advised not to teach winter
5   inter-session or summer courses, is that accurate?
6          MS. WERMUTH: Objection to form,
7   misstates the testimony.
8          THE WITNESS: Yes.
9   BY MS. SCATCHELL:
10      Q     Okay. Did they suggest or did they
11  advise you?
12      A     I'm trying to get the difference
13  between suggest and advise. Wait. That was made
14  as a -- that was made as a -- that was -- that was
15  recommended as an accommodation actually by the
16  disabilities office or accommodations office, by
17  Gianna, not you Gianna, but the other, Gianna
18  Bellavia.
19      Q     Okay. And you are paid a certain
20  salary if you work the winter inter-session or
21  summer inter-session, correct?
22      A     Yes.
23          MS. WERMUTH: Objection.
24          THE WITNESS: Yes. So what happens

Page 501

1   is you have your regular course load which is
2   normally on average six courses per year. But
3   then you have the option of teaching winter
4   inter-session and summer for additional funds. It
5   is essentially the only University-provided way of
6   making additional funds beyond your regular
7   salary.
8   BY MS. SCATCHELL:
9       Q     Okay. And that was suggested as an
10  accommodation for your disability?
11      A     Yes.
12      Q     Okay. As an accommodation, did you
13  also ask for more time to prepare for your
14  classes?
15      A     I did.
16      Q     And what happened?
17      A     I was given less time actually. And
18  at one point I was told the reason why I had less
19  time, and I had to correct Gianna Bellavia. And
20  I'm sorry if I am saying her name wrong. I had to
21  correct her in our discussions to let her know,
22  no, I gave my teaching schedule well in advance,
23  and we were able to make it well in advance for
24  those accommodations. But she tried to make it

MAGNA
LEGAL SERVICES

Page 502

1  seem like I was the reason why I couldn't have
2  more time when she had my teaching schedule since
3  2018.  And when 2019 came, the accommodations
4  weren't in place, and she tried to, again, blame
5  it on me.  And then she realized it wasn't me, and
6  I think eventually they tried to correct it.  But
7  time is fleeting, it comes and goes.  So the
8  longer they took, the more it increased the
9  chances of having medical issues because they
10 weren't responding in an appropriate time or
11 within a timely manner.
12      Q    Okay.  So then let's see what else.
13 What is The DePaulia?
14      A    That's the school newspaper.
15      Q    At the University?
16      A    At DePaul.
17      Q    Or just the College of Communication?
18      A    So The DePaulia comes from the
19 College of Communication.  It is the student-run
20 newspaper through the College of Communication,
21 but it was started by the students and majority of
22 the time ran by students.  I don't know for
23 certain, but I'm pretty sure they have maybe a
24 faculty advisor for the -- for them.

Page 503

1      Q    And did you ever have a student
2  become aggressive with you?
3      A    Yes.  Oh, my goodness, yes.
4      Q    Was it more than once?
5      A    It's happened numerous times.  But
6  one, one particular time was -- I mean, I've had
7  it recently happen, and then another time it
8  happened in person.  I've been attacked via email
9  and then also verbally in person too.
10     Q    Okay.  And do you have a specific
11 instance of what you believe to be an aggressive
12 situation?
13          MS. WERMUTH:  I am just going to
14 interpose a quick relevancy objection.  Thank you.
15          MS. SCATCHELL:  Again, I'm going
16 restate what I stated to you before about those
17 are preserved, and they are inappropriate for
18 depositions.
19          MS. WERMUTH:  Unless it can be cured.
20 So I'm doing what I'm doing.  It is not
21 inappropriate.  But anyway, I said it very
22 quickly, so we can move on.
23          THE WITNESS:  I'm sorry, I need the
24 hear the question again.

Page 504

1          (Question read as follows:
2          "Q.  Okay.  And do you have a
3          specific instance of what you
4          believe to be an aggressive
5          situation?")
6          THE WITNESS:  Oh, yes, I do.  I have
7  numerous instances, but I can give one example.
8  This was probably in 2013 or '14.  I remember
9  teaching a course.  It was PRAD 335 I believe
10 which is ethics.  We've changed the topic or the
11 title of the course over the years, it is not the
12 same one.  But it was like advertising and
13 society, but it is really talking about ethics I
14 think.
15          And I remember a student being
16 upset.  It was a white male student being upset
17 about his grade.  He received a B on the final
18 paper.  And so he wanted to talk to me about it.
19 So I was happy to talk to him as I am with most of
20 my students.  I went down and went through all of
21 the assignments and showed him the areas that he
22 could improve upon, and I offered to help him if
23 he would like to meet more and go over it.  And he
24 said to me:  I don't think what you did was right.

Page 505

1  And I said:  Unfortunately, as the instructor of
2  the course, you have to follow these guidelines,
3  and you have to -- unfortunately, this is the
4  grade that you have received based off of what you
5  submitted.  Now, if you would like for me to
6  regrade it, I can redo that.  Maybe there is
7  something I overlooked.  And his response was:
8  No, I don't want you to regrade it.  I think you
9  gave me the wrong grade.  And I said:  Sir -- and
10 I did say sir.  I probably shouldn't have called
11 him a sir.  But I did say:  Sir, actually, I am
12 the expert on this topic, so you have to trust in
13 my judgment in terms of the quality of your work.
14 And he literally stood up and banged on the table
15 with his fist.  He said:  You are no expert, and I
16 am talking to the dean.  I am going to go to the
17 dean.  And I was taken aback.  So I got up, and
18 opened my door, and then I went and sat back down
19 at my desk.  And I said:  You can feel free to
20 pick up any grievances that you have about your
21 grade with the dean.  And then I directed him to
22 the grade challenge website, and then he stormed
23 out of my office.
24          But you know, I'm pretty

MAGNA
LEGAL SERVICES

Page 506

1  certain that no one else has had to experience --
2  I mean I've talked to a lot people, and everyone
3  is like: Oh, my God, did that really happen?  It
4  really did happen.  That was one example of
5  someone being very aggressive with me, but that
6  was years ago.
7  BY MS. SCATCHELL:
8      Q    Did you complain to anybody?
9      A    I think I told my program chair.  I
10  think I told -- I don't think -- I don't think
11  ███████ was the program chair then.  I think it
12  might have been Teresa Mastin.  I think at the
13  time she was the program director.  We haven't
14  have a program chair yet.  I think she was the
15  director.  And she told me: It's okay, you know,
16  just wait it out.  See if the student does
17  anything.  See if you hear something back from the
18  dean.  And I never heard anything, so I let that
19  one go.
20          And more recent -- and I will
21  make this short.  A more recent encounter, a
22  student sent out an email to all of the advising
23  team or the advisors at the University, and she
24  essentially is slandering my name and saying

Page 507

1  things like:  The University should have never
2  hired me.  Shame on them for having me as a
3  professor because she failed my class when she
4  didn't turn in her assignment.  And it was during
5  last quarter in the fall when I was on leave.  I
6  was gone for seven out of the ten weeks.  And when
7  I came back to teach weeks eight through ten --
8  and someone else was over my course during that
9  time, she felt like she didn't have enough
10  support.  And instead of taking responsibility for
11  the assignments that she didn't turn in and got
12  zero for it, she felt that I was the problem even
13  though I wasn't even the one who taught the
14  course.  I wasn't there.
15          But somehow she realized who I
16  was, and she went around complaining about me.
17  And it was really hurtful.  And I accidentally
18  sent an email, which I was trying not to do.  And
19  I accidentally sent an email back to her and said
20  that was really hurtful.
21          But those are the types of
22  experiences that I had at the University that I am
23  pretty certain that others don't have.  And I
24  didn't know that others didn't have it -- I mean,

Page 508

1  I didn't know that it was common to
2  African-Americans and people of Black descent
3  until I went more recently to Being Black At
4  DePaul panel that we just had maybe a month -- not
5  even a month, maybe three weeks ago.
6      Q    What is that?
7      A    What is what?
8      Q    Being Black At DePaul, is that an
9  organization or --
10      A    No, no, no.  So DPUBLIC, which is the
11  Black Leadership Coalition, DePaul's Black
12  Leadership Coalition, which is the employee
13  resource group who was working with her name is
14  Dr. ████████, she is like the diversity
15  fellow.  And she was trying to figure out what are
16  some of the best ways to get the University to
17  respond to the concerns of Black faculty, staff,
18  and students because we have been spending the
19  last two to three years trying to get the
20  University to see that there are some structural
21  and cultural issues with the way that Black
22  faculty, staff, and students are being exposed to
23  or experiencing.  And so she came up with the idea
24  that we have this Being Black At DePaul panel in

Page 509

1  which previous, like, faculty members that are
2  retired, staff members that are no longer at the
3  University, and current students can speak out
4  about their experiences.  And we also did an
5  anonymous survey for people to discuss their
6  experiences because we know for a fact that staff
7  members are the most vulnerable population, and
8  they are more likely to lose their jobs.  They
9  don't have tenure and things like that.
10          So we thought it would be good
11  to shelter them by giving them an outlet to
12  discuss their grievances but anonymously.  So they
13  collected that information and presented it at
14  this Being Black At DePaul panel.  And lo and
15  behold, the things that I was saying that I was
16  experiencing, you know, lack of advancement in my
17  position, being treated unfairly by my students,
18  being rated and reviewed differently than my white
19  counterparts or male counterparts, all those types
20  of experiences came out in that survey.  And I
21  didn't even put my own experiences in it because I
22  knew that I had litigation, you know, a pending
23  suit against the University.  I didn't want to put
24  anything about myself in there.  But it was just

**MAGNA** ▶
LEGAL SERVICES

Page 510

1  crazy that I could see that I wasn't the only
2  person that was experiencing this.
3          And so the fact that DPUBLIC
4  has been asking the University to address this for
5  years, and we even gave them a statement to, you
6  know, that details data and all this other stuff
7  to support why we are saying this needs to change,
8  and the University just glosses over it.  They
9  show up to meetings without having actually read
10  our statement or looked at all of the details.
11  And that's why they ended up doing this, right?
12  This is the exact reason why these types of
13  documents are being put together because DePaul
14  needs to seriously take a look at discrimination
15  at the University.
16      Q     Okay.  About how many people
17  responded?
18      A     To the survey?
19      Q     To the survey, yes.
20      A     I'm sorry.  I don't remember off the
21  top of my head.
22      Q     Was it more than five?
23      A     Oh, yes.  It was certainly more than
24  five.

Page 511

1      Q     More than ten?
2      A     I would say there were hopefully at
3  least ten.  But the people that showed up to the
4  event, I mean, to the anonymous survey I would say
5  at least ten.  People in the event, I think we had
6  at least one-hundred-odd-something people.  And
7  the panel included another ten respondents that
8  talked about their experiences, the ones that
9  weren't afraid of the retaliation that might
10  happen to them if they speak their truth.
11      Q     And then you provided some -- like a
12  spreadsheet, correct?
13      A     That was the survey that was provided
14  to me by ████████.
15      Q     Okay.  I'm going to circulate that.
16  And then also there was a chat?
17      A     Yes.  So there was a chat in the
18  panel discussion as well where people were talking
19  about their experiences in the chat box as well.
20      Q     Okay.  And you produced that to me as
21  well, correct?
22      A     Yes, I did.  I did.
23      Q     And what -- actually, hold on, I'm
24  going to send out a document I will mark as

Page 512

1  Exhibit 148.
2          THE REPORTER:  I think we have 148.
3  Let me check.  Yes.  We have 148.
4          MS. SCATCHELL:  Okay.  149.
5              (Exhibit No. 149 identified.)
6          MS. SCATCHELL:  I just circulated
7  that.
8          THE WITNESS:  Can we go off the
9  record for a second?  I need to let my dog back in
10  the house.
11          MS. SCATCHELL:  Sure.
12              (Brief recess taken.)
13          MS. SCATCHELL:  Back on the record.
14          MS. WERMUTH:  I have an email with
15  three attachments.  Are you making this a Group
16  Exhibit, Gia?
17          MS. SCATCHELL:  Yes.  I couldn't
18  Bates stamp them because I didn't want to
19  interfere with the integrity of the actual
20  document that was provided to me.
21          MS. WERMUTH:  Understood.  I know you
22  sent these to me I think the day before
23  Dr. Dillard's deposition started.
24          MS. SCATCHELL:  Right.  Dr. Dillard,

Page 513

1  did you receive them?
2          THE WITNESS:  I did, yes.
3  BY MS. SCATCHELL:
4      Q     Okay.  Could you open up the Excel
5  spreadsheet?
6      A     I have it.  It's open.
7      Q     It is a read-only file.  You see
8  that, correct?
9      A     I don't know where you see that.
10     Q     At the top of the --
11     A     Yes, I see it.
12     Q     Okay.  And is it your under -- what
13  is your understanding of what a read-only is?
14     A     It can't be modified.  Once it is in
15  that format, it is stuck in that format and can't
16  be changed.
17     Q     Perfect.  And so then for the first
18  column do you see auto time stamp of when the form
19  was submitted or survey was submitted?
20     A     Yes, that would be a time stamp of
21  when it was submitted.
22          MS. WERMUTH:  I'm sorry, where are
23  you?
24          MS. SCATCHELL:  Column A.

MAGNA ▶
LEGAL SERVICES

Page 514

1    MS. WERMUTH:  Okay.  I see.
2    MS. SCATCHELL:  And then column B
3  would be the person's affiliation to DePaul.
4    THE WITNESS:  Yes.
5  BY MS. SCATCHELL:
6    Q    And it would only -- it would be
7  either a student, staff or faculty, is that
8  accurate?
9    A    That's accurate.
10   Q    Or --
11   A    I think it was alums, but they were
12 students.  We just wanted to make sure the alums
13 knew they were heard as well.
14   Q    Okay.  And column C is where the
15 person who took the survey would provide their
16 experiences, is that accurate?
17   A    Yes.  So we wanted both positive and
18 negative.  We wanted the challenges and positive
19 experiences.  We didn't want it to be leaning one
20 way or the other.  We just wanted general
21 experiences.
22   Q    Okay.  And then section D is how the
23 Black community could hold -- at DePaul could hold
24 the University accountable, correct?

Page 515

1    A    Yes.
2    Q    Okay.  And then column E would be any
3  suggestions or feedback that the person taking the
4  survey would have for any of the DePaul
5  administrators to help make the institution more
6  diverse, equitable, and inclusive; correct?
7    A    That's correct.
8    Q    And then if you scroll all the way
9  down to row 25, that would be the last submission.
10 Is that what you see?
11   A    Yes.  The last submission for me is
12 an alum, alum No. 25.
13   Q    Great.  Do you know if DPUBLIC
14 had shared this document with any of the DePaul
15 administrators?
16   A    Yes.  This document has been shared
17 with the administration.
18   Q    Okay.  And do you know which
19 administrators have received a copy of this
20 spreadsheet?
21   A    I think for certain Cindy Pickett and
22 Liz Ortiz, they were, Cindy Pickett is the
23 associate provost for diversity, equity, and
24 inclusion.  And Liz Ortiz is director of OIDE.

Page 516

1  But they both received it.  I'm not exactly sure
2  if it was sent to the provost.  I'd have to
3  double-check because I'm not the communications
4  coordinator for DPUBLIC.
5    Q    And there are two other attachments.
6  One says:  Meeting saved chat.  Could you open
7  that?
8    A    Okay.  I have it open.
9    Q    Okay.  What is this document?
10   A    This is just the chat box for the
11 Being Black At DePaul.  So while people were
12 talking about their experiences or answering the
13 panel discussions, we encouraged people to use the
14 chat box to elicit questions or put comments or
15 just talk about what they were feeling.
16   Q    Okay.
17   A    So you will notice people say:  Hey,
18 so-and-so, hey so-and-so.  It is just a chat box
19 so everyone can communicate with each other.
20   Q    Do you know if that -- if this
21 session was taped or recorded?
22   A    I don't think it was recorded, not to
23 my knowledge.
24   Q    Okay.  And then the last exhibit

Page 517

1  which says:  Meeting saved closed caption, could
2  you open that?
3    A    I have it open.
4    Q    Okay.  What is this document?
5    A    This would be the captions of what,
6  at least as best it can be captured, of what was
7  said at the meeting.  I mean, this was
8  automatically transcribed by Zoom as a part of the
9  Being Black panel discussion.
10   Q    Okay.  Got it.  Thank you for that.
11 Now, did -- back to DePaulia, the news
12 publication, did they ever reach out to you about
13 your lawsuit?
14   A    Yes.
15   Q    Okay.  And did they ever write an
16 article about the lawsuit?
17   A    They did, yes.
18   Q    Okay.  Did you provide any specific
19 input to them?
20   A    No.
21   Q    And did you read the article that
22 they wrote?
23   A    I did.  I don't know if they -- I
24 believe they wrote more than one to be honest.  I



Page 518

1  don't quite remember. But I do remember reading
2  the first one, and me having -- excuse me for a
3  second.
4          I'm sorry. Sorry. That's my
5  mother picking my son up from baseball. I'm
6  sorry. What was the question?
7          MS. SCATCHELL: Could you read back
8  the question, Madam Court Reporter?
9          (Record read as requested.)
10         THE WITNESS: If there were two, I
11  don't remember reading the second one. But I do
12  remember reading the first one, and immediately
13  getting sick and being triggered and having a
14  discussion with several colleagues about it
15  because I didn't know that it was going to be
16  published. I didn't see the email of them asking
17  me to be a part of the news article until the
18  night before it was published. And I just woke up
19  the next day, and the whole University saw it.
20  The whole world could see it.
21  BY MS. SCATCHELL:
22     Q    Okay. And did anybody reach out to
23  you after that article was published?
24     A    A couple of my colleagues did. Maria

Page 519

1  DeMoya, of course, because I consider her a
2  friend. Robin Hoecker reached out to me, and I
3  believe Jill ████ reached out as well.
4     Q    And do you remember what Jill ████
5  reached out to you and said?
6     A    No. Actually, we didn't really get
7  to talk. She said she'd like to talk to me about
8  her experience with the short-term disability
9  process. But I think that was all. We didn't
10  really get to connect like we wanted to.
11         MS. SCATCHELL: Off the record for
12  just a few minutes. I'm going to present my last
13  few exhibits, and I'm going to send them as one
14  email so we don't have to have multiple emails.
15         MS. WERMUTH: All right.
16         (Recess taken.)
17         MS. SCATCHELL: I just sent
18  documents, Exhibits 150 to 155.
19         THE WITNESS: Got it.
20  BY MS. SCATCHELL:
21     Q    Could you open up 150?
22     A    It's open.
23         (Exhibit No. 150 identified.)
24

Page 520

1  BY MS. SCATCHELL:
2     Q    Okay. Do you recognize that
3  document?
4     A    Yes. This looks like -- yes. This
5  is Ashlyn, one of the staff members in the College
6  reaching out after reading the DePaul article.
7  Yes.
8     Q    Okay. And do you know what her
9  ethnicity is?
10    A    I think she's white.
11    Q    Okay. And the email thread begins
12  actually on Bates stamp Dillard DePaul 8186,
13  correct?
14    A    Yes.
15    Q    Okay. And the first email would be
16  on January 27, 2021?
17    A    That's correct.
18    Q    Okay. And then proceeded by two more
19  emails from you on January 27, 2021, and then her
20  on January 28, 2021, is that accurate?
21    A    That is correct.
22    Q    Have you spoken with her since these
23  emails?
24    A    Yes, but not in reference to this

Page 521

1  content. I've spoken to her about other
2  work-related items.
3     Q    Okay. And when she sent you the
4  email on 1-28, do you see that on Page 8185?
5     A    8185, yes. What about?
6     Q    She says: We are aware and we are
7  saddened and disturbed by what you've experienced.
8  Bringing these to light takes so much courage. Do
9  you know what she meant by: We are afraid and we
10  are saddened?
11         MS. WERMUTH: Objection to the
12  mischaracterization of the document.
13         THE WITNESS: Yes. I'm not seeing
14  where you're looking at.
15  BY MS. SCATCHELL:
16     Q    I'm looking at the second to last
17  sentence: We are aware and we are saddened and
18  disturbed by what you've experienced. Bringing
19  these things to light takes so much courage. Do
20  you see that?
21    A    Give me a second. I'm having trouble
22  finding that. What is the date? What is the
23  bottom of the stamp so I can find the right page?
24    Q    8185.

Page 522

1    A    I see it now, I'm sorry.  I was
2 looking at the bottom.  It is at the top.  Go
3 ahead.  We are aware and saddened.  No, I don't
4 know.  I would assume she's talking about the
5 College, but I really don't know who she is
6 referencing.
7    Q    Okay.  I'm going to show you or could
8 you please open up Exhibit 151, and take a moment
9 to review it.
10         (Exhibit No. 151 identified.)
11         THE WITNESS:  Yes, I remember this
12 email.
13 BY MS. SCATCHELL:
14    Q    So it is an email thread, correct?
15    A    Yes.  It is an email thread between
16 myself, Dr. ██████, and Dr. █████.
17    Q    Who is Dr. █████?
18    A    Dr. ██████ is or was -- she is a
19 faculty member in I think political science, and
20 she is also currently the presidential diversity
21 fellow for the University.
22    Q    Okay.  And then Dr. ██████?
23    A    I believe she is a faculty member in
24 accounting in the business school.

Page 523

1    Q    And do you know what race ████████
2 ████████ identifies with?
3    A    She is African-American.
4    Q    And do you know -- what?  I'm sorry.
5    A    I am saying domestic minority,
6 African-American.
7    Q    And what about Stephani ████████?
8    A    Same for her.
9    Q    Domestic African-American?
10    A    Domestic minority, African-American.
11    Q    Okay.  Did you ever speak with either
12 one of them outside this email thread about your
13 lawsuit?
14    A    I talked to ██████ about it, and was
15 trying to find ways to avoid being in the
16 spotlight.  And she said:  Just don't respond to
17 any articles.  If you don't want to be seen, don't
18 say anything, just keep living your life
19 regularly.  She also encouraged me to speak out
20 though.  She said:  I think if we speak out, you
21 will be surprised that more people have similar
22 experiences.
23    Q    Okay.  And then in this email thread,
24 there was some conversation about being open to

Page 524

1 having some sort of town hall or group discussion.
2 Correct?
3    A    Yes.
4    Q    Okay.  Did that ever happen?
5    A    We did have a Black town hall meeting
6 in 2021, so I believe we had another town hall
7 meeting later that year online.  It might have
8 been in April I think.  I'd have to look at my
9 records.  I'm pretty certain we had one more
10 meeting after this one too.
11    Q    Okay.  And do you remember what the
12 nature of that meeting was?
13    A    The nature of that meeting was to
14 discuss how the University -- like, what were the
15 next steps for supporting Black faculty staff and
16 students because after the wake of the George
17 Floyd riots, the University put out a statement
18 saying that they stand in solidarity against
19 racism, and they wanted to develop an and
20 antiracism approach for the University's mission
21 as one of the University's missions.
22         And the University then
23 administered campus-wide listening tours where
24 they would listen, ask questions, and listen to

Page 525

1 people's experiences, and then they were supposed
2 to do some kind of action plan or development
3 after that.  But the whole year went -- came and
4 went, and nothing happened.  And so that's when
5 DPUBLIC decided to have another -- I think another
6 Black town hall meeting discussing what would the
7 next steps be.  And that's where we came to
8 develop the statement that was put forth to the
9 University -- yeah, put forth to the University.
10 And this statement is not to be confused with a
11 different statement that came to the University
12 from outside.
13    Q    Which was from whom?
14    A    What?  Which statement are you
15 talking about?
16    Q    The second that wasn't from DPUBLIC,
17 who was that from?
18    A    That one, I don't know really who to
19 attribute it to.  But I know that some scholars,
20 critical race scholars got wind of my situation
21 when the article was published, and they took up a
22 petition to call the University to action to ask
23 them to make changes and to make structural
24 changes that acknowledged that there is something

MAGNA ▶
LEGAL SERVICES

Page 526

1 inherently wrong with the system, that there is
2 discrimination that's happening towards domestic
3 minorities. And they took up a petition and had
4 scholars from around the world calling the
5 University to get diversity training to change
6 their effort to make changes and not continue to
7 let people like ████████ and ████████ and
8 myself and ██ Calvente and all the others that
9 haven't sued the University, not let our voices be
10 lost in the wake because, as you can see, all of
11 them have left. And I'm still one of the few, if
12 not the only person still there.
13     Q    I don't mean to cut you off. Do you
14 know if anything happened based on those calls to
15 action?
16     A    Nothing has happened, at least from
17 my understanding. After we did the statement that
18 came from the Black town hall meeting, we provided
19 that to the University. The University didn't
20 respond to us for a very long time. They actually
21 ignored us. We asked for a meeting with the
22 president as well as some representative from the
23 board of trustees that went unanswered. Then we
24 finally did have a meeting. And when we came to

Page 527

1 the meeting, the provost was there, and the
2 president was there. DPUBLIC chairs were both
3 there. I was there, and I think the associate
4 provosts for DEI and OIDE as well. OIDE was
5 there. But I distinctly remember the chair of
6 DPUBLIC deciding she was done, and that she no
7 longer wanted to fight this fight because when we
8 got to the meeting, they hadn't even looked at our
9 statement and hadn't made any segue on developing
10 any kind of action plan other than a one-page
11 statement saying they are going to do something.
12 But nothing ever came of it.
13     Q    Do you know who runs DPUBLIC?
14     A    Well, it's -- it is a -- it is run by
15 elected members. So this year -- actually,
16 earlier this year I was elected to become the
17 co-chair DPUBLIC. But prior to that, I was the
18 communications coordinator.
19     Q    And then who was the co-chair when
20 the lawsuit was filed?
21     A    ██████████ and ████████████ I
22 believe his name is. It was one staff and faculty
23 member.
24     Q    Do you know if DPUBLIC is a

Page 528

1 corporation or a 501(3)(c)?
2     A    No, it is an employee resource group
3 through the University.
4     Q    Oh, okay. Do you know if it has
5 funding through the University?
6     A    Yes, we have some funding through the
7 University.
8     Q    Just going back to a prior exhibit --
9 one second.
10         MS. SCATCHELL: Anna, do you have the
11 exhibit number for the -- oh, here it is. 85.
12         (Exhibit No. 85 identified.)
13         THE WITNESS: Do you want me to go to
14 85?
15 BY MS. SCATCHELL:
16     Q    Yes, please.
17     A    All right, I'm there.
18     Q    All right. And this is the meeting
19 that you previously testified that you had with
20 ██ Calvente, Salma Ghanem, and yourself,
21 correct?
22     A    Yes.
23     Q    And after this meeting, did
24 anything -- did any sort of -- did anything happen

Page 529

1 with your position that you feel -- with your job
2 that you feel was a direct result of this meeting?
3         MS. WERMUTH: Objection, vague.
4         THE WITNESS: I feel like part of the
5 reason why I wasn't selected for the program chair
6 position was a result of me having this candid
7 conversation about discrimination in our program
8 or in our College because --
9 BY MS. SCATCHELL:
10     Q    Okay.
11     A    Go ahead, I am --
12     Q    I just said okay. I'm sorry.
13     A    I couldn't -- the fact that there
14 were no reasons given as to I wasn't selected.
15 And given my history, it's really difficult not to
16 see that as the main reason or see discrimination
17 as the main reason why I wasn't selected for that,
18 for -- why my growth and development and my career
19 was stifled.
20     Q    Okay. Then I'm going to have you
21 open up Exhibit 152.
22         (Exhibit No. 152 identified.)
23         THE WITNESS: All right. It's open.
24 BY MS. SCATCHELL:

MAGNA
LEGAL SERVICES

Page 530

1    Q    Okay. And can you take a moment and
2 review this document?
3    A    Okay, I've seen it.
4    Q    What is that document?
5    A    This is an email chain or exchange
6 between myself and Dr. ███ who is a faculty
7 member in my College. I think she also teaches in
8 the journalism program. And she was asking me --
9 she was telling me that she saw my -- the article
10 about my lawsuit in The DePaulia. And she was
11 reaching out, and she would be happy to talk about
12 her experiences while she was pregnant and her
13 short-term disability experience that would be
14 helpful for me.
15    Q    And did you ever end up speaking with
16 her?
17    A    No. We were never able to connect.
18    Q    Okay. I am going to have you open up
19 Exhibit 154.
20        MS. WERMUTH: I have two marked 154.
21        MS. SCATCHELL: One is the
22 attachment.
23        MS. WERMUTH: I see. Got it. Thank
24 you.

Page 531

1        THE WITNESS: Open up the attachment
2 or 154?
3        MS. SCATCHELL: First 154.
4        THE WITNESS: Okay, got it open.
5        (Exhibit No. 154 identified.)
6 BY MS. SCATCHELL:
7    Q    Who is -- or actually, do you
8 recognize this document?
9    A    Yes. This looks like an email sent
10 from DPUBLIC to I'm guessing its constituents
11 about my lawsuit and the article that was -- that
12 was published.
13    Q    Okay. And then there is also email
14 from a Dan ███?
15    A    Yes.
16    Q    Who is he?
17    A    I have no idea who Dan ███ is.
18    Q    Okay. What about the -- what about
19 Thomas Tatum?
20    A    His name sounds familiar. I think he
21 might be a member of DePaulia.
22    Q    Okay. And then if you would open up
23 154 dash attachment?
24        MS. WERMUTH: Gia, can I ask real

Page 532

1 quick? I don't see anything in this email that
2 suggests that what you have labeled as 154
3 attachment was attached to it. Can you tell me
4 where --
5        MS. SCATCHELL: That's my question.
6 I don't know.
7        MS. WERMUTH: Oh, I see.
8        MS. SCATCHELL: Yes. I --
9        MS. WERMUTH: I just don't see an
10 attachment to -- like, anything to indicate there
11 is an attachment. Okay.
12        MS. SCATCHELL: I can mark it as 156.
13 I assumed it was the attachment, but maybe I was
14 wrong.
15        MS. WERMUTH: I don't know. I'm just
16 asking because I didn't see a reference to an
17 attachment.
18        MS. SCATCHELL: We will remark that
19 as 156. I will resend it.
20        (Exhibit No. 156 identified.)
21        THE WITNESS: I have the attachment
22 open or file, I don't know what you call it.
23        MS. SCATCHELL: I am going to relabel
24 it for a clear record.

Page 533

1 BY MS. SCATCHELL:
2    Q    Could you please open up Exhibit 156?
3    A    156, you just sent it again?
4    Q    I relabeled it.
5    A    Okay.
6    Q    Can you take a moment and review that
7 document?
8    A    All right.
9    Q    What is that document?
10    A    This is a statement put out by the
11 DPUBLIC -- by DPUBLIC following our 2021 DPUBLIC
12 town hall meeting. What happened was, again, this
13 has been, like I said, ongoing. We were waiting
14 for the University to respond, and our
15 constituents were growing restless and wanted more
16 concrete -- concrete information and examples for
17 how the University could move forward. So it
18 includes data about the University's climate
19 toward Black faculty staff and students of African
20 descent. It talked about limited opportunities
21 for advancement and promotion and how that has
22 adversely affected Black faculty staff and
23 students. And then it also talks about, you know,
24 accountability, limited accountability and the

MAGNA ◆
LEGAL SERVICES

Page 534

1  University's lack of actual true commitment to
2  diversity, equity, and inclusion.  It talks about
3  graduation rate and attrition rate.  And it also
4  provides at least a good 15 to 20 bullet points on
5  recommendations how the University can respond to
6  these --
7           (Audio distortion.)
8        MS. WERMUTH:  You muted yourself.
9        THE WITNESS:  Sorry about that.  Hold
10  on a second.  Sorry, my dog went into the other
11  room.
12        THE REPORTER:  I'll read the portion
13  before we lost you:  "And it also provides at
14  least a good 15 to 20 bullet points on
15  recommendations how the University can respond to
16  these --"
17        THE WITNESS:  Yes.
18        -- (continuing) respond to
19  these experiences authentically about, you know,
20  instead of just providing lip service and, you
21  know, continuing listening tours where they are
22  just listening to people.  This document was
23  supposed to provide direction coming from the
24  Black community which is a part of DePaul,

Page 535

1  providing more strategic ways of responding to it.
2  And it gives us an opportunity to start building
3  on what we know we have or what resources we have
4  and ways we can address these concerns.
5  BY MS. SCATCHELL:
6      Q     Okay.  And then can you also, lastly,
7  open up Exhibit 155?
8      A     All right.  I have it.
9      Q     Okay.  Could you -- who is ███████ --
10  oh, boy, ████████████,
11      A     I know him as ██████, and he was a
12  faculty member in the College of Communication,
13  specifically in my College or my program, public
14  relations and advertising.
15      Q     Okay.  And what is his ethnicity?
16      A     He is a white male or white man.
17      Q     And does he still work there?
18      A     No.  No, he does not.
19      Q     What happened to him?
20      A     After he finished his first year, he
21  was at the University for one year, and they did
22  not renew his contract to continue at the
23  University.
24      Q     Okay.  And do you know -- do you know

Page 536

1  why they didn't renew his contract?
2      A     What I was told by him and others was
3  that he wasn't -- well, I heard lots of different
4  stories.  One story is this, so obscene, but he
5  told me that there were concerns about his service
6  and that he -- someone in the meeting, Jay Baglia
7  is what I heard, but that they complained about
8  him letting class out early, and he didn't show up
9  to enough meetings, and so he wasn't fulfilling
10  his responsibilities in reference to service
11  because he had -- he supposedly had excellent
12  teaching and excellent -- or very good teaching
13  and excellent and very good research.
14      Q     Who is ███████████?
15      A     ███████████ was a faculty member
16  at DePaul University when I first got there.  He
17  used to be in PR and advertising, tenure-track
18  faculty member as well.
19      Q     What is his ethnicity?
20      A     A white man.
21      Q     And did he ever get tenure?
22      A     He left the University before he
23  received tenure.  But he has been tenured at his
24  other new University.

Page 537

1      Q     Okay.  And have you ever seen this
2  email that's been marked as Exhibit 155?
3           (Exhibit No. 155 identified.)
4        THE WITNESS:  No, I've never seen
5  this before.  This is my first time now.  I'm
6  reading it now.
7  BY MS. SCATCHELL:
8      Q     Okay.  Great.  And then lastly, in
9  your opinion, in order to -- does racial
10  discrimination mean that you have to have
11  derogatory words used towards you?
12        MS. WERMUTH:  Objection, it calls for
13  a legal conclusion.
14        THE WITNESS:  Can I answer?
15        MS. WERMUTH:  Yes.
16        THE WITNESS:  In my opinion, as a
17  person, but also as an expert in Critical Race
18  Theory, no, you do not need direct -- direct words
19  to be said to you for it -- for someone to
20  discriminate against you.  And that's why I gave
21  the example of redlining earlier.  The racism --
22  the more formidable forms of racism happen
23  structurally, and they are much more difficult to
24  pin down and much more difficult to identify as

MAGNA
LEGAL SERVICES

Page 538

1  truth because they are often hidden, and they
2  can't be seen.
3           MS. SCATCHELL:  Okay.  I have no
4  further questions.
5           MS. WERMUTH:  I have just a couple of
6  quick questions based on the examination by your
7  lawyer, not many though.
8           FURTHER EXAMINATION
9            By Ms. Wermuth:
10      Q    Dr. Dillard, did Salma Ghanem vote on
11  your nomination for PRAD chair?
12      A    Did she vote on it?  No.
13      Q    You never saw ██████████
14  ████-Hébert's full tenure submission, did you?
15      A    No, I only heard what she told me.
16      Q    Okay.  And Salma Ghanem was not the
17  dean when ████ ████-Hébert was denied tenure, am
18  I right about that?
19      A    I don't remember honestly.  There was
20  a switch between ████ to Salma, but I don't
21  remember if it was the same year that ████ went
22  up.
23      Q    Okay.  And in Exhibit 1 -- actually,
24  strike that.

Page 539

1           Going back to that graduate
2  class with five students where we looked at your
3  scores earlier today, you testified in examination
4  by your lawyer that those five students were upset
5  for reasons beyond your control.  Do you recall
6  that testimony?
7      A    I do recall that.
8      Q    Okay.  And in your personnel
9  interview where these -- well, strike that.
10           Did you inform the personnel
11  committee about these issues related to your
12  students being frustrated for reasons beyond your
13  control?
14      A    I did.
15      Q    You did?
16      A    I did because they happened in the
17  spring.  So when I went up for the review in 2017,
18  I did bring it up because it was immediately
19  following my previous review.  And I said:  I
20  hadn't even had time to, you know, make changes.
21  So I felt like they should not have been included.
22      Q    So my question is:  Did you tell the
23  personnel committee that the students gave you bad
24  scores for reasons beyond your control?

Page 540

1      A    I gave them --
2           MS. SCATCHELL:  Objection, misstates
3  testimony.
4           THE WITNESS:  I gave them the context
5  of what happened in that class.  I can assume that
6  that's exactly why.  But given the way that that
7  interaction was with the Steans Center, I did tell
8  them there was something going on there that was
9  beyond my control.
10  BY MS. WERMUTH:
11      Q    And you said that in the personnel
12  interview in your 2017 review?
13      A    I believe it was 2017.  I have to
14  look at the dates one more time.  '13, '15, I
15  think it was the 2017 -- wait.  I have to look at
16  all the dates of when I had the reviews.  But it
17  was the one in which they were reviewing that
18  year.
19      Q    Okay.  So it was the one in which
20  they recommended you have more face-to-face
21  classes?
22      A    Yes, yes.
23      Q    Today there were a couple times when
24  you looked at your phone.  I know your mother

Page 541

1  reached out to you.  Did you communicate with your
2  lawyer, your spouse, or any other witness by using
3  your phone during this deposition today while you
4  were in the chair answering questions?
5      A    No.  I mean, I communicated go ahead
6  pick up the baby from school, but nothing in
7  reference to this.
8      Q    Okay.
9      A    My mother was on her way to pick my
10  son up from school; and I told her, no, my husband
11  will get him instead.
12      Q    So the only person you communicated
13  with by use of your phone today during the course
14  of the deposition was with your mother --
15      A    Yes.
16      Q    -- on the topic of childcare issues?
17      A    Yes.
18      Q    Thank you.  And I know at one point
19  earlier this morning your husband, around
20  10 o'clock this morning, your husband was making
21  you Theraflu.  Did he stay in the room during the
22  deposition?
23      A    No.  He went to work.  So he made my
24  Theraflu and went to work.

MAGNA ▶
LEGAL SERVICES

Page 542

1    Q    And the last question I will ask is I
2  will just request of you, Dr. Dillard, and you,
3  Gia, that you put the binder back in the box.
4  Obviously, anything marked during the course of
5  your deposition will be attached to the
6  transcript, so you will get copies of them.  But I
7  would ask that you put the binders back in the
8  boxes and not review them.  And I will arrange to
9  have someone pick them up.  I will work with your
10 lawyer, Dr. Dillard, to make sure you are home to
11 do that.  Okay?
12            THE WITNESS:  Okay.  Do I get to say
13 anything else or we are done with the questioning?
14            MS. WERMUTH:  At this point, the
15 deposition -- I mean I'm done with my questioning.
16 There is no question pending.  So my only question
17 is do you agree to put the binder back in the box
18 and not review it?
19            THE WITNESS:  Yes.
20            MS. WERMUTH:  Thank you.
21            MS. SCATCHELL:  I am going to again
22 object to the fact that these exhibits, I haven't
23 gong through them all, but I assume they have
24 already been produced already, and I believe as

Page 543

1  the Plaintiff in this case that we have a right to
2  review the documents, especially in light of the
3  fact that there was an examination.  But that
4  being said, that's fine.  We will put it in the
5  box.  I don't know if I have the original box to
6  be honest with you, but it will be in a box of
7  some sort.
8            MS. WERMUTH:  Thank you.  I
9  appreciate that courtesy.  With that, are we
10 adjourned.
11            MS. SCATCHELL:  Yes.  I will speak
12 with you, Sydney, personally when we are off the
13 record.  Okay.
14            MS. WERMUTH:  Sheri, I will order.
15            THE REPORTER:  This session and last
16 one as well?
17            MS. WERMUTH:  Yes, thank you.
18            MS. SCATCHELL:  And we will as well,
19 we will take a copy rather.
20            THE REPORTER:  E-Tran or paper
21 transcript?
22            MS. WERMUTH:  E-Tran.
23            MS. SCATCHELL:  E-Tran.
24            THE REPORTER:  Regular delivery okay

Page 544

1  or does anyone need it faster?
2            MS. WERMUTH:  Regular.
3            MS. SCATCHELL:  Regular is fine.
4            (Whereupon, the deposition
5             concluded at 5:13 p.m.)

Page 545

1  STATE OF ILLINOIS        )
                            )  SS.
2  COUNTY OF C O O K        )
3
        I, Sheri L. Arendt, a certified shorthand
4  reporter in the State of Illinois, do hereby
   certify that SYDNEY DILLARD, PH.D. was by me first
5  duly sworn to testify to the truth, and that the
   above matter was recorded stenographically by me
6  and reduced to writing by me.
7        I FURTHER CERTIFY that the foregoing
   transcript of the said matter is a true, correct
8  and complete transcript of the testimony given by
   the said witness at the times and places specified
9  herein before.
10       I FURTHER CERTIFY that I am not a relative
   or employee of any of the parties, nor a relative
11 or employee of the attorneys of record, or
   financially interested directly or indirectly in
12 the action.
13       IN WITNESS WHEREOF, I have hereunto set my
14 hand at Chicago, Illinois this 5th day of May,
15 2022.
16
17
18
19
20
21  _____
22      Certified Shorthand Reporter
        Illinois CSR License No. 084-002856
23
24

MAGNA ▶
LEGAL SERVICES

## A

**aback** 505:17
**ability** 262:1 392:21
**able** 273:7 288:13 311:2
356:17 374:6 376:1
381:17,20 385:14 399:7
403:13 415:10 437:15
475:17,18 477:23 487:7
501:23 530:17
**Abnee** 326:14
**absolute** 403:24
**abstained** 366:24
**abstaining** 367:3
**abstention** 365:21,23
**academic** 262:19 284:19
285:14 287:11,17
389:20,24 450:10
**academy** 400:9 418:20
**accent** 371:12 372:17
474:1 476:5
**accept** 495:3 496:14
**acceptable** 375:6 420:2,3
**accepted** 447:6 487:2
495:20
**access** 283:21 284:1
303:20 311:4,6 466:13
487:7
**accidentally** 507:17,19
**accommodation** 500:15
501:10,12
**accommodations** 262:18
500:16 501:24 502:3
**accountability** 533:24,24
**accountable** 320:1
514:24
**accounting** 522:24
**accurate** 275:21 304:4
326:19 353:21 379:8
438:20 442:19 500:5
514:8,9,16 520:20
**accurately** 262:1
**accusations** 304:21
**accuse** 339:23
**accused** 305:3 339:17
340:9 477:12 478:20

**accusing** 340:5
**acknowledge** 357:4,24
395:6 400:21 436:16
461:9
**acknowledged** 292:23
374:5 525:24
**acknowledging** 306:5
**acted** 367:16
**acting** 320:2 357:6
429:19
**action** 437:3 462:21,23
466:23 525:2,22 526:15
527:10 545:12
**actions** 435:7
**acts** 434:14,20
**actual** 293:4 310:24
330:4,7 335:22 337:21
408:1 422:5 512:19
534:1
**actuality** 365:16 392:2
**acutely** 484:19
**add** 302:2 319:8 375:21
375:22 435:4 488:15
**added** 360:16 375:22
496:5
**additional** 266:21 269:5
272:21 302:11 318:18
319:13 322:8 334:22
343:9 364:12 433:16
453:5 459:13,14 461:23
501:4,6
**address** 510:4 535:4
**adjourned** 543:10
**adjunct** 488:23,24
492:21
**adjuncts** 492:20
**adjust** 492:6,7
**administered** 524:23
**administration** 515:17
**administrators** 515:5,15
515:19
**admonished** 292:13,15
293:12 294:17,18,20
**admonishing** 304:20
**advance** 381:20 424:20
471:2 501:22,23

**advancement** 509:16
533:21
**adversely** 381:19 533:22
**advertising** 282:18 374:6
374:7,8 390:23 391:1
400:10 413:6 450:12,15
450:18 451:3 453:1
466:18,20 473:9,13,13
492:17 493:6 504:12
535:14 536:17
**advise** 500:11,13
**advised** 500:4
**advising** 506:22
**advisor** 502:24
**advisors** 506:23
**advocate** 420:20 432:6
432:15 458:14,15
**affairs** 389:20,24
**affidavit** 385:18,20
**affiliation** 514:3
**afford** 465:16
**afield** 350:21 439:15
**afraid** 476:12 511:9
521:9
**Africa** 402:8 486:1
**African** 355:7 401:16
533:19
**African-American**
295:12 355:11 371:16
393:8 402:12,14 404:14
405:2 410:6,14 413:9
415:22 433:2,12 467:2
467:4 477:15 481:17
523:3,6,9,10
**African-Americans**
328:18 355:10 400:13
400:14 401:14,24
412:22 419:1 508:2
**afternoon** 324:14
**after-thought** 356:3
**age** 419:24 469:16
**agencies** 391:13
**agency** 391:10
**aggressive** 477:13,16
481:16 503:2,11 504:4
506:5

**advancement** ...
**ago** 267:16 268:9 393:22
413:1 417:24 420:2
456:3 472:7 506:6
508:5
**agree** 304:5 328:13
391:22 460:13 542:17
**agreed** 465:5 471:16
**agreement** 366:4 471:2
471:12 474:3,4
**ahead** 263:1 300:7
301:12 361:14 382:1,20
388:3 398:13 413:10
415:16 426:19 438:16
461:3 522:3 529:11
541:5
**ahold** 478:13
**air** 425:22 426:4 427:20
**alarmingly** 400:15
**Alexandra** 289:14
**alignment** 396:11
**allegation** 291:11 294:13
294:16,24 295:4 306:11
426:8
**allegations** 267:18
325:16 332:23 342:17
424:3 429:13,14
**alleviate** 469:9
**allow** 304:11 318:18
330:22 331:21 451:24
467:24
**allowed** 328:19
**allowing** 271:23 397:2,3
**Alongside** 333:21
**alternate** 359:21
**altogether** 377:13
**alum** 515:12,12
**alumni** 455:17,18
**alums** 514:11,12
**Alvaray** 285:11
**Alyssa** 359:19
**Amended** 265:14 268:13
292:5,6 364:17
**America** 294:5
**Americans** 401:17
**ammunition** 433:21
**amount** 277:18 337:9



355:2 383:7 384:4
391:8 430:14
**analyses** 464:20
**analyzing** 303:11,12
**ancillary** 393:18
**and/or** 433:2
**angry** 477:16
**anguish** 487:22
**animosity** 372:6 399:22
**Anna** 258:11 285:2
326:18 350:12 381:2
430:21 437:11 445:10
454:20 462:18 528:10
**annual** 316:2 489:1
**anonymous** 330:12
334:21 366:22 367:7
421:5 427:11 428:5
430:18,23 436:24
437:17,24 509:5 511:4
**anonymously** 334:4
421:9 423:20 425:16
426:13 496:11 509:12
**answer** 291:21 325:22
332:1 340:3 350:18,19
372:15 380:23 382:2
383:21 399:4 404:3
414:11,12 430:9 537:14
**answered** 325:14 437:7
**answering** 516:12 541:4
**answers** 350:14 379:23
**anticipated** 453:13
**antiracism** 524:20
**anti-racism** 436:18
**anybody** 312:10 418:2
455:19 479:17 489:17
498:16 506:8 518:22
**anymore** 444:1 457:2
**anyway** 311:14 458:18
503:21
**apologized** 308:16 358:6
358:7 481:1
**apologizing** 358:12,13
**apparently** 331:10 406:4
459:3 495:23
**appeal** 487:3 488:15
489:5

**appealed** 487:18
**APPEARANCES** 258:1
**appeared** 258:6,12
343:24
**appears** 275:21
**apples** 286:6,6
**application** 301:2,21,23
303:12
**applications** 277:2
**applied** 277:3 301:17
320:6 372:2 389:15
411:4,9 439:14 462:1
486:21 493:16 497:6
**applies** 416:24
**apply** 492:24
**applying** 288:11 433:7
440:21
**appreciate** 350:20
351:13,19 403:9 543:9
**approach** 396:14 397:20
524:20
**appropriate** 502:10
**approve** 390:4
**approved** 300:14,19,20
**approximately** 380:12
382:23 420:15
**April** 257:16 268:5,6,10
268:13,14 472:5,5,7
524:8
**area** 315:14 338:23
374:10 393:2 415:15
**areas** 328:12 364:6
504:21
**Arendt** 257:15,24 545:3
**argue** 453:5
**arguments** 425:5
**arrange** 363:15 542:8
**arrive** 381:1
**article** 517:16,21 518:17
518:23 520:6 525:21
530:9 531:11
**articles** 447:17,24 523:17
**Ashlyn** 520:5
**aside** 325:5
**asked** 267:7 268:21
279:22 294:19 297:11

297:16 298:5,10 301:6
311:16,17 313:5 324:9
329:3 330:16 354:3
360:22 373:20 398:2,9
399:15 404:3 419:11,19
426:12,12 437:6 444:22
453:15,18 470:16,24
471:20 477:19,21,24
493:15,22 526:21
**asking** 264:19,20 270:22
271:18 287:16 299:24
309:19 325:15 341:10
347:16 348:24 349:4
363:18 364:8 381:2
384:3 417:19 418:9
426:14 429:21 437:9,13
489:4 510:4 518:16
530:8 532:16
**asks** 364:3
**asserting** 351:3
**assertions** 423:24 439:17
**assessing** 447:14
**assessment** 355:22
**assigned** 278:7,8
**assignment** 507:4
**assignments** 446:20
464:9 504:21 507:11
**assist** 267:7,11 344:17
346:20 361:1
**assistance** 266:11 268:17
284:7,8 290:7
**assistant** 298:14,16
347:15 350:5 371:10
373:16 443:9
**assisted** 267:9
**associate** 412:13 455:12
515:23 527:3
**assume** 294:3 337:8
367:1 373:2 458:6
460:24 522:4 540:5
542:23
**assumed** 461:22 481:15
532:13
**assuming** 264:10 356:6
**astronomical** 357:1
**atmosphere** 483:16

**attached** 532:3 542:5
**attachment** 262:4 530:22
531:1,23 532:3,10,11
532:13,17,21
**attachments** 512:15
516:5
**attacked** 503:8
**attacking** 473:22,23
**attempt** 437:1
**attention** 333:14 342:19
354:8 356:4 358:1
469:23
**attorney** 291:13 302:10
398:17,17
**attorneys** 545:11
**attribute** 525:19
**attrition** 400:14 401:13
401:16 534:3
**audio** 324:5,6 430:4,7
440:23 534:7
**August** 263:15
**authentically** 534:19
**author** 431:14
**authored** 431:16
**auto** 513:18
**automatically** 381:21
517:8
**available** 283:2,5,6
**average** 381:13 382:5,8
501:2
**avoid** 407:12,13 425:4
523:15
**avoided** 487:24
**avoiding** 269:2
**Awalt** 443:24
**award** 271:3
**awarded** 270:11,14
**aware** 290:15 327:20,21
328:15 330:18 350:3
396:24 442:4 484:16,19
484:20 489:17 521:6,17
522:3
**awe** 459:1 499:11
**awermuth@cozen.com**
258:9
**awesome** 461:18



**a.m** 257:17

**B**

**B** 270:8 275:22 504:17
  514:2
**baby** 541:6
**back** 274:18 279:8,10
  285:5 286:16 288:12
  292:10 296:9 297:8
  298:3,4 299:13 300:4
  301:24 302:9,14 310:16
  310:21 317:8 321:2
  325:6 330:15 331:24
  332:15 334:21 335:8
  340:21 341:15 342:16
  350:10 355:7 361:22
  362:1 364:11,15,16
  365:24,24 379:23 386:5
  393:20 397:18 412:18
  413:19 415:6 418:12,13
  419:12 420:11 425:12
  425:14 430:18 438:6,18
  456:7 464:7 468:13
  474:1 487:4,20 494:10
  498:16 499:19 505:18
  506:17 507:7,19 512:9
  512:13 517:11 518:7
  528:8 539:1 542:3,7,17
**background** 374:20
  390:17
**backwards** 264:4
**back-paid** 487:21
**back-pay** 487:22
**bad** 312:11 463:6 476:2
  539:23
**Baglia** 357:13 359:6
  361:15 489:22 536:6
**banged** 505:14
**banning** 394:6
**Barb** 339:9
**Barbara** 285:8 329:21,22
  332:15,21 334:6,10,20
  335:8,14 336:22 339:5
  437:12
**barbs** 472:14
**baseball** 518:5

**based** 266:1 267:13,19
  290:13 295:19 305:24
  306:12 307:7,11 309:2
  315:11 325:4,9,10,18
  325:19 329:18 340:15
  341:11 344:14 353:17
  354:21 376:3,18 391:21
  392:1,10 397:9 401:8,9
  403:3,5 411:19 417:2
  441:20 468:1 469:14,16
  469:16,17 472:14 476:5
  479:10 482:7 483:13
  495:2 505:4 526:14
  538:6
**basis** 294:12 295:4,6
  344:24 350:2 351:3
  395:2 407:14 464:24
  489:1 496:19
**Bates** 285:16 512:18
  520:12
**bathroom** 499:17
**bear** 423:13
**bearings** 476:14
**becoming** 455:2
**began** 369:16 389:4
  390:15 410:8 425:18
**beginning** 313:15 410:4
  471:8 475:9
**begins** 299:15 520:11
**behalf** 258:6,12 337:1
  339:5 451:21 481:1
**behavior** 308:17 429:15
**behold** 509:15
**belief** 344:7
**beliefs** 396:12
**believe** 261:23 262:2
  265:16 273:22 279:17
  280:23 297:6 307:10
  309:5 310:5 311:15
  316:22 318:20 319:15
  319:20,22 325:8,17
  329:23 330:2 339:9
  343:3 344:12 347:9
  349:3,21 354:19 359:10
  365:20 367:5 371:7
  373:23 374:2 388:17

  396:13 397:20 398:7
  399:16 402:11 408:15
  409:8,24 414:23 415:14
  415:18,21 416:5,21
  427:21 429:12 431:2
  433:4 435:1 442:18,21
  457:22 459:15 461:1
  472:5 479:10 488:7
  498:4 503:11 504:4,9
  517:24 519:3 522:23
  524:6 527:22 540:13
  542:24
**believed** 346:14 356:19
  420:19
**believes** 453:19
**belittle** 479:15
**belittled** 352:10 354:4
**Bellavia** 500:18 501:19
**benefit** 460:23
**best** 351:12 352:5 353:17
  356:14 495:4 508:16
  517:6
**better** 267:2 271:13
  285:20 286:2 376:17
  400:8 412:17 436:22
  453:7 488:2
**beyond** 304:18 325:15
  328:20 433:17 464:5
  501:6 539:5,12,24
  540:9
**bias** 481:14
**big** 363:23 402:21 405:17
  471:24 472:20
**biggest** 293:3 401:22
  404:2 488:4
**bill** 439:5
**binder** 262:22 263:2
  265:8 470:1,11,17,23
  542:3,17
**binders** 471:9,11 542:7
**biometrics** 450:22
**bit** 261:9 305:9 377:18
  383:23 390:16 391:17
  416:14 432:9 451:18,23
  455:2
**bite** 491:1

**biting** 491:6
**bits** 460:2
**black** 346:20 390:7
  394:21 400:16 402:4,4
  414:16 419:16,16,19
  422:10 423:7 485:24
  508:2,3,8,11,11,17,21
  508:24 509:14 514:23
  516:11 517:9 524:5,15
  525:6 526:18 533:19,22
  534:24
**blame** 502:4
**blank** 362:7
**blind** 447:6
**block** 428:14
**board** 526:23
**boat** 467:18 468:19
  484:18,24
**body** 381:9 490:19 491:3
**bolded** 321:15
**bone** 491:14
  ████████ 326:16
  498:24
**book** 436:18
**books** 394:4
**Booth** 308:15
**born** 293:24 294:4
  295:13 372:20,20 373:3
  396:22 402:8,9 483:6
  483:10 484:22
**bottom** 315:5 331:4
  334:14 341:23 354:11
  363:8 427:22 431:12
  442:15 470:5 521:23
  522:2
**bought** 450:21
**box** 262:22 484:3,4
  511:19 516:10,14,18
  542:3,17 543:5,5,6
**boxes** 282:3 542:8
**boy** 535:10
**brain** 490:16
**brand** 261:20 450:13
**break** 341:4,5 385:2,6,8
  386:1 455:6 499:17
**breathing** 490:22



**Brenders** 285:9
**Bridge** 401:1
**bridging** 401:3
**brief** 332:11 343:7
  512:12
**briefly** 437:2
**bring** 356:3 432:8 478:4
  539:18
**bringing** 466:12 521:8
  521:18
**brings** 498:24
**Brittany** 258:11 285:4
**brittanygreen@cozen....**
  258:10
**broad** 407:3,6 439:16
**broader** 406:21
**broke** 365:7
**Bronstein** 285:10 290:7
  290:8,12 326:21 327:9
  362:23 363:2 463:11
**brought** 310:20 331:9
  345:20,22 357:19 358:1
  438:11 497:21
**Browne** 347:15 349:21
  350:3
**brutality** 418:24
**Bryant** 285:10
**bug** 261:9
**build** 371:20 446:6
  463:21,23
**building** 446:3 450:14
  535:2
**built** 371:22 465:15
**bullet** 354:10 362:6,9
  388:5 434:4,8,9 534:4
  534:14
**bullying** 337:3
**burden** 318:3 378:1
  469:10
**business** 522:24
**busy** 472:8
**button** 445:8

─────── **C** ───────

**C** 514:14 545:2
**cabinet** 348:21

**calculating** 383:7
**calendar** 341:9
**call** 343:21 385:21
  390:14 427:20 428:13
  428:15 450:1 462:22
  464:15 471:16 499:22
  525:22 532:22
**called** 257:11 261:2
  450:14 467:3 476:15
  505:10
**calling** 526:4
**calls** 291:20 338:23
  380:17,22 414:5,9
  526:14 537:12
**Calvente** 270:2 295:10
  333:21 335:10 336:23
  339:14 356:12,16 371:4
  396:6 408:13 412:6
  415:12,13 420:4,18
  421:4,16 424:9 431:17
  431:24 455:11 459:20
  526:8 528:20
**Calvente's** 330:13
**campaigns** 462:22
  466:20,22
**campus** 347:14
**campus-wide** 524:23
**candid** 529:6
**candidate** 371:11 374:2
  374:5,11,16,18 375:3,5
  376:1,5 473:24 476:5
  496:7,17 497:1
**candidates** 277:4 373:12
  374:1 375:8,14 376:14
  376:18 474:2,16,18
  475:6
**capacity** 290:6
**caption** 517:1
**captions** 517:5
**captured** 517:6
**card** 484:11 485:1
**care** 356:9
**career** 267:6 273:15
  381:18,20,20 382:20
  391:8 413:17 415:11
  434:18 469:8 493:13

  529:18
**careful** 412:1,12,13
**Carolyn** 285:10 326:21
  327:9 362:22 363:2
  463:10 464:11
**case** 260:20 265:14 291:5
  311:6 364:22 370:3,13
  371:4 392:14 395:23
  401:23 424:6 444:14
  446:3 480:1 481:10
  487:23 495:13 543:1
**cases** 272:22 444:23
**categories** 405:20,22
  406:12 409:13,14,19
  410:5
**category** 272:19 295:18
  406:2 410:1 432:2,5
  438:20 439:1
**Caucasian** 294:2,3,5
**cause** 304:16 335:22
  347:4 392:18 453:5
**caused** 304:14 347:4
  432:24 463:9
**causes** 318:3 335:22
**celebrate** 297:21
**celebrated** 362:21
**celebration** 362:10
  363:15,19,20
**celebrations** 362:15,19
**cell** 499:22
**Center** 463:14 465:14
  540:7
**certain** 271:1 284:6
  290:3 299:2 307:22
  316:20 324:2 334:18
  357:23 362:24 369:12
  391:21 392:11 415:20
  417:12 418:8 422:20
  423:3 443:21 448:18
  486:18 500:19 502:23
  506:1 507:23 515:21
  524:9
**certainly** 310:6 394:8
  510:23
**certificate** 450:23
**certified** 545:3,22

**certify** 545:4,7,10
**chain** 348:7 530:5
**chair** 268:22 278:10
  279:9 284:4 296:22
  297:3,12,12,14,15,16
  298:1,2,5,8,15,19
  300:23 306:2 311:12
  318:14,16 327:18 328:6
  363:4 380:13 381:11,24
  382:4,9 447:10 492:12
  492:14 493:8,9 494:11
  495:16,22 496:1 497:5
  506:9,11,14 527:5
  529:5 538:11 541:4
**chaired** 476:22,23
**chairs** 305:3 306:1
  494:24 527:2
**challenge** 505:22
**challenges** 514:18
**chance** 264:23 323:12
  375:19 404:4
**chances** 502:9
**change** 277:17 287:6
  311:18 312:14 395:5
  396:16,17 397:14,16
  398:8 399:16 406:22
  409:7 510:7 526:5
**changed** 278:23 279:8,10
  288:12 362:20 365:18
  402:22 409:17 436:13
  464:8,17 504:10 513:16
**changes** 279:1 431:18
  525:23,24 526:6 539:20
**changing** 293:7 306:4,6
  397:6 410:5 443:8
  465:10
**charge** 263:12 426:9
**Charles** 329:23
**chat** 499:21 511:16,17,19
  516:6,10,14,18
**chatted** 413:1
**check** 512:3
**Chicago** 258:3,8 411:6
  464:3,4 466:8,9,10
  545:14
**childcare** 541:16



children's 394:5
chipped 491:14
Cho 370:24 422:15 526:7
choice 376:16 388:10
    452:3,4 454:2
choices 482:4
chooses 495:3
Christmas 341:9
    ███ 289:15,24 290:11
    297:12 299:16 326:15
    360:2,13,23 362:14,24
    363:5,14 476:15 478:1
    480:6 495:15 497:4
    ███ 535:10
Cindy 515:21,22
circle 285:5
circulate 511:15
circulated 442:20,23
    512:6
circumstances 356:15
city 369:18
Civil 257:13
claim 294:9
claims 372:9
clarify 288:3 327:3
    369:15
class 277:20 281:21,23
    282:1,16,23 283:1
    293:1 302:20 306:23
    312:1,3 417:13 461:21
    462:15,19,20,20 463:6
    463:10,11 466:9 467:3
    485:11,13 507:3 536:8
    539:2 540:5
classes 272:15 279:2,5,13
    287:6 360:4,4,12
    361:16 371:19,23
    402:11 462:2,4,10,12
    462:14,17 466:1,6,15
    467:1,8,11,14 469:7,9
    501:14 540:21
classroom 464:5
clean 338:1
cleaned 337:22
clear 271:6 296:13 307:1
    335:3 336:17 369:7

372:9 382:8 435:11
    461:24 472:17 532:24
clearly 393:17 481:16
clenches 490:19
click 427:10,11,23
client 468:9 471:14
client's 407:17
climate 387:19 533:18
clinic 449:3
clock 273:24 274:6,12
close 338:9 341:7,9
    385:16 474:12
closed 311:1 341:5,7
    369:10 460:11 517:1
closely 333:24
closing 474:7
club 436:18
coach 327:1
coaching 266:11 268:17
    269:19
Coalition 422:10 450:4
    508:11,12
code 392:2
coerced 366:19,20
coercion 366:14,17
cold 261:9,12,22
Cole 285:9
colleague 293:7 345:20
    357:13
colleagues 272:3 279:9
    290:5 308:14 318:4
    326:1,2 398:3 399:21
    422:23 436:21 450:8
    456:20 468:24 493:23
    497:18 499:14 518:14
    518:24
collect 471:11
collected 509:13
collecting 471:9
college 277:6,12,24
    286:24 287:3,20 288:7
    288:21 289:2 293:2
    307:23 325:8,17 326:10
    326:12,13 336:18 337:4
    345:7 349:12,14,17
    355:3,4,22 357:10,15

358:13 359:8,12,17
    368:23 371:21 390:17
    390:19 394:24 395:20
    396:9 400:19 401:11
    402:1,20,24 404:13,21
    404:24 410:7,15 412:20
    413:5 414:14 415:14
    416:11 425:20 429:4,21
    433:7,11 434:14 436:21
    438:7,20,23 443:10,24
    445:5 448:12 451:24
    452:17 455:17 478:19
    482:9 485:19,24 495:5
    497:10,20,22 502:17,19
    502:20 520:5 522:5
    529:8 530:7 535:12,13
colleges 383:4
colon 321:10
color 337:4 357:2,7
    392:5 396:22 400:12,13
    401:14,15 414:15
    419:16 435:24 436:5
    439:6 457:16 463:3
    483:23 484:12,20,22
    485:6,8,19,20,23 486:7
column 282:8 513:18,24
    514:2,14 515:2
columns 281:2,8,11
    282:6
come 296:2 312:17
    314:22 321:2 324:7
    325:6 327:12 336:4
    344:10 347:17 355:12
    401:24 403:13 417:3
    420:11 425:11 462:13
    477:20,21 478:1,6
    479:8 484:13 499:19
comes 296:17 328:10
    392:5 461:6 502:7,18
comfortable 335:4,10
    363:20 365:3,6,10,13
    428:9,12,16,18 431:22
    432:10 469:3
coming 362:1 436:20
    534:23
commencing 257:16

commend 276:17
commended 273:1
commending 276:16
comment 351:8
comments 516:14
commitment 498:1 534:1
committee 269:6 296:22
    296:24 297:1,4,13,15
    297:23 298:1,9,15,19
    299:22 309:7,8,9,11
    315:12 375:18 408:8
    421:20 424:10 440:6
    442:5 445:1 447:10,11
    470:6 473:6,8,10 474:3
    474:11 476:22,23
    477:20 479:18 539:11
    539:23
committees 298:21
    359:24 422:19,20 481:6
committee's 422:1
common 459:3 508:1
communicate 516:19
    541:1
communicated 431:21
    541:5,12
communication 277:6,24
    286:24 287:3 288:22
    297:8 336:18 349:12,15
    349:17 371:22 374:9
    390:23 391:6 394:24
    395:20 404:13,22 410:7
    413:5 415:14 425:20
    429:5 433:8 434:15
    438:23 452:17 455:18
    466:17 482:10 485:24
    502:17,19,20 535:12
communications 282:17
    391:4 398:23 400:11
    516:3 527:18
community 462:22
    463:21 464:6,13,22,24
    465:2 466:22 514:23
    534:24
company 257:22 488:8
comparable 382:7,10
    383:4



comparing 286:3
competence 468:3
competent 469:13
compiled 472:22
complain 289:12 420:17
  421:3 427:1 506:8
complained 279:6
  288:10 289:11,13,14,15
  289:23 312:22 314:10
  314:23 336:2 420:8,12
  420:19,22 536:7
complaining 507:16
complaint 265:14 268:13
  291:10 292:6 325:1
  330:3,8,12,14,20
  332:24 333:3,6,6,8,10
  333:22 335:23 339:5
  352:8,23 364:15,17
  370:16 420:10 421:6,8
  421:17,23 422:4,24
  423:11,19,22,23 424:1
  425:16 426:9 427:7,16
  428:1,6,16 430:19,24
  435:12,17
complaints 329:11
  416:12 420:5,6 421:11
  421:12 426:4 427:3,5
  427:24 437:21
complete 322:9 326:19
  351:11 441:17 545:8
component 432:23 448:5
compound 419:7
compounding 412:17
compounds 382:16
computer 287:14 347:18
  348:23 451:7 474:6
  475:12,12
concept 366:10 466:12
concern 301:8 473:15,17
concerned 279:12,12
  481:8
concerns 334:23 337:2
  342:10 343:9 346:9
  368:4 387:18 388:5,5,6
  388:13 407:4 408:14,14
  408:19 432:9 435:7

437:22 438:8 508:17
  535:4 536:5
conclude 329:1
concluded 375:7 544:5
conclusion 291:21
  294:10 380:18,22
  537:13
concrete 533:16,16
concur 317:22
condition 350:4
conducting 472:22
conference 498:14
confidential 460:13,14
confused 309:23 312:9
  312:24 377:8 382:14
  383:6,23 476:19,20
  525:10
Congratulations 494:10
conjunction 265:9
  431:16
connect 463:16 519:10
  530:17
connected 463:18 464:6
connection 263:13
  292:12 323:18 328:5
  329:5 332:16 354:14
consciousness 491:5
consider 278:24 295:17
  486:6 519:1
consideration 291:15
considered 295:8 393:22
  400:1 405:20 420:1
  422:20 434:10 435:11
  483:22
considering 389:2
considers 293:23 295:10
  295:11
consisted 473:11
constantly 394:22
constituents 531:10
  533:15
constructed 391:23
  392:5
cont 261:5
contact 346:20 428:11
contend 276:3,4

content 521:1
contention 267:12 345:1
  406:10
context 351:5 399:5
  540:4
continual 407:14
continue 260:19 279:2
  329:12 377:15 389:3
  433:21 526:6 535:22
continued 257:10 330:22
  476:3
continuing 407:16
  534:18,21
contract 272:18 489:15
  535:22 536:1
contradictory 409:22
contributed 355:21
  357:9
contribution 446:15
  447:12,15
control 385:20 391:11
  464:5 465:12 492:1
  539:5,13,24 540:9
controversial 393:14
  394:8
conversation 298:4
  309:21 367:5 375:23
  384:24 385:3 388:23
  389:1,3,5,7,9,11 406:21
  410:3,4 411:19 415:21
  417:10 418:3 432:13
  438:9 455:21 458:1
  464:10 498:15,18 499:5
  523:24 529:7
conversations 295:19
  456:17 469:1 499:9
coordinator 516:4
  527:18
copies 465:3 542:6
copy 336:23 443:4,12,17
  443:19 465:3 515:19
  543:19
cordial 289:17 418:8
  477:6
corner 262:24
coronavirus 449:4

corporation 528:1
correct 262:17,20 264:7
  264:8 265:15 268:7,9
  268:14 270:5,6 273:21
  274:1,2,6,16,19 275:20
  278:16 281:19 283:3,4
  286:13 299:16 300:4
  303:24 316:3,6,19
  317:17 318:6,9 328:2
  334:4,7 336:16,24
  339:12 342:8,15 348:11
  349:24 353:16,22 358:2
  365:1,5 371:3 372:10
  388:13 389:21 393:6
  411:20,23 427:4 443:14
  486:13,22 487:1 490:4
  492:2 500:21 501:19,21
  502:6 511:12,21 513:8
  514:24 515:6,7 520:13
  520:17,21 522:14 524:2
  528:21 545:7
correctly 425:7 455:13
corroborate 360:11
costs 277:19,19 381:10
cough 261:10,15,19
  387:5
counsel 384:23 425:6
  454:23
counterpart 433:14,15
counterparts 509:19,19
country 372:21 483:7,23
County 449:1,2 545:2
couple 320:18 377:19
  380:8 421:15 423:2
  449:8 518:24 538:5
  540:23
coupled 357:18
courage 521:8,19
course 278:1 281:17
  282:10,11,14 351:21,21
  351:22 352:18 380:9
  388:9 394:17 467:2
  477:14 486:1 492:18
  501:1 504:9,11 505:2
  507:8,14 519:1 541:13
  542:4



courses 277:9,13 279:16
282:19,20 284:4 289:3
293:16 355:23 359:20
359:20 360:17,24 361:2
361:12 374:6,7 466:21
469:5 500:5 501:2
coursework 273:4 287:8
court 257:1 292:8 471:17
518:8
courtesy 351:19 543:9
Courts 257:14
covert 417:10
covertly 397:1
COVID 390:4 449:4
COZEN 258:7
co-chair 297:1 298:1
300:18 301:6 373:14,17
422:9 477:19 527:17,19
co-chaired 476:22
co-chairing 300:12
373:13
co-chairs 297:20 298:24
474:9
co-counsel 385:4
co-PI 451:12
co-PI'd 450:7
Craig 330:1 346:4,7
crazy 310:15 510:1
create 395:3 396:19,23
450:23
created 325:9 329:18
358:16 441:22,23
443:10 450:13 495:21
495:24
creating 325:3,19 357:22
400:21
creative 450:13
criteria 277:2 296:24
343:11 375:5,10,15
376:18 409:9 432:24
433:5,23 434:11
critical 391:5,17,19
393:4,11 394:7 461:8
525:20 537:17
cross-listed 282:12,16
crux 407:15

crying 478:12
CSR 257:24 545:22
cues 392:10
cultural 508:21
culture 357:22 358:14,15
358:16 371:17 391:10
394:14,23 395:3 396:8
396:23 397:20 412:11
425:19,19 426:18
483:16
culture-centered 396:14
cured 503:19
current 509:3
currently 413:11 429:20
449:10 451:10 522:20
curriculum 451:2
cut 380:19 385:15 447:20
526:13
CV 312:19 462:6,7 466:3
cycle 318:6 369:7
C-H 423:4
C-I-C-C-H-I-R-I-L-L-O
535:10
C.S.R 257:15

**D**

D 514:22
daily 392:8 417:10
482:18 484:6
damages 376:20 380:5
383:16 422:6
Dan 285:10 531:14,17
dance 425:4
Daniel 408:23
dash 531:23
data 280:20,24 510:6
533:18
date 300:3,5,6 321:15
441:17 442:11,15,19,19
442:24 444:4 464:7
521:22
dated 299:19 322:1
336:21 340:23 342:7
442:17
dates 275:19 465:10
540:14,16

daughter 369:19
Dave 357:13
David 285:9,10
day 257:16 318:9,10
322:4,16 324:13 330:8
330:10 357:12 379:21
387:15,22,24 393:1
396:7 419:24 479:2,3
485:21 491:11 512:22
518:19 545:14
days 268:15
Daytime 261:22
day-to-day 491:18
deadline 318:5 319:2,4
319:11 320:10,12
321:19 323:21 465:11
deadlines 317:24 318:3
320:5,6
deal 271:15
dealing 491:10
dean 272:17 278:10
306:16 314:5 317:16
336:3,14,18 347:16
350:6 357:4 415:9
417:19 429:4,19,20,22
430:13 438:7 443:9
453:3 475:6,16 495:2,3
495:14 496:14,14,24
497:10,16 505:16,17,21
506:18 538:17
deans 271:14
dean's 273:6
December 340:23
decide 268:3 272:17
decided 297:19 366:23
411:16 451:24 474:18
495:15 525:5
decides 496:14
deciding 276:17 328:10
452:12 527:6
decision 298:23 482:6
decisions 329:5 401:6
452:7,11 484:17
decision-makers 424:4,6
dedicated 453:6
deeper 375:9

default 497:3
Defendant 257:7,12
258:12 261:2
define 328:3 372:3
481:17
defining 474:17
definitely 371:23 378:23
definition 482:8
degree 390:22 391:4
degrees 390:20
DEI 414:22 527:4
delete 305:8,8
deleting 310:16
delivered 442:12
delivery 543:24
demographic 463:2
demonstrated 296:23
demoted 422:19
DeMoya 290:5 292:19
293:14,22 294:11
295:15 308:7 319:11
340:9 360:11,23 362:15
408:15 420:20 432:1
458:12 459:20 483:20
494:4 495:20 496:1
519:1
DeMoya's 297:21
Deng 451:22
denial 382:3,14 405:18
488:6
denied 356:15,16 365:19
402:20 405:7,11,12,13
405:15 406:13 410:10
411:9,11 416:4 488:17
488:17 494:16 495:17
538:17
deny 417:2 495:3
department 330:6
448:16,17 449:7
DePaul 257:6 265:24
266:19 271:2,7,10
303:1 342:21 349:9
370:23 371:1 381:7
383:9 391:1 394:15
395:11 397:21 398:16
399:21 400:15,24 402:2



402:13 422:10 427:8
429:6 439:14 448:5
459:11 462:3 467:8
486:22 493:11,16
502:16 508:4,8,24
509:14 510:13 514:3,23
515:4,14 516:11 520:6
520:12 534:24 536:16
**DePaulia** 502:13,18
517:11 530:10 531:21
**DePaul's** 302:19 329:10
371:1 398:18,19 399:10
482:9 508:11
**depending** 362:20
**Depends** 309:15
**depose** 296:4,12
**deposition** 257:10 260:20
264:24 265:2,13 296:18
329:1 351:11 385:17
390:16 403:9 468:5
471:7,8 494:13 512:23
541:3,14,22 542:5,15
544:4
**depositions** 467:24
470:17 471:21 503:18
**derive** 380:15
**derogatory** 327:24 328:1
328:3 537:11
**descendant** 393:10
396:23 413:10
**descendants** 392:14
436:1
**descent** 508:2 533:20
**describe** 393:12
**describers** 475:7
**description** 488:18,20,22
488:22 489:4,11,11,18
489:19 490:1
**descriptor** 391:24
**descriptors** 469:14
**design** 452:12 496:7
**designing** 287:8
**desk** 343:12 344:4,17
345:13 348:23 505:19
**detail** 396:4 472:9
**details** 330:16,17 373:21

**388:24** 427:16 437:14
443:8 510:6,10
**determines** 434:18
**detracting** 308:9
**detracts** 306:18,19 318:4
**develop** 290:23 392:22
395:19 450:20 453:7
464:21 493:19 497:23
524:19 525:8
**developed** 453:1
**developing** 269:3 450:11
451:2 452:13,24 527:9
**development** 284:8
382:19 434:18 492:23
498:1 525:2 529:18
**Devlin** 266:18 269:14,18
270:14,23,23 271:6
536:14,15
**Diaz** 326:8 329:21,22
339:10 340:21
**difference** 319:23 366:18
482:20 483:5,24 500:12
**differences** 276:6 392:1
392:1 462:1
**different** 276:7 277:2,3
286:3 288:11 298:21
319:16 323:20 339:20
343:11 355:23 357:17
358:11 359:24 373:12
377:23 399:24 402:9
409:18 410:11 417:8
425:9 426:4,6,24
440:22 450:22 460:9
462:4,10,12 477:2
478:21 479:24 481:23
481:23 482:3 483:7
485:10,14 489:23 496:3
497:24 525:11 536:3
**differential** 289:22
**differently** 275:23 279:7
288:11 290:17,24 291:1
291:4 308:13 314:24
343:10 345:8 372:2
375:10 411:3 433:9
509:18
**differing** 339:20

**difficult** 346:21 374:23
388:22 480:22 482:18
529:15 537:23,24
**dig** 375:9
**Dillard** 257:3,11 259:3
260:20,22 261:1,7,24
262:7,11,21 264:9
265:6 271:18 286:9
296:11 307:2 313:14
327:10 328:20 329:1
352:7 376:23 378:14,16
378:19 390:12 424:23
430:8 442:2 512:24
520:12 538:10 542:2,10
545:4
**Dillard's** 385:17 424:6
512:23
**direct** 333:14 351:7
428:21 477:5,15 481:18
529:2 537:18,18
**directed** 354:21 434:21
505:21
**direction** 401:10 413:17
451:18 492:16 493:13
534:23
**directly** 336:3 411:1
492:20 545:11
**director** 381:12 414:22
422:9,9 452:1,19
506:13,15 515:24
**directs** 492:15
**disabilities** 500:16
**disability** 357:16 480:21
486:10,21,22 487:5,6
487:19 498:4,10,24
499:7 501:10 519:8
530:13
**disagree** 455:3
**disagreement** 340:6
**disclose** 428:10
**disclosed** 480:2
**Discover** 466:7
**discrepancies** 276:9
433:13
**discriminate** 371:18
537:20

**discriminated** 267:13,19
267:24 290:13,20 325:8
328:16 329:17 345:9
423:1
**discriminating** 268:3
325:18
**discrimination** 291:11
319:21 328:11 329:11
331:16 332:3 335:20
371:15 421:12 422:16
427:4,5 428:1 429:15
436:9,10 438:2,4,9
459:7 461:6 510:14
526:2 529:7,16 537:10
**discriminatory** 434:14
434:20 435:7 436:4
**discuss** 388:19 389:1
399:5,8 408:5 481:3
509:5,12 524:14
**discussed** 296:15 328:9
388:12 409:6 498:21
**discussing** 525:6
**discussion** 273:5 296:8
299:12 317:6 331:22
332:13 345:21 394:7
408:3,10 425:18,18
457:15 465:21 467:2
472:18 493:8 494:6,9
511:18 517:9 518:14
524:1
**discussions** 375:7 394:1
394:3 416:10 467:5
501:21 516:13
**disheartening** 498:11
**dislocated** 347:13 491:12
**dismissal** 435:7
**disorder** 486:12,15
**disorganized** 308:4
**DISPARTI** 258:2
**dispute** 338:16,18 358:11
**disqualify** 371:11 374:15
375:3 376:3 473:24
474:18 476:4
**dissension** 425:22
**distanced** 457:12
**distinctly** 373:11 489:3



527:5
**distortion** 324:5 430:4 534:7
**distributed** 441:23
**District** 257:1,1,13
**disturbed** 521:7,18
**disturbing** 432:23
**diverse** 515:6
**Diversion** 415:3
**diversity** 395:15 414:17 415:2 420:20 432:6,14 450:15,17 458:14 481:20 482:1,2 508:14 515:23 522:20 526:5 534:2
**DIVISION** 257:2
**dizzy** 475:23 479:1
**Doc** 475:14,15
**doctor** 378:8,9,10,22 492:5
**document** 276:14 283:14 316:24 331:7,8,10,11 331:12,17 332:4 333:18 333:20 337:16 338:10 352:15,21 353:11 440:5 440:8 441:22 442:4,4 442:10,20 443:10,11,13 471:14 472:3 473:7 474:23 475:4,5 511:24 512:20 515:14,16 516:9 517:4 520:3 521:12 530:2,4 531:8 533:7,9 534:22
**documentation** 318:1
**documented** 361:3,6
**documents** 263:22 378:18 440:22 443:7 471:4 472:1,4,6,22 510:13 519:18 543:2
**dog** 512:9 534:10
**doing** 307:20 313:2 338:5,7 351:12 352:5 360:16 367:19,22 385:17 398:15 424:4,12 429:23 432:10 452:15 452:16 475:24 478:15

479:12,14 480:12 503:20,20 510:11
**domestic** 291:3,6 355:11 357:3 402:4,5 436:2 482:15,21 483:15 485:19,23 523:5,9,10 526:2
**domestic-born** 483:1
**Dominican** 293:24
**Don** 327:11,17
**Donna** 348:8,9,11,13 349:3
**door** 343:13 505:18
**dossier** 303:7
**dossiers** 303:2
**double-check** 367:18 516:3
**doubt** 460:24
**download** 322:24
**downtown** 464:4
**dozens** 284:10,18
**DPUBLIC** 422:10
508:10 510:3 515:13 516:4 525:5,16 527:2,6 527:13,17,24 531:10 533:11,11,11
**Dr** 260:20,22 261:7,24 262:7,11,21 264:9 265:6 271:18 273:17 274:8 275:23 284:14 286:9,17 289:24,24,24 290:1,7,8,11,11,11,12 290:12 292:15 293:15 293:15,15 294:11,11,11 294:11,12 296:11 297:21,22 299:16 300:12 301:9 307:2 313:7,14 316:2 322:15 323:4 325:2,2,3,3 327:10 328:20 329:1 330:13 335:10 336:23 337:7 339:14 343:8 352:7 355:1 376:23 378:14,16,19 390:12 424:6,23 430:8 442:2 450:7 451:24 508:14

512:23,24 522:16,16,17 522:18,22 530:6 538:10 542:2,10
**draft** 367:23 368:1,2 442:24
**draw** 354:8 407:19 469:22
**drive** 258:2,8 479:7
**drivers** 391:13
**drop** 359:18
**Dropbox** 443:19
**dropped** 430:7 494:2
**due** 264:11 318:9,11 322:5 452:5
**duly** 261:3 545:5
**dump** 472:4
**duplicates** 310:3,7
**duplicative** 342:18
█████ 268:21,23 289:13 305:23,24 306:2 307:16 311:11,11,12 318:14 319:17 322:1 326:13 386:20 408:24
**dynamic** 391:9
**dynamics** 391:15

━━━━━ **E** ━━━━━

**E** 261:5 390:10 515:2
**earlier** 273:8 323:7 324:13 373:15 386:16 494:13 497:7,7,8 527:16 537:21 539:3 541:19
**early** 267:6 274:4,9,9,13 297:9 343:7 456:6 469:7 536:8
**earning** 383:5
**ease** 471:3
**easier** 362:4 396:2 446:2
**easiest** 407:11
**EASTERN** 257:2
**editing** 338:10,12
**editor** 447:5
**education** 389:13 449:18
**EEO** 329:10,16 330:21 339:6,8

**EEOC** 263:12 352:22 426:9
**effect** 306:21 479:16
**effectiveness** 284:6
**effects** 392:19 491:10
**effort** 436:12 463:23 499:13,14 526:6
**eight** 487:15 507:7
**either** 270:20 313:22 314:7,13,17 428:19 434:22 456:23 457:12 472:1 477:24 480:14 514:7 523:11
**elected** 373:17 527:15,16
**election-like** 494:23
**electrical** 490:16
**electrodes** 490:16
**electronic** 303:6
**elementary** 394:1
**elements** 496:6
**elicit** 516:14
**else's** 375:11
**elucidate** 412:18
**email** 262:4 299:2,15,16 299:18 318:23,24 319:16 320:23 321:2,4 321:7,24 322:8,20 323:2,8,11,16,19,20 324:1,4,10,12,16,17,23 330:15 334:19,21 335:18,21 336:11,13 340:20 342:6,9,14 347:14 348:7 363:13,14 386:9,19,21,23 387:11 387:14 388:20,23 421:21 424:10 426:15 427:24 428:2,8,18,19 428:20 437:13,24 438:8 456:24 477:3,9 480:8 480:10 503:8 506:22 507:18,19 512:14 518:16 519:14 520:11 520:15 521:4 522:12,14 522:15 523:12,23 530:5 531:9,13 532:1 537:2
**emailed** 320:13 477:10



**emailing** 428:18
**emails** 278:22 299:4
320:19 332:10 348:2
387:9 479:22 519:14
520:19,23
**emotion** 340:15
**employee** 286:24 287:20
288:21 295:14 297:2
298:13 422:11 508:12
528:2 545:10,11
**employees** 266:9,15
270:8 271:21 288:7
292:14 294:8,18,19
329:16
**employment** 329:6
**encounter** 392:17 506:21
**encouraged** 516:13
523:19
**ended** 270:24 312:11
360:15 375:23 460:8
464:4 477:18 479:1
491:8 494:17 510:11
**enemies** 366:11
**engage** 448:24 449:18
**engagement** 450:19
451:8 472:15 497:23
**engagements** 461:10
**engages** 467:4
**engaging** 469:1 472:18
485:5
**enhanced** 397:21
**enjoyed** 273:3 451:17
**enrichment** 450:16
**entered** 344:8,9,13 345:4
345:12 470:9,13 471:6
**entering** 344:18 349:9
**entire** 276:13 288:15
402:2 471:22 487:4
491:14 493:10 499:5
**entirely** 483:7 495:21
**environment** 266:1
306:12 307:7,11 325:4
325:10,13,19 326:8
329:13,18 330:23
331:17 342:23 344:14
358:18 452:5

**EOOR** 449:18
**epithet** 435:5
**epithets** 434:21
**equality** 415:2
**equals** 382:15
**equitable** 515:6
**equity** 414:17 415:3
481:20 515:23 534:2
**erase** 357:23
**escalate** 479:17
**escalated** 477:7 479:19
**ESI** 443:1 472:15,18
**especially** 367:18 417:12
543:2
**ESQ** 258:5,11,11
**essential** 488:20
**essentially** 306:2 381:5
467:13 492:22 501:5
506:24
**established** 441:21 442:8
442:22
**ethics** 466:17 504:10,13
**ethnic** 449:1 482:15
**ethnicity** 291:2 415:19
520:9 535:15 536:19
**Eva** 326:15 498:23
**evaluate** 442:6
**evaluated** 273:12 275:23
314:1 407:5
**evaluating** 317:19 328:6
328:6
**evaluation** 280:22 316:3
461:17 498:7
**evaluations** 270:9 271:22
272:11,13 273:7,14
275:9 276:12 278:14
283:22 372:2 433:20
**event** 351:9 511:4,5
**eventually** 269:2 336:4
367:2 411:11 413:18
437:19 469:8 478:12
485:1 502:6
**everybody** 260:18 262:4
386:4 408:12
**everybody's** 475:20
**everyone's** 374:17

**evidence** 319:21 371:14
398:24 424:2 439:9,17
460:7,19,20,22 467:23
467:24 470:9,13,16
471:6
**exacerbated** 486:18
**exact** 319:19 344:2
455:14 510:12
**exactly** 274:20 275:1,12
290:15 303:19 313:21
345:10 348:3 373:5
395:22 420:23 453:18
476:15 478:18 516:1
540:6
**examination** 259:5
472:23 538:6,8 539:3
543:3
**examined** 261:3 431:3,4
**example** 272:4 276:15
303:8 310:8 330:21
335:2 381:7 396:6
401:22 417:14,16,17
418:11,22 422:2 433:9
435:5 473:23 483:20,21
484:10 504:7 506:4
537:21
**examples** 286:1 294:22
295:22 401:21 533:16
**exceeded** 351:15
**Excel** 513:4
**excellent** 405:22 409:10
409:11,16 410:1 536:11
536:12,13
**exceptions** 278:11
**exchange** 334:19 530:5
**exclamation** 321:12
**excuse** 518:2
**exhibit** 262:5,8,9,22
263:5,6,11,18,19,20,24
265:7 275:14 280:1,2,7
280:16,17,19 283:10,12
284:13,23 285:18
286:16 292:2,4,7,10
299:5,11 302:1,14
315:3,4,22,23 316:9,12
317:12,14 320:15,20,21

321:1,21,22 322:11,12
325:2 330:24 331:2
332:5,7,19 333:3,4,15
334:11,12 336:6,7
337:11,13 340:16,17
341:20,21 342:16
347:20,22 350:10
352:14,19,24 353:1,2
358:19,21 361:22 363:7
363:9 364:15,16 368:16
379:5,12,15,23 386:9
386:11,15,22,24 387:1
430:21,21 431:3,9,11
439:21 440:2 469:23,24
470:8,10 473:3 512:1,5
512:16 516:24 519:23
522:8,10 528:8,11,12
529:21,22 530:19 531:5
532:20 533:2 535:7
537:2,3 538:23
**exhibits** 259:10 265:10
320:14 470:15 519:13
519:18 542:22
**existence** 357:24
**expand** 391:16 394:15
414:1,9 415:10
**expect** 396:16 400:18
**expectations** 311:9
413:23 493:24
**expected** 363:4 366:13
413:24 437:17 464:11
499:12
**experience** 300:24
304:18,19 308:1,12
344:20 374:13 394:22
402:8 407:20 419:21
435:23 437:21 446:4
479:9 480:3,14 485:3
486:3 506:1 519:8
530:13
**experienced** 304:18
416:11 458:22 521:7,18
**experiences** 292:22
330:13,13 344:11 392:3
392:18 416:10 447:11
458:10,11 460:1 461:16



463:17 464:20 466:15
481:24 482:18 483:17
483:21 484:6,17 485:8
485:10 486:4 507:22
509:4,6,20,21 511:8,19
514:16,19,21 516:12
523:22 525:1 530:12
534:19
**experiencing** 346:12,14
508:23 509:16 510:2
**expert** 338:23 505:12,15
537:17
**expertise** 328:12 393:3
**explain** 272:6 328:22
358:17 435:9 445:20
475:3
**explained** 293:11 295:16
346:9,11 358:14 361:20
365:13 474:7,13 478:3
478:13 480:22 481:4
482:8
**explaining** 301:3 311:20
313:6 443:7
**explanation** 298:23
303:9 456:24
**exposed** 508:22
**express** 477:11
**expressed** 301:8 389:16
**extension** 264:16,17
**extent** 304:17 314:16
338:22 351:1 380:17,22
381:17
**external** 495:9
**ex-employees** 266:19
**eye** 450:21
**E-Tran** 543:20,22,23

**F**

**f** 302:15
**face** 276:20,20,23,23
277:15,15 278:14,14
279:10,10 287:2,7,7
288:13,13,16,16 289:6
289:6,10,10 388:16,16
**faces** 395:9
**face-to-face** 276:22

277:20,22 279:2,5,13
279:16 281:20 282:10
282:11 286:23 287:2,12
287:19 288:6,20 289:3
293:16 316:18 317:10
540:20
**fact** 266:22 297:17 305:7
357:4 358:5 365:7
402:22 424:24 435:8
464:10 468:23 471:24
485:15 490:12 496:21
509:6 510:3 529:13
542:22 543:3
**factor** 328:10 462:24
**factors** 391:14
**facts** 461:2
**faculty** 266:23,24 272:16
277:6,7,9,12 278:2
283:21 284:6,11,18
289:4,6 290:23 292:16
292:17,21 293:11
297:23 304:19 307:24
337:4 345:22 346:20
354:18 355:11 356:5
360:4 365:8 367:9,20
368:5 370:21 371:1
387:19 389:22 396:21
398:3 400:16,16,17
404:12 405:13 406:6,20
408:5,17,18,22 410:14
413:5 415:13 418:4
431:19 433:12 438:19
440:7,10 445:4 451:22
455:20 457:16 463:15
469:12 475:2,4 476:24
477:1 478:4 483:18
485:18,20,23,23 492:19
496:10,10 497:14
502:24 508:17,22 509:1
514:7 522:19,23 524:15
527:22 530:6 533:19,22
535:12 536:15,18
**failed** 386:17 507:3
**failure** 380:11,12 382:22
468:5
**fair** 282:2 304:15 315:19

329:19 333:8 405:23
409:10,11 410:2 418:14
426:16 443:13
**fairly** 299:8 316:20
443:21
**fall** 288:23 368:11,12,13
368:17 370:7 429:12
432:1,5 507:5
**false** 340:11
**familiar** 531:20
**family** 373:4 413:22
**far** 328:20 350:21 362:5
439:15
**faster** 544:1
**father** 411:5
**fault** 351:16
**favor** 364:24 365:18,21
365:22 442:14
**favorably** 319:3,5,7
323:17
**fear** 399:23,23 426:2
**Federal** 398:24 467:23
**feedback** 269:7,9,11,13
307:23 408:6 431:18
496:10 515:3
**feel** 308:20 363:20
366:11 401:7 407:14
428:9,12,18 431:21
432:10 482:9 505:19
529:1,2,4
**feeling** 385:10 461:5
468:9 516:15
**feels** 419:20 434:1 495:4
**fellow** 508:15 522:21
**felt** 310:22 345:8 411:2,8
411:12 419:14 425:11
425:24,24 426:17 454:8
460:7 467:17 468:17
479:19 507:9,12 539:21
**FEMA** 449:6
**female** 393:5 410:7
**fewer** 400:13
**field** 400:11
**fight** 351:10 487:23
527:7,7
**fighting** 487:6

**figure** 323:23 360:14
508:15
**figured** 347:2 495:16
**file** 264:15,18 303:6
312:2,7,8 323:6 423:19
437:11 440:9 442:11
444:18 489:6 513:7
532:22
**filed** 263:13,15 265:14
268:5,12,13 292:3,8
423:21,24 527:20
**files** 304:11 310:1,24
311:1,18,24 441:4
443:23
**filing** 332:23 465:4
**fill** 373:13 427:11 437:15
478:16 495:7,10
**filled** 337:23
**final** 379:7 446:6 474:15
478:17 504:17
**finalized** 367:24
**finally** 366:3 391:3
526:24
**financially** 545:11
**find** 289:8 320:22 377:20
377:20,21 378:23
419:11 480:2 495:11
498:17 521:23 523:15
**finding** 319:1 521:22
**fine** 265:3 280:6 302:8
326:24 327:6 348:3
352:4 363:22 367:15,19
375:16 386:2 453:3
471:18 472:11 480:18
499:23 543:4 544:3
**finger** 392:7
**finish** 288:2 318:18
445:10,14 470:22
**finished** 309:9 375:22
444:21 449:11,12
493:10 494:6 535:20
**finishes** 261:18
**finishing** 385:17
**fire** 348:24 421:18
456:15
**fired** 421:22 424:11



457:1
**firing** 421:20
**firm** 323:21 351:17
**first** 267:6 269:21 278:19
279:19 281:8 299:18
305:23 315:11,17,18
335:2,5 345:2 346:7
348:5 349:11 352:22
353:4 360:5 363:13
367:14 368:22 375:4
376:16 378:22 380:10
390:15 402:18 403:7,19
419:13 431:20 438:18
456:11 463:13 488:3
491:22 492:4 513:17
518:2,12 520:15 531:3
535:20 536:16 537:5
545:4
**first-generation** 395:17
**first-hand** 270:4
**fist** 505:15
**fit** 374:11 401:9
**fits** 439:5
**five** 272:24,24 281:23
282:12,18 290:10
294:21 295:4,21 305:10
355:10 409:13 461:21
462:19 463:2 465:24
494:9 499:22 510:22,24
539:2,4
**five-minute** 455:6
**five-point** 405:24
**flag** 435:15,16
**fleeting** 502:7
**flexibility** 350:21 351:13
**flexible** 351:18
**flip-flopped** 288:12
**floor** 262:24
**flourish** 396:19
**flow** 440:13
**Floyd** 418:23 524:17
**fluffy** 348:22
**fluid** 444:12
**foaming** 490:23
**focus** 350:22 373:18
390:19 391:5,14 395:15

450:11 469:8
**focused** 317:23 391:8
395:23 425:3 449:21
452:18 461:21 462:20
469:6,7
**focuses** 392:16 450:15
**focusing** 433:11
**fold** 400:18
**folder** 311:20 312:5,6,7
320:23 321:2 323:6
**folks** 290:11 304:3
320:14 359:6 361:16
386:10
**follow** 330:4 334:7
346:24 446:4 478:10
494:18 505:2
**followed** 330:19 333:11
333:23 334:8 335:16
**following** 266:2 287:4,5
287:5 341:16 342:9,12
342:23 406:13,18
429:23 533:11 539:19
**follows** 261:4 468:15
504:1
**follow-up** 339:10 341:11
341:17 437:3 444:5
**food** 359:17
**footnote** 275:15,18 276:3
280:6,9 309:4
**force** 408:7
**forced** 276:22 277:1
279:11 297:1
**forcing** 329:12
**foregoing** 545:7
**foreign** 371:12 372:13
373:3
**foreign-born** 482:24
484:12 485:18
**forewarning** 435:21
**forgive** 311:13 313:20
**forgot** 426:20
**form** 276:19 325:21
372:6 393:15 398:12
427:12,12 428:9 437:15
444:7 445:23 478:16
483:2 494:22 500:6

513:18
**formal** 275:19 278:15
279:14 280:11 303:3,4
303:12 315:8 316:14
321:5 332:23 440:14
474:19
**format** 513:15,15
**formidable** 537:22
**forms** 305:5,6,24 306:5
537:22
**forth** 262:18 274:9,10,11
276:3 297:9 310:21
388:20 465:11 525:8,9
**forthright** 328:17
**forward** 335:4,11 336:4
339:21 381:18 392:21
431:22 432:7,8 461:3
533:17
**found** 297:20 477:21
498:23
**foundation** 340:3 403:4
403:6,19,23 404:4
407:3,7,10,17,21
424:13 432:17,18
441:21 442:12 444:20
444:22 453:11,15 454:5
483:3
**four** 281:11,23 294:20
298:21 365:16 376:20
377:22 428:6 434:9
446:5 494:1 499:3
**fourth** 446:9
**four-dozen** 285:12
**frank** 452:17
**free** 505:19
**friend** 490:12 519:2
**friends** 456:19
**front** 275:12,15 280:17
306:20 475:4 494:22
**frowned** 419:24
**frustrated** 539:12
**fulfill** 429:24
**fulfilling** 392:22 536:9
**full** 382:2 418:5 538:14
**full-on** 436:12
**full-time** 477:1

**function** 328:14 491:18
**functions** 488:21 489:7
491:3
**Fund** 450:11
**funding** 389:20,24 390:2
450:18 452:9 497:21,21
528:5,6
**funds** 451:20 501:4,6
**further** 261:4 281:4
374:19 390:6 396:1
538:4,8 545:7,10
**future** 399:24,24

<hr>

**G**

**g** 266:5 302:16 325:1
**game** 426:16
**gamut** 446:21
**garbled** 324:7
**Gary** 449:7,7
**gathering** 455:18
**gears** 486:10
**gender** 291:2 422:17
469:17 479:11 485:13
498:5,9
**general** 276:8 277:21
292:17 293:18 325:12
391:4 418:21 429:23
455:14 469:12 514:20
**generally** 381:11,12
383:9
**genetic** 392:2
**George** 418:23 524:16
**getting** 270:2,5 273:12
323:8 345:6 393:19
403:1 439:15 449:19
452:18 456:11 460:9
463:5 475:23 479:1
490:21 518:13
**Ghanem** 289:15 290:1
290:12 306:16 307:16
325:2 326:14 335:24
336:14 337:7 339:4
343:8 355:1 417:22
419:10 429:1 528:20
538:10,16
**Ghanem's** 316:2 317:16



**Gia** 264:10 299:7 350:20
376:19 378:7 385:21
424:20 470:13 499:21
512:16 531:24 542:3
**Gianna** 258:5 384:24
398:16 500:17,17,17
501:19
**gia@dispartilaw.com**
258:4
**Gina** 348:11 423:3
**Gina's** 423:3
**give** 272:3 274:24 332:11
373:21 384:19 417:16
418:22 435:20 436:20
439:20 460:23 475:2,5
488:19 504:7 521:21
**given** 266:10,22 269:10
273:13 278:6 282:21
284:13,13 289:22
298:10 319:13 320:3
367:23 368:1,2 382:17
404:4,5 446:21 496:13
501:17 529:14,15 540:6
545:8
**gives** 273:14 535:2
**giving** 318:21 322:8
355:4 357:14 359:21
401:6 499:12 509:11
**glad** 309:4
**glasses** 450:21
**glossed** 461:19
**glosses** 510:8
**go** 260:17 263:1 264:4
266:20,21 269:4 272:20
273:7 274:4,8 279:11
279:20 281:11 282:6
289:16 293:20 299:6,7
300:6,7 301:12 302:9
302:15,16 303:4,18
305:5 311:3,16,18
313:18,19 315:22 316:9
317:2 322:11 325:24
330:24 331:20 343:16
345:14 348:2 351:23
353:10,23 355:7 356:17
356:18 359:23 361:14

363:13 364:15 377:17
379:14,23 380:2 382:1
382:20 388:3 396:1,2,4
398:13 399:13,13
409:15 411:15 413:10
413:18,22 415:16
424:21 425:14 426:19
430:18 431:9 433:4,16
436:14 438:16 441:11
445:24 449:15 455:10
458:7 459:12 461:3
462:5,9 464:23 465:19
472:8 477:8 482:1
484:11 486:10 487:3,9
488:11 489:16 493:6,13
494:10 495:1,8 498:16
499:13 504:23 505:16
506:19 512:8 522:2
528:13 529:11 541:5
**goals** 493:9,21 496:8
**God** 506:3
**goes** 328:20 402:11
433:17 440:13 445:21
453:18 475:4 487:10,22
502:7
**going** 261:10,14 265:8
270:24 273:10 286:16
288:3 291:17,19 292:10
292:18 293:8 297:19,21
297:24 301:4,24 302:10
313:4,11 314:15 319:8
319:10 320:18 325:5
338:21 341:15 342:16
343:9 346:19 350:10
351:14,17 356:7,19
361:22 362:1,5 375:12
375:13 376:2 380:16,21
383:20 390:1,3,6
392:23 393:1 396:1,3
397:9 398:21 406:24
407:15 410:9 414:14
419:12 423:17,18 425:2
425:2,8,8,14 426:8
429:20 432:16 436:14
444:17 445:14,19
449:11 452:14,21 453:3

453:20 454:7,11 456:18
456:22 466:4 467:15,20
468:11,22 469:22 470:8
470:23 471:4,16,17
472:13 474:8,15 476:4
476:9 477:7 481:8,9
486:10 495:14,17
498:22 503:13,15
505:16 511:15,24
518:15 519:12,13 522:7
527:11 528:8 529:20
530:18 532:23 539:1
540:8 542:21
**Goldman** 326:15 450:9
███ 268:21,23 289:13
289:24 290:11 307:16
318:14 322:15 323:4
325:3 326:13 386:20
408:24
**gong** 542:23
**good** 260:18 303:8
315:13,13,20,20 369:11
385:5 396:6 401:4
405:22,23,23 406:8
409:10,11,11,14,19,20
409:23,23 410:1,2
414:15 430:13 451:20
462:11 466:24 483:21
493:11 509:10 534:4,14
536:12,13
**goodness** 503:3
**good-bye** 355:24
**good-bye's** 355:18,20
**Google** 450:21 475:14,15
**gotcha** 315:19 445:17
**gotten** 419:23 458:14
497:3,9,14
**government** 449:8
**graciously** 497:19
**grade** 504:17 505:4,9,21
505:22
**grader** 360:17
**graduate** 281:17 284:5
450:24 464:14 466:21
539:1
**graduation** 534:3

**grain** 396:2,4
**grand** 490:8 491:9,16
**grant** 448:12,14,20,24
449:17,20 450:7,7,11
451:7
**granted** 488:3
**grants** 448:8 449:14
453:16,19
**great** 273:1 276:20
357:15 393:11 405:21
443:16 452:23 465:18
472:9 473:3 486:2,2
499:24 515:13 537:8
**greater** 285:21
**green** 258:11 484:11
485:1
**grievances** 339:22
425:22 426:5 427:21
505:20 509:12
**grieve** 411:7
**grounds** 467:21
**group** 258:2 392:16
393:23 417:11,15
422:11 433:13 434:2
464:22 485:7 508:13
512:15 524:1 528:2
**groups** 357:23 391:21
392:4,11,17 394:10,12
395:7 482:17
**grow** 414:18
**growing** 533:15
**growth** 450:10 529:18
**guess** 276:1 303:4 316:23
317:1 399:23 459:2
463:9 482:1
**guessing** 531:10
**guide** 267:1
**guidelines** 402:23 433:8
442:5 505:2
**guts** 366:16
**guy** 486:1
**guys** 264:15 438:21

---

**H**

███ 305:1,3,12,17,19,23
306:1 307:17



hair 417:19 419:17,19,22
half 337:9 386:1 436:11
Halfway 315:19
hall 524:1,5,6 525:6
  526:18 533:12
hand 350:20 458:20,22
  458:24 459:5,6,9 482:2
  482:2 545:14
handbook 274:11 365:8
  367:20 368:6 478:4
handle 323:24 411:16,22
handled 444:24,24
hands 452:2
hang 285:7 397:8 439:11
  465:18 470:12
happen 304:22 314:13
  356:11,12,13 366:9
  367:16,17 396:18
  417:10 418:15,19
  422:15,22 424:11 491:1
  498:16 503:7 506:3,4
  511:10 524:4 528:24
  537:22
happened 307:19 308:19
  309:5 311:14 343:6
  354:16,23 355:19
  365:16,16,24 369:4,12
  371:24,24 373:20,21
  381:6 388:15 399:6,6
  405:10,18 416:3,9
  417:20 418:7 422:18
  438:3,5 448:19 457:24
  458:2,23 459:1,11,19
  472:16,16 476:16
  477:23 481:4 490:24
  491:6 493:3,4 498:12
  499:10 501:16 503:5,8
  525:4 526:14,16 533:12
  535:19 539:16 540:5
happening 289:18
  290:16 345:11 349:8
  357:12 365:24 366:15
  367:5 372:5 395:23
  407:13 419:1,3,4,5,7
  423:15 432:13 435:14
  435:21,22,24 438:1,2,4

451:10 457:6,10 458:17
  459:2 460:4,6,8 461:12
  463:11 464:4 526:2
happens 273:9,11 400:18
  490:15 491:2 500:24
happiness 389:16
happy 296:18 404:5
  465:9 504:19 530:11
harassing 403:13
harassment 337:3
hard 321:19 353:20
  395:24 401:4,5 403:17
  435:9 451:4 456:7
  485:22
hardest 436:6,20
harm 433:1
harsh 386:19
harshly 273:13
Harvard 389:13 493:17
hazards 348:24
head 293:18 296:2
  308:11 326:17 372:12
  382:21 384:12 510:21
health 282:16 374:9
  391:6 392:20 448:17
  449:7 450:3 453:4
  462:24 464:18,21
  466:19,20 467:3,4
  480:3,17 488:7,10
healthcare 462:22
  466:22 488:12
Healthy 466:9
hear 386:10 416:19
  430:5 434:6 435:3
  472:19 481:14 486:14
  503:24 506:17
heard 298:3 397:3 411:1
  480:19 482:5,5 489:24
  506:18 514:13 536:3,7
  538:15
hearing 378:22 461:15
hearsay 423:20 424:13
heater 347:17 348:20
held 319:24 383:6,9
hello's 355:18
help 267:1 290:23 493:18

504:22 515:5
helped 269:3 353:19
helpful 476:18 530:14
helping 359:7
helps 309:4 463:15
hereunto 545:13
hesitant 307:16
hesitation 449:22
hey 435:13 516:17,18
  ███████ 531:14,17
hidden 538:1
high 400:15 401:13,17
  450:17
higher 272:22
highlight 305:5
highlighted 272:24
highlighting 433:13,15
highly 469:6
hire 356:6 473:9
hired 297:24 485:24
  507:2
hiring 301:7 473:12,16
  474:21 476:24 477:1
  492:19
historical 280:20,20,24
  283:15
historically 392:13
history 349:8 371:22
  392:9 394:4 395:6
  466:10 482:14,16
  529:15
Hoecker 292:20 293:15
  294:11 373:23 375:19
  473:12 519:2
hold 296:6 298:9 404:1
  468:11 511:23 514:23
  514:23 534:9
home 369:11,19 413:20
  413:21 479:3 542:10
HON 466:8
honest 347:5 353:21
  378:6 418:5 420:23
  421:10 457:11,18 465:8
  517:24 543:6
honestly 262:1 274:21
  388:21 412:4 446:17

459:8,10 461:2 476:1
  481:9 489:20 538:19
honors 466:9
hoopla 363:24
hope 350:24 450:1
hopefully 511:2
hoping 387:18
  ███████ 292:20 293:15
  294:12 408:15 489:22
  519:3,4 530:6
host 441:14
hosted 441:4
hostile 266:1 306:12
  307:6,10 325:3,9,12,19
  326:7 329:13,18 330:23
  331:16 342:22 344:14
  358:18 452:5
hostility 354:20
hot 445:7
hotline 427:20
hour 257:16 386:1
  498:14
hours 261:11 318:20,21
  322:8,10 337:9 338:9
  350:13 438:10
house 512:10
housekeeping 441:16
  444:4,6
housewife 377:13
how's 456:18
HR 330:5
HTHC 281:14
huge 442:14 462:24
hundreds 488:13,13
hurt 481:10
hurtful 357:8 507:17,20
husband 261:18 479:7
  541:10,19,20
hush 460:14

_____

**I**

idea 348:14 372:20 414:3
  508:23 531:17
identical 322:16
identified 262:9 263:6,20
  280:2 283:12 294:20



299:11 315:4,23 316:12
317:14 320:15,21
321:22 322:12 331:2
332:7 333:4 334:12
336:7 337:13 340:17
341:21 347:22 353:2
358:21 363:9 378:8
379:15 386:11 387:1
431:11 440:2 469:24
512:5 519:23 522:10
528:12 529:22 531:5
532:20 537:3
**identifies** 294:5 415:18
415:22 523:2
**identify** 294:19 325:2
354:3 380:5 393:5
537:24
**identifying** 294:8 375:5
403:21
**identity** 399:18
**ignore** 299:3
**ignored** 329:11 526:21
**Illinois** 257:1 258:3,8
545:1,4,14,22
**imagine** 466:10 482:19
**immediately** 347:16
518:12 539:18
**impact** 301:14,20,22
357:1 370:13 482:6
484:5
**impacting** 305:7
**implementing** 395:2
**important** 269:12 304:2
304:5
**improve** 504:22
**improving** 318:1
**inability** 472:15
**inaccurate** 489:19
**inappropriate** 468:7
470:24 471:18 472:21
503:17,21
**incident** 354:15,20 373:8
**incidents** 349:8
**include** 285:8 296:18
326:3,5,7,8 330:17
446:13,14,16,18,19,23

**included** 273:5 292:19
355:14,20 356:1 372:4
394:4 408:23 434:17
445:22 469:15 482:4
511:7 539:21
**includes** 381:22 425:23
533:18
**including** 357:12 362:14
392:19 400:6 482:16
491:4 494:4
**inclusion** 414:17 415:2,3
481:20,21,22,22,24
482:1,3,9 515:24 534:2
**inclusive** 395:10 396:20
397:21 400:2,5 482:10
482:13,19 515:6
**inclusiveness** 395:16
**inconsistencies** 394:22
**inconsistent** 471:12,15
471:24
**incorrect** 305:6,13,19
307:20
**increase** 279:2 449:2
450:17
**increased** 502:8
**INDEX** 259:1
**Indiana** 448:16 449:2,6
450:3 464:2
**indicate** 431:20 441:2
532:10
**indicated** 261:8 265:13
295:21 337:1 386:19
**indicates** 280:10
**Indicating** 261:22
**indirectly** 545:11
**individual** 464:24
**individuals** 285:12
294:21 295:22,23 327:5
327:16,22 329:4,17,20
335:9 362:14 383:5
439:13
**inequalities** 466:2
**inequality** 466:7
**inequities** 391:15 392:20
422:17,17 462:24
**influences** 391:3

**inform** 539:10
**information** 269:10
274:23 284:2 285:15,19
289:20 302:12 305:13
305:14,20 308:24
335:15 340:11 353:16
378:17,18 403:1,22,23
427:13,14 428:10,11
444:2 445:22 451:2
460:11 480:4,18 488:7
488:10 509:13 533:16
**informed** 297:17,18,24
300:1 350:6
**Ingle** 327:11,17
**inherently** 526:1
**initially** 289:16 319:16
326:20 419:11 480:9,10
486:24 488:19
**initials** 442:23
**initiative** 492:21
**initiatives** 415:5
**injustices** 372:8
**inmates** 464:15
**Innovation** 450:11
**input** 475:20 517:19
**inquire** 389:20
**ins** 412:11
**inside** 397:14,16
**inspections** 348:20
**instability** 392:20
**instance** 272:2 276:15,19
276:21 295:9 306:15
328:18 354:3 416:23
421:15 438:11 492:17
503:11 504:3
**instances** 435:19 504:7
**Institute** 493:17
**institution** 395:14 484:15
515:5
**institutions** 381:10
**instruction** 286:23 287:2
287:12,19 288:6,21
302:21 306:23
**instructor** 488:23,24
505:1
**insurance** 488:8

**intangible** 392:6
**integrated** 390:23
**integrity** 512:19
**interacting** 468:10
**interaction** 308:16
309:18 316:8 340:15
357:2 364:10 402:24
465:17 476:2 477:4
480:8 540:7
**interactions** 268:2
419:15 461:10 465:1,9
469:2
**interest** 319:23 452:23
462:8
**interested** 300:2 326:11
545:11
**interesting** 297:18
310:10 311:2 394:18
444:11
**interfere** 261:24 512:19
**Interfolio** 304:13 443:21
446:10
**interim** 429:8,20 495:16
**interject** 313:4 398:22
423:18,18
**internal** 391:13 397:7
**internally** 396:15 399:17
495:11
**international** 373:3
484:12 485:6,18
**interplay** 391:10
**interpose** 466:5 503:14
**Interrogatories** 353:5
379:24
**interrupt** 299:10
**interrupted** 407:14
454:22
**interrupting** 424:22
**interview** 539:9 540:12
**interviewed** 377:22
**interviewing** 373:12
**interviews** 338:6,6 374:1
376:13
**inter-session** 500:5,20,21
501:4
**intimidated** 352:11



354:4
**intrusive** 344:19
**invasive** 342:24 343:4
347:8
**investigated** 438:12
**investigation** 330:4,18
335:22 436:12
**investigative** 339:8
**invite** 364:4,7,9
**involved** 408:1,3 424:6
464:3
**involvement** 399:20
**in-depth** 338:6,8 464:20
**in-person** 370:3
**irrelevant** 426:10
**Isabel** 326:8 329:20,22
339:9
**issue** 386:17 405:19
407:21 445:6
**issued** 264:10
**issues** 306:24 310:13
351:16 406:24 409:5
435:13 453:4 466:11
469:19 488:5 502:9
508:21 539:11 541:16
**item** 354:2,24
**items** 388:19 391:11
521:2

**J**

**Jackie** 538:20
**Jain** 272:3 273:17 274:8
275:23 284:14 286:17
292:15 293:15 294:11
362:15 461:16
**Jain's** 283:15
**January** 321:12 322:1
323:3 342:7 379:7
386:18 520:16,19,20
**Jay** 359:6 361:15 489:22
536:6
**Jean-Claude** 285:9
**Jill** 292:20 408:15 489:22
519:3,4
**Jim** 327:11
**job** 273:1 276:20 347:3

348:17 422:6 430:13
432:7 439:2 479:12
488:18,18,19,22 489:4
489:8,10,11,18,18
490:1 497:2 529:1
**jobs** 509:8
**jog** 314:5
▮▮▮▮ 508:14 511:14
522:16,17,18 523:2
**join** 298:10
**joined** 355:3
**joke** 417:11,15 435:2
**journalism** 390:24
402:17,18 404:21 530:8
▮▮▮▮ 297:22 300:18
301:8 373:14,22,24
451:15 452:16,19
473:11 474:4,9,9,14
475:8 480:7,16 494:4
**judge** 351:24
**judged** 409:13
**judgment** 505:13
**June** 299:19,19 300:9
430:23
**junior** 297:22 408:17,18

**K**

**K** 545:2
**Kathleen** 347:15 348:10
348:11 349:21 350:3
**keep** 272:18 280:3,5,6
331:10 350:16 362:4
430:2,11 439:6 460:14
478:24 523:18
**keeps** 454:20
▮▮▮▮ 289:15 297:12
298:5,22 307:15 308:16
308:24 309:1 326:13,15
360:2,12,14,16,22
362:14,22,24 363:5,14
476:15,16 477:24 480:6
480:15 495:15 497:4
506:11
**Ken** 326:15 450:8
**Kendra** 364:22 365:1
370:12

**kept** 269:1 306:2 331:10
377:24 443:8 452:7
458:9 464:7 465:10
489:14
**Kessler** 307:15 308:24
309:1 313:7 325:3
326:13
**Kessler's** 308:17
**kick** 304:12
**kill** 490:12
▮▮▮▮ 292:19 293:15
294:11 299:23
**kind** 298:2 307:17
313:20 351:3 375:7
409:22 444:12 452:1
457:12 460:22 469:14
489:13 490:11 499:5,6
525:2 527:10
**knew** 308:6 312:10 344:1
345:7,11,19 349:21
374:11 414:14 461:12
475:9 493:12 509:22
514:13
**Knight** 365:1
**Knight's** 364:22
**know** 266:18 269:17
270:13,16,20,22 271:8
271:11,19,19,20 272:11
273:5 274:12,13 278:11
278:18 284:12 285:14
286:14 289:17 293:14
293:23,24 294:4,24
295:11 300:23 302:10
303:15,15,17,18 305:15
305:22 306:9,21 308:18
308:19,20 310:23 311:3
311:7,8,12,24 312:8,10
314:6,9,22 315:1 319:1
319:4,5,6,6,10,24 320:2
320:9,11,18 327:1,12
328:9,10,14 330:1
335:13,20 337:23
338:11 339:2,7 341:6
343:14,22,23 344:3,9
344:10,22 345:3 346:7
346:16 347:3,5 348:3

348:13,15,17 349:16
350:3,7,8,8 351:15
355:2,4 356:5 357:9,9
357:12 361:17,17,20
365:12 366:10,12,21,22
366:24 367:11,21 369:1
369:9 371:6 372:1,11
372:22 373:3 381:9,15
381:18,23,24 383:8
389:14 391:22,24 392:4
392:9,19,21,24 393:20
393:21 394:5,18,21
395:24 396:20 400:18
401:15,16 402:19
403:10 404:15,16 405:8
407:4,19 409:14,18,24
410:16,17,19 412:5,13
412:15,24 414:7,20
415:6,20 416:3,6,9
417:1,14 418:8,10
419:17 421:1,22 422:3
423:2,3,4,5,21,22,23
424:3,5,11,17,22
425:10 428:14 429:7
432:5 434:9 435:21
436:11,11 437:20,24
441:3,10,21 443:10,17
444:22 446:19 452:21
453:3,17 456:11,12,14
457:17 458:7,8,16,21
460:8 461:6,7,7,8
463:21,22 465:10 468:8
469:14 471:1,5,11
472:6,23 474:11,16,17
476:7,17,21 477:9,22
480:11,12,17,20 481:13
482:12 485:13 487:9
488:13 489:21 490:14
491:16 496:11 497:17
498:13,22 499:7,8
501:21 502:22 505:24
506:15 507:24 508:1
509:6,16,22 510:6
512:21 513:9 515:13,18
516:20 517:23 518:15
520:8 521:9 522:4,5



523:1,4 525:18,19
526:14 527:13,24 528:4
532:6,15,22 533:23
534:19,21 535:3,11,24
535:24 539:20 540:24
541:18 543:5
**knowing** 310:14,17
396:4
**knowledge** 266:17 270:4
333:11 353:17 359:13
516:23
**known** 445:15
**knows** 403:22 428:20
442:9
**Krimstein** 326:15 450:8

**L**

**L** 257:15,24 545:3
**lab** 450:19,21 451:7,9,9
451:11,20,23 452:1,8,9
452:13,19,24 453:20
497:23
**labeled** 406:7 532:2
**lack** 392:21 466:12
509:16 534:1
**lacking** 453:15
**lacks** 424:12 453:11
**lady** 374:9
**laid** 454:4
**Lake** 449:1
**laking** 432:17
**language** 276:14 312:17
**laptop** 309:24
**larger** 410:3
**largest** 497:21
**lastly** 535:6 537:8
**late** 297:9 328:17
**Latin** 294:4 484:1
**Latina** 402:5 415:22
433:1,12 483:22
**Latino** 402:5
**Latinx** 402:5 483:22
**latitude** 403:8
**Latrina** 422:24
**laughing** 417:16
**law** 258:2 351:17 370:22

370:24 371:1 422:15
466:18
**lawsuit** 263:13 268:5,6
372:10 517:13,16
523:13 527:20 530:10
531:11
**lawsuits** 370:18
**lawyer** 353:8 384:19,21
538:7 539:4 541:2
542:10
**lay** 404:4 407:9
**lays** 275:18 474:15
**lead** 301:7 363:2 448:7
492:22
**leader** 447:10 493:12
**leaders** 393:23
**leadership** 290:4,6,11
298:9 301:5,18 389:13
400:7 422:10 428:3,4
435:15 496:22 508:11
508:12
**leading** 393:16 395:7
418:18 493:11,15
**Leah** 285:10
**leaning** 514:19
**leap** 401:4,5
**learned** 485:5
**learning** 463:17 484:6
**leave** 300:9 349:23
361:10,13,15,18 363:1
398:5 400:16,17 411:2
411:4,9,10 439:21
489:22 490:2 499:5,6
507:5
**leaves** 356:10 494:8
**leaving** 436:1
**lecture** 392:24,24
**left** 272:13 274:15,17,18
274:21 332:17 355:3,4
355:17 356:14 377:14
398:1,4 399:15 402:21
409:2 410:10,10 411:12
411:16 413:12,13
414:20 415:5,9 423:5
423:13 444:1 451:12
476:10 526:11 536:22

**legal** 257:22 291:21
380:17,22 537:13
**legislation** 394:6
**lengthy** 299:8
**leniency** 320:4
**lesser** 439:6
**letter** 262:12,14 306:15
306:17 308:7,8 314:5,6
316:2,6 317:16,20
365:9,14 367:15,24
399:11 431:15 447:4,9
488:6 497:16
**letters** 273:6 464:16
**letting** 300:23 481:10
536:8
**let's** 260:17 266:8 302:9
307:13 308:24 311:23
326:24 330:24 331:20
363:7 375:16 382:17
385:24 402:3 416:24
418:22,23 420:9,9
430:17,18 436:18,18
448:4 455:5,10 460:3
467:10 476:16,17 478:7
478:9 483:19,19 494:24
502:12
**level** 296:23 359:11
394:2,2 466:19,21
497:9
**levels** 478:24
**Lexa** 289:14 326:3,13
387:11 388:18 389:5,5
428:23 429:17,19 478:1
478:3,3,13 479:19,20
480:6,15,21,24 495:15
**Liberty** 488:9,20
**license** 471:4 545:22
**life** 356:8 392:22 419:18
419:21 491:14,18
523:18
**lifelong** 485:2
**lifetime** 382:19
**light** 394:9,21 521:8,19
543:2
**lights** 476:11,12
**likes** 337:17 460:23

485:7
**limited** 302:7 328:24
440:16 486:4 533:20,24
**limiting** 413:16
**line** 291:20 395:21
413:24 427:22 435:2,4
478:14 481:5
**lineage** 483:14
**link** 427:10
**lip** 534:20
███ 270:2 295:10 330:13
333:21 349:17 355:14
356:12,12,13,15,16
371:4 389:5 396:6
402:13 404:8 408:13
409:2,13 410:9 412:6
415:12,13 420:4,18
421:4,6,16,16 424:9
431:17,24 435:1 437:18
455:11 456:18 457:13
458:22 459:20 526:8
528:20 538:13,17,21
**list** 325:24 327:13 355:18
374:4 410:9 420:7
**listed** 384:4 388:24 462:6
462:7
**listen** 403:7 479:21
524:24,24
**listening** 338:8 436:19
475:22 478:20 479:24
524:23 534:21,22
**literally** 285:12 412:5
413:1 414:21 473:20
475:5 505:14
**litigation** 509:22
**little** 309:23 312:9
383:23 390:16 391:16
419:15 450:9 494:8
**live** 436:22 484:21
**lived** 464:20
**living** 523:18
**Liz** 330:2 334:9 515:22
515:24
**lo** 509:14
**load** 501:1
**location** 464:23



**lockdown** 369:15
**locked** 343:13,24 369:18
**lodge** 471:5
**long** 267:16 287:22
   311:21 312:13 327:13
   357:14 359:2 367:11
   379:1 385:6,12 395:6
   403:12 410:19 416:10
   420:7 429:10 436:19
   437:10 438:10 466:10
   482:16 484:8,21 487:14
   491:20 498:15 499:1
   526:20
**longer** 279:3 303:1
   350:13 367:7 383:12
   388:23 436:15 502:8
   509:2 527:7
**long-term** 392:19
**look** 275:14 279:19 281:1
   285:23 291:12 292:9
   299:4 300:5 303:11
   309:24 311:2 314:4
   315:3 318:24 320:19
   321:1,21,24 322:21
   323:14 324:1,16 332:5
   332:10 333:3 334:11
   336:5 337:11,17 341:8
   341:19 347:20 351:23
   352:7,14 358:19 359:3
   363:7 370:6,15 374:19
   375:14 379:13 384:9
   385:19 390:1 399:19
   418:12 435:16,22,23,23
   436:2 470:16 471:21
   472:21 473:3 479:21
   480:9 482:14 510:14
   524:8 540:14,15
**looked** 286:5 323:6,9
   325:7 333:10 367:19
   374:17 381:8,11 383:4
   391:2 457:6 510:10
   527:8 539:2 540:24
**looking** 265:9 272:11
   286:6 288:14 292:5
   295:9 310:1 352:2
   368:20 395:4 407:16

430:20 470:20 473:7
   521:14,16 522:2
**looks** 263:23 283:15
   324:3 334:1 348:9
   387:10,14 482:12 486:2
   486:2 520:4 531:9
**looped** 480:15,16
**lose** 304:11 356:24 357:6
   357:7 381:21 491:3,5
   509:8
**lost** 339:7 356:4,8 380:11
   381:6 382:22 411:5
   430:9 526:10 534:13
**lot** 263:7 304:14 308:23
   312:20,21 320:3 328:15
   338:6 355:23 366:14,17
   367:4,4 372:5 388:17
   391:14 392:2 393:19
   394:14 403:8 417:9
   441:9,9 444:1 445:4
   448:15 451:1,1 453:4
   458:7,10 462:4,23
   463:12,21 465:11
   481:24 499:14 506:2
**lots** 399:22,22 420:2
   439:16 450:22 463:23
   463:23 480:19 536:3
**Lou** 266:18 269:15,18
   270:1,2,5,11 271:9,9,10
**Lou's** 266:18 269:17
**low** 282:3 292:13 294:17
**lower** 272:14 276:18,21
   276:24 292:14,23
   293:13,16,19 294:18
   439:2
**lowest** 462:19
**low-income** 395:17
**LSP** 466:8
**Luckily** 491:2
**Luiesela** 285:11
**lunch** 297:20 385:8
   386:7

---

### M

**M** 261:5 390:10
**machine** 465:3

**macro** 416:18,20
**macroaggression** 416:23
   417:6 418:16
**macroaggressions**
   412:16 416:16,17,21
**Madam** 518:8
**Magna** 257:22
**main** 489:9 529:16,17
**mainstream** 393:13,18
**maintain** 471:1
**major** 390:19 449:8
   483:4 490:6
**majority** 308:20 400:1,1
   400:2 448:2 483:8
   497:14 502:21
**Makagon** 285:11 408:23
**making** 261:18 267:18
   272:18 304:21 313:1
   315:12,20 329:5 332:22
   405:20 406:8 417:15
   452:7,10 454:19 501:6
   512:15 541:20
**mal** 490:8 491:9,16
**male** 271:9 357:13
   433:14 504:16 509:19
   535:16
**man** 402:4,4,5 535:16
   536:20
**manage** 492:18,19
**managed** 451:19
**manager** 428:3,17
**manipulated** 391:12
**manner** 306:18 365:4
   468:1 502:11
**March** 278:15 279:14
   280:11,12 282:20
   316:14 369:16,17
   483:20
**marginalization** 328:11
   337:3 391:20 467:5
**marginalized** 312:21
   392:17 483:12,12
**margins** 397:2
**Maria** 290:4 292:19
   293:14,22 295:15 308:7
   319:11,19 322:15

323:17 324:22 340:8
   360:11,11,13,23 362:15
   362:23 386:17,20
   408:14 420:19 432:1
   457:14,20 458:12,13,23
   459:20 479:6 494:4
   495:20 496:1 518:24
**mark** 262:7 320:14
   439:24 511:24 532:12
**marked** 284:22 439:23
   530:20 537:2 542:4
**marker** 328:9 391:23
   392:5
**markers** 392:11 394:10
   406:23 417:3 474:17
**marketing** 390:23
**Marshall** 326:14 450:8
   ███████ 522:16,22 523:7
**mass** 449:3
**master's** 391:1
**Mastin** 267:7,13,19
   412:23,24 413:4 458:15
   506:12
**material** 319:14 320:12
   332:16 349:5 446:10
**materiality** 468:4
**materials** 272:11,12
   303:23 304:3,6 305:4
   305:21 306:17 312:3
   317:24 318:6,9,19
   320:10 321:10,11 322:5
   374:17 386:18 446:7,8
**Matt** 308:15 362:14,22
   494:4
**matter** 277:17 399:17
   436:7 485:9 545:5,7
**matters** 444:4,6
**max** 473:20
**mayor** 449:7
**ma'am** 331:6 342:2
**meals** 359:18
**mean** 273:6 275:2 285:11
   293:2,3,6,7 302:4
   308:11 310:7,15 313:1
   318:10 325:23 334:1
   341:7 350:5 368:18



371:6 374:21,24 377:1
391:24 394:17 395:4
396:3 397:6 399:2
400:5,6,10 401:22
407:6 409:16,24 414:10
418:21 420:8 433:11
437:10 441:19 442:1
444:10,16 446:1 449:15
449:16 452:10 460:7,19
460:21 461:7 462:15
467:13 469:6,10 471:1
476:22 477:16 480:8
483:5,19 489:13,20
494:20 498:3 503:6
506:2 507:24 511:4
517:7 526:13 537:10
541:5 542:15
**meaning** 359:22 364:1
395:3 444:16 496:6
**means** 274:4 409:21
**meant** 353:1 394:15
412:3,5 433:22 448:24
521:9
**mechanism** 428:8
**mechanisms** 427:7 428:6
**media** 391:1,2 450:18
451:8,9,20 497:23
**mediation** 398:15,23
399:6,7
**mediator** 479:20
**medical** 414:23 415:4
486:9 488:12 489:24
502:9
**medication** 491:21 492:1
492:5,6
**medicine** 261:10,11,15
261:19 387:5
**meet** 267:1 339:8,14
387:22 388:15,17
408:18 452:6 454:9
460:3 464:8,23 496:11
504:23
**meeting** 311:11,15,16
317:23 318:2 337:7,18
337:20,22,22 339:6,10
341:12 354:18,24

355:15 357:8 358:2,5
361:21 370:4 387:15,19
388:1 398:20 418:5
452:7 458:1 459:21,22
474:5,7 476:3,7,17,17
477:10,19,24 478:2,11
481:3 493:6,20 498:21
516:6 517:1,7 524:5,7
524:10,12,13 525:6
526:18,21,24 527:1,8
528:18,23 529:2 533:12
536:6
**meetings** 359:23 388:18
405:14 458:7 510:9
536:9
**Megan** 378:11,16 379:5
**Mellee** 378:11,16 379:6
**member** 277:24 278:2
289:4 290:23 297:23
298:21 301:6 309:9,11
356:5 367:9 370:21
396:21 400:16 404:12
408:18 410:14 413:5
415:14 422:23 423:6
451:22 455:20 469:12
476:24 477:1,20,20
485:23 522:19,23
527:23 530:7 531:21
535:12 536:15,18
**members** 266:24,24
272:16 283:22 284:7,11
292:16,18,21 293:11
304:20 307:24 345:22
346:20 355:11 389:23
398:3 400:16,17 406:20
408:5,18 423:7 431:20
433:12 440:10 442:6
445:4 463:15 475:2,5
483:18 485:18,20
492:19 496:10,11 509:1
509:2,7 520:5 527:15
**memory** 314:5 379:20
398:19 437:4
**men** 266:20
**menial** 465:4
**mention** 306:23 328:5

**mentioned** 326:21 333:2
351:2 364:14 370:18
416:14 425:10
**message** 319:19 322:16
340:9,10 348:8 438:8
**messengers** 471:10
**met** 269:8 372:5 388:2,12
399:22,23 420:24
457:20
**metadata** 338:13,17,24
339:2
**Michael** 266:17 269:14
269:18 270:1,14 271:6
536:14,15
**Michigan** 413:20,21
415:6,8
**micro** 416:18
**microaggression** 354:5
417:8,18 418:10,11
420:1 457:15 458:1
**microaggressions** 345:21
352:12 412:16 416:15
417:9 418:15,19 419:6
457:16 458:3,9,19
**Mike** 270:23
**mind** 294:15 323:15
327:12 379:2 394:5
418:9 461:5 464:14
478:22
**mine** 272:14 277:4
345:20 403:10 490:12
**minimize** 394:11
**minor** 450:13
**minorities** 294:9 295:8
356:24 357:3,3 436:2
438:22,22 449:1 482:15
482:15,21,21,24 483:1
526:3
**minority** 291:9 295:14
295:17 345:22 450:3
483:8,11,15 484:13
485:8 523:5,10
**minute** 261:17 264:12
302:16 332:9 348:1
490:23
**minutes** 350:15,24 352:3

390:7 494:10 499:19,21
499:22 519:12
**mirror** 287:8
**mischaracterization**
521:12
**misfiring** 490:16
**missed** 319:2,4,11,12
320:10,12 325:13
**missing** 310:2,6 488:6
**mission** 395:12,12
524:20
**missions** 524:21
**misstates** 398:13 444:8
500:7 540:2
**mistakes** 309:22
**misunderstanding**
477:12
**mixed** 403:1
**modality** 276:19 277:1
277:17
**modified** 513:14
**modify** 396:14
**moment** 263:8 265:1
267:21 285:8 290:20
321:2 325:5,23 332:11
334:16 343:18 452:2
522:8 530:1 533:6
**Monday** 321:11
**money** 277:18 381:21
450:20 451:7
**month** 413:1 508:4,5
**months** 472:7,12 490:13
**morning** 260:18 541:19
541:20
**Morris** 285:10
**mother** 518:5 540:24
541:9,14
**motivated** 344:21 345:1
346:15,17,18 347:10
349:4,7,10 452:22
**motivation** 426:14
**motivations** 454:4
**Motzer** 327:11
**Mousin** 346:4
**mouth** 490:24
**move** 273:15 313:11



339:21 347:18 351:17 375:3 376:1 381:18,20 392:21 398:22 403:3,11 414:17 445:17 454:6,8 454:15 455:4 461:3,18 472:24 503:22 533:17
**moved** 270:17 304:12 330:5 344:1,5 365:20 377:19 454:5
**movement** 399:20
**moving** 312:12 377:24 381:23 453:10 463:12
**multimedia** 441:4
**multiple** 362:1 420:22 447:18 491:12 492:7 519:14
███████ 297:22,22 300:12 301:9 373:14,23 450:7 451:15 473:11 494:4
**Murphy** 289:14,14,24 290:11 326:3,14 387:11 428:23 429:18,19 478:1 480:7 495:15
**muted** 534:8
**Mutual** 488:9,20
**myriad** 354:23

### N

**N** 261:5,5 390:10,10
**name** 266:18 269:17 308:10 326:9 329:23,24 330:1 346:4,6,7 367:21 378:5 404:9 422:23 423:4,5 426:2,15 437:19 451:15 501:20 506:24 508:13 527:22 531:20
**named** 295:5 327:4,23 329:4 467:14
**names** 327:13 330:17 364:4,7,12
**national** 291:11 372:13 429:23 436:16 479:11
**nationality** 413:8 485:12
**natural** 419:17

**nature** 306:20 355:5 360:18 396:8 400:9 401:4 418:20 422:21 463:7 524:12,13
**near** 457:9
**necessarily** 276:6 290:19 351:16 358:15 381:16 392:7 395:21 435:17 436:6 459:7
**need** 284:7 285:1 294:24 295:3 307:9 323:22 351:9 354:19 367:6 374:19 396:14 409:15 441:5,10 451:18 461:20 474:8 475:17,19 484:2 499:20 503:23 512:9 537:18 544:1
**needed** 310:17 406:22 409:7 411:7 416:22 438:12 474:14 475:9 479:20 487:8 496:7
**needing** 310:8 491:16
**needs** 293:6 396:17,18 440:6 450:15 461:23 495:11 510:7,14
**negative** 418:6 457:3 514:18
**negatively** 301:14
**neither** 311:7 335:3,10
**never** 267:22 269:3 301:7 335:16,17 341:15 341:16 343:13 345:19 363:6 364:11 366:9,13 372:18,23 402:1,3,6 444:9 463:19 465:13 474:10 476:21 482:13 488:10 489:24 491:13 498:16 499:12 506:18 507:1 530:17 537:4 538:13
**new** 291:23 304:13 311:20 312:12 320:4 355:2,3 367:9 409:16 450:13,18,20 451:22 463:24 473:9,18 494:11 495:21,24 496:5,5

497:23 536:24
**news** 369:6 517:11 518:17
**newspaper** 502:14,20
**nice** 337:9 456:18
**nigger** 435:2
**night** 490:4,7 518:18
**Nina** 326:14
**nine** 448:3
**nominate** 327:17
**nominated** 494:1
**nomination** 328:7 494:3 494:3 495:20 538:11
**nominations** 495:7,19
**Nonni** 355:19 356:13,16 410:12
**nonprofit** 395:13 449:8 463:16
**non-minority** 266:9,15 270:8 271:21 286:23 287:3,13,20 288:6 292:14 294:7,12,17,19 295:5,13,19 371:10
**non-qualified** 297:2 298:13
**non-renewal** 270:21
**non-responsive** 313:12
**non-tenure** 439:13
**norm** 400:22
**normal** 308:22 357:6,6,7 430:2,10 446:4
**normally** 283:20 501:2
**North** 258:8
**NORTHERN** 257:1
**Northwestern** 414:21
**note** 306:16 311:19 407:16 471:14
**noted** 403:11 425:9 432:20 454:18
**notes** 337:17,20,21 358:5 358:10 446:20 475:8
**notice** 276:8 319:23 469:5 516:17
**noticed** 348:20 367:15 372:18
**noticing** 276:21

**notified** 368:8 378:14 389:11
**noting** 433:9
**November** 370:2 371:9 373:6 420:16 429:12 473:7
**nuances** 457:5 485:16
**number** 282:2 292:20,21 373:7 381:1 382:18 384:22 401:24 428:14 433:6 496:20 528:11
**numbers** 285:3,16
**numeral** 380:10
**numerous** 272:15 284:18 292:17 293:11 313:18 398:2,2 503:5 504:7
**Nur** 326:15 362:17,18 363:1 369:3 370:11 371:10 372:13,16,20 373:1,22,24 374:3,14 374:19 375:24 451:24 452:6,15,18 453:19 454:8,11 473:11,17 474:5,22 476:19 478:2 478:3 479:20 480:12 481:3,4,7 494:6
**Nur's** 370:3

### O

**O** 261:5 390:10 545:2,2
**oath** 260:23
**object** 291:17,19 314:15 338:22 351:18 380:16 380:21 393:15 397:9 398:12 399:1 403:24 424:20 426:7,8 432:16 441:20 444:22 445:11 445:15 467:20 468:5 542:22
**objecting** 445:13
**objection** 325:21 340:2 383:21 384:6 385:16 401:18 403:11,16,17 407:2,12,17 411:17 414:5 418:18 432:3,11 432:19 437:6 439:8



444:7,20 445:23 454:17
455:1,1,2 466:5 468:2
470:8 471:5,15 472:3,3
472:20 483:2 500:6,23
503:14 521:11 529:3
537:12 540:2
**objections** 468:1,6,12
472:10
**objects** 445:17
**obscene** 536:4
**obstructionist** 455:2
**obtain** 271:23 273:17
284:12,14,19
**obtained** 272:5,7 285:15
403:22
**obtaining** 266:12 365:1
**obvious** 355:19
**Obviously** 542:4
**occasion** 296:22 297:4
**occasions** 314:2 398:2
**occupant** 348:22
**October** 321:5 336:14,22
347:12 348:5 349:24
358:2 420:16
**offender** 423:12
**offensive** 419:12
**offer** 376:5,9
**offered** 266:24 359:17
360:12 363:6 376:7
504:22
**offers** 398:5
**offhand** 430:22
**office** 329:10,16 330:12
330:21,21 339:9 343:1
343:5,11,15,18,22,23
343:24 344:8,9,13,16
344:18 345:4 347:9,11
347:17,19 348:21 349:9
378:1 476:10 498:13,17
500:16,16 505:23
**offices** 377:19
**official** 432:14 435:17
**officially** 262:8
**oh** 264:2 273:1 279:23
290:20 300:17 301:22
328:8 357:20 366:10

367:20 383:17 397:15
408:12 409:10 419:19
434:8 435:10 448:22
461:20,24 462:11,17
467:2 499:1 503:3
504:6 506:3 510:23
528:4,11 532:7 535:10
**OIDE** 330:5,12,21 331:9
332:17 335:24 339:6,7
421:6 427:10,22 457:18
458:6 515:24 527:4,4
**okay** 261:7,14 262:3,14
264:2,9,22 265:4,6,10
265:22,23 266:4 268:16
273:16,23 274:3,14,22
275:4,7,18 278:12
280:9 281:1,6,14,20
282:13,19 283:17,20
286:11,12,15,21 289:11
290:18 292:10 293:21
297:11 299:7,8,18,21
300:3,15,22 301:24
302:6,13,17,23 303:6
304:2 306:7 307:1,14
308:23 309:10,16
313:11,23 315:18
316:17 317:5 318:5,14
318:17,24 319:8 321:3
321:4,9,18 322:4,7,13
324:24 327:6,9 329:8
330:24 331:15 332:12
332:21 333:2,17 334:3
334:6,20 335:19,23
336:5,10,13,17,21
338:20 339:4,11,17
340:8,20,23 341:4,10
341:19 342:5,13,16
344:7,24 346:1 347:8
347:20 348:5 349:3,20
350:2,10 352:5,7,20
353:19,23 354:2,17,22
358:19 359:5 361:19,22
362:5,6,8,13 363:8
364:14,24 365:3 367:23
369:20,22 370:2,6,12
371:8 373:11 376:5,15

376:21 377:7 378:21
379:4,22 380:1 382:12
385:1,11 386:1 387:8,9
387:21 388:4,11 389:10
390:5,9 391:16 393:11
397:11,23 401:12
403:15 404:17,20 405:1
405:4 406:17 407:10,21
407:22,24 410:18 412:9
414:3,13 415:24 416:13
417:7 418:2 419:10
425:1,9 427:18 429:16
430:18 431:7,19 432:1
432:20 433:24 434:3
439:4,4,20 440:8,18,19
441:2,12 442:7 443:16
445:16 447:16 448:4,4
448:6,22 449:10,13
451:6,16 454:17 455:2
455:7 459:18,18 460:18
463:1 465:18 467:16,22
468:2,16 469:22 470:4
470:19 471:20,22
472:11 473:5,15 481:19
482:7,20 486:21 488:1
489:17 490:3,8 492:4,9
492:24 494:15 499:24
500:3,10,19 501:9,12
502:12 503:10 504:2
506:15 510:16 511:15
511:20 512:4 513:4,12
514:1,14,22 515:2,13
515:18 516:8,9,16,24
517:4,10,15,18 518:22
520:2,8,11,15,18 521:3
522:7,22 523:11,23
524:4,11 528:4 529:10
529:12,20 530:1,3,18
531:4,13,18,22 532:11
533:5 535:6,9,15,24
537:1,8 538:3,13,16,23
539:8 540:19 541:8
542:11,12 543:13,24
**old** 425:18
**Olsen** 355:6 410:12
**Olson** 410:13

**ombudsman** 329:24
343:12,16 345:5
**ombudsperson** 345:5,15
345:18,19,23 346:2
**once** 261:17 315:1
356:10 365:5 381:18,19
382:20 415:9 461:1
468:23 484:3 487:20
503:4 513:14
**ones** 271:15 284:15,16
406:19 445:2 490:6
511:8
**one-hundred-odd-som...**
511:6
**one-on-one** 266:10
268:17 269:19
**one-page** 527:10
**one-vote** 366:18
**one-year** 489:15
**ongoing** 266:1 307:6
342:22 378:19 403:18
533:13
**online** 276:20,24 277:5,8
277:13,15,15,20,21
278:1,5,8 279:3 428:12
524:7
**on-campus** 463:15
**open** 322:24 395:4 408:4
408:12 425:17 435:17
513:4,6 516:6,8 517:2,3
519:21,22 522:8 523:24
529:21,23 530:18 531:1
531:4,22 532:22 533:2
535:7
**opened** 318:17 330:19
437:11 495:19 505:18
**opening** 395:5
**openly** 328:8
**operating** 305:11 320:3
**operation** 449:18
**opinion** 407:20 433:21
435:14 439:10 481:11
481:12 490:9 537:9,16
**opinions** 339:21 400:22
**opportunities** 266:22
301:5 381:6 395:16



413:16 533:20
**opportunity** 273:14
296:4,12 298:8,11
331:21 404:5 436:22
535:2
**option** 501:3
**order** 351:12 396:18
440:13 537:9 543:14
**organization** 395:13
458:5 463:15,19 464:13
508:9
**organizations** 449:9
463:16 464:3 465:16
**organized** 312:15 362:18
**orientation** 469:18
**oriented** 312:20
**origin** 291:11 479:11
**original** 543:5
**Ortiz** 330:2 334:9 341:10
515:22,24
**ostracize** 433:21
**ostracized** 352:11 354:4
354:14 392:12 396:5
411:8 453:2
**ostracizing** 371:22 454:8
**OTE's** 284:17 285:8,13
**outdated** 443:19 444:1
**outlet** 509:11
**outline** 434:5
**outrageous** 479:23
**outs** 412:11
**outside** 364:9 399:7
400:22,23 447:14
452:14 465:16 497:20
498:13 523:12 525:12
**outspoken** 396:8,9,10
**overall** 356:21
**overexaggeration** 340:14
**overheard** 455:21,22
**overlooked** 273:4 286:3
505:7
**overseas** 419:22
**oversee** 492:22
**oversight** 357:19
**overstatement** 340:12
**overt** 328:14,14 351:4

397:1 416:22 460:20,22
**overtly** 329:7
**overturned** 422:1
**overview** 387:17 393:2
**overworked** 413:15
**overwrite** 312:7
**o'clock** 257:17 541:20
**O'CONNOR** 258:7

---

## P

**P** 402:23 408:1,4,10
409:7 433:7
**padding** 312:15,23,23
313:1,9
**page** 259:5 265:18,20,21
275:16 281:5 285:3
286:10 342:17 353:10
353:10,11,12,24 354:8
361:23 362:7 368:21
370:17 379:14,17 380:2
380:7 396:17 434:13
438:18 440:17,18,19
442:16 521:4,23
**pages** 286:8,12 316:23
472:6 488:14
**paid** 381:12,12 487:11,13
500:19
**pamphlet** 343:12 344:4
345:2,4
**pandemic** 368:24 369:3
369:5,7,12 449:24
**panel** 345:21 508:4,24
509:14 511:7,18 516:13
517:9
**paper** 456:22 486:2
504:18 543:20
**papers** 344:6
**paperwork** 474:19
478:17
**paragraph** 265:18,21,23
266:16 270:7 272:1
275:22 286:16,17,21
292:11 295:24 296:14
296:21 302:14 315:11
315:17,19 321:9 325:5
325:17 326:21 335:2,5

342:17 350:11 364:20
364:20 368:15 370:6,16
370:19 371:9 380:4
431:20 432:22 440:17
441:15
**paragraphs** 266:5 325:7
**part** 306:12 307:6 329:16
338:7 400:2 432:7
434:15 440:15 444:24
463:8 490:5,6 498:11
517:8 518:17 529:4
534:24
**participating** 408:10
**participation** 364:21
389:21
**particular** 275:8,10
276:2,11 278:17 300:24
308:12,21 311:6 320:4
332:3 354:17,23,24
355:6 373:8 374:2,4,8
374:18,20 392:3,16
394:10 395:7,7 407:19
417:13,15 444:14
463:10 466:15 495:13
503:6
**particularly** 393:3
485:10
**parties** 545:10
**partner** 464:6,22,24
465:2
**partnered** 449:6 450:2
**parts** 407:19
**pass** 376:21
**passed** 490:13
**pastor** 411:6
**path** 266:12 414:15
**patients** 377:12
**Paul** 308:15
**paused** 273:24 274:5,12
**pay** 382:5,8 422:17
██████ 356:13,15 402:13
404:9,10 409:2,13
410:9
██████-Hébert 538:17
██████-Hébert's 538:14
**peer** 283:2 448:1,3

**penalty** 353:15
**pending** 291:23 302:4
371:5 426:24 509:22
542:16
**people** 289:23 290:5
294:8 295:4,7 328:15
328:17 349:9 355:2,3,4
355:17 357:2,7 359:19
360:3 364:4,6,8 366:1,1
366:2 367:6,10 371:18
391:12,21,22 392:3,4
392:16 393:23 395:7
397:1 400:12,21 401:6
401:14,15 405:15
411:10 414:15 417:17
418:8,23 419:15,22
423:2 425:10,23 433:10
435:9,24 436:5 439:1,6
445:3 449:5,19,23
460:15,23 461:15
465:24 480:19 482:16
484:20 485:6 489:21
493:11,15 494:1,5
499:9 506:2 508:2
509:5 510:16 511:3,5,6
511:18 516:11,13,17
523:21 526:7 534:22
**people's** 349:9 391:3
392:2 430:1,9 454:4
460:12 525:1
**perceived** 477:17
**percent** 304:1 365:2
366:5 467:1
**perception** 295:14
365:15 391:3
**perfect** 272:23 273:3
276:16 286:2 386:3
417:16 439:24 461:18
513:17
**performance** 266:12
328:6 415:15 432:24
433:5,23 434:11
**performing** 348:19
**period** 287:1 376:23
455:24 467:16 468:17
**perjury** 353:15



**permission** 344:19
  345:13
**persecuted** 310:22
**person** 271:14 276:18
  277:8 286:20 289:9,17
  308:5 314:11 329:24
  336:3 344:12 362:21
  365:19 366:19 367:1
  376:7,9 381:14 382:6
  396:22 401:8 402:3,9
  402:19 417:2,5,12
  419:18 428:3 434:1
  460:23 477:6 483:23
  484:12,22 485:7 489:1
  492:15 494:8 496:6,12
  498:23,23 503:8,9
  510:2 514:15 515:3
  526:12 537:17 541:12
**personal** 411:4,9,10
  428:19 480:17
**personally** 335:17
  405:16 406:16 463:20
  543:12
**personnel** 268:22 269:6
  271:16 272:16 305:2
  309:11 314:6,21,23
  315:12 317:22 318:15
  365:14 421:20 422:1
  424:10 440:6,10,14
  442:5 445:1 456:23
  539:8,10,23 540:11
**person's** 375:10 514:3
**perspective** 301:15
**petition** 525:22 526:3
**phone** 388:3,15,17 419:2
  428:13,14 540:24 541:3
  541:13
**phonetic** 358:8
**physical** 491:17
**physically** 339:18,23
  340:5,10
**Ph.D** 257:11 259:3 261:1
  390:18,20 391:4 393:21
  545:4
**PI** 449:6
**pick** 479:8 505:20 541:6

541:9 542:9
**Pickett** 515:21,22
**picking** 518:5
**picture** 304:4
**pictures** 486:3
**pieces** 337:23 338:2
  460:2 463:12
**pin** 537:24
**pink** 282:3
**pinpoint** 275:12 420:23
  460:10
**piqued** 319:22
**place** 344:2 368:23 436:5
  483:10 502:4
**placed** 278:18 295:18
  344:4 345:12,13 460:16
**places** 545:8
**Plaintiff** 257:4,11 258:6
  265:24 266:10,13 270:9
  271:22,24 292:13
  296:21 297:1 302:18
  342:22,23 382:23 543:1
**Plaintiff's** 329:11 353:4
**plan** 261:15 284:4 525:2
  527:10
**planning** 387:22 388:1
**plans** 284:9
**play** 391:15
**plays** 394:5 483:17
  484:16
**pleasant** 309:21
**please** 263:2,4,18 264:12
  265:6,17 280:1 296:7
  315:3,22 316:10 320:17
  323:16 331:1 333:15
  336:6 337:12 340:16
  347:21 354:15 358:20
  364:7 431:9 468:11,13
  473:3 522:8 528:16
  533:2
**plenty** 304:10 439:1
**Plus** 414:16
**point** 264:11,21 273:5
  276:6 280:14 286:6
  302:5 303:22 304:24
  308:6 317:18 321:13

342:19 347:2 350:17
  354:10 355:8 356:22
  361:10 362:6 377:9
  399:14 411:4 421:16
  452:6 453:2 472:12
  479:2 480:18 489:9
  501:18 541:18 542:14
**pointed** 388:5
**points** 362:9 434:4,8,9
  534:4,14
**police** 418:24
**policies** 293:9
**policy** 408:2,4 409:7
  494:23
**political** 522:19
**pool** 496:7
**popularity** 393:19
**population** 509:7
**populations** 312:22
**Porter** 449:1
**portfolio** 311:2,4 312:12
**portion** 392:15 534:12
**position** 298:18 300:2,14
  300:20 327:18 373:13
  373:13 374:7,12 376:6
  376:8,10 381:23 382:4
  382:6,9 383:6,9 393:13
  393:14 416:24 417:5
  428:4 429:2,11,24
  430:2,11 439:13,14
  440:21 471:22 478:15
  488:21 492:13,14,15
  493:1 494:2,16,17
  495:8,10,18 496:23
  497:3,6,11 509:17
  529:1,6
**positions** 300:17 301:19
  359:24 401:6 439:6
**positive** 477:4 514:17,18
**possible** 350:6
**post** 433:20 446:7,8
**potentially** 443:1 491:4
**power** 391:9,14 421:20
  439:7
**PowerPoint** 358:9,24
  440:24

**powers** 339:8
**PR** 390:24 450:12 451:3
  453:1 473:13 492:17
  536:17
**practice** 395:21 401:1,2
  401:3
**practices** 395:1
**PRAD** 282:7 327:18
  380:13 382:4 504:9
  538:11
**preach** 395:21 401:1
**prefer** 299:9 390:12
**preference** 352:1
**pregnant** 530:12
**prep** 385:14
**prepackaged** 359:18
**Preparation** 321:10
**prepare** 337:20 353:8,19
  493:14 501:13
**prepared** 267:3 301:11
  331:12 333:20
**present** 339:15 395:1
  418:2 519:12
**presented** 509:13
**presents** 394:23
**preserve** 403:16
**preserved** 468:3 503:17
**president** 526:22 527:2
**presidential** 522:20
**pretty** 271:1 299:2
  307:22 309:21 324:2
  334:18 359:2 360:10
  362:5,24 369:12 398:4
  401:17 430:13 446:22
  448:17 459:3,23 472:17
  502:23 505:24 507:23
  524:9
**prevalent** 393:24
**prevent** 492:1
**previous** 384:21,23
  398:17 476:3 496:24
  509:1 539:19
**previously** 261:3 313:23
  455:11 465:23 481:6,19
  486:11 490:3 494:7,12
  500:3 528:19



**primarily** 388:6
**primary** 394:2
**prior** 272:8 273:20 300:2
320:1,9,9 323:8 324:4
341:13 342:11 369:2,23
370:11,11 406:7,23
407:5 437:23 458:14
467:15 527:17 528:8
**prisoners** 464:15
**private** 381:10 395:13
**privileged** 398:23,24
403:13
**proactive** 435:18
**probably** 271:14 282:23
289:6 290:4 328:13
340:13,14,14 408:7
417:24 418:15 419:15
448:11 476:6 487:24
497:22 504:8 505:10
**problem** 424:19 507:12
**problematic** 306:22
357:5 365:17 366:6
367:14
**problems** 304:14,16
485:17 491:14
**procedure** 257:13 478:8
478:9,10
**procedures** 323:23
**proceed** 397:10
**proceeded** 520:18
**process** 429:21,23 440:7
441:11 445:21 446:1
473:16 474:21 477:2
493:7 495:1,6,8,21,22
495:24 496:4,5 497:8
519:9
**processes** 430:2,10
**produce** 275:4
**produced** 264:7 284:10
284:17 285:13 286:13
286:14 338:13,17
387:10 441:24 471:14
472:1,2 511:20 542:24
**production** 284:23 342:3
342:4 363:11 472:14
**professional** 478:23

**professor** 298:14,16
371:11 373:16 394:20
402:17,18 404:20
415:24 422:15 507:3
**professors** 410:7 473:10
473:12
**program** 278:10 279:9
284:3,5 297:11 298:7
364:9 381:11,12,23
382:9 389:13,23 413:6
413:7 450:12,12,14,16
450:24 451:3 473:14
492:12,14,16,18,22
493:6,7,9,16 494:24
495:5,16,22 496:1,10
497:5,18 498:2 506:9
506:11,13,14 529:5,7
530:8 535:13
**programs** 404:23 452:24
464:21
**program-seeking** 448:7
**progress** 272:19 315:13
315:20 405:21 406:2,8
406:9
**progressed** 360:6
**Project** 450:1
**promote** 380:11,13
382:23
**promoted** 362:16 429:22
497:15
**promotion** 267:3 297:22
303:5 362:11 382:15
402:23 433:8 497:8
533:21
**Promotions** 466:19
**prompted** 343:15 345:14
**propensity** 398:8
**properly** 305:4,11 320:3
495:24
**protected** 371:19,23
402:10 417:13 438:19
485:11,12
**proud** 451:3
**prove** 461:11,12
**provide** 268:17 284:8
387:17 408:5 441:3

489:6 514:15 517:18
534:23
**provided** 286:20 298:22
330:16 353:16 378:17
389:24 452:9 511:11,13
512:20 526:18
**providers** 488:12
**provides** 534:4,13
**providing** 351:5 534:20
535:1
**provost** 429:8,13 515:23
516:2 527:1
**provosts** 527:4
**psychotherapist** 378:15
**public** 282:17 369:19
413:6 493:5 535:13
**publication** 517:12
**published** 442:20 443:14
443:15 447:2,4,5,16,23
518:16,18,23 525:21
531:12
**Puerto** 415:23
**pull** 289:1
**pulled** 309:8,24
**pulling** 433:18
**punch** 435:2
**purchased** 450:20
451:21
**Purdue** 450:2
**purpose** 491:24
**purposes** 472:22
**pursuant** 257:12
**pursued** 390:18
**push** 436:16
**pushed** 411:12
**pushing** 397:1 400:24
464:7
**put** 305:10 306:16 308:8
310:14,17,19 311:18
312:23 330:11 343:12
343:13,15 346:19
362:23 383:19 392:7
416:11 421:17,23 422:3
422:24 423:11 426:1,4
427:13 428:15 435:6
446:20 457:16,17 458:5

474:8 484:2 488:14
499:14 509:21,23
510:13 516:14 524:17
525:8,9 533:10 542:3,7
542:17 543:4
**puts** 382:19 484:3
**putting** 295:7 305:3
308:21 344:17 426:15
440:12 441:8 470:15
473:9
**p.m** 321:12 544:5

---

## Q

**qualifications** 401:9
498:20
**qualified** 403:2 496:17
**qualitative** 433:19
**quality** 505:13
**quarter** 282:2 288:8,16
288:19,19 360:19 465:6
487:16 507:5
**question** 271:5 273:16
274:5 277:11 278:4
285:5 287:24 291:22,23
294:6,14 301:21 302:4
320:8 324:7,24 325:14
327:3 328:21 335:9
338:22 349:14 350:19
350:20 351:6,7,9
373:18,19 380:24 382:2
384:16,17 388:11
397:12 398:1 404:3
423:19 424:21 425:15
426:12,20,24 444:21
445:10,13,14 453:22,23
467:21 468:14 470:14
471:17 494:16 503:24
504:1 518:6,8 532:5
539:22 542:1,16,16
**questioning** 291:20
542:13,15
**questions** 299:22 302:11
334:22 350:23 376:20
378:13 380:8 382:1
390:6 407:18 425:3
427:17 473:1 493:23



516:14 524:24 538:4,6
541:4
**question-and-answer**
493:22 496:12
**quick** 350:14 380:8
387:17 400:4 418:22
448:19 499:16 503:14
532:1 538:6
**quicker** 273:15
**quickly** 359:3 379:13
398:9 469:2 486:11
490:18 503:22
**Quinetta** 527:21
**quite** 305:9 313:16 338:5
338:8 356:18 409:17
412:4 434:6 450:24
451:23 457:5 461:4
473:22 474:11 483:14
494:18 497:22 518:1
**quote** 279:12 422:5
467:17 468:19
**quotes** 312:23

---

**R**
**race** 266:2 267:14,20
290:13 291:2 293:21
305:14 306:9,13 307:7
307:11 325:4,9,10,18
325:20 327:24 328:1,5
328:9,11 329:5,18
344:14 348:15 351:3,8
354:21 371:14 391:6,17
391:19,21,23 393:4,12
394:7,11 459:8 461:8
462:13,21,23,23 466:1
466:2,18 467:12,18
468:20 469:6,7,15,15
469:20 479:11 485:13
486:6 498:4 523:1
525:20 537:17
**racial** 434:21 435:5
463:2 466:7 537:9
**racially** 329:13 330:22
344:21 345:1 346:14,17
346:18 347:9 349:4,7
349:10

**racism** 328:13 436:17
439:5 466:11,13 467:5
524:19 537:21,22
██████ 308:15 362:14
494:5
**raise** 368:3 387:18
458:22
**raised** 337:2 342:10
388:4 458:24 459:4,6,9
483:7,16 484:9
**raises** 381:16
**raising** 458:20
**Rajul** 272:3 283:15
292:19 293:14 362:15
362:24 461:16
**Ramsay** 443:9
**ran** 457:14 502:22
**random** 342:24
**rarely** 355:17
**rate** 400:14 401:13,16
469:12 534:3,3
**rated** 315:12 409:19,20
509:18
**rationale** 368:9
**reach** 294:10 299:21
389:19 437:17,19
517:12 518:22
**reached** 319:16 332:16
438:6 519:2,3,5 541:1
**reaching** 520:6 530:11
**reactive** 435:19
**read** 299:6 316:23 317:2
317:4 333:24 334:17
348:1 354:18 374:22
388:8 468:13,15 504:1
510:9 517:21 518:7,9
534:12
**reading** 518:1,11,12
520:6 537:6
**reads** 321:10,19
**ready** 362:5 375:17
**read-only** 513:7,13
**real** 398:9 436:17 531:24
**realize** 356:4 479:4
**realized** 289:21 375:2
418:24 468:23 469:2

502:5 507:15
**really** 273:3 277:16
297:17 300:23 310:23
311:8 312:16 328:17
359:3 374:3,14,14
385:20 388:21 389:8
394:17 396:13 399:16
400:4 401:8 418:24
419:1,24 423:16 425:5
437:8 439:15 444:13
448:13,19 451:3,5,17
453:2 456:7,17 457:13
460:4 474:11 475:19,21
476:18,19,20,21 480:20
481:7 482:18 487:7
490:14 504:13 506:3,4
507:17,20 519:6,10
522:5 525:18 529:15
**reappoint** 422:2 495:15
**reason** 261:23 299:3
338:16,18 349:20
358:11 402:10 403:24
417:1,1 442:18,21
471:10 501:18 502:1
510:12 529:5,16,17
**reasons** 397:24 417:3,4
449:23 474:17 484:24
489:23,24 496:21
529:14 539:5,12,24
**recall** 300:8 338:14
361:15 444:5 539:5,7
**receive** 269:19 271:6,10
322:20 356:20 443:4
453:19 513:1
**received** 262:15 270:23
271:3 275:19 280:21
307:23 319:15 323:3,8
330:3,7 335:17 347:14
359:11 363:21 444:9
450:6 487:18 497:10
504:17 505:4 515:19
516:1 536:23
**receives** 277:18
**recess** 386:7 455:8 500:1
512:12 519:16
**recognize** 262:11 263:22

283:14 331:6 333:17
336:10 337:16 352:15
352:20 440:5 520:2
531:8
**recognizing** 358:14
**recommend** 493:15
**recommendation** 270:21
278:20,24 279:15 495:2
**recommendations**
317:23 460:16 534:5,15
**recommended** 279:1
287:6 316:18 317:9
500:15 540:20
**reconvened** 386:9
**record** 260:17 261:8
262:8 296:7,8,9 299:6,7
299:12,13 304:4 306:19
308:10 312:24 313:9
317:2,5,6,8 318:4
326:19,24 331:20,22,24
332:12,13,15 348:2
390:13 398:4 399:1
403:14 425:6 439:18
444:8 453:6 454:22
455:1 465:19,21 467:23
468:15 472:17,24 498:1
512:9,13 518:9 519:11
532:24 543:13 545:11
**recorded** 419:2 516:21
516:22 545:5
**recording** 338:3,4
**records** 379:10,10
488:13 524:9
**recuperate** 487:8
**red** 282:2 435:14,16
**redirect** 385:24
**redlining** 328:18,23
329:2 350:22 351:2
466:12 537:21
**redo** 505:6
**reduced** 545:6
**reference** 295:9 307:12
310:14 318:2 325:11
332:3 466:11 471:3
483:6 486:3 520:24
532:16 536:10 541:7



referenced 329:4 338:3
referencing 431:23 522:6
referred 269:19 335:24
referring 266:15 271:24
  272:2 275:10 278:15
  286:18 291:7,8 293:10
  295:23 296:13 297:5
  359:1 386:21 414:4
  434:10,22
refresh 379:19,20 437:4
refuse 368:7
refused 452:6 454:9
  494:3
regarding 266:11 268:18
  321:5
regards 393:3
register 449:19
regrade 505:6,8
regular 274:10 395:2
  501:1,6 543:24 544:2,3
regularly 267:1 419:4
  523:19
reject 496:15
rejected 486:24
relabel 532:23
relabeled 533:4
relate 282:13,15
related 280:20 539:11
relations 282:17 413:6
  493:5 535:14
relationships 452:13
  463:22,24 464:1 465:15
relative 545:10,10
relatively 473:18
relevance 393:16 397:9
  401:18 403:10,20 432:3
  467:21 468:3,6,12
relevancy 466:5 503:14
relevant 401:23 424:8,13
  426:13,16,19
rely 285:19
remark 532:18
remember 274:20
  281:24 293:17 296:16
  309:5,18,20 310:21
  313:16,21 314:11,21

330:10 334:8 340:1,4
346:17,19 353:7 355:14
373:11 378:5 379:9
384:11 387:24 388:22
389:6 408:9,13,22
409:6,17 420:14,21
421:18 427:19 437:9
455:24 456:14 458:8,20
459:4,9,18,19 460:3
463:1,4,6 480:15
487:16 488:5 489:3
497:4,5 504:8,15
510:20 518:1,1,11,12
519:4 522:11 524:11
527:5 538:19,21
remotely 257:14
removal 409:8
remove 265:8 347:17
  358:18 406:22
removed 348:24 349:5
  410:1 422:19 480:7,10
renew 272:17 309:15
  535:22 536:1
reopen 375:8
repeat 269:12 397:11
repeating 294:15
replacement 377:21,22
replacing 299:22
replica 324:4
report 283:16 474:15
reporter 324:6 430:7
  439:22 512:2 518:8
  534:12 543:15,20,24
  545:4,22
representative 526:22
represents 446:23
Republic 294:1
request 284:3 297:14
  361:4,5,7 422:1 542:2
requested 266:20 296:21
  297:3 518:9
requests 323:24
required 272:20 277:5,7
  277:8,10,21,22 278:1,2
  278:3,5,14 286:22
  287:1,11,18 288:5,9,16

288:20 289:7,9 292:24
293:20 305:20 427:12
427:15 476:20
requirement 277:12,14
  278:18,19,21,21 279:8
  289:12 302:20 306:23
requirements 320:5
  446:18
requires 435:18 475:20
requiring 433:16
reread 316:21
research 267:9,11 338:7
  384:13,14,18,20 392:15
  446:15 447:1 450:19
  536:13
researcher 396:12
resend 532:19
resource 422:11 508:13
  528:2
resources 357:17 450:14
  466:13 487:7 535:3
respect 325:1,6,15,16
  343:21
respond 342:13 408:19
  508:17 523:16 526:20
  533:14 534:5,15,18
responded 300:11,13,22
  301:13 319:17,18
  324:22 332:21 364:11
  437:13 510:17
respondents 511:7
responding 363:19
  502:10 535:1
responds 421:11
response 324:10,11,17
  330:15 353:4 398:19
  399:10,10 436:10
  437:12 505:7
responses 353:8,20
  433:19
responsibilities 359:22
  360:24 536:10
responsibility 357:22
  358:6 507:10
rest 356:8 358:13 406:19
restart 495:6

restate 503:16
restless 533:15
resubmit 305:20
result 491:16 529:2,6
resulted 437:3
resulting 491:9
retaliated 424:1 426:2
retaliates 425:21
retaliating 422:14
  425:11
retaliation 372:7,10
  423:14 426:9,18 427:6
  511:9
retired 377:12 509:2
return 264:20 300:5
  428:11
returned 487:20
returning 260:19 300:8
review 266:21 269:5,21
  272:21 274:23 275:8,10
  278:16,17,17 279:11,15
  279:20 280:10,11
  282:21,22,24,24 283:3
  283:7 284:5 287:5,17
  287:18 288:5 289:8,9
  292:2,7,18 293:8,20
  301:14 303:4,12,18
  306:15,17 309:1 310:12
  310:19 313:13,19 315:9
  316:15 317:9,24 321:6
  321:11 323:13,22
  331:18 346:10 374:17
  440:7,14,14 445:7,20
  445:21 446:1,6 459:13
  459:14 522:9 530:2
  533:6 539:17,19 540:12
  542:8,18 543:2
reviewed 302:19 303:23
  307:3 311:5 447:7
  448:1,3 461:23 509:18
reviewers 283:2 303:11
reviewing 374:1 440:10
  444:17 540:17
reviews 274:15,23
  275:11,20 276:2,5,7,10
  286:20 303:2,3 313:18



313:24 343:9 406:1
433:16 460:12 463:6,7
489:16 540:16
**revoted** 365:7
**rewrite** 408:7,8,11
**rewriting** 408:1
**re-upload** 305:8,9
**Rican** 415:23
**rid** 457:8
**right** 262:16 263:16,19
269:15,16 270:7 274:9
279:18 280:8,12,22
281:18 283:9 285:7
286:15,21 290:1,2,19
293:5,8 296:2,20
297:13 298:24 300:12
301:17,24 303:13,22
305:21 306:4 313:14
315:21 316:15 318:2,15
321:6,16 322:5,24
323:12 324:3 331:13,17
332:19 333:9 334:23
336:1,8,15,19,23 337:4
338:17 339:18,19 341:9
342:14 345:15 347:23
352:19 353:21 354:1
363:15 364:3,4,11,12
364:22 365:11 366:22
367:24 368:9,13,14,15
368:24 369:16 370:4,9
370:22 371:2,5,19
376:24 377:10,16
379:16 383:11 386:8
387:16,23 388:7 389:13
395:12 400:10 401:23
402:12 418:21 419:3
420:1 421:13 424:9
429:20,24 430:9 435:12
436:19 437:5 440:1
449:11 451:11 453:18
455:10 456:21 459:16
470:21 475:11 476:8
479:14 484:14,18
504:24 510:11 512:24
519:15 521:23 528:17
528:18 529:23 533:8

535:8 538:18 543:1
**riots** 524:17
**rise** 376:13
**risk** 424:22
**Robert** 527:21
**Robin** 292:20 373:23,24
375:19,20,21 473:12
474:4 480:7,16,16
519:2
**Robinson** 527:21
**rock** 467:18 468:19
484:18,24
**role** 298:9 307:18 432:14
435:15 458:14
**roles** 484:4,5
**roll** 307:21
**Roman** 380:10
**room** 309:20 366:15
367:6 370:8 405:12
414:18 464:12 498:13
498:14 534:11 541:21
**rose** 298:18
**rotated** 314:21
**route** 495:14
**row** 515:9
**rub** 457:10,11
**rug** 347:18 348:22
**ruin** 407:15
**rule** 293:5 409:16 438:13
494:24
**rules** 257:12 365:8
398:24 409:16,18
467:23,23 494:19,21
**run** 313:20 440:14
527:14
**running** 289:20 449:17
**runs** 527:13
**Rutigliano** 269:15

**S**

**saddened** 521:7,10,17
522:3
**salary** 381:13,14,22
500:20 501:7
**Salma** 289:15 306:16
307:16 308:7 326:14

335:24 336:13 339:4
344:11 355:1 357:19
389:3 417:22 418:7
419:10 420:8,12 421:24
429:1 438:7 489:4
493:15 528:20 538:10
538:16,20
**Salma's** 356:3 358:1
**sat** 269:2 463:10 476:10
505:18
**save** 384:13,18
**saved** 516:6 517:1
**saw** 272:13 276:9 332:19
378:4 383:5 411:10
413:1 421:15,16 422:6
422:8,11,12,14,22
442:3 445:3 458:22
461:17 518:19 530:9
538:13
**saying** 273:1 275:22
276:20 278:4 287:10
290:22 305:16 306:8,14
306:17 307:15 323:5
332:2 346:19 351:10
367:6,8 369:22,22
371:7 374:22 382:12,14
382:16 383:14,17,18
417:14 420:10 436:4,7
438:8 447:5 455:12
460:3 461:18 468:8
475:22 478:18 497:2,14
501:20 506:24 509:15
510:7 523:5 524:18
527:11
**says** 268:8 286:4 292:12
293:6 296:21 311:24
315:5 316:23 317:22
331:3 334:14 341:23
348:19 353:3 359:4
363:8 368:15 379:17
382:13 389:2 440:15
441:15 443:19 444:3
468:9 475:6 498:24
516:6 517:1 521:6
**scale** 405:24
**scan** 488:14

**scared** 425:24 426:1
**Scatchell** 258:5 259:7
264:14,22 265:2 271:12
285:2 291:17,19 299:9
314:15 317:1 322:22
325:21 326:18 327:2
338:21 340:2 350:12
351:1,14 352:2 369:14
378:21 380:16,21
383:20 384:6 385:5,9
385:15,23 386:3,5,12
390:9,11 394:13 397:13
397:17 399:4,12 400:3
401:20 402:15 403:5,7
404:1,7 407:9,23
411:18 414:7,12 415:1
419:9 424:14,18 425:1
425:13 426:11,22 430:5
430:16 431:1,4,7,8
432:19,21 437:8 438:14
439:10,19,24 440:4
441:24 442:3,9,13
443:3 444:15 445:12,18
446:12 453:14,22 454:7
454:13,17,24 455:5,9
465:18,22 467:6,22
469:21 470:2,10,18,20
471:20 473:2 486:5
499:18,24 500:2,9
501:8 503:15 506:7
512:4,6,11,13,17,24
513:3,24 514:2,5 518:7
518:21 519:11,17,20
520:1 521:15 522:13
528:10,15 529:9,24
530:21 531:3,6 532:5,8
532:12,18,23 533:1
535:5 537:7 538:3
540:2 542:21 543:11,18
543:23 544:3
██████ 329:21,22
332:15,22 334:6,10,20
335:8,14 336:22 339:5
339:9 340:21 341:11
342:6 437:13
**schedule** 274:10,10



278:23 284:4 501:22
502:2
**scheduled** 387:15
**schedules** 289:1
**scheduling** 284:9 492:18
**scholars** 525:19,20 526:4
**school** 341:5,6,8 369:10
369:18,19 370:22,24
371:1 394:1,2 414:23
415:4,9 450:17 502:14
522:24 541:6,10
**schools** 381:8 384:9
**science** 522:19
**scope** 403:8
**scores** 272:14,21,23,24
273:3 276:12,14,17,18
276:22,24 280:21 282:1
282:3,13,15 283:1
284:11,12 285:20,20
286:1,2,2 292:13,14,23
293:1,13,16,19 294:17
294:18 433:10,18
462:19 539:3,24
**screen** 390:7
**scroll** 515:8
**scrutinized** 308:13
**scrutiny** 285:22
**SDR** 443:8
**search** 296:22 297:3
298:21 299:22 343:18
343:22 347:9,11 429:24
470:6 473:5,8,10
474:12 479:18 495:10
**searched** 343:22
**searches** 343:1,5
**searching** 300:16
**seat** 397:3
**second** 265:13 268:12
279:20 286:10 287:15
292:5,6 296:6 321:9
324:12,17,22 343:16
345:16 347:8,11 364:17
375:6 378:3 397:5,19
404:2 439:20 446:8
465:19 466:3 470:12
476:14 512:9 518:3,11

521:16,21 525:16 528:9
534:10
**seconds** 499:22
**secret** 471:24 472:20
**section** 514:22
**see** 261:21 263:24 264:3
265:22 266:2,5 275:16
276:5 278:22 279:17
280:14,16 281:2,3,4,6,7
281:10,12,15 282:1,4,7
282:13 284:6,21 285:1
286:8,10 289:3,5
290:16 299:1 302:21,22
303:16,19,19 310:1,24
315:14,15,18,19,20
318:22 321:13,14,19
322:1,2 324:15,20
329:13 331:18 332:2,24
333:1 335:4,7 340:20
340:24 341:13 342:7
343:1,2,16 346:1,8
348:8 349:1 352:12
354:2,5,6 357:5 362:11
362:12,16 368:17
369:21 370:19 371:12
371:13,20,23 372:12
377:18,23 378:2 380:5
383:17 387:12,19,20,20
395:8,22 409:9 419:4
419:20 426:18 430:17
434:15,16 436:12,15
440:15 441:17 442:15
456:19 461:1,17 464:17
466:3 467:10 474:23
475:1,15,18 478:19
480:17 485:16 498:2,3
498:3 502:12 506:16,17
508:20 510:1 513:7,9
513:11,18 514:1 515:10
518:16,20 521:4,20
522:1 526:10 529:16,16
530:23 532:1,7,9,16
**seed** 450:20
**seeing** 377:12 379:5,6
393:24 412:15 436:17
488:5 521:13

**seek** 496:9
**seeking** 453:7,16 495:7
**seen** 356:11,12,13 366:9
368:5 379:1 395:19
399:19,20 419:18
421:11 423:14 425:19
435:20 443:6,12 456:10
456:21 494:7,8 497:22
498:16 523:17 530:3
537:1,4 538:2
**seeped** 476:6 482:17
**segue** 527:9
**seizure** 350:4 476:13
486:12,15 490:9,10
491:20,23,24 492:1
**seizures** 347:13 480:19
490:4,14,15 491:9,13
491:16 492:5
**selected** 373:16,17
389:12,15 496:1 529:5
529:14,17
**selecting** 493:7 495:22
**self-nominated** 493:4,5
**Selma** 389:4
**send** 264:22 364:3,7,8
440:1 471:2 511:24
519:13
**sending** 471:10 490:17
490:18
**senior** 266:24 476:24
**senior-track** 356:5
**sense** 289:7 342:5 498:19
**sent** 262:22 272:12
284:24 305:23 320:23
322:15 323:10 324:2,12
324:21,21 334:21 365:9
369:19 386:9 421:21
477:3 506:22 507:18,19
512:22 516:2 519:17
521:3 531:9 533:3
**sentence** 317:21 321:18
521:17
**separate** 311:19,24 312:2
315:1 339:21 420:10
423:11
**separately** 408:20

**September** 262:15 359:4
**serendipitous** 489:14
**series** 266:4 327:4 388:4
**seriously** 436:8 510:14
**served** 497:19
**service** 267:10 296:23
312:19,20 313:9 359:22
446:15 447:8,13 448:5
534:20 536:5,10
**services** 257:22 377:15
**session** 379:7 398:15
493:22 496:13 516:21
543:15
**set** 274:10,10 276:3
293:4 308:2 353:4
387:9 388:20 545:13
**sets** 262:18
**setting** 325:4 395:24
**seven** 316:23 507:6
**Severe** 261:22
**sexual** 469:17
**Seyi** 402:7,7
**shaking** 382:21 490:22
490:22
**Shame** 507:2
**shape** 391:11 392:18
466:14
**share** 302:11 464:24
475:15
**sharecroppers** 413:10
**shared** 386:15 399:17,18
480:3 515:14,16
**SharePoint** 302:19,23
303:16,21 304:19,20
306:18 307:4,12,14
308:1,6,9 309:2,23
310:9,13 313:5,8 314:1
314:10 316:6 317:19
318:2,17 320:2 325:12
325:15,16 386:16
440:11,23 443:20,20
446:11
**shed** 394:21
**Sheena** 358:8
**Shelby** 527:21
**shelter** 509:11



Shena 443:9
Sheri 257:15,24 397:12
    543:14 545:3
she'd 519:7
shift 486:10
shines 394:9
shock 490:20,21
shocked 490:21
short 311:21 312:13
    319:18 323:20 328:15
    350:17,19 351:11
    377:24 437:11 438:7
    494:9 506:21
shorthand 545:3,22
shortly 282:24 311:10
    344:10 347:12 409:4
    429:14 456:14 458:21
short-term 357:15 487:5
    487:6,18 519:8 530:13
shoulder 491:13
shoulders 347:13 491:11
    491:12,15
show 282:3 284:20
    320:18 339:19 422:4
    469:11 474:20 510:9
    522:7 536:8
showed 324:10 498:1
    504:21 511:3
shown 392:10 452:23
    453:6 497:18
shows 371:17
sick 460:9 478:24 479:1
    518:13
sickness 499:6
side 303:17 308:2,15
    351:20 488:16 491:10
sign 273:10 367:21 368:7
signals 490:17
signature 353:14
significant 391:8
signing 368:9
signs 416:22
similar 381:10 389:23
    460:1 523:21
similarly 266:9 381:8
    382:6

simply 401:7 418:20
    479:10,12
simultaneously 449:17
sincerity 468:8
single 275:24 277:24
    309:1
singled 302:18 307:3
    342:24
sir 505:9,10,11,11
sit 267:17 327:10 372:19
    407:3 422:20
sitting 298:19 309:20
situated 266:10 381:8
    382:6
situation 293:10 302:3
    345:12 355:6 361:18
    444:11 445:5 503:12
    504:5 525:20
situations 273:2 434:3
six 305:10 355:13,16
    383:13 501:2
sixth 446:5,9
size 381:9
skip 302:15
slandering 506:24
slaves 392:14 393:10
    396:23 436:1
slipped 379:2
slowly 490:18
small 392:1 393:23
    412:15 417:11 419:6
    430:14
Smith 370:21 422:8
    526:7
Snelling 329:23
social 376:24 377:5
    378:15
socially 391:23 392:5
society 391:2,5 418:21
    420:3 504:13
socioeconomic 392:20
    483:13
software 302:24 303:1
    450:22
sole 297:12,15
solidarity 524:18

somebody 440:21 445:19
    489:12 498:6
somebody's 444:17
someone's 344:18
somewhat 396:10
son 490:13 518:5 541:10
son's 369:10
soon 301:4 447:4 476:10
    481:9
sooner 271:23 272:6
    273:17
sorry 265:20 269:16
    270:10 271:5 279:23
    287:14 291:18 295:13
    299:19 305:15,17
    308:17 324:6 325:13
    326:23 328:24 336:17
    341:3 352:24,24 353:1
    360:14,19 368:20,21
    378:3,8,24 379:22
    380:19 387:7 397:12
    398:22 426:21 428:21
    430:8 447:20 453:10
    470:7 481:2 501:20
    503:23 510:20 513:22
    518:4,4,6 522:1 523:4
    529:12 534:9,10
sort 261:9,19 282:3
    354:20 427:4 467:1
    471:23 524:1 528:24
    543:7
sought 377:5 449:14
sound 269:15 379:8
sounds 385:5 401:4
    531:20
so-and-so 423:21,24
    516:18,18
space 263:8 347:17
    348:20 356:23 395:3
    396:20 399:19 400:2,21
    412:21 414:18 416:23
    425:17 436:4 440:16
    482:10,13,19 493:18
spaces 328:14,14 400:7
speak 349:7 375:20
    376:4 422:11 466:7

469:17 477:23 509:3
    511:10 523:11,19,20
    543:11
speaking 309:12 325:11
    372:7 373:8 530:15
speaks 374:24
specific 395:12 433:18
    446:18 503:10 504:3
    517:18
specifically 309:19
    325:12 327:24 329:4
    331:15 400:11,14 408:8
    408:13 414:16 434:24
    438:11 480:7 535:13
specified 545:8
speculate 306:9 349:6
    414:13 432:4
speculating 454:3
speculation 414:6,9
    423:21 432:17,18
    439:16 453:21
speculations 461:4
speculative 424:8 453:12
    453:14
speech 357:14 493:8,21
spend 338:9
spending 508:18
spent 338:11 355:1 391:7
    419:21 472:12
split 406:5
spoke 307:24 326:1,2
    373:14 394:14 422:16
    445:3 465:24 466:1
    467:12
spoken 343:8 375:19
    445:4 520:22 521:1
spotlight 523:16
spouse 541:2
spreadsheet 511:12
    513:5 515:20
spring 281:12,18 282:7
    282:19 297:9 487:16
    539:17
SS 545:1
staff 422:23 423:6,7
    442:6 508:17,22 509:2



509:6 514:7 520:5
524:15 527:22 533:19
533:22
**stamp** 512:18 513:18,20
520:12 521:23
**stand** 366:16 367:17
524:18
**standard** 293:4
**standards** 288:11
**standing** 357:14 498:13
**start** 266:8 307:13,14,15
308:24 313:20 368:23
371:20 395:8 402:3
436:17 469:19 535:2
**started** 272:9 273:20,23
282:23 287:7 318:8
355:16 369:3,8,9,15
390:16 406:21 421:1
422:13 450:13 460:5
475:11,23 478:12
502:21 512:23
**starting** 319:23 381:21
387:5 419:13
**starts** 348:7 387:10
423:4
**state** 454:21,24 545:1,4
**stated** 416:14 438:18
503:16
**statement** 368:8,9
434:23 438:21 496:8
510:5,10 524:17 525:8
525:10,11,14 526:17
527:9,11 533:10
**statements** 378:13 407:3
407:6 424:23
**states** 257:1,13 265:23
392:15 483:9 484:2,13
485:2
**stating** 472:19,24
**stats** 312:16
**status** 291:3,6 483:13
**stay** 410:23 412:6 455:15
478:23 485:1 541:21
**stead** 359:23
**Steans** 463:14 465:14
540:7

**steer** 267:2
**stellar** 374:10
**stenographically** 545:5
**step** 367:22 372:4 432:7
432:8 461:19
**Stephani** 523:7
**stepped** 307:17
**stepping** 335:4,11 431:22
497:5
**steps** 482:4 495:17
524:15 525:7
**Steven** 443:24
**stifled** 529:19
**stood** 505:14
**stop** 343:17 351:23
356:10 372:4 381:24
397:5 400:4
**stopped** 377:9,12 379:5,6
**storage** 440:16,19
**stores** 461:18
**stories** 536:4
**stormed** 479:23 505:22
**storming** 477:13
**story** 311:21 312:13
425:7 437:11 536:4
**strategic** 401:10 492:16
492:21 535:1
**street** 414:21
**stress** 453:5 463:9
478:24 487:22
**strict** 293:9 444:13
**strike** 270:9 275:24
313:12 327:16 343:3
348:6 349:21 403:3,12
403:24 453:11 454:5,16
538:24 539:9
**stringent** 270:9 271:22
272:10 273:7,13 275:9
276:4 277:4 278:13
320:5,7
**strive** 400:8
**strong** 398:4 406:5
**structural** 391:15 466:2
508:20 525:23
**structurally** 537:23
**structure** 391:10 397:7

397:14,16 461:9
**structures** 392:18 396:15
396:16 466:14
**struggles** 484:20
**stuck** 369:11 513:15
**student** 381:9 441:8
503:1 504:15,16 506:16
506:22 514:7
**students** 273:3 281:23
282:12,18 357:1 374:22
374:22 375:1 395:17
433:19 446:21 450:17
453:8 461:22 462:20
463:2,18 464:3,8,14,19
465:7,8 469:3,11
502:21,22 504:20
508:18,22 509:3,17
514:12 524:16 533:19
533:23 539:2,4,12,23
**student-run** 502:19
**studied** 391:17
**studies** 415:15 469:11
**study** 391:20
**studying** 393:20
**stuff** 304:11 342:18
487:9 497:17 510:6
**subject** 342:24 343:10
**subjected** 265:24 270:8
271:21 275:8 278:13
285:21 342:22
**subjecting** 307:10
**subjective** 406:23 432:24
433:5,19,23 434:11
**subjectively** 277:3
**subjugate** 394:11
**submission** 314:10 515:9
515:11 538:14
**submissions** 305:7 310:9
335:1
**submit** 305:14 319:14
386:18 427:12,21
474:20,24 475:16
**submitted** 285:24 334:2
334:3 339:4 472:4
505:5 513:19,19,21
**submitting** 301:1 303:23

317:24 318:6,8,18
320:10 475:1
**subparagraph** 266:8
270:7
**subpoena** 378:18
**substantial** 269:11 355:1
489:7
**substantiate** 489:7
**substitute** 361:11
**sub-marked** 266:5
**successor** 429:17
**sue** 422:13
**sued** 526:9
**sufficient** 358:17
**suggest** 500:10,13
**suggested** 269:6 475:13
501:9
**suggestions** 515:3
**suggests** 532:2
**suit** 509:23
**Suite** 258:2,8
**Sumi** 370:24 422:15
526:7
**summer** 297:7,10 450:14
450:16 500:5,21 501:4
**supervisor** 428:22 429:3
435:13
**supplied** 489:10,11
**supply** 489:10
**support** 270:3,5 289:19
289:21 345:6,6 359:9
359:11,14 424:2 440:6
461:2 497:9,16,18
507:10 510:7
**supported** 439:17 496:23
499:15
**supporting** 450:18
524:15
**supposed** 278:9 290:23
311:4 313:2 314:22
347:6 367:22 388:15
411:15 432:8 438:13
440:9,12 441:11 444:6
445:9 446:1,2,6,7 447:9
464:8,9,23 478:15
479:5 488:9 489:12



495:6,9 525:1 534:23
**supposedly** 424:4 536:11
**sure** 263:3,10 267:21
  275:11 290:2 299:1
  310:2 313:12 318:13
  324:9 326:19 345:10
  360:10 367:7,19 369:6
  384:14 385:5,13 386:6
  425:7 437:4 443:1
  460:11 464:2 465:20
  478:9 482:4 499:18
  502:23 512:11 514:12
  516:1 542:10
**surfaced** 429:15
**surprised** 459:24 523:21
**survey** 509:5,20 510:18
  510:19 511:4,13 513:19
  514:15 515:4
**swear** 353:15
**switch** 538:20
**switched** 306:1
**sworn** 261:3 545:5
**Sydney** 257:3,10 259:3
  260:20 261:1 264:15,23
  315:20 385:9 386:1
  390:13,14,15 404:2,8
  407:11 425:1 437:20
  442:14 443:5 453:24
  478:5 543:12 545:4
**syllabus** 312:5,6 446:19
**symptoms** 360:6
**system** 302:20 303:14
  304:6,8,13,13 305:11
  306:24 307:4 308:7,9
  309:2 310:15 311:23
  312:12 347:6 526:1
**systemic** 391:20

**T**

**T** 261:5 390:10 402:23
  408:1,4,10 409:7 433:7
**table** 397:4 505:14
**tailor** 424:15 425:3
**take** 261:15 263:1 285:23
  291:12,14 314:4 323:14
  332:9 334:16 348:1

357:21 358:5 359:2
  360:3,4,23 361:12,24
  362:2 379:13 385:1,7
  385:24 411:7,10 418:10
  420:9 425:9 434:19
  436:8 455:5 483:19
  499:16 510:14 522:8
  530:1 533:6 543:19
**taken** 257:14 261:11
  298:3,16 386:7 398:6
  455:8 500:1 505:17
  512:12 519:16
**takes** 263:7 305:9 463:22
  484:4 521:8,19
**talk** 320:8 343:18,19
  345:15 349:18 352:10
  362:10 364:21 366:1,2
  366:3 373:1 408:19
  418:22 420:11 448:4
  457:13 458:16 460:3
  462:23 464:17 466:16
  466:18,21 478:7 483:21
  489:21 504:18,19
  516:15 519:7,7 530:11
**talked** 290:10 292:11,17
  292:22 293:18 313:10
  344:11 354:7 359:16,19
  359:21 394:19 405:15
  411:1 425:23 435:8
  458:12,23 459:20
  463:10 475:10 493:21
  506:2 511:8 523:14
  533:20
**talking** 272:10 276:11,13
  292:5,15,16 295:1,15
  309:10 310:23 313:8,13
  328:23 330:8 355:2
  356:11 366:18 386:16
  390:16 392:4 403:18
  421:2 428:16 448:18
  449:19 458:2,19,20
  459:23 461:15 504:13
  505:16 511:18 516:12
  522:4 525:15
**talks** 533:23 534:2
**tallied** 365:4

**tally** 365:7
**tandem** 384:22
**tangible** 461:11
**taped** 516:21
**taper** 469:19
**task** 408:7
**tasks** 465:4
**Tatum** 531:19
**taught** 281:18 282:20
  289:2,6 301:9 312:1
  374:6 462:2,4,9,11
  467:3,15 469:5 507:13
**tax** 264:20
**taxes** 264:11,15
**teach** 272:20 276:23,24
  277:1,10,12,14,20
  278:1,3,3,5,8,9,14
  279:3,15 286:22 287:1
  287:12,18 288:5,13,16
  288:20 289:10 292:24
  359:20 360:12 361:16
  374:7,8 385:12 390:24
  500:4 507:7
**teacher** 461:23
**teaches** 530:7
**teaching** 267:10 268:18
  269:4 271:3 272:20
  276:12,19,19 277:5,7,8
  277:16,16,16,21 278:23
  279:13 280:10,21 284:6
  284:7 286:1 315:8,14
  316:18 317:10 355:22
  360:23 361:1 402:22
  446:14,16,24 464:12
  467:7,11 469:4,19
  501:3,22 502:2 504:9
  536:12,12
**team** 290:4 293:9 489:23
  506:23
**Teboul** 285:9
**tech** 351:16
**technology** 391:2,5
  450:21 451:21
**tell** 266:14 270:1 271:19
  275:1 285:6,7 291:13
  307:19 309:16 315:15

343:4 345:17 346:13
  354:13,15 359:5 384:10
  390:18 409:22 413:13
  416:16 424:9 428:2
  435:4 442:15 532:3
  539:22 540:7
**telling** 332:22 363:21
  365:10 421:18,21 457:1
  481:5 530:9
**tells** 440:11
**temporary** 486:22
**ten** 400:18 420:2 448:3
  462:12 487:15 499:19
  499:20 507:6,7 511:1,3
  511:5,7
**tendency** 435:10
**tension** 395:19
**tenurability** 497:17
**tenurable** 497:15
**tenure** 266:12 267:3
  270:12,15,23,24 271:6
  271:10,23 272:5,7,19
  273:11,17 274:9 279:19
  296:24 297:21 298:7,7
  301:1,4,14,16,20,22
  303:4,4,11 311:3
  315:13,21 356:6,15,16
  356:17,19 362:16
  363:21 364:22 365:1
  368:22 369:2 370:8,13
  396:21 402:20,20,23
  403:2 405:4,6,7,18,21
  406:8,9,10,24 409:15
  410:10 411:14,15 416:4
  416:7 433:8 438:24
  439:2 440:21 444:17,17
  445:20 452:21 453:21
  454:12 456:4,4 467:12
  467:15 481:8,10 497:8
  509:9 536:21,23 538:14
  538:17
**tenured** 367:10 396:21
  406:20 408:21 409:23
  413:4 536:23
**tenure-line** 292:21
  406:20 408:5



tenure-track 355:7
402:18 404:12 410:14
433:1 439:14 536:17
Teresa 267:7,12,19,23
412:23,24 413:4 458:15
506:12
term 365:12 366:10
terms 267:9,10,11 269:3
277:19 281:2 301:7
309:13 310:16 381:13
408:21 447:12 460:14
461:7 467:18 468:20
482:14 505:13
Terrific 262:3 265:12
Terry 370:21 422:8
526:7
testified 261:3 273:19
313:24 314:16 323:7
378:19 383:4 397:19
401:12 414:6,8 455:11
465:23 481:20 486:12
486:15 490:3 494:12
500:3 528:19 539:3
testify 262:1 444:23
545:5
testifying 326:20 333:9
403:20
testimony 277:23 305:12
326:6 327:4 329:15
372:21 398:13 407:13
407:18 432:17 453:11
500:7 539:6 540:3
545:8
text 340:9,10
thank 260:18 261:7
262:3,21 263:4 264:6
283:9 296:20 300:11
301:24 302:12 326:22
333:9 370:15 371:8
393:16 466:5 503:14
517:10 530:23 541:18
542:20 543:8,17
thanked 359:6,8
thanks 355:5 386:4
theories 401:3
theorist 461:8

theory 391:6,18,19 393:4
393:12 394:7 401:2
537:18
Theraflu 261:21,22
541:21,24
therapist 377:15,18,24
378:4,7
therapists 377:23
therapy 377:2 487:9
490:21 491:17,17
They'd 447:2
thing 293:4 302:2 324:3
359:16 366:21 367:12
402:11 404:2 408:17
419:5 420:11 422:14,18
432:6 433:17 444:3
447:1 482:22
things 307:18 310:1,15
310:16 344:1,2 345:5
354:23 355:5,23 357:11
367:8 373:7 375:21
385:24 388:24 394:1,19
394:19 395:17,23
396:24 398:8 410:3
418:9 419:3 420:2
421:16 422:18,21 433:6
436:13,15,17 440:11,12
441:10 450:23 460:9,17
464:17,18 465:3,4,12
476:1 477:14 478:21
479:22,24 484:14 485:4
485:14 490:24 496:9
497:24 499:1,7 507:1
509:9,15 521:19
think 266:20 267:22
268:1,2,3 269:1,11
270:23 271:13 278:22
279:19,21 281:22,22,23
286:3,5,7 290:12
292:11 294:6 295:10
296:1 298:2 300:6
303:16,19 304:17 309:6
309:6,7,19,22 310:3
311:14 312:10 314:12
318:21 319:17 323:10
323:24 324:13 326:9,16

329:19,24 330:15,20
344:15,20 347:12,18
348:3 350:15,21,23
351:2,4 352:22 355:13
356:14 360:10,20,21
361:6 362:20,21 363:2
366:8 367:14 369:6,14
371:20 372:6,14,23,24
374:9,19 376:11,11
378:9 385:2 388:1,14
388:14 389:7,8,9,22,23
396:11 403:23 404:1
407:11 408:7,23 409:10
409:12,13 411:13 412:2
413:20,20 415:7,23
418:6 419:4,17 421:1
426:15,23 430:13 432:9
434:16 441:6 443:18,22
443:23 446:23 447:23
448:2,13 451:19 452:15
452:16,18 453:6 455:14
455:22 456:7 457:22
458:13 459:11 460:5
470:14,24 471:8,11,15
471:18,22 472:17,21
473:10,18 476:1,5,19
476:23 477:6 479:6
480:9 481:7,12 482:11
482:12 483:5 484:1
485:22 487:15 488:4
493:24 494:4,5 496:7
496:20 497:11,12 502:6
504:14,24 505:8 506:9
506:10,10,10,11,12,14
511:5 512:2,22 514:11
515:21 516:22 519:9
520:10 522:19 523:20
524:8 525:5 527:3
530:7 531:20 540:15
thinking 381:5 481:23
485:22
third 279:20 286:10
345:18,24 354:10
432:22
Thomas 531:19
thought 267:15,22,23

279:23 289:18 290:22
310:17 313:23 314:17
334:9 344:16 346:18
365:17 367:14 372:24
374:10 393:23 418:7
469:9 471:1 477:11
480:13 481:9 497:24
509:10
thread 520:11 522:14,15
523:12,23
threatening 339:18,24
340:5,10
three 275:2,3 286:8
305:10 309:14 370:18
374:3 376:20 377:22
380:11 382:13,23 383:3
383:8,9,13,15,16,18
384:3 391:11 412:10
423:7 490:13 494:9
499:2,3,3,4 508:5,19
512:15
three-year 309:13
throw 348:22 472:13
tied 426:16
tightest 490:20
tightly 490:19
time 267:16,23 269:24
272:10,15 273:9,11,21
273:24 283:23 286:19
287:1 289:18 290:14,15
290:16,21 291:13
296:17 298:9 302:5,7
302:12 304:10 305:2,10
309:7,9 311:1,12 312:9
313:17 314:9 318:15,18
319:14 321:15 328:24
332:24 337:10 338:5,8
338:11 339:24 344:18
345:10,17,18,24 346:5
346:12,21 347:7 349:11
350:4 351:15 353:17
355:2,12,15,24 356:18
359:7 363:5 368:3
370:10 371:24 376:23
377:9,18,24 379:1
381:7,22 382:16 385:14



390:6 391:8 395:18
399:21 402:2 408:17
411:7 412:4,6,16 419:7
419:8,12,22,23 422:1
423:15 424:15,16 427:9
428:17 430:14 432:10
434:20 436:19 438:5,24
446:2,7 448:5 449:16
451:20 455:24 456:12
457:4 458:12 461:4,15
461:24 462:8 463:23
467:8,16 468:17 469:20
472:8 480:21 483:8
487:4,8,11 488:3
495:19,21 497:4,19,22
499:5,12 501:13,17,19
502:2,7,10,22 503:6,7
506:13 507:9 513:18,20
526:20 537:5 539:20
540:14
**timeframe** 288:14 297:4
456:14
**timely** 306:18 386:17
502:11
**times** 315:1 328:15 362:1
377:19 384:4 395:5
420:22 491:12 492:8
503:5 540:23 545:8
**Timothy** 285:9
**title** 298:17 312:4,7
452:18 453:20 454:11
488:18 504:11
**titles** 439:3
**Titrate** 492:11
**today** 260:19,23 262:1
267:17 268:14 372:19
378:20 386:16 426:17
539:3 540:23 541:3,13
**told** 266:23 269:4,12,24
270:1,2 288:17 290:4
290:14 305:24 306:3,3
308:2,3,4 312:14
313:15 331:9 340:8
341:18 346:16 360:2,5
360:7,13,13 361:8,9,9
376:2 403:21 405:9,14

406:5,7,14,15,15 411:2
411:8,22,24 412:6,12
413:14,15,18 416:8
417:17 421:21 423:10
435:1 438:10 452:19
453:3 455:11 456:15
470:14 472:7 476:4
479:6 499:10 501:18
506:9,10,15 536:2,5
538:15 541:10
**tongue** 491:1,2,2,6
**tonight** 385:13
**Tony** 451:22
**top** 293:17 296:1 308:11
326:17 340:20 347:18
372:11 374:3 376:13
384:11 510:21 513:10
522:2
**topic** 445:8 462:15
504:10 505:12 541:16
**topics** 398:18
**totaled** 384:5
**totally** 426:10
**touch** 417:19 419:19,22
**touched** 437:2 486:9
**tough** 359:7 456:2
**tours** 436:19 524:23
534:21
**tower** 348:23
**town** 524:1,5,6 525:6
526:18 533:12
**to-do** 402:21 405:18
**track** 298:7 396:21 439:2
439:13 469:4 476:24
**tracking** 450:22
**trail** 299:15
**train** 359:17 479:2,3,4
**training** 312:18 492:21
493:10 496:22 526:5
**trajectory** 469:4
**Tran** 305:1,3,13,17,19
307:17 325:2
**transcribed** 517:8
**transcript** 542:6 543:21
545:7,8
**transcription** 338:5

**transcript-like** 358:4
**transition** 493:12
**transitions** 483:9
**transparency** 418:5
**transpired** 481:2
**treat** 261:12 433:22
**treated** 279:7 288:10
290:17,24 291:1,4
319:2,5,6 323:17
343:10 345:8 376:24
377:1,7 378:16 388:7
392:12 411:3 423:1
436:3 460:15 509:17
**treating** 308:18 314:24
377:10
**treatment** 289:22 319:24
332:23 377:5 378:19
**trickles** 466:13,14
**tried** 289:16 371:11
372:4 374:15 394:20
400:8 421:18 423:11
435:20,22 436:23
450:23 469:8 477:10
478:4,5 501:24 502:4,6
**triggered** 475:23 476:11
518:13
**triggering** 479:9 480:3
480:13
**triggers** 486:19
**trope** 481:16
**tropes** 477:14
**trouble** 347:4 521:21
**true** 273:22 304:1 322:6
353:16 379:11 442:19
534:1 545:7
**truly** 396:19
**trust** 379:10 505:12
**trusted** 347:5
**trustees** 526:23
**truth** 436:22 485:9
511:10 538:1 545:5
**truthfully** 421:10 461:1
**try** 307:19 327:12 350:16
373:18 377:20 378:2
401:1 408:19 425:2
436:7 452:22

**trying** 276:1 280:14
290:21 294:9 314:2
328:22 344:17 352:16
355:8 356:22 363:14
373:21 375:2,8 395:9
395:15 403:16 412:11
412:18 424:14 430:1,10
436:3,6,20,24 443:1
449:5,22 456:15,19
457:7 472:12 473:24
475:3 477:6 478:14,16
478:23,23 479:15
484:14 487:23 493:14
500:12 507:18 508:15
508:19 523:15
**Tuesday** 257:15
**tuition** 277:19 381:10
**Turkey** 373:1,2,4
**turn** 263:5,18 265:7,17
265:21 280:1 283:10
299:5 317:12 340:16
379:4,12,22 380:7
386:24 507:4,11
**turned** 366:12 367:2
372:6 476:11
**turning** 367:3
**turns** 311:22 481:6
**twice** 309:3 313:24 315:2
343:6
**two** 266:19 280:11,13
282:6 300:16 311:24
313:17,24 314:2 315:1
337:2,8,9 339:12
341:12 350:12 355:16
355:17 362:9 365:15
387:15,21 388:12,19
389:22 409:14 410:21
410:24 411:14 412:10
423:8 438:10,19,21
446:3,4,5,10 473:9,19
488:5 490:13 499:4,21
508:19 516:5 518:10
520:18 530:20
**two-and-a-half-hour**
337:7
**two-hour** 337:6



**two-second** 385:3
**two-thousand** 314:12
330:11
**type** 293:10 298:20
307:23 358:16 367:11
393:13 414:19 417:12
427:11 460:15 465:17
490:10
**types** 289:20 349:8 372:8
375:4 418:9 427:17
460:17 461:9,10 469:1
499:7 507:21 509:19
510:12
**typically** 309:13

**U**

**UBTP** 365:9 368:8
**ultimately** 487:17
**um-hum** 283:8 299:20
304:7 316:16 322:10,17
341:1 352:9 363:16
434:12 482:23
**unaccounted** 499:13
**unanswered** 526:23
**unclarity** 441:10
**uncomfortable** 454:20
468:10,24
**uncordial** 477:5
**undergraduate** 390:22
466:19
**understand** 260:22 276:2
278:4 294:10 295:3
305:16 307:9 314:2
335:21 354:19 374:23
383:16 409:20 412:11
443:2 449:22 457:5
476:9 485:16
**understandable** 302:8
**understanding** 287:21
369:20 383:2 391:9,9
399:18 412:17 449:21
484:5 488:1 513:13
526:17
**Understood** 376:19
512:21
**unexplainable** 417:3

**unfair** 332:23
**unfairly** 313:24 317:19
433:22 509:17
**unfortunately** 374:4
392:13 400:9 416:2
423:5 425:24 484:15
505:1,3
**United** 257:1,13 392:14
483:9 484:2,13 485:2
**universities** 382:7 398:6
**university** 257:6 270:18
270:24 272:9,13 274:16
274:17 277:18 298:6,17
301:9,10 349:13 355:9
355:21 356:7 360:1
370:23 376:12 381:16
382:10 394:23 398:1,5
398:10 401:10 402:21
404:18 406:19 409:3
410:24 411:13 412:10
412:21 413:11,16,23
414:19,20 415:7,8,10
416:1 419:13 421:11,19
422:12,13,16 423:6,10
423:14 425:20 426:3
429:9 435:9,20 436:2
436:21 437:12,17 438:5
438:13 439:15 446:16
447:13,14 450:2 451:13
451:23 453:7 462:12
464:1,6 473:18,21
479:10 484:11,15 485:6
485:15 487:24 488:2,19
489:2,5,13 496:23
497:20 499:13 502:15
506:23 507:1,22 508:16
508:20 509:3,23 510:4
510:8,15 514:24 518:19
522:21 524:14,17,22
525:9,9,11,22 526:5,9
526:19,19 528:3,5,7
533:14,17 534:5,15
535:21,23 536:16,22,24
**University's** 524:20,21
533:18 534:1
**University-provided**

501:5
**unnecessary** 318:3 468:7
469:10 476:1 479:9
**unprepared** 308:5
469:13
**unqualified** 417:4
**unquote** 279:12 422:5
467:18 468:19
**unsatisfactory** 405:23
409:12,21 410:2
**unseasoned** 311:8
**unsettling** 344:20
**unusual** 312:16
**upbringing** 483:6
**upcoming** 284:9 387:18
**update** 444:10
**updated** 312:19 442:17
443:11,16,22 444:6
**upload** 304:11 440:22
446:10
**uploaded** 311:23 312:3,4
312:8 321:11
**uploading** 303:2 318:10
**upset** 375:16,24 376:2
465:7,8 474:22 475:21
504:16,16 539:4
**uptake** 449:2
**urinating** 491:4
**urination** 491:7
**use** 302:19 303:1,15
307:3 309:2 314:1
317:19 331:16 375:4
392:8 394:10 419:23
428:7 432:23 440:10
443:20,21 471:4 516:13
541:13
**useful** 451:1
**users** 304:15,17
**uses** 427:8
**usurp** 430:1,10
**US-born** 291:8 295:8
355:10 357:3 371:15
402:4 438:22 482:15,21
**utilize** 463:16
**Uysal** 326:15 362:17,18
369:3 371:10 451:24

473:11,17 494:6

**V**

**vaccinated** 449:5,20,24
**vaccination** 449:2,3,21
**vague** 423:24 424:2
529:3
██████ 508:14 511:14
523:1,14
**value** 400:22 436:23
**values** 395:14
**venture** 367:1
**verbal** 361:4,5,6 392:11
**verbally** 434:21 503:9
**verifying** 353:14
**version** 268:6
**versus** 273:2 276:20,23
395:1
**vestibular** 491:17
**video** 440:23
**videoconference** 257:14
**Vietnamese** 415:23
**view** 372:16 430:1,10
**Vincent** 535:9
**Vincentian** 395:14
436:23
**Vinny** 535:11
**visual** 392:1,10
**voice** 464:11
**voices** 395:9 397:2 400:6
425:21,22 482:3,5
526:9
**voicing** 408:14
**Voight** 348:8,13 349:3
**vote** 272:16 365:20 366:1
366:1,2 367:2 368:22
369:2,22,23,24 370:12
375:17,18 376:9 406:2
464:12 474:2 494:10
495:2,3 496:13,15
538:10,12
**voted** 365:19,20,21 366:3
366:5,14,23 367:2
370:3,10 406:11 457:2
498:19
**votes** 365:4,15,16,18,23


MAGNA
LEGAL SERVICES

366:8 495:4 497:14
**voting** 367:3 370:8
 375:23
**vs** 257:5
**vulnerable** 509:7

**W**

**Wacker** 258:2,8
**wages** 380:11 382:22
**wait** 320:7 368:13 375:17
 421:22 427:14 430:5
 445:10,13,16 448:19
 468:11 470:7 482:22
 500:13 506:16 540:15
**waited** 476:13
**waiting** 445:9 533:13
**waived** 468:4
**wake** 449:4 524:16
 526:10
**walked** 476:8
**walking** 459:23
**want** 263:1 265:7 290:1
 299:10 307:1 308:19
 317:2 320:22 326:18
 332:9 334:16 347:3
 348:1 354:18 360:3
 361:24 362:3 363:23
 364:1 366:11 371:21
 377:11 382:2 385:2,7
 385:13,21,22 425:6,15
 437:4 449:15 453:4
 455:15 456:20 457:1,8
 457:9,11 462:5 467:17
 468:18 472:2,9 473:21
 474:23 475:1,11,17
 480:11,20 482:11
 484:24 499:19 505:8
 509:23 512:18 514:19
 523:17 528:13
**wanted** 300:23 311:19
 327:2 364:8 374:3,14
 387:16 413:17,19,22
 414:16 416:22 446:20
 453:20 454:11 464:2
 477:8 480:11 481:15
 493:13,18 498:3 504:18

514:12,17,18,20 519:10
 524:19 527:7 533:15
**wanting** 300:24
**washed** 452:1
**wasn't** 271:6 274:5
 278:19 288:8 289:21
 290:15,19 297:18
 298:15 303:17 311:1,20
 314:19,24 333:6,8
 345:10 351:4,6 355:20
 355:24 356:16,19
 357:20 365:13,23
 373:15 374:11 376:16
 381:19 404:4 414:15
 428:16 459:6 473:22
 474:6 475:22 476:23
 478:20 479:5,24 480:1
 484:9 487:2,7 491:3
 498:18 499:6 502:5
 507:13,14 510:1 525:16
 529:5,14,17 536:3,9
**way** 268:4 289:10 293:21
 297:10 308:18,19,21
 311:5 319:18 350:8
 360:15 370:7 376:3
 379:5 381:7 394:11
 407:12,21 410:11
 418:20 425:3 427:19,21
 461:11 468:10 469:16
 472:16 479:3,5,7 501:5
 508:21 514:20 515:8
 522:2 540:6 541:9
**ways** 266:2 342:23
 371:18 394:9 396:11
 426:4,6 427:1 481:23
 508:16 523:15 535:1,4
**wear** 387:5
**website** 427:10,23
 505:22
**Wednesday** 336:22
**week** 265:12 300:4
 341:13
**weeks** 487:15 507:6,7
 508:5
**weird** 441:7
**welcome** 436:5

**welcoming** 395:3 412:21
**well-known** 411:6
**went** 272:8 273:19 274:9
 274:13 279:18 287:14
 290:6 297:8 298:4
 304:19 312:11,18 336:2
 342:18 343:14 345:20
 346:1,8 366:19 367:18
 377:2,20 390:17 393:20
 402:19 405:6,14,24
 406:9 411:14 414:20
 415:6 416:7 445:7
 456:17 458:9 459:15
 462:18 467:11 474:20
 480:14 492:4 495:18,23
 497:11 504:20,20
 505:18 507:16 508:3
 525:3,4 526:23 534:10
 538:21 539:17 541:23
 541:24
**weren't** 289:7 293:19
 344:2 351:16 411:11
 469:3 472:18 498:20
 502:4,10 511:9
**Wermuth** 258:11 259:6
 259:8 260:17 261:6
 262:10 263:9,21 264:9
 264:19 265:5 271:17
 280:4 283:13 285:4,17
 291:18,22 292:1 296:7
 296:9,10 299:13,14
 314:18 315:7 316:1,13
 317:5,7,15 320:13,16
 320:24 321:23 322:14
 323:1 324:9,19 326:4
 326:23 327:6,8,14
 331:5,20,23 332:8,12
 332:14 333:7 334:15
 336:9 337:15 339:3
 340:7,19 342:1 347:24
 350:14,18 351:6,21
 352:5,6 353:6 358:23
 363:10 369:17 370:1
 376:19,22 378:7,12
 379:3,18 381:3 384:2,8
 385:1,7,19 386:4,6,8,14

387:3 390:5 393:15
 397:8 398:12,21 401:18
 403:3,6,15 407:2
 411:17 414:5,8 418:18
 423:17 424:17,19 426:7
 430:23 431:2,6,13
 432:3,11,16 437:6
 439:8,11 441:20 442:1
 442:7,11,22 444:7,20
 445:23 453:10,17 454:3
 454:10,15,21 455:3,7
 465:20 466:4 467:20
 470:7,12,19,22 472:11
 483:2 499:16,20 500:6
 500:23 503:13,19
 512:14,21 513:22 514:1
 519:15 521:11 529:3
 530:20,23 531:24 532:7
 532:9,15 534:8 537:12
 537:15 538:5,9 540:10
 542:14,20 543:8,14,17
 543:22 544:2
**West** 258:2
**West-Shield** 422:24
**we'll** 285:15 360:14
 420:11 434:19
**we're** 328:23 375:17
 392:4 395:24 407:15
 429:20 440:9 474:24
**we've** 296:14 350:21
 351:15 395:6 402:5
 416:11 423:20 435:8,19
 441:21 482:13 504:10
**whatnot** 311:9 406:12
**WHEREOF** 545:13
**white** 266:20 271:9
 357:13 433:14 504:16
 509:18 520:10 535:16
 535:16 536:20
**whoa** 421:22
**wholeheartedly** 389:6
**wide** 446:22
**wide-ranging** 439:16
**wife** 359:18
**Willard** 285:8
**willing** 395:4,5 449:23



497:1
**Willona** 355:6 410:13
**wind** 525:20
**window** 348:21
**winter** 281:3,9 341:4,5,7
 360:19,20,21,22 500:4
 500:20 501:3
**witness** 257:12 259:3
 260:24 261:2 263:7
 264:17,24 265:4 271:13
 280:3 315:5 317:3
 320:22 322:13,23
 324:11 325:23 326:22
 327:1 331:3 333:5
 334:13 336:8 337:14
 339:1 340:4,18 341:22
 347:23 350:16 353:3
 358:22 369:21 376:21
 378:10,24 379:16
 380:19,24 383:22 384:7
 385:11 386:2,13 387:2
 393:17 397:11,15
 398:14 399:2,9,14
 407:8,22 414:10,13
 418:19 426:20 430:12
 431:12 432:4,12 437:10
 440:3 442:2 444:9
 445:2,16,24 454:19
 466:6 468:22 470:1
 483:4 500:8,24 503:23
 504:6 512:8 513:2
 514:4 518:10 519:19
 521:13 522:11 528:13
 529:4,23 531:1,4
 532:21 534:9,17 537:4
 537:14,16 540:4 541:2
 542:12,19 545:8,13
**woke** 518:18
**woman** 393:9 394:21
 405:2 415:17,18 419:16
 419:16
**women** 357:7 389:12
 402:12 414:16 433:1
 435:24 477:15 481:17
**wondering** 385:12
 498:14

**word** 294:7 435:2 492:9
**words** 331:16 455:15
 537:11,18
**work** 266:1 269:6 278:9
 298:20 300:4,8 304:9
 305:11 306:12 307:6,10
 310:9 312:20,21 325:4
 325:9,13,19 326:7
 329:12,18 330:22,23
 331:16 342:22 358:18
 414:19 447:3,3 448:12
 448:14 450:24 451:4
 452:5,20 463:21 487:4
 487:12,14,20 488:14
 492:20 493:18 495:23
 500:20 505:13 535:17
 541:23,24 542:9
**worked** 451:4 463:19
 465:14
**worker** 376:24 377:6
 378:15
**workers** 441:8
**working** 265:24 304:6
 342:21 353:7,20 451:17
 463:14 464:14 508:13
**works** 401:2 451:22
 489:1
**work-related** 521:2
**world** 424:7 518:20
 526:4
**worse** 360:6
**worst** 460:24 461:22
 490:10
**worth** 305:10 496:22
**worthy** 417:5
**wouldn't** 288:14 303:17
 349:10 369:4 373:2
 418:23
**wrap** 352:3
**write** 266:9 297:2 311:19
 329:10 387:16 425:15
 447:11 464:16 475:14
 475:17 489:4 517:15
**writer** 334:22
**write-up** 341:17
**writing** 545:6

**written** 401:2
**wrong** 265:20 305:1
 308:3 310:4 368:21
 479:2,3,4 489:10
 490:17 501:20 505:9
 526:1 532:14
**wrote** 335:8 426:12
 431:17 480:21 517:22
 517:24
**www.MagnaLS.com**
 257:23
**W-2** 263:23 264:13,20,23
**W-2's** 263:24 264:6

---

**X**

**X** 261:5 390:10
**XX** 441:17 444:4

---

**Y**

**yeah** 287:9 301:12 310:7
 326:12,12,12 339:1,2
 377:7 399:13 419:14
 437:10 441:13 451:3
 456:6 457:7 525:9
**year** 262:19 267:7 268:9
 268:11,15 272:8 273:12
 273:20,24 274:6 284:9
 284:19 285:14 287:11
 288:9,9,15,18 298:18
 301:10 313:19 320:4
 321:8 330:9 342:11
 369:2,11,23 370:11
 382:10 383:5,15,18,24
 384:1 389:4 406:13
 410:20 411:14 415:5
 445:6 446:5,8,9,9
 457:19 463:13 473:19
 473:21 489:13,15
 493:10 495:18 496:2
 501:2 524:7 525:3
 527:15,16 535:20,21
 538:21 540:18
**years** 280:11,14 286:4
 287:17,24 288:1,4
 305:10 306:24 309:5,14
 314:19,20 320:1,8,9

355:22 380:12 382:14
 382:23 383:3,8,10,13
 383:13,15,16,18 393:22
 395:19 406:7,18 410:24
 411:15 412:10,15
 417:24 420:2 423:10
 446:3,5,10 456:2 484:7
 485:5 499:3,3,4 504:11
 506:6 508:19 510:5
**year's** 496:22
**yell** 396:15 397:13,15
 475:11
**yelling** 454:20 475:24
**yesterday** 264:11
**Yeuseung** 292:19 299:23
 299:23
**young** 394:5

---

**Z**

**zero** 507:12
**Zoom** 257:14 517:8

---

**$**

**$115,000** 448:21,24
**$150,000** 380:12,15
 382:3,10,15,24 383:3,5
 383:14,15 448:16,20,23
**$163,000** 450:10
**$40,000** 449:20 450:2
**$450,000** 382:13,15,18

---

**0**

**0425** 315:6
**084-002856** 545:22

---

**1**

**1** 265:7 275:14 280:7
 286:16 292:2,4,7,10
 302:1,9,14 325:2
 342:16 350:10 364:15
 364:16 368:16 538:23
**1st** 387:11,22
**1-10-2019** 379:17
**1-28** 521:4
**1:00** 324:14
**1:15** 386:5



**1:20-CV-7760** 257:5
**10** 358:2 379:7 393:22
  541:20
**10th** 322:2 323:3 336:22
**10:00** 257:17
**100** 304:1 365:2 366:5
**104** 259:21 341:20,21
**11** 259:23 379:12,15
  447:24
**11th** 472:5
**11:59** 321:12
**110** 466:8
**12** 353:24
**121** 258:2 259:23 363:7,9
**123** 258:8
**125** 386:24 387:1,8
**13** 263:15 370:17 540:14
**14** 354:8 418:1 504:8
**145** 259:10 262:5,8,9
**146** 259:15 320:14,15
  322:23
**147** 259:24 386:9,11,15
  386:22 439:21,22
**148** 260:1 440:1,2 512:1
  512:2,3
**149** 260:2 512:4,5
**15** 281:3 286:5 314:14
  361:23 362:7 393:22
  484:7 534:4,14 540:14
**150** 260:3 519:18,21,23
**151** 260:3 522:8,10
**152** 260:4 529:21,22
**154** 260:5 530:19,20
  531:2,3,5,23 532:2
**155** 260:6 519:18 535:7
  537:2,3
**156** 260:5 532:12,19,20
  533:2,3
**16** 423:10
**163** 450:9
**17** 314:7,14
**18** 342:17 380:4
**18th** 299:19
**18(b)** 352:8
**18(c)** 342:19
**18(d)** 350:11

**1800** 258:8
**19** 369:9
**19th** 257:16 268:14
  299:19

---
**2**
---

**2** 259:22 353:1,2 361:22
  379:23
**2nd** 371:10 473:8
**2.0** 466:9
**20** 484:7 534:4,14
**20th** 340:23
**20-cv-7760** 260:21
**2008** 393:21
**2012** 286:4 402:2
**2013** 269:21 418:1 504:8
**2014** 267:16 269:22,23
  281:2,8 286:5 311:24
  312:1
**2014-ish** 456:6
**2014-2015** 281:12 282:7
**2015** 279:24 280:11
  281:8,18 282:19,21
  283:2 309:6,17 311:13
  312:2 313:7,13,16,22
  314:7,17 315:9 316:3
**2016** 321:5
**2017** 263:23 264:1,4
  269:1 278:15 279:14,18
  279:21,24 280:12 283:7
  287:5,17,18 288:5,24
  289:2 304:23 309:6
  313:16,22 314:17 316:7
  316:14 317:16 321:5,12
  322:2 323:3 330:11
  343:7,8 346:9 348:6
  349:24 360:9 379:7
  386:18 421:2 457:22,23
  491:22 539:17 540:12
  540:13,15
**2017-2018** 287:11
**2018** 274:18 284:11,15
  284:18 297:6 299:19
  300:9 304:23 309:7
  314:13,13 327:18
  330:11 336:14,22

340:24 355:12 358:2
  359:4 360:9,10,20,21
  360:22 371:10 373:6
  420:16,24 429:11,12
  430:23 502:3
**2018-2019** 285:13
**2019** 262:15 263:15
  264:1 284:11,15,18
  342:7 369:3,4,10,13,15
  370:2 387:12,22 416:5
  420:24 502:3
**2019-2020** 262:19
**2020** 264:3,5,5 368:11,12
  368:13,17,21 369:16,18
  370:7
**2021** 264:10,13 268:6,7
  268:14 368:12 520:16
  520:19,20 524:6 533:11
**2022** 257:16 268:14
  545:15
**21** 359:4
**22** 342:7
**23** 280:11
**23rd** 282:23
**2300** 258:2
**24** 259:12 261:11 283:10
  283:12 284:13 285:18
**25** 265:18 282:20 515:9
  515:12
**2540** 363:8,11,12
**2541** 363:13
**26th** 262:15
**261** 259:6
**262** 259:10
**263** 259:11,11
**27** 520:16,19
**28** 520:20
**280** 259:12
**2810** 341:23 342:2,3
**283** 259:12
**2907** 331:4
**2914** 431:12
**2974** 334:14
**299** 259:13

---
**3**
---

**3** 259:11 263:5,6,11
  342:17 352:14,19,24
**3rd** 278:15 279:14
  316:14
**3,000** 472:6
**3-12-2015** 442:17,17
**30** 259:12 280:1,2,8,16
  280:17,19 338:9 350:15
  350:24 352:3
**31** 265:21,23 302:14
  325:7,17 326:21 380:2
**31(b)** 286:16 292:12
  295:24
**31(c)** 286:21
**31(d)** 292:11 296:14
**31(e)** 296:21
**31(f)** 325:5 329:8
**31(g)** 325:1
**312** 258:3,9
**315** 259:13,14
**316** 259:14
**317** 259:15
**32** 259:13 315:3,4
**320** 259:15,16
**321** 259:16
**322** 259:17
**33** 259:14 315:22,23
**331** 259:17
**332** 259:18
**333** 259:18
**334** 259:19
**335** 504:9
**336** 259:19
**337** 259:20
**34** 353:12
**340** 259:20
**341** 259:21
**347** 259:21
**35** 353:12
**353** 259:22
**358** 259:22
**36** 259:16 320:20,21
  321:1
**363** 259:23
**379** 259:23
**38** 259:11 263:18,19,20



263:24
**382-3100** 258:9
**386** 259:24
**39** 259:17 322:11,12
**390** 259:7

**4**

**4** 275:16 354:2 440:17,17
    440:18,19
**40** 259:16 321:21,22
**408** 399:1
**42** 259:14 316:9,12
**43** 259:15 317:12,14
**431** 260:1
**440** 260:1
**450** 382:17
**469** 260:2
**47** 259:21 347:20,22
**48** 259:17 318:22 330:24
    331:2 332:19
**49** 259:18 332:5,7

**5**

**5** 265:18
**5th** 545:14
**5:13** 544:5
**5:45** 385:13
**50** 259:22 358:19,21
**501(3)(c)** 528:1
**506-5511** 258:3
**512** 260:2
**519** 260:3
**520** 281:14
**522** 260:3
**528** 260:4
**529** 260:4
**531** 260:5
**532** 260:5
**537** 260:6
**538** 259:8
**583** 281:5
**595** 282:7

**6**

**60** 364:20,20 368:15,19
    466:24

**60's** 352:17
**60601** 258:3
**60606** 258:8
**624-6221** 257:23
**65** 368:18
**66** 364:21 368:20
**67** 259:18 260:1 333:3,4
    333:15 431:3,9,11

**7**

**7** 265:21
**7th** 268:13
**70** 371:9 373:9 467:1
**703** 470:4
**72** 318:20,21 322:8,10
    370:16
**75** 259:19 334:11,12
**76** 259:13 299:5,11

**8**

**8th** 472:5
**8185** 521:4,5,24
**8186** 520:12
**84** 259:19 336:6,7
**85** 259:20 260:4 337:11
    337:13 528:11,12,14
**866** 257:23
**88** 260:2 469:23,24
    470:10 473:3

**9**

**9th** 321:12
**9-21-18** 354:11
**97** 259:20 340:16,17



Ex. 151

**From:** Mason, Stephani [SMASON18@depaul.edu]
**Sent:** 2/1/2021 3:27:56 PM
**To:** Johnson, Valerie [valerie.c.johnson@depaul.edu]; Dillard, Sydney [SDILLAR2@depaul.edu]
**Subject:** RE: DePaulia Article

I am supposed to go up next year because I took the covid year. In the last year, nearly every conversation I have had with my chair is about "low" teaching evals. He told a senior faculty member that he wouldn't recommend that I go up. I keep Willie in prayer because these people are dirty!

I think the lack of engagement is personal despair. There is nothing about these people that makes me afraid, but the weight of it all is a lot. I suspect that could be the same for others. I am open to a small group. Please send suggestions for times.

**From:** Johnson, Valerie <valerie.c.johnson@depaul.edu>
**Sent:** Friday, January 29, 2021 11:37 AM
**To:** Mason, Stephani <SMASON18@depaul.edu>; Dillard, Sydney <SDILLAR2@depaul.edu>
**Subject:** RE: DePaulia Article

Stephani, I cringe every time I hear that story. It's unconscionable, and I think that something needs to be done in response to such incidents. Are you up for tenure this year? If so, how is it going? I was happy to see that Willie is now associate dean. After the way they did Elijah, they knew that they needed to do something different.

I would ideally like to begin the discussion with a few select black women and then think about adding black men. I have often been baffled by the lack of engagement among black faculty on issues of diversity, equity, and inclusion. I don't know whether the lack of engagement results from fear or sheer pessimism. Another option is to have another DPUBLC Black Townhall meeting (of black faculty, staff, and students). It's been far too long since we've done something like that.

Let me know what you all think.

Val

Valerie C. Johnson, Ph.D.
Associate Professor
Department of Political Science
DePaul University
990 West Fullerton Street, #2201
Chicago, Illinois 60614-2458
(773) 325-4731
(773) 325-7337 (fax)
valerie.c.johnson@depaul.edu

**From:** Mason, Stephani <SMASON18@depaul.edu>
**Sent:** Friday, January 29, 2021 11:19 AM
**To:** Johnson, Valerie <valerie.c.johnson@depaul.edu>; Dillard, Sydney <SDILLAR2@depaul.edu>
**Subject:** RE: DePaulia Article

Here is one of the parallels to my situation – being denied medical leave! I had to have a hysterectomy due to large and numerous fibroids (research suggests that stress is a contributor to the growth of fibroids). I was told that I should schedule my "elective" surgery during my research quarter off. A few years later, I got sick at the American Accounting Association meeting after having a work dinner with my department colleagues and feeling all the microaggressions. Had to be rushed into emergency gallbladder removal surgery. This place...

Confidential

Let me know possible times for Zoom.

Valerie, the next panel discussion is going to deal with Black women storming the political stage. Aiming for March.

---

**From:** Johnson, Valerie <valerie.c.johnson@depaul.edu>
**Sent:** Friday, January 29, 2021 11:04 AM
**To:** Mason, Stephani <SMASON18@depaul.edu>; Dillard, Sydney <SDILLAR2@depaul.edu>
**Subject:** RE: DePaulia Article

Sisters, it is truly distressing.  We must organize a Zoom to discuss this further.

Val

Valerie C. Johnson, Ph.D.
Pronouns: She/Her/Hers
Associate Professor
Department of Political Science
DePaul University
990 West Fullerton Street, #2201
Chicago, Illinois 60614-2458
(773) 325-4731
(773) 325-7337 (fax)
valerie.c.johnson@depaul.edu

---

**From:** Mason, Stephani <SMASON18@depaul.edu>
**Sent:** Friday, January 29, 2021 10:37 AM
**To:** Dillard, Sydney <SDILLAR2@depaul.edu>
**Cc:** Johnson, Valerie <valerie.c.johnson@depaul.edu>
**Subject:** FW: DePaulia Article

Sister, I support you!! This feels like the story of my life at DePaul, especially the part about the environment making you physically ill!

Stephani Mason, PhD, MBA, CPA
Assistant Professor
School of Accountancy & MIS
DePaul University
(312) 362-5628

---

**From:** DPUBLC <DPUBLC@depaul.edu>
**Sent:** Friday, January 29, 2021 9:33 AM
**To:** DPUBLC <DPUBLC@depaul.edu>
**Subject:** DePaulia Article

Dear DPUBLC Community,

Dr. Dillard was unaware that her lawsuit would be publicized, and she did not participate in the creation of the DePaulia article. However, now that the information is out, give the article a read, and let's support her and each other.

https://depauliaonline.com/52194/news/second-professor-from-depauls-college-of-communication-files-racial-discrimination-lawsuit/#comment-122550

---

Confidential

Thank you,

DPUBLC E-Board

Confidential

# Ex. 156

## Message to DePaul University from Faculty, Staff, and Students of African descent

The DePaul community of African descent, under the leadership of the DePaul University Black Leadership Coalition (DPUBLC) and the Black Student Union (BSU), is committed to assisting the DePaul University Officers in ensuring a better DePaul, where the mission of St. Vincent de Paul becomes a lived experience.

In its June 9, 2020 Message of Solidary, the officers of the University acknowledged that DePaul is not immune to racism, recognizing that "DePaul, as an institution, is part of these systems." They stated that they "…know that statements are not enough. Words must be followed by action.," and that they …cannot look at the world and say it needs to change, and not seek to transform systems of racial inequality within our own institution." They further committed to "work[ing] with students, staff, and faculty to address structural racism within our university."

Responding to this call, DPUBLC convened a black townhall meeting on April 1, 2021 to discuss the experiences of faculty, staff, and students of African descent, and to make recommendations to the administration and Board of Trustees.

The community of African descent serves an invaluable role in assisting DePaul to carry out its mission to DePaul students and to the community. Much of the diversity and social justice-oriented programming and services at DePaul have been created by and/or administered by faculty and staff of African descent. These programs include the Center for Black Diaspora, the African and Black Diaspora Studies Department, the Black Student Resource Center, the Egan Office of Urban Education and Community Partnerships, the Faculty Council Committee on Equity, Inclusion, and Diversity (CEID), and the Center for Access and Attainment. Together, these programs and units form an essential component of DePaul's diversity initiatives and community engagement. Faculty of African descent provide a significant proportion of courses that assist students in fulfilling course requirements in the Liberal Studies Program-- multiculturalism, Social, Cultural, and Behavioral Inquiry, and experiential learning. Collectively, they provide "DePaul students a greater opportunity to learn about issues and engage directly in action research, planning and programming aimed at addressing critical urban problems, alleviating poverty, and promoting social justice."

Faculty, staff, and students of African descent are a vital part of DePaul and deserve to work and matriculate in a supportive and welcoming environment that values our contribution, respects our humanity, provides avenues of leadership development and opportunity, and assists students in successfully matriculating to graduation. Unfortunately, we find that DePaul has fallen short on its stated commitment to diversity, equity, and inclusion.

Students of African descent have the lowest four- and five-year graduation rates (41.3% and 52% respectively) and are the smallest proportion of students from all racial and ethnic categories. Black students were 6.9% of the 2020 freshmen class, falling behind Asian-American students (11%) and Hispanic students (25%). Black students are also a lower proportion of total undergraduate (7.9%) and total student population (9.9%).

Dillard_DePaul08157

Due to higher service commitments, many faculty of African descent languish in the associate professor category and face greater barriers to promotion to associate and full professor. They are also underrepresented in associate dean and associate provost positions. Graduate students of African descent are 13.7% of graduate students, yet occupy only 7.6% of graduate assistantships.

Staff of African descent occupy fewer positions in the "Executive, Administrative, and Managerial (9%)" and "Other Professional (9%)" categories, and are concentrated in the "Clerical/Secretarial (17%)" and "Service Maintenance (23%)" categories. Conversely, white staff 64% of "Executive, Administrative, and Managerial positions, and 64% of "Other Professional" positions. DePaul resides in the heart of one of the most diverse cities in America. Its faculty, staff, and students should reflect this diversity.

<u>**The April 1, 2021 Black Town Hall Meeting**</u>

**The Experiences of Faculty, Staff, and Students of African Descent**

Three issues pervaded the discussion about the experiences of faculty, staff, and students of African descent:

1. University Climate
2. Limited opportunities for advancement and promotion;
3. Limited Accountability and Commitment to Diversity, Inclusion, and Equity

**University Climate**

Students expressed that they did not feel welcome at DePaul. Among their complaints were a heavy reliance on a Eurocentric curriculum; indifference and a general lack of support on the part of faculty and administrators; racial hostility; and limited advising and career support. Faculty and staff expressed a fear of retaliation, social isolation, and a lack of inclusiveness, particularly when expressing issues related to racism and campus climate. Faculty pointed to the protracted battle getting the Faculty Handbook 4.4.1 misconduct charge removed from the Faculty Handbook, despite support for its removal from the American Association of University Professors, two faculty committees, and two votes of the Faculty Council. They also pointed to enormous stress and stress related illnesses associated with hostility and discrimination; the feeling that DePaul marginalizes or push out vocal faculty of color; and the burden incurred by faculty having to file lawsuits to resolve conflict and discrimination.

**Limited Opportunities for Advancement and Promotion**

Staff and faculty expressed limited opportunities for advancement and promotion. They both expressed cultural taxation—heavy service, mentoring demands, and diversity work that goes uncompensated and undervalued, and frequently made them targets for racial hostility. Faculty felt that this cultural taxation disadvantaged them in the tenure and promotion process. Faculty also discussed DePaul's heavy reliance on student evaluations in personnel decisions (formal evaluations and tenure and promotion), despite significant evidence of their vulnerability to bias. Staff noted that they do not receive mentoring or leadership development that would position them for promotion for supervisory or executive level positions. Faculty also expressed a good

Dillard_DePaul08158

ole boy network that positions less qualified white faculty for promotion to associate dean or associate provost positions.

**Limited Accountability and Commitment to Diversity, Inclusion, and Equity**

Faculty, staff, and students uniformly discussed a gap between DePaul's stated DEI commitment and their actual record of accomplishment. They noted that the stated commitment was for marketing purposes and was in word only, and that DePaul did not do a good job of creating DEI metrics and goals to hold themselves accountable and measure progress. Faculty and staff also noted that their complaints were often invalidated or not taken seriously.

DePaul faculty, students, and staff, expressed disdain for the continual listening tours. They felt that they are condescending and evince a lack of real commitment to change, and expressed a need for DePaul administrators to move from listening to dedicated action and a commitment of resources.

<strong>Recommendations</strong>

Faculty, staff, and students of African descent requests a meeting between President Esteban and the President of the Board of Trustees and the leadership of DPUBLC and the Black Student Union to discuss the following recommendations:

- A national search for the permanent provost position
    - We need a chief academic officer who possesses a sophistical and nuanced understanding of issues of racism and structural inequality.
- A requirement that future administrative hires demonstrate a record of accomplishment to DEI.
- A diverse Board of Trustees with avenues of communication with diverse faculty, staff, and students
- A black faculty representative to the Board of Trustees
- Bi-annual climate survey for faculty, staff, and students of African descent
    - We want data collection on climate issues and want data to count in decision making.
- Campus-wide Difficult Dialogues
- Implicit bias training for all faculty and staff
    - Faculty and staff and called upon to serve an increasingly diverse student body, and need a better understanding of DEI, racism, and structural inequality. Faculty in particular must move to more multicentric approaches to education.
- Ensure greater representation of faculty, staff, and student of African descent in University brochures and marketing material
- Increase funding of Black student organizations and programs.
- A campus-wide diversity plan
- A three-year commitment to increase total black student enrollment to 15%
- A three-year commitment to increase teaching assistantship for black graduate students to 15%
- A three-year commitment to increase black tenure-line faculty to 15% of total faculty

Dillard_DePaul08159

- A three-year commitment to increase staff promotion to "Executive, Administrative, and Managerial" and "Other Professional" categories to 15% of total
- A black faculty, staff, and student directory to ensure greater communication.
- A Black Student Resource Handbook
- Formal evaluations of faculty, staff, and administrators on diversity competency and commitment to DEI
- A more effective and properly marketed Bias Incident Report Protocol
- A review of the curriculum of each academic unit to ensure greater racial awareness and inclusion
- Greater advising support to increase black student graduation to 60% in three years
- A three-year strategic plan to increase black student retention
- Staff related Diversity, Equity, and Inclusion initiatives
- Eliminating student evaluations in the tenure and promotion process
- Compensation for cultural and diversity work
- A greater emphasis on a university wide commitment to DEI on the part of all faculty, staff, and students
- Create an Ombuds in Student Affairs to serve as an intermediary administrative body appointed to receive and investigate racial complaints made by students against university officials, faculty, and staff.
- Developing real DEI metrics and goals
- Increased funding and resources for additional mental health professionals of color, in order to increase mental health programming and outreach.
- Expansion of the Black Student Resource Center
- Increase staffing and funding for the Office of Multicultural Student Success
- Penalties and consequences for public safety officers who profile black students.
- Staff leadership development pathways
- Greater emphasis on the role of service, diversity work, and mentoring in the promotion to full professor
- Ensure greater participation among white faculty and staff in diversity related programs and events
- Unit level DEI plans

**Conclusion**

We join DePaul in its commitment to ending institutional racism and structural inequality, and call on the University Officers to a more engaged approach to ensuring that DePaul is a socially just, equitable, diverse, and inclusive campus.

Please contact the following officers of DPUBLC and the Black Student Union to arrange a meeting before May 21, 2021:

Shelby, Quinetta -- QSHELBY@depaul.edu

Dillard_DePaul08160

Robert Robinson -- RROBIN32@depaul.edu

Natalie Daniels -- NDANIEL4@depaul.edu

Sydney Dillard -- SDILLAR2@depaul.edu

Keith Norward -- KNORWARD@depaul.edu

Dillard_DePaul08161

# EXHIBIT C

# DR. MURPHY DEPOSITION

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SYDNEY DILLARD,                    )
                                   )
              Plaintiff,           )
                                   )
     -vs-                          ) No. 1:20-cv-7760
                                   )
DEPAUL UNIVERSITY,                 )
                                   )
              Defendant.           )


          The videoconference discovery deposition of

ALEXANDRA MURPHY, taken pursuant to the provisions of the

Code of Civil Procedure and the Supreme Court Rules of

the State of Illinois pertaining to the taking of

depositions for the purpose of discovery, taken before

DEANNA L. TUFANO, Certified Shorthand Reporter of the

State of Illinois, wherein all parties attended remotely

on Thursday, April 21, 2022 at 12:00 p.m.



Reported for:

MAGNA LEGAL SERVICES

(866) 624-6221

www.magnals.com, by:

Deanna L. Tufano, C.S.R.



Page 2

```
1   A P P E A R A N C E S:        VIA VIDEOCONFERENCE
2
    DISPARTI LAW GROUP, P.A.
3   MS. GIANNA R. SCATCHELL
    121 West Wacker Drive, Suite 2300
4   Chicago, IL  60601
    (312) 506-5511
5   gia@dispartilaw.com
6     on behalf of the Plaintiff;
7
    COZEN O'CONNOR
8   MS. ANNA WERMUTH
    MS. BRITTANY GREEN
9   123 North Wacker Drive, Suite 1800
    Chicago, IL  60606
10  (312) 474-7900
    awermuth@cozen.com
11  brittanygreen@cozen.com
12    on behalf of the Defendant;
13
    Reported BY:  DEANNA L. TUFANO, CSR
14       LICENSE NO. 084-003819
15
    ALSO PRESENT:  Plaintiff, Sydney Dillard
16
17
18
19
20
21
22
23
24
```

Page 3

```
1              I N D E X
2   WITNESS                    PAGE
3   SYDNEY DILLARD
4     Examination by Ms. Scatchell ...............4, 180
5     Examination by Ms. Wermuth ................ 171
6
7            E X H I B I T S
8   Exhibit No. 1 ............................... 41
    Exhibit No. 2 ........................... 47
9   Exhibit No. 3 ............................ 51
    Exhibit No. 4 ............................. 63
10  Exhibit No. 5 ............................. 63
    Exhibit No. 6 ............................. 113
11  Exhibit No. 7 ............................. 119
    Exhibit No. 8-18 ....................... 129
12  Exhibit No. 19 ........................... 179
13  Exhibit Nos. 8-21 were marked, but Exhibit Nos. 8-19 were
14       referred to and tendered.
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1                   (Witness sworn.)
2              ALEXANDRA MURPHY,
3   called as a witness herein on behalf of the Plaintiff
4   having been duly sworn, was examined and testified as
5   follows:
6              EXAMINATION
7   BY MS. SCATCHELL:
8       Q  Good morning, Lexa.  Actually, let me back up.
9   What do you preferred to be called, Dr. Murphy, Lexa?
10      A  Lexa is fine.
11      Q  Okay.  Perfect.  I am Gianna Scatchell and I am
12  going to be representing Ms. Dillard today in this
13  matter.  Have you been deposed before?
14      A  I have.
15      Q  Okay.  So you're aware that you're under oath and
16  you have to testify truthfully, correct?
17      A  Yes.
18      Q  And to make a clear record we have to say, you
19  know, yes, no, instead of uh-huhs or shaking your head,
20  correct?
21      A  Yes.
22      Q  Okay.  Perfect.  And then you haven't taken any
23  medication that would affect your ability to testify
24  truthfully today, have you?
```

Page 5

```
1       A  No.
2       Q  Okay.  And at times, your attorney is going to
3   object.  If it's an objection that's based on privilege
4   or she instructs you not to answer, that's when you do
5   not answer the question.  If it's an objection based on
6   what maybe sounds like objection, form or objection,
7   relevance, or objection, objection, at that point, just
8   you're able to answer.  It's only when your attorney
9   tells you not to answer.
10          And if we just try not to talk over each
11  other, that will be helpful to make a clear record.  And
12  if you don't understand the question, please let me know
13  and I will rephrase it.  If you don't say that you don't
14  understand the question, I'm going to assume that you do.
15          All right.  With that, we'll get started.
16  Could you please state your name for the record.
17      A  Alexandra Murphy.
18      Q  Okay.  And Alexandra, what is your current
19  position?
20      A  Professor and Interim Dean in the College of
21  Communication.
22      Q  And how long have you worked for DePaul?
23      A  Since 1998.
24      Q  Okay.  And what were the positions that you held
```



Page 6

1    at DePaul?
2        A   I started out as Assistant Professor, moved to
3    Associate Professor also as -- and then to Professor.  I
4    also was Director of Community Service Studies, and I
5    have been a Graduate Director, and then also an Associate
6    Dean.
7        Q   Okay.  And is associate dean different than
8    interim dean?
9        A   Yes.
10       Q   What are the differences?
11       A   Associate dean reports to the dean, so there are
12   several associate deans within the college.  Interim dean
13   means that I'm serving in the dean role in the interim as
14   we move toward a search to put someone in as a final
15   person or permanent person.
16       Q   Okay.  And then how long have you held the
17   interim dean position?
18       A   Interim dean position, I have held for one year.
19       Q   Okay.
20       A   And prior to that, it was acting dean, so that
21   began in October of 2018.
22       Q   Okay.  And then is there a difference between
23   acting dean and interim dean?
24       A   Yes.

Page 7

1        Q   Okay.  And what is that difference?
2        A   So acting dean I was holding the position because
3    the person who had been the dean was temporarily also
4    acting provost, and so the position was still hers for
5    she to choose to return to it.
6        Q   And do you know who it was in that position?
7        A   Salma Ghanem.
8        Q   And then she ended up becoming provost, correct?
9        A   Correct.
10       Q   And then with this position of acting dean, was
11   there candidates to select from?
12       A   Acting dean position, no.
13       Q   Was it a position that you had to apply for?
14       A   No.  It happened very quickly.
15       Q   Okay.  And when you say quickly, could you expand
16   on that?
17       A   Yes.  The person who was the provost at the
18   university became ill, and so within a matter of one
19   night, Salma Ghanem was placed in the position of acting
20   provost and so she identified me to be the acting dean
21   within that day.
22       Q   Okay.  And then is there a process for how that
23   appointment would work or is it just at the discretion of
24   the acting dean?

Page 8

1        A   The acting provost?
2        Q   Yes.
3        A   I think it's a pretty rare situation, so I think
4    that deans are appointed by the provost, and so in that
5    case, they followed that particular process.
6        Q   Okay.  And then what would your job duties be as
7    the acting dean?
8        A   As the acting dean, the same as the interim dean,
9    and quite frankly the same as the dean.
10       Q   Okay.  And what are those duties?
11       A   I oversee the functioning of the College of
12   Communication.
13       Q   And how big is the College of Communication at
14   DePaul?
15       A   In terms of faculty, we have about 53 full-time
16   faculty.  We have 14 staff that are full-time, and we
17   have, on any given quarter, between 60 and 80 part-time
18   faculty.
19       Q   And how many students are there on average?
20       A   Approximately 1300.
21       Q   Okay.  And then what is the average class size
22   for a communications course?
23       A   They range on average probably as an
24   undergraduate class between 20 and 30 students, graduate

Page 9

1    classes between 10 and 15.
2        Q   And then be out of those 53 full-time staff, how
3    many are on the tenure track?
4        A   I think we have 32 or 33.  I don't have it in
5    front of me, but approximately 32 or 33 are tenure track.
6        Q   Okay.  And do you happen to know the approximate
7    racial demographic of those 32 to 33 tenure track
8    professors?
9        MS. WERMUTH:  Objection --
10   BY THE WITNESS:
11       A   I don't have it in front of me.
12   BY MS. SCATCHELL:
13       Q   Is that something that you could provide to your
14   attorney?
15       A   I don't recall if I was asked to provide that.
16       Q   But is it something that you could provide?
17       A   That information would be located on our
18   institutional research site, DePaul University has that.
19       Q   Okay.  And is that available to the public?
20       A   I don't know if it's available to the public, but
21   it's available to any employee.
22       Q   Okay.  Could you explain the process of tenure
23   track of how you go from, you know, being hired on with
24   tenure track and then all the way to becoming a professor



Page 10

1 or a paying tenure --
2    A    Yes.  The typical trajectory is we will hire
3 someone in as an assistant professor, and the standard
4 length of probation is six years.  So during that time,
5 they are in the -- I just said -- in the probationary
6 period as an assistant professor.  Then at the beginning
7 of their sixth year, they would apply for tenure &
8 promotion.  And so they would go through the review
9 process for tenure & promotion.  And then if successful,
10 they are tenured and then promoted to associate
11 professor.
12    Q    And then once they become associate professor, is
13 there a higher position that they could attain or how
14 does that work?
15    A    They can, if they choose to, apply for promotion
16 to full professor.
17    Q    And how long does that on average take?
18    A    That really ranges.  We have some associate
19 professors in our college that have been associate
20 professors for 25 years.  They've chosen not to move
21 forward in that way.  And then we have had some faculty
22 who have applied for promotion to full professor within
23 five to six years of obtaining associate professor.
24    Q    Okay.  And then you had previously stated that

Page 11

1 there was a standard length of probation of six years.
2 Could anything affect that standard length?
3    A    Yes.
4    Q    Okay.  What would those factors be?
5    A    Anytime the university has a policy that anytime
6 the academic year during that first six months is
7 interrupted by any kind of leave meaning research leave,
8 medical leave.  If it's a personal leave, then I think it
9 is not necessarily in the same case.  It's automatically
10 extended by one full year.  A candidate can choose to not
11 extend their tenure clock in those cases.
12    Q    Okay.  And is there a reason why somebody would
13 not want to extend their clock?
14    A    Yes.  Depending on what might be going on during
15 that leave, it allows them the ability to makeup anytime
16 with research in particular, that's usually why someone
17 might choose to extend their research -- or excuse me,
18 their tenure clock.
19    Q    And then if somebody goes on personal leave, how
20 does that differ?
21    A    I believe in the handbook personal leave is
22 excluded from this.  I think probably it would depend on
23 what happens.  It would probably have to be approved by
24 the dean and the provost, but I'd have to look back at

Page 12

1 the policy just to double check.
2    Q    And how does the decision get made to become or
3 to have somebody obtain tenure, is it a vote?
4    A    Yes.  There's a vote of all the tenured faculty
5 on a candidate's application, that's considered a
6 recommendation to the dean of the college.  And then the
7 dean of the college will write their own report.  All of
8 that information then goes to the University Board for
9 Tenure & Promotion, and then they assess the case, and
10 then they also do a vote.  And then that vote is a
11 recommendation to the provost of the university.  And so
12 it's the provost of the university that in the end either
13 accepts or denies recommendations.
14    Q    Okay.  And the provost could say if the board
15 decided against a candidate the provost could overturn
16 that decision, right?
17    A    Yes.
18    Q    Okay.  I just want to clarify something.  So it
19 seems that there is four different steps to voting on the
20 tenure faculty member or whether or not to grant them
21 tenure; is that accurate?
22    A    I didn't count up the steps, so which ones?
23    Q    So I just want to make sure I have it correctly.
24 I am not trying to trip you up.

Page 13

1    A    That's okay.
2    Q    All the full-time faculty members, they vote.
3 Then that recommendation goes to the dean.  Then the dean
4 --
5    A    Let me stop already, I'm sorry.  There's one step
6 ahead of that in our college.  And I should say different
7 colleges have some different steps.  We are a college
8 that considers the entire college as the local unit so we
9 as a college make the recommendation to the dean where
10 some other colleges have departments for us.  We do a
11 personnel committee, so there is a personnel committee
12 that does a review of a candidate's documents.  And then
13 that review feeds into the tenured faculty discussion,
14 and then the tenured faculty are the ones who then will
15 vote.  So I missed that part when we were talking
16 through.
17    Q    No problem?
18    A    So, five steps maybe.
19    Q    Okay.  So is it the personnel committee that
20 ultimately makes the decision to the dean --
21    A    No --
22    Q    -- or recommendation?
23    A    No.
24    Q    Okay.



Page 14

1     A  The personnel committee does the first level
2 review and they provide that information to the tenured
3 faculty. The tenured faculty still have access to all of
4 the information and documents and they do a review as
5 well. And then the vote happens with the tenured
6 faculty, so the tenured faculty make the recommendation
7 to the dean.
8     Q  Okay. And then from there it goes?
9     A  To the University Board for a tenure & promotion
10 which is shortened as UBPT.
11     Q  Got it. And then at that point it goes to the
12 provost?
13     A  Yes.
14     Q  Okay. Great.
15         And how on average how many faculty
16 members go up for tenure?
17     A  At the university or in the college?
18     Q  In the college.
19     A  In the college it ranges. It depends on how many
20 people we've hired the six years prior, so we've had
21 years with no one going up for tenure & promotion, and
22 we've had years with three or four people going up for
23 tenure & promotion.
24     Q  Okay. And is there a difference between a formal

Page 15

1 review and an informal review?
2     A  Yes.
3     Q  Okay. What is that difference?
4     A  A formal review, according to the university
5 faculty handbook, all faculty that are in that
6 probationary period need to have a formal review every
7 two probationary years.
8     Q  And would there ever be an instance where
9 that formal review would be less than two years?
10     A  Yes, yes.
11     Q  Okay. What would that be?
12     A  The tenured faculty when looking at a formal
13 review can make a decision to call for an additional
14 formal review.
15     Q  Okay. And what factors would go into that
16 decision?
17     A  Often they may be looking at wanting to see
18 someone's research showing up a little more -- like if
19 they've got concerns about research, if they might have
20 any questions or concerns about teaching and/or service.
21 So if there are thing that come up during a review where
22 they would like to check in with the candidate prior to
23 the two years.
24     Q  Okay. So if that does happen where a

Page 16

1 tenure-track faculty member has to go through an
2 additional formal review, is there any kind of coaching
3 or additional help that is provided to that candidate, or
4 how does that work?
5     A  So in terms of just official, can you help me
6 understand a little more?
7     Q  Oh, yeah, sure. I am trying to figure out so if
8 they want to see someone if they have concerns about
9 research or about their teaching or service, is there
10 anything that the college does to help that candidate
11 clarify that or coach them to say have better teaching
12 scores or something like that?
13     A  Yes, the report that comes out of the formal
14 review will have -- will indicate areas that the faculty
15 would like to see addressed.
16     Q  Okay.
17     A  Often the chair of the personnel committee would
18 also talk to candidates and let them know.
19     Q  And then what documents does the personnel
20 committee review in terms of creating recommendation for
21 tenure track or for tenure position or recommending them
22 not to get that?
23     A  They will review all published research. They
24 will review all teaching evaluations as well as peer

Page 17

1 observations of teaching. They will review any documents
2 that the candidate submits in terms of their teaching;
3 such as, syllabi, examples of course activities. And
4 then they will also review committee work that the
5 candidate has done in terms of service.
6     Q  Okay. And what is committee work?
7     A  Committee work is the main way, the kind of third
8 piece in terms of teaching, research, and service. It's
9 usually the way in which someone accomplishes that. At a
10 university, faculty do more than teach and do research,
11 they also work on committees to help either the program
12 that the college or the university kind of keep things
13 moving. So there's a variety of different committees
14 that that faculty will serve on.
15     Q  Okay. And how long are those different
16 committees, like the length of time? Does it range or is
17 it like a certain term?
18     A  Typically, when someone joins a committee, it's
19 for a three-year term. It can vary depending on some of
20 the committees.
21     Q  Okay. And then if somebody doesn't do committee
22 work, is there any other way to meet that service prompt
23 of tenure?
24     A  That's the primary way. They will look at



Page 18

1    professional service, but in our guidelines, service to
2    the college and the university is primary.
3        Q   Okay.  And what would an example of professional
4    service be?
5        A   We have faculty who do reviews for conferences
6    where they're read papers and rank the papers and decide
7    which papers would be accepted for a conference.  We
8    also are peer reviewers for each other's research and so
9    you'll serve as a blind reviewer for publications.
10   Sometimes if you do that enough for a particular journal,
11   they will make you an editor of the journal, and so we
12   have some that will do things like that.  Other kinds of
13   roles as with professional associations would be
14   professional service, some are more official than others.
15   So those kinds of things.
16       Q   Okay.  And then so the paperwork or documents
17   that you had indicated that are looked at; such as,
18   syllabi, student reviews, peer evaluations, does anything
19   weigh more heavily in terms of deciding to grant or deny
20   tenure than other documents?
21       A   That is hard to answer without, you know, context
22   in a case.  I think usually faculty try to look at all of
23   the information and kind of make an assessment based on
24   all of the data that they have.

Page 19

1        Q   Okay.  And then how do you aggregate all of that
2    data for viewing the applications?
3        A   The teaching evaluations are --
4        Q   No.  The tenure track applications, is it
5    SharePoint or something?
6        A   Oh, how is it like presented and kind of
7    collected?
8        Q   Yes.
9        A   It used to be SharePoint, we've now moved -- the
10   university moved to a different database system that's
11   called Interfolio.
12       Q   Okay.  And when did you guys transition from
13   SharePoint to Interfolio?
14       A   I think it was 2019.  It was either 2019 or 2020.
15       Q   Okay.  Was there anything that made you guys
16   change from one provider to the other?
17       A   We aren't the decision makers on that, that's a
18   university decision.
19       Q   And by university decision, you mean the
20   university board?
21       A   No.  The university information systems group and
22   information technology.
23       Q   Okay.  And did you use SharePoint?
24       A   When I went up for tenure or just in other roles?

Page 20

1        Q   Just in other roles.
2        A   Oh, yes.  SharePoint is -- I'm not a techy, so
3    it's hard to say exactly how to put it.  But SharePoint
4    is basically how the websites are constructed, how any
5    kind of team group managing system is constructed.  It's
6    like it was basically the dominant thing at the
7    university for anything kind of technological, so yeah.
8        Q   Did you find it to be user friendly?
9        A   No.  SharePoint is not user friendly.
10       Q   Okay.  Was there a lot of technical glitches with
11   SharePoint?
12       A   SharePoint was very idiosyncratic in terms of how
13   things were managed, it's not a user friendly kind of
14   system.
15       Q   Okay.  And then was there any training on
16   SharePoint?
17       A   We offered, I think, some workshops on
18   SharePoint.
19       Q   Okay.  And were the workshops mandatory?
20       A   No.
21       Q   Okay.  And was there like a written guideline of
22   how to use SharePoint?
23       A   I don't remember.  Yeah, I don't remember.
24       Q   And was there tech support available through

Page 21

1    SharePoint problems?
2        A   The university had tech support and we had
3    someone within the college named Steven Awalt who tried
4    to help where possible.
5        Q   And then it's very idiosyncratic, could you
6    expand on that?
7        A   One example is SharePoint did everything -- it
8    organized things, I believe, alphabetically just as part
9    of its system, so we had to try to have everyone label
10   their files in a particular way so when things were
11   uploaded in SharePoint, it didn't move them in place that
12   they didn't want them to get moved.  And then if you
13   wanted to move things, I believe you had to download,
14   then reupload.  It wasn't very friendly in terms of just
15   moving and dropping and dragging.
16       Q   Okay.  And then was there also something wrong
17   with it where SharePoint would delete a file that you
18   tried to -- if you uploaded the same file name in two
19   different places it would delete it out of one or
20   something?
21       A   I don't remember that exactly.  It's possible.
22       Q   Okay.  And is Interfolio more user friendly?
23       A   Yes.
24       Q   Okay.  So let's go back to committee work.  So



Page 22

1  the College of Communication, how many different
2  committees does it have for a tenure-track faculty member
3  to accomplish the service component?
4     A  I would have to look at the list. We have
5  it -- we have the committees all listed out, so I don't
6  have the total number off the top of my head. I'll give
7  10, 15. Honestly, I couldn't makeup a number, but I
8  don't have it in front of me.
9     Q  Okay. Could you give me some examples of what
10 committees, and maybe that will help out?
11    A  Yes. We have a curriculum committee, an
12 assessment committee, a teaching research and learning
13 committee. I am trying to remember. What else do we
14 have. I'm trying to think of the constant ones. The
15 assessment committee is broken out into program areas so
16 there's some extra -- like has the larger ones and then
17 smaller ones within that. I am sure I'm blanking on
18 other standard ones. And then we also have kind of ad
19 hoc committees that will come up on a year to year -- oh,
20 sorry, international committee, that's one that's
21 constant. Then we have ad hoc committees; such as, a
22 search committee or different task forces that if we have
23 a project that is something that has a start and stop
24 date, then we'll pull a committee together for that.

Page 23

1     Q  Okay. And what is the search committee?
2     A  So a search is committee is formed when we have
3  the opportunity to hire a new faculty member.
4     Q  Okay. And then how do you decide who you
5  ultimately select to be on the search committee?
6     A  So the dean will, depending on where the hires
7  going to be, so the dean will go to the program chair of
8  the particular area that the hires going to be in and
9  they'll talk about who they might want to do as a chair
10 of the committee. And then they'll put a call out to the
11 faculty to see who would like to serve on the committee.
12 And then, I believe, typically you have at least -- again
13 I don't have it in front of me -- two or three faculty
14 that are within the program area and then you ask for one
15 outside of the program area to serve on the committee.
16 That's typical.
17    Q  Okay. And when you say outside the program area,
18 what do you mean by that?
19    A  So for example if the hire was going to be in
20 journalism, then we would ask for someone outside of
21 journalism to also serve on the committee.
22    Q  Okay. Got it. And then how long does a search
23 committee last for?
24    A  It lasts for the length of the hire or until the

Page 24

1  search -- or excuse me, the hire is complete. That's
2  typically two to three months.
3     Q  Okay. And do leadership make a decision on who
4  serves before they put out the call or after?
5     MS. WERMUTH:  I'm sorry. Let me just object to form
6  insofar as it misstated the testimony. Go ahead, Lexa.
7  BY THE WITNESS:
8     A  The decision on who serves on that committee is
9  made after the call.
10 BY MS. SCATCHELL:
11    Q  Okay. And then do you know who Sydney Dillard
12 is?
13    A  Yes.
14    Q  Who is she?
15    A  Sydney Dillard is an associate professor in our
16 public relations and advertising faculty.
17    Q  And how would you describe her ethnicity or race?
18    A  As African-American.
19    Q  Okay. And how long has she been at the
20 university for?
21    A  I believe she was hired in 2012 --
22    Q  Oh, I wasn't sure you were finished. I didn't
23 want to cut you off.
24    A  I'm sorry. I, again, don't have her file in

Page 25

1  front of me, but I believe it was 2012.
2     Q  Okay. And you were at the University at that
3  time, correct?
4     A  Yes I was.
5     Q  Okay. What was your position during that time in
6  2012?
7     A  I believe I was program chair of communication
8  studies, which I didn't mention in my long list of all
9  the different positions I've had at this university.
10    Q  No problem. Actually, let me do one background
11 question now that we're going back.
12       So where did you get your PHD from?
13    A  I received my PHD from the University of South
14 Florida.
15    Q  Okay. And what was your primary area?
16    A  My area is organizational communication and
17 cultural studies.
18    Q  Okay. And did you have a specific focus?
19    A  It was on gender, power, and politics in the
20 workplace.
21    Q  Did you publish anything on gender, politics in
22 the workplace?
23    A  Yes.
24    Q  Okay. And what did you publish?



Page 26

1    A  I published about 20 articles, so I've --
2 primarily in airlines and healthcare.
3    Q  Okay.  And what was the, and forgive me, I might
4 have the jargon a little bit wrong with the higher
5 education thing, so I'm not trying to be offensive.
6         So what was the kind of crux of your
7 position in your research?
8    A  That's a tough one to answer in a short way.
9 Best summarized as I looked at organizational practices,
10 and when organizational practices are taken for granted,
11 and kind of reproduced at what point those need to be
12 questioned.  So I looked at things like, especially on
13 the safety in high reliability organizations.  So in
14 airlines when you have pilots not listening to flight
15 attendants because they are just doing certain things or
16 I looked at emergency rooms and some of the practices
17 that take place in emergency rooms that needed to be
18 questioned that were taken for granted.
19    Q  Okay.  And when you say taken for granted, could
20 you expand on what you mean by that?
21    A  Sure.  So for example in an airline, if you get
22 into real behavior; such as, a safety check that's not
23 actually performed and you just automatically say yes, so
24 at what point do you need to take a pause.  And if you're

Page 27

1 in an emergency room, I looked a lot at transitions
2 between nurses to physicians to physicians and
3 what information was just rotely kind of passed along
4 without actually paying attention to what really anything
5 that could have taken it as an outlier or moved it in a
6 different place.  Sorry, I'll move it into a lecture and
7 I don't want to take your time.
8    Q  No, no, no.  I want to understand it.
9         I just want to make sure I am
10 understanding you correctly.  Are you saying that more of
11 like your background was in the role the gender played to
12 say a female would say to a pilot we're not doing the
13 proper protocols, and they just disregarded it because
14 she was a woman or a flight attendant instead of an
15 actual pilot or co-pilot?
16    A  Yes.
17    Q  Okay.  And is it fair to say that the airlines
18 are a traditionally male dominating profession?
19    MS. WERMUTH:  I am just going to object.  I think
20 we're getting far afield here.  Relevance.  Go ahead.
21 BY THE WITNESS:
22    A  I think it's fair to say that the roles are still
23 quite gendered.  So those that are in the pilot position
24 are still very masculine and those that are in the flight

Page 28

1 attendant position are still quite feminine.
2 BY MS. SCATCHELL:
3    Q  And would you say the same is true as to an
4 emergency room --
5    A  Yes.
6    Q  -- with doctors and nurses?
7    A  Yes.
8    Q  Do you feel it's the same way in higher education
9 as well where there's gendered roles?
10    A  I think there's been some research to show that
11 the gendered roles play out sometimes in committee work
12 where women might take on more maintenance committees.
13 Whereas, men might take on more task-related committees,
14 but I'm not up-to-date on that research.
15    Q  In your experience?
16    A  In my experience it's hard to -- I haven't
17 noticed the same kind of occupational genderedness in
18 higher education as I would in more exaggerated cases
19 like airlines and hospitals, but I think there's
20 particular occupations within higher education that are
21 more feminine than others that are viewed that way.
22 Probably communication, psychology, versus business.
23    Q  Okay.  And what about how those roles play out
24 say in a racial perspective where there's more say

Page 29

1 Caucasian tenured professors than African-American
2 professors?
3    MS. WERMUTH:  Object to form and vague.  Go ahead.
4 BY THE WITNESS:
5    A  I will ask you to be more specific on what you're
6 asking me to respond to.
7 BY MS. SCATCHELL:
8    Q  Sure.  So you said like there's certain gendered
9 roles so you have a pilot that would be male and a flight
10 attendant that would be a female.  So now putting that
11 kind of gendered role, but instead of it being gender,
12 it's race where there would be say the pilot would be
13 Caucasian.  But I am meaning this -- actually, that's a
14 bad question.  Let me just strike that.
15         So what I am trying to ask is that do you
16 feel that in your experience there's been more Caucasian
17 tenured professors than other races like, let's say,
18 African-American?
19    A  Yes.  Numbers-wise there are more Caucasian
20 faculty than there are African-American faculty.
21    Q  Okay.  And you had mentioned maintenance-based
22 committees versus task committees.  Could you explain on
23 what that difference is?
24    A  Maintenance committees are considered ones that

MAGNA ▶
LEGAL SERVICES

Page 30

1  are kind of helping the university just keep going.
2  Whereas, a task-based committee is typically one that
3  would make a decision. I don't want to overstate that
4  though because I am remembering some research from a
5  while back, and so...
6      Q  Okay. No problem.
7          And in terms of the tenure track process,
8  what are the position requests and justifications, what
9  are those?
10     A  Are you referring to when we request to be able
11 to hire a position?
12     Q  Yes.
13     A  So on an annual basis, the colleges are asked to
14 put forward their request for new positions or
15 replacement positions and those requests go to academic
16 affairs, specifically the provost.
17     Q  Okay. And who is the Office of Institutional
18 Diversity or what is the Office of Institutional
19 Diversity, rather?
20     A  The Office of Institutional Diversity and Equity,
21 I believe, OIDE.
22     Q  Yes.
23     A  And that's an office at DePaul that can take any
24 complaints that might arise that someone might consider

Page 31

1  if their concerns about either diversity or equity
2  issues, then they can file a complaint with OIDE.
3      Q  And what would an example of an equity issue be?
4      MS. WERMUTH: Let me just object on foundation. Go
5  ahead.
6  BY THE WITNESS:
7      A  I would imagine if someone felt like they were
8  not being treated in the same way that they think some of
9  their peers or colleagues would be treated would be an
10 equity issue.
11 BY MS. SCATCHELL:
12     Q  Okay. And do you know if that Office of
13 Institutional Diversity and Equity is still a current
14 department or if it's called something else now?
15     A  I am not sure if it changed its name or what its
16 current status is.
17     Q  Do you know who would know that?
18     A  I can look it up. You know, the people that I
19 know that were in that office are no longer there, so the
20 first names that come up -- I know Barbara ███████ has
21 retired, so I'd have to look it up and see what the
22 structure is now.
23     Q  Okay. Is there a woman Isabel Diaz that was
24 there?

Page 32

1      A  Yes. And I'm not sure if Isabel is still there
2  or not.
3      Q  Okay. And do you know how the complaint process
4  would work for an OIDE complaint?
5      MS. WERMUTH: Objection. Foundation. Go ahead.
6  BY THE WITNESS:
7      A  My understanding is someone would approach the
8  office and then they would make a decision as to whether
9  it would launch some level of an investigation.
10 BY MS. SCATCHELL:
11     Q  Okay. And do you know what factors go into that
12 decision?
13     MS. WERMUTH: Objection. Foundation.
14     THE WITNESS: (inaudible)
15     THE COURT REPORTER: I'm sorry, I didn't hear her
16 answer.
17     THE WITNESS: I answered, I do not know.
18 BY MS. SCATCHELL:
19     Q  And do you know if the current name of the OIDE
20 office is now called the EEO office?
21     A  I don't know if that was the direct shift.
22     Q  And if somebody in the College of Communication
23 had a complaint about equity or discrimination, could
24 they make that complaint to you?

Page 33

1      A  They can tell me their complaint, yes.
2      Q  And then what would happen next?
3      A  Then I would refer them to the proper structure.
4      Q  And what would that be?
5      A  Well, that is what I would have to look up if
6  OIDE is no longer in place.
7      Q  Okay. Have you ever been involved in an EEO or
8  OIDE investigation before?
9      MS. WERMUTH: Objection. Vague. Go ahead.
10 BY THE WITNESS:
11     A  There was one investigation years ago that I was
12 involved with.
13 BY MS. SCATCHELL:
14     Q  And do you remember who was involved in that
15 complaint?
16     A  Yes. That was Barbara ███████ did the
17 investigation, and it was -- do you want me to tell you
18 who the complainant is, is that --
19     Q  Yes.
20     A  And it was ███████████
21     Q  And when you say some years ago, was it about two
22 or three years ago?
23     A  No, it was longer than that. It was, I think,
24 2015-ish.





Page 34

1    Q  Do you know what the nature of that complaint
2    was?
3        MS. WERMUTH: Objection. Relevance. Foundation. Go
4    ahead.
5    BY THE WITNESS:
6        A  I never saw the complaint.  I was only
7    interviewed and provided information.
8    BY MS. SCATCHELL:
9        Q  And what information were you provided?
10       A  I was asked to provide information on any female
11   faculty member who had taken a leave of absence due to
12   having a baby.
13       Q  Okay.  And do you remember how many people that
14   was?
15       A  I don't remember.
16       Q  Okay.  Would anything refresh your recollection?
17       A  A list of how many there were.
18       Q  Okay.  A list that you provided?
19       A  Yeah.
20       Q  Okay.  Perfect.  And do you receive any training
21   on discrimination or harassment?
22       A  There's not a mandatory training moving into the
23   dean position, but there are workshops that we can
24   attend.

Page 35

1        Q  Okay.  Do you happen to know the name of those
2    workshops?
3        A  I don't know them off the top of my head, no.
4        Q  Okay.  And before you moved into the dean
5    position, was there any kind of mandatory training on EEO
6    issues or discrimination?
7        A  No.
8        Q  Okay.  And do you know if there were any for
9    professors?
10       A  Mandatory, no.  Not that I'm aware of.
11       Q  Okay.  And did you have any prior experience with
12   EEO investigations before you came to the university?
13       A  No.
14       Q  Okay.  And have you attended any of the
15   discretionary workshops?
16       A  I've attended ones on implicit bias and on search
17   committee hiring practices.
18       Q  Okay.  And do you remember the approximate date
19   that you took the implicit bias workshop?
20       A  I don't.  It's been a few years.
21       Q  Okay.  What about the search committee hiring
22   practices?
23       A  Search committee hiring practices, the first one
24   I attend the was also probably at least 10 years ago and

Page 36

1    then have gone through one since then.  Often at that
2    point, ███ who is, I'll get her title wrong, VP for
3    diversity and equity would come and meet with search
4    committees, so that's how they did that then.  I believe
5    there's much more formal training that are happening now.
6        Q  Okay.  And you don't know what those formal
7    trainings are?
8        A  I know there's formal trainings now for search
9    committee hiring for evaluations, various things like
10   that, but I don't have the list in front of me.
11       Q  Okay.  Do you know what factors go into these
12   workshops that say for evaluations?
13       A  I don't know what factors go into the actual
14   workshops.  What do you mean by -- or who takes them?
15       Q  What like factors they consider.  I'm guessing
16   that the evaluation search committee workshop would deal
17   with how to equitably evaluate a candidate, correct?
18       A  Yes.
19       Q  Okay.  And do you know what say some of those
20   factors would be that would go into the evaluation
21   process?
22       A  That's tough to answer.  I am not doing the
23   workshops.
24       Q  Okay.  No problem.  So the implicit bias workshop

Page 37

1    that you took, if you could just summarize it in a couple
2    sentences?  What was the nature of the workshop?
3        A  For implicit bias?
4        Q  Yes.
5        A  Trying to have individuals recognize as they go
6    into a decisions any of the factors that could be
7    influencing their decision other than the qualities of
8    the candidate.
9        Q  Okay.  And you previously testified that that's a
10   discretionary workshop?
11       A  It's no longer discretionary, it's required for
12   anyone doing a search committee or as part of a search
13   committee.
14       Q  Do you know when it became mandatory?
15       A  I believe it became mandatory in 2020, but I'm
16   not sure.  We always had everyone in our college go
17   through a training for search committees, but I don't
18   know when the university exactly required it.  But I know
19   as of the last few searches, our last search wouldn't
20   move forward until all of them had gone through it.
21       Q  Okay.  And when you say that you always had
22   everybody go through the implicit bias workshop, did
23   anybody at the college keep a record of who took what
24   workshop and when?





Page 38

```
 1        A  I don't know that we have a centralized record on
 2   that, no.
 3        Q  Okay.  Would it be fair to say that members who
 4   were on these various committees were on the honor system
 5   that they said they took it?
 6        A  I believe, but I'm not entirely sure that at that
 7   point before the iteration that's currently in place,
 8   someone would come and meet with the search committee.
 9   So it was a different process.
10        Q  Okay.  And do you know if there would be a record
11   of who that person was and what was discussed?
12        A  I believe it was █████ in that office that
13   would come in.  But again, I could be misremembering.
14        Q  Okay.  And in your position, do you manage
15   faculty members, is that what you would call it or how
16   would you describe the relationship between the faculty
17   members and you?
18        A  I try to be accessible and open to all faculty
19   members.  We have a system where we have program chairs,
20   so the program chairs are kind of their first point of
21   contact, but I am available and here.
22        Q  Okay.  And do you make hiring and promotion
23   decisions?
24        A  As dean, most everything is faculty driven in
```

Page 39

```
 1   terms of a vote, but those votes are considered
 2   recommendations.  And so the dean has the prerogative to
 3   make a different decision.
 4        Q  Okay.  On average since you've been the interim
 5   dean or the associate dean or the acting dean, how many
 6   recommendations have you received for tenure-track
 7   faculty members?
 8        MS. WERMUTH:  Objection to form.  Vague.  Go ahead.
 9   BY THE WITNESS:
10        A  Again, I feel like I should have this all
11   memorized.  But I would have to go through and count up
12   the first set of recommendations I made within 2018, and
13   we had three people going up for an associate and I
14   believe one for full, so that was four.  Then I think the
15   next year was one.  And then the following year, around
16   eight to ten.  But I would have to go through and count
17   up.
18        Q  Okay.  And is that something that you could
19   provide to your attorney?
20        A  Yes.
21        Q  Okay.  And the three that went up for associate
22   professor in 2018, do you remember the names of those
23   individuals?
24        A  Yes.
```

Page 40

```
 1        Q  Who were they?
 2        A  ████████ Sydney Dillard, and Brea McEwan.
 3        Q  How do you spell her last name?
 4        A  M, little c, big E-W-A-N.
 5        Q  And then who was the full tenure professor?
 6        A  I think it was Paul Booth that year, but I'd have
 7   to look back.  The years start to merge a little bit.
 8        Q  I think everything has went from pre-pandemic is
 9   kind of a blur and everything post-pandemic is still a
10   blur.
11           So in 2019, do you remember who that
12   candidate was?
13        A  That was Nor Uysal, and I don't recall if there
14   was any full professors that year or not.
15        Q  And then in 2020, there were a lot, you said
16   eight to ten?
17        A  Okay.  I don't know if I add up to that many.  So
18   2018, 2019, Nur --
19        Q  Would it ████ ████ Jill ████?
20        A  Thank you.  If you have it, that would be great.
21        Q  ██ --
22        A  ██ Kessler and ████ ████.
23        Q  Yes.
24        A  So that was it, yes.
```

Page 41

```
 1        Q  And did I miss anybody?
 2        A  I don't believe so because then we have someone
 3   this year, Matt ████, who is up for full professor and
 4   that's the only case we have this year.
 5        Q  And all of these candidates from 2018 to 2020,
 6   was there ever a decision that you overturned?
 7        A  No.
 8        Q  And on average, how long does it take to make a
 9   decision whether or not to recommend somebody for tenure?
10        MS. WERMUTH:  Objection.  Vague.  Go ahead.
11   BY THE WITNESS:
12        A  You know it's hard to calculate in hours because,
13   you know, I'm familiar with cases and then I reread and
14   go through the various applications that come forward as
15   well as the tenured report, so it will take hours, eight
16   to ten hours across.  It doesn't happen in like one day.
17   I get the recommendation in mid November and my decision
18   has to go to the University Board of Tenure & Promotion
19   by the end of January.
20        Q  And I'm going to show you what I'm going to mark
21   as Exhibit No. 1.
22             (Exhibit No. 1 was marked
23              for identification.)
24        MS. SCATCHELL:  Anna, do you want me to email just to
```





MAGNA
LEGAL SERVICES

Page 42

1  you or do you want me to email it to Lexa's email as
2  well?
3      MS. WERMUTH:  I would suggest just for purposes of
4  expediency that you copy me and Lexa and Brittany at the
5  same time.
6      MS. SCATCHELL:  Okay.  What's Lexa's email?
7      MS. WERMUTH:  Lexa, are you okay with providing that?
8      THE WITNESS:  Yes, that's fine.  It's
9  amurphy1@depaul.edu.
10     MS. SCATCHELL:  Okay.  You guys should have it.
11     MS. WERMUTH:  Not yet.  Do you have it yet, Anna?
12     THE WITNESS:  No.
13     MS. WERMUTH:  Brittany, do you have it?
14     MS. GREEN:  No, not yet.
15     MS. SCATCHELL:  It should be another second.  Still
16  nothing?
17     MS. WERMUTH:  No.  Did we lose Gia?
18     THE COURT REPORTER:  It looks like it.
19                    (Lost connection.)
20  BY MS. SCATCHELL:
21     Q  Could you take a moment and look at this document
22  and tell me if you recognize the document.
23     A  It looks like it's excerpts from our 2010 faculty
24  handbook.

Page 43

1      Q  Okay.  And you're familiar with that handbook,
2  correct?
3      A  I am familiar with the handbook.  It's been
4  changed since 2010.
5      Q  Okay.  And I'm going to direct your attention to
6  Page 2, which is labeled Dillard_DePaul 0005.
7      MS. WERMUTH:  And just to be clear for the record,
8  this is Page 2 of Chapter 3.  I think each chapter starts
9  with a new number one, Gia.
10     MS. SCATCHELL:  Okay.  Thank you.
11     MS. WERMUTH:  But to your point, it's labeled
12  Dillard_DePaul 0005.
13     THE WITNESS:  Okay.  I think I'm on the right page.
14  Does it been with to be conducted by the faculty member's
15  home academic unit?
16  BY MS. SCATCHELL:
17     Q  Yes.  Could you look at line 601 to 603 in
18  particular and just read it into the record, please.
19     A  "A formal evaluation by peers, selected by the
20  faculty in the unit, shall take place at least every
21  second year.  However, formal evaluations by the academic
22  unit shall be made annually if early evaluations make
23  reappointment questionable."
24     Q  Okay.  And you previously testified that the

Page 44

1  formal evaluation occurs every two years, correct?
2      A  Yes.
3      Q  And then here in the 2010 handbook, it says it
4  could be made annually if the early evaluations make the
5  reappointment questionable.  What does questionable mean
6  to you?
7      A  Questionable would be if there were potential
8  issues that they are seeing as a result of the formal
9  review so they want to check in with the candidate again
10  prior to the two years.
11     Q  Okay.  And when there is a questionable decision
12  that's made, what factors go into it or does it vary?
13     MS. WERMUTH:  Objection to form.  Go ahead.
14  BY THE WITNESS:
15     A  I think it varies.
16  BY MS. SCATCHELL:
17     Q  Okay.  And do you remember any faculty tenure
18  track applicant that had annual evaluations because their
19  reappointment was questionable?
20     A  We have called for additional formal reviews for
21  either a full formal review or for various aspects for
22  faculty over the years that I've been here, yes.
23     Q  Okay.  Do you remember any of those examples?
24     A  Yes.  I remember Sydney's.

Page 45

1      Q  Okay.  What do you remember about hers?
2      A  I recall after her first formal review, some
3  concerns were raised in terms of teaching, and I don't
4  remember if they were concerns raised in any of the other
5  areas, so I think they asked for an additional review in
6  that case.  And then I know that there was an additional
7  teaching review that was asked after her -- I don't
8  remember -- I don't have the interims of the years, but
9  there was an additional teaching review that was asked
10  after another formal review.
11     Q  Okay.  So then I just want to make sure I
12  understand what you're saying here.  So that when there
13  is an annual review, formal review, it doesn't have to be
14  for the whole everything, it just could be portions of
15  it, whatever there concern is?
16     MS. WERMUTH:  Objection.  Vague.  Go ahead.
17  BY THE WITNESS:
18     A  Yes.  They can make a determination if they want
19  to do the entire file again or case or if they want to
20  just look at certain aspects.
21  BY MS. SCATCHELL:
22     Q  Okay.  And do you know what would make that
23  factor where it would be full versus, I guess, this
24  partial?



1    A  The factor would be where if the areas are in one
2   area more than others, then they would just look at
3   those, just look at that particular area.
4    Q  Okay.  We'll use Sydney as our example.  Do you
5   remember why they wanted a full formal review for her on
6   an annual basis?
7    MS. WERMUTH:  Objection to form.  Completely
8   misstates the record evidence.  You can answer.
9   BY THE WITNESS:
10   A  There was never any decision made to have a
11  formal review on an annual basis for Sydney.  There was a
12  request for the full review after the first review.  And
13  then the second time, it was just for teaching.
14  BY MS. SCATCHELL:
15   Q  Okay.  And do you know who reviewed her
16  application?  Was it you?
17   A  I was part of the review, but, no, it would have
18  gone through the process that we talked about earlier
19  where a personnel committee would have reviewed it.  Then
20  it would go to the tenured faculty, and then the tenured
21  faculty would make whatever recommendation.  At that
22  point when it's not a tenure & promotion review, the
23  recommendation is for reappointment.
24   Q  Okay.  And then I'm going to show you what I'm

1   going to mark as Exhibit No. 2. I just sent that over.
2    (Exhibit No. 2 was marked
3     for identification.)
4    MS. SCATCHELL:  Do you guys have it?
5    THE WITNESS:  No.  Wait, it just got here, I think.
6    MS. WERMUTH:  Do you have it, Lexa?
7    THE WITNESS:  I do.
8    MS. SCATCHELL:  All right.  Would you hang tight for
9   just a moment, I don't have it.  Thank you.
10  Brittany, did you get it?
11   MS. GREEN:  No, not yet.
12   MS. SCATCHELL:  I will resend it to you guys.  Oh,
13  you want to know why because it only went to Lexa.  It
14  replied to her auto reply, that's what happened.  I
15  apologize.  That's what happened there.  So let me get it
16  where everybody is on the same page.  I apologize about
17  that.
18   MS. WERMUTH:  The joys of Zoom depositions.
19   MS. SCATCHELL:  Exactly.
20   MS. WERMUTH:  Okay.  I have it now.
21  BY MS. SCATCHELL:
22   Q  Okay.  Lexa, could you please open that document?
23   A  I have it open.
24   Q  And could you take a moment to review it.

1    A  Okay.
2    Q  Do you recognize this document?
3    A  Yes.
4    Q  What is it?
5    A  This is our list of college level committees as
6   well as university level committees.
7    Q  Okay.  And is this way you were referring to
8   before about the various committees that a faculty or
9   tenure-track faculty member could join?
10   A  Yes.
11   Q  And do you see at the bottom of Page 2, which
12  would be Dillard_DePaul 5046?
13   A  Yes.
14   Q  Where it says PRAD Search Committee?
15   A  Yes.
16   Q  What is that?
17   A  That would have been an ad hoc committee for a
18  search.  I don't remember what one that would have been.
19   Q  Okay.  And what is PRAD?
20   A  Public Relations and Advertising, the program.
21   Q  And then I'm going to show you what I'm going to
22  mark as Exhibit No. 3.  Okay.  That's sent.
23   MS. WERMUTH:  Okay.  It says Exhibit No. 3.  I don't
24  know that I can open it.  It's locked.

1    MS. SCATCHELL:  It is?
2    THE WITNESS:  Mine opened.
3    MS. WERMUTH:  Hold on.  I'm getting a weird signal.
4   Okay.  I do have it.
5   BY MS. SCATCHELL:
6    Q  Okay.  Could you take a moment to review that
7   document.  And the Bates stamp for this exhibit for some
8   reason aren't showing up, but it should be Dillard_DePaul
9   5568 to 5573.
10   MS. WERMUTH:  I'm sorry, Gia.  Can you say those
11  numbers again.
12   MS. SCATCHELL:  Sure.  5586 to 5573.  It's your
13  production Dillard_DePaul.
14   MS. WERMUTH:  Okay.  So I'll just put this on the
15  record.  I mean, I haven't looked at this.  I don't
16  know --
17   MS. SCATCHELL:  I'll resend it with the Bates Stamp.
18  I don't know why it --
19   MS. WERMUTH:  I think that's a good idea.
20   MS. SCATCHELL:  That's fine.
21   MS. WERMUTH:  Thank you.  I appreciate that.
22   MS. SCATCHELL:  No problem.  I don't know why it
23  seems like a weird copy because it even saved kind of
24  strange, I don't know why.



Page 50

```
 1        MS. WERMUTH:  Yeah.  It showed up weird in my box as
 2   I said.  it has like a lock on it.  I was able to open
 3   it, but it looks like it was encrypted or something.  I
 4   don't really understand it either.
 5        MS. SCATCHELL:  Okay.  I just resent the corrected
 6   version.
 7        MS. WERMUTH:  Okay.  This actually even looks
 8   different that what you sent before.  I have it now.  Do
 9   you have it, Lexa?
10        THE WITNESS:  Do I have the exhibit?
11        MS. WERMUTH:  The new one.  She sent the new version
12   because there was something wrong with that version.
13        THE WITNESS:  Sorry.  I thought you just couldn't
14   open that one.  Yes, I have the new one.
15        MS. WERMUTH:  Let's all work off of that one because
16   it has the Bates on those.  Do you see in the lower
17   right, Lexa?
18        THE WITNESS:  Uh-huh.
19        MS. WERMUTH:  It says, Dillard_DePaul.
20        THE WITNESS:  Yep, got it.  Okay.  Oh, wait, I'm
21   sorry.  This is actually completely different.  This is
22   Rajul's.
23        MS. WERMUTH:  Yeah.  So Gia, do you want --
24        MS. SCATCHELL:  Can we go off the record for one
```

Page 51

```
 1   second and I'll produce the right one.
 2        MS. WERMUTH:  Can we maybe take a quick break then?
 3   Lexa, do you want to take a break?
 4        THE WITNESS:  That would be great.
 5             (Short recess.)
 6        MS. SCATCHELL:  Back on record.
 7   BY MS. SCATCHELL:
 8     Q   Could you take a moment and review the second
 9   corrected version of Exhibit No. 3.
10             (Corrected Exhibit No. 3 was
11              marked for identification.)
12        MS. WERMUTH:  Alexa, did you get that?
13        THE WITNESS:  Yes.  Let me open it.
14   BY MS. SCATCHELL:
15     Q   And that will be Bates stamped 5502 to 5508 and
16   that's Dillard_DePaul.  And Lexa, when you finish
17   reviewing it, just let me know.
18     A   Okay.  Depending on how thorough you want to
19   review, I've gone through.
20     Q   Enough to be able to discuss it; is that fair?
21     A   Sure.
22     Q   Okay.  And if you need more time, I don't want to
23   rush you.
24     A   That's okay.
```

Page 52

```
 1        MS. WERMUTH:  I'm sorry.  I got kicked out so I'm
 2   back here again.
 3        BY MS. SCATCHELL:  We didn't say anything.  I just
 4   asked her if she finished reviewing it.
 5        MS. WERMUTH:  Understood.  Thank you.  Sorry about
 6   that.
 7   BY THE WITNESS:
 8     A   Okay.  Gia, if you have questions, I can try to
 9   answer.  If I need to go back and look at that, we can do
10   that.
11   BY MS. SCATCHELL:
12     Q   So I just wanted to ask you if you recognize this
13   document?
14     A   Yes.
15     Q   Okay.  What is it?
16     A   This would be the recommendation to the dean
17   about the continuation or termination of untenured
18   faculty contract and this particular one is for Sydney.
19     Q   Okay.  Do you see the part where it says
20   personnel committee recommendation, votes in favor, 7?
21     A   Yes.
22     Q   Votes against zero?
23     A   Yes.
24     Q   And at the college recommendation it says
```

Page 53

```
 1   contract renewal votes in favor, 14?
 2     A   Yes.
 3     Q   And votes against zero, correct?
 4     A   Correct.
 5     Q   Okay.  So that would mean that there was nobody
 6   that was against Ms. Dillard getting her contract
 7   renewed, correct?
 8     A   That is correct.
 9     Q   Okay.  And would it be fair to say that on Page
10   1, which will be Dillard_DePaul 5502, do you see the part
11   where it says reasons for recommendation?
12     A   Yes.
13        MS. WERMUTH:  I'm sorry, you caught out for me, Gia.
14   What was the question?
15        MS. SCATCHELL:  I just said on Page 1, Dillard_DePaul
16   5502, the part at the bottom where it says reasons for
17   recommendation?
18        THE WITNESS:  Yes.
19   BY MS. SCATCHELL:
20     Q   Okay.  Do you see the part where it says that the
21   faculty concludes that for this period, Sydney is making
22   fair progress toward tenure in teaching, very good
23   progress toward tenure in research and good/very good
24   progress tenure in service, correct?
```




Page 54

1     A  Yes.
2     Q  Okay.  Could you explain to me what the
3 difference of fair, very good, and good are in terms of
4 this recommendation spectrum?
5     A  This language comes from our tenure & promotion
6 guidelines for the college and so there's a level at
7 graduation of the different terms of we will assess and
8 use the language to be consistent.  So there's fair, very
9 good, and then excellent.
10     Q  Okay.
11     A  The last one I believe is unsatisfactory.  So
12 it's unsatisfactory, fair, very good, and excellent.
13     Q  And was good always part of this evaluation?
14     MS. WERMUTH:  Let me just object to the form of the
15 question as vague.  Go ahead.
16 BY THE WITNESS:
17     A  What do you mean by was good always part of the
18 evaluation?
19 BY MS. SCATCHELL:
20     Q  Correct me if I am wrong, but there was a time
21 period where the good level was included and then it
22 wasn't included?
23     A  I'd have to go back and look at where the
24 language is, but yes, there was a change in the tenure &

Page 55

1 promotion guidelines where we shifted.  I believe it was
2 from good to fair.
3     Q  Okay.  Did you get rid of fair or was fair kept
4 in the spectrum?
5     A  We put fair in instead of good.
6     Q  Okay.  But then here it has fair and good?
7     A  I don't recall.  I'd have to look at exactly the
8 dates.  Sometimes they'll try to put in something to show
9 kind of a range, but I don't recall exactly what would
10 have been going in for this particular one.
11     Q  Okay.  Do you know why they changed it from good
12 to fair?
13     A  Yes.  In part, it was a request from faculty that
14 were untenured who felt like getting something that said
15 good was a misnomer when good is not -- when you go up
16 for tenure & promotion, we're looking for very good to
17 excellent and excellent in at least two out of the three
18 categories.  And so there was a discussion that I believe
19 was prompted mostly from untenured faculty asking for
20 more clarity in the term.
21     Q  Okay.  Did this come up when you say there was a
22 concern from junior faculty, did this come up -- was
23 there a particular case that made this an issue or was it
24 just across the board?

Page 56

1     A  I think it was across the board.  I don't recall
2 it being tied to a particular case.
3     Q  Okay.  Do you know a woman named ███ Peco --
4     A  ██████████████
5     Q  Yes.
6     A  Yes.
7     Q  Okay.  Could you spell her name for the court
8 reporter.
9     A  ███████ ██████ █ ███████████
10     Q  Okay.  And who is she?
11     A  ███ █████████ was on our faculty as an
12 assistant professor in journalism.
13     Q  Okay.  And do you know what ethnicity she
14 identified as?
15     A  She was a mixed race, I believe.  She identified
16 as African-American, but I'm not entirely sure.
17     Q  Is she still at the university?
18     A  No, she's not.
19     Q  Is she not in the college either?
20     A  No, she's not at the university so not at the
21 school.
22     Q  Sorry, that was a dumb question.
23     A  That's okay.
24     Q  And do you know approximately what year she left

Page 57

1 the university?
2     A  I don't recall what year it was.
3     Q  Okay.  Did she receive her tenure before she left
4 the university?
5     A  No, she did not.
6     Q  And she was tenure tracked, correct?
7     A  Yes, she was.
8     Q  Okay.  And do you remember if the good to fair
9 classification came up during her tenure application?
10     A  I honestly don't remember.
11     Q  Would anything refresh your recollection?
12     A  It's possible, but I remember having that
13 conversation, but I don't remember exactly the context
14 and who was up or what was going on.
15     Q  Okay.  No problem.  And do you know approximately
16 how many tenure track candidates are denied tenure in the
17 last five years?
18     MS. WERMUTH:  Objection.  Vague.
19 BY THE WITNESS:
20     A  No.
21 BY MS. SCATCHELL:
22     Q  And is it fair to say that somebody -- actually,
23 strike that.  I'm going to ask that later.
24     Could you look at Ms. Dillard's reviews



Page 58

1   and point out where her evaluation would be quote,
2   unquote questionable or appointment would be quote,
3   unquote questionable?
4       MS. WERMUTH: Objection vague. Are you asking her to
5   look at corrected Exhibit No. 3?
6       MS. SCATCHELL: Yes.
7       MS. WERMUTH: Or second corrected Exhibit No. 3.
8       MS. SCATCHELL: Second corrected Exhibit No. 3.
9   BY THE WITNESS:
10      A  I think if you go to the last portion of it, the
11  faculty summarize it by saying that there were some
12  concerns in teaching.
13  BY MS. SCATCHELL:
14      Q  Okay. And do you have any recollection of why
15  some concerns in teaching would have made her go through
16  a whole formal review the next year and not just a
17  portion?
18      A  In looking at this, it looks likely they did just
19  do a portion.
20      Q  Okay. Where do you see that at?
21      A  Maybe I saw it in the first one you sent. I'm
22  trying to see.
23      Q  Wait. Hold on one second Anna was kicked out.
24          (Lost connection.)

Page 59

1       MS. WERMUTH: Gia, I'm sorry. It's my turn now. I just
2   got kicked out. Can we stop the examination for a
3   moment?
4       MS. SCATCHELL: Oh, yeah.
5       MS. WERMUTH: The last thing I heard from you, Dr.
6   Murphy was if you go to the last section on the last
7   page, and then from there it went blank. Ms. Tufano, do
8   you mind reading back for me?
9          (Lost connection.)
10      MS. WERMUTH: I do have my IT person is hopefully
11  coming up shortly.
12      THE COURT REPORTER: I think she got kicked out
13  again.
14      MS. WERMUTH: Okay. Ms. Tufano, can you guys hear
15  me, I'm really sorry. I'm trying to get my IT guy.
16      THE COURT: You tell me when to read back. I'll be
17  happy to do so.
18      MS. WERMUTH: Thank you. I appreciate it. Go ahead
19  and start and let's hope I'm in here.
20          (Question and answer read.)
21      MS. WERMUTH: Thank you.
22      THE COURT REPORTER: You're welcome.
23      MS. WERMUTH: So, Gia, is there -- I'm not trying to
24  interfere with your examination. I don't know if Dr.

Page 60

1   Murphy was done. Were you done or --
2       THE WITNESS: If you look at the overview, it just
3   says the personnel committee will evaluate Sydney's
4   teaching again in winter, 2015 due to the teaching
5   challenges that we identified. However, she is making
6   very good progress in research and good/very good
7   progress in service --
8   BY MS. SCATCHELL:
9       Q  Okay. And is there a difference between a formal
10  review versus an annual or merit review?
11      A  Yes.
12      Q  Okay. What is that difference?
13      A  An annual or merit review is done by the program
14  chair and it looks at the last academic period, just the
15  one year. And then the formal reviews are the ones that
16  we're talking about now that go through a personnel
17  process and they look at not only the time period between
18  from the last formal review to the current one, but also
19  trajectory toward tenure.
20      Q  Okay. And then was there any reason why Ms.
21  Dillard had a formal review versus an annual regarding
22  this 2013 review?
23      A  Yes. All faculty go through an annual review
24  that's a merit review each year, so that's a totally

Page 61

1   separate system. And then the formal reviews are the
2   ones toward tenure & promotion.
3       THE COURT REPORTER: Hold on one second. It does
4   look like the two attorneys are frozen again. Hold on,
5   here they come.
6          (Lost connection.)
7       THE COURT REPORTER: So I saw you go out.
8       MS. WERMUTH: Yes.
9          (Question and answer read.)
10      MS. WERMUTH: Okay.
11      MS. SCATCHELL: Anna, is your IT person coming up
12  soon?
13      MS. WERMUTH: He's on with the network folks. I even
14  tried to do my hotspot and that was no better. I'm happy
15  to come over to your office, Gia.
16      MS. SCATCHELL: Do you want to just take like a ten
17  minute break?
18      MS. WERMUTH: Yeah.
19      MS. SCATCHELL: And if you need like an extra five
20  minutes or whatever, I feel like we'll make it up at the
21  end.
22      MS. WERMUTH: Thank you. I appreciate that. So do
23  you guys want to try to just come back at 2:00?
24      MS. SCATCHELL: That's perfect. If you need more





Page 62

1    time, just text me and we'll go from there.
2        MS. WERMUTH:  Thank you so much.
3                  (Short recess.)
4        MS. SCATCHELL:  Are we good to go?
5        MS. WERMUTH:  Yes.
6    BY MS. SCATCHELL:
7        Q  So I'm going to send you -- actually, let me
8    back up before we go on to the next exhibit.  Lexa, are
9    you there?
10       A  Yes.
11       Q  Okay.  Perfect.  So in your experience, would a
12   faculty member vote for someone to be reappointed if they
13   they thought that there were questionable issues with
14   their evaluation?
15       MS. WERMUTH:  Objection.  Vague.  Foundation.  Go
16   ahead.
17   BY THE WITNESS:
18       A  Yes because you're really looking at a couple
19   different things with that, so the tenure process we
20   talked about is a six-year probationary period, and so a
21   faculty member can say, yes, I want to reappoint because
22   that's a one-year reappointment with the hopes that and
23   still want to see these things addressed.  So it's a
24   different factor that they're considering.  There can

Page 63

1    still be concerns, but the concerns aren't so egregious
2    because you wouldn't want to reappoint someone because
3    that's the end and that means they're no longer going to
4    be a part of the faculty.
5        Q  Okay.  Got it.  So I'm going to send what I am
6    going to mark as Exhibit Nos.  4 and 5.  Let me know when
7    you guys receive them.
8                  (Exhibit Nos. 4 and 5 were
9                  marked for identification.)
10       MS. WERMUTH:  I have them.
11       THE WITNESS:  I just got them.
12   BY MS. SCATCHELL:
13       Q  Okay.  Perfect.  Could you please open up Exhibit
14   No. 4, please.
15       A  All right.  It's open.
16       Q  And that is titled Dillard_DePaul 6189,
17   Dillard_DePaul all the way to 6192.  And I'd like to
18   direct your attention to the emails that begins on 6189
19   and continues to 6190.  Could you take a moment and
20   review that, please.
21       A  Okay.
22       Q  Do you recognize that document?
23       A  No.
24       Q  Okay.  Do you see on page 6190 where it says your

Page 64

1    name, Murphy, Alexandra, and then your email address at
2    the top.
3        A  Oh, at the very top?
4        Q  Yes.
5        A  Sorry.  I don't see where I came in on it.
6        Q  At the top of 6190, it says --
7        A  Oh, sorry okay.  Yeah, okay.
8        Q  And it says, I will forward your feedback to the
9    leadership team and will talk to Lexa about having a
10   meeting with junior faculty.  Do you know what this is
11   about?
12       A  Looking at this this is actually about the annual
13   review not the formal review.
14       Q  Okay.  And this would be taking the good --
15       A  It's a different system.  It's about the annual
16   review rubric, so it's a completely different rubric than
17   the one for the formal review.
18       Q  Okay.  And what are the differences between the
19   two rubrics?
20       A  The annual review what they're talking here still
21   had, I think, excellent, very good, good.  I don't have
22   it in front of me, that iteration.  There was a great gap
23   category that was for like extraordinary, and that's the
24   one that program chair every year that all faculty go

Page 65

1    through.  So the program chair looks at it, makes their,
2    his or her, determination and then that moves forward
3    just to the dean, and it's only based on that one year
4    and it's only the annual -- that period is under what's
5    reviewed.
6        Q  Okay.
7        A  So there's that review.  Then there's the tenure
8    & promotion reviews which are the formal reviews that
9    we've been talking about, and the formal reviews are the
10   ones that go through a personnel process and the tenured
11   faculty then vote on them, and so they're not the same.
12       Q  Okay.  So then if somebody did not receive a good
13   annual review, would there be any consequence or what
14   would happen?
15       A  It would be a consequence in terms of merit, but
16   not contract renewal.
17       Q  Okay.  And then -- it seems that Brittany has
18   left.
19       MS. WERMUTH:  That's okay.  I'm here so we can keep
20   going.
21   BY MS. SCATCHELL:
22       Q  Okay.  How would that impact their merit?
23       A  We get a range, so the university gives a range
24   of -- they put funds in each college, and so usually





Page 66

1  they'll say okay, there's a three percent range or like
2  up to.  And so depending on the kind of overall merit
3  review that one gets, then it can distinguish what
4  percentage of that faculty might get to be added to their
5  base salary each year.
6      Q  Okay.  And then so that one faculty member's
7  merit, like a bad merit -- a bad review in terms of merit
8  could affect the whole college potentially in terms of
9  funding?
10     A  No, no.  The funding is given ahead of time.
11  It's like the percentage of the total number of faculty
12  in the college.
13     Q  Okay.  All right.  And then what is this breakout
14  that you were describing?
15     A  That was something that was attached to the merit
16  reviews that to know -- let's say somebody won the
17  teaching award or somebody in that year published two
18  books, or you know, something that even went beyond
19  excellent because the merit review like -- and I think
20  Salma says in here.  Excellent is a really broad
21  category in terms of merit.
22     Q  And then how does that differ from the very
23  good/fair category as defined in the formal reviews?
24     A  They're completely different systems and

Page 67

1  processes.
2      Q  And is there any reason for that difference, like
3  is there -- has it always been that way or is there a
4  specific --
5      A  Yeah.  The annual review again is something all
6  faculty go through, and so that's something that happens
7  to determine the raise package.  The tenure & promotion
8  process is a more kind of elaborate review process that
9  again goes over the six-year period of probation.  So
10  post someone becoming an associate professor, DePaul
11  doesn't have a post-tenure review process that
12  is -- instead they would only go through the annual merit
13  review until they decide to go up for full professor.  So
14  the process for the formal reviews is pretty like almost
15  exclusively for that probationary period, and that's what
16  decides contract renewal and kind of pushing towards
17  success towards tenure.
18     Q  Okay.  And is the formal reviewed tied to how
19  many publications a candidates publishes.
20     A  What do you mean by tied to?
21     Q  If say a candidate published a lot of or several
22  articles versus say one or one that was in progress,
23  would that have any bearing on their formal review?
24     A  It would be looked at -- so the formal review is

Page 68

1  going to look at teaching, research and service and
2  they're going to do it according to the handbook again
3  every two probationary years.  So they're going to go
4  back at least those two years and then they'll look and
5  see.  So in response to your question if somebody has
6  certain publications or what's their research activity,
7  what's going on with that, then yes, they will assess
8  that.  The annual review is only going to look at the
9  last year and they also will look at teaching research
10  and service but, it's just the program chair that's kind
11  of looking at those things.  And they tend to try to say
12  we'll count it when it's published because it can take
13  two to three years for an article to actually go through
14  the pipeline for a publication, so they want to kind of
15  in an annual review give you credit for the year that it
16  actually comes out.
17     Q  Okay.  And is there a range with how much -- like
18  what somebody's annual review score is and what their
19  raise package would look like?
20     A  Yeah.  It's pretty -- it's not a very distinct --
21  like it's not broken up in a bunch of small categories
22  because I'll be honest, in higher education the raise
23  packages are so small that, you know, it's kind of broad
24  categories in terms of what the packages in tied to the

Page 69

1  review.
2      Q  And then when you had mentioned the three
3  different categories of how a tenure-track member is
4  evaluated, is it each one a third, a third, a third, or
5  is anyone of those categories weighed more than the other
6  two?
7      A  They're going to look at the whole candidate in
8  terms of teaching, research, and service.  DePaul is, I
9  would say, probably teaching and research are paid
10  attention to probably more even.  I mean, service is
11  still necessary, and so they're going to look at all
12  three but probably weigh teaching and research more.
13     Q  Okay.  And does the College of Communication have
14  a diversity and equity inclusion plan?
15     A  We do.
16     Q  Okay.  And when did that go into effect?
17     A  We started with a full review of the college and
18  that would have been in '19 to '20, academic year '19 to
19  2020.  And based on that review, we put into place an
20  action plan.  So the beginning of the actual action plan
21  started in 2020.
22     Q  Okay.  And do you know was it a task force or who
23  participated in that full review?
24     A  Yeah, it was a task force that was led by our



Page 70

1    Diversity Advocate, Maria DeMoya for the 2019 to the 2020
2    year.
3        Q   And do you remember what that full review, what
4    the results of that full review were?
5        A   There's a report that came out.  So in terms of
6    the full review, I haven't looked at it recently,
7    recently.  So I can say I think there were some questions
8    about staff and staff versus faculty and feelings of kind
9    of staff feeling a business disempowered and a little bit
10   excluded, and so that was one of the things that we tried
11   to address in our action plan.  I believe that the
12   results, and again I want to look back to make sure I am
13   capturing it right, but I believe that the student and
14   faculty results were relatively positive just in terms of
15   college, but we can always do better.  And so we
16   established kind of some of the things that we want to
17   try to address in the action plan.
18       Q   Okay.  Do you know how many students responded to
19   the survey?
20       A   I don't know.
21       Q   Was it a survey that they responded to or how did
22   they give the feedback?
23       A   I believe they did a survey and focus groups, but
24   I'd have to go back and look.  I wasn't on the task force

Page 71

1    and it's been a couple years since I looked at it.
2        Q   And do you remember who else was on it besides
3    Maria DeMoya?
4        A   Again, I'd have to look at it.  I believe Sheena
5    Ramsay was on it from staff, I think Karen Winters, Jay
6    Baglia, and I'd have too look to see who else.  I'm sure
7    I'm missing people.
8        Q   And so then before 2019, there wasn't a diversity
9    equity, and inclusion policy?
10       MS. WERMUTH:  Objection.  Form.  Misstates the record
11   evidence.  Go ahead.
12   BY THE WITNESS:
13       A   We had a diversity advocate in place, and then
14   we're working toward -- we didn't have like a systematic
15   action plan before that.
16   BY MS. SCATCHELL:
17       Q   Okay.  And was the diversity advocate, a tenured
18   professor or was it a staff member?
19       A   I believe when Maria started, she's faculty.  I
20   believe she took the position prior to tenure, but kept
21   it post-tenure.  So she was a tenured track, but not
22   tenured when she first started.
23       Q   Okay.  And then is this for just the college or
24   for the university as a whole?

Page 72

1        A   She represented the college, but she worked with
2    other diversity advocates and it was coordinated by the
3    university.
4        Q   Okay.  And then you had mentioned that the staff
5    had felt disempowered and excluded, correct?
6        MS. WERMUTH:  I'm going to object to the question.  I
7    think you've misstated the testimony.  Go ahead, Lexa.
8    BY THE WITNESS:
9        A   You had asked what I remembered from the report,
10   and one of the area that I remembered from the report was
11   wanting to address faculty and staff divides.
12   BY MS. SCATCHELL:
13       Q   Okay.  And if you remember, do you remember what
14   those divisions were?
15       A   I could try to go back and recollect, but without
16   it in front of me, I'd feel like I'm kind of talking
17   through it, so...
18       Q   We can come back to it.  I think I should have
19   it.
20           And it's fair to say that diversity,
21   equity, and inclusion is abbreviated DEI?
22       A   Yes.
23       Q   Were there any DEI concerns before the college
24   put the action plan in place in 2020?

Page 73

1        MS. WERMUTH:  Objection.  Vague.
2    BY THE WITNESS:
3        A   I think we are always trying to look and do
4    better.
5    BY MS. SCATCHELL:
6        Q   And do you remember what any of the specific DEI
7    concerns were?
8        MS. WERMUTH:  Objection.  Assumes facts not of
9    record.  Go ahead.
10   BY THE WITNESS:
11       A   Not enough to give you like one, two, three,
12   four.
13   BY MS. SCATCHELL:
14       Q   Okay.  If I just gave you a list of them, would
15   you be able to say yes or no?
16       MS. WERMUTH:  Objection to the form of the question.
17   Vague.  Calls.  For speculation.
18   BY MS. SCATCHELL:
19       Q   Okay.  Have you as the associate dean, interim
20   dean, or acting dean, so that would be 2018 to 2022, have
21   any faculty members come to you with any sort of racial
22   discrimination concerns?
23       A   To me directly, no.
24       Q   Okay.  Do you know if they came to somebody else?





Page 74

1    A  I believe that there were meetings with Salma
2  Ghanem.
3    Q  Okay.  And do you know what faculty members that
4  those included?
5    A  Yes.  I think it was Sydney and ███████
6    Q  And do you know if Maria DeMoya was part of any
7  of those communications or complaints?
8    A  I don't know.
9    Q  And what is your knowledge of any of those
10  complaints made by Sydney and ████
11    A  All I know is that I believe there was something
12  that was pushed forward to OIDE, but I wasn't privy to
13  the actual -- I was never given the actual complaint.
14    Q  Okay.  Do you know who received the complaint?
15    A  I would imagine Salma would have received it, but
16  I'm not sure if she got a copy of that, but it would have
17  gone through whoever the OIDE officer was who was
18  handling it.
19    Q  And I'm going to direct your attention to Exhibit
20  No. 5.
21    A  Okay.
22    Q  Okay.  Can you take a moment and review it,
23  please.
24    MS. WERMUTH:  I don't have it yet.  What number is

Page 75

1  this?
2    MS. SCATCHELL:  It was in the last email with 4 and
3  5.
4    MS. WERMUTH:  I'm sorry.  Thank you.  Okay.
5    THE WITNESS:  Okay.  Oh, Anna, do you have it, sorry?
6    MS. WERMUTH:  I do.  Thank you.
7  BY MS. SCATCHELL:
8    Q  Could you take a moment to review it.
9    A  Yeah.
10    Q  Just let me know when you're finished.
11    A  I am, sorry.
12    Q  Okay.  Do you recognize that document?
13    A  I can see what it is, which is Sydney's CV.
14    Q  And then do you see there are certain handwritten
15  numbers on some of the pages?
16    A  I do.
17    Q  Okay.  Did you put those numbers in there?
18    A  No.
19    MS. WERMUTH:  Gia, I'm sorry.  What are you looking
20  at?
21    MS. SCATCHELL:  There are certain handwritten page
22  numbers on the exhibit.
23    MS. WERMUTH:  And can you point me to a Bates number
24  because I'm not seeing handwritten page numbers.

Page 76

1    MS. SCATCHELL:  No, no, no, not handwritten page
2  numbers, handwritten numbers on the pages.
3    MS. WERMUTH:  Okay.  Can you point me to the pages?
4    MS. SCATCHELL:  Yes.  It will be Dillard_DePaul 3195
5  which contains handwritten numbers one, two, three, and
6  four and then two stars where it comes to two of the
7  articles.  And then on Page 3196, there is a number 5.
8    MS. WERMUTH:  Okay.  Thank you.  And I'm sorry, the
9  question is?
10    MS. SCATCHELL:  Ms. Tufano, could you read back the
11  question.
12    (Question read.)
13  BY MS. SCATCHELL:
14    Q  And Lexa, do you know who did put those numbers
15  on the first two pages?
16    A  No.
17    Q  And you don't know what those numbers mean?
18    A  No.
19    Q  Or what those stars mean, correct?
20    A  Correct.
21    Q  Okay.  And are you familiar with the program, the
22  PRAD chair position?
23    A  Yes.
24    Q  Okay.  What is that position?

Page 77

1    A  We have four programs in the College of
2  Communication and PRAD is one of them.  And each of the
3  programs has a chair who oversees the activities within
4  that program.
5    Q  Okay.  And what activities would the PRAD chair
6  be reviewing?
7    A  So the PRAD chair would call the program meetings
8  and would assign teaching, do the scheduling for the
9  teaching, hires adjuncts for the program, and then also
10  does those annual reviews that we talked about.
11    Q  Okay.  And that would only be for the PRAD?
12    A  Yes.
13    Q  Okay.  And then about how many faculty members
14  are involved in the PRAD?
15    A  You probably have a document that has this, so I
16  would -- I think there's about 16-ish.
17    Q  Okay.
18    A  But I don't remember off the top of my head.
19    Q  No problem.  And who is the current PRAD chair?
20    A  Currently, it's Maria DeMoya.
21    Q  Okay.  And how long has she been in that position
22  for?
23    A  This is her second year.
24    Q  Okay.  And who was the PRAD chair prior to Ms.





Page 78

1  DeMoya?
2      A  ████████
3      Q  And before ████  ████
4      A  ████  ████████
5      Q  Okay.  And then how long was ████  ████  in that
6  position for?
7      A  I believe she stepped into Theresa's position for
8  a year, then another three years and then one more year.
9  So five years.
10     Q  Okay.  And then do you receive extra compensation
11 for serving as the PRAD chair?
12     A  Yes.
13     Q  And how much is that?
14     A  So it again ranges across the different program
15 chairs.  For the PRAD chair -- well, all program chairs
16 receive one unit of summer pay which is one-twelfth of
17 their base salary, and then they receive an annual
18 stipend.  It's different per chair depending on the scope
19 of what they do.  So for the PRAD chair, I believe it's
20 7,000 to 7,500, something like that for the year.
21     Q  And was ████  ████  first a program director
22 and then she became a PRAD chair?
23     A  Yeah.  We shifted the name of it to better
24 indicate the duties.

Page 79

1      Q  What's the difference between a program director
2  versus a program chair?
3      A  So when the program director first started, we
4  had a centralized scheduling and hiring of adjuncts.  So
5  as the scope got bigger for the position, we shifted it
6  from director to chair just as a way to better to
7  indicate the scope of the job.
8      Q  Okay.  And is there any salary difference between
9  director and chair?
10     A  The director -- we don't have directors anymore,
11 so I don't -- I wasn't involved with what the salary was
12 for Theresa, so I don't know what she got as a director
13 versus moving to chair.
14     Q  And did Ms. Dillard ever apply for the PRAD chair
15 position?
16     A  Yes.
17     Q  Okay.  Do you remember approximately when that
18 was?
19     A  She applied for the chair position in winter of
20 2019.
21     Q  And do you remember what the outcome of that
22 application was?
23     A  Yes, I do.
24     Q  What was that?

Page 80

1      A  She was not selected as program chair.
2      Q  So there was a faculty vote, correct?
3      A  Yes.
4      Q  And do you remember who voted on that?
5      A  On all full-time faculty are eligible to vote --
6      Q  Okay --
7      A  Sorry, I should clarify, within public relations
8  and advertising.
9      Q  And just because they're all eligible to vote
10 doesn't mean they all have to vote, right?
11     A  Right.
12     Q  How many factors do you need for a quorum or does
13 that not matter?
14     A  I believe it's two-thirds.
15     Q  Okay.  And do you remember how many people voted
16 against Ms. Dillard for being the program chair?
17     A  I believe 13.
18     Q  Do you remember how many voted in favor of her
19 becoming program chair?
20     A  I believe it was three.
21     Q  Did you vote in that --
22     A  No.
23     Q  Were you present for the vote?
24     A  Yes.

Page 81

1      Q  And were there minutes that were taken during
2  that vote?
3      A  No.
4      Q  Is there fully reason why there weren't any
5  minutes taken?
6      A  I don't know that we have taken minutes in
7  meetings, so it wasn't...
8      Q  Was there any sort of record that was made?
9      A  Meaning?
10     Q  Of like the vote of like who said yes, who said
11 no?
12     A  No.
13     Q  Do you remember any of the reasons why
14 individuals voted against Ms. Dillard becoming program
15 chair?
16     A  It's an anonymous vote, so it's not a hands up,
17 so I can't say this was from one person to another in
18 terms of why they might have voted against.
19     Q  So I guess I just want to understand how the
20 process works.  So does the whole faculty discuss the
21 candidacy before voting or how does that work?
22     A  So in this case the way the program chair
23 election went, the program meets, and any candidate gives
24 a little overview just in terms of their statement to the





Page 82

1    faculty goals, different things like that, that person
2    then leaves the room or people will leave the room and
3    then a discussion would happen and then the vote is
4    taken.
5        Q  Okay.  And then do you remember if anybody else
6    was up for that position or was it just Ms. Dillard?
7        A  There were other people nominated who chose not
8    to run.
9        Q  Okay.  And was Ms. Dillard nominated?
10       A  She nominated herself and then she was nominated
11   by one other person.
12       Q  Do you remember who that one other person was?
13       A  Yes, it was Don Ingal.
14       Q  And do you remember if anybody abstained from
15   that vote?
16       A  I don't believe so.
17       Q  Okay.  And then prior to taking the vote at any
18   of these elections or chair election positions, is there
19   any sort of discussion about the individual candidates or
20   how does that work?
21       A  So, yeah.  Ideally you have a discussion
22   about -- as the candidate leaves, you have a discussion
23   and then the vote is called.
24       Q  Okay.  And do you remember what the discussion

Page 83

1    consisted of in this particular case?
2        A  Yeah.  A lot of the discussion started
3    circulating around feelings about the actual process
4    people feeling like -- as well as the position itself,
5    and they would talk about the position itself just in
6    terms of what does it take to be a program chair in PRAD,
7    what does this look like, kind of is it tenable for one
8    person to do.  So there was a lot of discussion about
9    that.
10       Q  Okay.  And what was the outcome of those
11   discussions?
12       A  The outcome of the discussions?
13       Q  Uh-huh.
14       A  About the process?
15       Q  Yes.
16       A  We changed the process.
17       Q  Okay.  And when did you change the process?
18       A  We changed the process prior to the next year.
19       Q  Okay.  And what did you guys change about the
20   process?
21       A  We shifted the process so that now there is a
22   written statement that any faculty who's either -- who's
23   nominated or nominates themselves.  They give a written
24   statement if they accept the nomination, there's time.

Page 84

1    And then they also provide not only that statement but
2    their CV that goes to all of the program members.  And
3    anyone we allow for an anonymous survey to go out that
4    let's people give feedback about any of the candidates so
5    we give time for that to take place.  And then we come
6    back and follow through with -- then a statement can
7    happen and then a discussion happens and then the vote.
8        Q  Okay.  And do you remember what the feedback was
9    from the voting results from Ms. Dillard?
10       A  Can you tell mean by feedback --
11       Q  You said that during the survey faculty members
12   are allowed to give feedback --
13       A  We didn't have that in place during --
14       Q  Oh, okay --
15       A  Yes.  That was one of the issues that was raised
16   was that there wasn't a good way to provide feedback
17   about any particular candidate.
18       Q  Okay.  Do you remember if Ms. Dillard's CV was
19   provided to the faculty members that voted?
20       A  I don't recall.
21       Q  Anything that would refresh your recollection?
22       A  Only if I saw that we did distribute it.  So
23   that's not part of the process, but I don't remember if
24   that was part of the process at that point which was one

Page 85

1    of the reasons why we kind of took a pause and wanted to
2    rethink the process based on that feedback.
3        Q  Okay.  Do you remember if anything -- I guess my
4    question is, I'm a little bit confused.  What of Ms.
5    Dillard's qualifications were discussed in this election?
6        A  A lot of conversation kind of circled around just
7    in terms of what do you need in a program chair, you need
8    someone who's responsive, you need someone who's timely,
9    you need kind of collaboration, various kind of aspects
10   of the position.  I don't remember how specifically
11   was tied back to Sydney in terms of the conversation.  A
12   lot of what took from it as a very new dean in that role
13   was getting -- feeling like people were telling me we
14   feel very rushed in this.  We feel like this position
15   needs to be rethunk, rethought, and so it was one of
16   those where there were conversations kind of circling
17   around and indications.  But to be able to say
18   specifically this, this, and this, it's hard to kind of
19   tieback.
20       Q  Okay.  Is there any record of the voting results
21   or any of the discussion that occurred?
22       A  We didn't take minutes, so there's not a written
23   record.
24       Q  So not even like an informal email or anything



Page 86

1    like that?
2        A   I don't remember if an email went out after the
3    fact that included the vote.  I don't remember.
4        Q   And when you had said that, and I don't want to
5    misstate your testimony, but you stated that there was
6    some qualifications that a program share was supposed to
7    have which would be that there are responsive, timely.
8    Did I miss anything else?
9        A   I think present, timely, responsive, they talked
10   a lot about just the number of the kind of time
11   commitment that it took in terms of the program chair, I
12   think they felt like it had grown so much in terms of
13   hiring adjunct and the various things that they needed to
14   be thinking about.
15       Q   And also collaborative, too, right?
16       A   Yeah, I think that was mentioned as well.
17       Q   Okay.  And so out of any of those qualifications,
18   what if any of Sydney's qualifications were tied back to
19   any of those determinations?
20       A   That's where again I think that there were things
21   that were floated out and I don't know -- I can't tell
22   you if people were professional courtesy, just unwilling
23   to say this, this, and this, you know, tie in
24   specifically that they kind of just put things out, that

Page 87

1    was the way I felt the conversation was kind of
2    unfolding.  And then as it moved toward kind of looking
3    at me like this process, we needed a chance to be able to
4    rethink the process and they rethink the position.  There
5    was a lot of that discussion that was kind of again
6    floating around.
7        Q   Okay.  And was there anything specifically that
8    made you think that they were trying to extend a
9    professional courtesy to some of those issues that were
10   being floated around?
11       A   For me, just the implication was because nothing
12   was -- I didn't see anything specifically directly saying
13   Sydney is not responsive, you know.
14       Q   Do you remember if Sydney talked about her
15   qualifications at the beginning of her presentation or at
16   any place during her presentation?
17       A   She did make a statement at the beginning and did
18   talk about kind of her vision and the kinds of workshops
19   and things that she had done in terms of leadership.
20       Q   Okay.  And do you remember what that consisted of
21   specifically?
22       A   I believe she talked about, and I can't remember
23   the name of it, but she was participating in a leadership
24   development program with DePaul.  And so I think she

Page 88

1    talked about some of the things that she had learned in
2    that program.
3        Q   Okay.  And do you know if any of those leadership
4    qualities were discussed in the vote?
5        A   I don't remember.
6        Q   Okay.  And who is Eva ███████████?
7        A   Eva ███████████ was a lecturer in the public
8    relations and advertising program.
9        Q   Is she currently at the university?
10       A   No, she's not.
11       Q   Do you know when she left?
12       A   Yes, she left in 2019.
13       Q   Do you know why she left?
14       A   Yes, her contract was not renewed.
15       Q   Okay.  Any particular reason why?
16       A   Yes.  There had been a pattern with Eva
17   ███████████ of a lack of service commitments and some
18   teaching questions.
19       Q   Okay.  And do you remember if she said anything
20   about Sydney during the vote?
21       A   Yes.
22       Q   What did she say?
23       A   I do remember that -- I don't exactly remember
24   the phrasing, but I do remember that Eva ███████ said

Page 89

1    something about we need to have a program chair who is
2    present and on campus.
3        Q   And do you know what she meant by that?
4        A   I don't want to put myself in her mind, but, you
5    know, in terms of where she was, I think she felt like --
6        MS. WERMUTH:  I am going to object on foundation, I'm
7    sorry.  Calls for speculation.  Go ahead, Lexa, I'm
8    sorry.
9    BY THE WITNESS:
10       A   I am speculating because I'm not Eva ███████,
11   but I think it was about kind of the need to have
12   somebody who was a presence on campus.
13   BY MS. SCATCHELL:
14       Q   Okay.  And was there any reason to think to
15   Sydney wasn't present on campus?
16       A   I think the indication was that --
17       MS. WERMUTH:  I'm sorry, Lexa.  Hang on one second.
18   Again, I'm objecting on foundation and calls for
19   speculation.  Go ahead.
20   BY THE WITNESS:
21       A   What I would take is public relations and
22   advertising are a pretty active faculty, they do a lot of
23   events.  They do a lot of evening events pre-Covid.  And
24   now I think that the implication would be that they



Page 90

1    didn't see Sydney at a lot of those events.
2    BY MS. SCATCHELL:
3        Q   Okay.  In your opinion, do you think Sydney was
4    present and on campus?
5        A   It's hard for me to judge because I wasn't in
6    public relations and advertising, and so I had a very
7    different relationship with her then the faculty in the
8    program, so I also was not going to all of those events
9    at that point.  So it's hard for me to say one way or
10   another.  My role was very different.
11       Q   Okay.  And were those events mandatory?
12       A   No.
13       Q   And when he Eva ████████ had mentioned the
14   whole presence on campus aspect of it, do you know what
15   anybody's response was to that, did they jump in, or what
16   happened next?
17       A   I do remember in terms of the presence piece of
18   it.  I think people agreed that the program chair needed
19   to have a presence on campus.  She did, yeah.
20       Q   And do you know if Sydney's -- let me back up.
21            Are you aware that Sydney has a medical
22   condition?
23       A   I am.
24       Q   Okay.  Do you know what that is?

Page 91

1        A   I don't know the details of it.  I know what
2    Sydney has told me just in terms of a neurological issue
3    with the results in seizures.
4        Q   And do you know if Sydney had went on maternity
5    leave?
6        A   If she what?
7        Q   Went on maternity leave?
8        A   I know that she had had, yeah, a baby, so she was
9    on a leave a couple years prior to that.
10       Q   Okay.  So when you decided to rethink the process
11   of program chair after this election, was there any
12   reason why you let the vote go through or continue?
13       A   Yeah, because I think we were in the current
14   process and so to stop that vote would have, I think,
15   been unfair.
16       Q   Unfair to who?
17       A   To Sydney.  I didn't expect the vote to go.  It
18   wasn't like I knew where the vote was going to go.
19       Q   Okay.  And by expect the vote to go, can you
20   expand on that?
21       A   I didn't expect the majority of the faculty to
22   vote against her candidacy.
23       Q   And you testified that you didn't vote, right?
24       A   Correct, I did not vote.

Page 92

1        Q   And was there any reason why you expected the
2    vote not to be against her candidacy?
3        MS. WERMUTH:  I'm going to just object insofar as you
4    mischaracterized her testimony.
5    BY THE WITNESS:
6        A   I didn't know what the vote would be, so I needed
7    to let the vote happen because that would be part of the
8    process.
9    BY MS. SCATCHELL:
10       Q   Would another option have been to not have the
11   vote at that time?
12       A   That would have been another option, yes.
13       Q   Okay.  Was that within your control or authority?
14       A   Probably.
15       Q   Okay.  Is there any reason why you didn't do
16   that?
17       A   Because in that moment, I was following the
18   process as it was laid out.
19       Q   Okay.  And was that in the handbook or where is
20   that process laid out?
21       A   No, it's not in the handbook, but we had a
22   document that explained what the process was.
23       Q   Do you remember what that document was called?
24       A   It would have been called -- no.  It would have

Page 93

1    had something to do with program chair selection.  It's
2    now been changed to the one that we've -- now that we've
3    overhauled the process, now it's been changed.  But it
4    was a broader -- it didn't have the detail that it does
5    now.
6        Q   And did anybody mention Sydney's medical
7    condition when they were discussing their position?
8        A   I didn't hear anyone mention specifically
9    medical position.  Eva ████████ asked a question that
10   I can't remember the exact phrasing of, but it was
11   leading toward inappropriate and I told her that, so we
12   stopped that line of conversation.
13       Q   Do you remember what the gist of it was?  It
14   doesn't mean you have to know it verbatim.
15       A   I think it was connected to is she around, you
16   know, and then leading towards -- she was starting to go
17   into questions of is something wrong.
18       Q   Okay.  And did she also ask something like does
19   she even teach her?
20       A   I don't remember that exactly.
21       Q   Okay.  And do you know if she was disciplined for
22   her inappropriate question?
23       A   Disciplined post.  I think she was called on the
24   inappropriateness question in the moment.



Page 94

1    Q  And in your opinion, would Ms. Dillard's presence
2  on campus and her medical condition have any connection
3  to the position?
4    A  I think that the position does require someone to
5  be present.  You know, now again, that was pre-Covid so
6  we didn't have the things that we have in place now, but
7  I do think it at that point especially was a very kind of
8  on-campus position.  I wouldn't connect that to her
9  medical condition.
10   Q  Okay.  And do you know if Ms. Dillard has any
11 kind of physical or mental limitation based on her
12 disability?
13   MS. WERMUTH:  Objection.  Vague.  Calls for an expert
14 opinion.  Foundation.  Go ahead.
15 BY THE WITNESS:
16   A  I only know what I've seen as depicted in the
17 lawsuit.
18 BY MS. SCATCHELL:
19   Q  Okay.  And do you know if she's requested any
20 accommodations?
21   A  Yes.
22   Q  Do you know what those accommodations were?
23   A  Yes.  Do you want me to--
24   Q  Yeah, go ahead.

Page 95

1    A  So, yes.  Starting in 2018, I believe, I was
2  actually involved with our HR coordinator or the liaison
3  with navigating and coming up with the accommodations,
4  and so requests were made for a research assistant and
5  for a teaching assistant and for some modifications in
6  terms of teaching either courses or modality.
7    Q  Do you remember what accommodations were given to
8  Ms. Dillard?
9    A  Yes.  We brought in a research assistant and a
10 teaching assistant and also worked to shift the courses
11 she was set to teach as well as the modalities.
12   Q  Okay.  And what would you consider to be the job
13 duties that would require the program chair to be on
14 campus?
15   A  Well, again, at the time, our business was on
16 campus, so I think that there's a lot of -- and being at
17 the different events being kind of the face of the
18 program.
19   Q  Okay.  At the time that Sydney applied for the
20 position, was there a job description or job duties list
21 for that specific position?
22   A  Probably.  I have to look back and see.  I think
23 it might have been at the top of the selection process,
24 and those were -- that's a kind of general list for all

Page 96

1  the program chairs.  And I don't want to over emphasize
2  presence on campus as like the reason people voted
3  against her because I really don't know.
4    Q  Okay.  And in your opinion, do you think that Ms.
5  Dillard was qualified for the program chair position?
6    A  I think she met the minimum qualifications, yes.
7    Q  And in your opinion, what would those
8  qualifications be?
9    A  Minimally, you needed to be a tenure-track
10 faculty member with tenure in the program area.
11   Q  Okay.  And do you think that she was lacking any
12 of the qualifications?
13   A  At the time, you know, I needed to -- the way the
14 process works it's a faculty driven process, and so at
15 that point I am looking at what recommendation comes to
16 me from the faculty.
17   Q  Okay.  And could you have overturned the
18 faculty's decision?
19   A  In theory, yes.
20   Q  Okay.  And in theory, what do you mean by that?
21   A  In theory, it's a recommendation to the dean, a
22 decision like that and it's similar to the tenure
23 promotion that we've talked about.  So yes, in theory I
24 could do that.  In practice, that's a rare thing to do.

Page 97

1    Q  Okay.  And is there any reason why you didn't
2  overturn the vote?
3    A  In the moment, yes.  I think that trying to kind
4  of listen and pay attention to all of the kind of
5  messages coming at me, and so I had to kind of weigh.  If
6  I would have overturned that vote, then I'm looking at a
7  13 to 3 kind of pretty major majority, and I didn't want
8  to, first of all, set somebody up for failure if you put
9  them into a position where they don't have the confidence
10 of the faculty within the program, then that's an uphill
11 battle there.  And so that's where I thought, okay, my
12 best route forward is try to just do a pause.  And so my
13 goal was do a pause on this, not make this necessarily
14 about Sydney's candidacy as much as we need to kind of
15 revisit, again, the process and the position, and I let
16 her know that that's what I wanted to do.  And so that's
17 what we did is took a pause, took some time to kind of
18 look at the position, look at the selection process, look
19 for ways that we could make it kind of more thorough.
20 And so then, we put that into place the following fall
21 and called for new nominations then that next year.
22   Q  And was there any of the job duties that the
23 program chair had at the time that could not be done
24 remotely or not on campus?



Page 98

1    A   That's a hard question.  Again, we were pre-Covid
2   so life is on campus.  So we really didn't have a culture
3   of doing things remotely, it was more rare that someone
4   would phone in or we didn't have Zoom capabilities.  We
5   didn't have what we have now.
6    Q   Okay.  And speaking of culture, how would you
7   describe the faculty culture at the Department of
8   Communications or College of Communications?
9    MS. WERMUTH:  Objection.  Vague.  Go ahead.
10   THE WITNESS:  Yeah, that's a big question.
11  BY MS. SCATCHELL:
12   Q   Okay.
13   A   So, you know, I think if you think of
14  organizational cultures, I can't say that it's like one
15  unified thing.  There's definitely different kind of ways
16  of thinking about it.
17   Q   Okay.  And what are some of those different ways
18  of thinking about it?
19   A   So, yeah, depending on -- I mean, I think I need
20  more help to narrow it down.
21   Q   Okay.  I'll come back to that one.  Let me just
22  go back to the program chair.
23        So who ended up serving that position for
24  the rest of that term?

Page 99

1    A   I went back to ███████ who had asked not to -- she
2   wasn't going to -- she was going to step out of the
3   program chair position, and I felt that the best way
4   forward was to ask her to continue for the one extra year
5   while we worked out the kind of issues that the faculty
6   were wanting us to look at.  So she stayed in it for the
7   extra year.
8    Q   And that would be ████  ████
9    A   Yes.
10   Q   ████████
11   A   ████████
12   Q   Okay.  Did you ask Sydney if while you guys were
13  revamping the program chair position, if she would like
14  to step in as the interim program chair?
15   A   No, I didn't.
16   Q   Any reason why?
17   A   Yeah.  I think going back to what I talked about
18  before, I didn't want to put her in a position again
19  where she -- at that point, the vote told me that there
20  wasn't enough confidence in moving forward in that
21  election for whatever reasons, and so I thought, again,
22  take a pause, continue with ████ for the year while we
23  rethink, and then invite for the nominations to come
24  back.

Page 100

1    Q   And do you remember if you had any discussion
2   with Sydney about the voting results?
3    A   I did talk to her right after the vote to let her
4   know what had happened, and then we had a phone call, I
5   think, a week later.
6    Q   Okay.  And did you explain to Sydney what those
7   reasons were for that she wasn't nominated for the
8   position?
9    A   I think I tried to talk a lot about, again, what
10  I heard from the meeting, which was we need to take this
11  pause.  So I was trying to emphasize that we need to kind
12  of pay attention to what was going on with the process
13  and what was going on with the position.
14   Q   Okay.  Did you ask Sydney to be part of the
15  process in terms of revamping that position?
16   A   Specifically --
17   Q   Yes --
18   A   -- revamping the position?
19   Q   Yes.
20   A   No.
21   Q   Do you remember who was a part of that decision?
22   A   A part of the process of looking at that, I talked
23  to our leadership team about it and then tried to get
24  feedback on what was going on with all the program

Page 101

1   chairs.  Because even though I had only talked to the
2   PRAD faculty, I wanted to make sure and see is this
3   something that's common across all of the other program
4   chair positions.  So one of the things that had come up
5   was the scheduling issues.  So I got feedback from all
6   the program chairs to get a sense of what their workload
7   was like, how many people do they typically hire, what
8   are the different kinds of aspects or the pressure points
9   of the position.  And so from that, made a decision to
10  rethink our director of advising who now serves as a role
11  as a assistant dean of advising and scheduling.
12   Q   Okay.  And what specifically about scheduling was
13  a quote, unquote, pressure point?
14   A   It's a really time-sensitive process.  And so
15  when you're trying to balance research, teaching, all of
16  your other service obligations, the other kinds of duties
17  in terms of the program chair as well as just being a
18  regular faculty member then the schedule is a tricky
19  thing because it has to be in at a certain deadline, and
20  that was one of the things that had moved into the realm
21  of program chair that was not part of the program
22  director role.  So it really only been a part of that
23  role for maybe five or six years, and so it just felt
24  like a good time to revisit that, is it too much.  Is it



Page 102

1　too much for any one person to do across the different
2　programs.
3　　　　And so from that what I learned is that
4　for a couple of the programs, it seemed okay because
5　they're smaller.  But for two of the programs, it's just
6　com studies and public relations in advertising.  They
7　handle a lot more classes that they have to schedule, and
8　we wanted to also try to look at how we could coordinate
9　the scheduling across the area so that we could maximize
10　the courses that different students could take because
11　that helps with enrollment in the classes.  So we, again,
12　used to have a centralized schedule person.  It got too
13　big for that but what we lost with centralizing it was
14　the coordination.  And so for a lot of reasons, in
15　talking through this it made sense to have somebody kind
16　of help oversee it.  She does do more help with public
17　relations and advertising with the like kind of the
18　logistics of the early schedule than she does for any of
19　the other programs.
20　　Q  And then just so we have a clear record, who do
21　you mean when you say she?
22　　A  Sorry.  Ginny Nightingale who is our assistant
23　dean for scheduling and advising.
24　　Q  And when did she start at the university?

Page 103

1　　A  Oh, gosh.  I have no idea when she started at the
2　university.  It was before 206 (sic) because we were
3　still up in Lincoln Park.  I am going to throw out 2005,
4　but up not entirely sure.
5　　Q  Okay.  And you had previously stated that the
6　program chair position for PRAD was a significant time
7　commitment, right?
8　　A  Yes.
9　　Q  And that ███ ███ had she stepped down or why
10　did she not want to be the program chair?
11　　A  She was ready to do some other things.
12　　Q  Okay.  It's a three-year term, right, for program
13　chair?
14　　A  Yes.
15　　Q  And do you know if she was at the end of her
16　three-year term?
17　　A  ███ ███ is not in the role any more.
18　　Q  When she was, was --
19　　A  Oh, yes.  That's why.  She was at the end of her
20　three-year term and so she could have gone for another
21　term if she would have chosen to, and so she had chosen
22　not to move forward, and so that's where we're doing the
23　election.
24　　Q  And did you do a vote for her to remain in that

Page 104

1　position?
2　　A  No, I did not.
3　　Q  Is there any reason why?
4　　A  No.  I think it was just a continuation.  So for
5　newer role, I didn't feel, no.
6　　Q  Is that part of the policy that any extension of
7　three years requires another vote, or how does that work?
8　　A  I don't think we have in written into a policy.
9　　Q  Okay.  Do you remember if there's been other
10　circumstances where if somebody's been asked to remain in
11　that role, hence the term?
12　　A  No.  I can't -- I don't recall hearing.  I think
13　it's happened in probably other colleges.
14　　Q  Okay.  Do you remember or let me back up.
15　　　　Did you have any concern about ███ ███
16　remaining in that position considering that she decided
17　that she did not want to do that position again?
18　　A  No, I didn't have any concerns.
19　　Q  Okay.  And why is that?
20　　A  I worked pretty closely with ███ in that role
21　for the time period that she had been in the program
22　chair position.
23　　Q  Okay.  Now, Sydney was not included in that
24　discussion with all the issues with the program chair,

Page 105

1　correct?
2　　MS. WERMUTH:  Objection.  Vague.  Confusing.  Go
3　ahead.
4　BY THE WITNESS:
5　　A  She wasn't in the room when they first started
6　talking those concerns.
7　BY MS. SCATCHELL:
8　　Q  Was she in the room later?
9　　A  We kind of went back to -- I took the feedback
10　and then started working through, kind of what we're
11　going to do -- we didn't hold other major meetings about
12　it.
13　　Q  Okay.  And have you seen any other program chair
14　candidates that were voted down?
15　　A  Have I seen that?
16　　Q  Yes.
17　　A  I'm trying to think back when we were a
18　department, we had one that was -- no, she wasn't.  So,
19　no.
20　　Q  Okay.  And how many tenured faculty would you say
21　identify as African-American at the College of
22　Communications?
23　　A  In the College of Communications right now, I
24　think Sydney is our only tenure track, tenured faculty

27 (Pages 102 to 105)



Page 106

1  member.
2      Q  That's African-American?
3      A  That's African-American.  We have one member of
4  the public relations and advertising program who is an
5  assistant professor, but he is African.
6      Q  And in your opinion, is there a difference
7  between the two?
8      MS. WERMUTH: Objection.  Form.  Go ahead.
9  Foundation.  Go ahead.
10  BY THE WITNESS:
11     A  I think that one is African-American, one is
12  African.  One is African, so he's got -- they are going
13  to each have different aspects of identity and
14  experience.
15  BY MS. SCATCHELL:
16     Q  Okay.  And do you know -- well, you identify as a
17  Caucasian, correct?
18     A  Yes.
19     Q  Okay.  And a female, correct?
20     A  Yes.
21     Q  Okay.  Do you remember what Sydney had said
22  during her presentation?
23     A  Which presentation?
24     Q  For program chair.

Page 107

1      A  I think I said already that I recall her talking
2  about her experience in the leadership workshop that she
3  was a part of or the leadership development program at
4  the university.  I don't remember other details of her
5  presentation.
6      Q  In that leadership role, did you help her with
7  that at all?
8      A  The leadership development program?
9      Q  Yes.
10     A  We had at least one meeting where we talked
11  about -- she kind of laid out her goals in terms of
12  developing as a leader, and so we talked about that.  And
13  then we did talk after the program chair position where I
14  tried to -- we looked at what are other leadership
15  opportunities, both within the college and outside of the
16  college, that would kind of help her -- I was hoping
17  would help her, you know, find ways to build experience,
18  have that experience in terms of a leadership role.
19     Q  And do you remember what options that you guys
20  discussed?
21     A  Yeah.  We talked about within the college looking
22  at graduate director positions.  And then outside of the
23  college, I talked to her about things like faculty
24  council and looking at leadership opportunities in those

Page 108

1  areas.
2      Q  Okay.  And do you remember if she said anything
3  about the innovation fund?
4      MS. WERMUTH: Objection.  Vague.  Go ahead.
5  BY THE WITNESS:
6      A  Do you mean in her presentation?
7  BY MS. SCATCHELL:
8      Q  Yes.
9      A  I don't remember.  She might have, I don't
10  remember.
11     Q  Are you aware of any innovation grant that Sydney
12  had led the charge on?
13     MS. WERMUTH: Objection to form.
14  BY THE WITNESS:
15     A  ▇▇▇ ▇▇▇▇ and Sydney were able to secure and
16  what's the -- it's AGIF and I can't think of the name.
17  It is an innovation fund, but I can't think of what the A
18  and the G stand for.  And so yes, they secured funding
19  through that mechanism.
20  BY MS. SCATCHELL:
21     Q  Okay.  And in your opinion, in what ways has
22  Sydney contributed to the PRAD program?
23     A  I think that's one of the ways.  I think one of
24  the things I've been most impressed about was the Summer

Page 109

1  BRAND Camp that she did that was part of that innovation
2  grant.  So during that process, she worked with various
3  corporations including Facebook and Leo Burnett and
4  negotiated and navigated that with Chicago scholars and
5  brought students in that can get kind of exposure to
6  being in a university setting and really kind of picture
7  themselves there.  And then also think about it in terms
8  of advertising and branding as kind of a potential
9  career.
10     Q  And has Sydney gotten any other grants, if you
11  know?
12     A  She's gotten external grants that I think have
13  helped sponsor some of her research.
14     Q  Okay.  And do you know if ▇▇▇ ▇▇▇▇ had
15  received any other grants or had applied for them?
16     A  I don't know off the top of my head what other
17  grants he's applied for or received.
18     Q  Okay.  Would you have any record of that
19  anywhere?
20     A  We'd have to go back and look at his vitaes that
21  are timestamped to see what they were.  But yeah, I don't
22  know.
23     Q  Is there an advertising search committee?
24     MS. WERMUTH: Objection.  Form.  Go ahead.

28 (Pages 106 to 109)



MAGNA ▸
LEGAL SERVICES

Page 110

1  BY THE WITNESS:
2      A  A search committee is formed when there's a
3  position available, so it's not an ongoing committee.
4  BY MS. SCATCHELL:
5      Q  Okay.  Do remember there being an advertising
6  search committee?
7      A  Yes.
8      Q  Okay.  Do you remember approximately when that
9  was?
10      A  I believe the search, yes, would have been Fall
11  of 2018.
12      Q  Okay.  And how many people are usually on a
13  committee?
14      A  Usually there's at least -- well, it's usually
15  three to five, I believe.
16      Q  Okay.  And is there any requirement that out of
17  those three to five faculty members, that they have to
18  have a certain number of years or be tenured or is there
19  any requirements like that?
20      A  The requirements have to be tenure track because
21  we're hiring into -- if we're hearing into a tenure-track
22  position, they must be tenure-track faculty.  And only
23  one -- well, sorry, not only one.  I'd have to look back.
24  I think it's at least two to three need to be from the

Page 111

1  program area with one that's outside of the program area.
2  We also do searches for term faculty, which are not
3  tenure track and those -- actually, no, those have to
4  still be tenure-track faculty members.  You have to be
5  tenure-track to serve on a search committee, I believe.
6      Q  Okay.  Do you remember if Sydney was ever on an
7  advertising search committee?
8      A  Yes.
9      Q  And that was in that same time period of
10  approximately 2018?
11      A  Yes.
12      Q  Okay.  Do you remember who else was on that
13  search committee?
14      A  ████ ████, Robin Hoecker, ████████.
15      Q  Did you say ████ ████?
16      A  Yes.
17      MS. SCATCHELL:  Actually, can we take a ten minute
18  break?
19      THE COURT REPORTER:  Before we do, can I just ask you
20  Nur -- will you say that name again?
21      THE WITNESS:  Nur, N-U-R.  And then Uysal is U --
22      MS. SCATCHELL:  I got it it's U-Y-S-A-L.
23      THE WITNESS:  U-Y-S-A-L, yeah.
24      MS. SCATCHELL:  And then Robin is Robin Hoecker,

Page 112

1  H-O-E-C-K-E-R?
2      THE WITNESS:  Yes.
3      MS. SCATCHELL:  And then ████ for ████ is
4  M-U-N-D-E-L.
5      THE COURT REPORTER:  Thank you.
6  BY MS. SCATCHELL:
7      Q  And then actually, could I just ask you what a
8  Robin's ethnicity?
9      A  I believe she identifies as Caucasian, but I
10  don't know.
11      Q  And Nur?
12      A  Nur -- I don't know her ethnicity.  She's a
13  Muslim international from Turkey, I guess.  But race
14  would be white.
15      Q  And ████?
16      A  ████ is LatinX.
17      MS. SCATCHELL:  Okay.  Great.  Can we just take a ten
18  minute break and come back at 3:27.
19      MS. WERMUTH:  Okay.
20      (Short recess.)
21      MS. SCATCHELL:  Okay.  What was the last question
22  that I asked, Ms. Tufano?
23      (Question read.)
24  BY MS. SCATCHELL:

Page 113

1      Q  So was Robin a tenured-faculty member at that
2  time?
3      A  No.
4      Q  And was ████ ████ a tenured-faculty member at
5  that time?
6      A  No.
7      Q  Okay was Nur a faculty member at that time?
8      A  Yes, a faculty member.
9      Q  Tenured-faculty member?
10      A  No.
11      Q  Okay.  And I'm going to show you what I'm going
12  to mark as Exhibit No. 6.
13      (Exhibit No. 6 was marked
14      for identification.)
15  BY MS. SCATCHELL:
16      Q  And when you get it, please just let me know and
17  take a moment to look at it.
18      A  Okay.  I've gotten it.
19      Q  Okay.  Do you recognize that document?
20      A  Yes.
21      Q  Okay.  What is that?
22      A  Again, I'm looking at the whole chain.  This
23  looks like it's an email chain that happened as a result
24  of the search committee.

29 (Pages 110 to 113)



Page 114

1  Q  The advertising search committee?
2  A  Yes.
3  Q  And what was the nature of this thread?
4  MS. WERMUTH:  Objection.  The document speaks for
5  itself.  Go ahead.
6  BY THE WITNESS:
7  A  So the email chain starts with Sydney following
8  up on an instance that took place during the search
9  committee conversation during the committee's meeting,
10  and then a back and forth between she and Nur.
11  Q  Okay.  And what issues were raised during that
12  search committee meeting?
13  MS. WERMUTH:  Objection.  Foundation.  Go ahead.
14  BY THE WITNESS:
15  A  I want to be clear I was not at the search
16  committee meeting, so I know what's also in the documents
17  and from the conversation with Sydney and Nur that as
18  stated there was concerns raised.  I think Sydney and Nur
19  had a conversation that involved whether a report was
20  going to be sent out to the search committee before it
21  went to the rest of the faculty, something like that.
22  And there was, you know, other than what's in here.  If
23  you have a a more specific question.
24  BY MS. SCATCHELL:

Page 115

1  Q  Sure.  So this discussion about potential bias
2  and procedural problems with the search process, was that
3  brought to your attention?
4  A  Yes, particularly the procedural problems.
5  Q  Okay.  And what was the nature of what was
6  brought to your attention?
7  A  What I recall from this is that again there was
8  an issue about whether or not the committee would see the
9  report that was written about the top candidates or the
10  recommendations of the candidates prior to going to the
11  full faculty for review and vote.  And I believe Nur
12  thought that there should be a report or wanted to see
13  this report, and Sydney was saying that isn't how it's
14  done and I think they were kind of talking across each
15  other in that way, and so we needed to kind of clarify
16  with that had happened.  So that's my recollection.
17  Q  Okay.  And do you remember if there was any
18  investigation that was done?
19  A  Investigation on?
20  Q  The potential bias and procedural problems?
21  A  We talked about the procedural problems in a
22  meeting with Sydney and Nur, myself and ███ ██ and
23  clarified at that point that there wasn't a report that
24  Nur wanted to be able to -- that there was

Page 116

1  misunderstandings there.  I don't recall what we talked
2  about in terms of potential bias.
3  Q  Okay.  Is there anything that would refresh your
4  recollection?
5  A  Not without being back in the room.
6  Q  Okay.  But if you were back in the room, is there
7  anything like an email or an incident report or something
8  that would help you refresh your recollection?
9  A  Possibly.
10  Q  Okay.  And what would that be?
11  A  I don't know.  I thought you were asking in a
12  general --
13  Q  Okay.
14  A  So, no.
15  Q  Okay.  And did you take notes at the meeting that
16  you had about the procedural issues?
17  A  No, not that I remember.
18  Q  Is there a correct procedure for how -- or I
19  guess what is the correct procedure in this instance, is
20  it that there is a report or is not a report made?
21  A  There is a recommendation that gets made -- the
22  search committee typically comes to the larger faculty
23  and gives a verbal report on the strengths and weaknesses
24  of each of the candidates.

Page 117

1  Q  Okay.  And was one of the candidates familiar
2  with Nur or was there some sort of allegation about that?
3  A  That, I don't remember.
4  Q  Okay.  Did Sydney raise any concerns about her
5  interaction with Nur to you?
6  MS. WERMUTH:  Objection.  Vague.  Are you talking
7  about in connection with this?
8  MS. SCATCHELL:  With this incident, yes.  What I knew
9  OF the instances of what you're seeing in the emails, so
10  Sydney raised concerns based on these emails.  So we came
11  together and had a conversation altogether.
12  Q  Okay.  And then did you have a conference with
13  just you and Sydney regarding this email thread?
14  A  I can't remember if just Sydney and I talked
15  about this.
16  Q  If I said that you did, would you have any reason
17  to believe that that didn't happen?
18  MS. WERMUTH:  Objection --
19  BY THE WITNESS:
20  A  I don't remember if it happened.
21  BY MS. SCATCHELL:
22  Q  Would anything refresh your recollection?
23  A  No.
24  Q  Okay.  Like a calendar?





Page 118

1    A  I am not sure what --
2    Q  Would it be in your calendar if you had a meeting
3 with her, that's all I'm asking?
4    A  Possibly.
5    Q  Okay.  On Page 8363 Dillard_DePaul where Sydney
6 sends Nur an email with ████ Shu-████an, and that's S-H-U
7 -████ A-N, you as Lexa Murphy, ████████, and I think
8 that was it.  Do you see that email at the bottom of that
9 page?
10    A  Yes.
11    Q  And do you see the portion of it that says the
12 hiring search process seems unclear to you and perhaps
13 could use more clarity.  It would probably be beneficial
14 if both you and I were to meet with either ████ or a
15 Lexa to discuss your concerns?
16    A  Yes.
17    Q  Do you remember if there was any meeting with
18 either you or ████ and Sydney and Nur?
19    MS. WERMUTH: Objection.  Asked and answered.  She's
20 testified to this.  Go ahead.
21 BY THE WITNESS:
22    A  Yes.  That's the meeting I referred to.
23 BY MS. SCATCHELL:
24    Q  Okay.  And who is Shu-████an?

Page 119

1    A  ████ ████
2    Q  Okay.  I see now.  And what is ████ ████'s
3 position?
4    A  She is a professor in the public relations and
5 advertising program.
6    Q  And how long has she been at the university for?
7    A  I don't remember her start date.
8    Q  And do you know what ethnicity she identifies
9 herself as?
10    A  She is Asian.
11    Q  And I'm going to show you what I'm going to mark
12 as Exhibit No. 7.
13           (Exhibit No. 7 was marked
14           for identification.)
15 BY MS. SCATCHELL:
16    Q  Let me know when you've received it.
17    A  Okay.  I've received it.
18    Q  Okay.  Could you please review the emails in this
19 thread and let me know when you finish.
20    A  Okay.
21    Q  Okay.  And what is this document?
22    A  This is an email chain that continues the
23 conversation about the search committee.
24    Q  Okay.  Does that refresh your recollection on

Page 120

1 whether you, as in the whole search committee, had a
2 meeting about this incident?
3    A  I told you that we did have a meeting about the
4 incident.  What I did not recall is if I met individually
5 with Sydney.
6    Q  Right, okay.  And then I'm going to circle back
7 to Exhibit No. 6.  Could you go back to that exhibit.
8    A  Yeah.  I'm back.
9    Q  And do you see the email from Nur?
10    A  Yes.
11    Q  Okay.  And Nur would be considered a junior
12 faculty member compared to Sydney, correct?
13    A  They're pretty close.  She was hired after
14 Sydney, but came in with ears to her credit.  It's kind
15 all in there.
16    Q  okay.  But she wasn't tenured at that point in
17 2018, correct?
18    A  Correct.  None of the faculty members were
19 tenured at this point.
20    Q  Okay.  And do you see the sentence where it says
21 I think this would have made more sense to you if you had
22 listened to me and the other committee members further
23 before you stormed out of the meeting today?
24    A  Yes.

Page 121

1    Q  Do you remember if there was any if that specific
2 statement came up at the meeting that you had referenced?
3    A  Yes.
4    Q  Okay.  And do you remember what in particular had
5 come up about that sentence during the meeting?
6    A  What I remember was Nur feeling like Sydney had
7 left in the middle of the conversation, and so they had
8 to workout both of their interpretations of that.
9    Q  Okay.  And do you think that in your opinion that
10 the use of the word stormed out is an accurate depiction
11 of what the situation that was presented to you was?
12    MS. WERMUTH:  Objection.  Foundation.  Go ahead.
13 BY THE WITNESS:
14    A  I was not at the meeting and did not witness or
15 either hear or see what happened, so I don't feel
16 qualified to give an accurate interpretation of whether
17 that was appropriate or not.
18 BY MS. SCATCHELL:
19    Q  Okay.  In your opinion, was that a more
20 argumentative way of saying someone left a meeting?
21    A  I don't want to -- I can't really give an opinion
22 on it because I wasn't present.
23    Q  Right.  But the term stormed out of the meeting,
24 in your opinion, is that a more argumentative way of

31  (Pages 118 to 121)



Page 122

1  saying someone left the meeting?
2      MS. WERMUTH: Objection. Asked and answered. Calls
3  for foundation. Lack of foundation.
4      MS. SCATCHELL: I said in her opinion.
5      MS. WERMUTH: I understand what you said. I'm just
6  stating my objections. Go ahead.
7  BY THE WITNESS:
8      A  I'll answer the best way possible, which is again
9  I am not -- I can't really give an opinion on something
10 that I did not see.
11 BY MS. SCATCHELL:
12     Q  I'm saying in general. In general like the way
13 that that term is used. Stormed out, you don't think
14 that that is a bit of an argumentative term?
15     MS. WERMUTH: Objection. Argumentative. Go ahead.
16 BY THE WITNESS:
17     A  I think it depends on how someone sees or views
18 the activity.
19 BY MS. SCATCHELL:
20     Q  And you have no opinion based on reading the
21 email that you read?
22     A  My opinion, no. I see people with different
23 interpretations of what happened. One saw it one way,
24 one say it another way, and that was what we need to

Page 123

1  discuss.
2      Q  Okay. And do you remember if Sydney had told you
3  how the situation made her feel?
4      A  Can you be more specific?
5      Q  Did she say she was uncomfortable?
6      A  When we were in the meeting, she talked about, I
7  believe, her discomfort in the way the conversation was
8  unfolding, I believe.
9      Q  Okay. And do you remember what happened next?
10     A  I don't remember.
11     Q  Do you remember if Sydney cried during the
12 meeting?
13     A  I don't remember that.
14     Q  Okay. Is that something that if it happened you
15 would have remembered or no?
16     MS. WERMUTH: Objection. Argumentative. Go ahead.
17 BY THE WITNESS:
18     A  All I can tell you is I don't remember.
19     Q  Okay. If Sydney said she cried during the
20 meeting, do you have any reason to not believe that she
21 did?
22     MS. WERMUTH: Objection. Argumentative.
23 BY MS. SCATCHELL:
24     Q  You can answer.

Page 124

1      A  I don't remember.
2      Q  No, no. I'm saying if she said that she cried
3  during the meeting, do you have any reason to believe
4  that she wasn't being truthful?
5      A  I would have no reason to believe that, no.
6      Q  Okay. And do you believe that Sydney is a
7  truthful person?
8      MS. WERMUTH: Objection. Argumentative.
9  BY MS. SCATCHELL:
10     Q  You can answer.
11     A  I believe, yeah, I would say in my experience.
12     Q  Okay. Let's shift gears to the diversity,
13 equity, and inclusion action plan that you had previously
14 talked about. Do you know if -- (inaudible)
15     MS. WERMUTH: You broke up.
16     MS. SCATCHELL: Yeah, I heard the same thing.
17 BY MS. SCATCHELL:
18     Q  Do you know if, is it diversity workshop that is
19 included in this DEI action plan?
20     A  I need you to be more specific. You mean the
21 college level?
22     Q  The one that you previously testified, the
23 college level, the action planned that you guys
24 implemented, I believe within the past year, you guys

Page 125

1  said that there was a series of things that the college
2  was doing to foster and further the initiatives of
3  diversity, equity, and inclusion, right?
4      A  Yes.
5      Q  And is one of those initiatives having diversity
6  workshops?
7      A  Yes.
8      Q  Okay. And do you know what the diversity
9  workshops consist of?
10     A  We have the diversity workshops for the search
11 committees. We also did at every faculty meeting a
12 series of what we call micro-trainings on various topics.
13     Q  And are these diversity trainings or micro-topics
14 are they mandatory or are they discretionary?
15     A  The search committees are mandatory and the
16 micro-trainings are if you're at the meeting, you're
17 there. Most people are at the meetings.
18     Q  Okay. And is there the same type of diversity
19 workshop or are than more one type?
20     A  There are different types.
21     Q  And do you happen to know what those types are?
22     A  I am not sure what you're asking to be honest.
23     Q  Like what types of diversity programs or
24 workshops are being offered by your college?

32  (Pages 122 to 125)





Page 126

```
1          A  So in terms of the search committee, those are
2    all university workshops so we take advantage of the
3    university workshops on that.  And in terms of the
4    college level, we implemented the micro-trainings at the
5    different faculty meetings.
6          Q  Okay.  And who leads the micro --
7          A  The micro-trainings?
8          Q  Yes.
9          A  The first year that we did them, they were led by
10   the diversity advocate and then a few were done in
11   conjunction with a staff member.  And then they've
12   continued, we've had a switch in terms of the diversity
13   advocate so they've switched over to the new diversity
14   advocate.
15         Q  And did you testify who the new diversity
16   advocate is?
17         A  No.  During last year, it was Dustin ████.
18         Okay?
19         A  And this year it's ████ ████.
20         Q  And Dustin ████, what's his ethnicity?
21         A  He is White, Jewish.
22         Q  And can you spell the second name and tell me
23   what his ethnicity is?
24         A  It's a she. ████ L-U-I-S-E-L-A, ████ and
```

Page 127

```
1    are she is Latin American.
2          Q  Domestic?
3          A  She is -- no, foreign.  Outside of the U.S.
4          Q  And what's Dustin ████'s position?
5          A  He is a professor.
6          Q  Okay.  How long has he been at the university
7    for?
8          A  I don't know exactly.
9          Q  Okay.  Give or take?
10         A  13-ish years.
11         Q  Okay.  Do you know if he was ever involved in any
12   sort of discrimination complaint?
13         A  I don't know.
14         MS. WERMUTH:  Objection.  Vague.  I think you
15   answered.  Are you waiting for an answer?
16         MS. SCATCHELL:  Yeah.
17   BY THE WITNESS:
18         A  Oh, No, I don't know.
19   BY MS. SCATCHELL:
20         Q  Okay.  And do you recall a situation where
21   Sydney's medical information was disclosed in an email
22   thread?
23         MS. WERMUTH:  Objection.  Vague.  Go ahead.
24   BY THE WITNESS:
```

Page 128

```
1          A  No.
2    BY MS. SCATCHELL:
3          Q  You don't remember if there was an email that
4    involved ████ and a few other members from the
5    college and you and had her medical information on it?
6          A  I don't remember that.
7          MS. SCATCHELL:  Okay.  Could we go off the record for
8    one second?
9          MS. WERMUTH:  Sure.
10         (Short recess.)
11   BY MS. SCATCHELL:
12         Q  I just sent everyone a series of exhibits, so let
13   me know when you guys receive them.
14         MS. WERMUTH:  I don't have them yet.
15         MS. SCATCHELL:  Okay.
16         MS. WERMUTH:  Okay.  I got a bunch.
17         MS. SCATCHELL:  It should be Exhibit No. 8 through
18   21.
19         (Exhibit Nos. 8-21 were
20         marked for identification.)
21         MS. WERMUTH:  I see 8 through 21, but I also see
22   something that's not marked with a number--
23         MS. SCATCHELL:  Not sure I'm going to use that yet.
24         MS. WERMUTH:  I see.
```

Page 129

```
1    BY MS. SCATCHELL:
2          Q  Lexa, would you mind opening up Exhibit No. 8 and
3    reading that?
4          A  Hold on.  I just got it, and it's still
5    downloading attachment.  Okay.  There we go.  Number 8,
6    is that what you said?
7          Q  Yeah.
8          A  Okay.  I've read it.
9          Q  Okay.  What is that document?
10         A  This is a document that is talking about
11   SharePoint and -- yeah, talking about SharePoint.
12         Q  And what's the nature of that thread is
13   about with SharePoint specifically?
14         MS. WERMUTH:  Objection.  The documents speaks for
15   themselves.  Go ahead.
16   BY THE WITNESS:
17         A  So if you start at the bottom of the chain, it
18   was a conversation responding to Sydney having some
19   challenges with SharePoint logging her out and trying to
20   get her documents uploaded.
21   BY MS. SCATCHELL:
22         Q  And Steve Awalt is the technical -- is the IT
23   guy?
24         A  Steven Awalt worked on our website, so he had
```

33 (Pages 126 to 129)



Page 130

1   familiarity with SharePoint.
2       Q   Okay.  And who is Unnati?
3       A   Unnati was an administrative assistant in the
4   college.
5       Q   And Gina?
6       A   Gina is our director of operations in the
7   college.
8       Q   Okay.  So when the first email in the thread
9   which is Dillard_DePaul 7187, the email -- you see that
10  the email is from you, correct?
11      A   Yes.
12      Q   And it said that Unnati is completely swamped
13  with work, and Gina isn't able to spare anyone else right
14  now to help with the SharePoint file uploads.  Salma and
15  I will be asking her to help me brainstorm ways which we
16  can get better support faculty trying to get their files
17  appropriately uploaded; do you see that?
18      A   Yes.
19      Q   Okay.  And then it says in the meantime, please
20  do the best you can to get the files uploaded.  I am very
21  sorry not to have a better answer right now, correct?
22      A   Yes.
23      Q   And was that the year that Sydney was going up
24  for tenure?

Page 131

1       A   No.  That was -- if I looked at the date of
2   January, 2018, that would be her teaching review, that
3   formal review.
4       Q   Okay.  That would be going towards whether or not
5   she would be considered for tenure?
6       MS. WERMUTH:  Objection.  Misstates the evidence.
7   BY THE WITNESS:
8       A   This would be her formal review looking at her
9   teaching.
10  BY MS. SCATCHELL:
11      Q   And do you know if she ever got any assistance?
12      A   I believe Steven helped to try to figure out what
13  the logging off issue was.
14      Q   And do you know if that solved Ms. Dillard's
15  problem?
16      A   I don't remember.
17      Q   Do you remember if there was every year where Ms.
18  Dillard had two reviews in one year, formal reviews?
19      A   Not in the same academic year.
20      Q   Okay.  But it could happen within the calendar
21  year?
22      A   Yes, it can happen in a calendar year.
23      Q   Is that the normal protocol for an annual review
24  or how does that work?

Page 132

1       A   That is normal for the way that the formal
2   reviews are scheduled, yes.
3       Q   Okay.  And in your opinion, is the preparation
4   process for a formal review a time consuming task for
5   faculty member?
6       A   It can be, yes, to organize their files.
7       Q   Okay.  And what in particular would be some of
8   the things that would make it a time consuming process?
9       A   Regardless of what you're doing, you're
10  compiling -- in what way you're doing it, you're
11  compiling all of your documents that will be moving
12  forward for your application or for your review.
13      Q   And then can you open up Exhibit No. 9, please.
14      A   Sorry.  It's open.  I'm looking at it.
15      Q   Okay.  Just review it, please.
16      A   Okay.
17      Q   Okay.  What is that email?
18      A   This is an email from ▮▮ to the personnel
19  committee.
20      Q   And who is ▮▮▮▮▮▮
21      A   ▮▮▮▮ He is a professor in -- sorry.
22  Associate professor in journalism, and at the time was
23  chair of the personnel committee.
24      Q   Okay.  And the subject line says personnel

Page 133

1   updates and Sydney's draft doc.  Do you see that?
2       A   Yes.
3       Q   And then the attachments say
4   Dillard_Teaching_2018.
5       A   Yes.
6       Q   What is that attachment?
7       A   That is the, I'm assuming -- well, that would be
8   the -- sorry, not assuming.  That's going to be according
9   to the email, the draft of her teaching review, the
10  formal review.  They would have written the report and
11  attached it as a draft.
12      Q   And do you know -- Anna, I don't think the
13  attachment was with this email.  Do you know where we can
14  get a copy of it?
15      MS. WERMUTH:  I can certainly follow-up.  I mean,
16  this came out of the email search, I think, so I don't
17  know.
18      MS. SCATCHELL:  That's just Bates stamp 5675.  It
19  just says Dillard_Teaching_2018.docx.
20      MS. WERMUTH:  Yep, I do see that.  I can certainly
21  inquire.  This is the -- I mean, you've seen obviously
22  the final version, which was unanimously positive as you
23  may recall.
24      MS. SCATCHELL:  Right.  I just want to see the draft

34  (Pages 130 to 133)



Page 134

1   to see if there's any changes in it because it says
2   that --
3           Lexa, do you see at the bottom of Page 5676
4   where it says post-interview dates.
5   BY THE WITNESS:
6       A  Yes, sorry.
7   BY MS. SCATCHELL:
8       Q  Okay.  It says revised/close, read/edited.  And
9   then it says, documents are sent to candidates for
10  fact-checking.  Documents are sent to tenured faculty for
11  feedback or questions and then there's a tenured faculty
12  meeting.  What do each of these different designations
13  represent?
14      A  So because it's a collective document, the
15  personnel committee has a primary rider and a secondary
16  rider, they work together to write the first draft of the
17  document, then it's sent to the entire committee for
18  edits.  Then it's sent to the candidate to make sure that
19  there aren't any factual errors prior to it going to the
20  whole tenured faculty.
21      Q  Okay.  And then on Page 5675 in subsection 3.  Do
22  you see that?
23      A  Yes.
24      Q  Okay.  Where it says Lexa and Sydney will have

Page 135

1   another meeting in the afternoon.  What is that referring
2   to?
3       A  I honestly don't remember.
4       Q  Is there anything that would refresh your
5   recollection?
6       A  No.
7       Q  Okay.  No problem.  All right.  If you can open
8   up Exhibit No. 10, please.  And whenever you're ready,
9   just let me know.
10      A  Sorry, it's long.
11      Q  No problem.  I just wanted to make sure we didn't
12  lose anybody.
13      A  I'm to the appendix so if you want to ask.
14      Q  Well, just review the appendix.
15      A  Okay.
16      Q  Do you recognize that document?
17      A  No, I have not seen this document.
18      Q  Okay.  Do you know the content like what
19  complaint this document is referring to?
20      A  This is referring to what we discussed early on,
21  which was the internal investigation based on an OIDE
22  complaint from ███ ███████
23      Q  Okay.  And in the appendix, do you see that or
24  could you go to the appendix?

Page 136

1       MS. WERMUTH:  There are multiple appendices.  Which
2   one are you pointing to?
3       MS. SCATCHELL:  One.  8903.
4       THE WITNESS:  Yep, I'm there.
5   BY MS. SCATCHELL:
6       Q  Okay.  What does the UT stand for in the
7   tenure-track status.
8       MS. WERMUTH:  Objection.  Foundation.  Dr. Murphy has
9   neither authored this document --
10  BY MS. SCATCHELL:
11      Q  If you know --
12      MS. WERMUTH:  nor did she receive it at the time.  Go
13  ahead.
14  BY THE WITNESS:
15      A  Untenured.
16  BY MS. SCATCHELL:
17      Q  Okay.  Great.  Could you please open up Exhibit
18  No. 11.
19      A  Okay.  It's open.  I'm reviewing it.
20      Q  Okay.
21      A  Okay.
22      Q  What is that document?
23      A  The document is an email chain that begins with
24  Sydney asking for an additional meeting to talk about the

Page 137

1   results of the program chair search and includes Isabel
2   and Barbara from what I keep calling OIDE.
3       Q  Okay.  And you previously testified that Barbara
4   has since left the university, correct?
5       A  Yes.
6       Q  Okay.  And you mean program chair vote, not the
7   search committee?
8       A  Is that not what I said.  Yes, program chair,
9   yes.
10      Q  Okay.  I just wanted to make sure.
11          And do you remember why Isabel Diaz or
12  Barbara ███████ were on this thread?
13      A  I only know what's on the email, Sydney brought
14  them into the thread.
15      Q  And do you remember having any conversation with
16  Barbara ███████ about the program chair selection?
17      A  No.
18      Q  Okay.  Do you remember having any conversation
19  with Isabel Diaz about the program chair selection?
20      A  I don't remember.
21      Q  Okay.  And do you have anything that would
22  refresh your recollection?
23      A  No.
24      Q  And do you know what Sydney is referring to when



Page 138

1 she says that -- actually, let me back up.
2     Do you know what Ms. Diaz is stating in
3 her February 20, 2019 email, which is Dillard_DePaul 3599
4 where she says, I am not saying that we are not able or
5 willing to participate in a meeting with you and the
6 dean. Our office investigates complaints of
7 discrimination and harassment and I am unclear as to what
8 role you see us having in the meeting. Can you please
9 advise. Do you see that email?
10     A  Yes.
11     Q  Okay. Do you know what Ms. Diaz is referring to?
12     MS. WERMUTH: Objection. Foundation. Objection
13 vague.
14 BY THE WITNESS:
15     A  Beyond what's in the email, this is what I know.
16 BY MS. SCATCHELL:
17     Q  Okay. Could you open Exhibit No. 12 please --
18 actually you know what, I just want you to review the
19 first page?
20     MS. WERMUTH: You can look at the whole document,
21 Lexa.
22 BY MS. SCATCHELL:
23     Q  You could but that's what we're going to focus on
24 because I realize it's a repeat of Exhibit No. 11 with

Page 139

1 the exception of the first page.
2     A  Okay.
3     Q  So I'm going to direct your attention to
4 Dillard_DePaul 3636.
5     A  Yep.
6     Q  And where Isabel Diaz has an email to Sydney,
7 you, Barbara , Salma Ghanem, EEO_Investigations,
8 and she says that, becasue there is the potential
9 investigation and/or harassment, our office should not
10 partake in the meeting. Do you see that part?
11     A  Yes.
12     Q  Okay. Do you know how the EEO complaint
13 investigation process begins at the College of
14 Communication?
15     MS. WERMUTH: Objection. Vague. Assumes facts not
16 of record. Foundation. Go ahead.
17     THE WITNESS: What do you mean?
18 BY MS. SCATCHELL:
19     Q  I can rephrase. That's no problem.
20     Okay. So we had talked about it already
21 that there is an EEO office or OIDE office, correct?
22     A  Yes.
23     Q  Okay. And as part of the OIDE or EEO office,
24 they would process complaints that deal with

Page 140

1 discrimination and harassment, correct?
2     A  Yes.
3     Q  Okay. And my question to you is that if
4 somebody, if a student or faculty member raises a
5 discrimination or harassment question or issue to this
6 office, what is the next step in their investigatory
7 process, if you know?
8     MS. WERMUTH: Same objections.
9 BY THE WITNESS:
10     A  I'm not in that office, so I can't tell you their
11 exact process.
12 BY MS. SCATCHELL:
13     Q  Okay. And you're testifying that you don't know
14 how that process would work?
15     A  I don't know.
16     Q  Okay. And as the Dean of the College of
17 Communications, what are your job expectations when
18 you're faced with the discrimination or harassment
19 complaint within the college?
20     A  What are my job expectations?
21     Q  Yes.
22     A  What I need to do. I would refer the person to
23 the EEO or OIDE.
24     Q  Okay. And is that all that you have to do or is

Page 141

1 there anything else?
2     A  All that I have to -- I would listen to the
3 complaint and then refer it to the appropriate channels
4 for a more formal complaint that would then result in
5 that office deciding on an investigation or not.
6     Q  Okay. And what do you mean by a more formal?
7     A  That again, you'd have to ask in terms of those
8 that are actually in that office.
9     Q  Okay. And the college has not given you any sort
10 of guidelines on what you to expect when you refer a
11 complaint to the EEO or the OIDE office, correct?
12     A  The guidelines that I know are very general that
13 if a complaint is lodged in that office that they go
14 through their internal process of which I do not have
15 details on that will have them make the decision as to
16 whether or not they will launch an internal
17 investigation.
18     Q  Okay. And did Sydney make a complaint of
19 discrimination to you?
20     A  She did not, no.
21     Q  And what would you consider to be a
22 discrimination complaint?
23     MS. WERMUTH: Objection. Vague.
24 BY THE WITNESS:



Page 142

1     A  I think someone coming to me and saying I've been
2  discriminated against.
3  BY MS. SCATCHELL:
4     Q  Okay.  Do you remember if any faculty members
5  have come to you in the last say five years and
6  complained about discrimination?
7     A  The one conversation that I have had was with
8  ███████ ███████
9     Q  Okay.  And what happened with the complaint that
10 ████ made to you?
11    A  I referred her to, I keep saying OIDE, but I told
12 her what her avenues were.
13    Q  Okay.  And what were those avenues?
14    A  At that point, I was an associate dean, so I told
15 her to go to -- if she had a formal complaint to go to
16 OIDE and that that was like her -- that was her pathway.
17    Q  Okay.  And is ████████████ still at the
18 university?
19    A  No.
20    Q  Okay.  Do you know what happened to her?
21    A  Yes.  She did not receive tenure.
22    Q  Okay.  And do you remember if there was a faculty
23 decision to not renew her contract that was overturned by
24 Salma Ghanem?

Page 143

1     A  Yes.
2     Q  Do you remember when that was?
3     A  It was -- I don't have the dates in front of me.
4  It happened once in, was it, 2015 and another time in
5  2017.
6     Q  Okay.  So she was overturned twice?
7     MS. WERMUTH:  Objection.  Vague.
8     THE WITNESS:  (Nodding.)
9  BY MS. SCATCHELL:
10    Q  I'm just trying to understand what you meant by
11 the two time periods?
12    A  Yes.
13    Q  Okay.  And did you have any discussion with Salma
14 Ghanem about that decision?
15    A  No.
16    Q  Okay.  In your opinion, does an act of
17 discrimination have to be an overt act --
18    MS. WERMUTH:  Object to the form.  I'm sorry.  Go
19 ahead.
20 BY MS. SCATCHELL:
21    Q  -- or could it be something that's more subtle?
22    MS. WERMUTH:  Object to the form of the question.
23 It's vague.  It's confusing.  It calls for opinion
24 testimony by a lay witness.  It calls for a legal

Page 144

1  conclusion.  Go ahead, Lexa.
2  BY THE WITNESS:
3     A  I think in my understanding there can be bias
4  without discrimination.  There could be subtle forms of
5  things like that, but I think that there's a distinction.
6  BY MS. SCATCHELL:
7     Q  Okay.  And what is that distinction in your
8  opinion?
9     MS. WERMUTH:  Same objection.
10 BY THE WITNESS:
11    A  In my opinion, I think biases happen.
12 Discrimination can be negative consequences of that.
13 BY MS. SCATCHELL:
14    Q  Okay.  And have you personally witnessed any
15 examples of this implicit bias at the College of
16 Communications?
17    MS. WERMUTH:  Objection.  Vague.  Go ahead.
18 BY THE WITNESS:
19    A  I need to think more in terms of what type of
20 bias you're talking about.
21 BY MS. SCATCHELL:
22    Q  Race, start there.
23    A  Whether I've seen that?
24    Q  Whether you've experienced it or observed it?

Page 145

1     A  No.
2  BY MS. SCATCHELL:
3     Q  Okay.  And gender?
4     A  No.
5     MS. WERMUTH:  Objection.  Relevance.
6  BY MS. SCATCHELL:
7     Q  Okay.  Is there any other examples of implicit
8  bias that you can think of that you've seen?
9     MS. WERMUTH:  Objection to the form of the question.
10 Calls for a legal conclusion.  Vague.  Assumes facts not
11 of record.  Misstates her prior testimony.  Go ahead,
12 Lexa.
13 BY THE WITNESS:
14    A  So just types of bias, that's almost impossible
15 to answer, so no.
16 BY MS. SCATCHELL:
17    Q  Okay.  Did Sydney ever discuss any sort of pay
18 inequities with you or bring that to your attention?
19    A  Yes.
20    Q  Okay.  Do you remember what the nature of that
21 was?
22    A  Yes.
23    Q  What was it?
24    A  So Sydney and ████ ██████ both approached me




Page 146

1 about -- they saw the range for incoming assistant
2 professors when they were part of the search committee.
3     Q  Okay. What did they say to you about that?
4     A  Concerns that the range was higher than current
5 salary, than their current salary.
6     Q  Okay. And what did you do with that information?
7     A  I explained that that's just the range that we
8 are approved to hire someone within, and that that
9 doesn't necessarily mean that that person would get hired
10 at that level. And then also talked about just time and
11 compression of salaries.
12     Q  And what do you mean by time and compression of
13 salaries?
14     A  So I explained and used myself as an example to
15 that someone who's hired even five years or ten years
16 before is going to get hired at a particular salary, and
17 give inflation and various other types of influences,
18 salaries go higher, even initial salaries. And so that
19 is kind of a normal process of what happens in terms of
20 hiring.
21     Q  Okay. And do you know if there was a pay
22 disparity that Sydney ended up getting corrected?
23     A  No.
24     Q  And when do pay raises occur?

Page 147

1     A  Pay raises occur in -- you're notified in
2 December and they kick in January 1st.
3     Q  All right. I'm going to go to 13. Could you
4 open that email.
5     A  Okay. I have it open.
6     Q  Okay. Could you review it and let me know if you
7 recognize that document.
8     A  Okay. I've reviewed it.
9     Q  Okay. Do you recognize that document?
10     A  No.
11     Q  Okay. Do you know who Vincent --
12     A  ███████.
13     Q  And could please spell his name.
14     A  Vincent, and then C-I-C-C-H-I-R-I-L-L-O.
15     Q  Okay. Great. Thank you. Do you happen to know
16 him?
17     A  Yes.
18     Q  And who is he?
19     A  He was a faculty member that was brought in as an
20 assistant professor.
21     Q  Okay. Is he still at the university?
22     A  No, he's not.
23     Q  Okay. What happened to him?
24     A  He did not have a contract renewed.

Page 148

1     Q  Okay. And what is his ethnicity?
2     A  He is white.
3     Q  And do you remember what year that approximately
4 was?
5     A  I believe it was 2017. I don't remember exactly.
6     Q  Okay. And then could you please open the next
7 exhibit.
8     MS. WERMUTH: So when you say next, can you tell us
9 what that is because I don't have 14, 15, 16. I go from
10 13 to 17. Do you want to us to open 17.
11     MS. SCATCHELL: No. Thank you. I will send you that
12 right now.
13 BY MS. SCATCHELL:
14     Q  Could you open Exhibit No. 14, please.
15     MS. WERMUTH: I just got it. Did you get it, Lexa?
16     THE WITNESS: I haven't gotten it yet. I just got
17 it. I got 14.
18 BY MS. SCATCHELL:
19     Q  Do you recognize that document?
20     A  I am just now looking at it.
21     Q  Oh, okay.
22     A  Okay. I've read it.
23     Q  And what is this document?
24     A  This is an email chain talking about teaching

Page 149

1 evaluations.
2     Q  Okay. And could you expand on what that
3 particular thread is about?
4     A  It is about --
5     MS. WERMUTH: Objection. The document speaks for
6 itself. Go ahead.
7 BY THE WITNESS:
8     A  The thread is looking at the teaching evaluations
9 and questions that Sydney had about the means and how
10 those were calculated in the standard deviations as well
11 as one of the teaching evaluations that had a different
12 instructor name on it.
13     Q  Okay. Ken is the name?
14     A  It looked like it was Ken Krimstein.
15     Q  And who is he?
16     A  Ken Krimstein was a term faculty member and
17 instructor in public relations and advertising.
18     Q  Okay. And is he still at the university?
19     A  No, he is not.
20     Q  And when did he leave?
21     A  He left Fall of 2020.
22     Q  Okay. Do you know why he left?
23     A  He retired. Resigned, retired.
24     Q  Okay. He resigned or retired?



Page 150

1    A  I don't know which.  I don't know if he had
2  enough -- he, we'll say, resigned.
3    Q  Got it.  And do you know what his ethnicity was?
4    A  White, Jewish.
5    Q  Okay.  And do you know who DPUBLIC is or what
6  DPUBLIC is?
7    A  Yes.
8    Q  What is it?
9    A  DPUBLIC is a university group of faculty who
10  identify as Black or people of color.
11    Q  And do you know anything about -- or do you know
12  if they have any sort of meetings?
13    A  I think they have, yes.  I think they have
14  meetings.
15    Q  Do you know if they've had any what they would
16  call town hall meeting?
17    A  I don't.  I know there have been town hall
18  meetings, I don't know if they're specific to DPUBLIC.
19    Q  And do you work with anybody from DPUBLIC
20  regarding any sort of racial inequities at the college?
21    A  No --
22    MS. WERMUTH:  Objection to form.  Assumes facts not
23  of record.
24  BY MS. SCATCHELL:

Page 151

1    Q  Okay.  Do you know who does?
2    MS. WERMUTH:  Objection to form.  Assumes facts not
3  of record.
4  BY THE WITNESS:
5    A  They're not a formal group, so we don't have a
6  formal liaison.
7    Q  And who is Depaulia?
8    A  The Depaulia is the student print newspaper.
9    Q  And are you aware of any article that was written
10  about this lawsuit?
11    A  Yes.
12    Q  Okay.  And what was the nature of that article?
13    A  The article included the lawsuit and talked about
14  like referenced that there was a lawsuit against the
15  College of Communication.
16    Q  And is that all you remember from it?
17    A  Yeah.
18    Q  Okay.  Could you open up attachment 15, please.
19    MS. SCATCHELL:  Wait, does anyone need a quick break?
20    MS. WERMUTH:  Lexa, do you need a break?
21    THE WITNESS:  It depends how much longer we're going
22  to go.
23    MS. WERMUTH:  Yeah, I have that same question.
24    MS. SCATCHELL:  I just sent you guys Exhibit No. 16

Page 152

1  and I only have about four or five exhibits left to go.
2    MS. WERMUTH:  So is that an hour or --
3    MS. SCATCHELL:  Should be a half hour, not even.
4    MS. WERMUTH:  Lexa, do you want to take a quick
5  break?
6    THE WITNESS:  I'm okay if we keep going.
7    MS. WERMUTH:  Okay.  Can we go off the record for one
8  second, please.
9    MS. SCATCHELL:  Sure.
10    (Whereupon, a discussion
11    was had off the record.)
12    MS. WERMUTH:  Back on the record.  Let's go.
13    THE WITNESS:  Okay I've got it open.
14  BY MS. SCATCHELL:
15    Q  Okay.  Could you please read through that
16  document.
17    MS. WERMUTH:  Sorry, are we looking at 15?
18    MS. SCATCHELL:  Yes.
19    MS. WERMUTH:  Is there a portion of 15 that's cuff
20  off.  It starts mid page and it looks --
21    MS. SCATCHELL:  Yeah.  It's your production, I just
22  wanted that specific email so that's why I included just
23  that email.
24    MS. WERMUTH:  Okay.  So I'm going to state for the

Page 153

1  record that this is an incomplete version of the
2  conversation, so I think that's important to note.  Go
3  ahead.
4    THE WITNESS:  Okay.
5  BY MS. SCATCHELL:
6    Q  And then could you just review it and let me know
7  when you finish reviewing it?
8    A  Okay.  I've reviewed it.
9    Q  Okay.  Do you recognize that email thread?
10    A  Yes.
11    Q  Okay.  What is it?
12    A  This is an email thread that was part of setting
13  up a meeting that Sydney and I had in the spring.
14    Q  Okay.  And do you see the email that is on page
15  5826?
16    A  Yes.
17    Q  That is from Sydney to you?
18    A  Yes.
19    Q  And do you see where she says that I have
20  experienced instances of microaggression, social
21  isolation and treatment unbecoming of the College of
22  Education?
23    A  Yes.
24    Q  And then the rest of the paragraph goes onto say





Page 154

1    a list of her concerns?
2         A   Yes.
3         Q   Where she says that as U.S. born African-American
4    woman who was tenure track and then it goes on to have
5    one, two, three, four, five, six bullet points?
6         A   Yes.  Do I see that, yes.
7         Q   Okay.  Is it still your testimony that Ms.
8    Dillard never complained to you about feelings of being
9    discriminated against?
10        A   We did have that conversation, so I guess
11   discrimination biases we -- so this came forward.  I
12   don't recall any conversation where she explicitly said
13   that she felt discriminated against.
14        Q   Okay.  I guess let's go through these concerns
15   one by one.  So is it your opinion that when Ms. Dillard
16   said that she's concerned about having limited career
17   advancement opportunities as an African-American woman
18   who was tenure track, you don't believe that to be
19   discrimination?
20        A   I think there's limited career advancement
21   opportunities in a college.
22        Q   Okay.  What do you mean by that?
23        A   That there -- well, I shouldn't even say career
24   advancement.  The academic profile of a faculty member

Page 155

1    goes from assistant to associate to full.  In terms of
2    career advancements, administrative or leadership
3    opportunities, are kind of a separate pathway.
4         Q   Okay.  Then let's go to -- it's your opinion that
5    the second bullet point her saying she feels socially
6    isolated and harassed as a U.S. born African-American
7    woman who is tenure track within the college is not
8    considered to discrimination?
9         MS. WERMUTH:  I'm going to object to the form of the
10   question, and I also object insofar as your question
11   misstates the record evidence.  Go ahead, Lexa.
12   BY MS. SCATCHELL:
13        Q   I will reask the question, okay.
14            So please review the second bullet point
15   beginning with socially isolating.  And after you review
16   it, please let me know if it's your opinion that you
17   don't consider that bullet point to be discrimination or
18   harassment.
19        MS. WERMUTH:  And I object to the form of the
20   question.  Go ahead.
21   BY THE WITNESS:
22        A   So we're getting hung up on discrimination I
23   guess in this, and so these were bullet points that I
24   took seriously and talked to Sydney about when we met.

Page 156

1    BY MS. SCATCHELL:
2         Q   I guess maybe we should start with what is your
3    definition of discrimination?
4         A   I think I answered that before.
5         Q   Yes.  In context of this email?
6         A   In context of this email?
7         Q   Yes.
8         A   This would be her laying out some of her concerns
9    and her experiences.
10        Q   And did you escalate this to OIDE or the EEO?
11        A   I don't think I did because we were meeting to
12   talk about it.
13        Q   Okay.  Do you have any particular reason why you
14   didn't refer it to the EEO office?
15        A   I think I was waiting for us to have our
16   conversation.
17        Q   Okay.  And then have after you had your
18   conversation?
19        A   After we had our conversation, I think we talked
20   a lot about different opportunities, that was the
21   conversation I think I mentioned to you before about
22   other kinds of internal and external leadership
23   opportunities in ways that we can support her goals.  And
24   I think at the end of that conversation, it felt like we

Page 157

1    had moved forward and resolved or we were in a place
2    where we were going to work together on this.
3         Q   Okay.  And do you feel that ultimately ended up
4    -- that you guys worked together and the issue was
5    resolved?
6         A   We ended up with her taking on the graduate
7    director role in the public relations and advertising
8    program looking at different types of funding streams for
9    leadership development opportunities, and so that seemed
10   to be where the conversation moved.
11        Q   Okay.  And then I just sent a corrected Exhibit
12   No. 15.  Could you take a look at that.
13        MS. WERMUTH:  I'm sorry, what to you mean by
14   corrected?
15        MS. SCATCHELL:  I sent the wrong one.  Hang on one
16   second.  Could we go off the record for one second.
17            (Very brief recess.)
18        MS. SCATCHELL:  Okay.  That should be the right one.
19        THE WITNESS:  I haven't gotten it yet.
20        MS. WERMUTH:  I have not either.
21        THE WITNESS:  I just got it.
22   BY MS. SCATCHELL:
23        Q   Okay.  And is that document with the exception of
24   the email on the first page the same document that you



Page 158

1  just reviewed?
2  A  Yes.
3  Q  Okay.  Could you please open up Exhibit No. 16.
4  A  Okay.
5  Q  Do you recognize that document?
6  A  I did see this when it first came out.
7  Q  And what is it?
8  A  It's a message from DPUBLIC that went out to
9  faculty, staff, and students.
10  Q  Okay.  And what is the -- if you could just
11  summarize what believe this article says?
12  A  This would be a summary of some of the concerns
13  that they are raising for all faculty staff and students
14  of African descent at the university, and then a list of
15  some requests and recommendations.
16  Q  Do you know if any of these recommendations have
17  been implemented by the College of Communication?
18  A  Many of the recommendations are university based,
19  so I'd have to go through each bullet and see how we have
20  operationalized those.
21  Q  Sure.
22  A  I can say as I see one that we now have our DEI
23  plan.  I mean, I don't know if you want me to --
24  Q  Just point out which ones have been --

Page 159

1      MS. WERMUTH:  Because these demands are based --
2  they're calls to action to the university, not to the
3  College of communication?
4      MS. SCATCHELL:  Right.  And then she said she was
5  just going to review it and let me know what the
6  university has implemented and I said sure.
7      MS. WERMUTH:  No, no, no.  She did not say she was
8  going to review for what the university implemented.  I
9  don't know that she has -- let me just object to
10  foundation.  She is the Dean of the College of
11  Communication.
12  BY MS. SCATCHELL:
13  Q  Within the university right?
14      MS. WERMUTH:  Lexa, you can --
15  BY THE WITNESS:
16  A  Sorry.  I am a part of the university, but my
17  role is as Dean of the College of Communications, so the
18  recommendations are university based.
19  BY MS. SCATCHELL:
20  Q  Did you have any discussion with anybody else
21  from the university regarding any of the these discussion
22  about race issues?
23  A  The university has ongoing discussions about race
24  for students, faculty, and staff.

Page 160

1  Q  Did you participate?
2  A  Yes.
3  Q  Okay.  So in your experience, would you be able
4  to look at the bullet points and decide or answer which
5  ones have been implemented and which s have not?
6      MS. WERMUTH:  I'm going to object to foundation and
7  the form of the question.
8  BY MS. SCATCHELL:
9  Q  You could answer.
10  A  I can looks at the bullet points and tell you
11  what I think.  Some of them are already being addressed.
12  Some things are being addressed along the way in terms of
13  conversations, so I wouldn't feel confident in being a
14  kind of a final word on this.
15  Q  That's fine.
16  A  Okay.  Do you want me to go through -- I don't
17  know what the question is.
18  Q  Whatever ones you know that have been
19  implemented, whatever ones you can answer, answer.  If
20  you can't, that's -- I am not asking you to say I don't
21  know what this bullet -- just when you go through the
22  bullet point, that would be helpful, that's all.
23  A  So in university conversations I think DE and I
24  things that have been implemented at the university

Page 161

1  level, there's now an associate provost for diversity,
2  equity, and inclusion.  I believe that person was hired
3  in 2020.  Many of the activities I think on this bullet
4  point list are things that are within that person's kind
5  of purview and also working with the vice-president for
6  diversity equity and inclusion at the university level.
7  So I know many of these things are happening in those
8  kinds of conversations.  I think that DE and I factors
9  into probably safe to say all decisions so things like
10  improving retention, improving admissions and graduation
11  rates, I think these are all things that are priorities.
12  As I mentioned, unit level DE and I plans, we are -- we
13  had already created one.  But for those units that have
14  not created one, there is a call out now for all colleges
15  and units to create a DE and I action plan.  I think we
16  already talked about trainings that are now being
17  implemented.
18  Q  Okay.  Anything else?
19      MS. WERMUTH:  Again, objection.  Foundation.
20  BY THE WITNESS:
21  A  So, you know, other more specifics things, I
22  wouldn't be the right person to say yes or no.
23  BY MS. SCATCHELL:
24  Q  Who would be the right person?



Page 162

1    MS. WERMUTH: Objection. Foundation.
2  BY THE WITNESS:
3    A  For each of these things, I think you would talk
4  to the associate provost for diversity, equity, and
5  inclusion or the vice-president for diversity.
6  BY MS. SCATCHELL:
7    Q  Okay.  And were you aware of an external petition
8  that was directed at the College of Communication
9  regarding the discriminatory behavior by certain
10 professors?
11   MS. WERMUTH: Objection. Argumentative.  You can
12 answer.
13 BY THE WITNESS:
14   A  A petition about certain professors.
15 BY MS. SCATCHELL:
16   Q  That were being discriminated against?
17   MS. WERMUTH: Again, objection insofar as it is
18 argumentative and assumes facts not of record.
19 BY THE WITNESS:
20   A  Yes.  I am aware of an external petition.
21 BY MS. SCATCHELL:
22   Q  Okay.  What was that petition?
23   MS. WERMUTH: What was the question?
24   MS. SCATCHELL: What was that petition.

Page 163

1    MS. WERMUTH: What was that petition, objection.
2  Foundation.
3    MS. SCATCHELL: She said she's aware of it.
4    MS. WERMUTH: Vague.  In addition.
5  BY THE WITNESS:
6    A  Yeah, actually as I say that, I'm not sure if I
7  am thinking of the same thing you're thinking.  So if you
8  want to be more specific, that would help me.
9  BY MS. SCATCHELL:
10   Q  That's why I was trying to drill down into it.
11 So as it -- do you recall an article being published in
12 the Depaulia newspaper about a petition calling for an
13 end to discrimination at the College of Communication?
14   A  Yes, I'm aware of that article.
15   Q  And do you remember what the nature of that
16 petition was?
17   A  The nature of the petition was about looking at
18 the College of Communication and the practices in the
19 College of Communication.
20   Q  Okay.  What did you do, if anything, after you
21 read that article?
22   MS. WERMUTH: Objection. Foundation.  I have no idea
23 of like the timing of this.  Foundation.  Vague.  Go
24 ahead.  You can answer Lexa.

Page 164

1    THE WITNESS: I am trying to think how to answer.
2  What did I do?
3  BY MS. SCATCHELL:
4    Q  Did you relay it to the EEO office?
5    A  The petition was not directed to me.
6    Q  But it was directed to the College of
7  Communication.
8    MS. WERMUTH: Objection. Assumes facts not of
9  record.
10 BY THE WITNESS:
11   A  I don't have it in front of me so I can't tell
12 you one way or the other -- so it was not sent to me to
13 do anything.
14 BY MS. SCATCHELL:
15   Q  All right.  Could you please open up Exhibit No.
16 17.
17   A  I don't know where Exhibit No. 17 is.
18   Q  It's in the prior email.
19   MS. WERMUTH: You sent us several emails in the last
20 hour.  It's in an email that I have timestamped 4:04 if
21 that's helpful to you, Lexa.
22   THE WITNESS: I have one from 3:44.  Oh, wait, here.
23 Okay.  I have it open.
24 BY MS. SCATCHELL:

Page 165

1    Q  Can you just review it and let me know when you
2  finish.
3    A  Okay.
4    Q  Do you recognize that document?
5    A  Yes.
6    Q  Okay.  What is it?
7    A  This was the email chain post the public
8  relations and advertising program chair election.
9    Q  Could you open up Exhibit No. 18, please.
10   A  Okay.
11   Q  Okay.  What is that document?
12   A  It's an email chain between ██ ██ and Sydney
13 regarding her review and kind of the outcome of
14 clarifying some questions and things about the review and
15 teaching.
16   Q  Okay.  And then who is ████ ████████
17   A  ████ ████ is an associate professor in the
18 College of Communication.
19   Q  Okay.  And was she just voted -- was there a vote
20 involving ████ ████
21   A  She just went through the tenure & promotion
22 process.
23   Q  And do you remember if there was anything unusual
24 about the vote process with Ms. ████





Page 166

1     MS. WERMUTH: Objection. Vague. Go ahead.
2   BY THE WITNESS:
3     A  So her vote was taken on Zoom because it was when
4   the first time we had to do personnel and do our
5   personnel process and vote via Zoom.
6   BY MS. SCATCHELL:
7     Q  Okay.  And were you present for that vote?
8     A  Yes, I was.
9     Q  Okay.  And do you remember hearing anybody say
10  that they didn't want Ms. ███ to feel like she has any
11  enemies at the College of Communication?
12    A  I do remember someone saying that.
13    Q  Okay.  Do you remember who said that?
14    A  I don't.
15    Q  And what is Ms. Knight's ethnicity?
16    A  White.
17    Q  And was there some allegation about there being
18  four votes or something like that?
19    MS. WERMUTH: Objection. Vague. Go ahead.
20  BY THE WITNESS:
21    A  So the vote process was challenging because we
22  were doing it via poll on Zoom so it was unclear
23  whether or not it had been accurately done.
24  BY MS. SCATCHELL:

Page 167

1     Q  Okay.  What part was unclear about it?
2     A  As it turned out, and this is what it seemed like
3   someone who creates the pole cannot actually vote in the
4   pole, and so the chair of the personnel committee logged
5   onto two separate devices, so we weren't entirely sure if
6   that was throwing in an extra vote.  There was a no vote
7   that came in, and there was no discussion that seemed to
8   indicate that in terms of the conversation of the tenured
9   faculty.  And so that's what brought up the overall
10  discussion about what was going on with the vote.
11    Q  Okay.  So what is your opinion on why somebody
12  said we don't want Ms. ███ to feel like she has
13  enemies?
14    A  I really don't --
15    MS. WERMUTH: Objection --
16  BY THE WITNESS:
17    A  -- have an opinion on that.
18  BY MS. SCATCHELL:
19    Q  Do you know how many votes were taken that day?
20    A  There were two votes.  There were two others that
21  didn't count because they didn't show up for everybody.
22    Q  What do you mean they didn't show up for
23  everybody?
24    A  I don't have it in front of me, so I can't

Page 168

1   remember the details of how it went.  But there were two
2   votes that had results and then there was at least one
3   that not everybody had access to the poll so they
4   scrapped it, they scrapped it before they actually showed
5   the results.
6     Q  Okay.  Do you remember what the results of each
7   vote was?
8     A  The first one had one negative vote, and the
9   second one -- I don't remember how that fell out.  There
10  were questions of a missing vote or whether it like kept
11  kicking in.  I could try to talk through it, but I don't
12  have it in front of me to be so accurate.
13    Q  Okay.  Would that be something you could produce
14  to your attorney?
15    MS. WERMUTH: Objection.  We have produced this
16  information.
17  BY THE WITNESS:
18    A  Yeah.
19    MS. WERMUTH: Oh, no, actually, I don't think you
20  guys ever asked for this information.  Strike that.
21    MS. SCATCHELL:  Okay.  We'll look into that.
22  BY MS. SCATCHELL:
23    Q  But is it something that you do have a record of
24  it?

Page 169

1     A  (Nodding.)
2     Q  Okay.  Did the faculty handbook allow for voting
3   more than one time?
4     A  The faculty handbook, once someone has voted,
5   they're not allowed to change their vote.  I believe
6   that's how it's put.
7     Q  Okay.  And what happens if the person changes
8   their vote?
9     A  I'm sorry?
10    Q  You said they're not allowed to change their
11  vote.  And what happens if they do?
12    A  I think the way it's written is to avoid someone
13  who once a vote's been announced going up to the person
14  taking the vote and saying I now want to vote a different
15  way.
16    Q  Okay.  And is the College of Communication
17  changing its voting procedures?
18    A  We have just gone through a process of changing
19  and clarifying our voting procedures.
20    Q  And was there a technical glitch during that
21  vote?
22    A  That is what we -- that's why they called for
23  another vote --
24    Q  Okay.  What was that glitch?

43  (Pages 166 to 169)





Page 170

1    MS. WERMUTH: Did you finish your answer. I don't
2    know if she was done.
3    MS. SCATCHELL: I apologize.
4    BY THE WITNESS:
5    A   I can just continue where it was. I think that
6    the concern was that we were again on Zoom and it was
7    very new trying to figure out a polling system and trying
8    to figure out what was going on when someone's running
9    the poll and it's on a Separate device.
10   BY MS. SCATCHELL:
11   Q   Okay. Who ran the poll?
12   A   Paul Booth.
13   Q   And do you if he's the one who said we don't want
14   Ms. ███ to feel like she has enemies at the college?
15   A   I don't know.
16   Q   Okay. Do you remember at what point of the
17   meeting you heard that statement?
18   A   I'm sorry, can you repeat that?
19   Q   Do you know at what point of the meeting you
20   heard it, was it like toward the beginning, middle, or
21   end?
22   A   I don't remember.
23   MS. SCATCHELL: Okay. We are finished.
24   MS. WERMUTH: Okay. Can I take five minutes, and I

Page 171

1    do have a couple of follow-up. So Lexa, I'm sorry to
2    keep you a little bit longer but, if I could get five
3    minutes, that would be helpful to get my thoughts
4    together and then we can rejoin. I don't have a lot so
5    it should be relatively quick.
6    MS. SCATCHELL: Great.
7            (Short recess.)
8    MS. WERMUTH: Dr. Murphy, I thank you for your
9    patience. Let's go on the record.
10           EXAMINATION
11   BY MS. WERMUTH:
12   Q   I have a couple of questions for you.
13       Early on you were asked some questions
14   about mandatory training in the college and you testified
15   about some in-person training. Are employees also
16   required to go through any virtual or digital sort of
17   modules related to topics of discrimination and
18   harassment?
19   A   Yes.
20   Q   Okay. And does that come through a compliance
21   office?
22   A   Yes.
23   Q   Okay. And you were asked at one point how long
24   does it take to make a tenure decision. And you

Page 172

1    answered, about how long you as a dean have to weigh in
2    on the process. But I'd like to make sure that we're
3    clear for the record, the process has multi layers; is
4    that correct?
5    A   Yes.
6    Q   And it goes through multiple review levels,
7    correct?
8    A   Yes.
9    Q   Okay. And that process takes how long from start
10   to finish?
11   A   From start to finish, the application is first
12   declared of May of spring that someone wants to go up for
13   the spring of the prior year for tenure & promotion, and
14   then the first level of review is in the fall with the
15   college. And then the next level of review would be with
16   UBPT in the winter, and then it moves forward from there.
17   So the decisions don't actually come out until mid may to
18   June.
19   Q   The final decision from the provost?
20   A   Correct.
21   Q   But the candidate is made aware of each level of
22   review the recommendation at each level in real-time; is
23   that right?
24   A   They are made aware of the recommendation for the

Page 173

1    college level, and then the dean in -- so they get that
2    in December, and then they get the dean recommendation in
3    January. They get the UBPT according to the handbook by
4    May 15th.
5    Q   Okay. And then the provost in June?
6    A   Provost by I think June, but I don't remember the
7    exact day, but there is a date in the handbook.
8    Q   Let's go to the testimony about the PRAD chair
9    election in the Winter of 2019 during which Dr. Dillard
10   was a nominee. In the Winter of 2019, if I recall
11   correctly, early to mid February of 2019?
12   A   Yes.
13   Q   Okay. And so how long had you been in the role
14   of acting dean or interim dean at that point in time?
15   A   About three months.
16   Q   And had you presided over another program chair
17   election and deliberation prior to February of 2019?
18   A   No.
19   Q   Okay. And you testified that Dr. Dillard met the
20   minimum qualifications for the position; do you recall
21   that testimony?
22   A   Yes.
23   Q   Okay. And you described the minimum
24   qualifications as being a tenure-track faculty member in



Page 174

1  the program with tenure.  Is it required that the
2  candidate have tenure at the time of the nomination?
3      A  Not required.  I think it's preferred.
4      Q  Okay.  You also testified that what resulted from
5  the deliberations on February of 2019 was a new process
6  which included a job description for the program chair
7  position for all of the program chairs in the college; is
8  that right?
9      A  Yes.
10     Q  And once that process had been developed and
11 reduced to writing, was that distributed to the faculty
12 and the college for input and feedback?
13     A  Yes.
14     Q  And that would have included distribution to Dr.
15 Dillard for her feedback; is that right?
16     A  Yes.
17     Q  Okay.  Can you for a moment go back to the
18 corrected Exhibit No. 15.
19     A  Can you tell me where?  Let's see, I have so
20 many.
21     Q  It was sent at 5:09, at least that's when I got
22 it.
23     A  Got it.
24     Q  Do you have it, okay.

Page 175

1          So you were asked some questions about the
2  exchange between you and Dr. Dillard on May 1st of 2019;
3  do you see that?
4      A  Yes.
5      Q  And did you and Dr. Dillard meet that same day to
6  discuss these topics?
7      A  I believe we had a meeting set up for soon after
8  that.  I don't remember if it was the same day, but it
9  was -- we already had a meeting set up.
10     Q  Okay.  And based on your prior testimony, I just
11 want to make sure I understood, so you did discuss the
12 issues that she raised in her issue to you; is that your
13 recollection?
14     A  Yes.
15     Q  And the outcome of that discussion was that you
16 committed to assist her in her leadership plan and
17 identifying and securing and in other ways supporting her
18 leadership opportunities?
19     A  Yes.
20     MS. SCATCHELL: Objection.  Form.
21 BY MS. WERMUTH:
22     Q  Okay.  So I see that this email trail then goes
23 onto include notice from Sydney to you that she had been
24 selected to participate in a woman and education

Page 176

1  leadership program; do you see that?
2      A  Yes.
3      Q  Okay.  And so she inquired of you as to whether
4  or not there was university funding for this
5  opportunity, right?
6      A  Yes.
7      Q  And you ultimately did help her secure that
8  funding by reaching out to academic affairs; is that
9  right?
10     A  Yes.
11     Q  Okay.  Now, as of May 1, 2019, where was --
12 Strike that.
13         You testified earlier there were three
14 individuals who applied for tenure in the 2018, 2019
15 academic year, right?
16     A  Yes.
17     Q  And Dr. Dillard was one of them?
18     A  Yes.
19     Q  Okay.  So by May 1 of 2019, she had been notified
20 at least through the college level that the college was
21 supporting her application for tenure, correct?
22     A  Yes.
23     MS. SCATCHELL: Objection.  Form.  Assumes facts not
24 in evidence.  You can answer.

Page 177

1      MS. WERMUTH:  The facts are in evidence.  The
2  documents are in evidence.
3      MS. SCATCHELL: Okay.  That's argumentative.  I move
4  to strike that.  Go ahead.
5  BY MS. WERMUTH:
6      Q  Okay.  So now in May 1 of 2019, that was --
7  Strike that.
8          Could you look back at Exhibit No. 12,
9  please, if you can find that.  I don't know if you still
10 have it open.
11     A  Okay.  Yes.
12     Q  You have that open, okay.  So you've already
13 testified about this email trail in February of 2019.  In
14 the last email in this trail that you're copied on is
15 from Isabel Diaz; do you see that?
16     A  Yes.
17     Q  And it's dated February 20, 2019; do you see
18 that?
19     A  Yes.
20     Q  Okay.  And this was the meetings that and the
21 conversations that Sydney wanted to have with you about
22 the PRAD chair selection process, right?
23     A  Right.
24     Q  Okay.  And as of February 20, 2019, Isabel Diaz




Page 178

1 told Sydney, according to this email, that if after
2 meeting with you, if she decided she wanted to -- that
3 she had a complaint that she should contact Barbara
4 ███ or Isabel to schedule time to meet and discuss
5 those concerns; do you see that?
6    A  Yes.
7    Q  Okay.  Do you know if Dr. Dillard ever did that?
8    A  I do not know.
9    Q  Okay.  Now, with respect to ███ ███ tenure
10 voting issue, was that something that you communicated
11 with the UBPT about?
12    A  Yes.
13    Q  So as the dean of the college, when a tenure case
14 leaves the college and goes to the UBPT, are you involved
15 at all in the UBPT's review of the case?
16    A  Yes.
17    Q  And what is that involvement, Dr. Murphy?
18    A  I am called to a meeting with them, and they
19 can -- it's basically an interview of the dean.
20    Q  And so did the committee in that interview with
21 you question you on the voting issue with respect to
22 ███ Knight's case?
23    A  Yes.
24    Q  And did you explain to them what happened?

Page 179

1    A  I did explain what happened and followed up in
2 writing.
3    Q  You followed up in writing.  I'm going to send an
4 email around.  I guess this would be -- what was the last
5 exhibit marked, Ms. Tufano?
6    THE COURT REPORTER:  18.
7    MS. WERMUTH:  I am marking what I'm sending as
8 Exhibit No. 19 or ask that it be marked Exhibit No. 19.
9 Let me know when you get it, please?
10              (Exhibit No. 19 was marked
11                  for identification.)
12    THE WITNESS:  Just got it.
13    MS. WERMUTH:  Do you all have it?  Gia, do you have
14 it?
15    MS. SCATCHELL:  Yes.
16 BY MS. WERMUTH:
17    Q  Oh, terrific, okay.
18        Dr. Murphy, do you recognize that
19 document?
20    A  Yes.
21    Q  What do you recognize it to be?
22    A  This is the email follow-up that I sent to the
23 University Board for Promotion & Tenure that explains
24 voting in ███ Knight's case.

Page 180

1    Q  Okay.  So based on your interactions with the
2 UBPT, they wanted to understand what happened with the
3 poll voting in her case, correct?
4    A  Yes.
5    Q  And even in spite of the issues with the poll
6 voting in her case, the UBPT decided to grant her tenure
7 or recommended that she be granted tenure; is that
8 correct?
9    A  Yes.
10    MS. WERMUTH:  Okay.  And by the way, that was
11 produced to you, Gia.
12        So anyway, I have no further questions at
13 this time.
14    MS. SCATCHELL:  Okay.  I just have one follow-up
15 question.
16        FURTHER EXAMINATION
17 BY MS. SCATCHELL:
18    Q  When was ███ Knight's vote?
19    A  It would have been in November of 2020.
20    Q  Okay.  And what is the date on Exhibit No. 19,
21    A  That is March 9th --
22    Q  The date that -- Sorry.  I just wanted to clarify
23 the date that you sent the email to ███ ███
24    Q  March 9, 2021?

Page 181

1    A  March 9, 2021.
2    Q  Okay.  And is that the first communication that
3 you had with UBPT about the voting issue or glitch?
4    MS. WERMUTH:  Objection.  Asked and answered.
5 BY THE WITNESS:
6    A  This would have been just a few days after -- I
7 probably met with them the Friday before for the
8 interview, so I followed up with this email after that
9 Friday.
10 BY MS. SCATCHELL:
11    Q  Okay.  And were you aware if there was any
12 complaints made to the university about the voting
13 process?
14    A  A complaint made?
15    Q  Uh-huh.
16    A  No, I'm not aware of a complaint.
17    MS. SCATCHELL:  Okay.  I have no further questions.
18    THE COURT REPORTER:  Signature?
19    MS. WERMUTH:  Yes, we will reserve.  Thank you.
20        * * * * * * * *
21              (Ending time: 5:59 p.m.)
22
23
24

46  (Pages 178 to 181)



Page 182

```
 1              REPORTER'S CERTIFICATE
 2        The within and foregoing statement of the
 3   witness, ALEXANDRA MURPHY, was taken before DEANNA L.
 4   TUFANO, CSR, and Notary Public, at 121 West Wacker Drive,
 5   Suite 2300, Chicago, Illinois, County of Cook, at 12:00
 6   p.m. on the 21st of April, A.D., 2022.
 7        The said witness was first duly sworn and was
 8   then examined upon oral interrogatories; and the
 9   questions and answers were taken down in shorthand by the
10   undersigned, acting as stenographer and Notary Public;
11   and the within and foregoing is a true, correct, and
12   accurate record of all of the questions asked of and
13   answers made by the said witness, ALEXANDRA MURPHY, at
14   the time and place hereinabove referred to.
15        The undersigned is not interested in the within
16   case, nor of kin or counsel to any of the parties.
17        Witness my official signature and seal as Notary
18   Public in and for Cook County, Illinois on this
19   5th Day of May, A.D., 2022.
20   _____
          DEANNA L. TUFANO, CSR,
21        CSR No. 084-003819
          MAGNA LEGAL SERVICES
22        SEVEN PENN CENTER
          1635 MARKET STREET, 8TH FLOOR
23        PHILADELPHIA, PA 19103
          (866) 624-6221
24
```

47 (Page 182)





| A |
| --- |

**A.D**
182:6,19
**abbreviated**
72:21
**ability**
4:23 11:15
**able**
5:8 30:10 50:2 51:20
73:15 85:17 87:3
108:15 115:24
130:13 138:4 160:3
**absence**
34:11
**abstained**
82:14
**academic**
11:6 30:15 43:15,21
60:14 69:18 131:19
154:24 176:8,15
**accept**
83:24
**accepted**
18:7
**accepts**
12:13
**access**
14:3 168:3
**accessible**
38:18
**accommodations**
94:20,22 95:3,7
**accomplish**
22:3
**accomplishes**
17:9
**accurate**
12:21 121:10,16
168:12 182:12
**accurately**
166:23
**act**
143:16,17
**acting**
6:20,23 7:2,4,10,12

7:19,20,24 8:1,7,8
39:5 73:20 173:14
182:10
**action**
69:20,20 70:11,17
71:15 72:24 124:13
124:19,23 159:2
161:15
**active**
89:22
**activities**
17:3 77:3,5 161:3
**activity**
68:6 122:18
**actual**
27:15 36:13 69:20
74:13,13 83:3
**ad**
22:18,21 48:17
**add**
40:17
**added**
66:4
**addition**
163:4
**additional**
15:13 16:2,3 44:20
45:5,6,9 136:24
**address**
64:1 70:11,17 72:11
**addressed**
16:15 62:23 160:11
160:12
**adjunct**
86:13
**adjuncts**
77:9 79:4
**administrative**
130:3 155:2
**admissions**
161:10
**advancement**
154:17,20,24
**advancements**
155:2
**advantage**

126:2
**advertising**
24:16 48:20 80:8
88:8 89:22 90:6
102:6,17 106:4
109:8,23 110:5
111:7 114:1 119:5
149:17 157:7 165:8
**advise**
138:9
**advising**
101:10,11 102:23
**advocate**
70:1 71:13,17 126:10
126:13,14,16
**advocates**
72:2
**affairs**
30:16 176:8
**affect**
4:23 11:2 66:8
**afield**
27:20
**African**
106:5,12,12 158:14
**African-American**
24:18 29:1,18,20
56:16 105:21 106:2
106:3,11 154:3,17
155:6
**afternoon**
135:1
**aggregate**
19:1
**AGIF**
108:16
**ago**
33:11,21,22 35:24
**agreed**
90:18
**ahead**
13:6 24:6 27:20 29:3
31:5 32:5 33:9 34:4
39:8 41:10 44:13
45:16 54:15 59:18
62:16 66:10 71:11

72:7 73:9 89:7,19
94:14,24 98:9 105:3
106:8,9 108:4
109:24 114:5,13
118:20 121:12
122:6,15 123:16
127:23 129:15
136:13 139:16
143:19 144:1,17
145:11 149:6 153:3
155:11,20 163:24
166:1,19 177:4
**airline**
26:21
**airlines**
26:2,14 27:17 28:19
**Alexa**
51:12
**Alexandra**
1:10 4:2 5:17,18 64:1
182:3,13
**allegation**
117:2 166:17
**allow**
84:3 169:2
**allowed**
84:12 169:5,10
**allows**
11:15
**alphabetically**
21:8
**altogether**
117:11
███████
126:19,24
**American**
127:1
**amurphy1@depau…**
42:9
**and/or**
15:20 139:9
**Anna**
2:8 41:24 42:11
58:23 61:11 75:5
133:12
**announced**



169:13
**annual**
30:13 44:18 45:13
46:6,11 60:10,13,21
60:23 64:12,15,20
65:4,13 67:5,12
68:8,15,18 77:10
78:17 131:23
**annually**
43:22 44:4
**anonymous**
81:16 84:3
**answer**
5:4,5,8,9 18:21 26:8
32:16 36:22 46:8
52:9 59:20 61:9
122:8 123:24
124:10 127:15
130:21 145:15
160:4,9,19,19
162:12 163:24
164:1 170:1 176:24
**answered**
32:17 118:19 122:2
127:15 156:4 172:1
181:4
**answers**
182:9,13
**anybody**
37:23 41:1 82:5,14
93:6 135:12 150:19
159:20 166:9
**anybody's**
90:15
**anymore**
79:10
**anytime**
11:5,5,15
**anyway**
180:12
**apologize**
47:15,16 170:3
**appendices**
136:1
**appendix**
135:13,14,23,24

**applicant**
44:18
**application**
12:5 46:16 57:9
79:22 132:12
172:11 176:21
**applications**
19:2,4 41:14
**applied**
10:22 79:19 95:19
109:15,17 176:14
**apply**
7:13 10:7,15 79:14
**appointed**
8:4
**appointment**
7:23 58:2
**appreciate**
49:21 59:18 61:22
**approach**
32:7
**approached**
145:24
**appropriate**
121:17 141:3
**appropriately**
130:17
**approved**
11:23 146:8
**approximate**
9:6 35:18
**approximately**
8:20 9:5 56:24 57:15
79:17 110:8 111:10
148:3
**April**
1:16 182:6
**area**
23:8,14,15,17 25:15
25:16 46:2,3 72:10
96:10 102:9 111:1,1
**areas**
16:14 22:15 45:5
46:1 108:1
**argumentative**
121:20,24 122:14,15

123:16,22 124:8
162:11,18 177:3
**article**
68:13 151:9,12,13
158:11 163:11,14
163:21
**articles**
26:1 67:22 76:7
**Asian**
119:10
**asked**
9:15 30:13 34:10
45:5,7,9 52:4 72:9
93:9 99:1 104:10
112:22 118:19
122:2 168:20
171:13,23 175:1
181:4 182:12
**asking**
29:6 55:19 58:4
116:11 118:3
125:22 130:15
136:24 160:20
**aspect**
90:14
**aspects**
44:21 45:20 85:9
101:8 106:13
**assess**
12:9 54:7 68:7
**assessment**
18:23 22:12,15
**assign**
77:8
**assist**
175:16
**assistance**
131:11
**assistant**
6:2 10:3,6 56:12 95:4
95:5,9,10 101:11
102:22 106:5 130:3
146:1 147:20 155:1
**associate**
6:3,5,7,11,12 10:10
10:12,18,19,23

24:15 39:5,13,21
67:10 73:19 132:22
142:14 155:1 161:1
162:4 165:17
**associations**
18:13
**assume**
5:14
**assumes**
73:8 139:15 145:10
150:22 151:2
162:18 164:8
176:23
**assuming**
133:7,8
**attached**
66:15 133:11
**attachment**
129:5 133:6,13
151:18
**attachments**
133:3
**attain**
10:13
**attend**
34:24 35:24
**attendant**
27:14 28:1 29:10
**attendants**
26:15
**attended**
1:15 35:14,16
**attention**
27:4 43:5 63:18
69:10 74:19 97:4
100:12 115:3,6
139:3 145:18
**attorney**
5:2,8 9:14 39:19
168:14
**attorneys**
61:4
**authored**
136:9
**authority**
92:13



47:14
automatically
11:9 26:23
available
9:19,20,21 20:24
  38:21 110:3
avenues
142:12,13
average
8:19,21,23 10:17
  14:15 39:4 41:8
avoid
169:12
Awalt
21:3 129:22,24
award
66:17
aware
4:15 35:10 90:21
  108:11 151:9 162:7
  162:20 163:3,14
  172:21,24 181:11
  181:16
awermuth@cozen....
2:10

**B**

B
3:7
baby
34:12 91:8
back
4:8 11:24 21:24
  25:11 30:5 40:7
  51:6 52:2,9 54:23
  59:8,16 61:23 62:8
  68:4 70:12,24 72:15
  72:18 76:10 84:6
  85:11 86:18 90:20
  95:22 98:21,22 99:1
  99:17,24 104:14
  105:9,17 109:20
  110:23 112:18
  114:10 116:5,6
  120:6,7,8 138:1

152:12 174:17
  177:8
background
25:10 27:11
bad
29:14 66:7,7
Baglia
71:6
balance
101:15
Barbara
31:20 33:16 137:2,3
  137:12,16 139:7
  178:3
base
66:5 78:17
based
5:3,5 18:23 65:3
  69:19 85:2 94:11
  117:10 122:20
  135:21 158:18
  159:1,18 175:10
  180:1
basically
20:4,6 178:19
basis
30:13 46:6,11
Bates
49:7,17 50:16 51:15
  75:23 133:18
battle
97:11
bearing
67:23
becasue
139:8
becoming
7:8 9:24 67:10 80:19
  81:14
began
6:21
beginning
10:6 69:20 87:15,17
  155:15 170:20
begins
63:18 136:23 139:13

behalf
2:6,12 4:3
behavior
26:22 162:9
believe
11:21 21:8,13 23:12
  24:21 25:1,7 30:21
  36:4 37:15 38:6,12
  39:14 41:2 54:11
  55:1,18 56:15 70:11
  70:13,23 71:4,19,20
  74:1,11 78:7,19
  80:14,17,20 82:16
  87:22 95:1 110:10
  110:15 111:5 112:9
  115:11 117:17
  123:7,8,20 124:3,5
  124:6,11,24 131:12
  148:5 154:18
  158:11 161:2 169:5
  175:7
beneficial
118:13
best
26:9 97:12 99:3
  122:8 130:20
better
16:11 61:14 70:15
  73:4 78:23 79:6
  130:16,21
beyond
66:18 138:15
bias
35:16,19 36:24 37:3
  37:22 115:1,20
  116:2 144:3,15,20
  145:8,14
biases
144:11 154:11
big
8:13 40:4 98:10
  102:13
bigger
79:5
bit
26:4 40:7 70:9 85:4

122:14 171:2
**Black**
150:10
blank
59:7
blanking
22:17
blind
18:9
blur
40:9,10
board
12:8,14 14:9 19:20
  41:18 55:24 56:1
  179:23
████████████
88:6,7,17,24 89:10
  90:13 93:9
books
66:18
Booth
40:6 170:12
born
154:3 155:6
bottom
48:11 53:16 118:8
  129:17 134:3
box
50:1
brainstorm
130:15
BRAND
109:1
branding
109:8
Brea
40:2
break
51:2,3 61:17 111:18
  112:18 151:19,20
  152:5
breakout
66:13
brief
157:17
bring



145:18
**Brittany**
2:8 42:4,13 47:10
65:17
**brittanygreen@co...**
2:11
**broad**
66:20 68:23
**broader**
93:4
**broke**
124:15
**broken**
22:15 68:21
**brought**
95:9 109:5 115:3,6
137:13 147:19
167:9
**build**
107:17
**bullet**
154:5 155:5,14,17,23
158:19 160:4,10,21
160:22 161:3
**bunch**
68:21 128:16
**Burnett**
109:3
**business**
28:22 70:9 95:15

————————————
**C**
————————————
**c**
2:1 40:4
████████
99:10,11
████████ **A-N**
118:7
**C-I-C-C-H-I-R-I-...**
147:14
**C.S.R**
1:24
**calculate**
41:12
**calculated**
149:10

**calendar**
117:24 118:2 131:20
131:22
**call**
15:13 23:10 24:4,9
38:15 77:7 100:4
125:12 150:16
161:14
**called**
4:3,9 19:11 31:14
32:20 44:20 82:23
92:23,24 93:23
97:21 169:22
178:18
**calling**
137:2 163:12
**calls**
73:17 89:7,18 94:13
122:2 143:23,24
145:10 159:2
████████
33:20 40:2 74:5
135:22 142:8,17
**Camp**
109:1
**campus**
89:2,12,15 90:4,14
90:19 94:2 95:14,16
96:2 97:24 98:2
**candidacy**
81:21 91:22 92:2
97:14
**candidate**
11:10 12:15 15:22
16:3,10 17:2,5
36:17 37:8 40:12
44:9 67:21 69:7
81:23 82:22 84:17
134:18 172:21
174:2
**candidate's**
12:5 13:12
**candidates**
7:11 16:18 41:5
57:16 67:19 82:19
84:4 105:14 115:9

115:10 116:24
117:1 134:9
**capabilities**
98:4
**capturing**
70:13
**career**
109:9 154:16,20,23
155:2
**case**
8:5 11:9 12:9 18:22
41:4 45:6,19 55:23
56:2 81:22 83:1
178:13,15,22
179:24 180:3,6
182:16
**cases**
11:11 28:18 41:13
**categories**
55:18 68:21,24 69:3
69:5
**category**
64:23 66:21,23
**Caucasian**
29:1,13,16,19 106:17
112:9
**caught**
53:13
**CENTER**
182:22
**centralized**
38:1 79:4 102:12
**centralizing**
102:13
**certain**
17:17 26:15 29:8
45:20 68:6 75:14,21
101:19 110:18
162:9,14
**certainly**
133:15,20
**CERTIFICATE**
182:1
**Certified**
1:14
**chain**

113:22,23 114:7
119:22 129:17
136:23 148:24
165:7,12
**chair**
16:17 23:7,9 25:7
60:14 64:24 65:1
68:10 76:22 77:3,5
77:7,19,24 78:11,15
78:18,19,22 79:2,6
79:9,13,14,19 80:1
80:16,19 81:15,22
82:18 83:6 85:7
86:11 89:1 90:18
91:11 93:1 95:13
96:5 97:23 98:22
99:3,13,14 101:4,17
101:21 103:6,10,13
104:22,24 105:13
106:24 107:13
132:23 137:1,6,8,16
137:19 165:8 167:4
173:8,16 174:6
177:22
**chairs**
38:19,20 78:15,15
96:1 101:1,6 174:7
**challenges**
60:5 129:19
**challenging**
166:21
**chance**
87:3
**change**
19:16 54:24 83:17,19
169:5,10
**changed**
31:15 43:4 55:11
83:16,18 93:2,3
**changes**
134:1 169:7
**changing**
169:17,18
**channels**
141:3
**chapter**



43:8,8
**charge**
108:12
**check**
12:1 15:22 26:22
44:9
**Chicago**
2:4,9 109:4 182:5
**choose**
7:5 10:15 11:10,17
**chose**
82:7
**chosen**
10:20 103:21,21
███
40:22 78:2,3,5 99:8
103:9,17 104:15
115:22 118:18
119:1 128:4
███**'s**
119:2
███
147:12
**circle**
120:6
**circled**
85:6
**circling**
85:16
**circulating**
83:3
**circumstances**
104:10
**Civil**
1:11
**clarified**
115:23
**clarify**
12:18 16:11 80:7
115:15 180:22
**clarifying**
165:14 169:19
**clarity**
55:20 118:13
**class**
8:21,24

**classes**
9:1 102:7,11
**classification**
57:9
**clear**
4:18 5:11 43:7
102:20 114:15
172:3
**clock**
11:11,13,18
**close**
120:13
**closely**
104:20
**co-pilot**
27:15
**coach**
16:11
**coaching**
16:2
**Code**
1:11
**collaboration**
85:9
**collaborative**
86:15
**colleagues**
31:9
**collected**
19:7
**collective**
134:14
**college**
5:20 6:12 8:11,13
10:19 12:6,7 13:6,7
13:8,9 14:17,18,19
16:10 17:12 18:2
21:3 22:1 32:22
37:16,23 48:5 52:24
54:6 56:19 65:24
66:8,12 69:13,17
70:15 71:23 72:1,23
77:1 98:8 105:21,23
107:15,16,21,23
124:21,23 125:1,24
126:4 128:5 130:4,7

139:13 140:16,19
141:9 144:15
150:20 151:15
153:21 154:21
155:7 158:17 159:3
159:10,17 162:8
163:13,18,19 164:6
165:18 166:11
169:16 170:14
171:14 172:15
173:1 174:7,12
176:20,20 178:13
178:14
**colleges**
13:7,10 30:13 104:13
161:14
**color**
150:10
**com**
102:6
**come**
15:21 22:19 31:20
36:3 38:8,13 41:14
55:21,22 61:5,15,23
72:18 73:21 84:5
98:21 99:23 101:4
112:18 121:5 142:5
171:20 172:17
**comes**
16:13 54:5 68:16
76:6 96:15 116:22
**coming**
59:11 61:11 95:3
97:5 142:1
**commitment**
86:11 103:7
**commitments**
88:17
**committed**
175:16
**committee**
13:11,11,19 14:1
16:17,20 17:4,6,7
17:18,21 21:24
22:11,12,13,15,20
22:22,24 23:1,2,5

23:10,11,15,21,23
24:8 28:11 30:2
35:17,21,23 36:9,16
37:12,13 38:8 46:19
48:14,17 52:20 60:3
109:23 110:2,3,6,13
111:5,7,13 113:24
114:1,9,12,16,20
115:8 116:22
119:23 120:1,22
126:1 132:19,23
134:15,17 137:7
146:2 167:4 178:20
**committee's**
114:9
**committees**
17:11,13,16,20 22:2
22:5,10,19,21 28:12
28:13 29:22,22,24
36:4 37:17 38:4
48:5,6,8 125:11,15
**common**
101:3
**communicated**
178:10
**communication**
5:21 8:12,13 22:1
25:7,16 28:22 32:22
69:13 77:2 139:14
151:15 158:17
159:3,11 162:8
163:13,18,19 164:7
165:18 166:11
169:16 181:2
**communications**
8:22 74:7 98:8,8
105:22,23 140:17
144:16 159:17
**Community**
6:4
**compared**
120:12
**compensation**
78:10
**compiling**
132:10,11



complainant
33:18
complained
142:6 154:8
complaint
31:2 32:3,4,23,24
33:1,15 34:1,6
74:13,14 127:12
135:19,22 139:12
140:19 141:3,4,11
141:13,18,22 142:9
142:15 178:3
181:14,16
complaints
30:24 74:7,10 138:6
139:24 181:12
complete
24:1
completely
46:7 50:21 64:16
66:24 130:12
compliance
171:20
component
22:3
compression
146:11,12
concern
45:15 55:22 104:15
170:6
concerned
154:16
concerns
15:19,20 16:8 31:1
45:3,4 58:12,15
63:1,1 72:23 73:7
73:22 104:18 105:6
114:18 117:4,10
118:15 146:4 154:1
154:14 156:8
158:12 178:5
concludes
53:21
conclusion
144:1 145:10
condition

90:22 93:7 94:2,9
conducted
43:14
conference
18:7 117:12
conferences
18:5
confidence
97:9 99:20
confident
160:13
confused
85:4
confusing
105:2 143:23
conjunction
126:11
connect
94:8
connected
93:15
connection
42:19 58:24 59:9
61:6 94:2 117:7
consequence
65:13,15
consequences
144:12
consider
30:24 36:15 95:12
141:21 155:17
considered
12:5 29:24 39:1
120:11 131:5 155:8
considering
62:24 104:16
considers
13:8
consist
125:9
consisted
83:1 87:20
consistent
54:8
constant
22:14,21

constructed
20:4,5
consuming
132:4,8
contact
38:21 178:3
contains
76:5
content
135:18
context
18:21 57:13 156:5,6
continuation
52:17 104:4
continue
91:12 99:4,22 170:5
continued
126:12
continues
63:19 119:22
contract
52:18 53:1,6 65:16
67:16 88:14 142:23
147:24
contributed
108:22
control
92:13
conversation
57:13 85:6,11 87:1
93:12 114:9,17,19
117:11 119:23
121:7 123:7 129:18
137:15,18 142:7
153:2 154:10,12
156:16,18,19,21,24
157:10 167:8
conversations
85:16 160:13,23
161:8 177:21
Cook
182:5,18
coordinate
102:8
coordinated
72:2

coordination
102:14
coordinator
95:2
copied
177:14
copy
42:4 49:23 74:16
133:14
corporations
109:3
correct
4:16,20 7:8,9 25:3
36:17 43:2 44:1
53:3,4,7,8,24 54:20
57:6 72:5 76:19,20
80:2 91:24 105:1
106:17,19 116:18
116:19 120:12,17
120:18 130:10,21
137:4 139:21 140:1
141:11 172:4,7,20
176:21 180:3,8
182:11
corrected
50:5 51:9,10 58:5,7,8
146:22 157:11,14
174:18
correctly
12:23 27:10 173:11
council
107:24
counsel
182:16
count
12:22 39:11,16 68:12
167:21
County
182:5,18
couple
37:1 62:18 71:1 91:9
102:4 171:1,12
course
8:22 17:3
courses
95:6,10 102:10



court
1:1,11 32:15 42:18
56:7 59:12,16,22
61:3,7 111:19 112:5
179:6 181:18
courtesy
86:22 87:9
COZEN
2:7
create
161:15
created
161:13,14
creates
167:3
creating
16:20
credit
68:15 120:14
cried
123:11,19 124:2
crux
26:6
CSR
2:13 182:4,20,21
cuff
152:19
cultural
25:17
culture
98:2,6,7
cultures
98:14
current
5:18 31:13,16 32:19
60:18 77:19 91:13
146:4,5
currently
38:7 77:20 88:9
curriculum
22:11
cut
24:23
CV
75:13 84:2,18

**D**

D
3:1
data
18:24 19:2
database
19:10
date
22:24 35:18 119:7
131:1 173:7 180:20
180:22,23
dated
177:17
dates
55:8 134:4 143:3
day
7:21 41:16 167:19
173:7 175:5,8
182:19
days
181:6
DE
160:23 161:8,12,15
deadline
101:19
deal
36:16 139:24
dean
5:20 6:6,7,8,11,11,12
6:13,17,18,20,23,23
7:2,3,10,12,20,24
8:7,8,8,9 11:24 12:6
12:7 13:3,3,9,20
14:7 23:6,7 34:23
35:4 38:24 39:2,5,5
39:5 52:16 65:3
73:19,20,20 85:12
96:21 101:11
102:23 138:6
140:16 142:14
159:10,17 172:1
173:1,2,14,14
178:13,19
Deanna
1:14,24 2:13 182:3

182:20
deans
6:12 8:4
December
147:2 173:2
decide
18:6 23:4 67:13
160:4
decided
12:15 91:10 104:16
178:2 180:6
decides
67:16
deciding
18:19 141:5
decision
12:2,16 13:20 15:13
15:16 19:17,18,19
24:3,8 30:3 32:8,12
37:7 39:3 41:6,9,17
44:11 46:10 96:18
96:22 100:21 101:9
141:15 142:23
143:14 171:24
172:19
decisions
37:6 38:23 161:9
172:17
declared
172:12
Defendant
1:7 2:12
defined
66:23
definitely
98:15
definition
156:3
DEI
72:21,23 73:6 124:19
158:22
delete
21:17,19
deliberation
173:17
deliberations

174:5
demands
159:1
demographic
9:7
DeMoya
70:1 71:3 74:6 77:20
78:1
denied
57:16
denies
12:13
deny
18:19
department
31:14 98:7 105:18
departments
13:10
DePaul
1:6 5:22 6:1 8:14
9:18 30:23 67:10
69:8 87:24
Depaulia
151:7,8 163:12
depend
11:22
depending
11:14 17:19 23:6
51:18 66:2 78:18
98:19
depends
14:19 122:17 151:21
depicted
94:16
depiction
121:10
deposed
4:13
deposition
1:9
depositions
1:13 47:18
descent
158:14
describe
24:17 38:16 98:7



**described**
173:23
**describing**
66:14
**description**
95:20 174:6
**designations**
134:12
**detail**
93:4
**details**
91:1 107:4 141:15
168:1
**determination**
45:18 65:2
**determinations**
86:19
**determine**
67:7
**developed**
174:10
**developing**
107:12
**development**
87:24 107:3,8 157:9
**deviations**
149:10
**device**
170:9
**devices**
167:5
**Diaz**
31:23 137:11,19
138:2,11 139:6
177:15,24
**differ**
11:20 66:22
**difference**
6:22 7:1 14:24 15:3
29:23 54:3 60:9,12
67:2 79:1,8 106:6
**differences**
6:10 64:18
**different**
6:7 12:19 13:6,7
17:13,15 19:10

21:19 22:1,22 25:9
27:6 38:9 39:3 50:8
50:21 54:7 62:19,24
64:15,16 66:24 69:3
78:14,18 82:1 90:7
90:10 95:17 98:15
98:17 101:8 102:1
102:10 106:13
122:22 125:20
126:5 134:12
149:11 156:20
157:8 169:14
**digital**
171:16
**Dillard**
1:3 2:15 3:3 4:12
24:11,15 40:2 53:6
60:21 79:14 80:16
81:14 82:6,9 84:9
94:10 95:8 96:5
131:18 154:8,15
173:9,19 174:15
175:2,5 176:17
178:7
**Dillard's**
57:24 84:18 85:5
94:1 131:14
**Dillard_DePaul**
43:6,12 48:12 49:8
49:13 50:19 51:16
53:10,15 63:16,17
76:4 118:5 130:9
138:3 139:4
**Dillard_Teaching_...**
133:4
**Dillard_Teaching_...**
133:19
**direct**
32:21 43:5 63:18
74:19 139:3
**directed**
162:8 164:5,6
**directly**
73:23 87:12
**director**
6:4,5 78:21 79:1,3,6

79:9,10,12 101:10
101:22 107:22
130:6 157:7
**directors**
79:10
**disability**
94:12
**disciplined**
93:21,23
**disclosed**
127:21
**discomfort**
123:7
**discovery**
1:9,13
**discretion**
7:23
**discretionary**
35:15 37:10,11
125:14
**discriminated**
142:2 154:9,13
162:16
**discrimination**
32:23 34:21 35:6
73:22 127:12 138:7
140:1,5,18 141:19
141:22 142:6
143:17 144:4,12
154:11,19 155:8,17
155:22 156:3
163:13 171:17
**discriminatory**
162:9
**discuss**
51:20 81:20 118:15
123:1 145:17 175:6
175:11 178:4
**discussed**
38:11 85:5 88:4
107:20 135:20
**discussing**
93:7
**discussion**
13:13 55:18 82:3,19
82:21,22,24 83:2,8

84:7 85:21 87:5
100:1 104:24 115:1
143:13 152:10
159:20,21 167:7,10
175:15
**discussions**
83:11,12 159:23
**disempowered**
70:9 72:5
**disparity**
146:22
**DISPARTI**
2:2
**disregarded**
27:13
**distinct**
68:20
**distinction**
144:5,7
**distinguish**
66:3
**distribute**
84:22
**distributed**
174:11
**distribution**
174:14
**DISTRICT**
1:1,1
**diversity**
30:18,19,20 31:1,13
36:3 69:14 70:1
71:8,13,17 72:2,20
124:12,18 125:3,5,8
125:10,13,18,23
126:10,12,13,15
161:1,6 162:4,5
**divides**
72:11
**DIVISION**
1:2
**divisions**
72:14
**doc**
133:1
**doctors**



28:6

**document**
42:21,22 47:22 48:2
49:7 52:13 63:22
75:12 77:15 92:22
92:23 113:19 114:4
119:21 129:9,10
134:14,17 135:16
135:17,19 136:9,22
136:23 138:20
147:7,9 148:19,23
149:5 152:16
157:23,24 158:5
165:4,11 179:19

**documents**
13:12 14:4 16:19
17:1 18:16,20
114:16 129:14,20
132:11 134:9,10
177:2

**doing**
26:15 27:12 36:22
37:12 98:3 103:22
125:2 132:9,10
166:22

**Domestic**
127:2

**dominant**
20:6

**dominating**
27:18

**Don**
82:13

**double**
12:1

**download**
21:13

**downloading**
129:5

**DPUBLIC**
150:5,6,9,18,19
158:8

**Dr**
4:9 59:5,24 136:8
171:8 173:9,19
174:14 175:2,5

176:17 178:7,17
179:18

**draft**
133:1,9,11,24 134:16

**dragging**
21:15

**drill**
163:10

**Drive**
2:3,9 182:4

**driven**
38:24 96:14

**dropping**
21:15

**due**
34:11 60:4

**duly**
4:4 182:7

**dumb**
56:22

**Dustin**
126:17,20 127:4

**duties**
8:6,10 78:24 95:13
95:20 97:22 101:16

––––––––––––––
**E**
**E**
2:1,1 3:1,7

**E-W-A-N**
40:4

**earlier**
46:18 176:13

**early**
43:22 44:4 102:18
135:20 171:13
173:11

**ears**
120:14

**EASTERN**
1:2

**editor**
18:11

**edits**
134:18

**education**

26:5 28:8,18,20
68:22 153:22
175:24

**EEO**
32:20 33:7 35:5,12
139:12,21,23
140:23 141:11
156:10,14 164:4

**EEO_Investigations**
139:7

**effect**
69:16

**egregious**
63:1

**eight**
39:16 40:16 41:15

**either**
12:12 17:11 19:14
31:1 44:21 50:4
56:19 83:22 95:6
118:14,18 121:15
157:20

**elaborate**
67:8

**election**
81:23 82:18 85:5
91:11 99:21 103:23
165:8 173:9,17

**elections**
82:18

**eligible**
80:5,9

**email**
41:24 42:1,1,6 64:1
75:2 85:24 86:2
113:23 114:7 116:7
117:13 118:6,8
119:22 120:9
122:21 127:21
128:3 130:8,9,10
132:17,18 133:9,13
133:16 136:23
137:13 138:3,9,15
139:6 147:4 148:24
152:22,23 153:9,12
153:14 156:5,6

157:24 164:18,20
165:7,12 175:22
177:13,14 178:1
179:4,22 180:23
181:8

**emails**
63:18 117:9,10
119:18 164:19

**emergency**
26:16,17 27:1 28:4

**emphasize**
96:1 100:11

**employee**
9:21

**employees**
171:15

**encrypted**
50:3

**ended**
7:8 98:23 146:22
157:3,6

**enemies**
166:11 167:13
170:14

**enrollment**
102:11

**entire**
13:8 45:19 134:17

**entirely**
38:6 56:16 103:4
167:5

**equitably**
36:17

**equity**
30:20 31:1,3,10,13
32:23 36:3 69:14
71:9 72:21 124:13
125:3 161:2,6 162:4

**errors**
134:19

**escalate**
156:10

**especially**
26:12 94:7

**established**
70:16



**ethnicity**
24:17 56:13 112:8,12
  119:8 126:20,23
  148:1 150:3 166:15
**Eva**
88:6,7,16,24 89:10
  90:13 93:9
**evaluate**
36:17 60:3
**evaluated**
69:4
**evaluation**
36:16,20 43:19 44:1
  54:13,18 58:1 62:14
**evaluations**
16:24 18:18 19:3
  36:9,12 43:21,22
  44:4,18 149:1,8,11
**evening**
89:23
**events**
89:23,23 90:1,8,11
  95:17
**everybody**
37:22 47:16 167:21
  167:23 168:3
**evidence**
46:8 71:11 131:6
  155:11 176:24
  177:1,2
**exact**
93:10 140:11 173:7
**exactly**
20:3 21:21 37:18
  47:19 55:7,9 57:13
  88:23 93:20 127:8
  148:5
**exaggerated**
28:18
**examination**
3:4,5 4:6 59:2,24
  171:10 180:16
**examined**
4:4 182:8
**example**
18:3 21:7 23:19

26:21 31:3 46:4
  146:14
**examples**
17:3 22:9 44:23
  144:15 145:7
**excellent**
54:9,12 55:17,17
  64:21 66:19,20
**exception**
139:1 157:23
**excerpts**
42:23
**exchange**
175:2
**excluded**
11:22 70:10 72:5
**exclusively**
67:15
**excuse**
11:17 24:1
**exhibit**
3:8,8,9,9,10,10,11,11
  3:12,13,13 41:21,22
  47:1,2 48:22,23
  49:7 50:10 51:9,10
  58:5,7,8 62:8 63:6,8
  63:13 74:19 75:22
  113:12,13 119:12
  119:13 120:7,7
  128:17,19 129:2
  132:13 135:8
  136:17 138:17,24
  148:7,14 151:24
  157:11 158:3
  164:15,17 165:9
  174:18 177:8 179:5
  179:8,8,10 180:20
**exhibits**
128:12 152:1
**expand**
7:15 21:6 26:20
  91:20 149:2
**expect**
91:17,19,21 141:10
**expectations**
140:17,20

**expected**
92:1
**expediency**
42:4
**experience**
28:15,16 29:16 35:11
  62:11 106:14 107:2
  107:17,18 124:11
  160:3
**experienced**
144:24 153:20
**experiences**
156:9
**expert**
94:13
**explain**
9:22 29:22 54:2
  100:6 178:24 179:1
**explained**
92:22 146:7,14
**explains**
179:23
**explicitly**
154:12
**exposure**
109:5
**extend**
11:11,13,17 87:8
**extended**
11:10
**extension**
104:6
**external**
109:12 156:22 162:7
  162:20
**extra**
22:16 61:19 78:10
  99:4,7 167:6
**extraordinary**
64:23

_____
**F**
_____
**face**
95:17
**Facebook**
109:3

**faced**
140:18
**fact**
86:3
**fact-checking**
134:10
**factor**
45:23 46:1 62:24
**factors**
11:4 15:15 32:11
  36:11,13,15,20 37:6
  44:12 80:12 161:8
**facts**
73:8 139:15 145:10
  150:22 151:2
  162:18 164:8
  176:23 177:1
**factual**
134:19
**faculty**
8:15,16,18 10:21
  12:4,20 13:2,13,14
  14:3,3,6,6,15 15:5,5
  15:12 16:1,14 17:10
  17:14 18:5,22 22:2
  23:3,11,13 24:16
  29:20,20 34:11
  38:15,16,18,24 39:7
  42:23 43:14,20
  44:17,22 46:20,21
  48:8,9 52:18 53:21
  55:13,19,22 56:11
  58:11 60:23 62:12
  62:21 63:4 64:10,24
  65:11 66:4,6,11
  67:6 70:8,14 71:19
  72:11 73:21 74:3
  77:13 80:2,5 81:20
  82:1 83:22 84:11,19
  89:22 90:7 91:21
  96:10,14,16 97:10
  98:7 99:5 101:2,18
  105:20,24 107:23
  110:17,22 111:2,4
  113:7,8 114:21
  115:11 116:22



120:12,18 125:11
126:5 130:16 132:5
134:10,11,20 140:4
142:4,22 147:19
149:16 150:9
154:24 158:9,13
159:24 167:9 169:2
169:4 173:24
174:11
**faculty's**
96:18
**failure**
97:8
**fair**
27:17,22 38:3 51:20
53:9,22 54:3,8,12
55:2,3,3,5,6,12 57:8
57:22 72:20
**fall**
97:20 110:10 149:21
172:14
**familiar**
41:13 43:1,3 76:21
117:1
**familiarity**
130:1
**far**
27:20
**favor**
52:20 53:1 80:18
**February**
138:3 173:11,17
174:5 177:13,17,24
**feedback**
64:8 70:22 84:4,8,10
84:12,16 85:2
100:24 101:5 105:9
134:11 174:12,15
**feeds**
13:13
**feel**
28:8 29:16 39:10
61:20 72:16 85:14
85:14 121:15 123:3
157:3 160:13
166:10 167:12

170:14
**feeling**
70:9 83:4 85:13
121:6
**feelings**
70:8 83:3 154:8
**feels**
155:5
**fell**
168:9
**felt**
31:7 55:14 72:5
86:12 87:1 89:5
99:3 101:23 154:13
156:24
**female**
27:12 29:10 34:10
106:19
**feminine**
28:1,21
**figure**
16:7 131:12 170:7,8
**file**
21:17,18 24:24 31:2
45:19 130:14
**files**
21:10 130:16,20
132:6
**final**
6:14 133:22 160:14
172:19
**find**
20:8 107:17 177:9
**fine**
4:10 42:8 49:20
160:15
**finish**
51:16 119:19 153:7
165:2 170:1 172:10
172:11
**finished**
24:22 52:4 75:10
170:23
**first**
11:6 14:1 31:20
35:23 38:20 39:12

45:2 46:12 58:21
71:22 76:15 78:21
79:3 97:8 105:5
126:9 130:8 134:16
138:19 139:1
157:24 158:6 166:4
168:8 172:11,14
181:2 182:7
**five**
10:23 13:18 57:17
61:19 78:9 101:23
110:15,17 142:5
146:15 152:1 154:5
170:24 171:2
**flight**
26:14 27:14,24 29:9
**floated**
86:21 87:10
**floating**
87:6
**FLOOR**
182:22
**Florida**
25:14
**focus**
25:18 70:23 138:23
**folks**
61:13
**follow**
84:6
**follow-up**
133:15 171:1 179:22
180:14
**followed**
8:5 179:1,3 181:8
**following**
39:15 92:17 97:20
114:7
**follows**
4:5
**force**
69:22,24 70:24
**forces**
22:22
**foregoing**
182:2,11

**foreign**
127:3
**forgive**
26:3
**form**
5:6 24:5 29:3 39:8
44:13 46:7 54:14
71:10 73:16 106:8
108:13 109:24
143:18,22 145:9
150:22 151:2 155:9
155:19 160:7
175:20 176:23
**formal**
14:24 15:4,6,9,12,14
16:2,13 36:5,6,8
43:19,21 44:1,8,20
44:21 45:2,10,13
46:5,11 58:16 60:9
60:15,18,21 61:1,1
64:13,17 65:8,9
66:23 67:14,18,23
67:24 131:3,8,18
132:1,4 133:10
141:4,6 142:15
151:5,6
**formed**
23:2 110:2
**forms**
144:4
**forth**
114:10
**forward**
10:21 30:14 37:20
41:14 64:8 65:2
74:12 97:12 99:4,20
103:22 132:12
154:11 157:1
172:16
**foster**
125:2
**foundation**
31:4 32:5,13 34:3
62:15 89:6,18 94:14
106:9 114:13
121:12 122:3,3



136:8 138:12
139:16 159:10
160:6 161:19 162:1
163:2,22,23
**four**
12:19 14:22 39:14
73:12 76:6 77:1
152:1 154:5 166:18
**frankly**
8:9
**Friday**
181:7,9
**friendly**
20:8,9,13 21:14,22
**front**
9:5,11 22:8 23:13
25:1 36:10 64:22
72:16 143:3 164:11
167:24 168:12
**frozen**
61:4
**full**
10:16,22 11:10 39:14
40:5,14 41:3 44:21
45:23 46:5,12 67:13
69:17,23 70:3,4,6
115:11 155:1
**full-time**
8:15,16 9:2 13:2 80:5
**fully**
81:4
**functioning**
8:11
**fund**
108:3,17
**funding**
66:9,10 108:18 157:8
176:4,8
**funds**
65:24
**further**
120:22 125:2 180:12
180:16 181:17

---
**G**

**G**

108:18
**gap**
64:22
**gears**
124:12
**gender**
25:19,21 27:11 29:11
145:3
**gendered**
27:23 28:9,11 29:8
29:11
**genderedness**
28:17
**general**
95:24 116:12 122:12
122:12 141:12
**getting**
27:20 49:3 53:6
55:14 85:13 146:22
155:22
**Ghanem**
7:7,19 74:2 139:7
142:24 143:14
**Gia**
42:17 43:9 49:10
50:23 52:8 53:13
59:1,23 61:15 75:19
179:13 180:11
**gia@dispartilaw.c...**
2:5
**Gianna**
2:3 4:11
**Gina**
130:5,6,13
**Ginny**
102:22
**gist**
93:13
**give**
22:6,9 68:15 70:22
73:11 83:23 84:4,5
84:12 121:16,21
122:9 127:9 146:17
**given**
8:17 66:10 74:13
95:7 141:9

**gives**
65:23 81:23 116:23
**glitch**
169:20,24 181:3
**glitches**
20:10
**go**
9:23 10:8 14:16
15:15 16:1 21:24
23:7 24:6 27:20
29:3 30:15 31:4
32:5,11 33:9 34:3
36:11,13,20 37:5,16
37:22 39:8,11,16
41:10,14,18 44:12
44:13 45:16 46:20
50:24 52:9 54:15,23
55:15 58:10,15 59:6
59:18 60:16,23 61:7
62:1,4,8,15 64:24
65:10 67:6,12,13
68:3,13 69:16 70:24
71:11 72:7,15 73:9
84:3 89:7,19 91:12
91:17,18,19 93:16
94:14,24 98:9,22
105:2 106:8,9 108:4
109:20,24 114:5,13
118:20 120:7
121:12 122:6,15
123:16 127:23
128:7 129:5,15
135:24 136:12
139:16 141:13
142:15,15 143:18
144:1,17 145:11
146:18 147:3 148:9
149:6 151:22 152:1
152:7,12 153:2
154:14 155:4,11,20
157:16 158:19
160:16,21 163:23
166:1,19 171:9,16
172:12 173:8
174:17 177:4
**goal**

97:13
**goals**
82:1 107:11 156:23
**goes**
11:19 12:8 13:3 14:8
14:11 67:9 84:2
153:24 154:4 155:1
172:6 175:22
178:14
**going**
4:12 5:2,14 11:14
14:21,22 23:7,8,19
25:11 27:19 30:1
39:13 41:20,20 43:5
46:24 47:1 48:21,21
55:10 57:14,23 62:7
63:3,5,6 65:20 68:1
68:2,3,7,8 69:7,11
72:6 74:19 89:6
90:8 91:18 92:3
99:2,2,17 100:12,13
100:24 103:3
105:11 106:12
113:11,11 114:20
115:10 119:11,11
120:6 128:23
130:23 131:4 133:8
134:19 138:23
139:3 146:16 147:3
151:21 152:6,24
155:9 157:2 159:5,8
160:6 167:10
169:13 170:8 179:3
██████
126:17,20
███'s
127:4
**good**
4:8 49:19 53:22,23
54:3,3,9,12,13,17
54:21 55:2,5,6,11
55:15,15,16 57:8
60:6,6 62:4 64:14
64:21,21 65:12
84:16 101:24
**good/fair**



66:23
**good/very**
53:23 60:6
**gosh**
103:1
**gotten**
109:10,12 113:18
148:16 157:19
**graduate**
6:5 8:24 107:22
157:6
**graduation**
54:7 161:10
**grant**
12:20 18:19 108:11
109:2 180:6
**granted**
26:10,18,19 180:7
**grants**
109:10,12,15,17
**great**
14:14 40:20 51:4
64:22 112:17
136:17 147:15
171:6
**GREEN**
2:8 42:14 47:11
**group**
2:2 19:21 20:5 150:9
151:5
**groups**
70:23
**grown**
86:12
**guess**
45:23 81:19 85:3
112:13 116:19
154:10,14 155:23
156:2 179:4
**guessing**
36:15
**guideline**
20:21
**guidelines**
18:1 54:6 55:1
141:10,12

**guy**
59:15 129:23
**guys**
19:12,15 42:10 47:4
47:12 59:14 61:23
63:7 83:19 99:12
107:19 124:23,24
128:13 151:24
157:4 168:20

--- H ---

**H**
3:7
██████
132:20,21
**H-O-E-C-K-E-R**
112:1
████
132:18,20 165:12
**half**
152:3
**hall**
150:16,17
**handbook**
11:21 15:5 42:24
43:1,3 44:3 68:2
92:19,21 169:2,4
173:3,7
**handle**
102:7
**handling**
74:18
**hands**
81:16
**handwritten**
75:14,21,24 76:1,2,5
**hang**
47:8 89:17 157:15
**happen**
9:6 15:24 33:2 35:1
41:16 65:14 82:3
84:7 92:7 117:17
125:21 131:20,22
144:11 147:15
**happened**
7:14 47:14,15 90:16

100:4 104:13
113:23 115:16
117:20 121:15
122:23 123:9,14
142:9,20 143:4
147:23 178:24
179:1 180:2
**happening**
36:5 161:7
**happens**
11:23 14:5 67:6 84:7
146:19 169:7,11
**happy**
59:17 61:14
**harassed**
155:6
**harassment**
34:21 138:7 139:9
140:1,5,18 155:18
171:18
**hard**
18:21 20:3 28:16
41:12 85:18 90:5,9
98:1
**head**
4:19 22:6 35:3 77:18
109:16
**healthcare**
26:2
**hear**
32:15 59:14 93:8
121:15
**heard**
59:5 100:10 124:16
170:17,20
**hearing**
104:12 110:21 166:9
**heavily**
18:19
**held**
5:24 6:16,18
**help**
16:3,5,10 17:11 21:4
22:10 98:20 102:16
102:16 107:6,16,17
116:8 130:14,15

163:8 176:7
**helped**
109:13 131:12
**helpful**
5:11 160:22 164:21
171:3
**helping**
30:1
**helps**
102:11
**hereinabove**
182:14
**high**
26:13
**higher**
10:13 26:4 28:8,18
28:20 68:22 146:4
146:18
**hire**
10:2 23:3,19,24 24:1
30:11 101:7 146:8
**hired**
9:23 14:20 24:21
120:13 146:9,15,16
161:2
**hires**
23:6,8 77:9
**hiring**
35:17,21,23 36:9
38:22 79:4 86:13
110:21 118:12
146:20
**hoc**
22:19,21 48:17
**Hoecker**
111:14,24
**hold**
49:3 58:23 61:3,4
105:11 129:4
**holding**
7:2
**home**
43:15
**honest**
68:22 125:22
**honestly**



22:7 57:10 135:3
**honor**
38:4
**hope**
59:19
**hopefully**
59:10
**hopes**
62:22
**hoping**
107:16
███
40:19
**hospitals**
28:19
**hotspot**
61:14
**hour**
152:2,3 164:20
**hours**
41:12,15,16
**HR**
95:2
**hung**
155:22

**I**

**idea**
49:19 103:1 163:22
**Ideally**
82:21
**identification**
41:23 47:3 51:11
    63:9 113:14 119:14
    128:20 179:11
**identified**
7:20 56:14,15 60:5
**identifies**
112:9 119:8
**identify**
105:21 106:16
    150:10
**identifying**
175:17
**identity**
106:13

**idiosyncratic**
20:12 21:5
**IL**
2:4,9
**ill**
7:18
**Illinois**
1:1,12,15 182:5,18
**imagine**
31:7 74:15
**impact**
65:22
**implemented**
124:24 126:4 158:17
    159:6,8 160:5,19,24
    161:17
**implication**
87:11 89:24
**implicit**
35:16,19 36:24 37:3
    37:22 144:15 145:7
**important**
153:2
**impossible**
145:14
**impressed**
108:24
**improving**
161:10,10
**in-person**
171:15
**inappropriate**
93:11,22
**inappropriateness**
93:24
**inaudible**
32:14 124:14
**incident**
116:7 117:8 120:2,4
**include**
175:23
**included**
54:21,22 74:4 86:3
    104:23 124:19
    151:13 152:22
    174:6,14

**includes**
137:1
**including**
109:3
**inclusion**
69:14 71:9 72:21
    124:13 125:3 161:2
    161:6 162:5
**incoming**
146:1
**incomplete**
153:1
**indicate**
16:14 78:24 79:7
    167:8
**indicated**
18:17
**indication**
89:16
**indications**
85:17
**individual**
82:19
**individually**
120:4
**individuals**
37:5 39:23 81:14
    176:14
**inequities**
145:18 150:20
**inflation**
146:17
**influences**
146:17
**influencing**
37:7
**informal**
15:1 85:24
**information**
9:17 12:8 14:2,4
    18:23 19:21,22 27:3
    34:7,9,10 127:21
    128:5 146:6 168:16
    168:20
**Ingal**
82:13

**initial**
146:18
**initiatives**
125:2,5
**innovation**
108:3,11,17 109:1
**input**
174:12
**inquire**
133:21
**inquired**
176:3
**insofar**
24:6 92:3 155:10
    162:17
**instance**
15:8 114:8 116:19
**instances**
117:9 153:20
**institutional**
9:18 30:17,18,20
    31:13
**instructor**
149:12,17
**instructs**
5:4
**interaction**
117:5
**interactions**
180:1
**interested**
182:15
**interfere**
59:24
**Interfolio**
19:11,13 21:22
**interim**
5:20 6:8,12,13,17,18
    6:23 8:8 39:4 73:19
    99:14 173:14
**interims**
45:8
**internal**
135:21 141:14,16
    156:22
**international**



22:20 112:13
**interpretation**
121:16
**interpretations**
121:8 122:23
**interrogatories**
182:8
**interrupted**
11:7
**interview**
178:19,20 181:8
**interviewed**
34:7
**investigates**
138:6
**investigation**
32:9 33:8,11,17
  115:18,19 135:21
  139:9,13 141:5,17
**investigations**
35:12
**investigatory**
140:6
**invite**
99:23
**involved**
33:7,12,14 77:14
  79:11 95:2 114:19
  127:11 128:4
  178:14
**involvement**
178:17
**involving**
165:20
**Isabel**
31:23 32:1 137:1,11
  137:19 139:6
  177:15,24 178:4
**isolated**
155:6
**isolating**
155:15
**isolation**
153:21
**issue**
31:3,10 55:23 91:2

115:8 131:13 140:5
157:4 175:12
178:10,21 181:3
**issues**
31:2 35:6 44:8 62:13
  84:15 87:9 99:5
  101:5 104:24
  114:11 116:16
  159:22 175:12
  180:5
**iteration**
38:7 64:22

## J

**January**
41:19 131:2 147:2
  173:3
**jargon**
26:4
**Jay**
71:5
**Jewish**
126:21 150:4
**Jill**
40:19
**job**
8:6 79:7 95:12,20,20
  97:22 140:17,20
  174:6
**join**
48:9
**joins**
17:18
**journal**
18:10,11
**journalism**
23:20,21 56:12
  132:22
**joys**
47:18
█████
108:15 109:14
111:14,15 112:3,15
112:16 113:4 118:7
145:24
**judge**

90:5
**jump**
90:15
**June**
172:18 173:5,6
**junior**
55:22 64:10 120:11
**justifications**
30:8

## K

**Karen**
71:5
**keep**
17:12 30:1 37:23
  65:19 137:2 142:11
  152:6 171:2
████
40:21,22,22 78:2,3,5
  99:1,8,22 103:9,17
  104:15,20 115:22
  118:6,14,18 119:1,2
  128:4
**Ken**
149:13,14,16
████
40:19 165:16,17,20
  178:9,22 179:24
  180:18
**kept**
55:3 71:20 168:10
**Kessler**
40:22
**kick**
147:2
**kicked**
52:1 58:23 59:2,12
**kicking**
168:11
**kin**
182:16
**kind**
11:7 16:2 17:7,12
  18:23 19:6 20:5,7
  20:13 22:18 26:6,11
  27:3 28:17 29:11

30:1 35:5 38:20
40:9 49:23 55:9
66:2 67:8,16 68:10
68:14,23 70:8,16
72:16 83:7 85:1,6,9
85:9,16,18 86:10,24
87:1,2,5,18 89:11
94:7,11 95:17,24
97:3,4,5,7,14,17,19
98:15 99:5 100:11
102:15,17 105:9,10
107:11,16 109:5,6,8
115:14,15 120:14
146:19 155:3
160:14 161:4
165:13
**kinds**
18:12,15 87:18 101:8
  101:16 156:22
  161:8
**knew**
91:18 117:8
████
40:19 165:16,17,20
  165:24 166:10
  167:12 170:14
  178:9
**Knight's**
166:15 178:22
  179:24 180:18
**know**
4:19 5:12 7:6 9:6,20
  9:23 16:18 18:21
  24:11 31:12,17,17
  31:18,19,20 32:3,11
  32:17,19,21 34:1
  35:1,3,8 36:6,8,11
  36:13,19 37:14,18
  37:18 38:1,10 40:17
  41:12,13 45:6,22
  46:15 47:13 48:24
  49:16,18,22,24
  51:17 55:11 56:3,13
  56:24 57:15 59:24
  63:6 64:10 66:16,18
  68:23 69:22 70:18



70:20 73:24 74:3,6
74:8,11,14 75:10
76:14,17 79:12 81:6
86:21,23 87:13 88:3
88:11,13 89:3,5
90:14,20,24 91:1,1
91:4,8 92:6 93:14
93:16,21 94:5,10,16
94:19,22 96:3,13
97:16 98:13 100:4
103:15 106:16
107:17 109:11,14
109:16,22 112:10
112:12 113:16
114:16,22 116:11
119:8,16,19 124:14
124:18 125:8,21
127:8,11,13,18
128:13 131:11,14
133:12,13,17 135:9
135:18 136:11
137:13,24 138:2,11
138:15,18 139:12
140:7,13,15 141:12
142:20 146:21
147:6,11,15 149:22
150:1,1,3,5,11,11
150:15,17,18 151:1
153:6 155:16
158:16,23 159:5,9
160:17,18,21 161:7
161:21 164:17
165:1 167:19 170:2
170:15,19 177:9
178:7,8 179:9
**knowledge**
74:9
**Krimstein**
149:14,16

---

**L**

**L**
1:14,24 2:13 182:3
182:20
█████
56:9

**L-U-I-S-E-L-A**
126:24
**label**
21:9
**labeled**
43:6,11
**lack**
88:17 122:3
**lacking**
96:11
**laid**
92:18,20 107:11
**language**
54:5,8,24
**larger**
22:16 116:22
**lasts**
23:24
**Latin**
127:1
**LatinX**
112:16
**launch**
32:9 141:16
**LAW**
2:2
**lawsuit**
94:17 151:10,13,14
**lay**
143:24
**layers**
172:3
**laying**
156:8
**leader**
107:12
**leadership**
24:3 64:9 87:19,23
88:3 100:23 107:2,3
107:6,8,14,18,24
155:2 156:22 157:9
175:16,18 176:1
**leading**
93:11,16
**leads**
126:6

**learned**
88:1 102:3
**learning**
22:12
**leave**
11:7,7,8,8,15,19,21
34:11 82:2 91:5,7,9
149:20
**leaves**
82:2,22 178:14
**lecture**
27:6
**lecturer**
88:7
**led**
69:24 108:12 126:9
**left**
56:24 57:3 65:18
88:11,12,13 121:7
121:20 122:1 137:4
149:21,22 152:1
**legal**
1:21 143:24 145:10
182:21
**length**
10:4 11:1,2 17:16
23:24
**Leo**
109:3
**let's**
21:24 29:17 50:15
59:19 66:16 84:4
124:12 152:12
154:14 155:4 171:9
173:8 174:19
**level**
14:1 32:9 48:5,6 54:6
54:21 124:21,23
126:4 146:10 161:1
161:6,12 172:14,15
172:21,22 173:1
176:20
**levels**
172:6
**Lexa**
4:8,9,10 24:6 42:4,7

47:6,13,22 50:9,17
51:3,16 62:8 64:9
72:7 76:14 89:7,17
118:7,15 129:2
134:3,24 138:21
144:1 145:12
148:15 151:20
152:4 155:11
159:14 163:24
164:21 171:1
**Lexa's**
42:1,6
**liaison**
95:2 151:6
**LICENSE**
2:14
**life**
98:2
**limitation**
94:11
**limited**
154:16,20
**Lincoln**
103:3
**line**
43:17 93:12 132:24
████
33:20 40:2 56:3,4,9
56:11 74:5,10
135:22 142:8,10,17
**list**
22:4 25:8 34:17,18
36:10 48:5 73:14
95:20,24 154:1
158:14 161:4
**listed**
22:5
**listen**
97:4 141:2
**listened**
120:22
**listening**
26:14
**little**
15:18 16:6 26:4 40:4
40:7 70:9 81:24



85:4 171:2

36:2 38:12
**local**
13:8
**located**
9:17
**lock**
50:2
**locked**
48:24
**lodged**
141:13
**logged**
167:4
**logging**
129:19 131:13
**logistics**
102:18
**long**
5:22 6:16 10:17
17:15 23:22 24:19
25:8 41:8 77:21
78:5 119:6 127:6
135:10 171:23
172:1,9 173:13
**longer**
31:19 33:6,23 37:11
63:3 151:21 171:2
**look**
11:24 17:24 18:22
22:4 31:18,21 33:5
40:7 42:21 43:17
45:20 46:2,3 52:9
54:23 55:7 57:24
58:5 60:2,17 61:4
68:1,4,8,9,19 69:7
69:11 70:12,24 71:4
71:6 73:3 83:7
95:22 97:18,18,18
99:6 102:8 109:20
110:23 113:17
138:20 157:12
160:4 168:21 177:8
**looked**
18:17 26:9,12,16

27:1 49:15 67:24
70:6 71:1 107:14
131:1 149:14
**looking**
15:12,17 55:16 58:18
62:18 64:12 68:11
75:19 87:2 96:15
97:6 100:22 107:21
107:24 113:22
131:8 132:14
148:20 149:8
152:17 157:8
163:17
**looks**
42:18,23 50:3,7
58:18 60:14 65:1
113:23 152:20
160:10
**lose**
42:17 135:12
**lost**
42:19 58:24 59:9
61:6 102:13
**lot**
20:10 27:1 40:15
67:21 83:2,8 85:6
85:12 86:10 87:5
89:22,23 90:1 95:16
100:9 102:7,14
156:20 171:4
**lower**
50:16

180:23

126:19,24

--- M ---
**M**
40:4
**M-U-N-D-E-L**
112:4
**MAGNA**
1:21 182:21
**main**
17:7

**maintenance**
28:12 29:24
**maintenance-based**
29:21
**major**
97:7 105:11
**majority**
91:21 97:7
**makers**
19:17
**makeup**
11:15 22:7
**making**
53:21 60:5
**male**
27:18 29:9
**manage**
38:14
**managed**
20:13
**managing**
20:5
**mandatory**
20:19 34:22 35:5,10
37:14,15 90:11
125:14,15 171:14
**March**
180:21,24 181:1
**Maria**
70:1 71:3,19 74:6
77:20
**mark**
41:20 47:1 48:22
63:6 113:12 119:11
**marked**
3:13 41:22 47:2
51:11 63:9 113:13
119:13 128:20,22
179:5,8,10
**MARKET**
182:22
**marking**
179:7
**masculine**
27:24

78:4,21
**maternity**
91:4,7
**Matt**
41:3
**matter**
4:13 7:18 80:13
**maximize**
102:9
**McEwan**
40:2
**mean**
19:19 23:18 26:20
36:14 44:5 49:15
53:5 54:17 67:20
69:10 76:17,19
80:10 84:10 93:14
96:20 98:19 102:21
108:6 124:20
133:15,21 137:6
139:17 141:6 146:9
146:12 154:22
157:13 158:23
167:22
**meaning**
11:7 29:13 81:9
**means**
6:13 63:3 149:9
**meant**
89:3 143:10
**mechanism**
108:19
**medical**
11:8 90:21 93:6,9
94:2,9 127:21 128:5
**medication**
4:23
**meet**
17:22 36:3 38:8
118:14 175:5 178:4
**meeting**
64:10 100:10 107:10
114:9,12,16 115:22
116:15 118:2,17,22
120:2,3,23 121:2,5
121:14,20,23 122:1



123:6,12,20 124:3
125:11,16 134:12
135:1 136:24 138:5
138:8 139:10
150:16 153:13
156:11 170:17,19
175:7,9 178:2,18
**meetings**
74:1 77:7 81:7
105:11 125:17
126:5 150:12,14,18
177:20
**meets**
81:23
**member**
12:20 16:1 22:2 23:3
34:11 48:9 62:12,21
69:3 71:18 96:10
101:18 106:1,3
113:1,4,7,8,9
120:12 126:11
132:5 140:4 147:19
149:16 154:24
173:24
**member's**
43:14 66:6
**members**
13:2 14:16 38:3,15
38:17,19 39:7 73:21
74:3 77:13 84:2,11
84:19 110:17 111:4
120:18,22 128:4
142:4
**memorized**
39:11
**men**
28:13
**mental**
94:11
**mention**
25:8 93:6,8
**mentioned**
29:21 69:2 72:4
86:16 90:13 156:21
161:12
**merge**

40:7
**merit**
60:10,13,24 65:15,22
66:2,7,7,7,15,19,21
67:12
**message**
158:8
**messages**
97:5
**met**
96:6 120:4 155:24
173:19 181:7
**micro**
126:6
**micro-topics**
125:13
**micro-trainings**
125:12,16 126:4,7
**microaggression**
153:20
**mid**
41:17 152:20 172:17
173:11
**middle**
121:7 170:20
**mind**
59:8 89:4 129:2
**Mine**
49:2
**Minimally**
96:9
**minimum**
96:6 173:20,23
**minute**
61:17 111:17 112:18
**minutes**
61:20 81:1,5,6 85:22
170:24 171:3
**mischaracterized**
92:4
**misnomer**
55:15
**misremembering**
38:13
**missed**
13:15

**missing**
71:7 168:10
**misstate**
86:5
**misstated**
24:6 72:7
**misstates**
46:8 71:10 131:6
145:11 155:11
**misunderstandings**
116:1
**mixed**
56:15
**modalities**
95:11
**modality**
95:6
**modifications**
95:5
**modules**
171:17
**moment**
42:21 47:9,24 49:6
51:8 59:3 63:19
74:22 75:8 92:17
93:24 97:3 113:17
174:17
**months**
11:6 24:2 173:15
**morning**
4:8
**move**
6:14 10:20 21:11,13
27:6 37:20 103:22
177:3
**moved**
6:2 19:9,10 21:12
27:5 35:4 87:2
101:20 157:1,10
**moves**
65:2 172:16
**moving**
17:13 21:15 34:22
79:13 99:20 132:11
**multi**
172:3

**multiple**
136:1 172:6
███████
108:15 109:14
111:14,15 112:3,3
113:4 118:7 145:24
**Murphy**
1:10 4:2,9 5:17 59:6
60:1 64:1 118:7
136:8 171:8 178:17
179:18 182:3,13
**Muslim**
112:13

――――――――――
**N**

**N**
2:1 3:1
**N-U-R**
111:21
**name**
5:16 21:18 31:15
32:19 35:1 40:3
56:7 64:1 78:23
87:23 108:16
111:20 126:22
147:13 149:12,13
**named**
21:3 56:3
**names**
31:20 39:22
**narrow**
98:20
**nature**
34:1 37:2 114:3
115:5 129:12
145:20 151:12
163:15,17
**navigated**
109:4
**navigating**
95:3
**necessarily**
11:9 97:13 146:9
**necessary**
69:11
**need**



15:6 26:11,24 51:22
52:9 61:19,24 80:12
85:7,7,8,9 89:1,11
97:14 98:19 100:10
100:11 110:24
122:24 124:20
140:22 144:19
151:19,20
**needed**
26:17 86:13 87:3
90:18 92:6 96:9,13
115:15
**needs**
85:15
**negative**
144:12 168:8
**negotiated**
109:4
**neither**
136:9
**network**
61:13
**neurological**
91:2
**never**
34:6 46:10 74:13
154:8
**new**
23:3 30:14 43:9
50:11,11,14 85:12
97:21 126:13,15
170:7 174:5
**newer**
104:5
**newspaper**
151:8 163:12
**night**
7:19
**Nightingale**
102:22
**Nodding**
143:8 169:1
**nominated**
82:7,9,10,10 83:23
100:7
**nominates**

83:23
**nomination**
83:24 174:2
**nominations**
97:21 99:23
**nominee**
173:10
**normal**
131:23 132:1 146:19
**North**
2:9
**NORTHERN**
1:1
**Nos**
3:13,13 63:6,8
128:19
**Notary**
182:4,10,17
**note**
153:2
**notes**
116:15
**notice**
175:23
**noticed**
28:17
**notified**
147:1 176:19
**November**
41:17 180:19
**number**
22:6,7 43:9 66:11
74:24 75:23 76:7
86:10 110:18 129:5
**number--**
128:22
**numbers**
49:11 75:15,17,22,24
76:2,2,5,14,17
**Numbers-wise**
29:19
**Nur**
40:18 111:14,20,21
112:11,12 113:7
114:10,17,18
115:11,22,24 117:2

117:5 118:6,18
120:9,11 121:6
**nurses**
27:2,2 28:6

---

**O**

**O'CONNOR**
2:7
**oath**
4:15
**object**
5:3 24:5 27:19 29:3
31:4 54:14 72:6
89:6 92:3 143:18,22
155:9,10,19 159:9
160:6
**objecting**
89:18
**objection**
5:3,5,6,6,7,7 9:9 32:5
32:13 33:9 34:3
39:8 41:10 44:13
45:16 46:7 57:18
58:4 62:15 71:10
73:1,8,16 94:13
98:9 105:2 106:8
108:4,13 109:24
114:4,13 117:6,18
118:19 121:12
122:2,15 123:16,22
124:8 127:14,23
129:14 131:6 136:8
138:12,12 139:15
141:23 143:7 144:9
144:17 145:5,9
149:5 150:22 151:2
161:19 162:1,11,17
163:1,22 164:8
166:1,19 167:15
168:15 175:20
176:23 181:4
**objections**
122:6 140:8
**obligations**
101:16
**observations**

17:1
**observed**
144:24
**obtain**
12:3
**obtaining**
10:23
**obviously**
133:21
**occupational**
28:17
**occupations**
28:20
**occur**
146:24 147:1
**occurred**
85:21
**occurs**
44:1
**October**
6:21
**offensive**
26:5
**offered**
20:17 125:24
**office**
30:17,18,20,23 31:12
31:19 32:8,20,20
38:12 61:15 138:6
139:9,21,21,23
140:6,10 141:5,8,11
141:13 156:14
164:4 171:21
**officer**
74:17
**official**
16:5 18:14 182:17
**oh**
16:7 19:6 20:2 22:19
24:22 47:12 50:20
59:4 64:3,7 75:5
84:14 103:1,19
127:18 148:21
164:22 168:19
179:17
**OIDE**



30:21 31:2 32:4,19
33:6,8 74:12,17
135:21 137:2
139:21,23 140:23
141:11 142:11,16
156:10

**okay**
4:11,15,22 5:2,18,24
6:7,16,19,22 7:1,15
7:22 8:6,10,21 9:6
9:19,22 10:24 11:4
11:12 12:14,18 13:1
13:19,24 14:8,14,24
15:3,8,11,15,24
16:16 17:6,15,21
18:3,16 19:1,12,15
19:23 20:10,15,19
20:21 21:16,22,24
22:9 23:1,4,17,22
24:3,11,19 25:2,5
25:15,18,24 26:3,19
27:17 28:23 29:21
30:6,17 31:12,23
32:3,11 33:7 34:13
34:16,18,20 35:1,4
35:8,11,14,18,21
36:6,11,19,24 37:9
37:21 38:3,10,14,22
39:4,18,21 40:17
42:6,7,10 43:1,5,10
43:13,24 44:11,17
44:23 45:1,11,22
46:4,15,24 47:20,22
48:1,7,19,22,23
49:4,6,14 50:5,7,20
51:18,22,24 52:8,15
52:19 53:5,9,20
54:2,10 55:3,6,11
55:21 56:3,7,10,13
56:23 57:3,8,15
58:14,20 59:14 60:9
60:12,20 61:10
62:11 63:5,13,21,24
64:7,7,14,18 65:6
65:12,17,19,22 66:1
66:6,13 67:18 68:17

69:13,16,22 70:18
71:17,23 72:4,13
73:14,19,24 74:3,14
74:21,22 75:4,5,12
75:17 76:3,8,21,24
77:5,11,13,17,21,24
78:5,10 79:8,17
80:6,15 82:5,9,17
82:24 83:10,17,19
84:8,14,18 85:3,20
86:17 87:7,20 88:3
88:6,15,19 89:14
90:3,11,24 91:10,19
92:13,15,19 93:18
93:21 94:10,19
95:12,19 96:4,11,17
96:20 97:1,11 98:6
98:12,17,21 99:12
100:6,14 101:12
102:4 103:5,12
104:9,14,19,23
105:13,20 106:16
106:19,21 108:2,21
109:14,18 110:5,8
110:12,16 111:6,12
112:17,19,21 113:7
113:11,18,19,21
114:11 115:5,17
116:3,6,10,13,15
117:1,4,12,24 118:5
118:24 119:2,17,18
119:20,21,24 120:6
120:11,16,20 121:4
121:9,19 123:2,9,14
123:19 124:6,12
125:8,18 126:6,18
127:6,9,11,20 128:7
128:15,16 129:5,8,9
130:2,8,19 131:4,20
132:3,7,15,16,17,24
134:8,21,24 135:7
135:15,18,23 136:6
136:17,19,20,21
137:3,6,10,18,21
138:11,17 139:2,12
139:20,23 140:3,13

140:16,24 141:6,9
141:18 142:4,9,13
142:17,20,22 143:6
143:13,16 144:7,14
145:3,7,17,20 146:3
146:6,21 147:5,6,8
147:9,11,15,21,23
148:1,6,21,22 149:2
149:13,18,22,24
150:5 151:1,12,18
152:6,7,13,15,24
153:4,8,9,11,14
154:7,14,22 155:4
155:13 156:13,17
157:3,11,18,23
158:3,4,10 160:3,16
161:18 162:7,22
163:20 164:23
165:3,6,10,11,16,19
166:7,9,13 167:1,11
168:6,13,21 169:2,7
169:16,24 170:11
170:16,23,24
171:20,23 172:9
173:5,13,19,23
174:4,17,24 175:10
175:22 176:3,11,19
177:3,6,11,12,20,24
178:7,9 179:17
180:1,10,14,20
181:2,11,17

**on-campus**
94:8

**once**
10:12 143:4 169:4,13
174:10

**one-twelfth**
78:16

**one-year**
62:22

**ones**
12:22 13:14 22:14,16
22:17,18 29:24
35:16 60:15 61:2
65:10 158:24 160:5
160:18,19

**ongoing**
110:3 159:23

**open**
38:18 47:22,23 48:24
50:2,14 51:13 63:13
63:15 132:13,14
135:7 136:17,19
138:17 147:4,5
148:6,10,14 151:18
152:13 158:3
164:15,23 165:9
177:10,12

**opened**
49:2

**opening**
129:2

**operationalized**
158:20

**operations**
130:6

**opinion**
90:3 94:1,14 96:4,7
106:6 108:21 121:9
121:19,21,24 122:4
122:9,20,22 132:3
143:16,23 144:8,11
154:15 155:4,16
167:11,17

**opportunities**
107:15,24 154:17,21
155:3 156:20,23
157:9 175:18

**opportunity**
23:3 176:5

**option**
92:10,12

**options**
107:19

**oral**
182:8

**organizational**
25:16 26:9,10 98:14

**organizations**
26:13

**organize**
132:6



132:6
**organized**
21:8

36:2 38:12
**other's**
18:8
**outcome**
79:21 83:10,12
165:13 175:15
**outlier**
27:5
**outside**
23:15,17,20 107:15
107:22 111:1 127:3
**overall**
66:2 167:9
**overhauled**
93:3
**overseas**
77:3
**oversee**
8:11 102:16
**overstate**
30:3
**overt**
143:17
**overturn**
12:15 97:2
**overturned**
41:6 96:17 97:6
142:23 143:6
**overview**
60:2 81:24

**P**

**P**
2:1,1
H-E-B...
56:9
**P.A**
2:2
**p.m**
1:16 181:21 182:6
**PA**
182:23

**package**
67:7 68:19
**packages**
68:23,24
**page**
3:2 43:6,8,13 47:16
48:11 53:9,15 59:7
63:24 75:21,24 76:1
76:7 118:5,9 134:3
134:21 138:19
139:1 152:20
153:14 157:24
**pages**
75:15 76:2,3,15
**paid**
69:9
**papers**
18:6,6,7
**paperwork**
18:16
**paragraph**
153:24
**Park**
103:3
**part**
13:15 21:8 37:12
46:17 52:19 53:10
53:16,20 54:13,17
55:13 63:4 74:6
84:23,24 92:7
100:14,21,22
101:21,22 104:6
107:3 109:1 139:10
139:23 146:2
153:12 159:16
167:1
**part-time**
8:17
**partake**
139:10
**partial**
45:24
**participate**
138:5 160:1 175:24
**participated**
69:23

**participating**
87:23
**particular**
8:5 11:16 18:10
21:10 23:8 28:20
43:18 46:3 52:18
55:10,23 56:2 83:1
84:17 88:15 121:4
132:7 146:16 149:3
156:13
**particularly**
115:4
**parties**
1:15 182:16
**passed**
27:3
**pathway**
142:16 155:3
**patience**
171:9
**pattern**
88:16
**Paul**
40:6 170:12
**pause**
26:24 85:1 97:12,13
97:17 99:22 100:11
**pay**
78:16 97:4 100:12
145:17 146:21,24
147:1
**paying**
10:1 27:4
**Peco**
56:3

56:9

56:4,11
**peer**
16:24 18:8,18
**peers**
31:9 43:19
**PENN**
182:22
**people**

14:20,22 31:18 34:13
39:13 71:7 80:15
82:2,7 83:4 84:4
85:13 86:22 90:18
96:2 101:7 110:12
122:22 125:17
150:10
**percent**
66:1
**percentage**
66:4,11
**perfect**
4:11,22 34:20 61:24
62:11 63:13
**performed**
26:23
**period**
10:6 15:6 53:21
54:21 60:14,17
62:20 65:4 67:9,15
104:21 111:9
**periods**
143:11
**permanent**
6:15
**person**
6:15,15 7:3,17 38:11
59:10 61:11 81:17
82:1,11,12 83:8
102:1,12 124:7
140:22 146:9 161:2
161:22,24 169:7,13
**person's**
161:4
**personal**
11:8,19,21
**personally**
144:14
**personnel**
13:11,11,19 14:1
16:17,19 46:19
52:20 60:3,16 65:10
132:18,23,24
134:15 166:4,5
167:4
**perspective**



28:24
**pertaining**
1:12
**petition**
162:7,14,20,22,24
 163:1,12,16,17
 164:5
**PHD**
25:12,13
**PHILADELPHIA**
182:23
**phone**
98:4 100:4
**phrasing**
88:24 93:10
**physical**
94:11
**physicians**
27:2,2
**picture**
109:6
**piece**
17:8 90:17
**pilot**
27:12,15,23 29:9,12
**pilots**
26:14
**pipeline**
68:14
**place**
21:11 26:17 27:6
 33:6 38:7 43:20
 69:19 71:13 72:24
 84:5,13 87:16 94:6
 97:20 114:8 157:1
 182:14
**placed**
7:19
**places**
21:19
**Plaintiff**
1:4 2:6,15 4:3
**plan**
69:14,20,20 70:11,17
 71:15 72:24 124:13
 124:19 158:23

161:15 175:16
**planned**
124:23
**plans**
161:12
**play**
28:11,23
**played**
27:11
**please**
5:12,16 43:18 47:22
 63:13,14,20 74:23
 113:16 119:18
 130:19 132:13,15
 135:8 136:17 138:8
 138:17 147:13
 148:6,14 151:18
 152:8,15 155:14,16
 158:3 164:15 165:9
 177:9 179:9
**point**
5:7 14:11 26:11,24
 36:2 38:7,20 43:11
 46:22 58:1 75:23
 76:3 84:24 90:9
 94:7 96:15 99:19
 101:13 115:23
 120:16,19 142:14
 155:5,14,17 158:24
 160:22 161:4
 170:16,19 171:23
 173:14
**pointing**
136:2
**points**
101:8 154:5 155:23
 160:4,10
**pole**
167:3,4
**policy**
11:5 12:1 71:9 104:6
 104:8
**politics**
25:19,21
**poll**
166:22 168:3 170:9

170:11 180:3,5
**polling**
170:7
**portion**
58:10,17,19 118:11
 152:19
**portions**
45:14
**position**
5:19 6:17,18 7:2,4,6
 7:10,12,13,19 10:13
 16:21 25:5 26:7
 27:23 28:1 30:8,11
 34:23 35:5 38:14
 71:20 76:22,24
 77:21 78:6,7 79:5
 79:15,19 82:6 83:4
 83:5 85:10,14 87:4
 93:7,9 94:3,4,8
 95:20,21 96:5 97:9
 97:15,18 98:23 99:3
 99:13,18 100:8,13
 100:15,18 101:9
 103:6 104:1,16,17
 104:22 107:13
 110:3,22 119:3
 127:4 173:20 174:7
**positions**
5:24 25:9 30:14,15
 82:18 101:4 107:22
**positive**
70:14 133:22
**possible**
21:4,21 57:12 122:8
**Possibly**
116:9 118:4
**post**
67:10 93:23 165:7
**post-interview**
134:4
**post-pandemic**
40:9
**post-tenure**
67:11 71:21
**potential**
44:7 109:8 115:1,20

116:2 139:8
**potentially**
66:8
**power**
25:19
**practice**
96:24
**practices**
26:9,10,16 35:17,22
 35:23 163:18
**PRAD**
48:14,19 76:22 77:2
 77:5,7,11,14,19,24
 78:11,15,19,22
 79:14 83:6 101:2
 103:6 108:22 173:8
 177:22
**pre-Covid**
89:23 94:5 98:1
**pre-pandemic**
40:8
**preferred**
4:9 174:3
**preparation**
132:3
**prerogative**
39:2
**presence**
89:12 90:14,17,19
 94:1 96:2
**present**
2:15 80:23 86:9 89:2
 89:15 90:4 94:5
 121:22 166:7
**presentation**
87:15,16 106:22,23
 107:5 108:6
**presented**
19:6 121:11
**presided**
173:16
**pressure**
101:8,13
**pretty**
8:3 67:14 68:20
 89:22 97:7 104:20



120:13
**previously**
10:24 37:9 43:24
103:5 124:13,22
137:3
**primarily**
26:2
**primary**
17:24 18:2 25:15
134:15
**print**
151:8
**prior**
6:20 14:20 15:22
35:11 44:10 71:20
77:24 82:17 83:18
91:9 115:10 134:19
145:11 164:18
172:13 173:17
175:10
**priorities**
161:11
**privilege**
5:3
**privy**
74:12
**probably**
8:23 11:22,23 28:22
35:24 69:9,10,12
77:15 92:14 95:22
104:13 118:13
161:9 181:7
**probation**
10:4 11:1 67:9
**probationary**
10:5 15:6,7 62:20
67:15 68:3
**problem**
13:17 25:10 30:6
36:24 49:22 57:15
77:19 131:15 135:7
135:11 139:19
**problems**
21:1 115:2,4,20,21
**procedural**
115:2,4,20,21 116:16

**procedure**
1:11 116:18,19
**procedures**
169:17,19
**process**
7:22 8:5 9:22 10:9
30:7 32:3 36:21
38:9 46:18 60:17
62:19 65:10 67:8,8
67:11,14 81:20 83:3
83:14,16,17,18,20
83:21 84:23,24 85:2
87:3,4 91:10,14
92:8,18,20,22 93:3
95:23 96:14,14
97:15,18 100:12,15
100:22 101:14
109:2 115:2 118:12
132:4,8 139:13,24
140:7,11,14 141:14
146:19 165:22,24
166:5,21 169:18
172:2,3,9 174:5,10
177:22 181:13
**processes**
67:1
**produce**
51:1 168:13
**produced**
168:15 180:11
**production**
49:13 152:21
**profession**
27:18
**professional**
18:1,3,13,14 86:22
87:9
**professor**
5:20 6:2,3,3 9:24
10:3,6,11,12,16,22
10:23 24:15 39:22
40:5 41:3 56:12
67:10,13 71:18
106:5 119:4 127:5
132:21,22 147:20
165:17

**professors**
9:8 10:19,20 29:1,2
29:17 35:9 40:14
146:2 162:10,14
**profile**
154:24
**program**
17:11 22:15 23:7,14
23:15,17 25:7 38:19
38:20 48:20 60:13
64:24 65:1 68:10
76:21 77:4,7,9
78:14,15,21 79:1,2
79:3 80:1,16,19
81:14,22,23 83:6
84:2 85:7 86:6,11
87:24 88:2,8 89:1
90:8,18 91:11 93:1
95:13,18 96:1,5,10
97:10,23 98:22 99:3
99:13,14 100:24
101:3,6,17,21,21
103:6,10,12 104:21
104:24 105:13
106:4,24 107:3,8,13
108:22 111:1,1
119:5 137:1,6,8,16
137:19 157:8 165:8
173:16 174:1,6,7
176:1
**programs**
77:1,3 102:2,4,5,19
125:23
**progress**
53:22,23,24 60:6,7
67:22
**project**
22:23
**promoted**
10:10
**promotion**
10:8,9,15,22 12:9
14:9,21,23 38:22
41:18 46:22 54:5
55:1,16 61:2 65:8
67:7 96:23 165:21

172:13 179:23
**prompt**
17:22
**prompted**
55:19
**proper**
27:13 33:3
**protocol**
131:23
**protocols**
27:13
**provide**
9:13,15,16 14:2
34:10 39:19 84:1,16
**provided**
16:3 34:7,9,18 84:19
**provider**
19:16
**providing**
42:7
**provisions**
1:10
**provost**
7:4,8,17,20 8:1,4
11:24 12:11,12,14
12:15 14:12 30:16
161:1 162:4 172:19
173:5,6
**psychology**
28:22
**public**
9:19,20 24:16 48:20
80:7 88:7 89:21
90:6 102:6,16 106:4
119:4 149:17 157:7
165:7 182:4,10,18
**publication**
68:14
**publications**
18:9 67:19 68:6
**publish**
25:21,24
**published**
16:23 26:1 66:17
67:21 68:12 163:11
**publishes**



67:19
**pull**
22:24
**purpose**
1:13
**purposes**
42:3
**pursuant**
1:10
**purview**
161:5
**pushed**
74:12
**pushing**
67:16
**put**
6:14 20:3 23:10 24:4
30:14 49:14 55:5,8
65:24 69:19 72:24
75:17 76:14 86:24
89:4 97:8,20 99:18
169:6
**putting**
29:10

**—— Q ——**

**qualifications**
85:5 86:6,17,18
87:15 96:6,8,12
173:20,24
**qualified**
96:5 121:16
**qualities**
37:7 88:4
**quarter**
8:17
**question**
5:5,12,14 25:11
29:14 53:14 54:15
56:22 59:20 61:9
68:5 72:6 73:16
76:9,11,12 85:4
93:9,22,24 98:1,10
112:21,23 114:23
140:3,5 143:22
145:9 151:23

155:10,10,13,20
160:7,17 162:23
178:21 180:15
**questionable**
43:23 44:5,5,7,11,19
58:2,3 62:13
**questioned**
26:12,18
**questions**
15:20 52:8 70:7
88:18 93:17 134:11
149:9 165:14
168:10 171:12,13
175:1 180:12
181:17 182:9,12
**quick**
51:2 151:19 152:4
171:5
**quickly**
7:14,15
**quite**
8:9 27:23 28:1
**quorum**
80:12
**quote**
58:1,2 101:13

**—— R ——**

**R**
2:1,3
**race**
24:17 29:12 56:15
112:13 144:22
159:22,23
**races**
29:17
**racial**
9:7 28:24 73:21
150:20
█████
41:3
**raise**
67:7 68:19,22 117:4
**raised**
45:3,4 84:15 114:11
114:18 117:10

175:12
**raises**
140:4 146:24 147:1
**raising**
158:13
**Rajul's**
50:22
**Ramsay**
71:5
**ran**
170:11
**range**
8:23 17:16 55:9
65:23,23 66:1 68:17
146:1,4,7
**ranges**
10:18 14:19 78:14
**rank**
18:6
**rare**
8:3 96:24 98:3
**rates**
161:11
**reaching**
176:8
**read**
18:6 43:18 59:16,20
61:9 76:10,12
112:23 122:21
129:8 148:22
152:15 163:21
**read/edited**
134:8
**reading**
59:8 122:20 129:3
**ready**
103:11 135:8
**real**
26:22
**real-time**
172:22
**realize**
138:24
**really**
10:18 27:4 50:4
59:15 62:18 66:20

96:3 98:2 101:14,22
109:6 121:21 122:9
167:14
**realm**
101:20
**reappoint**
62:21 63:2
**reappointed**
62:12
**reappointment**
43:23 44:5,19 46:23
62:22
**reask**
155:13
**reason**
11:12 49:8 60:20
67:2 81:4 88:15
89:14 91:12 92:1,15
96:2 97:1 99:16
104:3 117:16
123:20 124:3,5
156:13
**reasons**
53:11,16 81:13 85:1
99:21 100:7 102:14
**recall**
9:15 40:13 45:2 55:7
55:9 56:1 57:2
84:20 104:12 107:1
115:7 116:1 120:4
127:20 133:23
154:12 163:11
173:10,20
**receive**
34:20 57:3 63:7
65:12 78:10,16,17
128:13 136:12
142:21
**received**
25:13 39:6 74:14,15
109:15,17 119:16
119:17
**recess**
51:5 62:3 112:20
128:10 157:17
171:7



**recognize**
37:5 42:22 48:2
  52:12 63:22 75:12
  113:19 135:16
  147:7,9 148:19
  153:9 158:5 165:4
  179:18,21
**recollect**
72:15
**recollection**
34:16 57:11 58:14
  84:21 115:16 116:4
  116:8 117:22
  119:24 135:5
  137:22 175:13
**recommend**
41:9
**recommendation**
12:6,11 13:3,9,22
  14:6 16:20 41:17
  46:21,23 52:16,20
  52:24 53:11,17 54:4
  96:15,21 116:21
  172:22,24 173:2
**recommendations**
12:13 39:2,6,12
  115:10 158:15,16
  158:18 159:18
**recommended**
180:7
**recommending**
16:21
**record**
4:18 5:11,16 37:23
  38:1,10 43:7,18
  46:8 49:15 50:24
  51:6 71:10 73:9
  81:8 85:20,23
  102:20 109:18
  128:7 139:16
  145:11 150:23
  151:3 152:7,11,12
  153:1 155:11
  157:16 162:18
  164:9 168:23 171:9
  172:3 182:12

**reduced**
174:11
**refer**
33:3 140:22 141:3,10
  156:14
**referenced**
121:2 151:14
**referred**
3:14 118:22 142:11
  182:14
**referring**
30:10 48:7 135:1,19
  135:20 137:24
  138:11
**refresh**
34:16 57:11 84:21
  116:3,8 117:22
  119:24 135:4
  137:22
**regarding**
60:21 117:13 150:20
  159:21 162:9
  165:13
**Regardless**
132:9
**regular**
101:18
**rejoin**
171:4
**related**
171:17
**relations**
24:16 48:20 80:7
  88:8 89:21 90:6
  102:6,17 106:4
  119:4 149:17 157:7
  165:8
**relationship**
38:16 90:7
**relatively**
70:14 171:5
**relay**
164:4
**relevance**
5:7 27:20 34:3 145:5
**reliability**

26:13
**remain**
103:24 104:10
**remaining**
104:16
**remember**
20:23,23 21:21 22:13
  33:14 34:13,15
  35:18 39:22 40:11
  44:17,23,24 45:1,4
  45:8 46:5 48:18
  57:8,10,12,13 70:3
  71:2 72:13,13 73:6
  77:18 79:17,21 80:4
  80:15,18 81:13 82:5
  82:12,14,24 84:8,18
  84:23 85:3,10 86:2
  86:3 87:14,20,22
  88:5,19,23,23,24
  90:17 92:23 93:10
  93:13,20 95:7 100:1
  100:21 104:9,14
  106:21 107:4,19
  108:2,9,10 110:5,8
  111:6,12 115:17
  116:17 117:3,14,20
  118:17 119:7 121:1
  121:4,6 123:2,9,10
  123:11,13,18 124:1
  128:3,6 131:16,17
  135:3 137:11,15,18
  137:20 142:4,22
  143:2 145:20 148:3
  148:5 151:16
  163:15 165:23
  166:9,12,13 168:1,6
  168:9 170:16,22
  173:6 175:8
**remembered**
72:9,10 123:15
**remembering**
30:4
**remotely**
1:15 97:24 98:3
**renew**
142:23

**renewal**
53:1 65:16 67:16
**renewed**
53:7 88:14 147:24
**repeat**
138:24 170:18
**rephrase**
5:13 139:19
**replacement**
30:15
**replied**
47:14
**reply**
47:14
**report**
12:7 16:13 41:15
  70:5 72:9,10 114:19
  115:9,12,13,23
  116:7,20,20,23
  133:10
**Reported**
1:20 2:13
**reporter**
1:14 32:15 42:18
  56:8 59:12,22 61:3
  61:7 111:19 112:5
  179:6 181:18
**REPORTER'S**
182:1
**reports**
6:11
**represent**
134:13
**represented**
72:1
**representing**
4:12
**reproduced**
26:11
**request**
30:10,14 46:12 55:13
**requested**
94:19
**requests**
30:8,15 95:4 158:15
**require**



94:4 95:13
**required**
37:11,18 171:16
174:1,3
**requirement**
110:16
**requirements**
110:19,20
**requires**
104:7
**reread**
41:13
**research**
9:18 11:7,16,17
15:18,19 16:9,23
17:8,10 18:8 22:12
26:7 28:10,14 30:4
53:23 60:6 68:1,6,9
69:8,9,12 95:4,9
101:15 109:13
**resend**
47:12 49:17
**resent**
50:5
**reserve**
181:19
**resigned**
149:23,24 150:2
**resolved**
157:1,5
**respect**
178:9,21
**respond**
29:6
**responded**
70:18,21
**responding**
129:18
**response**
68:5 90:15
**responsive**
85:8 86:7,9 87:13
**rest**
98:24 114:21 153:24
**result**
44:8 113:23 141:4

**resulted**
174:4
**results**
70:4,12,14 84:9
85:20 91:3 100:2
137:1 168:2,5,6
**retention**
161:10
**rethink**
85:2 87:4,4 91:10
99:23 101:10
**rethought**
85:15
**rethunk**
85:15
**retired**
31:21 149:23,23,24
**return**
7:5
**reupload**
21:14
**revamping**
99:13 100:15,18
**review**
10:8 13:12,13 14:2,4
15:1,1,4,6,9,13,14
15:21 16:2,14,20,23
16:24 17:1,4 44:9
44:21 45:2,5,7,9,10
45:13,13 46:5,11,12
46:12,17,22 47:24
49:6 51:8,19 58:16
60:10,10,13,18,21
60:22,23,24 63:20
64:13,13,16,17,20
65:7,13 66:3,7,19
67:5,8,11,13,23,24
68:8,15,18 69:1,17
69:19,23 70:3,4,6
74:22 75:8 115:11
119:18 131:2,3,8,23
132:4,12,15 133:9
133:10 135:14
138:18 147:6 153:6
155:14,15 159:5,8
165:1,13,14 172:6

172:14,15,22
178:15
**reviewed**
46:15,19 65:5 67:18
147:8 153:8 158:1
**reviewer**
18:9
**reviewers**
18:8
**reviewing**
51:17 52:4 77:6
136:19 153:7
**reviews**
18:5,18 44:20 57:24
60:15 61:1 65:8,8,9
66:16,23 67:14
77:10 131:18,18
132:2
**revised/close**
134:8
**revisit**
97:15 101:24
**rid**
55:3
**rider**
134:15,16
**right**
5:15 12:16 43:13
47:8 50:17 51:1
63:15 66:13 70:13
80:10,11 86:15
91:23 100:3 103:7
103:12 105:23
120:6 121:23 125:3
130:13,21 133:24
135:7 147:3 148:12
157:18 159:4,13
161:22,24 164:15
172:23 174:8,15
176:5,9,15 177:22
177:23
█████████
180:23
**Robin**
111:14,24,24 113:1
**Robin's**

112:8
**role**
6:13 27:11 29:11
85:12 90:10 101:10
101:22,23 103:17
104:5,11,20 107:6
107:18 138:8 157:7
159:17 173:13
**roles**
18:13 19:24 20:1
27:22 28:9,11,23
29:9
**room**
27:1 28:4 82:2,2
105:5,8 116:5,6
**rooms**
26:16,17
**rotely**
27:3
**route**
97:12
**rubric**
64:16,16
**rubrics**
64:19
**Rules**
1:11
**run**
82:8
**running**
170:8
**rush**
51:23
**rushed**
85:14

---
**S**
---

**s**
2:1 3:7 160:5
**S-H-U**
118:6
**safe**
161:9
**safety**
26:13,22
**salaries**



146:11,13,18,18
**salary**
66:5 78:17 79:8,11
146:5,5,16
**Salma**
7:7,19 66:20 74:1,15
130:14 139:7
142:24 143:13
**saved**
49:23
**saw**
34:6 58:21 61:7
84:22 122:23 146:1
**saying**
27:10 45:12 58:11
87:12 115:13
121:20 122:1,12
124:2 138:4 142:1
142:11 155:5
166:12 169:14
**says**
44:3 48:14,23 50:19
52:19,24 53:11,16
53:20 60:3 63:24
64:6,8 66:20 118:11
120:20 130:19
132:24 133:19
134:1,4,8,9,24
138:1,4 139:8
153:19 154:3
158:11
**Scatchell**
2:3 3:4 4:7,11 9:12
24:10 28:2 29:7
31:11 32:10,18
33:13 34:8 41:24
42:6,10,15,20 43:10
43:16 44:16 45:21
46:14 47:4,12,19,21
49:1,5,12,17,20,22
50:5,24 51:6,7,14
52:3,11 53:15,19
54:19 57:21 58:6,8
58:13 59:4 60:8
61:11,16,19,24 62:4
62:6 63:12 65:21

71:16 72:12 73:5,13
73:18 75:2,7,21
76:1,4,10,13 89:13
90:2 92:9 94:18
98:11 105:7 106:15
108:7,20 110:4
111:17,22,24 112:3
112:6,17,21,24
113:15 114:24
117:8,21 118:23
119:15 121:18
122:4,11,19 123:23
124:9,16,17 127:16
127:19 128:2,7,11
128:15,17,23 129:1
129:21 131:10
133:18,24 134:7
136:3,5,10,16
138:16,22 139:18
140:12 142:3 143:9
143:20 144:6,13,21
145:2,6,16 148:11
148:13,18 150:24
151:19,24 152:3,9
152:14,18,21 153:5
155:12 156:1
157:15,18,22 159:4
159:12,19 160:8
161:23 162:6,15,21
162:24 163:3,9
164:3,14,24 166:6
166:24 167:18
168:21,22 170:3,10
170:23 171:6
175:20 176:23
177:3 179:15
180:14,17 181:10
181:17
██████
31:20 33:16 137:12
137:16 139:7 178:4
**schedule**
101:18 102:7,12,18
178:4
**scheduled**
132:2

**scheduling**
77:8 79:4 101:5,11
101:12 102:9,23
**scholars**
109:4
**school**
56:21
**scope**
78:18 79:5,7
**score**
68:18
**scores**
16:12
**scrapped**
168:4,4
**seal**
182:17
**search**
6:14 22:22 23:1,2,5
23:22 24:1 35:16,21
35:23 36:3,8,16
37:12,12,17,19 38:8
48:14,18 109:23
110:2,6,10 111:5,7
111:13 113:24
114:1,8,12,15,20
115:2 116:22
118:12 119:23
120:1 125:10,15
126:1 133:16 137:1
137:7 146:2
**searches**
37:19 111:2
**second**
42:15 43:21 46:13
51:1,8 58:7,8,23
61:3 77:23 89:17
126:22 128:8 152:8
155:5,14 157:16,16
168:9
**secondary**
134:15
**section**
59:6
**secure**
108:15 176:7

**secured**
108:18
**securing**
175:17
**see**
15:17 16:8,15 23:11
31:21 48:11 50:16
52:19 53:10,20
58:20,22 62:23
63:24 64:5 68:5
71:6 75:13,14 87:12
90:1 95:22 101:2
109:21 115:8,12
118:8,11 119:2
120:9,20 121:15
122:10,22 128:21
128:21,24 130:9,17
133:1,20,24 134:1,3
134:22 135:23
138:8,9 139:10
153:14,19 154:6
158:6,19,22 174:19
175:3,22 176:1
177:15,17 178:5
**seeing**
44:8 75:24 117:9
**seen**
94:16 105:13,15
133:21 135:17
144:23 145:8
**sees**
122:17
**seizures**
91:3
**select**
7:11 23:5
**selected**
43:19 80:1 175:24
**selection**
93:1 95:23 97:18
137:16,19 177:22
**send**
62:7 63:5 148:11
179:3
**sending**
179:7



sends
118:6
sense
101:6 102:15 120:21
sent
47:1 48:22 50:8,11
58:21 114:20
128:12 134:9,10,17
134:18 151:24
157:11,15 164:12
164:19 174:21
179:22 180:23
sentence
120:20 121:5
sentences
37:2
separate
61:1 155:3 167:5
170:9
series
125:1,12 128:12
seriously
155:24
serve
17:14 18:9 23:11,15
23:21 111:5
serves
24:4,8 101:10
service
6:4 15:20 16:9 17:5,8
17:22 18:1,1,4,14
22:3 53:24 60:7
68:1,10 69:8,10
88:17 101:16
SERVICES
1:21 182:21
serving
6:13 78:11 98:23
set
39:12 95:11 97:8
175:7,9
setting
109:6 153:12
SEVEN
182:22
shaking

4:19
share
86:6
SharePoint
19:5,9,13,23 20:2,3,9
20:11,12,16,18,22
21:1,7,11,17 129:11
129:11,13,19 130:1
130:14
Sheena
71:4
shift
32:21 95:10 124:12
shifted
55:1 78:23 79:5
83:21
short
26:8 51:5 62:3
112:20 128:10
171:7
shortened
14:10
shorthand
1:14 182:9
shortly
59:11
show
28:10 41:20 46:24
48:21 55:8 113:11
119:11 167:21,22
showed
50:1 168:4
showing
15:18 49:8
Shu-███an
118:6,24
sic
103:2
signal
49:3
signature
181:18 182:17
significant
103:6
similar
96:22

site
9:18
situation
8:3 121:11 123:3
127:20
six
10:4,23 11:1,6 14:20
101:23 154:5
six-year
62:20 67:9
sixth
10:7
size
8:21
small
68:21,23
smaller
22:17 102:5
social
153:20
socially
155:5,15
solved
131:14
somebody
11:12,19 12:3 17:21
32:22 41:9 57:22
65:12 66:16,17 68:5
73:24 89:12 97:8
102:15 140:4
167:11
somebody's
68:18 104:10
someone's
15:18 170:8
soon
61:12 175:7
sorry
13:5 22:20 24:5,24
27:6 32:15 49:10
50:13,21 52:1,5
53:13 56:22 59:1,15
64:5,7 75:4,5,11,19
76:8 80:7 89:7,8,17
102:22 110:23
130:21 132:14,21

133:8 134:6 135:10
143:18 152:17
157:13 159:16
169:9 170:18 171:1
180:22
sort
73:21 81:8 82:19
117:2 127:12 141:9
145:17 150:12,20
171:16
sounds
5:6
South
25:13
spare
130:13
speaking
98:6
speaks
114:4 129:14 149:5
specific
25:18 29:5 67:4 73:6
95:21 114:23 121:1
123:4 124:20
150:18 152:22
163:8
specifically
30:16 85:10,18 86:24
87:7,12,21 93:8
100:16 101:12
129:13
specifics
161:21
spectrum
54:4 55:4
speculating
89:10
speculation
73:17 89:7,19
spell
40:3 56:7 126:22
147:13
spite
180:5
sponsor
109:13



**spring**
153:13 172:12,13
**staff**
8:16 9:2 70:8,8,9
71:5,18 72:4,11
126:11 158:9,13
159:24
**stamp**
49:7,17 133:18
**stamped**
51:15
**stand**
108:18 136:6
**standard**
10:3 11:1,2 22:18
149:10
**stars**
76:6,19
**start**
22:23 40:7 59:19
102:24 119:7
129:17 144:22
156:2 172:9,11
**started**
5:15 6:2 69:17,21
71:19,22 79:3 83:2
103:1 105:5,10
**starting**
93:16 95:1
**starts**
43:8 114:7 152:20
**state**
1:12,15 5:16 152:24
**stated**
10:24 86:5 103:5
114:18
**statement**
81:24 83:22,24 84:1
84:6 87:17 121:2
170:17 182:2
**STATES**
1:1
**stating**
122:6 138:2
**status**
31:16 136:7

**stayed**
99:6
**stenographer**
182:10
**step**
13:5 99:2,14 140:6
**stepped**
78:7 103:9
**steps**
12:19,22 13:7,18
**Steve**
129:22
**Steven**
21:3 129:24 131:12
**stipend**
78:18
**stop**
13:5 22:23 59:2
91:14
**stopped**
93:12
**stormed**
120:23 121:10,23
122:13
**strange**
49:24
**streams**
157:8
**STREET**
182:22
**strengths**
116:23
**strike**
29:14 57:23 168:20
176:12 177:4,7
**structure**
31:22 33:3
**student**
18:18 70:13 140:4
151:8
**students**
8:19,24 70:18 102:10
109:5 158:9,13
159:24
**studies**
6:4 25:8,17 102:6

**subject**
132:24
**submits**
17:2
**subsection**
134:21
**subtle**
143:21 144:4
**success**
67:17
**successful**
10:9
**suggest**
42:3
**Suite**
2:3,9 182:5
**summarize**
37:1 58:11 158:11
**summarized**
26:9
**summary**
158:12
**summer**
78:16 108:24
**support**
20:24 21:2 130:16
156:23
**supporting**
175:17 176:21
**supposed**
86:6
**Supreme**
1:11
**sure**
12:23 16:7 22:17
24:22 26:21 27:9
29:8 31:15 32:1
37:16 38:6 45:11
49:12 51:21 56:16
70:12 71:6 74:16
101:2 103:4 115:1
118:1 125:22 128:9
128:23 134:18
135:11 137:10
152:9 158:21 159:6
163:6 167:5 172:2

175:11
**survey**
70:19,21,23 84:3,11
**swamped**
130:12
**switch**
126:12
**switched**
126:13
**sworn**
4:1,4 182:7
**Sydney**
1:3 2:15 3:3 24:11,15
40:2 46:4,11 52:18
53:21 74:5,10 85:11
87:13,14 88:20
89:15 90:1,3,21
91:2,4,17 95:19
99:12 100:2,6,14
104:23 105:24
106:21 108:11,15
108:22 109:10
111:6 114:7,17,18
115:13,22 117:4,10
117:13,14 118:5,18
120:5,12,14 121:6
123:2,11,19 124:6
129:18 130:23
134:24 136:24
137:13,24 139:6
141:18 145:17,24
146:22 149:9
153:13,17 155:24
165:12 175:23
177:21 178:1
**Sydney's**
44:24 60:3 75:13
86:18 90:20 93:6
97:14 127:21 133:1
**syllabi**
17:3 18:18
**system**
19:10 20:5,14 21:9
38:4,19 61:1 64:15
170:7
**systematic**



MAGNA
LEGAL SERVICES

71:14
**systems**
19:21 66:24

***T***

**T**
3:7
█████
132:21
**take**
10:17 26:17,24 27:7
28:12,13 30:23 41:8
41:15 42:21 43:20
47:24 49:6 51:2,3,8
61:16 63:19 68:12
74:22 75:8 83:6
84:5 85:22 89:21
99:22 100:10
102:10 111:17
112:17 113:17
116:15 126:2 127:9
152:4 157:12
170:24 171:24
**taken**
1:10,13 4:22 26:10
26:18,19 27:5 34:11
81:1,5,6 82:4 166:3
167:19 182:3,9
**takes**
36:14 172:9
**talk**
5:10 16:18 23:9 64:9
83:5 87:18 100:3,9
107:13 136:24
156:12 162:3
168:11
**talked**
46:18 62:20 77:10
86:9 87:14,22 88:1
96:23 99:17 100:22
101:1 107:10,12,21
107:23 115:21
116:1 117:14 123:6
124:14 139:20
146:10 151:13
155:24 156:19

161:16
**talking**
13:15 60:16 64:20
65:9 72:16 102:15
105:6 107:1 115:14
117:6 129:10,11
144:20 148:24
**task**
22:22 29:22 69:22,24
70:24 132:4
**task-based**
30:2
**task-related**
28:13
**teach**
17:10 93:19 95:11
**teaching**
15:20 16:9,11,24
17:1,2,8 19:3 22:12
45:3,7,9 46:13
53:22 58:12,15 60:4
60:4 66:17 68:1,9
69:8,9,12 77:8,9
88:18 95:5,6,10
101:15 131:2,9
133:9 148:24 149:8
149:11 165:15
**team**
20:5 64:9 100:23
**tech**
20:24 21:2
**technical**
20:10 129:22 169:20
**technological**
20:7
**technology**
19:22
**techy**
20:2
**tell**
33:1,17 42:22 59:16
84:10 86:21 123:18
126:22 140:10
148:8 160:10
164:11 174:19
**telling**

85:13
**tells**
5:9
**temporarily**
7:3
**ten**
39:16 40:16 41:16
61:16 111:17
112:17 146:15
**tenable**
83:7
**tend**
68:11
**tendered**
3:14
**tenure**
9:3,5,7,22,24 10:1,7
10:9 11:11,18 12:3
12:9,20,21 14:9,16
14:21,23 16:21,21
17:23 18:20 19:4,24
30:7 40:5 41:9,18
44:17 46:22 53:22
53:23,24 54:5,24
55:16 57:3,6,9,16
57:16 60:19 61:2
62:19 65:7 67:7,17
71:20 96:10,22
105:24 110:20
111:3 130:24 131:5
142:21 154:4,18
155:7 165:21
171:24 172:13
174:1,2 176:14,21
178:9,13 179:23
180:6,7
**tenure-track**
16:1 22:2 39:6 48:9
69:3 96:9 110:21,22
111:4,5 136:7
173:24
**tenured**
10:10 12:4 13:13,14
14:2,3,5,6 15:12
29:1,17 41:15 46:20
46:20 65:10 71:17

71:21,22 105:20,24
110:18 120:16,19
134:10,11,20 167:8
**tenured-faculty**
113:1,4,9
█████
78:4,21
**term**
17:17,19 55:20 98:24
103:12,16,20,21
104:11 111:2
121:23 122:13,14
149:16
**termination**
52:17
**terms**
8:15 16:5,20 17:2,5,8
18:19 20:12 21:14
30:7 39:1 45:3 54:3
54:7 65:15 66:7,8
66:21 68:24 69:8
70:5,14 81:18,24
83:6 85:7,11 86:11
86:12 87:19 89:5
90:17 91:2 95:6
100:15 101:17
107:11,18 109:7
116:2 126:1,3,12
141:7 144:19
146:19 155:1
160:12 167:8
**terrific**
179:17
**testified**
4:4 37:9 43:24 91:23
118:20 124:22
137:3 171:14
173:19 174:4
176:13 177:13
**testify**
4:16,23 126:15
**testifying**
140:13
**testimony**
24:6 72:7 86:5 92:4
143:24 145:11



154:7 173:8,21
175:10
**text**
62:1
**thank**
40:20 43:10 47:9
49:21 52:5 59:18,21
61:22 62:2 75:4,6
76:8 112:5 147:15
148:11 171:8
181:19
**theory**
96:19,20,21,23
**Theresa**
79:12
**Theresa's**
78:7
**thing**
15:21 20:6 26:5 59:5
96:24 98:15 101:19
124:16 163:7
**things**
17:12 18:12,15 20:13
21:8,10,13 26:12,15
36:9 62:19,23 68:11
70:10,16 82:1 86:13
86:20,24 87:19 88:1
94:6 98:3 101:4,20
103:11 107:23
108:24 125:1 132:8
144:5 160:12,24
161:4,7,9,11,21
162:3 165:14
**think**
8:3,3 9:4 11:8,22
18:22 19:14 20:17
22:14 27:19,22
28:10,19 31:8 33:23
39:14 40:6,8 43:8
43:13 44:15 45:5
47:5 49:19 56:1
58:10 59:12 64:21
66:19 70:7 71:5
72:7,18 73:3 74:5
77:16 86:9,12,16,20
87:8,24 89:5,11,14

89:16,24 90:3,18
91:13,14 93:15,23
94:4,7 95:16,22
96:4,6,11 97:3
98:13,13,19 99:17
100:5,9 104:4,8,12
105:17,24 106:11
107:1 108:16,17,23
108:23 109:7,12
110:24 114:18
115:14 118:7
120:21 121:9
122:13,17 127:14
133:12,16 142:1
144:3,5,11,19 145:8
150:13,13 153:2
154:20 156:4,11,15
156:19,21,24
160:11,23 161:3,8
161:11,15 162:3
164:1 168:19
169:12 170:5 173:6
174:3
**thinking**
86:14 98:16,18 163:7
163:7
**third**
17:7 69:4,4,4
**thorough**
51:18 97:19
**thought**
50:13 62:13 97:11
99:21 115:12
116:11
**thoughts**
171:3
**thread**
114:3 117:13 119:19
127:22 129:12
130:8 137:12,14
149:3,8 153:9,12
**three**
14:22 23:13 24:2
33:22 39:13,21
55:17 66:1 68:13
69:2,12 73:11 76:5

78:8 80:20 104:7
110:15,17,24 154:5
173:15 176:13
**three-year**
17:19 103:12,16,20
**throw**
103:3
**throwing**
167:6
**Thursday**
1:16
**tie**
86:23
**tieback**
85:19
**tied**
56:2 67:18,20 68:24
85:11 86:18
**tight**
47:8
**time**
10:4 17:16 25:3,5
27:7 42:5 46:13
51:22 54:20 60:17
62:1 66:10 83:24
84:5 86:10 92:11
95:15,19 96:13
97:17,23 101:24
103:6 104:21 111:9
113:2,5,7 132:4,8
132:22 136:12
143:4,11 146:10,12
166:4 169:3 173:14
174:2 178:4 180:13
181:21 182:14
**time-sensitive**
101:14
**timely**
85:8 86:7,9
**times**
5:2
**timestamped**
109:21 164:20
**timing**
163:23
**title**

36:2
**titled**
63:16
**to--**
94:23
**today**
4:12,24 120:23
**told**
91:2 93:11 99:19
120:3 123:2 142:11
142:14 178:1
**top**
22:6 35:3 64:2,3,6
77:18 95:23 109:16
115:9
**topics**
125:12 171:17 175:6
**total**
22:6 66:11
**totally**
60:24
**tough**
26:8 36:22
**town**
150:16,17
**track**
9:3,5,7,23,24 16:21
19:4 30:7 44:18
57:16 71:21 105:24
110:20 111:3 154:4
154:18 155:7
**tracked**
57:6
**traditionally**
27:18
**trail**
175:22 177:13,14
**training**
20:15 34:20,22 35:5
36:5 37:17 171:14
171:15
**trainings**
36:7,8 125:13 161:16
**trajectory**
10:2 60:19



132:18,20,20
165:12
**transition**
19:12
**transitions**
27:1
**treated**
31:8,9
**treatment**
153:21
**tricky**
101:18
**tried**
21:3,18 61:14 70:10
100:9,23 107:14
**trip**
12:24
**true**
28:3 182:11
**truthful**
124:4,7
**truthfully**
4:16,24
**try**
5:10 18:22 21:9
38:18 52:8 55:8
61:23 68:11 70:17
72:15 97:12 102:8
131:12 168:11
**trying**
12:24 16:7 22:13,14
26:5 29:15 37:5
58:22 59:15,23 73:3
87:8 97:3 100:11
101:15 105:17
129:19 130:16
143:10 163:10
164:1 170:7,7
**Tufano**
1:14,24 2:13 59:7,14
76:10 112:22 179:5
182:4,20
**Turkey**
112:13
**turn**
59:1

**turned**
167:2
**twice**
143:6
**two**
15:7,9,23 21:18
23:13 24:2 33:21
44:1,10 55:17 61:4
64:19 66:17 68:3,4
68:13 69:6 73:11
76:5,6,6,15 102:5
106:7 110:24
131:18 143:11
154:5 167:5,20,20
168:1
**two-thirds**
80:14
**type**
125:18,19 144:19
**types**
125:20,21,23 145:14
146:17 157:8
**typical**
10:2 23:16
**typically**
17:18 23:12 24:2
30:2 101:7 116:22

---

**U**

**U**
111:21
**U-Y-S-A-L**
111:22,23
**U.S**
127:3 154:3 155:6
**UBPT**
14:10 172:16 173:3
178:11,14 180:2,6
181:3
**UBPT's**
178:15
**Uh-huh**
50:18 83:13 181:15
**uh-huhs**
4:19
**ultimately**

13:20 23:5 157:3
176:7
**unanimously**
133:22
**unbecoming**
153:21
**unclear**
118:12 138:7 166:22
167:1
**uncomfortable**
123:5
**undergraduate**
8:24
**undersigned**
182:10,15
**understand**
5:12,14 16:6 27:8
45:12 50:4 81:19
122:5 143:10 180:2
**understanding**
27:10 32:7 144:3
**understood**
52:5 175:11
**unfair**
91:15,16
**unfolding**
87:2 123:8
**unified**
98:15
**unit**
13:8 43:15,20,22
78:16 161:12
**UNITED**
1:1
**units**
161:13,15
**university**
1:6 7:18 9:18 11:5
12:8,11,12 14:9,17
15:4 17:10,12 18:2
19:10,18,19,20,21
20:7 21:2 24:20
25:2,9,13 30:1
35:12 37:18 41:18
48:6 56:17,20 57:1
57:4 65:23 71:24

72:3 88:9 102:24
103:2 107:4 109:6
119:6 126:2,3 127:6
137:4 142:18
147:21 149:18
150:9 158:14,18
159:2,6,8,13,16,18
159:21,23 160:23
160:24 161:6 176:4
179:23 181:12
**Unnati**
130:2,3,12
**unquote**
58:2,3 101:13
**unsatisfactory**
54:11,12
**untenured**
52:17 55:14,19
136:15
**unusual**
165:23
**unwilling**
86:22
**up-to-date**
28:14
**updates**
133:1
**uphill**
97:10
**uploaded**
21:11,18 129:20
130:17,20
**uploads**
130:14
**use**
19:23 20:22 46:4
54:8 118:13 121:10
128:23
**user**
20:8,9,13 21:22
**usually**
11:16 17:9 18:22
65:24 110:12,14,14
**UT**
136:6
**Uysal**



**V**

**vague**
29:3 33:9 39:8 41:10
45:16 54:15 57:18
58:4 62:15 73:1,17
94:13 98:9 105:2
108:4 117:6 127:14
127:23 138:13
139:15 141:23
143:7,23 144:17
145:10 163:4,23
166:1,19
**varies**
44:15
**variety**
17:13
**various**
36:9 38:4 41:14
44:21 48:8 85:9
86:13 109:2 125:12
146:17
**vary**
17:19 44:12
**verbal**
116:23
**verbatim**
93:14
**version**
50:6,11,12 51:9
133:22 153:1
**versus**
28:22 29:22 45:23
60:10,21 67:22 70:8
79:2,13
**vice-president**
161:5 162:5
**videoconference**
1:9 2:1
**viewed**
28:21
**viewing**
19:2
**views**
122:17
**Vincent**

147:11,14
**virtual**
171:16
**vision**
87:18
**vitaes**
109:20
**vote**
12:3,4,10,10 13:2,15
14:5 39:1 62:12
65:11 80:2,5,9,10
80:21,23 81:2,10,16
82:3,15,17,23 84:7
86:3 88:4,20 91:12
91:14,17,18,19,22
91:23,24 92:2,6,7
92:11 97:2,6 99:19
100:3 103:24 104:7
115:11 137:6
165:19,24 166:3,5,7
166:21 167:3,6,6,10
168:7,8,10 169:5,8
169:11,14,14,21,23
180:18
**vote's**
169:13
**voted**
80:4,15,18 81:14,18
84:19 96:2 105:14
165:19 169:4
**votes**
39:1 52:20,22 53:1,3
166:18 167:19,20
168:2
**voting**
12:19 81:21 84:9
85:20 100:2 169:2
169:17,19 178:10
178:21 179:24
180:3,6 181:3,12
**VP**
36:2
**vs-**
1:5

**W**

**Wacker**
2:3,9 182:4
**wait**
47:5 50:20 58:23
151:19 164:22
**waiting**
127:15 156:15
**want**
11:13 12:18,23 16:8
21:12 23:9 24:23
27:7,8,9 30:3 33:17
41:24 42:1 44:9
45:11,18,19 47:13
50:23 51:3,18,22
61:16,23 62:21,23
63:2 68:14 70:12,16
81:19 86:4 89:4
94:23 96:1 97:7
99:18 103:10
104:17 114:15
121:21 133:24
135:13 138:18
148:10 152:4
158:23 160:16
163:8 166:10
167:12 169:14
170:13 175:11
**wanted**
21:13 46:5 52:12
85:1 97:16 101:2
102:8 115:12,24
135:11 137:10
152:22 177:21
178:2 180:2,22
**wanting**
15:17 72:11 99:6
**wants**
172:12
**wasn't**
21:14 24:22 54:22
70:24 71:8 74:12
79:11 81:7 84:16
89:15 90:5 91:18
99:2,20 100:7 105:5
105:18 115:23
120:16 121:22

124:4
**way**
9:24 10:21 17:7,9,22
17:24 21:10 26:8
28:8,21 31:8 63:17
67:3 79:6 81:22
84:16 87:1 90:9
96:13 99:3 115:15
121:20,24 122:8,12
122:23,24 123:7
132:1,10 160:12
164:12 169:12,15
180:10
**ways**
97:19 98:15,17
107:17 108:21,23
130:15 156:23
175:17
**we'll**
5:15 22:24 46:4
61:20 62:1 68:12
150:2 168:21
**we're**
25:11 27:12,20 55:16
60:16 71:14 103:22
105:10 110:21,21
138:23 151:21
155:22 172:2
**we've**
14:20,20,22 19:9
65:9 93:2,2 96:23
126:12
**weaknesses**
116:23
**website**
129:24
**websites**
20:4
**week**
100:5
**weigh**
18:19 69:12 97:5
172:1
**weighed**
69:5
**weird**



49:3,23 50:1
**welcome**
59:22
**went**
19:24 39:21 40:8
47:13 59:7 66:18
81:23 86:2 91:4,7
99:1 105:9 114:21
158:8 165:21 168:1
**weren't**
81:4 167:5
**Wermuth**
2:8 3:5 9:9 24:5
27:19 29:3 31:4
32:5,13 33:9 34:3
39:8 41:10 42:3,7
42:11,13,17 43:7,11
44:13 45:16 46:7
47:6,8,18,20 48:23
49:3,10,14,19,21
50:1,7,11,15,19,23
51:2,12 52:1,5
53:13 54:14 57:18
58:4,7 59:1,5,10,14
59:18,21,23 61:8,10
61:13,18,22 62:2,5
62:15 63:10 65:19
71:10 72:6 73:1,8
73:16 74:24 75:4,6
75:19,23 76:3,8
89:6,17 92:3 94:13
98:9 105:2 106:8
108:4,13 109:24
112:19 114:4,13
117:6,18 118:19
121:12 122:2,5,15
123:16,22 124:8,15
127:14,23 128:9,14
128:16,21,24
129:14 131:6
133:15,20 136:1,8
136:12 138:12,20
139:15 140:8
141:23 143:7,18,22
144:9,17 145:5,9
148:8,15 149:5

150:22 151:2,20,23
152:2,4,7,12,17,19
152:24 155:9,19
157:13,20 159:1,7
159:14 160:6
161:19 162:1,11,17
162:23 163:1,4,22
164:8,19 166:1,19
167:15 168:15,19
170:1,24 171:8,11
175:21 177:1,5
179:7,13,16 180:10
181:4,19
**West**
2:3 182:4
**white**
112:14 126:21 148:2
150:4 166:16
**willing**
138:5
**winter**
60:4 79:19 172:16
173:9,10
**Winters**
71:5
**witness**
3:2 4:1,3 9:10 24:7
27:21 29:4 31:6
32:6,14,17 33:10
34:5 39:9 41:11
42:8,12 43:13 44:14
45:17 46:9 47:5,7
49:2 50:10,13,18,20
51:4,13 52:7 53:18
54:16 57:19 58:9
60:2 62:17 63:11
71:12 72:8 73:2,10
75:5 89:9,20 92:5
94:15 98:10 105:4
106:10 108:5,14
110:1 111:21,23
112:2 114:6,14
117:19 118:21
121:13,14 122:7,16
123:17 127:17,24
129:16 131:7 134:5

136:4,14 138:14
139:17 140:9
141:24 143:8,24
144:2,10,18 145:13
148:16 149:7 151:4
151:21 152:6,13
153:4 155:21
157:19,21 159:15
161:20 162:2,13,19
163:5 164:1,10,22
166:2,20 167:16
168:17 170:4
179:12 181:5 182:3
182:7,13,17
**witnessed**
144:14
**woman**
27:14 31:23 56:3
154:4,17 155:7
175:24
**women**
28:12
**won**
66:16
**word**
121:10 160:14
**work**
7:23 10:14 16:4 17:4
17:6,7,11,22 21:24
28:11 32:4 50:15
81:21 82:20 104:7
130:13 131:24
134:16 140:14
150:19 157:2
**worked**
5:22 72:1 95:10 99:5
104:20 109:2
129:24 157:4
**working**
71:14 105:10 161:5
**workload**
101:6
**workout**
121:8
**workplace**
25:20,22

**works**
81:20 96:14
**workshop**
35:19 36:16,24 37:2
37:10,22,24 107:2
124:18 125:19
**workshops**
20:17,19 34:23 35:2
35:15 36:12,14,23
87:18 125:6,9,10,24
126:2,3
**wouldn't**
37:19 63:2 94:8
160:13 161:22
**write**
12:7 134:16
**writing**
174:11 179:2,3
**written**
20:21 83:22,23 85:22
104:8 115:9 133:10
151:9 169:12
**wrong**
21:16 26:4 36:2
50:12 54:20 93:17
157:15
**www.magnals.com**
1:23

**X**

**X**
3:1,7

**Y**

**yeah**
16:7 20:7,23 34:19
50:1,23 59:4 61:18
64:7 67:5 68:20
69:24 75:9 78:23
82:21 83:2 86:16
90:19 91:8,13 94:24
98:10,19 99:17
107:21 109:21
111:23 120:8
124:11,16 127:16
129:7,11 151:17,23



152:21 163:6
168:18
**year**
6:18 10:7 11:6,10
22:19,19 39:15,15
40:6,14 41:3,4
43:21 56:24 57:2
58:16 60:15,24
64:24 65:3 66:5,17
68:9,15 69:18 70:2
77:23 78:8,8,20
83:18 97:21 99:4,7
99:22 124:24 126:9
126:17,19 130:23
131:17,18,19,21,22
148:3 172:13
176:15
**years**
10:4,20,23 11:1
14:20,21,22 15:7,9
15:23 33:11,21,22
35:20,24 40:7 44:1
44:10,22 45:8 57:17
68:3,4,13 71:1 78:8
78:9 91:9 101:23
104:7 110:18
127:10 142:5
146:15,15
**Yep**
50:20 133:20 136:4
139:5

---
**Z**

**zero**
52:22 53:3
**Zoom**
47:18 98:4 166:3,5
166:22 170:6

---
**0**

**0005**
43:6,12
**084-003819**
2:14 182:21

---
**1**

**1**
3:8 41:21,22 53:10
53:15 176:11,19
177:6
**1:20-cv-7760**
1:5
**10**
9:1 22:7 35:24 135:8
**11**
136:18 138:24
**113**
3:10
**119**
3:11
**12**
138:17 177:8
**12:00**
1:16 182:5
**121**
2:3 182:4
**123**
2:9
**129**
3:11
**13**
80:17 97:7 147:3
148:10
**13-ish**
127:10
**1300**
8:20
**14**
8:16 53:1 148:9,14
148:17
**15**
9:1 22:7 148:9
151:18 152:17,19
157:12 174:18
**15th**
173:4
**16**
148:9 151:24 158:3
**16-ish**
77:16
**1635**
182:22

**17**
148:10,10 164:16,17
**171**
3:5
**179**
3:12
**18**
165:9 179:6
**180**
3:4
**1800**
2:9
**19**
3:12 69:18,18 179:8
179:8,10 180:20
**19103**
182:23
**1998**
5:23
**1st**
147:2 175:2

---
**2**

**2**
3:8 43:6,8 47:1,2
48:11
**2:00**
61:23
**20**
8:24 26:1 69:18
138:3 177:17,24
**2005**
103:3
**2010**
42:23 43:4 44:3
**2012**
24:21 25:1,6
**2013**
60:22
**2015**
60:4 143:4
**2015-ish**
33:24
**2017**
143:5 148:5
**2018**

6:21 39:12,22 40:18
41:5 73:20 95:1
110:11 111:10
120:17 131:2
176:14
**2019**
19:14,14 40:11,18
70:1 71:8 79:20
88:12 138:3 173:9
173:10,11,17 174:5
175:2 176:11,14,19
177:6,13,17,24
**2020**
19:14 37:15 40:15
41:5 69:19,21 70:1
72:24 149:21 161:3
180:19
**2021**
180:24 181:1
**2022**
1:16 73:20 182:6,19
**206**
103:2
**21**
1:16 128:18,21
**21st**
182:6
**2300**
2:3 182:5
**25**
10:20

---
**3**

**3**
3:9 43:8 48:22,23
51:9,10 58:5,7,8
97:7 134:21
**3:27**
112:18
**3:44**
164:22
**30**
8:24
**312**
2:4,10
**3195**



76:4
**3196**
76:7
**32**
9:4,5,7
**33**
9:4,5,7
**3599**
138:3
**3636**
139:4

---
**4**
---
**4**
3:4,9 63:6,8,14 75:2
**4:04**
164:20
**41**
3:8
**47**
3:8
**474-7900**
2:10

---
**5**
---
**5**
3:10 63:6,8 74:20
75:3 76:7
**5:09**
174:21
**5:59**
181:21
**5046**
48:12
**506-5511**
2:4
**51**
3:9
**53**
8:15 9:2
**5502**
51:15 53:10,16
**5508**
51:15
**5568**
49:9

**5573**
49:9,12
**5586**
49:12
**5675**
133:18 134:21
**5676**
134:3
**5826**
153:15
**5th**
182:19

---
**6**
---
**6**
3:10 113:12,13 120:7
**60**
8:17
**601**
43:17
**603**
43:17
**60601**
2:4
**60606**
2:9
**6189**
63:16,18
**6190**
63:19,24 64:6
**6192**
63:17
**624-6221**
1:22 182:23
**63**
3:9,10

---
**7**
---
**7**
3:11 52:20 119:12,13
**7,000**
78:20
**7,500**
78:20
**7187**
130:9

---
**8**
---
**8**
128:17,21 129:2,5
**8-18**
3:11
**8-19**
3:13
**8-21**
3:13 128:19
**80**
8:17
**8363**
118:5
**866**
1:22 182:23
**8903**
136:3
**8TH**
182:22

---
**9**
---
**9**
132:13 180:24 181:1
**9th**
180:21



EXHIBIT

15

---

**From:** Murphy, Alexandra
**Sent:** Wednesday, May 1, 2019 11:52 AM
**To:** Dillard, Sydney
**Subject:** Re: Faculty Climate meeting talking points

Thanks for sending this Sydney. I look forward to talking with you and learning more.

All my best,
Lexa.

Sent from my iPad

Dillard_DePaul05825

On May 1, 2019, at 11:29 AM, Dillard, Sydney <SDILLAR2@depaul.edu> wrote:

Morning Lexa,

I just wanted to provide you a quick overview of some of the concerns I am hoping to raise at our upcoming faculty climate meeting.  After the last two PRAD program meetings and the New Center discussion meeting I have experienced what I believe to be instances of microaggressions, social isolation, and treatment unbecoming of the College of Communication. In several instances I've noticed a pattern in which my voice, input, and efforts place me in an ancillary position in which my qualifications of professional growth and potential advancement have been stifled, though I have shown steady contributions to the track, college, and university.  What's more concerning is that there seems to be little effort on the part of leadership within the college, that has attempted to address these issues informally and/or formally, though they have been raised on numerous occasions.  Below are list of some of my concerns:

- Limited career advancement opportunities, specifically for US born African American women who are tenure-track faculty members within the college

- Socially isolating and harassing behavior of US born African American women who are tenure-track faculty members within the college

- Unclear standards and procedures for growth and career advancement, especially in reference to US born African American women who are tenure-track faculty members within the college

- Oversight of procedures and processes that subjectively allow the potential for discrimination toward protected classes within CMN

- Lack of internal structures that proactively identify ways to minimize institutional barriers for people of protected classes, specifically for US born African American women who are tenure-track faculty members within the college

- Inconsistencies in the application of policies in different contexts

This is just a start, but I'd really like to continue the conversation Salma and I began last year and continue the topics of discussion since you and I last met when you were unable to identify any specific details from the PRAD program meeting which could direct me in advancing my career towards leadership roles.  Looking forward to our chat.

Best,

Sydney D.

--
Sydney Dillard, **Ph.D.**
Assistant Professor, Public Relations and Advertising
College of Communication, DePaul University
14 E. Jackson Blvd., Ste 1261, Chicago, IL 60604

Dillard_DePaul05826

office: 312.362.8840

**Faculty Profile** |  **Follow on twitter** @DrSydneyjd


*Communications Coordinator*, DPUBLC
*Professional Freedom & Responsibilty Chair*, Advertising Division, AEJMC
*Grant Program Chair*, Minority and Communications Division, AEJMC

Dillard_DePaul05827

**EXHIBIT**

**17**

| | |
|---|---|
| **From:** | Murphy, Alexandra |
| **Sent:** | Monday, February 18, 2019 8:58:27 PM |
| **To:** | Dillard, Sydney |
| **Cc:** | ███████████████████████████ |
| **Subject:** | Re: PRAD Program Chair election follow-up meeting |

Hi Sydney,

Thank you for reaching out. I was planning on following up with you to continue our conversation since we had such limited time last Friday. That is fine if you would like to meet with ████████████████ present. I can ask ███ to look into a time that will work for all of us. Could someone please tell me if she should include both ██████████████ l in the calendar search or if it should be whomever has availability?

I will say that there were no formal minutes taken during the meeting, so I won't have anything for us to review. Hopefully, when we can talk without being rushed, I will be able to clarify what I can about how the conversation unfolded. The primary duties of the chair position and the election process are in the document that I sent out last week. I can bring hard copies to the meeting to share with everyone.

All my best,
Lexa.

On Feb 18, 2019, at 4:43 PM, Dillard, Sydney <SDILLAR2@depaul.edu> wrote:

> Dear Lexa,
>
> After the Public Relation and Advertising program's (PRAD) last faculty meeting on 2/15/19, you and I were only able to speak briefly. I wanted to follow up with you to review the details of our talk and extend the conversation. As I recall, you noted:
> 1. I am qualified for the PRAD program chair position.
> 2. There were no areas of concern discussed during the voting meeting in reference to my qualifications for the PRAD program chair position.
> 3. I did not receive a majority vote in favor of my election for the PRAD program chair position.
> 4. The voting discussion for electing the PRAD program chair focused predominantly on reshaping the program chair position.
> 5. The voting discussion for electing the PRAD program chair found the position difficult for anyone to continue to effectively manage as it currently stands.
> 6. The next steps moving forward would be to extend another call out for nominations within PRAD and hold another election or complete an external open-rank search (filling Raju Jain's position) for the PRAD program chair position.
>
> As I am seeking clarity surrounding the details of a meeting that did not include a discussion of my qualification, but led to a majority vote in opposition to my nomination to program chair (12-opposed, 3- favor), I would like to request a meeting with you and

**CONFIDENTIAL**

DePaul's Employee Engagement & Equal Employment Opportunity representatives to discuss this matter. I am currently unclear about a number of factors that led to this outcome, given my history of service to the track, college, and university and current standing, as I've positively moved toward tenure. In our meeting I would like to request that you and I review the following items:

- The minutes of the 2/15/19 PRAD faculty meeting. As you noted, there were no concerns specifically surrounding my qualifications for the position and the voting discussion focused only on restructuring the program chair position. If this was the context of the meeting, as an active tenure-track faculty member of PRAD, I was excluded from the conversation when you facilitated the voting procedures and requested, I leave the meeting. The discussion of restructuring the program chair position was initiated during a time in which deliberations on my qualifications were supposed to be the **only** topic under discussion. Thus, I would like to request a copy of and review the minutes for the entire PRAD program faculty program meeting.
- The primary duties of the Program Chair position
- My qualifications for the Program Chair position
- My qualifications for leadership positions in CMN
- CMN's processes and procedures governing the method through which program chair voting deliberations are followed
- CMN's processes and procedures for assessing a nominee's qualifications during a voting discussion
- CMN's future plans for filling the PRAD program chair position

I am seeking clarity for future reference in the event that I am nominated, qualified for, willing to, and am the only viable candidate in the selection pool for another leadership position in CMN. With the conflicting information that I am receiving about my qualifications (no concerns noted in the voting meeting vs. 80% vote opposed to election) and my exclusion from this potentially program changing discussion (reshaping the program chair position), I am feeling isolated, uninformed, and unclear about my standing through the lens of my peers in PRAD and within CMN or the direction of the program's future structure. I would like to also request that we meet sooner, rather than later, while the details of this unfortunate situation are still current.

I look forward to discussing CMNs commitment to diversity and inclusion in leadership through objective processes. I also hope to review the manner in which subjective criteria in this specific instance reveal an employment environment where race and gender discrimination flourishes through exclusion directed towards those within protected classes, such as myself, given that I am the only tenure-track/tenured African American woman within PRAD and the College of Communication. I can make myself available almost any day this week for a meeting with you, █████████████.

Sincerely,

Sydney Dillard

**CONFIDENTIAL**                                          **Dillard_DePaul3589**

--
Sydney Dillard, **Ph.D.**
Assistant Professor, Public Relations and Advertising
College of Communication, DePaul University
14 E. Jackson Blvd., Ste 1261, Chicago, IL 60604
office: 312.362.8840
**Faculty Profile** | **Follow on twitter @DrSydneyjd**

*Communications Coordinator*, DPUBLC
*Professional Freedom & Responsibilty Chair*, Advertising Division, AEJMC
*Grant Program Chair*, Minority and Communications Division, AEJMC

# EXHIBIT D

# DR. GHANEM DEPOSITION

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SYDNEY DILLARD,                    )
                                   )
                Plaintiff,   )
                                   )
     -vs-                          ) No. 1:20-cv-7760
                                   )
DEPAUL UNIVERSITY,                 )
                                   )
                Defendant.   )


        The discovery deposition of SALMA GHANEM, taken

pursuant to the provisions of the Code of Civil Procedure

and the Supreme Court Rules of the State of Illinois

pertaining to the taking of depositions for the purpose

of discovery, taken before DEANNA L. TUFANO, Certified

Shorthand Reporter of the State of Illinois, at 121 West

Wacker Drive, Suite 2300, on Tuesday, May 3, 2022 at

11:00 a.m.



Reported for:

MAGNA LEGAL SERVICES

(866) 624-6221

www.magnals.com, by:

Deanna L. Tufano, C.S.R.



Page 2

1  A P P E A R A N C E S :       VIA VIDEOCONFERENCE
2
   DISPARTI LAW GROUP, P.A.
3  MS. GIANNA R. SCATCHELL
   121 West Wacker Drive, Suite 2300
4  Chicago, IL  60601
   (312) 506-5511
5  gia@dispartilaw.com
6    on behalf of the Plaintiff;
7
   COZEN O'CONNOR
8  MS. ANNA WERMUTH
   MS. BRITTANY GREEN
9  123 North Wacker Drive, Suite 1800
   Chicago, IL  60606
10 (312) 474-7900
   awermuth@cozen.com
11
     on behalf of the Defendant;
12
13 Reported BY:  DEANNA L. TUFANO, CSR
            LICENSE NO. 084-003819
14
15 ALSO PRESENT:  Plaintiff, Sydney Dillard
              (via videoconference)
16
17
18
19
20
21
22
23
24

Page 3

1              I N D E X
2  WITNESS                        PAGE
3  SALMA GHANEM
4      Examination by Ms. Scatchell .............  4
5      Examination by Ms. Wermuth .................128
6      Further Examination by Ms. Scatchell .......131
7
8          E X H I B I T S
9  Exhibit No. 1 ........................ 15
   Exhibit No. 2 ........................ 18
   Exhibit No. 3 ........................ 22
10 Exhibit No. 5 ........................ 26
   Exhibit No. 18 ....................... 30
11 Exhibit No. 41 ....................... 32
   Exhibit No. 4 ........................ 50
12 Exhibit No. 6 ........................ 53
   Exhibit No. 11 ....................... 57
13 Exhibit No. 17 ....................... 59
   Exhibit No. 20 ....................... 61
14 Exhibit No. 27 ....................... 63
   Exhibit No. 52 ....................... 64
15 Exhibit No. 12 ....................... 69
   Exhibit No. 8 ........................ 78
16 Exhibit No. 9 ........................ 79
   Exhibit No. 10 ....................... 83
17 Exhibit No. 13 ....................... 84
   Exhibit No. 51 ....................... 85
18 Exhibit No. 22 ....................... 97
   Exhibit No. 14 .......................101
19 Exhibit No. 15 .......................111
   Exhibit No. 19 .......................111
20 Exhibit No. 25 .......................122
   Exhibit No. 53 .......................129
21
   Exhibits were marked in order they were tendered.
22
23
24

Page 4

1              (Witness sworn.)
2           SALMA GHANEM,
3  called as a witness herein on behalf of the Plaintiff
4  having been duly sworn, was examined and testified as
5  follows:
6            EXAMINATION
7  BY MS. SCATCHELL:
8      Q  Could you please state your name and spell it for
9  the record.
10     A  Sure.  Salma Ghanem, S-A-L-M-A, G-H-A-N-E-M.
11     Q  And what do you prefer I call you, Dr. Ghanem --
12     A  Dr. Ghanem is fine.
13     Q  Perfect.  Dr. Ghanem, great.
14        And have you ever been deposed before?
15     A  Yes, I have.
16     Q  Okay.  And do you remember what the nature of
17  that deposition was?
18     A  There were two cases.  I don't know what you mean
19  by the nature, so I apologize.
20     Q  Was it like a personal injury, an employment?
21     A  Employment.
22     Q  And during those depositions, they gave you some
23  ground rules and they let you know that you're under
24  oath, correct?

Page 5

1      A  Correct.
2      Q  And you have to testify truthfully and
3  accurately?
4      A  Yes.
5      Q  And that to make a clear record, answer just like
6  you've been answering, yes, no.  No shoulder shrugs or
7  uh-huhs or huh-uhs, stuff like that.
8         And we have Madam Court Reporter, Deanna
9  Tufano, and she will be taking down everything that we
10 say, and that's why it's very important for us to not
11 talk over each other.  And I understand that you're
12 represented by counsel, and she from time to time will
13 make objections.  Obviously, let her make the objection
14 and then unless she tells you not to answer, you're going
15 to answer whatever question it is.
16        And if you don't understand the question,
17 just let me know and I will rephrase it.  Otherwise, if
18 you answer, I'm going to assume that you understand that;
19 do you understand that?
20     A  Yes, I do.
21     Q  Perfect.  And I ask this of everybody, not just
22 you.  But you're not taking any medication that would
23 affect your ability to testify truthfully today?
24     A  No, I am not.



2  (Pages 2 to 5)

Page 6

1    Q   And there's nothing else that would inhibit you
2   from testifying truthfully and accurate today, correct?
3    A   Correct.
4    Q   Now that we have the ground rules out of the way,
5   let's start with your current job position.
6    A   I am the Provost at DePaul University.
7    Q   And what are your job duties as the provost?
8    A   The provost is the chief academic officer, so I
9   am an Executive of the University.  All of the colleges
10  report to me as well as enrollment management and student
11  affairs.
12   Q   Okay.  And that is just the undergraduate or for
13  any of the graduate programs?
14   A   All programs.
15   Q   Okay.  And then how many programs are there at
16  DePaul University?
17   A   Over 200 programs.  There are 10 colleges and
18  each college has multiple programs, graduate and
19  undergraduate.
20   Q   Okay.  And how long have you been the provost
21  for?
22   A   In my -- as permanent provost, I was appointed, I
23  think, May 2001.  Prior to that, I served as interim
24  provost.  Prior to that, I served as acting provost.

Page 7

1    Q   Okay.  So let's just start with the most current
2   -- actually, let me back up.
3         What is the acting provost position?
4    A   Okay.  So the difference between acting, interim,
5   and permanent, let me start that way.  Acting means you
6   are taking that role until the person who used to fulfill
7   that role is going to come back.  Interim means that you
8   are in that role until they decide who is going to be the
9   permanent.  And then permanent provost.
10   Q   Okay.  And then is it a term or is it just until
11  you decide to leave, how does that work?
12   A   The permanent provost position, which one of
13  them?
14   Q   Yes.  Well, the permanent provost position.
15   A   I have a contract.  It is for four years, but I
16  am an at-will employee, so my contract could be
17  terminated at any time.
18   Q   Okay.  And other than your attorneys, have you
19  spoken with anybody at DePaul about today's deposition?
20   A   I might have mentioned I have a deposition.  My
21  assistant knows it's on the calendar, but I have not
22  talked about any specifics about the deposition.
23   Q   Okay.  And you haven't talked to Lexa Murphy
24  about the deposition?

Page 8

1    A   No, I have not.
2    Q   Or the president of --
3    A   No.
4    Q   Okay.  And nobody's promised anything for your
5   testimony here today, correct?
6    A   Correct.
7    Q   Okay.  As the provost of DePaul, are you
8   considered an officer of DePaul?
9    A   I believe so, yes.
10   Q   Okay.  And you have the ability to sign contracts
11  and agreements?
12   A   Yes, I do.
13   Q   Okay.  And could you explain what your role is in
14  the tenure process when someone is quote, unquote, going
15  up for tenure?
16   A   In my role as provost or in my previous role?
17   Q   In your role as provost, and then we'll go to
18  your previous role.
19   A   Okay.  I sit in the deliberations of the
20  University Board of Promotion & Tenure.  I do not
21  participate, but I observe the deliberations that take
22  place there, and then I get a recommendation from the
23  University Board on Promotion & Tenure.  Plus I review
24  the entire file all the way from the department all the

Page 9

1   way to that point, and then I make a decision on tenure &
2   promotion.
3    Q   Okay.  And are you able to overturn a decision by
4   the Dean of Students?
5    MS. WERMUTH:  Objection.  Assumes facts not of
6   record.
7   BY MS. SCATCHELL:
8    Q   You can answer.
9    A   The dean of students does not participate in the
10  tenure & promotion at all.
11   Q   And then prior to various provost positions, what
12  was your role at DePaul, if any?
13   A   I was the Dean of the College of Communication.
14   Q   Okay.  And then do you know who your successor
15  was?
16   A   Alexandra Murphy.
17   Q   Okay.  When did Lexa Murphy assume that position,
18  was it when you were acting?
19   A   Yes.
20   Q   Okay.  And do you know if Ms. Murphy received any
21  formal training to become the successor dean?
22   A   Deans usually don't have any formal training, but
23  she did serve as an associate dean prior to when she
24  became acting dean.



Page 10

1    Q   Okay.
2    A   And also I believe she had also served as interim
3  dean for a short while, but that was before I had come to
4  DePaul.
5    Q   Okay.  And would you consider Ms. Murphy a
6  colleague or friend or both?
7    A   I would consider her both.
8    Q   Okay.  And prior to your position as dean, did
9  you serve any other positions at DePaul?
10   A   No.
11   Q   And where did you do your undergraduate?
12   A   At the University of Texas-Pan American.  It has
13  since been renamed, and now it's called University of
14  Texas-Rio Grande Valley.
15   Q   And what was your major?
16   A   Communication.
17   Q   And what did you do your doctorate in?
18   A   I got my doctorate UT Austin.
19   Q   And what was the nature of that?
20   A   It was a PhD in journalism.
21   Q   And then do you remember what year that was
22  approximately?
23   A   I completed my PhD in 1996, I believe.
24   Q   And going back to the acting, interim, and

Page 11

1  permanent provost positions, was there any difference in
2  what responsibilities you had or what authority you had?
3    A   No.
4    Q   Okay.  And then prior to becoming the Dean of the
5  College of Communications, what was your position prior
6  to that?
7    A   I was Dean of the College of Communication and
8  Fine Arts at Central Michigan University.
9    Q   And is that a research University, like more of a
10  research than teaching?
11   A   It's a regional University.  I think -- I don't
12  know it's classification, but it was not an R1
13  University.
14   Q   And then what does it mean to be a regional
15  University?
16   A   In the state systems, you will have the flagship
17  University like, you know, Michigan State or University
18  of Michigan, and then you will have Central Michigan,
19  Eastern Michigan, Western Michigan, and so on.  So that's
20  what is referred to as a region.
21   Q   And then how does Central University compare to
22  DePaul?
23   MS. WERMUTH:  Objection.  Vague.  Relevance.
24  BY THE WITNESS:

Page 12

1    A   Again, it depends what you're comparing with.
2  They were very similar in size.  There were a lot more
3  similarities between, I would say, Central Michigan and
4  DePaul than there were differences, limited number of PhD
5  programs.  The biggest difference was that Central
6  Michigan University is a public University.  DePaul
7  University is a private University and a Catholic
8  University.
9    Q   Okay.  And what are the Vincentian values that
10  DePaul subscribes to?
11   A   DePaul University is a Catholic Vincentian
12  Institution.  Vincentian is kind of a type of Catholicism
13  with the idea that it is based on St. Vincent DePaul.
14  St. Vincent DePaul was a saint who really focused on
15  working with the poor and helping the poor and helping
16  those who are disenfranchised in society.  So that's kind
17  of the ethos of DePaul.
18   MS. SCATCHELL:  Off the record for one second.
19         (Brief recess.)
20   MS. SCATCHELL:  Back on the record.
21  BY MS. SCATCHELL:
22   Q   Okay.  So you were previously telling me about
23  the Vincentian values and the ethos of DePaul.
24         Let's go to your current role, if any, in

Page 13

1  the College of Communications.  Do you do anything on a
2  day-to-day basis for the College of Communications or is
3  it more or less people report to you?
4    A   More or less people report to me.  Right now,
5  I've got 10 colleges report to me.
6    Q   Okay.  And then how does that reporting work, is
7  that like a meeting that you have with each individual
8  college head, or is it like a meeting with all 10
9  colleges and you?
10   A   Both.  We have regular meetings of academic
11  council which involves all 10 deans as well as the
12  associate provost and the vice-president.  And then we
13  have deans council, which is all 10 deans.  And then I
14  meet on a monthly basis with each of the deans.
15   Q   Okay.  Let me see how I'm going to ask this, how
16  does the tenure track work for tenure track professor?
17   MS. WERMUTH:  Objection.  Vague.
18   THE WITNESS:  Can you specify what you mean, my role
19  or the whole process?
20  BY MS. SCATCHELL:
21   Q   The whole process.
22   A   Well, it starts by hiring a tenure-track faculty
23  member.  They are given a probationary time period,
24  usually it's six years, unless there are reasons to



Page 14

1    extend it or an offer is made for somebody to come in
2    with a shorter probationary period. They go through
3    formal reviews, and until they're up for tenure, it is
4    reviewed by the personnel committee of the department.
5    Now, it varies from college to college because some
6    colleges have departments, some colleges don't. But more
7    or less, there's a personnel committee, there is a
8    department-wide. And then if there is a department
9    chair, the department chair weighs in, then the college
10   committee weighs in, then the deans weigh in, then UBPT
11   weighs in, and then it comes to me. So it's a year long
12   process --
13       Q   Okay. And --
14       A   -- when they go up for tenure.
15       Q   Okay. And then what you had previously mentioned
16   that some people or some tenure track professors may have
17   a shorter time period or shorter review period. What are
18   some factors that would go into a shorter review?
19       A   Usually it is if they have years at another
20   institution. Otherwise, it's six years.
21       Q   Okay. And then is it a review each year or every
22   other year?
23       A   That is specified in the faculty handbook. I
24   believe it is a formal review every other year and then

Page 15

1    the final review for tenure.
2        Q   Okay. And then what's the difference between a
3    formal review and an informal review?
4        A   A formal review is one where all of the personnel
5    committee -- I mean, it follows that process that I
6    described to you. The informal would be just a review, I
7    believe, just by the dean, and a decision can be made
8    then whether to reappoint or not.
9        Q   Okay. And would there be any time where a
10   tenure-track faculty member would have to undergo a
11   formal review every year?
12       A   Yes. The faculty handbook indicates that if
13   there are areas of concern that they can have another
14   formal -- they can have multiple formal reviews.
15       Q   Okay. And I am going to show you what has been
16   marked as Exhibit No. 1.
17                      (Exhibit No. 1 was marked
18                       for identification.)
19   BY MS. SCATCHELL:
20       Q   And can you review it and let me know when you've
21   finished. This is Bates stamp number Dillard_DePaul 3189
22   to 3194.
23       A   This looks like a draft of a formal review.
24       Q   Okay. Do you know who drafts this document or

Page 16

1    who drafted rather?
2        A   No, I do not.
3        Q   Okay. Is it fair to say that it was not you?
4        A   That is correct.
5        Q   Okay. And did you ever see this document before?
6        A   Not in this form, no.
7        Q   Okay. But you saw it in a different form?
8        A   I get the final review once they're done, but not
9    this.
10       Q   Okay. And when it says on Page 2, which is
11   Dillard_DePaul 3190, there's a comment bubble. Do you
12   see that?
13       A   I do.
14       Q   Okay. Do you know who the comment bubble would
15   be?
16       A   No, I do not.
17       Q   Okay. Do you know who would know?
18       A   No, I do not.
19       Q   Okay. And going back to the formal reviews, are
20   the formal reviews considered developmental?
21       A   Yes.
22       Q   And could you expand a little bit more on that?
23       A   A formal review is an opportunity for a
24   candidate's file to be reviewed by their peers and to

Page 17

1    indicate areas where they're doing well and areas that
2    might need further work to get them in preparation for
3    their tenure review.
4        Q   Okay. And how are areas of concern defined?
5        MS. WERMUTH: Objection. Vague. Go ahead.
6    BY THE WITNESS:
7        A   If there is lack of research productivity, if
8    there is no participation in service, if there are issues
9    that are brought up about teaching. So those are the
10   three areas, teaching, service, and research.
11   BY MS. SCATCHELL:
12       Q   Okay. And that seems like a good place to kind
13   of expand a little bit more on.
14           So could you give me a little bit more
15   context of what is considered service as part of the
16   tenure-track process?
17       A   Service is participation in program,
18   departmental, college, University level service, that's
19   the internal service. The external service could be
20   involvement with community as well as professional
21   organizations and so on.
22       Q   Okay. And then research?
23       A   It depends on the field, but usually it's
24   research and creative activities, so it could be articles



Page 18

1  that were published, books.  In theater, it might be
2  productions.  In music, it might be a performance, that
3  kind of stuff.
4      Q   Okay.  And then so there was service, research
5  and then teaching.  Could you expand a little bit more on
6  teaching as part of the tenure-track process?
7      A   Yeah.  Teaching, they review student evaluations.
8  There is also, before they go up for tenure, they have
9  students survey other students who've taken the class, so
10 not currently in the class for their input.  They look at
11 syllabi, but they have peer observations from colleagues.
12 They look at assignments, that type of stuff.
13     Q   Okay.  And then I'm going to show you what is
14 going to be marked as Dillard_DePaul 3210 to 3215?
15              (Exhibit No. 2 was marked
16               for identification.)
17     THE WITNESS:  And what was the question?
18 BY MS. SCATCHELL:
19     Q   Sure.  Do you recognize that document?
20     A   Well, it looks again like a draft of a formal
21 review.
22     Q   Okay.  And do you know who drafts this document?
23     A   No, I do not.
24     Q   And if you go to Page 2, which will be

Page 19

1  Dillard_DePaul 3211.  Do you see the handwriting?
2      A   I do.
3      Q   Okay.  Is that your handwriting?
4      A   No, it is not.
5      Q   Okay.  Do you recognize that handwriting?
6      A   No, I do not.
7      Q   Do you know anybody who would know whose
8  handwriting it is?
9      MS. WERMUTH:  Objection.  Vague.  Calls for
10 speculation.
11 BY THE WITNESS:
12     A   I do not know who would know.
13 BY MS. SCATCHELL:
14     Q   And you did not draft this document?
15     A   No, I did not.
16     Q   Okay.  When you were in your position as
17 associate dean, would you be in charge of drafting these
18 formal reviews?
19     A   I was never associate dean --
20     MS. WERMUTH:  Objection --
21 BY MS. SCATCHELL:
22     Q   Oh, as dean, sorry.
23     A   And the question again?
24     Q   As dean, did you ever draft the formal reviews

Page 20

1  prior to --
2      A   No, I did not.
3      Q   And do you know who Sydney Dillard is?
4      A   Yes.
5      Q   Who is she?
6      A   Sydney Dillard is a faculty member in the College
7  of Communication.
8      Q   Okay.  And do you happen to know what her
9  ethnicity is?
10     A   I believe she's Black.
11     Q   Okay.  And how many tenured faculty members are
12 in the College of Communication?
13     A   I don't recall offhand, maybe 30-some.  I don't
14 have an exact number.
15     Q   So more than 20, less than 50?
16     A   Yes.
17     Q   And out of all of the tenure professors, how many
18 of them are African-American, if you know?
19     A   Right now?
20     Q   Yes.
21     A   I believe there are two.
22     Q   Okay.  And are they domestic born
23 African-Americans or were they born --
24     A   There was hiring that was done after I left, but

Page 21

1  I believe Sydney might be the only born African-American
2  on the tenure track.  There has been a hire of a
3  term-faculty member who's African-American.
4      Q   Okay.  And what's the difference between
5  term-faculty member and tenure-track faculty member?
6      A   A term-faculty member is not on the tenure track.
7  They do not go through the tenure review, so they usually
8  have an appointment of one, possibly, two years.  Some of
9  them have longer term appointments.
10     Q   Okay.  And then after that appointment, could
11 they have that appointment renewed or do they have to
12 leave the University?  How does that work?
13     A   No.  It can be renewed, but there is no guarantee
14 for renewal.
15     Q   Okay.  And do you know who ████████ is?
16     A   Yes, I do.
17     Q   And who is she?
18     A   She used to be a faculty member in the College of
19 Communication.
20     Q   And used to, she's no longer there?
21     A   That is correct.
22     Q   Okay.  And approximately when did she separate?
23     A   I'm not sure, but I think either the last
24 academic year was her final year or it was the year



Page 22

1  before that.
2    Q  So 2019 or 2018, give or take?
3    A  I think, and I am not 100 percent sure.  I think
4  '19, '20 might have been her last year.
5    Q  So 2019 into 2020?
6    A  Yes.
7    Q  And what was the reason why she left the
8  University?
9    A  She was denied tenure.
10   Q  And what was her ethnicity, if you know?
11   A  Hispanic, or at least she classifies as Hispanic.
12   Q  Let me show you what I'm going to mark as Exhibit
13  No. 3.  And that is Dillard_DePaul 3355.
14                    (Exhibit No. 3 was marked
15                     for identification.)
16  BY MS. SCATCHELL:
17   Q  Do you recognize this document?
18   A  I do.
19   Q  And what is this document?
20   A  This was an email that I sent to Barbara ████
21  regarding a meeting I had had with both Dr. Sydney
22  Dillard and Dr. ████████ where they had indicated as
23  the email states that they believe there's a pattern of
24  harassment, bullying and marginalization of faculty of

Page 23

1  color in the college.  So I talked to Barbara ████.
2    Q  And who is Barbara ████?
3    A  She was -- I believe at that point, there was
4  some shifting in the University of duties, but I believe
5  she was in HR at the time and she handled -- we referred
6  to her complaints about discrimination.
7    Q  Okay.  And in the signature line or your
8  signature line at the bottom quadrant of the page, it
9  says, Professor and Dean of College of Communication?
10   A  Correct.
11   Q  That was your position at that time?
12   A  Correct.
13   Q  And do you know what happened next after you sent
14  this email?
15   A  Not really because after I sent this email about
16  a week later, I was appointed acting provost.
17   Q  Okay.  So then that would have been the
18  responsibility of the dean to follow-up with?
19   A  No.  It would have been the responsibility of
20  Barbara ████ to follow-up.
21   Q  Okay.  And then would Barbara ████ follow-up
22  with you as the acting provost or whoever the dean was?
23   A  I don't know exactly what the process is.  I
24  believe, but I'm not sure, that the first thing would be

Page 24

1  for her to get in touch with Dr. Dillard and Dr.
2  ████████ but I'm not sure exactly what the process is.
3    Q  Okay.  So when you said they believe there is a
4  pattern of harassment, bullying and marginalization of
5  faculty of color in the college, and we had a talk for
6  over two hours.  I'm just going to take each one one at
7  at the time.  What is defined as a faculty of color, or
8  what are you referring to?
9    A  A faculty of color is usually a non-white faculty
10  member.
11   Q  Okay.  And then pattern of harassment, what did
12  you mean by that?
13   A  I was basing it on what they had told that they
14  were feeling.
15   Q  Okay.  And what was that -- what did they tell
16  you that they were feeling?
17   A  It was a two-hour meeting and they expressed
18  multiple concerns about the College of Communication and
19  how they felt.  This was following a college meeting that
20  had taken place.
21   Q  A college meeting amongst?
22   A  All.
23   Q  Okay.  And do you remember when approximately
24  that meeting was?

Page 25

1    A  Within a few days of when I met with them, but I
2  don't recall exactly when it was.
3    Q  And then when it says right here, we are planning
4  to schedule another time to talk some more.  Do you know
5  or do you remember if you did have a second meeting about
6  this?
7    A  No, I don't believe I did because I shifted
8  roles.
9    Q  And then the last line says, please let me know
10  if you are the appropriate person to look into this issue
11  if there is somebody else I need to contact.  Do you
12  recall if there was a secondary message or a reply
13  message from Barbara saying I am or I am not the correct
14  person?
15   A  I believe I am -- I can't remember exactly, but I
16  believe she responded and that was the right person to be
17  in touch with, but I can't recall exactly.
18   Q  Okay.  And then as the dean, what is your
19  responsibility for forwarding complaints such as the one
20  that Ms. Dillard and Ms. ████████ came to you with?
21   A  I have the responsibility to do so whenever a
22  complaint is brought to me that's discriminatory in
23  nature.  I have to report it.
24   Q  Okay.  And then is there like a complaint process



Page 26

1 like where you like say a case number opened up or how
2 does that process work?
3     MS. WERMUTH: Objection. Foundation. Go ahead.
4 BY THE WITNESS:
5     A I don't know how that office does their cases. I
6 know that my obligation is to let them know.
7     Q Okay. And do you know who would know what that
8 process or protocol looked like?
9     A Probably somebody in HR.
10     Q And do you recall having any conversations with
11 Lexa Murphy regarding this pending complaint?
12     A Not that I recall.
13     Q Okay. Here. This is Exhibit No. 5.
14             (Exhibit No. 5 was marked
15                 for identification.)
16 BY MS. SCATCHELL:
17     Q Okay. Can you just review that when you have a
18 moment. And that is Dillard_DePaul 3365 and
19 Dillard_DePaul 3366.
20         Okay. When did you transition into the
21 role of acting provost?
22     A I believe it was October 18th.
23     Q And do you recognize this document?
24     A Yes, I do.

Page 27

1     Q And what is this document?
2     A That is a response from Barbara ███ to the
3 email that you had showed me, and I believe it was
4 Exhibit No. 3 indicating that she is the person.
5     Q Okay. And then do you see -- so it seems that
6 there's two emails?
7     A Correct.
8     Q And then at the top of it, it says from you to
9 yourself?
10     A To myself.
11     Q Yes, that's what it looks like, and it's like a
12 forward. Do you see that?
13     A Yes.
14     Q Do you know why you forwarded that?
15     A Yes. I usually -- whenever I send an email, I
16 copy myself. This way I save my emails and I can have a
17 trail of that, and I believe I forgot to copy myself, so
18 I went to my send folder and forwarded it to myself so I
19 can have the full conversation.
20     Q And then when it says please call my cell, I'm
21 working from home and am available all day. Did Ms.
22 ███ call your cell phone that day, if you remember?
23     A I do not recall.
24     Q Okay. Would anything refresh your recollection?

Page 28

1     A You know, if you have something that reminds me
2 of a possible call, maybe, but I do not remember.
3     Q And then do you see below that where the email's
4 from Barbara ███ to you and it says, yes, HR is now
5 handling discrimination and harassment cases?
6     A Yes.
7     Q Do you know what she was referring to by saying
8 HR is now?
9     A Yes. It used to be through the -- Barbara
10 ███ was with the Office of Institutional Diversity
11 and Equity. And then that duty of investigation moved
12 from the Office of Institutional Diversity and Equity,
13 known as OIDE to HR. And as a result of that move,
14 that's why in my email I had asked if she was still the
15 same person.
16     Q And did you have anything to do with the
17 transition from OIDE to HR?
18     A No, I do not.
19     Q Do you know who did?
20     A No, I do not.
21     Q And do you recall if you had an interview with
22 Ms. ███ regarding this complaint?
23     A I do not recall.
24     Q Okay. And do you remember when the complaint

Page 29

1 protocol changed from OIDE to HR?
2     MS. WERMUTH: Objection to the form insofar as you
3 have misstated the record. Go ahead.
4 BY THE WITNESS:
5     A I do not.
6 BY MS. SCATCHELL:
7     Q Do you know who would know?
8     A HR or OIDE.
9     Q Or Ms. ███?
10     A Yeah.
11     Q Okay. And is your understanding of what OIDE,
12 what their role was to investigate complaints of
13 discrimination and harassment at DePaul?
14     THE WITNESS: Could you repeat the question?
15     MS. SCATCHELL: Could you read that back?
16             (Question read.)
17 BY THE WITNESS:
18     A I am not sure I understand the question.
19 BY MS. SCATCHELL:
20     Q Sure. It was a bad question so strike that.
21         So is it your understanding that OIDE was
22 in charge of investigating complaints that a faculty
23 member would bring to them about discrimination or
24 harassment?



Page 30

1    A   As I mentioned, yes, it was part of their
2  responsibility, but that responsibility moved from OIDE
3  at some point to the Human Resource Department.
4    MS. WERMUTH:  Can we take a quick break?
5    MS. SCATCHELL:  Yeah.
6    MS. WERMUTH:  Because I need to use the washroom.
7            (Short recess.)
8    MS. SCATCHELL:  Back on the record.
9  BY MS. SCATCHELL:
10    Q   So prior to the break, we were speaking about the
11  email chain with Barbara ▇▇▇▇.  Do you recall that,
12  correct?
13    A   Correct.
14    Q   And then I'm going to show you what I'm going to
15  mark as Exhibit No. 18.
16            (Exhibit No. 18 was marked
17              for identification.)
18  BY MS. SCATCHELL:
19    Q   And this is Dillard_DePaul 3483 and
20  Dillard_DePaul 3484.  Could you review this document and
21  let me know when you're finished.  Ready?
22    A   Ready.
23    Q   Okay.  Who is Isabel Diaz?
24    A   Isabel Diaz works in HR, and according to the

Page 31

1  email, she oversees the issues of discrimination and
2  harassment.  She is the director of employee relations.
3    Q   Okay.  So then would Isabel report to Barbara
4  ▇▇▇▇, or would Barbara ▇▇▇▇ report to Isabel?
5    MS. WERMUTH:  Objection.  Foundation.  Assumes facts
6  not of record.
7  BY MS. SCATCHELL:
8    Q   If you know?
9    A   I'm not sure, but I would believe that Barbara --
10  the way it's written, Barbara ▇▇▇▇ reports to Isabel
11  Diaz.
12    Q   And do you know why you were still included on
13  this email chain?
14    MS. WERMUTH:  Objection.  Foundation.
15  BY THE WITNESS:
16    A   I'd be speculating, but my guess is that Barbara
17  was showing me that she was following up.
18  BY MS. SCATCHELL:
19    Q   And this email chain was sent on or about October
20  11, 2018, you see that, correct?
21    A   Correct.
22    Q   And that was when you were still in your role as
23  the dean, correct?
24    A   Correct.

Page 32

1    Q   And what does CMN stand for?
2    A   That is the abbreviation for the College of
3  Communication.
4    Q   And then I'm going to show you what is going to
5  be marked as Exhibit No. 41, and that is Bates stamped
6  Dillard_DePaul 9077 to Dillard_DePaul 9082?
7    A   Okay.
8    Q   So it seems that the thread is reverse, so we'll
9  start with Dillard_DePaul 9080.  And then if you can look
10  at the -- at the bottom of it says on February 18,
11  2019, Dillard, Sydney wrote, and then it goes the email
12  the bulk of it goes to Dillard_DePaul 9081 and 9082.
13    A   Correct.
14    Q   So we'll start there.  What is the PRAD that's
15  referenced in that email if you know?
16    A   It's a program within the College of
17  communication, and it is the public relations and
18  advertising program.
19    Q   And do you know what Ms. Dillard's email to Lexa
20  is referencing with the PRAD program?
21    MS. WERMUTH:  Objection.  Foundation.  Go ahead.
22  BY THE WITNESS:
23    A   I believe it had something to do with the
24  selection of the PRAD program chair.

Page 33

1  BY MS. SCATCHELL:
2    Q   And do you know what the PRAD program chair
3  position entails?  What is it?
4    A   The person in that position would be involved in
5  scheduling of classes, being part of the dean's
6  leadership team and kind of manages the program.
7    Q   Okay.  And by program you mean?
8    A   The PRAD.
9    Q   Okay.  And are you aware of whether Sydney ever
10  applied for that position?
11    A   I had heard that she had applied for that
12  position following these emails and so on.
13    Q   Okay.  And what did you hear about her applying
14  for this position?
15    A   Can't recall exactly, but I think it starts with
16  the email that Sydney sends that she applied for the
17  position and did not get it.
18    Q   Okay.  And what would in your opinion the PRAD
19  position, serving as the PRAD coordinator, what would
20  that do for somebody that was going up on tenure, would
21  it be helpful -- actually, strike that.
22        The PRAD program chair position would
23  count towards a tenure-track faculty members service
24  component, right?



Page 34

1    A  Possibly, yes.  When you go up for tenure, they
2  look at the portfolio overall.
3    Q  Okay.  And do you know who created the program
4  chair selection process?
5    MS. WERMUTH:  Objection.  Vague.
6  BY THE WITNESS:
7    A  I don't recall.  I think it was under -- when I
8  was Dean of the College of Communication, we tried to
9  develop better policies and processes, so it might have
10  been under my watch.
11  BY MS. SCATCHELL:
12    Q  Okay.  And would there be anything that would
13  refresh your recollection?
14    A  Not particularly.
15    Q  Okay.  Let's go to the next email where on page
16  9080 where it says, Good Afternoon, Sydney at the top of
17  the page.  Barbara and I have reviewed the emails below
18  and both agree that at this point what you believe is an
19  academic issue and should be discussed with your dean.
20  If you believe you have been discriminated or harassed
21  and wish to move forward with a complaint please schedule
22  a time to meet with us.  Do you see that?
23    A  Yes, I do.
24    Q  And do you have any knowledge of why that would

Page 35

1  be considered an academic issue versus a complaint of
2  harassment?
3    MS. WERMUTH:  Okay.  I'm going to object to this
4  question.  I think you've misstated the document and it
5  also calls for speculation.  And there's no foundation
6  laid.  Go ahead, Salma.
7  BY THE WITNESS:
8    A  Again, I cannot tell how Isabel makes that
9  determination, but the best I can tell that there's
10  nothing in the email that Sydney said that indicates an
11  issue of discrimination.  So it becomes an issue that is
12  dealt with within the college.
13    Q  Okay.  What would indicate that there would be an
14  issue of discrimination?
15    MS. WERMUTH:  Objection.  Calls for speculation.
16  Lacks foundation.
17  BY MS. SCATCHELL:
18    Q  In your opinion, as the Dean of College of
19  Communication?
20    A  That really would be up to that office within HR,
21  that's why we have that office.
22    Q  Okay.
23    A  If there is something that would indicate, if the
24  faculty member said I believe I've been discriminated

Page 36

1  against or something of the sort.
2    Q  Okay.  I am going to direct your attention to
3  page 9081, Section 6 or Paragraph 6?
4    A  Okay.
5    Q  And the bullet point -- so there's three
6  subsections in Paragraph 6, and it's the bullet point,
7  which would be 1, 2, 3 paragraphs down beginning with the
8  minutes of 2/15/19 PRAD faculty.  Do you see that?
9    A  I do.
10    Q  Okay.  And do you see where Sydney says, as you
11  noted, there were no concerns specifically surrounding my
12  qualifications for the position and the voting discussion
13  focused only on restructuring the program chair position.
14  If this was the context of the meeting as an active
15  tenure-track faculty member of PRAD, I was excluded from
16  the conversation when you facilitated the voting
17  procedures and requested that I leave the meeting.  The
18  discussion of restructuring the program chair position
19  was initiated during a time in which deliberations of my
20  qualifications were supposed to be the only topic under
21  discussion.  Would that be something that you would
22  consider to be discrimination in your opinion?
23    MS. WERMUTH:  Hang on, let me object.  I am going to
24  object on a couple of grounds.  First of all, you're

Page 37

1  asking her about email communications that she didn't
2  send.  There's not a single email sent by Dr. Ghanem in
3  this train.  You haven't established that she was at the
4  PRAD chair meeting where these issues were discussed or
5  how it is that or why it is Dr. Dillard decided to
6  include Dr. Ghanem in these email trails.  You haven't
7  established any foundation for any of the communications
8  in this email trail because none of them were sent by Dr.
9  Ghanem.
10    MS. SCATCHELL:  She said she was aware of the PRAD
11  faculty vote, and that's why I was asking her --
12    MS. WERMUTH:  She said she was aware because she got
13  this email.
14    MS. SCATCHELL:  Right.
15  BY MS. SCATCHELL:
16    Q  And did you do any independent investigating to
17  find out more information about the nature of why you
18  received this email?
19    A  No, I did not.
20    Q  And did anybody approach you regarding this issue
21  that needs Sydney raised --
22    MS. WERMUTH:  Objection.  Vague --
23  BY THE WITNESS:
24    A  Not that I recall.



Page 38

1  BY MS. SCATCHELL:
2      Q  And do you know why you were included on the
3  email thread?
4      A  No, I do not know the reason why I was included.
5      Q  And you see that the date of this email thread is
6  in February of 2019, correct?
7      A  That is correct.
8      Q  Okay.  And that was after the meeting that ████
9  ████████ and Ms. Dillard had approached you with
10  regarding ongoing marginalization, harassment, and
11  discrimination, correct?
12     A  That is correct.
13     Q  And do you recall ever sending Ms. any Dillard
14  sort of email or sort of communications saying that I'm
15  now leaving the position of dean and going to be the
16  acting provost, and I am no longer going to be following
17  up with your complaint of discrimination and harassment?
18     A  Following the meeting that --
19     Q  Yes.
20     A  I can't recall exactly, but I do believe that I
21  might have said she needs to start following up with
22  Lexa, but I'm not sure.
23     Q  Okay.  And do you recall if you made Lexa aware
24  that Sydney may be following up with her regarding this

Page 39

1  issue of discrimination and harassment?
2      A  I believe, I did.
3      Q  Do you know if it was an email or a telephone
4  conversation?
5      A  I really don't remember.
6      Q  And would anything refresh your recollection?
7      A  Only if you showed me something that might.
8      Q  Okay.  And then going back to this email thread
9  on Page 9077 who is ████████
10     A  ████ vice-president of the Office of
11  Institutional Diversity and Equity.
12     Q  And who is Craig Mousin?
13     A  He is the University ombuds person.
14     Q  And Mousin is M-O-U-S-I-N.
15         And where it says VP of OIDE, I thought
16  that you had previously testified that the position had
17  shifted from OIDE to Human Resources?
18     A  The investigation --
19     MS. WERMUTH:  Hang on.  Let me just object.  You've
20  completely misstated her testimony.  The question again
21  lacks foundation.  Go ahead.
22  BY THE WITNESS:
23     A  I had said that the investigation of
24  discrimination moved from the Office of Institutional

Page 40

1  Diversity and Equity to HR.
2  BY MS. SCATCHELL:
3      Q  But then the OIDE remains in place or remained in
4  place?
5      A  Correct.
6      Q  Okay.  And do you know what their new -- Strike
7  that.
8         Do you know what their new, I guess, role
9  was if the investigation shifted over to HR, what was
10  their responsibilities?
11     MS. WERMUTH:  Hang on.  Objection.  Vague.  Calls for
12  speculation.  Lacks foundation.  Go ahead.
13  BY THE WITNESS:
14     A  The Office of Institutional Diversity and Equity
15  oversees a lot of diversity issues through the University
16  in general.  That person does not report to me.
17  BY MS. SCATCHELL:
18     Q  Okay.  Who does that person report to?
19     A  I believe that person reports to the president.
20     Q  Okay.  And the president, how do you spell his
21  name?
22     A  The President of DePaul University?
23     Q  Yes.
24     A  Is Gabriel Esteban.

Page 41

1      Q  And in the email thread that we were just looking
2  at, who is Lea that is referenced in the email thread?
3      A  Can you tell me where, which page, I'm sorry?
4      Q  I believe it was 9080.  It would be the middle
5  email.
6      A  Oh, I believe she is referring to Lea Palomino
7  (phonetic), the assistant to the Dean.
8      Q  Okay.  And could you spell her last name for the
9  record.
10     A  I'm not sure exactly if I've got the spelling
11  right, but I think it's P-A-L-M-E-N-O.
12     Q  Okay.  Thank you.  And do you know are you aware
13  of an organization called DPUBLIC --
14     MS. WERMUTH:  Objection to the form.  Go ahead.
15  BY THE WITNESS:
16     A  Yes.
17  BY MS. SCATCHELL:
18     Q  Okay.  What is it?
19     A  It is an organization on campus.
20     Q  And what is, if you know, what is their primary
21  purpose?
22     A  We have different organizations on campus
23  representing different affinity groups and DPUBLIC
24  represents Black faculty, staff, and students.

MAGNA ►
LEGAL SERVICES

Page 42

1    Q   Okay.  And is it independent of DePaul or is it
2    funded by DePaul, or how does that work?
3        MS. WERMUTH:  Objection to form.  Assumes facts not
4    of record.  Go ahead.
5        BY THE WITNESS:
6        A   I don't know exactly how the funding is of these
7    different affinity groups.
8        BY MS. SCATCHELL:
9        Q   Do you know who would know?
10       A   I believe it would be ▮▮▮ in the Office of
11   Institutional Diversity and Equity.
12       Q   And are you familiar with the term diversity,
13   equity, and inclusion or DEI?
14       A   Yes.
15       Q   And what is it?
16       MS. WERMUTH:  Objection.  Vague.
17       BY THE WITNESS:
18       A   I really don't understand the question.
19       BY MS. SCATCHELL:
20       Q   So you're aware of diversity, equity, and
21   inclusion as a philosophy, correct?
22       MS. WERMUTH:  Objection.  Vague.
23       BY THE WITNESS:
24       A   Yeah.  I know what DEI stands for.

Page 43

1    BY MS. SCATCHELL:
2        Q   Okay.  What does it stand for?
3        A   Diversity, equity, and inclusion.
4        Q   Is there any sort of training at DePaul for the
5    faculty members in DEI?
6        A   It depends in what area.  So for example in
7    faculty searches, there is training to make sure that
8    members of search committees are aware of implicit bias.
9    There is a lot of training that happens on campus to
10   explain to faculty how to address issues of DEI in their
11   classroom and in the University community.
12       Q   And do you know if such trainings are mandatory
13   or discretionary?
14       A   For the search committee, they're mandatory.
15       Q   Okay.  And then for the faculty?
16       A   For the faculty, there is a compliance training,
17   and if a person is classified, I think I believe as a
18   manager, then they have to complete the compliance
19   training and there's a module that deals with diversity,
20   equity, and inclusion.
21       Q   And who would be considered a manager?
22       MS. WERMUTH:  Objection.  Foundation.  Calls for
23   speculation.  Go ahead.
24       BY THE WITNESS:

Page 44

1    A   I believe anyone who has managerial duties or
2    manages a budget.  Again, that classification is done by
3    HR.  I don't know exactly how they classified it.  A dean
4    would be a manager, a provost would be a manager, but I
5    don't know how far it filters down.
6    BY MS. SCATCHELL:
7        Q   And what is implicit bias you previously
8    testified about?
9        A   My understanding of implicit bias is that
10   sometimes in our structures and the way we approach
11   things that there could be areas that would favor one
12   group or one person over the other, and it is to help
13   people understand where these biases can happen and take
14   place and to be aware of them.
15       Q   Okay.  And do you know who handles the training
16   or the modules, is it somebody from DePaul, is it
17   somebody from outside of DePaul?
18       A   The training for the search committee or the
19   modules?
20       Q   Both.  So we'll start with the search committee.
21       A   The search committee, I believe, it used to be
22   ▮▮▮ in the Office of Institutional Diversity and
23   Equity.  And then when we hired an associate provost for
24   the diversity, equity, and inclusion, she's also involved

Page 45

1    in the implicit bias training.  I do not know how they
2    divide the work between them, how many each one does and
3    so on.
4        Q   And then who handles the training for the module?
5        A   That is a computerized module that was part of
6    our compliance office and maybe HR.
7        Q   Okay.  And by computerized module?
8        A   It's a --
9        Q   Like a quiz or something?
10       A   They show you case studies, they show you certain
11   scenarios and then you answer questions, and so on.
12       Q   And do you know if DePaul keeps records of who
13   has taken these modules?
14       A   I believe they do.
15       Q   Okay.  And do you know who has access to those
16   records?
17       MS. WERMUTH:  Objection.  Assumes facts not of
18   record.  Also calls for speculation.  Lacks foundation.
19       BY THE WITNESS:
20       A   I would check with -- there's a compliance
21   office.  I would check with them, HR.
22       BY MS. SCATCHELL:
23       Q   Okay.  And you had previously testified about an
24   associate provost of DEI, who is that?



Page 46

1    A  Dr. Cynthia Pickett.
2    Q  And do you know who made the decision to hire
3  her?
4    A  Yes.  I did.
5    Q  Okay.  And do you know what year that was
6  approximately?
7    A  Okay.  When I first moved into the provost
8  office, we had one associate provost who was in charge of
9  research and diversity, equity, and inclusion, and I
10  split that position into two, and I had an associate
11  provost for research and an associate provost for DEI.  I
12  hired an interim associate provost for DEI while we
13  conducted a search.  So I'm trying to -- I think Dr.
14  Pickett might be in her third year with us now, or it
15  might be her second year.  I can't remember the timeline
16  exactly.
17    Q  Okay.  And was Ms. Pickett also the interim
18  associate dean for DEI?
19    MS. WERMUTH:  Objection to form.  Misstated the
20  testimony.  Go ahead.
21  BY THE WITNESS:
22    A  No, she was not.
23  BY MS. SCATCHELL:
24    Q  Do you know who that was?

Page 47

1    A  It was Dr. Ruben Parra.
2    Q  Para?
3    A  I think it's P-A-R-R-A.
4    Q  Okay.
5    A  And he did that for a year while we did a search,
6  and Dr. Cynthia Pickett was an external hire.
7    Q  So Dr. Ruben Parra was an internal hire?
8    A  Was appointed as interim associate provost for a
9  year.
10    Q  Okay.  And what was his position before he was
11  interim provost?
12    A  He was a faculty member in the chemistry
13  department.
14    Q  And do you know why he was selected?
15    A  I had a call for nominations for the interim and
16  had a couple of applications reviewed, interviewed them,
17  and made the decision.
18    Q  And you had previously testified that you split
19  the provost position that was research, diversity,
20  equity, and inclusion into provost of research and
21  provost DEI, correct?
22    A  Associate provost of research and associate
23  provost of DEI.
24    Q  And what made you split those two positions?

Page 48

1    A  I felt that both topics were extremely important
2  to the University, and that it would require somebody
3  dedicated to each one of them.
4    Q  Okay.  And was anybody else involved in that
5  position to split the two decisions?
6    A  I might have mentioned it to the president, but
7  it was my decision to split it.
8    Q  And you had previously testified that you felt it
9  was extremely important to the University that there was
10  a dedicated person for each of the two -- Strike that.
11        You previously testified that it was very
12  important to the University, correct?
13    A  Yes.
14    Q  And what was the nature of how you made that
15  determination?
16    MS. WERMUTH:  Objection.  Vague.  Go ahead.
17  BY THE WITNESS:
18    A  Well, the portfolio was too large to be able to
19  both focus on both areas, and they were two very
20  important areas for the University, and I believe that we
21  should have a dedicated associate provost to each of
22  those areas.
23    Q  And do you remember anyone or any organization
24  had made a request to have a dedicated DEI associate

Page 49

1  provost?
2    A  I believe there has been calls at the University
3  to have a dedicated person for that.
4    Q  And then do you remember who would have made
5  those calls or what organizations had made those calls?
6    A  Not specifically, no, I don't.
7    Q  Okay.  Do you recall Ms. Dillard having any
8  medical conditions?
9    A  Yes, I do.
10    Q  And what do you know about her medical
11  conditions?
12    A  If I recall, she had experienced seizures.
13    Q  Okay.  And do you remember if she went on any
14  sort of short-term disability in connection with her
15  seizures?
16    A  I know that there was some accommodations that
17  needed to be made, but I don't know if she actually took
18  a disability leave or not, I do not remember.
19    Q  Okay.  What do you remember about what
20  accommodations were made?
21    A  Accommodations in terms of needing assistance so
22  from research assistant or a teaching assistant, classes,
23  and so on.
24    MS. SCATCHELL:  I apologize, could you read back her





**Page 50**

1 answer.
2            (Answer read.)
3   MS. SCATCHELL: Okay. Thank you.
4 BY MS. SCATCHELL:
5   Q And is there a certain department that deals with
6 disability or accommodation requests?
7   A Yes.
8   Q Okay. And who was that?
9   A That would be through the HR Department.
10   Q And would that be Barbara ███████, or would that
11 be somebody else through the HR Department?
12   A No. I believe it would be somebody else.
13   Q All right. I'm going to show you what has been
14 previously marked as Exhibit No. 4. It will be
15 Dillard_DePaul 3356 to Dillard_DePaul 3364.
16         (Exhibit No. 4 was marked
17         for identification.)
18 BY MS. SCATCHELL:
19   Q Okay. Who is Gianna Bellavia-█████
20   A I believe she works for the HR Department, and
21 according to her signature, she's an employee relations
22 and engagement specialist.
23   Q Okay. And you see on Page 3362 into 3363 in the
24 email that is from Gianna Bellavia to what appears to be

**Page 51**

1 you on 3362 and 3363.
2   A Yes.
3   Q And your email address is sghanem@depaul.edu?
4   A Correct.
5   Q And do you recall the nature of this
6 communication thread with Ms. Bellavia?
7   A Yes.
8   Q What was it?
9   A It was to address the needed accommodations for
10 Sydney Dillard.
11   Q And do you know why Ms. Bellavia sent the
12 accommodation request update to you?
13   A Because I was the Dean at the time.
14   Q And do you know what course Ms. Dillard was
15 teaching that she needed the accommodation for?
16   MS. WERMUTH: Let me just object. Facts not of
17 record.
18 BY THE WITNESS:
19   A I don't remember the specific course, but in the
20 email it mentions PRAD 375 teaching in the fall, and then
21 it mentions PRAD 575 in the winter, but that's all. I do
22 not recall except what I'm seeing in the email.
23 BY MS. SCATCHELL:
24   Q Okay. And do you recall if there were teaching

**Page 52**

1 assistants that were made available to Ms. Dillard?
2   A I believe so, but I don't recall specifics.
3   Q In the thread for Exhibit No. 4, Ms. Murphy is on
4 some of the email threads; you see that, correct?
5   A Yes.
6   Q Do you know why she's on the email threads?
7   A I can't tell when it started, but it's because I
8 was leaving from the VMI, and I was telling Gianna that I
9 was going to be out of the office and if there's anything
10 she needed to be in touch with Dr. Lexa Murphy who was
11 the associate dean at the time.
12   Q And what does VMI stand for?
13   A Vincentian Mission Institute.
14   Q Okay. And what is that?
15   A The Vincentian Mission Institute is a program
16 that exists at DePaul where we took -- I believe it was
17 two years of studying Catholic higher education and our
18 Vincentian Mission. And then this is a trip that we go
19 to France where St. Vincent DePaul is from, and we go and
20 we visit different areas that St. Vincent DePaul has been
21 involved in, where he was raised, the University he went
22 to, hospitals he was involved with, and so on. So it's a
23 group of people from DePaul who go.
24   Q And how long is the program?

**Page 53**

1   A The Vincentian Mission Institute itself, as I
2 mentioned, is a two-year program of study, but the trip
3 is about -- for this one is about two weeks.
4   Q And I'm going to show you what I'm going to mark
5 as Exhibit No. 6, and it's Dillard_DePaul 3370 and 3371.
6         (Exhibit No. 6 was marked
7         for identification.)
8 BY THE WITNESS:
9   A Okay.
10 BY MS. SCATCHELL:
11   Q Do you recognize this document?
12   A Vaguely.
13   Q Okay. And what do you vaguely recognize about
14 this document?
15   A That this was an email from Bola Lamina to me
16 indicating that she received an email from Sydney and
17 informing me of how she responded to her.
18   Q Okay. And who is Bola, B-O-L-A, Lamina,
19 L-A-M-I-N-A?
20   A She is also in the HR Department and she's a
21 benefit specialist.
22   Q And do you know what the STD stands for in THE
23 subject line?
24   A I believe it stands for short-term disability.



Page 54

1    Q  And the claim number, is that assigned by DePaul
2  or a third-party administrator?
3    A  I do not know.
4    Q  Okay.  And who is ███ that's referenced in
5  this email?
6    A  ███ is a faculty member in the College of
7  Communication, and I believe she was the program chair in
8  public relations and advertising at the time.
9    Q  Okay.  And the way that this email is written, is
10  it your understanding where in Paragraph 2 it says
11  Sydney, and then underneath that, it is a block quote.
12  Do you see that?
13    A  I do see that.
14    Q  Okay.  Is it your understanding that that
15  references something that Sydney said?
16    A  From what I can gather, that is the email that
17  Sydney had sent to Bola.
18    Q  Okay.  And then where it says my response, and
19  then followed by a block quote, is it your understanding
20  that it was referencing what Ms. Lamina had said in
21  response to Sydney's email?
22    A  That's how I would read it, yes.
23    Q  Okay.  And then where Sydney states, I just ended
24  a phone call with Salma about my request for a letter of

Page 55

1  support from her and ███ (both my supervisors in
2  the College of Communication) and she said you informed
3  her that it is not university's policy to have such
4  letters added to STD appeals.  Do you recall having a
5  conversation with Ms. Dillard?
6    A  Vaguely.
7    Q  Okay.  What did you remember from that
8  conversation?
9    A  To the best of my ability, it was a follow-up.
10  She had made a request for a letter of support, and I had
11  checked with HR and was told that it wasn't University
12  policy, and I let Dr. Dillard know that.  And this might
13  have been a follow-up phone call about that.
14    Q  Okay.  And do you know what Ms. Dillard is
15  referencing for a letter of support?
16    A  I believe her request for short-term disability
17  was denied, or there was some issue, and she wanted a
18  letter of support.  And that's when I contacted HR to ask
19  them about such a letter.
20    Q  And your position is that they don't allow that?
21  Sorry, I don't want to misstate what you said.
22    A  When I asked that's what I understood from Ms.
23  Lamina that that is not the process and the procedure we
24  follow.

Page 56

1    Q  Do you remember if Ms. Lamina that told you why
2  they don't allow letters of support?
3    MS. WERMUTH:  Objection.  Insofar as you misstated
4  the record evidence and or the testimony.
5  BY MS. SCATCHELL:
6    Q  It's not the policy and procedure, I apologize.
7    A  I don't remember the specifics of what Ms. Lamina
8  had said, but something to the effect that Liberty Mutual
9  makes the decision based on medical documentation they
10  get or something.
11    Q  And do you know if Ms. Dillard was being paid
12  while she was denied short term disability?
13    A  No, I do not remember the details.
14    Q  And in Exhibit No. 6 where Bola indicates what
15  her response was to Ms. Dillard, do you know why she sent
16  that to you?
17    MS. WERMUTH:  Objection.  Foundation.  Go ahead.
18  BY THE WITNESS:
19    A  I have no idea, maybe just FYI.
20  BY MS. SCATCHELL:
21    Q  And I'M going to show you what is marked as
22  Exhibit No. 11.
23    MS. WERMUTH:  Can you read the page number, Gia.
24    MS. SCATCHELL:  Yes, it is Dillard_DePaul 3424 to

Page 57

1  Dillard_DePaul 3427.
2    MS. WERMUTH:  Thank you.
3    (Exhibit No. 11 was marked
4    for identification.)
5  BY MS. SCATCHELL:
6    Q  Okay.  And I'm just going to ask you about page
7  Dillard_DePaul 3424.
8    And do you see that it says from yourself
9  to yourself on June 17, 2018, correct?
10    MS. WERMUTH:  Objection.  Misstates the record
11  evidence.  Go ahead.
12  BY THE WITNESS:
13    A  I don't know if it's from myself to myself.  I'm
14  not sure what you're referring to.  Where it says sent
15  from my iPhone?
16  BY MS. SCATCHELL:
17    Q  No.  At the top of Page 3424, it says from
18  Ghanem, Salma?
19    A  Yeah, I copied myself.
20    Q  Okay.  So you copied yourself.  Then it also has
21  Lexa Murphy on there, correct?
22    A  Correct.
23    Q  And do you have any reason to believe that that
24  is not an email that you sent to yourself and to Ms.



Page 58

1  Murphy?
2      A  No reason not to believe that.  I didn't send it
3  to myself as I mentioned earlier --
4      Q  You cc'd --
5      A  I cc'd myself.
6      Q  And do you know what you're referencing here
7  where it says, she does speak Chinese by the way.  We'll
8  discuss with HR before we agree to anything?
9      A  Yes.  I believe part of the accommodation if I
10  recall that she requested a student who speaks Mandarin.
11  And Lexa was under the impression that she didn't speak
12  Mandarin, but I believe that Sydney did speak Mandarin.
13      Q  And what is GLE with China?
14      A  Global Learning Engagement, I think that's what
15  it stands for.  We have classes where a faculty member
16  would partner with another faculty member overseas, and
17  the students interact with each other.  So one of her
18  classes must have been doing that with a class in China.
19      Q  And do you know why Ms. Murphy we say she didn't
20  speak Mandarin before her seizures?
21      MS. WERMUTH:  Objection.  Foundation.
22  BY MS. SCATCHELL:
23      Q  If you know.
24      A  I have no idea.

Page 59

1      Q  I'm going to show you what I'm going to mark as
2  Exhibit No. 17.  It's Dillard_DePaul 3477 and 3478.
3              (Exhibit No. 17 was marked
4              for identification.)
5  BY MS. SCATCHELL:
6      Q  Okay.  Do you recognize this email thread?
7      A  I do.
8      Q  And what do you recognize it to be?
9      A  It was an inquiry that I sent to Ms. Bola Lamina
10  in HR following Sydney Dillard asking me to write a
11  letter of support for her appeal to Liberty Mutual, and I
12  was asking Bola if that is something I can do.
13      Q  And do you know why Ms. Lamina created a
14  statement that you could respond to Sydney with?
15      MS. WERMUTH:  Objection.  Calls for speculation.  Go
16  ahead.
17  BY THE WITNESS:
18      A  In matters of accommodation, we rely on HR to
19  tell us how to handle.  They're the experts.
20  BY MS. SCATCHELL:
21      Q  Okay.  And where Ms. Bola states I would
22  recommend not to provide a letter of support as this is
23  not part of the university's leave process.  Do you see
24  that?

Page 60

1      A  I do.
2      Q  And do you know what the university's leave
3  process is?
4      A  No, I do not.
5      Q  Do you know who would know besides Ms. Lamina?
6      A  Southbound in HR.
7      Q  And do you know where the leave process would be
8  located?
9      A  No, I do not.
10      Q  Do you know who would know?
11      A  Somebody probably in the Benefit's Office of HR,
12  but it's just a guess.
13      MS. SCATCHELL:  Do you want to take a break?
14      MS. WERMUTH:  We had a conversation about every hour.
15      MS. SCATCHELL:  That's fine.
16              (Short recess.)
17  BY MS. SCATCHELL:
18      Q  I'm going to show you what is going to be marked
19  as Exhibit No. 20.
20              (Exhibit No. 20 was marked
21              as requested.)
22  BY MS. SCATCHELL:
23      Q  And just review that document when you have a
24  moment.  And that is Dillard_DePaul 3487 and 3488, and do

Page 61

1  you recognize that document?  Whenever you're finished
2  reviewing, sorry.
3      A  Yes, I see it.
4      Q  Okay.  And what is this document?
5      A  This was the email that Sydney -- that Dr.
6  Dillard sent me requesting an appeal support letter for
7  her short-term disability claim that was denied.
8      Q  Okay.  And then the email on Page 3487 at the
9  top, do you recognize that document?
10      A  Yes, I do.
11      Q  And what does this document refer to?
12      A  That's the email that I sent to Sydney, to Dr.
13  Dillard, that I would be unable to provide her with a
14  letter of support because it's not part of the
15  University's leave process.
16      Q  And then where it says in the cc line of the
17  email ▆▆ Shu-▆▆an?
18      A  Correct.
19      Q  Is that ▆▆▆▆▆▆?
20      A  That is correct.
21      Q  And why is she cc'd on that message?
22      A  Because ▆▆ ▆▆ had received the same message
23  or the same request from Sydney.  And ▆▆▆ I believe, I
24  can't remember exactly, had reached out to me and so I





Page 62

1  was informing both Sydney as well as ███ about the
2  process.
3      Q  Okay.  And you had previously testified that you
4  didn't know what the university's leave process was,
5  correct?
6      A  Correct.
7      Q  And in here you say it's not part of the leave
8  process?
9      A  I was following the instructions from HR in the
10 email that I think it was Bola in one of the exhibits you
11 showed me.
12     Q  Okay.  But you didn't at this point do any
13 independent investigation on what the lead process was?
14     A  No, I did not.
15     Q  Was there any reason why you didn't look into it
16 further?
17     MS. WERMUTH:  I'm going to object to the form of the
18 question.  It's argumentative and it misstates her
19 testimony.  Go ahead.
20 BY THE WITNESS:
21     A  I checked.  My responsibility was to check with
22 HR and I followed the instructions I had from HR.
23 BY MS. SCATCHELL:
24     Q  Okay.  And then I'm going to show you what is

Page 63

1  going to be marked as Exhibit No. 27, which is
2  Dillard_DePaul 3538, 3539, and 3540.
3              (Exhibit No. 27 was marked
4               for identification.)
5  BY MS. SCATCHELL:
6      Q  Okay.  Do you recognize this email thread?
7      A  I believe I do, yes.
8      Q  And what is it?
9      A  It is a communication between Bola Lamina and
10 myself informing me that Liberty Mutual had denied her
11 short-term disability.
12     Q  Okay.  And do you see in there on Page 3538, the
13 email says, Hello Salma, no action is needed from you at
14 this time.  Liberty Mutual will contact Sydney to discuss
15 the next steps.  I couldn't reach her by phone but I've
16 emailed her to let her know that her pay has been
17 suspended, and that's signed, Bola.
18         And do you have any reason to believe that
19 this is not an email from Bola Lamina to you?
20     A  No.
21     Q  And does this refresh your recollection that Ms.
22 Dillard was not getting paid while she was on short-term
23 disability?
24     MS. WERMUTH:  Object to the form of the question.

Page 64

1  Misstates record evidence.  Go ahead.
2  BY THE WITNESS:
3      A  This reminds me that her pay was being suspended,
4  yes.
5  BY MS. SCATCHELL:
6      Q  And I'm going to show you what I'll mark as
7  Exhibit No. 52, which is Dillard_DePaul 9437 to 9438.
8              (Exhibit No. 52 was marked
9               for identification.)
10 BY THE WITNESS:
11     A  Okay.
12 BY MS. SCATCHELL:
13     Q  Okay.  Do you recognize this document at all?
14     A  I think so.
15     Q  Is it your understanding that the email is from
16 Alexandra Murphy to ███  ███
17     A  Correct.
18     Q  And who is ███  ███
19     A  She is the associate provost.  She's one of the
20 associate provost and she handles the UBPT.
21     Q  And UBPT stands for University Board on Promotion
22 & Tenure?
23     A  Correct.
24     Q  And then who is ███  ███

Page 65

1      A  ███  is a faculty member in the College
2  of Communication.
3      Q  And do you know what this is referencing where it
4  says ███ Knight's case?
5      A  Yes.
6      Q  Okay.  What is it referencing?
7      A  There was some question about some technical
8  glitches that had happened in the - I believe it was the
9  college's voting on Dr. Knight's case.
10     Q  Okay.  And where it says underneath the email, it
11 says, Dear ███ at the beginning of the email it says,
12 Thanks Lexa.  And then underneath it there's an email
13 that says to the University Board on Promotion and Tenure
14 and Provost Ghanem?
15     A  Correct.
16     Q  And that continues onto the next page.  Do you
17 recall receiving this communication from Ms. Murphy?
18     A  If it came to me, which I think it did, it would
19 have come to me from ███
20     Q  Okay.  And do you have any independent
21 recollection of receiving that email from ███
22     A  No reason to believe I did not.
23     Q  Okay.  And do you see in Paragraph 3 of the
24 letter that's directed to you and the UBPT.  It says, as

MAGNA ▶
LEGAL SERVICES

Page 66

1  T & P guidelines require a narration of any negative
2  vote, they weren't sure what to say in the document. No
3  one offered any additional commentary to put in an
4  addendum. What is the T & P guideline?
5      A  Tenure & promotion guidelines.
6      Q  Okay. And what does she mean by narration of any
7  negative vote?
8      A  You'd have to ask her, but the guidelines
9  indicate that there has to be an explanation of why there
10  was a negative vote.
11     Q  And then on Page 2 of the email, 9438, the first
12  paragraph says I can see how Sydney Dillard could
13  characterize the process as four separate votes. Do you
14  know what she's referring to here?
15     MS. WERMUTH: Objection. Foundation. Go ahead.
16  BY MS. SCATCHELL:
17     Q  If you know.
18  BY THE WITNESS:
19     A  I really don't recall how Sydney characterized
20  that part.
21  BY MS. SCATCHELL:
22     Q  But do you recall anything that Ms. Dillard had
23  raised or any issue that Ms. Dillard had raised about the
24  vote referenced in this email?

Page 67

1      A  I think there was something in what was uploaded,
2  but I don't recall exactly what it was.
3      Q  Okay. And do you have anything that would
4  refresh your recollection?
5      A  If I would see what she wrote, it might help.
6      Q  Okay. And where it says, as is standard they
7  circulated the document to all tenured faculty for at
8  least a week to solicit any feedback or needed changes.
9  Do you see that part?
10     A  I'm sorry, where is it?
11     Q  The same paragraph, I can see how.
12     A  I'm sorry, I can't see it. Oh, I can see how.
13     Q  Where it says, as is standard, it's the second to
14  last sentence.
15     A  Okay.
16     Q  Do you know what Ms. Murphy is referencing by as
17  is standard?
18     A  I can't tell what she's referring to, no.
19     Q  And then in the last paragraph where Ms. Murphy
20  says, I sincerely apologize that in my meeting with the
21  UBPT, I didn't fully recall some important details that
22  could help explain the process. Do you know what she's
23  referring to here?
24     A  Yes. When the UBPT reviews the portfolio of the

Page 68

1  candidate, one of the elements is to meet with the dean.
2  And the UBPT members or somebody in the UBPT committee
3  had raised this issue with Dr. Murphy trying to
4  understand what happened with the process.
5      Q  Okay. And do you recall or were you at the
6  meeting that she had with the UBPT?
7      A  I do attend all the meetings of UBPT, yes.
8      Q  And are there any minutes that are taken at these
9  UBPT meetings?
10     A  No, there are not.
11     Q  And do you know what was -- do you know if the
12  voting process changed after Ms. ███ voting issue?
13     A  Within UBPT?
14     Q  Within the faculty voting process?
15     A  In the College of Communication?
16     Q  Yes.
17     A  I do not know.
18     Q  Do you know who would know?
19     A  I do not know.
20     Q  Do you know if there's policy regarding the
21  voting process for faculty members?
22     MS. WERMUTH: Objection. Vague.
23  BY MS. SCATCHELL:
24     Q  That was a bad question, I apologize. So the T &

Page 69

1  P guidelines, do you know if they outline a voting
2  processor procedure?
3      A  I don't recall the details.
4  BY MS. SCATCHELL:
5      Q  Okay. And we will mark this as Exhibit No. 12.
6  It is Dillard_DePaul 4059. I have a copy for you.
7      MS. WERMUTH: Good.
8                    (Exhibit No. 12 was marked
9                    for identification.)
10  BY MS. SCATCHELL:
11     Q  Okay. Do you recognize this document?
12     A  Yes.
13     Q  Okay. What is it?
14     A  It is a document outlining the program chair
15  duties, selection, and review process.
16     Q  Okay. And do you know who drafted this?
17     A  I don't recall who drafted it, no.
18     Q  Did you have any part in this process?
19     A  To be honest, I don't recall what was my
20  involvement. I don't know if it was something that
21  already existed and we brought it up or if we modified
22  it, I don't recall.
23     Q  Okay. And do you see where it says in Bullet
24  Point Number 1, the Dean of the College invites



18 (Pages 66 to 69)

Page 70

1 nominations or several nominations from the program area
2 faculty?
3    A  Uh-huh.
4    Q  Would the Dean of the College be referencing your
5 position at that time which would be 3/8/2016?
6    A  Yes.
7    Q  And then Number 2 where it says, Dean of the
8 College asks if those nominated are willing to serve in
9 this role. Do you see that?
10    A  Yes.
11    Q  Okay. So I guess if you can clarify for me, is
12 the Dean of the College at the PRAD chair vote or when
13 does this get asked?
14    A  No. This is -- let's say there is a program
15 chair position that's going to be become available, you
16 send -- you ask via email usually for nominations or
17 self-nominations for people who for this -- to be
18 nominated for this position and then the next step is to
19 ask those who have been nominated because people could
20 have been nominated by other people if they would be
21 willing to serve in this role.
22    Q  Okay. And then it says in Subsection 8, if the
23 Dean of the College accepts this recommendation, the
24 process is complete?

Page 71

1    A  Yes.
2    Q  Could you expand on what that means?
3    A  That if the Dean of the College accepts the
4 recommendation by the majority of the full-time faculty
5 in the program and the Dean accepts it, then the person
6 has been selected as program chair.
7    Q  Okay. And then number 9 says, if the Dean of the
8 College rejects this recommendation, then the faculty is
9 asked to revote on any remaining viable candidates. Do
10 you see that?
11    A  I do.
12    Q  In your experience, have you ever rejected a
13 recommendation for PRAD chair before?
14    MS. WERMUTH: Objection. Assumes facts not of
15 record.
16 BY THE WITNESS:
17    A  No, I don't believe I have.
18 BY MS. SCATCHELL:
19    Q  Okay. And as of the Dean, can you overturn a
20 recommendation and chose somebody yourself or how would
21 that work?
22    A  If there is a -- I'm not sure I understand the
23 question. Could you specify?
24    Q  Yeah. If there was a certain person recommended

Page 72

1 and you did not like that candidate, could you reject
2 that recommendation and appoint somebody yourself or how
3 would that work?
4    A  Based on this policy, if the Dean rejects the
5 recommendation, then the faculty have to do another vote.
6    Q  Okay. And would there be anytime where the
7 faculty wouldn't have to do another vote to have a
8 program chair?
9    A  Not according to this document.
10    Q  Okay. And do you remember who the program chair
11 was in 2016, March of 2016?
12    A  I can't be 100 percent sure --
13    MS. WERMUTH: I want to state an objection here, too.
14 You're assuming that this -- that the PRAD chair is the
15 only program chair position in the college, so I just
16 want to make that clear.
17 BY MS. SCATCHELL:
18    Q  Is there any other program chairs in the College
19 of Communications?
20    A  Yes.
21    Q  And what is your understanding of what program
22 chair this duty selection and review process is referring
23 to?
24    A  To all program chairs.

Page 73

1    Q  Including the PRAD chair, correct?
2    A  Correct.
3    Q  And there's no specific PRAD chair selection
4 process and duties formed that exist outside this
5 document that you're aware of?
6    A  Not that I'm aware of.
7    Q  And in March of 2016, do you recall if the
8 program chair was ██████
9    A  I can't tell if it was ██ ████ or ███
10 ████
11    Q  And who is ██ ████
12    A  She used to be a program chair of PRAD as well,
13 but I can't remember when each one started.
14    Q  And when in Subpart numbers 8 and 9 accepting or
15 rejecting the recommendation, what factors go into
16 accepting or rejecting the recommendation referenced
17 here?
18    A  That's up to the Dean to accept or reject.
19 There's no factor in particular.
20    Q  Okay. So what information do -- when you were
21 the Dean of the College, what information did you use to
22 accept or reject the recommendation?
23    MS. WERMUTH: Let me just object to the form of the
24 question insofar as it assumes that during the period of



Page 74

1    time she was a Dean she made such a decision.  Go ahead
2    and answer.
3    BY MS. SCATCHELL:
4        Q   I'll back up.  So during your time as the Dean,
5    did you ever accept or reject a recommendation of any
6    program chair?
7        A   Yes, I believe I have.
8        Q   Okay.  And when you accepted or rejected any of
9    those recommendations, what information did you use to
10   make your decision to accept or reject?
11       A   I looked at the vote and my knowledge of the
12   candidate and that's as far as I can remember.
13       Q   Okay.  And do you see where it says that in
14   number 3, those willing to serve are asked to provide a
15   presentation and answer questions at a faculty meeting?
16       A   Uh-huh.
17       Q   Does that presentation and answers to the
18   questions factor into your decision to accept or reject
19   the candidate?
20       A   I don't believe I attended those presentations.
21   It's based on those presentations that I received the
22   recommendation from the faculty.
23       Q   Okay.  And it says review process at the end of
24   this document, and it says program chairs are reviewed

Page 75

1    annually by the Dean of the College.  Do you see that?
2        A   Yes.
3        Q   Okay.  And what kind of review is done by the
4    Dean of the College?
5        A   It is part of the annual performance review that
6    where each one of the program chairs is being reviewed.
7        Q   Okay.  And are you aware if the program selection
8    process meetings have any kind of minutes or are
9    recorded?
10       A   Not that I'm aware of.
11       Q   Okay.  And did you ever ask to be in the room
12   during the faculty members presentation or question and
13   answer session?
14       MS. WERMUTH:  I'm just going to object again as
15   vague.  Like, I don't even know which --
16       MS. SCATCHELL:  In Section 3.
17       MS. WERMUTH:  It's not even clear what particular
18   presentation you're talking about.
19       MS. SCATCHELL:  In Section 3.
20       MS. WERMUTH:  But whose presentation?  We haven't
21   even established --
22       MS. SCATCHELL:  It says that there's a presentation.
23   BY MS. SCATCHELL:
24       Q   Is it your understanding that the program chair

Page 76

1    candidate provides a presentation and Q & A session at a
2    faculty meeting to be selected as program chair?
3        MS. WERMUTH:  What time period are you talking about?
4        MS. SCATCHELL:  The time period that's referenced in
5    this document?
6        MS. WERMUTH:  In 2016?
7        MS. SCATCHELL:  Yes.
8    BY THE WITNESS:
9        A   I got a little bit confused so can I have the
10   question again?
11   BY MS. SCATCHELL:
12       Q   Yes, okay.  So is it your understanding that a
13   candidate for a program chair position gives a
14   presentation and answers questions at a faculty meeting
15   as laid out in Section 3 of this document?
16       A   Yes.
17       Q   Okay.  And it's also your understanding that this
18   presentation and Q & A session is what factors into the
19   faculty vote for the program chair candidate?
20       MS. WERMUTH:  Objection.
21   BY THE WITNESS:
22       A   Possibly.
23   BY MS. SCATCHELL:
24       Q   Do you have any reason to believe that that's not

Page 77

1    how the vote -- let me rephrase that.
2            Is there any reason to believe that a
3    presentation and Q & A session is not factored into the
4    faculty vote for program chair candidate?
5        MS. WERMUTH:  Objection.  Foundation.  Calls for
6    speculation.  Go ahead.
7    BY THE WITNESS:
8        A   I mean, this is how the process is outlined, so
9    it's part of what faculty, I assume, take into
10   consideration.
11   BY MS. SCATCHELL:
12       Q   And you believe this to be an accurate document
13   of how a program chair's duties, selection, and review
14   process works in 2016?
15       A   As far as I can recall.
16       Q   Okay.  Perfect.  And during these presentations
17   for candidates for program chair, did you ever ask to be
18   part of the presentation of Q & A session as outlined in
19   Number 3?
20       A   That, I don't recall.
21       MS. SCATCHELL:  Okay.  Actually, can we take a 10
22   minute break?
23       MS. WERMUTH:  You bet.
24            (Short break.)



Page 78

BY MS. SCATCHELL:
Q  I'm going to show you what we're going to mark as Exhibit No. 8, and it's Dillard_DePaul 3390.
(Exhibit No. 8 was marked
for identification.)
BY THE WITNESS:
A  Okay.
BY MS. SCATCHELL:
Q  What is this document?
A  This is my letter to Dr. Dillard following her fifth-year probationary teaching review.
Q  And the fifth-year probationary teaching review, do you know if that was a formal review or informal review?
A  I believe that was a formal review focusing just on teaching.
Q  Okay.  And do you know why it was a formal review focusing just on teaching?
A  Yes.  It was based on her prior formal review where they felt -- where the faculty felt that she needed an additional review focusing just on teaching.
Q  Okay.  And where you say I commend you for your reflexivity and pedagogical approaches you took to improve your teaching.  Could you expand on what you

Page 79

meant by that?
A  Yes.  There were some concerns that were brought up in her last formal review that she addressed and changed some of her teaching approaches that improved her teaching.  So I was commending her and congratulating her for doing that.
Q  Okay.  And then I'm going to show you what's been marked as Exhibit No. 9, which is Dillard_DePaul 3391 to 3392.
(Exhibit No. 9 was marked
for identification.)
BY MS. SCATCHELL:
Q  Actually, before we go to that document I actually have one more question.  Do you know if the peer-review committee or personnel committee rather had recommended Ms. Dillard to undergo a separate review for teaching, formal review for teaching?
A  I am not sure I follow you.
Q  So the personnel committee is the committee that does the tenure track reviews, correct?
A  It does the first review.
Q  The first review?
A  Yes.
Q  And do you know if the personnel committee had

Page 80

recommended Ms. Dillard to have a fifth-year probationary teaching review that focused only on teaching and was formal in nature?
A  I don't remember if it was the personnel that recommended it to the full faculty or if it was the full faculty who made that decision, no, I don't.
Q  Do you know would anything refresh your recollection?
A  I'd have to see the document.
Q  And what document are you referring to?
A  The formal review recommendation that comes to me.
Q  Okay.  That's it for that document.  So we'll go to Exhibit No. 9, which is 3391 and 3392.
A  Okay.
Q  Do you recognize this document?
A  I do.
Q  And what is this document?
A  This was my letter in regard to the recommendation that I had received from the college about her formal review.
Q  Okay.  And do you see where it says the tenured faculty did not unanimously agree about your progress towards tenure in teaching with 16 to 20 faculty members

Page 81

indicating that improvements in this area are warranted?
A  Okay.
Q  What were the improvements that they were referring to, and they being the faculty members?
A  They had outlined them.  I think I mentioned some of them here in this letter, feedback on assignments and organization.
Q  Okay.  And did you ever personally witness Ms. Dillard teaching any of her classes?
A  No, I did not.
Q  Okay.  Do you know if any of the faculty members that conducted this vote had personally witnessed her teaching?
A  My guess, yes, because there are peer review of teaching, but I cannot be sure.
Q  Okay.  And do you know how they came to that decision that she needed to make these improvements or what materials they used, the faculty?
A  They look at the materials that she submits for her formal review.
Q  And that would be like a syllabus or what would that information that Ms. Dillard would submit be?
A  There's a whole bunch of things, everything from syllabi to assignments to course evaluations.  If at the



Page 82

1  time there were peer reviews, those would be included and
2  so on.
3  Q  Okay.  And so in Exhibit No. 8, you had mentioned
4  that Ms. Dillard's teaching has improved?
5  A  Correct.
6  Q  Okay.  What changed from, I guess, it would be
7  from March 16, 2017, which is Exhibit No. 9 to March 13,
8  2018, which would be Exhibit No. 8?
9  A  That she made improvements in her teaching?
10  Q  Yes.
11  A  Between both of them.
12  Q  So what changed in terms of like her teaching
13  that would give her now satisfactory marks or however you
14  --
15  A  I cannot recall exactly what the tenured faculty
16  members had indicated or what her dossier showed, but I
17  would assume part of it would be her teaching
18  evaluations, both quantitative and qualitative.
19  Q  Okay.
20  A  As well as, I would like to add, there's a
21  narrative that is written by the faculty member.
22  Q  So Ms. Dillard would be the person that wrote the
23  narrative?
24  A  Yes.  And in the narrative, she would address the

Page 83

1  different approaches that she took, that's what I recall.
2  Q  Okay.
3  A  That's what I'm referring to in March, 2018.
4  Q  And then in Exhibit No. 10, and that is
5  Dillard_DePaul 3397.
6  A  Yes.
7          (Exhibit No. 10 was marked
8          for identification.)
9  BY MS. SCATCHELL:
10  Q  Okay.  And just review this document and let me
11  know when you finish.
12  A  Okay.
13  Q  What is this document?
14  A  It is an email from Dr. ████ to members of
15  the college with the external review letters.
16  Q  Okay.  And you're on this on the email thread,
17  correct?
18  A  Yes.
19  Q  And what are external review letters?
20  A  When a faculty member goes up for tenure or
21  promotion, they solicit feedback from reviewers outside
22  of the University to commend the quality of the
23  candidates research and creative activities.
24  Q  Okay.  And the three links that appear at the

Page 84

1  bottom app.box.com followed by a whole bunch of letters
2  and numbers.
3  A  Uh-huh.
4  Q  What are those links referring to?
5  A  Box folders that contain the external review
6  letters.
7  Q  And who is ████
8  A  He's a faculty member in the College of
9  Communications.
10  Q  And then I'm going to show you what's marked as
11  Exhibit No. 13, which is Dillard_DePaul 3441.
12          (Exhibit No. 13 was marked
13          for identification.)
14  BY MS. SCATCHELL:
15  Q  And do you recognize this document?
16  A  Yes, I do.
17  Q  And what is this document?
18  A  It's Dr. Lexa Murphy asking me for copies of the
19  letters I wrote to Sydney when she was on the under
20  formal review.
21  Q  Do you know why Ms. Murphy asked you for these
22  documents?
23  A  I do not recall.
24  Q  And do you know if this email had attachments

Page 85

1  included in it?
2  A  Based on my email response to Lexa and where it
3  says attachment, it mentions three attachments.
4  Q  And I'm going to mark this document as Exhibit
5  No. 51.
6          (Exhibit No. 51 was marked
7          for identification.)
8  BY THE WITNESS:
9  A  Okay.
10  Q  Do you recognize this document?
11  A  Vaguely, yes.
12  Q  Okay.  And what do you recognize about this
13  document?
14  A  This is a resolution that Faculty Council had
15  approved and comes to me to respond, and I respond on
16  behalf of the president.
17  Q  Okay.  And who is ████ ████
18  A  ████ ████ was Faculty Council's president at
19  that time.
20  Q  Okay.  And what is his role as Faculty Council
21  president?
22  A  He presides over Faculty Council.
23  Q  Okay.  And what would his duties be for as
24  presider of Faculty Council?



Page 86

1   A  I do not know in full detail what his role would
2   be.
3   Q  Do you know anything about what his role is?
4   A  He convenes the meetings of Faculty Council.
5   Q  And then it says your response is dated February
6   18, 2019, correct?
7   A  Correct.
8   Q  And you say I have reviewed Faculty Council's
9   Record of Action 1819-ROA-036 Motion regarding concerns
10  of faculty and staff of color.  Is the record of action
11  is that the document that appears on 9428 or Page 3 of
12  this document?
13  A  The record of action would be the whole document
14  if I'm not mistaken comes to me.  I think it would be
15  this one with the number, the record of action sent to
16  me.
17  Q  And this one, you mean 9428?
18  A  Correct.
19  Q  And then is there anything missing from --
20  A  I can't tell.
21  Q  And do you know who drafted the document on 9428?
22  A  No, I do not.
23  Q  And what does it mean for somebody to be a
24  sponsor as it refers to this document?

Page 87

1   A  When there is a motion in Faculty Council it has
2   to have a sponsor.
3   Q  And do you see where it says █████████
4   A  Yes.
5   Q  And who is she?
6   A  At that time, she was a Faculty Council
7   alternate, and she is a faculty member in the Department
8   of Political Science.
9   Q  And what ethnicity does she identify it?
10  A  I believe she identifies as Black.
11  Q  And who is ████████ ████████
12  A  ████████ ████  at that time a Faculty Council
13  representative to Faculty Council and Chair of the
14  Promotion and Tenure Policy Committee as it states in
15  there.  And she -- I don't know if she was or not chair
16  of the Chemistry Department.
17  Q  Okay.  And what's her ethnicity?
18  A  I believe it is Black.
19  Q  And she still at the University?
20  A  Yes, she is.
21  Q  Is that still her current position or does she
22  have some other position?
23  A  At the University?
24  Q  Yes.

Page 88

1   A  She is Chair of the Department of Chemistry and
2   she's Vice-President of Faculty Council.
3   Q  And who is ████ ███████
4   A  ████████ was an alternate member from the College
5   of Liberal Arts and Social Studies on Faculty Council.
6   Q  And what is his ethnicity?
7   A  I believe it is white.
8   Q  And is he still at the University?
9   A  I believe so, yes.
10  Q  And do you see where the next section says
11  indifference to concerns of faculty and staff of color?
12  A  Yes.
13  Q  And it says the University has consistently
14  disregarded the concerns of faculty and staff of color
15  through actions that include, but are not limited to a
16  pattern of buying out or pushing out faculty of color.
17  Do you what is referenced?
18  A  No, I do not.
19  Q  Did you do any kind of investigation to find out
20  what that meant?
21  A  No.  It's up to them to tell me what they mean.
22  Q  And was there any meeting that followed this
23  motion?
24  A  No.

Page 89

1   Q  Okay.  And did you ask them to give you more
2   information about what they meant by a pattern of buying
3   out or pushing out faculty of color?
4   A  Not that I recall.
5   Q  Any reason why?
6   A  Usually, the response I give to the motion to the
7   record of action responds to what I receive.
8   Q  And what is IRMA data in Bullet Point Number 2.
9   A  IRMA is Institutional Research and Marketing
10  Analytics.
11  Q  And who conducts those surveys?
12  A  What surveys?
13  Q  Or what would you call the analytics?
14  A  It's data that comes from -- it's a lot of data
15  on the IRMA website.
16  Q  Okay.  And who was in charge of putting the data
17  onto the IRMA website?
18  A  There's a whole office.
19  Q  At DePaul?
20  A  Yes.
21  Q  And did you inquire as to what they meant by a
22  lack of commitment to appropriating dedicated resources
23  to attracting and retaining faculty of color in Bullet
24  Point Number 3?



Page 90

1    A  No.  That's why I referred in my response that
2  several unsupported general associations.
3    Q  And was there any further action taken by the
4  Faculty Council after they received your response?
5    A  Not that I recall specifically with regard to my
6  response, I don't recall.
7    Q  And is there an appeal process or what would
8  happen in this situation if they pursued the matter
9  further?
10    A  They can resubmit it if they want.
11    Q  Okay.  Do you know if they resubmitted it in this
12  case?
13    A  I do not recall.
14    Q  Do you know if there is any -- would anything
15  refresh you've your recollection rather?
16    A  I have to see another Faculty Council Record of
17  Action.
18    Q  And do you know where those record of actions are
19  maintained?
20    A  Faculty Council maintains them.
21    Q  Okay.  And do you receive copies of all the
22  faculty motions?
23    A  Yes.
24    Q  And how do you get provided those documents?

Page 91

1    A  The secretary of Faculty Council following the
2  Faculty Council meetings sends me all of the records of
3  actions.
4    Q  Okay.  And is that on a rolling basis or is that
5  one time --
6    A  No.  They meet once a month and every month there
7  will be records of action.
8    Q  And you mentioned in your response that something
9  about Goal Number 2 of the current strategic plan?
10    A  Uh-huh.
11    Q  What is that?
12    A  There is a strategic plan, a University-wide
13  strategic University plan called grounded in mission that
14  addresses the various goals of the University.
15    Q  And is that document located anywhere?
16    A  I believe it is on the University website.
17    Q  And what is the difference between a
18  vice-president for institutional diversity and equity and
19  the associate provost for diversity?
20    A  The vice-president for institutional diversity
21  and equity reports to the president and addresses issues
22  of institutional diversity and equity throughout the
23  entire institution.  The associate provost for diversity
24  is focuses mainly on DEI issues within academic affairs.

Page 92

1    Q  And on Page 9427 or Number 2 of this document,
2  you state that the Office of the President will shortly
3  announce the Presidential Fellows Program appointment and
4  the Presidential Fellows will work with the President and
5  engage in research regarding diversity and inclusion
6  issues influencing the recruitment, retention, and
7  success of diverse faculty, staff, and students?
8    A  Yes.
9    Q  Do you know what has been done regarding these
10  issues of diversity and inclusion and influencing the
11  recruitment, retention, and success or diverse faculty,
12  staff, and students?
13    A  By the Presidential Fellows Program?
14    Q  Yes.
15    A  The Presidential Fellows Program has selected, I
16  believe two faculty members to each year to address
17  issues.  They come up with their own research project
18  dealing with DEI type issues.  They present their work.
19  They sometimes create certain work.  They present to
20  Joint Council, and they inform the rest of the University
21  about the work that they've done.
22    Q  Okay.  And do you agree with any of the
23  statements made by this Faculty Council, Document 9428,
24  regarding indifference to concerns of faculty and staff

Page 93

1  of color?
2    A  Do I agree -- could you repeat the question,
3  please?
4    Q  Let me rephrase it.
5        Do you agree that there is a lack of
6  commitment to appropriating dedicated resources to
7  attracting faculty of color as outlined in Bullet Point
8  3?
9    MS. WERMUTH:  Page 9428?
10    MS. SCATCHELL:  Yes.
11  BY THE WITNESS:
12    A  There have been resources dedicated to attracting
13  and retaining faculty of color.  I don't think there has
14  been a lack of commitment on the part of the University,
15  but there are resource constraints that exist at the
16  University.
17    Q  Okay.  And what are those resource constraints?
18    A  Budget.
19    Q  Is that it?
20    A  Yes.
21    Q  And do you believe that there is a pattern of
22  buying out or pushing out faculty of color as outlined in
23  Bullet Point Number 1 on Page 9428?
24    A  No, I do not.





Page 94

```
 1      Q   And what is your basis for that position?
 2      MS. WERMUTH:  Objection.  It's argumentative.
 3  Assumes facts not of record.  Go ahead.
 4  BY THE WITNESS:
 5      A   I am not aware of any process or pattern of focus
 6  on buying out or pushing out faculty of color.
 7  BY MS. SCATCHELL:
 8      Q   And you previously testified that Ms. Dillard is
 9  the only domestic African-American tenure faculty member
10  in the College of Communication, correct?
11      A   At this point, yes.
12      Q   And at this point, was there a different point
13  where there were more than one?
14      A   Yes.
15      Q   And what was that point in time?
16      A   I don't recall the exact date, but there have
17  been other Black faculty born in the United States in the
18  College of Communication.
19      Q   Okay.  And do you remember any of their names.
20      A   Yes.  I remember ████████  I can't remember
21  her first name, but ████████
22      Q   ███
23      A   ██████ yeah.  And ████████████
24      Q   Okay.  And let's start with █████████ is she
```

Page 95

```
 1  still at DePaul University?
 2      A   No, she's not.
 3      Q   And when did she separate from the University?
 4      A   I can't recall exactly when she separated.
 5      Q   Okay.  Do you know why she left the University?
 6      A   Yes.  She went to pursue a job opportunity at
 7  Northwestern.
 8      Q   Was she tenure track?
 9      A   She was tenured.
10      Q   And ████ --
11      A   ████       ██████  I think, was denied tenure
12  prior to my arrival at DePaul.
13      Q   And do you know when she separated from DePaul?
14      A   Yeah.  She would have separated -- her last year
15  would have been the first year I was at DePaul, so I
16  think that would have been -- she would have separated at
17  the end of 2014 to 2015.
18      Q   And then █████ ██████ █████
19      A   Yes.
20      Q   Is she still at the University?
21      A   No, she's not.
22      Q   And when did she separate from the University?
23      A   I don't recall exactly.
24      Q   Were you at the University when she left?
```

Page 96

```
 1      A   Yes.
 2      Q   And do you know if she was tenured or tenure
 3  track?
 4      A   She was tenure track.
 5      Q   Okay.  And do you know if she ever was accepted
 6  -- was she denied tenure?
 7      A   No, she was not.
 8      Q   Okay.  Do you know what stage the tenure track
 9  process she was in?
10      A   I don't remember what year she was in, but she
11  decided she no longer wanted to pursue going up for
12  tenure.
13      Q   Okay.  Do you know if she ever made it to the
14  tenure review?
15      A   I don't believe she did.
16      Q   Okay.  And back to ████ ████  Do you know if
17  she was tenured when she came to the University?
18      A   She was hired before I was, and I believe she
19  came in with tenure.
20      Q   And █████ ██████ was African-American, correct?
21      A   Correct.
22      Q   And ███ Picot was African-American, correct?
23      A   I believe so, yes.
24      Q   And ████ ██████ ████ was African-American,
```

Page 97

```
 1  correct?
 2      A   Correct.
 3      Q   And all three of them were domestic born
 4  African-Americans, from what you know?
 5      A   As far as I know, yes, but I can't be sure.
 6      Q   I'm going to show you what I'm going to mark as
 7  Exhibit No. 22 and this is Dillard_DePaul 3494 and 3495.
 8          (Exhibit No. 22 was marked
 9           for identification.)
10  BY MS. SCATCHELL:
11      Q   And the email from █████ █████ to you on
12  February 17, 2015.  Do you see that?
13      A   I do.
14      Q   Okay.  And do you have any reason to believe this
15  is not an accurate copy of this email that was sent by
16  ████ to you?
17      A   No reason.
18      Q   And do you see where the subject line, research
19  leave and December term teaching?
20      A   Correct.
21      Q   And on 3495 the document states, I personally
22  believe that Sydney needs to focus on her research.  As
23  to my knowledge, she has not published anything since her
24  last review and her 2013 publications are with her
```

25  (Pages 94 to 97)

MAGNA ▶
LEGAL SERVICES

Page 98

1  advisor.  I have attached her updated CV.  That being
2  said, as she's taking a two-quarter leave, she may need
3  the money.  I would never want to stay in the way of her
4  finances, but all things considered, I think she would be
5  better served to focus on her research without a teaching
6  interruption.  Please let me know your thoughts,
7  decision, et cetera.  Do you know what she's referring to
8  her?
9      A  From what I gather, I don't recall this exchange,
10  but based on what I'm gathering, she was granted a
11  research leave.  Research leave means you don't have to
12  do research, so you don't have to do teaching so you can
13  focus on your research.  Also, you get full pay or you
14  get paid during your research leave.  I don't know if it
15  was full pay or not.
16      Q  Okay.  And do you know what Ms. ▮▮▮ based her
17  statement that Ms. Dillard would be better served on her
18  research without a teaching interruption on?
19      A  Say that again.
20      Q  Do you know what she based that statement that
21  she should focus on research without a teaching
22  interruption?
23      A  I think based on her email, she is saying that
24  would allow her to focus on research.

Page 99

1      Q  Okay.  And do you recall doing any independent
2  investigation into whether or not her teaching or
3  research needed more?
4      A  As I mention in my reply, I don't believe that a
5  faculty member who's on leave for research should be
6  permitted to teach during that time.
7      Q  And do you know who ▮▮▮ ▮▮▮ is?
8      A  Yes.  ▮▮▮ was a staff member in the College
9  of Communication.
10      Q  Okay.  And was, she left the University?
11      A  I believe so, yes.
12      Q  Okay.  Do you know why she left the University?
13      A  I really don't recall.
14      Q  Okay.  And what was her ethnicity?
15      A  She's Black.
16      Q  And do you recall any complaints she made to you
17  about being discriminated against?
18      A  No, I do not recall.
19      Q  Would anything refresh your recollection?
20      A  I'd have to see some evidence.
21      Q  And do you recall when you were the Dean of the
22  college of Communication whether or not there were any
23  allegations of somebody being harassed or discriminated
24  against based on the race?

Page 100

1      MS. WERMUTH:  I'm sorry, can you restate that?
2      MS. SCATCHELL:  Yes.
3  BY MS. SCATCHELL:
4      Q  So when you were the Dean of Students for the
5  College of Communication, do you recall any instances
6  where a faculty member had approached you about being
7  discriminated against based on race?
8      MS. WERMUTH:  I'm going to object to the form of the
9  question because Dr. Ghanem was never Dean of Students.
10  I'm also objecting --
11      MS. SCATCHELL:  Associate Dean --
12      MS. WERMUTH:  She was Dean of the College of
13  Communication.  She wasn't Dean of Students.  Also,
14  insofar as she's already testified as to complaints that
15  she received from ▮▮▮ ▮▮▮ and Dr. Dillard.  We've
16  been over some of this already.
17  BY MS. SCATCHELL:
18      Q  So I apologize.  While you were the Dean of the
19  College of Communications, other than Ms. ▮▮▮ and
20  Ms. Dillard, do you recall any other faculty or staff
21  members that approached you with complaints of
22  discrimination or harassment based on their race?
23      A  I do not recall.
24      Q  And would anything refresh your recollection?

Page 101

1      A  If I see any documentation, it might be helpful.
2      Q  Okay.
3      MS. WERMUTH:  Do you want another quick break?
4      MS. SCATCHELL:  Yeah.  Now is a good time for a
5  break.
6            (recess.)
7      MS. SCATCHELL:  Back on the record.
8  BY MS. SCATCHELL:
9      Q  All right.  I am going to show you what is going
10  to be marked as Exhibit No. 14, and that is going to be
11  Dillard Discovery Production 2699.
12            (Exhibit No. 14 was marked
13            for identification.)
14  BY MS. SCATCHELL:
15      Q  And do you recognize that document?
16      A  No.
17      Q  Okay.  And where it says Lexa, do you recognize
18  -- Let me strike that.
19            Were you aware that ▮▮▮ ▮▮ was chosen
20  to be the PRAD chair for an additional year?
21      A  I really don't recall how they resolved it
22  internally within the college.
23      Q  Okay.  Then let's go to what I'm going mark as
24  Exhibit No. 15.  That is Dillard_DePaul 238, 239 to 240,



Page 102

1  and I have a copy for you, Anna.
2        (Exhibit No. 15 was marked
3           for identification.)
4    THE WITNESS:  I don't have 239.  I have 42 and 44.
5    MS. WERMUTH:  Can we go off the record for one
6  second.
7        (Short recess.)
8
9  BY THE WITNESS:
10    A  Okay.
11  BY MS. SCATCHELL:
12    Q  And do you recognize this document?
13    A  No, I don't.
14    Q  Okay.  And do you see where it says program chair
15  duties, selection and review process, correct?
16    A  Uh-huh.
17    Q  And do you know whose responsibility it would be
18  to draft this document?
19    A  No, I don't --
20    MS. WERMUTH:  Objection.  Foundation.  Go ahead.
21  BY THE WITNESS:
22    A  As I said, I do not know what this document -- is
23  it for the College of Communication?
24  BY MS. SCATCHELL:

Page 103

1    Q  I don't know.  This is produced by your attorney.
2    MS. WERMUTH:  Your question assumes that the provost
3  is even involved in local academic unit practices.
4    MS. SCATCHELL:  No, it doesn't.  I'm just asking her.
5    MS. WERMUTH:  So I guess to your point as to whether
6  or not we produced it, we did.  But in October of 2019,
7  Dr. Ghanem was the provost of the University.
8  BY MS. SCATCHELL:
9    Q  Do you know who ███████████ is?
10    A  I'm sorry, say that again.
11    Q  Do you know who ███████████ is?
12    A  Yes.  ███████████ is a faculty member in the
13  College of Communication.
14    Q  And does she serve on any other positions?
15    A  I believe she has a position with study abroad --
16  with the Office of International studies, focusing on
17  Latin America.
18    Q  Okay.  And does she also do something with the
19  diversity, equity, and inclusion?
20    A  I believe she used to be the -- I'm drawing a
21  blank on the name, I'm sorry.  She used to be what
22  ███████████ is doing now.  Diversity advocate for the
23  College of Communication, but not currently.  And I do
24  believe she is chair of PRAD.

Page 104

1    Q  Okay.  So she's the program chair for PRAD?
2    A  Yes.
3    Q  Do you know when she started that
4  position?
5    A  No.
6    Q  And I just want to make sure I have your
7  testimony correct.  Was she ever the diversity advocate?
8    A  Yes, she was.
9    Q  Okay.  Was she ever the diversity advocate when
10  you were the Dean of the College of Communication?
11    A  Yes, she was.
12    Q  What was your interaction with ███████████ as the
13  diversity advocate while you were the Dean?
14    A  There wasn't a formalized interaction, but she
15  would come and drop by my office and talk to me.
16    Q  Okay.  And would she ever -- do you recall if you
17  ever had a conversation with her about any sort of
18  discrimination or harassment based on race?
19    A  I don't believe there was any discussion about
20  discrimination, but they're more about the climate
21  overall in the college.
22    Q  Okay.  And do you remember what she said about
23  the climate?
24    A  No, I don't recall detail.

Page 105

1    Q  Okay.  Would that be memorialized anywhere in
2  writing?
3    A  Only if she or I had sent a follow-up, but I
4  don't recall.
5    Q  Okay.  And then when she would come to your
6  office, would it be more of an informal meeting or more
7  of a formal meeting?
8    A  I don't know what the delineation is between
9  formal and informal.
10    Q  Would she have to make an appointment ahead of
11  time, or would she just drop by your office if you she
12  saw you in the office?
13    A  It could be both.
14    Q  And do you believe that she's a truthful person
15  in your opinion?
16    A  I have no reason to believe not.
17    Q  Okay.  And who is DePaulia or what is DePaulia?
18    A  It's the independent student newspaper.
19    Q  And by independent, you mean separate from the
20  University?
21    A  Well, it's located at the University.  It has a
22  faculty advisor, but the University administration does
23  not dictate or have any editorial control of what is
24  published in the DePaulia.

Page 106

1  Q  And who is the faculty advisor?
2  MS. WERMUTH:  Currently?
3  BY THE WITNESS:
4  A  Yeah, I think it's ███████ (phonetic). I
5  think that's the name.
6  BY MS. SCATCHELL:
7  Q  And do you read the DePaulia?
8  A  Occasionally.
9  Q  And are you aware of any town hall meetings that
10  happen at DePaul?
11  A  They're multiple town hall meetings.
12  Q  Specifically Black town hall meetings?
13  A  I think the DPUBLIC have held a couple of town
14  hall meetings.
15  Q  And what exactly is a town hall meeting, in your
16  opinion?
17  A  Basically people are welcome to attend, and it's
18  an open meeting.  That's the way I would see a town hall
19  meeting.
20  Q  And is it staff, students?  Who is allowed to a
21  continued?
22  A  Depends on the organizers of the town hall.
23  Q  Okay.  And have you ever attended a town hall
24  meeting?

Page 107

1  A  Yes.  I participated in town hall meeting with
2  the president.  I've participated in University-wide town
3  hall meetings.
4  Q  Okay.  And do you recall ever attending a
5  DPUBLIC's Black town hall meeting?
6  A  No, I have not.
7  Q  And were you aware of the town hall meeting
8  occurring before it happened or did you find out
9  afterwards?
10  A  I don't recall specifics, but usually it's
11  afterwards.
12  Q  Who is ████████████?
13  A  It's not ringing a bell.
14  Q  Is he a staff co-chair on DPUBLIC?
15  A  I really don't recall.
16  Q  What about Natalie Daniels, do you know who that
17  is?
18  A  I don't recall.
19  Q  Do you know who currently is the head of DPUBLIC
20  at this time?
21  A  No, I do not.
22  Q  Does DePaul have a diversity advocate currently?
23  MS. WERMUTH:  Objection.  Vague.  Assumes facts not
24  of record.

Page 108

1  BY THE WITNESS:
2  A  Diversity advocates exist within each college, so
3  it's not one diversity advocate.
4  BY MS. SCATCHELL:
5  Q  Does the College of Communication have a
6  diversity advocate?
7  A  I believe it does.
8  Q  And who is that person?
9  A  I believe it's think it's Luisela ██████
10  Q  Are you familiar with the term microaggressions?
11  A  Yes.
12  Q  What does that term mean to you?
13  MS. WERMUTH:  I'm just going to object to the form of
14  the question.  Go ahead.
15  BY THE WITNESS:
16  A  A microaggression where it can basically -- it's
17  kind of I would call it a death by a thousand cuts.  So
18  it's the idea that you can have small aggressions
19  leveraged against a person and over time.  It's a big
20  issue, so it can be anything from the way somebody is
21  greeted to the way somebody is ignored through the way
22  somebody is talked to, so it can come in many, many
23  forms.
24  Q  Okay.  And has anyone come to you while you were

Page 109

1  the Dean of the College of Communication alleging that
2  there's been microaggressions leveraged against them.
3  MS. WERMUTH:  Asked and answered.  There's
4  substantial testimony on this topic already.  Go ahead
5  and answer.
6  BY THE WITNESS:
7  A  I believe in the meeting that was held with ███
8  ██████ and Sydney Dillard that was brought up.
9  BY MS. SCATCHELL:
10  Q  And do you know what was done to address those
11  issues of microaggressions?
12  A  It depends --
13  MS. WERMUTH:  Hang on.  Let me just object.  Assumes
14  facts not of record.  Go ahead.
15  BY THE WITNESS:
16  A  Again, you know, you'd have to tell me which
17  particular microaggression.  I tried to -- I had a long
18  discussion with ███ and Sydney during that meeting
19  trying to explain certain things, but there is not --
20  there isn't an action to be taken to every microaggression
21  that might happen or somebody might indicate has
22  happened.
23  BY MS. SCATCHELL:
24  Q  Okay.  And do you remember what specifically you

MAGNA ▶
LEGAL SERVICES

Page 110

1  stated about the microaggressions to ███ or Sydney
2  during the meeting that you're referencing?
3      MS. WERMUTH: Objection. Vague. Objection. Assumes
4  facts not of record. Go ahead.
5  BY THE WITNESS:
6      A  It was in response to whatever they brought up,
7  so I didn't bring up the issue of microaggressions. If I
8  recall, they brought up examples of microaggressions that
9  they felt, perceived.
10  BY MS. SCATCHELL:
11      Q  And do you know if there was an independent
12  investigation into those specific microaggressions that
13  were brought up?
14      A  That is when I referred back to our discussion to
15  Barbara ███, so I don't know if they investigated
16  those or not.
17      Q  And I'm going to show you what I'm going to mark
18  as Exhibit No. 19. Okay. You should have it now.
19      MS. WERMUTH: I don't yet.
20  BY MS. SCATCHELL:
21      Q  And this is going to be referred to as
22  Dillard_DePaul 8157 to 8161.
23                      (Exhibit No. 19 was marked
24                      for identification.)

Page 111

1  BY MS. SCATCHELL:
2      Q  Okay. Do you recognize that document?
3      A  I do.
4      Q  And what is this document?
5      A  This was a message from faculty staff and
6  students of African descent, the DPUBLIC community, I
7  think.
8      Q  Okay.
9      A  And the Black Student Union.
10      Q  And what is the Black Student Union?
11      A  A group of students of Black students
12  organization.
13      Q  And do you see on Page 8158 where it says
14  University climate?
15      A  Yes.
16      Q  Do you know what they're referencing when they
17  mention in the Faculty Handbook 4.4.1, misconduct charge?
18      A  Yes.
19      Q  Okay. What is that referring to?
20      MS. WERMUTH: Let me just object on relevance
21  grounds. Go ahead.
22  BY THE WITNESS:
23      A  The Faculty Handbook 4.4.1 outlines how
24  misconduct is to be handled at the University. Faculty

Page 112

1  Handbook 4.4.1 was developed by a committee and approved
2  by Faculty Council for inclusion in the Faculty Handbook.
3      Q  And do you have any idea why that would be
4  referenced in this letter?
5      MS. WERMUTH: Objection. Foundation. Calls for
6  speculation.
7  BY MS. SCATCHELL:
8      Q  If you know.
9      A  I do. There was some question about the way
10  4.4.1 was phrased that it could be targeting particularly
11  faculty of color or Black faculty.
12  BY MS. SCATCHELL:
13      Q  Okay. And do you know what language in
14  particular was the concern?
15      A  I think, and I don't have the handbook in front
16  of me, but it said something about misconduct based on a
17  bunch of things including a pattern of intimidation and
18  something else, but I can't remember what the exact
19  wording was.
20      Q  Okay. And then do you see the section on Page
21  8159 where it says limited accountability and commitment
22  to diversity, inclusion, and equity?
23      A  I'm sorry, can you say which page again?
24      Q  Sure. 8159.

Page 113

1      A  Yes, I see it.
2      Q  Okay. And do you know in the first sentence it
3  says, faculty, staff and students uniformly discussed a
4  gap between DePaul stated DEI commitment and their actual
5  record of accomplishment? Do you know what meeting
6  they're referring to or discussion rather?
7      A  No, I do not.
8      Q  Okay. And then do you see in the second
9  paragraph where it says mentioning listening tours?
10      A  Yes.
11      Q  What is a listening tour?
12      A  A listening tour were tours organized between the
13  President, the Vice-President Office of OIDE, ███
14  ███ and myself, and there might have been
15  somebody else where we met with different affinity groups
16  on campus to listen to their concerns, issues, and so on.
17      Q  Okay. Were you at any of the --
18      A  Yes, I was.
19      Q  Do you know how many listening tours there were
20  in, let's say, the last three years?
21      A  Well, I think they were started last year and
22  they were with each of the affinity groups, maybe six or
23  seven, or at least some with the affinity groups, six or
24  seven. I can't remember the exact number.

MAGNA ▶
LEGAL SERVICES

Page 114

1    Q   And by affinity groups, could you explain what
2  you mean by that?
3    A   Yeah, like with the DPUBLIC, it's called ERG
4  and now -- something, group.  So it would be one for
5  women, one for gay and lesbian groups, one for Latino
6  groups, and so on.  They were organized by the Office of
7  the President.
8    Q   Okay.  And then on the last page or second to
9  last page, Page 8160.
10   A   Yes.
11   Q   Sorry.
12   MS. WERMUTH:  We're there.  Tell us what the question
13  is.
14  BY MS. SCATCHELL:
15   Q   Where it says please contact the officers of
16  DPUBLIC and Black Student Union to arrange a meeting
17  before May 21, 2021.  Do you know who they're calling on
18  to arrange a meeting?
19   A   I believe they were requesting a meeting.  If you
20  go up to the beginning of the recommendation, a meeting
21  between President Esteban and the President of the Board
22  of Trustees.
23   Q   Do you know if any meeting happened with either
24  the Board of Trustees, the President and the Student

Page 115

1  Organization and DPUBLIC?
2    A   I do not know if there was a meeting.
3    Q   Okay.  And on Page 8157 it mentions an
4  organization called, CEID, which is Faculty Council on
5  Equity, Inclusion and Diversity.
6    A   Yes.
7    Q   What is that?
8    A   Faculty Council developed a committee called CEID
9  made of different faculty members.  Faculty Council has
10  multiple committees and this was a new committee that
11  they formed called CEID, which is the committee on
12  equity, inclusion and diversity.
13   Q   Have you discussed this document with anyone from
14  the University?
15   A   It was addressed at the cabinet.
16   Q   What's the cabinet?
17   A   The cabinet is the president, the
18  vice-presidents.  So the cabinet has several
19  vice-presidents including myself, the chief of staff, and
20  the president.
21   Q   Okay.  And do you recall when it was mentioned at
22  the cabinet?
23   A   No, I do not.
24   Q   Okay.  And do you recall what was mentioned

Page 116

1  during the cabinet about this letter?
2    MS. WERMUTH:  Can I just interject here?  Insofar as
3  the General Council as part of the cabinet, to the extent
4  there was any attorney/client privileged discussion being
5  had at the cabinet, I would instruct you not to answer.
6    MS. SCATCHELL:  Okay.  I am not looking for any
7  attorney/client privileged information.  I am looking for
8  topics of what was discussed at the cabinet meetings.  So
9  you're allow to testify as to topics, just not what was
10  said about those specific topics.
11   MS. WERMUTH:  You can answer in that way.  So to the
12  extent there was --
13   THE WITNESS:  What?
14   MS. WERMUTH:  You can answer in the way that she
15  described.  So I don't want you to get into specifics of
16  anything conveyed from the General Council, or you know,
17  seeking the General Council's advice and input from a
18  legal perspective.  But insofar as there were -- you can
19  provides topics of information that were discussed, that
20  is fine.
21  BY THE WITNESS:
22   A   To be honest, I remember we addressed or looked
23  at the concerns that had come up, but in what possible
24  actions could be taken, and that's it.

Page 117

1    MS. SCATCHELL:  Okay.  Could you read back her
2  answer?
3         (Answer read.)
4    THE WITNESS:  That's all I can share.
5  BY MS. SCATCHELL:
6    Q   Okay.  And do you know what action, if any, was
7  taken?
8    A   Well, there are a lot of actions taken by the
9  University that address several of these.  Like the
10  implicit bias training for all faculty and staff, I know
11  we had started it on the faculty side, and they
12  implemented it on the staff side.  There was a lot of
13  work done a campus-wide diversity plan where every unit
14  came up with a diversity plan.  Since I've become
15  provost, we've hired several deans, who are persons of
16  color.  ███  ██ is working on a website for DEI
17  Metrics.  So there's been a lot.  There's been action
18  that has been taken.
19   Q   And when you say faculty of color has been hired,
20  are you referring to domestic faculty of color or
21  international faculty of color?
22   A   I made a reference to deans.  And since I became
23  provost, we have two African-American deans, and starting
24  in July there will be a third African-American dean.

MAGNA ▶
LEGAL SERVICES

Page 118

1  Now, I'm assuming they are born in the U.S., but I've
2  never specifically asked that question.
3     Q  Okay.  And were you aware of any sort of petition
4  that was circulated to you regarding the tenure process
5  being disproportionately -- actually, let me rephrase
6  that question and come back to that one.
7        You previously testified that there was no
8  implicit bias training, correct?
9     MS. WERMUTH:  Objection.  Totally misstates her
10  testimony.
11  BY THE WITNESS:
12     A  That there isn't.
13  BY MS. SCATCHELL:
14     Q  Or it's not a requirement, I apologize.
15     A  Yes, it is for all searches.
16     Q  Okay.  But it's not required for any other
17  faculty?
18     A  For like personnel?
19     Q  Yes.
20     A  No, but we're working on it.
21     MS. DILLARD:  Working on it.
22     MS. SCATCHELL:  Could you mute yourself.
23     MS. DILLARD:  I'm sorry.
24     MS. SCATCHELL:  You know what, could we take a quick

Page 119

1  five-minute break?  I think we're almost finished
2  wrapping up here.
3     MS. WERMUTH:  Yeah, sure.
4            (Short recess.)
5        (Discussion was had before going
6         back on the record.)
7     MS. SCATCHELL:  All right.  Back on the record.  Was
8  it ever brought to your attention that there was an
9  external petition circulating from professors and
10  graduate students from across the country that were
11  calling to end a system of racism at DePaul's College of
12  Communication.
13     A  Yes.
14     Q  Okay.  What was brought to your attention?
15     A  I think I saw it on Facebook.  I don't recall
16  exactly where I saw it, but I saw it somewhere.
17     Q  Okay.  And was it ever emailed to you?
18     A  I do not recall how exactly I saw it, but I did
19  see it.
20     Q  Okay.  And do you remember what the gist of this
21  petition was about?
22     A  I'd have to look at it again.
23     Q  Was it fair to say that it was calling for some
24  end to some sort of racism?

Page 120

1     MS. WERMUTH:  Objection.  Vague.  Go ahead.
2  BY THE WITNESS:
3     A  Yes.
4  BY MS. SCATCHELL:
5     Q  At the College of Communication at DePaul?
6     A  I believe so, yes.
7     Q  And did you speak with anybody at the University
8  with regards to this petition?
9     A  I probably mentioned it to a few people, but I
10  don't recall any specific conversation about it.
11     Q  Okay.  And you say probably mentioned it to a few
12  people, who potentially would those people have been?
13     A  I might have mentioned it to the president.  I
14  might have mentioned it to Lexa.  I might have mentioned
15  it to an associate provost, but I really don't recall
16  specific conversations.
17     Q  Okay.  And would that be something that you could
18  review your emails to see if you were ever sent a copy of
19  this petition?
20     A  I can check and see.
21     Q  And that's something you could provide to your
22  attorney?
23     A  If I find it, yes.
24     MS. WERMUTH:  And if it's called for by your

Page 121

1  discovery requests, yes.
2  BY MS. SCATCHELL:
3     Q  Do you recall feeling concerned about the
4  contents of this petition when you read it?
5     MS. WERMUTH:  Objection.  Vague.  Go ahead.
6  BY THE WITNESS:
7     A  I am not sure what you meant by concerned.
8  BY MS. SCATCHELL:
9     Q  Well, they're accusing the College of
10  Communication of having a systemic racism problem, was
11  that concerning to you?
12     A  It was upsetting, yes.
13     Q  Okay.  And did you ever have a call with Faculty
14  Council regarding this petition?
15     A  Not that I recall.
16     Q  And did Faculty Council ever make you or ever say
17  anything to the effect of there is a racism problem at
18  DePaul?
19     A  Did Faculty Council ever say that in the history
20  of Faculty Council?
21     Q  No, no, since you've been the provost, I
22  apologize.  And that would be acting, interim, or
23  permanent?
24     A  I don't attend every meeting of Faculty Council,

MAGNA ▶
LEGAL SERVICES

Page 122

1  so I can't really say if it was addressed in a particular
2  meeting or not.
3      Q   Okay. And then I'm going to show you what I'm
4  going to mark as Exhibit No. 25.
5               (Exhibit No. 25 was marked
6               for identification.)
7  BY MS. SCATCHELL:
8      Q   And that is the second amended complaint that was
9  filed on April 7, 2021?
10     MS. WERMUTH: Are you marking it or --
11     MS. SCATCHELL: I just emailed it to you.
12     MS. WERMUTH: Okay. Got it.
13 BY MS. SCATCHELL:
14     Q   Okay. Do you recognize that document?
15     A   I think I do, yes.
16     Q   And what is that document?
17     A   It is --
18     MS. WERMUTH: Objection. Foundation. Go ahead.
19 BY THE WITNESS:
20     A   It says it's the second amended complaint.
21 BY MS. SCATCHELL:
22     Q   And you said you think you do, what is your basis
23 for that?
24     A   Well, you know, I get these and I look at them

Page 123

1  and I can't remember if this was the second one or the
2  exact details of it.
3      Q   Okay. But you understand that to be the second
4  amended complaint in the lawsuit, Sydney Dillard versus
5  DePaul University, correct?
6      A   Correct.
7      Q   And you don't have any reason to believe that
8  that isn't a true and accurate representation of the
9  second amended complaint?
10     MS. WERMUTH: Objection. Foundation. Go ahead.
11 BY THE WITNESS:
12     A   No, I don't.
13 BY MS. SCATCHELL:
14     Q   And we had previously discussed microaggressions,
15 correct?
16     A   Yes.
17     Q   Did you ever ask Ms. Dillard to touch her hair?
18     A   I do not recall.
19     Q   Okay. When a tenure-track faculty member was
20 evaluated in terms of their student evaluations, was
21 there some sort of standard that -- let me back up.
22          The student evaluations as it relates to
23 the tenure review, how was that standard or was there a
24 standard that made sure that the evaluations were looked

Page 124

1  at objectively and not subjectively?
2      MS. WERMUTH: Objection. Assumes facts not of
3  record. Vague. Confusing. Go ahead.
4  BY THE WITNESS:
5      A   There's a quantitative score that comes in for
6  the variety of questions and they are anonymous by the
7  student, so that's the quantitative part. And the
8  qualitative part where students respond, those are
9  anonymous as well.
10 BY MS. SCATCHELL:
11     Q   How does the personnel committee determine which
12 parts of the student evaluation to consider?
13     A   I think they look at them all, and they see if
14 there's anything that has, where are the high scores,
15 what are the average scores, where are of the low scores.
16     Q   And is there any way to say if there was an
17 outlier where there was one student that says this is the
18 worst teacher I've ever had. Do you know how that would
19 factor into the personnel committee's evaluation?
20     MS. WERMUTH: Objection. Calls for speculation --
21     MS. SCATCHELL: If you know --
22     MS. WERMUTH: It's an incomplete hypothetical --
23 BY MS. SCATCHELL:
24     Q   If you know.

Page 125

1      A   They look at in terms of the qualitative
2  responses if there are multiple students saying that, if
3  it's one student in multiple classes saying that. It's
4  kind of looked at holistically.
5      Q   Okay. And do these do these teaching
6  evaluations, in your opinion, do you believe that they
7  are a strong indicator of the quality of how a teacher
8  teaches a course?
9      A   It is one of the indicators and it is one of the
10 ways that the University reviews faculty teaching.
11     Q   Okay. And so you said there was the qualitative
12 and then the quantitative aspect of the teaching
13 evaluations, correct?
14     A   Correct.
15     Q   So is there an open-ended section of the teaching
16 evaluation for the student to fill out?
17     A   I don't believe it's just open-ended. I believe
18 there are questions and the students can respond in their
19 own words.
20     Q   Okay. And in your opinion, do you think that
21 there could be a racial or implicit bias in the student
22 opinion of teaching surveys?
23     MS. WERMUTH: Objection. Vague. Calls for
24 speculation. Go ahead.

MAGNA ▶
LEGAL SERVICES

Page 126

1   BY THE WITNESS:
2       A   It's possible, yes.
3   BY MS. SCATCHELL:
4       Q   And does the personnel committee do anything to
5   minimize the risk of racial bias or implicit bias coming
6   into student evaluations?
7       A   I don't believe that there is anything in
8   particular that they do, no.
9       Q   Okay.  And you had previously testified that the
10  personnel committee does not have -- it's not required
11  that the personnel committee be trained in implicit bias,
12  correct?
13      A   At this point, that is correct.
14      Q   Okay.  And if you know, is there a reason why the
15  search committee has a required training for implicit
16  bias, but the personnel committee does not?
17      A   No, I do not know.
18      Q   Okay.  And there's no requirement for implicit
19  bias training for deans of colleges, correct?
20      A   The deans do go through implicit bias training
21  because they're involved in the searches for faculty that
22  happen in their colleges.
23      Q   Let me just step out for a second with my client,
24  and we should be just about finished.

Page 127

1       MS. WERMUTH:  Okay.
2           (Brief recess.)
3   BY MS. SCATCHELL:
4       Q   Okay.  This is the last question.  In your
5   opinion, does implicit bias lead to issues of racism or
6   discrimination?
7       MS. WERMUTH:  I just object to the form of the
8   question.  It calls for speculation.  It asks for expert
9   opinion testimony from a lay witness, and on relevancy
10  grounds.  Go ahead.
11      THE WITNESS:  Can you repeat the question, please.
12      MS. SCATCHELL:  Could you read back the question,
13  please.
14          (Question read.)
15  BY THE WITNESS:
16      A   That is a question that requires a direct cause
17  and I am not an expert to be able to answer that
18  question.  That's why whenever there are allegations of
19  discrimination, I have to refer them to HR.
20      Q   Okay.  And is it your position that the HR staff
21  members are experts then?
22      A   They are trained to investigate.
23      Q   Okay.  We have no further questions.
24      MS. WERMUTH:  Great.  I have just a couple.

Page 128

1       THE WITNESS:  Okay.
2           EXAMINATION
3   BY MS. WERMUTH:
4       Q   Dr. Ghanem, how many deans are there at the
5   University?
6       A   10.
7       Q   Earlier today you testified about the meeting
8   where Dr. ████ and Dr. Dillard came to meet with you
9   in October of 2018.  Do you remember that testimony?
10      A   Yes.
11      Q   Okay.  And we saw in Exhibit No. 3 that you
12  escalated their concerns to Barbara ████ in the OIDE?
13      A   Let me just real quickly look at it.  Yes.
14      Q   And then you were asked about whether you did
15  anything to continue the conversation within the college.
16  Do you remember that line of questioning?
17      A   Okay.
18      Q   Yes, okay.  And shortly after that meeting, you
19  were elevated out of the college and into the acting
20  provost position; is that right?
21      A   That's correct, about a week later.
22      MS. WERMUTH:  Okay.  I am going to send you, Gia, a
23  document, and I suppose we can mark this as 52, does that
24  sound right?

Page 129

1       THE COURT REPORTER:  There was a 52 already.
2       MS. WERMUTH:  I will mark this as 53, and I will send
3   it to you.  Do you want me to send it to Dr. Dillard?
4   Gia, let me know when you get it.
5           (Exhibit No. 53 was marked
6           for identification.)
7       MS. SCATCHELL:  Okay.  Got it.
8       MS. WERMUTH:  You got it, okay.
9   BY MS. WERMUTH:
10      Q   So Dr. Ghanem, I am putting in front of you
11  what's been now marked as Exhibit No. 53, which is the
12  string of emails Bates labeled Dillard_DePaul 3667
13  through 3674.
14          So do you want to take a quick moment to
15  look through that?
16      A   Okay.
17      Q   Having reviewed this email trail, does this
18  refresh your recollection, Dr. Ghanem, as to whether or
19  not you communicated with Drs. ████ and Dillard about
20  following up with the dean, the acting dean of the
21  college as you moved out of the college?
22      A   Yes, it does.
23      Q   Okay.  And according to --
24      MS. SCATCHELL:  Really quick, I am just going to

MAGNA
LEGAL SERVICES

Page 130

1  object to foundation of it, but obviously we have an
2  answer.
3  BY MS. WERMUTH:
4      Q   Okay.  And according to this email trail, did
5  Sydney -- I'm sorry, forgive me.
6          Did Dr. Dillard affirmatively respond to
7  your discussion in that regard -- Strike that.  Let me
8  ask it this way.
9          How does Dr. Dillard respond to the
10  suggestion that they follow-up with the acting dean, Dr.
11  Murphy.
12     MS. SCATCHELL:  Objection.  Vague.  Calls for
13  speculation.
14  BY MS. WERMUTH:
15     Q   You can answer.
16  BY THE WITNESS:
17     A   According to this email, Dr. Dillard indicates
18  that she would still be open to meet with Lexa to focus
19  on priorities for developing pathways for diversity,
20  inclusion, and retention of minority tenured/tenure-track
21  faculty, but not to discuss the sensitive nature of the
22  previous discussion.  And then she asked for my
23  recommendation.
24     MS. WERMUTH:  Very good.  I have no further

Page 131

1  questions.
2              FURTHER EXAMINATION
3  BY MS. SCATCHELL:
4      Q   Okay.  Is this document about -- hold on.  Okay.
5  So on page 3668 of this document, which is Number 3, you
6  see where it states Hi, Salma and ▮▮▮ I would be open
7  to still meeting with Lexa if our priorities are
8  developing pathways for diversity, inclusion, and
9  retention of minority tenured/tenure faculty into the
10  vision and goals of the college.  Do you see that?
11     A   Yes.
12     Q   And so you see where it says diversity,
13  inclusion, and retention.  It doesn't say anything about
14  discrimination, correct?
15     A   Correct.
16     Q   Okay.  And in your opinion, based on the meeting
17  that you had with Ms. Dillard and Ms. ▮▮▮ would you
18  say that they brought up issues of diversity, equity,
19  inclusion?
20     A   Yes.
21     Q   And is it also fair to say that they brought up
22  issues about discrimination or harassment?
23     A   They mentioned the microaggressions that they
24  felt in the meeting and that is the reason why I

Page 132

1  contacted Barbara ▮▮▮.
2      Q   And the microaggressions were racial based
3  microaggressions, correct?
4      A   I believe so yes.
5      Q   And what if anything in this email thread led you
6  to -- actually, let me back up.
7          When you received this email thread from
8  between you, Ms. Dillard, and Mr. ▮▮▮ is that --
9  actually, strike that, too.  It's getting late.
10         Okay.  So is it fair to say that you did
11  not follow-up on this complaint after you became the
12  acting provost, correct?
13     A   No, I believe I did.  In terms of the priorities
14  for pathways for diversity, inclusion, and retention, I
15  suggested that they reach out to Dr. Murphy.  In terms of
16  the complaint of microaggressions, I had contacted
17  Barbara ▮▮▮, so both I believe both issues were
18  addressed.
19     MS. SCATCHELL:  Okay.  Thank you.  That's all I have.
20     MS. WERMUTH:  Nothing further.
21     THE COURT REPORTER:  Signature?
22     THE WITNESS:  We'll reserve.
23     THE COURT REPORTER:  Did you want this written?
24     MS. SCATCHELL:  Yes.

Page 133

1      MS. WERMUTH:   I'll take a copy.
2              * * * * * * * *
3              (Ending time: 4:26 p.m.)

Page 134

```
 1          REPORTER'S CERTIFICATE
 2       The within and foregoing statement of the
 3  witness, SALMA GHANEM, was taken before DEANNA L. TUFANO,
 4  CSR, and Notary Public, at 121 West Wacker Drive, Suite
 5  2300, Chicago, Illinois, County of Cook, at 11:00 a.m. on
 6  the 3rd of May, A.D., 2022.
 7       The said witness was first duly sworn and was
 8  then examined upon oral interrogatories; and the
 9  questions and answers were taken down in shorthand by the
10  undersigned, acting as stenographer and Notary Public;
11  and the within and foregoing is a true, correct, and
12  accurate record of all of the questions asked of and
13  answers made by the said witness, SALMA GHANEM, at the
14  time and place hereinabove referred to.
15       The undersigned is not interested in the within
16  case, nor of kin or counsel to any of the parties.
17       Witness my official signature and seal as Notary
18  Public in and for Cook County, Illinois on this
19  22nd Day of May, A.D., 2022.
20
            DEANNA L. TUFANO, CSR
21          CSR No. 084-003819
            MAGNA LEGAL SERVICES
22          SEVEN PENN CENTER
            1635 MARKET STREET, 8TH FLOOR
23          PHILADELPHIA, PA 19103
            (866) 624-6221
24
```



**A**

**abbreviation**
32:2
**ability**
5:23 8:10 55:9
**able**
9:3 48:18 127:17
**abroad**
103:15
**academic**
6:8 13:10 21:24
34:19 35:1 91:24
103:3
**accept**
73:18,22 74:5,10,18
**accepted**
74:8 96:5
**accepting**
73:14,16
**accepts**
70:23 71:3,5
**access**
45:15
**accommodation**
50:6 51:12,15 58:9
59:18
**accommodations**
49:16,20,21 51:9
**accomplishment**
113:5
**accountability**
112:21
**accurate**
6:2 77:12 97:15
123:8 134:12
**accurately**
5:3
**accusing**
121:9
**acting**
6:24 7:3,4,5 9:18,24
10:24 23:16,22
26:21 38:16 121:22
128:19 129:20
130:10 132:12

134:10
**action**
63:13 86:9,10,13,15
89:7 90:3,17 91:7
109:20 117:6,17
**actions**
88:15 90:18 91:3
116:24 117:8
**active**
36:14
**activities**
17:24 83:23
**actual**
113:4
**add**
82:20
**added**
55:4
**addendum**
66:4
**additional**
66:3 78:21 101:20
**address**
43:10 51:3,9 82:24
92:16 109:10 117:9
**addressed**
79:3 115:15 116:22
122:1 132:18
**addresses**
91:14,21
**administration**
105:22
**administrator**
54:2
**advertising**
32:18 54:8
**advice**
116:17
**advisor**
98:1 105:22 106:1
**advocate**
103:22 104:7,9,13
107:22 108:3,6
**advocates**
108:2
**affairs**

6:11 91:24
**affect**
5:23
**affinity**
41:23 42:7 113:15,22
113:23 114:1
**affirmatively**
130:6
**African**
111:6
**African-American**
20:18 21:1,3 94:9
96:20,22,24 117:23
117:24
**African-Americans**
20:23 97:4
**Afternoon**
34:16
**aggressions**
108:18
**agree**
34:18 58:8 80:23
92:22 93:2,5
**agreements**
8:11
**ahead**
17:5 26:3 29:3 32:21
35:6 39:21 40:12
41:14 42:4 43:23
46:20 48:16 56:17
57:11 59:16 62:19
64:1 66:15 74:1
77:6 94:3 102:20
105:10 108:14
109:4,14 110:4
111:21 120:1 121:5
122:18 123:10
124:3 125:24
127:10
**Alexandra**
9:16 64:16
**allegations**
99:23 127:18
**alleging**
109:1
**allow**

55:20 56:2 98:24
116:9
**allowed**
106:20
**alternate**
87:7 88:4

108:9
**amended**
122:8,20 123:4,9
**America**
103:17
**American**
10:12
**analytics**
89:10,13
**Anna**
2:8 102:1
**announce**
92:3
**annual**
75:5
**annually**
75:1
**anonymous**
124:6,9
**answer**
5:5,14,15,18 9:8
45:11 50:1,2 74:2
74:15 75:13 109:5
116:5,11,14 117:2,3
127:17 130:2,15
**answered**
109:3
**answering**
5:6
**answers**
74:17 76:14 134:9,13
**anybody**
7:19 19:7 37:20 48:4
120:7
**anytime**
72:6
**apologize**
4:19 49:24 56:6
67:20 68:24 100:18

118:14 121:22
**appeal**
59:11 61:6 90:7
**appeals**
55:4
**appear**
83:24
**appears**
50:24 86:11
**applications**
47:16
**applied**
33:10,11,16
**applying**
33:13
**appoint**
72:2
**appointed**
6:22 23:16 47:8
**appointment**
21:8,10,11 92:3
 105:10
**appointments**
21:9
**approach**
37:20 44:10
**approached**
38:9 100:6,21
**approaches**
78:23 79:4 83:1
**appropriate**
25:10
**appropriating**
89:22 93:6
**approved**
85:15 112:1
**approximately**
10:22 21:22 24:23
 46:6
**app.box.com**
84:1
**April**
122:9
**area**
43:6 70:1 81:1
**areas**

15:13 17:1,1,4,10
 44:11 48:19,20,22
 52:20
**argumentative**
62:18 94:2
**arrange**
114:16,18
**arrival**
95:12
**articles**
17:24
**Arts**
11:8 88:5
**asked**
28:14 55:22 70:13
 71:9 74:14 84:21
 109:3 118:2 128:14
 130:22 134:12
**asking**
37:1,11 59:10,12
 84:18 103:4
**asks**
70:8 127:8
**aspect**
125:12
**assigned**
54:1
**assignments**
18:12 81:6,24
**assistance**
49:21
**assistant**
7:21 41:7 49:22,22
**assistants**
52:1
**associate**
9:23 13:12 19:17,19
 44:23 45:24 46:8,10
 46:11,12,18 47:8,22
 47:22 48:21,24
 52:11 64:19,20
 91:19,23 100:11
 120:15
**associations**
90:2
**assume**

5:18 9:17 77:9 82:17
**assumes**
9:5 31:5 42:3 45:17
 71:14 73:24 94:3
 103:2 107:23
 109:13 110:3 124:2
**assuming**
72:14 118:1
**attached**
98:1
**attachment**
85:3
**attachments**
84:24 85:3
**attend**
68:7 106:17 121:24
**attended**
74:20 106:23
**attending**
107:4
**attention**
36:2 119:8,14
**attorney**
103:1 120:22
**attorneys**
7:18
**attorney/client**
116:4,7
**attracting**
89:23 93:7,12
**at-will**
7:16
**Austin**
10:18
**authority**
11:2
**available**
27:21 52:1 70:15
**average**
124:15
**aware**
33:9 37:10,12 38:23
 41:12 42:20 43:8
 44:14 73:5,6 75:7
 75:10 94:5 101:19
 106:9 107:7 118:3

awermuth@cozen....
2:10
**A.D**
134:6,19
**a.m**
1:16 134:5

**B**

**B**
3:7
**back**
7:2,7 10:24 12:20
 16:19 29:15 30:8
 39:8 49:24 74:4
 96:16 101:7 110:14
 117:1 118:6 119:6,7
 123:21 127:12
 132:6
**bad**
29:20 68:24
**Barbara**
22:20 23:1,2,20,21
 25:13 27:2 28:4,9
 30:11 31:3,4,9,10
 31:16 34:17 50:10
 110:15 128:12
 132:1,17
**based**
12:13 56:9 72:4
 74:21 78:19 85:2
 98:10,16,20,23
 99:24 100:7,22
 104:18 112:16
 131:16 132:2
**basically**
106:17 108:16
**basing**
24:13
**basis**
13:2,14 91:4 94:1
 122:22
**Bates**
15:21 32:5 129:12
**becoming**
11:4
**beginning**



36:7 65:11 114:20
**behalf**
2:6,11 4:3 85:16
**believe**
8:9 10:2,23 14:24
15:7 20:10,21 21:1
22:23 23:3,4,24
24:3 25:7,15,16
26:22 27:3,17 31:9
32:23 34:18,20
35:24 38:20 39:2
40:19 41:4,6 42:10
43:17 44:1,21 45:14
48:20 49:2 50:12,20
52:2,16 53:24 54:7
55:16 57:23 58:2,9
58:12 61:23 63:7,18
65:8,22 71:17 74:7
74:20 76:24 77:2,12
78:15 87:10,18 88:7
88:9 91:16 92:16
93:21 96:15,18,23
97:14,22 99:4,11
103:15,20,24
104:19 105:14,16
108:7,9 109:7
114:19 120:6 123:7
125:6,17,17 126:7
132:4,13,17
**bell**
107:13
**Bellavia**
50:24 51:6,11
**Bellavia-**⬛
50:19
**benefit**
53:21
**Benefit's**
60:11
**best**
35:9 55:9
**bet**
77:23
**better**
34:9 98:5,17
**bias**

43:8 44:7,9 45:1
117:10 118:8
125:21 126:5,5,11
126:16,19,20 127:5
**biases**
44:13
**big**
108:19
**biggest**
12:5
**bit**
16:22 17:13,14 18:5
76:9
**Black**
20:10 41:24 87:10,18
94:17 99:15 106:12
107:5 111:9,10,11
112:11 114:16
**blank**
103:21
**block**
54:11,19
**Board**
8:20,23 64:21 65:13
114:21,24
**Bola**
53:15,18 54:17 56:14
59:9,12,21 62:10
63:9,17,19
**books**
18:1
**born**
20:22,23 21:1 94:17
97:3 118:1
**bottom**
23:8 32:10 84:1
**Box**
84:5
**break**
30:4,10 60:13 77:22
77:24 101:3,5 119:1
**Brief**
12:19 127:2
**bring**
29:23 110:7
**BRITTANY**

2:8
**brought**
17:9 25:22 69:21
79:2 109:8 110:6,8
110:13 119:8,14
131:18,21
**bubble**
16:11,14
**budget**
44:2 93:18
**bulk**
32:12
**bullet**
36:5,6 69:23 89:8,23
93:7,23
**bullying**
22:24 24:4
**bunch**
81:23 84:1 112:17
**buying**
88:16 89:2 93:22
94:6
**B-O-L-A**
53:18

---

**C**

**C**
2:1 87:3
**cabinet**
115:15,16,17,18,22
116:1,3,5,8
**calendar**
7:21
**call**
4:11 27:20,22 28:2
47:15 54:24 55:13
89:13 108:17
121:13
**called**
4:3 10:13 41:13
91:13 114:3 115:4,8
115:11 120:24
**calling**
114:17 119:11,23
**calls**
19:9 35:5,15 40:11

43:22 45:18 49:2,5
49:5 59:15 77:5
112:5 124:20
125:23 127:8
130:12
⬛
21:15 22:22 24:2
25:20 38:9 100:15
100:19 109:8 128:8
129:19 131:17
132:8
**campus**
41:19,22 43:9 113:16
**campus-wide**
117:13
**candidate**
68:1 72:1 74:12,19
76:1,13,19 77:4
**candidates**
71:9 77:17 83:23
**candidate's**
16:24
**case**
26:1 45:10 65:4,9
90:12 134:16
**cases**
4:18 26:5 28:5
**Catholic**
12:7,11 52:17
**Catholicism**
12:12
**cause**
127:16
**cc**
61:16
**cc'd**
58:4,5 61:21
**CEID**
115:4,8,11
**cell**
27:20,22
**CENTER**
134:22
**Central**
11:8,18,21 12:3,5
**certain**



45:10 50:5 71:24
92:19 109:19
**CERTIFICATE**
134:1
**Certified**
1:13
**cetera**
98:7
**chain**
30:11 31:13,19
**chair**
14:9,9 32:24 33:2,22
34:34 36:13,18 37:4
54:7 69:14 70:12,15
71:6,13 72:8,10,14
72:15,22 73:1,3,8
73:12 74:6 75:24
76:2,13,19 77:4,17
87:13,15 88:1
101:20 102:14
103:24 104:1
**chairs**
72:18,24 74:24 75:6
**chair's**
77:13
**changed**
29:1 68:12 79:4 82:6
82:12
**changes**
67:8
**characterize**
66:13
**characterized**
66:19
**charge**
19:17 29:22 46:8
89:16 111:17
**check**
45:20,21 62:21
120:20
**checked**
55:11 62:21
**chemistry**
47:12 87:16 88:1
**Chicago**
2:4,9 134:5

**chief**
6:8 115:19
**China**
58:13,18
**Chinese**
58:7
**chose**
71:20
**chosen**
101:19
■
54:4,6 55:1 61:17,19
61:22 73:8,9 101:19
**Cindy**
113:14
**circulated**
67:7 118:4
**circulating**
119:9
**Civil**
1:10
**claim**
54:1 61:7
**clarify**
70:11
**class**
18:9,10 58:18
**classes**
33:5 49:22 58:15,18
81:9 125:3
**classification**
11:12 44:2
**classified**
43:17 44:3
**classifies**
22:11
**classroom**
43:11
**clear**
5:5 72:16 75:17
**client**
126:23
**climate**
104:20,23 111:14
**CMN**
32:1

**Code**
1:10
**colleague**
10:6
**colleagues**
18:11
**college**
6:18 9:13 11:5,7 13:1
13:2,8 14:5,5,9
17:18 20:6,12 21:18
23:1,9 24:5,18,19
24:21 32:2,16 34:8
35:12,18 54:6 55:2
65:1 68:15 69:24
70:4,8,12,23 71:3,8
72:15,18 73:21 75:1
75:4 80:20 83:15
84:8 88:4 94:10,18
99:8,22 100:5,12,19
101:22 102:23
103:13,23 104:10
104:21 108:2,5
109:1 119:11 120:5
121:9 128:15,19
129:21,21 131:10
**colleges**
6:9,17 13:5,9 14:6,6
126:19,22
**college's**
65:9
**color**
23:1 24:5,7,9 86:10
88:11,14,16 89:3,23
93:1,7,13,22 94:6
112:11 117:16,19
117:20,21
**come**
7:7 10:3 14:1 65:19
92:17 104:15 105:5
108:22,24 116:23
118:6
**comes**
14:11 80:11 85:15
86:14 89:14 124:5
**coming**
126:5

**commend**
78:22 83:22
**commending**
79:5
**comment**
16:11,14
**commentary**
66:3
**commitment**
89:22 93:6,14 112:21
113:4
**committee**
14:4,7,10 15:5 43:14
44:18,20,21 68:2
79:15,15,19,19,24
87:14 112:1 115:8
115:10,11 124:11
126:4,10,11,15,16
**committees**
43:8 115:10
**committee's**
124:19
**communicated**
129:19
**communication**
9:13 10:16 11:7 20:7
20:12 21:19 23:9
24:18 32:3,17 34:8
35:19 51:6 54:7
55:2 63:9 65:2,17
68:15 94:10,18 99:9
99:22 100:5,13
102:23 103:13,23
104:10 108:5 109:1
119:12 120:5
121:10
**communications**
11:5 13:1,2 37:1,7
38:14 72:19 84:9
100:19
**community**
17:20 43:11 111:6
**compare**
11:21
**comparing**
12:1



**complaint**
25:22,24 26:11 28:22
  28:24 34:21 35:1
  38:17 122:8,20
  123:4,9 132:11,16
**complaints**
23:6 25:19 29:12,22
  99:16 100:14,21
**complete**
43:18 70:24
**completed**
10:23
**completely**
39:20
**compliance**
43:16,18 45:6,20
**component**
33:24
**computerized**
45:5,7
**concern**
15:13 17:4 112:14
**concerned**
121:3,7
**concerning**
121:11
**concerns**
24:18 36:11 79:2
  86:9 88:11,14 92:24
  113:16 116:23
  128:12
**conditions**
49:8,11
**conducted**
46:13 81:12
**conducts**
89:11
**confused**
76:9
**Confusing**
124:3
**congratulating**
79:5
**connection**
49:14
**consider**

10:5,7 36:22 124:12
**consideration**
77:10
**considered**
8:8 16:20 17:15 35:1
  43:21 98:4
**consistently**
88:13
**constraints**
93:15,17
**contact**
25:11 63:14 114:15
**contacted**
55:18 132:1,16
**contain**
84:5
**contents**
121:4
**context**
17:15 36:14
**continue**
128:15
**continued**
106:21
**continues**
65:16
**contract**
7:15,16
**contracts**
8:10
**control**
105:23
**convenes**
86:4
**conversation**
27:19 36:16 39:4
  55:5,8 60:14 104:17
  120:10 128:15
**conversations**
26:10 120:16
**conveyed**
116:16
**Cook**
134:5,18
**coordinator**
33:19

**copied**
57:19,20
**copies**
84:18 90:21
**copy**
27:16,17 69:6 97:15
  102:1 120:18 133:1
**correct**
4:24 5:1 6:2,3 8:5,6
  16:4 21:21 23:10,12
  25:13 27:7 30:12,13
  31:20,21,23,24
  32:13 38:6,7,11,12
  40:5 42:21 47:21
  48:12 51:4 52:4
  57:9,21,22 61:18,20
  62:5,6 64:17,23
  65:15 73:1,2 79:20
  82:5 83:17 86:6,7
  86:18 94:10 96:20
  96:21,22 97:1,2,20
  102:15 104:7 118:8
  123:5,6,15 125:13
  125:14 126:12,13
  126:19 128:21
  131:14,15 132:3,12
  134:11
**council**
13:11,13 85:14,20,22
  85:24 86:4 87:1,6
  87:12,13 88:2,5
  90:4,16,20 91:1,2
  92:20,23 112:2
  115:4,8,9 116:3,16
  121:14,16,19,20,24
**Council's**
85:18 86:8 116:17
**counsel**
5:12 134:16
**count**
33:23
**country**
119:10
**County**
134:5,18
**couple**

36:24 47:16 106:13
  127:24
**course**
51:14,19 81:24 125:8
**Court**
1:1,11 5:8 129:1
  132:21,23
**COZEN**
2:7
**co-chair**
107:14
**Craig**
39:12
**create**
92:19
**created**
34:3 59:13
**creative**
17:24 83:23
**Crouse**
106:4
**CSR**
2:13 134:4,20,21
**current**
6:5 7:1 12:24 87:21
  91:9
**currently**
18:10 103:23 106:2
  107:19,22
**cuts**
108:17
**CV**
98:1
**Cynthia**
46:1 47:6
**C.S.R**
1:24

---
**D**
---
**D**
3:1
**Daniels**
107:16
**data**
89:8,14,14,16
**date**



38:5 94:16
**dated**
86:5
**day**
27:21,22 134:19
**days**
25:1
**day-to-day**
13:2
**De**
103:9,11,12 104:12
**dealing**
92:18
**deals**
43:19 50:5
**dealt**
35:12
**dean**
9:4,9,13,21,23,24
   10:3,8 11:4,7 15:7
   19:17,19,22,24 23:9
   23:18,22 25:18
   31:23 34:8,19 35:18
   38:15 41:7 44:3
   46:18 51:13 52:11
   68:1 69:24 70:4,7
   70:12,23 71:3,5,7
   71:19 72:4 73:18,21
   74:1,4 75:1,4 99:21
   100:4,9,11,12,13,18
   104:10,13 109:1
   117:24 129:20,20
   130:10
**Deanna**
1:13,24 2:13 5:8
   134:3,20
**deans**
9:22 13:11,13,13,14
   14:10 117:15,22,23
   126:19,20 128:4
**dean's**
33:5
**Dear**
65:11
**death**
108:17

**December**
97:19
**decide**
7:8,11
**decided**
37:5 96:11
**decision**
9:1,3 15:7 46:2 47:17
   48:7 56:9 74:1,10
   74:18 80:6 81:17
   98:7
**decisions**
48:5
**dedicated**
48:3,10,21,24 49:3
   89:22 93:6,12
**Defendant**
1:7 2:11
**defined**
17:4 24:7
**DEI**
42:13,24 43:5,10
   45:24 46:11,12,18
   47:21,23 48:24
   91:24 92:18 113:4
   117:16
**deliberations**
8:19,21 36:19
**delineation**
105:8
**denied**
22:9 55:17 56:12
   61:7 63:10 95:11
   96:6
**department**
8:24 14:4,8,9 30:3
   47:13 50:5,9,11,20
   53:20 87:7,16 88:1
**departmental**
17:18
**departments**
14:6
**department-wide**
14:8
**DePaul**
1:6 6:6,16 7:19 8:7,8

9:12 10:4,9 11:22
   12:4,6,10,11,13,14
   12:17,23 29:13
   40:22 42:1,2 43:4
   44:16,17 45:12
   52:16,19,20,23 54:1
   89:19 95:1,12,13,15
   106:10 107:22
   113:4 120:5 121:18
   123:5
**DePaulia**
105:17,17,24 106:7
**DePaul's**
119:11
**depends**
12:1 17:23 43:6
   106:22 109:12
**deposed**
4:14
**deposition**
1:9 4:17 7:19,20,22
   7:24
**depositions**
1:12 4:22
**descent**
111:6
**described**
15:6 116:15
**detail**
86:1 104:24
**details**
56:13 67:21 69:3
   123:2
**determination**
35:9 48:15
**determine**
124:11
**develop**
34:9
**developed**
112:1 115:8
**developing**
130:19 131:8
**developmental**
16:20
**Diaz**

30:23,24 31:11
**dictate**
105:23
**difference**
7:4 11:1 12:5 15:2
   21:4 91:17
**differences**
12:4
**different**
16:7 41:22,23 42:7
   52:20 83:1 94:12
   113:15 115:9
**Dillard**
1:3 2:15 20:3,6 22:22
   24:1 25:20 32:11
   37:5 38:9,13 49:7
   51:10,14 52:1 55:5
   55:12,14 56:11,15
   59:10 61:6,13 63:22
   66:12,22,23 78:10
   79:16 80:1 81:9,22
   82:22 94:8 98:17
   100:15,20 101:11
   109:8 118:21,23
   123:4,17 128:8
   129:3,19 130:6,9,17
   131:17 132:8
**Dillard's**
32:19 82:4
**Dillard_DePaul**
15:21 16:11 18:14
   19:1 22:13 26:18,19
   30:19,20 32:6,6,9
   32:12 50:15,15 53:5
   56:24 57:1,7 59:2
   60:24 63:2 64:7
   69:6 78:3 79:8 83:5
   84:11 97:7 101:24
   110:22 129:12
**direct**
36:2 127:16
**directed**
65:24
**director**
31:2
**disability**



49:14,18 50:6 53:24
55:16 56:12 61:7
63:11,23
**discovery**
1:9,13 101:11 121:1
**discretionary**
43:13
**discriminated**
34:20 35:24 99:17,23
100:7
**discrimination**
23:6 28:5 29:13,23
31:1 35:11,14 36:22
38:11,17 39:1,24
100:22 104:18,20
127:6,19 131:14,22
**discriminatory**
25:22
**discuss**
58:8 63:14 130:21
**discussed**
34:19 37:4 113:3
115:13 116:8,19
123:14
**discussion**
36:12,18,21 104:19
109:18 110:14
113:6 116:4 119:5
130:7,22
**disenfranchised**
12:16
**DISPARTI**
2:2
**disproportionately**
118:5
**disregarded**
88:14
**DISTRICT**
1:1,1
**diverse**
92:7,11
**diversity**
28:10,12 39:11 40:1
40:14,15 42:11,12
42:20 43:3,19 44:22
44:24 46:9 47:19

91:18,19,20,22,23
92:5,10 103:19,22
104:7,9,13 107:22
108:2,3,6 112:22
115:5,12 117:13,14
130:19 131:8,12,18
132:14
**divide**
45:2
**DIVISION**
1:2
**doctorate**
10:17,18
**document**
15:24 16:5 18:19,22
19:14 22:17,19
26:23 27:1 30:20
35:4 53:11,14 60:23
61:1,4,9,11 64:13
66:2 67:7 69:11,14
72:9 73:5 74:24
76:5,15 77:12 78:9
79:13 80:9,10,13,16
80:18 83:10,13
84:15,17 85:4,10,13
86:11,12,13,21,24
91:15 92:1,23 97:21
101:15 102:12,18
102:22 111:2,4
115:13 122:14,16
128:23 131:4,5
**documentation**
56:9 101:1
**documents**
84:22 90:24
**doing**
17:1 58:18 79:6 99:1
103:22
**domestic**
20:22 94:9 97:3
117:20
**dossier**
82:16
**DPUBLIC**
41:13,23 106:13
107:14,19 111:6

114:3,16 115:1
**DPUBLIC's**
107:5
**Dr**
4:11,12,13 22:21,22
24:1,1 37:2,5,6,8
46:1,13 47:1,6,7
52:10 55:12 61:5,12
65:9 68:3 78:10
83:14 84:18 100:9
100:15 103:7 128:4
128:8,8 129:3,10,18
130:6,9,10,17
132:15
**draft**
15:23 18:20 19:14,24
102:18
**drafted**
16:1 69:16,17 86:21
**drafting**
19:17
**drafts**
15:24 18:22
**drawing**
103:20
**Drive**
1:15 2:3,9 134:4
**drop**
104:15 105:11
**Drs**
129:19
**duly**
4:4 134:7
**duties**
6:7 23:4 44:1 69:15
73:4 77:13 85:23
102:15
**duty**
28:11 72:22

───── **E** ─────

**E**
2:1,1 3:1,7
**earlier**
58:3 128:7
**Eastern**

1:2 11:19
**editorial**
105:23
**education**
52:17
**effect**
56:8 121:17
**either**
21:23 114:23
**elements**
68:1
**elevated**
128:19
**email**
22:20,23 23:14,15
27:3,15 28:14 30:11
31:1,13,19 32:11,15
32:19 33:16 34:15
35:10 37:1,2,6,8,13
37:18 38:3,5,14
39:3,8 41:1,2,5
50:24 51:3,20,22
52:4,6 53:15,16
54:5,9,16,21 57:24
59:6 61:5,8,12,17
62:10 63:6,13,19
64:15 65:10,11,12
65:21 66:11,24
70:16 83:14,16
84:24 85:2 97:11,15
98:23 129:17 130:4
130:17 132:5,7
**emailed**
63:16 119:17 122:11
**emails**
27:6,16 33:12 34:17
120:18 129:12
**email's**
28:3
**employee**
7:16 31:2 50:21
**employment**
4:20,21
**ended**
54:23
**engage**



92:5
**engagement**
50:22 58:14
**enrollment**
6:10
**entails**
33:3
**entire**
8:24 91:23
**equity**
28:11,12 39:11 40:1
40:14 42:11,13,20
43:3,20 44:23,24
46:9 47:20 91:18,21
91:22 103:19
112:22 115:5,12
131:18
**ERG**
114:3
**escalated**
128:12
**established**
37:3,7 75:21
**Esteban**
40:24 114:21
**et**
98:7
**ethnicity**
20:9 22:10 87:9,17
88:6 99:14
**ethos**
12:17,23
**evaluated**
123:20
**evaluation**
124:12,19 125:16
**evaluations**
18:7 81:24 82:18
123:20,22,24 125:6
125:13 126:6
**everybody**
5:21
**evidence**
56:4 57:11 64:1
99:20
**exact**

20:14 94:16 112:18
113:24 123:2
**exactly**
23:23 24:2 25:2,15
25:17 33:15 38:20
41:10 42:6 44:3
46:16 61:24 67:2
82:15 95:4,23
106:15 119:16,18
**Examination**
3:4,5,6 4:6 128:2
131:2
**examined**
4:4 134:8
**example**
43:6
**examples**
110:8
**exchange**
98:9
**excluded**
36:15
**Executive**
6:9
**Exhibit**
3:8,9,9,10,10,11,11
3:12,12,13,13,14,14
3:15,15,16,16,17,17
3:18,18,19,19,20,20
15:16,17 18:15
22:12,14 26:13,14
27:4 30:15,16 32:5
50:14,16 52:3 53:5
53:6 56:14,22 57:3
59:2,3 60:19,20
63:1,3 64:7,8 69:5,8
78:3,4 79:8,10
80:14 82:3,7,8 83:4
83:7 84:11,12 85:4
85:6 97:7,8 101:10
101:12,24 102:2
110:18,23 122:4,5
128:11 129:5,11
**exhibits**
3:21 62:10
**exist**

73:4 93:15 108:2
**existed**
69:21
**exists**
52:16
**expand**
16:22 17:13 18:5
71:2 78:24
**experience**
71:12
**experienced**
49:12
**expert**
127:8,17
**experts**
59:19 127:21
**explain**
8:13 43:10 67:22
109:19 114:1
**explanation**
66:9
**expressed**
24:17
**extend**
14:1
**extent**
116:3,12
**external**
17:19 47:6 83:15,19
84:5 119:9
**extremely**
48:1,9

---

**F**

**Facebook**
119:15
**facilitated**
36:16
**factor**
73:19 74:18 124:19
**factored**
77:3
**factors**
14:18 73:15 76:18
**facts**
9:5 31:5 42:3 45:17

51:16 71:14 94:3
107:23 109:14
110:4 124:2
**faculty**
13:22 14:23 15:10,12
20:6,11 21:5,18
22:24 24:5,7,9,9
29:22 33:23 35:24
36:8,15 37:11 41:24
43:5,7,10,15,16
47:12 54:6 58:15,16
65:1 67:7 68:14,21
70:2 71:4,8 72:5,7
74:15,22 75:12 76:2
76:14,19 77:4,9
78:20 80:5,6,23,24
81:4,11,18 82:15,21
83:20 84:8 85:14,18
85:20,22,24 86:4,8
86:10 87:1,6,7,12
87:13 88:2,5,11,14
88:16 89:3,23 90:4
90:16,20,22 91:1,2
92:7,11,16,23,24
93:7,13,22 94:6,9
94:17 99:5 100:6,20
103:12 105:22
106:1 111:5,17,23
111:24 112:2,2,11
112:11 113:3 115:4
115:8,9,9 117:10,11
117:19,20,21
118:17 121:13,16
121:19,20,24
123:19 125:10
126:21 130:21
131:9
**fair**
16:3 119:23 131:21
132:10
**fall**
51:20
**familiar**
42:12 108:10
**far**
44:5 74:12 77:15



97:5
**favor**
44:11
**February**
32:10 38:6 86:5
97:12
**feedback**
67:8 81:16 83:21
**feeling**
24:14,16 121:3
**Fellows**
92:3,4,13,15
**felt**
24:19 48:1,8 78:20
78:20 110:9 131:24
**field**
17:23
**fifth-year**
78:11,12 80:1
**file**
8:24 16:24
**filed**
122:9
**fill**
125:16
**filters**
44:5
**final**
15:1 16:8 21:24
**finances**
98:4
**find**
37:17 88:19 107:8
120:23
**fine**
4:12 11:8 60:15
116:20
**finish**
83:11
**finished**
15:21 30:21 61:1
119:1 126:24
**first**
23:24 36:24 46:7
66:11 79:21,22
94:21 95:15 113:2

134:7
**five-minute**
119:1
**flagship**
11:16
**FLOOR**
134:22
**focus**
48:19 94:5 97:22
98:5,13,21,24
130:18
**focused**
12:14 36:13 80:2
**focuses**
91:24
**focusing**
78:15,18,21 103:16
**folder**
27:18
**folders**
84:5
**follow**
55:24 79:18
**followed**
54:19 62:22 84:1
88:22
**following**
24:19 31:17 33:12
38:16,18,21,24
59:10 62:9 78:10
91:1 129:20
**follows**
4:5 15:5
**follow-up**
23:18,20,21 55:9,13
105:3 130:10
132:11
**foregoing**
134:2,11
**forgive**
130:5
**forgot**
27:17
**form**
16:6,7 29:2 41:14
42:3 46:19 62:17

63:24 73:23 100:8
108:13 127:7
**formal**
9:21,22 14:3,24 15:3
15:4,11,14,14,23
16:19,20,23 18:20
19:18,24 78:13,15
78:17,19 79:3,17
80:3,11,21 81:20
84:20 105:7,9
**formalized**
104:14
**formed**
73:4 115:11
**forms**
108:23
**forward**
27:12 34:21
**forwarded**
27:14,18
**forwarding**
25:19
**foundation**
26:3 31:5,14 32:21
35:5,16 37:7 39:21
40:12 43:22 45:18
56:17 58:21 66:15
77:5 102:20 112:5
122:18 123:10
130:1
**four**
7:15 66:13
**France**
52:19
**friend**
10:6
**front**
112:15 129:10
**fulfill**
7:6
**full**
27:19 80:5,5 86:1
98:13,15
**fully**
67:21
**full-time**

71:4
**funded**
42:2
**funding**
42:6
**further**
3:6 17:2 62:16 90:3,9
127:23 130:24
131:2 132:20
**FYI**
56:19

--------

**G**

**Gabriel**
40:24
**gap**
113:4
**gather**
54:16 98:9
**gathering**
98:10
**gay**
114:5
**general**
40:16 90:2 116:3,16
116:17
**getting**
63:22 132:9
**Ghanem**
1:9 3:3 4:2,10,11,12
4:13 37:2,6,9 57:18
65:14 100:9 103:7
128:4 129:10,18
134:3,13
**Gia**
56:23 128:22 129:4
**Gianna**
2:3 50:19,24 52:8
**gia@dispartilaw.c...**
2:5
█
88:3,4
**gist**
119:20
**give**
17:14 22:2 82:13



89:1,6
**given**
13:23
**gives**
76:13
**GLE**
58:13
**glitches**
65:8
**Global**
58:14
**go**
8:17 12:24 14:2,14
14:18 17:5 18:8,24
21:7 26:3 29:3
32:21 34:1,15 35:6
39:21 40:12 41:14
42:4 43:23 46:20
48:16 52:18,19,23
56:17 57:11 59:15
62:19 64:1 66:15
73:15 74:1 77:6
79:13 80:13 94:3
101:23 102:5,20
108:14 109:4,14
110:4 111:21
114:20 120:1 121:5
122:18 123:10
124:3 125:24
126:20 127:10
**Goal**
91:9
**goals**
91:14 131:10
**goes**
32:11,12 83:20
**going**
5:14,18 7:7,8 8:14
10:24 13:15 15:15
16:19 18:13,14
22:12 24:6 30:14,14
32:4,4 33:20 35:3
36:2,23 38:15,16
39:8 50:13 52:9
53:4,4 56:21 57:6
59:1,1 60:18,18

62:17,24 63:1 64:6
70:15 75:14 78:2,2
79:7 84:10 85:4
96:11 97:6,6 100:8
101:9,9,10,23
108:13 110:17,17
110:21 119:5 122:3
122:4 128:22
129:24
**good**
17:12 34:16 69:7
101:4 130:24
■■■■
88:3,4
**graduate**
6:13,18 119:10
**Grande**
10:14
**granted**
98:10
**great**
4:13 127:24
**GREEN**
2:8
**greeted**
108:21
**ground**
4:23 6:4
**grounded**
91:13
**grounds**
36:24 111:21 127:10
**group**
2:2 44:12 52:23
111:11 114:4
**groups**
41:23 42:7 113:15,22
113:23 114:1,5,6
**guarantee**
21:13
**guess**
31:16 40:8 60:12
70:11 81:14 82:6
103:5
**guideline**
66:4

**guidelines**
66:1,5,8 69:1
**G-H-A-N-E-M**
4:10

---

## H

**H**
3:7
■■
83:14 84:7
**hair**
123:17
**hall**
106:9,11,12,14,15,18
106:22,23 107:1,3,5
107:7
**handbook**
14:23 15:12 111:17
111:23 112:1,2,15
**handle**
59:19
**handled**
23:5 111:24
**handles**
44:15 45:4 64:20
**handling**
28:5
**handwriting**
19:1,3,5,8
**Hang**
36:23 39:19 40:11
109:13
**happen**
20:8 44:13 90:8
106:10 109:21
126:22
**happened**
23:13 65:8 68:4
107:8 109:22
114:23
**happens**
43:9
**harassed**
34:20 99:23
**harassment**
22:24 24:4,11 28:5

29:13,24 31:2 35:2
38:10,17 39:1
100:22 104:18
131:22
**head**
13:8 107:19
**hear**
33:13
**heard**
33:11
**held**
106:13 109:7
**Hello**
63:13
**help**
44:12 67:5,22
**helpful**
33:21 101:1
**helping**
12:15,15
**hereinabove**
134:14
**Hi**
131:6
**high**
124:14
**higher**
52:17
**hire**
21:2 46:2 47:6,7
**hired**
44:23 46:12 96:18
117:15,19
**hiring**
13:22 20:24
**Hispanic**
22:11,11
**history**
121:19
**hold**
131:4
**holistically**
125:4
**home**
27:21
**honest**



69:19 116:22
**hospitals**
52:22
**hour**
60:14
**hours**
24:6
**HR**
23:5 26:9 28:4,8,13
28:17 29:1,8 30:24
35:20 40:1,9 44:3
45:6,21 50:9,11,20
53:20 55:11,18 58:8
59:10,18 60:6,11
62:9,22,22 127:19
127:20
**huh-uhs**
5:7
**Human**
30:3 39:17
**hypothetical**
124:22

**I**

**idea**
12:13 56:19 58:24
108:18 112:3
**identification**
15:18 18:16 22:15
26:15 30:17 50:17
53:7 57:4 59:4 63:4
64:9 69:9 78:5
79:11 83:8 84:13
85:7 97:9 101:13
102:3 110:24 122:6
129:6
**identifies**
87:10
**identify**
87:9
**ignored**
108:21
**IL**
2:4,9
**Illinois**
1:1,11,14 134:5,18

**implemented**
117:12
**implicit**
43:8 44:7,9 45:1
117:10 118:8
125:21 126:5,11,15
126:18,20 127:5
**important**
5:10 48:1,9,12,20
67:21
**impression**
58:11
**improve**
78:24
**improved**
79:4 82:4
**improvements**
81:1,3,17 82:9
**include**
37:6 88:15
**included**
31:12 38:2,4 82:1
85:1
**including**
73:1 112:17 115:19
**inclusion**
42:13,21 43:3,20
44:24 46:9 47:20
92:5,10 103:19
112:2,22 115:5,12
130:20 131:8,13,19
132:14
**incomplete**
124:22
**independent**
37:16 42:1 62:13
65:20 99:1 105:18
105:19 110:11
**indicate**
17:1 35:13,23 66:9
109:21
**indicated**
22:22 82:16
**indicates**
15:12 35:10 56:14
130:17

**indicating**
27:4 53:16 81:1
**indicator**
125:7
**indicators**
125:9
**indifference**
88:11 92:24
**individual**
13:7
**influencing**
92:6,10
**inform**
92:20
**informal**
15:3,6 78:13 105:6,9
**information**
37:17 73:20,21 74:9
81:22 89:2 116:7,19
**informed**
55:2
**informing**
53:17 62:1 63:10
**inhibit**
6:1
**initiated**
36:19
**injury**
4:20
**input**
18:10 116:17
**inquire**
89:21
**inquiry**
59:9
**insofar**
29:2 56:3 73:24
100:14 116:2,18
**instances**
100:5
**Institute**
52:13,15 53:1
**institution**
12:12 14:20 91:23
**institutional**
28:10,12 39:11,24

40:14 42:11 44:22
89:9 91:18,20,22
**instruct**
116:5
**instructions**
62:9,22
**interact**
58:17
**interaction**
104:12,14
**interested**
134:15
**interim**
6:23 7:4,7 10:2,24
46:12,17 47:8,11,15
121:22
**interject**
116:2
**internal**
17:19 47:7
**internally**
101:22
**international**
103:16 117:21
**interrogatories**
134:8
**interruption**
98:6,18,22
**interview**
28:21
**interviewed**
47:16
**intimidation**
112:17
**investigate**
29:12 127:22
**investigated**
110:15
**investigating**
29:22 37:16
**investigation**
28:11 39:18,23 40:9
62:13 88:19 99:2
110:12
**invites**
69:24



**involved**
33:4 44:24 48:4
52:21,22 103:3
126:21
**involvement**
17:20 69:20
**involves**
13:11
**iPhone**
57:15
**IRMA**
89:8,9,15,17
**Isabel**
30:23,24 31:3,4,10
35:8
**issue**
25:10 34:19 35:1,11
35:11,14 37:20 39:1
55:17 66:23 68:3,12
108:20 110:7
**issues**
17:8 31:1 37:4 40:15
43:10 91:21,24 92:6
92:10,17,18 109:11
113:16 127:5
131:18,22 132:17

---
**J**
---

**job**
6:5,7 95:6
███████
87:3
**Joint**
92:20
**journalism**
10:20
**July**
117:24
**June**
57:9

---
**K**
---

**keeps**
45:12
███████
54:4,6 55:1 61:19,22

61:23 62:1 73:8,9
101:19
███████
64:24 65:1,4
**kin**
134:16
**kind**
12:12,16 17:12 18:3
33:6 75:3,8 88:19
108:17 125:4
███████
64:24 65:1 68:12
**Knight's**
65:4,9
**know**
4:18,23 5:17 9:14,20
11:12,17 15:20,24
16:14,17,17 18:22
19:7,7,12,12 20:3,8
20:18 21:15 22:10
23:13,23 25:4,9
26:5,6,6,7,7 27:14
28:1,7,19 29:7,7
30:21 31:8,12 32:15
32:19 33:2 34:3
38:2,4 39:3 40:6,8
41:12,20 42:6,9,9
42:24 43:12 44:3,5
44:15 45:1,12,15
46:2,5,24 47:14
49:10,16,17 51:11
51:14 52:6 53:22
54:3 55:12,14 56:11
56:15 57:13 58:6,19
58:23 59:13 60:2,5
60:5,7,10,10 62:4
63:16 65:3 66:14,17
67:16,22 68:11,11
68:17,18,18,19,20
69:1,16,20 75:15
78:13,17 79:14,24
80:7 81:11,16 83:11
84:21,24 86:1,3,21
87:15 90:11,14,18
92:9 95:5,13 96:2,5
96:8,13,16 97:4,5

98:6,7,14,16,20
99:7,12 102:17,22
103:1,9,11 104:3
105:8 107:16,19
109:10,16 110:11
110:15 111:16
112:8,13 113:2,5,19
114:17,23 115:2
116:16 117:6,10
118:24 122:24
124:18,21,24
126:14,17 129:4
**knowledge**
34:24 74:11 97:23
**known**
28:13
**knows**
7:21

---
**L**
---

**L**
1:13,24 2:13 134:3
134:20
**labeled**
129:12
**lack**
17:7 89:22 93:5,14
**lacks**
35:16 39:21 40:12
45:18
**laid**
35:6 76:15
**Lamina**
53:15,18 54:20 55:23
56:1,7 59:9,13 60:5
63:9,19
**language**
112:13
**large**
48:18
**late**
132:9
**Latin**
103:17
**Latino**
114:5

███████
99:7,8
**LAW**
2:2
**lawsuit**
123:4
**lay**
127:9
**Lea**
41:2,6
**lead**
62:13 127:5
**leadership**
33:6
**Learning**
58:14
**leave**
7:11 21:12 36:17
49:18 59:23 60:2,7
61:15 62:4,7 97:19
98:2,11,11,14 99:5
**leaving**
38:15 52:8
**led**
132:5
**left**
20:24 22:7 95:5,24
99:10,12
**legal**
1:21 116:18 134:21
**lesbian**
114:5
**letter**
54:24 55:10,15,18,19
59:11,22 61:6,14
65:24 78:10 80:19
81:6 112:4 116:1
**letters**
55:4 56:2 83:15,19
84:1,6,19
**let's**
6:5 7:1 12:24 34:15
70:14 94:24 101:23
113:20
**level**
17:18



**leveraged**
108:19 109:2
**Lexa**
7:23 9:17 26:11
32:19 38:22,23
52:10 57:21 58:11
65:12 84:18 85:2
101:17 120:14
130:18 131:7
**Liberal**
88:5
**Liberty**
56:8 59:11 63:10,14
**LICENSE**
2:13
**limited**
12:4 88:15 112:21
**line**
23:7,8 25:9 53:23
61:16 97:18 128:16
**links**
83:24 84:4
<span>█</span>
21:15 22:22 38:8
94:22,23 95:10,11
96:22 100:15 109:7
109:18 110:1 131:6
**listen**
113:16
**listening**
113:9,11,12,19
**little**
16:22 17:13,14 18:5
76:9
<span>█</span>
39:9,10 42:10 44:22
113:13 117:16
**local**
103:3
**located**
60:8 91:15 105:21
**long**
6:20 14:11 52:24
109:17
**longer**
21:9,20 38:16 96:11

**look**
18:10,12 25:10 32:9
34:2 62:15 81:19
119:22 122:24
124:13 125:1
128:13 129:15
**looked**
26:8 74:11 116:22
123:24 125:4
**looking**
41:1 116:6,7
**looks**
15:23 18:20 27:11
**lot**
12:2 40:15 43:9
89:14 117:8,12,17
**low**
124:15
<span>█</span>
64:16,18 65:11,19,21
<span>█</span>
103:22
**Luisela**
108:9
**L-A-M-I-N-A**
53:19

--------

**M**

**Madam**
5:8
**MAGNA**
1:21 134:21
**maintained**
90:19
**maintains**
90:20
**major**
10:15
**majority**
71:4
**management**
6:10
**manager**
43:18,21 44:4,4
**managerial**
44:1

**manages**
33:6 44:2
**Mandarin**
58:10,12,12,20
**mandatory**
43:12,14
**March**
72:11 73:7 82:7,7
83:3
**marginalization**
22:24 24:4 38:10
**Maria**
103:9,11,12
**mark**
22:12 30:15 53:4
59:1 64:6 69:5 78:2
85:4 97:6 101:23
110:17 122:4
128:23 129:2
**marked**
3:21 15:16,17 18:14
18:15 22:14 26:14
30:16 32:5 50:14,16
53:6 56:21 57:3
59:3 60:18,20 63:1
63:3 64:8 69:8 78:4
79:8,10 83:7 84:10
84:12 85:6 97:8
101:10,12 102:2
110:23 122:5 129:5
129:11
**MARKET**
134:22
**Marketing**
89:9
**marking**
122:10
**marks**
82:13
**Marla**
106:4
<span>█</span>
73:10,11 94:20,24
96:16,20 97:11,16
98:16
**materials**

81:18,19
**matter**
90:8
**matters**
59:18
**mean**
4:18 11:14 13:18
15:5 24:12 33:7
66:6 77:8 86:17,23
88:21 105:19
108:12 114:2
**means**
7:5,7 71:2 98:11
**meant**
79:1 88:20 89:2,21
121:7
**medical**
49:8,10 56:9
**medication**
5:22
**meet**
13:14 34:22 68:1
91:6 128:8 130:18
**meeting**
13:7,8 22:21 24:17
24:19,21,24 25:5
36:14,17 37:4 38:8
38:18 67:20 68:6
74:15 76:2,14 88:22
105:6,7 106:15,18
106:19,24 107:1,5,7
109:7,18 110:2
113:5 114:16,18,19
114:20,23 115:2
121:24 122:2 128:7
128:18 131:7,16,24
**meetings**
13:10 68:7,9 75:8
86:4 91:2 106:9,11
106:12,14 107:3
116:8
**member**
13:23 15:10 20:6
21:3,5,5,6,18 24:10
29:23 35:24 36:15
47:12 54:6 58:15,16



65:1 82:21 83:20
84:8 87:7 88:4 94:9
99:5,8 100:6 103:12
123:19
**members**
20:11 33:23 43:5,8
68:2,21 75:12 80:24
81:4,11 82:16 83:14
92:16 100:21 115:9
127:21
**memorialized**
105:1
**mention**
99:4 111:17
**mentioned**
7:20 14:15 30:1 48:6
53:2 58:3 81:5 82:3
91:8 115:21,24
120:9,11,13,14,14
131:23
**mentioning**
113:9
**mentions**
51:20,21 85:3 115:3
**message**
25:12,13 61:21,22
111:5
**met**
25:1 113:15
**Metrics**
117:17
**Michigan**
11:8,17,18,18,19,19
12:3,6
**microaggressions**
108:10 109:2,11
110:1,7,8,12 123:14
131:23 132:2,3,16
**microagression**
108:16 109:17,20
**middle**
41:4
**minimize**
126:5
**minority**
130:20 131:9

**minute**
77:22
**minutes**
36:8 68:8 75:8
**misconduct**
111:17,24 112:16
**missing**
86:19
**mission**
52:13,15,18 53:1
91:13
**misstate**
55:21
**misstated**
29:3 35:4 39:20
46:19 56:3
**misstates**
57:10 62:18 64:1
118:9
**mistaken**
86:14
**modified**
69:21
**module**
43:19 45:4,5,7
**modules**
44:16,19 45:13
**moment**
26:18 60:24 129:14
**money**
98:3
**month**
91:6,6
**monthly**
13:14
**motion**
86:9 87:1 88:23 89:6
**motions**
90:22
**Mousin**
39:12,14
**move**
28:13 34:21
**moved**
28:11 30:2 39:24
46:7 129:21

**Moya**
103:9,11,12 104:12
**multiple**
6:18 15:14 24:18
106:11 115:10
125:2,3
**Murphy**
7:23 9:16,17,20 10:5
26:11 52:3,10 57:21
58:1,19 64:16 65:17
67:16,19 68:3 84:18
84:21 130:11
132:15
**music**
18:2
**mute**
118:22
**Mutual**
56:8 59:11 63:10,14
**M-O-U-S-I-N**
39:14

_____
**N**
**N**
2:1 3:1
**name**
4:8 40:21 41:8 94:21
103:21 106:5
**names**
94:19
**narration**
66:1,6
**narrative**
82:21,23,24
**Natalie**
107:16
**nature**
4:16,19 10:19 25:23
37:17 48:14 51:5
80:3 130:21
**need**
17:2 25:11 30:6 98:2
**needed**
49:17 51:9,15 52:10
63:13 67:8 78:20
81:17 99:3

**needing**
49:21
**needs**
37:21 38:21 97:22
**negative**
66:1,7,10
**never**
19:19 98:3 100:9
118:2
**new**
40:6,8 115:10
**newspaper**
105:18
**nobody's**
8:4
**nominated**
70:8,18,19,20
**nominations**
47:15 70:1,1,16

94:23 95:18 96:24
**non-white**
24:9
**North**
2:9
**NORTHERN**
1:1
**Northwestern**
95:7
**Notary**
134:4,10,17
**noted**
36:11
**number**
12:4 15:21 20:14
26:1 54:1 56:23
69:24 70:7 71:7
74:14 77:19 86:15
89:8,24 91:9 92:1
93:23 113:24 131:5
**numbers**
73:14 84:2

_____
**O**
**oath**
4:24


MAGNA
LEGAL SERVICES

object
35:3 36:23,24 39:19
    51:16 62:17 63:24
    73:23 75:14 100:8
    108:13 109:13
    111:20 127:7 130:1
objecting
100:10
objection
5:13 9:5 11:23 13:17
    17:5 19:9,20 26:3
    29:2 31:5,14 32:21
    34:5 35:15 37:22
    40:11 41:14 42:3,16
    42:22 43:22 45:17
    46:19 48:16 56:3,17
    57:10 58:21 59:15
    66:15 68:22 71:14
    72:13 76:20 77:5
    94:2 102:20 107:23
    110:3,3 112:5 118:9
    120:1 121:5 122:18
    123:10 124:2,20
    125:23 130:12
objections
5:13
objectively
124:1
obligation
26:6
observations
18:11
observe
8:21
obviously
5:13 130:1
Occasionally
106:8
occurring
107:8
October
26:22 31:19 103:6
    128:9
offer
14:1
offered

66:3
offhand
20:13
office
26:5 28:10,12 35:20
    35:21 39:10,24
    40:14 42:10 44:22
    45:6,21 46:8 52:9
    60:11 89:18 92:2
    103:16 104:15
    105:6,11,12 113:13
    114:6
officer
6:8 8:8
officers
114:15
official
134:17
Oh
19:22 41:6 67:12
OIDE
28:13,17 29:1,8,11
    29:21 30:2 39:15,17
    40:3 113:13 128:12
okay
4:16 6:12,15,20 7:1,4
    7:10,18,23 8:4,7,10
    8:13,19 9:3,14,17
    9:20 10:1,5,8 11:4
    12:9,22 13:6,15
    14:13,15,21 15:2,9
    15:15,24 16:3,5,7
    16:10,14,17,19 17:4
    17:12,22 18:4,13,22
    19:3,5,16 20:8,11
    20:22 21:4,10,15,22
    23:7,17,21 24:3,11
    24:15,23 25:18,24
    26:7,13,17,20 27:5
    27:24 28:24 29:11
    30:23 31:3 32:7
    33:7,9,13,18 34:3
    34:12,15 35:3,13,22
    36:2,4,10 38:8,23
    39:8 40:6,18,20
    41:8,12,18 42:1

43:2,15 44:15 45:7
45:15,23 46:5,7,17
47:4,10 48:4 49:7
49:13,19 50:3,8,19
50:23 51:24 52:14
53:9,13,18 54:4,9
54:14,18,23 55:7,14
57:6,20 59:6,21
61:4,8 62:3,12,24
63:6,12 64:11,13
65:6,10,20,23 66:6
67:3,6,15 68:5 69:5
69:11,13,16,23
70:11,22 71:7,19
72:6,10 73:20 74:8
74:13,23 75:3,7,11
76:12,17 77:16,21
78:7,17,22 79:7
80:13,15,22 81:2,8
81:11,16 82:3,6,19
83:2,10,12,16,24
85:9,12,17,20,23
87:17 89:1,16 90:11
90:21 91:4 92:22
93:17 94:19,24 95:5
96:5,8,13,16 97:14
98:16 99:1,10,12,14
101:2,17,23 102:10
102:14 103:18
104:1,3,9,16,22
105:1,5,17 106:23
107:4 108:24
109:24 110:18
111:2,8,19 112:13
112:20 113:2,8,17
114:8 115:3,21,24
116:6 117:1,6 118:3
118:16 119:14,17
119:20 120:11,17
121:13 122:3,12,14
123:3,19 125:5,11
125:20 126:9,14,18
127:1,4,20,23 128:1
128:11,17,18,22
129:7,8,16,23 130:4
131:4,4,16 132:10

    132:19
    
94:23 95:18 96:24
ombuds
39:13
once
16:8 91:6
ongoing
38:10
open
106:18 130:18 131:6
opened
26:1
open-ended
125:15,17
opinion
33:18 35:18 36:22
    105:15 106:16
    125:6,20,22 127:5,9
    131:16
opportunity
16:23 95:6
oral
134:8
order
3:21
organization
41:13,19 48:23 81:7
    111:12 115:1,4
organizations
17:21 41:22 49:5
organized
113:12 114:6
organizers
106:22
39:9,10 42:10 44:22
    113:13 117:16
outlier
124:17
outline
69:1
outlined
77:8,18 81:5 93:7,22
outlines
111:23

MAGNA ▶
LEGAL SERVICES

**outlining**
69:14
**outside**
44:17 73:4 83:21
**overall**
34:2 104:21
**overseas**
31:1 40:15 58:16
**overturn**
9:3 71:19
**O'CONNOR**
2:7

---

**P**

**P**
2:1,1 66:1,4 69:1
**PA**
134:23
█████
85:18
**page**
3:2 16:10 18:24 23:8
34:15,17 36:3 39:9
41:3 50:23 56:23
57:6,17 61:8 63:12
65:16 66:11 86:11
92:1 93:9,23 111:13
112:20,23 114:8,9,9
115:3 131:5
**paid**
56:11 63:22 98:14
**Palomino**
41:6
**Para**
47:2
**paragraph**
36:3,6 54:10 65:23
66:12 67:11,19
113:9
**paragraphs**
36:7
**Parra**
47:1,7
**part**
17:15 18:6 30:1 33:5
45:5 58:9 59:23

61:14 62:7 66:20
67:9 69:18 75:5
77:9,18 82:17 93:14
116:3 124:7,8
**participate**
8:21 9:9
**participated**
107:1,2
**participation**
17:8,17
**particular**
73:19 75:17 109:17
112:14 122:1 126:8
**particularly**
34:14 112:10
**parties**
134:16
**partner**
58:16
**parts**
124:12
**pathways**
130:19 131:8 132:14
**pattern**
22:23 24:4,11 88:16
89:2 93:21 94:5
112:17
**pay**
63:16 64:3 98:13,15
█████
95:10
█████
94:21 95:11
**pedagogical**
78:23
**peer**
18:11 81:14 82:1
**peers**
16:24
**peer-review**
79:15
**pending**
26:11
**PENN**
134:22
**people**

13:3,4 14:16 44:13
52:23 70:17,19,20
106:17 120:9,12,12
**perceived**
110:9
**percent**
22:3 72:12
**Perfect**
4:13 5:21 77:16
**performance**
18:2 75:5
**period**
13:23 14:2,17,17
73:24 76:3,4
**permanent**
6:22 7:5,9,9,12,14
11:1 121:23
**permitted**
99:6
**person**
7:6 25:10,14,16 27:4
28:15 33:4 39:13
40:16,18,19 43:17
44:12 48:10 49:3
71:5,24 82:22
105:14 108:8,19
**personal**
4:20
**personally**
81:8,12 97:21
**personnel**
14:4,7 15:4 79:15,19
79:24 80:4 118:18
124:11,19 126:4,10
126:11,16
**persons**
117:15
**perspective**
116:18
**pertaining**
1:12
**petition**
118:3 119:9,21 120:8
120:19 121:4,14
**PhD**
10:20,23 12:4

**PHILADELPHIA**
134:23
**philosophy**
42:21
**phone**
27:22 54:24 55:13
63:15
**phonetic**
41:7 94:23 95:18
96:24 106:4
**phrased**
112:10
**Pickett**
46:1,14,17 47:6
113:14
**Picot**
96:22
**place**
8:22 17:12 24:20
40:3,4 44:14 134:14
**Plaintiff**
1:4 2:6,15 4:3
**plan**
91:9,12,13 117:13,14
**planning**
25:3
**please**
4:8 25:9 27:20 34:21
93:3 98:6 114:15
127:11,13
**Plus**
8:23
**point**
9:1 23:3 30:3 34:18
36:5,6 62:12 69:24
89:8,24 93:7,23
94:11,12,12,15
103:5 126:13
**policies**
34:9
**policy**
55:3,12 56:6 68:20
72:4 87:14
**Political**
87:8
**poor**



12:15,15
**portfolio**
34:2 48:18 67:24
**position**
6:5 7:3,12,14 9:17
10:8 11:5 19:16
23:11 33:3,4,10,12
33:14,17,19,22
36:12,13,18 38:15
39:16 46:10 47:10
47:19 48:5 55:20
70:5,15,18 72:15
76:13 87:21,22 94:1
103:15 104:4
127:20 128:20
**positions**
9:11 10:9 11:1 47:24
103:14
**possible**
28:2 116:23 126:2
**possibly**
21:8 34:1 76:22
**potentially**
120:12
**practices**
103:3
**PRAD**
32:14,20,24 33:2,8
33:18,19,22 36:8,15
37:4,10 51:20,21
70:12 71:13 72:14
73:1,3,12 101:20
103:24 104:1
**prefer**
4:11
**preparation**
17:2
**present**
2:15 92:18,19
**presentation**
74:15,17 75:12,18,20
75:22 76:1,14,18
77:3,18
**presentations**
74:20,21 77:16
**president**

8:2 40:19,20,22 48:6
85:16,18,21 91:21
92:2,4 107:2 113:13
114:7,21,21,24
115:17,20 120:13
**Presidential**
92:3,4,13,15
**presider**
85:24
**presides**
85:22
**previous**
8:16,18 130:22
**previously**
12:22 14:15 39:16
44:7 45:23 47:18
48:8,11 50:14 62:3
94:8 118:7 123:14
126:9
**primary**
41:20
**prior**
6:23,24 9:11,23 10:8
11:4,5 20:1 30:10
78:19 95:12
**priorities**
130:19 131:7 132:13
**private**
12:7
**privileged**
116:4,7
**probably**
26:9 60:11 120:9,11
**probationary**
13:23 14:2 78:11,12
80:1
**problem**
121:10,17
**procedure**
1:10 55:23 56:6 69:2
**procedures**
36:17
**process**
8:14 13:19,21 14:12
15:5 17:16 18:6
23:23 24:2 25:24

26:2,8 34:4 55:23
59:23 60:3,7 61:15
62:2,4,8,13 66:13
67:22 68:4,12,14,21
69:15,18 70:24
72:22 73:4 74:23
75:8 77:8,14 90:7
94:5 96:9 102:15
118:4
**processes**
34:9
**processor**
69:2
**produced**
103:1,6
**Production**
101:11
**productions**
18:2
**productivity**
17:7
**professional**
17:20
**professor**
13:16 23:9
**professors**
14:16 20:17 119:9
**program**
17:17 32:16,18,20,24
33:2,6,7,22 34:3
36:13,18 52:15,24
53:2 54:7 69:14
70:1,14 71:5,6 72:8
72:10,15,18,21,24
73:8,12 74:6,24
75:6,7,24 76:2,13
76:19 77:4,13,17
92:3,13,15 102:14
104:1
**programs**
6:13,14,15,17,18
12:5
**progress**
80:23
**project**
92:17

**promised**
8:4
**promotion**
8:20,23 9:2,10 64:21
65:13 66:5 83:21
87:14
**protocol**
26:8 29:1
**provide**
59:22 61:13 74:14
120:21
**provided**
90:24
**provides**
76:1 116:19
**provisions**
1:10
**provost**
6:6,7,8,20,22,24,24
7:3,9,12,14 8:7,16
8:17 9:11 11:1
13:12 23:16,22
26:21 38:16 44:4,23
45:24 46:7,8,11,11
46:12 47:8,11,19,20
47:21,22,23 48:21
49:1 64:19,20 65:14
91:19,23 103:2,7
117:15,23 120:15
121:21 128:20
132:12
**public**
12:6 32:17 54:8
134:4,10,18
**publications**
97:24
**published**
18:1 97:23 105:24
**purpose**
1:12 41:21
**pursuant**
1:10
**pursue**
95:6 96:11
**pursued**
90:8



**pushing**
88:16 89:3 93:22
　94:6
**put**
66:3
**putting**
89:16 129:10
▮▮▮▮▮
85:17
**P-A-L-M-E-N-O**
41:11
**P-A-R-R-A**
47:3
**P.A**
2:2
**p.m**
133:3

_____
**Q**
**quadrant**
23:8
**qualifications**
36:12,20
**qualitative**
82:18 124:8 125:1,11
**quality**
83:22 125:7
**quantitative**
82:18 124:5,7 125:12
**question**
5:15,16 18:17 19:23
　29:14,16,18,20 35:4
　39:20 42:18 62:18
　63:24 65:7 68:24
　71:23 73:24 75:12
　76:10 79:14 93:2
　100:9 103:2 108:14
　112:9 114:12 118:2
　118:6 127:4,8,11,12
　127:14,16,18
**questioning**
128:16
**questions**
45:11 74:15,18 76:14
　124:6 125:18
　127:23 131:1 134:9

134:12
**quick**
30:4 101:3 118:24
　129:14,24
**quickly**
128:13
▮▮▮▮▮
87:11,12
**quiz**
45:9
**quote**
8:14 54:11,19

_____
**R**
**R**
2:1,3
**race**
99:24 100:7,22
　104:18
**racial**
125:21 126:5 132:2
**racism**
119:11,24 121:10,17
　127:5
**raised**
37:21 52:21 66:23,23
　68:3
**reach**
63:15 132:15
**reached**
61:24
**read**
29:15,16 49:24 50:2
　54:22 56:23 106:7
　117:1,3 121:4
　127:12,14
**Ready**
30:21,22
**real**
128:13
**really**
12:14 23:15 35:20
　39:5 42:18 66:19
　99:13 101:21
　107:15 120:15
　122:1 129:24

**reappoint**
15:8
**reason**
22:7 38:4 57:23 58:2
　62:15 63:18 65:22
　76:24 77:2 89:5
　97:14,17 105:16
　123:7 126:14
　131:24
**reasons**
13:24
**recall**
20:13 25:2,12,17
　26:10,12 27:23
　28:21,23 30:11
　33:15 34:7 37:24
　38:13,20,23 49:7,12
　51:5,22,24 52:2
　55:4 58:10 65:17
　66:19,22 67:2,21
　68:5 69:3,17,19,22
　73:7 77:15,20 82:15
　83:1 84:23 89:4
　90:5,6,13 94:16
　95:4,23 98:9 99:1
　99:13,16,18,21
　100:5,20,23 101:21
　104:16,24 105:4
　107:4,10,15,18
　110:8 115:21,24
　119:15,18 120:10
　120:15 121:3,15
　123:18
**receive**
89:7 90:21
**received**
9:20 37:18 53:16
　61:22 74:21 80:20
　90:4 100:15 132:7
**receiving**
65:17,21
**recess**
12:19 30:7 60:16
　101:6 102:7 119:4
　127:2
**recognize**

18:19 19:5 22:17
　26:23 53:11,13 59:6
　59:8 61:1,9 63:6
　64:13 69:11 80:16
　84:15 85:10,12
　101:15,17 102:12
　111:2 122:14
**recollection**
27:24 34:13 39:6
　63:21 65:21 67:4
　80:8 90:15 99:19
　100:24 129:18
**recommend**
59:22
**recommendation**
8:22 70:23 71:4,8,13
　71:20 72:2,5 73:15
　73:16,22 74:5,22
　80:11,20 114:20
　130:23
**recommendations**
74:9
**recommended**
71:24 79:16 80:1,5
**record**
4:9 5:5 9:6 12:18,20
　29:3 30:8 31:6 41:9
　42:4 45:18 51:17
　56:4 57:10 64:1
　71:15 86:9,10,13,15
　89:7 90:16,18 94:3
　101:7 102:5 107:24
　109:14 110:4 113:5
　119:6,7 124:3
　134:12
**recorded**
75:9
**records**
45:12,16 91:2,7
**recruitment**
92:6,11
**refer**
61:11 127:19
**reference**
117:22
**referenced**



32:15 41:2 54:4
66:24 73:16 76:4
88:17 112:4
**references**
54:15
**referencing**
32:20 54:20 55:15
58:6 65:3,6 67:16
70:4 110:2 111:16
**referred**
11:20 23:5 90:1
110:14,21 134:14
**referring**
24:8 28:7 41:6 57:14
66:14 67:18,23
72:22 80:10 81:4
83:3 84:4 98:7
111:19 113:6
117:20
**refers**
86:24
**reflexivity**
78:23
**refresh**
27:24 34:13 39:6
63:21 67:4 80:7
90:15 99:19 100:24
129:18
**regard**
80:19 90:5 130:7
**regarding**
22:21 26:11 28:22
37:20 38:10,24
68:20 86:9 92:5,9
92:24 118:4 121:14
**regards**
120:8
**region**
11:20
**regional**
11:11,14
**regular**
13:10
**reject**
72:1 73:18,22 74:5
74:10,18

**rejected**
71:12 74:8
**rejecting**
73:15,16
**rejects**
71:8 72:4
**relates**
123:22
**relations**
31:2 32:17 50:21
54:8
**relevance**
11:23 111:20
**relevancy**
127:9
**rely**
59:18
**remained**
40:3
**remaining**
71:9
**remains**
40:3
**remember**
4:16 10:21 24:23
25:5,15 27:22 28:2
28:24 39:5 46:15
48:23 49:4,13,18,19
51:19 55:7 56:1,7
56:13 61:24 72:10
73:13 74:12 80:4
94:19,20,20 96:10
104:22 109:24
112:18 113:24
116:22 119:20
123:1 128:9,16
**reminds**
28:1 64:3
**renamed**
10:13
**renewal**
21:14
**renewed**
21:11,13
**repeat**
29:14 93:2 127:11

**rephrase**
5:17 77:1 93:4 118:5
**reply**
25:12 99:4
**report**
6:10 13:3,4,5 25:23
31:3,4 40:16,18
**Reported**
1:20 2:13
**Reporter**
1:14 5:8 129:1
132:21,23
**REPORTER'S**
134:1
**reporting**
13:6
**reports**
31:10 40:19 91:21
**representation**
123:8
**representative**
87:13
**represented**
5:12
**representing**
41:23
**represents**
41:24
**request**
48:24 51:12 54:24
55:10,16 61:23
**requested**
36:17 58:10 60:21
**requesting**
61:6 114:19
**requests**
50:6 121:1
**require**
48:2 66:1
**required**
118:16 126:10,15
**requirement**
118:14 126:18
**requires**
127:16
**research**

11:9,10 17:7,10,22
17:24 18:4 46:9,11
47:19,20,22 49:22
83:23 89:9 92:5,17
97:18,22 98:5,11,11
98:12,13,14,18,21
98:24 99:3,5
**reserve**
132:22
**resolution**
85:14
**resolved**
101:21
**resource**
30:3 93:15,17
**resources**
39:17 89:22 93:6,12
**respond**
59:14 85:15,15 124:8
125:18 130:6,9
**responded**
25:16 53:17
**responds**
89:7
**response**
27:2 54:18,21 56:15
85:2 86:5 89:6 90:1
90:4,6 91:8 110:6
**responses**
125:2
**responsibilities**
11:2 40:10
**responsibility**
23:18,19 25:19,21
30:2,2 62:21 102:17
**rest**
92:20
**restate**
100:1
**restructuring**
36:13,18
**resubmit**
90:10
**resubmitted**
90:11
**result**



28:13
**retaining**
89:23 93:13
**retention**
92:6,11 130:20 131:9
131:13 132:14
**reverse**
32:8
**review**
8:23 14:17,18,21,24
15:1,3,3,4,6,11,20
15:23 16:8,23 17:3
18:7,21 21:7 26:17
30:20 60:23 69:15
72:22 74:23 75:3,5
77:13 78:11,12,13
78:14,15,17,19,21
79:3,16,17,21,22
80:2,11,21 81:14,20
83:10,15,19 84:5,20
96:14 97:24 102:15
120:18 123:23
**reviewed**
14:4 16:24 34:17
47:16 74:24 75:6
86:8 129:17
**reviewers**
83:21
**reviewing**
61:2
**reviews**
14:3 15:14 16:19,20
19:18,24 67:24
79:20 82:1 125:10
**revote**
71:9
**right**
13:4 20:19 25:3,16
33:24 37:14 41:11
50:13 101:9 119:7
128:20,24
▬▬▬▬
64:16,18
**ringing**
107:13
**risk**

126:5
**Robert**
107:12
**Robertson**
107:12
**role**
7:6,7,8 8:13,16,16,17
8:18 9:12 12:24
13:18 26:21 29:12
31:22 40:8 70:9,21
85:20 86:1,3
**roles**
25:8
**rolling**
91:4
**room**
75:11
**Ruben**
47:1,7
**rules**
1:11 4:23 6:4
**R1**
11:12

─────── **S** ───────

**S**
2:1 3:7
**saint**
12:14
**Salma**
1:9 3:3 4:2,10 35:6
54:24 57:18 63:13
131:6 134:3,13
**satisfactory**
82:13
**save**
27:16
**saw**
16:7 105:12 119:15
119:16,16,18
128:11
**saying**
25:13 28:7 38:14
98:23 125:2,3
**says**
16:10 23:9 25:3,9

27:8,20 28:4 32:10
34:16 36:10 39:15
54:10,18 57:8,14,17
58:7 61:16 63:13
65:4,10,11,11,13,24
66:12 67:6,13,20
69:23 70:7,22 71:7
74:13,23,24 75:22
80:22 85:3 86:5
87:3 88:10,13
101:17 102:14
111:13 112:21
113:3,9 114:15
122:20 124:17
131:12
**Scatchell**
2:3 3:4,6 4:7 9:7
12:18,20,21 13:20
15:19 17:11 18:18
19:13,21 22:16
26:16 29:6,15,19
30:5,8,9,18 31:7,18
33:1 34:11 35:17
37:10,14,15 38:1
40:2,17 41:17 42:8
42:19 43:1 44:6
45:22 46:23 49:24
50:3,4,18 51:23
53:10 56:5,20,24
57:5,16 58:22 59:5
59:20 60:13,15,17
60:22 62:23 63:5
64:5,12 66:16,21
68:23 69:4,10 71:18
72:17 74:3 75:16,19
75:22,23 76:4,7,11
76:23 77:11,21 78:1
78:8 79:12 83:9
84:14 93:10 94:7
97:10 100:2,3,11,17
101:4,7,8,14 102:11
102:24 103:4,8
106:6 108:4 109:9
109:23 110:10,20
111:1 112:7,12
114:14 116:6 117:1

117:5 118:13,22,24
119:7 120:4 121:2,8
122:7,11,13,21
123:13 124:10,21
124:23 126:3 127:3
127:12 129:7,24
130:12 131:3
132:19,24
**scenarios**
45:11
▬▬▬▬
22:20 23:1,2,20,21
27:2,22 28:4,10,22
29:9 30:11 31:4,4
31:10 50:10 110:15
128:12 132:1,17
**schedule**
25:4 34:21
**scheduling**
33:5
**Science**
87:8
**score**
124:5
**scores**
124:14,15,15
▬▬▬▬
85:17,18
**seal**
134:17
**search**
43:8,14 44:18,20,21
46:13 47:5 126:15
**searches**
43:7 118:15 126:21
**second**
12:18 25:5 46:15
67:13 102:6 113:8
114:8 122:8,20
123:1,3,9 126:23
**secondary**
25:12
**secretary**
91:1
**section**
36:3 75:16,19 76:15



88:10 112:20
125:15
**see**
13:15 16:5,12 19:1
27:5,12 28:3 31:20
34:22 36:8,10 38:5
50:23 52:4 54:12,13
57:8 59:23 61:3
63:12 65:23 66:12
67:5,9,11,12,12
69:23 70:9 71:10
74:13 75:1 80:9,22
87:3 88:10 90:16
97:12,18 99:20
101:1 102:14
106:18 111:13
112:20 113:1,8
119:19 120:18,20
124:13 131:6,10,12
**seeing**
51:22
**seeking**
116:17
**seizures**
49:12,15 58:20
**selected**
47:14 71:6 76:2
92:15
**selection**
32:24 34:4 69:15
72:22 73:3 75:7
77:13 102:15
**self-nominations**
70:17
**send**
27:15,18 37:2 58:2
70:16 128:22 129:2
129:3
**sending**
38:13
**sends**
33:16 91:2
**sensitive**
130:21
**sent**
22:20 23:13,15 31:19

37:2,8 51:11 54:17
56:15 57:14,24 59:9
61:6,12 86:15 97:15
105:3 120:18
**sentence**
67:14 113:2
**separate**
21:22 66:13 79:16
95:3,22 105:19
**separated**
95:4,13,14,16
**serve**
9:23 10:9 70:8,21
74:14 103:14
**served**
6:23,24 10:2 98:5,17
**service**
17:8,10,15,17,18,19
17:19 18:4 33:23
**SERVICES**
1:21 134:21
**serving**
33:19
**session**
75:13 76:1,18 77:3
77:18
**seven**
113:23,24 134:22
**sghanem@depaul....**
51:3
**share**
117:4
███████
87:11,12
**shifted**
25:7 39:17 40:9
**shifting**
23:4
**short**
10:3 30:7 56:12
60:16 77:24 102:7
119:4
**shorter**
14:2,17,17,18
**shorthand**
1:14 134:9

**shortly**
92:2 128:18
**short-term**
49:14 53:24 55:16
61:7 63:11,22
**shoulder**
5:6
**show**
15:15 18:13 22:12
30:14 32:4 45:10,10
50:13 53:4 56:21
59:1 60:18 62:24
64:6 78:2 79:7
84:10 97:6 101:9
110:17 122:3
**showed**
27:3 39:7 62:11
82:16
**showing**
31:17
**shrugs**
5:6
**Shu-███an**
61:17
**side**
117:11,12
**sign**
8:10
**signature**
23:7,8 50:21 132:21
134:17
**signed**
63:17
**similar**
12:2
**similarities**
12:3
**sincerely**
67:20
**single**
37:2
**sit**
8:19
**situation**
90:8
**six**

13:24 14:20 113:22
113:23
**size**
12:2
**small**
108:18
**Social**
88:5
**society**
12:16
**solicit**
67:8 83:21
**somebody**
14:1 25:11 26:9
33:20 44:16,17 48:2
50:11,12 60:11 68:2
71:20 72:2 86:23
99:23 108:20,21,22
109:21 113:15
**sorry**
19:22 41:3 55:21
61:2 67:10,12 100:1
103:10,21 112:23
114:11 118:23
130:5
**sort**
36:1 38:14,14 43:4
49:14 104:17 118:3
119:24 123:21
**sound**
128:24
**Southbound**
60:6
**speak**
58:7,11,12,20 120:7
**speaking**
30:10
**speaks**
58:10
**specialist**
50:22 53:21
**specific**
51:19 73:3 110:12
116:10 120:10,16
**specifically**
36:11 49:6 90:5



106:12 109:24
118:2
**specifics**
7:22 52:2 56:7
107:10 116:15
**specified**
14:23
**specify**
13:18 71:23
**speculating**
31:16
**speculation**
19:10 35:5,15 40:12
43:23 45:18 59:15
77:6 112:6 124:20
125:24 127:8
130:13
**spell**
4:8 40:20 41:8
**spelling**
41:10
**split**
46:10 47:18,24 48:5
48:7
**spoken**
7:19
**sponsor**
86:24 87:2
**St**
12:13,14 52:19,20
**staff**
41:24 86:10 88:11,14
92:7,12,24 99:8
100:20 106:20
107:14 111:5 113:3
115:19 117:10,12
127:20
**stage**
96:8
**stamp**
15:21
**stamped**
32:5
**stand**
32:1 43:2 52:12
**standard**

67:6,13,17 123:21,23
123:24
**stands**
42:24 53:22,24 58:15
64:21
**start**
6:5 7:1,5 32:9,14
38:21 44:20 94:24
**started**
52:7 73:13 104:3
113:21 117:11
**starting**
117:23
**starts**
13:22 33:15
**state**
1:11,14 4:8 11:16,17
72:13 92:2
**stated**
110:1 113:4
**statement**
59:14 98:17,20 134:2
**statements**
92:23
**states**
1:1 22:23 54:23
59:21 87:14 94:17
97:21 131:6
**stay**
98:3
**STD**
53:22 55:4
**stenographer**
134:10
**step**
70:18 126:23
**steps**
63:15
**strategic**
91:9,12,13
**STREET**
134:22
**strike**
29:20 33:21 40:6
48:10 101:18 130:7
132:9

**string**
129:12
**strong**
125:7
**structures**
44:10
**student**
6:10 18:7 58:10
105:18 111:9,10
114:16,24 123:20
123:22 124:7,12,17
125:3,16,21 126:6
**students**
9:4,9 18:9,9 41:24
58:17 92:7,12 100:4
100:9,13 106:20
111:6,11,11 113:3
119:10 124:8 125:2
125:18
**studies**
45:10 88:5 103:16
**study**
53:2 103:15
**studying**
52:17
**stuff**
5:7 18:3,12
**subject**
53:23 97:18
**subjectively**
124:1
**submit**
81:22
**submits**
81:19
**Subpart**
73:14
**subscribes**
12:10
**Subsection**
70:22
**subsections**
36:6
**substantial**
109:4
**success**

92:7,11
**successor**
9:14,21
**suggested**
132:15
**suggestion**
130:10
**Suite**
1:15 2:3,9 134:4
**supervisors**
55:1
**support**
55:1,10,15,18 56:2
59:11,22 61:6,14
**suppose**
128:23
**supposed**
36:20
**Supreme**
1:11
**sure**
4:10 18:19 21:23
22:3 23:24 24:2
29:18,20 31:9 38:22
41:10 43:7 57:14
66:2 71:22 72:12
79:18 81:15 97:5
104:6 112:24 119:3
121:7 123:24
**surrounding**
36:11
**survey**
18:9
**surveys**
89:11,12 125:22
**suspended**
63:17 64:3
**sworn**
4:1,4 134:7
**Sydney**
1:3 2:15 20:3,6 21:1
22:21 32:11 33:9,16
34:16 35:10 36:10
37:21 38:24 51:10
53:16 54:11,15,17
54:23 58:12 59:10



59:14 61:5,12,23
62:1 63:14 66:12,19
84:19 97:22 109:8
109:18 110:1 123:4
130:5
**Sydney's**
54:21
**syllabi**
18:11 81:24
**syllabus**
81:21
**system**
119:11
**systemic**
121:10
**systems**
11:16
**S-A-L-M-A**
4:10

---

**T**

**T**
3:7 66:1,4 68:24
**take**
8:21 22:2 24:6 30:4
44:13 60:13 77:9,21
118:24 129:14
133:1
**taken**
1:9,13 18:9 24:20
45:13 68:8 90:3
109:20 116:24
117:7,8,18 134:3,9
**talk**
5:11 24:5 25:4
104:15
**talked**
7:22,23 23:1 108:22
**talking**
75:18 76:3
**targeting**
112:10
**teach**
99:6
**teacher**
124:18 125:7

**teaches**
125:8
**teaching**
11:10 17:9,10 18:5,6
18:7 49:22 51:15,20
51:24 78:11,12,16
78:18,21,24 79:4,5
79:17,17 80:2,2,24
81:9,13,15 82:4,9
82:12,17 97:19 98:5
98:12,18,21 99:2
125:5,10,12,15,22
**team**
33:6
**technical**
65:7
**telephone**
39:3
**tell**
24:15 35:8,9 41:3
52:7 59:19 67:18
73:9 86:20 88:21
109:16 114:12
**telling**
12:22 52:8
**tells**
5:14
**tendered**
3:21
**tenure**
8:14,15,20,23 9:1,10
13:16,16 14:3,14,16
15:1 17:3 18:8
20:17 21:2,6,7 22:9
33:20 34:1 64:22
65:13 66:5 79:20
80:24 83:20 87:14
94:9 95:8,11 96:2,4
96:6,8,12,14,19
118:4 123:23
**tenured**
20:11 67:7 80:22
82:15 95:9 96:2,17
**tenured/tenure**
131:9
**tenured/tenure-tra...**

130:20
**tenure-track**
13:22 15:10 17:16
18:6 21:5 33:23
36:15 123:19
███████
73:9,11 94:20,24
96:16,20 97:11
**term**
7:10 21:9 42:12
56:12 97:19 108:10
108:12
**terminated**
7:17
**terms**
49:21 82:12 123:20
125:1 132:13,15
**term-faculty**
21:3,5,6
**testified**
4:4 39:16 44:8 45:23
47:18 48:8,11 62:3
94:8 100:14 118:7
126:9 128:7
**testify**
5:2,23 116:9
**testifying**
6:2
**testimony**
8:5 39:20 46:20 56:4
62:19 104:7 109:4
118:10 127:9 128:9
**Texas-Pan**
10:12
**Texas-Rio**
10:14
**Thank**
41:12 50:3 57:2
132:19
**Thanks**
65:12
**theater**
18:1
**thing**
23:24
**things**

44:11 81:23 98:4
109:19 112:17
**think**
6:23 11:11 21:23
22:3,3 33:15 34:7
35:4 41:11 43:17
46:13 47:3 58:14
62:10 64:14 65:18
67:1 81:5 86:14
93:13 95:11,16 98:4
98:23 106:4,5,13
108:9 111:7 112:15
113:21 119:1,15
122:15,22 124:13
125:20
**third**
46:14 117:24
**third-party**
54:2
**thought**
39:15
**thoughts**
98:6
**thousand**
108:17
**thread**
32:8 38:3,5 39:8 41:1
41:2 51:6 52:3 59:6
63:6 83:16 132:5,7
**threads**
52:4,6
**three**
17:10 36:5 83:24
85:3 97:3 113:20
**time**
5:12,12 7:17 13:23
14:17 15:9 23:5,11
24:7 25:4 34:22
36:19 51:13 52:11
54:8 63:14 70:5
74:1,4 76:3,4 82:1
85:19 87:6,12 91:5
94:15 99:6 101:4
105:11 107:20
108:19 133:3
134:14



timeline
46:15
today
5:23 6:2 8:5 128:7
today's
7:19
told
24:13 55:11 56:1
top
27:8 34:16 57:17
  61:9
topic
36:20 109:4
topics
48:1 116:8,9,10,19
Totally
118:9
touch
24:1 25:17 52:10
  123:17
tour
113:11,12
tours
113:9,12,19
town
106:9,11,12,13,15,18
  106:22,23 107:1,2,5
  107:7
track
13:16,16 14:16 21:2
  21:6 79:20 95:8
  96:3,4,8
trail
27:17 37:8 129:17
  130:4
trails
37:6
train
37:3
trained
126:11 127:22
training
9:21,22 43:4,7,9,16
  43:19 44:15,18 45:1
  45:4 117:10 118:8
  126:15,19,20

trainings
43:12
█████
83:14 84:7
transition
26:20 28:17
tried
34:8 109:17
trip
52:18 53:2
true
123:8 134:11
Trustees
114:22,24
truthful
105:14
truthfully
5:2,23 6:2
trying
46:13 68:3 109:19
Tuesday
1:15
Tufano
1:13,24 2:13 5:9
  134:3,20
two
4:18 20:21 21:8 24:6
  27:6 46:10 47:24
  48:5,10,19 52:17
  53:3 92:16 117:23
two-hour
24:17
two-quarter
98:2
two-year
53:2
type
12:12 18:12 92:18

_____ U _____

UBPT
14:10 64:20,21 65:24
  67:21,24 68:2,2,6,7
  68:9,13
Uh-huh
70:3 74:16 84:3

91:10 102:16
uh-huhs
5:7
unable
61:13
unanimously
80:23
undergo
15:10 79:16
undergraduate
6:12,19 10:11
underneath
54:11 65:10,12
undersigned
134:10,15
understand
5:11,16,18,19 29:18
  42:18 44:13 68:4
  71:22 123:3
understanding
29:11,21 44:9 54:10
  54:14,19 64:15
  72:21 75:24 76:12
  76:17
understood
55:22
uniformly
113:3
Union
111:9,10 114:16
unit
103:3 117:13
United
1:1 94:17
University
1:6 6:6,9,16 8:20,23
  10:12,13 11:8,9,11
  11:13,15,17,17,21
  12:6,6,7,7,8,11
  17:18 21:12 22:8
  23:4 39:13 40:15,22
  43:11 48:2,9,12,20
  49:2 52:21 55:11
  64:21 65:13 83:22
  87:19,23 88:8,13
  91:13,14,16 92:20

93:14,16 95:1,3,5
95:20,22,24 96:17
99:10,12 103:7
105:20,21,22
111:14,24 115:14
117:9 120:7 123:5
125:10 128:5
university's
55:3 59:23 60:2
  61:15 62:4
University-wide
91:12 107:2
unquote
8:14
unsupported
90:2
update
51:12
updated
98:1
uploaded
67:1
upsetting
121:12
use
30:6 73:21 74:9
usually
9:22 13:24 14:19
  17:23 21:7 24:9
  27:15 70:16 89:6
  107:10
UT
10:18
U.S
118:1

_____ V _____

vague
11:23 13:17 17:5
  19:9 34:5 37:22
  40:11 42:16,22
  48:16 68:22 75:15
  107:23 110:3 120:1
  121:5 124:3 125:23
  130:12
vaguely



53:12,13 55:6 85:11
█████
87:3
**Valley**
10:14
**values**
12:9,23
**varies**
14:5
**variety**
124:6
**various**
9:11 91:14
**versus**
35:1 123:4
**viable**
71:9
**vice-president**
13:12 39:10 88:2
91:18,20 113:13
**vice-presidents**
115:18,19
**videoconference**
2:1,15
**Vincent**
12:13,14 52:19,20
**Vincentian**
12:9,11,12,23 52:13
52:15,18 53:1
**vision**
131:10
**visit**
52:20
**VMI**
52:8,12
**vote**
37:11 66:2,7,10,24
70:12 72:5,7 74:11
76:19 77:1,4 81:12
**votes**
66:13
**voting**
36:12,16 65:9 68:12
68:12,14,21 69:1
**VP**
39:15

**vs**
1:5

---

## W

**Wacker**
1:15 2:3,9 134:4
**want**
55:21 60:13 72:13,16
90:10 98:3 101:3
104:6 116:15 129:3
129:14 132:23
**wanted**
55:17 96:11
**warranted**
81:1
**washroom**
30:6
**wasn't**
55:11 100:13 104:14
**watch**
34:10
**way**
6:4 7:5 8:24 9:1
27:16 31:10 44:10
54:9 58:7 98:3
106:18 108:20,21
108:21 112:9
116:11,14 124:16
130:8
**ways**
125:10
**website**
89:15,17 91:16
117:16
**week**
23:16 67:8 128:21
**weeks**
53:3
**weigh**
14:10
**weighs**
14:9,10,11
**welcome**
106:17
**went**
27:18 49:13 52:21

95:6
**weren't**
66:2
**Wermuth**
2:8 3:5 9:5 11:23
13:17 17:5 19:9,20
26:3 29:2 30:4,6
31:5,14 32:21 34:5
35:3,15 36:23 37:12
37:22 39:19 40:11
41:14 42:3,16,22
43:22 45:17 46:19
48:16 51:16 56:3,17
56:23 57:2,10 58:21
59:15 60:14 62:17
63:24 66:15 68:22
69:7 71:14 72:13
73:23 75:14,17,20
76:3,6,20 77:5,23
93:9 94:2 100:1,8
100:12 101:3 102:5
102:20 103:2,5
106:2 107:23
108:13 109:3,13
110:3,19 111:20
112:5 114:12 116:2
116:11,14 118:9
119:3 120:1,24
121:5 122:10,12,18
123:10 124:2,20,22
125:23 127:1,7,24
128:3,22 129:2,8,9
130:3,14,24 132:20
133:1
**West**
1:14 2:3 134:4
**Western**
11:19
█████
99:7
**we'll**
8:17 32:8,14 44:20
58:7 80:13 132:22
**we're**
78:2 114:12 118:20
119:1

**we've**
100:15 117:15
**white**
88:7
**who've**
18:9
**willing**
70:8,21 74:14
█████
94:23
**winter**
51:21
**wish**
34:21
**witness**
3:2 4:1,3 11:24 13:18
17:6 18:17 19:11
26:4 29:4,14,17
31:15 32:22 34:6
35:7 37:23 39:22
40:13 41:15 42:5,17
42:23 43:24 45:19
46:21 48:17 51:18
53:8 56:18 57:12
59:17 62:20 64:2,10
66:18 71:16 76:8,21
77:7 78:6 81:8 85:8
93:11 94:4 102:4,9
102:21 106:3 108:1
108:15 109:6,15
110:5 111:22
116:13,21 117:4
118:11 120:2 121:6
122:19 123:11
124:4 126:1 127:9
127:11,15 128:1
130:16 132:22
134:3,7,13,17
**witnessed**
81:12
**women**
114:5
**wording**
112:19
**words**
125:19



**work**
7:11 13:6,16 17:2
   21:12 26:2 42:2
   45:2 71:21 72:3
   92:4,18,19,21
   117:13
**working**
12:15 27:21 117:16
   118:20,21
**works**
30:24 50:20 77:14
**worst**
124:18
**wouldn't**
72:7
**wrapping**
119:2
**write**
59:10
**writing**
105:2
**written**
31:10 54:9 82:21
   132:23
**wrote**
32:11 67:5 82:22
   84:19
**www.magnals.com**
1:23

_____
           **X**
**X**
3:1,7

_____
           **Y**
**yeah**
18:7 29:10 30:5
   42:24 57:19 71:24
   94:23 95:14 101:4
   106:4 114:3 119:3
**year**
10:21 14:11,21,22,24
   15:11 21:24,24,24
   22:4 46:5,14,15
   47:5,9 92:16 95:14
   95:15 96:10 101:20

   113:21
**years**
   7:15 13:24 14:19,20
   21:8 52:17 113:20

_____
           **0**
**084-003819**
2:13 134:21

_____
           **1**
**1**
3:8 15:16,17 36:7
   69:24 93:23
**1:20-cv-7760**
1:5
**10**
3:16 6:17 13:5,8,11
   13:13 77:21 83:4,7
   128:6
**100**
22:3 72:12
**101**
3:18
**102**
3:19
**11**
3:12 31:20 56:22
   57:3
**11:00**
1:16 134:5
**111**
3:19
**12**
3:15 69:5,8
**121**
1:14 2:3 134:4
**122**
3:20
**123**
2:9
**128**
3:5
**129**
3:20
**13**
3:17 82:7 84:11,12

**131**
3:6
**14**
3:18 101:10,12
**15**
3:8,19 101:24 102:2
**16**
80:24 82:7
**1635**
134:22
**17**
3:13 57:9 59:2,3
   97:12
**18**
3:9,10 30:15,16
   32:10 86:6
**18th**
26:22
**1800**
2:9
**1819-ROA-036**
86:9
**19**
3:19 22:4 110:18,23
**19103**
134:23
**1996**
10:23

_____
           **2**
**2**
3:9 16:10 18:15,24
   36:7 54:10 66:11
   70:7 89:8 91:9 92:1
**2/15/19**
36:8
**20**
3:13 20:15 22:4
   60:19,20 80:24
**200**
6:17
**2001**
6:23
**2013**
97:24
**2014**

95:17
**2015**
95:17 97:12
**2016**
72:11,11 73:7 76:6
   77:14
**2017**
82:7
**2018**
22:2 31:20 57:9 82:8
   83:3 128:9
**2019**
22:2,5 32:11 38:6
   86:6 103:6
**2020**
22:5
**2021**
114:17 122:9
**2022**
1:15 134:6,19
**21**
114:17
**22**
3:9,18 97:7,8
**22nd**
134:19
**2300**
1:15 2:3 134:5
**238**
101:24
**239**
101:24 102:4
**240**
101:24
**25**
3:20 122:4,5
**26**
3:10
**2699**
101:11
**27**
3:14 63:1,3

_____
           **3**
**3**
1:15 3:9 22:13,14



27:4 36:7 65:23
74:14 75:16,19
76:15 77:19 86:11
89:24 93:8 128:11
131:5
**3rd**
134:6
**3/8/2016**
70:5
**30**
3:10
**30-some**
20:13
**312**
2:4,10
**3189**
15:21
**3190**
16:11
**3194**
15:22
**32**
3:11
**3210**
18:14
**3211**
19:1
**3215**
18:14
**3355**
22:13
**3356**
50:15
**3362**
50:23 51:1
**3363**
50:23 51:1
**3364**
50:15
**3365**
26:18
**3366**
26:19
**3370**
53:5
**3371**

53:5
**3390**
78:3
**3391**
79:8 80:14
**3392**
79:9 80:14
**3397**
83:5
**3424**
56:24 57:7,17
**3427**
57:1
**3441**
84:11
**3477**
59:2
**3478**
59:2
**3483**
30:19
**3484**
30:20
**3487**
60:24 61:8
**3488**
60:24
**3494**
97:7
**3495**
97:7,21
**3538**
63:2,12
**3539**
63:2
**3540**
63:2
**3667**
129:12
**3668**
131:5
**3674**
129:13
**375**
51:20

---
**4**
---
**4**
3:4,11 50:14,16 52:3
**4.4.1**
111:17,23 112:1,10
**4:26**
133:3
**4059**
69:6
**41**
3:11 32:5
**42**
102:4
**44**
102:4
**474-7900**
2:10

---
**5**
---
**5**
3:10 26:13,14
**50**
3:11 20:15
**506-5511**
2:4
**51**
3:17 85:5,6
**52**
3:14 64:7,8 128:23
129:1
**53**
3:12,20 129:2,5,11
**57**
3:12
**575**
51:21
**59**
3:13

---
**6**
---
**6**
3:12 36:3,3,6 53:5,6
56:14
**60601**
2:4
**60606**

2:9
**61**
3:13
**624-6221**
1:22 134:23
**63**
3:14
**64**
3:14
**69**
3:15

---
**7**
---
**7**
122:9
**78**
3:15
**79**
3:16

---
**8**
---
**8**
3:15 70:22 73:14
78:3,4 82:3,8
**8TH**
134:22
**8157**
110:22 115:3
**8158**
111:13
**8159**
112:21,24
**8160**
114:9
**8161**
110:22
**83**
3:16
**84**
3:17
**85**
3:17
**866**
1:22 134:23

---
**9**
---



**9**
 3:16 71:7 73:14 79:8
  79:10 80:14 82:7
**9077**
 32:6 39:9
**9080**
 32:9 34:16 41:4
**9081**
 32:12 36:3
**9082**
 32:6,12
**9427**
 92:1
**9428**
 86:11,17,21 92:23
  93:9,23
**9437**
 64:7
**9438**
 64:7 66:11
**97**
 3:18





**3/8/2016**

**Program Chair duties, selection, and review process.**

Primary Duties of Program Chair.

Program Chairs are responsible for the coordination of activities within their respective program areas. These duties include, but are not limited to, curricular review, the annual review of faculty, scheduling of courses, hiring part-time faculty, planning and conducting at least two quarterly meetings with faculty, attending and participating in leadership meetings, serving as the liaison between the Dean of the College and the faculty within their units.

Selection of Program Chair

Program Chairs serve three year terms. They are elected by the full-time faculty in the program unit. This election is a recommendation to the Dean of the College who has final say on the selection of a candidate. Program Chairs must be tenure-track with a strong preference given to those who are associate or full professors.

1. Dean of the College invites nominations or self-nominations from the program area faculty.
2. Dean of the College asks if those nominated are willing to serve in this role.
3. Those willing to serve are asked to provide a presentation and answer questions at a faculty meeting.
4. An election is held with all full-time faculty in the program area invited to vote by secret ballot.
5. Quorum of 2/3 of all eligible faculty must vote.
6. The person with a simple majority is elected.
7. This elected candidate is presented to the Dean of the College.
8. If the Dean of the College accepts this recommendation, the process is complete.
9. If the Dean of the College rejects this recommendation, then, the faculty is asked to revote on any remaining viable candidates.
10. The process repeats until a new Program Chair is elected.

For a normal election, the timeline will begin in Winter Quarter. Nominations are requested at the beginning of the quarter. The presentation and Q&A will happen at the first faculty meeting, or the third Friday of the quarter. Special elections can be called at any time if circumstances arise that a current program chair cannot fulfill the remaining term.

Review Process

Program Chairs are reviewed annually by the Dean of the College.

# EXHIBIT E

# DR. DEMOYA DEPOSITION

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SYDNEY DILLARD,                    )
                                   )
                Plaintiff,         )
                                   )
       -vs-                        ) No. 1:20-cv-7760
                                   )
DEPAUL UNIVERSITY,                 )
                                   )
                Defendant.         )


        The videoconference discovery deposition of
MARIA DE MOYA, taken pursuant to the provisions of the
Code of Civil Procedure and the Supreme Court Rules of
the State of Illinois pertaining to the taking of
depositions for the purpose of discovery, taken before
DEANNA L. TUFANO, Certified Shorthand Reporter of the
State of Illinois, at wherein all the parties attended
remotely on Wednesday, April 27, 2022 at 10:00 a.m.



Reported for:
MAGNA LEGAL SERVICES
(866) 624-6221
www.magnals.com, by:
Deanna L. Tufano, C.S.R.



Page 2

```
 1   A P P E A R A N C E S:        VIA VIDEOCONFERENCE
 2
     DISPARTI LAW GROUP, P.A.
 3   MS. GIANNA R. SCATCHELL
     121 West Wacker Drive, Suite 2300
 4   Chicago, IL  60601
     (312) 506-5511
 5   gia@dispartilaw.com
 6     on behalf of the Plaintiff;
 7
     COZEN O'CONNOR
 8   MS. ANNA WERMUTH
     123 North Wacker Drive, Suite 1800
 9   Chicago, IL  60606
     (312) 474-7900
10   awermuth@cozen.com
11     on behalf of the Defendant;
12
     Reported BY:  DEANNA L. TUFANO, CSR
13           LICENSE NO. 084-003819
14
     ALSO PRESENT:  Plaintiff, Sydney Dillard
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
 1              I N D E X
 2   WITNESS                      PAGE
 3   MARIA DE MOYA
 4     Examination by Ms. Scatchell ............... 4
 5     Examination by Ms. Wermuth ................ 150
 6     Further Examination by Ms. Scatchell ....... 152
 7
 8            E X H I B I T S
 9     Exhibit No. 1 ...............  51
       Exhibit No. 2 ...............  86
       Exhibit No. 4 ...............  88
10     Exhibit No. 6 ...............  90
       Exhibit No. 7 ...............  91
11     Exhibit No. 8 ...............  92
       Exhibit No. 10 .............  93
12     Exhibit No. 11 ............. 101
       Exhibit No. 12 ............. 103
13     Exhibit No. 13 ............. 108
       Exhibit No. 14 ............. 110
14     Exhibit No. 15 ............. 114
       Exhibit No. 17 ............. 119
15     Exhibit No. 19 ............. 120
       Exhibit No. 20 stricken ... 121
16     Exhibit No. 21 ............. 122
       Exhibit No. 23 ............. 138
17     Exhibit No. 24 ............. 138
18
19   ***See confidential information on Page 50.
20
21
22
23
24
```

Page 4

```
 1                (Witness sworn.)
 2              MARIA DE MOYA,
 3   called as a witness herein on behalf of the Plaintiff
 4   having been duly sworn, was examined and testified as
 5   follows:
 6              EXAMINATION
 7   BY MS. SCATCHELL:
 8       Q   What do you prefer to be called Dr. De Moya,
 9   Maria, what should I call you?
10       A   Maria.
11       Q   Perfect.  Well, good morning, Maria.  My
12   name is Gianna Scatchell.  I represent Sydney Dillard in
13   Dillard versus DePaul.  And you've just taken an oath to
14   tell the truth, you understand that, correct?
15       A   I do.
16       Q   Okay.  Have you ever been deposed before?
17       A   No.
18       Q   Okay.  So then we're going to go over some
19   instructions just to give you an overview of what to
20   expect.  So what I'm going to need is for you to give me
21   answers that are true, complete, and accurate.  Do you
22   understand that?
23       A   Yes.
24       Q   Okay.  And a court reporter is writing down
```

Page 5

```
 1   everything that we say because that's part of the nature
 2   of the deposition, so we need to make sure not to speak
 3   over each other.  Do you understand that?
 4       A   Yes.
 5       Q   Okay.  Great.  And we need to make sure you give
 6   clear answers just like you've been giving.  So no
 7   uh-huhs or body gestures, two things I am very guilty of
 8   doing.  And if you don't understand a question, please
 9   ask me to clarify and I'll rephrase it.  If you do answer
10   a question, I'm going to assume that you understood that.
11   And sometimes, you know, you may not remember something
12   unless you look at a document.  So if there's a certain
13   document or something that will jog your memory, just let
14   me know and we'll make sure that we could try to give it
15   to you if we have access to it.  And then you don't have
16   an attorney, correct?
17       A   No.
18       Q   Okay.  And DePaul's outside Counsel, Ms. Wermuth
19   is here this morning.  She may choose to object to
20   certain questions that are asked and she does that to
21   create a record.  But if she objects, that does not mean
22   that you're not able to answer the question unless it's
23   specifically said do not answer this question, and then
24   that's something that her and I will hash out.
```



Page 6

1        Is there anything that is preventing you
2  from testifying truthfully, completely, and accurately
3  here today?
4     A  No.
5     Q  Okay.  And I ask this of everybody.  This is not
6  anything against you.  Are you taking any medication that
7  effects your ability to testify truthfully, completely,
8  and accurately?
9     A  No.
10    Q  Okay.  Did you do anything to prepare for today's
11 deposition?
12    A  I had a conversation with Anna yesterday, that
13 was it.
14    Q  And did she give you anything to review?
15    A  No.
16    Q  And did you speak with anybody else at her firm?
17    A  No.
18    Q  And did you speak to anybody at DePaul about your
19 testimony?
20    A  No.  I mean, I told Sydney I am going to be
21 deposed next week, but that was it.
22    Q  Okay.  And nobody promised you anything for
23 testifying today, correct?
24    A  No.

Page 7

1     Q  Okay.  And now that we got the generalities out
2  of the way, we'll start with the more pertinent
3  questions.  Where did you go to college?
4     A  Three places.  In my home country, Dominican
5  Republic I did my bachelor's.  I did my masters at NYU.
6  I did my PhD at the University of Florida.
7     Q  When you did -- okay.  Let's back it up.
8        So when you were in college, you were in
9  the Dominican?
10    A  Yes.  I was born and raised in the Dominican
11 Republic.
12    Q  And when did you graduate from college in the
13 Dominican?
14    A  '99.
15    Q  And what degree did you earn?
16    A  We call it social communication, but it's mass
17 communication, a bachelor's in mass communication.  But
18 the direct translation will be social communication.
19    Q  And then your master's you got at NYC?
20    A  My master's is in business and economic
21 reporting.  It was half in journalism school, half in the
22 business school.  And I believe I graduated in January,
23 2003.
24    Q  Perfect.  And then your PhD?

Page 8

1     A  My PhD was in mass communication with the
2  emphasis in public relations and community organizing.  I
3  graduated, 2011.
4     Q  And then did you work any -- did you work
5  anywhere before you started working at DePaul?
6     A  Yes.  I worked at North Carolina State University
7  as an Assistant Professor for two years.
8     Q  And then you joined DePaul after?
9     A  Yes.
10    Q  Okay.  And what year was that?
11    A  2013.
12    Q  And what college are you a professor?
13    A  College of Communication.
14    Q  Okay.  And what is your current title?
15    A  I have three; Associate Professor of
16 Communication in Public Relations and Advertising.  I am
17 the Chair of Public Relations and Advertising, and I also
18 serve as Associate Director for Regional Initiatives in
19 Latin America for the Office of Global Engagement.  I
20 know that's a lot.
21    Q  That's the one thing I've been enjoying about
22 every professor.  They all have, I do three things.  I do
23 five things, and then each one is longer than the next,
24 so it's interesting.

Page 9

1        So did you ever serve as the Diversity
2  Advocate at DePaul?
3     A  I did.
4     Q  Okay.  And what does that job entail?
5     A  It has changed overtime.  When I took on the job,
6  my main responsibilities where to be available, or quote,
7  a resource for the faculty in my college.  And that
8  meant, you know, being available to help them if they had
9  any questions regarding diversity inclusion, maybe with
10 their class, maybe with interactions with students or
11 other faculty members and provide training, but that came
12 a little later.  And the other side was to represent the
13 college in the President's Diversity Council, and I was
14 in that role 2016 to 2020, I believe.
15    Q  Okay.  And then what made you leave that
16 position?
17    A  I took on the role as chair, and even though we
18 don't have a role in my college yet, I hope we will
19 soon, I strongly believe that anybody who is evaluating
20 faculty should not be the diversity advocate, that those
21 things should not mix.  So I spoke to the dean and she
22 agreed and we found a substitute for me.
23    Q  Okay.  And what reasons do you have to say that
24 the two shouldn't mix?



Page 10

1   A  I think that it might be uncomfortable for
2  somebody who wants to ask questions, for example, about
3  interactions with a colleague or interactions with a
4  student to talk to somebody who's going to be writing
5  their annual evaluation.  Ideally not, but I can see why
6  that might be an issue in any case.
7   Q  And what is the President's Diversity --
8   A  So the President's Diversity Council does not
9  exist anymore.  It existed until 2019, but sadly, I can't
10  be 100 percent sure about the year, but it was until we
11  received a new president.  It was a group made up of
12  around 45 people that represented different offices and
13  colleges in the university under the direction of ████
14  ████ who is our OIED vice-president, I think.  I can't
15  remember her title.  And the idea was to provide support,
16  advice, and strategic planning for the university's
17  president at that time, Father Holtschneider.
18   Q  Could you spell that?
19   A  I really could not.  I can try, but I'm not going
20  to get it right.  Father Holtschneider, yeah.  The good
21  thing is we have a building named after him now at
22  DePaul, so I know you can Google it very easily, I'm
23  sorry.  I don't trust my spelling.
24          And then what Dr. Estaban became the new

Page 11

1  President, he thought it was too big of a body so he
2  created a smaller, 12-person advisory council, which I
3  coincidentally sit on now.  But that's another story.
4   Q  Okay.  So then is there a difference between the
5  two, the diversity council versus this 12-person advisory
6  council?
7   A  Yes.  There's significant difference.  There's
8  less voices being heard, less representation.  So I guess
9  that means that there's, I guess, a little more distance
10  between the president and some offices.  And also in the
11  President Diversity Council -- when we had the President
12  Diversity Council, we did not have an associate provost
13  for diversity and now we do.  So now, the body has ████
14  ████ but also Cindy Pickett, who is our new associate
15  provost for diversity.  I believe she's been at DePaul
16  for two years.
17   Q  And were you part of her selection process?
18   A  No.
19   Q  Okay.  Do you know who was?
20   A  I think actually Dr. Dillard sat on that
21  committee, but I don't remember who else.  I know that
22  they did a call for anybody in the university who wanted
23  to be part of the search committee to volunteer.  I
24  didn't volunteer at that time.

Page 12

1   Q  And how often did the President Diversity Council
2  meet?
3   A  Did or does?
4   Q  Well, I'll go to the new 12 -- does the new
5  12-person committee have a name?
6   A  So the difference between the old one and the new
7  one is the old one is Diversity Council, the new one is
8  Diversity Advisory Council.  We call it PDAC.
9   Q  So we'll go to the old one first, the President's
10  Diversity Council.  How often did that council meet?
11   A  Yeah.  We met once a quarter, and in addition to
12  that, we had one or two meetings a quarter that were in
13  our working groups.  I was in the staff and faculty
14  working group.
15   Q  And what are working groups?
16   A  So we would take on different challenges to look
17  at them in more detail and to see how we could maybe, you
18  know, propose solutions or programs or initiatives.  So
19  there were several working groups.  I know, for example,
20  that there was a group that was working with parents, so
21  employee who are parents that was their focus.  I
22  volunteered for the staff and faculty, diversity working
23  group and what we discussed were issues that had to do
24  with climate, with opportunities.  And we had smaller

Page 13

1  meetings, kind of listened to people report out what they
2  had learned in their college and tried to provide some
3  information and advice that could go to the president's
4  office.
5   Q  And do you remember anybody specifically from
6  that working group regarding -- we'll just take each one
7  of them at a time -- regarding the faculty climate?
8   MS. WERMUTH:  Objection.  Overbroad.  Go ahead.
9  BY THE WITNESS:
10   A  I honestly can't.  I remember a couple people
11  that served with me.  I remember talking about staff
12  faculty relations broadly.  Oh, one specific thing that I
13  can remember is discussing kind of like inclusion and
14  bias training and making that mandatory.  And that's
15  something that ████ has been working on for a while,
16  but it's still optional, so I remember that came up
17  during that time.  But apart from that, I couldn't tell
18  you specific things.
19   Q  So when you say that it's optional, optional for
20  the staff or faculty, or who is it optional for?
21   A  For everybody, but mainly faculty.  Most of the
22  courses are available for faculty.  They're considered
23  professional development courses.  And there is a program
24  called the BUILD certificate that focuses on diversity



Page 14

```
 1   and inclusion and faculty had the option to sign onto
 2   that, and then we get invited to different lectures,
 3   groups, discussions. I invited speakers, trainees to
 4   learn more about diversity and inclusion.
 5       Q  And this built certificate is optional?
 6       A  That is BUILD with a D.
 7       Q  BUILD, okay. Thank you. And at these working
 8   group meetings, were there minute notes or anything like
 9   that?
10       A  I don't recall. The staff member that helps us
11   coordinate is no longer there, and I don't remember his
12   name.
13       Q  Okay.
14       A  So I don't recall if there were minutes.
15       Q  Do you know who would?
16       A          maybe, but I can't say for sure just
17   because she kind of had to have the overview of
18   everything. So she might know if there were minutes.
19       Q  And then now going to the President's Advisory
20   Council or PDAC, how often does that council meet?
21       A  We meet once a quarter and we might have other
22   meetings if there's a special event or something. So
23   about maybe six times a year total -- five times, yeah.
24       Q  And do you guys have working groups as well?
```

Page 15

```
 1       A  No because we're a smaller group. So I am one of
 2   the faculty members selected, meaning that I don't only
 3   represent my college, but I represent faculty.
 4       Q  And then who else is on the PDAC?
 5       A                          a professor in LAS -- why can't I remember
 6
 7   his first name right now --          another
 8   faculty member. And there are two staff members that I'm
 9   not remembering their name, but one of them has to deal
10   with student issues and the other one, I believe, is the
11   president of staff council. If she's not the president
12   of staff council, then she is on staff council. And
13   there is one more faculty member          whose last name I
14   can't remember,          is his first name, and
15                    also from LAS. I might have missed
16   somebody, but I think that's most of the people there.
17       Q  Okay. And then is there a differentiation of
18   professors who teach at the undergrad level or graduate
19   level?
20       A  No --
21       MS. WERMUTH: Objection. Vague.
22   BY MS. SCATCHELL:
23       Q  Okay. And what is staff council that you had
24   previously mentioned?
```

Page 16

```
 1       A  So like we have faculty council to govern and to
 2   represent faculty interest at the university level, we
 3   have staff council. Sadly, I don't know what they do
 4   beyond, you know, kind of represent the interest of the
 5   staff. But I know that they are represented in several
 6   university level committees.
 7       Q  Okay. And then do you serve on (inaudible)
 8       A  I'm sorry, can you repeat that?
 9       MS. WERMUTH: Gia, we couldn't hear you. We can't
10   hear you. We can see your lips moving, but we can't hear
11   you.
12       MS. SCATCHELL: How about now?
13       MS. WERMUTH: Yeah.
14       MS. SCATCHELL: Okay.
15   BY MS. SCATCHELL:
16       Q  My question was, do you serve on any other
17   university committees?
18       A  Yeah, on several. So I serve in the CEID, that
19   is Committee on Equity Inclusion and Diversity. That is
20   a faculty council committee, and our mandate is to
21   collect information, analyze and share information
22   regarding diversity, inclusion at DePaul, bring forward
23   initiatives to increase diversity, inclusion and equity
24   at DePaul. There's a representative of each college on
```

Page 17

```
 1   that committee and there's no staff representative on
 2   that college.
 3           I am also on the working group, which has
 4   no official name, but it's a working group to address
 5   Vincentian's relationship with slavery. I represent the
 6   CEID in that group because that was related to news that
 7   came out specifically regarding Father Rosati who had
 8   been a slave owner, and there's been efforts to kind of,
 9   you know, acknowledge, reconcile, and move to ideally,
10   you know, education and restitution, if possible, for
11   that experience and that heritage. That isn't exclusive
12   to DePaul, but DePaul is one of the, I believe, only two
13   Vincentian universities in the United States.
14       Q  Is it one of the largest catholic universities?
15       A  I believe it's the largest, unless numbers have
16   changed in another, but if it's not the largest, it's up
17   there.
18       Q  Okay. And then when was the CEID -- can I call
19   it the CEID Committee?
20       A  Yeah, that's what we call it.
21       Q  Okay. When was it started?
22       A  It was started two years ago right before the
23   pandemic. I want to say June.
24       Q  Of 2019 or 2020?
```

Page 18

1    A   Now I'm not 100 percent sure if it was before the
2    pandemic because we never met in person, we always met
3    online so that makes me think it may be after the
4    pandemic.
5    Q   Why was it started?
6    A   So ▓▓▓▓▓▓ ▓▓▓▓▓▓ -- I am so embarrassed that
7    I'm forgetting last names, but one of my colleagues first
8    name is Quineta, Q-U-I-N-E-T-A.  They had been trying to
9    get faculty council to address diversity, equity, and
10   inclusion more directly and more intentionally instead of
11   it being just one of those topics that would come up
12   every once in awhile.  They proposed that we have a
13   standing committee for that, and it was approved by
14   faculty council.  When it was approved by faculty
15   council, and that must have been 2019, then they send out
16   an email to the whole university asking who wanted to be
17   on that committee.  I had just stepped down as diversity
18   advocate for the college -- so that does means it's
19   2019 -- and I volunteered to be on that committee.
20   Q   And how often does that committee meet?
21   A   We meet once a quarter, but we have met more than
22   once a quarter.  Yeah, about once a quarter.
23   Q   Okay.  So is it just the three individuals that
24   you mentioned, or are there other --

Page 19

1    A   No.  There's a representative from each college.
2    The problem is that I am not going to be able to remember
3    everybody's name.
4    Q   No, no.  No worries.  Give or take, how many
5    people would you say that is?
6    A   That would be 10 people.
7    Q   And then who is Father Rosati?
8    A   He was a Vincentian priest that was involved with
9    DePaul University.  And the only thing I know about him
10   apart from that is that there was a room in the library
11   named after him.  So 1800's I believe, but again, I can't
12   be sure.
13   Q   And then you had previously stated that he was a
14   slave owner and part of what the CEID Committee is doing
15   is providing some sort of education and potential
16   restitution --
17   A   Pardon me, no.  And I apologize because I know
18   that the confusion comes from me.  I represent the CEID
19   Committee in that working group.  But that working group
20   is led by Father Memo, M-E-M-O.  I'm sure he has a last
21   name, but we call him Father Memo from Mission &
22   Ministry, which is another department.  So my job, when
23   they put that group together, they wanted to get
24   presentations from the different diversity units that

Page 20

1    existed at the university and I was the person selected
2    from CEID to go there to serve on that one.
3    Q   And you're tenured, correct?
4    A   Yes.
5    Q   Okay.  And when did you achieve your tenure?
6    A   '18.
7    Q   Okay.  And have you taught courses at the
8    university?
9    A   Yeah.
10   Q   Okay.  What courses have you taught?
11   A   Many.  Would you like me to list them all or do
12   you need to know just subject area?
13   Q   Subject area is perfect.
14   A   Public relations mainly, and kind of like three
15   specialized areas, one of them has to do with
16   multi-cultural Latino audiences.  The other one has to do
17   with activists in communication for social change, and
18   the third one has to do with law and ethics.
19   Q   I'm just taking notes.  So do you teach graduate
20   students or undergrad students, or is it a mix?
21   A   I teach both.  Most classes we separate graduate
22   and undergrad.  Every once in awhile, there might be a
23   class that has graduate and undergrad.
24   Q   Okay.  And what ethnicity do you identify with?

Page 21

1    A   I identify in order; Dominican, Caribbean,
2    Latina.
3    Q   And as a female?
4    A   Yes.
5    Q   Okay.  And is there a difference between, let's
6    say, African-American minority like that was born here
7    versus one that was a person of African descent that was
8    born say in Africa somewhere?
9    MS. WERMUTH:  Objection to form and foundation.  Go
10   ahead, Maria.
11   BY THE WITNESS:
12   A   The answer to your question is, yes.  And unless
13   you want me to dissertate, I really think we need to get
14   a lot more specific because it really is -- there are so
15   many, many differences.
16   BY MS. SCATCHELL:
17   Q   Okay.  If you could maybe just list a couple of
18   them and then maybe we can trickle down from there.
19   A   So the most important thing has to do with lived
20   experience, especially if we're talking about the U.S.
21   context.  If I may, can I call you Deanna?
22   Q   Yeah.
23   THE COURT REPORTER:  Hold on.  one second.  I am
24   Deanna.  This is Gia.



MAGNA
LEGAL SERVICES

Page 22

1     MS. SCATCHELL:  I thought you were calling me Gianna.
2     THE COURT REPORTER:  I didn't want the record to be
3  unclear so that's the reason why I interrupted.
4  BY MS. SCATCHELL:
5     Q  You can call me Gia if that's easier.
6     A  Okay.  So the way that I would refrain the
7  question in my brain is in the U.S. context, you know,
8  what's the difference between being an immigrant of
9  African descent and an African-American.  So is that a
10  fair representation of what you want to talk about a
11  little bit?
12     Q  Yes.
13     MS. WERMUTH:  Sorry, I am going to just post a
14  relevancy objection to this line of questioning.  But
15  please proceed.
16  BY THE WITNESS:
17     A  Sure.  An African-American is somebody who has a
18  heritage that is marked by slavery.  They were born and
19  most of them -- well, actually, all of them are born and
20  raised in the United States, meaning they're descendants
21  of slaves.  They have dealt with issues of discrimination
22  and all of the other things that have to do with a being
23  a Black person in America for all their lives.  An
24  immigrant, whether they're Black, or in my case, Latina,

Page 23

1  most of us from countries where we are the majority.  So
2  an African immigrant comes from a country where they are
3  ordinarily the majority, they have not had the lived
4  experience of a minority.  If they have suffered
5  discrimination or bias or hostility, it's usually not
6  related to race.  For example, in many of our countries,
7  it is related to maybe gender or social economic class.
8     Q  Can you briefly describe the tenure process of
9  when somebody goes up for tenure?
10     A  Sure.  So there is a timeline of when you're
11  hired as a tenure-track faculty member.  Assuming you
12  come directly out of grad school, you have about five
13  years to prepare your case.  And if you come from another
14  job like I did, you might have a little less time because
15  you might bring in a year.  But in total, a person has
16  around five years to prepare their case.  During those
17  five years, you are reviewed at least three times.  The
18  second year review, the fourth year review, and the
19  pre-tenure review.  Those reviews are done first by the
20  personnel committee.  It's a committee made up of
21  representatives of different programs in the college.  I
22  believe it has six or seven members, but sadly, I can't
23  be 100 percent sure about that, and then it goes to the
24  tenure faculty.  So the personnel committee provides an

Page 24

1  evaluation of your work, a summary.  The tenure-faculty
2  has access to that evaluation, but they also have access
3  to your whole case, the same thing that the personnel
4  committee saw.  They discuss your case, could take five
5  minutes, could take an hour, and then we have secret
6  ballot votes that talk about are you making progress
7  towards tenure.  That is summarized in our report and
8  given to the candidate or the person who's being
9  reviewed.  That is the same thing that happens in the
10  fourth year review.  So second year and fourth year
11  review are the same thing.
12        The pre-tenure review is an evaluation of
13  your case for tenure.  So the same, you meet with the
14  personnel committee, you submit your documents, they
15  evaluate you, they submit your evaluation to the tenure
16  faculty.  But here the decision isn't are you making
17  progress, but basically is your case tenurable.  Do they
18  recommend you for tenure & promotion.  That vote is
19  reported to the dean, the dean decides what to do with
20  that case.  So theoretically, although I don't think it's
21  happened, they could, you know, bounce back about the
22  case and tell the personnel committee I disagree with
23  you, and then it gets moved to UBPT, University Board for
24  Promotion & Tenure, Tenure & Promotion, which is a

Page 25

1  university level committee that also interviews you, also
2  looks at your case.  They make their recommendations to
3  the provost and the provost votes -- no.  They vote, make
4  recommendations to the provost and the provost affirms
5  their decision almost always.  But again, theoretically,
6  the provost would have the authority to disagree with the
7  committee and go against the recommendation.
8     Q  Okay.  Then you said that there's at least three
9  reviews?
10     A  Before tenure, yes.
11     Q  And then could you expand on what you mean by at
12  least?
13     A  The faculty handbook specifies that a person
14  going up for tenure will be reviewed three times and in
15  these three occasions.
16     Q  And could somebody be reviewed more than three
17  times?
18     A  I know that Dr. Dillard was reviewed more than
19  three times, I don't know if anybody else has been.  So
20  the answer to that would be, I guess, yes, she was
21  reviewed more than three times.  So it's happened at
22  least once.
23     Q  Okay.  And then for these faculty reviews, what
24  goes into them in terms of documentation --



Page 26

1    MS. WERMUTH: Objection. Vague.
2    BY THE WITNESS:
3    A  So we prepare a statement about our work in three
4    areas, research, teaching and service, and kind of
5    self-evaluating and self-reflecting. It's supposed to be
6    an essay that combines kind of like a self-reflection in
7    making your case. It's very difficult to write. We have
8    one peer observation from two faculty members. So two
9    faculty members are selected to review -- to observe one
10   of your classes live and they provide feedback and an
11   evaluation, they look at your course material. Usually
12   maybe just the syllabus and one assignment or something
13   like that.
14           Then you also have a student survey for
15   the pre-tenure one, so not for the other two evaluation,
16   but for the pre-tenure evaluation, they do a survey with
17   former students, they randomly call. They ask for
18   student volunteers to do the actual data collection and
19   the student volunteers write a report. For all three of
20   them, and I'm sorry for talking out of order, for all
21   three of them, they look at your most recent -- I need to
22   correct that, pardon me.
23           For the first two, they would look at your
24   most recent teaching evaluations. But for your tenure,

Page 27

1    you would look at all of your teaching evaluations. And
2    then you submit supporting documents to your case, that
3    includes material from your teaching, letters from
4    service, meaning the chair of that committee says, Maria
5    served in this committee, and she contributed this way,
6    and then also, your research. So actually samples of
7    your research -- I mean, not samples, your actual
8    research. A copy of your research is submitted, each
9    article. And in addition to that, letters, if you have
10   co-authored work, then the co-authored letters are
11   included there. I don't think I'm forgetting anything.
12   Yeah, that seems like everything.
13   BY MS. SCATCHELL:
14   Q  Okay. So when you said that former students are
15   randomly selected to write a report, that's for the
16   pre-tenure review?
17   A  Yes.
18   Q  Okay. And is that different from the other
19   student evaluations?
20   A  Yes. That's in addition to the student
21   evaluations. The student evaluations are filled out at
22   the end of the course. When students are on week 8 --
23   our courses are on 11 weeks -- the 11th week is exam
24   week, and students provide feedback about the class, your

Page 28

1    performance, would they recommend the class to others,
2    whatever. This is supposed to be more like outside of
3    the context of the class, the students that have had
4    Maria as a teacher, you know, what do they remember, what
5    feedback they have, things like that.
6    Q  Okay. So they're randomly selected throughout
7    the time, say it's the six years or somebody, five or six
8    years, do you know who reaches out to these students?
9    A  Today, no. But in the past, for example, when I
10   was going up for tenure, it was an administrative
11   assistant. Her name is ████████ -- ██████ I'm
12   blanking on her last name. And she would ask for
13   graduate student volunteers, and then the volunteers
14   would get a list of our former students and contact them.
15   How they did it, how they did the random sampling or
16   anything like that, I have no idea.
17   Q  Do you know who would know that?
18   A  Yeah. I'm 100 percent sure the dean would know
19   that and possibly the chair of personnel who currently
20   is -- is it Paul Booth or ██████?
21   Q  Is ████ still at the university?
22   A  No.
23   Q  Do you know when she left approximately?
24   A  At least three years, maybe four years, ago.

Page 29

1    Q  Do you know what her ethnicity is?
2    A  She's Black.
3    Q  Okay. And do you know if she made any complaints
4    about discrimination?
5    A  I don't know. So sadly with staff matters, they
6    tend to be channeled differently.
7    Q  Now, if somebody -- let me back up.
8           So if you apply for tenure, is it like
9    would you apply in the fall or when would the vote
10   happen?
11   A  You would submit documents September, so the fall
12   of the year that you're being reviewed, and then the
13   process takes about a whole year. And usually you have
14   your interview with the personnel committee around winter
15   because they have until May-something to submit their
16   recommendation to UBPT. So then you would hear about
17   your case -- actually, it's before May. You would hear
18   about your case in June. So let me go back. The only
19   thing that I'm 100 percent sure of regarding the dates is
20   that you submit early in the year around September and
21   that you hear by June. So when the other things happen,
22   I might be misremembering.
23   Q  Okay. Sounds good. And when you compile all of
24   the materials to go up for tenure, was the program that



Page 30

1   you use or platform rather, that called SharePoint?
2     A I don't remember. I remember that it changed at
3   least once in the process, and I don't remember if it was
4   called SharePoint. I think so, but I'm not sure.
5   Because I've been checking -- I've been evaluating other
6   people's cases, so I've been looking at SharePoint for
7   over two years, so I can't be sure that I'm remembering
8   that I used it or that I use it if that makes sense.
9     Q Yes. But you said that you remember using it for
10   at least reviewing or for yourself, correct?
11     A Yes.
12     Q And what's your experience with SharePoint, has
13   it been, I guess -- was there like technical issues or
14   anything like that?
15     MS. WERMUTH: Objection to form.
16     THE WITNESS: I --
17     MS. WERMUTH: And I know you're very cooperative, Dr.
18   De Moya, but I do need to be able to interpose objections
19   from time to time. I don't mean to interrupt you, but
20   you answer so quickly.
21     So anyway I am just going to objection to
22   form and foundation.
23     THE WITNESS: Thank you, Anna. I have a very kind of
24   conversational style, but sometimes I respond too

Page 31

1   quickly. But I can try to pause a little bit.
2     MS. WERMUTH: No worries. I'm explaining why I
3   interrupted you. I don't mean to do that.
4   BY THE WITNESS:
5     A Okay. I found the software to be clunky. So let
6   me see, when I was submitting my case, again I think it
7   was SharePoint, but it could have been another software.
8   I'm pretty sure it was SharePoint. Putting files in a
9   folder was like a six-step process. Like first you have
10   to add the folder, then you have to go back. And then if
11   you click back, then you're out of the system so it's not
12   intuitive. So it is a little time consuming. But yeah,
13   but whatever it is that we use, whatever the software is
14   called, it's used at the university level. So we're kind
15   of stuck with that.
16     Q And you had previously mentioned that the service
17   component of going up for tenure, how would somebody
18   obtain the service credit or service requirement?
19     A That is an exact science. We kind of -- okay.
20   So you get service credit for the work that you do in
21   service of your program, your college or university that
22   is outside the scope of your teaching and research. So
23   serving on a committee, organizing a community event, you
24   know, helping the dean address, I don't know, some issue

Page 32

1   that she needed an ad hoc committee for. Most of us --
2   because there are enough committees at the level of the
3   university and the college, most of us get our service
4   record by serving on committees. And the evidence of
5   that is a letter that is supplied.
6     Q And were you the PRAD committee chair?
7     MS. WERMUTH: Objection. Vague.
8   BY THE WITNESS:
9     A So there's no PRAD committee --
10   BY MS. SCATCHELL:
11     Q Program chair.
12     A That's okay. I am the program chair now.
13     Q And when did you become the program chair?
14     A June 2020.
15     Q And is it a three-year term?
16     A Yes.
17     Q And then let's see, do you get a salary or
18   stipend for serving on a program chair?
19     A Yes.
20     Q Okay. And what is that salary or stipend?
21     A The exact amount, I don't know. But I can tell
22   you that it's equivalent to teaching one summer course.
23   I believe that's about a tenth of your salary, annual
24   salary. So two equivalents of teaching a separate

Page 33

1   course. One of them is distributed throughout the school
2   year, so let's say that that's 5 or 6,000, it would be
3   distributed through the school year. And then in summer,
4   you get that same 5 or 6,000, so it would be two
5   equivalents if that makes sense.
6     Q And then were you nominated for that position?
7     A I was.
8     Q Okay. Do you remember who nominated you?
9     A I don't think I was told.
10     Q And then as the program chair, what are your job
11   duties?
12     A I'm sorry, that is a long list. Okay. So I
13   oversee anything that has to do with the public relations
14   and advertising curriculum especially for undergraduate
15   because at graduate level, I would have to coordinate
16   closely with the graduate director. Meaning, we have a
17   graduate academic director and in that role, she is the
18   person who is in charge of the grad curriculum. But any
19   changes or innovation or whatever would normally be
20   discussed with the chair. It's more of a collaboration
21   than it is supervision if that makes sense. I am in
22   charge of the schedule for the program, so all of the
23   classes that are taught, again, at the graduate level, I
24   have to coordinate with the graduate director to make



MAGNA
LEGAL SERVICES

Page 34

1   sure that the classes are scheduled and that we have
2   staff for them, that's another thing. I am in charge of
3   staffing those courses. That means selecting which
4   professors teach which courses, and if necessary, hiring
5   adjuncts to teach the courses that we don't have in-house
6   faculty to cover. I write annual evaluations for all
7   full-time faculty. That is the annual merit evaluation
8   that goes directly to the dean.
9           I also advise, so kind of like, it's
10  not -- I mean, I want to call it mentor, but mentor is
11  not a job. It's something else. But kind of like advise
12  the junior faculty in terms of their service obligations
13  and make sure that PRAD is represented in the different
14  committees at the local level. And for example, I might
15  coordinate with our associate dean for faculty affairs,
16  Michaela Winchatz. I can't spell that one. That, you
17  know, oh, Tony, would be good for this committee, or you
18  know, Jane would be good for this other committee kind of
19  things.
20          And I also serve in the leadership team
21  for the college. Any problem with faculty that students
22  have comes to me first, any challenge that a faculty has
23  regarding their teaching, anything from, you know, this
24  course isn't working out to I got sick and I can't show

Page 35

1   up to class today comes to me first. And any exception
2   that needs to be made to the degree progress report of a
3   student, I need to authorize those exceptions. I also
4   write a lot of recommendation letters, so anytime my
5   faculty want to apply for a grant or an award or
6   something like that, internally they almost always
7   require the chair's support. So that is part of my work
8   providing that support. And honestly, putting out fires.
9   Anything that comes up, usually comes to me first.
10  Q   Okay. And you had stated that one of the things
11  that you do or that your committee does is deciding
12  whether somebody is fit for different rolls. Did I say
13  that correctly?
14  MS. WERMUTH: Objection. Form. Insofar as it
15  misstates the record.
16  BY THE WITNESS:
17  A   Yeah, so no, not really. I'm assuming that
18  you're referring to service. I mentioned that I might
19  advise one junior faculty member about what the best
20  service opportunity is for them and that might happen,
21  you know, directly to the associate dean. That was the
22  part that I mentioned with Michaela Winchatz. So she
23  might say, Maria, we need a PRAD member for the teaching
24  committee and I would look at the record and say, well,

Page 36

1   maybe, Tony could use more service kind of to balance it
2   out. That happens more frequently than me going directly
3   to Tony and saying, hey, Tony, you should serve on this
4   committee. Because usually people are invited to
5   committees so I have to be careful that my faculty don't
6   feel that I'm telling them they have to join a committee.
7   Q   Okay. Is it any kind of standard criteria that
8   you use?
9   A   No. It is very much trying to estimate the time
10  commitment that the committees take so that I don't
11  recommend somebody who's already serving many hours and
12  might feel they have to say yes to that invitation
13  because it comes from the associate dean or something
14  like that.
15  Q   Okay. And does the PRAD chair manage the adjunct
16  faculty?
17  A   Yes, not alone.
18  Q   Okay. What do you mean by that?
19  A   So the adjunct faculty is evaluated by an adjunct
20  teaching committee that is made up of PRAD faculty
21  members, so they choose a group of adjuncts that teach
22  frequently in our program to evaluate their performance.
23  That's formally. Informally, I have access to their
24  teaching evaluations for the faculty that is new. I will

Page 37

1   review it more frequently for the faculty that has been
2   teaching for us a long time, the adjunct that's been
3   teaching for us a long time, I might review it every once
4   in a while or if somebody asks a question.
5           I have the power to hire new adjunct
6   faculty without consulting with anybody else. I have
7   never because I'm smarter than that. And I have the
8   power to not offer courses to an adjunct faculty member.
9   And the only reason I have not done that to date is
10  because we have less courses to offer than we did in the
11  past. So that's what I mean by yes and no in managing
12  the adjunct faculty -- or not alone, pardon me.
13  MS. SCATCHELL: Could we go off the record for one
14  second.
15          (Brief recess.)
16  MS. SCATCHELL: Back on the record, I'm sorry.
17  BY MS. SCATCHELL:
18  Q   So then how are requests for service roles that
19  come from the faculty handled by the program chair?
20  A   Not all of them are. So usually they come
21  directly from the associate dean. The associate dean
22  will email all of the faculty and say, we have openings
23  in these roles and most of the time faculty will
24  volunteer. Sometimes there's some competition, meaning,



Page 38

1  you know, maybe I want to serve in the -- God, there's
2  like a sports committee, I don't remember what the name
3  is, but something like that, or the library committee,
4  but Matt also wanted to.  But most of the time there
5  isn't a lot of competition because most of us already
6  have.  And in that case, you might have a vote, you know,
7  to select your representative and that is usually done by
8  email.
9          Those are for the committees at the
10  college level.  At the university level, we get an email
11  from faculty council or whatever university unit it is.
12  Some you can just volunteer for, but most of them you
13  have to be elected to.  So you write a paragraph about
14  why you're a good fit for that committee, and your
15  college or the university, depending on the type of
16  committee elects you to that role.  So for example, for
17  the CEID, I was elected by my college, the one that's
18  representing the college in the diversity -- in the
19  faculty council diversity committee.  But for other
20  committees, I'm in the program review committee at the
21  university level.  That I was selected by the committee
22  chairs.  There was no voting there.
23  Q  Okay.  And then you previously testified that you
24  know Sydney Dillard, correct?

Page 39

1  A  Oh, yeah.
2  Q  And how do you know her?
3  A  We are colleagues and friends.
4  Q  Okay.  And do you know when she went up for
5  tenure?
6  A  I believe it was the year after me, so it must
7  have been '18, '19.
8  Q  And do you know if she had applied for the
9  program chair position?
10  A  Yes.  I know she was interested in the program
11  chair position when it first came up.
12  Q  Okay.  And do you know whether or not she was
13  selected?
14  A  She wasn't selected.  She was presented as a
15  candidate, but when the faculty vote, she didn't get
16  majority faculty support.
17  Q  And were you at that meeting?
18  A  Yes and no, meaning I was at the meeting, but I
19  was virtual.  I had a family engagement in Miami and had
20  asked the dean to let me participate virtually.
21  Q  And then do you remember how long the meeting
22  was, the vote for program chair?
23  A  Approximately an hour, maybe an hour and a half.
24  Q  And do you remember what the approximate vote

Page 40

1  makeup was, like who said yes, who said no?
2  A  I can't remember who said no.  I believe she
3  received three votes yes.
4  Q  Out of how many people were in the vote?
5  A  I don't remember, but PRAD faculty, the biggest
6  it's been, it's 18.  It's been down to 15, so might be 15
7  to 18 people.
8  Q  And then at the beginning of the meeting, do you
9  remember if Sydney had given a statement about her
10  qualifications?
11  A  Yes.
12  Q  Do you remember what the nature of that statement
13  was or her qualifications were?
14  A  Yes.  Actually, in the handwritten notes that I
15  passed, one of those were kind of my notes when she was
16  speaking.  She spoke about her experience with the
17  program.  She spoke about being a good listener and being
18  willing and able to work with the faculty to represent
19  the faculty.  She spoke about wanting to take a little
20  kind of like time at the beginning to really immerse
21  herself in the role before making any kind of like big
22  changes or decisions.  If you would like more
23  specificity, I would have to look at the notes because I
24  don't remember.

Page 41

1  Q  Okay.  And do you have access to your notes?
2  A  I can find them on my computer, but you have
3  access to them.  Would you like me to find them?
4  MS. WERMUTH:  We produced these to you, Gia.
5  MS. SCATCHELL:  I just want to make sure we're
6  talking about same notes, that's all.
7  THE WITNESS:  Do you want to show me the ones you
8  have, does that work?
9  MS. SCATCHELL:  Anna, do you know the Bates stamp
10  number of them?
11  MS. WERMUTH:  I don't.
12  MS. SCATCHELL:  We'll take a break and we'll come
13  back to that part of it.
14  BY MS. SCATCHELL:
15  Q  All right.  Was Sydney asked to leave the vote
16  meeting?
17  A  Yes.  That's usually how it happens.
18  Q  Okay.  And do you remember what qualifications
19  were discussed about Sydney during that vote?
20  A  So you mean when she stepped out of the room?
21  Q  Yes.
22  A  Very little, honestly.  The conversation wasn't
23  about Sydney as much as it was about the chair role and
24  the fact that it was too much work for one person and



11 (Pages 38 to 41)



Page 42

1  that it was impossible and that this is why nobody wanted
2  to serve as chair.  I don't remember anything
3  specifically being said about Sydney as a candidate.  I
4  do remember saying, we are supposed to be discussing the
5  candidate because the conversation was about the role,
6  which is something we had kind of been stuck in for more
7  than a month, kind of just talking about the role.
8      Q   Okay.  And did you raise that generally to the
9  individuals that were voting, or who did you say that to?
10     A   I said it to the room.  I was on the computer,
11 but I was in the middle of the table, so they could hear
12 me.
13     Q   And do you remember if anybody responded to that
14 statement or request?
15     A   No, I don't remember.
16     Q   And you had previously said that nobody wanted to
17 serve as the program chair because it was a lot of work?
18     A   Yes.
19     Q   And Sydney had volunteered, correct?
20     A   Yes.
21     Q   And who was the program chair that would have
22 been the predecessor to this program chair?
23     A   Dr. ███████
24     Q   And do you know why ███████  -- or do you know

Page 43

1  if ███████  was interested in serving a second term or
2  another term for program chair?
3      A   She wasn't --
4      MS. WERMUTH:  Objection.  Foundation.
5  BY THE WITNESS:
6      A   As far as I know, she wasn't.
7  BY MS. SCATCHELL:
8      Q   She was not, okay.  And do you know who became
9  the program chair instead of Sydney?
10     A   ███████  stayed on another year.
11     Q   And do you remember if there was a vote to make
12 her program chair again?
13     A   There wasn't.
14     Q   Okay.  And do you know if somebody is already
15 program chair and their term is up, whether there has to
16 be another vote or how that process works?
17     MS. WERMUTH:  Objection to the form.  Go ahead.
18 BY THE WITNESS:
19     A   I don't know if it has to be another vote, I
20 don't think it does.  Assuming the program chair -- give
21 me one second, I'm recalling something.  Okay.  The
22 journalism chair, Jason Martin, volunteered to stay on
23 another year -- another term, and they sent an email to
24 the journalism faculty, I believe, asking, you know, if

Page 44

1  anybody else was interested.  So I'm assuming there is a
2  process now, but I know that this happened after I was
3  named chair, so this would have been after ███  stepped
4  down and after Sydney had volunteered for the position.
5  BY MS. SCATCHELL:
6      Q   And was anything said about Sydney in the
7  position of program chair during this vote?
8      MS. WERMUTH:  Objection.  Vague.
9  BY THE WITNESS:
10     A   What vote are we talking about --
11 BY MS. SCATCHELL:
12     Q   Program chair.
13     A   So when we were discussing Sydney's case?
14     Q   Yes.
15     A   So when she volunteered to be program chair, we
16 were discussing it.  There was nothing specific that I
17 can recall said about her qualifications.
18     Q   Do you remember if somebody had said during the
19 vote process is she even -- something to the effect of is
20 she even a professor here?
21     A   Yes, something to that effect.  Is wasn't that
22 exact wording.  It wasn't is she even a professor.  It
23 was something like what does she teach.  And it was Eva
24 ███████ , a former colleague.

Page 45

1      Q   Do you know why she would have said something
2  like that?
3      MS. WERMUTH:  Objection.  Foundation.
4  BY THE WITNESS:
5      A   Because she didn't know what area Sydney taught
6  in, I assume.
7  BY MS. SCATCHELL:
8      Q   And so is it fair to say that at that vote, it
9  was more about revamping the position of program chair
10 than about taking a vote for Sydney?
11     MS. WERMUTH:  Objection.  Leading.  Go ahead.
12 BY THE WITNESS:
13     A   I wouldn't say that's -- more than fair, I
14 wouldn't say that's accurate because whether we discussed
15 Sydney's case or not, the vote was about, you know, do we
16 want her to represent us as chair.
17     Q   And did anybody ask to suspend the vote or
18 postpone it to a time where Sydney's qualifications were
19 discussed?
20     A   No.
21     Q   Do you know why that is?
22     MS. WERMUTH:  Objection.  Foundation.
23 BY THE WITNESS:
24     A   I don't know.

MAGNA
LEGAL SERVICES

Page 46

1  BY MS. SCATCHELL:
2      Q   And in your experience in serving on various
3  committees, has something like that ever happened before
4  where Sydney's -- or where the candidates qualifications
5  were not being discussed?
6      MS. WERMUTH: Objection. Vague.
7  BY THE WITNESS:
8      A   I don't recall another meeting where I had to
9  vote where we didn't talk in detail about a candidate,
10 no.
11 BY MS. SCATCHELL:
12     Q   And did you also serve as a graduate director at
13 DePaul?
14     A   Yeah.
15     Q   And what does that position entail?
16     A   I was the academic director for the master's in
17 public relations and advertising. Most of my work had to
18 do with curriculum with making sure we taught a good
19 balance of classes between public relations and
20 advertising because it's a degree that covers both making
21 sure that we could staff -- we could staff the classes.
22 I could review faculty evaluations. I think I only did
23 that in one case because the chair was doing it. ▓▓▓▓
24 she was doing it. And to be 100 percent honest, I was

Page 47

1  happy to go with her recommendation with her on that
2  because she had more experience than me. And if there
3  was any -- mentoring the graduate students, industry
4  relationship building, and if there was conflict, there
5  was one or two cases of conflict between a faculty member
6  and a student, then I would be the intermediary. Oh, and
7  you also serve at the college level graduate director
8  committee.
9      Q   Okay. So you had previously testified that you
10 and Sydney are work colleagues and also friends?
11     A   Yes.
12     Q   Okay. Did you guys ever have any email or text
13 message communications?
14     A   Yeah.
15     Q   Have you applied for any other positions outside
16 of DePaul in the last five years?
17     A   Yes.
18     Q   Okay. We're actually not going to talk about
19 that.
20         So when you applied for other positions,
21 did you discover that there was any kind of limitation on
22 not having some sort of service requirement?
23     MS. WERMUTH: Objection. Vague.
24 BY THE WITNESS:

Page 48

1      A   No.
2  BY MS. SCATCHELL:
3      Q   Okay. Did any of the other places that you
4  applied to require you to have experience in let's say
5  like a program chair type position?
6      A   Yes.
7      Q   Okay. And at that time, did you have that
8  experience?
9      A   Yes.
10     Q   And was there ever a time that you applied to a
11 different university that you did not have that
12 experience as program chair?
13     A   Yes.
14     Q   And what happened then?
15     A   I wasn't selected.
16     Q   And did they say why or explain why?
17     A   No, but that's also very standard in academic
18 jobs. The assumption is always somebody more qualified
19 received the job.
20     MS. SCATCHELL: Could we go off the record for one
21 second. I am just going to send out some exhibits.
22     MS. WERMUTH: Okay. Do we want to take maybe a five
23 minute break or such? Is that okay while you email the
24 stuff?

Page 49

1      MS. SCATCHELL: Okay. That's fine.
2      THE WITNESS: That would be nice, and are you going
3  to email me?
4      MS. SCATCHELL: Actually, can I get your email
5  address.
6      THE WITNESS: I'll put it in the chat.
7      MS. SCATCHELL: Then we'll go back on the record at
8  11:19.
9          (Short recess.)
10 BY MS. SCATCHELL:
11     Q   Let's go back to what we were discussing before
12 the break, the program chair position. So as the program
13 chair, do you have direct reports?
14     A   Yes. Let me clarify I struggle with that a
15 little bit because even though I do advise and maybe
16 supervise in some way the faculty, we all -- our direct
17 supervisor is the theme because we don't have
18 departments, we have programs. So yes and no.
19     Q   And then does the graduate director have direct
20 reports?
21     A   No. Again maybe -- no, they wouldn't actually.
22     Q   Okay. And when you had said that you previously
23 applied to other positions, what were those other
24 positions that you were seeking?



Page 50

1    MS. WERMUTH: Objection. Relevance. Also, you know,
2  this is confidential information that really has --
3    MS. SCATCHELL: Do you have a protective order in
4  place?
5    MS. WERMUTH: I understand. If you can just let me
6  finish my objection. That's all I was going to do, state
7  an objection, get it on the record. You're going to get
8  your answer, but I do think it's outside of the scope of
9  the litigation.
10    MS. SCATCHELL: Okay. Your objection is noted.
11  BY THE WITNESS:
12    A  I will answer, but I am concerned because, as you
13  know, I don't necessarily want my employer to know I've
14  been looking for other jobs.
15  BY MS. SCATCHELL:
16    Q  Right.
17    A  One of the jobs that I applied to was to be
18  director of the school of advertising and public
19  relationship at the University of South Florida.
20    Q  I don't want to know where. I just want to know
21  -- here, I guess just like to get to the gist of what I
22  am looking for, it's not to try to get you into hot water
23  with your school or anything. I just want to know that
24  the different positions that you were applying to, was

Page 51

1  having direct reports a qualification that was preferred?
2    MS. WERMUTH: Hang on. I'm going to object to form
3  and I'm going to object to scope and relevance. Go
4  ahead.
5  BY THE WITNESS:
6    A  No, not exactly. But yes, having administrative
7  experience.
8    Q  Okay. And that's to get positions that are
9  higher up the academic chain so to speak for
10  administrative positions, correct?
11    MS. WERMUTH: Objection. Vague.
12  BY THE WITNESS:
13    A  So yes, there would be higher up administrative
14  positions.
15  BY MS. SCATCHELL:
16    Q  Okay. And then having a position like program
17  chair would give you those qualifications that you would
18  need to have that administrative experience, correct?
19    MS. WERMUTH: Objection. Leading.
20  BY THE WITNESS:
21    A  For two of the positions that I applied, yes.
22  BY MS. SCATCHELL:
23    Q  Okay. I'm going to show you what has been marked
24  as Exhibit No. 1 if you could go to that, please.

Page 52

1            (Exhibit No. 1 was marked
2              for identification.)
3    THE WITNESS: One second. Thank you. I have it open
4  now.
5  BY MS. SCATCHELL:
6    Q  Can you actually just open up Exhibit No. 1.
7    A  The cover says Exhibit 1.
8    Q  Yes. And what I'm going to show you is going to
9  be marked Dillard Discovery Production Page 2817 to
10  Dillard Discovery Production 2943.
11          Could you take a moment and review those
12  pages
13    MS. WERMUTH: That's like 120 some pages, you want
14  her to read all of it now?
15    MS. SCATCHELL: No. I just want her to gloss over it
16  and just tell me if she recognizes what that exhibit is.
17    THE WITNESS: Could I please get again what page I'm
18  supposed to be starting at?
19    MS. SCATCHELL: 2817.
20    MS. WERMUTH: So Maria, what she's referring to is do
21  you see on the second page of the PDF, at the bottom of
22  that page, there's a red marking that says Dillard
23  Discovery Production 2817.
24    THE WITNESS: Now I do.

Page 53

1    MS. WERMUTH: Those are the page numbers that Gia is
2  referring to.
3    THE WITNESS: Okay. Thank you. I actually hadn't
4  noticed that. Thank you, Anna.
5    MS. WERMUTH: No problem.
6  BY THE WITNESS:
7    A  I believe I recognize this as an email -- I'm
8  sorry, text exchanges between Sydney and myself.
9  BY MS. SCATCHELL:
10    Q  Perfect. Well, we're not going to go through all
11  143 pages. We're just going to go through some of them.
12  I just wanted to first make sure that you had the context
13  that it was communications between you and Sydney?
14    A  Yes.
15    Q  So if you could now go to -- or scroll to Page
16  2827.
17    A  Okay. I got it.
18    MS. WERMUTH: I'm sorry. I'm not quite there yet.
19  Hang on. What page of the PDF?
20    MS. SCATCHELL: 12.
21    MS. WERMUTH: Okay. That's helpful. Thank you.
22  Yes, I'm there. Thank you.
23  BY MS. SCATCHELL:
24    Q  Okay. Maria, would you mind just taking a look


MAGNA
LEGAL SERVICES



Page 54

1  at that page and reviewing it and let me know when you're
2  finished?
3      A  I read it.
4      Q  Okay.  And you see the part where it says well, I
5  should back up.
6          So the green text would be Sydney,
7  correct?
8      A  Uh-huh.
9      Q  And the gray text would be you.
10     A  Uh-huh.
11     Q  And it says at the top, "Hey if you are free, can
12  we talk?  I just talked to Salma."
13     A  Actually, I didn't see that on this page.  Oh,
14  yeah.  Yes, sorry.  Yes.
15     Q  And you see the date right above that which is
16  March 13, 2017, correct?
17     A  Yes.
18     Q  And do you remember what that conversation was
19  about and/or what she was referring to?
20     A  The accurate answer is no.  I can make an
21  assumption, but I can't promise 100 percent that it was a
22  conversation I had on that date.
23     Q  But do you remember a conversation happening
24  around that date?

Page 55

1      A  I remember a conversation that was relevant to
2  Sydney.
3      Q  Okay.  What do you remember?
4      A  And just let me clarify, I am very bad with
5  dates, so I don't trust my memory.  So we had talked
6  about how the evaluation criteria for tenure & promotion
7  wasn't clear, and I had gone to Salma as diversity
8  advocate to talk about that.  In that initial
9  conversation, if that was the first conversation that I
10  had with Salma about this topic, and Salma was our former
11  dean.  She's now the provost at the university.  I
12  believe I did not mention anybody specifically having
13  names.  I used the term faculty of color.  In this case,
14  I was referring specifically to Sydney, to myself, and to
15  ███████ ███████ because the three of us had talked about
16  the fact that the guidelines were vague and needed to be
17  more specific and clearly laid out.  That was the first
18  conversation that I had with Salma regarding diversity
19  that might have been something that I would talk to
20  Sydney about.
21     MS. WERMUTH:  I'm sorry.  Deanna can you read back
22  the question that Dr. De Moya just responded to.
23              (Question read.)
24     MS. WERMUTH:  There are some foundational issues

Page 56

1  here, so I'll just state that.
2  BY MS. SCATCHELL:
3      Q  And do you remember why in that conversation you
4  had mentioned faculty of color and not the specific names
5  of you, Sydney, or ████
6      A  Because at that time, I would have agreed with
7  Sydney and ████ not to mention their cases specifically,
8  but to talk about comments that I had received in
9  general.  So as diversity advocate, I would always ask
10  the faculty or staff, you know, do you want me to bring
11  this up on your behalf or in general.  And if I did that
12  in that case, it's because we had agreed that it would be
13  kind of more in general and broad.
14     Q  Did Sydney or ████ tell you why they wanted to
15  keep their identities hidden at that time?
16     A  I'm sure we had a conversation about that.
17  Specifically, I can't recall why we decided not to
18  mention our names.  Because I have to be clear in this
19  case, I also felt like I was advocating for myself.  I
20  was still pre-tenure and I felt that the guidelines were
21  unclear and open to interpretation to the faculty that
22  were going to be voting on our cases.
23     Q  And do you remember what portions of it you felt
24  needed clarification or were unclear?

Page 57

1      A  I mean, almost everything, but I think the main
2  concern had to do with research and service.  So teaching
3  at DePaul is very clear.  There's very high expectation,
4  and you have to have high marks across the board.
5  Service and research is a lot more up for debate and up
6  for interpretation.
7      Q  Okay.  And then going to the next page, could you
8  please review that, that would be 2828?
9      A  Okay.
10     Q  And could you just review that and let me know
11  when you've finished?
12     A  I'm finished.
13     Q  Do you see the part where it says, "Sorry I
14  missed your message yesterday.  ████ is 100% cool with
15  it.  No worries.  On a separate note, had a conversation
16  with ███ yesterday.  Wanted to talk to you about it."
17  Then you responded, "Am available, smiley face" Do you
18  see that?
19     A  Yes.
20     Q  Do you remember what that conversation about ███
21  was about?
22     MS. WERMUTH:  Objection.  Form.  Foundation.
23  BY THE WITNESS:
24     A  So this would have been a conversation between



15  (Pages 54 to 57)

Page 58

1  Sydney and ████  There were more than one conversations
2  in which I wasn't present.  If I was being told about it,
3  I mean, again, we have a friendship and a professional
4  relationship.  It could have been diversity advocate
5  related to ████ concerns about her case and how that
6  related to Sydney's case or my case, or it could have
7  been about anything else, so I can't.
8      Q  And ████ is ████ ████ correct?
9      A  Yes.
10     Q  And when you were speaking about the tenure &
11 promotion guidelines being vague, do you remember if
12 Sydney had approached you with concerns about service and
13 going up for tenure?
14     A  I can't remember specifics, no.
15     Q  Okay.  Would there be anything to refresh your
16 recollection?
17     A  No.  To be 100 percent clear, I can't remember
18 anything specific, but I can definitely remember we
19 talked about research and service because those were the
20 areas that were too broad.
21     Q  Okay.  And then you said you were advocating for
22 yourself, could you expand on what you meant by that?
23     A  I identify as a faculty of color.  I think that
24 the things that affect faculty of color could affect me

Page 59

1  as well.  I was also going up for tenure.  I was going up
2  for tenure before Sydney and ████ and I was a little
3  uncertain about my case.  So for me, a clarification of
4  the standards would have helped every untenured faculty
5  member including myself.
6      Q  And could you please go to 2830?
7      MS. WERMUTH:  Can you tell me the PDF page number?
8      MS. SCATCHELL:  15.
9      MS. WERMUTH:  Okay.  Thank you.
10 BY MS. SCATCHELL:
11     Q  Okay.  Could you review that and let me know when
12 you're finished?
13     A  I finished 2830.
14     Q  Do you see the part where it says Thursday, March
15 23, 2017?
16     A  Uh-huh.
17     Q  Do you see where you say, "Meeting with Salma
18 April 4th and with ████ ████ this coming Monday.  Have to
19 schedule a meeting with Lexa"?
20     A  Uh-huh.
21     Q  Do you remember what those meetings were about?
22     A  Yes.  So specifically ████ had already kind of
23 given me all of her case and talked to me about the parts
24 that were problematic in terms of their evaluation.  And

Page 60

1  around that time, Sydney and I had been up for our fourth
2  year review and we had similar experiences and similar
3  letters, but I had received an anonymous vote in all
4  three categories, and Sydney had received a split vote in
5  one category.  We had shared our documentation with each
6  other and we had discussed how in ████'s case and in
7  Sydney's case, there was an appearance of bias in the
8  evaluation because they didn't seem to be applied the
9  exact same way.  So I was going to go to the dean --
10 well, I went to the dean as diversity advocate to talk
11 about these cases, and in this time, yes, with names and
12 examples.  I speak to ████ before that because it
13 was going to be my first time, kind of like presenting a
14 formal complaint to the dean and I wanted some advice,
15 and she gave me some advice.  And she told me that it was
16 fair to say that there was an appearance of bias, and I
17 would have had to schedule a meeting with Lexa because
18 Lexa was the associate dean in charge of faculty.
19     Q  Okay.  So then do you remember what the
20 appearance of bias was?
21     A  The fact that some criteria would be used to
22 evaluate teaching for one person, but not for another.
23 That was one specific example.
24     Q  Do you have any other examples?

Page 61

1      A  The only thing that I remember -- give me one
2  second.  This is a general impression.  Not the letter
3  that we got signed from the dean, both Sydney and I were
4  very, very similar in wording.  And again, the fact that
5  with a similar analysis, you could -- it could result in
6  different votes -- brought a question of what was the
7  criteria that was being used by the person voting.  Those
8  are the two specific things that I can remember.  I don't
9  believe we talked about research or service at that time.
10 I believe the conversation was based on evaluation of
11 teaching.
12     Q  Okay.  And do you know what criteria was used?
13     A  Yes and no.  The criteria for teaching is still
14 the same criteria, but it is broad, meaning it defines,
15 you know, high quality of teaching.  And I remember in
16 ████'s case, there were comments about students feeling
17 uncomfortable in the class, and those comments, together
18 with others, that was not the only thing mentioned, led
19 to a conclusion that she was an ineffectual teacher.
20      So my question would be or is something
21 like well, are we looking at, you know, the level of
22 comfort of all students in all classes.  For example,
23 right, if this is one of the evaluations that we're going
24 to use to say that people are ineffectual.  And I also



Page 62

1  was concerned with the fact that they didn't account for
2  research that showed that faculty of color, especially
3  women of color, are evaluated differently by students.
4    Q  And do you remember what the outcome of that
5  meeting was?
6    A  Yes.  Salma told me that she had spoken to
7  Lawrence ████████, he was the associate provost for
8  research and diversity at that time, and that he had told
9  her that her obligation was to listen, and that I had,
10  you know, performed my obligation, and she had performed
11  hers, basically.
12    Q  And has the teaching criteria changed during that
13  meeting?
14    A  No --
15    MS. WERMUTH:  Objection.  Vague.  I'm sorry, what was
16  the answer?
17    THE WITNESS:  No.
18  BY MS. SCATCHELL:
19    Q  And do you know why it has not changed?
20    MS. WERMUTH:  Objection.  Foundation.
21  BY THE WITNESS:
22    A  We've had discussions about it being vague.  We
23  did after this meeting.  For example, there was some
24  changes to the tenure & promotions guidelines.  I cannot

Page 63

1  remember what they were, but I do remember having a brief
2  conversation at the end of the meeting about specificity
3  and the tenured faculty, which at that point were the
4  ones making decisions in terms of changes, disagreed with
5  my point that the guidelines were not clear enough.  That
6  was the only time I remember having a discussion about
7  that specific conversation.
8    Q  Do you remember approximately when those
9  conversations were?
10    A  They must have been -- I know that they were at
11  the end of the academic year, so May or June.  And they
12  must have been at the end of that academic year, so I'm
13  assuming 2017.
14    Q  And you had mentioned that Sydney had a split
15  vote in one category.  Do you remember what that category
16  was?
17    A  Teaching.
18    Q  And do you remember anything more about her
19  teaching and that review?
20    A  I mean, I'm sorry I don't understand what you're
21  asking.
22    Q  That was a bad question.  We'll come back to
23  that.  I'm sorry about that.  Now is there -- how is the
24  criteria?  Is it like a good, better, best or how does

Page 64

1  that work or good, better, excellent, something of that
2  nature?
3    A  And Gia I will answer the question to the best of
4  my ability, but I have to admit, I might be
5  misremembering because we recently went through the
6  ballots, you know, through the previous years because we
7  were doing some more -- adding some more specificity in
8  terms of process to the tenure & promotion guidelines.
9  So because of that, I can assume, you know, what were the
10  adjectives at that time, but I have to admit that I might
11  have been mistaken.  There are three -- usually three
12  adjectives; excellent, very good, and fair.  For some
13  reason they skip good, I don't know why.  Somewhere in
14  our faculty handbook it says that you have to be
15  excellent in two out of the three categories and very
16  good in the other to be considered tenure by your
17  peers -- to be recommended for tenure by your peers.
18        So that is what the personnel committee
19  includes in their report.  So they will tell the tenure
20  faculty, you know, in the area of service, we evaluate
21  Maria as very good.  However, the tenure faculty when we
22  vote in the second and in the fourth year review, we do
23  not use adjectives.  We just say is this person making
24  adequate progress toward tenure, yes or no.  In that

Page 65

1  review, Sydney would have been in her fourth review, so
2  it would not have an adjective there.
3    Q  And at the bottom of page or bottom of the text
4  message thread on Page 2830, do you see where it says
5  from Sydney, "Okay great!  Thanks again.  I wanted to ask
6  you a hard question yesterday, but didn't want to ask in
7  front of ████  Would you mind sharing the email that you
8  received from ████ about the peer observation upload
9  and your final personnel/reappointment letter"?
10    A  Yes.
11    Q  Is that what you were referring to about when you
12  guys were comparing evaluations or is that something
13  different?
14    A  That would be different.  ████████ would have told
15  me who needed to upload my peer evaluation.  So over the
16  time that I was being evaluated, that changed from the
17  evaluators are going to upload it to the candidate has it
18  upload it.  I believe that during that time, it was the
19  evaluators that were supposed to upload it.  And so if it
20  was missing, you know, it wasn't that you didn't put it
21  in, but the people who observed your class didn't put it
22  in.
23        I don't remember anything -- oh, oh, okay.
24  So that would be two different things.  About the peer



Page 66

1   observation upload, that's one thing. And the other
2   thing is my final letter, my evaluation letter, and did
3   share that with her. And that is a letter that I'm
4   referring to that had similar wording, but different
5   votes at the end.
6       Q   Okay. Perfect. And then could you go 2833,
7   which is 18 of the PDF?
8       A   Okay.
9       Q   Do you see where it says where you say, "Do you
10  feel bad about it?  Uncomfortable?"?
11      A   Yes, I do.
12      Q   Do you know what that's referring to?
13      A   A comment on her teaching evaluation on her
14  letter.
15      MS. WERMUTH: I'm going to object on foundation. I
16  don't see a date on here.
17  BY MS. SCATCHELL:
18      Q   And then we're going to go to 2835. Could you
19  review and let me know when you finish?
20      A   Uh-huh.
21      Q   Do you see where you say, "You are the only young
22  Black woman in our college. You'll be the one living
23  this experience, but I got your back"?
24      A   Absolutely.

Page 67

1       Q   Okay. Could you expand on when you mean by she's
2   the only Black woman in your college?
3       A   It really is just that, she's the only Black
4   woman in the college.
5       Q   Meaning tenure faculty or pre-tenure faculty?
6       A   I'm pretty sure meaning any staff or faculty, but
7   I would have to confirm when Rachel started.
8       Q   Okay. And who is Rachel?
9       A   Rachel is -- she was an admin in charge of
10  student records. Now, she is advisor, student advisor.
11      Q   And then we're going to go to 2846, which is 31
12  of the PDF.
13      A   Okay.
14      Q   And could you review that and let me know when
15  you're finished.
16      A   Yes.
17      Q   Okay. Do you see where it says Sydney says, he
18  let me ask you something, and I'm just paraphrasing,
19  about the very good, excellent, and tenure process
20  classifications?
21      A   I see it.
22      Q   Okay. Does that refresh your recollection on
23  that different standard about good versus very good and
24  excellent?

Page 68

1       MS. WERMUTH: Objection. Leading and vague.
2   BY THE WITNESS:
3       A   I don't think I have a problem recollecting -- I
4   mean, remembering the standard. I think that the problem
5   is that it can be applied however the person -- there's
6   no set criteria to determine one or the other, but I
7   remember that, you know, those are the standards, yes.
8   BY MS. SCATCHELL:
9       Q   Okay. And when you previously testified about
10  the text message I got your back?
11      A   Yes.
12      Q   What did you mean by that? Could you expand on
13  that?
14      A   That I would support her through the process.
15      Q   Okay. And then we're going to go to -- actually,
16  do you know former faculty member named Vinny?
17      A   Yes.
18      Q   Do you know what his last name is ████ or
19  something?
20      A   ████, something like that, yeah.
21      MS. SCATCHELL: Ms. Tufano, I'll get you the spelling
22  of that after the deposition.
23  BY MS. SCATCHELL:
24      Q   Do you remember who he was?

Page 69

1       A   Yeah. He was a faculty member in advertising --
2   tenure-track faculty member in advertising.
3       Q   Is he still at the university?
4       A   No, his contract wasn't renewed.
5       Q   Okay. And do you remember if he had made any or
6   raise any concerns to you about why his contract wasn't
7   renewed?
8       A   Not to me, no. I would have had nothing to do
9   with it.
10      Q   What was his race?
11      A   He was a white man or he is, sorry.
12      Q   Okay. And then let's go to Page 2852, which is
13  37 of the PDF.
14      A   Yes.
15      Q   Actually, I'm going to say 2853, which is, what
16  page is that, 38 -- actually 38 and 2855, which is 39 of
17  the PDF.
18      A   Okay. I'm finishing 38.
19      Q   Okay.
20      A   So if I'm correct, the 39 is just repeating the
21  same thing the previous text said.
22      Q   Yeah. I actually meant 40, which would be 2855,
23  I apologize.
24      A   No worries.



Page 70

1    Q   Okay.  So on Page 2855, do you see where you say,
2  I will wait until I know more about Vinny's case and I
3  will talk to you and ▇▇▇ about responding to your
4  official complaint or inquiry or whatever?
5    A   Uh-huh.
6    Q   Do you remember what that was referring to?
7    A   Yes.  I did not talk directly to Vinny about his
8  case.  We weren't very close.  I told him that it sucked.
9  But I did know that he was appealing the case.  The
10 assumption was that it could prove or substantiate the
11 argument that the criteria were being applied differently
12 for different people.  I knew that Vinny had not been
13 renewed mainly because of his service, but I wasn't privy
14 to the conversation, to the discussion.  He showed me his
15 letter and I was also -- and I wouldn't have been because
16 I wasn't tenured at the time.  So going forward to
17 talking -- I believe it was to Lexa at that time -- to
18 talk about again about possible biases in the process, I
19 was going to wait to see how Vinny's case was -- the
20 appeals of Vinny's case went to kind of bring this in as
21 possible sporting arguments.
22   Q   Okay.  And by ▇▇▇ and Sydney's official
23 complaint, could you expand on what you meant by that?
24   MS. WERMUTH:  Let me just object to the form of the

Page 71

1  question insofar as it misstates what the document says.
2  Please proceed.
3    THE WITNESS:  Yes --
4    MS. SCATCHELL:  It says official complaint.
5    MS. WERMUTH:  Or inquiry or whatever is what it says.
6  BY MS. SCATCHELL:
7    Q   Okay.  I will correct my statement.  Official
8  complaint or inquiry or whatever.
9    A   Yes.  I need to clarify that coming to me is not
10 an official complaint.  What I meant by that, I'm 100
11 percent sure, is on the record, meaning I am speaking on
12 your behalf, and the associate dean will know that I am
13 speaking about your cases.  That's what in my mind made
14 it official versus an unofficial conversation about, you
15 know, how do I deal with this kind of conversation in the
16 classroom.
17   Q   And let's go to 2861, which is 46 of the PDF.
18   A   Yeah.
19   Q   Could you read that and let me know when you're
20 finished?
21   A   I finished.
22   Q   Okay.  Do you see the part where you said you are
23 going to love this.  Apparently a journalism professor
24 has been recommending a diction class for Black students

Page 72

1  to quote, unquote help with their accent.  I almost lost
2  my shit?
3    A   Yes.
4    Q   Do you remember who that professor was?
5    A   Yes, Rick Brown.
6    Q   Okay.  And what is his ethnicity?
7    A   He's a white man.
8    Q   Okay.  And how did you find out that he was
9  recommending a diction class for Black students?
10   A   The journalism students wanted to form a Black
11 journalism association.  Sadly, we don't have Black
12 journalism faculty, and I had been advising the Latino
13 student association in journalism despite the fact that
14 I'm not a journalist anymore.  Because I had some
15 experience with journalism that was part of my undergrad
16 and my grad -- my master's, but I had also worked there.
17 So I had volunteered to help put this together.  Lawrence
18 ▇▇▇ on of -- not Lawrence ▇▇▇, last name I don't
19 recall, one of our adjuncts had volunteered to be their
20 advisor, but because he's an adjunct, he couldn't be
21 their official advisor.
22       So this was an initial meeting, and the
23 question in the meeting were kind of like what of the
24 things you wanted to do with this association.  And

Page 73

1  students talked about, you know, that they have had some
2  experience with faculty that they believed treated Black
3  students differently, and they mentioned this case
4  specifically.  And I was very upset and the students
5  noticed this because I thought it was bullshit.
6    Q   And did you tell anybody besides Sydney?
7    A   Yes.  I just don't remember at what time at what
8  moment.  I believe I told Lexa, again, as part of
9  faculty.  I know that I had decided to talk to Jason, his
10 supervisor, but I also know that I never did.
11   Q   And is there any reason why you did not talk to
12 his supervisor?
13   A   No.
14   Q   And did you ever speak with Rick, is it?  Did you
15 ever speak with Rick about this?
16   A   No.
17   Q   Okay.  Do you know if Lexa did anything?
18   MS. WERMUTH:  Objection.  Form.  Foundation.
19 BY THE WITNESS:
20   A   Yes.  It was addressed at that time.  I believe,
21 but you would have to ask her, that she spoke to Jason
22 who spoke to Rick.  And Rick has been receiving guidance
23 and mentoring to deal with his lack of knowledge, you
24 know, in terms of diversity and students of color.

MAGNA
LEGAL SERVICES

Page 74

1    Q.  Okay.  And is he a tenured professor?
2    A.  No.  He's a term-faculty member.
3    Q.  Okay.  And do you know why or what part of the
4  Black students -- what part of their speech would this
5  diction help?
6    MS. WERMUTH:  Objection.  Vague.  Form.  Foundation.
7  BY THE WITNESS:
8    A.  The fact that they spoke like Black people.  The
9  fact that I speak with an accent.  For example, one
10  student had a southern accent and that was the problem,
11  that's why it was problematic that he was doing this.  He
12  didn't realize that he was trying to get -- he was
13  recommending students to address things that have to do
14  with their identity.
15  BY MS. SCATCHELL:
16    Q.  And when you became the diversity advocate, was
17  there any sort of training that was provided to you when
18  you became or when you entered into that role?
19    A.  There was some, not sufficient.  I had a meeting
20  with ███████ she walked me through like being a
21  diversity advocate and some of the resources available at
22  DePaul, and she gave me a booklet that talked about, you
23  know, faculty of color in higher education.  I had access
24  to a lot of people to go to for support because of the

Page 75

1  President's Diversity Council, and I did.  But most of my
2  training I took on myself.  I am self-taught, I would
3  say, in that area.
4    Q.  And then did you raise any concerns about not
5  receiving adequate support -- or sufficient training?
6    A.  I did say that it would be helpful to receive
7  more training.  I said that it will be -- that in my
8  opinion, the diversity advocates, we you should be kind
9  of like at a similar level of knowledge.  I never felt
10  that I didn't have sufficient support, but I did feel
11  that I needed more training.
12    Q.  And did they give you any training on how to
13  process complaints of discrimination?
14    MS. WERMUTH:  Objection.  Form.  Assumes facts not of
15  record.  Go ahead.
16  BY THE WITNESS:
17    A.  That was not part of my responsibility.
18  BY MS. SCATCHELL:
19    Q.  Was there any training on how to identify
20  discrimination?
21    A.  Yes.  I participated in implicit bias training.
22  I also remember -- I don't remember the title of the
23  training, but it was about how we evaluate people who are
24  applying for jobs and how to make sure that we request

Page 76

1  information regarding their commitment to diversity,
2  equity, and inclusion and kind of using rubrics for that.
3  I went to many other trainings similar, but those are the
4  ones that are optional and open to all faculty, so not
5  exclusive to diversity advocates.
6    Q.  Then did you get any training on how to handle a
7  complaint if it was brought to your attention?
8    A.  No.  I was told that -- how I took -- pardon me.
9        Where I learned what to do with complaints
10  had to do with my five bullet point kind of list of
11  responsibilities and one of them would be to bring
12  attention to this to the leadership.  The faculty that
13  spoke to me knew that I wasn't kind of like an official
14  complaint mechanism, that they needed to go to HR for
15  that, but that I could advocate and that I could speak to
16  the leadership on their behalf.  And that's what I did.
17    Q.  And then what was your five-point system?
18    A.  Pardon me, not system, but list.
19    Q.  List.
20    A.  So it said that the diversity advocate is a
21  resource for, I remember that one very well, for the
22  faculty were responsible for providing kind of like
23  training and opportunities for development.  We are
24  responsible for bringing to the attention of the

Page 77

1  leadership, things that need to be attended, and there's
2  two more things probably that I don't recall.  But those
3  were -- so basically I'm referring to a description that
4  there was that had maybe five bullet points, maybe four
5  about what the role of the diversity advocate was.
6    Q.  Okay.  Going back to when Sydney and ███ had
7  brought a complaint of some sort to your attention and
8  you said you were going to follow-up with leadership, do
9  you remember if ███ or Sydney followed up with you
10  regarding the status of that complaint?
11    A.  Yes.  In Sydney's case, if I recall correctly, I
12  just reported that I had had the conversation with Salma
13  and with Lexa.  I don't think I had anything else to
14  report.  In ███'s case, I spoke to Lawrence ██████ and
15  he was again the associate provost for research and
16  diversity and that ███ had asked me to advocate for her
17  outside of the college, which is why I spoke to him.  And
18  he told me that, you knee, he was going to look more into
19  the case, and sadly never followed up.  I asked maybe
20  once or twice by email, Lawrence, is there any news, but
21  he left soon after.  My assumption is that he wasn't, you
22  know, focused on it at that time, that was the follow-up
23  in both of those cases.
24    Q.  Do you remember what Lawrence's last name is?



1    A  It's spelled ██████, I think it's pronounced
2  ██████, H-A-M-M-E-R.
3    Q  And then I'm going to direct your attention to
4  Dillard Discovery Production 2869, which is Page 54 of
5  the PDF?
6    A  Okay.
7    Q  And do you see where Sydney mentions, LOL, you
8  are the sweetest.  I am surprised the ███ K?
9    A  Yes.
10    Q  And then it goes on.  Do you know who ███ K is?
11    A  Yes.  My colleague, ███ Kessler.
12    Q  And then two text messages down at approximately
13  11:04 a.m. you responded good, he talked to me briefly
14  the other day.  Told me basically, can't remember word
15  for word, that it had been a great meeting and then KK
16  had derailed it.  Would KK be ███ Kessler?
17    A  Yes.
18    Q  Okay.  And do you know what she derailed?
19    A  She focused a lot on the SharePoint and the fact
20  that the files weren't organized in a certain way, and if
21  I recall my conversation with Matt, he was annoyed
22  because that wasn't very important.
23    Q  And then going to the next page 2870, could you
24  review that and let me know when you're finished.

1    A  Yes, I'm finished.
2    Q  Okay.  And do you see the text message that you
3  had -- the beginning the text message of 11:14.  Halfway
4  through it says because you made yourself be heard and
5  overcame a lot of bullshit, you deserve to celebrate it
6  as a win?
7    A  Yes.  And I'm sorry, my dog is barking, but yes.
8    Q  No problem.  I'm surprised it's not mine.
9       Could you expand on what you meant by
10  telling Sydney made yourself heard and overcame a lot of
11  bullshit?
12    A  Yeah.  So Sydney was -- I don't know if the right
13  term is unhappy, unpleased, upset about the fact that her
14  reviews seem to be confusing, unclear what they were
15  based on.  And the frustration there was, well, how can I
16  improve and meet the requirement that you want if I don't
17  know what the requirement that you want was.  One of the
18  things that Sydney and I have talked a lot of about is
19  how I have more of a diplomatic approach, which is I just
20  kind of like meet with people, ask a lot of questions,
21  and sometimes that can help.  So Sydney did that.  She
22  met with several people including the chair personnel to
23  kind of get an idea of what things she needed to address
24  in her case, kind of how to improve her letter.

1  Basically, how to make her case so that she didn't get
2  this unflattering and unhappy report that she had in the
3  past, and she had a very good report.  And I told her,
4  you know, it went well after all of your efforts, so
5  forget about it.  She had done a lot of homework and put
6  in a lot of -- done a lot of conversation and asking
7  questions to make sure that her case was presented in the
8  best light possible and it paid off.
9    Q  And the bullshit aspect of it, what part were you
10  referring to there?
11    A  The part that you can't -- you can never know how
12  people are going to evaluate you.  It's just, I don't
13  know how else to put it, but bullshit.  It feels
14  uncertain and there might be criteria that are not
15  spelled out.  I don't think I was referring to anything
16  very specific.
17    Q  Okay.  And would that be just to faculty of color
18  or to all faculty?
19    MS. WERMUTH:  Objection.  Vague.
20  BY THE WITNESS:
21    A  I believe the process is problematic for all
22  faculty.  I understand that the process effects faculty
23  of color differently, especially because of the
24  unconscious bias that people have including students who

1  evaluate us and the fact that we don't have anything in
2  place to try to avoid the bias from influencing people's
3  evaluations.  And can I just say, by we don't have
4  anything in place, I mean DePaul and many, many
5  universities in academia.  Sadly, this is not exclusive
6  to DePaul.  It's a problem the faculty of color face in
7  almost any institution.
8  BY MS. SCATCHELL:
9    Q  Okay.  So does it affect faculty of color in any
10  other ways besides the unconscious bias that you had just
11  explained?
12    MS. WERMUTH:  Objection.  Foundation.  Vague.
13  BY THE WITNESS:
14    A  The ways in which a faculty of color can be
15  affected in their tenure & promotion process are many.
16  So some have to do with bias, some have to do with plain,
17  you know, discrimination or racism.  Each case is
18  different, but I think what is most common and most
19  difficult to point to is unconscious bias.
20    Q  Okay.  And could you explain what unconscious
21  bias is?
22    A  Sure.  So we have -- I'm trying not to get too
23  kind of like technical.  But okay, the way in which we
24  process information, right, has to do a lot about how we

**MAGNA**
LEGAL SERVICES

Page 82

1  are socialized, and we have kind of like shorthands for
2  people, for places, for spaces that we are not
3  necessarily aware of.  So for example, if you see
4  somebody running towards you, you might qualify that in
5  your brain as a threat.  And you might not realize that
6  you only see it if it's a threat if it's a young Black
7  man towards you and not a young white guy or something
8  like that.  Unconscious bias is natural.  It's part of
9  our socialization process.  It is almost unavoidable.
10 The best that we can do is plan for it, meaning make sure
11 that we develop an understanding of our own biases and
12 try to create a system that allows you to put biases
13 aside.
14         For example, in teaching a rubric makes it
15 so that a professor always evaluates a student's work the
16 same way regardless of the student's name, gender,
17 ethnicity or whatever, we're using the same criteria.
18 That's what I mean by unconscious bias.
19     Q  Okay.  Could unconscious bias be found in a
20 formal review for a faculty member going up for tenure?
21     MS. WERMUTH:  Objection.  Calls for speculation --
22 BY MS. SCATCHELL:
23     Q  In your opinion --
24     MS. WERMUTH:  Vague and foundation.  And since you're

Page 83

1  seeking an opinion from a lay witness, I'll make that
2  objection as well.  You can proceed, Maria.
3  BY THE WITNESS:
4     A  Yes and no.  So What do you mean with find?  Let
5  me -- can it be found in an evaluation?
6  BY MS. SCATCHELL:
7     Q  During the evaluation process or the formal
8  review process, is unconscious bias a factor in the
9  decision making process?
10    MS. WERMUTH:  Same objections.
11 BY THE WITNESS:
12    A  Unconscious bias is a factor in all human
13 interaction, always, if we don't count for it.
14 BY MS. SCATCHELL:
15    Q  Okay.
16    A  I have a colleague named Daniel who I had not
17 worked with for a long time.  I did not like him, I can't
18 tell you why.  I still can't tell you why.  Working with
19 him I realized that we worked well together, but I was
20 aware of the fact that I didn't have any foundation for
21 my dislike.  I couldn't point to three specific things
22 that Daniel did that made me dislike him.  That's an
23 example of unconscious bias.  Therefore, I made an effort
24 that anything related to my work with him wasn't

Page 84

1  influenced by my irrational animosity towards him.
2     Q  And do you know if DePaul has any of those
3  protocols put in place?
4     MS. WERMUTH:  Objection.  Vague.
5  BY THE WITNESS:
6     A  No.  So we don't have something official
7  standardized that addresses the possibility of biases in
8  the process.  Some of the process including the open
9  discussion is supposed to avoid those kind of opinions
10 because we are able to ask somebody, you know, Anna, we
11 don't have an Anna faculty member.  Anna, why do you say
12 that Joe isn't a good teacher, right.  So we are able to
13 ask each other to substantiate our claims.  That is part
14 of the discussion, and that is one of the ways in which
15 we can reduce bias being used as criteria of evaluation
16 for the group.  At the end of the day, each vote is
17 individual and personal and you vote your conscious.  So
18 you vote whatever you think is best for the students and
19 for the college.
20    Q  Okay.  And this is probably going to cause an
21 objection, but I'm going to ask it anyway.
22         When Sydney was not selected as program
23 chair and her qualifications were not discussed, do you
24 think that, in your opinion, unconscious bias may have

Page 85

1  influenced that decision?
2     MS. WERMUTH:  Objection.  Arguments.  Calls for
3  speculation and foundation.
4  BY THE WITNESS:
5     A  I do.  I can't see any other reason why she
6  wasn't selected.
7     MS. SCATCHELL:  Okay.  Is it a good time to take a
8  break?
9     THE WITNESS:  Sure.
10    MS. SCATCHELL:  Five minutes good for everybody?
11    MS. WERMUTH:  Sure.
12         (Short recess.)
13 BY MS. SCATCHELL:
14    Q  We're going to switch gears a little bit here.
15 We'll probably come back to the text messages but we've
16 on that for a while, so we're going to switch gears.
17         Do you remember anything about Sydney
18 being on a short-term disability?
19    A  Yes, I remember conversations about her
20 requesting short-term disability.
21    Q  Do you remember what the outcome of that
22 short-term disability application was?
23    A  I know that it was initially denied.  I honestly
24 don't remember if it was approved.  I think she received





Page 86

1  some accommodation.
2      Q  And did you write a letter for her?
3      A  I did.
4      Q  Okay.  Could you just go to Exhibit No. 2 and let
5  me know if that is the letter that you wrote for Ms.
6  Dillard?
7      A  Where can I find Exhibit No. 2?
8      MS. WERMUTH:  Yeah, it's not tabbed --
9      MS. SCATCHELL:  It's right behind, so it's going to
10  be Page 130 or Dillard Discovery Production 2252.
11                 (Exhibit No. 2 was marked
12                  for identification.)
13  BY THE WITNESS:
14      A  Okay.  I have the letter.
15  BY MS. SCATCHELL:
16      Q  Okay.  And could you review it and let me know
17  when you're finished?
18      A  Sure.
19      Q  Okay.  Is this the letter that you wrote for her?
20      A  Yes.
21      Q  Okay.  And in this letter where you stated that
22  you witnessed her sneaking in naps under her desk between
23  classes and student meetings because she was too tired
24  during the day?

Page 87

1      A  Yes.
2      Q  And actually the one right before that, too,
3  where it says -- actually all three of those bullet
4  points.  The one that says her general slowing down,
5  looking tired, and worn out when she came to class, her
6  having to stop by or stop and sit down and/or take a
7  breath during casual conversations because she felt dizzy
8  or faint.  And then the last one, her sneaking in naps
9  under her desk in because student meetings because she
10  felt too tired during the day.  Could you expand on those
11  three bullet points?
12      A  I don't think I can expand except to say that I
13  knew she was ill.  We talked every time we saw each
14  other, and I had noticed those three things.  So they are
15  accurate, and I remember that.  The napping, I know -- I
16  remember one specific case in which I was like, oh my
17  God, Sydney, were you just napping under her desk.  I had
18  put my face against the glass because I knew she was in
19  her office, but I didn't see her, but I know she had
20  brought in a pillow and had brought in a blanket and
21  she had told me that sadly that had happened more than
22  once because she just got too tired throughout the whole
23  day.  So yeah, is there anything, I don't know, specific?
24      Q  No, no, that's it.  That's perfect, okay.

Page 88

1              And then who is ██████ ████
2      A  ████ ████ is our colleague.  She was a chair at
3  that time.
4      Q  And did ████ ████ ever ask you not to write a
5  letter for Ms. Dillard?
6      A  No, not in those words.  She advised me that I
7  didn't have the expertise to write this letter.
8      Q  And is she considered a supervisor of yours or
9  colleague?
10      A  It's a little difficult because the chair isn't
11  exactly a supervisor.  The dean is your direct
12  supervisor, but the chair does have some responsibilities
13  that can be interpreted as supervisory.  I am not being
14  intentionally vague, it is vague.
15      Q  And then could we go to Exhibit No. 4, please.
16      A  Page 134.  It's going to be an email --
17      Q  Oh, yeah, you're right.  Sorry.  134.
18                 (Exhibit No. 4 was marked
19                  for identification.)
20  BY MS. SCATCHELL:
21      Q  And then let me know when you've reviewed it.
22      A  I remember this email, yeah.
23      Q  Okay.  What is that email?
24      A  When we take leave -- pre-tenure leave, we can --

Page 89

1  we automatically get one-year extension to our tenure
2  clock.  If you do not want to take advantage of that,
3  meaning if you feel that your case is solid enough and
4  you want to proceed without that extra time, you can do
5  that.  So I had requested to the dean that they do not
6  count that extra time so that I could go up for tenure in
7  that year.  ████ ██████ is, I want to say, associate
8  provost.  But regardless of her title, she is the person
9  that handles the university and promotion cases at the
10  university level.  And this was a notice that she had
11  received my request via the dean, and that if I wanted to
12  apply this year, then I had to notify her by email May
13  15th.
14      Q  Okay.  And then let's go to exhibit -- actually,
15  going back to the question that I was asking you about
16  the letter that you wrote in Exhibit No. 2, did you and
17  Sydney ever have a conversation about ████ ████'s comment
18  to you about not being an expert?
19      A  We did.
20      Q  What did you say to her and what did she say to
21  you?
22      A  I told her that I had talked to ████ because I
23  don't remember how ████ found out that I would write the
24  letter.  I don't know if I told her that I was

MAGNA
LEGAL SERVICES

Page 90

1  considering it or if Sydney told her that I said I would
2  write it. I don't know, but I would guess I told ▉.
3  And ▉ had talked Salma, and she explained to me the
4  reasons why she didn't feel she could write the letter,
5  which was that she wasn't technically a supervisor. The
6  supervisor was Salma, and she didn't have the expertise,
7  like medical expertise, to make observations about
8  Sydney's condition. I told ▉ that I appreciated it
9  and that I would take it into consideration, but I didn't
10 feel like I was being asked to write a letter that
11 required medical expertise. It was just a letter about
12 what I had observed.
13     Q  Okay. And then let's go to Exhibit No. 6, Which
14 is Dillard_DePaul 3375 or Page 139 of the PDF.
15               (Exhibit No. 6 was marked
16               for identification.)
17 BY MS. SCATCHELL:
18     Q  And could you review that document?
19     A  139 you said?
20     Q  And I believe it goes onto Page 140, which would
21 be Dillard_DePaul 3376?
22     A  I finished that page.
23     Q  Do you recognize that document?
24     A  I really don't remember that exchange. I mean, I

Page 91

1  know what it's referring to, but I don't remember it, no.
2     Q  Okay. What is it referring to?
3     A  Accommodations provided for Sydney in teaching a
4  graduate class. The only reason I would be informed at
5  that time is because it was a graduate class.
6     Q  And you were the grad director at that time?
7     A  Yeah.
8     Q  Okay. And then going to Exhibit No. 7 which is
9  page 142, 143 and 144 the PDF, which is marked as
10 Dillard_DePaul 8134, 8135, and 8136.
11               (Exhibit No. 7 was marked
12               for identification.)
13 BY MS. SCATCHELL:
14     Q  Can you review that document and let me know when
15 you're finished?
16     A  Okay.
17     Q  Do you recognize what this email thread is?
18     A  Yeah. I had referred to it earlier to exchanges
19 with Michaela Winchatz about service obligations at the
20 program level, and this was one in which she asked me to
21 recommend somebody to serve on this committee. Based had
22 on the information she gave me and based on the
23 information I had, I thought that Sydney might be willing
24 and able to take this role on.

Page 92

1     Q  Okay. And do you know if Sydney ended up taking
2  that role?
3     A  I don't, but the fact it was resolved makes me
4  think that she did take the role.
5     Q  And then let's go to Exhibit No. 8, which will be
6  Page 146 of the PDF or Dillard_DePaul 5785.
7     MS. WERMUTH:  I'm so sorry, Gia, Exhibit No. 8 is
8  what we're looking at?
9     MS. SCATCHELL:  Yeah.
10    MS. WERMUTH:  Okay. Thank you.
11               (Exhibit No. 8 was marked
12               for identification.)
13 BY THE WITNESS:
14    A  I need to go further down a little bit, sorry,
15 because the exchanges are backwards. Yeah, I recognize
16 this exchange.
17 BY MS. SCATCHELL:
18    Q  Okay. What is that exchange?
19    A  ▉▉ ▉▉ was an evaluator for one of my
20 classes and she was giving me my report to read, usually
21 to look through it, and if there's any factual errors,
22 you can correct that. And then she told me that she was
23 going to send it in so that it was put in my personnel
24 case. We can -- and there's also kind of an invitation

Page 93

1  to talk. Sometimes when there's the need for
2  clarification or the opportunity for mentoring or advice,
3  you have a sit-down with your colleague to go over the
4  feedback. I believe in this case, we didn't. I remember
5  that at that time I was getting Carolyn's help with
6  my essay.
7     Q  And then could you go to -- let's go to Exhibit
8  No. 10, which would be 162 through 166 of the PDF or
9  Dillard_DePaul 8157 to Dillard_DePaul 8161.
10               (Exhibit No. 10 was marked
11               for identification.)
12 BY THE WITNESS:
13    A  That's at statement from DPUBLIC.
14 BY MS. SCATCHELL:  Q  Who is DPUBLIC?
15    A  They are called ERGs, Employee Resource Groups,
16 but DPUBLIC is bigger than that. It's a voluntary group
17 of faculty, staff, and students who identify as Black or
18 African-American.
19    Q  And what's the nature of the statement or the
20 message?
21    MS. WERMUTH:  Objection. Foundation.
22 BY THE WITNESS:
23    A  I can't speak to anything that isn't in the
24 context of the letter because I had no role in writing or



24 (Pages 90 to 93)

Page 94

1  --
2  BY MS. SCATCHELL:
3      Q  Did you receive a copy of it?
4      A  I believe I did, yeah.
5      Q  Do you know if it was emailed to you or how you
6  received a copy of it?
7      A  If I received it, I am pretty sure that I
8  received it from Sydney herself.  Sometimes we're talking
9  about committee work that we're doing.  She has mentioned
10  things that DPUBLIC does, and I'm usually interested in
11  learning about it and learning from them the work that
12  they're doing, so she has shared this in the past.
13          I'm sorry, that's not correct in this
14  case.  This one was sent to everybody in the university,
15  I remember now.  Because of the second paragraph, the
16  message of solidarity, yes.  So this one specifically was
17  sent to everybody so I would have received it directly
18  and not from Sydney.
19      Q  And where it says in the fourth paragraph --
20      A  Yes.
21      Q  Do you see where it says, Faculty Council
22  Committee on equity, inclusion, and diversity CEID?
23      A  CEID, yes.
24      Q  Okay.  That's the program that you had previously

Page 95

1  testified to, correct?
2      A  That's the committee that I serve on, yes.
3      Q  And then do you see on Page 2 of this document
4  where it says Dillard_DePaul 8158?
5      A  Okay.
6      Q  Where it says due to higher service commitments,
7  many faculty of African descent languish in the associate
8  professor category and face greater barriers to promotion
9  to associate and full professor.
10      A  Yes.
11      Q  Do you agree with that statement?
12      A  Yes.  There are statistics at the national level
13  and at the university level.
14      Q  Okay.  And you agree with that as it applies to
15  DePaul?
16      A  Yes.
17      Q  Okay.  And the College of Communication in
18  particular?
19      A  Our sample is too small, so we don't know.
20      Q  Okay.  And do you see at the bottom of Page 2
21  where it says, limited opportunities for advancement and
22  promotion?
23      A  I do.
24      Q  Could you review that and let me know when you're

Page 96

1  finished?
2      A  I finished.
3      Q  Okay.  And do you agree with that statement for
4  the limited opportunity for advancement and promotion as
5  it applies to DePaul's tenure track?
6      MS. WERMUTH:  Objection.  Foundation.
7  BY THE WITNESS:
8      A  I think I have difficulty agreeing to the
9  statement because -- have difficulty answering that
10  question because I can't disagree with people's lived
11  experience which is what's being reported here.  So I
12  think that would be difficult for me to judge.
13  BY MS. SCATCHELL:
14      Q  Okay.  And then the College of Communication only
15  has one African-American professor, correct?
16      A  Yes.  We have an African professor in addition to
17  one African-American professor, but yes, only one
18  African-American.
19      Q  Okay.  Do you know if there were any evaluations
20  for the faculty or administrators on diversity
21  competency?
22      A  I know there are no uniform formal evaluations.
23  I know that -- I want to stay starting three years ago,
24  the university started asking at the college level, the

Page 97

1  dean, and through the dean, the chairs to report on that.
2  And also we have survey called the Program Portfolio
3  Review.  One of the things that it evaluates is our
4  commitment to the mission and one of the things that we
5  have to explain is how we're working on diversity,
6  equity, and inclusion at the program level.  As far as I
7  know, those are the only things that have to do with
8  that.  Another thing that would be an indirect evaluation
9  is the Campus Climate Survey.
10      Q  Okay.  And what is the Campus Climate Survey?
11      A  It's a survey that talks about people's lived
12  experience in the college as students, as staff, as
13  faculty -- pardon me, in the university.  And it asks to
14  report on leaderships, commitment and work in diversity
15  and inclusion and also about sense of belonging and
16  things like that.  So you could extrapolate the answers
17  by college and by faculty of color to make some analysis
18  or some judgments if you wanted to.
19      Q  And how would you describe the faculty climate in
20  the College of Communications for domestic minorities?
21      MS. WERMUTH:  Objection.  Vague.  Foundation.  You
22  can proceed.
23  BY THE WITNESS:
24      A  I think there has been a shift, so I would have



1  to talk about, you know, before and now if that's okay.
2  When we did the initial evaluation, I think there was
3  more concern about being heard and sense of belonging and
4  a recognition or lack of a recollection of the fact that
5  we are taxed with invisible service, especially in the
6  form of mentoring students who come to us because they
7  identify with our ethnicity, with our background.  And
8  that is something that, despite that fact that I think
9  most of us do it with pleasure, you can't deny that it's
10  taxiing in terms of time and commitment.  The uncertainty
11  about tenure & promotion was something that faculty
12  members spoke of.  But I also have to clarify that I
13  spoke to minoritized faculty, which includes also people
14  who might be gender fluid or might be gay or lesbian, so
15  not only faculty of color.  And I also did not
16  differentiate between native faculty of color and
17  international like me.
18     Now, I think there's more opportunity for
19  discussion.  There's more open discussion.  There's more
20  investment.  There were no programs before systematic
21  about, you know, educating the college in terms of
22  diversity and inclusion, there has in the last three
23  years, especially the last two, and faculty are including
24  topics of diversity and inclusion and equity more in

1  their classes than they used to.  And based on this, I
2  would conclude that there's a better climate than there
3  used to be maybe three years ago.
4     Q  Okay.  And you mentioned somewhat of a shift.
5  What do you believe, in your opinion, was the reason for
6  that shift?
7     MS. WERMUTH:  Objection.  Foundation.  Go ahead.
8  BY THE WITNESS:
9     A  Honestly, I would say a two things.  The first is
10  the fact that ▮▮▮ and Sydney's case became public and it
11  led us to discuss things that maybe we hadn't discussed
12  in the past, and I was bringing this to the attention of
13  people.  And sadly, you know, a lot of the response
14  was -- especially from the tenured faculty -- was like
15  oh, no, don't worry.  You know we have your best interest
16  at heart, but that's not what I'm saying.  What I'm
17  saying is we need clear criteria, right.  So I think in
18  part because of that scrutiny, we have had these
19  conversations.  But whether or not we had had the
20  conversations, the second part is the fact that our
21  interim -- our acting and interim dean has dedicated time
22  and resources and space for diversity and inclusion
23  training and programs, and our college has made it
24  better.  Our students are also speaking up, which is

1  great.  So yeah, those are the reasons why I think we're
2  doing a little better.
3     Q  Okay.  And what did you do specifically to bring
4  the attention of Sydney and ▮▮▮'s cases attention to or
5  draw attention to them?
6     A  I mentioned -- I spoke to the dean as we
7  discussed.  I spoke to Lexa when she was associate dean.
8  I spoke in the tenure meeting form ▮▮▮'s case about the
9  fact that I believe that the student evaluations are
10  partly based (inaudible)
11     THE COURT REPORTER:  Hold on, Maria.  You were cut
12  off.
13     THE WITNESS:  That's okay.  I actually stopped
14  talking.
15         (Record read.)
16  BY THE WITNESS:
17     A  Oh because this is the part that I don't know if
18  I remember correctly.  We have a system where you agree
19  with people, so I know that ▮▮▮ Kessler brought it up
20  that there's something about her being a woman of color
21  teaching race and ethnicity that makes it difficult for
22  students and that can lead to negative evaluations.  And
23  now I'm not remembering if I also added to that comment
24  or if I just agreed with that.  But I know that that was

1  one of the things discussed in ▮▮▮'s case.  In Sydney's
2  case, it did not come up.  There was no question about
3  that.
4     And I actually took the strategy of being
5  wider in my approach because I feared that sometimes you
6  can look at cases and say, well, Maria is an exception,
7  right.  So focusing on a case might not be as productive
8  as focusing on what do we want to do for our faculty,
9  what do we want to do for our students, what do we want
10  to do for our staff.  So after ▮▮▮ and Sydney's case had
11  gone through the tenure process, I took a broader
12  approach to diversity and inclusion in the college.
13     Q  And going to Exhibit No. 11, which will be 168 of
14  the PDF to 177.  So it will be Dillard_DePaul 9413 to
15  9422.
16         (Exhibit No. 11 was marked
17         for identification.)
18  BY MS. SCATCHELL:
19     Q  Can you take a moment and review that document?
20     A  About the Liberal Studies Council?
21     Q  Yes.
22     MS. WERMUTH:  I will just object on form and
23  foundation and relevance.
24     MS. SCATCHELL:  You guys produced it.



| | |
|---|---|
| Page 102 | Page 103 |

**Page 102**

1   MS. WERMUTH: I see it must have got pulled into our
2   ESI, but it clearly doesn't relate to the College of
3   Communication.
4   BY THE WITNESS:
5   A  So I'm scanning the document and I know what it
6   refers to. I have not read it in detail. I can take the
7   time to do so, but honestly --
8   BY MS. SCATCHELL:
9   Q  No, no. I just wanted to know what the document
10  is?
11  A  It's about --
12  MS. WERMUTH: Hang on. Just let me object on
13  foundation because she's neither an author, nor recipient
14  as far as I can discern on this document.
15  MS. SCATCHELL: That's why I am asking her, so why
16  don't we let her answer.
17  BY THE WITNESS:
18  Q  So Faculty Council documents to clarify, Anna, we
19  don't receive them directly, but we all have access to
20  them, and that's all that I can say. It's a document
21  that was submitted on behalf -- by Faculty Council to the
22  provost, and revising one of their standing committees
23  and how it works, but I'm not involved with that standing
24  committee.

**Page 103**

1   BY MS. SCATCHELL:
2   Q  Okay. Perfect. And then could you please go to
3   Exhibit No. 12, which is Dillard_DePaul 304 to 313.
4                    (Exhibit No. 12 was marked
5                    for identification.)
6   BY MS. SCATCHELL:
7   Q  What report is this?
8   A  Uh-huh.
9   Q  Oh, I am just asking what report this is
10  referring to.
11  A  Yes, I'm sorry. I'm double checking which report
12  this is.
13  Q  Okay.
14  A  Because I saw it and I thought it was one and now
15  I think that this is another one.
16  Q  Take a moment?
17  A  Yeah, it isn't the one that I thought that it
18  was, but this is the PPR, I believe. Okay.
19  Q  Okay. Do you recognize this document?
20  A  Yes, but I don't think I have seen the results
21  before.
22  Q  Oh, okay. And so this report, is this report --
23  is says default report?
24  A  So when I was nominated or when I accepted a

| | |
|---|---|
| Page 104 | Page 105 |

**Page 104**

1   nomination to become chair, the faculty were asked to
2   provide anonymous feedback and evaluate me on these
3   criterias -- this criteria, sorry. And I knew that they
4   had evaluated me and this would go to the dean. I don't
5   know if it was shared with the PRAD faculty. I don't
6   think it was shared with me. But yeah, it was my peers
7   evaluating me as a potential program chair.
8   Q  And do you know who created this or the
9   parameters of this report?
10  A  Yes. And I know that -- so it was the acting
11  dean at that time, Lexa Murphy. She's currently still
12  our dean, but she's interim now. And I know that several
13  of us provided feedback including myself in terms of for
14  me it was very important that if I was going to be
15  considered for chair, there were clear criteria to
16  evaluate me or any candidate with.
17  Q  Do you know if a default report like this was
18  generated when Sydney was going up for program chair?
19  A  I know that it wasn't.
20  Q  Okay. Do you know why?
21  A  It didn't exist.
22  Q  So this came in existence after Sydney's losing
23  the program chair?
24  A  Yes.

**Page 105**

1   Q  And do you know if Sydney's situation of losing
2   the program chair position led to the creation of this
3   report?
4   MS. WERMUTH: Objection. Foundation. Calls for
5   speculation. Go ahead.
6   BY MS. SCATCHELL:
7   Q  If you know.
8   A  It must have influenced it because it definitely
9   influenced my need as a candidate to have a process
10  spelled out. I was not comfortable with votes that I had
11  no idea what they were based on. So I thought it was
12  important that we create an evaluation process. In fact,
13  I think I might have had a bigger hand than I remember in
14  creating this process, because now I'm recalling a
15  meeting with the PRAD faculty in which we looked at the
16  different criteria and made sure they were clearly
17  defined. So I might not have defined the criteria
18  myself, but I wanted the PRAD faculty to discuss it and
19  to be like okay, we understand. All of us agree on what
20  learning agility is, for example, which is on page 186
21  where I am now.
22  Q  And do you know when that meeting was
23  approximately?
24  A  No. It would have been before my election and it

Page 106

1  would have been one of the standing PRAD faculty meetings
2  that happened twice a quarter.
3     Q   And do you know if there was any notes, minute
4  notes that happen from that meeting?
5     A   I don't know, but we don't take minutes in the
6  PRAD faculty meeting.  As chair, I kind of -- I make
7  notes about things that need to be followed up on.  I've
8  tried to kind of get us into the habits of taking
9  minutes, but it's been unreliable.  We don't take
10 minutes.
11    Q   Okay.  And do you remember if you took any notes
12 at that meeting?
13    A   I have a PhD.  I always take notes.  I need to
14 take notes to listen whether I am teaching or I'm a
15 meeting, so I always take notes.
16    Q   I am the same way.
17        Do you happen to have those handy or could
18 you send them to Anna and myself?
19    MS. WERMUTH:  As to what meeting, I am sorry?
20    MS. SCATCHELL:  The meeting she's just been talking
21 about for the last three minutes, the meeting about this
22 PRAD share parameters.
23    MS. WERMUTH:  I definitely produced emails on that
24 topic.  We did --

Page 107

1     MS. SCATCHELL:  She said notes.
2     MS. WERMUTH:  I understand.  I'd like to finish if I
3  could, Gia, without you interrupting, we did ask Maria
4  for all of her notes.  So if there's anything else,
5  Maria, that you have that would be relevant, please let
6  me know.
7     THE WITNESS:  I will say because these notes are A
8  memory aid, I don't always keep all of them, but I have
9  at least five or six of my previous notebooks that I
10 started not throwing away precisely because sometimes --
11 so I will go through all of them, and if I have the notes
12 from this meeting, I will gladly share them, but I can't
13 promise that I do because sometimes, you know, I didn't
14 bring my notebook and I wrote somewhere else but I lost
15 it.
16 BY MS. SCATCHELL:
17    Q   Okay.  Thank you.  I appreciate that.  Then let's
18 go to -- actually, let me back up.
19        So at the meeting to discuss the
20 parameters about the program chair vote, do you know if
21 Sydney was at that meeting?
22    A   I don't recall.
23    Q   Okay.  And is there attendance or anything taken
24 at those meetings?

Page 108

1     A   No.  But there is the expectation that unless
2  you're sick or away from work, you're at that meeting.
3  So the likelihood would be that she would have been
4  there, too.
5     Q   Okay.  And then let's go to Page 190 of the PDF,
6  which is Exhibit No. 13 and that is Dillard_DePaul 2244.
7        (Exhibit No. 13 was marked
8            for identification.)
9  BY THE WITNESS:
10    A   Yes.
11 BY MS. SCATCHELL:
12    Q   Okay.  Could you review that document.
13    A   Okay.
14    Q   Do you recognize that document?
15    A   I do.  It's an email sent by Lexa asking for
16 nominations -- or self-nominations for program chair.
17    Q   Do you remember if you were nominated at this
18 time?
19    MS. WERMUTH:  Asked and answered.
20 BY THE WITNESS:
21    A   I was.
22 BY MS. SCATCHELL:
23    Q   In 2019?
24    A   I was nominated both times.

Page 109

1     Q   Okay.  Both times being 2019 and what was the
2  second time?
3     A   I'm not 100 percent sure about dates.  But the
4  first time when Sydney went up for the position, I had
5  been nominated and rejected the nomination.  The second
6  time, I had been nominated and decided to accept the
7  nomination.  So I believe that the second time might have
8  been 2020 because I started June 2020, so yes.  Since
9  this was sent August 2019.  Honestly, I don't know.  I
10 know there were two emails like this.
11    MS. WERMUTH:  I'm sorry, are we on Exhibit No. 13?
12    MS. SCATCHELL:  Yes.
13    MS. WERMUTH:  It looks like it was sent was sent in
14 February.
15    MS. SCATCHELL:  At the top of it it says August 28,
16 2019 --
17    THE WITNESS:  Oh, sorry.  I had the wrong date.
18    MS. WERMUTH:  I'm sorry.  That must have been
19 printed.  I don't know what that is.
20    THE WITNESS:  So that would have been the first one,
21 probably.  Yes, thank you.  I was looking at the top
22 date, not at the email date.
23 BY MS. SCATCHELL:
24    Q   Okay.  Does that change your testimony at all?

**MAGNA**
LEGAL SERVICES

28 (Pages 106 to 109)

Page 110

1    A  It doesn't.
2    Q  Okay.  And then let's go to Exhibit No. 14, which
3  is 192 of the PDF and 2974 to 2976 and that's
4  Dillard_DePaul.
5            (Exhibit No. 14 was marked
6             for identification.)
7  BY THE WITNESS:
8    A  Yes.
9  BY MS. SCATCHELL:
10    Q  Okay.  Can you take a moment and review this
11  document and tell me if you recognize it.
12    A  I have never seen this document before, but I can
13  continue to read it.
14    Q  No, that's okay.  I guess I just wanted to ask
15  you, you had previously testified about OIDE.  Who is
16  that or what does that stand for?
17    A  Office for Institutional Diversity and Equity, I
18  believe.
19    Q  Okay.  And in your former position as the
20  diversity advocate, would you coordinate with this
21  office?
22    A  Yes.  They were the lead for the diversity -- for
23  the President's Diversity -- for the President's
24  Diversity Council.  They were kind of like the head and

Page 111

1  the office that would put everything together.  And then
2  now, I still do because their director or whatever the
3  title is, I'm sorry, I don't recall, is coordinating the
4  President's Advisory Committee -- Jesus Christ.  I am so
5  sorry.  President Diversity Advisory Committee with the
6  associate provost.  I got completely tongue-tide.
7    Q  There's a lot acronyms and things get tongue-tied
8  here, so I completely understand.
9            So now with your position as diversity
10  advocate, would you receive any kind of complaints that
11  would be sent to OIDE if it dealt with College of
12  Communication?
13    A  No, I wouldn't.
14    Q  Okay.  What about if it dealt with the CEID
15  program?
16    A  In theory, yes, but we haven't received any
17  complaints through CEID, any direct complaints.  Because
18  I believe that these cases are seen as personnel issues,
19  and as diversity advocate, I had no role in personnel
20  decisions and employment issues.  CEID, I believe, it
21  would have to be brought up by the faculty member
22  themselves.  Like they would have to bring it to us for
23  us to kind of like either provide feedback or advocate
24  their case or seek new policies or procedures or

Page 112

1  something like that.
2    Q  Okay.  And do you know if there's a process for
3  how a faculty member would know to come to CEID?
4    A  We don't have one.  Sadly, that is one of the
5  items in our agenda.  We're a new committee, and there
6  had been something ongoing led by the committee members
7  that we just kept pursuing, but that was one of the
8  things that I mentioned in the agenda last time we need
9  to create a process for faculty to be able to consult
10  with us easily.  Because right now, I guess it would be
11  somebody talking to somebody who is a member, you know,
12  very loosely defined.
13    Q  Okay.  who did you have that discussion with?
14    A  The committee in our last meeting to make sure to
15  put it on the agenda.
16    Q  Okay.  And as you started as the diversity
17  advocate, what is the word advocate mean in terms of your
18  role, your position?
19    MS. WERMUTH:  Objection.  Asked and answered several
20  times now.  Go ahead.
21  BY THE WITNESS:
22    A  Yeah, it's more about kind of like peer mentor or
23  accompaniment.  I think the original idea was that it
24  would be somebody kind of like tasked with being aware of

Page 113

1  and leading conversations around diversity, equity, and
2  inclusion.
3  BY MS. SCATCHELL:
4    Q  And then do you remember ever having a meeting
5  with Sydney as the diversity advocate discussing some of
6  these issues facing while trying to go up for tenure and
7  in teaching?
8    A  Yes.  I have --
9    MS. WERMUTH:  Objection.  Vague.  Go ahead.
10  BY THE WITNESS:
11    A  I have several meetings.  I can't recall specific
12  dates or times.  I also have to specify that one of the
13  challenges is that often Sydney and I are chatting as
14  friends, you know, gossipy and having fun, and we tried
15  to make a clear distinction of what conversations are
16  kind of like on the record and which are not.  But
17  there's a possibility, you know, that I might misremember
18  on the record versus off, yeah.
19    Q  And then do you remember at any of the meetings
20  did you guys discuss Sydney feeling socially isolated?
21    A  Yes, we did.
22    Q  Could you expand on what you believe she meant by
23  that?
24    MS. WERMUTH:  Objection.  Foundation.

MAGNA
LEGAL SERVICES

Page 114

1    BY THE WITNESS:
2       A  I remember specifically after the share vote.
3    I'm talking about not feeling comfortable, you know,
4    welcome, included with the rest of her colleagues.  And
5    she has mentioned several times that I'm one of the few
6    people she talks to.  Because sometimes I will say
7    something like this, Sydney, did you hear.  And then
8    she'll say where am I going to hear it from.  I only talk
9    to you about this in the college.  So yes, it's come up
10   several ways, several times.
11   BY MS. SCATCHELL:
12      Q  Let's see here.  Could you please go to Exhibit
13   No. 15, which is 196 to 206 in the PDF or Dillard_DePaul
14   3178 to Dillard_DePaul 3188?
15                    (Exhibit No. 15 was marked
16                     for identification.)
17   BY THE WITNESS:
18      A  This is the program portfolio review document.  I
19   recently completed the new one, so I had opportunity to
20   revise this one.  Also, I should be able to answer any
21   questions related to it, yes.
22      MS. SCATCHELL:  Okay.  Really quickly, Anna, did you
23   produce?  I don't remember seeing one that was prepared
24   by Ms. De Moya?

Page 115

1       MS. WERMUTH:  Off the top of my head, I don't know.
2       THE WITNESS:  So she wouldn't have because we
3    finished it.  We are in the process of analyzing it at
4    the university level, and I just happen to be on that
5    committee.  But if you need a copy of the draft that I
6    submitted, which is not the official one received by the
7    university until they kind of approve it because
8    sometimes they edit, then I'm sure that can, you know, be
9    shared.
10      MS. WERMUTH:  So if this is ongoing work, Gia, it
11   wouldn't have been called for by your document request,
12   nor would it have been able to have been captured by our
13   ESI review when the ESI was collected several months ago.
14   so I just share that for what that's worth.
15      MS. SCATCHELL:  Okay.  When was this document
16   completed?
17      MS. WERMUTH:  What document, Exhibit No. 15 or --
18      MS. SCATCHELL:  Hold on.
19      MS. WERMUTH:  Hold on --
20      MS. SCATCHELL:  Now I'm getting confused --
21      MS. WERMUTH:  I said hold on because I was
22   mid-sentence and now I got cut off again.  Just to
23   finish, I'd like to say is your question relating to
24   Exhibit No. 15, which we did produce, or to the ongoing

Page 116

1    communications and work being done in this moment, which
2    we didn't produce because it wasn't called for in a
3    specific request and wasn't pulled by the ESI when we
4    collected email boxes several months ago.
5       MS. SCATCHELL:  Second one.
6       MS. WERMUTH:  Can I look on my calendar at my
7    computer because it was very recently, and I will say
8    that I am 100 percent sure that it was, and I cannot
9    recollect it was the time after the request for
10   documents.  Okay.  I want to say -- because I always put
11   everything in my PPR.  God, I want to say January, and I
12   can give you look a date if you give me a minute, but it
13   would be completed in January.  And then since then, what
14   we've been doing is looking at cleaning up the data,
15   looking at the reports, evaluating the programs because
16   this is a university level committee and a university
17   level report?
18      THE WITNESS:  Here we go.
19   BY MS. SCATCHELL:
20      Q  Are you saying January 2022?
21      A  Yes.  The latest version of this one, the updated
22   version of this one.  This one was completed in 2019 I
23   want to say at the end of the academic year around June
24   if I remember correctly, but I can find it exactly

Page 117

1    looking through my files.
2       Q  And then do you know if this draft that you
3    drafted -- this most recent one in January of 2022, do
4    you know if that was emailed or how that was circulated?
5       A  It hasn't been circulated because it hasn't been
6    approved.  It's still in analysis.  So the only people
7    that have it are ██████ and the IRMA office.  And
8    I apologize, I don't know what IRMA means except that the
9    R is for research, Institutional Research something.
10   Something.  So and it hasn't -- the only person who would
11   have seen it apart from me would be the dean.
12      Q  Okay.  And how did you give a copy of the 2022
13   report to the dean?
14      A  Actually, I didn't.  That's the thing.  I
15   submitted the survey via Qualtrics.  And I am saying that
16   if the dean wants to see our reports, she can.  And there
17   is a possibility that that the committee sent it to her
18   for confirmation, but I submit it directly to the
19   committee through a Qualtrics survey.
20      Q  And do you have a copy of this that you could
21   provide to us?
22      A  I do.
23      Q  Then I'm going to direct your attention to page
24   4.



Page 118

1     MS. WERMUTH:  Of Exhibit No. 15?
2     MS. SCATCHELL:  Yes.
3     THE WITNESS:  Is that 99 -- 199 of the PDF?
4  BY MS. SCATCHELL:
5     Q  Yes.
6     A  Wonderful, I'm there.
7     Q  Okay.  What is the summer PRAD -- Diversity Focus
8  PRAD Summer Bootcamp?
9     A  I believe that that is referring to the PRAD
10  program that was created by Sydney and ████ ████████.  And
11  I apologize, I don't know exactly how the work was
12  distributed.  I know that the grant that funded it, they
13  were both heading it, and I know that Sydney worked more
14  on the PRAD program, but I know that they were both
15  related to that.
16          This was a program for students in high
17  school to learn about advertising because we are -- we're
18  trying to increase the number of underrepresented
19  students who are mainly students of color who consider a
20  career in public relations and advertising.
21     MS. WERMUTH:  Gia, I'm sorry, where on this page --
22  oh, I see it, I'm sorry.  Diversity-focused PRAD Summer
23  Bootcamp.  I'm sorry, it took me a moment.  Thank you.
24  BY MS. SCATCHELL:

Page 119

1     Q  And on Page 1, 3178 where it says commitment to
2  social justice (implicitly).
3     A  Uh-huh.
4     Q  What does that mean?
5     MS. WERMUTH:  Objection.  Foundation.  Go ahead.
6  BY THE WITNESS:
7     A  The program Portfolio Review asks all programs to
8  respond on different questions related to the mission,
9  and one of those questions is how are we incorporating in
10  our learning objectives and our teaching things like
11  commitment to social justice or diversity and inclusion.
12  If it is one of our explicit learning objectives, then we
13  would answer that we incorporated explicitly.  If it is
14  part of the student learning other things, you know, but
15  it's not established as a direct target, then we would
16  answer that we are covering it implicitly and justify
17  that, or we could say we're not covering it at all.
18  BY MS. SCATCHELL:
19     Q  Okay.  And let's go to Exhibit No. 17, which is
20  213 of the PDF Dillard_DePaul 3315.
21          (Exhibit No. 17 was marked
22          for identification.)
23  THE WITNESS:  Okay.
24  BY MS. SCATCHELL:

Page 120

1     Q  And let me know when you've reviewed that
2  document.
3     A  I read it.
4     Q  Okay.  Do you know what that document is?
5     A  Sydney sharing an industry report.  We sometimes
6  send each other emails of things that we can incorporate
7  into our classes and this is what Sydney is doing here.
8     Q  Okay.  And did you happen to take a look at this
9  report?
10     A  I don't think I did.
11     Q  And then let's go to Exhibit No. 19, which is
12  Page 217.
13          (Exhibit No. 19 was marked
14          for identification.)
15  BY MS. SCATCHELL:
16     Q  Could you take a moment and review that document?
17     A  I remember this.
18     Q  Okay.  What is this document?
19     A  There was an email exchange regarding around the
20  George Floyd protest and, you know, universities and
21  people coming out with statements.  And Robin Hoecker is
22  one of our untenured faculty members and she is
23  encouraging us to consider issues at DePaul and in the
24  history of DePaul.  In addition to considering issues at

Page 121

1  the city and national level.
2     Q  And then let's go to Exhibit No. 20.  It's 219 of
3  the PDF and it's Dillard_DePaul 3324 to 3328.
4     MS. WERMUTH:  Let me just state for the record
5  quickly that Exhibit No. 19 appears to be one page in a
6  six page email trail, so it appears incomplete.  And
7  Exhibit No. 20 appears to be -- appears, I don't know, to
8  be Pages 2 through 6 of an email trail.  I don't know if
9  it's the same one.  So I think Exhibit No. 19 and No. 20
10  are both incomplete.
11     MS. SCATCHELL:  Then what we could do is we could
12  just call Exhibit No. 19 and we'll say that it goes from
13  Dillard_DePaul 3323 to 3328 and then strike Exhibit No.
14  20.
15     MS. WERMUTH:  I mean, I think it's important first to
16  understand from the witness, assuming she was on this
17  entire trail for the witness to indicate whether or not
18  that these go together.  I'm not going to presume that.
19     THE WITNESS:  I believe they go together.
20  BY MS. SCATCHELL:
21     Q  Okay.  And then if you just wouldn't mind to take
22  a moment to look at the other pages.
23     A  I remember this exchange.  If you want me to look
24  at the specific portion of it, I can, but I remember this





Page 122

1  exchange.
2      Q  And do you see on Page 5 of 6 or Dillard_DePaul
3  3327 an email from Sydney to you among other colleagues?
4      A  Yeah, I see it.  And I believe, if I remember
5  correctly, and based on the names there that is all the
6  full-time faculty and staff in the college who is the
7  recipient of this.  But yes, I remember this email.
8      Q  And then let's go to Exhibit No. 21, which is
9  224.
10                 (Exhibit No. 21 was marked
11                  for identification.)
12  BY THE WITNESS:
13      A  Okay.
14      Q  Do you recognize that email exchange?
15      A  Yes.  That was a response I received from ████
16  ████.  I believe he was the head of the personnel
17  committee at the time.  I had missed the deadline to
18  submit papers for my review, my tenure review, I believe.
19  God, I'm not 100 percent sure of tenure review, for my
20  review.  And I was granted three more days to provide
21  that information.
22      Q  Do you see at the top where it says from, Lexa
23  Murphy and to, Salma Ghanem?
24      A  Yes.

Page 123

1      Q  Do you know why Lexa Murphy would have forwarded
2  that email?
3      MS. WERMUTH:  Objection.  Foundation.
4  BY THE WITNESS:
5      A  I don't know.
6  BY MS. SCATCHELL:
7      Q  And if we could go back to Exhibit No. 1, the
8  test messages.
9      A  Sure.
10      Q  Okay.  Thank you.
11          Let's see, could you please go to 2900
12  which is, I will tell you exactly what page it is.  Give
13  me one second.  It should be Page 85 or Dillard Discovery
14  Production 2900.
15      A  That helps a lot.
16      Q  Okay.  Could you just review that and let me know
17  when you finish?
18      A  Sure.  Yeah.
19      Q  Okay.  What do you recall from this text message
20  exchange?
21      A  Sure.  ████ was a faculty member in
22  advertising.  He took the lead in proposing an innovation
23  grant and shared it with all the faculty to see if we
24  wanted weigh in.  ████ -- not ████ Eva ████████ was

Page 124

1  one of our term faculty members and she wanted to weigh
2  in, but sadly Eva was difficult, is the best way that I
3  can put it, and so, you know, she tended to be rude in
4  her formal speech.  So this exchange is about ████ and
5  Eva talking about the innovation grant.  The reason why
6  Sydney would be involved is because Sydney ended up
7  taking a very big role in helping ████ finalize the grant
8  and get it funded.
9      Q  And then let's scroll down to page 2902, which
10  should be 87.
11      A  Yes.
12      Q  Okay.  Could you review that and let me know when
13  you're finished?
14      A  Yes, I remember this (indicating).
15      Q  And you made a funny noise, is there any reason
16  why?
17      A  Because I laugh at inappropriate times is my best
18  answer.  I'm sorry, I have a very bad sense of humor and
19  difficulty controlling it, so my apologies.
20      Q  No problem.  Could you please let me know what
21  you meant by at 7:50 a.m. you said on July 9, 2019.
22  Gotta tell you, no idea how they put your committee
23  together.  Everyone but you is a first year.  Great
24  people, nice and smart, but shit, can they even answer

Page 125

1  questions about the program?
2      A  Can you repeat the first part of the question.
3  Was it why I said it or I'm sorry --
4      Q  Yeah, what was the context of that?
5      A  There was going to be a search for an advertising
6  position, a tenure-track advertising professor, and they
7  had -- they were putting together a search committee.
8  The weigh in which that is put together is a little
9  abstract, I guess.  Meaning, we are invited to express if
10  we're interested in being on a search committee and the
11  dean then sends us anyone notifying us who was on the
12  search committee.  Sometimes we don't get asked.  It
13  might be oh, you know, we're having a search and this is
14  a search committee, so it can change from case to case.
15  In this case, Sydney was asked to co-chair a committee
16  with ████ ██████, Robin Hoecker, and I don't remember the
17  other person, but I know -- oh, ████████.  So Nur, ████,
18  and Robin had just joined the university and I thought it
19  was weird that they were -- they had made up a committee
20  of people that didn't have a lot of experience with the
21  program except for Sydney.  ████████
22  was -- because they were going to do two searches at the
23  same time or that's what, you know, we were told.  But
24  they had decided instead of creating two committees, to

MAGNA
LEGAL SERVICES

1    have one committee co-chaired by two people, by ███ and
2    Sydney.
3        Q   Okay.  Got it.  And had the selection process for
4    the committee changed in your experience or was it like
5    this all of the time?
6        A   It has never been consistent, so it could change
7    at any time.  It's volunteer, it's not seen as
8    competitive, so basically you either get asked --
9    everybody gets asked if they want to be part or you get a
10   direct ask.  You know, the dean could email me and say,
11   Maria, do you want to be on this committee, for example.
12   So there's no consistent way in which the search
13   committees are put together.
14       Q   Okay.  And was ████████, was he a tenure-track
15   faculty member?
16       A   Yes.
17       Q   Okay.  And is ████████ -- I think you
18   previously testified that he had left the university,
19   correct?
20       A   Yes.  I did say that he had moved, yes.
21       Q   Did he leave as a tenured professor?
22       A   He left before tenure.
23       Q   Okay.  Let me just back up really quick.
24           If somebody is tenure track, what defines

1    tenure track?
2        A   It means that you are hired with the expectation
3    that you will apply to be tenured in the university.  It
4    means that you teach a set number of courses, but also
5    have obligations in terms of research and service to the
6    university.  Tenure track is every faculty member that is
7    tenured or untenured.  So, for example, despite the fact
8    that I'm tenured, I'm still considered a tenure-track
9    faculty member.  And we do that to differentiate for term
10   faculty members whose main responsibility it is to teach
11   and support the program with some service.
12       Q   Okay.  Do you know if ███ was an instructor or
13   tenure track when he began the year before he was
14   selected as the co-chair to this committee?
15       A   There was a little confusion or debate there
16   because he understood that he was starting as tenure
17   track right away.  But because his graduation date fell
18   after the cut -- what is it called.  Kind of like a
19   deadline, he had to be on instructor role for the first
20   year before he was able to get on the tenure track, which
21   basically means that his clock for tenure has started.
22   Because the clock works two ways, you have six years to
23   submit, but also you can't submit before you're five so
24   you have to wait to apply for tenure until the fifth

1    year.
2        Q   Okay.  And then could you go down to Page 2910
3    which, would be Page 95.  And let me know when you finish
4    reviewing that.
5        A   Yeah, I'm done.
6        Q   Okay.  Do you see the exchange that Sydney says
7    at 6:39 p.m., "Oh, yea, and I talked to ████ today"?
8        A   Yes.
9        Q   And then do you see the part where you responded,
10   "Yeah, I think they have a plan for you and me."?
11       A   Uh-huh.
12       Q   "Which would be fine if they talked to us instead
13   of trying to move us like pawns."  Could you explain what
14   you mean by that statement?
15       A   Yes.  I was not interest in the chair position
16   and Sydney was.  I was happy to stay on as graduate
17   director and work with Sydney as chair.  Sydney kept
18   getting encouraged to consider taking on the graduate
19   director role as I moved up to chair, despite us both
20   telling people that we were interested in the opposite
21   positions.  And I felt like the suggesting gotten more to
22   kind of like a pushing us towards those roles.  That's
23   what I mean by moving like pawns.
24       Q   Okay.  And you had previously testified that you

1    were first nominated for the program chair position and
2    declined it and then ultimately were nominated again and
3    then you accepted the nomination.  What changed between
4    those two time periods?
5        A   Well, the fact that we hadn't elected a chair
6    last time and that the position was still open, I felt
7    honestly responsible and a little guilty with regards to
8    ████ because I felt that if I had kind of -- they were
9    going to elect me, that was the impression that I got.
10   My thinking at the time was, well, I don't want this job
11   and Sydney does, so why should I even go up.  And I also
12   thought if I am to stay at DePaul, it's going to make my
13   progression towards full professor eventually better to
14   have this in my record.  So honestly, I felt that even
15   though I still don't like the position, it's still a
16   position I would rather not have, it was the best choice
17   at the time to both serve the program and to serve my
18   career progression.
19       Q   And you had just stated that -- let me back up.
20           When Sydney was denied the program chair
21   position, in your opinion, do you believe she was
22   qualified for that program chair at that time?
23       A   Yes, as qualified as any program chair we've had
24   in the past or have since.

Page 130

1    Q  Okay.  And then let's go to Page 29 -- sorry,
2 we're going to go backwards for a second.  Page 97, which
3 is 2912, and let me know when you finish reviewing it.
4    A  Yeah, I remember this exchange.
5    Q  Okay.  Who is Don?
6    A  Don Ingle is one of our colleagues.  He's a
7 term-faculty member who teaches in the public relations
8 program -- teaches public relations classes, pardon me.
9    Q  And then Jim, who is Jim?
10   A  Jim Motzer is a former faculty member, he
11 retired.  He was a term faculty member as well, also
12 teaching public relation.
13   Q  And Ron?
14   A  Ron Culp is our current professional director of
15 the graduate program.  He's also a term faculty.
16   Q  Okay.  And what do you remember about this
17 exchange?
18   A  Don is frequently socially awkward, I guess,
19 that's the best way of putting it.  And when he -- pardon
20 me.  Sydney is telling me that when she talked to him
21 about being interested in the chair position, he went --
22 he said something like well it's too bad that Jim can't
23 do it because Jim would be great at it.  We have frequent
24 conversations and often frustration about the fact this

Page 131

1 our term faculty members don't understand all the
2 responsibilities that tenure-track faculty members have.
3 And for example, in this case, that they don't understand
4 why a term faculty member can't serve as chair.
5    Q  And then please go to Page 2923, which is 108.
6    A  Yeah, I remember this.
7    Q  Okay.  What do you remember about it?
8    A  Honestly, I remember that it had a lot to do with
9 me.  I was just tenured and I was feeling burned out and
10 unhappy.  I had a lot of -- it was a very emotional time,
11 and I felt very disappointed like going through the
12 tenure process was jumping through a lot of hoops with
13 very little reward after it.  ████ ████ had just
14 joined, he is Argentinean and a fellow Spanish speaker,
15 and I had become his unofficial mentor, and I realize
16 that I had shared too much of my frustration with him.
17 And I was feeling guilty because was I felt like, you
18 know, I might have influenced him to start in a bad way,
19 not the way that I had started, kind of like with all of
20 this hope and happiness and optimism.  And that's what
21 Sydney says when she says, you know, ████ told me
22 everything you said is -- I have told him about the
23 things that had gone on with me, so how I was feeling.
24 One of my main frustrations was with the fact that I

Page 132

1 could not improve my teaching.  I have to say that my
2 teaching was already very good, but the feedback was, you
3 know, that there are some things that could be improved,
4 and I felt like I was asked to fit a mold that I was
5 never going to fit, and I came to the realization around
6 that time and that was very problematic for me.  Sydney
7 and I talked a lot during that time.
8    Q  Okay.  And what about the conversation -- or what
9 about the culture became toxic at DePaul as you
10 described?
11   A  There was, what I called at the time, willful
12 ignorance regarding some of these differences in terms
13 of, you know, well, you can't look at Sydney's
14 evaluations like without remembering that she's a young
15 Black woman in academia.  And we had been already
16 participating in conversations for more than a year,
17 maybe two years at that point.  I was tired and I was
18 feeling emotionally burdened, and I think that's what I
19 referred to as toxic.  Because I know if I would be
20 saying toxic today, I might say something different.  I
21 was never made to feel uncomfortable that I couldn't come
22 in, you know, that I couldn't belong that I know that
23 Sydney had difference experiences than me in that sense,
24 but I felt like I kept hitting a wall when I tried to

Page 133

1 talk about issues of diversity and inclusion.
2    Q  Okay.  And you had stated it was willful
3 ignorance.  Could you expand on what you mean by the
4 willful ignorance part?
5    A  I think there comes a point when if somebody
6 tells you that you have a problem, you should at least
7 double check that you don't.  And the response that I had
8 received talking to colleagues, officially and
9 unofficially, were things like well, no, don't worry,
10 trust your colleagues, or you know, this is a process or
11 we have your best interest.  And I remember making the
12 comparison if a student tells me that I evaluated their
13 assignment incorrectly before ensuring them that I
14 didn't, I would take a second look at how they evaluated
15 their assignments.
16     So I was frustrated about the fact that
17 nobody was willing to stop and take a second look of our
18 processes even if we ended up disagreeing in terms of,
19 you know, them being sufficient or not sufficient.
20 That's why for me the ignorance was willful because there
21 was no intent to review how we did things.
22   Q  Okay.  And do you think some of that willful
23 ignorance --
24   A  My dogs.



| Page 134 | Page 135 |
|---|---|
| 1   Q  Do you want to take a five minute break? | 1  people of different races. I thought it could, you know, |
| 2   A  Honestly, can I just finish answering this | 2  it would be beneficial to all tenure-track faculty |
| 3  question? | 3  members if things were clarified. |
| 4   Q  Perfect. | 4   Q  And let's go to 29 -- sorry, I didn't mean to go |
| 5   A  It is a little taxiing to remember that time. | 5  backwards here -- 2918. |
| 6  There's actually something called a post-tenure slump | 6   MS. WERMUTH: What page? |
| 7  that nobody tells you before you go through tenure. | 7   MS. SCATCHELL: 2918. Let me give you the PDF |
| 8      You were asking about that? | 8  number. |
| 9   Q  Yes. When you were talking about some of the | 9   MS. WERMUTH: It's more helpful than trying to scroll |
| 10  willful blindness, do you believe that race was a factor | 10  through. |
| 11  in any of that? | 11   THE WITNESS: I think it's 103. |
| 12   MS. WERMUTH: Objection. Vague. Foundation. Calls | 12   MS. WERMUTH: Thank you. I appreciate that. Is that |
| 13  for speculation. Go ahead. | 13  where we are, 2918? |
| 14  BY THE WITNESS: | 14   MS. SCATCHELL: Yes. |
| 15   A  I would have no way of knowing why they were | 15   MS. WERMUTH: Thank you. |
| 16  being -- you know, why there was an unwillingness. At | 16  BY MS. SCATCHELL: |
| 17  that time, I don't remember thinking that it was related | 17   Q  Do you recall saying something to the effect of I |
| 18  specifically to race. I remember thinking that it was | 18  think our colleagues were horrible to you and the |
| 19  more like honestly just over confidence and maybe | 19  treatment was not warranted? |
| 20  humorous, oh, no, we're right because this is how we've | 20   A  I did. I wrote that, yes. |
| 21  always done it. So my frustration was more about that | 21   Q  What did you mean by that? |
| 22  than, you know, they don't want to look at race because | 22   A  The fact that they had voted that they didn't |
| 23  honestly we didn't -- I don't think the lack of clarity, | 23  have confidence on Sydney being a chair where I couldn't |
| 24  the things that I was bringing up would only affect | 24  see any information that could substantiate that. It |

| Page 136 | Page 137 |
|---|---|
| 1  felt to me kind of like a popularity contest when it | 1   A  Yes. |
| 2  should have been, you know, do you support this person to | 2   Q  And then you guys were talking about -- everybody |
| 3  work for you as chair because I can tell you work of | 3  in that meeting was basically more or less talking about |
| 4  chair is not fun at all. | 4  revamping that position, correct? |
| 5   Q  Okay. And during that vote, do you remember -- | 5   A  Yes. |
| 6  the program chair vote for Sydney, do you remember | 6   Q  And Sydney was told to leave the meeting because |
| 7  whether Eva had said anything about Sydney being on | 7  you guys were voting on whether or not she should be |
| 8  maternity leave? | 8  program chair, correct? |
| 9   A  She didn't mention maternity leave. She said | 9   A  Yes. |
| 10  she's been sick or ill or something like that. And | 10   Q  Was she ever included back in the meeting when |
| 11  several of us actually told her that we don't talk about | 11  you guys were talking about the position and not on |
| 12  that or that's not a criteria for evaluation. | 12  basically her qualifications? |
| 13   Q  Do you remember how she responded? | 13   A  No. |
| 14   A  I don't, but we didn't go further into it so she | 14   Q  Okay. Do you know why that was? |
| 15  obviously was quiet. | 15   A  Because we were supposed to be talking about her |
| 16   Q  Okay. And do you know if she was disciplined or | 16  qualifications. |
| 17  anything happened for her saying that? | 17   Q  Okay. And do you remember at that same program |
| 18   A  No. Eva was eventually let go because of how | 18  chair meeting whether one of your colleagues, maybe Dan |
| 19  difficult she was to work with, but it was many | 19  Azzaro, had said something, why is Sydney being held to a |
| 20  instances. Whether that was one that was listed or not, | 20  different standard than ▇▇ ▇▇? |
| 21  I don't know. | 21   A  I don't recall that. I know that Dan Azzaro was |
| 22   Q  Okay. And you had previously testified that at | 22  there. But I do want you to remember that I was on, what |
| 23  that program chair meeting vote for Sydney that her | 23  is it called, video call, so I might have missed some |
| 24  qualification were not discussed, correct? | 24  things that were discussed. |





Page 138

1    Q   And you had previously testified about the notes
2  that you took at one of the meetings?
3    A   Uh-huh.
4    Q   I'm going to send you what I'll mark as Exhibit
5  No. 23 and 24.
6                (Exhibit Nos. 23 and 24 were
7                marked for identification.)
8  BY MS. SCATCHELL:
9    Q   And could you let me know if either of these
10 represent your notes?
11   A   So maybe we can take that stretching break now
12 for five minutes because it's going to take a minute for
13 it go through email.
14   Q   Perfect.  That makes sense.
15                (Short recess.)
16 BY MS. SCATCHELL:
17   Q   Who is ███
18   A   I think she's tenured already -- or tenure-track
19 faculty member, I honestly don't recall.  Yes, she was
20 tenured recently.  In interpersonal communications, I
21 believe.
22   Q   Do you have her last name by?
23   A   ███████
24   Q   ███████

Page 139

1    A   Yes.
2    Q   It's getting to be that time.
3    A   For some reason spelling out letters in English
4  for me is extra effort.
5    Q   Actually, let me back up.
6                When you guys are voting, and by you guys,
7  I mean, various faculty members say for the program chair
8  or whatever you have to revote.  Is there a process for
9  revoting?
10   MS. WERMUTH:  Objection.  Totally vague.
11   MS. SCATCHELL:
12   Q   Yeah, it's a bad question.
13                Actually, if you could just give me one
14 second to go off the record?
15   A   Okay.
16                (Brief recess.)
17   MS. SCATCHELL:  I'm sorry about that.  Back on the
18 record.
19 BY MS. SCATCHELL:
20   Q   Do you recall if ███ is on any specific
21 committees?
22   A   She is on the assessment committee at the college
23 level, so the program assessment committee, yes.
24   Q   Okay.  And was she voted onto that position?

Page 140

1    A   I don't recall.
2    Q   Okay.  And do you know if there's a voting
3  process for the program chair position?
4    A   Yes, there has been for the last three times.
5  There wasn't before that.
6    Q   Okay.  The last three times, so would that be the
7  2020, 2019?
8    A   Uh-huh.
9    Q   And which one was before that, do you happen to
10 know?
11   A   '14 or '15 when ███████ was elected.
12   Q   Okay.  So before ███████ was elected to the
13 program chair, there was no selection process in place?
14   A   No.  A couple things, we're a young college, so
15 we're only 11 or 12 years old.  The previous program
16 chair had been appointed by the Dean, ███████
17 When ███ left the institution, ███████ had been
18 asked or volunteered to be the next
19 program chair.  And that was kind of like a done deal
20 until the knew dean came, Salma Ghanem.  And she said
21 actually we need a process, like there should be some
22 faculty feedback before we appoint a program chair.  So
23 she asked ███ to make a little statement in front of
24 the PRAD faculty.  She asked -- we were supposed to ask

Page 141

1  ███ questions, we did.  I can't remember what we asked,
2  and then vote in support of her as program chair.  So
3  that's what we did.  The third time around when it was
4  time for ███ to step down, I believe that what Lexa
5  tried to do was follow a similar system that had been
6  followed the last time, but in this case the faculty
7  didn't support Sydney as chair, and that led to a lot
8  more discussion about the position and about the process.
9    Q   And do you remember a candidate named Candace?
10   A   She was a candidate for an advertising position.
11   Q   Okay.  Do you remember what her ethnicity was?
12   A   She is a Black woman.
13   Q   Was she selected?
14   A   No.  She was ranked -- she was ranked third, I
15 believe.  So when we have finalists, that means we invite
16 people to the campus, the college faculty vote on their
17 preferred, you know, hire, the one that they think is the
18 first choice.  And based on that, they are ranked first,
19 second, and third choice.  The idea is that the dean has
20 our advice or our support to offer the position to
21 anybody who is ranked.  In Candace's case, I know there
22 wasn't a lot of support.  There might be a possibility
23 that she was voted as an unacceptable candidate, but I'm
24 sorry, I don't recall.  If she was third, what would mean

Page 142

1  is if it's candidate one and two didn't accept the
2  position, number three would get offered.  If she was
3  determined unacceptable, which has happened in the past
4  with other candidates, then it means that the dean will
5  only offer the position to candidate one and two because
6  the faculty decided this candidate doesn't qualify for
7  this position.
8      Q   And so was her last name Edrington?
9      A   Yes.
10     Q   E-D-R-I-N-G-T-O-N?
11     A   Yes.
12     Q   Okay.  And how many people applied for the
13  position?
14     A   I don't know.  I wasn't in the search committee,
15  so I wouldn't know.
16     Q   Okay.  Do you know anything about any of her like
17  teaching scores or anything like that?
18     A   Yeah.  So I would have seen her application --
19  when they are finalists, we see all the materials, we
20  means all the faculty that can vote, tenure-track
21  faculty.  We see all the materials and also we see a
22  teaching presentation that they do about half an hour,
23  it's recorded.  And also, we see research presentation
24  which is also recorded and students are asked to say a

Page 143

1  short survey, like a three-question survey, basically,
2  you know, what do they think of the instructor and would
3  they be interested in taking classes with them.  So I did
4  feel that.
5      Q   Okay.  And either of the candidates for that
6  were considered during Candace's application, do you
7  remember which of the teachers had the strongest teaching
8  scores?
9      A   No, I don't remember which had the strongest
10  teaching score.
11     Q   Would anything refresh your recollection?
12     A   Looking at the scores again.  I remember that she
13  did well.  Are we talking specifically about Candace or
14  the search in general?
15     Q   Either, whatever you're able to remember?
16     A   Candace was a very strong candidate and she
17  flopped the research presentation.  Sadly, in many ways,
18  she was a little insecure, she went too short, didn't do
19  a great job answering the questions.  Some of my
20  colleagues felt that this meant that she was less
21  qualified for the job.  I had read and used her research
22  in my class so I was a little familiar with her research,
23  and I thought she just had a brad presentation, that that
24  doesn't disqualify her as a research.  So I believe the

Page 144

1  objections to her case were based on her research, not on
2  her teaching and her teaching feedback was good.
3      Q   Is DePaul a teaching institute or a research
4  institute?
5      A   It is a teaching institution, but we do have the
6  expectation to produce research.
7      Q   Okay.  Let's see here.  Okay.  Let's open up
8  Exhibit No. 23.
9      A   The notes?
10     Q   Yes.
11     A   Okay.  Got them.
12     Q   Would you review.  It is Dillard_DePaul 4954 to
13  Dillard_DePaul 4957.
14     A   Uh-huh.
15     Q   And let me know when you're finished.
16     A   I reviewed them when we were on break, so I did
17  see them.
18     Q   Are these the notes that you were referring to?
19     A   These are the notes that I took from my meeting
20  with Sydney after the vote and her to take kind of like
21  an on the record feedback regarding the chair process
22  that I could go to the dean with that before we had
23  another chair selection.
24     Q   And let's go to Exhibit No. 24, and that is

Page 145

1  Dillard_DePaul 4958.
2      A   I'm sorry.  Do I have that in a different email?
3      Q   There should be the same email.  There should be
4  two.
5      A   Give me one second.  I didn't notice the second
6  one.  You are right, it was an email, one second.  Okay.
7  These are the notes from when Sydney presented her kind
8  of like case for chair.
9      Q   Okay.  Is this your handwriting or someone
10  else's?
11     A   Sadly, that is my handwriting.
12     Q   And just to recap, are these about her
13  qualifications?
14     A   No.  This is a listening aid, so it starts at the
15  last part of the page.  So thankfully, you know, the
16  first half is in Spanish, so you know it is not about
17  that.  Then I have a comment about a student, so I
18  underlined Sydney as she was talking because we didn't
19  have a copy of her document.  I was making notes about
20  the things that she was saying about her qualifications
21  that I wanted to remember.  So they would be just kind of
22  like brief reminders to myself.
23     Q   Okay.  So would this be an accurate description
24  of what Sydney had listed were her qualifications?



37 (Pages 142 to 145)

Page 146

1    A   Yes.  The ones that I thought were, you know,
2   worth noting, yes.
3    Q   Okay.  Perfect.  And then do you remember a time
4   recently where there was more than one vote for a
5   candidate?
6    A   In which context, for the chair?
7    Q   With ▮▮▮▮
8    A   That was tenure review.
9    Q   Oh, yes, that's exactly it.
10   A   I guess, yes, except but do we consider more than
11  one vote.  But yes, I remember that the case.
12   Q   Okay.  Do you remember how many votes there were
13  or what the nature of the --
14   A   I'm going to answer the second part of the
15  question first.  We were reviewing her case, we discussed
16  her case, it was time to vote.  This is what the faculty
17  say that they recommend this candidate for tenure, yes or
18  no.  When with did the votes, there were answers that
19  appear to be a mistake.  This is why.  There were several
20  notes, but there have been no opposition in the
21  discussion.  Several, this maybe three or not.
22        Okay.  The discussion should reflect the
23  vote, there is no way to guarantee that, except that it
24  always has.  Meaning that if I say, you know, well, Maria

Page 147

1   doesn't have enough research, then you're probably going
2   to expect that there's probably going to be at least one
3   vote that says Maria does not qualify for tenure.  There
4   was nothing in the discussion about Kendra's case.  And
5   honestly, nothing in Kendra's case that would warrant a
6   negative vote, as I see it.  Again, remember each one of
7   us evaluate differently.
8        The number of votes wasn't the same as the
9   number of people online because I think if not our first,
10  one of our first voting on Zoom for tenure & promotion
11  because of the pandemic, and there were notes that
12  weren't explained by the discussion, and it was honestly
13  upsetting.  I remember that I got upset because I
14  remember saying to our group like if you have an
15  objection, why would you not mention it.  And if, you
16  know, don't mention it, then why would you vote no.
17  Again, there's nothing that mandates that our colleagues
18  express it, there's an expectation, and that's what I
19  personally was upset about.
20        We, I don't know how, came to the
21  conclusion that it was a glitch.  I know that several of
22  us agreed to try it again just to confirm that the voting
23  had been correct, and I know that we did at least three
24  times.  I know that it was more than two.  I know that it

Page 148

1   wasn't a dozen.  At some point, one of my colleagues
2   said, I think I'm the one that's screwing things up
3   because I'm logged in two places, whatever, whatever.  We
4   ended up supporting her case for tenure unanimously which
5   did reflect the discussion, at lease in my opinion, so I
6   walked out of there okay with the decision, yes.
7    Q   And what ethnicity is ▮▮▮▮
8    A   ▮▮▮ is white, I believe, yeah.
9    Q   And then do you remember during that vote anybody
10  saying something about her not wanting to feel like she
11  has enemies?
12   A   Not exactly that wording.  What I recall is some
13  people expressing concerns about kinds= of like this
14  unexplained no getting back to her because it would,
15  right.  So the candidate looks at their -- and feeling
16  like somebody is against them, I guess.  They might have
17  used the word enemy, but I honestly don't recall the
18  specific word.
19   Q   Was that a factor in the revote process or no?
20   MS. WERMUTH:  Objection.  Foundation.
21   BY THE WITNESS:
22   A   I didn't decide on the revote, so I can't say.  I
23  can say that for me when there wasn't.  When Paul said
24  there was a glitch, I had no reason to doubt that he was

Page 149

1   right.
2   BY MS. SCATCHELL:
3    Q   And then who made the decision to do the revote?
4    A   It was several of us.  Sometimes the way that
5   these decisions are made is I will propose something and
6   then, you know, you might support it.  And if there's no
7   opposition then we assume you're agreeing, it was
8   something like that.  So we didn't have a vote about
9   having another vote.
10   Q   Okay.  And then was there an extension the first
11  time?
12   A   I don't recall.  I only remember the no.
13   Q   And with a no vote, would ▮▮▮▮ still have made
14  tenure or would that no vote have precluded her from
15  becoming tenured?
16   A   No.  She would have made tenure because it would
17  have been one or two outliers and because her case was
18  going to get supported by the dean and double checked by
19  UBPT.  So again, it's not an exact science, but based on
20  everything, she would have made tenure, she would just
21  have seen a no in her letter.
22   MS. SCATCHELL:  And Anna, you don't have any issue
23  marking the comments about the other jobs that she was
24  looking for confidential, correct?

**MAGNA**
LEGAL SERVICES

Page 150

1    MS. WERMUTH:  Of course not.
2    BY MS. SCATCHELL:
3        Q   All right.  Well thank you so much for your time.
4    I really appreciate it.  I am going to turn you over to
5    Anna now.
6                    EXAMINATION
7    BY MS. WERMUTH:
8        Q   Hi, Dr. De Moya.  Thank you for being here today.
9    I have just a couple quick questions.
10       A   Sure.
11       Q   The student evaluations that are reviewed during
12   the probationary reviews and the tenure review, they're
13   like on a five-point scale; is that right?
14       A   Yes.
15       Q   Have you ever personally received student
16   evaluation in the twos?
17       A   No.
18       Q   Or in the ones, have you ever received
19   evaluations in the ones?
20       A   No.
21       Q   Okay.  Now in 2017 when you we're talking to ▮▮▮
22   ▮▮▮▮▮▮ and Sydney Dillard about their reviews and their
23   concerns about the appearance of bias as you put it, you
24   were not tenured at that time, correct?

Page 151

1        A   That's correct.
2        Q   Okay.  So at that time, you didn't have the
3    benefit of having reviewed their full cases; is that
4    correct?
5        A   That's correct.  And I should add that I would
6    never have that because you only get from the starting
7    point where you join.  So for Sydney and for ▮▮▮ both, I
8    only reviewed the most recent report.
9        Q   I see.  So when you did get tenured and then you
10   were sitting on the tenured faculty group to review their
11   tenure cases, you only had a portion of their file?
12       A   No.  I had the complete file, but I didn't have
13   the privilege of the two previous discussions or the
14   three, and I wasn't given access to them.  And I did ask
15   because I knew that ▮▮▮'s case especially was going to
16   be controversial and academic affairs explained that no,
17   we're supposed to see starting when we joined.
18       Q   I see.  But going back to 2017, you absolutely
19   did not have that full record, okay.
20       A   No.
21       MS. WERMUTH:  I have no further questions.  Thank
22   you, Dr. De Moya.
23       MS. SCATCHELL:  Actually, I just have one quick
24   redirect.

Page 152

1               FURTHER EXAMINATION
2    BY MS. SCATCHELL:
3        Q   So when Sydney and ▮▮▮ had come to you, they
4    were making a complaint, correct?
5        MS. WERMUTH:  Objection.  We've been over this.
6    We're just redoing old territory, okay.
7    BY THE WITNESS:
8        A   It's not a complaint, it's more like seeking
9    advocacy and support.
10       MS. SCATCHELL:  Okay.  Perfect.  No further
11   questions.
12       MS. WERMUTH:  Dr. De Moya before you, go.  Gia, I
13   think it's important to let De Moya know what her options
14   are.  You do have the option to review your transcript
15   before it becomes like final.  Or you can waive that
16   option and it really is your choice.  So whatever your
17   preference is, you can let us know.
18       THE WITNESS:  I think I would rather keep a copy of
19   my transcript, so I would rather look at them, yeah.
20       MS. WERMUTH:  So you would like to see in advance
21   before it comes like a final --
22       THE WITNESS:  Yes, I think --
23       MS. SCATCHELL:  To make any corrections --
24       THE WITNESS:  Just in case.  I doubt there's anything

Page 153

1    that needs to be corrected, but it's better to be safe
2    than sorry.  Again, sometimes my accent trips me up, but
3    who know, but I think we got it.
4        Gia, I'm so sorry.  I just remembered one
5    thing.  The date for the PPR survey, the updated one was
6    submitted January 21, 2022, I looked it up.
7        MS. SCATCHELL:  Okay.  Great.  Thank you so much.
8                  * * * * * * * *

MAGNA
LEGAL SERVICES

Page 154

```
 1              REPORTER'S CERTIFICATE
 2         The within and foregoing statement of the
 3   witness, MARIA DE MOYA, was taken before DEANNA L.
 4   TUFANO, CSR, and Notary Public, wherein all the parties
 5   attended remotely at 10:00 a.m. on the 27th of April,
 6   A.D., 2022.
 7         The said witness was first duly sworn and was
 8   then examined upon oral interrogatories; and the
 9   questions and answers were taken down in shorthand by the
10   undersigned, acting as stenographer and Notary Public;
11   and the within and foregoing is a true, correct, and
12   accurate record of all of the questions asked of and
13   answers made by the said witness, MARIA DE MOYA, at the
14   time and place hereinabove referred to.
15         The undersigned is not interested in the within
16   case, nor of kin or counsel to any of the parties.
17         Witness my official signature and seal as Notary
18   Public in and for Cook County, Illinois on this
19   14th Day of May, A.D., 2022.
20         _____
           DEANNA L. TUFANO, CSR,
21         CSR No. 084-003819
           MAGNA LEGAL SERVICES
22         SEVEN PENN CENTER
           1635 MARKET STREET, 8TH FLOOR
23         PHILADELPHIA, PA 19103
           (866) 624-6221
24
```



## A

**ability**
6:7 64:4
**able**
5:22 19:2 30:18
40:18 84:10,12
91:24 112:9
114:20 115:12
127:20 143:15
**absolutely**
66:24 151:18
**abstract**
125:9
**academia**
81:5 132:15
**academic**
33:17 46:16 48:17
51:9 63:11,12
116:23 151:16
**accent**
72:1 74:9,10 153:2
**accept**
109:6 142:1
**accepted**
103:24 129:3
**access**
5:15 24:2,2 36:23
41:1,3 74:23
102:19 151:14
**accommodation**
86:1
**Accommodations**
91:3
**accompaniment**
112:23
**account**
62:1
**accurate**
4:21 45:14 54:20
87:15 145:23
154:12
**accurately**
6:2,8
**achieve**

20:5
**acknowledge**
17:9
**acronyms**
111:7
**acting**
99:21 104:10
154:10
**activists**
20:17
**actual**
26:18 27:7
**ad**
32:1
**add**
31:10 151:5
**added**
100:23
**adding**
64:7
**addition**
12:11 27:9,20 96:16
120:24
**address**
17:4 18:9 31:24
49:5 74:13 79:23
**addressed**
73:20
**addresses**
84:7
**adequate**
64:24 75:5
**adjective**
65:2
**adjectives**
64:10,12,23
**adjunct**
36:15,19,19 37:2,5
37:8,12 72:20
**adjuncts**
34:5 36:21 72:19
**admin**
67:9
**administrative**

28:10 51:6,10,13,18
**administrators**
96:20
**admit**
64:4,10
**advance**
152:20
**advancement**
95:21 96:4
**advantage**
89:2
**advertising**
8:16,17 33:14 46:17
46:20 50:18 69:1,2
118:17,20 123:22
125:5,6 141:10
**advice**
10:16 13:3 60:14,15
93:2 141:20
**advise**
34:9,11 35:19 49:15
**advised**
88:6
**advising**
72:12
**advisor**
67:10,10 72:20,21
**advisory**
11:2,5 12:8 14:19
111:4,5
**advocacy**
152:9
**advocate**
9:2,20 18:18 55:8
56:9 58:4 60:10
74:16,21 76:15,20
77:5,16 110:20
111:10,19,23
112:17,17 113:5
**advocates**
75:8 76:5
**advocating**
56:19 58:21
**affairs**

34:15 151:16
**affect**
58:24,24 81:9
134:24
**affirms**
25:4
**Africa**
21:8
**African**
21:7 22:9 23:2 95:7
96:16
**African-American**
21:6 22:9,17 93:18
96:15,17,18
**agenda**
112:5,8,15
**agility**
105:20
**ago**
17:22 28:24 96:23
99:3 115:13 116:4
**agree**
95:11,14 96:3
100:18 105:19
**agreed**
9:22 56:6,12 100:24
147:22
**agreeing**
96:8 149:7
**ahead**
13:8 21:10 43:17
45:11 51:4 75:15
99:7 105:5 112:20
113:9 119:5
134:13
**aid**
107:8 145:14
**allows**
82:12
**America**
8:19 22:23
███████
15:13
**amount**



32:21
**analysis**
61:5 97:17 117:6
**analyze**
16:21
**analyzing**
115:3
**and/or**
54:19 87:6
**animosity**
84:1
**Anna**
2:8 6:12 30:23 41:9
53:4 84:10,11,11
102:18 106:18
114:22 149:22
150:5
**annoyed**
78:21
**annual**
10:5 32:23 34:6,7
**anonymous**
60:3 104:2
**answer**
5:9,22,23 21:12
25:20 30:20 50:8
50:12 54:20 62:16
64:3 102:16
114:20 119:13,16
124:18,24 146:14
**answered**
108:19 112:19
**answering**
96:9 134:2 143:19
**answers**
4:21 5:6 97:16
146:18 154:9,13
**anybody**
6:16,18 9:19 11:22
13:5 25:19 37:6
42:13 44:1 45:17
55:12 73:6 141:21
148:9
**anymore**

10:9 72:14
**anytime**
35:4
**anyway**
30:21 84:21
**apart**
13:17 19:10 117:11
**apologies**
124:19
**apologize**
19:17 69:23 117:8
118:11
**Apparently**
71:23
**appealing**
70:9
**appeals**
70:20
**appear**
146:19
**appearance**
60:7,16,20 150:23
**appears**
121:5,6,7,7
**application**
85:22 142:18 143:6
**applied**
39:8 47:15,20 48:4
48:10 49:23 50:17
51:21 60:8 68:5
70:11 142:12
**applies**
95:14 96:5
**apply**
29:8,9 35:5 89:12
127:3,24
**applying**
50:24 75:24
**appoint**
140:22
**appointed**
140:16
**appreciate**
107:17 135:12

150:4
**appreciated**
90:8
**approach**
79:19 101:5,12
**approached**
58:12
**approve**
115:7
**approved**
18:13,14 85:24
117:6
**approximate**
39:24
**approximately**
28:23 39:23 63:8
78:12 105:23
**April**
1:16 59:18 154:5
**area**
20:12,13 45:5 64:20
75:3
**areas**
20:15 26:4 58:20
**Argentinean**
131:14
**argument**
70:11
**arguments**
70:21 85:2
**article**
27:9
**aside**
82:13
**asked**
5:20 39:20 41:15
77:16,19 90:10
91:20 104:1
108:19 112:19
125:12,15 126:8,9
132:4 140:18,23
140:24 141:1
142:24 154:12
**asking**

18:16 43:24 63:21
80:6 89:15 96:24
102:15 103:9
108:15 134:8
**asks**
37:4 97:13 119:7
**aspect**
80:9
**assessment**
139:22,23
**assignment**
26:12 133:13
**assignments**
133:15
**assistant**
8:7 28:11
**associate**
8:15,18 11:12,14
34:15 35:21 36:13
37:21,21 60:18
62:7 71:12 77:15
89:7 95:7,9 100:7
111:6
**association**
72:11,13,24
**assume**
5:10 45:6 64:9
149:7
**Assumes**
75:14
**assuming**
23:11 35:17 43:20
44:1 63:13 121:16
**assumption**
48:18 54:21 70:10
77:21
**attendance**
107:23
**attended**
1:15 77:1 154:5
**attention**
76:7,12,24 77:7
78:3 99:12 100:4,4
100:5 117:23



attorney
5:16
audiences
20:16
August
109:9,15
author
102:13
authority
25:6
authorize
35:3
automatically
89:1
available
9:6,8 13:22 57:17
74:21
avoid
81:2 84:9
award
35:5
aware
82:3 83:20 112:24
awermuth@coze...
2:10
awhile
18:12 20:22
awkward
130:18
Azzaro
137:19,21
████████
15:14
A.D
154:6,19
a.m
1:16 78:13 124:21
154:5

——————————
**B**
——————————

**B**
3:7
bachelor's
7:5,17

back
7:7 24:21 29:7,18
31:10,11 37:16
41:13 49:7,11 54:5
55:21 63:22 66:23
68:10 77:6 85:15
89:15 107:18
123:7 126:23
129:19 137:10
139:5,17 148:14
151:18
background
98:7
backwards
92:15 130:2 135:5
bad
55:4 63:22 66:10
124:18 130:22
131:18 139:12
balance
36:1 46:19
ballot
24:6
ballots
64:6
barking
79:7
barriers
95:8
based
61:10 79:15 91:21
91:22 99:1 100:10
105:11 122:5
141:18 144:1
149:19
basically
24:17 62:11 77:3
78:14 80:1 126:8
127:21 137:3,12
143:1
**Bates**
41:9
becoming
149:15

began
127:13
beginning
40:8,20 79:3
behalf
2:6,11 4:3 56:11
71:12 76:16
102:21
believe
7:22 9:14,19 11:15
15:10 17:12,15
19:11 23:22 32:23
39:6 40:2 43:24
53:7 55:12 61:9,10
65:18 70:17 73:8
73:20 80:21 90:20
93:4 94:4 99:5
100:9 103:18
109:7 110:18
111:18,20 113:22
118:9 121:19
122:4,16,18
129:21 134:10
138:21 141:4,15
143:24 148:8
believed
73:2
belong
132:22
belonging
97:15 98:3
beneficial
135:2
benefit
151:3
best
35:19 63:24 64:3
80:8 82:10 84:18
99:15 124:2,17
129:16 130:19
133:11
better
63:24 64:1 99:2,24
100:2 129:13

153:1
beyond
16:4
bias
13:14 23:5 60:7,16
60:20 75:21 80:24
81:2,10,16,19,21
82:8,18,19 83:8,12
83:23 84:15,24
150:23
biases
70:18 82:11,12 84:7
big
11:1 40:21 124:7
bigger
93:16 105:13
biggest
40:5
████████
15:14
bit
22:11 31:1 49:15
85:14 92:14
**Black**
22:23,24 29:2 66:22
67:2,3 71:24 72:9
72:10,11 73:2 74:4
74:8 82:6 93:17
132:15 141:12
blanket
87:20
blanking
28:12
blindness
134:10
board
24:23 57:4
body
5:7 11:1,13
████████████
44:24 123:24
booklet
74:22
**Bootcamp**



118:8,23
**Booth**
28:20
**born**
7:10 21:6,8 22:18
22:19
**bottom**
52:21 65:3,3 95:20
**bounce**
24:21
**boxes**
116:4
**brad**
143:23
**brain**
22:7 82:5
**break**
41:12 48:23 49:12
85:8 134:1 138:11
144:16
**breath**
87:7
**brief**
37:15 63:1 139:16
145:22
**briefly**
23:8 78:13
**bring**
16:22 23:15 56:10
70:20 76:11 100:3
107:14 111:22
**bringing**
76:24 99:12 134:24
**broad**
56:13 58:20 61:14
**broader**
101:11
**broadly**
13:12
██████████
92:19
**brought**
61:6 76:7 77:7
87:20,20 100:19

111:21
**Brown**
72:5
**BUILD**
13:24 14:6,7
**building**
10:21 47:4
**built**
14:5
**bullet**
76:10 77:4 87:3,11
**bullshit**
73:5 79:5,11 80:9
80:13
**burdened**
132:18
**burned**
131:9
**business**
7:20,22

---

**C**

**C**
2:1
**calendar**
116:6
**call**
4:9 7:16 11:22 12:8
17:18,20 19:21
21:21 22:5 26:17
34:10 121:12
137:23
**called**
4:3,8 13:24 30:1,4
31:14 93:15 97:2
115:11 116:2
127:18 132:11
134:6 137:23
**calling**
22:1
**Calls**
82:21 85:2 105:4
134:12
██████████

55:15 58:8 150:22
**campus**
97:9,10 141:16
**Candace**
141:9 143:13,16
**Candace's**
141:21 143:6
**candidate**
24:8 39:15 42:3,5
46:9 65:17 104:16
105:9 141:9,10,23
142:1,5,6 143:16
146:5,17 148:15
**candidates**
46:4 142:4 143:5
**captured**
115:12
**career**
118:20 129:18
**careful**
36:5
**Caribbean**
21:1
**Carolina**
8:6
██████████
65:8,14 92:19 128:7
**Carolyn's**
93:5
**case**
10:6 22:24 23:13,16
24:3,4,13,17,20,22
25:2 26:7 27:2
29:17,18 31:6 38:6
44:13 45:15 46:23
55:13 56:12,19
58:5,6,6 59:3,23
60:6,7 61:16 70:2
70:8,9,19,20 73:3
77:11,14,19 79:24
80:1,7 81:17 87:16
89:3 92:24 93:4
94:14 99:10 100:8
101:1,2,7,10

111:24 125:14,14
125:15 131:3
141:6,21 144:1
145:8 146:11,15
146:16 147:4,5
148:4 149:17
151:15 152:24
154:16
**cases**
30:6 47:5 56:7,22
60:11 71:13 77:23
89:9 100:4 101:6
111:18 151:3,11
**casual**
87:7
**categories**
60:4 64:15
**category**
60:5 63:15,15 95:8
**catholic**
17:14
**cause**
84:20
**CEID**
16:18 17:6,18,19
19:14,18 20:2
38:17 94:22,23
111:14,17,20
112:3
**celebrate**
79:5
**CENTER**
154:22
**certain**
5:12,20 78:20
**certificate**
13:24 14:5 154:1
**Certified**
1:14
**chain**
51:9
**chair**
8:17 9:17 27:4
28:19 32:6,11,12



32:13,18 33:10,20
36:15 37:19 39:9
39:11,22 41:23
42:2,17,21,22 43:2
43:9,12,15,20,22
44:3,7,12,15 45:9
45:16 46:23 48:5
48:12 49:12,13
51:17 79:22 84:23
88:2,10,12 104:1,7
104:15,18,23
105:2 106:6
107:20 108:16
128:15,17,19
129:1,5,20,22,23
130:21 131:4
135:23 136:3,4,6
136:23 137:8,18
139:7 140:3,13,16
140:19,22 141:2,7
144:21,23 145:8
146:6

**chairs**
38:22 97:1

**chair's**
35:7

**challenge**
34:22

**challenges**
12:16 113:13

**change**
20:17 109:24
125:14 126:6

**changed**
9:5 17:16 30:2
62:12,19 65:16
126:4 129:3

**changes**
33:19 40:22 62:24
63:4

**channeled**
29:6

**charge**
33:18,22 34:2 60:18

67:9

**chat**
49:6

**chatting**
113:13

**check**
133:7

**checked**
149:18

**checking**
30:5 103:11

**Chicago**
2:4,9

**choice**
129:16 141:18,19
152:16

**choose**
5:19 36:21

**Christ**
111:4
██████
42:23,24 43:1,10
88:1,2,4 137:20
140:11,12,17
██████'s
89:17
█████████
68:18,20

**Cindy**
11:14 15:5

**circulated**
117:4,5

**city**
121:1

**Civil**
1:11

**claims**
84:13

**clarification**
56:24 59:3 93:2

**clarified**
135:3

**clarify**
5:9 49:14 55:4 71:9

98:12 102:18

**clarity**
134:23

**class**
9:10 20:23 23:7
27:24 28:1,3 35:1
61:17 65:21 71:24
72:9 87:5 91:4,5
143:22

**classes**
20:21 26:10 33:23
34:1 46:19,21
61:22 86:23 92:20
99:1 120:7 130:8
143:3

**classifications**
67:20

**classroom**
71:16

**cleaning**
116:14

**clear**
5:6 55:7 56:18 57:3
58:17 63:5 99:17
104:15 113:15

**clearly**
55:17 102:2 105:16

**click**
31:11

**climate**
12:24 13:7 97:9,10
97:19 99:2

**clock**
89:2 127:21,22

**close**
70:8

**closely**
33:16

**clunky**
31:5

**Code**
1:11

**coincidentally**
11:3

**collaboration**
33:20

**colleague**
10:3 44:24 78:11
83:16 88:2,9 93:3

**colleagues**
18:7 39:3 47:10
114:4 122:3 130:6
133:8,10 135:18
137:18 143:20
147:17 148:1

**collect**
16:21

**collected**
115:13 116:4

**collection**
26:18

**college**
7:3,8,12 8:12,13 9:7
9:13,18 13:2 15:3
16:24 17:2 18:18
19:1 23:21 31:21
32:3 34:21 38:10
38:15,17,18 47:7
66:22 67:2,4 77:17
84:19 95:17 96:14
96:24 97:12,17,20
98:21 99:23
101:12 102:2
111:11 114:9
122:6 139:22
140:14 141:16

**colleges**
10:13

**color**
55:13 56:4 58:23,24
62:2,3 73:24 74:23
80:17,23 81:6,9,14
97:17 98:15,16
100:20 118:19

**combines**
26:6

**come**
18:11 23:12,13



37:19,20 41:12
63:22 85:15 98:6
101:2 112:3 114:9
132:21 152:3
**comes**
19:18 23:2 34:22
35:1,9,9 36:13
133:5 152:21
**comfort**
61:22
**comfortable**
105:10 114:3
**coming**
59:18 71:9 120:21
**comment**
66:13 89:17 100:23
145:17
**comments**
56:8 61:16,17
149:23
**commitment**
36:10 76:1 97:4,14
98:10 119:1,11
**commitments**
95:6
**committee**
11:21,23 12:5 16:19
16:20 17:1,19
18:13,17,19,20
19:14,19 23:20,20
23:24 24:4,14,22
25:1,7 27:4,5
29:14 31:23 32:1,6
32:9 34:17,18
35:11,24 36:4,6,20
38:2,3,14,16,19,20
38:21 47:8 64:18
91:21 94:9,22 95:2
102:24 111:4,5
112:5,6,14 115:5
116:16 117:17,19
122:17 124:22
125:7,10,12,14,15
125:19 126:1,4,11

127:14 139:22,23
142:14
**committees**
16:6,17 32:2,4
34:14 36:5,10 38:9
38:20 46:3 102:22
125:24 126:13
139:21
**common**
81:18
**communication**
7:16,17,18 8:1
8:13,16 20:17
95:17 96:14 102:3
111:12
**communications**
47:13 53:13 97:20
116:1 138:20
**community**
8:2 31:23
**comparing**
65:12
**comparison**
133:12
**competency**
96:21
**competition**
37:24 38:5
**competitive**
126:8
**compile**
29:23
**complaint**
60:14 70:4,23 71:4
71:8,10 76:7,14
77:7,10 152:4,8
**complaints**
29:3 75:13 76:9
111:10,17,17
**complete**
4:21 151:12
**completed**
114:19 115:16
116:13,22

**completely**
6:2,7 111:6,8
**component**
31:17
**computer**
41:2 42:10 116:7
**concern**
57:2 98:3
**concerned**
50:12 62:1
**concerns**
58:5,12 69:6 75:4
148:13 150:23
**conclude**
99:2
**conclusion**
61:19 147:21
**condition**
90:8
**confidence**
134:19 135:23
**confidential**
3:19 50:2 149:24
**confirm**
67:7 147:22
**confirmation**
117:18
**conflict**
47:4,5
**confused**
115:20
**confusing**
79:14
**confusion**
19:18 127:15
**conscious**
84:17
**consider**
118:19 120:23
128:18 146:10
**consideration**
90:9
**considered**
13:22 64:16 88:8

104:15 127:8
143:6
**considering**
90:1 120:24
**consistent**
126:6,12
**consult**
112:9
**consulting**
37:6
**consuming**
31:12
**contact**
28:14
**contest**
136:1
**context**
21:21 22:7 28:3
53:12 93:24 125:4
146:6
**continue**
110:13
**contract**
69:4,6
**contributed**
27:5
**controlling**
124:19
**controversial**
151:16
**conversation**
6:12 41:22 42:5
54:18,22,23 55:1,9
55:9,18 56:3,16
57:15,20,24 61:10
63:2,7 70:14 71:14
71:15 77:12 78:21
80:6 89:17 132:8
**conversational**
30:24
**conversations**
58:1 63:9 85:19
87:7 99:19,20
113:1,15 130:24



132:16
**Cook**
154:18
**cool**
57:14
**cooperative**
30:17
**coordinate**
14:11 33:15,24
34:15 110:20
**coordinating**
111:3
**copy**
27:8 94:3,6 115:5
117:12,20 145:19
152:18
**correct**
4:14 5:16 6:23 20:3
26:22 30:10 38:24
42:19 51:10,18
54:7,16 58:8 69:20
71:7 92:22 94:13
95:1 96:15 126:19
136:24 137:4,8
147:23 149:24
150:24 151:1,4,5
152:4 154:11
**corrected**
153:1
**corrections**
152:23
**correctly**
35:13 77:11 100:18
116:24 122:5
**council**
9:13 10:8 11:2,5,6
11:11,12 12:1,7,8
12:10,10 14:20,20
15:11,12,12,23
16:1,3,20 18:9,14
18:15 38:11,19
75:1 94:21 101:20
102:18,21 110:24
**counsel**

5:18 154:16
**count**
83:13 89:6
**countries**
23:1,6
**country**
7:4 23:2
**County**
154:18
**couple**
13:10 21:17 140:14
150:9
**course**
26:11 27:22 32:22
33:1 34:24 150:1
**courses**
13:22,23 20:7,10
27:23 34:3,4,5
37:8,10 127:4
**court**
1:1,11 4:24 21:23
22:2 100:11
**cover**
34:6 52:7
**covering**
119:16,17
**covers**
46:20
**COZEN**
2:7
**co-authored**
27:10,10
**co-chair**
125:15 127:14
**co-chaired**
126:1
**create**
5:21 82:12 105:12
112:9
**created**
11:2 104:8 118:10
**creating**
105:14 125:24
**creation**

105:2
**credit**
31:18,20
**criteria**
36:7 55:6 60:21
61:7,12,13,14
62:12 63:24 68:6
70:11 80:14 82:17
84:15 99:17 104:3
104:15 105:16,17
136:12
**criterias**
104:3
**CSR**
2:12 154:4,20,21
**Culp**
130:14
**culture**
132:9
**current**
8:14 130:14
**currently**
28:19 104:11
**curriculum**
33:14,18 46:18
**cut**
100:11 115:22
127:18
**C.S.R**
1:24

————————————
**D**
————————————
**D**
3:1 14:6
137:18,21
**Daniel**
83:16,22
**data**
26:18 116:14
**date**
37:9 54:15,22,24
66:16 109:17,22
109:22 116:12

127:17 153:5
**dates**
29:19 55:5 109:3
113:12
**day**
78:14 84:16 86:24
87:10,23 154:19
**days**
122:20
**De**
1:10 3:3 4:2,8 30:18
55:22 114:24
150:8 151:22
152:12,13 154:3
154:13
**deadline**
122:17 127:19
**deal**
15:9 71:15 73:23
140:19
**dealt**
22:21 111:11,14
**dean**
9:21 24:19,19 28:18
31:24 34:8,15
35:21 36:13 37:21
37:21 39:20 55:11
60:9,10,14,18 61:3
71:12 88:11 89:5
89:11 97:1,1 99:21
100:6,7 104:4,11
104:12 117:11,13
117:16 125:11
126:10 140:16,20
141:19 142:4
144:22 149:18
**Deanna**
1:14,24 2:12 21:21
21:24 55:21 154:3
154:20
**debate**
57:5 127:15
**decide**
148:22



**decided**
56:17 73:9 109:6
125:24 142:6
**decides**
24:19
**deciding**
35:11
**decision**
24:16 25:5 83:9
85:1 148:6 149:3
**decisions**
40:22 63:4 111:20
149:5
**declined**
129:2
**dedicated**
99:21
**default**
103:23 104:17
**Defendant**
1:7 2:11
**defined**
105:17,17 112:12
**defines**
61:14 126:24
**definitely**
58:18 105:8 106:23
**degree**
7:15 35:2 46:20
**denied**
85:23 129:20
**deny**
98:9
**department**
19:22
**departments**
49:18
**DePaul**
1:6 4:13 6:18 8:5,8
9:2 10:22 11:15
16:22,24 17:12,12
19:9 46:13 47:16
57:3 74:22 81:4,6
84:2 95:15 120:23

120:24 129:12
132:9 144:3
**DePaul's**
5:18 96:5
**depending**
38:15
**deposed**
4:16 6:21
**deposition**
1:9 5:2 6:11 68:22
**depositions**
1:13
**derailed**
78:16,18
**descendants**
22:20
**descent**
21:7 22:9 95:7
**describe**
23:8 97:19
**described**
132:10
**description**
77:3 145:23
**deserve**
79:5
**desk**
86:22 87:9,17
**despite**
72:13 98:8 127:7
128:19
**detail**
12:17 46:9 102:6
**determine**
68:6
**determined**
142:3
**develop**
82:11
**development**
13:23 76:23
**diction**
71:24 72:9 74:5
**difference**

11:4,7 12:6 21:5
22:8 132:23
**differences**
21:15 132:12
**different**
10:12 12:16 14:2
19:24 23:21 27:18
34:13 35:12 48:11
50:24 61:6 65:13
65:14,24 66:4
67:23 70:12 81:18
105:16 119:8
132:20 135:1
137:20 145:2
**differentiate**
98:16 127:9
**differentiation**
15:17
**differently**
29:6 62:3 70:11
73:3 80:23 147:7
**difficult**
26:7 81:19 88:10
96:12 100:21
124:2 136:19
**difficulty**
96:8,9 124:19
**Dillard**
1:3 2:14 4:12,13
11:20 25:18 38:24
52:9,10,22 78:4
86:6,10 88:5
123:13 150:22
**Dillard_DePaul**
90:14,21 91:10 92:6
93:9,9 95:4 101:14
103:3 108:6 110:4
114:13,14 119:20
121:3,13 122:2
144:12,13 145:1
**diplomatic**
79:19
**direct**
7:18 49:13,16,19

51:1 78:3 88:11
111:17 117:23
119:15 126:10
**direction**
10:13
**directly**
18:10 23:12 34:8
35:21 36:2 37:21
70:7 94:17 102:19
117:18
**director**
8:18 33:16,17,24
46:12,16 47:7
49:19 50:18 91:6
111:2 128:17,19
130:14
**disability**
85:18,20,22
**disagree**
24:22 25:6 96:10
**disagreed**
63:4
**disagreeing**
133:18
**disappointed**
131:11
**discern**
102:14
**disciplined**
136:16
**discover**
47:21
**discovery**
1:9,13 52:9,10,23
78:4 86:10 123:13
**discrimination**
22:21 23:5 29:4
75:13,20 81:17
**discuss**
24:4 99:11 105:18
107:19 113:20
**discussed**
12:23 33:20 41:19
45:14,19 46:5 60:6



84:23 99:11 100:7
101:1 136:24
137:24 146:15
**discussing**
13:13 42:4 44:13,16
49:11 113:5
**discussion**
63:6 70:14 84:9,14
98:19,19 112:13
141:8 146:21,22
147:4,12 148:5
**discussions**
14:3 62:22 151:13
**dislike**
83:21,22
**DISPARTI**
2:2
**disqualify**
143:24
**dissertate**
21:13
**distance**
11:9
**distinction**
113:15
**distributed**
33:1,3 118:12
**DISTRICT**
1:1,1
**diversity**
9:1,9,13,20 10:7,8
11:5,11,12,13,15
12:1,7,8,10,22
13:24 14:4 16:19
16:22,23 18:9,17
19:24 38:18,19
55:7,18 56:9 58:4
60:10 62:8 73:24
74:16,21 75:1,8
76:1,5,20 77:5,16
94:22 96:20 97:5
97:14 98:22,24
99:22 101:12
110:17,20,22,23

110:24 111:5,9,19
112:16 113:1,5
118:7 119:11
133:1
**Diversity-focused**
118:22
**DIVISION**
1:2
**dizzy**
87:7
**document**
5:12,13 71:1 90:18
90:23 91:14 95:3
101:19 102:5,9,14
102:20 103:19
108:12,14 110:11
110:12 114:18
115:11,15,17
120:2,4,16,18
145:19
**documentation**
25:24 60:5
**documents**
24:14 27:2 29:11
102:18 116:10
**dog**
79:7
**dogs**
133:24
**doing**
5:8 19:14 46:23,24
64:7 74:11 94:9,12
100:2 116:14
120:7
**domestic**
97:20
**Dominican**
7:4,9,10,13 21:1
**Don**
130:5,6,18
**double**
103:11 133:7
149:18
**doubt**

148:24 152:24
**dozen**
148:1
**DPUBLIC**
93:13,14,16 94:10
**Dr**
4:8 10:24 11:20
25:18 30:17 42:23
55:22 150:8
151:22 152:12
**draft**
115:5 117:2
**drafted**
117:3
**draw**
100:5
**Drive**
2:3,8
**due**
95:6
**duly**
4:4 154:7
████████
122:15
**duties**
33:11

_____
**E**
_____
**E**
2:1,1 3:1,7
**earlier**
91:18
**early**
29:20
**earn**
7:15
**easier**
22:5
**easily**
10:22 112:10
**EASTERN**
1:2
**economic**
7:20 23:7

**edit**
115:8
**Edrington**
142:8
**educating**
98:21
**education**
17:10 19:15 74:23
**effect**
44:19,21 135:17
**effects**
6:7 80:22
**effort**
83:23 139:4
**efforts**
17:8 80:4
**either**
111:23 126:8 138:9
143:5,15
**elect**
129:9
**elected**
38:13,17 129:5
140:11,12
**election**
105:24
**elects**
38:16
**else's**
145:10
**email**
18:16 37:22 38:8,10
43:23 47:12 48:23
49:3,4 53:7 65:7
77:20 88:16,22,23
89:12 91:17
108:15 109:22
116:4 120:19
121:6,8 122:3,7,14
123:2 126:10
138:13 145:2,3,6
**emailed**
94:5 117:4
**emails**



106:23 109:10
120:6
**embarrassed**
18:6
**emotional**
131:10
**emotionally**
132:18
**emphasis**
8:2
**employee**
12:21 93:15
**employer**
50:13
**employment**
111:20
**encouraged**
128:18
**encouraging**
120:23
**ended**
92:1 124:6 133:18
148:4
**enemies**
148:11
**enemy**
148:17
**engagement**
8:19 39:19
**English**
139:3
**enjoying**
8:21
**ensuring**
133:13
**entail**
9:4 46:15
**entered**
74:18
**entire**
121:17
**equity**
16:19,23 18:9 76:2
94:22 97:6 98:24

110:17 113:1
**equivalent**
32:22
**equivalents**
32:24 33:5
**ERGs**
93:15
**errors**
92:21
**ESI**
102:2 115:13,13
116:3
**especially**
21:20 33:14 62:2
80:23 98:5,23
99:14 151:15
**essay**
26:6 93:6
**Estaban**
10:24
**established**
119:15
**estimate**
36:9
**ethics**
20:18
**ethnicity**
20:24 29:1 72:6
82:17 98:7 100:21
141:11 148:7
**Eva**
44:23 123:24 124:2
124:5 136:7,18
**evaluate**
24:15 36:22 60:22
64:20 75:23 80:12
81:1 104:2,16
147:7
**evaluated**
36:19 62:3 65:16
104:4 133:12,14
**evaluates**
82:15 97:3
**evaluating**

9:19 30:5 104:7
116:15
**evaluation**
10:5 24:1,2,12,15
26:11,15,16 34:7
55:6 59:24 60:8
61:10 65:15 66:2
66:13 83:5,7 84:15
97:8 98:2 105:12
136:12 150:16
**evaluations**
26:24 27:1,19,21,21
34:6 36:24 46:22
61:23 65:12 81:3
96:19,22 100:9,22
132:14 150:11,19
**evaluator**
92:19
**evaluators**
65:17,19
**event**
14:22 31:23
**eventually**
129:13 136:18
**everybody**
6:5 13:21 85:10
94:14,17 126:9
137:2
**everybody's**
19:3
**evidence**
32:4
**exact**
31:19 32:21 44:22
60:9 149:19
**exactly**
51:6 88:11 116:24
118:11 123:12
146:9 148:12
**exam**
27:23
**Examination**
3:4,5,6 4:6 150:6
152:1

**examined**
4:4 154:8
**example**
10:2 12:19 23:6
28:9 34:14 38:16
60:23 61:22 62:23
74:9 82:3,14 83:23
105:20 126:11
127:7 131:3
**examples**
60:12,24
**excellent**
64:1,12,15 67:19,24
**exception**
35:1 101:6
**exceptions**
35:3
**exchange**
90:24 92:16,18
120:19 121:23
122:1,14 123:20
124:4 128:6 130:4
130:17
**exchanges**
53:8 91:18 92:15
**exclusive**
17:11 76:5 81:5
**exhibit**
3:8,9,9,10,10,11,11
3:12,12,13,13,14
3:14,15,15,16,16
3:17 51:24 52:1,6
52:7,16 86:4,7,11
88:15,18 89:14,16
90:13,15 91:8,11
92:5,7,11 93:7,10
101:13,16 103:3,4
108:6,7 109:11
110:2,5 114:12,15
115:17,24 118:1
119:19,21 120:11
120:13 121:2,5,7,9
121:12,13 122:8
122:10 123:7



MAGNA
LEGAL SERVICES

138:4,6 144:8,24
**exhibits**
48:21
**exist**
10:9 104:21
**existed**
10:9 20:1
**existence**
104:22
**expand**
25:11 58:22 67:1
68:12 70:23 79:9
87:10,12 113:22
133:3
**expect**
4:20 147:2
**expectation**
57:3 108:1 127:2
144:6 147:18
**experience**
17:11 21:20 23:4
30:12 40:16 46:2
47:2 48:4,8,12
51:7,18 66:23
72:15 73:2 96:11
97:12 125:20
126:4
**experiences**
60:2 132:23
**expert**
89:18
**expertise**
88:7 90:6,7,11
**explain**
48:16 81:20 97:5
128:13
**explained**
81:11 90:3 147:12
151:16
**explaining**
31:2
**explicit**
119:12
**explicitly**

119:13
**express**
125:9 147:18
**expressing**
148:13
**extension**
89:1 149:10
**extra**
89:4,6 139:4
**extrapolate**
97:16
**E-D-R-I-N-G-T-...**
142:10

———————————
**F**
**face**
57:17 81:6 87:18
95:8
**facing**
113:6
**fact**
41:24 55:16 60:21
61:4 62:1 72:13
74:8,9 78:19 79:13
81:1 83:20 92:3
98:4,8 99:10,20
100:9 105:12
127:7 129:5
130:24 131:24
133:16 135:22
**factor**
83:8,12 134:10
148:19
**facts**
75:14
**factual**
92:21
**faculty**
9:7,11,20 12:13,22
13:7,12,20,21,22
14:1 15:2,3,8,13
16:1,2,20 18:9,14
18:14 23:11,24
24:16 25:13,23

26:8,9 34:6,7,12
34:15,21,22 35:5
35:19 36:5,16,19
36:20,24 37:1,6,8
37:12,19,22,23
38:11,19 39:15,16
40:5,18,19 43:24
46:22 47:5 49:16
55:13 56:4,10,21
58:23,24 59:4
60:18 62:2 63:3
64:14,20,21 67:5,5
67:6 68:16 69:1,2
72:12 73:2,9 74:23
76:4,12,22 80:17
80:18,22,22 81:6,9
81:14 82:20 84:11
93:17 94:21 95:7
96:20 97:13,17,19
98:11,13,15,16,23
99:14 101:8
102:18,21 104:1,5
105:15,18 106:1,6
111:21 112:3,9
120:22 122:6
123:21,23 124:1
126:15 127:6,9,10
130:10,11,15
131:1,2,4 135:2
138:19 139:7
140:22,24 141:6
141:16 142:6,20
142:21 146:16
151:10
**faint**
87:8
**fair**
22:10 45:8,13 60:16
64:12
**fall**
29:9,11
**familiar**
143:22
**family**

39:19
**far**
43:6 97:6 102:14
**Father**
10:17,20 17:7 19:7
19:20,21
**feared**
101:5
**February**
109:14
**feedback**
26:10 27:24 28:5
93:4 104:2,13
111:23 132:2
140:22 144:2,21
**feel**
36:6,12 66:10 75:10
89:3 90:4,10
132:21 143:4
148:10
**feeling**
61:16 113:20 114:3
131:9,17,23
132:18 148:15
**feels**
80:13
**fell**
127:17
**fellow**
131:14
**felt**
56:19,20,23 75:9
87:7,10 128:21
129:6,8,14 131:11
131:17 132:4,24
136:1 143:20
**female**
21:3
**fifth**
127:24
**file**
151:11,12
**files**
31:8 78:20 117:1



**filled**
27:21
**final**
65:9 66:2 152:15,21
**finalists**
141:15 142:19
**finalize**
124:7
**find**
41:2,3 72:8 83:4
86:7 116:24
**fine**
49:1 128:12
**finish**
50:6 66:19 107:2
115:23 123:17
128:3 130:3 134:2
**finished**
54:2 57:11,12 59:12
59:13 67:15 71:20
71:21 78:24 79:1
86:17 90:22 91:15
96:1,2 115:3
124:13 144:15
**finishing**
69:18
**fires**
35:8
**firm**
6:16
**first**
12:9 15:7,14 18:7
23:19 26:23 31:9
34:22 35:1,9 39:11
53:12 55:9,17
60:13 99:9 109:4
109:20 121:15
124:23 125:2
127:19 129:1
141:18,18 145:16
146:15 147:9,10
149:10 154:7
**fit**
35:12 38:14 132:4,5

**five**
8:23 14:23 23:12,16
23:17 24:4 28:7
47:16 48:22 76:10
77:4 85:10 107:9
127:23 134:1
138:12
**five-point**
76:17 150:13
**FLOOR**
154:22
**flopped**
143:17
**Florida**
7:6 50:19
**Floyd**
120:20
**fluid**
98:14
**focus**
12:21 118:7
**focused**
77:22 78:19
**focuses**
13:24
**focusing**
101:7,8
**folder**
31:9,10
**follow**
141:5
**followed**
77:9,19 106:7 141:6
**follows**
4:5
**follow-up**
77:8,22
**foregoing**
154:2,11
**forget**
80:5
**forgetting**
18:7 27:11
**form**

21:9 30:15,22 35:14
43:17 51:2 57:22
70:24 72:10 73:18
74:6 75:14 98:6
100:8 101:22
**formal**
60:14 82:20 83:7
96:22 124:4
**formally**
36:23
**former**
26:17 27:14 28:14
44:24 55:10 68:16
110:19 130:10
**forward**
16:22 70:16
**forwarded**
123:1
**found**
9:22 31:5 82:19
83:5 89:23
**foundation**
21:9 30:22 43:4
45:3,22 57:22
62:20 66:15 73:18
74:6 81:12 82:24
83:20 85:3 93:21
96:6 97:21 99:7
101:23 102:13
105:4 113:24
119:5 123:3
134:12 148:20
**foundational**
55:24
**four**
28:24 77:4
**fourth**
23:18 24:10,10 60:1
64:22 65:1 94:19
**free**
54:11
**frequent**
130:23
**frequently**

36:2,22 37:1 130:18
**friends**
39:3 47:10 113:14
**friendship**
58:3
**front**
65:7 140:23
**frustrated**
133:16
**frustration**
79:15 130:24
131:16 134:21
**frustrations**
131:24
**full**
95:9 129:13 151:3
151:19
**full-time**
34:7 122:6
**fun**
113:14 136:4
**funded**
118:12 124:8
**funny**
124:15
**further**
3:6 92:14 136:14
151:21 152:1,10

---

**G**

**gay**
98:14
**gears**
85:14,16
**gender**
23:7 82:16 98:14
**general**
56:9,11,13 61:2
87:4 143:14
**generalities**
7:1
**generally**
42:8
**generated**



104:18
**George**
120:20
**gestures**
5:7
**getting**
93:5 115:20 128:18
139:2 148:14
**Ghanem**
122:23 140:20
**Gia**
16:9 21:24 22:5
41:4 53:1 64:3
92:7 107:3 115:10
118:21 152:12
153:4
**Gianna**
2:3 4:12 22:1
**gia@dispartilaw....**
2:5
**gist**
50:21
**give**
4:19,20 5:5,14 6:14
19:4 43:20 51:17
61:1 75:12 116:12
116:12 117:12
123:12 135:7
139:13 145:5
**given**
24:8 40:9 59:23
151:14
**giving**
5:6 92:20
**gladly**
107:12
**glass**
87:18
**glitch**
147:21 148:24
**Global**
8:19
**gloss**
52:15

**go**
4:18 7:3 12:4,9 13:3
13:8 20:2 21:9
25:7 29:18,24
31:10 37:13 43:17
45:11 47:1 48:20
49:7,11 51:3,24
53:10,11,15 59:6
60:9 66:6,18 67:11
68:15 69:12 71:17
74:24 75:15 76:14
86:4 88:15 89:6,14
90:13 92:5,14 93:3
93:7,7 99:7 103:2
104:4 105:5
107:11,18 108:5
110:2 112:20
113:6,9 114:12
116:18 119:5,19
120:11 121:2,18
121:19 122:8
123:7,11 128:2
129:11 130:1,2
131:5 134:7,13
135:4,4 136:14,18
138:13 139:14
144:22,24 152:12
**God**
38:1 87:17 116:11
122:19
**goes**
23:9,23 25:24 34:8
78:10 90:20
121:12
**going**
4:18,20 5:10 6:20
10:4,19 14:19 19:2
22:13 25:14 28:10
30:21 31:17 36:2
47:18 48:21 49:2
50:6,7 51:2,3,23
52:8,8 53:10,11
56:22 57:7 58:13
59:1,1 60:9,13

61:23 65:17 66:15
66:18 67:11 68:15
69:15 70:16,19
71:23 77:6,8,18
78:3,23 80:12
82:20 84:20,21
85:14,16 86:9
88:16 89:15 91:8
92:23 101:13
104:14,18 114:8
117:23 121:18
125:5,22 129:9,12
130:2 131:11
132:5 138:4,12
146:14 147:1,2
149:18 150:4
151:15,18

▮▮▮▮
122:16
▮▮▮▮▮
15:15
**good**
4:11 10:20 29:23
34:17,18 38:14
40:17 46:18 63:24
64:1,12,13,16,21
67:19,23,23 78:13
80:3 84:12 85:7,10
132:2 144:2
**Google**
10:22
**gossipy**
113:14
**Gotta**
124:22
**gotten**
128:21
**govern**
16:1
**grad**
23:12 33:18 72:16
91:6
**graduate**
7:12 15:18 20:19,21

20:23 28:13 33:15
33:16,17,23,24
46:12 47:3,7 49:19
91:4,5 128:16,18
130:15
**graduated**
7:22 8:3
**graduation**
127:17
**grant**
35:5 118:12 123:23
124:5,7
**granted**
122:20
**gray**
54:9
**great**
5:5 65:5 78:15
100:1 124:23
130:23 143:19
153:7
**greater**
95:8
**green**
54:6
**group**
2:2 10:11 12:14,20
12:23 13:6 14:8
15:1 17:3,4,6
19:19,19,23 36:21
84:16 93:16
147:14 151:10
**groups**
12:13,15,19 14:3,24
93:15
**guarantee**
146:23
**guess**
11:8,9 25:20 30:13
50:21 90:2 110:14
112:10 125:9
130:18 146:10
148:16
**guidance**



73:22
**guidelines**
55:16 56:20 58:11
62:24 63:5 64:8
**guilty**
5:7 129:7 131:17
**guy**
82:7
**guys**
14:24 47:12 65:12
101:24 113:20
137:2,7,11 139:6,6

---

**H**

**H**
3:7
**habits**
106:8
■
28:20
**half**
7:21,21 39:23
142:22 145:16
**Halfway**
79:3
■
62:7 72:18,18 77:14
78:1,2
**hand**
105:13
**handbook**
25:13 64:14
**handle**
76:6
**handled**
37:19
**handles**
89:9
**handwriting**
145:9,11
**handwritten**
40:14
**handy**
106:17

**Hang**
51:2 53:19 102:12
**happen**
29:10,21 35:20
106:4,17 115:4
120:8 140:9
**happened**
24:21 25:21 44:2
46:3 48:14 87:21
106:2 136:17
142:3
**happening**
54:23
**happens**
24:9 36:2 41:17
**happiness**
131:20
**happy**
47:1 128:16
**hard**
65:6
**hash**
5:24
**head**
110:24 115:1
122:16
**heading**
118:13
**hear**
16:9,10,10 29:16,17
29:21 42:11 114:7
114:8
**heard**
11:8 79:4,10 98:3
**heart**
99:16
**held**
137:19
**help**
9:8 72:1,17 74:5
79:21 93:5
**helped**
59:4
**helpful**

53:21 75:6 135:9
**helping**
31:24 124:7
**helps**
14:10 123:15
**hereinabove**
154:14
**heritage**
17:11 22:18
**hey**
36:3 54:11
**Hi**
150:8
**hidden**
56:15
**high**
57:3,4 61:15 118:16
**higher**
51:9,13 74:23 95:6
**hire**
37:5 141:17
**hired**
23:11 127:2
**hiring**
34:4
**history**
120:24
**hitting**
132:24
**hoc**
32:1
**Hoecker**
120:21 125:16
**hold**
21:23 100:11
115:18,19,21
**Holtschneider**
10:17,20
**home**
7:4
**homework**
80:5
**honest**
46:24

**honestly**
13:10 35:8 41:22
85:23 99:9 102:7
109:9 129:7,14
131:8 134:2,19,23
138:19 147:5,12
148:17
**hoops**
131:12
**hope**
9:18 131:20
**horrible**
135:18
**hostility**
23:5
**hot**
50:22
**hour**
24:5 39:23,23
142:22
**hours**
36:11
**HR**
76:14
**human**
83:12
**humor**
124:18
**humorous**
134:20
**H-A-M-M-E-R**
78:2

---

**I**

**idea**
10:15 28:16 79:23
105:11 112:23
124:22 141:19
**ideally**
10:5 17:9
**identification**
52:2 86:12 88:19
90:16 91:12 92:12
93:11 101:17



103:5 108:8 110:6
114:16 119:22
120:14 122:11
138:7
**identify**
20:24 21:1 58:23
75:19 93:17 98:7
**identities**
56:15
**identity**
74:14
**ignorance**
132:12 133:3,4,20
133:23
**IL**
2:4,9
**ill**
87:13 136:10
**Illinois**
1:1,12,15 154:18
**immerse**
40:20
**immigrant**
22:8,24 23:2
**implicit**
75:21
**implicitly**
119:2,16
**important**
21:19 78:22 104:14
105:12 121:15
152:13
**impossible**
42:1
**impression**
61:2 129:9
**improve**
79:16,24 132:1
**improved**
132:3
**inappropriate**
124:17
**inaudible**
16:7 100:10

**included**
27:11 114:4 137:10
**includes**
27:3 64:19 98:13
**including**
59:5 79:22 80:24
84:8 98:23 104:13
**inclusion**
9:9 13:13 14:1,4
16:19,22,23 18:10
76:2 94:22 97:6,15
98:22,24 99:22
101:12 113:2
119:11 133:1
**incomplete**
121:6,10
**incorporate**
120:6
**incorporated**
119:13
**incorporating**
119:9
**incorrectly**
133:13
**increase**
16:23 118:18
**indicate**
121:17
**indicating**
124:14
**indirect**
97:8
**individual**
84:17
**individuals**
18:23 42:9
**industry**
47:3 120:5
**ineffectual**
61:19,24
**influenced**
84:1 85:1 105:8,9
131:18
**influencing**

81:2
**Informally**
36:23
**information**
3:19 13:3 16:21,21
50:2 76:1 81:24
91:22,23 122:21
135:24
**informed**
91:4
**Ingle**
130:6
**initial**
55:8 72:22 98:2
**initially**
85:23
**initiatives**
8:18 12:18 16:23
**innovation**
33:19 123:22 124:5
**inquiry**
70:4 71:5,8
**insecure**
143:18
**insofar**
35:14 71:1
**instances**
136:20
**institute**
144:3,4
**institution**
81:7 140:17 144:5
**Institutional**
110:17 117:9
**instructions**
4:19
**instructor**
127:12,19 143:2
**intent**
133:21
**intentionally**
18:10 88:14
**interaction**
83:13

**interactions**
9:10 10:3,3
**interest**
16:2,4 99:15 128:15
133:11
**interested**
39:10 43:1 44:1
94:10 125:10
128:20 130:21
143:3 154:15
**interesting**
8:24
**interim**
99:21,21 104:12
**intermediary**
47:6
**internally**
35:6
**international**
98:17
**interpersonal**
138:20
**interpose**
30:18
**interpretation**
56:21 57:6
**interpreted**
88:13
**interrogatories**
154:8
**interrupt**
30:19
**interrupted**
22:3 31:3
**interrupting**
107:3
**interview**
29:14
**interviews**
25:1
**intuitive**
31:12
**investment**
98:20



**invisible**
98:5
**invitation**
36:12 92:24
**invite**
141:15
**invited**
14:2,3 36:4 125:9
**involved**
19:8 102:23 124:6
**in-house**
34:5
**IRMA**
117:7,8
**irrational**
84:1
**isolated**
113:20
**issue**
10:6 31:24 149:22
**issues**
12:23 15:10 22:21
30:13 55:24
111:18,20 113:6
120:23,24 133:1
**items**
112:5

**J**

**Jane**
34:18
**January**
7:22 116:11,13,20
117:3 153:6
**Jason**
43:22 73:9,21
**Jesus**
111:4
**Jim**
130:9,9,10,22,23
**job**
9:4,5 19:22 23:14
33:10 34:11 48:19
129:10 143:19,21

**jobs**
48:18 50:14,17
75:24 149:23
**Joe**
84:12
**jog**
5:13
■
15:7,15 18:6
**join**
36:6 151:7
**joined**
8:8 125:18 131:14
151:17
**journalism**
7:21 43:22,24 71:23
72:10,11,12,13,15
**journalist**
72:14
■
118:10 123:21
124:4,7 125:16,17
125:21 126:1,14
126:17 127:12
131:13,21
**judge**
96:12
**judgments**
97:18
**July**
124:21
**jumping**
131:12
**June**
17:23 29:18,21
32:14 63:11 109:8
116:23
**junior**
34:12 35:19
**justice**
119:2,11
**justify**
119:16

**K**

**K**
78:8,10
**keep**
56:15 107:8 152:18
■
42:23,24 43:1,10
44:3 46:23 78:8,10
78:11,16 88:1,2,4
89:17,22,23 90:2,3
90:8 100:19 129:8
137:20 140:11,12
140:17,23 141:1,4
■
138:17 139:20
146:7 148:7,8
149:13
**Kendra's**
147:4,5
**kept**
112:7 128:17
132:24
**Kessler**
78:11,16 100:19
**kin**
154:16
**kind**
13:1,13 14:17 16:4
17:8 20:14 26:4,6
30:23 31:14,19
34:9,11,18 36:1,7
40:15,20,21 42:6,7
47:21 56:13 59:22
60:13 70:20 71:15
72:23 75:8 76:2,10
76:13,22 79:20,23
79:24 81:23 82:1
84:9 92:24 106:6,8
110:24 111:10,23
112:22,24 113:16
115:7 127:18
128:22 129:8
131:19 136:1
140:19 144:20

145:7,21
**kinds**
148:13
**KK**
78:15,16
**knee**
77:18
**knew**
70:12 76:13 87:13
87:18 104:3
140:20 151:15
■
138:23
**know**
5:11,14 8:20 9:8
10:22 11:19,21
12:18,19 14:15,18
16:3,4,5 17:9,10
19:9,17 20:12 22:7
24:21 25:18,19
28:4,8,17,17,18,23
29:1,3,5 30:17
31:24,24 32:21
34:17,18,23 35:21
38:1,6,24 39:2,4,8
39:10,12 41:9
42:24,24 43:6,8,14
43:19,24 44:2 45:1
45:5,15,21,24 50:1
50:13,13,20,20,23
54:1 56:10 57:10
59:11 61:12,15,21
62:10,19 63:10
64:6,9,13,20 65:20
66:12,19 67:14
68:7,16,18 70:2,9
71:12,15,19 73:1,9
73:10,17,24 74:3
74:23 77:22 78:10
78:18,24 79:12,17
80:4,11,13 81:17
84:2,10 85:23 86:5
86:16 87:15,19,23
88:21 89:24 90:2



91:1,14 92:1 94:5
95:19,24 96:19,22
96:23 97:7 98:1,21
99:13,15 100:17
100:19,24 102:5,9
104:5,8,10,12,17
104:19,20 105:1,7
105:22 106:3,5
107:6,13,20 109:9
109:10,19 112:2,3
112:11 113:14,17
114:3 115:1,8
117:2,4,8 118:11
118:12,13,14
119:14 120:1,4,20
121:7,8 123:1,5,16
124:3,12,20
125:13,17,23
126:10 127:12
128:3 130:3
131:18,21 132:3
132:13,19,22,22
133:10,19 134:16
134:22 135:1
136:2,16,21
137:14,21 138:9
140:2,10,18
141:17,21 142:14
142:15,16 143:2
144:15 145:15,16
146:1,24 147:16
147:20,21,23,24
147:24 149:6
152:13,17 153:3
**knowing**
134:15
**knowledge**
73:23 75:9

138:24

———————————
**L**
**L**
1:14,24 2:12 154:3

154:20
**lack**
73:23 98:4 134:23
**laid**
55:17
**languish**
95:7
**largest**
17:14,15,16
**LAS**
15:6,15
**latest**
116:21
**Latin**
8:19
**Latina**
21:2 22:24
**Latino**
20:16 72:12
**laugh**
124:17
**law**
2:2 20:18
**Lawrence**
62:7 72:17,18 77:14
77:20
**Lawrence's**
77:24
**lay**
83:1
**lead**
100:22 110:22
123:22
**leadership**
34:20 76:12,16 77:1
77:8
**leaderships**
97:14
**leading**
45:11 51:19 68:1
113:1
**learn**
14:4 118:17
**learned**

13:2 76:9
**learning**
94:11,11 105:20
119:10,12,14
**lease**
148:5
**leave**
9:15 41:15 88:24,24
126:21 136:8,9
137:6
**lectures**
14:2
**led**
19:20 61:18 99:11
105:2 112:6 141:7
**left**
28:23 77:21 126:18
126:22 140:17
**LEGAL**
1:21 154:21
**lesbian**
98:14
**letter**
32:5 61:2 65:9 66:2
66:2,3,14 70:15
79:24 86:2,5,14,19
86:21 88:5,7 89:16
89:24 90:4,10,11
93:24 149:21
**letters**
27:3,9,10 35:4 60:3
139:3
**let's**
7:7 21:5 32:17 33:2
48:4 49:11 69:12
71:17 89:14 90:13
92:5 93:7 107:17
108:5 110:2
114:12 119:19
120:11 121:2
122:8 123:11
124:9 130:1 135:4
144:7,7,24
**level**

15:18,19 16:2,6
25:1 31:14 32:2
33:15,23 34:14
38:10,10,21 47:7
61:21 75:9 89:10
91:20 95:12,13
96:24 97:6 115:4
116:16,17 121:1
139:23
**Lexa**
59:19 60:17,18
70:17 73:8,17
77:13 100:7
104:11 108:15
122:22 123:1
141:4
**Liberal**
101:20
**library**
19:10 38:3
**LICENSE**
2:13
**light**
80:8
**likelihood**
108:3
**limitation**
47:21
**limited**
95:21 96:4
**line**
22:14
**lips**
16:10

55:15 56:5,7,14
57:16,20 58:1,5,8
58:8 59:2,22 65:7
70:3,22 77:6,9,16
99:10 101:10
123:24,24 150:21
151:7 152:3
's
60:6 61:16 77:14

100:4,8 101:1
151:15
**list**
20:11 21:17 28:14
33:12 76:10,18,19
**listed**
136:20 145:24
**listen**
62:9 106:14
**listened**
13:1
**listener**
40:17
**listening**
145:14
**litigation**
50:9
**little**
9:12 11:9 22:11
23:14 31:1,12
40:19 41:22 49:15
59:2 85:14 88:10
92:14 100:2 125:8
127:15 129:7
131:13 134:5
140:23 143:18,22
**live**
26:10
**lived**
21:19 23:3 96:10
97:11
**lives**
22:23
**living**
66:22

10:13 11:13 13:15
14:16 15:5 59:18
60:12 74:20
**local**
34:14
**logged**
148:3
**LOL**

**78:7**
**long**
33:12 37:2,3 39:21
83:17
**longer**
8:23 14:11
**look**
5:12 12:16 26:11,21
26:23 27:1 35:24
40:23 53:24 77:18
92:21 101:6 116:6
116:12 120:8
121:22,23 132:13
133:14,17 134:22
152:19
**looked**
105:15 153:6
**looking**
30:6 50:14,22 61:21
87:5 92:8 109:21
116:14,15 117:1
143:12 149:24
**looks**
25:2 109:13 148:15
**loosely**
112:12
**losing**
104:22 105:1
**lost**
72:1 107:14
**lot**
8:20 21:14 35:4
38:5 42:17 57:5
74:24 78:19 79:5
79:10,18,20 80:5,6
80:6 81:24 99:13
111:7 123:15
125:20 131:8,10
131:12 132:7
141:7,22
**love**
71:23

89:7 117:7

## M

**MAGNA**
1:21 154:21
**main**
9:6 57:1 127:10
131:24
**majority**
23:1,3 39:16
**makeup**
40:1
**making**
13:14 24:6,16 26:7
40:21 46:18,20
63:4 64:23 83:9
133:11 145:19
152:4
**man**
69:11 72:7 82:7
**manage**
36:15
**managing**
37:11
**mandate**
16:20
**mandates**
147:17
**mandatory**
13:14
**March**
54:16 59:14
**Maria**
1:10 3:3 4:2,9,10,11
21:10 27:4 28:4
35:23 52:20 53:24
64:21 83:2 100:11
101:6 107:3,5
126:11 146:24
147:3 154:3,13
**mark**
138:4
**marked**
22:18 51:23 52:1,9
86:11 88:18 90:15
91:9,11 92:11

93:10 101:16
103:4 108:7 110:5
114:15 119:21
120:13 122:10
138:7
**MARKET**
154:22
**marking**
52:22 149:23
**marks**
57:4
**Martin**
43:22
**mass**
7:16,17 8:1
**masters**
7:5
**master's**
7:19,20 46:16 72:16
140:16
**material**
26:11 27:3
**materials**
29:24 142:19,21
**maternity**
136:8,9
**Matt**
38:4 78:21
**matters**
29:5
**May-something**
29:15
**mean**
5:21 6:20 25:11
27:7 30:19 31:3
34:10 36:18 37:11
41:20 57:1 58:3
63:20 67:1 68:4,12
81:4 82:18 83:4
90:24 112:17
119:4 121:15
128:14,23 133:3
135:4,21 139:7

141:24
**meaning**
15:2 22:20 27:4
33:16 37:24 39:18
61:14 67:5,6 71:11
82:10 89:3 125:9
146:24
**means**
11:9 18:18 34:3
117:8 127:2,4,21
141:15 142:4,20
**meant**
9:8 58:22 69:22
70:23 71:10 79:9
113:22 124:21
143:20
**mechanism**
76:14
**medical**
90:7,11
**medication**
6:6
**meet**
12:2,10 14:20,21
18:20,21 24:13
79:16,20
**meeting**
39:17,18,21 40:8
41:16 46:8 59:17
59:19 60:17 62:5
62:13,23 63:2
72:22,23 74:19
78:15 100:8
105:15,22 106:4,6
106:12,15,19,20
106:21 107:12,19
107:21 108:2
112:14 113:4
136:23 137:3,6,10
137:18 144:19
**meetings**
12:12 13:1 14:8,22
59:21 86:23 87:9
106:1 107:24

113:11,19 138:2
**member**
14:10 15:8,13 23:11
35:19,23 37:8 47:5
59:5 68:16 69:1,2
74:2 82:20 84:11
111:21 112:3,11
123:21 126:15
127:6,9 130:7,10
130:11 131:4
138:19
**members**
9:11 15:2,8 23:22
26:8,9 36:21 98:12
112:6 120:22
124:1 127:10
131:1,2 135:3
139:7
**Memo**
19:20,21
**memory**
5:13 55:5 107:8
**mention**
55:12 56:7,18 136:9
147:15,16
**mentioned**
15:24 18:24 31:16
35:18,22 56:4
61:18 63:14 73:3
94:9 99:4 100:6
112:8 114:5
**mentions**
78:7
**mentor**
34:10,10 112:22
131:15
**mentoring**
47:3 73:23 93:2
98:6
**merit**
34:7
**message**
47:13 57:14 65:4
68:10 79:2,3 93:20

94:16 123:19
**messages**
78:12 85:15 123:8
**met**
12:11 18:2,2,21
79:22
**Miami**
39:19
**Michaela**
34:16 35:22 91:19
**middle**
42:11
**mid-sentence**
115:22
**mind**
53:24 65:7 71:13
121:21
**mine**
79:8
**Ministry**
19:22
**minorities**
97:20
**minoritized**
98:13
**minority**
21:6 23:4
**minute**
14:8 48:23 106:3
116:12 134:1
138:12
**minutes**
14:14,18 24:5 85:10
106:5,9,10,21
138:12
**misremember**
113:17
**misremembering**
29:22 64:5
**missed**
15:15 57:14 122:17
137:23
**missing**
65:20

**mission**
19:21 97:4 119:8
**misstates**
35:15 71:1
**mistake**
146:19
**mistaken**
64:11
**mix**
9:21,24 20:20
**mold**
132:4
**moment**
52:11 73:8 101:19
103:16 110:10
116:1 118:23
120:16 121:22
**Monday**
59:18
**month**
42:7
**months**
115:13 116:4
**morning**
4:11 5:19
**Motzer**
130:10
**move**
17:9 128:13
**moved**
24:23 126:20
128:19
**moving**
16:10 128:23
**Moya**
1:10 3:3 4:2,8 30:18
55:22 114:24
150:8 151:22
152:12,13 154:3
154:13
**multi-cultural**
20:16
████████
118:10 123:21



125:16 126:14,17
131:13
**Murphy**
104:11 122:23
123:1
**M-E-M-O**
19:20

**N**

**N**
2:1 3:1
**name**
4:12 12:5 14:12
15:5,7,9,13,14
17:4 18:8 19:3,21
28:11,12 38:2
68:18 72:18 77:24
82:16 138:22
142:8
**named**
10:21 19:11 44:3
68:16 83:16 141:9
**names**
18:7 55:13 56:4,18
60:11 122:5
**napping**
87:15,17
**naps**
86:22 87:8
**national**
95:12 121:1
**native**
98:16
**natural**
82:8
**nature**
5:1 40:12 64:2
93:19 146:13
**necessarily**
50:13 82:3
**necessary**
34:4
**need**
4:20 5:2,5 20:12

21:13 26:21 30:18
35:3,23 51:18 71:9
77:1 92:14 93:1
99:17 105:9 106:7
106:13 112:8
115:5 140:21
**needed**
32:1 55:16 56:24
65:15 75:11 76:14
79:23
**needs**
35:2 153:1
**negative**
100:22 147:6
**neither**
102:13
**never**
18:2 37:7 73:10
75:9 77:19 80:11
110:12 126:6
132:5,21 151:6
**new**
10:11,24 11:14 12:4
12:4,6,7 36:24
37:5 111:24 112:5
114:19
**news**
17:6 77:20
**nice**
49:2 124:24
**noise**
124:15
**nominated**
33:6,8 103:24
108:17,24 109:5,6
129:1,2
**nomination**
104:1 109:5,7 129:3
**nominations**
108:16
**normally**
33:19
**North**
2:8 8:6

**NORTHERN**
1:1
**Nos**
138:6
**Notary**
154:4,10,17
**note**
57:15
**notebook**
107:14
**notebooks**
107:9
**noted**
50:10
**notes**
14:8 20:19 40:14,15
40:23 41:1,6 106:3
106:4,7,11,13,14
106:15 107:1,4,7
107:11 138:1,10
144:9,18,19 145:7
145:19 146:20
147:11
**notice**
89:10 145:5
**noticed**
53:4 73:5 87:14
**notify**
89:12
**notifying**
125:11
**noting**
146:2
**number**
41:10 59:7 118:18
127:4 135:8 142:2
147:8,9
**numbers**
17:15 53:1
**Nur**
125:17,17
**NYC**
7:19
**NYU**

7:5

**O**

**oath**
4:13
**object**
5:19 51:2,3 66:15
70:24 101:22
102:12
**objection**
13:8 15:21 21:9
22:14 26:1 30:15
30:21 32:7 35:14
43:4,17 44:8 45:3
45:11,22 46:6
47:23 50:1,6,7,10
51:11,19 57:22
62:15,20 68:1
73:18 74:6 75:14
80:19 81:12 82:21
83:2 84:4,21 85:2
93:21 96:6 97:21
99:7 105:4 112:19
113:9,24 119:5
123:3 134:12
139:10 147:15
148:20 152:5
**objections**
30:18 83:10 144:1
**objectives**
119:10,12
**objects**
5:21
**obligation**
62:9,10
**obligations**
34:12 91:19 127:5
**observation**
26:8 65:8 66:1
**observations**
90:7
**observe**
26:9
**observed**



MAGNA
LEGAL SERVICES

65:21 90:12
**obtain**
31:18
**obviously**
136:15
**occasions**
25:15
**offer**
37:8,10 141:20
142:5
**offered**
142:2
**office**
8:19 13:4 87:19
110:17,21 111:1
117:7
**offices**
10:12 11:10
**official**
17:4 70:4,22 71:4,7
71:10,14 72:21
76:13 84:6 115:6
154:17
**officially**
133:8
**oh**
13:12 34:17 39:1
47:6 54:13 65:23
65:23 87:16 88:17
99:15 100:17
103:9,22 109:17
118:22 125:13,17
128:7 134:20
146:9
**OIDE**
110:15 111:11
**OIED**
10:14
**okay**
4:11,16,18,24 5:5
5:18 6:5,10,22 7:1
7:7 8:4,10,14 9:4
9:15,23 11:4,19
14:7,13 15:17,23

16:7,14 17:18,21
18:20,23 20:5,7,10
20:24 21:5,17 22:6
25:8,23 27:14,18
28:6 29:3,23 31:5
31:19 32:12,20
33:8,12 35:10 36:7
36:15,18 38:23
39:4,12 41:1,18
42:8 43:8,14,21
47:9,12,18 48:3,7
48:22,23 49:1,22
50:10 51:8,16,23
53:3,17,21,24 54:4
55:3 57:7,9 58:15
58:21 59:9,11
60:19 61:12 65:5
65:23 66:6,8 67:1
67:8,13,17,22 68:9
68:15 69:5,12,18
69:19 70:1,22 71:7
71:22 72:6,8 73:17
74:1,3 77:6 78:6
78:18 79:2 80:17
81:9,20,23 82:19
83:15 84:20 85:7
86:4,14,16,19,21
87:24 88:23 89:14
90:13 91:2,8,16
92:1,10,18 94:24
95:5,14,17,20 96:3
96:14,19 97:10
98:1 99:4 100:3,13
103:2,13,18,19,22
104:20 105:19
106:11 107:17,23
108:5,12,13 109:1
109:24 110:2,10
110:14,19 111:14
112:2,13,16
114:22 115:15
116:10 117:12
118:7 119:19,23
120:4,8,18 121:21

122:13 123:10,16
123:19 124:12
126:3,14,17,23
127:12 128:2,6,24
130:1,5,16 131:6,7
132:8 133:2,22
136:5,16,22
137:14,17 139:15
139:24 140:2,6,12
141:11 142:12,16
143:5 144:7,7,11
145:6,9,23 146:3
146:12,22 148:6
149:10 150:21
151:2,19 152:6,10
153:7
**old**
12:6,7,9 140:15
152:6
**once**
12:11 14:21 18:12
18:21,22,22 20:22
25:22 30:3 37:3
77:20 87:22
**ones**
41:7 63:4 76:4
146:1 150:18,19
**one-year**
89:1
**ongoing**
112:6 115:10,24
**online**
18:3 147:9
**open**
52:3,6 56:21 76:4
84:8 98:19 129:6
144:7
**openings**
37:22
**opinion**
75:8 82:23 83:1
84:24 99:5 129:21
148:5
**opinions**

84:9
**opportunities**
12:24 76:23 95:21
**opportunity**
35:20 93:2 96:4
98:18 114:19
**opposite**
128:20
**opposition**
146:20 149:7
**optimism**
131:20
**option**
14:1 152:14,16
**optional**
13:16,19,19,20 14:5
76:4
**options**
152:13
**oral**
154:8
**order**
21:1 26:20 50:3
**ordinarily**
23:3
**organized**
78:20
**organizing**
8:2 31:23
**original**
112:23
**████**
10:14 11:14 13:15
14:16 15:5 59:18
60:12 74:20
**outcome**
62:4 85:21
**outliers**
149:17
**outside**
5:18 28:2 31:22
47:15 50:8 77:17
**Overbroad**
13:8



overcame
79:5,10
oversee
33:13
overtime
9:5
overview
4:19 14:17
owner
17:8 19:14
O'CONNOR
2:7

**P**

P
2:1,1
PA
154:23
page
3:2,19 52:9,17,21
52:22 53:1,15,19
54:1,13 57:7 59:7
65:3,4 69:12,16
70:1 78:4,23 86:10
88:16 90:14,20,22
91:9 92:6 95:3,20
105:20 108:5
117:23 118:21
119:1 120:12
121:5,6 122:2
123:12,13 124:9
128:2,3 130:1,2
131:5 135:6
145:15
pages
52:12,13 53:11
121:8,22
paid
80:8
pandemic
17:23 18:2,4 147:11
papers
122:18
paragraph

38:13 94:15,19
parameters
104:9 106:22
107:20
paraphrasing
67:18
pardon
19:17 26:22 37:12
76:8,18 97:13
130:8,19
parents
12:20,21
part
5:1 11:17,23 19:14
35:7,22 41:13 54:4
57:13 59:14 71:22
72:15 73:8 74:3,4
75:17 80:9,11 82:8
84:13 99:18,20
100:17 119:14
125:2 126:9 128:9
133:4 145:15
146:14
participate
39:20
participated
75:21
participating
132:16
particular
95:18
parties
1:15 154:4,16
partly
100:10
parts
59:23
passed
40:15
Paul
28:20 148:23
pause
31:1
pawns

128:13,23
PDAC
12:8 14:20 15:4
PDF
52:21 53:19 59:7
66:7 67:12 69:13
69:17 71:17 78:5
90:14 91:9 92:6
93:8 101:14 108:5
110:3 114:13
118:3 119:20
121:3 135:7
peer
26:8 65:8,15,24
112:22
peers
64:17,17 104:6
PENN
154:22
people
10:12 13:1,10 15:16
19:5,6 36:4 40:4,7
61:24 65:21 70:12
74:8,24 75:23
79:20,22 80:12,24
82:2 98:13 99:13
100:19 114:6
117:6 120:21
124:24 125:20
126:1 128:20
135:1 141:16
142:12 147:9
148:13
people's
30:6 81:2 96:10
97:11
percent
10:10 18:1 23:23
28:18 29:19 46:24
54:21 58:17 71:11
109:3 116:8
122:19
perfect
4:11 7:24 20:13

53:10 66:6 87:24
103:2 134:4
138:14 146:3
152:10
performance
28:1 36:22
performed
62:10,10
periods
129:4
person
18:2 20:1 21:7
22:23 23:15 24:8
25:13 33:18 41:24
60:22 61:7 64:23
68:5 89:8 117:10
125:17 136:2
personal
84:17
personally
147:19 150:15
personnel
23:20,24 24:3,14,22
28:19 29:14 64:18
79:22 92:23
111:18,19 122:16
personnel/reappo...
65:9
pertaining
1:12
pertinent
7:2
PhD
7:6,24 8:1 106:13
PHILADELPHIA
154:23
Pickett
11:14 15:5
pillow
87:20
place
50:4 81:2,4 84:3
140:13 154:14
places



7:4 48:3 82:2
148:3
**plain**
81:16
**Plaintiff**
1:4 2:6,14 4:3
**plan**
82:10 128:10
**planning**
10:16
**platform**
30:1
**please**
5:8 22:15 51:24
52:17 57:8 59:6
71:2 88:15 103:2
107:5 114:12
123:11 124:20
131:5
**pleasure**
98:9
**point**
63:3,5 76:10 81:19
83:21 132:17
133:5 148:1 151:7
**points**
77:4 87:4,11
**policies**
111:24
**popularity**
136:1
**portfolio**
97:2 114:18 119:7
**portion**
121:24 151:11
**portions**
56:23
**position**
9:16 33:6 39:9,11
44:4,7 45:9 46:15
48:5 49:12 51:16
105:2 109:4
110:19 111:9
112:18 125:6

128:15 129:1,6,15
129:16,21 130:21
137:4,11 139:24
140:3 141:8,10,20
142:2,5,7,13
**positions**
47:15,20 49:23,24
50:24 51:8,10,14
51:21 128:21
**possibility**
84:7 113:17 117:17
141:22
**possible**
17:10 70:18,21 80:8
**possibly**
28:19
**post**
22:13
**postpone**
45:18
**post-tenure**
134:6
**potential**
19:15 104:7
**power**
37:5,8
**PPR**
103:18 116:11
153:5
**PRAD**
32:6,9 34:13 35:23
36:15,20 40:5
104:5 105:15,18
106:1,6,22 118:7,8
118:9,14,22
140:24
**precisely**
107:10
**precluded**
149:14
**predecessor**
42:22
**prefer**
4:8

**preference**
152:17
**preferred**
51:1 141:17
**prepare**
6:10 23:13,16 26:3
**prepared**
114:23
**present**
2:14 58:2
**presentation**
142:22,23 143:17
143:23
**presentations**
19:24
**presented**
39:14 80:7 145:7
**presenting**
60:13
**president**
10:11,17 11:1,10,11
11:11 12:1 15:11
15:11 111:5
**president's**
9:13 10:7,8 12:9
13:3 14:19 75:1
110:23,23 111:4
**presume**
121:18
**pretty**
31:8 67:6 94:7
**preventing**
6:1
**previous**
64:6 69:21 107:9
140:15 151:13
**previously**
15:24 19:13 31:16
38:23 42:16 47:9
49:22 68:9 94:24
110:15 126:18
128:24 136:22
138:1
**pre-tenure**

23:19 24:12 26:15
26:16 27:16 56:20
67:5 88:24
**priest**
19:8
**printed**
109:19
**privilege**
151:13
**privy**
70:13
**probably**
77:2 84:20 85:15
109:21 147:1,2
**probationary**
150:12
**problem**
19:2 34:21 53:5
68:3,4 74:10 79:8
81:6 124:20 133:6
**problematic**
59:24 74:11 80:21
132:6
**Procedure**
1:11
**procedures**
111:24
**proceed**
22:15 71:2 83:2
89:4 97:22
**process**
11:17 23:8 29:13
30:3 31:9 43:16
44:2,19 64:8 67:19
68:14 70:18 75:13
80:21,22 81:15,24
82:9 83:7,8,9 84:8
84:8 101:11 105:9
105:12,14 112:2,9
115:3 126:3
131:12 133:10
139:8 140:3,13,21
141:8 144:21
148:19



133:18
**produce**
114:23 115:24
116:2 144:6
**produced**
41:4 101:24 106:23
**Production**
52:9,10,23 78:4
86:10 123:14
**productive**
101:7
**professional**
13:23 58:3 130:14
**professor**
8:7,12,15,22 15:6
44:20,22 71:23
72:4 74:1 82:15
95:8,9 96:15,16,17
125:6 126:21
129:13
**professors**
15:18 34:4
**program**
13:23 29:24 31:21
32:11,12,13,18
33:10,22 36:22
37:19 38:20 39:9
39:10,22 40:17
42:17,21,22 43:2,9
43:12,15,20 44:7
44:12,15 45:9 48:5
48:12 49:12,12
51:16 84:22 91:20
94:24 97:2,6 104:7
104:18,23 105:2
107:20 108:16
111:15 114:18
118:10,14,16
119:7 125:1,21
127:11 129:1,17
129:20,22,23
130:8,15 136:6,23
137:8,17 139:7,23
140:3,13,15,19,22

141:2
**programs**
12:18 23:21 49:18
98:20 99:23
116:15 119:7
**progress**
24:6,17 35:2 64:24
**progression**
129:13,18
**promise**
54:21 107:13
**promised**
6:22
**promotion**
24:18,24,24 55:6
58:11 64:8 81:15
89:9 95:8,22 96:4
98:11 147:10
**promotions**
62:24
**pronounced**
78:1
**propose**
12:18 149:5
**proposed**
18:12
**proposing**
123:22
**protective**
50:3
**protest**
120:20
**protocols**
84:3
**prove**
70:10
**provide**
9:11 10:15 13:2
26:10 27:24 104:2
111:23 117:21
122:20
**provided**
74:17 91:3 104:13
**provides**

23:24
**providing**
19:15 35:8 76:22
**provisions**
1:10
**provost**
11:12,15 25:3,3,4,4
25:6 55:11 62:7
77:15 89:8 102:22
111:6
**public**
8:2,16,17 20:14
33:13 46:17,19
50:18 99:10
118:20 130:7,8,12
154:4,10,18
**pulled**
102:1 116:3
**purpose**
1:13
**pursuant**
1:10
**pursuing**
112:7
**pushing**
128:22
**put**
19:23 49:6 65:20,21
72:17 80:5,13
82:12 84:3 87:18
92:23 111:1
112:15 116:10
124:3,22 125:8
126:13 150:23
**putting**
31:8 35:8 125:7
130:19
**P.A**
2:2
**p.m**
128:7

_____
**Q**
_____
**qualification**

51:1 136:24
**qualifications**
40:10,13 41:18
44:17 45:18 46:4
51:17 84:23
137:12,16 145:13
145:20,24
**qualified**
48:18 129:22,23
143:21
**qualify**
82:4 142:6 147:3
**quality**
61:15
**Qualtrics**
117:15,19
**quarter**
12:11,12 14:21
18:21,22,22 106:2
**question**
5:8,10,22,23 16:16
21:12 22:7 37:4
55:22,23 61:6,20
63:22 64:3 65:6
71:1 72:23 89:15
96:10 101:2
115:23 125:2
134:3 139:12
146:15
**questioning**
22:14
**questions**
5:20 7:3 9:9 10:2
79:20 80:7 114:21
119:8,9 125:1
141:1 143:19
150:9 151:21
152:11 154:9,12
**quick**
126:23 150:9
151:23
**quickly**
30:20 31:1 114:22
121:5



quiet
136:15
Quineta
18:8
quite
53:18
quote
9:6 72:1
Q-U-I-N-E-T-A
18:8

**R**

R
2:1,3 117:9
race
23:6 69:10 100:21
    134:10,18,22
races
135:1
Rachel
67:7,8,9
racism
81:17
raise
42:8 69:6 75:4
raised
7:10 22:20
random
28:15
randomly
26:17 27:15 28:6
ranked
141:14,14,18,21
reaches
28:8
read
52:14 54:3 55:21,23
    71:19 92:20
    100:15 102:6
    110:13 120:3
    143:21
realization
132:5
realize

74:12 82:5 131:15
realized
83:19
really
10:19 21:13,14
    35:17 40:20 50:2
    67:3 90:24 114:22
    126:23 150:4
    152:16
reason
22:3 37:9 64:13
    73:11 85:5 91:4
    99:5 124:5,15
    139:3 148:24
reasons
9:23 90:4 100:1
recall
14:10,14 44:17 46:8
    56:17 72:19 77:2
    77:11 78:21
    107:22 111:3
    113:11 123:19
    135:17 137:21
    138:19 139:20
    140:1 141:24
    148:12,17 149:12
recalling
43:21 105:14
recap
145:12
receive
75:6 94:3 102:19
    111:10
received
10:11 40:3 48:19
    56:8 60:3,4 65:8
    85:24 89:11 94:6,7
    94:8,17 111:16
    115:6 122:15
    133:8 150:15,18
receiving
73:22 75:5
recess
37:15 49:9 85:12

138:15 139:16
recipient
102:13 122:7
recognition
98:4
recognize
53:7 90:23 91:17
    92:15 103:19
    108:14 110:11
    122:14
recognizes
52:16
recollect
116:9
recollecting
68:3
recollection
58:16 67:22 98:4
    143:11
recommend
24:18 28:1 36:11
    91:21 146:17
recommendation
25:7 29:16 35:4
    47:1
recommendations
25:2,4
recommended
64:17
recommending
71:24 72:9 74:13
reconcile
17:9
record
5:21 22:2 32:4
    35:15,24 37:13,16
    48:20 49:7 50:7
    71:11 75:15
    100:15 113:16,18
    121:4 129:14
    139:14,18 144:21
    151:19 154:12
recorded
142:23,24

records
67:10
red
52:22
redirect
151:24
redoing
152:6
reduce
84:15
referred
91:18 132:19
    154:14
referring
35:18 52:20 53:2
    54:19 55:14 65:11
    66:4,12 70:6 77:3
    80:10,15 91:1,2
    103:10 118:9
    144:18
refers
102:6
reflect
146:22 148:5
refrain
22:6
refresh
58:15 67:22 143:11
regarding
9:9 13:6,7 16:22
    17:7 29:19 34:23
    55:18 76:1 77:10
    120:19 132:12
    144:21
regardless
82:16 89:8
regards
129:7
Regional
8:18
rejected
109:5
relate
102:2



related
17:6 23:6,7 58:5,6
83:24 114:21
118:15 119:8
134:17
relating
115:23
relation
130:12
relations
8:2,16,17 13:12
20:14 33:13 46:17
46:19 118:20
130:7,8
relationship
17:5 47:4 50:19
58:4
relevance
50:1 51:3 101:23
relevancy
22:14
relevant
55:1 107:5
remember
5:11 10:15 11:21
13:5,10,11,13,16
14:11 15:6,14 19:2
28:4 30:2,2,3,9
33:8 38:2 39:21,24
40:2,5,9,12,24
41:18 42:2,4,13,15
43:11 44:18 54:18
54:23 55:1,3 56:3
56:23 57:20 58:11
58:14,17,18 59:21
60:19 61:1,8,15
62:4 63:1,1,6,8,15
63:18 65:23 68:7
68:24 69:5 70:6
72:4 73:7 75:22,22
76:21 77:9,24
78:14 85:17,19,21
85:24 87:15,16
88:22 89:23 90:24

91:1 93:4 94:15
100:18 105:13
106:11 108:17
113:4,19 114:2,23
116:24 120:17
121:23,24 122:4,7
124:14 125:16
130:4,16 131:6,7,8
133:11 134:5,17
134:18 136:5,6,13
137:17,22 141:1,9
141:11 143:7,9,12
143:15 145:21
146:3,11,12 147:6
147:13,14 148:9
149:12
remembered
153:4
remembering
15:9 30:7 68:4
100:23 132:14
reminders
145:22
remotely
1:16 154:5
renewed
69:4,7 70:13
repeat
16:8 125:2
repeating
69:20
rephrase
5:9
report
13:1 24:7 26:19
27:15 35:2 64:19
77:14 80:2,3 92:20
97:1,14 103:7,9,11
103:22,22,23
104:9,17 105:3
116:17 117:13
120:5,9 151:8
reported
1:20 2:12 24:19

77:12 96:11
reporter
1:14 4:24 21:23
22:2 100:11
REPORTER'S
154:1
reporting
7:21
reports
49:13,20 51:1
116:15 117:16
represent
4:12 9:12 15:3,3
16:2,4 17:5 19:18
40:18 45:16
138:10
representation
11:8 22:10
representative
16:24 17:1 19:1
38:7
representatives
23:21
represented
10:12 16:5 34:13
representing
38:18
Republic
7:5,11
request
42:14 75:24 89:11
115:11 116:3,9
requested
89:5
requesting
85:20
requests
37:18
require
35:7 48:4
required
90:11
requirement
31:18 47:22 79:16

79:17
research
26:4 27:6,7,8,8
31:22 57:2,5 58:19
61:9 62:2,8 77:15
117:9,9 127:5
142:23 143:17,21
143:22,24 144:1,3
144:6 147:1
resolved
92:3
resource
9:7 76:21 93:15
resources
74:21 99:22
respond
30:24 119:8
responded
42:13 55:22 57:17
78:13 128:9
136:13
responding
70:3
response
99:13 122:15 133:7
responsibilities
9:6 76:11 88:12
131:2
responsibility
75:17 127:10
responsible
76:22,24 129:7
rest
114:4
restitution
17:10 19:16
result
61:5
results
103:20
retired
130:11
revamping
45:9 137:4



**review**
  6:14 23:18,18,19
    24:10,11,12 26:9
    27:16 37:1,3 38:20
    46:22 52:11 57:8
    57:10 59:11 60:2
    63:19 64:22 65:1,1
    66:19 67:14 78:24
    82:20 83:8 86:16
    90:18 91:14 95:24
    97:3 101:19
    108:12 110:10
    114:18 115:13
    119:7 120:16
    122:18,18,19,20
    123:16 124:12
    133:21 144:12
    146:8 150:12
    151:10 152:14
**reviewed**
  23:17 24:9 25:14,16
    25:18,21 29:12
    88:21 120:1
    144:16 150:11
    151:3,8
**reviewing**
  30:10 54:1 128:4
  130:3 146:15
**reviews**
  23:19 25:9,23 79:14
    150:12,22
**revise**
  114:20
**revising**
  102:22
**revote**
  139:8 148:19,22
    149:3
**revoting**
  139:9
**reward**
  131:13
**Rick**
  72:5 73:14,15,22,22

**right**
  10:20 15:7 17:22
    41:15 50:16 54:15
    61:23 79:12 81:24
    84:12 86:9 87:2
    88:17 99:17 101:7
    112:10 127:17
    134:20 145:6
    148:15 149:1
    150:3,13
  ▮▮▮▮
  89:7 117:7
**Robin**
  120:21 125:16,18
**role**
  9:14,17,18 33:17
    38:16 40:21 41:23
    42:5,7 74:18 77:5
    91:24 92:2,4 93:24
    111:19 112:18
    124:7 127:19
    128:19
**roles**
  37:18,23 128:22
**rolls**
  35:12
**Ron**
  130:13,14
**room**
  19:10 41:20 42:10
**Rosati**
  17:7 19:7
**rubric**
  82:14
**rubrics**
  76:2
**rude**
  124:3
**Rules**
  1:11
**running**
  82:4

———————
**S**
———————

**S**
  2:1 3:7
**sadly**
  10:9 16:3 23:22
    29:5 72:11 77:19
    81:5 87:21 99:13
    112:4 124:2
    143:17 145:11
**safe**
  153:1
**salary**
  32:17,20,23,24
**Salma**
  54:12 55:7,10,10,18
    59:17 62:6 77:12
    90:3,6 122:23
    140:20
**sample**
  95:19
**samples**
  27:6,7
**sampling**
  28:15
**sat**
  11:20
**saw**
  24:4 87:13 103:14
**saying**
  36:3 42:4 99:16,17
    116:20 117:15
    132:20 135:17
    136:17 145:20
    147:14 148:10
**says**
  27:4 52:7,22 54:4
    54:11 57:13 59:14
    64:14 65:4 66:9
    67:17,17 71:1,4,5
    79:4 87:3,4 94:19
    94:21 95:4,6,21
    103:23 109:15
    119:1 122:22
    128:6 131:21,21
    147:3

**scale**
  150:13
**scanning**
  102:5
**Scatchell**
  2:3 3:4,6 4:7,12
    15:22 16:12,14,15
    21:16 22:1,4 27:13
    32:10 37:13,16,17
    41:5,9,12,14 43:7
    44:5,11 45:7 46:1
    46:11 48:2,20 49:1
    49:4,7,10 50:3,10
    50:15 51:15,22
    52:5,15,19 53:9,20
    53:23 56:2 59:8,10
    62:18 66:17 68:8
    68:21,23 71:4,6
    74:15 75:18 81:8
    82:22 83:6,14 85:7
    85:10,13 86:9,15
    88:20 90:17 91:13
    92:9,17 93:14 94:2
    96:13 101:18,24
    102:8,15 103:1,6
    105:6 106:20
    107:1,16 108:11
    108:22 109:12,15
    109:23 110:9
    113:3 114:11,22
    115:15,18,20
    116:5,19 118:2,4
    118:24 119:18,24
    120:15 121:11,20
    123:6 135:7,14,16
    138:8,16 139:11
    139:17,19 149:2
    149:22 150:2
    151:23 152:2,10
    152:23 153:7
**schedule**
  33:22 59:19 60:17
**scheduled**
  34:1



**school**
7:21,22 23:12 33:1
  33:3 50:18,23
  118:17
**science**
31:19 149:19
**scope**
31:22 50:8 51:3
**score**
143:10
**scores**
142:17 143:8,12
**screwing**
148:2
**scroll**
53:15 124:9 135:9
**scrutiny**
99:18
**seal**
154:17
**search**
11:23 125:5,7,10,12
  125:13,14 126:12
  142:14 143:14
**searches**
125:22
**second**
21:23 23:18 24:10
  37:14 43:1,21
  48:21 52:3,21 61:2
  64:22 94:15 99:20
  109:2,5,7 116:5
  123:13 130:2
  133:14,17 139:14
  141:19 145:5,5,6
  146:14
**secret**
24:5
**see**
3:19 10:5 12:17
  16:10 31:6 32:17
  52:21 54:4,13,15
  57:13,18 59:14,17
  65:4 66:9,16,21

67:17,21 70:1,19
71:22 78:7 79:2
82:3,6 85:5 87:19
94:21 95:3,20
102:1 114:12
117:16 118:22
122:2,4,22 123:11
123:23 128:6,9
135:24 142:19,21
142:21,23 144:7
144:17 147:6
151:9,17,18
152:20
**seeing**
114:23
**seek**
111:24
**seeking**
49:24 83:1 152:8
**seen**
103:20 110:12
  111:18 117:11
  126:7 142:18
  149:21
**select**
38:7
**selected**
15:2 20:1 26:9
  27:15 28:6 38:21
  39:13,14 48:15
  84:22 85:6 127:14
  141:13
**selecting**
34:3
**selection**
11:17 126:3 140:13
  144:23
**self-evaluating**
26:5
**self-nominations**
108:16
**self-reflecting**
26:5
**self-reflection**

26:6
**self-taught**
75:2
**send**
18:15 48:21 92:23
  106:18 120:6
  138:4
**sends**
125:11
**sense**
30:8 33:5,21 97:15
  98:3 124:18
  132:23 138:14
**sent**
43:23 94:14,17
  108:15 109:9,13
  109:13 111:11
  117:17
**separate**
20:21 32:24 57:15
**September**
29:11,20
**serve**
8:18 9:1 16:7,16,18
  20:2 34:20 36:3
  38:1 42:2,17 46:12
  47:7 91:21 95:2
  129:17,17 131:4
**served**
13:11 27:5
**service**
26:4 27:4 31:16,18
  31:18,20,21 32:3
  34:12 35:18,20
  36:1 37:18 47:22
  57:2,5 58:12,19
  61:9 64:20 70:13
  91:19 95:6 98:5
  127:5,11
**SERVICES**
1:21 154:21
**serving**
31:23 32:4,18 36:11
  43:1 46:2

**set**
68:6 127:4
**seven**
23:22 154:22
**share**
16:21 66:3 106:22
  107:12 114:2
  115:14
**shared**
60:5 94:12 104:5,6
  115:9 123:23
  131:16
**SharePoint**
30:1,4,6,12 31:7,8
  78:19
**sharing**
65:7 120:5
**she'll**
114:8
**shift**
97:24 99:4,6
**shit**
72:2 124:24
**short**
49:9 85:12 138:15
  143:1,18
**shorthand**
1:14 154:9
**shorthands**
82:1
**short-term**
85:18,20,22
**show**
34:24 41:7 51:23
  52:8
**showed**
62:2 70:14
**sick**
34:24 108:2 136:10
**side**
9:12
**sign**
14:1
**signature**



154:17
**signed**
61:3
**significant**
11:7
**similar**
60:2,2 61:4,5 66:4
75:9 76:3 141:5
**sit**
11:3 87:6
**sitting**
151:10
**situation**
105:1
**sit-down**
93:3
**six**
14:23 23:22 28:7,7
107:9 121:6
127:22
**six-step**
31:9
**skip**
64:13
**slave**
17:8 19:14
**slavery**
17:5 22:18
**slaves**
22:21
**slowing**
87:4
**slump**
134:6
**small**
95:19
**smaller**
11:2 12:24 15:1
**smart**
124:24
**smarter**
37:7
**smiley**
57:17

**sneaking**
86:22 87:8
**social**
7:16,18 20:17 23:7
119:2,11
**socialization**
82:9
**socialized**
82:1
**socially**
113:20 130:18
**software**
31:5,7,13
**solid**
89:3
**solidarity**
94:16
▬▬▬▬
15:5
**solutions**
12:18
**somebody**
10:2,4 15:16 22:17
23:9 25:16 28:7
29:7 31:17 35:12
36:11 37:4 43:14
44:18 48:18 82:4
84:10 91:21
112:11,11,24
126:24 133:5
148:16
**somewhat**
99:4
**soon**
9:19 77:21
**sorry**
10:23 16:8 22:13
26:20 33:12 37:16
53:8,18 54:14
55:21 57:13 62:15
63:20,23 69:11
79:7 88:17 92:7,14
94:13 103:11
104:3 106:19

109:11,17,18
111:3,5 118:21,22
118:23 124:18
125:3 130:1 135:4
139:17 141:24
145:2 153:2,4
**sort**
19:15 47:22 74:17
77:7
**Sounds**
29:23
**South**
50:19
**southern**
74:10
**space**
99:22
**spaces**
82:2
**Spanish**
131:14 145:16
**speak**
5:2 6:16,18 51:9
60:12 73:14,15
74:9 76:15 93:23
**speaker**
131:14
**speakers**
14:3
**speaking**
40:16 58:10 71:11
71:13 99:24
**special**
14:22
**specialized**
20:15
**specific**
13:12,18 21:14
44:16 55:17 56:4
58:18 60:23 61:8
63:7 80:16 83:21
87:16,23 113:11
116:3 121:24
139:20 148:18

**specifically**
5:23 13:5 17:7 42:3
55:12,14 56:7,17
59:22 73:4 94:16
100:3 114:2
134:18 143:13
**specificity**
40:23 63:2 64:7
**specifics**
58:14
**specifies**
25:13
**specify**
113:12
**speculation**
82:21 85:3 105:5
134:13
**speech**
74:4 124:4
**spell**
10:18 34:16
**spelled**
78:1 80:15 105:10
**spelling**
10:23 68:21 139:3
**split**
60:4 63:14
**spoke**
9:21 40:16,17,19
73:21,22 74:8
76:13 77:14,17
98:12,13 100:6,7,8
**spoken**
62:6
**sporting**
70:21
**sports**
38:2
**staff**
12:13,22 13:11,20
14:10 15:8,11,12
15:12,23 16:3,5
17:1 29:5 34:2
46:21,21 56:10



67:6 93:17 97:12
101:10 122:6
**staffing**
34:3
**stamp**
41:9
**stand**
110:16
**standard**
36:7 48:17 67:23
68:4 137:20
**standardized**
84:7
**standards**
59:4 68:7
**standing**
18:13 102:22,23
106:1
**start**
7:2 131:18
**started**
8:5 17:21,22 18:5
67:7 96:24 107:10
109:8 112:16
127:21 131:19
**starting**
52:18 96:23 127:16
151:6,17
**starts**
145:14
**state**
1:12,15 8:6 50:6
56:1 121:4
**stated**
19:13 35:10 86:21
129:19 133:2
**statement**
26:3 40:9,12 42:14
71:7 93:13,19
95:11 96:3,9
128:14 140:23
154:2
**statements**
120:21

**States**
1:1 17:13 22:20
**statistics**
95:12
**status**
77:10
**stay**
43:22 96:23 128:16
129:12
**stayed**
43:10
**stenographer**
154:10
**step**
141:4
**stepped**
18:17 41:20 44:3
**stipend**
32:18,20
**stop**
87:6,6 133:17
**stopped**
100:13
**story**
11:3
**strategic**
10:16
**strategy**
101:4
**STREET**
154:22
**stretching**
138:11
**stricken**
3:15
**strike**
121:13
**strong**
143:16
**strongest**
143:7,9
**strongly**
9:19
**struggle**

49:14
**stuck**
31:15 42:6
**student**
10:4 15:10 26:14,18
26:19 27:19,20,21
28:13 35:3 47:6
67:10,10 72:13
74:10 86:23 87:9
100:9 119:14
133:12 145:17
150:11,15
**students**
9:10 20:20,20 26:17
27:14,22,24 28:3,8
28:14 34:21 47:3
61:16,22 62:3
71:24 72:9,10 73:1
73:3,4,24 74:4,13
80:24 84:18 93:17
97:12 98:6 99:24
100:22 101:9
118:16,19,19
142:24
**student's**
82:15,16
**Studies**
101:20
**stuff**
48:24
**style**
30:24
**subject**
20:12,13
**submit**
24:14,15 27:2 29:11
29:15,20 117:18
122:18 127:23,23
**submitted**
27:8 102:21 115:6
117:15 153:6
**submitting**
31:6
**substantiate**

70:10 84:13 135:24
**substitute**
9:22
**sucked**
70:8
**suffered**
23:4
**sufficient**
74:19 75:5,10
133:19,19
**suggesting**
128:21
**Suite**
2:3,8
**summarized**
24:7
**summary**
24:1
**summer**
32:22 33:3 118:7,8
118:22
**supervise**
49:16
**supervision**
33:21
**supervisor**
49:17 73:10,12 88:8
88:11,12 90:5,6
**supervisory**
88:13
**supplied**
32:5
**support**
10:15 35:7,8 39:16
68:14 74:24 75:5
75:10 127:11
136:2 141:2,7,20
141:22 149:6
152:9
**supported**
149:18
**supporting**
27:2 148:4
**supposed**



26:5 28:2 42:4
52:18 65:19 84:9
137:15 140:24
151:17
**Supreme**
1:11
**sure**
5:2,5,14 10:10
14:16 18:1 19:12
19:20 22:17 23:10
23:23 28:18 29:19
30:4,7 31:8 34:1
34:13 41:5 46:18
46:21 53:12 56:16
67:6 71:11 75:24
80:7 81:22 82:10
85:9,11 86:18 94:7
105:16 109:3
112:14 115:8
116:8 122:19
123:9,18,21
150:10
**surprised**
78:8 79:8
**survey**
26:14,16 97:2,9,10
97:11 117:15,19
143:1,1 153:5
**suspend**
45:17
**sweetest**
78:8
**switch**
85:14,16
**sworn**
4:1,4 154:7
**Sydney**
1:3 2:14 4:12 6:20
38:24 40:9 41:15
41:19,23 42:3,19
43:9 44:4,6 45:5
45:10 47:10 53:8
53:13 54:6 55:2,14
55:20 56:5,7,14

58:1,12 59:2 60:1
60:4 61:3 63:14
65:1,5 67:17 73:6
77:6,9 78:7 79:10
79:12,18,21 84:22
85:17 87:17 89:17
90:1 91:3,23 92:1
94:8,18 100:4
104:18 107:21
109:4 113:5,13,20
114:7 118:10,13
120:5,7 122:3
124:6,6 125:15,21
126:2 128:6,16,17
128:17 129:11,20
130:20 131:21
132:6,23 135:23
136:6,7,23 137:6
137:19 141:7
144:20 145:7,18
145:24 150:22
151:7 152:3
**Sydney's**
44:13 45:15,18 46:4
58:6 60:7 70:22
77:11 90:8 99:10
101:1,10 104:22
105:1 132:13
**syllabus**
26:12
**system**
31:11 76:17,18
82:12 100:18
141:5
**systematic**
98:20

15:6

_____

**T**

**T**
3:7
**tabbed**
86:8

**table**
42:11
**take**
12:16 13:6 19:4
24:4,5 36:10 40:19
41:12 48:22 52:11
85:7 87:6 88:24
89:2 90:9 91:24
92:4 101:19 102:6
103:16 106:5,9,13
106:14,15 110:10
120:8,16 121:21
133:14,17 134:1
138:11,12 144:20
**taken**
1:10,13 4:13 107:23
154:3,9
**takes**
29:13
**talk**
10:4 22:10 24:6
46:9 47:18 54:12
55:8,19 56:8 57:16
60:10 70:3,7,18
73:9,11 93:1 98:1
114:8 133:1
136:11
**talked**
54:12 55:5,15 58:19
59:23 61:9 73:1
74:22 78:13 79:18
87:13 89:22 90:3
128:7,12 130:20
132:7
**talking**
13:11 21:20 26:20
41:6 42:7 44:10
70:17 94:8 100:14
106:20 112:11
114:3 124:5 133:8
134:9 137:2,3,11
137:15 143:13
145:18 150:21
**talks**

97:11 114:6
**target**
119:15
**tasked**
112:24
**taught**
20:7,10 33:23 45:5
46:18
**taxed**
98:5
**taxiing**
98:10 134:5
**teach**
15:18 20:19,21 34:4
34:5 36:21 44:23
127:4,10
**teacher**
28:4 61:19 84:12
**teachers**
143:7
**teaches**
130:7,8
**teaching**
26:4,24 27:1,3
31:22 32:22,24
34:23 35:23 36:20
36:24 37:2,3 57:2
60:22 61:11,13,15
62:12 63:17,19
66:13 82:14 91:3
100:21 106:14
113:7 119:10
130:12 132:1,2
142:17,22 143:7
143:10 144:2,2,3,5
**team**
34:20
**technical**
30:13 81:23
**technically**
90:5
**tell**
4:14 13:17 24:22
32:21 52:16 56:14



59:7 64:19 73:6
83:18,18 110:11
123:12 124:22
136:3
**telling**
36:6 79:10 128:20
130:20
**tells**
133:6,12 134:7
**tend**
29:6
**tended**
124:3
**tenth**
32:23
**tenurable**
24:17
**tenure**
20:5 23:8,9,24 24:7
24:13,15,18,24,24
25:10,14 26:24
28:10 29:8,24
31:17 39:5 55:6
58:10,13 59:1,2
62:24 64:8,16,17
64:19,21,24 67:5
67:19 81:15 82:20
89:1,6 96:5 98:11
100:8 101:11
113:6 122:18,19
126:22,24 127:1,6
127:13,16,20,21
127:24 131:12
134:7 146:8,17
147:3,10 148:4
149:14,16,20
150:12 151:11
**tenured**
20:3 63:3 70:16
74:1 99:14 126:21
127:3,7,8 131:9
138:18,20 149:15
150:24 151:9,10
**tenure-faculty**

24:1
**tenure-track**
23:11 69:2 125:6
126:14 127:8
131:2 135:2
138:18 142:20
■■■■
140:16,17
**term**
32:15 43:1,2,15,23
55:13 79:13 124:1
127:9 130:11,15
131:1,4
**terms**
25:24 34:12 59:24
63:4 64:8 73:24
98:10,21 104:13
112:17 127:5
132:12 133:18
**term-faculty**
74:2 130:7
**territory**
152:6
**test**
123:8
**testified**
4:4 38:23 47:9 68:9
95:1 110:15
126:18 128:24
136:22 138:1
**testify**
6:7
**testifying**
6:2,23
**testimony**
6:19 109:24
**text**
47:12 53:8 54:6,9
65:3 68:10 69:21
78:12 79:2,3 85:15
123:19
**thank**
14:7 30:23 52:3
53:3,4,21,22 59:9

92:10 107:17
109:21 118:23
123:10 135:12,15
150:3,8 151:21
153:7
**thankfully**
145:15
**Thanks**
65:5
**theme**
49:17
**theoretically**
24:20 25:5
**theory**
111:16
**thing**
8:21 10:21 13:12
19:9 21:19 24:3,9
24:11 29:19 34:2
61:1,18 66:1,2
69:21 97:8 117:14
153:5
**things**
5:7 8:22,23 9:21
13:18 22:22 28:5
29:21 34:19 35:10
58:24 61:8 65:24
72:24 74:13 77:1,2
79:18,23 83:21
87:14 94:10 97:3,4
97:7,16 99:9,11
101:1 106:7 111:7
112:8 119:10,14
120:6 131:23
132:3 133:9,21
134:24 135:3
137:24 140:14
145:20 148:2
**think**
10:1,14 11:20 15:16
18:3 21:13 24:20
27:11 30:4 31:6
33:9 43:20 46:22
50:8 57:1 58:23

68:3,4 77:13 78:1
80:15 81:18 84:18
84:24 85:24 87:12
92:4 96:8,12 97:24
98:2,8,18 99:17
100:1 103:15,20
104:6 105:13
112:23 120:10
121:9,15 126:17
128:10 132:18
133:5,22 134:23
135:11,18 138:18
141:17 143:2
147:9 148:2
152:13,18,22
153:3
**thinking**
129:10 134:17,18
**third**
20:18 141:3,14,19
141:24
**thought**
11:1 22:1 73:5
91:23 103:14,17
105:11 125:18
129:12 135:1
143:23 146:1
**thread**
65:4 91:17
**threat**
82:5,6
**three**
7:4 8:15,22 18:23
20:14 23:17 25:8
25:14,15,16,19,21
26:3,19,21 28:24
40:3 55:15 60:4
64:11,11,15 83:21
87:3,11,14 96:23
98:22 99:3 106:21
122:20 140:4,6
142:2 146:21
147:23 151:14
**three-question**



143:1
**three-year**
32:15
**throwing**
107:10
**Thursday**
59:14
**time**
10:17 11:24 13:7,17
23:14 28:7 30:19
30:19 31:12 36:9
37:2,3,23 38:4
40:20 45:18 48:7
48:10 56:6,15 60:1
60:11,13 61:9 62:8
63:6 64:10 65:16
65:18 70:16,17
73:7,20 77:22
83:17 85:7 87:13
88:3 89:4,6 91:5,6
93:5 98:10 99:21
102:7 104:11
108:18 109:2,4,6,7
112:8 116:9
122:17 125:23
126:5,7 129:4,6,10
129:17,22 131:10
132:6,7,11 134:5
134:17 139:2
141:3,4,6 146:3,16
149:11 150:3,24
151:2 154:14
**timeline**
23:10
**times**
14:23,23 23:1
25:14,17,19,21
108:24 109:1
112:20 113:12
114:5,10 124:17
140:4,6 147:24
**tired**
86:23 87:5,10,22
132:17

**title**
8:14 10:15 75:22
89:8 111:3
**today**
6:3,23 28:9 35:1
128:7 132:20
150:8
**today's**
6:10
**told**
6:20 33:9 58:2
60:15 62:6,8 65:14
70:8 73:8 76:8
77:18 78:14 80:3
87:21 89:22,24
90:1,2,8 92:22
125:23 131:21,22
136:11 137:6
**tongue-tide**
111:6
**tongue-tied**
111:7
**Tony**
34:17 36:1,3,3
**top**
54:11 109:15,21
115:1 122:22
**topic**
55:10 106:24
**topics**
18:11 98:24
**total**
14:23 23:15
**Totally**
139:10
**toxic**
132:9,19,20
**track**
96:5 126:24 127:1,6
127:13,17,20
**trail**
121:6,8,17
**trainees**
14:3

**training**
9:11 13:14 74:17
75:2,5,7,11,12,19
75:21,23 76:6,23
99:23
**trainings**
76:3

28:20
**transcript**
152:14,19
**translation**
7:18
**treated**
73:2
**treatment**
135:19
**trickle**
21:18
**tried**
13:2 106:8 113:14
132:24 141:5

28:11,11,21 57:14
**trips**
153:2
**true**
4:21 154:11
**trust**
10:23 55:5 133:10
**truth**
4:14
**truthfully**
6:2,7
**try**
5:14 10:19 31:1
50:22 81:2 82:12
147:22
**trying**
18:8 36:9 74:12
81:22 113:6
118:18 128:13
135:9
**Tufano**

1:14,24 2:12 68:21
154:4,20
**turn**
150:4
**twice**
77:20 106:2
**two**
5:7 8:7 9:24 11:5,16
12:12 15:8 17:12
17:22 26:8,8,15,23
30:7 32:24 33:4
47:5 51:21 61:8
64:15 65:24 77:2
78:12 98:23 99:9
109:10 125:22,24
126:1 127:22
129:4 132:17
142:1,5 145:4
147:24 148:3
149:17 151:13
**twos**
150:16
**type**
38:15 48:5

---
**U**
---
**UBPT**
24:23 29:16 149:19
**Uh-huh**
54:8,10 59:16,20
66:20 70:5 103:8
119:3 128:11
138:3 140:8
144:14
**uh-huhs**
5:7
**ultimately**
129:2
**unacceptable**
141:23 142:3
**unanimously**
148:4
**unavoidable**
82:9



**uncertain**
59:3 80:14
**uncertainty**
98:10
**unclear**
22:3 56:21,24 79:14
**uncomfortable**
10:1 61:17 66:10
132:21
**unconscious**
80:24 81:10,19,20
82:8,18,19 83:8,12
83:23 84:24
**undergrad**
15:18 20:20,22,23
72:15
**undergraduate**
33:14
**underlined**
145:18
**underrepresented**
118:18
**undersigned**
154:10,15
**understand**
4:14,22 5:3,8 50:5
63:20 80:22
105:19 107:2
111:8 121:16
131:1,3
**understanding**
82:11
**understood**
5:10 127:16
**unexplained**
148:14
**unflattering**
80:2
**unhappy**
79:13 80:2 131:10
**uniform**
96:22
**unit**
38:11

**United**
1:1 17:13 22:20
**units**
19:24
**universities**
17:13,14 81:5
120:20
**university**
1:6 7:6 8:6 10:13
11:22 16:2,6,17
18:16 19:9 20:1,8
24:23 25:1 28:21
31:14,21 32:3
38:10,11,15,21
48:11 50:19 55:11
69:3 89:9,10 94:14
95:13 96:24 97:13
115:4,7 116:16,16
125:18 126:18
127:3,6
**university's**
10:16
**unofficial**
71:14 131:15
**unofficially**
133:9
**unpleased**
79:13
**unquote**
72:1
**unreliable**
106:9
**untenured**
59:4 120:22 127:7
**unwillingness**
134:16
**updated**
116:21 153:5
**upload**
65:8,15,17,18,19
66:1
**upset**
73:4 79:13 147:13
147:19

**upsetting**
147:13
**use**
30:1,8 31:13 36:1,8
61:24 64:23
**usually**
23:5 26:11 29:13
35:9 36:4 37:20
38:7 41:17 64:11
92:20 94:10
**Uysal**
125:17
**U.S**
21:20 22:7

---
### V

**vague**
15:21 26:1 32:7
44:8 46:6 47:23
51:11 55:16 58:11
62:15,22 68:1 74:6
80:19 81:12 82:24
84:4 88:14,14
97:21 113:9
134:12 139:10
▉▉▉▉
15:7 18:6
**various**
46:2 139:7
**version**
116:21,22
**versus**
4:13 11:5 21:7
67:23 71:14
113:18
**vice-president**
10:14
**video**
137:23
**videoconference**
1:9 2:1
**Vincentian**
17:13 19:8
**Vincentian's**

17:5
**Vinny**
68:16 70:7,12
**Vinny's**
70:2,19,20
**virtual**
39:19
**virtually**
39:20
**voices**
11:8
**voluntary**
93:16
**volunteer**
11:23,24 37:24
38:12 126:7
**volunteered**
12:22 18:19 42:19
43:22 44:4,15
72:17,19 140:18
**volunteers**
26:18,19 28:13,13
**vote**
24:18 25:3 29:9
38:6 39:15,22,24
40:4 41:15,19
43:11,16,19 44:7
44:10,19 45:8,10
45:15,17 46:9 60:3
60:4 63:15 64:22
84:16,17,18
107:20 114:2
136:5,6,23 141:2
141:16 142:20
144:20 146:4,11
146:16,23 147:3,6
147:16 148:9
149:8,9,13,14
**voted**
135:22 139:24
141:23
**votes**
24:6 25:3 40:3 61:6
66:5 105:10


MAGNA
LEGAL SERVICES

146:12,18 147:8
**voting**
38:22 42:9 56:22
  61:7 137:7 139:6
  140:2 147:10,22
**vs**
1:5

**W**

**Wacker**
2:3,8
**wait**
70:2,19 127:24
**waive**
152:15
**walked**
74:20 148:6
**wall**
132:24
**want**
17:23 21:13 22:2,10
  34:10 35:5 38:1
  41:5,7 45:16 48:22
  50:13,20,20,23
  52:13,15 56:10
  65:6 79:16,17 89:2
  89:4,7 96:23 101:8
  101:9,9 116:10,11
  116:23 121:23
  126:9,11 129:10
  134:1,22 137:22
**wanted**
11:22 18:16 19:23
  38:4 42:1,16 53:12
  56:14 57:16 60:14
  65:5 72:10,24
  89:11 97:18 102:9
  105:18 110:14
  123:24 124:1
  145:21
**wanting**
40:19 148:10
**wants**
10:2 117:16

**warrant**
147:5
**warranted**
135:19
**wasn't**
39:14 41:22 43:3,6
  43:13 44:21,22
  48:15 55:7 58:2
  65:20 69:4,6 70:13
  70:16 76:13 77:21
  78:22 83:24 85:6
  90:5 104:19 116:2
  116:3 140:5
  141:22 142:14
  147:8 148:1,23
  151:14
**water**
50:22
**way**
7:2 22:6 27:5 49:16
  60:9 78:20 81:23
  82:16 106:16
  124:2 126:12
  130:19 131:18,19
  134:15 146:23
  149:4
**ways**
81:10,14 84:14
  114:10 127:22
  143:17
**Wednesday**
1:16
**week**
6:21 27:22,23,24
**weeks**
27:23
**weigh**
123:24 124:1 125:8
**weird**
125:19
**welcome**
114:4
**went**
39:4 60:10 64:5

70:20 76:3 80:4
  109:4 130:21
  143:18
**weren't**
70:8 78:20 147:12
**Wermuth**
2:8 3:5 5:18 13:8
  15:21 16:9,13 21:9
  22:13 26:1 30:15
  30:17 31:2 32:7
  35:14 41:4,11 43:4
  43:17 44:8 45:3,11
  45:22 46:6 47:23
  48:22 50:1,5 51:2
  51:11,19 52:13,20
  53:1,5,18,21 55:21
  55:24 57:22 59:7,9
  62:15,20 66:15
  68:1 70:24 71:5
  73:18 74:6 75:14
  80:19 81:12 82:21
  82:24 83:10 84:4
  85:2,11 86:8 92:7
  92:10 93:21 96:6
  97:21 99:7 101:22
  102:1,12 105:4
  106:19,23 107:2
  108:19 109:11,13
  109:18 112:19
  113:9,24 115:1,10
  115:17,19,21
  116:6 118:1,21
  119:5 121:4,15
  123:3 134:12
  135:6,9,12,15
  139:10 148:20
  150:1,7 151:21
  152:5,12,20
**West**
2:3 28:11
**we'll**
5:14 7:2 12:9 13:6
  41:12,12 49:7
  63:22 85:15

121:12
**we're**
4:18 15:1 21:20
  31:14 41:5 47:18
  53:10,11 61:23
  66:18 67:11 68:15
  82:17 85:14,16
  92:8 94:8,9 97:5
  100:1 112:5
  118:17 119:17
  125:10,13 130:2
  134:20 140:14,15
  150:21 151:17
  152:6
**we've**
62:22 85:15 116:14
  129:23 134:20
  152:5
**white**
69:11 72:7 82:7
  148:8
**wider**
101:5
**willful**
132:11 133:2,4,20
  133:22 134:10
**willing**
40:18 91:23 133:17
**win**
79:6
**Winchatz**
34:16 35:22 91:19
**winter**
29:14
**witness**
3:2 4:1,3 13:9 21:11
  22:16 26:2 30:16
  30:23 31:4 32:8
  35:16 41:7 43:5,18
  44:9 45:4,12,23
  46:7 47:24 49:2,6
  50:11 51:5,12,20
  52:3,17,24 53:3,6
  57:23 62:17,21



68:2 71:3 73:19
74:7 75:16 80:20
81:13 83:1,3,11
84:5 85:4,9 86:13
92:13 93:12,22
96:7 97:23 99:8
100:13,16 102:4
102:17 107:7
108:9,20 109:17
109:20 110:7
112:21 113:10
114:1,17 115:2
116:18 118:3
119:6,23 121:16
121:17,19 122:12
123:4 134:14
135:11 148:21
152:7,18,22,24
154:3,7,13,17
**witnessed**
86:22
**woman**
66:22 67:2,4 100:20
132:15 141:12
**women**
62:3
**Wonderful**
118:6
**word**
78:14,15 112:17
148:17,18
**wording**
44:22 61:4 66:4
148:12
**words**
88:6
**work**
8:4,4 24:1 26:3
27:10 31:20 35:7
40:18 41:8,24
42:17 46:17 47:10
64:1 82:15 83:24
94:9,11 97:14
108:2 115:10

116:1 118:11
128:17 136:3,3,19
**worked**
8:6 72:16 83:17,19
118:13
**working**
8:5 12:13,14,15,19
12:20,22 13:6,15
14:7,24 17:3,4
19:19,19 34:24
83:18 97:5
**works**
43:16 102:23
127:22
**worn**
87:5
**worries**
19:4 31:2 57:15
69:24
**worry**
99:15 133:9
**worth**
115:14 146:2
**wouldn't**
45:13,14 49:21
70:15 111:13
115:2,11 121:21
142:15
**write**
26:7,19 27:15 34:6
35:4 38:13 86:2
88:4,7 89:23 90:2
90:4,10
**writing**
4:24 10:4 93:24
**wrong**
109:17
**wrote**
86:5,19 89:16
107:14 135:20
**www.magnals.com**
1:23

---

**X**

**X**
3:1,7

---

**Y**

**yea**
128:7
**yeah**
10:20 12:11 14:23
16:13,18 17:20
18:22 20:9 21:22
27:12 28:18 31:12
35:17 39:1 46:14
47:14 54:14 68:20
69:1,22 71:18
79:12 86:8 87:23
88:17,22 91:7,18
92:9,15 94:4 100:1
103:17 104:6
112:22 113:18
122:4 123:18
125:4 128:5,10
130:4 131:6
139:12 142:18
148:8 152:19
**year**
8:10 10:10 14:23
23:15,18,18 24:10
24:10,10 29:12,13
29:20 33:2,3 39:6
43:10,23 60:2
63:11,12 64:22
89:7,12 116:23
124:23 127:13,20
128:1 132:16
**years**
8:7 11:16 17:22
23:13,16,17 28:7,8
28:24,24 30:7
47:16 64:6 96:23
98:23 99:3 127:22
132:17 140:15
**yesterday**
6:12 57:14,16 65:6
**young**

66:21 82:6,7 132:14
140:14

---

**Z**

**Zoom**
147:10

---

**0**

**084-003819**
2:13 154:21

---

**1**

**1**
3:8 51:24 52:1,6,7
119:1 123:7
**1:20-cv-7760**
1:5
**10**
3:11 19:6 93:8,10
**10:00**
1:16 154:5
**100**
10:10 18:1 23:23
28:18 29:19 46:24
54:21 58:17 71:10
109:3 116:8
122:19
**100%**
57:14
**101**
3:12
**103**
3:12 135:11
**108**
3:13 131:5
**11**
3:12 27:23 101:13
101:16 140:15
**11th**
27:23
**11:04**
78:13
**11:14**
79:3



**11:19**
49:8
**110**
3:13
**114**
3:14
**119**
3:14
**12**
3:12 12:4 53:20
  103:3,4 140:15
**12-person**
11:2,5 12:5
**120**
3:15 52:13
**121**
2:3 3:15
**122**
3:16
**123**
2:8
**13**
3:13 54:16 108:6,7
  109:11
**130**
86:10
**134**
88:16,17
**138**
3:16,17
**139**
90:14,19
**14**
3:13 110:2,5 140:11
**14th**
154:19
**140**
90:20
**142**
91:9
**143**
53:11 91:9
**144**
91:9

**146**
92:6
**15**
3:14 40:6,6 59:8
  114:13,15 115:17
  115:24 118:1
  140:11
**15th**
89:13
**150**
3:5
**152**
3:6
**162**
93:8
**1635**
154:22
**166**
93:8
**168**
101:13
**17**
3:14 119:19,21
**177**
101:14
**18**
20:6 39:7 40:6,7
  66:7
**1800**
2:8
**1800's**
19:11
**186**
105:20
**19**
3:15 39:7 120:11,13
  121:5,9,12
**190**
108:5
**19103**
154:23
**192**
110:3
**196**

114:13
**199**
118:3

_____
2
_____

**2**
3:9 86:4,7,11 89:16
  95:3,20 121:8
**20**
3:15 121:2,7,9,14
**2003**
7:23
**2011**
8:3
**2013**
8:11
**2016**
9:14
**2017**
54:16 59:15 63:13
  150:21 151:18
**2019**
10:9 17:24 18:15,19
  108:23 109:1,9,16
  116:22 124:21
  140:7
**2020**
9:14 17:24 32:14
  109:8,8 140:7
**2022**
1:16 116:20 117:3
  117:12 153:6
  154:6,19
**206**
114:13
**21**
3:16 122:8,10 153:6
**213**
119:20
**217**
120:12
**219**
121:2
**224**

122:9
**2244**
108:6
**2252**
86:10
**23**
3:16 59:15 138:5,6
  144:8
**2300**
2:3
**24**
3:17 138:5,6 144:24
**27**
1:16
**27th**
154:5
**28**
109:15
**2817**
52:9,19,23
**2827**
53:16
**2828**
57:8
**2830**
59:6,13 65:4
**2833**
66:6
**2835**
66:18
**2846**
67:11
**2852**
69:12
**2853**
69:15
**2855**
69:16,22 70:1
**2861**
71:17
**2869**
78:4
**2870**
78:23



**29**
130:1 135:4
**2900**
123:11,14
**2902**
124:9
**2910**
128:2
**2912**
130:3
**2918**
135:5,7,13
**2923**
131:5
**2943**
52:10
**2974**
110:3
**2976**
110:3

**3**

**304**
103:3
**31**
67:11
**312**
2:4,9
**313**
103:3
**3178**
114:14 119:1
**3188**
114:14
**3315**
119:20
**3323**
121:13
**3324**
121:3
**3327**
122:3
**3328**
121:3,13

**3375**
90:14
**3376**
90:21
**37**
69:13
**38**
69:16,16,18
**39**
69:16,20

**4**

**4**
3:4,9 88:15,18
117:24
**4th**
59:18
**40**
69:22
**45**
10:12
**46**
71:17
**474-7900**
2:9
**4954**
144:12
**4957**
144:13
**4958**
145:1

**5**

**5**
33:2,4 122:2
**50**
3:19
**506-5511**
2:4
**51**
3:8
**54**
78:4
**5785**

92:6

**6**

**6**
3:10 90:13,15 121:8
122:2
**6,000**
33:2,4
**6:39**
128:7
**60601**
2:4
**60606**
2:9
**624-6221**
1:22 154:23

**7**

**7**
3:10 91:8,11
**7:50**
124:21

**8**

**8**
3:11 27:22 92:5,7
92:11
**8TH**
154:22
**8134**
91:10
**8135**
91:10
**8136**
91:10
**8157**
93:9
**8158**
95:4
**8161**
93:9
**85**
123:13
**86**

3:9
**866**
1:22 154:23
**87**
124:10
**88**
3:9

**9**

**9**
124:21
**90**
3:10
**91**
3:10
**92**
3:11
**93**
3:11
**9413**
101:14
**9422**
101:15
**95**
128:3
**97**
130:2
**99**
7:14 118:3



# EXHIBIT F

# DR. AZZARO DEPOSITION

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SYDNEY DILLARD,                    )
                                   )
                Plaintiff,         )
                                   )
        -vs-                       ) No. 1:20-CV-7760
                                   )
DEPAUL UNIVERSITY,                 )
                                   )
                Defendant.         )


        The videoconference discovery deposition of

DAN AZZARO, taken pursuant to the provisions of the Code

of Civil Procedure and the Supreme Court Rules of the

State of Illinois pertaining to the taking of depositions

for the purpose of discovery, taken before DEANNA L.

TUFANO, Certified Shorthand Reporter of the State of

Illinois, at wherein all the parties attended remotely on

Wednesday, May 27, 2022 at 9:00 a.m.



Reported for:

MAGNA LEGAL SERVICES

(866) 624-6221

www.magnals.com, by:

Deanna L. Tufano, C.S.R.



```
                                                        Page 2
 1   A P P E A R A N C E S:            VIA VIDEOCONFERENCE

 2

     DISPARTI LAW GROUP, P.A.
 3   MS. GIANNA R. SCATCHELL
     121 West Wacker Drive, Suite 2300
 4   Chicago, IL  60601
     (312) 506-5511
 5   gia@dispartilaw.com

 6        on behalf of the Plaintiff;

 7

     COZEN O'CONNOR
 8   MS. ANNA WERMUTH
     123 North Wacker Drive, Suite 1800
 9   Chicago, IL  60606
     (312) 474-7900
10   awermuth@cozen.com

11        on behalf of the Defendant;

12

     Reported BY:  DEANNA L. TUFANO, CSR
13                 LICENSE NO. 084-003819

14

     ALSO PRESENT:  Plaintiff, Sydney Dillard
15

16

17

18

19

20

21

22

23

24
```



```
                                                      Page 3

 1                    I N D E X

 2   WITNESS                                         PAGE

 3   DAN AZZARO

 4        Examination by Ms. Scatchell .............. 4

 5        Examination by Ms. Wermuth ............... 28

 6

 7                  E X H I B I T S

 8

          No exhibits were marked or tendered.
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```



Page 4

                                              (Witness sworn.)

2                          DAN AZZARO,

3      called as a witness herein on behalf of the Plaintiff

4      having been duly sworn, was examined and testified as

5      follows:

6                          EXAMINATION

7      BY MS. SCATCHELL:

8          Q    What do you prefer that I call you, Mr. Azzaro,

9      Dan, Professor?

10         A    Mr. Azzaro.

11         Q    Okay.  Well, good morning, Mr. Azzaro.  My name

12     is Gianna Scatchell.  I represent Sydney Dillard in the

13     matter of Dillard versus DePaul.  And have you ever been

14     deposed before?

15         A    No.

16         Q    Okay.  So I'm going to go over some ground rules

17     about how a deposition works.  It's basically a

18     conversation between the two of us where you're under

19     oath and you're sworn to tell the truth.  You understand

20     that part, correct?

21         A    Yes.

22         Q    Okay.  And I am going to ask you a series of

23     questions that I ask everybody.  It's nothing about you

24     personally.  But have you taken any medication today that



Page 5

1   could affect your ability to testify truthfully and

2   accurately today?

3        A    No.

4        Q    Okay.  Because we have a court reporter here

5   taking down everything that we say, it's very important

6   that we don't talk over each other.  So if you don't

7   understand a question as well, please let me know and

8   I'll rephrase the question.  But if you don't ask me to

9   rephrase the question, I'm going to assume that you

10  understand what I'm asking you.  From time to time, your

11  attorney, Ms. Wermuth, is going to make objections.

12  Unless she specifically instructs you not to answer the

13  question, please answer the question.  She's just going

14  to make her objection for the record, and then you're

15  able to continue on unless she instructs you otherwise.

16            And then if you if you need a break or

17  anything like that, you just let us know.  And we just

18  ask that when you ask to take a break, that there are no

19  pending questions at that time.

20       A    Okay.

21       Q    Okay.  Can you please state and spell your name

22  for the record.

23       A    Daniel Azzaro, A-Z-Z-A-R-O.

24       Q    And what is your current occupation?



Page 6

1      A   I am a Professional Lecturer at DePaul.

2      Q   Okay.  Great.  How long have you been in that

3   position for?

4      A   I believe it's like 12 years.

5      Q   Okay.  And do you teach a specific subject?

6      A   I teach a variety of subjects in the PRAD

7   Program.

8      Q   Okay.  And that is at the College of

9   Communications within DePaul?

10     A   Yes.

11     Q   Okay.  And are you a tenured professor?

12     A   No.

13     Q   Okay.  And do you know Sydney Dillard?

14     A   Yes.

15     Q   And how long have you known her for?

16     A   As long as when she got to DePaul.  I think it

17   was a couple years after me.

18     Q   Okay.  And how do you know her just from being

19   another professor or more on a social level too?

20     A   Just as a colleague.

21     Q   Okay.  And do you know what subjects that Ms.

22   Dillard teaches?

23     A   Some advertising, and I believe some health

24   advertising classes.  Specifically, no.  Probably



1  principles of advertising.  I think she taught media

2  planning, but I'm not exactly totally sure on the

3  specifics.

4      Q   Okay.  And are you familiar with the position of

5  program chair?

6      A   Yes.

7      Q   Okay.  And what is that position?

8      A   It is basically -- okay, there's a chair of the

9  program.  Basically you run the program, you know.

10 Responsible for hiring, reviews, curriculum for our

11 specific group.

12     Q   Okay.  And then is there a difference between a

13 program chair and a program director?

14     MS. WERMUTH:  Objection.  Vague.

15 BY MS. SCATCHELL:

16     Q   You can answer.

17     A   I don't know.  I've always called it a chair or a

18 director.  But I believe we call them chairs, directors,

19 I am not sure.

20     Q   Okay.  And do you know if Ms. Dillard ever

21 applied for the PRAD chair position?

22     A   Yes, she did.

23     Q   Okay.  Do you remember approximately what year

24 that was?



Page 8

1      A    2018, 2019, something like that.  It was before

2   the pandemic.

3      Q    Okay.  And do you remember what the outcome of

4   her running for -- or applying for that position was?

5      A    She didn't get it.

6      Q    And how was a program chair selected, is it a

7   vote?

8      A    Yes.  In this particular case, it was a vote.

9      Q    And it's a faculty vote, correct?

10      A    Correct.

11      Q    Okay.  And do you remember who voted?

12      A    I'm not trying to be a wise ass, but the faculty

13   term, which is what I am, nontenure and tenure.  I can't

14   tell you everybody was in the room, but it as a lot of

15   us.

16      Q    Okay.  So it would be like more than 10?

17      A    Yes.

18      Q    Okay.  Less than 20?

19      A    Okay.  It's probably in the 10 to 15 range, but I

20   honestly couldn't tell you the exact number.

21      Q    Okay.  And you were a part of that vote, correct?

22      A    Yes.

23      Q    Okay.  And do you have to have a quorum or how do

24   you guys figure out how many people need to be there out



Page 9

1    of the faculty that vote?

2        MS. WERMUTH:  Objection.  Foundation.  Go ahead.

3    BY THE WITNESS:

4        A   I don't know.

5    BY MS. SCATCHELL:

6        Q   Okay.  Do you remember how many people voted in

7    favor of Ms. Dillard becoming the program chair?

8        A   I believe it was three.

9        Q   Okay.  And you previously testified that you

10   voted, correct?

11       A   I did vote.

12       Q   And then did you vote for or against Ms. Dillard

13   getting the program position?

14       A   ████████████

15       Q   Okay.  And was it an anonymous vote?

16       A   Yes.

17       Q   Okay.  And do you know if there are minutes that

18   were taken during that vote?

19       A   I don't know.

20       Q   Do you know who would know?

21       A   The dean or the interim dean at that time.

22       Q   That would be Lexa Murphy?

23       A   Yep.

24       Q   Do you know if there was any sort of record that



Page 10

1    was made?

2        MS. WERMUTH:  Foundation.  Objection.

3    BY THE WITNESS:

4        A   I don't know.

5    BY MS. SCATCHELL:

6        Q   Okay.  And do you remember if Ms. Dillard gave a

7    speech at the beginning or before the vote took place?

8        A   Yes, she did.

9        Q   And then that was -- do you remember what she

10   said?

11       A   Not totally.  There were a few things in terms of

12   what she saw the direction of the department going.  She

13   had said that she wasn't going to put -- and I'm

14   paraphrasing because the intent is not coming t

15   hrough -- that she wasn't going to put the type of hours

16   that ███ ██, the previous chair did.  And I'll back

17   that up with ███ tended to be on email 24 hours a day,

18   7 days a week.  And Sydney said it in a far better way.

19   I know I'm saying it now and it comes off like she didn't

20   want to do the work, that's not what I'm saying.  But

21   rather, just not the insane hours that ███ would keep.

22       Q   Okay.  So is it fair to say that Sydney was

23   trying to be more mindful of work hours versus non-work

24   hours?



Page 11

```
 1     A   Yes --

 2     MS. WERMUTH:  Objection.  Foundation.

 3  BY MS. SCATCHELL:

 4     Q   And is it also fair to say that Sydney's approach

 5  was taking more of a worklife balance?

 6     MS. WERMUTH:  Objection.  Foundation.  Argumentative.

 7  Irrelevant.  Go ahead.

 8  BY THE WITNESS:

 9     A   Yeah.  I would say so.

10  BY MS. SCATCHELL:

11     Q   Okay.  And do you remember if Sydney was

12  nominated or who nominated her?

13     A   I believe she nominated herself.

14     Q   Okay.  And do you know if anybody else had

15  nominated her as well?

16     A   I don't know.

17     Q   Okay.  Do you know somebody named Don Ingle?

18     A   Yes.

19     Q   Who is he?

20     A   He is a fellow teacher in the department.

21     Q   Do you think that he nominated her?

22     A   I don't know.

23     Q   Do remember if anybody had abstained from voting?

24     A   I don't know.
```



Page 12

1     Q   And then prior to taking a vote, is there any

2  kind of discussion that occurs?

3     A   Yes.

4     Q   Okay.  What happens with that?

5     MS. WERMUTH:  Objection.  Vague.

6  BY MS. SCATCHELL:

7     Q   What happens with that discussion?

8     A   People comment on the candidate.

9     Q   And do you remember what the discussion was with

10 Syndney's candidacy?

11    A   ███████████████████    ██████████████████████

██    ████████████████████████████████████████████████████

██    ██████████████████████████████    ████████████████████

██    █████████████████████████████    ███████████████████

██    ██████████████████████████████████████████

16    Q   Okay.  And was that ███████████████i?

17    A   Yes.

18    █   ███████    ██████████████████████████████████

██    █████████████████████████████████████████████████████

██    ██████████████████████████████████████████████████████

██    ████████████████████████████████

22    MS. WERMUTH:  Objection.  Asked and answered.  Vague.

23 Vis-a-vis stuff like that.  You can answer, Dan.

24 BY THE WITNESS:



Page 13

1 ███ ██████████████████████

██ █████████████████████████████

██ ████████████████████      But other than that, I

4 don't remember anything else.

5 ███ ████████ ██████████████████████

██ ██████████████████████████████████

██ ████████████████████████████

8 ███ ████████ ██████████████████████████

██ ██████████████ ████████████████████

██ ██████████████████ ██████████████████

██ ████████████████████████████

12 Q ████████████ ████████████████████

██ ████████████████████████████████

██ ████████████

15 ███ ████████████████ ████████████████████

16     Q   Okay.  Do you remember if Sydney's CV was

17 provided to the faculty members that voted?

18     A   I don't remember.

19     Q   Okay.  Would there be anything that would refresh

20 your recollection?

21     A   No, sorry.

22     Q   No problem.  All right.  And then was Sydney in

23 the room for that vote?

24     A   No.



Page 14

1    Q   Do you remember how long the conversation lasted

2    for in terms of discussion to vote?

3    A   You mean the discussion after -- hang on.

4    Clarify that for me, please.

5    Q   Sure.  So how long did the conversation or

6    discussion last for prior to deciding to vote on whether

7    or not Sydney should get program chair?

8    A   I believe it was in the area of like a half hour

9    to an hour, but I can't really remember that.  But I do

10   know it was longer than a half hour.

11   Q   Okay.  And then is the vote immediate, or the

12   results immediate rather?

13   A   You have a discussion and then we voted.

14   Q   And then the results are tallied immediately, I'm

15   assuming?

16   A   Yes.

17   Q   Okay.  And who is ███████  ███████?

18   A   She was the -- I'll say it this way -- retiring.

19   Meaning, she was leaving the chair.  She was the previous

20   chair of the department.

21   Q   Okay.  And do you remember anything that you had

22   said during the discussion of the vote for Sydney's

23   program chair?

24   ██  ████████████████████████████████████████







Page 16

1 ████████████████████████████████████████████

2 ████████████████████████████    ██████████

3 ███████████████████

4   Q   All right.  And then was there an underlined tone

5 that Sydney wasn't able to make it as the program chair?

6   MS. WERMUTH:  Objection.  Vague.

7 BY THE WITNESS:

8   A   I don't think so.  I don't remember.

9 BY MS. SCATCHELL:

10      ██  ████████  ███████████████████████

11 ████████████████████████████████████████████████

12 ██████

13      ██  ████████████████  ██████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████

16 ███████████

17   Q   And then --

18   A   Let me finish, please.

19   Q   I'm sorry.

20   A   I'm not sure what else was said.  I don't

21 remember.

22      ██  ██████  ██████████████████████████████

23 ██████████████████████████████████████

24 ██████████████████████████



Page 17

1    MS. WERMUTH:  Objection.  Foundation.  Also vague.

2  BY MS. SCATCHELL:

3    Q   You can answer.

4    ▮ ████████████████████████████████████

▮ ████████████████████████████  ████████████

▮ ██████████████████████████████████

▮ █████████████  ██████████████████████████

▮ ████████████████████████████████  ████

▮ ████████████████████████████████████

▮  ████████████

▮   ▮  ████  ████████████████████████████

▮  ██████████████████

13    A   I'm sorry, could you repeat that.

14    Q   Was knowing Sydney a requirement or qualification

15  ████████████████████

▮  ▮  ████████████

▮  ▮  ████████████████  ████████████

▮  ████████████

19    MS. WERMUTH:  I'm going to object.  Hang on one

20  second.  You're characterizing these are his words.  That

21  mischaracterizes his testimony.  Go ahead, Dan.

22  BY THE WITNESS:

23    ▮  ████████████████████████

▮  ████████████████████████████████



Page 18

1 ████████████    ██████████████    █████████████

██  ████████    ██████████████████████    ████████

██  ████████████████████████    ████████████████████

██  ████████████████████████████

██  ████████████████████████████    ████████████

██  ██████████████

7    BY MS. SCATCHELL:

8        Q    And then did you have any conversations with Ms.

9    Dillard after the program chair results had come out?

10       A    I did.

11       Q    Do you remember what she said to you and what you

12   said to her?

13       A    She came into my office and said thank you for

14   voting for me, which I was surprised that she knew that,

15   so someone had told her, not me.    ████████████████████

██  ████████████████    ████████████████████████

██  ██████████████    ████████████████████    But if you

18   want this job, knock yourself out.  And that's why I

19   figured we'll figure it out later if you don't work out.

20   She was the only one who got nominated or put herself in

21   nomination for this.  However, it happened.  So she

22   wanted the responsibility, God love her.  And that was

23   the conversation we basically had in my office, I believe

24   it was a little while after the vote after Lexa had a



Page 19

1    conversation with her.

2        Q   Okay.  And then ████ ██ is, you said that she

3    was the retiring program chair?

4        A   Right.

5        Q   All right.  And was she tenure track as well?

6        A   She already had tenure by that point.  I don't

7    believe you can be chair without having tenure, but I

8    could be wrong on that.

9        Q   And do you know if there was a vote to have ████

10   ██ stay in that position?

11       A   No.  The decision was made probably by Lexa --

12   again, not sure -- that ████ agreed to stay on for one

13   more year, and then we'd have a redefining of the job

14   responsibilities, if you will, the chair and have another

15   vote in the following year.  ████ wanted to get back in

16   doing more research and other things.  Again, when you're

17   chair, you have time for nothing else.

18       Q   Okay.  And were you part of the vote -- let me

19   back up.

20               So the program chair is a three-year

21   position?

22       A   I believe so.

23       Q   And do you know if there's any policy that allows

24   a program chair to be in that position for one year



Page 20

1    instead of the three years?

2         A    I don't know.

3         Q    And when ███ was originally voted for program

4    chair, were you part of that vote?

5         A    I probably was, I don't remember.

6         Q    Okay. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██ ██ ████████████████████████████

████████████████████████████████████████

████████ ████████████████████████████

████████████████████████████ ██

████████████████████ But again, ████████

15   wanted to run.  And again, okay, we're going to vote her

16   in.

17        Q    And do you know how the current PRAD

18   qualifications have been revised since the vote with

19   Sydney in 2019?

20        A    No, I don't.

21        Q    Okay.  Have you been part of any additional votes

22   for program chair?

23        A    No.

24        Q    Then do you know who the current program chair is



Page 21

1   at that point in time?

2       A   Yeah, Maria.

3       Q   De Moya?

4       A   Yes.

5       Q   All right.  And do you know when she was

6   installed into that position or voted into that position?

7       A   Well, if the voting thing with Sydney happened in

8   2019, it probably was 2020.  But don't quote me on that,

9   I don't remember.

10      Q   All right.  And do you recall there being any

11  conversation about having any concerns that ██████ ████

12  wanted to step down from the position and now she was

13  going to be renewed for another year?

14      A   Can you rephrase that?  I'm not sure what you're

15  getting at.

16      Q   Sure.  So basically the fact that you said ████

17  ████ was retiring, yet she was renewed for one year?

18      A   Let's change the word retiring.  She was

19  leaving -- her time was up.  She wanted to leave the

20  position, so she served, I believe, for three years.  A

21  three-year term she was done.  That's typical for a lot

22  of people.

23      Q   Okay.  And then now she was asked to stay on one

24  extra year, correct?



Page 22

1      A    Right.

2      Q    And then do you know who asked her to stay on for

3  the extra year?

4      A    I believe it would have been the dean, the

5  interim dean.  That would have been Lexa.

6      Q    And do you know why they wanted her to stay on an

7  extra year rather than choosing Sydney who wanted to do

8  the position?

9      MS. WERMUTH:  Let me just object to this.  First of

10  all, when you say they wanted her to stay on, it's

11  unclear, it's vague.  I will also just point out that you

12  actually have deposed Lexa Murphy.  You might want to ask

13  him if he had a conversation about her decision.  But

14  just asking him why --

15      MS. SCATCHELL:  Your objection is noted.  Your

16  objection is noted.  I don't need a monologue --

17      MS. WERMUTH:  It's inappropriate and lacks

18  foundation --

19      MS. SCATCHELL:  Okay.  I don't need your monologue.

20  I just need your objection.  Speaking objections are

21  inappropriate --

22      MS. WERMUTH:  I will refrain from saying much, but

23  like this entire deposition has been -- just in the 30

24  minutes we have been going has been precisely this kind



Page 23

1    of questioning, inappropriate.  Go ahead, Dan.

2        THE WITNESS:  Can you repeat the question?

3        MS. SCATCHELL:  Ms. Court Reporter, could you please

4    repeat the question.

5                              (Question read.)

6    BY THE WITNESS:

7        A    Well, the faculty voted against Sydney, and

8    therefore, Sydney was not going to be chair.  She lost

9    that vote.  We then had nobody else willing to step up,

10   so Lexa came up with a suggestion -- because people were

11   talking about two different things, not voting in Sydney,

12   and at the same time talking about revising the duties,

13   Lexa came up with a suggestion -- I believe it was

14   Lexa -- came up with the suggestion of having ████ stay

15   one more year while a team, a group of people, worked

16   on -- and I don't know who was on that group before you

17   even ask.  A group of people come up with revising the

18   role of the chair, the duties of the chair, and that

19   ████ agreed to stay on one year and then we would have

20   other people running for that chair position.

21       Q    Got it.  And then at the beginning of the -- or

22   prior to taking the vote or having the discussion for the

23   program chair position, the speech that Sydney would give

24   or the presentation, would that be an opportunity for the



Page 24

1  faculty to get to quote, unquote, know Ms. Dillard?

2      A   It certainly would.  I mean, as someone that's

3  giving their qualifications, yeah, then you could

4  probably say that's an opportunity to take -- for the

5  candidate to take.

6      Q   Okay.  And would there be any other opportunities

7  for somebody to quote, unquote, get to know Ms. Dillard?

8      MS. WERMUTH:  Objection.  Lacks foundation.

9  BY THE WITNESS:

10     A   Yeah, I would guess.  You know, not in that

11  particular meeting, just the day-to-day operations and

12  day-to-day teaching.

13 BY MS. SCATCHELL:

14     Q   And in your opinion, do you think that the way

15  that the vote was handled regarding Ms. Dillard's program

16  chair vote was fair?

17     A   Yes --

18     MS. WERMUTH:  Objection.

19     MS. SCATCHELL:  Now, there's an objection, okay.

20 BY MS. SCATCHELL:

21     Q   Why did you think it was fair?

22     MS. WERMUTH:  I'm sorry, what?  What, Gia?

23 BY MS. SCATCHELL:

24     Q   Why do you think it was fair?



Page 25

1    MS. WERMUTH:  Wait, I'm sorry.  I need to understand

2  what you said, Gia, so I can respond.

3    MS. SCATCHELL:  No, it was nothing.  It was my own

4  speaking utterance.  Go ahead.

5    MS. WERMUTH:  No, no, no.  No, no, no.  I'm sorry.

6  If you made an assertion or some sort of comment that I'm

7  only objecting because -- or that I withdraw my objection

8  because it was answered, that's not accurate.  He

9  answered before I had the opportunity to object.  I do

10  think your question was objectionable.  He did answer it.

11  So we don't -- if you're going to say something on the

12  record, you have to be willing to say it --

13    MS. SCATCHELL:  Oh, I'm willing to say anything on

14  the record --

15    MS. WERMUTH:  -- be prepared to allow counsel to

16  respond --

17    MS. SCATCHELL:  I am prepared to allow counsel to

18  respond.  It just was not necessary.

19  BY MS. SCATCHELL:

20    Q   And why do you think it was fair, Mr. Azzaro?

21    A   Sydney was given the opportunity to make her

22  pitch.  We took a vote, and it seemed to me as a normal

23  operating procedure in process.

24    Q   All right.  And let's see here, I guess I'm just



Page 26

1  trying to understand how you say the process was fair,

2  but then going back to your prior testimony about you

3  ██████████████████████████████████████████████████

   ██████████████████████████████████████████████████

   ████████████████

6      MS. WERMUTH:  I'm sorry, can you read the question

7  back.

8                              (Question read.)

9      MS. WERMUTH:  Let me just object.  Argumentative.  Go

10  ahead.

11  BY THE WITNESS:

12      A   The process I still believe was fair, right.

13  People give their speech.  I can't understand -- asking

14  me to explain what other people think is just a guess on

15  my part.  But the process is the process.

16  BY MS. SCATCHELL:

17      Q   Right.  And maybe I wasn't clear and I apologize

18  for that.  My understanding is that there is a discussion

19  prior to the vote?

20      A   Right.

21      Q   And the discussion takes place amongst the whole

22  faculty, correct?

23      A   Right.

24      Q   Okay.  And then during that discussion, I'm only



Page 27

1   assuming that some people said this is why we want Ms.

2   Dillard to be program chair, and then some people said

3   this is why we do not, correct?

4       A   Probably.  I honestly don't remember who said

5   what at what time.

6       Q   Except for what you previously testified that ▇

▇       ▇▇▇▇▇▇▇▇▇  had stated?

8       A   Right.

9       Q   Okay.  Is there anything else that you remember

10  from the program chair vote regarding Sydney Dillard's

11  candidacy?

12      A   No, nothing.

13      Q   All right.  And then is there anything else that

14  you remember from your discussion with Ms. Dillard after

15  the program chair voting results had come in?

16      A   No.  That conversation was more about my comment

17  to her about why I voted for her and just talking about

18  that.  There were other things discussed, but I don't

19  remember.

20      Q   Okay.  And why did you vote for Ms. Dillard?

21      A   As I mentioned earlier --

22      MS. WERMUTH:  Asked and answered --

23  BY THE WITNESS:

24      A   Sorry.  If you want this particular job, go ahead



Page 28

1    and take it.  She was the only one who applied.  I know

2    how tough it can be.  And therefore, I figured if she

3    wanted that responsibility, go right ahead and we'll

4    figure it out as we go along.

5    BY MS. SCATCHELL:

6        Q    All right.  When you made that decision to vote

7    for Sydney, did you look at any of her qualifications in

8    terms of what made you decide to vote for her, or was is

9    it just the fact that she wanted to do the position, then

10   she should be able to do it?

11       A    It was more if you want to take that

12   responsibility on, go ahead.  I wasn't really even

13   looking at her qualifications.

14       MS. SCATCHELL:  All right.  We have no further

15   questions.

16       MS. WERMUTH:  Thanks, Dan.  I have just two or three

17   quick clarifying questions.

18       THE WITNESS:  Yes.

19                         EXAMINATION

20   BY MS. WERMUTH:

21       Q    In discussion about the vote, there's been

22   reference to all of the faculty or the whole faculty.  I

23   just want to clarify we're talking faculty just in the

24   PRAD program?



Page 29

```
 1      A   Correct.
 2      Q   Okay.  So the other programs within the college,
 3   faculty from those programs were not voting in this
 4   particular set of deliberations?
 5      A   No.  When you vote for a chair in your group,
 6   it's just your group.  So for example, if it's Media Com,
 7   it's just them for Media Com.
 8      Q   Got it.  Thank you.  And along those same lines,
 9   I just want to clarify, too.  Ms. Scatchell asked if you
10   were tenured, you said no.  But let me ask you this
11   question, are you on the tenure track?
12      A   Nope.
13      Q   Okay.  So you're a term faculty, which means you
14   are in a position that's not eligible for tenure?
15      A   Correct.
16      Q   Thank you.  And I just want to make sure we're
17   aligned on the issue of ████ ███ retiring.  She is not
18   retired from her position as a tenured faculty member in
19   the College of Communication; is that right?
20      A   That's right.  She was -- it's a three-year --
21   whatever you guys want to call it, that's what it is.
22   But basically, she was leaving her position, but she's
23   still obviously with us as a teacher.
24      Q   Meaning she was leaving her position as PRAD
```



Page 30

1   chair?

2       A   Bingo, sorry.

3       Q   Okay.  But she was still a tenured associate

4   professor at the time?

5       A   Absolutely.

6       MS. WERMUTH:  Thank you.  I have no further

7   questions.

8       MS. SCATCHELL:  Okay.  We have nothing further.

9       MS. WERMUTH:  Dan, thank you.

10      THE COURT REPORTER:  Hold on.  Can someone let him

11  know about signature.

12      MS. WERMUTH:  Sure.  Gia, do you want to let him know

13  about that -- I can tell him.

14              Dan, so you have the opportunity to review

15  your transcript and make any sort of typographical edits

16  before it becomes a final sort of transcript, you're

17  welcome to do that.  You also have the opportunity to

18  waive that process.  And if you don't know in this

19  moment, we can always get back to the court reporter.

20      THE WITNESS:  No, I'd like to review it.

21      MS. WERMUTH:  Okay.  We reserve then.  Thank you.

22              * * * * * * * *

23

24



Page 31

1                    REPORTER'S CERTIFICATE

2            The within and foregoing statement of the

3    witness, DAN AZZARO, was taken before DEANNA L. TUFANO,

4    CSR, and Notary Public, wherein all the parties attended

5    remotely at 9:00 a.m. on the 27th of May, A.D., 2022.

6            The said witness was first duly sworn and was

7    then examined upon oral interrogatories; and the

8    questions and answers were taken down in shorthand by the

9    undersigned, acting as stenographer and Notary Public;

10   and the within and foregoing is a true, correct, and

11   accurate record of all of the questions asked of and

12   answers made by the said witness, DAN AZZARO, at the time

13   and place hereinabove referred to.

14           The undersigned is not interested in the within

15   case, nor of kin or counsel to any of the parties.

16           Witness my official signature and seal as Notary

17   Public in and for Cook County, Illinois on this

18   6th Day of June, A.D., 2022.

19                          _____
                            DEANNA L. TUFANO, CSR
20                          CSR No. 084-003819
                            MAGNA LEGAL SERVICES
21                          SEVEN PENN CENTER
                            1635 MARKET STREET, 8TH FLOOR
22                          PHILADELPHIA, PA 19103
                            (866) 624-6221
23

24



**A**

**A-Z-Z-A-R-O**
5:23
**A.D**
31:5,18
**a.m**
1:16 31:5
**ability**
5:1 16:11
**able**
5:15 16:5 28:10
**Absolutely**
30:5
**abstained**
11:23
**academia**
15:24 16:2
**accurate**
25:8 31:11
**accurately**
5:2
**acting**
31:9
**actual**
13:7
**additional**
20:21
**advertising**
6:23,24 7:1
**affect**
5:1
**agreed**
19:12 23:19
**ahead**
9:2 11:7 15:13 17:21
  23:1 25:4 26:10
  27:24 28:3,12
**aligned**
29:17
**allow**
25:15,17
**allows**
19:23
**ANNA**
2:8

**anonymous**
9:15
**answer**
5:12,13 7:16 12:23
  13:8 17:3 25:10
**answered**
12:22 25:8,9 27:22
**answers**
31:8,12
**anybody**
11:14,23 15:12
**apologize**
26:17
**applied**
7:21 28:1
**applying**
8:4
**approach**
11:4
**approximately**
7:23
**area**
14:8
**Argumentative**
11:6 26:9
**asked**
12:22 21:23 22:2
  27:22 29:9 31:11
**asking**
5:10 22:14 26:13
**ass**
8:12
**assertion**
25:6
**associate**
30:3
**assume**
5:9
**assuming**
14:15 27:1
**attended**
1:15 31:4
**attorney**
5:11
**awermuth@cozen....**
2:10

**awful**
15:5
**Azzaro**
1:10 3:3 4:2,8,10,11
  5:23 25:20 31:3,12

**B**

**B**
3:7
**back**
10:16 19:15,19 26:2
  26:7 30:19
**balance**
11:5
**basically**
4:17 7:8,9 18:23
  21:16 29:22
**becoming**
9:7
**beginning**
10:7 23:21
**behalf**
2:6,11 4:3
**believe**
6:4,23 7:18 9:8 11:13
  14:8 15:21 18:23
  19:7,22 21:20 22:4
  23:13 26:12
**better**
10:18
**biggest**
16:14
**Bingo**
30:2
████████
12:16 27:7
**break**
5:16,18
**BS**
15:11
**business**
16:1

**C**

**C**
2:1

**C.S.R**
1:24
**call**
4:8 7:18 29:21
**called**
4:3 7:17
**candidacy**
12:10 27:11
**candidate**
12:8 13:7 24:5
**case**
8:8 31:15
**CENTER**
31:21
**certainly**
24:2
**CERTIFICATE**
31:1
**Certified**
1:14
**cetera**
18:1 20:11
**chair**
7:5,8,13,17,21 8:6
  9:7 10:16 13:7 14:7
  14:19,20,23 15:5,10
  15:18 16:5,12 17:12
  18:4,9 19:3,7,14,17
  19:20,24 20:4,22,24
  23:8,18,18,20,23
  24:16 27:2,10,15
  29:5 30:1
**chairs**
7:18
**change**
21:18
**changing**
13:6,8
**characterizing**
17:20
**Chicago**
2:4,9
**choosing**
22:7
████████
10:16 14:17 19:2,10



21:11,17 29:17
**Civil**
1:11
**clarify**
14:4 28:23 29:9
**clarifying**
28:17
**classes**
6:24
**clear**
26:17
**Code**
1:10
**colleague**
6:20
**college**
6:8 29:2,19
**Com**
29:6,7
**come**
18:9 23:17 27:15
**comes**
10:19
**coming**
10:14 16:14
**comment**
12:8 25:6 27:16
**comments**
12:11
**communicate**
15:19
**Communication**
29:19
**Communications**
6:9
**concern**
16:14
**concerns**
16:11,13 21:11
**context**
20:7
**continue**
5:15
**conversation**
4:18 14:1,5 18:23
19:1 21:11 22:13

27:16
**conversations**
18:8
**Cook**
31:17
**correct**
4:20 8:9,10,21 9:10
21:24 26:22 27:3
29:1,15 31:10
**counsel**
25:15,17 31:15
**County**
31:17
**couple**
6:17
**courses**
17:24
**court**
1:1,11 5:4 23:3 30:10
30:19
**COZEN**
2:7
**CSR**
2:12 31:4,19,20
**current**
5:24 20:17,24
**curriculum**
7:10
**CV**
13:16

---
**D**

**D**
3:1
**Dan**
1:10 3:3 4:2,9 12:23
17:21 23:1 28:16
30:9,14 31:3,12
**Daniel**
5:23
**day**
10:17 31:18
**day-to-day**
24:11,12
**days**
10:18

**De**
21:3
**dean**
9:21,21 22:4,5
**Deanna**
1:13,24 2:12 31:3,19
**decide**
28:8
**deciding**
14:6
**decision**
19:11 22:13 28:6
**Defendant**
1:7 2:11
**define**
17:16,23
**deliberations**
29:4
**department**
10:12 11:20 12:12
14:20 15:10
**DePaul**
1:6 4:13 6:1,9,16
12:15
**deposed**
4:14 22:12
**deposition**
1:9 4:17 22:23
**depositions**
1:12
**difference**
7:12
**different**
17:4 23:11
**Dillard**
1:3 2:14 4:12,13 6:13
6:22 7:20 9:7,12
10:6 17:15 18:9
24:1,7 27:2,14,20
**Dillard's**
24:15 27:10
**direction**
10:12
**director**
7:13,18
**directors**

7:18
**discovery**
1:9,13
**discussed**
13:13 27:18
**discussion**
12:2,7,9 13:6,9,14
14:2,3,6,13,22
23:22 26:18,21,24
27:14 28:21
**DISPARTI**
2:2
**DISTRICT**
1:1,1
**DIVISION**
1:2
**doing**
15:24 19:16
**Don**
11:17
**downtown**
20:12
**Drive**
2:3,8
**duly**
4:4 31:6
**duties**
23:12,18

---
**E**

**E**
2:1,1 3:1,7
**earlier**
27:21
**EASTERN**
1:2
**edits**
30:15
**effect**
13:3 20:7 26:3
**eligible**
29:14
**email**
10:17
**entire**
22:23



**especially**
20:11
**et**
18:1 20:11
**Eva**
12:16 13:2
**evening**
12:13
**everybody**
4:23 8:14 15:9
**exact**
8:20
**exactly**
7:2 13:10 18:15
**Examination**
3:4,5 4:6 28:19
**examined**
4:4 31:7
**example**
29:6
**exhibits**
3:8
**expand**
15:17
**explain**
26:14
**extra**
21:24 22:3,7

**F**

**fact**
21:16 28:9
**faculty**
8:9,12 9:1 13:17 23:7
24:1 26:22 28:22,22
28:23 29:3,13,18
**fair**
10:22 11:4 24:16,21
24:24 25:20 26:1,12
**familiar**
7:4
**far**
10:18
**fault**
12:14,14
**favor**

**9:7**
**feeling**
20:9
**fellow**
11:20
**figure**
8:24 15:7 18:19 28:4
**figured**
18:19 28:2
**final**
30:16
**finish**
16:18
**first**
22:9 31:6
**FLOOR**
31:21
**following**
19:15
**follows**
4:5
**foregoing**
31:2,10
**foundation**
9:2 10:2 11:2,6 17:1
22:18 24:8
**further**
28:14 30:6,8

**G**

**getting**
9:13 15:20 21:15
**Gia**
24:22 25:2 30:12
**gia@dispartilaw.c...**
2:5
**Gianna**
2:3 4:12
**give**
20:6 23:23 26:13
**given**
25:21
**giving**
24:3
**go**
4:16 9:2 11:7 15:12

15:13 17:21 23:1
25:4 26:9 27:24
28:3,4,12
**God**
18:5,22
**going**
4:16,22 5:9,11,13
10:12,13,15 12:19
17:4,19 20:15 21:13
22:24 23:8 25:11
26:2
**good**
4:11 15:18
**Great**
6:2
**ground**
4:16
**group**
2:2 7:11 17:6 23:15
23:16,17 29:5,6
**guess**
17:4 20:6 24:10
25:24 26:14
**guessing**
17:7,9
**guys**
8:24 29:21

**H**

**H**
3:7
**half**
14:8,10
**halls**
18:2
**handled**
24:15
**hang**
14:3 17:19
**happened**
18:21 21:7
**happens**
12:4,7
**health**
6:23
**hereinabove**

31:13
**hiring**
7:10
**Hold**
30:10
**honestly**
8:20 16:13 27:4
**hour**
14:8,9,10
**hours**
10:15,17,21,23,24
**housed**
20:13
**hrough**
10:15

**I**

**IL**
2:4,9
**Illinois**
1:1,12,15 31:17
**immediate**
14:11,12
**immediately**
14:14
**important**
5:5
**in-depth**
18:1
**inappropriate**
22:17,21 23:1
**Ingle**
11:17
**insane**
10:21
**installed**
21:6
**instructs**
5:12,15
**intent**
10:14
**interested**
31:14
**interim**
9:21 22:5
**interrogatories**



31:7
**Irrelevant**
11:7
**issue**
29:17

---

**J**

**job**
15:4,5,8,24 18:18
19:13 27:24
**June**
31:18

---

**K**

**keep**
10:21 15:5,9
■
10:16,17,21 14:17
15:3 18:16 19:2,9
19:12,15 20:3,8,13
20:14,14 21:11,16
23:14,19 26:3 29:17
**kin**
31:15
**kind**
12:2 22:24
**knew**
18:14 20:14
**knock**
18:18
**know**
5:7,17 6:13,18,21 7:9
7:17,20 9:4,17,19
9:20,20,24 10:4,19
11:14,16,17,22,24
12:18 13:2 14:10
15:2,5,19,23 16:15
16:23,24 17:6,8,18
18:1,3,5,16,17 19:9
19:23 20:2,8,9,10
20:10,13,17,24 21:5
22:2,6 23:16 24:1,7
24:10 26:4 28:1
30:11,12,18
**knowing**
12:13,20 16:2 17:11

17:14,16,23,24 18:1
**known**
6:15

---

**L**

**L**
1:13,24 2:12 31:3,19
**lacks**
22:17 24:8
**lasted**
14:1
**LAW**
2:2
**leave**
21:19
**leaving**
14:19 21:19 29:22,24
**Lecturer**
6:1
**LEGAL**
1:21 31:20
**let's**
17:23 21:18 25:24
**level**
6:19
**Lexa**
9:22 18:24 19:11
22:5,12 23:10,13,14
**LICENSE**
2:13
**Lincoln**
20:12
**line**
15:6,9
**lines**
29:8
**little**
18:24
**long**
6:2,15,16 14:1,5
**longer**
12:12,15 14:10 15:24
**look**
18:16 28:7
**looking**
28:13

**lost**
23:8
**lot**
8:14 20:12,14 21:21
**love**
18:5,22

---

**M**

**MAGNA**
1:21 31:20
**management**
15:22
**Maria**
21:2
**marked**
3:8
**MARKET**
31:21
**matter**
4:13
**mean**
12:18 14:3 15:18
24:2
**Meaning**
14:19 29:24
**means**
29:13
**media**
7:1 29:6,7
**medication**
4:24
**meeting**
15:2 24:11
**member**
29:18
**members**
13:17
**mentioned**
27:21
**mindful**
10:23
**minutes**
9:17 22:24
**mischaracterizes**
17:21
**moment**
21:12

30:19
**monologue**
22:16,19
**morning**
4:11
**Moya**
21:3
**Murphy**
9:22 22:12

---

**N**

**N**
2:1 3:1
**name**
4:11 5:21
**named**
11:17
**necessary**
25:18
**need**
5:16 8:24 15:23
22:16,19,20 25:1
**nominated**
11:12,12,13,15,21
18:20
**nomination**
18:21
**non-work**
10:23
**nontenure**
8:13
**Nope**
29:12
**normal**
25:22
**North**
2:8
**NORTHERN**
1:1
**Notary**
31:4,9,16
**noted**
22:15,16
**number**
8:20



**O**

**O'CONNOR**
2:7
**oath**
4:19
**object**
17:19 22:9 25:9 26:9
**objecting**
25:7
**objection**
5:14 7:14 9:2 10:2
11:2,6 12:5,22 16:6
17:1 22:15,16,20
24:8,18,19 25:7
**objectionable**
25:10
**objections**
5:11 22:20
**obviously**
29:23
**occupation**
5:24
**occurs**
12:2
**office**
18:13,23
**offices**
20:12
**official**
31:16
**Oh**
25:13
**okay**
4:11,16,22 5:4,20,21
6:2,5,8,11,13,18,21
7:4,7,8,12,20,23 8:3
8:11,16,18,19,21,23
9:6,9,15,17 10:6,22
11:11,14,17 12:4,16
12:18 13:16,19
14:11,17,21 15:8,16
16:22 17:11 18:2
19:2,18 20:6,15,21
21:23 22:19 24:6,19
26:24 27:9,20 29:2

29:13 30:3,8,21
**operating**
25:23
**operations**
24:11
**opinion**
24:14
**opportunities**
24:6
**opportunity**
23:24 24:4 25:9,21
30:14,17
**oral**
31:7
**originally**
20:3
**outcome**
8:3

**P**

**P**
2:1,1
**P.A**
2:2
**PA**
31:22
**PAGE**
3:2
**pandemic**
8:2
**paraphrasing**
10:14
**Park**
20:12
**part**
4:20 8:21 13:8 19:18
20:4,21 26:15
**particular**
8:8 24:11 27:24 29:4
**parties**
1:15 31:4,15
**pending**
5:19
**PENN**
31:21
**people**

8:24 9:6 12:8 16:14
17:5,9 20:14 21:22
23:10,15,17,20
26:13,14 27:1,2
**person**
12:12,15
**person's**
12:14
**personally**
4:24
**pertaining**
1:12
**PHILADELPHIA**
31:22
**phrase**
13:1
**pitch**
25:22
**place**
10:7 15:21 26:21
31:13
**Plaintiff**
1:4 2:6,14 4:3
**planning**
7:2
**please**
5:7,13,21 14:4 16:18
23:3
**point**
19:6 21:1 22:11
**policy**
19:23
**position**
6:3 7:4,7,21 8:4 9:13
13:7,9 17:12 19:10
19:21,24 21:6,6,12
21:20 22:8 23:20,23
28:9 29:14,18,22,24
**PRAD**
6:6 7:21 13:7 20:17
28:24 29:24
**precisely**
22:24
**prefer**
4:8
**prepared**

25:15,17
**PRESENT**
2:14
**presentation**
23:24
**pretty**
15:15
**previous**
10:16 14:19
**previously**
9:9 27:6
**primarily**
20:13
**principles**
7:1
**prior**
12:1 14:6 23:22 26:2
26:19
**private**
16:1
**probably**
6:24 8:19 13:15 16:2
17:7 19:11 20:5
21:8 24:4 27:4
**problem**
13:22
**procedure**
1:11 25:23
**process**
13:6 15:21,22 16:2
25:23 26:1,12,15,15
30:18
**Professional**
6:1
**professor**
4:9 6:11,19 30:4
**program**
6:7 7:5,9,9,13,13 8:6
9:7,13 14:7,23 16:5
16:11 17:12 18:9
19:3,20,24 20:3,22
20:24 23:23 24:15
27:2,10,15 28:24
**programs**
29:2,3
**provided**



13:17
**provisions**
1:10
**Public**
31:4,9,17
**purpose**
1:13
**pursuant**
1:10
**put**
10:13,15 18:20

**Q**

**qualification**
17:11,14
**qualifications**
13:13 20:18 24:3
28:7,13
**question**
5:7,8,9,13,13 23:2,4
23:5 25:10 26:6,8
29:11
**questioning**
23:1
**questions**
4:23 5:19 28:15,17
30:7 31:8,11
**quick**
28:17
**quorum**
8:23
**quote**
21:8 24:1,7

**R**

**R**
2:1,3
**raised**
16:11
**range**
8:19
**read**
23:5 26:6,8
**really**
14:9,24 15:2 18:17
20:9 26:4 28:12

**recall**
21:10
**recollection**
13:20
**record**
5:14,22 9:24 25:12
25:14 31:11
**redefining**
19:13
**reference**
28:22
**referred**
31:13
**refrain**
22:22
**refresh**
13:19
**regarding**
24:15 27:10
**remember**
7:23 8:3,11 9:6 10:6
10:9 11:11,23 12:9
12:18,19 13:1,4,5
13:12,15,16,18 14:1
14:9,21,24 16:8,10
16:13,21 18:11 20:5
21:9 27:4,9,14,19
**remotely**
1:15 31:5
**removed**
15:14
**renewed**
21:13,17
**repeat**
17:13 23:2,4
**rephrase**
5:8,9 21:14
**Reported**
1:20 2:12
**reporter**
1:14 5:4 23:3 30:10
30:19
**REPORTER'S**
31:1
**represent**
4:12

**requirement**
17:14
**research**
19:16 20:10
**reserve**
30:21
**respond**
25:2,16,18
**responsibilities**
13:10 19:14
**responsibility**
15:13 18:5,22 28:3
28:12
**Responsible**
7:10
**results**
14:12,14 18:9 27:15
**retired**
29:18
**retiring**
14:18 19:3 21:17,18
29:17
**review**
30:14,20
**reviews**
7:10 17:24
**revised**
20:18
**revising**
23:12,17
**right**
13:5,8,12,22 15:13
16:4,10 19:4,5 21:5
21:10 22:1 25:24
26:12,17,20,23 27:8
27:13 28:3,6,14
29:19,20
**role**
23:18
**room**
8:14 13:23
**Roosevelt**
15:11
**rules**
1:11 4:16
**run**

7:9 17:5,6 20:15
**running**
8:4 23:20

**S**

**S**
2:1 3:7
**saw**
10:12
**saying**
10:19,20 13:2 16:14
22:22 26:3
**Scatchell**
2:3 3:4 4:7,12 7:15
9:5 10:5 11:3,10
12:6 16:9 17:2 18:7
22:15,19 23:3 24:13
24:19,20,23 25:3,13
25:17,19 26:16 28:5
28:14 29:9 30:8
**schedules**
17:5
**school**
15:22
**seal**
31:16
**second**
17:20
**see**
15:11 18:2 25:24
**selected**
8:6
**series**
4:22
**served**
21:20
**SERVICES**
1:21 31:20
**set**
29:4
**SEVEN**
31:21
**shorthand**
1:14 31:8
**signature**
30:11 31:16



simple
15:15
simply
15:6
social
6:19
somebody
11:17 17:8 24:7
sorry
13:21 16:19 17:13
24:22 25:1,5 26:6
27:24 30:2
sort
9:24 25:6 30:15,16
speaking
22:20 25:4
specific
6:5 7:11
specifically
5:12 6:24 12:11 13:1
specifics
7:3
speech
10:7 23:23 26:13
spell
5:21
state
1:12,14 5:21
stated
12:20 20:7 27:7
statement
31:2
STATES
1:1
stay
19:10,12 21:23 22:2
22:6,10 23:14,19
stenographer
31:9
step
15:23 21:12 23:9
STREET
31:21
stuff
12:21,23
subject

6:5
subjects
6:6,21
suggestion
23:10,13,14
Suite
2:3,8
Supreme
1:11
sure
7:2,19 14:5 16:3,20
19:12 21:14,16
29:16 30:12
surprised
18:14
sworn
4:1,4,19 31:6
Sydney
1:3 2:14 4:12 6:13
10:18,22 11:11
13:22 14:7 15:3
16:5 17:11,14 18:1
20:19 21:7 22:7
23:7,8,11,23 25:21
26:5 27:10 28:7
Sydney's
11:4 12:13 13:13,16
14:22
Syndney's
12:10

---
**T**

t
3:7 10:14
take
5:18 15:13 18:4 24:4
24:5 28:1,11
taken
1:10,13 4:24 9:18
31:3,8
takes
15:24 26:21
talk
5:6
talked
13:6,11,11

talking
23:11,12 27:17 28:23
tallied
14:14
taught
7:1 12:13,21
teach
6:5,6
teacher
11:20 29:23
teaches
6:22 13:2 17:24
20:11
teaching
18:3 24:12
team
23:15
tell
4:19 8:14,20 13:10
30:13
tended
10:17
tendered
3:8
tends
17:6
tenure
8:13 19:5,6,7 29:11
29:14
tenured
6:11 29:10,18 30:3
term
8:13 21:21 29:13
terms
10:11 14:2 17:23
28:8
testified
4:4 9:9 27:6
testify
5:1
testimony
17:21 26:2
thank
18:13 29:8,16 30:6,9
30:21
thankless

15:4,8
Thanks
28:16
thing
21:7
things
10:11 15:19,20 16:16
17:9 19:16 23:11
27:18
think
6:16 7:1 11:21 15:2
16:8,14,23 17:23
20:14 24:14,21,24
25:10,20 26:14
three
9:8 20:1 21:20 28:16
three-year
19:20 21:21 29:20
time
5:10,10,19 9:21
19:17 20:8 21:1,19
23:12 27:5 30:4
31:12
today
4:24 5:2
told
18:15,15,16
tone
16:4
totally
7:2 10:11
tough
28:2
track
19:5 29:11
transcript
30:15,16
true
31:10
truth
4:19
truthfully
5:1
trying
8:12 10:23 14:24
15:5,9 26:1



**Tufano**
1:14,24 2:12 31:3,19
**two**
4:18 23:11 28:16
**type**
10:15
**typical**
21:21
**typographical**
30:15

**U**

**unclear**
22:11
**underlined**
16:4
**undersigned**
31:9,14
**understand**
4:19 5:7,10 25:1 26:1
26:13
**understanding**
26:18
**UNITED**
1:1
**University**
1:6 15:11
**unquote**
24:1,7
**utterance**
25:4

**V**

**vague**
7:14 12:5,22 16:6
17:1 22:11
**variety**
6:6
**verbatim**
12:19
**versus**
4:13 10:23
**videoconference**
1:9 2:1
**Vis-a-vis**
12:23

**vote**
8:7,8,9,21 9:1,11,12
9:15,18 10:7 12:1
13:23 14:2,6,11,22
15:3 18:24 19:9,15
19:18 20:4,15,18
23:9,22 24:15,16
25:22 26:4,19 27:10
27:20 28:6,8,21
29:5
**voted**
8:11 9:6,10,14 13:17
14:13 18:6,17 20:3
20:8 21:6 23:7 26:3
27:17
**votes**
20:21
**voting**
11:23 18:14 21:7
23:11 27:15 29:3
**vs-**
1:5

**W**

**Wacker**
2:3,8
**Wait**
25:1
**waive**
30:18
**want**
10:20 15:4,13 18:4,4
18:18 22:12 27:1,24
28:11,23 29:9,16,21
30:12
**wanted**
18:22 19:15 20:15
21:12,19 22:6,7,10
28:3,9
**wasn't**
10:13,15 16:5 26:17
28:12
**way**
10:18 14:18 24:14
**we'll**
15:7,14 18:19 28:3

**we're**
20:15 28:23 29:16
**Wednesday**
1:16
**week**
10:18
**welcome**
30:17
**Wermuth**
2:8 3:5 5:11 7:14 9:2
10:2 11:2,6 12:5,22
16:6 17:1,19 22:9
22:17,22 24:8,18,22
25:1,5,15 26:6,9
27:22 28:16,20 30:6
30:9,12,21
**West**
2:3
**wife**
15:10
**willing**
23:9 25:12,13
**wise**
8:12
**wish**
15:12
**withdraw**
25:7
**witness**
3:2 4:1,3 9:3 10:3
11:8 12:24 16:7
17:22 23:2,6 24:9
26:11 27:23 28:18
30:20 31:3,6,12,16
**word**
21:18
**words**
17:17,20
**work**
10:20,23 18:19
**worked**
23:15
**working**
12:15
**worklife**
11:5

**workout**
15:14
**works**
4:17
**worlds**
17:7
**wouldn't**
15:3,12 26:4
**wrong**
19:8
**www.magnals.com**
1:23

**X**

**X**
3:1,7

**Y**

**yeah**
11:9 21:2 24:3,10
**year**
7:23 19:13,15,24
21:13,17,24 22:3,7
23:15,19
**years**
6:4,17 20:1 21:20
**Yep**
9:23

**Z**

**0**

**084-003819**
2:13 31:20

**1**

**1:20-CV-7760**
1:5
**10**
8:16,19
**12**
6:4
**121**
2:3
**123**
2:8



**15**
8:19
**1635**
31:21
**1800**
2:8
**19103**
31:22

---
**2**
---
**20**
8:18
**2018**
8:1
**2019**
8:1 20:19 21:8
**2020**
21:8
**2022**
1:16 31:5,18
**2300**
2:3
**24**
10:17
**27**
1:16
**27th**
31:5
**28**
3:5

---
**3**
---
**30**
22:23
**312**
2:4,9

---
**4**
---
**4**
3:4
**474-7900**
2:9

---
**5**
---
**506-5511**
2:4

---
**6**
---
**60601**
2:4
**60606**
2:9
**624-6221**
1:22 31:22
**6th**
31:18

---
**7**
---
**7**
10:18

---
**8**
---
**866**
1:22 31:22
**8TH**
31:21

---
**9**
---
**9:00**
1:16 31:5



# EXHIBIT G

# DR. CRISTEA DEPOSITION

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS


SYDNEY DILLARD,                    )
                                   )
              Plaintiff,           )
                                   ) CIVIL ACTION NO.
vs.                                ) 1:20-cv-7760
                                   )
DEPAUL UNIVERSITY,                 )
                                   )
              Defendant.           )


THE DEPOSITION UPON ORAL EXAMINATION OF

RICHARD CRISTEA, M.D.,

a witness produced and sworn before me,
Mary Beth Schafer, RPR, a Notary Public at
large, in and for the State of Indiana, taken
through Zoom videoconferencing on behalf of the
Defendant, with the witness appearing from
Merrillville, Indiana, on August 8, 2022,
commencing at approximately 6:30 p.m., EST,
pursuant to the Federal Rules of Civil
Procedure


Magna Legal Services
(866)624-6221
www.magnals.com



Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

Gianna Scatchell, Esq.
Disparti Law Group
121 West Wacker Drive
Suite 2300
Chicago, IL 60601
gia@dispartilaw.com

ON BEHALF OF THE DEFENDANT:

Anneliese Wermuth, Esq.
Brittany Green, Esq.
Cozen O'Connor
123 N. Wacker Drive
Suite 1800
Chicago, IL 60606
awermuth@cozen.com
brittanygreen@cozen.com

Also Present:

Sydney Dillard

Page 3

INDEX OF EXAMINATION

PAGE

EXAMINATION ....................................6
    Questions By:  Ms. Wermuth
EXAMINATION ................................115
    Questions By:  Ms. Scatchell
FURTHER EXAMINATION .........................137
    Questions By:  Ms. Wermuth
FURTHER EXAMINATION .........................138
    Questions By:  Ms. Scatchell

Page 4

INDEX OF EXHIBITS

PAGE

Deposition Exhibits
Exhibit 1 - Compilation of Records          10
Exhibit 2 - 06/05/2018 Letter to "To Whom It    89
    May Concern" from Richard Cristea,
    M.D.
Exhibit 3 - 10/02/2018 Letter to "To Whom It    91
    May Concern" from Richard Cristea,
    M.D.

Page 5

```
 1        (The witness is sworn by the court
 2    reporter at 6:30 p.m., at which time the
 3    following proceedings are had:)
 4        RICHARD CRISTEA, M.D.,
 5        having been duly sworn to tell the
 6        truth, the whole truth, and nothing but
 7        the truth, relating to said matter, is
 8        examined and testifies as follows:
 9        MS. WERMUTH:  Thank you, Doctor.  Thank
10    you again for making time for us this evening.
11        Madam Court Reporter, do we need appearances
12    on the record?
13        THE COURT REPORTER:  That is up to you
14    if you want to go ahead and do that, that's fine
15    with me.
16        MS. WERMUTH:  Okay.  Why don't we go
17    ahead.  My name is Anna Wermuth.  I represent
18    DePaul University.  And I have with me today
19    Brittany Green, also represents DePaul
20    University.
21        Gia, do you want to put your appearance on
22    the record?
23        MS. SCATCHELL:  Sure.  My name is
24    Gianna Scatchell, and I am the attorney for
25    Plaintiff, Sydney Dillard, in the above-captioned
```



Page 6

```
1    matter which would be Dillard vs. DePaul.
2         MS. WERMUTH:  Okay.  Dr. Cristea, let
3    me just also state for the record, this is the
4    fact deposition of Dr. Richard Cristea in the
5    case Dillard vs. DePaul University, No.
6    20-cv-7760, pending in the United States District
7    Court for the Northern District of Illinois.
8    EXAMINATION
9         QUESTIONS BY MS. WERMUTH:
10   Q.  I saw, Dr. Cristea, that you raised your hand
11       right away so I'm assuming you have had your
12       deposition taken a few times in the past?
13   A.  Yes, I have.
14   Q.  Is that right?
15   A.  Yes, correct.
16   Q.  Okay.  I'm not going to spend too much time going
17       over the rules.  It sounds like you probably know
18       the rules of engagement.  I just ask that you
19       allow me to finish my questions and I'll do my
20       best to allow you to finish your answers so that
21       we can get a clean record with the court
22       reporter.  Is that fair?
23   A.  Yes.
24   Q.  Okay.  Thank you, sir.
25         Have you testified ever in another case
```

Page 7

```
1    involving a patient who was suing his or her
2    employer?
3    A.  Not that I recall.
4    Q.  Okay.  So this would be the first time that you
5        think you've been deposed in that capacity?
6    A.  Yes, other than a workman's compensation issue.
7    Q.  Understood.  Thank you.  And just very briefly,
8        is there anything that's preventing you from
9        testifying honestly or truthfully today?
10   A.  No.
11   Q.  And is there anything that we should know that
12       may impact your memory this evening?
13   A.  Not that I'm aware of.
14   Q.  Thank you.  So did you have an opportunity -- so
15       let me walk back for a second.  My office
16       subpoenaed your office for records relating to
17       Dr. Dillard, and we have shared those records
18       with Dr. Dillard and her lawyer.  Do you have
19       those records with you this evening?
20   A.  I do.
21   Q.  Okay.  And do you have those records with that
22       numbering in the bottom right-hand corner that
23       says Dillard_DePaul and then has a series of
24       numbers?
25   A.  I do.
```

Page 8

```
1    Q.  Okay.  Terrific.  Thank you.
2         Are there any other documents that you're
3        looking at or that you have with you this
4        evening?
5    A.  Just that was provided by your service.
6    Q.  Okay.  Terrific.  Thank you.
7         And then do you have -- is there anyone in
8        the room with you this evening?
9    A.  No.
10   Q.  Okay.  And where are you this evening?  Since
11       we're on Zoom, I have to just sort of make sure I
12       know where everybody is sitting.
13   A.  At my office in Merrillville, Indiana.
14   Q.  Okay.  And will you let us know if someone else
15       joins you in the room?
16   A.  Sure.
17   Q.  Thank you.  I appreciate that.
18         Did you do anything to prepare for your
19        deposition this evening?
20   A.  No.
21   Q.  Okay.  Have you talked to Dr. Dillard either by
22       telephone, by video chat, by email, by text
23       message, in any capacity about your deposition
24       today?
25   A.  No.
```

Page 9

```
1    Q.  Okay.  What about Dr. Dillard's lawyer, Ms.
2        Scatchell, have you talked with her by telephone,
3        by email, by video, prior to your deposition
4        today?
5    A.  No.
6    Q.  Okay.  Did you have an opportunity to review the
7        records before your deposition this evening?
8    A.  Not in detail.  I thumbed through them about five
9        minutes ago.
10         MS. WERMUTH:  Okay.  Fair enough.  Fair
11       enough.  Okay.  Thank you.
12         So let me start with this.  And if you don't
13       mind, I'm going to share my screen also so that
14       we can all make sure we're looking on the same
15       page.  If that gets confusing, we can always find
16       another way too.
17         So I will have marked, Madam Court Reporter,
18       all of the records that have been -- from Dr.
19       Cristea's office that have been produced today as
20       Exhibit 1.  I will make sure, Mary Beth, that you
21       get those.  Okay?
22         THE COURT REPORTER:  Okay.
23         (Deposition Exhibit(s) 1, having been
24       marked for identification, is displayed on the
25       videoconference screen for the witness and all
```



Page 10

1    parties to view at this time, as testimony
2    continues:)
3  QUESTIONS BY MS. WERMUTH:
4  Q.  So, Dr. Cristea, I am looking at what is Bates
5    marked Dillard_DePaul9900.  This is your CV that
6    was produced to us by your office.  Are you
7    familiar with this document?
8  A.  Yes.
9  Q.  Okay.  And you're welcome to follow along with
10    the papers if it's easier as well.  It's your
11    choice.  But I just -- my questions for you, your
12    CV appears on pages 9900 through 9908.  If you
13    could just confirm to me that the information
14    contained therein is true and accurate to the
15    best of your memory?
16  A.  Yes, it is.
17  Q.  Okay.  So I'm just going to use that as a way to
18    sort of dispense with all the background
19    information so that we can move along.  Okay?
20  A.  Sure.
21  Q.  I would like to ask you a quick question, though.
22    I see that you're board certified in neurology.
23    Can you -- do I have that correct?
24  A.  That's correct.
25  Q.  Okay.  And can you tell us what neurology is?

Page 11

1  A.  Sure.  Neurology encompasses a broad range of
2    disorders, including both central and peripheral
3    nervous systems.  Anything from traumatic brain
4    injury, epilepsy, movement disorders, Alzheimer's
5    disease, tumors, spine diseases, peripheral nerve
6    diseases, muscle diseases as it relates to the
7    nervous system.

13  Q.  Are there other seizure disorders other than
14    epilepsy where a patient might experience some
15    form of seizure that's not as you've described it
16    as epilepsy?

23  Q.  Okay.  And that typically comes with some form of
24    loss of consciousness as well?

Page 12

1  Q.  I see.  Okay.  Thank you for that clarification.
2    Okay.  Have you heard the phrase grand mal
3    seizure?
4  A.  Yes.

8  Q.  Okay.  And so folks who experience syncope could
9    also experience in that episode a grand mal
10    seizure if it involves convulsions?
11  A.  Well, grand mal seizure isn't used in what we
12    call syncopal seizure.  Usually in a syncopal
13    seizure, patients will have a few symmetric jerks
14    of the arms and/or legs or some tonic movement
15    lasting very briefly.  Grand mal seizure is
16    usually a term reserved for epilepsy patients
17    with seizures due to electrical discharges in the
18    brain.
19  Q.  Got it.  Have you ever heard the phrase or used
20    the phrase statistical seizure?
21  A.  Not used in clinical practice that I'm aware of.

Page 13

9    for a visit sometime in
    2022?
10  A.  Yes.
11  Q.  Okay.  And when is she expected to return?
12  A.  I don't have that exact information, but I would
13    assume probably soon since it's been about six
14    months since I've last seen her.
15  Q.  So if there's an appointment that's set up for
16    soon, you don't have that information in front of
17    you?
18  A.  No.
19  Q.  Okay.  Thank you.
20    And have you diagnosed Dr. Dillard?
21  A.  Yes.
22  Q.  What is her diagnosis?



4  (Pages 10 to 13)

MAGNA ▶
LEGAL SERVICES

Page 14

7   Q.   So can we focus on the seizures for a moment?
8   A.   Sure.
9   Q.   Is there a name to her -- well, strike that.
10       Is she an epileptic?

13  Q.   Got it.  And is it your understanding that since
14       2017, from September 2017 through the present,
15       she's had two seizures?
16  A.   She's had more than two seizures, but, yes.  So
17       by definition, she is an epileptic.
18  Q.   Okay.  And as you sit here now, can you tell me
19       how many seizures she has had?
20  A.   Well, I didn't prepare beforehand counting up the
21       seizures, but we know she had September of 2017,
22       October of 2017.  And then I think there were
23       some episodes noted by her husband throughout my
24       care and treatment where she'd be jerking and
25       gasping for air while sleeping, which are

Page 15

1   consistent with nocturnal seizures.
2   Q.   So if you're asleep and you're jerking and
3        gasping for air, that would be an indication of a
4        seizure?
5   A.   In a patient with a clinical history of a
6        diagnosis of epilepsy, yes.
7   Q.   I see.  And those seizures or episodes were
8        reported to you by her husband?
9   A.   Yes.
10  Q.   Okay.  And those episodes were not ones where you
11       like immediately clinically treated her so as to
12       be able to assess other sort of medical indicia
13       of the seizure?
14  A.   Could you rephrase?
15  Q.   Yes.  I'm sorry.  I'm not being clear.
16       You had previously said, for example, an
17       episode of syncope -- and I know I keep saying it
18       wrong.  I'm sorry.  Syncope is often associated
19       with some sort of blood pressure change, I think?
20  A.   Right.  To cut to the chase, in Dr. Dillard's
21       case, she did not have or ever been diagnosed
22       with syncope.  Her diagnosis was epilepsy.
23  Q.   I see, okay.  And that was -- that diagnosis was
24       based on her reports to you of her episodes?
25  A.   And observed seizure.

Page 16

1   Q.   You observed her with a seizure?
2   A.   By history of observed seizure by her husband.
3   Q.   I see.  Okay.  Now are there other ways other
4        than through observation to diagnose someone?
5        Like observation and then reporting, self-
6        reporting?  Are there other ways to diagnose
7        epilepsy?
8   A.   Well, epilepsy is a clinical diagnosis.
9        Sometimes we have EEG abnormalities.  In a
10       majority of patients we don't, especially in
11       generalized epilepsy.  So it's usually by
12       observation or clinical history.  We teach our
13       medical students that if you don't have a
14       diagnosis 90 percent of the time after a history,
15       don't examine them.  Go back and take another
16       history.  So history is critical in the
17       management of our patients, diagnosis and
18       management.
19  Q.   Got it.  Okay.  Now is EEG, is that also an
20       electroencephalogram report?
21  A.   That's correct.
22  Q.   And she had one of those that showed that
23       her brain activity was in the normal range; is
24       that right?
25  A.   Yes, that's correct.

Page 17

1   Q.   So is a normal range EEG inconsistent with a
2        diagnosis of epilepsy or how does --

5   Q.   I see.
6   A.   EEG is a surface recording.  In patients that we
7        evaluate for epilepsy surgery, so the kids you
8        see running around with helmets on who have
9        seizures and are mentally handicapped, in those
10       patients what we do is we put them in epilepsy
11       monitoring units.  Then we put what we call --
12       well, there's different ways to monitor them.  We
13       will put depth electrodes in where we actually
14       put electrodes deep in the brain.  There's
15       procedures where we take the skull off and put
16       the electrodes on the surface of the brain.  But
17       those -- we don't routinely do that in patients
18       who can be managed medically and who are not
19       additionally mentally handicapped.
20  Q.   Okay.  What about an MRI?  Does an MRI also help
21       with a diagnosis of epilepsy?
22  A.   It can in some instances.  Many times an MRI is
23       normal.
24  Q.   Okay.  And hers was normal; right?  Dr. Dillard's
25       was normal?



Page 18

1  A.  My recollection is that that's correct.
2  Q.  Okay.  And then what is a vestibular evoked
3      myogenic potential?  What kind of exam is that?
4  A.  That has to do more with the disease centers of
5      the brain and not the epileptic centers of the
6      brain.
7  Q.  And so she had a vestibular evoked myogenic
8      potential exam or test that was also normal.  Do
9      you recall that?
10 A.  Yes.
11 Q.  Can you turn to page -- so we're going to go to
12     sort of the top of the documents now.  So page --
13     I think it's 4565.
14 A.  Yes, that's the September 26, 2017, note.
15 Q.  Hang on just a moment.  Let me get there with
16     you.  4565.
17        Actually, you know what, can you turn
18     instead to page 4558, so before we get to that
19     first visit.  And I can share screen unless
20     everyone just wants to look at their own version.
21     Is it easier to look at your own version, Doctor?
22 A.  Yeah, that's fine.  I'm on that page.
23 Q.  So this page, the top of it reads Summary Report.
24     Do you see that?
25 A.  Yes.

Page 19

1  Q.  Okay.  And this appears to have, as we page
2      through it, like a summary of many -- or her
3      visits up until the point in time where we
4      subpoenaed the records.  Can you tell me what a
5      summary report is coming out of your office, sir?
6  A.  Actually I don't know.  This is not something
7      used in my daily care and treatment of patients.
8      I suspect it's an electronic health record
9      tabbing procedure.  I usually refer just to my
10     chart notes in chronological order.
11 Q.  Okay.  And so the chart notes were what we were
12     looking at on page 4565 a minute ago; is that
13     right?
14 A.  That's correct.
15 Q.  So this did come from your office.  So let me, if
16     I could, direct you to page 4559 in the summary.
17 A.  Okay.
18 Q.  And do you see in sort of the middle of the page
19     there's a reference to "Seizure," and then as you
20     kind of move across, there's a set of texts that
21     starts with 9/20/17?  Do you see that?
22 A.  Yes.
23 Q.  So I'm going to walk through this with you.  And
24     then if we need to go into each chart record we
25     can do that as well.

Page 20

1  A.  Okay.
2  Q.  Okay.  So according to the summary, it looks like
3      her first seizure occurred while she was
4      sleeping; right?
5  A.  Yes.
6  Q.  Okay.  And is that what you recall about her
7      telling you when she came to see you?
8  A.  Yes.
9  Q.  Okay.  And it says "witnesses tonic-clonic."  Is
10     that the report from the husband about her
11     jerking movements?
12 A.  I don't have a direct recollection, so it's
13     either from her husband or from a hospital note.
14 Q.  Okay.  And what does "tonic-clonic" mean?
15 A.  That's a grand mal seizure.
16 Q.  And then it goes on to say, "no tongue biting/
17     loss of urine, dislocated shoulders.  MRI brain
18     SZ protocol NL."  What does that mean?
19 A.  Seizure protocol normal.
[redacted]
.
24 Q.  So she had a second seizure again also while she
25     was asleep; right?

Page 21

1  A.  Correct.
2  Q.  Okay.  And then there's some reference to Keppra,
3      which we'll come back -- oh, I'm sorry.
4      "Ambulatory EEG with left temporal activity."
5      What's that reference?
6  A.  So that's referencing an abnormality in the left
7      side of the brain in the temporal area.
8  Q.  And this was done on the first EEG.  Was there a
9      second EEG?
10 A.  Ambulatory would be a prolonged EEG where we put
11     electrodes on and they go home, and we monitor
12     them that way.  So I would suspect that's after
13     the first routine EEG, which is usually 45
14     minutes to an hour or less.
15 Q.  So the first EEG came back normal.  Then she had
16     the ambulatory EEG where she went home with the
17     electrodes, and you saw some activity in her left
18     brain?
19 A.  Yes.
20 Q.  Okay.  And that activity was consistent with what
21     you would say is an epileptic condition?
22 A.  Well, anytime you see abnormalities in the brain
23     on an EEG, it could represent what we call an
24     epileptogenic focus, meaning where the seizure
25     could start.



Page 22

1    Q.  I see.  Okay.
2         And was that -- have you taken that sort of
3    exam again of her since this reported event?
4    A.  I don't recall, but I don't think so.
5    Q.  Okay.  Then there's a mention of Keppra.  I will
6    come back to Keppra in a moment.  And then it
7    says, "Had a spell of syncope 4/12/18."  Do you
8    see that?
9    A.  Yes.
10   Q.  Does that mean that between October '17 and April
11   '18 she didn't have a seizure, at least that was
12   reported to you?
13   A.  Correct.
14   Q.  Okay.  And then the syncope was -- do you recall
15   what that was in April of 2018?
16   A.  Well, that's consistent with seizure in a patient
17   with a history of epilepsy who is being
18   treated --
19   Q.  Okay.
20   A.  -- (indiscernible).
21        THE COURT REPORTER:  I'm sorry, Doctor.
22   I missed the last word you said.  You said,
23   "That's consistent with seizure in a patient with
24   a history of epilepsy who is being treated."
25        THE WITNESS:  That was it.

Page 23

1         MS. WERMUTH:  I'm sorry.  I may have
2    interrupted you.  I apologize.
3    QUESTIONS BY MS. WERMUTH:
4    Q.  And then near the end of this summary about four
5    lines up, it says, "No spells since 4/20/18."  Do
6    you see that?
7    A.  Yes.
8    Q.  And then it says, "Doing well 9/2019 through
9    5/2020."  Do you see that?
10   A.  Yes.
11   Q.  And then the last entry -- I'm sorry.  It's not
12   the last.  Oh, yeah.  The last entry, "No issues
13   3-8/2021."  Do you see that?
14   A.  Yes.
15   Q.  So would this summary tell you that between
16   September of 2017 and March of 2021 she had two
17   seizures and one episode of syncope?
18   A.  Based on this note, that's correct.
19   Q.  And you don't have any reason to believe that
20   this note is not correct?
21   A.  Well, it's just a summary.  We'd have to go
22   through each chart note.  Sometimes these get
23   modified.  And, again, I don't use this page, so
24   I'm not sure how it's collated.  It seems
25   consistent with your questioning, but I can't

Page 24

1    guarantee that.
2    Q.  Okay.  So why don't we do this.  Let's go to your
3    December 7, 2021, note, which is the last visit
4    you had with her.  So I'm looking at page 9916.
5    Actually go to page -- let's start with the top
6    of it.
7         MS. SCATCHELL:  Of 9916?
8         MS. WERMUTH:  No.  I'm sorry.  The top
9    of the note.  So I'm going to go to page 9912,
10   sir.
11        THE WITNESS:  Hang on.  All of my pages
12   are in the four thousands.  And then the December
13   2021 note was just handed to me, and I assume
14   scanned and emailed to you guys.  So which note
15   are you referencing?
16        MS. WERMUTH:  So it's the December 7,
17   2021, note.
18        THE WITNESS:  Correct.  I have that in
19   front of me.
20        MS. WERMUTH:  Okay.  I actually did
21   provide your office with a Bates labeled version
22   of this, so I'm not sure why --
23        THE WITNESS:  Hang on.  Let me check
24   here.
25        MS. WERMUTH:  And, Gia, when I sent the

Page 25

1    email to Tabitha, Gia, I sent it to you as well.
2         MS. SCATCHELL:  It's the three separate
3    documents; right?
4         MS. WERMUTH:  Yeah, yeah.
5         MS. SCATCHELL:  Okay.
6         THE WITNESS:  Yeah.  The last Bates
7    stamp that I have says Dillard_DePaul4848.
8         MS. WERMUTH:  Okay.  Well, why don't
9    we -- just so that we're all looking at the same
10   thing, I'm going to share my screen, and you can
11   tell me, Doctor, if you're looking at the same
12   document that I'm looking at.
13        THE WITNESS:  That's correct.
14        MS. WERMUTH:  Okay.  So when I go down
15   to the end of the notes, assessment.  So this is
16   the last page where there's assessment.
17        THE WITNESS:  Correct.
18        MS. SCATCHELL:  What page is that?
19        MS. WERMUTH:  For your reference it's
20   9916.
21        MS. SCATCHELL:  Okay.
22   QUESTIONS BY MS. WERMUTH:
23   Q.  And do you see the third bullet point in
24   assessment says "seizure"?
25   A.  Correct.



Page 26

1  Q.  Okay.  And when I look -- I mean, is there
2     anything in this note in December of '21 that
3     suggests that she had any sort of either seizure
4     or spell of syncope after April of 2018?
5  A.  Not according to this note, that's correct.
6  Q.  Now there is this reference, "Husband notices
7     jerking and gasping for air while sleeping 2
8     times in the last six months."  Do you see that?
9  A.  Yes.
10 Q.  Can you tell what the date of that report to you
11    is?
12 A.  It's going to be between -- let's see here.
13    Usually these are in chronological order.  I add
14    to the bottom of the note.  So let's see here.
15    It looks like it would come sometime after
16    4/12/18.
17 Q.  Okay.  Except do you see in that second to last
18    line it says, "No spells since 4/2018"?
19 A.  That was probably referencing two generalized
20    tonic-clonic or grand mal events.
21 Q.  But the event in April of 2018 was not a grand
22    mal event; right?
23 A.  Correct.
24 Q.  Okay.  So just to be clear, when it says, "No
25    spells since 4/2018," are you saying that the

Page 27

1     husband reported the jerking and gasping for air
2     sometime after that or sometime before April
3     2018?
4  A.  Hold on one second here.  It looks like -- I'm
5     looking at Bates stamp 4778.
6  Q.  Okay.  Let me get there.  Okay.  I'm there.
7  A.  So this is April 3, 2019, office visit note.  So
8     we know she had the event April of 2018.  So she
9     had two additional spells between April of '18
10    and April of '19.
11 Q.  So when I --
12 A.  Based on this.
13 Q.  When I look at Dillard_DePaul4778, that appears
14    to be a note from January 10th of 2019.
15 A.  Correct.
16 Q.  Okay.  So not April 2019.  I want to just be
17    clear.
18 A.  Let me make sure this is -- no, you are correct.
19    Someone went in and must have printed the chart.
20    The last person goes in the chart they redate it,
21    so, no, you're correct.  Well, actually it's
22    within a more finite time window.  So it would be
23    April of '18 and January of '19.
24 Q.  Okay.  So between -- and you are getting that --
25    show me where on 4778, please, sir, where you see

Page 28

1     that reference.
2  A.  Under "Seizure."
3  Q.  Okay.
4  A.  So if you look midway down it says, "Syncope
5     4/12/18.  No warning other than anxious while
6     sitting and reading.  Keppra at bedtime 2/2019.
7     She is back to work as a professor.  Husband
8     notices jerking and gasping for air two times in
9     the last six months."
10 Q.  Okay.  So those reports were made to you in
11    January.  So sometime between June, June of 2018
12    going forward -- through January 10th of 2019
13    there were the two reported nighttime jerking?
14 A.  That's correct.
15 Q.  Was it reported to you that she was -- well, she
16    was asleep, so I guess she was unconscious;
17    right?
18 A.  Sleeping is not considered unconscious.
19 Q.  Okay.
20 A.  The brain mechanisms of unconsciousness and sleep
21    are different things, but she was certainly
22    sleeping.
23 Q.  Okay.  But you don't have any more information as
24    to like exactly when these incidents occurred,
25    other than it was just sometime in that six-month

Page 29

1     window?
2  A.  Yeah, that's correct.  Based on her -- you know,
3     what we were treating her for, there would be --
4     it's entirely consistent with her diagnosis.
5  Q.  Sure.  And so he noted gasping for air and
6     jerking.  Did you have any indication as to sort
7     of the temporal -- the length of the episode?
8  A.  I have no recollection, and I didn't document it.
9  Q.  And there was no like immediate effort to seek
10    treatment as a result of either one of those two
11    incidents as far as you know?
12        MS. SCATCHELL:  Objection.
13        Argumentative.  Form.
14 QUESTIONS BY MS. WERMUTH:
15 Q.  You can answer, sir.
16 A.  The way we treat epileptics is, you know, the
17    advice is not to go to the hospital with every
18    seizure, so neurologists kind of look at a
19    seizure as a bad headache.  The keys are patients
20    have episodes and they wake up after those
21    episodes.  There's no reason to seek emergency
22    care in a known epileptic who's on known
23    treatment.
24 Q.  Okay.  And at this time she was on treatment;
25    correct?



Page 30

1　A. Yes.
2　Q. So let's -- one more question to go back to my
3　　 question about unconsciousness. It was not
4　　 reported to you that she appeared to be
5　　 unconscious during either of these two reported
6　　 episodes in the period between March of 2018 and
7　　 January 10th of 2019?
8　A. No. The two episodes reported initiated while
9　　 she was asleep.
10　Q. Okay. All right. So let's talk about Keppra for
11　　 a moment. Is that the treatment that -- or at
12　　 least the prescription medication she was
13　　 receiving for her epilepsy?
14　A. Yes.
15　Q. And she changed her dosage over time; is that
16　　 right?
17　A. I think there was one point in time we either
18　　 adjusted to a long-acting form or decreased the
19　　 dose slightly at a time when she was trying to
20　　 get pregnant.
21　Q. What's a long-acting form versus something other?
22　A. Well, you just take it once a day as opposed to
23　　 twice a day. Patients with busy lifestyles and
24　　 work lifestyles, it's much more convenient.
25　Q. And why is that?

Page 31

1　A. Well, taking something -- doing something once a
2　　 day versus two or three times a day, it's
3　　 intuitive, right? It's just easier.
4　Q. Okay. Fair enough. I didn't know if that meant
5　　 if it had something to do with the effects of the
6　　 medication, so not taking it during a time when
7　　 you were working, if that's what you were
8　　 referring to. But you're talking about just
9　　 literally the convenience of taking it --
10　　 remembering to take it once a day versus twice a
11　　 day?
12　A. In this instance. I don't recall, and it would
13　　 be outlined in the notes. Some people have side
14　　 effects to short-acting preparations. And then
15　　 the long-acting preparations are more effective
16　　 from a side effect profile as well.
17　Q. So can you go -- and I know I'm jumping around
18　　 here so bear with me, Doctor. I really
19　　 appreciate your patience.
20　A. Okay.
21　Q. To 4552. This is something produced by your
22　　 office to us called a medication history. Are
23　　 you familiar with this?
24　A. No. I don't use this in my care and treatment of
25　　 my patients. Again, I think it's just something

Page 32

1　　 that is tabbed in the electronic health record.
2　Q. Okay. But this would presumably have accurate
3　　 information about the medications that Dr.
4　　 Dillard was taking at any given time; would that
5　　 be accurate?
6　A. Not necessarily. A lot of times medicines are
7　　 entered that patients have been on in the past by
8　　 the medical assistant. I see that actually on a
9　　 frequent basis, and I have to go in and delete
10　　 them. Sometimes I forget to delete them. But,
11　　 you know, we hope most of the time it's
12　　 relatively accurate, but, again, I use my chart
13　　 notes more than the summaries.
14　Q. Okay. So looking at your chart notes then, I was
15　　 hoping we could stick with the summary just
16　　 because it's all in one place, but let's go to
17　　 your notes.
18　A. We could try it.
19　Q. No. I mean, if it's not accurate, I'd prefer to
20　　 get accurate testimony, so let's go to then 4565.
21　A. Okay.
22　Q. So this was September, your first visit with her;
23　　 right?
24　A. That's correct.
25　Q. And as far as I can tell, sir -- you tell me if

Page 33

1　　 I'm wrong -- she was not prescribed Keppra after
2　　 that visit?
3　　　　 MS. SCATCHELL: Objection; form.
4　A. You can see -- can I answer that?
5　Q. Please, yes.
6　A. At the bottom of 4565 under "Plan," under
7　　 "Instructions: No driving. After workup will
8　　 determine if medications indicated. No treatment
9　　 as of today."
10　Q. Okay.
11　A. So many times after first seizure, we restrict
12　　 them from driving or risky activities and
13　　 evaluate them and decide before we treat. It's
14　　 controversial whether to treat first seizure or
15　　 not in the literature.
16　Q. That makes sense.
17　　　 And, by the way, you were aware of what Dr.
18　　 Dillard's profession was at this time that you
19　　 met with her?
20　A. I knew she was a professor at a university in
21　　 Chicago.
22　Q. Okay. And did you know what her job duties
23　　 involved as a professor?
24　A. I don't recall if we discussed it that day. We
25　　 may have.



Page 34

1  Q.  Okay.  So there's -- as far as I can tell then,
2      she was not prescribed, as you point out, any
3      medication for treatment of the seizure at that
4      point in time.  Can you stay on page 4565 with me
5      for a moment?
6  A.  Of course.
7  Q.  Under "History of Present Illness," do you see
8      that?
9  A.  Yes.
10 Q.  Okay.  It says -- there's a sentence near the
11     bottom of that section two lines up from past
12     medical history that says, "The patient is," and
13     then it says, "Is patient able to perform ADLs."
14     Do you see that?
15 A.  Yes.
16 Q.  What is that reference to?
17 A.  The medical assistant didn't change the template.
18     That's a question that the medical assistant
19     answers.  So it's really just a template for them
20     to click on and type in.  So it's really an
21     irrelevant part of the chart.
22 Q.  Let me ask you this question, what is an ADL?
23 A.  Activities of daily living.
24 Q.  So it was not charted in this particular visit
25     whether she was capable of doing that or not?

Page 35

1  A.  In that section, that's correct.
2  Q.  Okay.  Is there another section where it is
3      charted?
4  A.  Well, under the instructions we gave her
5      limitations.  No driving.
6  Q.  No driving.  Okay.
7          And so I think we've talked about, Doctor,
8      five episodes.  So a grand mal seizure in
9      September of 2017 while she was sleeping; right?
10     That's one?
11 A.  Yes.
12 Q.  And then a grand mal seizure in October 2017 when
13     she was sleeping; right?
14 A.  Yes.
15 Q.  And then the April 2018 syncope; right?
16 A.  Yes.
17 Q.  And then the two other episodes of jerking and
18     gasping for air while sleeping; right?
19 A.  Yes.  However, I'm looking at an emergency room
20     note dated 9-2017 where she went presenting to
21     the emergency room status post seizure.  So I'm
22     not sure if that's an additional one or if that
23     got charted as an October -- or charted in the
24     October visit.
25 Q.  Well, I see.  And what page are you looking at,

Page 36

1      sir?
2  A.  4575.
3  Q.  I see she was playing on a couch when she
4      apparently had a tonic-clonic-type seizure.  Is
5      that what you're referring to?
6  A.  Yes.
7  Q.  And that was on September 20th of 2017?
8  A.  Correct.
9  Q.  Okay.  And this is different than the issue
10     reported to you in October?
11 A.  One second, here.  Bates stamp page 4613, which
12     is my October 11, 2017, note.  Under history of
13     present illness, the last paragraph, I have her
14     last seizure was on 10-7-17.  So that's likely an
15     additional seizure.
16 Q.  I see.  Okay.  So she had two in September of
17     2017, one in October of 2017, a syncope spell in
18     April of 2018, and then sometime between April of
19     2018 and January 10 of 2019, she had two other
20     episodes of jerking movements in her sleep,
21     gasping for air; right?
22 A.  Correct.
23 Q.  So that's six total between September of 2017 and
24     January 10th of 2019?
25 A.  That sounds accurate.

Page 37

1  Q.  And so four of those episodes occurred while she
2      was sleeping; right?
3  A.  Yes.
4  Q.  One of those episodes occurred while she was
5      playing on a couch; right?
6  A.  Yes.
7  Q.  Okay.  And then the last episode where the
8      syncope, she was reading; right?
9  A.  Yes.
10 Q.  Okay.  So only one of these episodes followed a
11     period of time when she was reading?
12 A.  Okay.
13 Q.  Okay.  And most of them -- four of them occurred
14     while she was asleep; right?
15 A.  Yes.
16 Q.  Okay.  So since we're on that October 2017 note,
17     can you -- I see the ADL reference is again just
18     the template?
19 A.  Correct.
20 Q.  Okay.  Did she have any limitations on her at
21     that point in time?
22 A.  Well, no driving.  I'm sure we had the discussion
23     no swimming alone, no working in elevated spaces.
24 Q.  Like on top of a ladder?
25 A.  Exactly.



Page 38

1  Q.  Yeah, okay.  And then at the end of this note on
2      page 4616, it looks like she was on that date
3      prescribed Keppra?
4  A.  Yes.
5  Q.  Okay.  And it says a 250-milligram oral tablet.
6      Do you see that?
7  A.  Yes.
8  Q.  And so it says one to two tablets by oral route
9      two times per day.  So that's -- if I understand
10     that note correctly, that's 500 to 1,000
11     milligrams per day?
12 A.  Correct.
13 Q.  Okay.  What is a neuro-ophthalmology opinion?
14 A.  A neuro-ophthalmologist is a neurologist who
15     specializes in disorders of the visual system and
16     optic nerves from neurological causes.
17 Q.  And so she had a neuro-ophthalmology exam as
18     well; right?
19 A.  Yes.
20 Q.  And you recall that that exam was negative?
21 A.  Could you reference the page, please?
22 Q.  I will.  I will come back to that with a page
23     number in a minute.
24     Okay.  Can you go to page 4618?
25 A.  Okay.

Page 39

1  Q.  And what do you recognize that as, sir?
2  A.  It's my November 1, 2017, chart note.
3  Q.  And we haven't really talked about this.  So is
4      the chart note -- this is an electronic charting
5      system; is that right?
6  A.  Yes.
7  Q.  And so there are a variety of categories of
8      information like chief complaint, history of
9      present illness.  Do you see that?
10 A.  Yes.
11 Q.  And those are pre-populated in the electronic
12     system?
13 A.  Parts of it are.
14 Q.  Parts of it are?
15 A.  Yeah.  For example, under "History of Present
16     Illness," the last paragraph looks like something
17     I would have typed in.
18 Q.  The last paragraph being, "Patient was last seen
19     10/11/2017"?
20 A.  Correct.
21 Q.  What's everything that comes before that?
22 A.  That's all templated.
23 Q.  So in that second paragraph under "History of
24     Present Illness" where it says, "The patient
25     complains of seizure activity that includes the

Page 40

1      following symptoms: Extreme fatigue.  She states
2      the onset of her seizures have been acute and
3      they are occurring for six weeks and they are
4      improving."  That's template?
5  A.  Yes.  I mean, it's a template where the MA will
6      change the date; six weeks.  The fatigue, the MA
7      probably typed that part in.
8  Q.  Okay.  So the MA is the medical assistant?
9  A.  Correct.
10 Q.  And is the MA with you during the visit or exam?
11 A.  No.
12 Q.  So how would the MA get the information to update
13     or fill this in?
14 A.  Well, she's preparing the chart for me with the
15     patient.  Most of the time they just kind of
16     carry the note over from last time.  Take a
17     height, weight, and blood pressure and review the
18     medications and then move the patient on.  It's
19     not a long period of time spent from a detail
20     perspective.
21 Q.  But the part that you would complete is typically
22     the last paragraph of this section?
23 A.  In this chart note, that's correct.
24 Q.  And then we go into past medical history.  Which
25     part of the past medical history are you

Page 41

1      personally completing, Doctor?
2  A.  Well, all of those, the ones that are currently
3      listed; cognitive, dislocated shoulder, seizure
4      and vestibular.
5  Q.  So these notes are your notes?
6  A.  Yes.
7  Q.  Okay.
8  A.  Let me clarify one other thing.  See where it
9      says date of onset?
10 Q.  On which page, sir?
11 A.  Well, see past medical history?
12 Q.  Yes, yes.
13 A.  As you go over, it says date of onset, those are
14     not accurate.  That's usually just when the
15     information is loaded.
16 Q.  Okay.
17 A.  Just in case you had questions about that.
18 Q.  I appreciate that.  When you say when it's
19     loaded, meaning when your office becomes aware of
20     the information?
21 A.  Or actually when I type it in.  If I don't go up
22     there and change the date, it will say that date
23     forever.
24 Q.  I see.
25 A.  And I never -- my clinical practice is I don't go



Page 42

1   back and say, oh, it started in October of '17.
2   So that's where the notes section is a little
3   more accurate.
4   Q.  And the notes section is the history of present
5   illness or what section?
6   A.  If you look under this medical history here.
7   Q.  Oh, I see.  Okay.
8       So past medical has three columns; disease
9   name, date onset, and notes?
10  A.  Correct.
11  Q.  Okay.  And so the notes has the more accurate
12  information as compared to the date of onset?
13  A.  Yes.
14  Q.  Thank you.  I appreciate that.  Okay.
15      So go to please, sir, page 4622.
16  A.  Okay.
17  Q.  The very last entry says, "Return visit request
18  in/on 3 months plus or minus 2 days."  Do you see
19  that?
20  A.  Yes.
21  Q.  And is that something that you prepared or
22  entered?
23  A.  Yeah.  That's a rough estimate on when we'd like
24  to see the patient back.  The "plus minus 2
25  days," I don't know why that's there.

Page 43

1   Q.  But in November of 2017, you thought she was
2   sufficiently stable that you didn't need to see
3   her for three months?
4       MS. SCATCHELL:  Objection;
5   argumentative.
6   A.  Well, I -- so what happens is she may have
7   appointments between this visit and the three
8   months I'm requesting.  My schedule books out
9   three to four months in advance.  So sometimes I
10  will go out and grab an appointment even though
11  she may have an appointment prior to that.
12  That's my usual practice.
13      So in regards to your question, I don't know
14  if that was I was waiting for three months or she
15  had something in between which we can look at.
16  Q.  Her next visit was January 2018.  So about two
17  months later?
18  A.  Correct.
19  Q.  Okay.  Now in -- so why did you -- so let me ask
20  you about the Keppra change here.  So hang on one
21  second.  So we were looking at page -- wait.
22  Page 4627.  Do you see that page, Doctor?
23  A.  Yes.
24  Q.  Is that different than what we were just looking
25  at?

Page 44

1   A.  This is the note by Dr. Misra, who was a provider
2   here, who did see some of our seizure patients.
3   Q.  Oh, I see.  Okay.  And, Dr. Misra -- so you would
4   have had access to this information; right?  This
5   is something you would have reviewed as you were
6   treating Dr. Dillard.
7   A.  More likely than not, yes.
8   Q.  Okay.  And it looks like if you go to page 4632,
9   so it's near the end of Dr. Misra's note?
10  A.  Yes.
11  Q.  It says under medications, "Keppra XR 750 mg.
12  oral tab extended release."  So is this moving
13  from two tablets a day to one?
14  A.  It was moving from short-acting Keppra to a long-
15  acting version.  But that script was written
16  before where it said one to two was a titrating
17  script.  In other words, she was advised on how
18  to increase her dose slowly.  You don't just
19  start someone on 1,000 milligrams twice a day.
20  So that's why that script looked like that.  And
21  then Dr. Misra made the decision apparently to
22  switch her to a once-a-day preparation.
23  Q.  So the 750 once a day is about midway between the
24  500 and 1,000 twice a day that you had --
25  A.  You can't -- the pharmacology of how the

Page 45

1   medication works, it's not -- it's not linear.
2   Q.  Okay.  Understood.
3   A.  So Keppra XR has a time-release component to it.
4   So you get more stable levels throughout the day
5   as well.
6   Q.  Understood.  So is there anything significant or
7   does this change in her medication indicate
8   something about Dr. Dillard's condition?
9   A.  No.  She was diagnosed with epilepsy, and it was
10  determined she needs, you know, chronic treatment
11  for her epilepsy to avoid recurrent seizures.
12  Q.  So in this time period -- let me ask you this:
13  Did you understand that part of Dr. Dillard's job
14  duties involved research?
15  A.  Yes.
16  Q.  Okay.  And that her research involved publication
17  and papers?
18  A.  I have a recollection of some of that, yes.
19  Q.  And that papers sometimes were presented at
20  conferences, academic conferences?
21  A.  Yes, correct.
22  Q.  And did you understand that Dr. Dillard as part
23  of her job duties was attending conferences and
24  presenting papers at conferences?
25  A.  Yes.



Page 46

1   Q.   And did you put any restrictions at this point in
2        time on her -- well, you didn't put any
3        restrictions on her work activities other than no
4        driving at this point in time; is that right?
5            MS. SCATCHELL:  Objection; form.
6   QUESTIONS BY MS. WERMUTH:
7   Q.   You can answer.
8   A.   I think my recollection is that's correct.
9   Q.   Okay.  And knowing that she had three seizures in
10       pretty short succession as of November 1, 2017,
11       did you have any concerns about her traveling
12       outside of the country to attend conferences?
13  A.   No.  Many times patients with chronic diseases,
14       whether it be epilepsy, multiple sclerosis, even
15       traumatic brain injury patients, I don't restrict
16       patients from life.  They have to operate within
17       the limits of there -- (beeping sound).  I'm
18       sorry.  I don't know how to turn that off.
19  Q.   That's okay.
20  A.   Function within the limits of their disability
21       and their chronic diseases.  She was well managed
22       and had appropriate doses of Keppra.
23           Also to be honest, it depends on the
24       patient.  Dr. Dillard obviously is a bright woman
25       and appeared to use good judgment and follow

Page 47

1        recommendations very well.  So with that being
2        said, when you're being managed with epilepsy and
3        anti-epileptic medications, other than the
4        driving from six months primary seizure, we don't
5        restrict completely.  It depends on the patient.
6   Q.   Okay.  So as you sit here now and you think
7        about, okay, Dr. Dillard had three seizures in
8        short succession and is it safe for her to travel
9        to China for work-related purposes, was this a
10       discussion that you had with Dr. Dillard at the
11       time?
12           MS. SCATCHELL:  Objection;
13       argumentative.
14  A.   I specifically don't recall -- or I don't recall
15       a trip specifically to China.  I do have a vague
16       recollection that we discussed the medication
17       use, the consistency of medication use, things
18       that lower the seizure threshold, different
19       activities or features in our lives that lower
20       the seizure threshold in using good judgment.  I
21       do have a vague recollection of conversations
22       such as that.  I don't recall a specific
23       conversation about China.
24  Q.   Thank you.  Okay.  So then turning to your
25       January of 2018 note, which is -- I will get you

Page 48

1        the page.
2   A.   4637.  That was Dr. Misra's.  Is that the one?
3   Q.   Oh, yeah.  So that's Dr. Misra again, not you,
4        that saw her that day; is that right?
5            MS. SCATCHELL:  Objection; vague.
6   Q.   I'm sorry, Doctor.  I didn't hear your answer.
7   A.   January 3, 2018, is a chart entry completed by
8        Dr. Misra.
9   Q.   Did you see -- did you have a visit with Dr.
10       Dillard on that day as well?
11  A.   No.
12  Q.   Okay.  And so on this page, it says, "The patient
13       is able to do activities of daily living with
14       limitations and patient does not drive at this
15       time."  Do you see that?
16  A.   Yes.
17  Q.   Was that her limitation at the time; no driving?
18  A.   Well, I don't know what Dr. Misra told her, but
19       what's documented implies that the limitation was
20       not driving.
21  Q.   And then if you see on page 4638.
22  A.   Yes.
23  Q.   There's a note sort of just above where it says
24       "HX."
25  A.   Yes.

Page 49

1   Q.   "Wants to become pregnant possibly in the future.
2        Explained effect of AED on unborn fetus."  What
3        is AED?
4   A.   Anti-epileptic drug.
5   Q.   The Keppra?
6   A.   Yes.
7   Q.   Okay.  And is it safe to take Keppra while you're
8        pregnant?
9   A.   Of all the anti-epileptic medications Keppra is
10       the safer one to be used.
11  Q.   And at some point while you were treating her,
12       Dr. Dillard did become pregnant?
13  A.   Yes.
14  Q.   And during that period of time, she treated with
15       Keppra?
16  A.   Yes.  I think there was a period of time
17       initially, either before she became pregnant or
18       early in the pregnancy, we reduced the dose a
19       bit.
20  Q.   Okay.  Did it ever come to your attention that
21       Dr. Dillard wasn't following the recommended
22       dosages that you had prescribed or that Dr. Misra
23       had prescribed?
24           MS. SCATCHELL:  Objection;
25       argumentative.



Page 50

1  QUESTIONS BY MS. WERMUTH:
2  Q.  You can answer, Doctor.
3  A.  In the course of my treatment of Dr. Dillard, I
4      have no recollection of her ever deviating from
5      the care and treatment that we recommended.
6  Q.  Can you turn to page 4824.  Is that your
7      electronic signature on that page, Doctor?
8  A.  Hang on one second.  Still working on it.
9  A.  I'm sorry.  It's a big file.
10 A.  Yes.
11 Q.  That's your electronic signature?
12 A.  Yes.
13 Q.  And this relates to a visit on May 5th of 2020?
14 A.  Correct.
15 Q.  And under "Instructions," do you see where it
16     says, "She reports taking only one Keppra XR 500
17     instead of two at HS"?
18 A.  Correct.
19 Q.  What is "HS," first of all?
20 A.  Bedtime.
21 Q.  Oh.  What does HS stand for?
22 A.  That's Latin for -- I forgot what it was.  HS
23     something -- it means bedtime.
24 Q.  Okay.
25 A.  And the Q before it means every, if you were to

Page 51

1  put a Q.
2  Q.  Got it.  Thank you.
3      So does this refresh your memory as to
4  whether Dr. Dillard wasn't following the
5  recommended dosage at some points in time?
6  A.  Well, I don't think that's what that represents.
7  I think we had a previous discussion about
8  reducing dosage either during pregnancy, before
9  pregnancy, or Dr. Dillard was always very
10 concerned about -- we had multiple discussions
11 about her just taking medication.  Many times,
12 especially very bright people tend to feel that
13 any kind of medication is going to hurt them or
14 their body.  So I think it's representative of
15 one of those things.  And, again, I'll state
16 again.  Not once during my course of treatment
17 was I ever concerned that she was inappropriate
18 in following our recommendations.
19 Q.  Okay.  All right.  Now I'm going to take us back
20 in time again, sir -- I apologize -- to 4648.
21 Are you there or are you still getting there?
22 A.  February 8, 2018.
23 Q.  Right.  Okay.  And on this date in 2018, she saw
24 you, not Dr. Misra; is that right?
25 A.  Yes.

Page 52

1  Q.  Okay.  And under history of present illness is
2      there anything that you wrote?
3  A.  The last paragraph, "Patient was last seen...."
4  Q.  And it says, "She has experienced an increase in
5      anxiety."  Were you -- you had mentioned earlier
6      that one of the diagnoses you made was general
7      anxiety disorder or GAD, I think?
8  A.  Yes.
9  Q.  And were you treating her for anxiety as well?
10 A.  Yes.
11 Q.  Did you give her any medication for anxiety?
12 A.  On this day I started her on sertraline, generic
13     Zoloft.
14 Q.  I see.  And did she take that for any period of
15     time?
16 A.  It looks like in the notes, Bates stamped page
17     4655, the top line, "Consider after pregnancy."
18     So I don't recall on that day.  We can go through
19     the details of the note.  But if she was pregnant
20     or trying to get pregnant, many times
21     obstetricians do not like patients on
22     serotonin-type reuptake medications.
23 Q.  I'm sorry.  What page is that, Doctor?  Did you
24     say 4655?
25 A.  I apologize.

Page 53

1  Q.  Don't apologize.  There's a lot of documents
2      here.
3  A.  Oh, yes, on two different pages.  On 4655 at the
4      top, it says, "Consider after pregnancy."
5  Q.  Where are you seeing that?
6  A.  Oh, oh, I see.  Okay.  And then also on 4657, you
7      can see I actually discontinued it.
8  Q.  Okay.  So you had her on that for just a month,
9      from February to March of 2018?
10 A.  Correct.
11 Q.  And what was the reason for discontinuing it?
12 A.  The risks during pregnancy.
13 Q.  Was she pregnant at this time?
14 A.  I don't recall if she was pregnant at that time
15     or was trying to get pregnant.
16 Q.  Okay.  The two pages you just referred me to are
17     part of your March 5, 2018, note; is that right?
18 A.  Yes, that's correct.
19 Q.  And on that date, she met with you or had a visit
20     with you; correct?
21 A.  Correct, yes.
22 Q.  And then under history of present illness, is any
23     of that prepared by you?
24 A.  Which page are you referencing?
25 Q.  So that first page of your March 5, 2018, note.



14  (Pages 50 to 53)

Page 54

1  So there's the history of present illness on page
2  4654.
3  A.  Yes.  The patient was last seen 2/12/18.  She is
4  here for a follow-up visit.
5  Q.  Okay.  And then the rest of this was template
6  information?
7  A.  Under HPI.
8  Q.  Okay.  And so would you agree with me that if a
9  third party is reviewing this, they might not
10  appreciate that those prior paragraphs are
11  templates?
12  A.  So that's why usually when we get to deposition
13  in my personal injury or medical malpractice or
14  the times I've been deposed or gone to court, I
15  explain that.
16  Q.  But like, for example, if a short-term disability
17  provider was looking at notes to determine
18  whether or not she's disabled, that provider is
19  potentially going to look at this entire note and
20  see things like her symptoms are improving.  So
21  do you see in the second paragraph, "The onset of
22  her seizures have been acute and they are
23  occurring for six weeks and they are improving"?
24  Do you see that?
25  A.  Correct.

Page 55

1  Q.  Okay.  So a third-party carrier might see that
2  and not recognize that that's a template; right?
3  A.  Correct.  And that's why under the current model
4  since electronic health records, we're
5  communicating frequently with outside reviewers
6  and also dictating and writing letters in support
7  or not in support of a certain disability.
8  Q.  Understood.  Thank you.
9  Okay.  But at first read, a carrier might
10  read that differently than how it's intended and
11  you would have to follow up then?
12  MS. SCATCHELL:  Objection; form.
13  A.  Yeah, but so what happens now is at the advent of
14  electronic health records, carriers recognize
15  this and independent reviewers and then
16  communicate with the treating physician either by
17  letter or by phone call.  I complete these calls
18  very frequently and write many letters across my
19  patient population.  And that tends to be the
20  standard practice now of disability reviewers.
21  Q.  Okay.  That's helpful.  Thank you.
22  If you go to page 4657.  This is the same
23  visit?
24  A.  Yes.
25  Q.  Under "Plan Instructions."  Do you see that?

Page 56

1  A.  Yes.
2  Q.  It says, "She wants to decrease Keppra XR to 500
3  milligrams per day and see if she remains seizure
4  free, as she wants to become pregnant."  Do you
5  see that?
6  A.  Yes.
7  Q.  So as of March of 2018, she had been seizure free
8  since the prior October?
9  A.  Correct.
10  Q.  So as of March of 2018, she had been seizure free
11  for several months and she wanted to decrease her
12  Keppra dosage?
13  A.  Yes.
14  Q.  And she was working during that period of time?
15  Between September 2017 and March of 2018 she was
16  working; correct?
17  A.  Yes, I think you're correct.
18  Q.  Okay.  Now on this date, even though she had been
19  seizure free since October and she wanted to
20  decrease her Keppra, you also write here, "She is
21  unable to work as a professor currently due to
22  seizure and inability to drive."  Do you see
23  that?
24  A.  Yes.
25  Q.  So what happened in this visit even though she

Page 57

1  had been seizure free for several months and
2  wanted to decrease her dosage that led you to
3  believe that she couldn't do the work that she
4  had been doing for the last several months?
5  A.  There's a couple of things.  So in a stable
6  patient, when you reduce the medication dose, it
7  runs the risk of recurrent seizure.  We had a
8  discussion about that and certainly no driving
9  allowed.  Also we had an abnormal ambulatory EEG
10  suggesting a propensity for her to have a
11  seizure.  So I think at that time, and, again, I
12  don't recall the length of that time that I
13  didn't want her to work or drive, but because of
14  those risks, that was my decision.
15  Q.  Okay.  But why in March of 2018 when she had
16  already been working for several months without a
17  seizure was she unable to work?
18  A.  Because I just explained the risk of seizure in
19  reducing an epileptic when you reduce a dose will
20  lower the seizure threshold, depending on her
21  metabolism.
22  Q.  And when was the ambulatory EEG?
23  A.  October 2017.
24  Q.  Okay.  So despite the ambulatory EEG, she worked
25  from October 2017 to March of 2018?



Page 58

1  A.  I wasn't implying that the ambulatory EEG allows
2      work.  What I'm stating is that the ambulatory
3      EEG showed a structural abnormality in an
4      epileptogenic focus, potential epileptogenic
5      focus.  So in a patient who is predisposed to
6      seizures, anytime you lower the dose increases
7      the risk of seizure.
8  Q.  So it was the decrease in the dosage of Keppra
9      that caused you to conclude that she was unable
10     to work as a professor --
11 A.  Correct.
12 Q.  -- based on the history?
13 A.  That's correct.  And her inability to drive.
14 Q.  Right.  But she had not been able to drive and
15     had been working since at least September of
16     2017; right?
17 A.  Correct.
18 Q.  So what about her not driving at this point in
19     time made her unable to do her job?
20 A.  Well, that's a continuation of the restriction.
21     So I don't -- so don't tie the two together.  I
22     think the main issue here is the potential for
23     having a seizure and the reduction of the dosage.
24 Q.  Okay.  So even though she's seizure free for
25     almost six months, you think that there's enough

Page 59

1      of a potential that she's going to have a
2      recurring seizure in March of 2018 that you take
3      her out of work?
4          MS. SCATCHELL:  Objection;
5      argumentative, form.
6  A.  I'll explain it again.  I have no problem
7      explaining it again.  In a patient with an
8      abnormal EEG with a potentially epileptogenic
9      focus, who is stable on a medicine, when you
10     reduce the medicine, there is a risk that there
11     could be a recurrent seizure.
12 Q.  Okay.  And so the reduction in the medication is
13     the catalyst --
14 A.  Yes.
15 Q.  -- for your conclusion that she cannot work?
16 A.  Correct.
17 Q.  And the reduction in the medication is at her
18     request?
19         MS. SCATCHELL:  Objection.  Misstates
20     testimony.
21         THE WITNESS:  Go ahead.  I'm sorry.
22         MS. SCATCHELL:  I said objection.
23     Misstates testimony.
24 QUESTIONS BY MS. WERMUTH:
25 Q.  You can still answer, Doctor.

Page 60

1  A.  It's a discussion in which she had with me.  She
2      didn't unilaterally decide.
3  Q.  No, I know.  I said at her request.  I didn't say
4      at her decision.  So it was her request to
5      decrease the Keppra?
6  A.  Correct.  Because of the potential risks in her
7      mind to a fetus.
8  Q.  Okay.  Would you turn to page 4661.
9  A.  Okay.
10 Q.  Do you recognize this document, Doctor?
11 A.  Well, it's a document from Liberty Mutual
12     Insurance.
13 Q.  Okay.  And is that your signature on the bottom
14     of the page?
15 A.  Yes.
16 Q.  And the top part of this page where there's
17     handwritten notations with a Leave ID number and
18     employee name, that was not completed by you.  Am
19     I right?
20 A.  Correct.
21 Q.  Do you know who completed the top portion of this
22     form?
23 A.  No.
24 Q.  Okay.  And this form is called a Certification of
25     Health Care Provider For Employee's Serious

Page 61

1      Health Condition form.  Do you see that?
2  A.  Yes.
3  Q.  Okay.  And then the bottom of the page, did you
4      complete that, Doctor?
5  A.  That's my signature.  Usually we have a medical
6      records person who would fill in the demographic
7      information and some of the chart information
8      before we review it.
9  Q.  So you signed this after reviewing this document
10     and the chart; is that right?
11 A.  It looks like it, yes.
12 Q.  Okay.  So on the next page, do you know in
13     paragraph 1, "Medical Facts/Treatment," do you
14     know who completed that?
15 A.  It would have been a staff member.
16 Q.  At your office?
17 A.  Yes.
18 Q.  And then section 2, do you see continuous leave?
19         MS. SCATCHELL:  Anna, I don't mean to
20     interrupt you, but are we still on 4661?  I'm
21     just trying to make sure that we're on the same
22     page.
23         MS. WERMUTH:  4662, the next page.
24         MS. SCATCHELL:  Okay, okay.
25         MS. WERMUTH:  I'm sorry, Gia.  I



Page 62

1    thought I said the next page. I'm sorry if I
2    didn't.
3          MS. SCATCHELL: I think you did. I
4    think -- yeah. It's getting late, so I think I
5    just --
6    QUESTIONS BY MS. WERMUTH:
7    Q. Okay. Paragraph 2, section (2A) is not completed
8    but (2B) is completed. Do you see that?
9    A. Yes.
10   Q. And did you complete (2B)?
11   A. I don't recall.
12   Q. But you did sign this document. So you approved
13   the completed -- whoever completed that, you
14   approved what was inputted in there; right?
15   A. Yes.
16   Q. Okay. So at this point in time you're suggesting
17   she needs to be off work for six months; correct?
18   A. Yes. We usually pick either a three- or
19   six-month window.
20   Q. Okay. And then section 3, it says, "Absence From
21   Work: Due to incapacity caused by possible
22   episodic flare-ups." Do you see that?
23   A. Yes.
24   Q. And then there's this note that says -- if I'm
25   reading it correctly, "Patient can only attend

Page 63

1    conferences and participate in continuing
2    education. No driving." Do you see that?
3    A. Yes.
4    Q. Did you write that note?
5    A. That's not my handwriting, but it would have been
6    under the direction of myself.
7    Q. So you were comfortable with her -- she needed to
8    be relieved from all work duties except for
9    conferences?
10   A. That's what we wrote there.
11   Q. And did you talk to her about any restrictions in
12   or around travel or conference participation or
13   anything like that?
14   A. So, we had discussions obviously about driving,
15   which we document because of medical liability,
16   liability risk, but we've had multiple
17   discussions through the course of treatment about
18   situations that lower the seizure threshold.
19   Q. What does that mean; lower the seizure threshold?
20   A. So things, for example, like excessive alcohol
21   use increase your risk of seizure or lower the
22   seizure threshold.
23   Q. Okay. So lowering the seizure threshold means
24   something that would increase the risk of
25   seizure?

Page 64

1    A. Correct.
2    Q. Is travel something that would increase the risk
3    of seizure?
4    A. Not in and of itself, no.
5    Q. Would overseas travel be something that would
6    increase the risk of seizure?
7    A. Not in and of itself.
8    Q. Would preparing to present a paper to a group of
9    academics be something that would increase the
10   risk of seizure?
11   A. Not in and of itself.
12   Q. Would actually presenting the paper to a large
13   group of academics be something that would
14   increase the risk of seizure?
15   A. Not in and of it -- by itself.
16   Q. And then the next page, which is page 4663,
17   there's an Accident/Injury Questionnaire. Do you
18   see that?
19   A. Yes.
20   Q. And there's some words at the top that are
21   scribbled out. Do you see that?
22   A. Yes.
23   Q. Do you know what that notation is?
24   A. "Medical assistant."
25   Q. Do you know who wrote that?

Page 65

1    A. No. I've never seen this form. Actually I've
2    never seen it in my office. I don't know who's
3    using it.
4    Q. Okay. So you don't know who prepared this
5    document?
6    A. No.
7    Q. And do you see at the bottom where it says No.
8    2B, and then it's scratched out and then it says,
9    "Needs continuous leave with conference travel
10   approval. Needs notes." Do you see that?
11   A. Yes.
12   Q. So do you recall having a conversation with Dr.
13   Dillard where she told you she needed leave but
14   she wanted to still be able to go to conferences?
15   A. I think it was in a broader context. I don't
16   recall a specific phone call or meeting about
17   that, but I do have a vague recollection that we
18   did discuss travel and continuing to participate
19   in some capacity as a professor.
20   Q. Okay. So she wasn't completely disabled from all
21   of her work duties in March through September of
22   2018?
23         MS. SCATCHELL: Objection. Calls for a
24   legal conclusion.
25   A. Well, referencing the discussion we had earlier



Page 66

1    in the deposition about an hour and a half ago,
2    you know, when I have patients with chronic
3    diseases, I -- based on the patient and who they
4    are, they work within the limits of their
5    restrictions. However, people have to live, and
6    I try to allow patients to live within their --
7    to participate as they're capable, especially
8    when patients use good judgment.
9         Dr. Dillard certainly -- I don't recall any
10   conversation I've ever had with her where she
11   didn't want to work at all. She always wanted to
12   work and teach and do her research, and she
13   seemed very diligent in her career. And, again,
14   in situations like that, it's kind of a gestalt
15   of allowing patients to live their life. We
16   don't restrict -- it's never a hundred percent or
17   zero.
18  Q.  No, I understand. So my question is only this,
19   Doctor, when you filled out these forms in March
20   of 2018, there were certain work activities that
21   you had concluded she was disabled from, but
22   there were other work activities that you had
23   concluded she could continue to perform?
24  A.  Yes.
25  Q.  Okay. Thank you. Would you turn to page 4659.

Page 67

1  A.  Yes.
2  Q.  So what prompted -- is that your signature on
3   this note, Doctor?
4  A.  Yes.
5  Q.  And did you prepare this note?
6  A.  Yes.
7  Q.  And you had seen her on March 5th of 2018; right?
8  A.  Yes.
9  Q.  So between March 5th of 2018 and March 15th of
10  2018, what prompted this note that you prepared
11  for her?
12  A.  I suspect we had the conversation about
13  restrictions and what she wanted -- you know, was
14  capable of doing at work and staying engaged in
15  some capacity at work. So what likely happened
16  is that she needed it memorialized. So there
17  must have been a phone call or -- and asked me to
18  summarize the conversation that related to
19  travel.
20  Q.  Thank you. Would you turn to page 4680. While
21  you're getting there, Doctor, do you know if she
22  was, in fact, given time off of work as a result
23  of your medical certification?
24  A.  I don't recall as I sit here at this moment.
25  Q.  Okay. No problem.

Page 68

1     All right. Page 4680.
2  A.  Yes.
3  Q.  And this is an April 17, 2018, visit with you; is
4   that right?
5  A.  Correct.
6  Q.  And, again, under History of Present Illness can
7   you tell me which portion of that you prepared?
8  A.  "Patient was last seen 3/5/18."
9  Q.  Okay. And it says, "She states she fainted while
10  reading last week." Do you see that?
11  A.  Yes.
12  Q.  So this was the April 18th episode of syncope;
13  right?
14  A.  Yes.
15  Q.  And on page 4681 in the section on seizure it is
16  described as a spell of syncope; right?
17  A.  Yes.
18  Q.  And then it says, "Needs to take Keppra BID and
19  will follow." What does that mean?
20  A.  Take twice a day.
21  Q.  So at this point in time -- well, so in March,
22  had you decreased her Keppra as she had asked?
23  A.  Well, at this visit before we increased it up,
24  she was on XR 750, so it looks like -- hang on.
25  Let me take a peek here. It looks like on March

Page 69

1  6, 2018, I adjusted the dose to the XR 500.
2  Q.  And so here in April, you are increasing it again
3  to XR 750. And I'm sorry. I'm looking at page
4  4683.
5  A.  No, that's correct. So we went back up.
6  Q.  Okay. So as you had suggested earlier, there was
7  an increased risk of seizure if you adjusted her
8  medication down. That happened, and so you
9  adjusted it back up again?
10  A.  That's correct.
11  Q.  And then on page 4683 -- hang on. Let me see if
12  that's right.
13     Oh, under "Plan" and then "Instructions" on
14  that page.
15  A.  Yes.
16  Q.  There's a note here that says -- do you see where
17  it says, "Filled out Chicago IVF form"?
18  A.  Yes.
19  Q.  Is that note prepared by you?
20  A.  Probably.
21  Q.  And there's a sentence that reads, "She had an
22  additional spell which statistically was a
23  seizure." Do you see that?
24  A.  Yes.
25  Q.  What does that mean?



Page 70

1   A.  It was probably where -- my recollection is that
2       it's likely that I was referencing the syncopal
3       spell.  I mean, we talked about that earlier as
4       well, so in a patient with epilepsy, a spell like
5       that is by definition a seizure.
6   Q.  And when she had this additional seizure, at that
7       point in time did you say to her maybe it's not a
8       good time for you to travel to Italy to present a
9       paper?
10          MS. SCATCHELL:  Objection;
11      argumentative, assumes facts not in evidence.
12          MS. WERMUTH:  I'll strike it.
13  QUESTIONS BY MS. WERMUTH:
14  Q.  Doctor, let me ask you this question:  After she
15      had this additional seizure because of her
16      adjustment to the medication going down, did you
17      talk to her about maybe now is not a good time
18      for you to be traveling overseas?
19          MS. SCATCHELL:  Same objection.
20  QUESTIONS BY MS. WERMUTH:
21  Q.  You can answer.
22  A.  I don't recall.
23  Q.  Okay.  If you would go to 4689.
24  A.  Yes.
25  Q.  So you met with her on May 1st of 2018; is that

Page 71

1       right, sir?
2   A.  Correct.
3   Q.  And under "History of Present Illness," can you
4       tell me what you prepared there?
5   A.  "Patient was last seen," that paragraph.
6   Q.  The very last paragraph in that section.
7           On 4692, there is a note -- the very bottom
8       of page 4692, there's a section that reads
9       "Plan."  Do you see that, Doctor?
10  A.  Yes.
11  Q.  And then under "Plan" there is another header
12      that says "Instructions."  Do you see that?
13  A.  Yes.
14  Q.  So did you prepare that note?
15  A.  Yes.
16  Q.  Okay.  So it says, "She's unable to read without
17      onset of dizziness followed by intermittent loss
18      of consciousness."  Do you see that?
19  A.  Yes.
20  Q.  Now as I understand it, I'm aware of the one
21      reported incident, the April 2018 syncope, that
22      was -- that followed her doing some reading, but
23      this seems to suggest there were more episodes of
24      that.  Am I missing something, sir?
25  A.  Sure.  So we made another diagnosis of vestibular

Page 72

1       dysfunction, which is a secondary cause or
2       another cause of episodic dizziness.
3   Q.  Okay.
4   A.  This started after the onset of one of her
5       seizures.  So there are something called
6       vestibular seizures.  And if you look above
7       "Plan" where it says "Vestibular dysfunction,"
8       she will get these episodic intermittent dizzy
9       spells "worse in a.m. or with stress or reading,"
10      which is an eye-movement-induced and visual-
11      induced episode, which will also lower the
12      seizure threshold.
13  Q.  And so you as a result of that, her reports to
14      you that she would experience dizziness, you sent
15      her for the neuro-ophthalmology opinion; right?
16  A.  Just to examine eye movements to see if there was
17      anything in the eye movement or what we call
18      vestibulo-ocular reflexes that needed additional
19      treatment other than the vestibular
20      rehabilitation, which I had already ordered.
21  Q.  Okay.  And she was already participating in that;
22      correct?
23  A.  Yes.
24  Q.  What does vestibular mean?
25  A.  Vestibular is a complex neuroanatomical system

Page 73

1       which helps people stay upright.  It keeps us
2       from getting -- walking on two legs as opposed to
3       four limbs.  It allows us to walk without moving
4       our heads like a duck or a bird, and it's this
5       complex pathway that has developed over evolution
6       that encompasses brain, brain stem, the
7       vestibular part of the nerve or vestibular nerve
8       or inner ear and the upper cervical spinal
9       region.
10  Q.  And in this note above plan where you pointed us
11      to the vestibular dysfunction, there's a note
12      that says -- that appears to read that the
13      dizziness is aggravated by the Keppra; is that
14      right?  Am I reading that right?
15  A.  Yeah.  She wasn't sure if it was aggravated by,
16      so I put that in there as something we want to
17      consider, depending on how she responded to the
18      vestibular rehabilitation.
19  Q.  Okay.  So that was May of 2018.  If you would go
20      to 4703 now.
21  A.  Yes.
22  Q.  She visited with you on June 5 of 2018.  Do you
23      see that?
24  A.  That's correct.
25  Q.  Is there any note in "History of Present Illness"



Page 74

1     that was prepared by you, Doctor?
2   A.   It looks like -- I'm not sure this was me or my
3     medical assistant, but "Patient last OV was on
4     5/1/18. Here for follow-up visit. She has
5     continued therapy. She is still experiencing
6     sensitivity to light."
7   Q.   Okay. She was referred to Dr. Singh. Who is Dr.
8     Singh?
9   A.   He's a Ph.D. neuropsychologist. Through the
10     course of treatment, it's documented somewhere in
11     here, she was complaining of some cognitive
12     issues and some forgetfulness and memory issues.
13     So I wanted to see if we could differentiate out.
14     Many times patients with recurrent seizures and
15     spells can have memory issues. Many times the
16     medications are confounding to the memory issues,
17     as well as amongst other things. So I wanted to
18     have him evaluate her to see if we could tease
19     out. Sometimes you can't, but to see if there
20     was anything we could focus treatment on.
21   Q.   And then the note reads, "Patient would like to
22     be able to go back to work." Do you see that?
23   A.   Yes.
24   Q.   Okay. So within two months of that, less than
25     two months of that episode in April of 2018, she

Page 75

1     at least felt like she was able to go back to
2     work; is that fair?
3   A.   Yeah. I found her always wanting to work or do
4     something to participate. She wasn't my typical
5     patient who has chronic disease or chronic
6     illnesses that tried to get out of work. So it
7     was a constant battle back and -- not battle. I
8     don't want to use that word. It was a constant
9     discussion back and forth of using good judgment,
10     which she had, but also applying some caution to
11     the decisions we made, including whether it was
12     medication, work, things like that.
13   Q.   Okay. And so you agree that she could return at
14     that point?
15   A.   Well, I gave her significant criteria in which
16     she could return to work.
17   Q.   Okay. So let's look at that. Would you turn to
18     page 4706?
19   A.   Correct.
20   Q.   So you said she could work with temporary
21     restrictions; right?
22   A.   Yes.
23   Q.   So you did not review these restrictions as being
24     something that would carry her through the rest
25     of her career; right?

Page 76

1   A.   Well, as of this note, I qualified it as
2     temporary.
3   Q.   Okay.
4   A.   I mean, as we go through the process, would it
5     become more permanent? I didn't know at the
6     time. So it would be poor form for a specialist
7     to say, "Oh, no, you can't do this ever again."
8   Q.   Okay. Fair enough.
9     So the first one says, "Limited focus
10     writing and reading greater than one hour." I
11     don't really understand that phrase. Tell me
12     what you're conveying there and how you came to
13     that conclusion?
14   A.   So I'll reference back to some of the reading and
15     the cause of the dizziness while reading. So
16     what I want her to do is limit her focus and
17     writing. I know it's not grammatically correct.
18     So writing and reading greater than an hour. So,
19     in other words, I wanted her to make sure that
20     she was able to do finite periods of work. So
21     limit it to one hour requiring focus. Reading
22     and writing with limited focus.
23   Q.   So like no more than one hour at a time? That's
24     what you mean by greater than one hour?
25   A.   Correct. Without a break.

Page 77

1   Q.   Okay. So she could read more than an hour in a
2     day. She just needed to break after each hour?
3   A.   Yeah. It's not clear in the note, so I don't
4     have a direct recollection of how we broke that
5     up through the day.
6   Q.   And is this something that she suggested to you
7     or you suggested to her?
8   A.   No. I mean, it was never she told me or I told
9     her. I mean, we have -- the way my usual
10     practice and scope of practice is I work with
11     patients, especially when they show good
12     judgment, they understand their job better than I
13     do. Right? I don't -- I incorporate what the
14     neurological syndromes that they have, along with
15     assessing their judgment on what they feel they
16     can do.
17   Q.   And looking at item 4, so you understand -- let
18     me ask you this first, Doctor: As a professor,
19     you understand that one of her duties is
20     teaching; right?
21   A.   Yes.
22   Q.   Okay. And so in order for her to perform the
23     essential functions of her job, she has to teach;
24     right?
25     MS. SCATCHELL: Objection. Calls for a



Page 78

1    legal conclusion.
2    A.   Well, I don't know what the requirements of her
3    job are, but in a usual sense, professors teach,
4    they do research, they write papers.  I don't
5    know what ratios or expectations were required by
6    DePaul University, but I have a general sense of
7    what a professor does.  Do I have a specific
8    sense of what her requirements were?  No.
9    Q.   But you did understand that she had an obligation
10   to teach classes?
11   A.   Well, yeah, because I have something in here she
12   can teach online classes.
13   Q.   So how is it that you reached that conclusion
14   about online classes?
15   A.   I think my vague recollection is that after -- we
16   had a long discussion about this.  Is that the
17   stimuli in an environment where she's teaching an
18   online class versus a live class is significantly
19   different.
20   Q.   Okay.  And did she tell you whether or not DePaul
21   had any requirements around online teaching
22   versus in-person teaching?
23   A.   I don't recall that that was a discussion.
24   Q.   And then you say, "Additional time to develop
25   research agenda and publications."  Do you see

Page 79

1    that?
2    A.   Yes.
3    Q.   And by that do you mean an extension in her
4    tenure clock?
5    A.   Well, I don't know anything about tenure and
6    where she was in the tenure track.  However, due
7    to her neurological condition and her clinical
8    state, it's almost like a kid who has an
9    executive processing disorder, they need extended
10   time, class notes, et cetera.
11   Q.   And do you know what time obligations or what
12   time restrictions were put on Dr. Dillard
13   vis-a-vis her research agenda and publications?
14   A.   No.
15   Q.   So you're not sure if that would -- if item 5
16   would require like an extension to the time that
17   she would need to go prepare her case for tenure?
18        MS. SCATCHELL:  Objection.  Asked and
19   answered.  Form.
20   A.   Again, I don't know what this had to do with
21   tenure other than the fact she was a professor,
22   and we must have talked about her research and
23   publications, and I was of the opinion based on
24   her medical condition, neurological condition,
25   that she needs more time than she would have

Page 80

1    prior to her diagnosis of epilepsy.
2    Q.   All right.  Item 6:  "May need help with service
3    committee alternate."  What do you mean by
4    "service committee alternate"?
5    A.   That's something she advised me on, that she
6    was -- apparently needed help in this committee.
7    You know, I don't recall exactly what we spoke
8    about, but she said she may need help with that,
9    and, in fact, we put may.  Not did.  So I think
10   we left that up to a judgment call is my
11   recollection.
12   Q.   Okay.  So let me ask you that same question
13   because it says, "She may be able to teach," so
14   using that same "may" construction, in item 4 it
15   says, "She may be able to teach online classes."
16   Tell me what you mean by that.
17   A.   Well, someone who is able to do something and may
18   be able to do something before we actually know.
19   I always like to say may be able.  I always like
20   my patients to try if that's what's appropriate.
21   I've learned over 30 years of doing this that
22   employers, et cetera, and work comp companies, if
23   you write a definitive, then my patients have
24   been harmed in many ways over the years both in a
25   job situation and personally, so I always like to

Page 81

1    make sure, look, we're trying to relax
2    restrictions.  We have to do a trial basis and
3    let's see.  If I can relax them more, great.  But
4    if it doesn't work, then we need to restrict
5    them.
6    Q.   Right.  So you understand that restrictions and
7    accommodations can be trial and error; right?
8    Like you have to try things out and see if they
9    work?  You would agree with that?
10   A.   As a general statement, yes.  A lot of times it's
11   circumstantial.
12   Q.   Understood.  Let me ask you this question:
13   Knowing that teaching is one of her job
14   responsibilities, when you say she may be able to
15   teach online classes, does that mean she can't
16   teach any other kind of classes but maybe she can
17   teach this but maybe she can't teach at all?
18   What exactly are you saying with that sentence?
19   A.   Well, right now it says may be able to teach
20   online classes.
21   Q.   So was there any restriction -- I don't see any
22   reference in here to in-person classes.  So are
23   you saying she can't --
24   A.   Oh, oh, I see your question.  Yeah.  No, no.  I
25   wouldn't say in-person is fine but may be able to



Page 82

1 teach online. It's the reverse. So, yeah, my
2 implication there is I don't want her in the
3 classroom at this point in time in a lecture
4 hall.
5 Q. Okay. So what you're saying is she can't teach
6 at all but maybe she can teach online?
7 MS. SCATCHELL: Objection. Misstates
8 his testimony.
9 A. I'm releasing her to attempt to teach online
10 classes as an initial event.
11 Q. Okay. But if she couldn't teach online, then
12 your default would be she can't teach at all?
13 I'm just trying to understand if she could teach
14 at all based on this instruction?
15 MS. SCATCHELL: Objection; asked and
16 answered.
17 A. What I'm stating is will attempt to see if she
18 can teach online. If she were to come back to me
19 and say, "I can't," then we would have another
20 discussion about what she's able to do. I'm not
21 going to say right now if she couldn't teach
22 online, then she could teach four minutes a day
23 or eighteen minutes a class. You know, I don't
24 know. I mean, that's why we started with this.
25 Basically it's like a fork in the road. Right?

Page 83

1 You come to a fork in the road and you take the
2 best path.
3 Q. Did you send these instructions to DePaul
4 University?
5 A. If they were under -- I don't recall if there was
6 a specific note sent, but when the patient gets
7 their printout when they leave, the instruction
8 sections are on a document with our heading. So
9 I don't know if she provided them or if one of my
10 staff members provided them to the university.
11 Q. Okay. Can you go to the next page, which is page
12 4708.
13 A. Yes.
14 Q. All right. So this is a DePaul University form.
15 It says "Office of Human Resources - Employee
16 Relations ADA Accommodation - Healthcare Provider
17 Certification." Do you recognize that?
18 A. Yes.
19 Q. And if you go to the last page of this record,
20 which is 4710, do you see that page?
21 A. Yeah.
22 Q. Okay. Is that your signature, Doctor?
23 A. Yes.
24 Q. So did you complete this form and submit it on
25 her behalf?

Page 84

1 A. Well, it's just one, two, three -- three check
2 boxes that were checked, yes.
3 Q. Right. So I see going back to page 4708, to your
4 point, there's a check box and you say yes; she
5 has a physical or mental impairment. And then it
6 says, "If yes, please describe the nature and
7 severity of the impairment." But I don't see any
8 description here. Any reason why you didn't
9 complete that?
10 A. I was just asked to do check boxes, I guess.
11 Q. So with number 2, it says, "Does the impairment
12 substantially limit a major life activity?" And
13 you checked the box yes. Do you see that?
14 A. Yes.
15 Q. And then it asks you to describe her limitations
16 and what major life activities were limited, but,
17 again, it's blank.
18 A. Correct.
19 Q. As you sit here today, can you tell me what major
20 life activities were substantially limited in the
21 middle of 2018 for Dr. Dillard?
22 A. So one is the inability to drive. We stopped her
23 from undergoing IVF at that time. And, again, we
24 just went through a list of work restrictions
25 which limits her abilities.

Page 85

1 Q. Okay. So her major life activities that you say
2 were limited were working and driving, and I
3 don't really know enough about the IVF situation,
4 but no IVF, no driving, and limitations on your
5 ability to work?
6 MS. SCATCHELL: Objection. Misstates
7 his testimony. Calls for a legal conclusion.
8 QUESTIONS BY MS. WERMUTH:
9 Q. Did I state that correctly, Doctor?
10 A. Well, partially in work, yes, that's correct.
11 For example, I have in here she needs to wear
12 sunglasses indoors. I guess that impacts her at
13 work. But the light, sensitivity to light
14 indoors from the types of lighting could be an
15 issue.
16 Dizzy. Remove herself from situations when
17 she becomes dizzy due to overstimulation. That's
18 not necessarily isolated to a work environment.
19 That could be a movie theater. If she enjoys
20 watching movies, she's not going to be -- you
21 know, I want her restricted from doing things
22 like that as well. So those are some conclusions
23 which can be drawn from the instruction section
24 on 4706.
25 Q. Okay. On the next page, 4709, there's item 3,



Page 86

1 section B, the question is: "Is the employee
2 taking medications or receiving treatment for the
3 impairment that limit the employee's ability to
4 perform the essential functions of the job?" And
5 you say no; right?
6 A. Correct.
7 Q. And then there's the next section, "Please
8 provide suggestions for workplace or job
9 adjustments or accommodations." Do you see that?
10 A. Yes.
11 Q. And then that section is blank as well.
12 A. Correct.
13 MS. WERMUTH: So I'm going to mark as
14 Exhibit 2 -- and by the way, let me just for the
15 record get Exhibit 1, the Bates numbers into the
16 record. So hold on one second. And I'll make
17 sure the court reporter has all of this
18 information. So Dillard_DePaul4659 through 4848.
19 And Dillard_DePaul9897 through 9916. That is
20 Exhibit 1.
21 Exhibit 2 I will pull up here in a moment.
22 I didn't see this in your file, Doctor. That's
23 why I'm pulling this up, but it is on your
24 letterhead so let me -- so I'll mark as
25 Exhibit 2 what's been Bates labeled

Page 87

1 Dillard_DePaul2711.
2 MS. SCATCHELL: Anna, really quick,
3 could you just give me a second to pull that
4 document up.
5 MS. WERMUTH: I can also email it to
6 you.
7 MS. SCATCHELL: This isn't a part of
8 the three documents you sent; right?
9 MS. WERMUTH: Correct. It was not in
10 Dr. Cristea's -- I'm sorry. Is that how I
11 pronounce your name?
12 THE WITNESS: Yeah, that's fine.
13 CHRIS-tee.
14 MS. WERMUTH: I didn't see this in his
15 files, but I had it in DePaul's files. Do you
16 want me to email it to you?
17 MS. SCATCHELL: Yeah. Would you mind
18 just emailing it to me just save us some time
19 looking for it.
20 MS. WERMUTH: Yes.
21 MS. SCATCHELL: Thank you.
22 MS. WERMUTH: Whoops. I'm showing you
23 all my state secrets. Hang on one second.
24 MS. SCATCHELL: Good thing I'm on my
25 phone so I can't even see.

Page 88

1 MS. WERMUTH: I was just like showing
2 you all of my emails. Okay. Hang on one second.
3 I'm going to send -- and, Mary Beth, why don't
4 you give me your -- is your email in the chat
5 box?
6 THE COURT REPORTER: Let me check here.
7 I think normally they ask that it goes to Magna,
8 and then I can go ahead and get it from them, but
9 I can give it to you at the end.
10 MS. WERMUTH: It's okay. I can give it
11 to Magna after. That's fine.
12 So, Gia, I'm handing you two accommodation
13 letters that were not in the file.
14 MS. SCATCHELL: Okay.
15 MS. WERMUTH: And I will mark the
16 first -- I will mark Dillard_DePaul2711 as
17 Exhibit 2.
18 And just given the hour, Gia, do you mind if
19 I -- can you look at my screen or do you want to
20 wait until you get the email?
21 MS. SCATCHELL: I have not gotten it
22 yet, but I could -- oh, it just came through. Go
23 ahead.
24 (Deposition Exhibit(s) 2, 06/05/2018
25 Letter to "To Whom It May Concern" from Richard

Page 89

1 Cristea, M.D., having been marked for
2 identification, is displayed on the
3 videoconference screen for the witness and all
4 parties to view at this time, as testimony
5 continues:)
6 QUESTIONS BY MS. WERMUTH:
7 Q. So, Doctor, this is a letter that looks like it's
8 on the Neurological Institute Specialty Centers'
9 letterhead. Do you see that?
10 A. Yes.
11 Q. And it's dated 6/5/2018. Do you see that?
12 A. Yes.
13 Q. And that's your signature there?
14 A. Yes.
15 Q. And is this a letter that you gave to Dr. Dillard
16 or you gave directly to DePaul, do you recall?
17 A. I have no recollection who I gave it to.
18 Q. Did this accompany the certification form that we
19 were just looking at that had all the blank spots
20 in it?
21 A. What's the question?
22 Q. Did this letter -- before I pulled up this
23 letter, we were looking at that form that had the
24 check boxes but had a lot of sections blank. Did
25 this letter accompany that form when you sent it?



Page 90

1   A.  I don't know.  I wouldn't have sent it myself.
2       It would have been sent through the medical
3       records department.
4   Q.  Okay.
5   A.  I suspect this was in response to that because
6       it's a more detailed dictation as opposed to
7       writing in a box.
8   Q.  And this is basically -- with the exception of
9       the first sentence where it says, "Sydney is a
10      patient of mine and had an appointment with me
11      today," the rest of it is in that note that we
12      just read?
13  A.  Yes.
14  Q.  Okay.  And after you sent that letter, did you
15      have any conversations with anybody at DePaul
16      directly?
17  A.  I don't recall.
18  Q.  Did you have any conversations with Dr. Dillard
19      about whether she got all the accommodations she
20      wanted or whether any of the accommodations in
21      her mind were not working?  Do you recall any
22      conversations to that effect?
23          MS. SCATCHELL:  Objection.  Calls for a
24      legal conclusion.
25  A.  I don't have a direct recollection of the details

Page 91

1       of any conversation, as I sit here right now.
2   Q.  Okay.
3           MS. WERMUTH:  I'm going to mark as
4       Exhibit 3, what is Bates labeled
5       Dillard_DePaul2683.  I will share this with you,
6       Doctor.
7           (Deposition Exhibit(s) 3, 10/02/2018
8       Letter to "To Whom It May Concern" from Richard
9       Cristea, M.D., having been marked for
10      identification, is displayed on the
11      videoconference screen for the witness and all
12      parties to view at this time, as testimony
13      continues:)
14  QUESTIONS BY MS. WERMUTH:
15  Q.  Doctor, can you see my screen?
16  A.  Yes.
17  Q.  This is another letter that's on the letterhead
18      of your office; correct?
19  A.  Yes.
20  Q.  And it's dated October 2, 2018?
21  A.  Yes.
22  Q.  So it's about four months after your prior
23      letter; is that right?
24  A.  Yes.
25  Q.  And is that your signature at the bottom?

Page 92

1   A.  Yes.
2   Q.  And did you prepare this letter?
3   A.  It looks like it's the same as previous.  Right?
4       Other than that was -- the date was changed?  Is
5       that accurate?
6   Q.  I don't think it's totally identical.  I think
7       the six accommodations are largely identical, but
8       there's no reference here to IVF.  And then
9       there's reference to physical and vestibular
10      rehab that I don't think was in there before.
11  A.  I think the vestibular comment was in there.  The
12      IVF wouldn't have been something that has to do
13      with a work restriction.
14  Q.  But you did put that in your first letter?
15  A.  To DePaul?
16  Q.  Let me go back and look.  Hang on.  Maybe I'm
17      wrong.
18  A.  It's under the instruction section, but I don't
19      have the letter in front of me.
20  Q.  Yeah, it is -- here.  I know you don't have it in
21      front of you.  It wasn't in your file for
22      whatever reason, so let me share this again.
23          (Deposition Exhibit(s) 2, 06/05/2018
24      Letter to "To Whom It May Concern" from Richard
25      Cristea, M.D., having been marked for

Page 93

1       identification, is displayed on the
2       videoconference screen for the witness and all
3       parties to view at this time, as testimony
4       continues:)
5   QUESTIONS BY MS. WERMUTH:
6   Q.  I'm sharing Exhibit 2 again, so this is the
7       letter dated 6-5-2018, and there is the reference
8       to the IVF.
9   A.  Okay.
10  Q.  Okay.  And do you recall any conversations with
11      Dr. Dillard in or around October of 2018 where
12      she tells you that she's not -- she doesn't think
13      she's getting the right kind of accommodations or
14      that she needs more help from you in that regard?
15  A.  I have a vague recollection -- and, again, this
16      is four years ago, but knowing her well, I have a
17      vague recollection that she was struggling with
18      accommodations at the university, that she was
19      being able to function within those
20      accommodations.  That's all -- as I sit here
21      right now, without further discussion, that's all
22      I remember.
23  Q.  Did you offer to intervene and talk to her
24      employer about her needs?
25  A.  I may have.  I have done that on occasion.



Page 94

1    Q.  Okay.  Now let's go back to your records, sir.
2        All right.  So June is when you sent the first
3        accommodation letter in; right?
4    A.  (No audible response.)
5    Q.  The next time she comes to your office after that
6        was -- hang on just a moment.  July of 2018, so
7        if you would look at 4725.
8    A.  That's a note authored by my nurse practitioner.
9    Q.  Okay.  So in July of 2018, you didn't visit with
10       her?
11   A.  No, I didn't see her until August.
12   Q.  Okay.  So the rest of June and in July, you're
13       not communicating with her, correct, personally?
14   A.  I don't recall.  I mean, the chart notes are as
15       documented, but I don't recall if I had a
16       conversation with her otherwise.
17   Q.  Well, there's nothing documented between June and
18       August of 2018 with respect to a conversation --
19       any conversations between you and Dr. Dillard;
20       right?
21   A.  Well, my usual practice is seeing as I'm not an
22       attorney I don't document phone calls.  You know,
23       a lot of times I'll just have conversations, and
24       if I need to intervene or do something, I'll do
25       it.  Let's say someone calls and requests a

Page 95

1        letter.  My typical pattern is that I don't
2        document, nor do I have the time to document it.
3    Q.  Okay.  So if somebody calls and requests a
4        letter, but let me ask you -- well, let's look at
5        your August visit then.  That is --
6    A.  4730.
7    Q.  Yeah, 4730.  Okay.  And that's you personally
8        visiting with her, and this is August 22nd;
9        right?
10   A.  Correct.
11   Q.  So she's been back to work with accommodations
12       since early June at this point; right?
13   A.  That's my understanding.
14   Q.  Okay.  And so when we look at the history of
15       present illness, that last paragraph was written
16       by you; is that right?
17   A.  That is possibly my MA.  There's not a lot of
18       information there other than she's still
19       experiencing light-headedness.
20   Q.  And there's nothing in these notes of a report
21       from her to you that her accommodations are not
22       effective?
23   A.  Correct.
24   Q.  And then in September she doesn't see you, but
25       she comes in for some Vitamin D; is that right?

Page 96

1        So look at page 4738.
2    A.  Yes.
3    Q.  And I'm sorry.  I should say 4737 and 38.
4    A.  Yes.
5    Q.  So who does she see on that day?
6    A.  It was probably a phone call, so they probably
7        told her her Vitamin D was low and called in a
8        prescription.
9    Q.  Okay.  After taking some labs?
10   A.  Correct.
11   Q.  Okay.  And so then you next see her in October;
12       is that right?
13   A.  Yes.
14   Q.  And that's page 4742?
15   A.  Yes.
16   Q.  And it says in the HPI, or history of present
17       illness -- the last paragraph, is that written by
18       you?
19   A.  Either myself or my medical assistant.
20   Q.  She's reporting a new symptom here of low back
21       pain radiating down her leg; right?
22   A.  Yes.
23   Q.  But she doesn't otherwise report that the
24       accommodations that her work has provided her are
25       not working?

Page 97

1    A.  No.  The only thing documented is that I'm
2        recommending continued accommodations as
3        previously noted.
4    Q.  Okay.
5    A.  Under cognitive complaints -- well, this is
6        interesting.  That's a good question.  Under
7        cognitive complaints, the first item under the
8        assessment.
9    Q.  And this is on page -- so we're all clear --
10       4745; right?
11   A.  Correct.  See where it says, "Needs
12       accommodations of work"?
13   Q.  Yeah.
14   A.  See the "needs" in all capitals?
15   Q.  Yes, sir.
16   A.  That implies to me that they weren't being
17       followed, the fact that I highlighted it that
18       way.
19   Q.  Okay.  And then you sent in the second letter in
20       October of 2018?
21   A.  Yes.
22   Q.  But at this point in time she's not reporting to
23       you any other seizures?
24           MS. SCATCHELL:  Objection; asked and
25       answered.



Page 98

1  A.  Correct.  We outlined, like all the events that
2     she had, I think, earlier on.
3  Q.  Right, right.  Okay.
4        And at this visit when you put "needs" in
5     all caps, did you tell her that you would
6     intervene and talk to her employer?
7  A.  I don't recall the specific conversation we had.
8  Q.  Okay.  And then you don't meet with her again
9     until January of 2019.  Page 4777.  Is that
10    right?
11 A.  One second.  What was the date?
12 Q.  January 10th of 2019.
13 A.  Correct.
14 Q.  And we've already talked about that note, so I'm
15    not going to force us to do it again.
16        And then you saw her in March of 2019 and
17    I'm looking at page 4767.
18 A.  One second.
19 Q.  Certainly.
20 A.  I'm looking at some other notes.  July 9th?
21 Q.  No.  January 10th of 2019.  So 4767.  I'm sorry.
22    I said January.  March 4th of 2019.
23 A.  4767?  Hang on.  Sorry.
24        MS. SCATCHELL:  And that's March of
25    2019?

Page 99

1        MS. WERMUTH:  Yeah.
2        MS. SCATCHELL:  March 4th?
3        THE WITNESS:  Yes, 4767.
4        MS. SCATCHELL:  Okay.
5        MS. WERMUTH:  Are you there, Gia?
6        MS. SCATCHELL:  Yes.
7        MS. WERMUTH:  I may have transposed the
8     numbers.  I'm really sorry if I did.
9  QUESTIONS BY MS. WERMUTH:
10 Q.  So on this visit, Doctor, your note under the
11    history of present illness would start at the top
12    of page 4768; is that right?
13 A.  Yes.
14 Q.  Okay.  And it says "LOV" -- oh, last office
15    visit.  Is that what that stands for?
16 A.  Correct.
17 Q.  "01/10/2019 did not get the Vit D filled."  Does
18    that mean she didn't fill the Vitamin D?
19 A.  Correct.
20 Q.  "And reports that she's unaware of any new
21    seizures."
22 A.  Correct.
23 Q.  Okay.  "She is having more migraines when
24    overstimulated or in stressful situations
25    sometimes happens before a seizure."

Page 100

1        But no new seizures that she was aware of at
2     that point?
3  A.  Correct.
4  Q.  And at this point, you reduce her medication then
5     down -- back to 500, or did you do that in
6     January?
7  A.  Must have been January.
8  Q.  So in January of 2019, you bumped her back down
9     to 500?  That would be page 4778, I think.
10 A.  That's what was filled on that day, yes.
11 Q.  Okay.  Do you recall why you reduced it to 500 on
12    that day?
13 A.  No, I don't actually.
14 Q.  And then in that same month, you updated her
15    accommodations letter at 4771.  So do I have that
16    right?
17 A.  4727.
18 Q.  4772.  Thank you, sir.  That's it.  Okay.
19        In that month, you updated her accommodation
20    letter.  So can you help me with this one?  It
21    says, "She may be able to teach online classes is
22    the preferred modality."
23 A.  Yeah, if my grammar was correct, I suspect that I
24    meant that's the preferred teaching at this time.
25    However, I said she can move to face-to-face

Page 101

1     learning, but requires an assistant as previously
2     documented.
3  Q.  Okay.  So although online was preferred, at this
4     point you were comfortable with her being back in
5     the classroom?
6  A.  As a trial, yes.
7  Q.  And do you know how many in-person classes she
8     taught between June of 2018 and the end of the
9     academic year in 2019?
10 A.  No.
11 Q.  Did she report that to you?
12 A.  I don't recall if she did.  She may have, but
13    there's nothing documented, so I don't have a
14    recollection.
15 Q.  And then in April, you changed her accommodations
16    again, and I'm looking at page 4768.
17 A.  Yes.
18 Q.  And here you say she is "currently only able to
19    teach online/hybrid classes."  Do you see that?
20 A.  Yes.
21 Q.  What are hybrid classes?
22 A.  My recollection is it's a combination of online
23    and live.
24 Q.  So what happened in that month between these two
25    letters where you said she could teach face to



Page 102

1  face and then you say she should teach online and
2  hybrid only? What happened in that month for you
3  to change that?
4  A.  We must have had a conversation about some
5      struggles she was having at the university, but I
6      don't recall directly.
7  Q.  And there's nothing in your notes that explain
8      it?
9  A.  No.
10 Q.  And after April of 2019, you didn't send in any
11     additional accommodation notes; is that right?
12 A.  It appears that's correct.
13 Q.  Okay.  And she didn't require any accommodations
14     after that period of time; is that right?
15 A.  No.  I think my last accommodations note would
16     have remained in force until I changed it.
17 Q.  Well, it says temporary.  Are you telling me that
18     for the two years -- three years now since that
19     note was issued, that she continues to operate
20     under those accommodations?  Is that your
21     position, Doctor?  Or should continue to operate
22     under those accommodations?
23 A.  Well, based on the chronology of the notes,
24     that's what my recollection is, but I don't know
25     if anything changed in the notes -- we can go

Page 103

1  through them -- where in the notes it allowed her
2  to do more or she may have done more on her own.
3  I don't know.
4  Q.  Well, the note we just looked at from April of
5      2019 said that they were temporary; right?  So
6      let's go back to that page.
7  A.  Correct.  But they would have remained temporary
8      until I would have changed it is my
9      understanding.  Temporary is not necessarily
10     limited by six months or a year or two years.
11 Q.  Right.  But that note is two and a half years old
12     now, so I'm just trying to understand --
13 A.  And your point is?  So, yes, correct, it is two
14     and a half years old.  I'll testify to that fact.
15 Q.  Okay.  Are you aware if she has asked for any
16     accommodations after April of 2019?
17         MS. SCATCHELL:  Objection; asked and
18     answered.
19 A.  I don't recall that she asked for more because
20     that's the last note I wrote.  I apparently have
21     not adjusted them since that time.
22 Q.  No, my question is -- I'm sorry.  I was very
23     unclear in my question.  Did she ever tell you
24     that she asked DePaul to continue those
25     accommodations?

Page 104

1  A.  No, no.  I don't know what she asked DePaul.  My
2      understanding is I provided that note to, I'm
3      assuming, DePaul.
4  Q.  Okay.  Did she ever tell you that she didn't need
5      accommodations any longer?
6  A.  Well, there's certainly entries in the record in
7      the notes that it's gone back and forth where she
8      tried in-class learning and was ready to go to
9      in-class learning and then moved to a hybrid
10     model.
11 Q.  I'm sorry.  Again, I was unclear.  After April of
12     2019, did she tell you that she told DePaul she
13     no longer needed accommodations?
14 A.  No, I don't know.
15 Q.  Okay.  And are you aware that she's testified
16     that she no longer needed accommodations after
17     that period of time?
18         MS. SCATCHELL:  Objection.  Calls for
19     speculation.
20 A.  I'm not aware that she testified.
21 Q.  And you, according to your notes, after the
22     October 2019 visit, you visited with her again in
23     November of that year.  I think it's 4808.  No,
24     that's January.
25 A.  There is October 1st of '19 on 4803.

Page 105

1  Q.  Right.  We've already discussed that.
2      Oh, there's a November.  Here we go.  Page
3      4809.  I'm sorry.
4  A.  Okay.
5  Q.  So she saw you in November of 2019.  At this
6      point she's pregnant.  Is that your memory?
7  A.  Yes.  In October she reported she was six months
8      pregnant.
9  Q.  It looks like actually back in March of 2019 she
10     reported she was six weeks pregnant.  Do you see
11     that on page 4810?
12 A.  Yes, I'm sorry.  Did I misspeak?  She reported in
13     October she was six months pregnant.  Not six
14     weeks.
15 Q.  Right, right, right.  But you knew as of March
16     that she was pregnant?
17 A.  Oh, yes.
18 Q.  Okay.  Fair enough.
19     And is there any reference in this note in
20     November of 2019 to accommodations?
21 A.  Not in this note.
22 Q.  Then you next saw her in January of 2020, and
23     that's page 4823, I think.  I'm trying to get
24     there.
25 A.  4815 is the page 1 of January 21, '20.



Page 106

1  Q.  Oh, 4815.  You're right.  Okay.  And in this note
2     on that page, you write that she's had no
3     seizures since the last office visit; right?  It
4     says the last seizure was February of 2018.  Do
5     you see that?
6  A.  Yes.
7  Q.  Did you mean April 2018?
8  A.  There's a reference to February of 2018 and then
9     she references possibly some small seizures in
10    March of '19 overnight.
11 Q.  Okay.  Where do you see that, sir?
12 A.  Page 4810.
13 Q.  Oh, from your November?
14 A.  Last OV 3/4/19, so it's after the next visit
15    after March 4th.  She reported she may have had
16    some small seizures overnight.
17 Q.  Right, we talked about that, and you
18    determined -- the first note of that was in
19    January of 2019.  So somewhere, remember, between
20    March of 2018 and January 10th of 2019 there were
21    these two instances.
22       But my question is, we were looking at -- I
23    think we've already talked about that, Doctor.
24    I'm now looking at January of 2020, which you
25    corrected me is page 4815.  I'm sorry.  Yeah,

Page 107

1     4815; right?  So on page 4815 that is your notes
2     from your January 21, 2020.  Do you see that?
3  A.  Correct.
4  Q.  Okay.  And so I was asking you about this note
5     here, last seizure was 2/20/18.  That's not a
6     particularly accurate note; right?  Because her
7     last syncope was March of 2018, and then there
8     were two reported, where the husband reported two
9     overnight --
10 A.  Well, remember we saw -- had that ER visit, I
11    think, was February.  So she may have had two in
12    there.  Remember that ER visit she had, where she
13    went to the ER with the visit, and I saw her a
14    few weeks later?
15 Q.  No, sir, I don't.
16 A.  Yeah, we discussed it earlier.
17 Q.  I remember a September 2017 ER visit.
18 A.  Is that when it was?  It was an ER visit.  I'll
19    have to go through the transcript.  Hang on.
20    September of 2017.  You're correct.
21 Q.  Yes, okay.  All right.  So let me direct your
22    attention to 4816.  It looks like she's on Keppra
23    500 milligrams again starting in November.
24 A.  She's taking two, so it would be 1,000.
25 Q.  Oh, I see.  Wait.  I don't see.  Oh, "2 PO QHS."

Page 108

1     Is that what that means?
2  A.  Yes.
3  Q.  So wait.  So she's pregnant but she's up to 1,000
4     now?
5  A.  Yes.
6  Q.  Or wait.  She's not pregnant yet.
7  A.  No.  She -- what's the date of this?
8  Q.  In November she wasn't pregnant -- oh, no, no.
9     She was pregnant.
10 A.  Yeah, this is the January note, correct.
11 Q.  Okay.  Why did you increase at that point in
12    time?
13 A.  The risk -- after discussion again throughout the
14    course of her treatment, the risk of a seizure to
15    a fetus is much more significant than the risk of
16    Keppra to a fetus.
17 Q.  Oh, I see.  Because she was pregnant, you upped
18    the dose?
19 A.  Yeah.
20 Q.  Okay.  That's helpful.  Thank you.
21       So then you saw her in May of 2020 and that
22    is at page?
23 A.  4820.
24 Q.  Is it 4820?  You beat me to it.  And on 4821, you
25    write that she just had her baby and she wants to

Page 109

1     lower her Keppra; right?
2  A.  Correct.
3  Q.  And did you do that?
4  A.  Yeah, I think on the refill we went down to one,
5     and it's something we discussed.  I think she did
6     it right before she saw me.
7  Q.  Okay.  And so after she had the baby, was she not
8     working?
9         MS. SCATCHELL:  Objection; form.
10 QUESTIONS BY MS. WERMUTH:
11 Q.  Do you know?
12 A.  I don't recall if she was working.
13 Q.  Okay.
14 A.  I mean, I don't know if she was on maternity
15    leave or what the situation was.
16 Q.  That's what I meant.  I didn't mean that she
17    quit.  I just meant that she was on some sort of
18    leave related to the birth of her child?  Do you
19    know?
20 A.  I don't know.
21 Q.  You don't know.  And if she was on leave, then
22    she wouldn't have needed accommodations, though?
23    You would agree to that; right?
24 A.  Well, yeah, if she's not working, there's nothing
25    to accommodate.



Page 110

1   Q.  Right.  Then you saw her in August of 2020.  I
2       think that's 4827.  On that day she tells us
3       there's no new issues or concerns.  Do you see
4       that?
5   A.  Yes.
6   Q.  And did you lower her Keppra on that date?
7   A.  It was still written in at two at bedtime.  I'm
8       not sure if she was taking one or two.  Sometimes
9       we leave the script alone, so we can make an
10      adjustment at home to avoid an unnecessary office
11      visit, but I don't know if she was taking the one
12      or the two.
13  Q.  Okay.  And so now your visits with her are
14      happening about every what?  Three or four months
15      now?
16  A.  Yes.
17  Q.  So you see her in October of 2020 -- I'm sorry.
18      November of 2020?  That's page 4831.
19  A.  Yes.
20  Q.  And it looks like the main thing you talked about
21      on that day was needing a refill of her Keppra?
22  A.  Correct.
23  Q.  Okay.  And in your seizure notes, you report that
24      she's doing well; right?
25  A.  Yes.

Page 111

1   Q.  Okay.  And that's on page 4832?
2   A.  Yes.
3   Q.  All right.  And then you see her five months
4       later in March of '21.  So this is a full year
5       after the birth of her child; right?
6   A.  Yes.
7   Q.  Okay.  And on page 4839 she reports she has no
8       seizures or spells.  Do you see that?
9   A.  Yes.
10  Q.  And in your seizure notes on that same page, you
11      write, "No issues 3/20/21."  Do you see that?
12  A.  Correct.
13  Q.  And then you see her five months later in August.
14  A.  Okay.
15  Q.  And that's page 4843?
16  A.  Yes.
17  Q.  Okay.  And you write, "Patient states that she
18      has not had any seizures since her last
19      appointment."  Do you see that?
20  A.  Yes.
21  Q.  And then in your seizure notes, you actually
22      didn't update it.  You still say -- oh.  No.  You
23      say no issues March through August 2021?
24  A.  Correct.
25  Q.  Okay.  Then you see her in December, and that's

Page 112

1       your last visit with her.  And we looked at this
2       briefly, but for me that's page 9912.  Doctor, I
3       know you don't have that Bates number, but I'm
4       looking at December 7, 2021.
5   A.  Yes, I have it.
6   Q.  Okay.  On this date you report no seizures on her
7       behalf, right, at the bottom of that page?
8   A.  Correct.
9   Q.  On the next page, which for my opposing counsel,
10      page 9913, you write, "No issues."  Under the
11      seizure section you write, "No issues March
12      through December 2021."  Do you see that?
13  A.  Yes.
14  Q.  Okay.  And that was the last time you saw her?
15  A.  Yes.
16  Q.  And so she's been seizure free for a couple of
17      years now, you would agree with that?
18  A.  Yes.
19          MS. WERMUTH:  I have no further
20      questions at this time, Doctor.  Ms. Scatchell
21      may have some questions for you.
22          THE WITNESS:  Thank you.
23          MS. SCATCHELL:  I do.  Can we just take
24      a 10-minute break real quick?  I know it's late,
25      but I just feel like I need to take 10 minutes to

Page 113

1       go to the bathroom and grab something to drink.
2           THE WITNESS:  Sure.  How long do you
3       think we are going to go?
4           MS. SCATCHELL:  Just 10 minutes.  So we
5       will come back at 8:17.
6           MS. WERMUTH:  I think he's asking how
7       much longer?
8           MS. SCATCHELL:  Oh, I would say no more
9       than probably 45 minutes.
10          THE WITNESS:  So let me ask you a
11      question.  My understanding in Illinois under --
12      at least in personal injury, there's a three-hour
13      limit.
14          MS. WERMUTH:  Right.  That's a state
15      court rule.  In federal court, I hate to tell
16      you, there's a seven-hour limit.  I did my best
17      to get you done sooner than three hours.  And I
18      hope that Gia Scatchell can also expedite here so
19      hopefully we can all be out of here by nine
20      o'clock.
21          THE WITNESS:  Yeah, well, I have a 6:30
22      first patient, and I have other obligations
23      tonight, so we may have to reconvene.  If I need
24      to do anything with a lawyer to help this
25      process, let me know if I need to do that, but I



Page 114

1    can't sit here until nine o'clock.
2          MS. WERMUTH:  Okay.  Gia, what do you
3    want to do?
4          MS. SCATCHELL:  I'm not opposed to just
5    doing this a different time for the redirect.
6    What do you think?
7          THE WITNESS:  My schedule the next time
8    that opportunity will exist will probably be
9    about six weeks.
10         MS. WERMUTH:  Gia, we have a report due
11   to the judge on Wednesday, you know.  I would say
12   this, the judge was mindful of the doctor's
13   schedule over the summer, and I can't promise you
14   he will be again, but I just put that out there.
15         MS. SCATCHELL:  I think what we do is I
16   just don't want to inconvenience him.  I
17   appreciate him coming after having a full day of
18   patients and then sitting here for a good three
19   hours, so I would prefer to reconvene just
20   because I'd like for everybody to be fresh.  It's
21   getting super late, and I feel like our
22   questions, you know, have -- they're pretty
23   substantive type of work.  And if he has a 6:30
24   a.m. patient, I don't want to put him in a weird
25   spot, having to drive home and everything else.

Page 115

1          THE WITNESS:  The driving is not an
2    issue.  I'm staying in a hotel actually tonight
3    since this deposition and my early schedule, but,
4    I mean, we could keep going and see how we get
5    through it, but what do you want to do?
6          MS. SCATCHELL:  Anna, why don't I just
7    give you a call right now while we take a quick
8    break and then we'll just kind of figure it out.
9          MS. WERMUTH:  Certainly.  Happy to.  So
10   I guess that means, Doctor, that Gia would like
11   to take a break, so at least for five minutes.
12         THE WITNESS:  Yeah, no worries.  That's
13   fine.
14         MS. SCATCHELL:  Thank you.
15         THE COURT REPORTER:  Okay.  So we are
16   going off the record for five minutes?
17         MS. SCATCHELL:  Ten, if possible.
18         THE COURT REPORTER:  Ten minutes.
19   Sounds good.
20   EXAMINATION
21   QUESTIONS BY MS. SCATCHELL:
22   Q.  Doctor, can you hear me okay?
23   A.  Yes.  Perfect.
24   Q.  So I apologize.  I'm Sydney Dillard's attorney,
25        so I just wanted to introduce myself.

Page 116

1          So you had previously testified that
2    Ms. Dillard had several different other diagnoses
3    in addition to just having epilepsy.  What were
4    the other disorders that she had?
5          MS. WERMUTH:  Objection; asked and
6    answered.
7    QUESTIONS BY MS. SCATCHELL:
8    Q.  You can answer.
9    A.  Yeah.  She had other diagnoses throughout the
10        course of her treatment.  So we talked
11        extensively and mostly just about the seizures,
12        the epilepsy.  But she also had generalized
13        anxiety that was consistently discussed
14        throughout the treatment records.  We discussed
15        the use of the sertraline, but via OB-GYN, that
16        that's a concern during -- planning pregnancy or
17        during pregnancy.  That's number one.
18             Number two, she had this -- vestibular
19        dysfunction is a broad term which started after
20        the seizures.  This is clinically characterized
21        by intermittent dizziness.  Movements, especially
22        head movements, can make it worse or aggravated.
23        And it's a sense of wooziness in the head all the
24        time.  Not all the time but intermittently, which
25        was in her case.

Page 117

1          She also had cognitive complaints.  This was
2    in the onset of mid 2017.  She developed
3    forgetfulness, trouble with remembering words and
4    names.  She would lose her keys.  And focus
5    difficulties.  And this all started after the
6    first seizure.  This is not atypical in patients
7    who have had one or more seizures and then being
8    placed on medication.
9          So one of the concerns I had when we talked
10   about work as a professor and as an educator is
11   professors who have forgetfulness and cognitive
12   issues, that's also contributory to her overall
13   diagnoses and care.
14         She developed cervicogenic headaches.  In
15   that sense that means headaches that come from
16   the genesis of the cervical spine and occipital
17   nerve.  You'll see in my notes referencing GON,
18   or greater occipital neuralgia.  That is why I
19   referred her to physical therapy or manual
20   therapy to her neck because it helps cervicogenic
21   headache.  In fact, there is documentation
22   through the notes that it helped significantly.
23   Cervicogenic headache is activated -- is
24   aggravated by the activities.  Stress will
25   certainly increase symptoms through a myofascial

Page 118

1  component. In other words, stress creates muscle
2  spasm, which can secondarily impact the
3  cervicogenic headache.
4      She also had treated for dislocated
5  shoulders, which was a result of the seizures,
6  from the violent shaking of the seizures and
7  potential trauma as well that way. So there were
8  additional diagnoses being treated throughout.
9  Q. Okay. And then is it typical to have, I guess,
10  would you call them co-mobidities with a seizure
11  disorder?
12  A. That's a great term. Absolutely.
13  Q. And so I guess would it be fair to say that
14  Sydney needed a multifaceted therapeutic approach
15  to treat these various diagnoses?
16  A. Correct. You know, we had an extensive
17  discussion about epilepsy medicine and some EEG
18  abnormalities and things like that, but there
19  were other things. We did dizzy testing. We
20  arranged for the physical therapies I just
21  referenced, as well as the dizzy therapy or
22  what's better known as vestibular rehabilitation.
23  We even got neuro-psychometric testing by Dr.
24  Singh. He's a neuropsychologist. I think we
25  referenced that. We didn't really much talk

Page 119

1  about the results, but his findings suggested --
2  not suggested. Concluded that she had major
3  depressive disorder and anxiety disorder.
4  Q. Okay. And then in terms of having the grand mal
5  seizures or any seizures, was it clear what
6  brought on or what exacerbated these seizures in
7  Ms. Dillard?
8  A. Well, the initial seizure was the first event,
9  the first seizure she had dating back to
10  September 20 of 2017. She obviously had a
11  predisposition to having seizures. Right? So
12  based on that ambulatory EEG, she had slowing and
13  changes in the left temporal region. That's
14  number one. So recurrent seizures occur -- once
15  you've had one seizure, you have a higher risk of
16  having a second.
17      We talked a little bit about lowering the
18  seizure threshold or what lowers the seizure
19  threshold. I think I referenced one of the
20  points. Excessive alcohol use which was not an
21  issue here. Certainly sleep deprivation can
22  lower the seizure threshold. Sleep deprivation
23  can occur under multiple circumstances. Patients
24  with anxiety, generalized anxiety disorders and
25  major depressive disorders have significant sleep

Page 120

1  disturbances, which can, as I said, lower the
2  seizure threshold.
3  Q. Okay. And then you had -- I had seen in your
4  notes that it said that Ms. Dillard had no prior
5  history of having seizures in her family.
6  A. Correct. There's no family history of seizures
7  or epilepsy.
8  Q. And what could -- so if that's the case, what
9  could bring about a seizure like that in a
10  patient like Ms. Dillard with no family history?
11      MS. WERMUTH: Objection; vague.
12  QUESTIONS BY MS. SCATCHELL:
13  Q. You can answer.
14  A. So we don't always know what will start a
15  seizure. Humans will experience statistically
16  one seizure in their life, and, again, these
17  things that lower seizure threshold include sleep
18  deprivation, excessive alcohol use, drugs, hard
19  drug use, head trauma.
20  Q. Okay. And then after somebody has a seizure, are
21  there any residual symptoms that occur post-
22  seizure?
23  A. Well, there can be. Sometimes there's not, but
24  other times there are. We talked a little bit
25  about her cognitive issues started after the

Page 121

1  first seizure. She developed the following
2  seizure anxiety disorders and the depressive
3  disorder. Patients who have recurrent episodes
4  or recurrent neurological symptoms can commonly
5  develop those disorders.
6      Also she developed the vestibular
7  dysfunction after the seizure, and that could be
8  due to several reasons. One is that it could be
9  due to the seizure itself. Number two is that
10  that first seizure, the head movements, right, so
11  when patients have what we referred to earlier as
12  a grand mal seizure, or a convulsion, there's
13  rhythmic jerking of the arms and legs and
14  movement of the head. So when the head moves
15  like this, it creates sort of a brain trauma.
16  And under those circumstances many times
17  following that kind of movement, you can develop
18  a vestibular disorder. We see this commonly in
19  patients who have let's say rear-end collisions,
20  who have acceleration/deceleration injuries. So
21  you can have these symptoms even without hitting
22  your head. Just the movement, the acceleration/
23  deceleration movements can bring on generalized
24  tonic-clonic seizure.
25  Q. Okay. And then let's talk a little bit more



Page 122

1    about the issues that could arise with being
2    pregnant and having a seizure disorder.
3  A.  Was that a question?
4  Q.  Yes.  Sorry.
5  A.  Oh, I'm sorry.  I apologize.  So pregnancy by
6    definition is a diseased state.  Women who become
7    pregnant are at risk of seizure.  The issue is
8    the fetus, right?  So and we discussed this a
9    little bit earlier.  Protecting the fetus.  So we
10    have to be very careful about medication use.
11    And as I mentioned earlier, we talked about
12    Keppra, which of the epilepsy -- anti-epileptic
13    medications, that's the safest.  So we need to
14    protect her during that spell, during that time
15    period.  Well, actually during all time periods,
16    but certainly while pregnant.
17        And, again, that's why we couldn't treat her
18    depression or anxiety with medication because of
19    the risks during pregnancy.  In fact, my
20    understanding was she was getting counseling to
21    deal with all the stressors in her life, to
22    treat, you know, the disruptions that were
23    ongoing.
24  Q.  Okay.  Let's go to -- you had previously
25    testified that one of the precursors for a

Page 123

1    seizure was that she was, quote/unquote, playing
2    on the couch, and that is Dillard-DePaul4575.
3    Could you go there when you have a moment.
4  A.  I'm on 4575.
5  Q.  Yes, and it says "History of Present Illness."
6  A.  Yes.
7  Q.  And then it says, "This is a 32-year-old female
8    presenting to the emergency room for evaluation
9    status post-seizure.  Patient was playing on the
10    couch when she apparently had a tonic-clonic type
11    of seizure."  Were these your notes?
12  A.  No.  This is an ER visit.  So I want to make sure
13    I testify correctly.  Playing on the couch is
14    really irrelevant to her having a seizure.  It's
15    just what she was doing at the time that she had
16    a seizure.  This is an ER doctor's note just
17    documenting the history.  The husband must have
18    said she was playing on the couch and then had a
19    seizure.
20  Q.  Okay.  Got it.  And then if you could go to 4633.
21  A.  Okay.
22  Q.  And then you see where it says, "Current
23    Complaints/Gains:  Dizziness is seemingly worse,
24    returning from a break in Texas secondary to
25    traveling outside the country.  Still not

Page 124

1    sleeping through the night since returning.
2    Stress and anxiety is worse from work since
3    returning, which makes her dizziness worse."
4  A.  Yes.
5        MS. WERMUTH:  I'm going to object on
6    foundation.
7  QUESTIONS BY MS. SCATCHELL:
8  Q.  Are these your notes, Dr. Cristea?
9  A.  I referred Dr. Dillard to integrated therapy
10    practice for vestibular rehabilitation, and this
11    is their report back to me which is contained in
12    my chart.
13  Q.  So you're familiar with this document?
14  A.  Yes. It's part of my medical record, and it's a
15    report to me on the care and treatment of Sydney
16    Dillard.
17  Q.  And then did Ms. Dillard talk to you about the
18    issues that she was facing at work?
19  A.  As I testified to earlier --
20        MS. WERMUTH:  I'm sorry.  Objection;
21    vague.  Go ahead.  You can proceed.  I needed to
22    state the objection to get it into the record.
23  A.  She -- we had conversations over multiple visits,
24    and my recollection is, and, again, I know
25    counsel had asked me some questions specifically

Page 125

1    earlier about DePaul University, but my
2    recollection is that she had -- was under a lot
3    of stress at work.  I see in my notes I had
4    multiple accommodation letters.  Some have been
5    revised to allow for some relaxing of the
6    accommodations.  There's a reference in one of my
7    chart notes with the highlighted needs which
8    clearly means that they weren't being followed at
9    the time of that visit.  I don't remember the
10    exact date.  It's something I testified to
11    earlier.  So I know she was struggling with
12    issues at work and her position at the
13    university.
14  Q.  And then when you had previously testified that
15    the stimuli was different in a face-to-face class
16    versus a remote class, could you expand on that a
17    little bit more?
18  A.  Well, if you're lecturing to a large group of
19    students in a large lecture hall, it's a lot of
20    stimulus.  Right?  So you have multiple students
21    that you're lecturing to.  You have a large
22    space.  There's lighting.  Remember, we talked,
23    she has documentation about how lights hurt her
24    eyes.  And, in fact, one of the accommodations
25    was sunglasses to be used computer or live.



Page 126

1     So an increased stimulus can induce
2   vestibular symptoms, as well as visual stimuli
3   can lower the seizure threshold.  One of the
4   things we used to do in the old days when we
5   would do an EEG, we would do what we call photic
6   stimulation where we would flash lights or a
7   strobe light which can induce seizures.  So
8   there's multiple stimuli in that environment to
9   not only increase the risk of seizure but also to
10  increase the risk of dizziness due to the
11  vestibular disorder that she had following her
12  first seizure.
13 Q.  Okay.  And then could you explain what exactly
14  the nocturnal seizures -- how those -- that's a
15  bad question.  Let me rephrase it.
16    So when you typically treat a patient with a
17  nocturnal seizure disorder, how is it diagnosed?
18    MS. WERMUTH:  Objection; vague.
19 A.  Well, seizures -- let me start broadly.  Seizures
20  are diagnosed based on clinical history and the
21  description of the event.  It's called
22  phenomenology.  That's number one.  So there's
23  characteristic patterns of seizure.
24    We know, and it's well documented for the
25  last 80 years, that many patients will have

Page 127

1   seizures during sleep.  Okay?  Her husband
2   clearly documented extreme detail of her spells
3   to me.  I met with him on multiple occasions
4   throughout the course of my treatment with her,
5   and I know -- I mean, he's a police officer, so
6   he also has -- not only a husband but additional
7   training in this space.  I see a lot of police
8   officers as patients as well, especially Chicago
9   police, so they are well trained and some of them
10  are even cross-trained as EMTs.  So the
11  description to me was very classic of a seizure.
12  And then when you have the nocturnal component,
13  it's not an uncommon occurrence especially in
14  first seizure.
15 Q.  Okay.  And you had previously been testifying
16  about Sydney's ability to travel either overseas
17  to lecture.  What were the conditions that you
18  released her to travel overseas?
19 A.  Well, no driving, of course, whether here or
20  there.  And we had discussions, as I testified
21  earlier, about what things lower the seizure
22  threshold.  Make sure you take your medication.
23  Try and get consolidated sleep the best you can.
24  Decrease stressors that will impact sleep.  And
25  to be reasonable.  I found Dr. Dillard to be

Page 128

1   extremely reasonable in her approach to her
2   balance between her healthcare and her teaching
3   or her job.
4  Q.  And then did you ever discuss with her the
5   possibility of recording her lectures before she
6   gave the presentation or before she lectured?
7  A.  I'm sure I have.  That sounds very familiar.
8  Q.  We had briefly talked about the different effects
9   that the medication Keppra or Zoloft could have
10  on a fetus, but are there any general side
11  effects to first starting Keppra?
12 A.  Well, patients can have -- they can be tired on
13  it.  They can get -- sometimes it affects
14  their -- it can cause agitation.  And then we
15  have the metabolic effects.  That's why we
16  monitor with labs.  It can affect the liver as
17  well.  We check blood counts and liver studies.
18 Q.  And then you had previously testified about
19  certain major life activities that Ms. Dillard
20  wasn't able to do, which were inability to drive,
21  stop from going or undergoing IVF and some work
22  restrictions; correct?
23 A.  Yes.
24 Q.  Okay.  And then you also had described that she
25  had some, I guess, the vestibular issues which

Page 129

1   would affect her posture, balance; correct?
2  A.  Yeah.  Vestibular issues when they occur, you get
3   woozy and dizzy.  You're at risk of falling.
4   Certainly in a patient with seizures, you don't
5   want a head trauma.  That also increases the
6   risk.  I think we talked about that earlier
7   increasing the risk of seizures.
8  Q.  And then you had also previously testified that
9   she had brain abnormalities that you saw on one
10  of the scans; correct?
11 A.  On the ambulatory EEG, the brainwave test.
12 Q.  Okay.  And did she testify -- or did she describe
13  to you that she had issues sleeping at night?
14 A.  Yeah.  There's -- all through the medical record
15  there's documentation of difficulty sleeping and
16  insomnia.
17 Q.  Do you remember approximately for how long Sydney
18  was in the vestibular therapy?
19 A.  Well, I know she started in October of '17 and
20  there's notes going into January of '18.  So
21  what's that?  Four months?  Three or four months.
22    Well, actually then she intermittently
23  treats all the way through -- well, she also had
24  some physical therapy to her neck too.  Right?
25  At the same center.  So there's treatment notes



33 (Pages 126 to 129)

Page 130

1    in May of '18.
2        I'm just thumbing quickly through these
3    records.  December of '18.  So, in fact, in some
4    of my accommodation letters, I talk about the
5    ongoing treatment with physical and vestibular
6    rehab based on clinical symptoms for maintenance
7    therapy to keep her symptoms at bay.  It's akin
8    to taking daily blood pressure medicine as an
9    example.  You need the blood pressure medicine to
10   keep the symptoms of blood pressure low.  This is
11   kind of the same techniques we use in patients
12   with chronic neck and vestibular issues.
13   Intermittent therapies to kind of keep their
14   symptoms under control.
15   Q.  Okay.  And then you had talked about or
16   previously testified as to titrating her
17   medication?
18   A.  Yes.
19   Q.  Could you explain how that works, titrating the
20   medication?
21   A.  Well, the original prescription was for
22   short-acting Keppra.  And we used 500-milligram
23   dosages.  And as I spoke about earlier, it said
24   one to two twice a day.  So starting one at
25   bedtime and then one in the morning and one at

Page 131

1    night, and then one and two and two and two, et
2    cetera.  So you slowly go up on the dose.  And
3    then we had switched over -- Dr. Misra had
4    switched her over to the long-acting preparation.
5    Q.  Okay.  And is that like more of a trial and error
6    of figuring out the patient's dosage?
7    A.  Yeah.  So with Keppra what we do -- it's a little
8    bit different than the traditional old-time
9    anti-epileptics that you may have heard of, like
10   Dilantin or phenobarbital where you titrate them
11   to a drug level, a blood level.  With Keppra you
12   titrate them to a clinical response.  In other
13   words, you give them enough medicine so they
14   don't have seizures.  So that's why we had a
15   little more flexibility on the fluctuation of the
16   Keppra.  When she was concerned about potentially
17   being pregnant, well, we drop the dose and see.
18   And if she were to have a seizure -- and I think
19   one of the times I dropped the dose, we talked
20   about a restriction then, too, to be cautious,
21   but see how she would do.
22       And then, for example, during pregnancy, we
23   had discussion back and forth.  I think there
24   were some dosage alterations to protect her, like
25   an increase in the dose.  I think that's when we

Page 132

1    referenced the 750 but was taking two of those a
2    day.
3    Q.  Okay.  And then on page 4756, if you could please
4    go there.
5    A.  Yes.
6    Q.  Okay.  Do you recognize this document?
7    A.  This is a physical therapy progress note from
8    Integrated Therapy Practice where I sent her.
9    Q.  And this was part of your medical file; correct?
10   A.  Yes.
11   Q.  Okay.  And do you see the part where it says
12   short-term goals and long-term goals?
13   A.  Yes.
14   Q.  Is that something that you discussed with Sydney
15   as well?
16   A.  It's something that the therapist discussed with
17   her, and then we do a cursory review if need be,
18   so at some point in time, we discuss a home
19   program and things like that.
20   Q.  Okay.  And then you see where it says
21   "Assessment/ Diagnosis" at the top?
22   A.  Yes.
23   Q.  What are "somatosensory cues"?
24       MS. WERMUTH:  Where exactly are you,
25   Gia?

Page 133

1        MS. SCATCHELL:  It's the third line,
2    middle of the third line.
3        MS. WERMUTH:  Oh, okay.  "Somatosensory
4    cues."
5        MS. SCATCHELL:  Thank you.
6    A.  Yeah, so sensory stimuli.  So somatosensory cues
7    can be things like visual input.  Right?  It's a
8    sensory input.  A tactile.  Where your feet are
9    on the floor.  Those are somatosensory cues.
10   Q.  Okay.
11   A.  Examples of them.
12   Q.  When it says, "Continuation is recommended to
13   progress NMS functioning," do you know what the
14   NMS is?
15   A.  Neuromuscular system.
16   Q.  Okay.  And you had previously testified that Ms.
17   Dillard has generalized anxiety disorder and that
18   she didn't have a prior history of it before
19   2017; correct?
20   A.  Yes.
21   Q.  Okay.  In your opinion what do you think was the
22   cause of her anxiety disorder?
23       MS. WERMUTH:  I'm going to object to
24   the form of the question and belatedly object to
25   the prior question because I think it is

Page 134

1  inconsistent with record testimony already in
2  evidence in this case. I also think your
3  question is argumentative. Go ahead.
4        MS. SCATCHELL: You can answer.
5        THE WITNESS: Could you repeat the
6  question?
7        MS. SCATCHELL: Ms. Court Reporter,
8  could you read back the question.
9        (The requested material is read by the
10  court reporter.)
11  A.  Well, I think it's multifactorial in this case.
12  I think the initial seizure and her concern of
13  having more seizures and treatment. And then she
14  did report to me the issues she was having at
15  work; stress, as she described it, at work, and
16  trying to balance her work life and perform like
17  she was used to within the context of her
18  limitations. It's not uncommon that we see
19  people who are highly productive and highly --
20  how do I say this? Very intellectual, smart
21  people who are highly productive who have a
22  passion for their job who then, all of a sudden,
23  have difficulties in life, work life, and just
24  struggling with symptoms will develop generalized
25  anxiety disorders. And then when you add on the

Page 135

1  inability to function as she previously did and
2  have stresses that are encompassing in your life
3  that will perpetuate an ongoing problem.
4  Q.  Okay. And you had previously stated that
5  epilepsy is a chronic problem; correct?
6  A.  Yeah. It's a permanent condition. It's a
7  lifelong disorder.
8  Q.  Okay. And there's no cure for it; correct?
9  A.  In her case, no. I mean, you know there are
10  patients who have brain tumors that cause
11  seizures where we can cut them out, and their
12  seizures go away.
13        MS. SCATCHELL: Okay. Let me just
14  confer with my client and see if there is
15  anything. I'll just be brief.
16        THE WITNESS: Sure. No problem.
17        MS. SCATCHELL: Thank you.
18        (A brief recess is taken, after which
19  the following proceedings are had.)
20        MS. SCATCHELL: You know what, if we
21  actually just could stop for the evening. I'm
22  pretty sure that we're finished. I just know
23  that my client is kind of tapped out, and I feel
24  like I'm getting a little bit sloppy in my
25  questioning too, so if we -- I think that we're

Page 136

1  just about finished, but if we could stop for the
2  evening, would be great.
3        THE WITNESS: That's fine with me.
4        MS. SCATCHELL: Okay. And, Anna, we
5  had previously discussed -- I just want to put it
6  on the record that you don't have an objection if
7  once I'm fresh minded, I come back and discuss
8  with my client, we have a few other questions,
9  you won't object to any motion I file with the
10  judge requesting that; right?
11        MS. WERMUTH: So here's my concern,
12  Gia: If you come back and say we have no more
13  questions, it's conceivable -- I have two
14  based -- like two very quick ones based on the
15  testimony today. But if you come back and say
16  you have no further questions, I'm not precluded
17  then from my ability to get back on the record
18  and ask those two questions, so --
19        MS. SCATCHELL: Well, then do you want
20  to just plan on coming back if necessary --
21  well --
22        MS. WERMUTH: Look, I don't want to
23  force you to come back, but this is a confusing
24  situation because previously you were talking
25  about adjourning before you had started your

Page 137

1  examination. Now you're talking about adjourning
2  mid examination, although it is 10 minutes until
3  nine. The doctor said he could go until nine. I
4  literally have 20 seconds worth of questions, so
5  I just don't --
6        MS. SCATCHELL: Do you want to just go
7  out of order and ask your two questions and then
8  this way if I speak with my client and we feel
9  comfortable that we don't have anything to ask,
10  so this way hopefully we don't have to -- and it
11  just kind of encompasses everybody's --
12        MS. WERMUTH: I would appreciate that.
13  And then based on that, then, we can decide
14  whether or not there is a need for a motion to
15  bring the doctor back. And I appreciate that
16  courtesy, Gia.
17        And, Doctor, if you will indulge me, I have
18  two very quick questions.
19        THE WITNESS: No worries.
20        MS. WERMUTH: And thank you again, Gia.
21  FURTHER EXAMINATION
22  QUESTIONS BY MS. WERMUTH:
23  Q.  So you testified about Dr. Dillard seeking out
24  therapy for her anxiety disorder; right?
25  A.  Yes, I think there's some documentation in my

MAGNA
LEGAL SERVICES

Page 138

1    notes that she was attending some help.
2  Q.  Right, thank you.  But you did not receive
3    records from that therapist like you did from the
4    physical therapists; correct?
5  A.  That's correct.
6  Q.  Okay.  So you don't have the full history of
7    whatever stressors and whether it was life events
8    or work events or family events that were causing
9    her anxiety; right?  You don't have the full
10   background?
11 A.  No.  Just what I testified to.
12 Q.  Okay.  And are you aware that she stopped going
13   to therapy?
14 A.  I don't know that she stopped.
15       MS. WERMUTH:  That's all I have,
16   Doctor.  Thank you.
17       MS. SCATCHELL:  I'm just going to ask a
18   couple of quick questions.
19 FURTHER EXAMINATION
20   QUESTIONS BY MS. SCATCHELL:
21 Q.  Ms. Dillard specifically had mentioned to you
22   various issues and stressors that she was
23   experiencing at work; correct?
24 A.  Yes.
25 Q.  So you have first-hand knowledge?

Page 139

1       MS. WERMUTH:  Objection.  That's
2    totally inaccurate.  He has secondhand knowledge
3    of what she told him.
4       MS. SCATCHELL:  No.  I said he has
5    firsthand knowledge of her discussing with him
6    that she was experiencing workplace issues.
7       MS. WERMUTH:  Okay.
8  QUESTIONS BY MS. SCATCHELL:
9  Q.  Is that accurate?
10 A.  Yes, that is accurate.
11 Q.  And would you need the therapist's notes to make
12   your assessment that Ms. Dillard had a
13   generalized anxiety disorder?
14 A.  In my medical record, I have documentations from
15   a board certified neuropsychologist, a Ph.D.
16   neuropsychologist, documenting it.
17 Q.  Okay.
18 A.  I mean, I could take a few minutes and peruse
19   that note.  He may have some details.  I haven't
20   looked at it since probably the time it was
21   generated, but may have some details about
22   what her stressors are in the note.  I need to
23   look at that or it's in my notes, which are now
24   an exhibit, so...
25 Q.  Yeah.  While we're here, if you wouldn't mind

Page 140

1    taking a couple of minutes.
2  A.  Sure.  Let me find it.
3  Q.  Thank you.  If you haven't found it yet, I think
4    it's --
5  A.  I have it.
6  Q.  Okay.  Perfect.
7  A.  I'm reading through it.
8       MS. WERMUTH:  What pages are we looking
9    at?  4747?
10       MS. SCATCHELL:  Yes.  To 4754.
11       THE WITNESS:  Do you want me to
12   highlight features of his report that I can
13   discuss now that are in addition to the anxiety
14   in reference to what we talked about?
15       MS. SCATCHELL:  Yes.
16 A.  So 4748 under "History of Present Problem," the
17   history that Dr. Singh or his associate received
18   directly from Dr. Dillard was, "I have difficulty
19   reading, memory loss and assimilation to my job.
20   When I was lecturing I have dizziness and
21   migraines.  My eyes start twitching.  I skip
22   words.  I have word and name-finding
23   difficulties."
24       And then I'm continuing to read.
25       "I started feeling anxious in 2017.  Before

Page 141

1    tenure, you have reviews.  I have received
2    reviews every year.  In 2016, I had a review and
3    the faculty recommended retention.  They did not
4    think I was making progress in teaching."
5       So then on page 4750, his diagnoses were;
6    number one, major depressive disorder; and number
7    two, generalized anxiety disorder.
8       And then on page 4751 he just has some
9    recommendations.  The usual things.  Individual
10   supportive therapy, et cetera.
11       So Dr. Singh, as I said, is a board
12   certified neuropsychologist making his two
13   diagnoses after an extensive battery of testing.
14 Q.  Okay.  And on page 4748 where it says trauma at
15   job.
16       MS. WERMUTH:  Objection.  Misstates the
17   record.
18 QUESTIONS BY MS. SCATCHELL:
19 Q.  "Some trauma at my job."  Thank you.
20 A.  Yes, that's in quotes.
21 Q.  Okay.  And would that be considered a stressor
22   based on your assessment?
23 A.  Well, if someone --
24       MS. WERMUTH:  Objection to form.  Go
25   ahead.



Page 142

```
 1        A.  If someone says, "Some trauma at my job,"
 2     obviously there's some disturbance going on.  I
 3     can't tell if it's someone slamming her head
 4     against the wall or if it's, on the other
 5     extreme, anxiety and stress from some other
 6     reason.
 7           MS. SCATCHELL:  Okay.  At this point I
 8     don't think we have any other questions, so I
 9     think you're free to go.
10           MS. WERMUTH:  Doctor, thank you so
11     much.
12           MS. SCATCHELL:  I really appreciate
13     your time.
14           THE WITNESS:  Thank you.
15           MS. WERMUTH:  We really appreciate your
16     time.  It was helpful.
17           (Deposition proceedings conclude at
18     10:00 p.m.)
19
20
21
22
23
24
25
```

Page 143

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

SYDNEY DILLARD,                )
                               )
         Plaintiff,            )
                               )  CIVIL ACTION NO.
vs.                            )  1:20-cv-7760
                               )
DEPAUL UNIVERSITY,             )
                               )
         Defendant.            )

The deposition of RICHARD CRISTEA, M.D., taken in the
above-captioned case, on August 8, 2022, at the time
and place hereof it was requested that said deposition
be transcribed and reduced to typewritten form.
It was agreed by the deponent, all parties, and by
their respective counsel that the signature of the
deponent to the deposition be waived; said deposition
to be read with the same force and effect as if signed
by said deponent.

(The reading, examination and signature by the
witness are hereby waived by the witness and by
the parties.)

FURTHER THE DEPONENT SAITH NOT

(Signature Waived)
_____
     RICHARD CRISTEA, M.D.

Magna Legal Services
(866)624-6221
www.magnals.com

Page 144

STATE OF INDIANA  )
                  ) SS.
COUNTY OF DELAWARE )

CERTIFICATE OF COURT REPORTER

I, Mary Beth Schafer, the undersigned Court
Reporter and Notary Public, residing and maintaining
offices in the City of Muncie, County of Delaware,
State of Indiana, do hereby certify:
That at the time and place described in this
transcript, the deponent, RICHARD CRISTEA, M.D.,
presented himself before me for administration
of an oath of truthfulness, which oath I then
administered;
That I then reported to the best of my ability
in machine shorthand all of the words spoken by all
parties in attendance during the course of the
ensuing proceedings, including objections, if any,
made by all counsel present;
That I later reduced my stenographic notes into
the foregoing typewritten transcript form, which
typewritten transcript is a true record of the
testimony given by this witness as stated above;

I do further certify that I am a disinterested
person in this cause of action; that I am not a
relative or attorney or employee of any of the
parties, that I am not a relative or an employee of
such attorney or counsel, and that I am not
financially interested in this action.
IN WITNESS HERETO, I have affixed my Notarial
Seal and subscribed my signature below this
25th day of August, 2022.

_____
     Mary Beth Schafer, RPR, Notary Public
County of Residence:  Delaware
My Commission Expires:  April 11, 2023



## A

**abilities**
84:25
**ability**
85:5 86:3 127:16
  136:17 144:10
**able**
15:12 34:13 48:13
  58:14 65:14 74:22
  75:1 76:20 80:13,15
  80:17,18,19 81:14
  81:19,25 82:20
  93:19 100:21
  101:18 128:20
**abnormal**
11:10 57:9 59:8
**abnormalities**
16:9 21:22 118:18
  129:9
**abnormality**
21:6 58:3
**above-captioned**
5:25 143:9
**Absence**
62:20
**Absolutely**
118:12
**academic**
45:20 101:9
**academics**
64:9,13
**acceleration**
121:22
**acceleration/decele...**
121:20
**access**
44:4
**Accident/Injury**
64:17
**accommodate**
109:25
**accommodation**
83:16 88:12 94:3
  100:19 102:11
  125:4 130:4

**accommodations**
81:7 86:9 90:19,20
  92:7 93:13,18,20
  95:11,21 96:24 97:2
  97:12 100:15
  101:15 102:13,15
  102:20,22 103:16
  103:25 104:5,13,16
  105:20 109:22
  125:6,24
**accompany**
89:18,25
**accurate**
10:14 32:2,5,12,19
  32:20 36:25 41:14
  42:3,11 92:5 107:6
  139:9,10
**acting**
44:15
**action**
1:5 143:4 144:16,18
**activated**
117:23
**activities**
33:12 34:23 46:3
  47:19 48:13 66:20
  66:22 84:16,20 85:1
  117:24 128:19
**activity**
16:23 21:4,17,20
  39:25 84:12
**acute**
40:2 54:22
**ADA**
83:16
**add**
26:13 134:25
**addition**
116:3 140:13
**additional**
27:9 35:22 36:15
  69:22 70:6,15 72:18
  78:24 102:11 118:8
  127:6
**additionally**
17:19

**adjourning**
136:25 137:1
**adjusted**
30:18 69:1,7,9
  103:21
**adjustment**
70:16 110:10
**adjustments**
86:9
**ADL**
34:22 37:17
**ADLs**
34:13
**administered**
144:9
**administration**
144:8
**advance**
43:9
**advent**
55:13
**advice**
29:17
**advised**
44:17 80:5
**AED**
49:2,3
**affect**
128:16 129:1
**affixed**
144:19
**agenda**
78:25 79:13
**aggravated**
73:13,15 116:22
  117:24
**agitation**
128:14
**ago**
9:9 19:12 66:1 93:16
**agree**
54:8 75:13 81:9
  109:23 112:17
**agreed**
143:10
**ahead**

**adjourning**
5:14,17 59:21 88:8
  88:23 124:21 134:3
  141:25
**air**
14:25 15:3 26:7 27:1
  28:8 29:5 35:18
  36:21
**akin**
130:7
**alcohol**
63:20 119:20 120:18
**allow**
6:19,20 66:6 125:5
**allowed**
57:9 103:1
**allowing**
66:15
**allows**
58:1 73:3
**alterations**
131:24
**alternate**
80:3,4
**Alzheimer's**
11:4
**ambulatory**
21:4,10,16 57:9,22
  57:24 58:1,2 119:12
  129:11
**and/or**
12:14
**Anna**
5:17 61:19 87:2
  115:6 136:4
**Anneliese**
2:8
**answer**
29:15 33:4 46:7 48:6
  50:2 59:25 70:21
  116:8 120:13 134:4
**answered**
79:19 82:16 97:25
  103:18 116:6
**answers**
6:20 34:19
**anti-epileptic**



47:3 49:4,9 122:12
**anti-epileptics**
131:9
**anxiety**
14:2 52:5,7,9,11
116:13 119:3,24,24
121:2 122:18 124:2
133:17,22 134:25
137:24 138:9
139:13 140:13
141:7 142:5
**anxious**
28:5 140:25
**anybody**
90:15
**anytime**
21:22 58:6
**apologize**
23:2 51:20 52:25
53:1 115:24 122:5
**apparently**
36:4 44:21 80:6
103:20 123:10
**appearance**
5:21
**appearances**
5:11
**appeared**
30:4 46:25
**appearing**
1:14
**appears**
10:12 19:1 27:13
73:12 102:12
**applying**
75:10
**appointment**
13:15 43:10,11 90:10
111:19
**appointments**
43:7
**appreciate**
8:17 31:19 41:18
42:14 54:10 114:17
137:12,15 142:12
142:15

**approach**
118:14 128:1
**appropriate**
46:22 80:20
**approval**
65:10
**approved**
62:12,14
**approximately**
1:15 129:17
**April**
22:10,15 26:4,21
27:2,7,8,9,10,16,23
35:15 36:18,18 68:3
68:12 69:2 71:21
74:25 101:15
102:10 103:4,16
104:11 106:7
144:23
**area**
21:7
**argumentative**
29:13 43:5 47:13
49:25 59:5 70:11
134:3
**arms**
12:14 121:13
**arranged**
118:20
**asked**
67:17 68:22 79:18
82:15 84:10 97:24
103:15,17,19,24
104:1 116:5 124:25
**asking**
107:4 113:6
**asks**
84:15
**asleep**
15:2 20:25 28:16
30:9 37:14
**assess**
15:12
**assessing**
77:15
**assessment**

25:15,16,24 97:8
132:21 139:12
141:22
**assimilation**
140:19
**assistant**
32:8 34:17,18 40:8
64:24 74:3 96:19
101:1
**associate**
140:17
**associated**
15:18
**assume**
13:13 24:13
**assumes**
70:11
**assuming**
6:11 104:3
**attempt**
82:9,17
**attend**
46:12 62:25
**attendance**
144:11
**attending**
45:23 138:1
**attention**
49:20 107:22
**attorney**
5:24 94:22 115:24
144:16,17
**atypical**
117:6
**audible**
94:4
**August**
1:14 94:11,18 95:5,8
110:1 111:13,23
143:9 144:20
**authored**
94:8
**avoid**
45:11 110:10
**aware**
7:13 12:21 33:17

41:19 71:20 100:1
103:15 104:15,20
138:12
**awermuth@cozen....**
2:11
**a.m**
72:9 114:24

---

**B**

**B**
4:1 86:1
**baby**
108:25 109:7
**back**
7:15 16:15 21:3,15
22:6 28:7 30:2
38:22 42:1,24 51:19
69:5,9 74:22 75:1,7
75:9 76:14 82:18
84:3 92:16 94:1
95:11 96:20 100:5,8
101:4 103:6 104:7
105:9 113:5 119:9
124:11 131:23
134:8 136:7,12,15
136:17,20,23
137:15
**background**
10:18 138:10
**bad**
29:19 126:15
**balance**
128:2 129:1 134:16
**based**
15:24 23:18 27:12
29:2 58:12 66:3
79:23 82:14 102:23
119:12 126:20
130:6 136:14,14
137:13 141:22
**basically**
82:25 90:8
**basis**
32:9 81:2
**Bates**
10:4 24:21 25:6 27:5



36:11 52:16 86:15
86:25 91:4 112:3
**bathroom**
113:1
**battery**
141:13
**battle**
75:7,7
**bay**
130:7
**bear**
31:18
**beat**
108:24
**bedtime**
28:6 50:20,23 110:7
130:25
**beeping**
46:17
**began**
12:25
**behalf**
1:13 2:2,7 83:25
112:7
**belatedly**
133:24
**believe**
23:19 57:3
**best**
6:20 10:15 83:2
113:16 127:23
144:10
**Beth**
1:12 9:20 88:3 144:4
144:22
**better**
77:12 118:22
**BID**
68:18
**big**
50:9
**bird**
73:4
**birth**
109:18 111:5
**bit**

49:19 119:17 120:24
121:25 122:9
125:17 131:8
135:24
**biting**
20:16
**blank**
84:17 86:11 89:19,24
**blood**
11:21 15:19 40:17
128:17 130:8,9,10
131:11
**board**
10:22 139:15 141:11
**body**
51:14
**books**
43:8
**bottom**
7:22 26:14 33:6
34:11 60:13 61:3
65:7 71:7 91:25
112:7
**box**
84:4,13 88:5 90:7
**boxes**
84:2,10 89:24
**brain**
11:3,9,10,18 12:18
16:23 17:14,16 18:5
18:6 20:17 21:7,18
21:22 28:20 46:15
73:6,6 121:15 129:9
135:10
**brainwave**
129:11
**break**
76:25 77:2 112:24
115:8,11 123:24
**brief**
135:15,18
**briefly**
7:7 12:15 112:2
128:8
**bright**
46:24 51:12

**bring**
120:9 121:23 137:15
**Brittany**
2:9 5:19
**brittanygreen@co...**
2:12
**broad**
11:1 116:19
**broader**
65:15
**broadly**
126:19
**broke**
77:4
**brought**
119:6
**bullet**
25:23
**bumped**
100:8
**busy**
30:23

---

**C**

**C**
2:1
**call**
11:20 12:12 17:11
21:23 55:17 65:16
67:17 72:17 80:10
96:6 115:7 118:10
126:5
**called**
31:22 60:24 72:5
96:7 126:21
**calls**
55:17 65:23 77:25
85:7 90:23 94:22,25
95:3 104:18
**capable**
34:25 66:7 67:14
**capacity**
7:5 8:23 65:19 67:15
**capitals**
97:14
**caps**

98:5
**care**
13:24 14:24 19:7
29:22 31:24 50:5
60:25 117:13
124:15
**career**
66:13 75:25
**careful**
122:10
**carrier**
55:1,9
**carriers**
55:14
**carry**
40:16 75:24
**case**
6:5,25 15:21 41:17
79:17 116:25 120:8
134:2,11 135:9
143:9
**catalyst**
59:13
**categories**
39:7
**cause**
11:11 72:1,2 76:15
128:14 133:22
135:10 144:16
**caused**
58:9 62:21
**causes**
38:16
**causing**
138:8
**caution**
75:10
**cautious**
131:20
**center**
129:25
**centers**
18:4,5 89:8
**central**
11:2
**certain**



55:7 66:20 128:19
**certainly**
28:21 57:8 66:9
98:19 104:6 115:9
117:25 119:21
122:16 129:4
**CERTIFICATE**
144:3
**certification**
60:24 67:23 83:17
89:18
**certified**
10:22 139:15 141:12
**certify**
144:6,15
**cervical**
73:8 117:16
**cervicogenic**
14:5 117:14,20,23
118:3
**cetera**
79:10 80:22 131:2
141:10
**change**
15:19 34:17 40:6
41:22 43:20 45:7
102:3
**changed**
30:15 92:4 101:15
102:16,25 103:8
**changes**
119:13
**characteristic**
126:23
**characterized**
116:20
**chart**
19:10,11,24 23:22
27:19,20 32:12,14
34:21 39:2,4 40:14
40:23 48:7 61:7,10
94:14 124:12 125:7
**charted**
34:24 35:3,23,23
**charting**
39:4

**chase**
15:20
**chat**
8:22 88:4
**check**
24:23 84:1,4,10 88:6
89:24 128:17
**checked**
84:2,13
**Chicago**
2:5,11 33:21 69:17
127:8
**chief**
39:8
**child**
109:18 111:5
**China**
47:9,15,23
**choice**
10:11
**CHRIS-tee**
87:13
**chronic**
45:10 46:13,21 66:2
75:5,5 130:12 135:5
**chronological**
19:10 26:13
**chronology**
102:23
**circumstances**
119:23 121:16
**circumstantial**
81:11
**City**
144:5
**Civil**
1:5,15 143:4
**clarification**
12:1
**clarify**
41:8
**class**
78:18,18 79:10 82:23
125:15,16
**classes**
78:10,12,14 80:15

81:15,16,20,22
82:10 100:21 101:7
101:19,21
**classic**
127:11
**classroom**
82:3 101:5
**clean**
6:21
**clear**
15:15 26:24 27:17
77:3 97:9 119:5
**clearly**
125:8 127:2
**click**
34:20
**client**
135:14,23 136:8
137:8
**clinical**
11:11 12:21 15:5
16:8,12 41:25 79:7
126:20 130:6
131:12
**clinically**
15:11 116:20
**clock**
79:4
**cognitive**
14:1 41:3 74:11 97:5
97:7 117:1,11
120:25
**collated**
23:24
**collisions**
121:19
**columns**
42:8
**combination**
101:22
**come**
19:15 21:3 22:6
26:15 38:22 49:20
82:18 83:1 113:5
117:15 136:7,12,15
136:23

**comes**
11:23 39:21 94:5
95:25
**comfortable**
63:7 101:4 137:9
**coming**
19:5 114:17 136:20
**commencing**
1:15
**comment**
92:11
**Commission**
144:23
**committee**
80:3,4,6
**commonly**
121:4,18
**communicate**
55:16
**communicating**
55:5 94:13
**comp**
80:22
**companies**
80:22
**compared**
42:12
**compensation**
7:6
**Compilation**
4:5
**complaining**
74:11
**complains**
39:25
**complaint**
39:8
**complaints**
97:5,7 117:1
**Complaints/Gains**
123:23
**complete**
40:21 55:17 61:4
62:10 83:24 84:9
**completed**
48:7 60:18,21 61:14



62:7,8,13,13
**completely**
47:5 65:20
**completing**
41:1
**complex**
72:25 73:5
**component**
45:3 118:1 127:12
**computer**
125:25
**conceivable**
136:13
**concern**
4:6,8 88:25 91:8
92:24 116:16
134:12 136:11
**concerned**
51:10,17 131:16
**concerns**
46:11 110:3 117:9
**conclude**
58:9 142:17
**concluded**
66:21,23 119:2
**conclusion**
59:15 65:24 76:13
78:1,13 85:7 90:24
**conclusions**
85:22
**condition**
21:21 45:8 61:1 79:7
79:24,24 135:6
**conditions**
127:17
**confer**
135:14
**conference**
63:12 65:9
**conferences**
45:20,20,23,24 46:12
63:1,9 65:14
**confirm**
10:13
**confounding**
74:16

**confusing**
9:15 136:23
**consciousness**
11:12,24,25 71:18
**consider**
13:6 52:17 53:4
73:17
**considered**
28:18 141:21
**consistency**
47:17
**consistent**
15:1 21:20 22:16,23
23:25 29:4
**consistently**
116:13
**consolidated**
127:23
**constant**
75:7,8
**construction**
80:14
**contained**
10:14 124:11
**context**
65:15 134:17
**continuation**
58:20 133:12
**continue**
66:23 102:21 103:24
**continued**
74:5 97:2
**continues**
10:2 89:5 91:13 93:4
102:19
**continuing**
63:1 65:18 140:24
**continuous**
61:18 65:9
**contributory**
117:12
**control**
130:14
**controversial**
33:14
**convenience**

31:9
**convenient**
30:24
**conversation**
47:23 65:12 66:10
67:12,18 91:1 94:16
94:18 98:7 102:4
**conversations**
47:21 90:15,18,22
93:10 94:19,23
124:23
**conveying**
76:12
**convulsion**
12:7 121:12
**convulsions**
12:10
**corner**
7:22
**correct**
6:15 10:23,24 12:24
13:2,5 16:21,25
18:1 19:14 21:1
22:13 23:18,20
24:18 25:13,17,25
26:5,23 27:15,18,21
28:14 29:2,25 32:24
35:1 36:8,22 37:19
38:12 39:20 40:9,23
42:10 43:18 45:21
46:8 50:14,18 53:10
53:18,20,21 54:25
55:3 56:9,16,17
58:11,13,17 59:16
60:6,20 62:17 64:1
68:5 69:5,10 71:2
72:22 73:24 75:19
76:17,25 84:18
85:10 86:6,12 87:9
91:18 94:13 95:10
95:23 96:10 97:11
98:1,13 99:16,19,22
100:3,23 102:12
103:7,13 107:3,20
108:10 109:2
110:22 111:12,24

112:8 118:16 120:6
128:22 129:1,10
132:9 133:19 135:5
135:8 138:4,5,23
**corrected**
106:25
**correctly**
38:10 62:25 85:9
123:13
**couch**
36:3 37:5 123:2,10
123:13,18
**counsel**
112:9 124:25 143:11
144:12,17
**counseling**
122:20
**counting**
14:20
**country**
46:12 123:25
**counts**
128:17
**County**
144:2,5,23
**couple**
57:5 112:16 138:18
140:1
**course**
34:6 50:3 51:16
63:17 74:10 108:14
116:10 127:4,19
144:11
**court**
1:1 5:1,11,13 6:7,21
9:17,22 22:21 54:14
86:17 88:6 113:15
113:15 115:15,18
134:7,10 143:1
144:3,4
**courtesy**
137:16
**Cozen**
2:9
**co-mobidities**
118:10



creates
118:1 121:15
Cristea
1:11 4:6,8 5:4 6:2,4
6:10 10:4 89:1 91:9
92:25 124:8 143:8
143:18 144:7
Cristea's
9:19 87:10
criteria
75:15
critical
16:16
cross-trained
127:10
cues
132:23 133:4,6,9
cure
135:8
current
13:6 55:3 123:22
currently
41:2 56:21 101:18
cursory
132:17
cut
15:20 135:11
CV
10:5,12

———————————
**D**

D
3:1 4:1 95:25 96:7
99:17,18
daily
19:7 34:23 48:13
130:8
date
26:10 38:2 40:6 41:9
41:13,22,22 42:9,12
51:23 53:19 56:18
92:4 98:11 108:7
110:6 112:6 125:10
dated
35:20 89:11 91:20
93:7

dating
119:9
day
30:22,23 31:2,2,10
31:11 33:24 38:9,11
44:13,19,23,24 45:4
48:4,10 52:12,18
56:3 68:20 77:2,5
82:22 96:5 100:10
100:12 110:2,21
114:17 130:24
132:2 144:20
days
42:18,25 126:4
deal
122:21
deceleration
121:23
December
13:3 24:3,12,16 26:2
111:25 112:4,12
130:3
decide
33:13 60:2 137:13
decision
44:21 57:14 60:4
decisions
75:11
decrease
56:2,11,20 57:2 58:8
60:5 127:24
decreased
30:18 68:22
deep
17:14
default
82:12
Defendant
1:7,14 2:7 143:7
definition
14:11,17 70:5 122:6
definitive
80:23
Delaware
144:2,5,23
delete

32:9,10
demographic
61:6
department
90:3
DePaul
1:6 5:18,19 6:1,5
78:6,20 83:3,14
89:16 90:15 92:15
103:24 104:1,3,12
125:1 143:6
DePaul's
87:15
depending
57:20 73:17
depends
46:23 47:5
deponent
143:10,11,12,15
144:7
deposed
7:5 54:14
deposition
1:10 4:4 6:4,12 8:19
8:23 9:3,7,23 54:12
66:1 88:24 91:7
92:23 115:3 142:17
143:8,9,11,11
depression
122:18
depressive
119:3,25 121:2 141:6
deprivation
119:21,22 120:18
depth
17:13
describe
84:6,15 129:12
described
11:15 12:6 68:16
128:24 134:15
144:7
description
84:8 126:21 127:11
despite
57:24

detail
9:8 40:19 127:2
detailed
90:6
details
52:19 90:25 139:19
139:21
determine
33:8 54:17
determined
45:10 106:18
develop
78:24 121:5,17
134:24
developed
73:5 117:2,14 121:1
121:6
deviating
50:4
diagnose
16:4,6
diagnosed
13:20,23,25 15:21
45:9 126:17,20
diagnoses
13:23 52:6 116:2,9
117:13 118:8,15
141:5,13
diagnosis
13:22 15:6,22,23
16:8,14,17 17:2,21
29:4 71:25 80:1
132:21
dictating
55:6
dictation
90:6
different
17:12 28:21 36:9
43:24 47:18 53:3
78:19 114:5 116:2
125:15 128:8 131:8
differentiate
74:13
differently
55:10



**difficulties**
117:5 134:23 140:23
**difficulty**
129:15 140:18
**Dilantin**
131:10
**diligent**
66:13
**Dillard**
1:3 2:14 5:25 6:1,5
7:17,18 8:21 12:22
13:20 32:4 44:6
45:22 46:24 47:7,10
48:10 49:12,21 50:3
51:4,9 65:13 66:9
79:12 84:21 89:15
90:18 93:11 94:19
116:2 119:7 120:4
120:10 124:9,16,17
127:25 128:19
133:17 137:23
138:21 139:12
140:18 143:3
**Dillard's**
9:1 15:20 17:24
33:18 45:8,13
115:24
**Dillard-DePaul4575**
123:2
**Dillard_DePaul**
7:23
**Dillard_DePaul2683**
91:5
**Dillard_DePaul2711**
87:1 88:16
**Dillard_DePaul4659**
86:18
**Dillard_DePaul4778**
27:13
**Dillard_DePaul4848**
25:7
**Dillard_DePaul9897**
86:19
**Dillard_DePaul9900**
10:5
**direct**

19:16 20:12 77:4
90:25 107:21
**direction**
63:6
**directly**
89:16 90:16 102:6
140:18
**disability**
46:20 54:16 55:7,20
**disabled**
54:18 65:20 66:21
**discharge**
11:10
**discharges**
12:17
**discontinued**
53:7
**discontinuing**
53:11
**discuss**
65:18 128:4 132:18
136:7 140:13
**discussed**
33:24 47:16 105:1
107:16 109:5
116:13,14 122:8
132:14,16 136:5
**discussing**
139:5
**discussion**
37:22 47:10 51:7
57:8 60:1 65:25
75:9 78:16,23 82:20
93:21 108:13
118:17 131:23
**discussions**
51:10 63:14,17
127:20
**disease**
11:5 18:4 42:8 75:5
**diseased**
122:6
**diseases**
11:5,6,6 46:13,21
66:3
**disinterested**

144:15
**dislocated**
14:2 20:17 41:3
118:4
**disorder**
11:9,17,18 14:1,3
52:7 79:9 118:11
119:3,3 121:3,18
122:2 126:11,17
133:17,22 135:7
137:24 139:13
141:6,7
**disorders**
11:2,4,13 38:15
116:4 119:24,25
121:2,5 134:25
**Disparti**
2:4
**dispense**
10:18
**displayed**
9:24 89:2 91:10 93:1
**disruptions**
122:22
**District**
1:1,1 6:6,7 143:1,1
**disturbance**
142:2
**disturbances**
120:1
**dizziness**
71:17 72:2,14 73:13
76:15 116:21
123:23 124:3
126:10 140:20
**dizzy**
72:8 85:16,17 118:19
118:21 129:3
**doctor**
5:9 18:21 22:21
25:11 31:18 35:7
41:1 43:22 48:6
50:2,7 52:23 59:25
60:10 61:4 66:19
67:3,21 70:14 71:9
74:1 77:18 83:22

85:9 86:22 89:7
91:6,15 99:10
102:21 106:23
112:2,20 115:10,22
137:3,15,17 138:16
142:10
**doctor's**
114:12 123:16
**document**
10:7 25:12 29:8
60:10,11 61:9 62:12
63:15 65:5 83:8
87:4 94:22 95:2,2
124:13 132:6
**documentation**
117:21 125:23
129:15 137:25
**documentations**
139:14
**documented**
48:19 74:10 94:15,17
97:1 101:2,13
126:24 127:2
**documenting**
123:17 139:16
**documents**
8:2 18:12 25:3 53:1
87:8
**doing**
23:8 31:1 34:25 57:4
67:14 71:22 80:21
85:21 110:24 114:5
123:15
**dosage**
30:15 51:5,8 56:12
57:2 58:8,23 131:6
131:24
**dosages**
49:22 130:23
**dose**
30:19 44:18 49:18
57:6,19 58:6 69:1
108:18 131:2,17,19
131:25
**doses**
46:22



**Dr**
6:2,4,10 7:17,18 8:21
9:1,18 10:4 12:22
13:20 15:20 17:24
32:3 33:17 44:1,3,6
44:9,21 45:8,13,22
46:24 47:7,10 48:2
48:3,8,9,18 49:12
49:21,22 50:3 51:4
51:9,24 65:12 66:9
74:7,7 79:12 84:21
87:10 89:15 90:18
93:11 94:19 118:23
124:8,9 127:25
131:3 137:23
140:17,18 141:11
**drawn**
85:23
**drink**
113:1
**drive**
2:4,10 48:14 56:22
57:13 58:13,14
84:22 114:25
128:20
**driving**
33:7,12 35:5,6 37:22
46:4 47:4 48:17,20
57:8 58:18 63:2,14
85:2,4 115:1 127:19
**drop**
11:22 131:17
**dropped**
131:19
**drug**
49:4 120:19 131:11
**drugs**
120:18
**duck**
73:4
**due**
12:17 56:21 62:21
79:6 85:17 114:10
121:8,9 126:10
**duly**
5:5

**duties**
33:22 45:14,23 63:8
65:21 77:19
**dysfunction**
14:1 72:1,7 73:11
116:19 121:7

**E**

**E**
2:1,1 3:1,1 4:1,1
**ear**
73:8
**earlier**
52:5 65:25 69:6 70:3
98:2 107:16 121:11
122:9,11 124:19
125:1,11 127:21
129:6 130:23
**early**
49:18 95:12 115:3
**easier**
10:10 18:21 31:3
**education**
63:2
**educator**
117:10
**EEG**
16:9,19 17:1,6 21:4,8
21:9,10,13,15,16,23
57:9,22,24 58:1,3
59:8 118:17 119:12
126:5 129:11
**EEGs**
17:4
**effect**
31:16 49:2 90:22
143:12
**effective**
31:15 95:22
**effects**
31:5,14 128:8,11,15
**effort**
29:9
**eighteen**
82:23
**either**

8:21 20:13 26:3
29:10 30:5,17 49:17
51:8 55:16 62:18
96:19 127:16
**electrical**
11:10,17 12:17
**electrodes**
17:13,14,16 21:11,17
**electroencephalogr...**
16:20
**electronic**
19:8 32:1 39:4,11
50:7,11 55:4,14
**elevated**
37:23
**email**
8:22 9:3 25:1 87:5,16
88:4,20
**emailed**
24:14
**emailing**
87:18
**emails**
88:2
**emergency**
29:21 35:19,21 123:8
**employee**
60:18 83:15 86:1
144:16,17
**employee's**
60:25 86:3
**employer**
7:2 93:24 98:6
**employers**
80:22
**EMTs**
127:10
**encompasses**
11:1 73:6 137:11
**encompassing**
135:2
**engaged**
67:14
**engagement**
6:18
**enjoys**

85:19
**ensuing**
144:11
**entered**
32:7 42:22
**entire**
54:19
**entirely**
29:4
**entries**
104:6
**entry**
23:11,12 42:17 48:7
**environment**
78:17 85:18 126:8
**epilepsy**
11:4,8,8,9,14,16,17
12:16 15:6,22 16:7
16:8,11 17:2,4,7,10
17:21 22:17,24
30:13 45:9,11 46:14
47:2 70:4 80:1
116:3,12 118:17
120:7 122:12 135:5
**epileptic**
14:10,12,17 18:5
21:21 29:22 57:19
**epileptics**
29:16
**epileptogenic**
21:24 58:4,4 59:8
**episode**
12:9 15:17 23:17
29:7 37:7 68:12
72:11 74:25
**episodes**
14:23 15:7,10,24
29:20,21 30:6,8
35:8,17 36:20 37:1
37:4,10 71:23 121:3
**episodic**
62:22 72:2,8
**ER**
107:10,12,13,17,18
123:12,16
**error**



81:7 131:5
**especially**
16:10 51:12 66:7
77:11 116:21 127:8
127:13
**Esq**
2:3,8,9
**essential**
77:23 86:4
**EST**
1:15
**estimate**
42:23
**et**
79:10 80:22 131:1
141:10
**evaluate**
17:7 33:13 74:18
**evaluation**
123:8
**evening**
5:10 7:12,19 8:4,8,10
8:19 9:7 135:21
136:2
**event**
22:3 26:21,22 27:8
82:10 119:8 126:21
**events**
11:11,20 26:20 98:1
138:7,8,8
**everybody**
8:12 114:20
**everybody's**
137:11
**evidence**
70:11 134:2
**evoked**
18:2,7
**evolution**
73:5
**exacerbated**
119:6
**exact**
13:12 125:10
**exactly**
28:24 37:25 80:7

81:18 126:13
132:24
**exam**
18:3,8 22:3 38:17,20
40:10
**examination**
1:10 3:3,4,5,6 6:8
115:20 137:1,2,21
138:19 143:13
**examine**
16:15 72:16
**examined**
5:8
**example**
15:16 39:15 54:16
63:20 85:11 130:9
131:22
**Examples**
133:11
**exception**
90:8
**excessive**
63:20 119:20 120:18
**executive**
79:9
**exhibit**
4:5,6,8 9:20 86:14,15
86:20,21,25 88:17
91:4 93:6 139:24
**Exhibits**
4:4
**Exhibit(s)**
9:23 88:24 91:7
92:23
**exist**
114:8
**expand**
125:16
**expectations**
78:5
**expected**
13:8,11
**expedite**
113:18
**experience**
11:14 12:8,9 72:14

120:15
**experienced**
52:4
**experiencing**
74:5 95:19 138:23
139:6
**Expires**
144:23
**explain**
54:15 59:6 102:7
126:13 130:19
**explained**
49:2 57:18
**explaining**
59:7
**extended**
44:12 79:9
**extension**
79:3,16
**extensive**
118:16 141:13
**extensively**
116:11
**extreme**
40:1 127:2 142:5
**extremely**
128:1
**eye**
72:16,17
**eyes**
125:24 140:21
**eye-movement-ind...**
72:10

_____
**F**
_____
**F**
3:1 4:1
**face**
101:25 102:1
**face-to-face**
100:25 125:15
**facing**
124:18
**fact**
6:4 17:3 67:22 79:21
80:9 97:17 103:14

117:21 122:19
125:24 130:3
**facts**
70:11
**Facts/Treatment**
61:13
**faculty**
141:3
**fainted**
68:9
**fair**
6:22 9:10,10 31:4
75:2 76:8 105:18
118:13
**falling**
129:3
**familiar**
10:7 31:23 124:13
128:7
**family**
20:20 120:5,6,10
138:8
**far**
29:11 32:25 34:1
**fatigue**
40:1,6
**features**
47:19 140:12
**February**
51:22 53:9 106:4,8
107:11
**federal**
1:15 113:15
**feel**
51:12 77:15 112:25
114:21 135:23
137:8
**feeling**
140:25
**feet**
133:8
**felt**
75:1
**female**
123:7
**fetus**



49:2 60:7 108:15,16
122:8,9 128:10
**figure**
115:8
**figuring**
131:6
**file**
50:9 86:22 88:13
92:21 132:9 136:9
**files**
87:15,15
**fill**
40:13 61:6 99:18
**filled**
66:19 69:17 99:17
100:10
**financially**
144:18
**find**
9:15 140:2
**findings**
119:1
**fine**
5:14 18:22 81:25
87:12 88:11 115:13
136:3
**finish**
6:19,20
**finished**
135:22 136:1
**finite**
27:22 76:20
**first**
7:4 18:19 20:3 21:8
21:13,15 32:22
33:11,14 50:19
53:25 55:9 76:9
77:18 88:16 90:9
92:14 94:2 97:7
106:18 113:22
117:6 119:8,9 121:1
121:10 126:12
127:14 128:11
**firsthand**
139:5
**first-hand**

138:25
**five**
9:8 35:8 111:3,13
115:11,16
**flare-ups**
62:22
**flash**
126:6
**flexibility**
131:15
**floor**
133:9
**fluctuation**
131:15
**focus**
14:7 21:24 58:4,5
59:9 74:20 76:9,16
76:21,22 117:4
**folks**
12:8
**follow**
10:9 46:25 55:11
68:19
**followed**
37:10 71:17,22 97:17
125:8
**following**
5:3 11:21 40:1 49:21
51:4,18 121:1,17
126:11 135:19
**follows**
5:8
**follow-up**
54:4 74:4
**force**
98:15 102:16 136:23
143:12
**foregoing**
144:13
**forever**
41:23
**forget**
32:10
**forgetfulness**
74:12 117:3,11
**forgot**

50:22
**fork**
82:25 83:1
**form**
11:15,23,25 29:13
30:18,21 33:3 46:5
55:12 59:5 60:22,24
61:1 65:1 69:17
76:6 79:19 83:14,24
89:18,23,25 109:9
133:24 141:24
143:10 144:13
**forms**
66:19
**forth**
75:9 104:7 131:23
**forward**
28:12
**found**
75:3 127:25 140:3
**foundation**
124:6
**four**
23:4 24:12 37:1,13
43:9 73:3 82:22
91:22 93:16 110:14
129:21,21
**free**
56:4,7,10,19 57:1
58:24 112:16 142:9
**frequent**
32:9
**frequently**
55:5,18
**fresh**
114:20 136:7
**front**
13:16 24:19 92:19,21
**full**
111:4 114:17 138:6,9
**function**
46:20 93:19 135:1
**functioning**
133:13
**functions**
77:23 86:4

**further**
3:5,6 93:21 112:19
136:16 137:21
138:19 143:15
144:15
**future**
49:1

**G**

**GAD**
52:7
**gasping**
14:25 15:3 26:7 27:1
28:8 29:5 35:18
36:21
**general**
52:6 78:6 81:10
128:10
**generalized**
14:2 16:11 26:19
116:12 119:24
121:23 133:17
134:24 139:13
141:7
**generated**
139:21
**generic**
52:12
**genesis**
117:16
**gestalt**
66:14
**getting**
27:24 51:21 62:4
67:21 73:2 93:13
114:21 122:20
135:24
**Gia**
5:21 24:25 25:1
61:25 88:12,18 99:5
113:18 114:2,10
115:10 132:25
136:12 137:16,20
**Gianna**
2:3 5:24
**gia@dispartilaw.c...**



2:6
**give**
52:11 87:3 88:4,9,10
115:7 131:13
**given**
32:4 67:22 88:18
144:14
**go**
5:14,16 13:24 14:4
16:15 18:11 19:24
21:11 23:21 24:2,5
24:9 25:14 29:17
30:2 31:17 32:9,16
32:20 38:24 40:24
41:13,21,25 42:15
43:10 44:8 52:18
55:22 59:21 65:14
70:23 73:19 74:22
75:1 76:4 79:17
83:11,19 88:8,22
92:16 94:1 102:25
103:6 104:8 105:2
107:19 113:1,3
122:24 123:3,20
124:21 131:2 132:4
134:3 135:12 137:3
137:6 141:24 142:9
**goals**
132:12,12
**goes**
20:16 27:20 88:7
**going**
6:16,16 9:13 10:17
18:11 19:23 24:9
25:10 26:12 28:12
51:13,19 54:19 59:1
70:16 82:21 84:3
85:20 86:13 88:3
91:3 98:15 113:3
115:4,16 124:5
128:21 129:20
133:23 138:12,17
142:2
**GON**
117:17
**good**

46:25 47:20 66:8
70:8,17 75:9 77:11
87:24 97:6 114:18
115:19
**gotten**
88:21
**grab**
43:10 113:1
**grammar**
100:23
**grammatically**
76:17
**grand**
12:2,5,6,9,11,15
20:15 26:20,21 35:8
35:12 119:4 121:12
**great**
81:3 118:12 136:2
**greater**
76:10,18,24 117:18
**Green**
2:9 5:19
**group**
2:4 64:8,13 125:18
**guarantee**
24:1
**guess**
28:16 84:10 85:12
115:10 118:9,13
128:25
**guys**
24:14

––––––––––––––
**H**
––––––––––––––

**H**
4:1
**half**
66:1 103:11,14
**hall**
82:4 125:19
**hand**
6:10
**handed**
24:13
**handicapped**
17:9,19

**handing**
88:12
**handwriting**
63:5
**handwritten**
60:17
**hang**
18:15 24:11,23 43:20
50:8 68:24 69:11
87:23 88:2 92:16
94:6 98:23 107:19
**happened**
56:25 67:15 69:8
101:24 102:2
**happening**
110:14
**happens**
43:6 55:13 99:25
**Happy**
115:9
**hard**
120:18
**harmed**
80:24
**hate**
113:15
**head**
116:22,23 120:19
121:10,14,14,22
129:5 142:3
**headache**
14:5 29:19 117:21,23
118:3
**headaches**
117:14,15
**header**
71:11
**heading**
83:8
**heads**
73:4
**health**
19:8 32:1 55:4,14
60:25 61:1
**healthcare**
83:16 128:2

**hear**
48:6 115:22
**heard**
12:2,19 131:9
**heart**
11:21
**height**
40:17
**helmets**
17:8
**help**
17:20 80:2,6,8 93:14
100:20 113:24
138:1
**helped**
117:22
**helpful**
55:21 108:20 142:16
**helps**
73:1 117:20
**hereof**
143:9
**HERETO**
144:19
**higher**
119:15
**highlight**
140:12
**highlighted**
97:17 125:7
**highly**
134:19,19,21
**history**
15:5 16:2,12,14,16
16:16 20:21 22:17
22:24 31:22 34:7,12
36:12 39:8,15,23
40:24,25 41:11 42:4
42:6 52:1 53:22
54:1 58:12 68:6
71:3 73:25 95:14
96:16 99:11 120:5,6
120:10 123:5,17
126:20 133:18
138:6 140:16,17
**hitting**



121:21
**hold**
27:4 86:16
**home**
21:11,16 110:10
114:25 132:18
**honest**
46:23
**honestly**
7:9
**hope**
32:11 113:18
**hopefully**
113:19 137:10
**hoping**
32:15
**hospital**
20:13 29:17
**hotel**
115:2
**hour**
21:14 66:1 76:10,18
76:21,23,24 77:1,2
88:18
**hours**
113:17 114:19
**HPI**
54:7 96:16
**HS**
50:17,19,21,22
**Human**
83:15
**Humans**
120:15
**hundred**
66:16
**hurt**
51:13 125:23
**husband**
14:23 15:8 16:2
20:10,13 26:6 27:1
28:7 107:8 123:17
127:1,6
**HX**
48:24
**hybrid**

101:21 102:2 104:9

---
**I**

**ID**
60:17
**identical**
92:6,7
**identification**
9:24 89:2 91:10 93:1
**IL**
2:5,11
**Illinois**
1:1 6:7 113:11 143:1
**illness**
34:7 36:13 39:9,16
39:24 42:5 52:1
53:22 54:1 68:6
71:3 73:25 95:15
96:17 99:11 123:5
**illnesses**
75:6
**immediate**
29:9
**immediately**
15:11
**impact**
7:12 118:2 127:24
**impacts**
85:12
**impairment**
84:5,7,11 86:3
**implication**
82:2
**implies**
48:19 97:16
**implying**
58:1
**improving**
40:4 54:20,23
**inability**
56:22 58:13 84:22
128:20 135:1
**inaccurate**
139:2
**inappropriate**
51:17

**incapacity**
62:21
**incident**
71:21
**incidents**
28:24 29:11
**include**
120:17
**includes**
39:25
**including**
11:2,11 75:11 144:11
**inconsistent**
17:1 134:1
**inconvenience**
114:16
**incorporate**
77:13
**increase**
44:18 52:4 63:21,24
64:2,6,9,14 108:11
117:25 126:9,10
131:25
**increased**
68:23 69:7 126:1
**increases**
58:6 129:5
**increasing**
69:2 129:7
**independent**
55:15
**Indiana**
1:13,14 8:13 144:1,6
**indicate**
45:7
**indicated**
33:8
**indication**
15:3 29:6
**indicia**
15:12
**indiscernible**
22:20
**Individual**
141:9
**indoors**

85:12,14
**induce**
126:1,7
**induced**
72:11
**indulge**
137:17
**information**
10:13,19 13:12,16
28:23 32:3 39:8
40:12 41:15,20
42:12 44:4 54:6
61:7,7 86:18 95:18
**initial**
82:10 119:8 134:12
**initially**
49:17
**initiated**
30:8
**injuries**
121:20
**injury**
11:4 46:15 54:13
113:12
**inner**
73:8
**input**
133:7,8
**inputted**
62:14
**insomnia**
129:16
**instance**
31:12
**instances**
17:22 106:21
**Institute**
89:8
**instruction**
82:14 83:7 85:23
92:18
**instructions**
33:7 35:4 50:15
55:25 69:13 71:12
83:3
**Insurance**



60:12
**integrated**
124:9 132:8
**intellectual**
134:20
**intended**
55:10
**interested**
144:18
**interesting**
97:6
**intermittent**
71:17 72:8 116:21
130:13
**intermittently**
116:24 129:22
**interrupt**
61:20
**interrupted**
23:2
**intervene**
93:23 94:24 98:6
**introduce**
115:25
**intuitive**
31:3
**involved**
33:23 45:14,16
**involves**
12:10
**involving**
7:1
**in-class**
104:8,9
**in-person**
78:22 81:22,25 101:7
**in/on**
42:18
**irrelevant**
34:21 123:14
**isolated**
85:18
**issue**
7:6 36:9 58:22 85:15
115:2 119:21 122:7
**issued**

102:19
**issues**
23:12 74:12,12,15,16
110:3 111:11,23
112:10,11 117:12
120:25 122:1
124:18 125:12
128:25 129:2,13
130:12 134:14
138:22 139:6
**Italy**
70:8
**item**
77:17 79:15 80:2,14
85:25 97:7
**IVF**
69:17 84:23 85:3,4
92:8,12 93:8 128:21

**J**

**January**
27:14,23 28:11,12
30:7 36:19,24 43:16
47:25 48:7 98:9,12
98:21,22 100:6,7,8
104:24 105:22,25
106:19,20,24 107:2
108:10 129:20
**jerking**
14:24 15:2 20:11
26:7 27:1 28:8,13
29:6 35:17 36:20
121:13
**jerks**
12:13
**job**
33:22 45:13,23 58:19
77:12,23 78:3 80:25
81:13 86:4,8 128:3
134:22 140:19
141:15,19 142:1
**joins**
8:15
**judge**
114:11,12 136:10
**judgment**

46:25 47:20 66:8
75:9 77:12,15 80:10
**July**
94:6,9,12 98:20
**jumping**
31:17
**June**
28:11,11 73:22 94:2
94:12,17 95:12
101:8

**K**

**keep**
15:17 115:4 130:7,10
130:13
**keeps**
73:1
**Keppra**
21:2 22:5,6 28:6
30:10 33:1 38:3
43:20 44:11,14 45:3
46:22 49:5,7,9,15
50:16 56:2,12,20
58:8 60:5 68:18,22
73:13 107:22
108:16 109:1 110:6
110:21 122:12
128:9,11 130:22
131:7,11,16
**keys**
29:19 117:4
**kid**
79:8
**kids**
17:7
**kind**
18:3 19:20 29:18
40:15 51:13 66:14
81:16 93:13 115:8
121:17 130:11,13
135:23 137:11
**knew**
33:20 105:15
**know**
6:17 7:11 8:12,14
14:21 15:17 18:17

19:6 27:8 29:2,11
29:16 31:4,17 32:11
33:22 42:25 43:13
45:10 46:18 48:18
60:3,21 61:12,14
64:23,25 65:2,4
66:2 67:13,21 76:5
76:17 78:2,5 79:5
79:11,20 80:7,18
82:23,24 83:9 85:3
85:21 90:1 92:20
94:22 101:7 102:24
103:3 104:1,14
109:11,14,19,20,21
110:11 112:3,24
113:25 114:11,22
118:16 120:14
122:22 124:24
125:11 126:24
127:5 129:19
133:13 135:9,20,22
138:14
**knowing**
46:9 81:13 93:16
**knowledge**
138:25 139:2,5
**known**
29:22,22 118:22

**L**

**labeled**
24:21 86:25 91:4
**labs**
96:9 128:16
**ladder**
37:24
**large**
1:13 64:12 125:18,19
125:21
**largely**
92:7
**lasting**
12:15
**late**
62:4 112:24 114:21
**Latin**



50:22
**Law**
2:4
**lawyer**
7:18 9:1 113:24
**learned**
80:21
**learning**
101:1 104:8,9
**leave**
60:17 61:18 65:9,13
83:7 109:15,18,21
110:9
**lecture**
82:3 125:19 127:17
**lectured**
128:6
**lectures**
128:5
**lecturing**
125:18,21 140:20
**led**
57:2
**left**
21:4,6,17 80:10
119:13
**leg**
96:21
**legal**
1:20 65:24 78:1 85:7
90:24 143:19
**legs**
12:14 73:2 121:13
**length**
29:7 57:12
**letter**
4:6,8 55:17 88:25
89:7,15,22,23,25
90:14 91:8,17,23
92:2,14,19,24 93:7
94:3 95:1,4 97:19
100:15,20
**letterhead**
86:24 89:9 91:17
**letters**
55:6,18 88:13 101:25

125:4 130:4
**let's**
24:2,5 26:12,14 30:2
30:10 32:16,20
75:17 81:3 94:1,25
95:4 103:6 121:19
121:25 122:24
**level**
131:11,11
**levels**
45:4
**liability**
63:15,16
**Liberty**
60:11
**life**
46:16 66:15 84:12,16
84:20 85:1 120:16
122:21 128:19
134:16,23,23 135:2
138:7
**lifelong**
135:7
**lifestyles**
30:23,24
**light**
74:6 85:13,13 126:7
**lighting**
85:14 125:22
**lights**
125:23 126:6
**light-headedness**
95:19
**limbs**
73:3
**limit**
76:16,21 84:12 86:3
113:13,16
**limitation**
48:17,19
**limitations**
35:5 37:20 48:14
84:15 85:4 134:18
**limited**
76:9,22 84:16,20
85:2 103:10

**limits**
46:17,20 66:4 84:25
**line**
26:18 52:17 133:1,2
**linear**
45:1
**lines**
23:5 34:11
**list**
13:24 84:24
**listed**
41:3
**literally**
31:9 137:4
**literature**
33:15
**little**
42:2 119:17 120:24
121:25 122:9
125:17 131:7,15
135:24
**live**
66:5,6,15 78:18
101:23 125:25
**liver**
128:16,17
**lives**
47:19
**living**
34:23 48:13
**loaded**
41:15,19
**long**
40:19 44:14 78:16
113:2 129:17
**longer**
104:5,13,16 113:7
**long-acting**
30:18,21 31:15 131:4
**long-term**
132:12
**look**
18:20,21 26:1 27:13
28:4 29:18 42:6
43:15 54:19 72:6
75:17 81:1 88:19

92:16 94:7 95:4,14
96:1 136:22 139:23
**looked**
44:20 103:4 112:1
139:20
**looking**
8:3 9:14 10:4 19:12
24:4 25:9,11,12
27:5 32:14 35:19,25
43:21,24 54:17 69:3
77:17 87:19 89:19
89:23 98:17,20
101:16 106:22,24
112:4 140:8
**looks**
20:2 26:15 27:4 38:2
39:16 44:8 52:16
61:11 68:24,25 74:2
89:7 92:3 105:9
107:22 110:20
**lose**
117:4
**loss**
11:12,24,25 20:17
71:17 140:19
**lot**
32:6 53:1 81:10
89:24 94:23 95:17
125:2,19 127:7
**LOV**
99:14
**low**
96:7,20 130:10
**lower**
47:18,19 57:20 58:6
63:18,19,21 72:11
109:1 110:6 119:22
120:1,17 126:3
127:21
**lowering**
63:23 119:17
**lowers**
119:18

_____
**M**
**M**



3:1
**MA**
40:5,6,8,10,12 95:17
**machine**
144:10
**Madam**
5:11 9:17
**Magna**
1:20 88:7,11 143:19
**main**
58:22 110:20
**maintaining**
144:5
**maintenance**
130:6
**major**
14:3 84:12,16,19
85:1 119:2,25
128:19 141:6
**majority**
16:10 17:3
**making**
5:10 141:4,12
**mal**
12:2,5,6,9,11,15
20:15 26:20,22 35:8
35:12 119:4 121:12
**malpractice**
54:13
**managed**
17:18 46:21 47:2
**management**
16:17,18
**manual**
117:19
**March**
23:16 30:6 53:9,17
53:25 56:7,10,15
57:15,25 59:2 65:21
66:19 67:7,9,9
68:21,25 98:16,22
98:24 99:2 105:9,15
106:10,15,20 107:7
111:4,23 112:11
**mark**
86:13,24 88:15,16

91:3
**marked**
9:17,24 10:5 89:1
91:9 92:25
**Mary**
1:12 9:20 88:3 144:4
144:22
**material**
134:9
**maternity**
109:14
**matter**
5:7 6:1
**mean**
20:14,18 22:10 26:1
32:19 40:5 61:19
63:19 68:19 69:25
70:3 72:24 76:4,24
77:8,9 79:3 80:3,16
81:15 82:24 94:14
99:18 106:7 109:14
109:16 115:4 127:5
135:9 139:18
**meaning**
21:24 41:19
**means**
50:23,25 63:23 108:1
115:10 117:15
125:8
**meant**
31:4 100:24 109:16
109:17
**mechanisms**
28:20
**medical**
15:12 16:13 32:8
34:12,17,18 40:8,24
40:25 41:11 42:6,8
54:13 61:5,13 63:15
64:24 67:23 74:3
79:24 90:2 96:19
124:14 129:14
132:9 139:14
**medically**
17:18
**medication**

30:12 31:6,22 34:3
45:1,7 47:16,17
51:11,13 52:11 57:6
59:12,17 69:8 70:16
75:12 100:4 117:8
122:10,18 127:22
128:9 130:17,20
**medications**
32:3 33:8 40:18
44:11 47:3 49:9
52:22 74:16 86:2
122:13
**medicine**
59:9,10 118:17 130:8
130:9 131:13
**medicines**
32:6
**meet**
98:8
**meeting**
65:16
**member**
61:15
**members**
83:10
**memorialized**
67:16
**memory**
7:12 10:15 51:3
74:12,15,16 105:6
140:19
**mental**
84:5
**mentally**
17:9,19
**mention**
22:5
**mentioned**
11:8 52:5 122:11
138:21
**Merrillville**
1:14 8:13
**message**
8:23
**met**
33:19 53:19 70:25

127:3
**metabolic**
128:15
**metabolism**
57:21
**mg**
44:11
**mid**
117:2 137:2
**middle**
19:18 84:21 133:2
**midway**
28:4 44:23
**migraines**
99:23 140:21
**milligrams**
38:11 44:19 56:3
107:23
**mind**
9:13 60:7 87:17
88:18 90:21 139:25
**minded**
136:7
**mindful**
114:12
**mine**
90:10
**minus**
42:18,24
**minute**
14:11 19:12 38:23
**minutes**
9:9 21:14 82:22,23
112:25 113:4,9
115:11,16,18 137:2
139:18 140:1
**Misra**
44:1,3,21 48:3,8,18
49:22 51:24 131:3
**Misra's**
44:9 48:2
**missed**
22:22
**missing**
71:24
**misspeak**



misspeak
105:12
**Misstates**
59:19,23 82:7 85:6
141:16
modality
100:22
model
55:3 104:10
modified
23:23
moment
14:7 18:15 22:6
30:11 34:5 67:24
86:21 94:6 123:3
monitor
17:12 21:11 128:16
monitoring
17:11
month
53:8 100:14,19
101:24 102:2
months
13:14 26:8 28:9
42:18 43:3,8,9,14
43:17 47:4 56:11
57:1,4,16 58:25
62:17 74:24,25
91:22 103:10 105:7
105:13 110:14
111:3,13 129:21,21
morning
130:25
motion
136:9 137:14
move
10:19 19:20 40:18
100:25
moved
104:9
movement
11:4 12:14 72:17
121:14,17,22
movements
20:11 36:20 72:16
116:21,22 121:10

121:23
moves
121:14
movie
85:19
movies
85:20
moving
44:12,14 73:3
**MRI**
17:20,20,22 20:17
multifaceted
118:14
multifactorial
134:11
multiple
13:23 46:14 51:10
63:16 119:23
124:23 125:4,20
126:8 127:3
**Muncie**
144:5
muscle
11:6 118:1
**Mutual**
60:11
myofascial
117:25
myogenic
18:3,7
**M.D**
1:11 4:7,9 5:4 89:1
91:9 92:25 143:8,18
144:7

_____

**N**

_____

**N**
2:1,10 3:1,1,1 4:1
name
5:17,23 14:9 42:9
60:18 87:11
names
117:4
name-finding
140:22
nature

84:6
near
23:4 34:10 44:9
necessarily
32:6 85:18 103:9
necessary
136:20
neck
117:20 129:24
130:12
need
5:11 19:24 43:2 79:9
79:17 80:2,8 81:4
94:24 104:4 112:25
113:23,25 122:13
130:9 132:17
137:14 139:11,22
needed
63:7 65:13 67:16
72:18 77:2 80:6
104:13,16 109:22
118:14 124:21
needing
110:21
needs
45:10 62:17 65:9,10
68:18 79:25 85:11
93:14,24 97:11,14
98:4 125:7
negative
38:20
nerve
11:5 73:7,7 117:17
nerves
38:16
nervous
11:3,7
neuralgia
117:18
neuroanatomical
72:25
neurological
38:16 77:14 79:7,24
89:8 121:4
neurologist
38:14

neurologists
29:18
neurology
10:22,25 11:1
**Neuromuscular**
133:15
neuropsychologist
74:9 118:24 139:15
139:16 141:12
neuro-ophthalmol...
38:14
neuro-ophthalmol...
38:13,17 72:15
neuro-psychometric
118:23
never
41:25 65:1,2 66:16
77:8
new
96:20 99:20 100:1
110:3
night
124:1 129:13 131:1
nighttime
28:13
nine
113:19 114:1 137:3,3
**NL**
20:18
**NMS**
133:13,14
nocturnal
15:1 126:14,17
127:12
normal
16:23 17:1,4,23,24
17:25 18:8 20:19,20
21:15
normally
88:7
**Northern**
1:1 6:7 143:1
**Notarial**
144:19
**Notary**
1:12 144:5,22



**notation**
64:23
**notations**
60:17
**note**
18:14 20:13 23:18,20
23:22 24:3,9,13,14
24:17 26:2,5,14
27:7,14 35:20 36:12
37:16 38:1,10 39:2
39:4 40:16,23 44:1
44:9 47:25 48:23
52:19 53:17,25
54:19 62:24 63:4
67:3,5,10 69:16,19
71:7,14 73:10,11,25
74:21 76:1 77:3
83:6 90:11 94:8
98:14 99:10 102:15
102:19 103:4,11,20
104:2 105:19,21
106:1,18 107:4,6
108:10 123:16
132:7 139:19,22
**noted**
14:23 29:5 97:3
**notes**
19:10,11 25:15 31:13
32:13,14,17 41:5,5
42:2,4,9,11 52:16
54:17 65:10 79:10
94:14 95:20 98:20
102:7,11,23,25
103:1 104:7,21
107:1 110:23
111:10,21 117:17
117:22 120:4
123:11 124:8 125:3
125:7 129:20,25
138:1 139:11,23
144:13
**notices**
26:6 28:8
**November**
39:2 43:1 46:10
104:23 105:2,5,20

106:13 107:23
108:8 110:18
**number**
38:23 60:17 84:11
112:3 116:17,18
119:14 121:9
126:22 141:6,6
**numbering**
7:22
**numbers**
7:24 86:15 99:8
**nurse**
94:8

---

**O**

**O**
3:1,1 4:1
**oath**
144:8,8
**object**
124:5 133:23,24
136:9
**objection**
29:12 33:3 43:4 46:5
47:12 48:5 49:24
55:12 59:4,19,22
65:23 70:10,19
77:25 79:18 82:7,15
85:6 90:23 97:24
103:17 104:18
109:9 116:5 120:11
124:20,22 126:18
136:6 139:1 141:16
141:24
**objections**
144:11
**obligation**
78:9
**obligations**
79:11 113:22
**observation**
16:4,5,12
**observed**
15:25 16:1,2
**obstetricians**
52:21

**obviously**
46:24 63:14 119:10
142:2
**OB-GYN**
116:15
**occasion**
93:25
**occasions**
127:3
**occipital**
117:16,18
**occur**
119:14,23 120:21
129:2
**occurred**
20:3 28:24 37:1,4,13
**occurrence**
127:13
**occurring**
40:3 54:23
**October**
14:22 22:10 35:12,23
35:24 36:10,12,17
37:16 42:1 56:8,19
57:23,25 91:20
93:11 96:11 97:20
104:22,25 105:7,13
110:17 129:19
**offer**
93:23
**office**
7:15,16 8:13 9:19
10:6 19:5,15 24:21
27:7 31:22 41:19
61:16 65:2 83:15
91:18 94:5 99:14
106:3 110:10
**officer**
127:5
**officers**
127:8
**offices**
144:5
**oh**
21:3 23:12 42:1,7
44:3 48:3 50:21

53:3,6,6 69:13 76:7
81:24,24 88:22
99:14 105:2,17
106:1,13 107:25,25
108:8,17 111:22
113:8 122:5 133:3
**okay**
5:16 6:2,16,24 7:4,21
8:1,6,10,14,21 9:1,6
9:10,11,21,22 10:9
10:17,19,25 11:23
12:1,2,8,22,25
13:11,19 14:18
15:10,23 16:3,19,22
17:20,24 18:2 19:1
19:11,17 20:1,2,6,9
20:14,20 21:2,20
22:1,5,14,19 24:2
24:20 25:5,8,14,21
26:1,17,24 27:6,6
27:16,24 28:3,10,19
28:23 29:24 30:10
31:4,20 32:2,14,21
33:10,22 34:1,10
35:2,6 36:9,16 37:7
37:10,12,13,16,20
38:1,5,13,24,25
40:8 41:7,16 42:7
42:11,14,16 43:19
44:3,8 45:2,16 46:9
46:19 47:6,7,24
48:12 49:7,20 50:24
51:19,23 52:1 53:6
53:8,16 54:5,8 55:1
55:9,21 56:18 57:15
57:24 58:24 59:12
60:8,9,13,24 61:3
61:12,24,24 62:7,16
62:20 63:23 65:4,20
66:25 67:25 68:9
69:6 70:23 71:16
72:3,21 73:19 74:7
74:24 75:13,17 76:3
76:8 77:1,22 78:20
80:12 82:5,11 83:11
83:22 85:1,25 88:2



88:10,14 90:4,14
91:2 93:9,10 94:1,9
94:14 95:3,7,14
96:9,11 97:4,19
98:3,8 99:4,14,23
100:11,18 101:3
102:13 103:15
104:4,15 105:4,18
106:1,11 107:4,21
108:11,20 109:7,13
110:13,23 111:1,7
111:14,17,25 112:6
112:14 114:2
115:15,22 118:9
119:4 120:3,20
121:25 122:24
123:20,21 126:13
127:1,15 128:24
129:12 130:15
131:5 132:3,6,11,20
133:3,10,16,21
135:4,8,13 136:4
138:6,12 139:7,17
140:6 141:14,21
142:7
**old**
103:11,14 126:4
**old-time**
131:8
**once**
30:22 31:1,10 44:23
51:16 119:14 136:7
**once-a-day**
44:22
**ones**
14:3 15:10 41:2
136:14
**ongoing**
122:23 130:5 135:3
**online**
78:12,14,18,21 80:15
81:15,20 82:1,6,9
82:11,18,22 100:21
101:3,22 102:1
**online/hybrid**
101:19

**onset**
40:2 41:9,13 42:9,12
54:21 71:17 72:4
117:2
**operate**
46:16 102:19,21
**opinion**
38:13 72:15 79:23
133:21
**opportunity**
7:14 9:6 114:8
**opposed**
30:22 73:2 90:6
114:4
**opposing**
112:9
**optic**
38:16
**oral**
1:10 38:5,8 44:12
**order**
19:10 26:13 77:22
137:7
**ordered**
72:20
**original**
130:21
**outlined**
31:13 98:1
**outside**
46:12 55:5 123:25
**OV**
74:3 106:14
**overall**
117:12
**overnight**
106:10,16 107:9
**overseas**
64:5 70:18 127:16,18
**overstimulated**
99:24
**overstimulation**
85:17
**o'clock**
113:20 114:1
**O'Connor**

2:9

___

**P**

___

**P**
2:1,1
**page**
3:2 4:3 9:15 18:11,12
18:18,22,23 19:1,12
19:16,18 23:23 24:4
24:5,9 25:16,18
34:4 35:25 36:11
38:2,21,22,24 41:10
42:15 43:21,22,22
44:8 48:1,12,21
50:6,7 52:16,23
53:24,25 54:1 55:22
60:8,14,16 61:3,12
61:22,23 62:1 64:16
64:16 66:25 67:20
68:1,15 69:3,11,14
71:8 75:18 83:11,11
83:19,20 84:3 85:25
96:1,14 97:9 98:9
98:17 99:12 100:9
101:16 103:6 105:2
105:11,23,25 106:2
106:12,25 107:1
108:22 110:18
111:1,7,10,15 112:2
112:7,9,10 132:3
141:5,8,14
**pages**
10:12 24:11 53:3,16
140:8
**pain**
96:21
**paper**
64:8,12 70:9
**papers**
10:10 45:17,19,24
78:4
**paragraph**
36:13 39:16,18,23
40:22 52:3 54:21
61:13 62:7 71:5,6
95:15 96:17

**paragraphs**
54:10
**part**
34:21 40:7,21,25
45:13,22 53:17
60:16 73:7 87:7
124:14 132:9,11
**partially**
85:10
**participate**
63:1 65:18 66:7 75:4
**participating**
72:21
**participation**
63:12
**particular**
34:24
**particularly**
107:6
**parties**
10:1 89:4 91:12 93:3
143:10,14 144:11
144:17
**Parts**
39:13,14
**party**
54:9
**passing**
11:19
**passion**
134:22
**path**
83:2
**pathway**
73:5
**patience**
31:19
**patient**
7:1 11:14 12:22 13:6
15:5 22:16,23 34:12
34:13 39:18,24
40:15,18 42:24
46:24 47:5 48:12,14
52:3 54:3 55:19
57:6 58:5 59:7
62:25 66:3 68:8



70:4 71:5 74:3,21
75:5 83:6 90:10
111:17 113:22
114:24 120:10
123:9 126:16 129:4
**patients**
11:18 12:13,16 16:10
16:17 17:3,6,10,17
19:7 29:19 30:23
31:25 32:7 44:2
46:13,15,16 52:21
66:2,6,8,15 74:14
77:11 80:20,23
114:18 117:6
119:23 121:3,11,19
126:25 127:8
128:12 130:11
135:10
**patient's**
131:6
**pattern**
95:1
**patterns**
126:23
**peek**
68:25
**pending**
6:6
**people**
31:13 51:12 66:5
73:1 134:19,21
**percent**
16:14 66:16
**Perfect**
115:23 140:6
**perform**
34:13 66:23 77:22
86:4 134:16
**period**
30:6 37:11 40:19
45:12 49:14,16
52:14 56:14 102:14
104:17 122:15
**periods**
76:20 122:15
**peripheral**

11:2,5
**permanent**
76:5 135:6
**perpetuate**
135:3
**person**
27:20 61:6 144:16
**personal**
54:13 113:12
**personally**
41:1 80:25 94:13
95:7
**perspective**
40:20
**peruse**
139:18
**pharmacology**
44:25
**phenobarbital**
131:10
**phenomenology**
126:22
**phone**
55:17 65:16 67:17
87:25 94:22 96:6
**photic**
126:5
**phrase**
12:2,19,20 76:11
**physical**
84:5 92:9 117:19
118:20 129:24
130:5 132:7 138:4
**physician**
55:16
**Ph.D**
74:9 139:15
**pick**
62:18
**place**
32:16 143:9 144:7
**placed**
117:8
**Plaintiff**
1:4 2:2 5:25 143:4
**plan**

33:6 55:25 69:13
71:9,11 72:7 73:10
136:20
**planning**
116:16
**playing**
36:3 37:5 123:1,9,13
123:18
**please**
27:25 33:5 38:21
42:15 84:6 86:7
132:3
**plus**
42:18,24
**PO**
107:25
**point**
19:3 25:23 30:17
34:2,4 37:21 46:1,4
49:11 58:18 62:16
68:21 70:7 75:14
82:3 84:4 95:12
97:22 100:2,4 101:4
103:13 105:6
108:11 132:18
142:7
**pointed**
73:10
**points**
51:5 119:20
**police**
127:5,7,9
**poor**
76:6
**population**
55:19
**portion**
60:21 68:7
**position**
102:21 125:12
**possibility**
128:5
**possible**
62:21 115:17
**possibly**
49:1 95:17 106:9

**post**
35:21 120:21
**posture**
129:1
**post-seizure**
123:9
**potential**
18:3,8 58:4,22 59:1
60:6 118:7
**potentially**
54:19 59:8 131:16
**practice**
12:21 41:25 43:12
55:20 77:10,10
94:21 124:10 132:8
**practitioner**
94:8
**precluded**
136:16
**precursors**
122:25
**predisposed**
58:5
**predisposition**
119:11
**prefer**
32:19 114:19
**preferred**
100:22,24 101:3
**pregnancy**
49:18 51:8,9 52:17
53:4,12 116:16,17
122:5,19 131:22
**pregnant**
30:20 49:1,8,12,17
52:19,20 53:13,14
53:15 56:4 105:6,8
105:10,13,16 108:3
108:6,8,9,17 122:2
122:7,16 131:17
**preparation**
44:22 131:4
**preparations**
31:14,15
**prepare**
8:18 14:20 67:5



71:14 79:17 92:2
**prepared**
42:21 53:23 65:4
67:10 68:7 69:19
71:4 74:1
**preparing**
40:14 64:8
**prescribed**
33:1 34:2 38:3 49:22
49:23
**prescription**
30:12 96:8 130:21
**present**
2:13 14:14 34:7
36:13 39:9,15,24
42:4 52:1 53:22
54:1 64:8 68:6 70:8
71:3 73:25 95:15
96:16 99:11 123:5
140:16 144:12
**presentation**
128:6
**presented**
45:19 144:8
**presenting**
35:20 45:24 64:12
123:8
**pressure**
11:21 15:19 40:17
130:8,9,10
**presumably**
32:2
**pretty**
46:10 114:22 135:22
**preventing**
7:8
**previous**
51:7 92:3
**previously**
15:16 97:3 101:1
116:1 122:24
125:14 127:15
128:18 129:8
130:16 133:16
135:1,4 136:5,24
**pre-populated**

39:11
**primary**
47:4
**printed**
27:19
**printout**
83:7
**prior**
9:3 20:20 43:11
54:10 56:8 80:1
91:22 120:4 133:18
133:25
**probably**
6:17 13:13 26:19
40:7 69:20 70:1
96:6,6 113:9 114:8
139:20
**problem**
59:6 67:25 135:3,5
135:16 140:16
**procedure**
1:16 19:9
**procedures**
17:15
**proceed**
124:21
**proceedings**
5:3 135:19 142:17
144:11
**process**
76:4 113:25
**processing**
79:9
**produced**
1:12 9:19 10:6 31:21
**productive**
134:19,21
**profession**
33:18
**professor**
28:7 33:20,23 56:21
58:10 65:19 77:18
78:7 79:21 117:10
**professors**
78:3 117:11
**profile**

31:16
**program**
132:19
**progress**
132:7 133:13 141:4
**prolonged**
21:10
**promise**
114:13
**prompted**
67:2,10
**pronounce**
87:11
**propensity**
57:10
**protect**
122:14 131:24
**Protecting**
122:9
**protocol**
20:18,19
**provide**
24:21 86:8
**provided**
8:5 83:9,10 96:24
104:2
**provider**
44:1 54:17,18 60:25
83:16
**Public**
1:12 144:5,22
**publication**
45:16
**publications**
78:25 79:13,23
**pull**
86:21 87:3
**pulled**
89:22
**pulling**
86:23
**purposes**
47:9
**pursuant**
1:15
**put**

5:21 17:10,11,13,14
17:15 21:10 46:1,2
51:1 73:16 79:12
80:9 92:14 98:4
114:14,24 136:5
**p.m**
1:15 5:2 142:18

---

**Q**

**QHS**
107:25
**qualified**
76:1
**question**
10:21 30:2,3 34:18
34:22 43:13 66:18
70:14 80:12 81:12
81:24 86:1 89:21
97:6 103:22,23
106:22 113:11
122:3 126:15
133:24,25 134:3,6,8
**questioning**
23:25 135:25
**Questionnaire**
64:17
**questions**
3:3,4,5,6 6:9,19 10:3
10:11 23:3 25:22
29:14 41:17 46:6
50:1 59:24 62:6
70:13,20 85:8 89:6
91:14 93:5 99:9
109:10 112:20,21
114:22 115:21
116:7 120:12 124:7
124:25 136:8,13,16
136:18 137:4,7,18
137:22 138:18,20
139:8 141:18 142:8
**quick**
10:21 87:2 112:24
115:7 136:14
137:18 138:18
**quickly**
130:2



**quit**
109:17
**quotes**
141:20
**quote/unquote**
123:1

---
**R**

**R**
2:1
**radiating**
96:21
**raised**
6:10
**range**
11:1 16:23 17:1
**rate**
11:21
**ratios**
78:5
**reached**
78:13
**read**
55:9,10 71:16 73:12
77:1 90:12 134:8,9
140:24 143:12
**reading**
28:6 37:8,11 62:25
68:10 71:22 72:9
73:14 76:10,14,15
76:18,21 140:7,19
143:13
**reads**
18:23 69:21 71:8
74:21
**ready**
104:8
**real**
112:24
**really**
31:18 34:19,20 39:3
76:11 85:3 87:2
99:8 118:25 123:14
142:12,15
**rear-end**
121:19

**reason**
23:19 29:21 53:11
84:8 92:22 142:6
**reasonable**
127:25 128:1
**reasons**
121:8
**recall**
7:3 18:9 20:6 22:4,14
31:12 33:24 38:20
47:14,14,22 52:18
53:14 57:12 62:11
65:12,16 66:9 67:24
70:22 78:23 80:7
83:5 89:16 90:17,21
93:10 94:14,15 98:7
100:11 101:12
102:6 103:19
109:12
**receive**
138:2
**received**
140:17 141:1
**receiving**
30:13 86:2
**recess**
135:18
**recognize**
39:1 55:2,14 60:10
83:17 132:6
**recollection**
18:1 20:12 29:8
45:18 46:8 47:16,21
50:4 65:17 70:1
77:4 78:15 80:11
89:17 90:25 93:15
93:17 101:14,22
102:24 124:24
125:2
**recommendations**
47:1 51:18 141:9
**recommended**
49:21 50:5 51:5
133:12 141:3
**recommending**
97:2

**reconvene**
113:23 114:19
**record**
5:12,22 6:3,21 19:8
19:24 32:1 83:19
86:15,16 104:6
115:16 124:14,22
129:14 134:1 136:6
136:17 139:14
141:17 144:14
**recording**
17:6 128:5
**records**
4:5 7:16,17,19,21 9:7
9:18 14:5 19:4 55:4
55:14 61:6 90:3
94:1 116:14 130:3
138:3
**recurrent**
45:11 57:7 59:11
74:14 119:14 121:3
121:4
**recurring**
59:2
**redate**
27:20
**redirect**
114:5
**reduce**
57:6,19 59:10 100:4
**reduced**
49:18 100:11 143:10
144:13
**reducing**
51:8 57:19
**reduction**
58:23 59:12,17
**refer**
19:9
**reference**
19:19 21:2,5 25:19
26:6 28:1 34:16
37:17 38:21 76:14
81:22 92:8,9 93:7
105:19 106:8 125:6
140:14

**referenced**
118:21,25 119:19
132:1
**references**
106:9
**referencing**
21:6 24:15 26:19
53:24 65:25 70:2
117:17
**referred**
53:16 74:7 117:19
121:11 124:9
**referring**
31:8 36:5
**refill**
109:4 110:21
**reflexes**
72:18
**refresh**
51:3
**regard**
93:14
**regards**
43:13
**region**
73:9 119:13
**rehab**
92:10 130:6
**rehabilitation**
72:20 73:18 118:22
124:10
**related**
67:18 109:18
**relates**
11:6 50:13
**relating**
5:7 7:16
**Relations**
83:16
**relative**
144:16,17
**relatively**
32:12
**relax**
81:1,3
**relaxing**



125:5
**release**
44:12
**released**
127:18
**releasing**
82:9
**relieved**
63:8
**remained**
102:16 103:7
**remains**
56:3
**remember**
93:22 106:19 107:10
107:12,17 125:9,22
129:17
**remembering**
31:10 117:3
**remote**
125:16
**Remove**
85:16
**repeat**
134:5
**rephrase**
15:14 126:15
**report**
16:20 18:23 19:5
20:10 26:10 95:20
96:23 101:11
110:23 112:6
114:10 124:11,15
134:14 140:12
**reported**
15:8 22:3,12 27:1
28:13,15 30:4,5,8
36:10 71:21 105:7
105:10,12 106:15
107:8,8 144:10
**reporter**
5:2,11,13 6:22 9:17
9:22 22:21 86:17
88:6 115:15,18
134:7,10 144:3,5
**reporting**

16:5,6 96:20 97:22
**reports**
15:24 28:10 50:16
72:13 99:20 111:7
**represent**
5:17 21:23
**representative**
51:14
**represents**
5:19 51:6
**request**
42:17 59:18 60:3,4
**requested**
134:9 143:9
**requesting**
43:8 136:10
**requests**
94:25 95:3
**require**
79:16 102:13
**required**
78:5
**requirements**
78:2,8,21
**requires**
101:1
**requiring**
76:21
**research**
45:14,16 66:12 78:4
78:25 79:13,22
**reserved**
12:16
**Residence**
144:23
**residing**
144:5
**residual**
120:21
**Resources**
83:15
**respect**
94:18
**respective**
143:11
**responded**

73:17
**response**
90:5 94:4 131:12
**responsibilities**
81:14
**rest**
54:5 75:24 90:11
94:12
**restrict**
33:11 46:15 47:5
66:16 81:4
**restricted**
85:21
**restriction**
58:20 81:21 92:13
131:20
**restrictions**
46:1,3 63:11 66:5
67:13 75:21,23
79:12 81:2,6 84:24
128:22
**result**
29:10 67:22 72:13
118:5
**results**
119:1
**retention**
141:3
**return**
13:8,11 42:17 75:13
75:16
**returning**
123:24 124:1,3
**reuptake**
52:22
**reverse**
82:1
**review**
9:6 40:17 61:8 75:23
132:17 141:2
**reviewed**
44:5
**reviewers**
55:5,15,20
**reviewing**
54:9 61:9

**reviews**
141:1,2
**revised**
125:5
**rhythmic**
121:13
**Richard**
1:11 4:6,8 5:4 6:4
88:25 91:8 92:24
143:8,18 144:7
**right**
6:11,14 12:23 15:20
16:24 17:24 19:13
20:4,25 25:3 26:22
28:17 30:10,16 31:3
32:23 35:9,13,15,18
36:21 37:2,5,8,14
38:18 39:5 44:4
46:4 48:4 51:19,23
51:24 53:17 55:2
58:14,16 60:19
61:10 62:14 67:7
68:1,4,13,16 69:12
71:1 72:15 73:14,14
75:21,25 77:13,20
77:24 80:2 81:6,7
81:19 82:21,25
83:14 84:3 86:5
87:8 91:1,23 92:3
93:13,21 94:2,3,20
95:9,12,16,25 96:12
96:21 97:10 98:3,3
98:10 99:12 100:16
102:11,14 103:5,11
105:1,15,15,15
106:1,3,17 107:1,6
107:21 109:1,6,23
110:1,24 111:3,5
112:7 113:14 115:7
119:11 121:10
122:8 125:20
129:24 133:7
136:10 137:24
138:2,9
**right-hand**
7:22



MAGNA
LEGAL SERVICES

**risk**
57:7,18 58:7 59:10
  63:16,21,24 64:2,6
  64:10,14 69:7
  108:13,14,15
  119:15 122:7 126:9
  126:10 129:3,6,7
**risks**
53:12 57:14 60:6
  122:19
**risky**
33:12
**road**
82:25 83:1
**room**
8:8,15 35:19,21
  123:8
**rough**
42:23
**route**
38:8
**routine**
21:13
**routinely**
17:17
**RPR**
1:12 144:22
**rule**
113:15
**rules**
1:15 6:17,18
**running**
17:8
**runs**
57:7

———————————
S
———————————

**S**
2:1 4:1
**safe**
47:8 49:7
**safer**
49:10
**safest**
122:13
**SAITH**

143:15
**save**
87:18
**saw**
6:10 21:17 48:4
  51:23 98:16 105:5
  105:22 107:10,13
  108:21 109:6 110:1
  112:14 129:9
**saying**
15:17 26:25 81:18,23
  82:5
**says**
7:23 20:9 22:7 23:5,8
  25:7,24 26:18,24
  28:4 34:10,12,13
  38:5,8 39:24 41:9
  41:13 42:17 44:11
  48:12,23 50:16 52:4
  53:4 56:2 62:20,24
  65:7,8 68:9,18
  69:16,17 71:12,16
  72:7 73:12 76:9
  80:13,15 81:19
  83:15 84:6,11 90:9
  96:16 97:11 99:14
  100:21 102:17
  106:4 123:5,7,22
  132:11,20 133:12
  141:14 142:1
**scanned**
24:14
**scans**
129:10
**Scatchell**
2:3 3:4,6 5:23,24 9:2
  24:7 25:2,5,18,21
  29:12 33:3 43:4
  46:5 47:12 48:5
  49:24 55:12 59:4,19
  59:22 61:19,24 62:3
  65:23 70:10,19
  77:25 79:18 82:7,15
  85:6 87:2,7,17,21
  87:24 88:14,21
  90:23 97:24 98:24

99:2,4,6 103:17
  104:18 109:9
  112:20,23 113:4,8
  113:18 114:4,15
  115:6,14,17,21
  116:7 120:12 124:7
  133:1,5 134:4,7
  135:13,17,20 136:4
  136:19 137:6
  138:17,20 139:4,8
  140:10,15 141:18
  142:7,12
**Schafer**
1:12 144:4,22
**schedule**
43:8 114:7,13 115:3
**sclerosis**
46:14
**scope**
77:10
**scratched**
65:8
**screen**
9:13,25 18:19 25:10
  88:19 89:3 91:11,15
  93:2
**scribbled**
64:21
**script**
44:15,17,20 110:9
**Seal**
144:19
**second**
7:15 20:21,24 21:9
  26:17 27:4 36:11
  39:23 43:21 50:8
  54:21 86:16 87:3,23
  88:2 97:19 98:11,18
  119:16
**secondarily**
118:2
**secondary**
72:1 123:24
**secondhand**
139:2
**seconds**

137:4
**secrets**
87:23
**section**
34:11 35:1,2 40:22
  42:2,4,5 61:18 62:7
  62:20 68:15 71:6,8
  85:23 86:1,7,11
  92:18 112:11
**sections**
83:8 89:24
**see**
10:22 12:1 15:7,23
  16:3 17:5,8 18:24
  19:18,21 20:7,22
  21:22 22:1,8 23:6,9
  23:13 25:23 26:8,12
  26:14,17 27:25 32:8
  33:4 34:7,14 35:25
  36:3,16 37:17 38:6
  39:9 41:8,11,24
  42:7,18,24 43:2,22
  44:2,3 48:9,15,21
  50:15 52:14 53:6,7
  54:20,21,24 55:1,25
  56:3,5,22 61:1,18
  62:8,22 63:2 64:18
  64:21 65:7,10 68:10
  69:11,16,23 71:9,12
  71:18 72:16 73:23
  74:13,18,19,22
  78:25 81:3,8,21,24
  82:17 83:20 84:3,7
  84:13 86:9,22 87:14
  87:25 89:9,11 91:15
  94:11 95:24 96:5,11
  97:11,14 101:19
  105:10 106:5,11
  107:2,25,25 108:17
  110:3,17 111:3,8,11
  111:13,19,25
  112:12 115:4
  117:17 121:18
  123:22 125:3 127:7
  131:17,21 132:11
  132:20 134:18



135:14
**seeing**
53:5 94:21
**seek**
29:9,21
**seeking**
137:23
**seemingly**
123:23
**seen**
13:14 39:18 52:3
54:3 65:1,2 67:7
68:8 71:5 120:3
**seizure**
11:13,15 12:3,5,6,10
12:11,12,13,15,20
15:4,13,25 16:1,2
19:19 20:3,15,19,20
20:21,24 21:24
22:11,16,23 25:24
26:3 28:2 29:18,19
33:11,14 34:3 35:8
35:12,21 36:4,14,15
39:25 41:3 44:2
47:4,18,20 56:3,7
56:10,19,22 57:1,7
57:11,17,18,20 58:7
58:23,24 59:2,11
63:18,19,21,22,23
63:25 64:3,6,10,14
68:15 69:7,23 70:5
70:6,15 72:12 99:25
106:4 107:5 108:14
110:23 111:10,21
112:11,16 117:6
118:10 119:8,9,15
119:18,18,22 120:2
120:9,15,16,17,20
120:22 121:1,2,7,9
121:10,12,24 122:2
122:7 123:1,11,14
123:16,19 126:3,9
126:12,17,23
127:11,14,21
131:18 134:12
**seizures**

11:11,20 12:17 13:25
14:7,12,15,16,19,21
15:1,7 17:9 23:17
40:2 45:11 46:9
47:7 54:22 58:6
72:5,6 74:14 97:23
99:21 100:1 106:3,9
106:16 111:8,18
112:6 116:11,20
117:7 118:5,6 119:5
119:5,6,11,14 120:5
120:6 126:7,14,19
126:19 127:1 129:4
129:7 131:14
134:13 135:11,12
**self**
16:5
**send**
83:3 88:3 102:10
**sense**
33:16 78:3,6,8
116:23 117:15
**sensitivity**
74:6 85:13
**sensory**
133:6,8
**sent**
24:25 25:1 72:14
83:6 87:8 89:25
90:1,2,14 94:2
97:19 132:8
**sentence**
34:10 69:21 81:18
90:9
**separate**
25:2
**September**
13:1 14:14,21 18:14
23:16 32:22 35:9
36:7,16,23 56:15
58:15 65:21 95:24
107:17,20 119:10
**series**
7:23
**Serious**
60:25

**serotonin-type**
52:22
**sertraline**
52:12 116:15
**service**
8:5 80:2,4
**Services**
1:20 143:19
**set**
13:15 19:20
**seven-hour**
113:16
**severity**
84:7
**shaking**
11:21 118:6
**share**
9:13 18:19 25:10
91:5 92:22
**shared**
7:17
**sharing**
93:6
**she'd**
14:24
**short**
46:10 47:8
**shorthand**
144:10
**short-acting**
31:14 44:14 130:22
**short-term**
54:16 132:12
**shoulder**
41:3
**shoulders**
14:2 20:17 118:5
**show**
27:25 77:11
**showed**
16:22 58:3
**showing**
87:22 88:1
**side**
21:7 31:13,16 128:10
**sign**

62:12
**signature**
50:7,11 60:13 61:5
67:2 83:22 89:13
91:25 143:11,13,16
144:19
**signed**
61:9 143:12
**significant**
45:6 75:15 108:15
119:25
**significantly**
78:18 117:22
**simple**
12:6
**Singh**
74:7,8 118:24 140:17
141:11
**sir**
6:24 19:5 24:10
27:25 29:15 32:25
36:1 39:1 41:10
42:15 51:20 71:1,24
94:1 97:15 100:18
106:11 107:15
**sit**
14:18 47:6 67:24
84:19 91:1 93:20
114:1
**sitting**
8:12 28:6 114:18
**situation**
80:25 85:3 109:15
136:24
**situations**
63:18 66:14 85:16
99:24
**six**
13:13 26:8 28:9
36:23 40:3,6 47:4
54:23 58:25 62:17
92:7 103:10 105:7
105:10,13,13 114:9
**six-month**
28:25 62:19
**skip**



140:21
**skull**
17:15
**slamming**
142:3
**sleep**
28:20 36:20 119:21
119:22,25 120:17
127:1,23,24
**sleeping**
14:25 20:4 26:7
28:18,22 35:9,13,18
37:2 124:1 129:13
129:15
**slightly**
30:19
**sloppy**
135:24
**slowing**
119:12
**slowly**
44:18 131:2
**small**
106:9,16
**smart**
134:20
**somatosensory**
132:23 133:3,6,9
**somebody**
95:3 120:20
**soon**
13:13,16
**sooner**
113:17
**sorry**
15:15,18 21:3 22:21
23:1,11 24:8 46:18
48:6 50:9 52:23
59:21 61:25 62:1
69:3 87:10 96:3
98:21,23 99:8
103:22 104:11
105:3,12 106:25
110:17 122:4,5
124:20
**sort**

8:11 10:18 15:12,19
18:12 19:18 22:2
26:3 29:6 48:23
109:17 121:15
**sound**
46:17
**sounds**
6:17 36:25 115:19
128:7
**space**
125:22 127:7
**spaces**
37:23
**spasm**
118:2
**speak**
137:8
**specialist**
76:6
**specializes**
38:15
**Specialty**
89:8
**specific**
47:22 65:16 78:7
83:6 98:7
**specifically**
47:14,15 124:25
138:21
**speculation**
104:19
**spell**
22:7 26:4 36:17
68:16 69:22 70:3,4
122:14
**spells**
23:5 26:18,25 27:9
72:9 74:15 111:8
127:2
**spend**
6:16
**spent**
40:19
**spinal**
73:8
**spine**

11:5 117:16
**spoke**
80:7 130:23
**spoken**
144:10
**spot**
114:25
**spots**
89:19
**SS**
144:1
**stable**
43:2 45:4 57:5 59:9
**staff**
61:15 83:10
**stamp**
25:7 27:5 36:11
**stamped**
52:16
**stand**
50:21
**standard**
55:20
**stands**
99:15
**start**
9:12 21:25 24:5
44:19 99:11 120:14
126:19 140:21
**started**
42:1 52:12 72:4
82:24 116:19 117:5
120:25 129:19
136:25 140:25
**starting**
107:23 128:11
130:24
**starts**
11:10 19:21
**state**
1:13 6:3 51:15 79:8
85:9 87:23 113:14
122:6 124:22 144:1
144:6
**stated**
135:4 144:14

**statement**
81:10
**states**
1:1 6:6 40:1 68:9
111:17 143:1
**stating**
58:2 82:17
**statistical**
12:20
**statistically**
69:22 120:15
**status**
35:21 123:9
**stay**
34:4 73:1
**staying**
67:14 115:2
**stem**
73:6
**stenographic**
144:13
**stick**
32:15
**stimulation**
126:6
**stimuli**
78:17 125:15 126:2,8
133:6
**stimulus**
125:20 126:1
**stop**
128:21 135:21 136:1
**stopped**
84:22 138:12,14
**stress**
72:9 117:24 118:1
124:2 125:3 134:15
142:5
**stresses**
135:2
**stressful**
99:24
**stressor**
141:21
**stressors**
122:21 127:24 138:7



138:22 139:22
**strike**
14:9 70:12
**strobe**
126:7
**structural**
58:3
**struggles**
102:5
**struggling**
93:17 125:11 134:24
**students**
16:13 125:19,20
**studies**
128:17
**stumble**
14:4
**subject**
11:19
**submit**
83:24
**subpoenaed**
7:16 19:4
**subscribed**
144:19
**substantially**
84:12,20
**substantive**
114:23
**succession**
46:10 47:8
**sudden**
134:22
**sufficiently**
43:2
**suggest**
71:23
**suggested**
69:6 77:6,7 119:1,2
**suggesting**
57:10 62:16
**suggestions**
86:8
**suggests**
26:3
**suing**

7:1
**Suite**
2:5,10
**summaries**
32:13
**summarize**
67:18
**summary**
18:23 19:2,5,16 20:2
23:4,15,21 32:15
**summer**
114:13
**sunglasses**
85:12 125:25
**super**
114:21
**support**
55:6,7
**supportive**
141:10
**sure**
5:23 8:11,16 9:14,20
10:20 11:1 14:8
23:24 24:22 27:18
29:5 35:22 37:22
61:21 71:25 73:15
74:2 76:19 79:15
81:1 86:17 110:8
113:2 123:12
127:22 128:7
135:16,22 140:2
**surface**
17:6,16
**surgery**
17:7
**suspect**
19:8 21:12 67:12
90:5 100:23
**swimming**
37:23
**switch**
44:22
**switched**
131:3,4
**sworn**
1:12 5:1,5

**Sydney**
1:3 2:14 5:25 90:9
115:24 118:14
124:15 129:17
132:14 143:3
**Sydney's**
127:16
**symmetric**
12:13
**symptom**
96:20
**symptoms**
40:1 54:20 117:25
120:21 121:4,21
126:2 130:6,7,10,14
134:24
**syncopal**
11:20 12:12,12 70:2
**syncope**
11:19,25 12:8 15:17
15:18,22 22:7,14
23:17 26:4 28:4
35:15 36:17 37:8
68:12,16 71:21
107:7
**syndromes**
77:14
**system**
11:7 38:15 39:5,12
72:25 133:15
**systems**
11:3
**SZ**
20:18

---

**T**

**T**
3:1 4:1
**tab**
44:12
**tabbed**
32:1
**tabbing**
19:9
**Tabitha**
25:1

**tablet**
38:5
**tablets**
38:8 44:13
**tactile**
133:8
**take**
16:15 17:15 30:22
31:10 40:16 49:7
51:19 52:14 59:2
68:18,20,25 83:1
112:23,25 115:7,11
127:22 139:18
**taken**
1:13 6:12 22:2
135:18 143:8
**talk**
30:10 63:11 70:17
93:23 98:6 118:25
121:25 124:17
130:4
**talked**
8:21 9:2 35:7 39:3
70:3 79:22 98:14
106:17,23 110:20
116:10 117:9
119:17 120:24
122:11 125:22
128:8 129:6 130:15
131:19 140:14
**talking**
31:8 136:24 137:1
**tapped**
135:23
**taught**
101:8
**teach**
16:12 66:12 77:23
78:3,10,12 80:13,15
81:15,16,17,17,19
82:1,5,6,9,11,12,13
82:18,21,22 100:21
101:19,25 102:1
**teaching**
77:20 78:17,21,22
81:13 100:24 128:2



141:4
tease
74:18
techniques
130:11
telephone
8:22 9:2
tell
5:5 10:25 14:18 19:4
23:15 25:11 26:10
32:25,25 34:1 68:7
71:4 76:11 78:20
80:16 84:19 98:5
103:23 104:4,12
113:15 142:3
telling
20:7 102:17
tells
93:12 110:2
template
34:17,19 37:18 40:4
40:5 54:5 55:2
templated
39:22
templates
54:11
temporal
21:4,7 29:7 119:13
temporary
75:20 76:2 102:17
103:5,7,9
Ten
115:17,18
tend
51:12
tends
55:19
tenure
79:4,5,6,17,21 141:1
term
12:16 116:19 118:12
terms
12:6 119:4
Terrific
8:1,6
test

18:8 129:11
testified
6:25 104:15,20 116:1
122:25 124:19
125:10,14 127:20
128:18 129:8
130:16 133:16
137:23 138:11
testifies
5:8
testify
103:14 123:13
129:12
testifying
7:9 127:15
testimony
10:1 32:20 59:20,23
82:8 85:7 89:4
91:12 93:3 134:1
136:15 144:14
testing
118:19,23 141:13
Texas
123:24
text
8:22
texts
19:20
thank
5:9,9 6:24 7:7,14 8:1
8:6,17 9:11 12:1
13:19 42:14 47:24
51:2 55:8,21 66:25
67:20 87:21 100:18
108:20 112:22
115:14 133:5
135:17 137:20
138:2,16 140:3
141:19 142:10,14
theater
85:19
therapeutic
118:14
therapies
118:20 130:13
therapist

132:16 138:3
therapists
138:4
therapist's
139:11
therapy
74:5 117:19,20
118:21 124:9
129:18,24 130:7
132:7,8 137:24
138:13 141:10
thing
25:10 41:8 87:24
97:1 110:20
things
28:21 47:17 51:15
54:20 57:5 63:20
74:17 75:12 81:8
85:21 118:18,19
120:17 126:4
127:21 132:19
133:7 141:9
think
7:5 14:5,22 15:19
18:13 22:4 30:17
31:25 35:7 46:8
47:6 49:16 51:6,7
51:14 52:7 56:17
57:11 58:22,25 62:3
62:4,4 65:15 78:15
80:9 88:7 92:6,6,10
92:11 93:12 98:2
100:9 102:15
104:23 105:23
106:23 107:11
109:4,5 110:2 113:3
113:6 114:6,15
118:24 119:19
129:6 131:18,23,25
133:21,25 134:2,11
134:12 135:25
137:25 140:3 141:4
142:8,9
third
25:23 54:9 133:1,2
third-party

55:1
thought
43:1 62:1
thousands
24:12
three
25:2 31:2 42:8 43:3,7
43:9,14 46:9 47:7
62:18 84:1,1 87:8
102:18 110:14
113:17 114:18
129:21
three-hour
113:12
threshold
47:18,20 57:20 63:18
63:19,22,23 72:12
119:18,19,22 120:2
120:17 126:3
127:22
thumbed
9:8
thumbing
130:2
tie
58:21
time
5:2,10 6:16 7:4 10:1
16:14 19:3 27:22
29:24 30:15,17,19
31:6 32:4,11 33:18
34:4 37:11,21 40:15
40:16,19 45:12 46:2
46:4 47:11 48:15,17
49:14,16 51:5,20
52:15 53:13,14
56:14 57:11,12
58:19 62:16 67:22
68:21 70:7,8,17
76:6,23 78:24 79:10
79:11,12,16,25 82:3
84:23 87:18 89:4
91:12 93:3 94:5
95:2 97:22 100:24
102:14 103:21
104:17 108:12



112:14,20 114:5,7
116:24,24 122:14
122:15 123:15
125:9 132:18
139:20 142:13,16
143:9 144:7
**times**
6:12 17:22 26:8 28:8
31:2 32:6 33:11
38:9 46:13 51:11
52:20 54:14 74:14
74:15 81:10 94:23
120:24 121:16
131:19
**time-release**
45:3
**tired**
128:12
**titrate**
131:10,12
**titrating**
44:16 130:16,19
**today**
5:18 7:9 8:24 9:4,19
33:9 84:19 90:11
136:15
**told**
48:18 65:13 77:8,8
96:7 104:12 139:3
**tongue**
20:16
**tonic**
12:14
**tonic-clonic**
20:9,14 26:20 121:24
123:10
**tonic-clonic-type**
36:4
**tonight**
113:23 115:2
**top**
18:12,23 24:5,8
37:24 52:17 53:4
60:16,21 64:20
99:11 132:21
**total**

36:23
**totally**
92:6 139:2
**track**
79:6
**traditional**
131:8
**trained**
127:9
**training**
127:7
**transcribed**
143:10
**transcript**
107:19 144:7,13,14
**transposed**
99:7
**trauma**
118:7 120:19 121:15
129:5 141:14,19
142:1
**traumatic**
11:3 46:15
**travel**
47:8 63:12 64:2,5
65:9,18 67:19 70:8
127:16,18
**traveling**
46:11 70:18 123:25
**treat**
29:16 33:13,14
118:15 122:17,22
126:16
**treated**
15:11 22:18,24 49:14
118:4,8
**treating**
12:25 29:3 44:6
49:11 52:9 55:16
**treatment**
14:24 19:7 29:10,23
29:24 30:11 31:24
33:8 34:3 45:10
50:3,5 51:16 63:17
72:19 74:10,20 86:2
108:14 116:10,14

124:15 127:4
129:25 130:5
134:13
**treats**
129:23
**trial**
81:2,7 101:6 131:5
**tried**
75:6 104:8
**trip**
47:15
**trouble**
117:3
**true**
10:14 144:14
**truth**
5:6,6,7
**truthfully**
7:9
**truthfulness**
144:8
**try**
32:18 66:6 80:20
81:8 127:23
**trying**
30:19 52:20 53:15
61:21 81:1 82:13
103:12 105:23
134:16
**tumors**
11:5 135:10
**turn**
18:11,17 46:18 50:6
60:8 66:25 67:20
75:17
**turning**
47:24
**twice**
30:23 31:10 44:19,24
68:20 130:24
**twitching**
140:21
**two**
14:11,15,16 23:16
26:19 27:9 28:8,13
29:10 30:5,8 31:2

34:11 35:17 36:16
36:19 38:8,9 43:16
44:13,16 50:17 53:3
53:16 58:21 73:2
74:24,25 84:1 88:12
101:24 102:18
103:10,11,13
106:21 107:8,8,11
107:24 110:7,8,12
116:18 121:9
130:24 131:1,1,1
132:1 136:13,14,18
137:7,18 141:7,12
**type**
34:20 41:21 114:23
123:10
**typed**
39:17 40:7
**types**
85:14
**typewritten**
143:10 144:13,14
**typical**
75:4 95:1 118:9
**typically**
11:23 40:21 126:16

———————
**U**
———————
**unable**
56:21 57:17 58:9,19
71:16
**unaware**
99:20
**unborn**
49:2
**unclear**
103:23 104:11
**uncommon**
127:13 134:18
**unconscious**
28:16,18 30:5
**unconsciousness**
28:20 30:3
**undergoing**
84:23 128:21
**undersigned**



144:4
**understand**
38:9 45:13,22 66:18
71:20 76:11 77:12
77:17,19 78:9 81:6
82:13 103:12
**understanding**
14:13 95:13 103:9
104:2 113:11
122:20
**Understood**
7:7 45:2,6 55:8 81:12
**unilaterally**
60:2
**United**
1:1 6:6 143:1
**units**
17:11
**university**
1:6 5:18,20 6:5 33:20
78:6 83:4,10,14
93:18 102:5 125:1
125:13 143:6
**unnecessary**
110:10
**update**
40:12 111:22
**updated**
100:14,19
**upped**
108:17
**upper**
73:8
**upright**
73:1
**urine**
20:17
**use**
10:17 23:23 31:24
32:12 46:25 47:17
47:17 63:21 66:8
75:8 116:15 119:20
120:18,19 122:10
130:11
**usual**
43:12 77:9 78:3

94:21 141:9
**usually**
12:12,16 16:11 19:9
21:13 26:13 41:14
54:12 61:5 62:18

_____
**V**
_____
**vague**
47:15,21 48:5 65:17
78:15 93:15,17
120:11 124:21
126:18
**variety**
39:7
**various**
118:15 138:22
**version**
18:20,21 24:21 44:15
**versus**
30:21 31:2,10 78:18
78:22 125:16
**vestibular**
14:1 18:2,7 41:4
71:25 72:6,7,19,24
72:25 73:7,7,11,18
92:9,11 116:18
118:22 121:6,18
124:10 126:2,11
128:25 129:2,18
130:5,12
**vestibulo-ocular**
72:18
**video**
8:22 9:3
**videoconference**
9:25 89:3 91:11 93:2
**videoconferencing**
1:13
**view**
10:1 89:4 91:12 93:3
**violent**
118:6
**visit**
13:3,8 18:19 24:3
27:7 32:22 33:2
34:24 35:24 40:10

42:17 43:7,16 48:9
50:13 53:19 54:4
55:23 56:25 68:3,23
74:4 94:9 95:5 98:4
99:10,15 104:22
106:3,14 107:10,12
107:13,17,18
110:11 112:1
123:12 125:9
**visited**
73:22 104:22
**visiting**
95:8
**visits**
19:3 110:13 124:23
**visual**
38:15 72:10 126:2
133:7
**vis-a-vis**
79:13
**Vit**
99:17
**Vitamin**
95:25 96:7 99:18
**vs**
1:5 6:1,5 143:5

_____
**W**
_____
**Wacker**
2:4,10
**wait**
43:21 88:20 107:25
108:3,6
**waiting**
43:14
**waived**
143:11,14,16
**wake**
29:20
**walk**
7:15 19:23 73:3
**walking**
73:2
**wall**
142:4
**want**

5:14,21 27:16 57:13
66:11 73:16 75:8
76:16 82:2 85:21
87:16 88:19 114:3
114:16,24 115:5
123:12 129:5 136:5
136:19,22 137:6
140:11
**wanted**
56:11,19 57:2 65:14
66:11 67:13 74:13
74:17 76:19 90:20
115:25
**wanting**
75:3
**wants**
18:20 49:1 56:2,4
108:25
**warning**
28:5
**wasn't**
49:21 51:4 58:1
65:20 73:15 75:4
92:21 108:8 128:20
**watching**
85:20
**way**
9:16 10:17 21:12
29:16 33:17 77:9
86:14 97:18 118:7
129:23 137:8,10
**ways**
16:3,6 17:12 80:24
**wear**
85:11
**Wednesday**
114:11
**week**
68:10
**weeks**
40:3,6 54:23 105:10
105:14 107:14
114:9
**weight**
40:17
**weird**



114:24
**welcome**
10:9
**went**
21:16 27:19 35:20
  69:5 84:24 107:13
  109:4
**weren't**
97:16 125:8
**Wermuth**
2:8 3:3,5 5:9,16,17
  6:2,9 9:10 10:3 23:1
  23:3 24:8,16,20,25
  25:4,8,14,19,22
  29:14 46:6 50:1
  59:24 61:23,25 62:6
  70:12,13,20 85:8
  86:13 87:5,9,14,20
  87:22 88:1,10,15
  89:6 91:3,14 93:5
  99:1,5,7,9 109:10
  112:19 113:6,14
  114:2,10 115:9
  116:5 120:11 124:5
  124:20 126:18
  132:24 133:3,23
  136:11,22 137:12
  137:20,22 138:15
  139:1,7 140:8
  141:16,24 142:10
  142:15
**West**
2:4
**we'll**
21:3 115:8
**we're**
8:11 9:14 18:11 25:9
  37:16 55:4 61:21
  81:1 97:9 135:22,25
  139:25
**we've**
35:7 63:16 98:14
  105:1 106:23
**Whoops**
87:22
**window**

27:22 29:1 62:19
**witness**
1:12,14 5:1 9:25
  22:25 24:11,18,23
  25:6,13,17 59:21
  87:12 89:3 91:11
  93:2 99:3 112:22
  113:2,10,21 114:7
  115:1,12 134:5
  135:16 136:3
  137:19 140:11
  142:14 143:14,14
  144:14,19
**witnesses**
20:9
**woman**
46:24
**Women**
122:6
**wooziness**
116:23
**woozy**
129:3
**word**
22:22 75:8 140:22
**words**
44:17 64:20 76:19
  117:3 118:1 131:13
  140:22 144:10
**work**
28:7 30:24 46:3
  56:21 57:3,13,17
  58:2,10 59:3,15
  62:17,21 63:8 65:21
  66:4,11,12,20,22
  67:14,15,22 74:22
  75:2,3,6,12,16,20
  76:20 77:10 80:22
  81:4,9 84:24 85:5
  85:10,13,18 92:13
  95:11 96:24 97:12
  114:23 117:10
  124:2,18 125:3,12
  128:21 134:15,15
  134:16,23 138:8,23
**worked**

57:24
**working**
31:7 37:23 50:8
  56:14,16 57:16
  58:15 85:2 90:21
  96:25 109:8,12,24
**workman's**
7:6
**workplace**
86:8 139:6
**works**
45:1 130:19
**workup**
33:7
**work-related**
47:9
**worries**
115:12 137:19
**worse**
72:9 116:22 123:23
  124:2,3
**worth**
137:4
**wouldn't**
81:25 90:1 92:12
  109:22 139:25
**write**
55:18 56:20 63:4
  78:4 80:23 106:2
  108:25 111:11,17
  112:10,11
**writing**
55:6 76:10,17,18,22
  90:7
**written**
44:15 95:15 96:17
  110:7
**wrong**
15:18 33:1 92:17
**wrote**
52:2 63:10 64:25
  103:20
**www.magnals.com**
1:21 143:20

**X**

**X**
3:1,1 4:1,1
**XR**
44:11 45:3 50:16
  56:2 68:24 69:1,3

**Y**

**yeah**
18:22 23:12 25:4,4,6
  29:2 38:1 39:15
  42:23 48:3 55:13
  62:4 73:15 75:3
  77:3 78:11 81:24
  82:1 83:21 87:12,17
  92:20 95:7 97:13
  99:1 100:23 106:25
  107:16 108:10,19
  109:4,24 113:21
  115:12 116:9 129:2
  129:14 131:7 133:6
  135:6 139:25
**year**
101:9 103:10 104:23
  111:4 141:2
**years**
80:21,24 93:16
  102:18,18 103:10
  103:11,14 112:17
  126:25

**Z**

**zero**
66:17
**Zoloft**
52:13 128:9
**Zoom**
1:13 8:11

**0**

**01/10/2019**
99:17
**06/05/2018**
4:6 88:24 92:23

**1**

**1**
1



4:5 9:20,23 39:2
46:10 61:13 86:15
86:20 105:25
**1st**
70:25 104:25
**1,000**
38:10 44:19,24
107:24 108:3
**1:20-cv-7760**
1:5 143:5
**10**
4:5 36:19 112:25
113:4 137:2
**10th**
27:14 28:12 30:7
36:24 98:12,21
106:20
**10-minute**
112:24
**10-7-17**
20:21 36:14
**10/02/2018**
4:8 91:7
**10/11/2017**
39:19
**10:00**
142:18
**11**
36:12 144:23
**115**
3:4
**121**
2:4
**123**
2:10
**137**
3:5
**138**
3:6
**15th**
67:9
**17**
22:10 42:1 68:3
129:19
**18**
22:11 27:9,23 129:20

130:1,3
**18th**
68:12
**1800**
2:10
**19**
27:10,23 104:25
106:10

——————— **2** ———————
**2**
4:6 26:7 42:18,24
61:18 62:7 84:11
86:14,21,25 88:17
88:24 91:20 92:23
93:6 107:25
**2A**
62:7
**2B**
62:8,10 65:8
**2/12/18**
54:3
**2/20/18**
107:5
**2/2019**
28:6
**20**
105:25 119:10 137:4
**20th**
36:7
**20-cv-7760**
6:6
**2016**
141:2
**2017**
13:1 14:14,14,21,22
18:14 23:16 35:9,12
36:7,12,17,17,23
37:16 39:2 43:1
46:10 56:15 57:23
57:25 58:16 107:17
107:20 117:2
119:10 133:19
140:25
**2018**
22:15 26:4,21 27:3,8

28:11 30:6 35:15
36:18,19 43:16
47:25 48:7 51:22,23
53:9,17,25 56:7,10
56:15 57:15,25 59:2
65:22 66:20 67:7,9
67:10 68:3 69:1
70:25 71:21 73:19
73:22 74:25 84:21
91:20 93:11 94:6,9
94:18 97:20 101:8
106:4,7,8,20 107:7
**2019**
27:7,14,16 28:12
30:7 36:19,24 98:9
98:12,16,21,22,25
100:8 101:9 102:10
103:5,16 104:12,22
105:5,9,20 106:19
106:20
**2020**
50:13 105:22 106:24
107:2 108:21 110:1
110:17,18
**2021**
13:4 23:16 24:3,13
24:17 111:23 112:4
112:12
**2022**
1:14 13:9 143:9
144:20
**2023**
144:23
**21**
26:2 105:25 107:2
111:4
**22nd**
95:8
**2300**
2:5
**25th**
144:20
**250-milligram**
38:5
**26**
18:14

——————— **3** ———————
**3**
4:8 27:7 42:18 48:7
62:20 85:25 91:4,7
**3-8/2021**
23:13
**3/20/21**
111:11
**3/4/19**
106:14
**3/5/18**
68:8
**30**
80:21
**32-year-old**
123:7
**38**
96:3

——————— **4** ———————
**4**
77:17 80:14
**4th**
98:22 99:2 106:15
**4/12/18**
22:7 26:16 28:5
**4/20/18**
23:5
**4/2018**
26:18,25
**45**
21:13 113:9
**4552**
31:21
**4558**
18:18
**4559**
19:16
**4565**
18:13,16 19:12 32:20
33:6 34:4
**4575**
36:2 123:4
**4613**
36:11



**4616**
38:2
**4618**
38:24
**4622**
42:15
**4627**
43:22
**4632**
44:8
**4633**
123:20
**4637**
48:2
**4638**
48:21
**4648**
51:20
**4654**
54:2
**4655**
52:17,24 53:3
**4657**
53:6 55:22
**4659**
66:25
**4661**
60:8 61:20
**4662**
61:23
**4663**
64:16
**4680**
67:20 68:1
**4681**
68:15
**4683**
69:4,11
**4689**
70:23
**4692**
71:7,8
**4703**
73:20
**4706**
75:18 85:24

**4708**
83:12 84:3
**4709**
85:25
**4710**
83:20
**4725**
94:7
**4727**
100:17
**4730**
95:6,7
**4737**
96:3
**4738**
96:1
**4742**
96:14
**4745**
97:10
**4747**
140:9
**4748**
140:16 141:14
**4750**
141:5
**4751**
141:8
**4754**
140:10
**4756**
132:3
**4767**
98:17,21,23 99:3
**4768**
99:12 101:16
**4771**
100:15
**4772**
100:18
**4777**
98:9
**4778**
27:5,25 100:9
**4803**
104:25

**4808**
104:23
**4809**
105:3
**4810**
105:11 106:12
**4815**
105:25 106:1,25
107:1,1
**4816**
107:22
**4820**
108:23,24
**4821**
108:24
**4823**
105:23
**4824**
50:6
**4827**
110:2
**4831**
110:18
**4832**
111:1
**4839**
111:7
**4843**
111:15
**4848**
86:18

---
**5**
---
**5**
53:17,25 73:22 79:15
**5th**
50:13 67:7,9
**5/1/18**
74:4
**5/2020**
23:9
**500**
38:10 44:24 50:16
56:2 69:1 100:5,9
100:11 107:23
**500-milligram**

130:22

---
**6**
---
**6**
3:3 69:1 80:2
**6-5-2018**
93:7
**6/5/2018**
89:11
**6:30**
1:15 5:2 113:21
114:23
**60601**
2:5
**60606**
2:11

---
**7**
---
**7**
24:3,16 112:4
**750**
44:11,23 68:24 69:3
132:1

---
**8**
---
**8**
1:14 51:22 143:9
**8:17**
113:5
**80**
126:25
**866)624-6221**
1:20 143:20
**89**
4:6

---
**9**
---
**9th**
98:20
**9-2017**
35:20
**9/20/17**
19:21
**9/2019**
23:8
**90**



16:14
**91**
4:8
**9900**
10:12
**9908**
10:12
**9912**
24:9 112:2
**9913**
112:10
**9916**
24:4,7 25:20 86:19



# EXHIBIT H

# DR. SMITH DEPOSITION

```
       IN THE DISTRICT COURT OF THE UNITED STATES
           FOR THE NORTHERN DISTRICT OF ILLINOIS
                      EASTERN DIVISION

SYDNEY DILLARD,              )
                Plaintiff,)
                             )
           -vs-              )   No.  1:20-cv-7760
                             )
DEPAUL UNIVERSITY,           )
                Defendant.)
```

The deposition of STAN V. SMITH, Ph.D., called by the Defendant for examination, pursuant to notice and pursuant to the Rules of Civil Procedure for the United States District Courts, taken before Marcie A. Haw, CSR and Notary Public in and for the County of Cook and State of Illinois, on August 22, 2023 at 10:00 a.m, 123 North Wacker Drive, Suite 1800, Chicago, Illinois.



Page 2

```
1       There were present at the taking of this
2   deposition the following counsel:
3
4       DISPARTI LAW GROUP, PA, by
        MS. GIANNA SCATCHELL
5       121 West Wacker Drive, Suite 2300
        Chicago, Illinois 60601
6       Phone: (312) 506-5511
        E-mail: gia@dispartilaw.com
7
        Appearing telephonically on
8       behalf of the Plaintiff;
9   COZEN O'CONNOR, by
        MS. ANNA WERMUTH
10      123 North Wacker Drive, Suite 1800
        Chicago, Illinois 60606
11      Phone: (312) 382-3100
        E-mail: awermuth@cozen.com
12
        on behalf of the Defendant;
13
    ALSO PRESENT: Ms. Kathryn Rosenbaum
14          In-house counsel for
            DePaul University.
15
16
17
18
19
20
21
22
23
24
```

Page 3

```
                  I N D E X
WITNESS                    PAGE
Stan V. Smith, Ph.D.
Examination by Ms. Wermuth        5
Examination by Ms. Scatchell    144

              E X H I B I T S
                          PAGE

Deposition Exhibit No. 1      7

Deposition Exhibit No. 2     12

Deposition Exhibit No. 3     14

Deposition Exhibit No. 4     16

Deposition Exhibit No. 5     17

Deposition Exhibit No. 6     24

Deposition Exhibit No. 7     26

Deposition Exhibit No. 8     30

Deposition Exhibit No. 9     32

Deposition Exhibit No. 10    35

Deposition Exhibit No. 11    36

Deposition Exhibit No. 12    38

Deposition Exhibit No. 13    48

Deposition Exhibit No. 14    55

Deposition Exhibit No. 15    55

Deposition Exhibit No. 16    55
```

Page 4

```
          E X H I B I T S
          C O N T I N U E D

                   PAGE
Deposition Exhibit No. 17     55
Deposition Exhibit No. 18     99
Deposition Exhibit No. 19    101
Deposition Exhibit No. 20    103
Deposition Exhibit No. 21    104
Deposition Exhibit No. 22    108
Deposition Exhibit No. 23    115
Deposition Exhibit No. 24    135
Deposition Exhibit No. 25    137
          * * * * *
```

Page 5

```
1       STAN V. SMITH, Ph.D.,
2   called as a witness herein, having been first duly sworn,
3   was examined upon oral interrogatories and testified as
4   follows:
5           EXAMINATION
6   BY MS. WERMUTH:
7       Q.  Dr. Smith, thank you for coming this morning.
8   We're here on the case Dillard versus DePaul University.
9   And that case number is 20 CV 7760, pending in the U.S.
10  District Court for the Northern District of Illinois.
11      Dr. Smith, I know you've had your deposition
12  taken hundreds of times, maybe thousands of times, but
13  let me just give a couple of short instructions here.
14      One is I'm not always super articulate, so if
15  there's a question I pose to you that you don't
16  understand, feel free to let me know that and I will do
17  my best to rephrase it, okay?
18      A.  Perfect.
19      Q.  Also, I sometimes take some time to get through
20  a question.  As you know, the court reporter can only
21  transcribe one person speaking at a time, so do your best
22  to allow me to finish even though I sometimes pause in
23  the middle of my sentences, and I'll do my best to allow
24  you to finish as well.
```



Page 6

1    A.  Certainly.
2    Q.  Sounds good.  All right.
3    MS. SCATCHELL:  Anna, before we start, do you want
4  to say on the record about Dr. Smith's court mandate?
5    MS. WERMUTH:  Yeah, I was just going through some
6  preliminaries, Gia.
7    MS. SCATCHELL:  Oh, okay.
8  BY MS. WERMUTH:
9    Q.  And if you need a break at any time, Dr. Smith,
10  you know you can do that.
11    A.  Thank you.
12    Q.  Terrific.  And before we get started today --
13  and we'll put on the record what Gia just said in a
14  moment -- could you just tell me if there's any
15  medication that you've taken in the last 24 hours that
16  could impact your ability to testify accurately today?
17    A.  No.
18    Q.  Okay.  And any alcohol consumed in the last 24
19  hours?
20    A.  No.
21    Q.  Okay.  Very good.
22    So as Gia Scatchell alluded to, we have been
23  informed this morning that you have been called to
24  testify at trial or court at 2:00 o'clock this afternoon.

Page 7

1  We'll do our best to get you out of here, but we'll see
2  how the day progresses, okay?
3    A.  Thank you.
4    MS. WERMUTH:  Gia, anything else you want to say on
5  that topic?
6    MS. SCATCHELL:  Nope.
7    MS. WERMUTH:  Okay.
8  BY MS. WERMUTH:
9    Q.  I will start, Dr. Smith -- I will do my best to
10  call you Dr. Smith.
11    MS. WERMUTH:  Could we get this marked as Exhibit 1,
12  please?
13    (Document marked as requested.)
14  BY MS. WERMUTH:
15    Q.  Dr. Smith, do you recognize Deposition Exhibit
16  1?
17    A.  It's my resume.
18    Q.  Got it.
19    A.  And also attached is my testimony.
20    Q.  Got it.  So Bates pages 57 through 92
21  contain your C.V. and your list of testimony over the
22  last four years as of May 21st, 2022; is that right?
23    A.  Yes.
24    Q.  Okay.  Now you've presented your report to us

Page 8

1  in this case, disclosed it in September of 2022.
2    Any reason why we got your list of testimony
3  only through May of that year?
4    A.  I provide the list of testimony upon request,
5  and it was requested that day.
6    Q.  On May 31st of 2022?
7    A.  Right.  We print it.  It's current, and it was
8  sent.  I certainly can provide an update upon request.
9    Q.  Okay.  Terrific.  And so just to save some time
10  today, is it your testimony that everything in your C.V.
11  about your educational background, your professional
12  activities, your employment and your publications is true
13  and accurate?
14    A.  Yes.
15    Q.  Okay.  And if I could just ask you to look very
16  briefly at page -- Bates page 58, which is the second
17  page of the exhibit.
18    A.  Yes.
19    Q.  At the bottom of that page, you start listing
20  your publications, which continue through page 62; is
21  that right?
22    A.  Yes.
23    Q.  Okay.  And am I reading this correctly -- when
24  I look at your most recent publications, it looks like

Page 9

1  the last eight years or so you published almost
2  exclusively in the Vegas Legal Magazine?
3    A.  Yes.
4    Q.  Okay.  And that's not a peer-reviewed
5  publication; is that right?
6    A.  No.
7    Q.  Okay.  And then in terms of your testimony in
8  the last four years, as of May 21st, 2022, it looks like
9  you've testified in over 800 matters during that time
10  period, give or take?
11    A.  800 instances -- sometimes a particular case
12  may appear at a deposition once or twice and then a
13  trial.  So it's 800 instances, a few cases have repeat
14  citations.
15    Q.  Okay.  And your list, then, is every time that
16  you've testified, right?
17    A.  Yes.
18    Q.  Okay.  So there are several instances,
19  including like today, for example, right, where you've
20  testified multiple times in a day, correct?
21    A.  Yes.
22    Q.  And some of this testimony listed on pages 69
23  through 92 are depositions and others are trial; is that
24  fair?





Page 10

1    A.  Yes.
2    Q.  Okay.  And on some days you testify as many as
3  three times in a day; is that accurate?
4    A.  That has happened.
5    Q.  Okay.
6    A.  There are times when I take three weeks'
7  vacation, like I just came back from.
8    Q.  Good for you.  Good for you.  Okay.  And then
9  your testimony in these cases is as an economist; is that
10  right?
11    A.  Yes.
12    Q.  So in each one of these matters listed on pages
13  69 through 92 you have been engaged as an expert to
14  provide an economic analysis?
15    A.  Yes.
16    Q.  Can you tell me from this document the
17  percentage or just an average of how many of these
18  matters where you are testifying for the plaintiff?
19    A.  In commercial cases, it's about 50/50.  That's
20  about half of my overall work.  In personal injury or
21  wage claims, let's just say arising for various reasons,
22  including physical injury but not exclusive, wage
23  analysis is about the other half of my work, and that's
24  about three-quarters for plaintiff.

Page 11

1    Q.  Okay.  And have you been engaged in employment
2  cases before then?
3    A.  Often.
4    Q.  Often?  Okay.  And that would include cases
5  where there are claims being made under Title VII of the
6  Civil Rights Act of 1964?
7    A.  Yes.
8    Q.  That would include cases where the plaintiff is
9  alleging disability discrimination under the Americans
10  with Disabilities Act?
11    A.  Yes.
12    Q.  That would also include claims made by a
13  plaintiff under the Equal Pay Act?
14    A.  Yes.
15    Q.  Okay.  And have you ever been involved or
16  engaged by a plaintiff who was a tenured faculty member,
17  other than this case?
18    A.  I believe that's happened, yes.
19    Q.  Do you recall how many times?
20    A.  Maybe not more than a handful who have been
21  tenured, but certainly some instances.
22    Q.  And were those local matters here in the
23  Chicago area?
24    A.  No, they were, I think, probably East or West

Page 12

1  Coast.
2    Q.  Okay.  Have you been engaged by Disparti Law
3  before?
4    A.  I have had occasion --
5    Q.  Do you know how many times?
6    A.  -- and in the past --
7    Q.  Oh, I'm sorry.
8    A.  I think I have about a handful of cases
9  currently open with them, maybe three or four other
10  matters.
11    Q.  Okay.  And over the last four years, do you
12  know how many times you have been engaged by Disparti
13  Law?
14    A.  Well, as I say, we have about three or four
15  other matters that are opened.  I think they have all
16  opened in the last three or four years, probably.
17    Q.  I see.  Okay.  Are those cases personal injury
18  cases or employment cases?
19    A.  I just don't recall at the present.
20    Q.  Fair enough.
21    MS. WERMUTH:  Could you mark this as 2, please?
22      (Document marked as requested.)
23  BY MS. WERMUTH:
24    Q.  Do you recognize Exhibit 2, Dr. Smith?

Page 13

1    A.  Yes.  It's --
2    Q.  And what --
3    A.  -- a request for a retainer, which we usually
4  send out at the start of a case.
5    Q.  Okay.  So were you engaged on or about
6  September 14th of 2022?
7    A.  Yes.
8    Q.  You billed Disparti law for a $2,500
9  engagement; is that right?
10    A.  For a retainer, yes.
11    Q.  I'm sorry.  For the retainer.  Okay.  What have
12  you charged them since the retainer?
13    A.  So shortly after that we completed the report,
14  and we billed $7,000.  I have a copy of that invoice
15  here.
16    Q.  Oh, terrific.  We can get a copy of that, then?
17    A.  Right.
18    Q.  Okay.  So you charged a $2,500 retainer.  And
19  then $7,000 for the report, was that charged against the
20  retainer or on top of the retainer?
21    A.  No, the retainer would be a credit to it.
22    Q.  Okay.  So the total --
23    A.  The report --
24    Q.  I'm sorry.





Page 14

```
 1        A.  -- was finished so quickly that the time we
 2   sent out the report invoice, the retainer had been paid.
 3        Q.  Oh, I see.  Okay.
 4        A.  So there's still -- there's $7,000 as of that
 5   invoice.
 6        Q.  So the total to date is 7,000, not 9,500?
 7        A.  Correct.
 8        Q.  Thank you.  And just as a general proposition,
 9   do you have an understanding of Dr. Dillard's claims in
10   this matter?
11        A.  Only what I see in the record and the
12   complaint, but it's discrimination, I think -- or I'm
13   just going to say this, loosely speaking, that she didn't
14   feel she was being paid equally nor promoted equally, but
15   I'm not going to get into the details beyond that.
16        Q.  Okay.  And the reason you're not going to get
17   into the details beyond that is because you're not giving
18   a liability opinion?
19        A.  Correct.
20        MS. WERMUTH:  Can you mark this as 3?  Thank you.
21            (Document marked as requested.)
22   BY MS. WERMUTH:
23        Q.  Dr. Smith, you have now been handed what's been
24   marked as Deposition Exhibit No. 3.  Do you recognize
```

Page 15

```
 1   that document?
 2        A.  Yes, it's my report.
 3        Q.  Okay.  So it spans pages -- discovery -- it
 4   says Dillard expert discovery, 1 through 42.
 5            Is that what you have, sir?
 6        A.  Yes.
 7        Q.  Okay.  Can I draw your attention quickly to the
 8   second page of your report in the background section?
 9        A.  Yes.
10        Q.  You write in that first sentence that Sidney
11   Dillard was injured on November 13, 2020.  Do you see
12   that?
13        A.  Yes.  I think more artfully I could have put --
14   I use that date as the date of discrimination.
15        Q.  Okay.  And how is it that you came to land on
16   that particular date?
17        A.  The intake form that was provided to me by
18   plaintiff's counsel filled in a few of the blanks, one of
19   them, date of incident is 11-13-2020.  So we use injury
20   in a very generic sense, a career injury.
21        Q.  Okay.  And you said you got that from the
22   intake form?
23        A.  Yes.
24        Q.  Okay.
```

Page 16

```
 1        A.  Here's a copy.
 2        Q.  Yeah, I have one, too.  Just give me a minute
 3   and I will get it marked for you.
 4        A.  I'm just showing you so you can recognize it.
 5        Q.  Thank you.  I'm familiar with that document.
 6        A.  Okay.
 7        Q.  I just need to find it.
 8            (Brief pause.)
 9        THE WITNESS:  Gia, are you able to hear us when I
10   speak low?
11        MS. SCATCHELL:  Yes.
12        THE WITNESS:  Okay.  Great.
13        MS. WERMUTH:  If you could mark this.
14            (Document marked as requested.)
15   BY MS. WERMUTH:
16        Q.  Okay.  Dr. Smith, is Exhibit 4 the case intake
17   form that you were referring to?
18        A.  Yes.
19        Q.  And who filled this out?
20        A.  Plaintiff's counsel returned it to me filled
21   out.
22        Q.  Okay.  So this was not completed by your
23   office?
24        A.  Correct.
```

Page 17

```
 1        Q.  So when it says date of incident or date of
 2   death, 11-13-22, that's what you're using as the date of
 3   injury?
 4        A.  Correct.
 5        Q.  Okay.  And as you sit here right now, do you
 6   know if anything happened on November 13 of 2020?
 7        A.  I didn't memorize the sequence of events.  I
 8   think that's when she left DePaul.
 9        Q.  Okay.
10        A.  She --
11        Q.  Are you aware Dr. Dillard is still currently
12   working at DePaul?
13        A.  Yes.
14        Q.  Okay.  So in this moment, you're not sure what
15   happened on November 13th of 2020?
16        A.  I can look at the notes, but I know the losses
17   were claiming -- I didn't memorize the incidents --
18        Q.  Okay.
19        MS. WERMUTH:  Could you mark this as 5, please?
20            (Document marked as requested.)
21   BY MS. WERMUTH:
22        Q.  Dr. Smith, we have put Exhibit 5 in front of
23   you.  Can you just tell me if that's the notes you just
24   referred to?
```

5  (Pages 14 to 17)





Page 18

1  A. Yes.
2  Q. Okay. You see it sitting right there?
3  A. Yes.
4  Q. Okay. All right. So is there anything in the
5  notes that refreshes your recollection as to what
6  happened on November 13th of 2020?
7  A. Just a lot of notes about her career here.
8  Just give me a moment.
9  Q. Certainly.
10  (Long pause.)
11  A. I can't say for certain that it's a failure to
12  earn what she believes she would have earned, but that's
13  the date of which I show what she is earning, versus what
14  I projected she would have earned.
15  Q. So just so I follow that. November 13, 2020 is
16  the date showing that she earned -- is earning what she
17  should have been earning?
18  A. 2021 is the first year in which we show she's
19  not earning what she should have been earning.
20  Q. But if I look at the tables, Dr. Smith, in your
21  report, which is Exhibit 3, the tables begin on
22  Bates 19, all start from -- show damages starting
23  from 2017. Do you see that?
24  A. Yeah. There are some -- losses of benefits

Page 19

1  part of that time, so from 2017 to 2023 we show loss of
2  retirement benefits.
3  Q. Well, and loss of wages if you look at page 19,
4  right?
5  A. Yes.
6  Q. So Table 1 shows that damages start accruing in
7  2017 on wages, benefits and reduced value of life, right?
8  A. Yes.
9  Q. Okay. So is the injury 2017 or 2020?
10  A. Well, that's what they claim was the date of
11  incident, but we show earnings history -- we show losses
12  beginning for wages in 2017, and for loss of enjoyment of
13  life. Because we take her wage base of 104,000 in 2017,
14  and assume that that would grow, and we also reflected a
15  promotion that we believe would have occurred at that
16  time.
17  Q. Right. Which is why I'm asking about the 2020
18  date, because I don't see anything in your report tied to
19  11-13-2020. I'm just trying to understand that.
20  A. Correct. Well, that's -- you can ask plaintiff
21  counsel why they put that date in.
22  Q. Okay. Okay. So it's not a date that you
23  actually use as a marker for wage loss?
24  A. Correct.

Page 20

1  Q. Okay. So when I look at Exhibit 5, which are
2  your work notes -- and by the way, who prepared those
3  work notes?
4  A. I do.
5  Q. You do?
6  A. Yes.
7  Q. Okay. And did you interview Dr. Dillard?
8  A. She was interviewed by one of my trained staff,
9  economic research analyst by the name of Josh Kvachkoff,
10  K-v-a-c-h-k-o-f-f, at my direction and my request and
11  under my personal supervision. I was not on the line or
12  in the room. There was no need as yet.
13  Q. Okay. So if I look at Exhibit 5, Bates page
14  206, are those the notes of the interview with
15  Dr. Dillard?
16  A. Yes.
17  Q. And what is SRU/JDK? What does that refer to?
18  A. The JDK is for Josh.
19  Q. The person you just identified?
20  A. Yes.
21  Q. And what is SRU?
22  A. His immediate supervisor who played no role in
23  this case, Stephanie Uhl, U-h-l.
24  Q. What does the R stand for, do you know?

Page 21

1  A. I barely remember my middle initial.
2  Q. Okay. Fair enough. Okay. So they interviewed
3  her, provided you with those interview notes, which you
4  then used to work up your analysis, which you do
5  initially in your work notes, and then you prepare the
6  report? Do I have that succession of events right?
7  A. Yes. Except it was Josh, not "they."
8  Q. I'm. Sorry. Josh.
9  A. Again, Stephanie played no role. She's there
10  as backup.
11  Q. Okay. So she was present, but she did not do
12  the interviewing?
13  A. She played zero role. She was nowhere. She is
14  simply listed as his supervisor as a matter of protocol.
15  If I gave him direction and I'm not around to explain a
16  question he may have, she can back me up.
17  Q. Okay. And just so I understand, if we look at
18  page -- the first page of Exhibit 5, I just want to
19  understand some acronyms here. DOI is date of injury?
20  A. Or incident.
21  Q. DOL refers to date of loss?
22  A. Yes.
23  Q. What is DOT?
24  A. Trial.

6 (Pages 18 to 21)



Page 22

1  Q.  I see.  Okay.  And then we have RLE as of DOT.
2  What does that mean?
3  A.  Remaining life expectancy.
4  Q.  Okay.  And what is LE as of DOT?
5  A.  Life expectancy.
6  Q.  What is HLE?
7  A.  Healthy life expectancy.
8  Q.  Okay.  What does that mean, healthy life
9  expectancy?
10  A.  It's a government table that shows how long
11  people may have the intellectual -- well, let me rephrase
12  it.
13      How long people may be free from intellectual,
14  emotional or physical impairments that may preclude them
15  from holding a full-time job.
16  Q.  And what is the government table called?
17  A.  Healthy life expectancy.
18  Q.  Okay.  And who produces that?
19  A.  Health and Human Services.  It's part of the
20  life expectancy series.
21  Q.  Okay.  Thank you.  Are you familiar with the
22  damages that are available under Title VII of the Civil
23  Rights Act?
24  A.  I'm not going to claim that I am.  I have been

Page 23

1  given assignments to compute losses.  I work under so
2  many different types of claims that I can't pretend to
3  memorize them all.
4  Q.  Okay.
5  A.  All I know is I have been asked to assess the
6  difference in the wages that she believes she may have
7  earned versus what she has earned.
8  Q.  So just so I'm clear, your analysis is not tied
9  to any particular statutory cause of action?
10  A.  Correct.
11  Q.  Okay.  So if any one of those statutory causes
12  of action goes away -- like if the Americans with
13  Disabilities Act claim goes away or the Title VII Act
14  claim goes away -- what's your position on the utility of
15  your analysis?
16  A.  Well, this is what I --
17  MS. SCATCHELL:  Objection; calls for a legal
18  conclusion.  You can answer.
19  BY THE WITNESS:
20  A.  This is what I believe is her actual loss,
21  irrespective of her legal ability to claim.
22  BY MS. WERMUTH:
23  Q.  Okay.  So you're not familiar with any caps on
24  damages under the ADA or Title VII?

Page 24

1  A.  I just don't recall.
2  MS. SCATCHELL:  Objection; calls for a legal
3  conclusion.  You can answer.
4  BY THE WITNESS:
5  A.  I don't recall.
6  BY MS. WERMUTH:
7  Q.  And are you familiar with whether
8  compensatory-type damages are available at all under the
9  Equal Pay Act?
10  A.  I'm not labeling --
11  MS. SCATCHELL:  Objection; calls for a legal
12  conclusion.  He can answer.
13  BY THE WITNESS:
14  A.  Yeah.  I'm not labeling these as compensatory.
15  They're simply wage losses that I've computed,
16  irrespective of how they are presented.
17  BY MS. WERMUTH:
18  Q.  Okay.
19  MS. WERMUTH:  Can I please have this marked as 6?
20      (Document marked as requested.)
21  BY MS. WERMUTH:
22  Q.  Dr. Smith, I had the court reporter hand you
23  what's been now marked as Exhibit 6.
24      Are you familiar with that document?

Page 25

1  A.  Yes.  I'm familiar with the type of document,
2  yes.
3  Q.  Have you seen this particular document before?
4  A.  No.
5  Q.  Okay.
6  MS. WERMUTH:  And, Gia, just so you know, I realize
7  all of a sudden you're on the phone.  So just you know,
8  Exhibit 1 is a C.V., Exhibit 2 is the retainer request,
9  Exhibit 3 is his report, Exhibit 4 is the intake form,
10  Exhibit 5 are the notes, work notes.  And Exhibit 6 is
11  the expert disclosure that you served on us, Gia.  Okay?
12  MS. SCATCHELL:  Okay.  I'm following along.  I have
13  the report in front of me, but thank you.  That's
14  helpful.
15  MS. WERMUTH:  Okay.  Good.
16  BY MS. WERMUTH:
17  Q.  Okay.  So you haven't seen this particular
18  document, but you're familiar with these types of
19  documents?
20  A.  Yes.  The Rule 26, paren "a", close paren,
21  paren "2" open paren "b", close paren, or what I often
22  call Rule 26(a)(2)(b).
23  Q.  Got it.  So let's do this instead.  Why don't
24  we put that aside, and let's take a look at page 2 of





Page 26

1   your report, which is Exhibit 3.
2       The reason I put Exhibit 6 in front of you is I
3   want to talk to you about some of the documents you
4   relied upon, but you also put them in your report.  So I
5   want to just walk through some of those --
6       A.  Yes, at the bottom.
7       Q.  Yeah.
8       A.  -- of page 2 --
9       Q.  Yep.
10      A.  -- is a listing.
11      Q.  Correct.  Okay.  So one item listed there is
12  Dr. Dillard -- so this is Item 2.  Her pay stubs from
13  July 1, '22 through September 23, '22.  Do you see that?
14      A.  Yes.
15      Q.  Okay.
16      MS. WERMUTH:  And I'm going to mark those stubs.
17      MS. SCATCHELL:  Can I get a Bates stamp for those?
18      MS. WERMUTH:  Yeah.  Let's get back on the record
19  and I'll do that.
20      (Document marked as requested.)
21  BY MS. WERMUTH:
22      Q.  Dr. Smith, you have been handed Deposition
23  Exhibit 7, which is Bates labeled Dillard Expert
24  Discovery 831 through 846.  Do you see that?

Page 27

1       A.  Yes.
2       Q.  Okay.  These were the pay stubs you listed on
3   page 2 of your report.  Do I have that correct?
4       A.  Yes.
5       Q.  Is there any reason why you looked only at a
6   portion of her pay in the year 2022?
7       A.  That's all I was provided, because imagine --
8   if my report is dated 2022, as of that time, we would not
9   have the complete pay scale for the year.
10      Q.  Okay.
11      A.  And I'll just say, undoubtedly, there is more
12  records that I haven't seen.  This report is as of then.
13  I may be asked to update it.  I have not been asked to
14  update it, so we can speak as of the information I had as
15  of the time I did the report.
16      Q.  Okay.  Any reason why you don't have any pay
17  stubs before July 1 of '22?
18      A.  I just have what I've been provided.
19      Q.  Okay.  So let's look at page 831, that first
20  page of Exhibit 7.
21      A.  Yes.
22      Q.  So this is a pay stub for a payroll period
23  beginning September 5th of 2022, and ending September
24  18th of 2022.  Do you see that?

Page 28

1       A.  Yes.  It's a two-week payroll period.  Fairly
2   typical.
3       Q.  Yep.  And under hours and earnings, do you see
4   that box?
5       A.  Yes.
6       Q.  I see items listed here as regular salary.  Do
7   you see that?
8       A.  Yes.
9       Q.  Okay.  So that would be -- your understanding
10  is that would be her base salary rate or her base salary?
11      A.  Base pay, yes.
12      Q.  Okay.  And then there's something listed as
13  Faculty Admin Stipend.  Do you see that?
14      A.  Yes.
15      Q.  Do you know what that is?
16      A.  I can't say for certain.
17      Q.  Okay.  It looks like as of September 23rd, when
18  she was paid, her earnings to date in that category were
19  $14,719.29.  Do you see that?
20      A.  Yes.
21      Q.  Okay.  And then under Faculty Admin Stipend,
22  there is something called Faculty Admin Service.  Do you
23  see that?
24      A.  Yes.

Page 29

1       Q.  Do you know what that is?
2       A.  Same answer.  It's different names for
3   different things.  And I'm not sure what they all are,
4   but what I need to know is what she earned and not the
5   different pigeonholes in which they categorize it.
6       Q.  Okay.  And then that amount year-to-date was
7   $105.  Do you see that?
8       A.  A whopping amount, yes.
9       Q.  Okay.  And then there's something called
10  one-time payment.  Do you see that?
11      A.  Yes.
12      Q.  And year-to-date -- I'm sorry.  Do you know
13  what one-time payment is?
14      A.  No.
15      Q.  By its description, does that suggest to you
16  that that's -- was paid out on a single occasion?
17      A.  As of that date, yes.
18      Q.  Okay.
19      A.  But there may be -- may have been more one-time
20  payments later in the year; can't tell.
21      Q.  Right.  In part you can't tell because you
22  don't have all the pay stubs, right?
23      A.  Yes.
24      Q.  Okay.  And that one-time payment was $1,500.



Page 30

1  Do you see that?
2      A.  Yes.
3      Q.  Okay.
4      A.  But, again, there may be multiple one-time
5  payments.  It's just a term --
6      Q.  Right.
7      A.  -- used.
8      Q.  It's a term, but you don't know what that term
9  means; is that right?
10     A.  It wouldn't matter.  That's true.
11     Q.  Okay.  And then you looked at her -- you also
12  looked at her W2 forms from 2017 through 2020; is that
13  right?
14     A.  Yes.
15     Q.  Okay.
16     MS. WERMUTH:  Can you mark this as 8, please?
17         (Document marked as requested.)
18  BY MS. WERMUTH:
19     Q.  So this Exhibit 8, Dr. Smith, are Dr. Dillard's
20  W2 statements from DePaul, from the years 2017 through
21  2020; is that right?
22     A.  Yes.
23     Q.  Okay.  And any reason why you didn't ask also
24  for the 2021 W2?

Page 31

1      A.  I do ask for financial information.  This is
2  what I was provided.
3      Q.  Okay.  If you look at -- I'm assuming the
4  relevant box is Box 3; is that right?
5      A.  Yes, that's the total earnings.
6      Q.  Okay.  So on these W2 statements, you see total
7  earnings.  You don't see them broken down by the
8  categories we just talked about in Exhibit 7; is that
9  right?
10     A.  I don't need that, and you do not see that on
11  the W2, correct.
12     Q.  Okay.  So based on this information, her wages
13  increased from '17 to '18, correct?
14     A.  Yes.
15     Q.  And then decreased from 2018 to 2019?  Do you
16  see that?
17     A.  Yes.
18     Q.  And then increased again from 2019 to 2020.  Do
19  you see that?
20     A.  Yes.
21     Q.  Okay.  And do you have any explanation for the
22  decrease from 2018 to 2019?
23     A.  No.
24     Q.  Is it possible that the decrease was related

Page 32

1  in any way to faculty administrative stipends, faculty
2  administrative service payments or one-time payments?
3      A.  I'm sure it was related to something with a
4  name in front of it.
5      Q.  But you don't know what it was related to?
6      A.  No.
7      Q.  Okay.
8      MS. WERMUTH:  Could we mark this as 9, please -- oh,
9  I'm sorry.  I didn't get those Bates numbers to you.
10     Expert Dillard Discovery 188 through 191, Gia.
11     MS. SCATCHELL:  Okay.  Thank you.
12     MS. WERMUTH:  Exhibit 9, please.
13         (Document marked as requested.)
14  BY MS. WERMUTH:
15     Q.  Dr. Smith, I have handed you -- or the court
16  reporter has handed you what's been marked as Deposition
17  Exhibit 9, which is Bates labeled Dillard Expert
18  Discovery 719 through 720.
19     And this is also listed on page 3 of your
20  report as Dillard's 2021 pay and benefit statement and
21  summary.  Do you see that?
22     A.  Very good.
23     Q.  Okay.  So this is another document you relied
24  on; is that right?

Page 33

1      A.  Yes.
2      Q.  Okay.  So instead of a W2 for 2021, you
3  received this information about her compensation in 2021;
4  is that right?
5      Q.  Okay.  And on page 720, Bates page 720, I see a
6  variety of what looked like links to the left, and one of
7  those links says base pay.
8      Do you see that in the upper left?
9      A.  Do you want to show me?
10     Q.  Upper left, right there (indicating) it
11  says base --
12     A.  Oh, I see.
13     Q.  -- pay.
14     A.  Yes.
15     Q.  Yeah.  So you didn't get copies of what all of
16  those links would take to you, I'm assuming?
17     A.  I just got this page.
18     Q.  Got it.  And I see base pay is listed at the
19  bottom of this document as 86,584.17.  Do you see that?
20     A.  Yes.
21     Q.  Okay.  And then there's this category, three
22  lines above it, that says non-base pay.  Do you see that?
23     A.  Yes.



Page 34

1    Q.  And do you know what categories of pay are
2 included in non-base pay?
3    A.  No.
4    Q.  Okay.  And that amount for non-base pay
5 $15,623.18.  Do you see that?
6    A.  Yes.  I included both of those as part of her
7 actual earnings history.
8    Q.  Got it.  Okay.  But you don't know if non-base
9 pay, how that changes from year to year?
10   A.  Correct.
11   Q.  Okay.  So you don't know if --
12   A.  Employers have millions of ways of categorizing
13 all the different pieces of a paycheck.  Every employer
14 has a different term for a different pigeonhole.  Names
15 of the pigeonholes aren't as relevant to me as what is
16 the total bottom line.
17   Q.  And I know that your report was provided to us
18 in 2022, but we could, at this point in time, being that
19 we're well into 2023, we could update with 2022 actual
20 information, right?
21   A.  Certainly.
22   Q.  Okay.  You also identified in your report some
23 1099 payments from other sources other than DePaul.
24   MS. WERMUTH:  Can you please mark this as 10?

Page 35

1           (Document marked as requested.)
2    MS. WERMUTH:  So, Gia, I've marked Exhibit 10 as
3 Dillard Expert Discovery 717 through 718.
4    MS. SCATCHELL:  Okay.  Thank you.
5    MS. WERMUTH:  Yep.
6 BY MS. WERMUTH:
7    Q.  So it looks like Dr. Dillard received $1,500
8 from Purdue University in 2019.  Do you see that on page
9 717?
10   A.  Yes.
11   Q.  And then it looks like in 2018 she received
12 1,642.20 from the Cook County Clerk in Chicago.  Do you
13 see that?
14   A.  Yes.
15   Q.  Okay.  Did either one of these payments figure
16 into your damages calculation?
17   A.  No.
18   Q.  Okay.  So you don't know what those payments
19 were for?
20   A.  Well, they were unrelated to DePaul.
21   Q.  Okay.
22   A.  But I don't know what they were related to.
23   Q.  Okay.
24   MS. WERMUTH:  Can you mark this as 11, please?

Page 36

1           (Document marked as requested.)
2 BY MS. WERMUTH:
3    Q.  Dr. Smith, this is another --
4    MS. WERMUTH:  Gia, we marked as Exhibit 11, Dillard
5 Expert Discovery 778 through 779.
6    MS. SCATCHELL:  Thank you.
7    MS. WERMUTH:  You bet.
8 BY MS. WERMUTH:
9    Q.  Can you identify this document, Dr. Smith?  I'm
10 sorry.  Do you recognize this document?
11   A.  Yes.
12   Q.  What do you recognize it to be?
13   A.  Ameritrade.
14   THE WITNESS:  A-m-e-r-i-t-r-a-d-e.
15 BY MS. WERMUTH:
16   Q.  Okay.
17   A.  Trade form -- Ameritrade trade form with some
18 information about her account.
19   Q.  Okay.  Do you see in the upper -- it's a little
20 obscured by the confidential stamp, but do you see in the
21 upper right, it says page 1 of 6?
22   A.  Yes.
23   Q.  And then if you go to the next page, in the
24 upper right, it says page 3 of 6.  Do you see that?

Page 37

1    A.  Yes.
2    Q.  Did you receive pages 2, 4, 5 and 6 of 6?
3    A.  No.
4    Q.  Okay.  And do you know why you were provided
5 with only the two pages?
6    A.  I don't know why I was provided with either of
7 the two pages because they weren't relevant.
8    Q.  You didn't use this exhibit at all?
9    A.  Correct.
10   Q.  Okay.  Can you turn to page 4 of your expert
11 report, which is marked as Exhibit 3?
12   A.  Yes.
13   Q.  And this is in a section with the header, it
14 says:  One, loss of wages and employee benefits, annual
15 employment.
16   A.  Yes.
17   Q.  So at the top of page 4, which is Bates labeled
18 4, also, it says:  Mrs. Dillard reports DePaul constantly
19 and excessively scheduled reviews that prevented her from
20 pursuing early tenure.
21       Do you see that?
22   A.  I wrote it.
23   Q.  You wrote it?  Okay.  And then -- based on
24 information she provided you?



Page 38

1      A.  Yes, statements from the interview.
2      Q.  Got it.  Okay.  And she said her colleagues
3  were able to obtain early tenure.
4          Did she tell you how many colleagues obtained
5  tenure on an early schedule?
6      A.  She did not provide additional detail.
7      Q.  Okay.  And it says she's -- you go on to write:
8  She states -- she planned on being tenured and promoted
9  by 2017.
10         Do you see that?
11     A.  Yes.
12     Q.  Now, do you have -- well, you were provided
13  with information about the tenure process at DePaul; is
14  that right?
15     A.  Some, yes.
16     Q.  Okay.
17     MS. WERMUTH:  Would you mark this as 12, please?
18         (Document marked as requested.)
19  BY MS. WERMUTH:
20     Q.  So you have been handed what's been marked as
21  Exhibit 12, Dr. Smith.
22     MS. WERMUTH:  Gia, it's Bates labeled Dillard Expert
23  Discovery 725 through 752.
24  BY MS. WERMUTH:

Page 39

1      Q.  Do you see that, Dr. Smith?
2      A.  Yes.
3      Q.  So you were provided with information from the
4  faculty handbook about the promotion and tenure process
5  at DePaul; is that right?
6      A.  It's Chapter 3, yes.
7      Q.  Okay.  And do you know what year this handbook
8  was published?
9      A.  I don't have the face sheet, so no.
10     Q.  Okay.  And do you understand that tenure at
11  DePaul, like the application process and review process,
12  takes pretty much a year?  Are you familiar with that?
13     A.  I haven't memorized the timetable, but let's
14  say that's true.
15     Q.  Okay.  Well, if you look at page -- Dillard
16  Expert 751 -- which is the second to the last page of
17  Exhibit 12 -- you'll see there is a schedule for
18  promotion and tenure?
19     A.  Yes.
20     Q.  And it looks, based on that schedule, like the
21  process starts around April 1st of each year; is that
22  right?
23     A.  Yes.
24     Q.  And concludes around June 15th of each year --

Page 40

1  of the following year?
2      A.  Yes.
3      Q.  Okay.  And so when you write in your report
4  that she planned on being tenured and promoted by 2017,
5  does that mean applying by April or some time in 2017
6  with the decision being made in 2018?  Or do you mean
7  applying in 2016 with a decision being made in 2017?
8      A.  I take her to mean that if she would have
9  achieved success, it would have been reflected in her
10  2017 earnings.
11     Q.  Okay.  And if you look at the very last page of
12  Exhibit 12, you see that the decision on tenure by the
13  university provost is made on or about June 19 of the
14  year.  Do you see that?
15     A.  Yes.
16     Q.  And so if someone is promoted on June 15th of
17  the year, then presumably, their promotional increase
18  would follow that date?
19     A.  Yes.
20     Q.  Okay.  And when you were doing your
21  calculations, you had her damages beginning to accrue as
22  of January 1st of 2017; is that right?
23     A.  Yes.
24     Q.  So you had six months of a promotional increase

Page 41

1  in there that may not have been available to her under
2  this schedule?
3      A.  I don't understand the question.
4      Q.  Okay.  So if she were not -- if she were
5  promoted in 2017, as she contends she would have been,
6  then that promotion would have happened in the middle of
7  '17, right?
8      A.  No.  It's my understanding the 2017 would have
9  reflected her promotion, not the second half.  But she
10  would have been promoted so that she would have been a
11  tenured associate professor during all of 2017.  If
12  that's a misunderstanding, that's a modest change in the
13  analysis; but without quibbling as to whether my
14  interpretation is correct or not, I assumed a promotion
15  would have been reflected at the beginning of 2017 in her
16  pay.
17     Q.  Okay.
18     A.  And I appreciate what you're saying that her
19  statement is perhaps indeterminate.  I took it to mean
20  fully reflected in 2017.
21     Q.  Okay.  So if the increase would not have gone
22  into effect until middle of 2017, would you agree that
23  your calculation for 2017 is inflated?
24     A.  It would have a very small -- we would just



Page 42

1    take half of 2017's loss.
2        Q.  Okay.
3        A.  Which is -- give that sense to you for one
4    moment.  So Table 14, we show the 2017 offset is 86,000
5    on --
6        Q.  What table are you looking at, sir?
7        A.  14.
8        Q.  Table 14.
9        A.  In Table 7, we show that we believed she would
10   have earned 114,000.  The difference is roughly 28,000.
11   And if overall it should only be half of that year, not
12   the full year, as we imagined, then the losses summarized
13   on page 20 of my report, amounting to approximately
14   3.2 million, would be reduced by a little less than one
15   half of one percent, about 14,000.
16       Q.  Now -- so your calculations are potentially,
17   then, inflated by at least that number; is that right?
18       A.  By a little less than one half of one percent,
19   yes.
20       Q.  Okay.  Now, do you know when Dr. Dillard
21   started in a tenure-track role at DePaul University?
22       A.  She began working as an assistant professor in
23   the fall of 2012.  I don't know if that was -- if that
24   qualified her to start the tenure-track at that time or

Page 43

1    not.
2        Q.  So she started working in the fall of 2012 at
3    DePaul University --
4        A.  Yes.
5        Q.  -- that's your understanding?
6        A.  That she was promoted from assistant to
7    associate in July of 2019.
8        Q.  Right.  Okay.  But her statements to your staff
9    was that she believed she should have been promoted two
10   years prior to that?
11       A.  Correct.
12       Q.  Okay.
13       A.  So she achieved that promotion July of 2019,
14   two years longer, she said, than planned.  So let's, I
15   think, both understand that the promotion she refers to
16   may have been achieved in the middle of 2017, as you
17   suggested, as opposed to the start of 2017, as I had
18   imagined it.  So there may be that $14,000 that we would
19   discount.
20       Q.  Understood.  Now, if she were to achieve tenure
21   in 2017, according to the handbook that we looked at,
22   Exhibit 12, she would have had to apply in 2016, right?
23       A.  Apparently.
24       Q.  All right.  And so that is about four years

Page 44

1    after she started, right?
2        A.  Yes.
3        Q.  Okay.  And do you know the frequency with which
4    assistant professors at DePaul apply for tenure on a
5    four-year schedule?
6        A.  No.
7        Q.  And so I assume, then, you also don't know the
8    success rate of anyone applying on a four-year schedule?
9        A.  Correct.  And as you know, I'm not here on
10   liability.  So I'm not here to say she should have been
11   successful, would have been successful.  I'm just saying,
12   assuming a promotion, at least in this report, by the
13   start of 2017 -- understanding it may have been by the
14   start of the second half of 2017 -- assuming that,
15   without regard to what happens with other professors at
16   DePaul and whatever schedules they are successful.
17       Q.  Okay.  Are you aware that Dr. Dillard requested
18   that her tenure clock be stopped because of some leaves
19   of absence?
20       A.  That may be in the note, but I can't say for
21   certain.
22       Q.  Do you know what that means to stop one's
23   tenure clock?
24       A.  Not beyond the obvious words, no.

Page 45

1        Q.  If it meant that --
2        A.  Is that different from the pitcher's clock at
3    Cubs stadium?
4        Q.  Don't ask me to opine on that, Dr. Smith.
5            (Laughter.)
6        Q.  If stopping your tenure clock means that you
7    get additional time to go up for tenure, and that she
8    requested that additional time, does that change your
9    analysis in any way?
10       A.  No.  Again, I'm not here to opine on the
11   timing.  I'm just telling you what I assumed.  If I'm
12   given the assignment to assume a different timing, I can
13   certainly do it.  I am not undertaking the analysis of
14   the overall tenure process and the timetable upon which
15   it should have been achieved.
16       Q.  Okay.  All right.  Going back to Exhibit 3,
17   which is your report, page 4 -- well, strike that.
18           Let me ask this question:  Are you aware of
19   anyone -- what the success rates for tenure are for an
20   assistant professor who goes up three years after being
21   appointed as assistant?
22       A.  No.  I don't --
23       MS. SCATCHELL:  Objection; foundation.  You can
24   answer.

12  (Pages 42 to 45)



Page 46

```
1    BY THE WITNESS:
2        A.  No, I don't.  I just know that she sought to
3    pursue early tenure that others had, and that's really
4    all I know.
5    BY MS. WERMUTH:
6        Q.  Okay.  Now, she -- in this same paragraph on
7    page 4 of your report, you say:  Mrs. Dillard knows that
8    she was also earned less than lesser-qualified assistant
9    professors.  Do you see that?
10           Page 4 of your report, Exhibit 3, the first
11   full paragraph, second to the last sentence:
12   Mrs. Dillard notes she was also earned less than
13   lesser-qualified assistant professors.  Do you see that?
14       A.  Page 4?
15       Q.  Yes, sir.
16       A.  I see the word.
17       Q.  Right here. (Indicating.)
18       A.  Oh, the second to the last sentence.
19       Q.  Yeah.
20       A.  Yes.
21       Q.  Did you --
22       A.  I suppose we should take out the word "was".
23       Q.  Yeah, there's a small typo.
24       A.  So that my English teacher won't be upset.
```

Page 47

```
1        Q.  Got it.  So did you obtain from either
2    Dr. Dillard, or her counsel, any information about these
3    lesser-qualified assistant professors?
4        A.  I didn't pursue that investigation.  There was
5    no need.  It wasn't my assignment.
6        Q.  Okay.
7        A.  It's the statement she made.  That's all.
8        Q.  So you were not assigned to do an analysis of
9    her Equal Pay Act claim, then?
10       A.  Correct.
11       Q.  Okay.  Now, further down that page, the second
12   to the last paragraph that begins with Mrs. Dillard's
13   2017 through 2020 DePaul W2s.  Do you see that?
14       A.  Yes.
15       Q.  Okay.  You write that -- you write her earnings
16   for each year, 2017 through 2020.  And then for 2018, you
17   note that her increase -- you write after -- I'm sorry.
18   Very bad question.  Let me strike it and start over.
19          For each year, you identify her income, her
20   total income, for the year; is that correct, sir?
21       A.  Yes.
22       Q.  Okay.  And you write $91,435 in 2018.  And then
23   after that, you have a parenthetical that says:  After
24   her earnings were increased due to her complaint.
```

Page 48

```
1           Do you see that?
2        A.  Yes.
3        Q.  Okay.  So if we look at her 2017 to her 2018
4    compensation, that's about a little over 16 percent
5    increase; is that right?
6        A.  Yes.
7        Q.  Okay.  You attribute that entire increase to
8    her quote, unquote, "complaint."  Do you see that?
9        A.  She does.
10       Q.  She does.  And you adopt that in your report?
11       A.  I don't adopt.  I simply repeat what she
12   stated.
13       Q.  Okay.  Do you know what complaint she's
14   referring to?
15       A.  No.
16       Q.  No?
17       MS. WERMUTH:  Could you mark this as 13, please?
18           (Document marked as requested.)
19   BY MS. WERMUTH:
20       Q.  Okay.  Dr. Smith, I'm showing you what's been
21   marked as Deposition Exhibit 13.
22       MS. WERMUTH:  Gia, this is Dillard Discovery -- so
23   not expert discovery --
24       MS. SCATCHELL:  Okay.
```

Page 49

```
1        MS. WERMUTH:  Dillard Discovery 450.
2    BY MS. WERMUTH:
3        Q.  I'm assuming you haven't seen this --
4        MS. SCATCHELL:  It's just one page?
5        MS. WERMUTH:  Yep.
6        MS. SCATCHELL:  Okay.
7    BY MS. WERMUTH:
8        Q.  I'm assuming you haven't seen this letter
9    before, Dr. Smith?
10       A.  Correct.
11       Q.  And as you can see, her -- there's a -- she's
12   being notified of a 2.9 percent increase, effective
13   January 1st of 2019.  Do you see that?
14       A.  Correct.
15       MS. SCATCHELL:  We're going to object to this as
16   lack of foundation, but you can answer.
17   BY MS. WERMUTH:
18       Q.  Okay.
19       A.  Correct.
20       Q.  There's nothing in here about a 16 percent
21   increase; is that right, Dr. Smith?
22       MS. SCATCHELL:  Same objection.
23   BY THE WITNESS:
24       A.  Correct.
```

13  (Pages 46 to 49)





Page 50

```
1    BY MS. WERMUTH:
2        Q.  Okay.  Now, going back to Exhibit 3, your
3    expert report, it looks like you relied on DePaul's
4    Institutional Research and Market Analytics data.
5        Do you see that?
6        A.  Yes.
7        Q.  Okay.  And did you actually produce the
8    spreadsheet that you relied on in your file?
9        A.  I believe I have some of it.
10       Q.  Okay.  Good.
11       A.  I will show you.  Is this what you are
12   referring to? (Indicating.)
13       Q.  Yes, sir.  And I would want a copy of this,
14   because if you go there now, it's been updated, so 2016
15   doesn't appear.  So I can't get what you saw, so --
16       A.  Yes.
17       Q.  Yeah, we'd like to get a copy of this.
18       A.  Certainly.
19       Q.  Okay.  And just so I'm clear, you pulled this
20   off of the web link as you have identified here, right,
21   on your report?
22       A.  Yes.  The IRMA DePaul website.
23       Q.  So just for clarity purposes, it's
24   IRMA.DePaul.ED/AAUP/AAUP.ASPX.
```

Page 51

```
1        A.  Those are forward slashes.
2        Q.  Forward slashes.  Thank you.  I said it wrong.
3    Thank you.
4        A.  Yes.  Computers are fussy.
5        Q.  And my brain is fussier.  Okay.
6        So how did you become aware that this data was
7    available?
8        A.  Well, we're good at nosing around and finding
9    things, but I can't say if we weren't tipped off.  I just
10   don't know.
11       Q.  Okay.  Very good.  And this data purports to
12   show, by rank, average salaries for full-time faculty
13   members?
14       A.  Yes.
15       Q.  With one column for doctorals and one for
16   DePaul?
17       A.  Yes.
18       Q.  Do you know what the doctorals column refers
19   to?
20       A.  No.
21       Q.  Okay.  And it's your understanding that the
22   DePaul column refers to DePaul salaries --
23       A.  Yes.
24       Q.  -- on average?
```

Page 52

```
1        A.  Yes.
2        Q.  By rank?
3        A.  Yes.
4        Q.  And so this data is not disaggregated by any
5    particular academic unit at DePaul?
6        A.  Correct.
7        Q.  So it would include salaries of professors and
8    assistant and associate professors in the business
9    school, right?
10       A.  Let me take a quick look.
11           (Brief pause.)
12       A.  It's what DePaul reports for full-time faculty
13   members.
14       Q.  Yeah.  I understand that.
15       A.  And so you'd have to ask your client what they
16   included -- I am just sending this to --
17       Q.  You took a picture to send it to counsel?
18       A.  Yeah.  I just popped it in to send to counsel
19   so she could see it.
20           This is what I might call a survey.  And the
21   source of the data is the American Association of
22   University Professors, data reported in the fall of the
23   year listed.  So, presumably, this is a report by DePaul
24   to that American Association of University Professors
```

Page 53

```
1    survey request.
2        Q.  Okay.  And that's your best guess, based on
3    what you're looking at --
4        A.  It's all it says, yes.
5        Q.  Okay.  And the DePaul data, just so I'm clear,
6    it is not, like, disaggregated by college, within DePaul?
7        A.  Correct.
8        Q.  And it's not disaggregated by discipline
9    either?
10       A.  Correct.
11       Q.  Okay.  And there is no information about length
12   of service?
13       A.  Correct.
14       Q.  Okay.  And so the assistant professor ranks --
15   I'm sorry.
16           The associate professor ranks, which is below
17   full professor, folks in that rank could be there for
18   their entire career and never make full professor.  Is
19   that your understanding?
20       A.  Possibly, yes.
21       Q.  So this data would include pay rates for at
22   least some number of very senior folks who have been
23   around for a long time?
24       A.  Yes.
```



Page 54

1     Q.  Okay.  Did you ask Dr. Dillard or obtain from
2  Dr. Dillard any information about promotional increases
3  in the College of Communication where she's employed?
4     A.  We had asked her about her career and her
5  expected earnings, and this is all we have, what are in
6  the notes. I'm perfectly happy if DePaul -- if DePaul
7  has more refined data, if that's provided to me, I can
8  certainly take that into account.
9     Q.  So you're not aware that the College of
10  Communications' practice is to give a $10,000 promotional
11  increase to base pay, upon promotion, to associate
12  professor with tenure?
13     A.  Correct.
14     Q.  Okay.  And so --
15          (Long pause.)
16          (WHEREUPON, the court reporter
17            requests a break.)
18     MS. WERMUTH: Yeah.  Yes.  We can take a quick
19  break.  That will give me time to find what I'm looking
20  for.
21          (Short break taken.)
22          (Documents marked as requested.)
23     MS. WERMUTH: We're back on the record.  While off
24  the record, we had three exhibits marked.

Page 55

1        Exhibit 14 is Bates labeled -- this is a
2  defense production, Gia.  Dillard underscore DePaul 2184
3  through 2191.
4     MS. SCATCHELL:  And these are the documents that he
5  testified that he had never seen, correct?
6     MS. WERMUTH:  He hasn't testified about them at all
7  yet.
8     MS. SCATCHELL:  Oh, okay.
9     MS. WERMUTH:  And we also marked as Exhibit 15, the
10  October 19th, 2022 invoice for $7,000 to your firm.  And
11  then we marked as Exhibit 16, a copy of the IRMA data
12  that Dr. Smith relied on in his report, which I think he
13  took a picture of and text to you, Gia.
14     MS. SCATCHELL: Yes.
15  BY MS. WERMUTH:
16     Q.  So let's go back to Exhibit 14 first.
17        So, Dr. Smith, I'm assuming you have not seen
18  these documents before?
19     A.  Correct.
20     Q.  All right.  So I'll represent to you that these
21  are a series of annual contracts of employment that
22  DePaul sent Dr. Dillard during the course of her
23  employment, okay?
24        So I want to draw your attention to page 2189,

Page 56

1  which is the June --
2     MS. SCATCHELL:  And just, Anna, before you get into
3  it, I just want to object to lack of foundation, but you
4  can answer.
5     MS. WERMUTH:  Okay.
6  BY MS. WERMUTH:
7     Q.  So page 2189, which is the June 2016 letter, do
8  you see that, Dr. Smith?
9     A.  Yes.
10     Q.  And according to this letter, her
11  compensation -- her base salary, as of June 1, 2016,
12  would be $68,340.  Do you see that?
13     A.  Yes.
14     Q.  So if Dr. Dillard had gone up for tenure that
15  fall and achieved tenure the following 2017, and the
16  College of Communication had a policy of granting $10,000
17  promotional increases, her salary for 2017 would have
18  been 78,340?
19     A.  Her base pay.
20     Q.  Her base pay, yeah.
21     A.  It says base.
22     Q.  Correct.
23     A.  Is the key word.
24     Q.  Yep.  Okay.  So that 78,340 is significantly

Page 57

1  lower than the loss -- or the wage estimate you put on
2  Table 1 of your report at page 19.
3        So you have her wage estimate -- assuming she
4  were promoted -- at $104,083.  Do you see that?
5     A.  Well, there's a difference between earnings and
6  the base pay.
7     Q.  Right.
8     A.  She didn't earn only her base pay.  We saw that
9  in an earlier-marked document.  I'm going to make
10  reference to Exhibit 9 --
11     Q.  Okay.
12     A.  -- where we saw a base pay of 86,000, and
13  non-base pay of an amount equal to 20 percent more,
14  15,600. So I'm not seeking to argue with you here, but we
15  can't conflate what we expect she would earn in a given
16  year with what DePaul calls the base pay.
17     Q.  Right.  But your analysis includes assumptions
18  for administrative supplements, right?
19     A.  It just includes what she earned -- the
20  analysis for the wage loss is based on her actual 2018
21  earnings, assuming that should have prevailed.
22     Q.  Okay.  And so --
23     A.  Minus some inflation, of course.
24     Q.  Right.  So your calculations assume growth in

15  (Pages 54 to 57)





Page 58

1  every single year, right?
2      A.  Yes.
3      Q.  Okay.  And that, then, would assume growth in
4  base, in addition to growth and those other non-based
5  categories we looked at?
6      A.  Growth for the total, yes.
7      Q.  So inclusive of both of those components?
8      A.  Yes.  Whatever are the components, the growth
9  is in the total.
10     Q.  Okay.  But if you look at page 4 of your
11  report, you can see that her pay goes up and down over
12  the years?
13     A.  Correct.  I understand she's claiming she
14  wasn't paid all that she should have been paid.
15     Q.  What's the explanation for the pay up and down?
16  If you're assuming that there's always wage growth and
17  that the non-base always grows in addition to the base,
18  how do we account for the significant increase and then
19  the decrease and then the significant increase again in
20  her total earnings?
21     A.  There was a very modest dip in 2019, and I
22  don't know why.
23     Q.  Okay.  So let's look at how you start your
24  calculations.  I'm looking at page 5 of your report now.

Page 59

1      To derive your 2017 wage loss -- or wage -- I
2  don't know that it's a loss.  The 2017 projected wages
3  that you contend she would have earned but for the
4  discrimination, you start with her actual earnings in
5  2018?
6      A.  Yes.
7      Q.  Okay.  And then you take those 2018 dollars and
8  you add 7.35 percent on top of that.  Do you see that?
9      A.  It's the other way around.  I take off that
10  percentage.
11     Q.  You take off 7.35 percent?
12     A.  Yes.  If we look at the IRMA document, I
13  believe that the increment from '17 to '18 is 7.35
14  percent.  So if we know what 2018 was, we assume 2017
15  would be decreased by 7.35.  The slash, the forward
16  slash, means reduced by.
17     Q.  And what forward slash are you pointing to?
18     A.  Oh, work notes.
19     Q.  Work notes?
20     A.  But I can follow along on the report --
21     Q.  Okay.
22     A.  -- where you were reading just to get clear.
23     Q.  Yeah.  So I'm on page 5.
24     A.  On page 5.

Page 60

1      Q.  Yeah.  So it says at the very top:  Based on
2  the above figures, DePaul's average assistant professor
3  salaries increased by .47 percent in 2017, and 7.35
4  percent in 2018.
5      A.  Yeah, so you can see that the increase of
6  7.35 percent from 2017 to 2018 is what we used to
7  decrease the 2018 figure back to 2017.
8      Q.  Why don't you just use her 2017 figure?  You
9  have that data.
10     A.  Well, look, we're saying we believe 2018 was
11  the appropriate pay rate, but for the associate professor
12  promotion.
13     So if we say, well, look, if she'd been paid in
14  2017 at the rate at which she was paid in 2018, we take
15  the 2018 pay, we back it down to 2017, and we add the
16  associate professor wage factor.
17     Q.  Okay.  So rather than inquiring about
18  promotional increases in the College of Communication,
19  you take the IRMA data, so you take data related to all
20  associate professors in 2018, regardless of whether they
21  were just promoted or whether they'd been in that role
22  for 30 years, right?
23     A.  We take the growth for all of them, yes.
24     Q.  Right.  Right.  And you then back that out of

Page 61

1  her 2018 pay?
2      A.  Yes.  We back it down to 2017.
3      Q.  So what number are you starting with that
4  you're backing 7.35 percent out, from what number?
5      A.  The 2018 W2.
6      Q.  And the 2018 W2 was?
7      A.  91,435.
8      Q.  Okay.  So you back out the 7.35 percent?
9      A.  Right.
10     Q.  And what do you do next?
11     A.  We then say, had she earned that, plus the
12  associate professor pay differential, which we see as 22
13  percent, based on the -- can we call it the IRMA data?
14     Q.  Yeah.
15     A.  We see that that's a 22 percent differential.
16     Q.  So there's a 22 percent differential between
17  associate professors -- sorry.  Between assistant
18  professors and associate professors?
19     A.  Yes.
20     Q.  In what year?
21     A.  2017.
22     Q.  Okay.  So you start with her 2018 total
23  compensation.  You back out 7.35 percent.  And what's the
24  number you get?

16  (Pages 58 to 61)


MAGNA
LEGAL SERVICES

Page 62

```
 1        A.  Can I direct you to page 3 of the work notes?
 2        Q.  That would be very helpful.
 3        A.  So some of the nitty-gritty math is there.
 4        Q.  Page 3 of the work notes?
 5        A.  Yes.
 6        Q.  So you take her actual earnings, and then you
 7   front slash them by 7.35 percent, and you get down to
 8   85,175?
 9        A.  Yes.
10        Q.  And you multiple that by 1.22 to account for
11   what you say is a 22 percent wage growth?
12        A.  Yes.
13        Q.  Where do you get the 22?
14        A.  The IRMA data in 2017, or the difference
15   between associate and assistant professor.  Associate
16   professor, $101,296, and assistant professor is 87,000.
17        Q.  That's 2018, right?
18        A.  Yes.  I'm sorry.  I will revise this.
19   Associate professor, 96,626; assistant professor is
20   79,071.  I punched in the wrong numbers, but that should
21   be the 22 percent.
22        Q.  Are you doing the calculations now?
23        A.  Yes.
24        Q.  Did you get 22 percent again?
```

Page 63

```
 1        A.  Precisely 22.2 percent, exactly what's on page
 2   3 of my report.
 3        Q.  Okay.  1.22 --
 4        A.  Showing that my highly-trained staff, economic
 5   research analysts can use the Steve Jobs' calculation.
 6        Q.  Got it.  So that's how you get the 104,083 for
 7   2017?
 8        A.  Yes.
 9        Q.  And then for every year after that, you do
10   what?
11        A.  Then I increase it by the IRMA data showing the
12   DePaul average increase from 2017 to '18.  The associate
13   professor pay, it's very modest.  It goes from 96,000 to
14   97,000.  It's a small amount.  Same for 2018 to 2019.
15        Q.  Okay.
16        A.  That's 1.8 percent.  The 2019 and 2020, here's
17   where we see national inflation having a bit of an
18   impact.  It goes up by 6 percent, 6.02.  In 2021, we do
19   not have DePaul data, so we use statistically average
20   national pay growth, period, of 5.79 percent.  That's
21   what I call a proxy.  It's a figure we use absent having
22   the specific DePaul data.
23        Q.  Okay.
24        A.  Thereafter, in 2022, we go to 6 percent, which
```

Page 64

```
 1   in September of '22, was our estimate for the wage growth
 2   that year.
 3        Q.  Based on what?
 4        A.  It's my estimate --
 5        Q.  All right.
 6        A.  -- based on 40 years of background, training
 7   and experience and the actual data.
 8        Q.  Why didn't you use the national average again
 9   like you did in 2021?
10        A.  Well, we don't have it in the middle of 2021.
11        Q.  I see.  Okay.  Got it.
12        A.  We're estimating it.  Turns out it was 5.9.  My
13   estimate was off by a whopping one-tenth of one percent.
14        Q.  Okay.
15        A.  And then in 2023, we are, back then, estimating
16   a three percent number.  It turns out it was a little
17   higher, but actually we don't know the number.  It looks
18   like it might be a little higher, but those are roughly
19   correct.
20        Q.  Okay.  And just so I'm clear, for '18, '19 and
21   '20, you say actual DePaul average growth.  And that's
22   from --
23        A.  That's --
24        Q.  That's associate professor growth within that
```

Page 65

```
 1   range?
 2        A.  Year by year, yes.
 3        Q.  Okay.  I see.  Okay.  Now, going back to
 4   Exhibit 14.  I'm sorry -- I'm sorry.  Stick with your
 5   work notes.
 6            Are you doing more calculations, sir?
 7        A.  No.  I'm good.  Thanks.
 8        Q.  Okay.  Okay.  So stick with your work notes for
 9   a second.  So it looks like for 2017 she was earning
10   91,435, and you say had she been promoted, she would have
11   earned 104,083.
12            Do I understand that correctly?
13        A.  Yes.
14        Q.  So that's a differential of about close to --
15   what is that, 13 or $14,000?
16        A.  Yes.  If I may give you just a quick overview.
17            The past losses are really de minimis to the
18   future losses.  So whether something should be a couple
19   thousand dollars more, a couple thousand dollars less,
20   all of that is a, candidly speaking, a hiccup.  We can
21   stay in these weeds as long as you wish.  Whether it's
22   1.35 percent or 1.25 percent, the past losses on
23   Table 14, let's say through 2023, I show the offset
24   through 2023 of 720,000 -- the -- what she should have
```

17 (Pages 62 to 65)



Page 66

1    made is 881,000.  We're at about a 160,000 past loss.
2        Q.  Yeah.
3        A.  I think you can see over those five -- over
4    those six years of 160,000, that's peanuts compared to
5    the big picture of a $3.2 million loss in the long run.
6        Q.  Sir -- I will get there, sir.
7        A.  No, I know.  I'm just trying to give you
8    relative --
9        Q.  I understand.
10       A.  -- merits of whether it should be 1.35 percent
11   or 1.25 percent, or whether there was or wasn't a $10,000
12   pay grant.  There's a billion details, I grant you, but
13   the big picture is the last six years are nothing.
14       Q.  Okay.
15       A.  They're less than five percent of the big
16   picture.
17       Q.  I understand that, sir.
18       A.  I'm not faulting you.  I'm --
19       Q.  Yeah, I --
20       A.  -- trying to --
21       Q.  -- need to conduct my examination.
22       A.  No, I know.  I'm trying to give you a -- what
23   do they call it on a camera?  A wide screen --
24       Q.  And I know --

Page 67

1        A.  -- as -- as we've --
2        Q.  -- what -- I know what the --
3        A.  -- been focusing --
4        Q.  -- wide screen is.  I understand it.  I
5    understand your analysis.
6        A.  Yes.
7        Q.  And I'm going to take us all the way through
8    it --
9        A.  Yes, but --
10       Q.  -- but if you could --
11       A.  -- I also wanted it for Gia's perspective and
12   for my own.
13       Q.  Okay.  Well, there wasn't a question pending --
14       MS. SCATCHELL:  Thank you.
15   BY MS. WERMUTH:
16       Q.  -- on that point.  So presumably you and Gia
17   have already talked about this, I can --
18       A.  No, we --
19       Q.  -- imagine.
20       A.  -- don't talk.
21       Q.  So going back to Exhibit 14 -- are you with me,
22   sir?
23       A.  Certainly.
24       Q.  I don't see Exhibit 14 in front of you.

Page 68

1        A.  You may ask about it.  I have a good memory.
2        Q.  Okay.  Well, this is a letter you haven't seen
3    before, but it's on page 2191 --
4        A.  Very good.
5        Q.  -- and you can see this is the last page of the
6    group exhibit, that her promotional increase, when she
7    was promoted with tenure, was $10,000.  I just wanted to
8    draw your attention to that.
9        Do you see that?
10       A.  Yes.  You had mentioned that, yes.
11       Q.  Okay.
12       MS. SCATCHELL:  And same objection as to form and
13   for lack of foundation.
14       THE WITNESS:  Yes.
15   BY MS. WERMUTH:
16       Q.  So all of -- Table 1 has all of that wage
17   growth -- year-projected wage growth that we talked
18   about; is that right?
19       A.  Yes.
20       Q.  For a total of $743,000 and -- or $743,146,
21   right?
22       A.  Yes.
23       Q.  And then Table 2, you have a benefits estimate
24   associated with those wages, right?

Page 69

1        A.  Yes.
2        Q.  And how do you reach those assessments on Table
3    2?
4        A.  So the benefits -- she reported she had health,
5    dental, life, retirement.  These are found on her Bluesky
6    account.
7        Q.  Which is where?
8        A.  I think this is the Bluesky account.
9        Q.  What number is that, 9 -- No. 9?
10       A.  Well --
11       Q.  Is that marked, that exhibit?
12       A.  That's my copy.
13       Q.  Oh, I'm sorry.
14       A.  Yes.
15       Q.  And so does Table 2 include lost medical,
16   dental, vision, life, disability, all of that?
17       A.  Yes.
18       Q.  Okay.  She was employed from 2017 through the
19   present time.  Did you discount for --
20       A.  Bear in mind, Tables 1 through 7 are what she
21   would have earned.  It's not her losses.  It's what she
22   would have earned.
23       Q.  Okay.
24       A.  And then offset with what she did earn, so that

18  (Pages 66 to 69)



Page 70

1  includes benefits there. So we're not on Table 1. These
2  are not losses. This is the but-for.
3      Q. But-for? Okay.
4      A. Yes.
5      Q. Okay. So to understand the loss, we have to go
6  to Table --
7      A. 8 through 14.
8      Q. -- 8, right?
9      A. Yes.
10     Q. So starting at Table 8, let's talk about her --
11 you offset her wages by actual earnings during '17
12 through '20, right, 2017 through 2020?
13     A. Yes.
14     Q. How do you get -- oh, and then you have Exhibit
15 9 data for '21, correct?
16     A. Yes.
17     Q. Okay. So for that you add base pay, plus
18 non-base pay to get the 102,207?
19     A. Yes.
20     Q. And you see there is a dip there in terms of
21 her compensation, yes, from the year prior? Just looking
22 at Table 8.
23     A. Well, table -- between what year and what year?
24     Q. So there is a dip from 2018 to 2019, and

Page 71

1  another dip from 2020 to 2021, yes?
2      A. This is actual, yes.
3      Q. Right. Okay. How do you get the figures in
4  2022 for offset wages?
5      A. It's actual 2021, plus six percent.
6      Q. And that was your estimated average, right?
7      A. Yes.
8      Q. Okay. And then for 2023, how do you get --
9  that's just a half a year, I'm assuming, the 55,642?
10     A. Yes. Yes.
11     Q. And how did you get that number?
12     A. Plus three percent.
13     Q. Okay. So in your Table 9, you offset benefits;
14 is that right, sir?
15     A. Yes.
16     Q. And how can I see what you did to discount for
17 her current employment? Well, strike that.
18        Did you discount for the fact that she was
19 still obtaining those benefits in 2017 through 2023?
20     A. Yes. The benefits are shown only to be loss of
21 retirement benefits, which is typically a percentage of
22 pay.
23     Q. Got it.
24     A. No loss of any other benefit.

Page 72

1      Q. Okay. What percentage did you use then to
2  calculate the retirement?
3      A. The retirement benefit is 9.8 percent.
4      Q. And where do you derive that figure?
5      A. She had her retirement component.
6      Q. From what year?
7      A. It was $4,329 in 2021.
8      Q. Okay. You're looking at your notes?
9      A. Yes.
10     Q. You say in 2021 her retirement was how much?
11     A. 4,329 plus Social Security.
12     Q. Where do I see -- where can I see -- oh. I
13 see. 4,329, and then retirement is in parenthesis after.
14 Okay.
15     A. Yes, plus Social Security, so there's two --
16 there's the DePaul retirement, there's the government
17 retirement.
18     Q. Okay.
19     A. That together is 9.8 percent.
20     Q. Okay. But DePaul doesn't pay the government
21 benefit, right?
22     A. DePaul pays Social Security, legally required,
23 yes.
24     Q. Oh, I see. Okay. Yes. So that's how you

Page 73

1  derive the percentage of -- what did you say, 9.8?
2      A. Yes.
3      Q. You're doing calculations, sir?
4      A. Yes.
5      Q. Are you texting people?
6      A. No.
7      Q. I heard a text message sound.
8      A. That's the calculation. Well, I did tell my
9  assistant to get a prescription, but -- and I just got a
10 text saying it was available for my son. It's a heart
11 transplant kit.
12     Q. Oh, gosh. Sorry to hear about that.
13        Have you been texting other people, other than
14 Gia and your assistant?
15     A. No.
16     Q. And what have you been texting with Gia?
17     A. I sent her those three pictures, no words.
18     Q. What were the other three pictures? So I know
19 there was the IRMA data. What were the other two?
20     A. I will show you one.
21        (Indicating.)
22     Q. What is that? I can't see from here.
23     A. That's Exhibit 13.
24     Q. Okay.



Page 74

1      A.  She says thanks.  Then the IRMA data, no
2  response.  And then exhibit -- the letter -- exhibit
3  what -- 14; no response.
4      Q.  Okay.
5      A.  That's all I -- she's not coaching me.
6      Q.  Okay.
7      A.  Just so you know.
8      Q.  Yeah.  I'm just hearing text message sounds so
9  I have to ask.
10      A.  No, I know.  I'm just trying to get my son's
11  prescription delivery --
12      Q.  Okay.
13      A.  -- because she didn't do it yesterday and I'd
14  like to get it.
15      Q.  Of course, yeah.  I'm sorry to hear about his
16  condition.
17      A.  Oh, he's in wonderful shape.
18      Q.  Oh, good.  Okay.  Okay.  Then -- so going back
19  to before we get to offset.  In Tables 4 through 6, you
20  project out wage growth through age 83?
21      A.  Yes.
22      Q.  Okay.  And you've already told me what your
23  wage growth numbers or percentages are after 2023, or
24  have you told me that?

Page 75

1      A.  After 2023, I assume a one percent long-term
2  average wage growth.
3      Q.  One percent per year?
4      A.  Yes.  Above the rate of inflation.
5      Q.  Above -- okay.
6      A.  Yes.  All the figures we've been speaking of
7  before, those percentages are either actual or estimated
8  to include inflation --
9      Q.  Right.
10      A.  -- because they're past --
11      Q.  Right.
12      A.  -- actual numbers.  The future we deal only in
13  inflation free.  So if I -- so we're assuming that the
14  figures that I project are now just reflecting a real
15  wage growth rate in the amount of wages that would be
16  above inflation.  We do that because we discount using a
17  real discount rate, which means excludes inflation from
18  the discount rate.
19      Q.  I see.  So no inflation is included in your
20  wage growth after 2023?
21      A.  Correct, or on the discount rate after -- or in
22  the --
23      Q.  Because it's also excluded from the discount
24  rate?

Page 76

1      A.  Correct.  So it's a wash.
2      Q.  Okay.  Understood.  Thank you.  Now, I see you
3  project this out through age 83.  Do you see that?
4      A.  Through each and every year, through to the end
5  of her life expectancy --
6      Q.  Why do you use life expec --
7      A.  I just don't know how many professors at DePaul
8  are teaching to the end of their life expectancy.  Can
9  be.  I know University of Chicago, my alma mater, there
10  are professors in the '80s who died while teaching.  I
11  should say while tenured.  I didn't kill any of them,
12  but... I'm joking.
13      Q.  But she told you that she was planning to work
14  until age 67, you or your staff, right?
15      A.  Correct.  Here's --
16      Q.  So you could have just estimated this out to
17  her statement?
18      A.  Well, I think there's two considerations.
19  Number one, I don't know whether -- what she's entitled
20  to into her claim, whether it's the capacity to teach or
21  the actual plan to teach.  I leave that up to Gia to tell
22  what the claim is.  I show the trier of fact all the
23  years so that they may select the year that they think is
24  the correct year to end the losses.

Page 77

1      I make no -- I have no opinion on what is the
2  correct year to end the losses, but I do know that if
3  it's capacity, she may have the capacity to teach to the
4  end of her healthy life expectancy, which would be age
5  73.
6      Secondly, a plan to retire is nothing more than
7  the plan.  And the Social Security Administration has two
8  big billboards.  The first billboard says people are now
9  working longer than ever, historically.
10      And number two, the second billboard says
11  whenever we ask people about their plans and track them,
12  they work longer on average than their plan.  So I am not
13  going to state at which year these losses should end or
14  when she would stop working, nor to when is she entitled
15  to collect.  I leave all that to the trier of fact to
16  figure out and for the Court and the parties to
17  determine.
18      So I give them the tools, and they take a
19  redline pencil and draw the loss to end at any year.
20      Q.  Okay.  Now, let's talk about --
21      A.  And incidentally, I do show on my summary
22  table, as an example, age 67.  Purely as the report says,
23  "as an example."
24      Q.  Okay.  So can we talk about --



Page 78

1    A.  And she said, by the way, at least age 67.
2    Q.  So if you look at Table --
3    A.  And -- sorry.  Can I just add?  She said, and
4  until age 70 or older.
5    Q.  She doesn't say that.
6    A.  Yes, she does.  She says both those tables, and
7  she says age is not an issue for professors.
8    Q.  So she says, according to --
9    A.  Her interview notes, page 8.
10    Q.  Her interview notes, page 8?
11    A.  Third paragraph.
12    MS. WERMUTH:  So this is Exhibit 5, for a clean
13  record.
14  BY MS. WERMUTH:
15    Q.  She reports that she's wanted to work until age
16  70 or older, but at least age 67?
17    A.  That makes it a perfect statement because age
18  isn't an issue.
19    Q.  That makes the further statement that age isn't
20  an issue for professors, is what she says?
21    A.  Correct.
22    Q.  Because she has tenure, right, which is
23  lifetime employment?
24    A.  Yes.

Page 79

1    Q.  Now, in Table 5 you -- sorry.  Tables 5 and 6,
2  that's the present value of future benefits, right?
3  Table 5 is the present value of future benefits?
4    A.  Five is benefits.  Four is wages, five is
5  benefits.
6    Q.  Six is the total between the two?
7    A.  Yes.
8    Q.  Okay.  And then you start to offset in Table 8,
9  right?
10    A.  Yes.
11    Q.  Okay.  So in Table --
12    MS. WERMUTH:  You okay?
13    THE COURT REPORTER:  Oh, yeah.
14    MS. WERMUTH:  Somebody's tooting --
15    THE WITNESS:  That's my prescription --
16    MS. WERMUTH:  Do you need to take a quick break?
17    THE WITNESS:  No.  No.  She's -- she responded
18  saying yes.  That's all.
19  BY MS. WERMUTH:
20    Q.  All right.  So let's take a look at your offset
21  tables.  So we talked about Table 8, which is offset
22  through basically the present, with 2023 being truncated
23  because of the date of your report.  Okay.
24    Then Table 9 you have the offset of employment

Page 80

1  benefits and that's just retirement, right?
2    A.  Yes.
3    Q.  Because she remained employed.  All right.
4  Then, Table 10, you total those.  All right.  And then in
5  Table 11 we get to offset for future wages.  And in 2024,
6  your offset for wages is 43,448; do you see that?
7    A.  Yes.
8    Q.  And that's a significantly lower offset than
9  what we see her income being in the years prior, right?
10    A.  What year?
11    Q.  So I'm looking at Table 11, year 2024.
12    A.  Yeah.  So in the future -- so for the future,
13  which starts in 20 -- mid year 2023 for the future --
14    Q.  Okay.
15    A.  -- we then show a disability impact.
16    Q.  So you take the position that from 2023 going
17  forward, she has only a 38.55 percent chance of
18  continuing to work?
19    A.  Mid year 2023 --
20    Q.  Uh-huh.
21    A.  -- an estimate -- the present cash value date,
22  the assumed date of trial --
23    Q.  Uh-huh.
24    A.  -- we assume in the long run she is working

Page 81

1  with an impairment that I understand will be claimed as
2  depression and anxiety.
3    I'm told there are medical professionals who
4  have provided that diagnosis, but I'm not here to argue
5  whether they are right or wrong or whether there has been
6  one or not.
7    But what I have done is assuming the trier of
8  fact is asked to -- is told that her claim is that she
9  has an impairment characterized as trouble
10  concentrating -- and that's all based on her report that
11  she has difficulty concentrating, memory difficulties,
12  speaking difficulty, reading difficulty, writing
13  difficulty, difficulty standing for long periods of time,
14  difficulty interacting with people, that there are
15  triggers and stressors that can cause a seizure is what
16  she says.  I looked at government tables showing future
17  career impact that people who have an impairment
18  characterized as trouble concentrating.
19    Q.  Okay.
20    A.  And that's based on Americans with Disabilities
21  research.
22    Q.  Okay.  So that was a lot that you just said
23  there, so let me try to get through some of that.
24    So from mid 2023, going forward, you discount





Page 82

1  her wages based on research regarding the employability
2  of someone with difficulty concentrating?
3      A.  Correct.
4      Q.  So you go from being a hundred percent capable
5  of working in '22 and -- are you texting again?
6      A.  Just telling ███ -- she said thanks.  She
7  said okay.  Yeah.
8      Q.  ███ is your assistant?
9      A.  Kelsey.  Kelsey.
10     Q.  Do you want to take a break?
11     A.  I said get delivered, please.  She said, yes,
12 will do.
13     Q.  Okay.  Thank you.  We're happy to take a break
14 if you prefer?
15     A.  No, I'm good.  It's just a half-a-second
16 disruption.
17     Q.  Okay.
18         So she goes from being capable of working at a
19 hundred percent in year 2022 to being only 38.55 percent
20 capable of working by mid 2023?
21     A.  On average.
22     Q.  Okay.
23     A.  So there could be years in which she's far more
24 capable, years in which she's less capable.  It's an

Page 83

1  average of that level of impairment.  It's difficult to
2  tell -- and as she said, she's got seizures.  She's got
3  difficulties.  Some may present themselves more
4  impactfully due to some particular circumstances.  So I'm
5  just saying an average of that impact.
6      Q.  Are you aware that she's been working full-time
7  since 2017 when her seizure disorder started?
8      A.  Yes.  By I'm -- well, I don't know about
9  full-time.  She'll have to tell you what she has missed
10 due to any emotional difficulties or not.  I can't say
11 she has or hasn't, but it's factually whatever is true, I
12 don't dispute.
13     Q.  So you also don't dispute, then, that she
14 hasn't had a seizure since 2018?
15     A.  Correct.  But imagine this:  Someone goes to
16 the hospital and they go through a CT scan where the
17 machine is set for the x-rays improperly and they're
18 given a very unhealthy dose of radiation.  They don't
19 fall apart the next day.  It has an impact over time.
20         So you can't -- given that she has this
21 impairment that she claims, it's -- I, as a -- cannot
22 predict when it may have a particular impact or not, on
23 what particular day or month or quarter.  There may be
24 good years or bad years.  I'm just saying, on average,

Page 84

1  the government reports that people with difficulty --
2  this difficulty she claims -- have a reduced overall
3  level of impairment, and it doesn't mean every moment of
4  every day.
5          My heart rate is low at night when I sleep, and
6  it's higher when I jog.  I know the average heart rate.
7      Q.  But you would agree with me that this is an
8  individual who is in her 30s or 40s -- late 30s, early
9  40s -- who has been working continuously for her adult
10 life, hasn't requested an accommodation since 2019,
11 hasn't had a seizure since 2018, and you discount her
12 ability to work, going forward, by close to 70 percent
13 from one year to the next than through the rest of her
14 life?
15     A.  On average.  According --
16     Q.  You say it's on average, but it is --
17     A.  -- to --
18     Q.  -- you are discounting her wages by 60 -- what
19 is it?  Almost 62 percent, right, from 2023 going
20 forward?
21     A.  60 -- I'm sorry.
22     Q.  So you're saying she has a 38.55 percent chance
23 of working --
24     A.  Yes.

Page 85

1      Q.  -- from 2023 going forward?
2      A.  Well, I'm not saying it.  The government says
3  that's the statistically average reduction in work
4  capacity for people who claim this level of disability.
5      Q.  And if she has worked throughout 2023, so far,
6  and will -- has been assigned to teach full-time through
7  the end of this year, your prediction of a 38.55 percent
8  chance of working through the end of 2023 would be
9  incorrect, because it would be a hundred percent, right?
10     A.  It's just a prediction.  It's a lifelong
11 prediction.  She may be working a hundred percent next
12 year, and she may have to retire five years early, which
13 means a hundred percent loss in other years.
14         So a hundred percent loss in some years and a
15 zero loss in some years, that average is 50 percent loss,
16 right?  So the government tables say for all the
17 variability that may occur in someone's lifetime about
18 their capacity to be employed, for all the ups and downs
19 that there may be in her life, that it averages a 62
20 percent reduction.
21     Q.  Okay.
22         MS. WERMUTH:  Can you mark this, please, as -- what
23 are we on now?  And, Gia, this is the Taylor study that
24 was cited --

22  (Pages 82 to 85)



Page 86

1          MS. SCATCHELL:  Okay.
2          MS. WERMUTH:  -- in Dr. Smith's report.  It wasn't
3    produced to us, I don't think.  I was able to get a copy
4    somehow.  I don't think you produced it, but in any
5    event...
6          THE WITNESS:  Yeah, it's online.
7               (Document marked as requested.)
8    BY MS. WERMUTH:
9       Q.  Okay.  So when you say you were relying on
10   government data to come up with your 38.55 percent chance
11   of working from this year through the end of her life --
12      A.  Yeah.
13      Q.  -- this is the government data that you're
14   talking about in the Taylor report?
15      A.  Correct.
16      Q.  And this report was published in 2018 -- are
17   you on your phone, sir?
18      A.  I just texted the first page to Gia.
19      Q.  All right.  You should let me know when you're
20   doing that.  I would appreciate that.
21      A.  Okay.
22         MS. WERMUTH:  And, Gia, I'm assuming you're not
23   communicating --
24         MS. SCATCHELL:  I didn't --

Page 87

1          MS. WERMUTH:  -- with the witness?
2          MS. SCATCHELL:  -- receive them.
3          THE WITNESS:  You don't have to assume.  You can
4    look at my phone.  She just said thanks once.  That was
5    it.
6          MS. SCATCHELL:  Yeah.
7          MS. WERMUTH:  Okay.
8          THE WITNESS:  I'm just trying to keep Gia aware.
9          MS. SCATCHELL:  Yep.  Understood.
10         MS. SCATCHELL:  I didn't receive that, though.  If
11   you prefer to send it to me, I'm fine with that, too.
12         MS. WERMUTH:  Send you a copy of the report?
13         MS. SCATCHELL:  No.  Whatever the first page is he
14   just sent.
15         MS. WERMUTH:  I don't have a copy of the first page.
16   I have the report.  It's the --
17         MS. SCATCHELL:  Okay.
18         MS. WERMUTH:  -- Daniel Taylor report cited in
19   his -- Dr. Smith's report.
20         MS. SCATCHELL:  Okay.
21   BY MS. WERMUTH:
22      Q.  Okay.  And just so I'm clear, the data dates
23   from 2014, but her publication is from 2018; is that
24   right?

Page 88

1       A.  Yes.
2       Q.  Okay.  And you are relying on Table A-2, I
3    believe, to come up with your calculations; is that
4    right?
5       A.  Yes.
6       Q.  So Table A-2 is on page --
7          MS. WERMUTH:  Gia, do you have a question?
8          MS. SCATCHELL:  Yeah.  If you could just provide me
9    the URL that you accessed this.
10         MS. WERMUTH:  Well, you know, to be honest, it would
11   have been a good idea to actually have this produced in
12   advance.  It wasn't.  That way we'd all be working off
13   the same stuff.  I will try to send this to you if you
14   give me a moment.
15         THE WITNESS:  Gia?  Gia, if you just Google
16   Americans with Disabilities 2014 --
17         MS. SCATCHELL:  Uh-huh.
18         THE WITNESS:  -- and then the word Taylor, the
19   author's name, I'm sure it will pop up.
20         MS. SCATCHELL:  Okay.
21              (Long pause.)
22         THE WITNESS:  It's a U.S. Census Bureau --
23         MS. WERMUTH:  I'm sending it by e-mail, Gia.  And as
24   I said, this should have been sent to us, but --

Page 89

1          MS. SCATCHELL:  Well, I mean, you could have also
2    sent your exhibits beforehand as well --
3          MS. WERMUTH:  Gia, I would -- no.
4          MS. SCATCHELL:  -- because that's also --
5          MS. WERMUTH:  Gia, no, because this was an in-person
6    deposition and it was noticed as such, so there was no
7    need for me to send these in advance.
8          MS. SCATCHELL:  I always send my deposition exhibits
9    in advance for in-person, but it's a matter of
10   preference.
11         MS. WERMUTH:  Yeah, I don't think I've ever gotten
12   exhibits in advance from you, like when you deposed
13   Dr. Ghannam (phonetic).  I know I didn't get exhibits in
14   advance from you.  But in any event --
15         MS. SCATCHELL:  Well, that was a year ago.
16         MS. WERMUTH:  You said it was your practice.  It's
17   only your current practice?
18         MS. SCATCHELL:  Yeah, it changed.  It's my current
19   practice.
20         MS. WERMUTH:  Okay.
21   BY MS. WERMUTH:
22      Q.  Table A-2 on page 27 --
23      A.  Yes.
24      Q.  -- that's where you're pulling the data from?

23  (Pages 86 to 89)



Page 90

1    Is that right, Dr. Smith?
2        A.   Yes.
3        Q.   Okay.  And what you say is -- and by the way,
4    super quick, there are -- you're looking at -- well, tell
5    me what lines you're looking at to get to your numbers?
6        A.   Table A-2, down at the bottom, second to the
7    last line, trouble concentrating.
8        Q.   Okay.  And so you take the percentage of 2.71,
9    the employed percentage of individuals with trouble
10   concentrating.  Do you see that?
11       A.   Yes.
12       Q.   Okay.  And then you take that against the --
13   what number to get 38.55 percent?
14       A.   Against the figure at the top of A-2, the very
15   top, page 26, of 70.3 percent of the overall population
16   being employed.
17       Q.   Okay.  So you multiply -- let me say it this
18   way: 38.55 percent is 38 -- I'm sorry.  27.1 is 38.55
19   percent of 70.3; is that right?
20       A.   Yes.
21       Q.   Okay.  And you used that figure --
22            (Phone ringing.)
23       MS. WERMUTH:  We're going to take a break.
24            (Short break taken.)

Page 91

1    BY MS. WERMUTH:
2        Q.   So we were talking about Table A-2 in the
3    Taylor study.
4        A.   Yes.
5        Q.   And we learned how you determined the 38.55
6    percent.  You say it's an average, but you apply the same
7    figure every year based on the single calculation,
8    correct?
9        A.   Because it is an average, yes.
10       Q.   Well, the 38.55 percent is an average percent?
11       A.   It's applied each year, which means it's an
12   average across all years.
13       Q.   But how is -- you're applying it every single
14   year.  You're saying her wages are going to decrease by
15   close to -- over 60 percent every single year from 2023
16   going forward?
17       A.   No.  That's just the table showing a
18   year-by-year.  If you take it from now to any future
19   year, it's 38 percent across all years, on average.
20   Whether there are ups and downs is not relevant.
21       Q.   But you're not --
22       A.   You know, if you --
23       Q.   -- applying it across all years -- or I mean,
24   you're not applying it on ---

Page 92

1        A.   You're arguing with me.
2        Q.   -- an average basis --
3        A.   I'm trying to educate you and you are willfully
4    not trying to see my point.  I am mathematically correct,
5    just assume it.
6            Now, what's important is if you try and see the
7    error of your ways, as opposed to trying to persuade me
8    the error of my ways, because I am a professor at this,
9    and I am perfect at this, and if you would at least see
10   that I have a correct point of view, given my Ph.D.,
11   background, training and having learned econometrics at
12   the top university on the planet of econometrics, you may
13   consider that I might be right.  And instead of arguing,
14   attempt to see how I am right and where you are wrong,
15   and that would produce a more efficient deposition today.
16       Q.   Since you are perfect, sir, and I'm clearly
17   imperfect --
18       A.   At this point, I am.
19       Q.   Could you please explain to me how applying a
20   discount of 61-and-a-half percent every year --
21       A.   I'll give you an example.
22       Q.   Hang on.  Let me finish my question.
23            Since you are perfect and I'm imperfect, please
24   explain to me how applying a 61-and-a-half percent

Page 93

1    discount every single year, from 2023 through 2067, is
2    somehow tantamount to an average?
3        A.   It is exactly the average.  So imagine someone
4    has a heart rate, as I said, that averages 72.  When
5    they're asleep it averages 62.  When they're awake it
6    averages 82, but the average is 72 overall.
7            So if you take their heart rate over 20 years,
8    and sometimes they're asleep and it's less and sometimes
9    they're jogging and it's more, but it averages 72, and if
10   you assume it averages 72 over 20 years, it doesn't
11   matter what the ups and downs are on any given day or
12   hour or month or week.
13           What matters is that if you take her losses to
14   age 67, precisely as the tables do, the discount of her
15   employability is exactly 32 percent.
16           Now, if there are variations year by year, it's
17   irrelevant, as long as it averages 32 percent, which the
18   tables say for people like her it does.
19       Q.   What the table says is that for those aged 18
20   to 64 years old in 2014, with a mental disability of
21   trouble concentrating, the percent of people employed
22   that year is 27.1 percent, right?  That's what the table
23   says?
24       A.   Correct.



Page 94

1    Q.  Okay.  And you're saying from to 2023 through
2  2067, she's going to be disabled to that extent every
3  single year?
4    A.  No.  On average.  You keep mischaracterizing my
5  words.  On average.
6    Q.  But --
7    A.  On average.  So stop saying --
8    Q.  -- where in your report --
9    A.  -- every single year.
10    Q.  -- does it say that?
11    A.  The math shows it every single year, but the
12  impact is on average across all the years.
13    Q.  Okay.  The math shows it every single year,
14  correct?
15    A.  Yes, but --
16    Q.  Thank you.
17    A.  -- when you take it over to age 67, it is an
18  average over 20 or 30 years, whatever it turns out.
19    Q.  Now, if you look further at Table A-2 on page
20  28.
21    A.  Yes.
22    Q.  Are you there?
23    A.  Yes.  I know the table.
24    Q.  Okay.  There are disability domains.  Do you

Page 95

1  see that?
2    A.  I know the table.
3    Q.  Okay.  And so if an individual has a disability
4  in only one domain, the percentage of folks employed with
5  a mental disability in only one domain is 64.7 percent.
6      Do you see that?
7    A.  Yes.
8    Q.  Okay.  And so the only disability that you've
9  applied here is a mental disability of trouble
10  concentrating.  So why do you use the 27.1 percent
11  instead of the 67.1 percent in the same table?
12    A.  Because the one domain means across all
13  domains.  We actually know her domain, so it's not a
14  statistical unknown one domain.  It's a precisely known
15  domain.  If you go even further on the table where you
16  cannot only select trouble concentrating where you know
17  the domain, but you go to the next page of the table
18  under selected conditions where it says a mental or
19  emotional problem, it's an even higher level of
20  disability.
21    Q.  Where do you see selective conditions?
22    A.  It's the second to the last line.
23    Q.  On what page, sir?
24    A.  Page 28, the table -- the page after.

Page 96

1    Q.  I see.  Okay.
2    A.  You see 21.7, which is a very significantly
3  higher level of disability where there is, quote, mental
4  or emotional problem, which may more accurately reflect
5  her overall condition.  Because she said she had trouble
6  concentrating and enumerated multiple other difficulties
7  that she had, in contrast to your suggestion that there's
8  only one condition that she is suffering from.
9    Q.  But you --
10    A.  She states she's suffering from multiple
11  conditions.  I selected one, which is trouble
12  concentrating.  But if you go to the next page, and just
13  say she is -- she falls under the -- under the mental or
14  emotional problem impairment line, instead of being 27
15  percent, it's 21 percent, which is one-quarter less,
16  even.
17    Q.  So what you're pointing out here is that there
18  are a variety of different percentages you could rely
19  on --
20    A.  No.
21    Q.  -- there's the -- there's the trouble
22  concentrating, which is what is in your report.  There's
23  the mental disability in a single domain, which is
24  triple --

Page 97

1    A.  No, I never suggested that.  No.  You suggested
2  that.  I denied that applies to her.
3    Q.  Okay.  What about disability in two domains,
4  physical and mental?  That's 31.5 percent.
5    A.  But it doesn't specify the domains.  The more
6  specific you can be, the more precise is the calculation.
7    Q.  Okay.  So that's why you didn't choose mental
8  or emotional, because that isn't specific, whereas
9  trouble concentrating is more specific?
10    A.  Well, mental or emotional is what she has,
11  both.  It's not just trouble concentrating, which is
12  mental.
13    Q.  But you selected trouble concentrating?
14    A.  To be conservative, yes.  If I had selected
15  that she has both mental and emotional, that would even
16  be higher.  She does not have, as you keep suggesting, a
17  single condition, is my understanding.
18    Q.  Well, but it's not condition.  It's domain.  A
19  domain is different than a condition, yes --
20    A.  The word says -- what condition?  And then it
21  also uses symptoms.  Where are you getting the word
22  domain?
23    Q.  Page 28, disability domains.
24    A.  All right.  I haven't used that section.

25  (Pages 94 to 97)



Page 98

1    Q.  Right, but that's present here in this report,
2  yes, sir?
3    A.  It's less specific, yes, than the conditions.
4    Q.  But you didn't use conditions.
5    A.  I didn't use mental or emotional.
6    Q.  Right.
7    A.  Because that would be even higher.
8    Q.  By the way, this study doesn't distinguish
9  between individuals disabled from birth or those who
10  suffer disability later in life, as far as you can tell;
11  is that right?
12    A.  Correct.
13    Q.  Before I move to your RVL analysis, I'd like to
14  go through a couple of other documents.
15    A.  Certainly.
16    Q.  In your report you identify some other
17  materials that you reviewed to perform your evaluation.
18  I just want to make sure I understand how you used them.
19    A.  Yes.
20    THE WITNESS:  And may I say on the record, there are
21  many ways in which I am perfect, but I am capable of
22  dividing two numbers perfectly and knowing whether it's
23  an average or not.  That's a very limited claim.  Just as
24  the selected condition is very limited to her trouble

Page 99

1  concentrating.
2    MS. WERMUTH:  Move to strike.  Non-responsive.  No
3  question pending.
4    THE WITNESS:  I was intending to add a little humor
5  here.
6    MS. WERMUTH:  Could we have this marked, please?
7  Thank you.
8    (Document marked as requested.)
9  BY MS. WERMUTH:
10    Q.  Are you on your phone again, sir?
11    A.  I'm told they are sending me my deposition of
12  my trial -- my deposition testimony for trial.
13    MS. WERMUTH:  I'm just going to ask and put it on
14  the record, if you need to use your phone, you should
15  take a break and not be on your phone during the
16  deposition.  Thank you.
17    THE WITNESS:  Very good.
18  BY MS. WERMUTH:
19    Q.  Exhibit 18, sir, are you familiar with that?
20    A.  Yes.
21    Q.  And how, if at all, did you rely on this string
22  of e-mails in performing your evaluation?
23    A.  I don't see that these played any particular
24  role.

Page 100

1    MS. SCATCHELL:  Can I get the Bates number?
2    MS. WERMUTH:  Dillard Expert Discovery 707 through
3  709.
4    MS. SCATCHELL:  Thanks.
5  BY MS. WERMUTH:
6    Q.  Do you see the dates on these e-mails, sir?
7    A.  Certainly.
8    Q.  They're from June of 2018?
9    A.  I see the dates.
10    Q.  Okay.  So June of 2018 was a period of time
11  after which Dr. Dillard contends she should have been
12  promoted, right?
13    A.  Yes.
14    Q.  Okay.  And it's about her role on a search
15  committee; is that right?
16    A.  Well, I haven't digested it fully, but I will
17  take your word for it.
18    Q.  Okay.  And according to your report, and your
19  staff's interview with Dr. Dillard, her inability to
20  serve on a search committee or -- strike that.
21    She says she reports that taking on additional
22  roles, such as chair of the search committee, increased
23  yearly earnings through additional stipends from the
24  university.

Page 101

1    Do you see that?
2    A.  Yes.
3    Q.  In 2018, does it appear her income was impacted
4  by her participation on a search committee?
5    A.  I don't know if the records show that or not.
6  All I cared about was what was her total earnings.
7    Q.  So if search committees last for a year and any
8  additional compensation goes away when you're done, that
9  didn't figure into your analysis; is that right, sir?
10    A.  I just took what she made in 2018.  There is
11  many ways in which you can make money at a university and
12  a search committee may be one of them.
13    MS. WERMUTH:  Can you mark this as 19, please?
14    (Document marked as requested.)
15  BY MS. WERMUTH:
16    Q.  Sir, you have been handed what's been marked as
17  Deposition Exhibit 19.
18    MS. WERMUTH:  Gia, this is Dillard Expert Discovery
19  713 through 716.
20  BY MS. WERMUTH:
21    Q.  Do you recognize that document, sir?
22    A.  Yes.
23    Q.  What do you recognize it to be?
24    A.  It's a posting, full-time faculty for the



Page 102

1    College of Communication.
2        Q.  Can you tell the date on that posting?
3        A.  Well, if you can point me to it so we don't
4    waste time.
5        Q.  Looks like on page 714, the open date is
6    7-12-2018.  Do you see that?
7        A.  Yes.
8        Q.  Okay.
9        A.  That's not necessarily the date of the posting.
10   Do you see the date of the posting?
11       Q.  Well, the date that it was opened is 7-12-2018.
12   Do you see that?
13       A.  Yes.
14       Q.  Okay.  To fill positions for the start of the
15   academic year 2019.  Is that your understanding?
16       A.  Well, if it says that somewhere, point me to
17   it.  I don't have to have an understanding.  The document
18   will speak for itself.
19       Q.  Okay.  The first page:  College of
20   Communications at DePaul University invites applicants
21   for two tenure line assistant professor positions and
22   advertising to begin August 2019.  Do you see that?
23       A.  Very good.  Yes.
24       Q.  So how and why was this important or used or

Page 103

1    relied upon in your evaluation?
2        A.  Just background.  It was a document sent to me.
3        Q.  So you didn't give any particular weight to it
4    in your analysis?
5        A.  Not mathematically in any way, no.
6        Q.  So you do see that there is a proposed salary
7    range listed in here?  Do you see that?
8        A.  Yes.
9        Q.  Okay.  But that didn't figure into your
10   analysis in any way?
11       A.  It's just based --
12       Q.  That's a no?
13       A.  Correct.
14       Q.  Thank you.
15       MS. WERMUTH:  Can you mark this as 20, please?
16           (Document marked as requested.)
17   BY MS. WERMUTH:
18       Q.  You have been handed Deposition Exhibit No. 20,
19   which is Bates labeled Dillard Expert Discovery 696
20   through 698.  Do you see that, sir?
21       A.  Yes.
22       Q.  Do you see it's a string of e-mails from
23   February of 2019?
24       A.  Yes.

Page 104

1        Q.  Related to a position called prad share.  Do
2    you see that?
3        A.  Yes.
4        Q.  How, if at all, did you use this particular
5    e-mail trail to provide your opinions in your report?
6        A.  I did not.
7        Q.  Okay.  Did you use any e-mails relating to
8    search committee work or prad share jobs in your
9    analysis?
10       A.  Not that I recall.
11       Q.  Okay.
12       MS. WERMUTH:  Can you mark this as 21?
13           (Document marked as requested.)
14   BY MS. WERMUTH:
15       Q.  You've been handed Exhibit 21, sir.
16       MS. WERMUTH:  Gia, it's Bates labeled Dillard
17   Expert Discovery 827 through 828.
18       MS. SCATCHELL:  Thanks.
19   BY MS. WERMUTH:
20       Q.  This is an e-mail about a gift for a colleague
21   who achieved tenure, and it's dated June of 2020.
22           Did that e-mail figure into your analysis in
23   any way, in your opinion in any way, Dr. Smith?
24       A.  No.

Page 105

1        Q.  Did DePaul University's motion to dismiss the
2    first complaint figure into your analysis in any way?
3        A.  No.
4        Q.  Going back to Exhibit 14, if you would, for
5    just a second.  These are her salary letters, her annual
6    contracts?
7        A.  Yes.
8        Q.  I'm trying to find it, too, so give me a
9    moment.
10           (Brief pause.)
11       Q.  Okay.  So turning to the second page and
12   thereafter, you can see that annual increases go into
13   effect -- sorry.
14       MS. WERMUTH:  It's actually the third page.  Dillard
15   underscore DePaul 2186 through the end.
16   BY MS. WERMUTH:
17       Q.  Her contracts with her salary are being issued
18   in June each year, right?
19       A.  Yes.
20       Q.  Okay.  So going back to your report where you
21   say that her income in 2018 grew as a result of her
22   complaint, if she complained prior to June of 2018, then
23   her 2018 compensation might be impacted by that; is that
24   right, sir?

27 (Pages 102 to 105)



Page 106

1    A.  I don't know.
2    Q.  Okay.
3    A.  And it's not I who said it grew.  It's she who
4  claimed that.  I merely restated what she said.
5    Q.  Okay.  So you don't know when in 2018 she
6  complained?
7    A.  Correct.
8    Q.  And you don't know when that complaint would
9  have resulted in any increase, whether it was in 2018 or
10  2019, other than what she reported to you?
11    A.  Correct.
12    Q.  Okay.  Let's stick with Exhibit 3.
13         And you can go until 2:30?  I just want to be
14  clear before I start on the RVL.
15    A.  Yes.
16    Q.  Okay.  So on page 7 of your report, this is
17  where you explain what you call the reduced value of life
18  calculation; is that right?
19    A.  Yes.
20    Q.  Okay.  And do you know if -- can I refer to
21  that as RVL?
22    A.  Sure.
23    Q.  Do you know if RVL damages are available under
24  Title VII?

Page 107

1    A.  I don't.
2    Q.  Do you know if they're available under the
3  Americans With Disabilities Act?
4    A.  Same answer.
5    MS. SCATCHELL:  Objection; calls for a legal
6  conclusion.
7  BY THE WITNESS:
8    A.  Yeah, I'm not here -- even if I knew, I really
9  wouldn't want to testify on the record as to legal
10  matters.
11  BY MS. WERMUTH:
12    Q.  Okay.  Do you know if RVL damages are available
13  under the Equal Pay Act?
14    A.  Same answer.
15    MS. SCATCHELL:  Same objection.
16    MS. WERMUTH:  Okay.
17  BY MS. WERMUTH:
18    Q.  Now, to get to RVL, you start with the concept
19  of the value of a statistical life, right?  That's your
20  starting point?
21    A.  Yes.
22    Q.  And the value of a statistical life is not the
23  same as -- so VSL is not the same as RVL, correct?
24    A.  Well, RVL is my measure of the reduction and

Page 108

1  the value of her ability to enjoy her future, meaning
2  life expectancy.
3    Q.  Okay.  So the VSL analysis begins with
4  studies -- well, strike that.
5         VSL is the value that society places on
6  reducing the statistical probability of death; is that
7  right?
8    A.  No, it's not what society places.  It's what
9  we, as individuals, on average place.  So when you buy a
10  carbon monoxide detector, it is not society saying you
11  value your life.  It's you saying I value my life.
12         When you look both ways when you cross the
13  street -- and I say that as a metaphor, it's you wanting
14  to preserve the quality of your life, not society.
15    Q.  Do you rely on an article in your analysis
16  authored by Mrozek and Taylor?
17    A.  Among hundreds, yes.
18    Q.  Among hundreds, right?  And if you look at --
19    MS. WERMUTH:  Let me get this marked as 22.
20         (Document marked as requested.)
21  BY MS. WERMUTH:
22    Q.  Sir, I've marked the Mrozek and Taylor article,
23  one of many cited in your report.  This one is entitled,
24  What Determines the Value of Life, a Meta-Analysis.

Page 109

1         You're familiar with that document?
2    A.  I cite it, yes.
3    Q.  And you would agree with me, in the
4  introduction, the two authors write:  Proper evaluation
5  requires an estimate of the value society places on a
6  life saved.  Do you see that?
7    A.  Which paragraph are we at?
8    Q.  First paragraph in the introduction.
9    A.  Yes, but --
10    Q.  Okay.  And --
11    A.  -- if I can understand -- that it is not what
12  they mean by that.  I'd like to explain.
13    Q.  Well, let me just go on quickly and then I'd
14  like to hear your explanation.
15         They go on to write:  The concern is not with
16  the value of an identified life -- right -- but the value
17  society places on reducing the statistical probability
18  that one among them dies, the so-called value of a
19  statistical life.  Do you see that?
20    A.  Yes.
21    Q.  So when I asked you earlier if that's what VSL
22  is, the value society places on reducing the statistical
23  probability that one among them dies, you said no, that's
24  not the case.  So tell me how you differ from these two



Page 110

```
 1   authors in understanding what VSL is?
 2       A.  I don't differ from them.  I want to explain
 3   what they mean.  So if you say society recognizes that we
 4   shouldn't -- that we should look both ways before we
 5   cross the street, it's not because there's been some 200
 6   million persons surveyed.  It's because we see people, by
 7   and large, looking.  We see millions of people, one by
 8   one, day by day, year by year, looking both ways before
 9   we cross the street.  And when we observe that millions
10   of people are, one by one, each by themselves, looking
11   both ways before we cross the street, by observing the
12   millions of people that do that as individuals, we then
13   say, in general, people in society -- or society sees
14   that it is important to look both ways.  We, in an
15   American society, see that it's important to look both
16   ways before we cross the street.
17       So in that way, they use society to mean
18   individually as a collection of hundreds of millions we
19   act as a society.
20       Q.  Okay.  And in fact, in your report on page 7,
21   you say:  My estimate of the value of life is based on
22   many economic studies on what we, as a contemporary
23   society, actually pay to preserve the ability to lead a
24   normal life.  Do you see that?
```

Page 111

```
 1       A.  Yes, one by one.
 2       Q.  Okay.  You say that the studies examine
 3   incremental pay for risky occupations, as well as a
 4   multitude of data for life-saving by individuals,
 5   industry and state and federal agencies.  Do you see
 6   that?
 7       A.  I wrote that.
 8       Q.  Okay.  So these studies are based on risky
 9   occupations, right?
10       A.  Of which there are many, yes.
11       Q.  Yes.  Would you say being a tenured professor
12   is a risky occupation?
13       A.  That's got nothing to do with the value of
14   life, but no.
15       Q.  Okay.  And then in addition to risky
16   occupations, the other studies deal with an
17   individual willing to pay for life-saving opportunities?
18       A.  Yes.
19       Q.  Okay.  And these studies, although there are
20   many of them and over decades, remain somewhat
21   controversial.  Would you agree with that?
22       A.  No.
23       Q.  No?  Okay.
24       A.  This group -- this field of economics is
```

Page 112

```
 1   perhaps one of the most well-settled amongst many fields
 2   of economics.  This is probably the least controversial,
 3   the most well-settled field.
 4       Q.  Well, isn't it true that these studies report
 5   wide variations in the estimate of VSL?
 6       A.  Wide is a point of view.  They behave no
 7   differently than other types of statistics that we
 8   measure routinely, such as the average earnings of a
 9   lawyer, which can range from $10,000 a year, if you're at
10   a Northwestern University legal aid clinic, to
11   $5 million a year if you're -- or more, if you're a
12   senior partner at a top Wall Street law firm.
13       That is what some people call a wide variation.
14   10,000 a year for one lawyer, five million a year, or
15   more, for another lawyer.  And if you're a lawyer who is
16   actually head of a Fortune 500 company, you might be
17   earning $50 million a year.  Some people might consider
18   that to be a wide variation.
19       But the earnings of lawyers and all their
20   different occupations is a fairly well-behaved set of
21   statistics, as is the value of life studies.
22       Q.  So we're not here -- and you haven't opined on
23   anything other than the value of a statistical life,
24   which even according to the article that we just looked
```

Page 113

```
 1   at, the VSL varies substantially:  Reported estimates of
 2   the VSL varies substantially, from less than $100,000 to
 3   more than $25 million.  Do you see that in the very first
 4   paragraph?
 5       A.  They didn't use the word why.  They used the
 6   word substantially.  Yes.  I agree with what they wrote.
 7       Q.  You do agree with what they wrote?  So there's
 8   substantial variation in the estimates of the VSL?
 9       A.  As there are substantial variations in
10   estimates of what a lawyer may make, yes.
11       Q.  Which we're not here to discuss today.
12       A.  Yes.  But my point is I'm trying to teach you
13   something about statistics in the world and that you
14   don't see this as anything unusual.  If you had a Ph.D.
15   in econometrics, you would see these kinds of variations
16   that are substantial are, in fact, commonly observed in
17   hundreds and hundreds of areas.  And the point of this
18   article is to make some sense of the different
19   variations, which they do.
20       Q.  Well, and this article also talks about the
21   controversy around the validity of using VSL estimates.
22   Does it not, sir?
23       A.  Can you point me to the sentence?
24       Q.  First page, last paragraph.
```

29 (Pages 110 to 113)



Page 114

1     A.  They're talking about using it from labor
2   market studies, not safety studies.
3     Q.  Okay.  And so they talk about controversy
4   around a variety of issues.  One topic is the
5   statistically significant relationship between the risk
6   of death on the job and workers' wages, right?  And on
7   the second page, a second issue is the wide variation and
8   the VSL estimates reported in this literature.
9         Do you see that?
10    A.  Yes.
11    Q.  Okay.  And they go on to then cite a variety of
12  different variations in that same paragraph, yes, sir?
13    A.  Yes.  And they conclude that you can make
14  perfect sense of this in a peer-reviewed journal article
15  whereby they, then, after peer review, put forth what
16  they believe is the appropriate range of the correct
17  value of life.
18    Q.  This article, I can't really tell when it was
19  published.  It looks like 2001, perhaps?  2002?
20    A.  Which one, Mrozek?
21    Q.  Yes.
22    A.  Yes.  And you should read in their abstract
23  that they say the range is below previous reviews, and
24  they do suggest a correct range here in this article.

Page 115

1     Q.  In 1998 dollars?
2     A.  Yes.
3     Q.  Okay.
4     A.  And my point is that this article -- peer
5   reviewed in the Journal of Policy Analysis and
6   Management, a very high-quality journal -- these authors
7   say all of this is well-resolved, well-understood that
8   there is an appropriate range for the value of life.
9   It's not particularly wide, and they resolved the
10  controversy.
11    MS. WERMUTH:  Can you mark this as 23?
12        (Document marked as requested.)
13  BY MS. WERMUTH:
14    Q.  I've now handed you what's been marked as
15  Exhibit 23, which is the article.
16    MS. WERMUTH:  Gia, again, I don't think this was
17  produced to us so I pulled it.  It's Bellavance, Dionne
18  and Lebeau.  I don't speak French so I know I butchered
19  all of that.
20        This is another article you cited in your
21  report, sir?
22    A.  I believe so.
23    Q.  And this article was published in 2008 or --
24  2009, I think, actually; is that correct, sir?

Page 116

1     A.  Yes.
2     Q.  And this article also notes the wide variations
3   among the various studies performed; is that right, sir?
4     A.  They talk about -- they discuss the variability
5   and then make sense of it, yes.
6     Q.  Okay.  And --
7     A.  And you must read their conclusion.
8     Q.  Okay.  I'd like to -- these VSL studies are
9   related to policies or measures that can be taken to
10  reduce mortality, right?
11    A.  No.  They say this information can be used for
12  such evaluations.
13    Q.  Right.
14    A.  The underlying studies are not based on that.
15    Q.  Well, aren't they based on the willingness to
16  pay to avoid death, right?
17    A.  Yes, that's not government policies.  Those are
18  individual decisions.
19    Q.  Okay.  I said policies or measures.  So folks
20  can take individual measures to reduce their own
21  mortality, right?
22    A.  Well, they make individual decisions, whether
23  to look both ways to cross a street or whether to accept
24  a job in a risky occupation, yes.

Page 117

1     Q.  Right.  And neither one of those scenarios are
2   presented in this case, right?
3     A.  They have -- the measure of the value of life
4   has nothing -- the value of statistical life has nothing
5   to do with how it's arrived at.  There is different ways
6   of arriving at it, and you arrive at it through either
7   looking at safety measures, or you look at it through
8   people taking risky jobs.
9         But the value of a statistical life would apply
10  to a statistically average person, has nothing to do with
11  whether that person is in a risky job or not.
12    Q.  But many of the studies are based on risky
13  occupations, yes, sir?
14    A.  In order to value the average value of the
15  average person's life, yes.
16    Q.  Is gender taken into account in these studies?
17    A.  There is no indication that women or people of
18  different -- that gender plays a role in the value of
19  life, so no.
20    Q.  What about race or ethnicity?
21    A.  Same answer.
22    Q.  What about wealth?
23    A.  There's actually almost nothing that impacts
24  the value of a statistical life except people below the



Page 118

1   poverty line. Those studies show that there's a
2   different value, but...
3       Q.   They might be less willing to pay to avoid
4   death because they have less money?  Is that the point?
5       A.   They're just in dire circumstances.
6       Q.   Okay.
7       A.   They're not a statistically average person.
8       Q.   Is someone who is willing to pay a lot because
9   they are wealthy, is that a factor taken into account?
10      A.   You can be Bill Gates and buy a carbon monoxide
11  detector and pay the same price you and I would.
12      Q.   Okay.  What about health?  Does that impact the
13  value of a statistical life?
14      A.   The statistically average person is crossing
15  the street.  We don't know how healthy they are.  They're
16  just in average health.
17      Q.   What about age?  Does that factor in?
18      A.   Yes, we factor age, as part of how many future
19  years of life you expect to take value, just as we factor
20  age into this analysis of how many future years of
21  earnings.
22      Q.   What about intelligence?
23      A.   No indication.
24      Q.   What about education?

Page 119

1       A.   There is no indication of anything, other than
2   the future number of years and living above poverty.
3   That's it.  Any other factors you care to mention, you
4   can lump into one group.  They're not important.
5       Q.   Okay.  So when I look at page -- and by the
6   way, on page 8 you indicate the two types -- the groups
7   that the studies fall into, being consumer behavior and
8   purchases of safety devices and then wage risk premiums
9   to workers, right?
10      A.   Yes.
11      Q.   So to get to your VSL analysis, you rely on Ted
12  Miller's meta-analysis; is that right?
13      A.   No.  He's one of five meta-analyses, but those
14  five meta-analyses rely on the entire body of literature,
15  which I do.  I simply cite them because they're a
16  convenient repository of assessment of the entire body of
17  literature.
18      Q.   If we look at page 18 of your report, you list
19  there the five meta-analyses that you rely on to reach
20  your conclusion?
21      A.   I don't solely rely on them.  I do rely on
22  them, as well as the entire underlying body of
23  literature, which is cited elsewhere in the report.
24      Q.   I'm looking at page 18 of your report.  Is that

Page 120

1   a table that you reproduced directly from Ted Miller's
2   2008 article?
3       A.   Yes.
4       Q.   Okay.  And why did you reproduce that in your
5   report?
6       A.   Because Miller cites those five meta-studies
7   and including one of his own.  And those five
8   meta-studies review the vast majority of the literature.
9       Q.   Okay.  And so did you rely on this table on
10  page 18 to come up with your own conclusion around the
11  value of a statistical life?
12      A.   You just asked that, and I said yes.  That
13  table, as well as the entire body of literature, which is
14  cited both there and elsewhere in my report.  I rely on
15  the entire body of literature of which I've accessed, I
16  believe, well over 95 percent of it.  And if you look at
17  what I said in my report, I believe it would cover over
18  95 percent of the entire body of literature.
19      Q.   So please turn to page 17 of your report.
20      A.   Yes.
21      Q.   You say:  Below I list the principle
22  symptomatic reviews, meta-analyses, since the year 2000,
23  of the value of life literature and the values of
24  statistical life they recommend.  Do you see that?

Page 121

1       A.   I wrote it.
2       Q.   You wrote it.  And when you say below, you are
3   referring to the table on page 18, correct?
4       A.   Yes.
5       Q.   Okay.  And you say:  These statistically-based
6   studies place the value between 4.4 and 7.5 million.  Do
7   you see that?
8       A.   Yes.
9       Q.   And you derive those figures from the table on
10  page 18, correct?
11      A.   Yes.
12      Q.   So the best estimate, 2005 dollars column, the
13  lowest figure there is 4.4 million, right?
14      A.   In 2002 dollars, yes.
15      Q.   Well, it says 2005.
16      A.   I'm sorry.  2005, yes.
17      Q.   And then the highest figure is 7.5.  Do you see
18  that?
19      A.   Yes.
20      Q.   Okay.  So then you say with 5.9 million in the
21  year 2005 dollars, representing a conservative, yet
22  credible, estimate of the average and range midpoint of
23  the values of a statistical life published in the studies
24  in year 2005 dollars.  Do you see that?



Page 122

1     A.  Yes.
2     Q.  Okay.  So how do you get to 5.9 in these
3  meta-analyses?
4     A.  You average those figures.
5     Q.  You merely average the table figures?
6     A.  Yes.
7     Q.  Okay.  And then from that you say -- and you're
8  dealing in 2005 dollars there.
9        Then you go on to write:  Net of human capital,
10  a credible net value of life based on all these
11  literature reviews -- no.  I'm sorry.  Net of human
12  capital, a credible net value of life based on all
13  these literature reviews to be 4.8 million in 2005 dollars.  Do
14  you see that?
15     A.  Yes.
16     Q.  Okay.  So you go from 5.9, being what you said
17  was the mid point; is that right?
18     A.  The average.
19     Q.  The average?  Of the studies reported on the
20  following page.
21        So you go from 5.9 to 4.8.  How do you -- why
22  do you discount for 1.1 million there?
23     A.  Well, the value of life consists of two
24  components recognized by economists.  One, the value of

Page 123

1  our ability to work and produce, as well as the value of
2  the nonworking part of our life.  So the human capital
3  part is about 1.1 million.  So if we're looking at the
4  value of a person, the two components of the value of
5  their ability to do or produce, and their value they
6  place on their being, if we subtract out the value of
7  their ability to produce, about 1.1 million, the human
8  capital value, we're left with just the capital of the
9  being of about 4.8 million.
10     Q.  And why do you use the 1.1?  Like where does
11  that 1.1 million figure -- where is that derived?
12     A.  The average earnings per capita over a
13  lifetime, over 45 years.
14     Q.  Average earnings per capita over 45 years?
15     A.  Over a future average remaining life expectancy
16  of 45 years --
17     Q.  Oh.
18     A.  -- the average value of life for the average
19  person.  The average person has 45 years left to live.
20     Q.  Where I do find that data?
21     A.  The Bureau of the Census will tell you that the
22  average person's got -- in their mid 30s with 45 years
23  left to live, according to the United States life tables.
24     Q.  Right.  But where I do find the average

Page 124

1  earnings per capita?  Where would I find the
2  $1.1 million figure?
3     A.  What you'll find is the average earnings
4  per capita of people in the work force is about 50,000 a
5  year.  Then you look and see that only about 70 percent
6  of the population is employed.  That reduces that to
7  about 35,000 a year for the average person, and the
8  average future work life for the average person is
9  something on the order of 20 years or so, plus benefits.
10  It comes out to about 1.1 million.
11     Q.  Why would you not, in this instance, use the
12  human capital that you've attributed to Dr. Dillard here
13  instead?
14     A.  Because we want to know the average value of a
15  person's being by subtracting out the average value of a
16  person's doing [sic].  This is all before we get to
17  Dr. Dillard.
18     Q.  Well, I get that, but -- I mean, I see that
19  that's what you're doing, but my question is why are you
20  doing that?  Why are we not looking at the value of her
21  life, as opposed to the value of a statistical life?
22     A.  We do look at the value of her life.  We've
23  looked at the value of her human capital.  But we also
24  want to look at the statistically average value of the

Page 125

1  part of her life that does not involve human capital.
2  And you do that by first looking at average people and
3  then subtracting out the average human capital.  To do it
4  the other way would be categorically wrong.  Not a
5  forensic economist on the planet would approve of your
6  suggestion.
7     Q.  But when you get to her situation, you don't
8  remove human capital that's attributable to her?  You've
9  already done that but you've done it on a basis that's
10  not directly tied to her life, right?
11     A.  We look at the value of her statistical life
12  and that of human capital by using that from the average
13  person, yes.
14     Q.  Right.
15     A.  We look at the non-component.  You wouldn't
16  want to look at Bill Gates's earnings capacity and
17  subtract that from the 5.9 million.
18     Q.  I agree, but why would you not want to look at
19  Dr. Dillard's earning capacity --
20     A.  For the same reason, because these -- we're
21  looking at an average person first, and we want to know
22  the average value of a person's being first.
23     Q.  But isn't that value of her being,
24  Dr. Dillard's being, net of her human capital?

1    A.  The value of her being, I assume, is the same
2  as the value of everybody's being, which is net of the
3  average person's human capital.  It's not net of her
4  human capital or net of Bill Gates's human capital.  It's
5  that of the average person's human capital.
6    Q.  Okay.  So you take 5.9 million in 2005 dollars
7  and you subtract 1.1 average statistical person's human
8  capital, and you get 4.8 million in 2005 dollars, and
9  then you'd take that up to 5.4 in 2008 dollars.
10    Do you see that?
11    A.  Yes.  And the same approach used elsewhere in
12  the peer-reviewed economic literature.
13    Q.  Okay.  But why are we talking about -- I get
14  that we're talking about 2005 dollars, because that's
15  what the table on page 18 is.  But why do you take it up
16  to 2008 dollars?
17    A.  You could take it to any year you want.
18    Q.  So then why take it up at all?  Or why not go
19  to 2022 dollars?
20    A.  I could.
21    Q.  Okay.  So then you go on to say:  The actual
22  value I use --
23    A.  I do take it to 2022 --
24    Q.  Hang on.  I'll get there.  The actual --

1    A.  In the rest of that sentence.
2    Q.  The actual value that I use, 4.1 million in
3  2008 dollars.
4    So I just want to follow this through.  You got
5  5.9 in 2005 dollars.  You subtract out 1.1 to get 4.8 in
6  '05 dollars.  You then take that to 5.4 in '08 dollars.
7  And then you say, but wait, the actual value I'm going to
8  use is 4.1 in '08 dollars.  So then you subtract out
9  another 1.3 million from 5.4 down to 4.1, right?
10    A.  I don't subtract it out.  I use it.
11    Q.  You say:  The actual value I use, 4.1 million
12  in 2008 dollars.
13    Do you see that?
14    A.  Yes.
15    Q.  Why did you change 5.4 in 2008 dollars to
16  4.1 in 2008 dollars?
17    A.  I didn't change it.  I say the actual value is
18  5.4 million and then what I use is 4.1.
19    Q.  So now you've discounted even below the 4.8 in
20  '05 dollars, where you've subtracted human capital?
21    A.  I used a figure less than that, yes.
22    Q.  Okay.  And why?  Why do you -- what are you
23  doing here to derive the 4.1?
24    A.  I explain in the next few sentences.  This is a

1  value I arrived at based on a review I did originally in
2  the literature in the 1980s, averaging results published
3  since that time increased by inflation.  So I continue to
4  use a conservative figure that I've been using for the
5  last 30 years, which these later meta-analyses show,
6  taking into account the later literature has shown upward
7  increase in the statistically average value of life over
8  the years.  I continue to use the earlier, more
9  conservative measure.
10    Q.  And you use that in all your reports, the same
11  figure; is that right?
12    A.  Correct.
13    Q.  And those reports would have been reports that
14  were issued at least as -- in cases detailed in the
15  addenda to your C.V.?
16    A.  Some of those cases do look at the value of
17  life, yes.
18    Q.  Okay.  So that's your starting point.
19  4.1 million in '08 dollars, 5.6 million in '22 dollars.
20  That's your starting point for your analysis on the
21  reduction in the value of life for Dr. Dillard, right?
22    A.  Yes.
23    Q.  So what you do from there is you take that
24  figure -- and are you using the 4.1 or the 5.6?

1    A.  They're the same number adjusted for different
2  calendar years.  It's the same number.
3    Q.  Okay.  So I'm on page 8 of your report.  And
4  you say:  As a methodology -- so I'm looking in the last
5  paragraph, just above where you mentioned Table 15, okay?
6  As a -- sorry.  I'm sorry.  I don't want to point to
7  that.
8    All right.  So then you explain what you do on
9  pages 8 and 9 with respect to her -- coming up with an
10  opinion on how to value her reduced feelings about her
11  life, right?
12    A.  Reduced quality of her life based on the
13  allegations in this case, yes.
14    Q.  Well, it's not based on the allegation.  It's
15  based on her self-report of how she would characterize
16  her impairment, correct?
17    A.  Isn't that all part of the allegations?
18    Q.  Well, so you -- in her interview, sir, she is
19  asked what percentage -- hang on.  Let's see what the
20  question is.
21    (Brief pause.)
22    Q.  The 40 to 60 percent that she places -- what's
23  the question that you ask your --
24    A.  I'll have the --



1     Q.  -- litigants?

2     A.  How have the allegations and the consequences

3 of what's happened to you impacted you in -- and we ask

4 four domains; daily practical living and your social and

5 leisure activities as a part of -- in your occupational

6 endeavors, and your emotional life and overall -- given

7 all that thoughtful review that she took my interviewer

8 through with these many paragraphs about the impacts

9 overall -- if the quality of your life -- given whatever

10 quality of life that you had before this incident began

11 to impact you, what percent do you now have compared to

12 what you had beforehand?

13       And she reported 50 percent.  We show it at 40

14 and 60 to help the trier of fact see the range of -- that

15 if you adopt something less or adopt something more, it,

16 of course, varies up and down, as you might expect, in

17 the linear fashion.

18     Q.  All right.  So on the last page of Exhibit 5,

19 over in the section titled, Overall RVL, your

20 interviewer, staff member writes:  She estimates her loss

21 as 50 percent.  Do you see that?

22     A.  Yes.

23     Q.  Okay.  And so you take that self-reported loss

24 and you go ten percent below and ten percent above to

1 assist the trier of fact?  Is that your testimony?

2     A.  Yes.

3     Q.  Okay.  And you don't give any 50 percent

4 analysis at all; is that right?

5     A.  Oh, absolutely.  Did you read the report?

6     Q.  Where is the 50 percent?

7     A.  At the tail end of that section.

8     Q.  Tell me what page, sir?

9     A.  I'll get to it.

10        (Brief pause.)

11     A.  On page 9, above the dotted line.

12     Q.  Yeah.

13     A.  Where we say the 40 percent number of 2 million

14 6, the 60 percent number of 3 million 9, averaging 3.3,

15 257,415, which would be exactly the 50 percent.

16     Q.  That would be the 50 percent?  Okay.  But your

17 tables don't reflect that?  You'd have to do the math to

18 average it, right?

19     A.  Math people learn in third grade, yes.

20     Q.  Okay.  But it's not --

21     A.  No, you don't have to do the math.  I did the

22 math for them.  It's in my report.

23     Q.  But it's not in the tables that way, correct?

24 I just want to be clear.

1     A.  How many complaints do you want to hear?  I

2 tell you where it is.  It's not on page 1.  It's not on

3 page 2.  It's not on any of the pages.  It is in the

4 report.  If you want to complain that that number should

5 be on every single page in bold-face, underlined,

6 italicized, you may issue a complaint to my staff.

7     MS. WERMUTH:  Move to strike based on --

8 BY THE WITNESS:

9     A.  It is not --

10     MS. WERMUTH:  -- nonresponsive, and frankly, it's

11 inappropriate --

12 BY THE WITNESS:

13     A.  Let me finish.

14     MS. WERMUTH:  -- harassing -- no, I'm not going to

15 let you finish, because --

16 BY THE WITNESS:

17     A.  No, you're harassing me --

18     MS. WERMUTH:  -- your not --

19 BY THE WITNESS:

20     A.  -- no.  It's not --

21     MS. WERMUTH:  You're not --

22 BY THE WITNESS:

23     A.  It is where it's not, it is where it is.

24 Period.

1 BY MS. WERMUTH:

2     Q.  Thank you, sir.

3     A.  And just accept that it is where it is --

4     Q.  Thank you, sir.

5     A.  -- clearly in black and white.

6     Q.  Well, it doesn't say clearly in black --

7     A.  It's clear --

8     Q.  -- and white that it's --

9     A.  You're interrupting.  It's clear.  If you think

10 it's defective, complain to the jury.

11     MS. WERMUTH:  I'll complain in a Daubert motion

12 first.

13 BY THE WITNESS:

14     A.  That I didn't put it on every single page?

15 BY MS. WERMUTH:

16     Q.  I didn't ever once suggest that you need to put

17 it on every single page.

18     A.  Well, you're about to get there.

19     Q.  Okay.  Now, let's talk about the methodology --

20     THE WITNESS:  Gia, can't see me smiling and

21 laughing, because I hope you take this in humor.

22     MS. WERMUTH:  It's not humorous.  It's rude.  And

23 you're laughing --

24     THE WITNESS:  Well, no.  You are rude --



Page 134

1    MS. WERMUTH:  -- in my face --
2    THE WITNESS:  -- you're rude.
3    MS. WERMUTH:  You're not laughing because you think
4  it's humorous.  Like, you're laughing because you're
5  making fun of me.
6    THE WITNESS:  No, I'm not making fun of you.
7    MS. WERMUTH:  Yes, you are.
8    THE WITNESS:  I'm saying if you complain that it's
9  not on every single page, I would find that humorous.
10    MS. WERMUTH:  Okay.  Moving on, please.
11    THE WITNESS:  Thank you.
12  BY MS. WERMUTH:
13    Q.  Your analysis of the reduction in the value of
14  life is based on two components.  The statistical value
15  of life that you've discounted, to some degree, as well
16  as her self-reported loss, correct?
17    A.  Understanding that -- correct.  Understanding
18  that the self-reported loss is what I understand she'll
19  testify to under oath at trial.  So it is the claim.  The
20  self-reported loss is part of what I understand to be the
21  claim, the allegation, yes.
22    Q.  And none of the papers that you cite in your
23  study employ an RVL method that you just described, where
24  you used a self-reported figure to reduce?

Page 135

1    A.  I do cite a peer-reviewed journal article.  I
2  am a co-author of it, but it's been peer reviewed and
3  authored by two other authors.
4    Q.  Is that your 1990 pedantic damages and personal
5  injury of conceptual approach?
6    A.  Yes.
7    Q.  Let's take a look at that.
8    A.  And I believe it's also in one of the Miller
9  articles, and it may be in some of the other articles I
10  cited.  I just haven't memorized...
11    Q.  But let's be clear, the question is whether
12  self-reporting impairment rating has been peer reviewed
13  as a method for identifying the reduction in the value of
14  life?  Okay.
15    MS. WERMUTH:  I am going to have this marked as
16  Exhibit 24, I believe?
17        (Document marked as requested.)
18    MS. WERMUTH:  Gia, Exhibit 24 is Dillard Discovery
19  pages 3439 through 3442.  This was produced by you all.
20  Gia, for some reason it doesn't have the expert
21  denominator.  I don't really know why, but just FYI.
22    MS. SCATCHELL:  Was it produced?  Okay.
23    MS. WERMUTH:  It's called Dillard Discovery pages
24  3439 through 3442.

Page 136

1    MS. SCATCHELL:  Okay.  That's fine.
2    MS. WERMUTH:  Okay.
3  BY MS. WERMUTH:
4    Q.  Is this the article, Dr. Smith, where you
5  indicate that your methodology has been peer reviewed?
6    A.  This article suggests you can use a percentage.
7  Here it says a psychologist may develop a percentage, but
8  the point is a percentage can be used.  Period.
9        This article says -- the source of that
10  percentage can be, may be a psychological evaluation.  It
11  does not exclude the source of that percentage can be a
12  hypothetical requested by plaintiffs -- to the trier of
13  fact and leave it up to them to determine a percentage.
14  It doesn't suggest that there's any best way, just that
15  this is a way among other ways.
16    Q.  Well, it says this is a way, but it doesn't
17  discuss any other ways, correct?
18    A.  Well, when you say it's a way, it implies it's
19  not the only way.
20    Q.  It certainly -- this isn't an article that was
21  peer reviewed where your self-reporting analysis is
22  adopted, correct?
23    A.  This article is an alternative to that, yes.
24    Q.  Correct.  And then the Miller article that I

Page 137

1  think you're talking about actually suggests that
2  self-reporting is an inappropriate way of determining the
3  reduction and the value of a statistical life?
4    A.  You have to show me the Miller article.  Ted
5  Miller has testified in cases with me where we used
6  self-reporting.
7        (Document marked as requested.)
8    MS. WERMUTH:  Again, Gia, this article is Exhibit
9  25.  It is referenced in Dr. Smith's report, but it is --
10  it was not produced to us so I obtained it another way.
11    MS. SCATCHELL:  What's the name of it?
12    MS. WERMUTH:  Hedonic Damages, colon, Were the
13  Crippling Blows to the Golden Goose well-founded?  March
14  29th, 2008, Ted Miller.
15    MS. SCATCHELL:  All right.
16  BY MS. WERMUTH:
17    Q.  Okay.  Dr. Smith, if you look at page 5 -- so
18  the premise of this article is that VSLs could
19  potentially be used in non-fatal cases, right?  Where
20  mortality is not in play; is that right, sir?
21    A.  As many articles, yes.  This is one of them.
22    Q.  Okay.  And so you see on page 5 in Section 7,
23  there's a section entitled:  How Are Non-Fatal Diagnoses
24  Valued with VSL.  Do you see that?



Page 138

1     A.  Yes.
2     Q.  And he says:  I found a practical solution.
3  One uses objective measures to capture the functional
4  losses over time, generally by diagnosis or for a
5  plaintiff.
6        So you see, he talks about objective measures.
7  Do you see that?
8     A.  This is a practical solution, not the only
9  practical solution.
10     Q.  Okay.
11     A.  So he makes a suggestion here, yes.
12     Q.  And his suggestion, if you look on page 7, is
13  to avoid subjective self-reports, yes?
14     A.  Well, we have to read the sentence.
15            (Brief pause.)
16     A.  It said:  Ideally, the measurement scale should
17  avoid subjective [sic] report.  But that's ideally.  That
18  doesn't mean a jury can't hear a subjective report.
19     Q.  Well, it goes on to say:  If a subjective
20  self-report is a critical determinant, moral hazard can
21  tempt a respondent to lie about the amount of quality of
22  life lost.  Do you see that?
23     A.  Yeah.  The entire fact he's hired to make
24  determinations about the credibility of witnesses.

Page 139

1  That's precisely their role.  That's why they're paid the
2  big bucks, $35 a day, to make sense of subjective
3  self-reports.
4     Q.  So neither Exhibit 24, your article from 1990,
5  nor Exhibit 25, Ted Miller's article of 2008, propose a
6  methodology that you use in your report of relying solely
7  on a subjective self-report?
8     A.  Miller discusses that self-reports have been
9  used, are used.  That's the whole point is he's offering
10  an alternative to it.  He doesn't say they're unuseable.
11  He doesn't say you can't do it.  He's suggesting that if
12  you want to avoid the subjectivity, there is more
13  objective ways.
14        I put forth in the article by Brookshire and
15  Burleigh where we use a psychologist.  Miller is talking
16  about another approach.  Here we don't have either of
17  those approaches, but both articles imply that the
18  self-report is an approach that is used.  No one
19  criticizes that it should not be used.  They suggest
20  alternatives that may avoid some of the problems with it.
21  We don't have those alternatives here.  The trier of fact
22  is left with the fact that, yes, there may be a
23  temptation on the part of people who self-report -- well,
24  I've seen, actually, men suck it up and under report, in

Page 140

1  my opinion, the severity of the impact because they don't
2  want their wife and children to see them as crybabies.
3  So I've seen self-reports that I believe that are
4  extraordinarily conservative.  You may suggest another
5  plaintiff's self-report may be tempted to -- you know,
6  tempted to lie could be like a man lying to his wife
7  about how badly he hurts.
8     Q.  So I just want to be clear.  Your peer-reviewed
9  article of 1990 presents a methodology that includes a
10  lost pleasure of life scale as conducted by a
11  professional, correct?
12     A.  As one method of providing a percentage to the
13  jury.
14     Q.  That's the only method discussed in your
15  article, yes, sir?
16     A.  It's proposed as one method.  It's the only
17  method discussed --
18     Q.  Correct.
19     A.  -- but it does not say it's the only method.
20  It assumes that there are other methods, including the
21  self-report.  Miller assumes the other methods include
22  self-report.  In fact, he explicitly discusses the
23  existence of self-reporting as a method.
24     Q.  As a method to be avoided?

Page 141

1     A.  You have to read the sentence.  Ideally the
2  measurement scale should avoid.
3     Q.  Yes.
4     A.  Ideally.
5     Q.  Yep.
6     A.  He doesn't say you must.  He says ideally.
7     Q.  Right.
8     A.  Yes.
9     Q.  Thank you.
10     A.  But he obviously discusses --
11     Q.  That was my question.
12     A.  Well, that's my answer.
13     Q.  Now, did you know that Dr. Dillard had, at one
14  point in time, been treating with a psychologist?
15     A.  I understand she was treated for anxiety and
16  depression.  She stated in her interview.  I testified to
17  that several hours ago.
18     Q.  And did you do anything to look at her medical
19  records to consider whether or not her self-report was
20  accurate?
21     A.  I'm not a medical doctor, and I cannot make
22  determinations of the accuracy of medical records.
23     Q.  So you did not review her medical records?
24     A.  For the reason I just gave you, I would not

36 (Pages 138 to 141)



Page 142

1    undertake to endeavor in another person's field of
2    expertise, no.
3        Q.  Did you account for the fact -- in doing your
4    RVL analysis -- account for the fact that she stopped
5    treating with a mental health professional several years
6    ago?
7        A.  It's irrelevant to what her condition is
8    whether she treats or not.
9        Q.  And -- well, if she treats --
10       MS. SCATCHELL:  Objection; calls for speculation.
11   You can answer.
12   BY MS. WERMUTH:
13       Q.  Did you take into consideration that she has
14   avoided using any medication to treat her mental health
15   symptoms?
16       MS. SCATCHELL:  Objection; argumentative.  Assumes
17   facts not in evidence, foundation.
18   BY THE WITNESS:
19       A.  Whatever she does medically and whatever her
20   diagnosis is, I have no comment on.
21   BY MS. WERMUTH:
22       Q.  Okay.
23       A.  It's all up to the trier of fact.  I'm taking
24   her as she is, irrespective of how she got there.

Page 143

1        Q.  Or you could have used the methodology in your
2    1990 article and have her submit to a psychological LPL
3    analysis, yes?
4        A.  That's almost never done in the field of
5    forensic economics.  And I don't see that she treated
6    with anybody who did diagnose her on a quality of life
7    scale.  There are quality of life scales available to
8    psychologists.  I didn't see any of them did.
9        Q.  You didn't look at her medical records to know
10   that, right?
11       A.  I know that there was none.
12       Q.  Okay.
13       A.  And I do know there are rare instances in which
14   a psychologist or psychiatrist would give her a rating on
15   a scale of global functioning.  It's very, very rare.  I
16   don't believe there was one in this instance.
17       Q.  But that was the methodology that you proposed
18   in your 1990 article?
19       A.  I'm not the person who directs her medical
20   treatment, nor the person who directs what medical tests
21   should be made of her.  I do not see that such a test was
22   made, and that's it.
23       MS. WERMUTH:  Can we take a break?
24            (Short break taken.)

Page 144

1        MS. WERMUTH:  Back on the record.  We have no
2    further questions at this time.  I don't know, Gia, if
3    you have examination for the doctor?
4            EXAMINATION
5    BY MS. SCATCHELL:
6        Q.  I just wanted to clarify that you previously
7    testified that on the intake form, which I believe is
8    Exhibit 4, that there was an injury date of November of
9    2020, correct?
10       A.  Well, some sort of -- it says date of incident,
11   yes.  And your firm filled out that particular date,
12   which didn't have any particular meaning to me.
13       Q.  Okay.
14       MS. SCATCHELL:  Perfect.  No further questions.
15       MS. WERMUTH:  We're done.  Thank you.
16       MS. SCATCHELL:  We'll take a copy.
17       THE WITNESS:  I typically waive, unless you
18   recommend I reserve, Gia.
19       MS. SCATCHELL:  Yeah, you can waive.
20       THE WITNESS:  I'll waive.
21       MS. WERMUTH:  We'll order.
22       MS. SCATCHELL:  PDF copy.
23            * * * * *
24

Page 145

1    STATE OF ILLINOIS)
              ) ss:
2    COUNTY OF C O O K)
3
4        The within and foregoing deposition of the
5    aforementioned witness was taken before MARCIE A. HAW,
6    C.S.R., at the place, date and time aforementioned.
7        There were present during the taking of the
8    deposition the previously named counsel.
9        The said witness was first duly sworn and
10   was then examined upon oral interrogatories; the
11   questions and answers were taken down in shorthand by the
12   undersigned, acting as stenographer; and the within and
13   foregoing is a true, accurate and complete record of all
14   of the questions asked of and answers made by the
15   aforementioned witness, at the time and place hereinabove
16   referred to.
17       The signature of the witness was waived by
18   agreement of counsel.
19       The undersigned is not interested in the
20   within case, nor of kin or counsel to any of the parties.
21
22
23
24

37  (Pages 142 to 145)





Page 146

```
1          Witness my official signature and seal as
2     Notary Public in and for Cook County, Illinois on this
3     5th day of September, A.D. 2023.
4
5
6
7
8          _____
           MARCIE A. HAW, C.S.R.
9          License No. 084-004463
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```





**A**

**A-2**
88:2,6 89:22 90:6,14
91:2 94:19
**A-m-e-r-i-t-r-a-d-e**
36:14
**A.D**
146:3
**a.m**
1:13
**ability**
6:16 23:21 84:12
108:1 110:23 123:1
123:5,7
**able**
16:9 38:3 86:3
**absence**
44:19
**absent**
63:21
**absolutely**
131:5
**abstract**
114:22
**academic**
52:5 102:15
**accept**
116:23 133:3
**accessed**
88:9 120:15
**accommodation**
84:10
**account**
36:18 54:8 58:18
62:10 69:6,8 117:16
118:9 128:6 142:3,4
**accrue**
40:21
**accruing**
19:6
**accuracy**
141:22
**accurate**
8:13 10:3 141:20
145:13

**accurately**
6:16 96:4
**achieve**
43:20
**achieved**
40:9 43:13,16 45:15
56:15 104:21
**acronyms**
21:19
**act**
11:6,10,13 22:23
23:13,13 24:9 47:9
107:3,13 110:19
**acting**
145:12
**action**
23:9,12
**activities**
8:12 130:5
**actual**
23:20 34:7,19 57:20
59:4 62:6 64:7,21
70:11 71:2,5 75:7
75:12 76:21 126:21
126:24 127:2,7,11
127:17
**ADA**
23:24
**add**
59:8 60:15 70:17
78:3 99:4
**addenda**
128:15
**addition**
58:4,17 111:15
**additional**
38:6 45:7,8 100:21
100:23 101:8
**adjusted**
129:1
**Admin**
28:13,21,22
**Administration**
77:7
**administrative**
32:1,2 57:18

**adopt**
48:10,11 130:15,15
**adopted**
136:22
**adult**
84:9
**advance**
88:12 89:7,9,12,14
**advertising**
102:22
**aforementioned**
145:5,6,15
**afternoon**
6:24
**age**
74:20 76:3,14 77:4
77:22 78:1,4,7,15
78:16,17,19 93:14
94:17 118:17,18,20
**aged**
93:19
**agencies**
111:5
**ago**
89:15 141:17 142:6
**agree**
41:22 84:7 109:3
111:21 113:6,7
125:18
**agreement**
145:18
**aid**
112:10
**alcohol**
6:18
**allegation**
129:14 134:21
**allegations**
129:13,17 130:2
**alleging**
11:9
**allow**
5:22,23
**alluded**
6:22
**alma**

**76:9**
**alternative**
136:23 139:10
**alternatives**
139:20,21
**American**
52:21,24 110:15
**Americans**
11:9 23:12 81:20
88:16 107:3
**Ameritrade**
36:13,17
**amount**
29:6,8 34:4 57:13
63:14 75:15 138:21
**amounting**
42:13
**analysis**
10:14,23 21:4 23:8
23:15 41:13 45:9,13
47:8 57:17,20 67:5
98:13 101:9 103:4
103:10 104:9,22
105:2 108:3,15
115:5 118:20
119:11 128:20
131:4 134:13
136:21 142:4 143:3
**analyst**
20:9
**analysts**
63:5
**Analytics**
50:4
**Anna**
2:9 6:3 56:2
**annual**
37:14 55:21 105:5,12
**answer**
23:18 24:3,12 29:2
45:24 49:16 56:4
107:4,14 117:21
141:12 142:11
**answers**
145:11,14
**anxiety**



81:2 141:15
**anybody**
143:6
**apart**
83:19
**Apparently**
43:23
**appear**
9:12 50:15 101:3
**Appearing**
2:7
**applicants**
102:20
**application**
39:11
**applied**
91:11 95:9
**applies**
97:2
**apply**
43:22 44:4 91:6
117:9
**applying**
40:5,7 44:8 91:13,23
91:24 92:19,24
**appointed**
45:21
**appreciate**
41:18 86:20
**approach**
126:11 135:5 139:16
139:18
**approaches**
139:17
**appropriate**
60:11 114:16 115:8
**approve**
125:5
**approximately**
42:13
**April**
39:21 40:5
**area**
11:23
**areas**
113:17

**argue**
57:14 81:4
**arguing**
92:1,13
**argumentative**
142:16
**arising**
10:21
**arrive**
117:6
**arrived**
117:5 128:1
**arriving**
117:6
**artfully**
15:13
**article**
108:15,22 112:24
113:18,20 114:14
114:18,24 115:4,15
115:20,23 116:2
120:2 135:1 136:4,6
136:9,20,23,24
137:4,8,18 139:4,5
139:14 140:9,15
143:2,18
**articles**
135:9,9 137:21
139:17
**articulate**
5:14
**aside**
25:24
**asked**
23:5 27:13,13 54:4
81:8 109:21 120:12
129:19 145:14
**asking**
19:17
**asleep**
93:5,8
**assess**
23:5
**assessment**
119:16
**assessments**

69:2
**assigned**
47:8 85:6
**assignment**
45:12 47:5
**assignments**
23:1
**assist**
131:1
**assistant**
42:22 43:6 44:4
45:20,21 46:8,13
47:3 52:8 53:14
60:2 61:17 62:15,16
62:19 73:9,14 82:8
102:21
**associate**
41:11 43:7 52:8
53:16 54:11 60:11
60:16,20 61:12,17
61:18 62:15,15,19
63:12 64:24
**associated**
68:24
**Association**
52:21,24
**assume**
19:14 44:7 45:12
57:24 58:3 59:14
75:1 80:24 87:3
92:5 93:10 126:1
**assumed**
41:14 45:11 80:22
**assumes**
140:20,21 142:16
**assuming**
31:3 33:17 44:12,14
49:3,8 55:17 57:3
57:21 58:16 71:9
75:13 81:7 86:22
**assumptions**
57:17
**attached**
7:19
**attempt**
92:14

**attention**
15:7 55:24 68:8
**attributable**
125:8
**attribute**
48:7
**attributed**
124:12
**August**
1:13 102:22
**author's**
88:19
**authored**
108:16 135:3
**authors**
109:4 110:1 115:6
135:3
**available**
22:22 24:8 41:1 51:7
73:10 106:23 107:2
107:12 143:7
**average**
10:17 51:12,24 60:2
63:12,19 64:8,21
71:6 75:2 77:12
82:21 83:1,5,24
84:6,15,16 85:3,15
91:6,9,10,12,19
92:2 93:2,3,6 94:4,5
94:7,12,18 98:23
108:9 112:8 117:10
117:14,15 118:7,14
118:16 121:22
122:4,5,18,19
123:12,14,15,18,18
123:19,22,24 124:3
124:7,8,8,14,15,24
125:2,3,12,21,22
126:3,5,7 128:7
131:18
**averages**
85:19 93:4,5,6,9,10
93:17
**averaging**
128:2 131:14
**avoid**



116:16 118:3
138:13,17 139:12
139:20 141:2
**avoided**
140:24 142:14
**awake**
93:5
**aware**
17:11 44:17 45:18
51:6 54:9 83:6 87:8
**awermuth@cozen....**
2:11

---
**B**
**b**
3:6 4:1 25:21
**back**
10:7 21:16 26:18
45:16 50:2 54:23
55:16 60:7,15,24
61:2,8,23 64:15
65:3 67:21 74:18
105:4,20 144:1
**background**
8:11 15:8 64:6 92:11
103:2
**backing**
61:4
**backup**
21:10
**bad**
47:18 83:24
**badly**
140:7
**barely**
21:1
**base**
19:13 28:10,10,11
33:8,12,19 54:11
56:11,19,20,21 57:6
57:8,12,16 58:4,17
70:17
**based**
31:12 37:23 39:20
53:2 57:20 60:1
61:13 64:3,6 81:10

81:20 82:1 91:7
103:11 110:21
111:8 116:14,15
117:12 122:10,12
128:1 129:12,14,15
132:7 134:14
**basically**
79:22
**basis**
92:2 125:9
**Bates**
7:20 8:16 18:22
20:13 26:17,23 32:9
32:17 33:6 37:17
38:22 55:1 100:1
103:19 104:16
**Bear**
69:20
**began**
42:22 130:10
**beginning**
19:12 27:23 40:21
41:15
**begins**
47:12 108:3
**behalf**
2:8,12
**behave**
112:6
**behavior**
119:7
**believe**
11:18 19:15 23:20
50:9 59:13 60:10
88:3 114:16 115:22
120:16,17 135:8,16
140:3 143:16 144:7
**believed**
42:9 43:9
**believes**
18:12 23:6
**Bellavance**
115:17
**benefit**
32:20 71:24 72:3,21
**benefits**

18:24 19:2,7 37:14
68:23 69:4 70:1
71:13,19,20,21 79:2
79:3,4,5 80:1 124:9
**best**
5:17,21,23 7:1,9 53:2
121:12 136:14
**bet**
36:7
**beyond**
14:15,17 44:24
**big**
66:5,13,15 77:8
139:2
**Bill**
118:10 125:16 126:4
**billboard**
77:8,10
**billboards**
77:8
**billed**
13:8,14
**billion**
66:12
**birth**
98:9
**bit**
63:17
**black**
133:5,6
**blanks**
15:18
**Blows**
137:13
**Bluesky**
69:5,8
**body**
119:14,16,22 120:13
120:15,18
**bold-face**
132:5
**bottom**
8:19 26:6 33:20
34:16 90:6
**box**
28:4 31:4,4

**brain**
51:5
**break**
6:9 54:17,19,21
79:16 82:10,13
90:23,24 99:15
143:23,24
**Brief**
16:8 52:11 105:10
129:21 131:10
138:15
**briefly**
8:16
**broken**
31:7
**Brookshire**
139:14
**bucks**
139:2
**Bureau**
88:22 123:21
**Burleigh**
139:15
**business**
52:8
**but-for**
70:2,3
**butchered**
115:18
**buy**
108:9 118:10

---
**C**
**C**
4:1 145:2
**C.S.R**
145:6 146:8
**C.V**
7:21 8:10 25:8
128:15
**calculate**
72:2
**calculation**
35:16 41:23 63:5
73:8 91:7 97:6
106:18



**calculations**
40:21 42:16 57:24
58:24 62:22 65:6
73:3 88:3
**calendar**
129:2
**call**
7:10 25:22 52:20
61:13 63:21 66:23
106:17 112:13
**called**
1:8 5:2 6:23 22:16
28:22 29:9 104:1
135:23
**calls**
23:17 24:2,11 57:16
107:5 142:10
**camera**
66:23
**candidly**
65:20
**capable**
82:4,18,20,24,24
98:21
**capacity**
76:20 77:3,3 85:4,18
125:16,19
**capita**
123:12,14 124:1,4
**capital**
122:9,12 123:2,8,8
124:12,23 125:1,3,8
125:12,24 126:3,4,4
126:5,8 127:20
**caps**
23:23
**capture**
138:3
**carbon**
108:10 118:10
**care**
119:3
**cared**
101:6
**career**
15:20 18:7 53:18

54:4 81:17
**case**
5:8,9 8:1 9:11 11:17
13:4 16:16 20:23
109:24 117:2
129:13 145:20
**cases**
9:13 10:9,19 11:2,4,8
12:8,17,18,18
128:14,16 137:5,19
**cash**
80:21
**categorically**
125:4
**categories**
31:8 34:1 58:5
**categorize**
29:5
**categorizing**
34:12
**category**
28:18 33:22
**cause**
23:9 81:15
**causes**
23:11
**Census**
88:22 123:21
**certain**
18:11 28:16 44:21
**certainly**
6:1 8:8 11:21 18:9
34:21 45:13 50:18
54:8 67:23 98:15
100:7 136:20
**chair**
100:22
**chance**
80:17 84:22 85:8
86:10
**change**
41:12 45:8 127:15,17
**changed**
89:18
**changes**
34:9

**Chapter**
39:6
**characterize**
129:15
**characterized**
81:9,18
**charged**
13:12,18,19
**Chicago**
1:14 2:5,10 11:23
35:12 76:9
**children**
140:2
**choose**
97:7
**circumstances**
83:4 118:5
**citations**
9:14
**cite**
109:2 114:11 119:15
134:22 135:1
**cited**
85:24 87:18 108:23
115:20 119:23
120:14 135:10
**cites**
120:6
**Civil**
1:10 11:6 22:22
**claim**
19:10 22:24 23:13,14
23:21 47:9 76:20,22
81:8 85:4 98:23
134:19,21
**claimed**
81:1 106:4
**claiming**
17:17 58:13
**claims**
10:21 11:5,12 14:9
23:2 83:21 84:2
**clarify**
144:6
**clarity**
50:23

**clean**
78:12
**clear**
23:8 50:19 53:5
59:22 64:20 87:22
106:14 131:24
133:7,9 135:11
140:8
**clearly**
92:16 133:5,6
**Clerk**
35:12
**client**
52:15
**clinic**
112:10
**clock**
44:18,23 45:2,6
**close**
25:20,21 65:14 84:12
91:15
**co-author**
135:2
**coaching**
74:5
**Coast**
12:1
**colleague**
104:20
**colleagues**
38:2,4
**collect**
77:15
**collection**
110:18
**college**
53:6 54:3,9 56:16
60:18 102:1,19
**colon**
137:12
**column**
51:15,18,22 121:12
**come**
86:10 88:3 120:10
**comes**
124:10



MAGNA ▶
LEGAL SERVICES

coming
5:7 129:9
comment
142:20
commercial
10:19
committee
100:15,20,22 101:4
101:12 104:8
committees
101:7
commonly
113:16
communicating
86:23
Communication
54:3 56:16 60:18
102:1
Communications
102:20
Communications'
54:10
company
112:16
compared
66:4 130:11
compensation
33:3 48:4 56:11
61:23 70:21 101:8
105:23
compensatory
24:14
compensatory-type
24:8
complain
132:4 133:10,11
134:8
complained
105:22 106:6
complaint
14:12 47:24 48:8,13
105:2,22 106:8
132:6
complaints
132:1
complete

27:9 145:13
completed
13:13 16:22
component
72:5
components
58:7,8 122:24 123:4
134:14
compute
23:1
computed
24:15
Computers
51:4
concentrating
81:10,11,18 82:2
90:7,10 93:21 95:10
95:16 96:6,12,22
97:9,11,13 99:1
concept
107:18
conceptual
135:5
concern
109:15
conclude
114:13
concludes
39:24
conclusion
23:18 24:3,12 107:6
116:7 119:20
120:10
condition
74:16 96:5,8 97:17
97:18,19,20 98:24
142:7
conditions
95:18,21 96:11 98:3
98:4
conduct
66:21
conducted
140:10
confidential
36:20

conflate
57:15
consequences
130:2
conservative
97:14 121:21 128:4,9
140:4
consider
92:13 112:17 141:19
consideration
142:13
considerations
76:18
consists
122:23
constantly
37:18
consumed
6:18
consumer
119:7
contain
7:21
contemporary
110:22
contend
59:3
contends
41:5 100:11
continue
8:20 128:3,8
continuing
80:18
continuously
84:9
contracts
55:21 105:6,17
contrast
96:7
controversial
111:21 112:2
controversy
113:21 114:3 115:10
convenient
119:16
Cook

1:12 35:12 146:2
copies
33:16
copy
13:14,16 16:1 50:13
50:17 55:11 69:12
86:3 87:12,15
144:16,22
correct
9:20 14:7,19 16:24
17:4 19:20,24 23:10
26:11 27:3 31:11,13
34:10 37:9 41:14
43:11 44:9 47:10,20
49:10,14,19,24 52:6
53:7,10,13 54:13
55:5,19 56:22 58:13
64:19 70:15 75:21
76:1,15,24 77:2
78:21 82:3 83:15
86:15 91:8 92:4,10
93:24 94:14 98:12
103:13 106:7,11
107:23 114:16,24
115:24 121:3,10
128:12 129:16
131:23 134:16,17
136:17,22,24
140:11,18 144:9
correctly
8:23 65:12
counsel
2:2,14 15:18 16:20
19:21 47:2 52:17,18
145:8,18,20
County
1:12 35:12 145:2
146:2
couple
5:13 65:18,19 98:14
course
55:22 57:23 74:15
130:16
court
1:1 5:10,20 6:4,24
24:22 32:15 54:16



77:16 79:13
**Courts**
1:11
**cover**
120:17
**COZEN**
2:9
**credibility**
138:24
**credible**
121:22 122:10,12
**credit**
13:21
**Crippling**
137:13
**critical**
138:20
**criticizes**
139:19
**cross**
108:12 110:5,9,11,16
116:23
**crossing**
118:14
**crybabies**
140:2
**CSR**
1:11
**CT**
83:16
**Cubs**
45:3
**current**
8:7 71:17 89:17,18
**currently**
12:9 17:11
**CV**
5:9

———————————
**D**
———————————
**D**
3:1 4:1
**daily**
130:4
**damages**
18:22 19:6 22:22

23:24 24:8 35:16
40:21 106:23
107:12 135:4
137:12
**Daniel**
87:18
**data**
50:4 51:6,11 52:4,21
52:22 53:5,21 54:7
55:11 60:9,19,19
61:13 62:14 63:11
63:19,22 64:7 70:15
73:19 74:1 86:10,13
87:22 89:24 111:4
123:20
**date**
14:6 15:14,14,16,19
17:1,1,2 18:13,16
19:10,18,21,22
21:19,21 28:18
29:17 40:18 79:23
80:21,22 102:2,5,9
102:10,11 144:8,10
144:11 145:6
**dated**
27:8 104:21
**dates**
87:22 100:6,9
**Daubert**
133:11
**day**
7:2 8:5 9:20 10:3
83:19,23 84:4 93:11
110:8,8 139:2 146:3
**days**
10:2
**de**
65:17
**deal**
75:12 111:16
**dealing**
122:8
**death**
17:2 108:6 114:6
116:16 118:4
**decades**

111:20
**decision**
40:6,7,12
**decisions**
116:18,22
**decrease**
31:22,24 58:19 60:7
91:14
**decreased**
31:15 59:15
**defective**
133:10
**Defendant**
1:6,9 2:12
**defense**
55:2
**degree**
134:15
**delivered**
82:11
**delivery**
74:11
**denied**
97:2
**denominator**
135:21
**dental**
69:5,16
**DePaul**
1:5 2:14 5:8 17:8,12
30:20 34:23 35:20
37:18 38:13 39:5,11
42:21 43:3 44:4,16
47:13 50:22 51:16
51:22,22 52:5,12,23
53:5,6 54:6,6 55:2
55:22 57:16 63:12
63:19,22 64:21
72:16,20,22 76:7
102:20 105:1,15
**DePaul's**
50:3 60:2
**deposed**
89:12
**deposition**
1:8 2:2 3:8,9,10,11

3:12,13,14,15,16,17
3:18,19,20,21,22,23
4:4,5,6,7,8,9,10,11
4:12 5:11 7:15 9:12
14:24 26:22 32:16
48:21 89:6,8 92:15
99:11,12,16 101:17
103:18 145:4,8
**depositions**
9:23
**depression**
81:2 141:16
**derive**
59:1 72:4 73:1 121:9
127:23
**derived**
123:11
**described**
134:23
**description**
29:15
**detail**
38:6
**detailed**
128:14
**details**
14:15,17 66:12
**detector**
108:10 118:11
**determinant**
138:20
**determinations**
138:24 141:22
**determine**
77:17 136:13
**determined**
91:5
**Determines**
108:24
**determining**
137:2
**develop**
136:7
**devices**
119:8
**diagnose**



143:6
**Diagnoses**
137:23
**diagnosis**
81:4 138:4 142:20
**died**
76:10
**dies**
109:18,23
**differ**
109:24 110:2
**difference**
23:6 42:10 57:5
62:14
**different**
23:2 29:2,3,5 34:13
34:14,14 45:2,12
96:18 97:19 112:20
113:18 114:12
117:5,18 118:2
129:1
**differential**
61:12,15,16 65:14
**differently**
112:7
**difficult**
83:1
**difficulties**
81:11 83:3,10 96:6
**difficulty**
81:11,12,12,13,13,14
82:2 84:1,2
**digested**
100:16
**Dillard**
1:3 5:8 15:4,11 17:11
20:7,15 26:12,23
32:10,17 35:3,7
36:4 37:18 38:22
39:15 42:20 44:17
46:7,12 47:2 48:22
49:1 54:1,2 55:2,22
56:14 100:2,11,19
101:18 103:19
104:16 105:14
124:12,17 128:21

135:18,23 141:13
**Dillard's**
14:9 30:19 32:20
47:12 125:19,24
**Dionne**
115:17
**dip**
58:21 70:20,24 71:1
**dire**
118:5
**direct**
62:1
**direction**
20:10 21:15
**directly**
120:1 125:10
**directs**
143:19,20
**Disabilities**
11:10 23:13 81:20
88:16 107:3
**disability**
11:9 69:16 80:15
85:4 93:20 94:24
95:3,5,8,9,20 96:3
96:23 97:3,23 98:10
**disabled**
94:2 98:9
**disaggregated**
52:4 53:6,8
**discipline**
53:8
**disclosed**
8:1
**disclosure**
25:11
**discount**
43:19 69:19 71:16,18
75:16,17,18,21,23
81:24 84:11 92:20
93:1,14 122:22
**discounted**
127:19 134:15
**discounting**
84:18
**discovery**

15:3,4 26:24 32:10
32:18 35:3 36:5
38:23 48:22,23 49:1
100:2 101:18
103:19 104:17
135:18,23
**discrimination**
11:9 14:12 15:14
59:4
**discuss**
113:11 116:4 136:17
**discussed**
140:14,17
**discusses**
139:8 140:22 141:10
**dismiss**
105:1
**disorder**
83:7
**Disparti**
2:4 12:2,12 13:8
**dispute**
83:12,13
**disruption**
82:16
**distinguish**
98:8
**District**
1:1,1,11 5:10,10
**dividing**
98:22
**DIVISION**
1:2
**doctor**
141:21 144:3
**doctorals**
51:15,18
**document**
7:13 10:16 12:22
14:21 15:1 16:5,14
17:20 24:20,24 25:1
25:3,18 26:20 30:17
32:13,23 33:20 35:1
36:1,9,10 38:18
48:18 57:9 59:12
86:7 99:8 101:14,21

102:17 103:2,16
104:13 108:20
109:1 115:12
135:17 137:7
**documents**
25:19 26:3 54:22
55:4,18 98:14
**DOI**
21:19
**doing**
40:20 62:22 65:6
73:3 86:20 124:16
124:19,20 127:23
142:3
**DOL**
21:21
**dollars**
59:7 65:19,19 115:1
121:12,14,21,24
122:8,13 126:6,8,9
126:14,16,19 127:3
127:5,6,6,8,12,15
127:16,20 128:19
128:19
**domain**
95:4,5,12,13,14,15
95:17 96:23 97:18
97:19,22
**domains**
94:24 95:13 97:3,5
97:23 130:4
**dose**
83:18
**DOT**
21:23 22:1,4
**dotted**
131:11
**downs**
85:18 91:20 93:11
**Dr**
5:7,11 6:4,9 7:9,10
7:15 12:24 14:9,23
16:16 17:11,22
18:20 20:7,15 24:22
26:12,22 30:19,19
32:15 35:7 36:3,9



38:21 39:1 42:20
44:17 45:4 47:2
48:20 49:9,21 54:1
54:2 55:12,17,22
56:8,14 86:2 87:19
89:13 90:1 100:11
100:19 104:23
124:12,17 125:19
125:24 128:21
136:4 137:9,17
141:13
**draw**
15:7 55:24 68:8
77:19
**Drive**
1:14 2:5,10
**due**
47:24 83:4,10
**duly**
5:2 145:9

---
**E**
---
**E**
3:1,6 4:1,1
**e-mail**
2:6,11 88:23 104:5
104:20,22
**e-mails**
99:22 100:6 103:22
104:7
**earlier**
109:21 128:8
**earlier-marked**
57:9
**early**
37:20 38:3,5 46:3
84:8 85:12
**earn**
18:12 57:8,15 69:24
**earned**
18:12,14,16 23:7,7
29:4 42:10 46:8,12
57:19 59:3 61:11
65:11 69:21,22
**earning**
18:13,16,17,19,19

65:9 112:17 125:19
**earnings**
19:11 28:3,18 31:5,7
34:7 40:10 47:15,24
54:5 57:5,21 58:20
59:4 62:6 70:11
100:23 101:6 112:8
112:19 118:21
123:12,14 124:1,3
125:16
**East**
11:24
**EASTERN**
1:2
**econometrics**
92:11,12 113:15
**economic**
10:14 20:9 63:4
110:22 126:12
**economics**
111:24 112:2 143:5
**economist**
10:9 125:5
**economists**
122:24
**educate**
92:3
**education**
118:24
**educational**
8:11
**effect**
41:22 105:13
**effective**
49:12
**efficient**
92:15
**eight**
9:1
**either**
35:15 37:6 47:1 53:9
75:7 117:6 139:16
**emotional**
22:14 83:10 95:19
96:4,14 97:8,10,15
98:5 130:6

**employ**
134:23
**employability**
82:1 93:15
**employed**
54:3 69:18 80:3
85:18 90:9,16 93:21
95:4 124:6
**employee**
37:14
**employer**
34:13
**Employers**
34:12
**employment**
8:12 11:1 12:18
37:15 55:21,23
71:17 78:23 79:24
**endeavor**
142:1
**endeavors**
130:6
**engaged**
10:13 11:1,16 12:2
12:12 13:5
**engagement**
13:9
**English**
46:24
**enjoy**
108:1
**enjoyment**
19:12
**entire**
48:7 53:18 119:14,16
119:22 120:13,15
120:18 138:23
**entitled**
76:19 77:14 108:23
137:23
**enumerated**
96:6
**equal**
11:13 24:9 47:9
57:13 107:13
**equally**

14:14,14
**error**
92:7,8
**estimate**
57:1,3 64:1,4,13
68:23 80:21 109:5
110:21 112:5
121:12,22
**estimated**
71:6 75:7 76:16
**estimates**
113:1,8,10,21 114:8
130:20
**estimating**
64:12,15
**ethnicity**
117:20
**evaluation**
98:17 99:22 103:1
109:4 136:10
**evaluations**
116:12
**event**
86:5 89:14
**events**
17:7 21:6
**everybody's**
126:2
**evidence**
142:17
**exactly**
63:1 93:3,15 131:15
**examination**
1:9 3:4,5 5:5 66:21
144:3,4
**examine**
111:2
**examined**
5:3 145:10
**example**
9:19 77:22,23 92:21
**excessively**
37:19
**exclude**
136:11
**excluded**



75:23
**excludes**
75:17
**exclusive**
10:22
**exclusively**
9:2
**exhibit**
3:8,9,10,11,12,13,14
3:15,16,17,18,19,20
3:21,22,23 4:4,5,6,7
4:8,9,10,11,12 7:11
7:15 8:17 12:24
14:24 16:16 17:22
18:21 20:1,13 21:18
24:23 25:8,8,9,9,10
25:10 26:1,2,23
27:20 30:19 31:8
32:12,17 35:2 36:4
37:8,11 38:21 39:17
40:12 43:22 45:16
46:10 48:21 50:2
55:1,9,11,16 57:10
65:4 67:21,24 68:6
69:11 70:14 73:23
74:2,2 78:12 99:19
101:17 103:18
104:15 105:4
106:12 115:15
130:18 135:16,18
137:8 139:4,5 144:8
**exhibits**
54:24 89:2,8,12,13
**existence**
140:23
**expec**
76:6
**expect**
57:15 118:19 130:16
**expectancy**
22:3,5,7,9,17,20 76:5
76:8 77:4 108:2
123:15
**expected**
54:5
**experience**

64:7
**expert**
10:13 15:4 25:11
26:23 32:10,17 35:3
36:5 37:10 38:22
39:16 48:23 50:3
100:2 101:18
103:19 104:17
135:20
**expertise**
142:2
**explain**
21:15 92:19,24
106:17 109:12
110:2 127:24 129:8
**explanation**
31:21 58:15 109:14
**explicitly**
140:22
**extent**
94:2
**extraordinarily**
140:4

---

**F**
**face**
39:9 134:1
**fact**
71:18 76:22 77:15
81:8 110:20 113:16
130:14 131:1
136:13 138:23
139:21,22 140:22
142:3,4,23
**factor**
60:16 118:9,17,18,19
**factors**
119:3
**facts**
142:17
**factually**
83:11
**faculty**
11:16 28:13,21,22
32:1,1 39:4 51:12
52:12 101:24

**failure**
18:11
**fair**
9:24 12:20 21:2
**fairly**
28:1 112:20
**fall**
42:23 43:2 52:22
56:15 83:19 119:7
**falls**
96:13
**familiar**
16:5 22:21 23:23
24:7,24 25:1,18
39:12 99:19 109:1
**far**
82:23 85:5 98:10
**fashion**
130:17
**faulting**
66:18
**February**
103:23
**federal**
111:5
**feel**
5:16 14:14
**feelings**
129:10
**field**
111:24 112:3 142:1
143:4
**fields**
112:1
**figure**
35:15 60:7,8 63:21
72:4 77:16 90:14,21
91:7 101:9 103:9
104:22 105:2
121:13,17 123:11
124:2 127:21 128:4
128:11,24 134:24
**figures**
60:2 71:3 75:6,14
121:9 122:4,5
**file**

50:8
**fill**
102:14
**filled**
15:18 16:19,20
144:11
**financial**
31:1
**find**
16:7 54:19 105:8
123:20,24 124:1,3
134:9
**finding**
51:8
**fine**
87:11 136:1
**finish**
5:22,24 92:22 132:13
132:15
**finished**
14:1
**firm**
55:10 112:12 144:11
**first**
5:2 15:10 18:18
21:18 27:19 46:10
55:16 77:8 86:18
87:13,15 102:19
105:2 109:8 113:3
113:24 125:2,21,22
133:12 145:9
**five**
66:3,15 79:4,4 85:12
112:14 119:13,14
119:19 120:6,7
**focusing**
67:3
**folks**
53:17,22 95:4 116:19
**follow**
18:15 40:18 59:20
127:4
**following**
2:2 25:12 40:1 56:15
122:20
**follows**



5:4
**force**
124:4
**foregoing**
145:4,13
**forensic**
125:5 143:5
**form**
15:17,22 16:17 25:9
36:17,17 68:12
144:7
**forms**
30:12
**forth**
114:15 139:14
**Fortune**
112:16
**forward**
51:1,2 59:15,17
80:17 81:24 84:12
84:20 85:1 91:16
**found**
69:5 138:2
**foundation**
45:23 49:16 56:3
68:13 142:17
**four**
7:22 9:8 12:9,11,14
12:16 43:24 79:4
130:4
**four-year**
44:5,8
**frankly**
132:10
**free**
5:16 22:13 75:13
**French**
115:18
**frequency**
44:3
**front**
17:22 25:13 26:2
32:4 62:7 67:24
**full**
42:12 46:11 53:17,18
**full-time**

22:15 51:12 52:12
83:6,9 85:6 101:24
**fully**
41:20 100:16
**fun**
134:5,6
**functional**
138:3
**functioning**
143:15
**further**
47:11 78:19 94:19
95:15 144:2,14
**fussier**
51:5
**fussy**
51:4
**future**
65:18 75:12 79:2,3
80:5,12,12,13 81:16
91:18 108:1 118:18
118:20 119:2
123:15 124:8
**FYI**
135:21

_____
**G**
_____

**Gates**
118:10
**Gates's**
125:16 126:4
**gender**
117:16,18
**general**
14:8 110:13
**generally**
138:4
**generic**
15:20
**getting**
97:21
**Ghannam**
89:13
**Gia**
6:6,13,22 7:4 16:9
25:6,11 32:10 35:2

36:4 38:22 48:22
55:2,13 67:16 73:14
73:16 76:21 85:23
86:18,22 87:8 88:7
88:15,15,23 89:3,5
101:18 104:16
115:16 133:20
135:18,20 137:8
144:2,18
**Gia's**
67:11
**gia@dispartilaw.c...**
2:6
**GIANNA**
2:4
**gift**
104:20
**give**
5:13 9:10 16:2 18:8
42:3 54:10,19 65:16
66:7,22 77:18 88:14
92:21 103:3 105:8
131:3 143:14
**given**
23:1 45:12 57:15
83:18,20 92:10
93:11 130:6,9
**giving**
14:17
**global**
143:15
**go**
36:23 38:7 45:7
50:14 55:16 63:24
70:5 75:15 82:4
83:16 95:15,17
96:12 98:14 105:12
106:13 109:13,15
114:11 122:9,16,21
126:18,21 130:24
**goes**
23:12,13,14 45:20
58:11 63:13,18
82:18 83:15 101:8
138:19
**going**

6:5 14:13,15,16
22:24 26:16 45:16
49:15 50:2 57:9
65:3 67:7,21 74:18
77:13 80:16 81:24
84:12,19 85:1 90:23
91:14,16 94:2 99:13
105:4,20 127:7
132:14 135:15
**Golden**
137:13
**good**
6:2,21 10:8,8 25:15
32:22 50:10 51:8,11
65:7 68:1,4 74:18
82:15 83:24 88:11
99:17 102:23
**Google**
88:15
**Goose**
137:13
**gosh**
73:12
**gotten**
89:11
**government**
22:10,16 72:16,20
81:16 84:1 85:2,16
86:10,13 116:17
**grade**
131:19
**grant**
66:12,12
**granting**
56:16
**Great**
16:12
**grew**
105:21 106:3
**group**
2:4 68:6 111:24
119:4
**groups**
119:6
**grow**
19:14



**grows**
58:17
**growth**
57:24 58:3,4,6,8,16
60:23 62:11 63:20
64:1,21,24 68:17,17
74:20,23 75:2,15,20
**guess**
53:2

**H**

**H**
3:6 4:1
**half**
10:20,23 41:9 42:1
42:11,15,18 44:14
71:9
**half-a-second**
82:15
**hand**
24:22
**handbook**
39:4,7 43:21
**handed**
14:23 26:22 32:15,16
38:20 101:16
103:18 104:15
115:14
**handful**
11:20 12:8
**hang**
92:22 126:24 129:19
**happened**
10:4 11:18 17:6,15
18:6 41:6 130:3
**happens**
44:15
**happy**
54:6 82:13
**harassing**
132:14,17
**Haw**
1:11 145:5 146:8
**hazard**
138:20
**head**

112:16
**header**
37:13
**health**
22:19 69:4 118:12,16
142:5,14
**healthy**
22:7,8,17 77:4
118:15
**hear**
16:9 73:12 74:15
109:14 138:18
**heard**
73:7
**hearing**
74:8
**heart**
73:10 84:5,6 93:4,7
**Hedonic**
137:12
**help**
130:14
**helpful**
25:14 62:2
**hereinabove**
145:15
**hiccup**
65:20
**high-quality**
115:6
**higher**
64:17,18 84:6 95:19
96:3 97:16 98:7
**highest**
121:17
**highly-trained**
63:4
**hired**
138:23
**historically**
77:9
**history**
19:11 34:7
**HLE**
22:6
**holding**

22:15
**honest**
88:10
**hope**
133:21
**hospital**
83:16
**hour**
93:12
**hours**
6:15,19 28:3 141:17
**human**
22:19 122:9,11 123:2
123:7 124:12,23
125:1,3,8,12,24
126:3,4,4,5,7
127:20
**humor**
99:4 133:21
**humorous**
133:22 134:4,9
**hundred**
82:4,19 85:9,11,13
85:14
**hundreds**
5:12 108:17,18
110:18 113:17,17
**hurts**
140:7
**hypothetical**
136:12

**I**

**idea**
88:11
**ideally**
138:16,17 141:1,4,6
**identified**
20:19 34:22 50:20
109:16
**identify**
36:9 47:19 98:16
**identifying**
135:13
**Illinois**
1:1,13,14 2:5,10 5:10

145:1 146:2
**imagine**
27:7 67:19 83:15
93:3
**imagined**
42:12 43:18
**immediate**
20:22
**impact**
6:16 63:18 80:15
81:17 83:5,19,22
94:12 118:12
130:11 140:1
**impacted**
101:3 105:23 130:3
**impactfully**
83:4
**impacts**
117:23 130:8
**impairment**
81:1,9,17 83:1,21
84:3 96:14 129:16
135:12
**impairments**
22:14
**imperfect**
92:17,23
**implies**
136:18
**imply**
139:17
**important**
92:6 102:24 110:14
110:15 119:4
**improperly**
83:17
**In-house**
2:14
**in-person**
89:5,9
**inability**
100:19
**inappropriate**
132:11 137:2
**incident**
15:19 17:1 19:11



21:20 130:10
144:10
**incidentally**
77:21
**incidents**
17:17
**include**
11:4,8,12 52:7 53:21
69:15 75:8 140:21
**included**
34:2,6 52:16 75:19
**includes**
57:17,19 70:1 140:9
**including**
9:19 10:22 120:7
140:20
**inclusive**
58:7
**income**
47:19,20 80:9 101:3
105:21
**incorrect**
85:9
**increase**
40:17,24 41:21 47:17
48:5,7 49:12,21
54:11 58:18,19 60:5
63:11,12 68:6 106:9
128:7
**increased**
31:13,18 47:24 60:3
100:22 128:3
**increases**
54:2 56:17 60:18
105:12
**increment**
59:13
**incremental**
111:3
**indeterminate**
41:19
**indicate**
119:6 136:5
**indicating**
33:11 46:17 50:12
73:21

**indication**
117:17 118:23 119:1
**individual**
84:8 95:3 111:17
116:18,20,22
**individually**
110:18
**individuals**
90:9 98:9 108:9
110:12 111:4
**industry**
111:5
**inflated**
41:23 42:17
**inflation**
57:23 63:17 75:4,8
75:13,16,17,19
128:3
**information**
27:14 31:1,12 33:3
34:20 36:18 37:24
38:13 39:3 47:2
53:11 54:2 116:11
**informed**
6:23
**initial**
21:1
**initially**
21:5
**injured**
15:11
**injury**
10:20,22 12:17 15:19
15:20 17:3 19:9
21:19 135:5 144:8
**inquiring**
60:17
**instance**
124:11 143:16
**instances**
9:11,13,18 11:21
143:13
**Institutional**
50:4
**instructions**
5:13

**intake**
15:17,22 16:16 25:9
144:7
**intellectual**
22:11,13
**intelligence**
118:22
**intending**
99:4
**interacting**
81:14
**interested**
145:19
**interpretation**
41:14
**interrogatories**
5:3 145:10
**interrupting**
133:9
**interview**
20:7,14 21:3 38:1
78:9,10 100:19
129:18 141:16
**interviewed**
20:8 21:2
**interviewer**
130:7,20
**interviewing**
21:12
**introduction**
109:4,8
**investigation**
47:4
**invites**
102:20
**invoice**
13:14 14:2,5 55:10
**involve**
125:1
**involved**
11:15
**IRMA**
50:22 55:11 59:12
60:19 61:13 62:14
63:11 73:19 74:1
**IRMA.DePaul.ED/...**

50:24
**irrelevant**
93:17 142:7
**irrespective**
23:21 24:16 142:24
**issue**
78:7,18,20 114:7
132:6
**issued**
105:17 128:14
**issues**
114:4
**italicized**
132:6
**item**
26:11,12
**items**
28:6

---

**J**

**January**
40:22 49:13
**JDK**
20:18
**job**
22:15 114:6 116:24
117:11
**jobs**
104:8 117:8
**Jobs'**
63:5
**jog**
84:6
**jogging**
93:9
**joking**
76:12
**Josh**
20:9,18 21:7,8
**journal**
114:14 115:5,6 135:1
**July**
26:13 27:17 43:7,13
**June**
39:24 40:13,16 56:1
56:7,11 100:8,10



104:21 105:18,22
**jury**
133:10 138:18
140:13

---

**K**

**K**
145:2
**K-v-a-c-h-k-o-f-f**
20:10
**Kathryn**
2:13
**keep**
87:8 94:4 97:16
█████
82:6,8
**Kelsey**
82:9,9
**key**
56:23
**kill**
76:11
**kin**
145:20
**kinds**
113:15
**kit**
73:11
**knew**
107:8
**know**
5:11,16,20 6:10 12:5
12:12 17:6,16 20:24
23:5 25:6,7 28:15
29:1,4,12 30:8 32:5
34:1,8,11,17 35:18
35:22 37:4,6 39:7
42:20,23 44:3,7,9
44:22 46:2,4 48:13
51:10,18 58:22 59:2
59:14 64:17 66:7,22
66:24 67:2 73:18
74:7,10 76:7,9,19
77:2 83:8 84:6
86:19 88:10 89:13
91:22 94:23 95:2,13

95:16 101:5 106:1,5
106:8,20,23 107:2
107:12 115:18
118:15 124:14
125:21 135:21
140:5 141:13 143:9
143:11,13 144:2
**knowing**
98:22
**known**
95:14
**knows**
46:7
**Kvachkoff**
20:9

---

**L**

**labeled**
26:23 32:17 37:17
38:22 55:1 103:19
104:16
**labeling**
24:10,14
**labor**
114:1
**lack**
49:16 56:3 68:13
**land**
15:15
**large**
110:7
**late**
84:8
**laughing**
133:21,23 134:3,4
**Laughter**
45:5
**law**
2:4 12:2,13 13:8
112:12
**lawyer**
112:9,14,15,15
113:10
**lawyers**
112:19
**LE**

22:4
**lead**
110:23
**learn**
131:19
**learned**
91:5 92:11
**leave**
76:21 77:15 136:13
**leaves**
44:18
**Lebeau**
115:18
**left**
17:8 33:7,9,11 123:8
123:19,23 139:22
**legal**
9:2 23:17,21 24:2,11
107:5,9 112:10
**legally**
72:22
**leisure**
130:5
**length**
53:11
**lesser-qualified**
46:8,13 47:3
**let's**
10:21 25:23,24 26:18
27:19 39:13 43:14
55:16 58:23 65:23
70:10 77:20 79:20
106:12 129:19
133:19 135:7,11
**letter**
49:8 56:7,10 68:2
74:2
**letters**
105:5
**level**
83:1 84:3 85:4 95:19
96:3
**liability**
14:18 44:10
**License**
146:9

**lie**
138:21 140:6
**life**
19:7,13 22:3,5,7,8,17
22:20 69:5,16 76:5
76:6,8 77:4 84:10
84:14 85:19 86:11
98:10 106:17
107:19,22 108:2,11
108:11,14,24 109:6
109:16,19 110:21
110:24 111:14
112:21,23 114:17
115:8 117:3,4,9,15
117:19,24 118:13
118:19 120:11,23
120:24 121:23
122:10,12,23 123:2
123:15,18,23 124:8
124:21,21,22 125:1
125:10,11 128:7,17
128:21 129:11,12
130:6,9,10 134:14
134:15 135:14
137:3 138:22
140:10 143:6,7
**life-saving**
111:4,17
**lifelong**
85:10
**lifetime**
78:23 85:17 123:13
**limited**
98:23,24
**line**
20:11 34:16 90:7
95:22 96:14 102:21
118:1 131:11
**linear**
130:17
**lines**
33:23 90:5
**link**
50:20
**links**
33:7,8,17



**list**
7:21 8:2,4 9:15
119:18 120:21
**listed**
9:22 10:12 21:14
26:11 27:2 28:6,12
32:19 33:19 52:23
103:7
**listing**
8:19 26:10
**literature**
114:8 119:14,17,23
120:8,13,15,18,23
122:11,13 126:12
128:2,6
**litigants**
130:1
**little**
36:19 42:14,18 48:4
64:16,18 99:4
**live**
123:19,23
**living**
119:2 130:4
**local**
11:22
**long**
18:10 22:10,13 53:23
54:15 65:21 66:5
80:24 81:13 88:21
93:17
**long-term**
75:1
**longer**
43:14 77:9,12
**look**
8:15,24 17:16 18:20
19:3 20:1,13 21:17
25:24 27:19 31:3
39:15 40:11 48:3
52:10 58:10,23
59:12 60:10,13 78:2
79:20 87:4 94:19
108:12,18 110:4,14
110:15 116:23
117:7 119:5,18

120:16 124:5,22,24
125:11,15,16,18
128:16 135:7
137:17 138:12
141:18 143:9
**looked**
27:5 30:11,12 33:7
43:21 58:5 81:16
112:24 124:23
**looking**
42:6 53:3 54:19
58:24 70:21 72:8
80:11 90:4,5 110:7
110:8,10 117:7
119:24 123:3
124:20 125:2,21
129:4
**looks**
8:24 9:8 28:17 35:7
35:11 39:20 50:3
64:17 65:9 102:5
114:19
**loosely**
14:13
**loss**
19:1,3,12,23 21:21
23:20 37:14 42:1
57:1,20 59:1,2 66:1
66:5 70:5 71:20,24
77:19 85:13,14,15
85:15 130:20,23
134:16,18,20
**losses**
17:16 18:24 19:11
23:1 24:15 42:12
65:17,18,22 69:21
70:2 76:24 77:2,13
93:13 138:4
**lost**
69:15 138:22 140:10
**lot**
18:7 81:22 118:8
**low**
16:10 84:5
**lower**
57:1 80:8

**lowest**
121:13
**LPL**
143:2
**lump**
119:4
**lying**
140:6

---

**M**

**machine**
83:17
**Magazine**
9:2
**majority**
120:8
**making**
134:5,6
**man**
140:6
**Management**
115:6
**mandate**
6:4
**March**
137:13
**Marcie**
1:11 145:5 146:8
**mark**
12:21 14:20 16:13
17:19 26:16 30:16
32:8 34:24 35:24
38:17 48:17 85:22
101:13 103:15
104:12 115:11
**marked**
7:11,13 12:22 14:21
14:24 16:3,14 17:20
24:19,20,23 26:20
30:17 32:13,16 35:1
35:2 36:1,4 37:11
38:18,20 48:18,21
54:22,24 55:9,11
69:11 86:7 99:6,8
101:14,16 103:16
104:13 108:19,20

108:22 115:12,14
135:15,17 137:7
**marker**
19:23
**market**
50:4 114:2
**mater**
76:9
**materials**
98:17
**math**
62:3 94:11,13 131:17
131:19,21,22
**mathematically**
92:4 103:5
**matter**
14:10 21:14 30:10
89:9 93:11
**matters**
9:9 10:12,18 11:22
12:10,15 93:13
107:10
**mean**
22:2,8 40:5,6,8 41:19
84:3 89:1 91:23
109:12 110:3,17
124:18 138:18
**meaning**
108:1 144:12
**means**
30:9 44:22 45:6
59:16 75:17 85:13
91:11 95:12
**meant**
45:1
**measure**
107:24 112:8 117:3
128:9
**measurement**
138:16 141:2
**measures**
116:9,19,20 117:7
138:3,6
**medical**
69:15 81:3 141:18,21
141:22,23 143:9,19



143:20
**medically**
142:19
**medication**
6:15 142:14
**member**
11:16 130:20
**members**
51:13 52:13
**memorize**
17:7,17 23:3
**memorized**
39:13 135:10
**memory**
68:1 81:11
**men**
139:24
**mental**
93:20 95:5,9,18 96:3
96:13,23 97:4,7,10
97:12,15 98:5 142:5
142:14
**mention**
119:3
**mentioned**
68:10 129:5
**merely**
106:4 122:5
**merits**
66:10
**message**
73:7 74:8
**meta-analyses**
119:13,14,19 120:22
122:3 128:5
**meta-analysis**
108:24 119:12
**meta-studies**
120:6,8
**metaphor**
108:13
**method**
134:23 135:13
140:12,14,16,17,19
140:23,24
**methodology**

129:4 133:19 136:5
139:6 140:9 143:1
143:17
**methods**
140:20,21
**mid**
80:13,19 81:24 82:20
122:17 123:22
**middle**
5:23 21:1 41:6,22
43:16 64:10
**midpoint**
121:22
**Miller**
120:6 135:8 136:24
137:4,5,14 139:8,15
140:21
**Miller's**
119:12 120:1 139:5
**million**
42:14 66:5 110:6
112:11,14,17 113:3
121:6,13,20 122:13
122:22 123:3,7,9,11
124:2,10 125:17
126:6,8 127:2,9,11
127:18 128:19,19
131:13,14
**millions**
34:12 110:7,9,12,18
**mind**
69:20
**minimis**
65:17
**Minus**
57:23
**minute**
16:2
**mischaracterizing**
94:4
**missed**
83:9
**misunderstanding**
41:12
**modest**
41:12 58:21 63:13

**moment**
6:14 17:14 18:8 42:4
84:3 88:14 105:9
**money**
101:11 118:4
**monoxide**
108:10 118:10
**month**
83:23 93:12
**months**
40:24
**moral**
138:20
**morning**
5:7 6:23
**mortality**
116:10,21 137:20
**motion**
105:1 133:11
**move**
98:13 99:2 132:7
**Moving**
134:10
**Mrozek**
108:16,22 114:20
**multiple**
9:20 30:4 62:10 96:6
96:10
**multiply**
90:17
**multitude**
111:4

—————————————
**N**
—————————————
**N**
3:1 4:1,1
**name**
20:9 32:4 88:19
137:11
**named**
145:8
**names**
29:2 34:14
**national**
63:17,20 64:8
**necessarily**

102:9
**need**
6:9 16:7 20:12 29:4
31:10 47:5 66:21
79:16 89:7 99:14
133:16
**neither**
117:1 139:4
**net**
122:9,10,11,12
125:24 126:2,3,4
**never**
53:18 55:5 97:1
143:4
**night**
84:5
**nitty-gritty**
62:3
**non-base**
33:23 34:2,4,8 57:13
58:17 70:18
**non-based**
58:4
**non-component**
125:15
**non-fatal**
137:19,23
**Non-responsive**
99:2
**nonresponsive**
132:10
**nonworking**
123:2
**Nope**
7:6
**normal**
110:24
**North**
1:13 2:10
**Northern**
1:1 5:10
**Northwestern**
112:10
**nosing**
51:8
**Notary**



1:12 146:2
**note**
44:20 47:17
**notes**
17:16,23 18:5,7 20:2
  20:3,14 21:3,5
  25:10,10 46:12 54:6
  59:18,19 62:1,4
  65:5,8 72:8 78:9,10
  116:2
**notice**
1:9
**noticed**
89:6
**notified**
49:12
**November**
15:11 17:6,15 18:6
  18:15 144:8
**number**
5:9 42:17 53:22 61:3
  61:4,24 64:16,17
  69:9 71:11 76:19
  77:10 90:13 100:1
  119:2 129:1,2
  131:13,14 132:4
**numbers**
32:9 62:20 74:23
  75:12 90:5 98:22

———————————
**O**
———————————
**O**
4:1 145:2,2
**o'clock**
6:24
**O'CONNOR**
2:9
**oath**
134:19
**object**
49:15 56:3
**objection**
23:17 24:2,11 45:23
  49:22 68:12 107:5
  107:15 142:10,16
**objective**

138:3,6 139:13
**obscured**
36:20
**observe**
110:9
**observed**
113:16
**observing**
110:11
**obtain**
38:3 47:1 54:1
**obtained**
38:4 137:10
**obtaining**
71:19
**obvious**
44:24
**obviously**
141:10
**occasion**
12:4 29:16
**occupation**
111:12 116:24
**occupational**
130:5
**occupations**
111:3,9,16 112:20
  117:13
**occur**
85:17
**occurred**
19:15
**October**
55:10
**offering**
139:9
**office**
16:23
**official**
146:1
**offset**
42:4 65:23 69:24
  70:11 71:4,13 74:19
  79:8,20,21,24 80:5
  80:6,8
**oh**

6:7 12:7 13:16 14:3
  32:8 33:13 46:18
  55:8 59:18 69:13
  70:14 72:12,24
  73:12 74:17,18
  79:13 123:17 131:5
**okay**
5:17 6:7,18,21 7:2,7
  7:20,24 8:9,15,23
  9:4,7,15,18 10:2,5,8
  11:1,4,15 12:2,11
  12:17 13:5,11,18,22
  14:3,16 15:3,7,15
  15:21,24 16:6,12,16
  16:22 17:5,9,14,18
  18:2,4 19:9,22,22
  20:1,7,13 21:2,2,11
  21:17 22:1,4,8,18
  22:21 23:4,11,23
  24:18 25:5,11,12,15
  25:17 26:11,15 27:2
  27:10,16,19 28:9,12
  28:17,21 29:6,9,18
  29:24 30:3,11,15,23
  31:3,6,12,21 32:7
  32:11,23 33:2,6,22
  34:4,8,11,22 35:4
  35:15,18,21,23
  36:16,19 37:4,10,23
  38:2,7,16 39:7,10
  39:15 40:3,11,20
  41:4,17,21 42:2,20
  43:8,12 44:3,17
  45:16 46:6 47:6,11
  47:15,22 48:3,7,13
  48:20,24 49:6,18
  50:2,7,10,19 51:5
  51:11,21 53:2,5,11
  53:14 54:1,14 55:8
  55:23 56:5,24 57:11
  57:22 58:3,10,23
  59:7,21 60:17 61:8
  61:22 63:3,15,23
  64:11,14,20 65:3,3
  65:8,8 66:14 67:13
  68:2,11 69:18,23

70:3,5,17 71:3,8,13
  72:1,8,14,18,20,24
  73:24 74:4,6,12,18
  74:18,22 75:5 76:2
  77:20,24 79:8,11,12
  79:23 80:14 81:19
  81:22 82:7,13,17,22
  85:21 86:1,9,21
  87:7,17,20,22 88:2
  88:20 89:20 90:3,8
  90:12,17,21 94:1,13
  94:24 95:3,8 96:1
  97:3,7 100:10,14,18
  102:8,14,19 103:9
  104:7,11 105:11,20
  106:2,5,12,16,20
  107:12,16 108:3
  109:10 110:20
  111:2,8,15,19,23
  114:3,11 115:3
  116:6,8,19 118:6,12
  119:5 120:4,9 121:5
  121:20 122:2,7,16
  126:6,13,21 127:22
  128:18 129:3,5
  130:23 131:3,16,20
  133:19 134:10
  135:14,22 136:1,2
  137:17,22 138:10
  142:22 143:12
  144:13
**old**
93:20
**older**
78:4,16
**once**
9:12 87:4 133:16
**one's**
44:22
**one-quarter**
96:15
**one-tenth**
64:13
**one-time**
29:10,13,19,24 30:4
  32:2



online
86:6
open
12:9 25:21 102:5
opened
12:15,16 102:11
opine
45:4,10
opined
112:22
opinion
14:18 77:1 104:23
129:10 140:1
opinions
104:5
opportunities
111:17
opposed
43:17 92:7 124:21
oral
5:3 145:10
order
117:14 124:9 144:21
originally
128:1
overall
10:20 42:11 45:14
84:2 90:15 93:6
96:5 130:6,9,19
overview
65:16

**P**

PA
2:4
page
3:2,7 4:3 8:16,16,17
8:19,20 15:8 18:22
19:3 20:13 21:18,18
25:24 26:8 27:3,19
27:20 32:19 33:6,6
33:18 35:8 36:21,23
36:24 37:10,17
39:15,16 40:11
42:13 45:17 46:7,10
46:14 47:11 49:4

55:24 56:7 57:2
58:10,24 59:23,24
62:1,4 63:1 68:3,5
78:9,10 86:18 87:13
87:15 88:6 89:22
90:15 94:19 95:17
95:23,24,24 96:12
97:23 102:5,19
105:11,14 106:16
110:20 113:24
114:7 119:5,6,18,24
120:10,19 121:3,10
122:20 126:15
129:3 130:18 131:8
131:11 132:2,3,5
133:14,17 134:9
137:17,22 138:12
pages
7:20 9:22 10:12 15:3
37:2,5,7 129:9
132:3 135:19,23
paid
14:2,14 28:18 29:16
58:14,14 60:13,14
139:1
papers
134:22
paragraph
46:6,11 47:12 78:11
109:7,8 113:4,24
114:12 129:5
paragraphs
130:8
paren
25:20,20,21,21,21
parenthesis
72:13
parenthetical
47:23
part
19:1 22:19 29:21
34:6 118:18 123:2,3
125:1 129:17 130:5
134:20 139:23
participation
101:4

particular
9:11 15:16 23:9 25:3
25:17 52:5 83:4,22
83:23 99:23 103:3
104:4 144:11,12
particularly
115:9
parties
77:16 145:20
partner
112:12
pause
5:22 16:8 18:10
52:11 54:15 88:21
105:10 129:21
131:10 138:15
pay
11:13 24:9 26:12
27:2,6,9,16,22
28:11 29:22 32:20
33:8,14,19,23 34:1
34:2,4,9 41:16 47:9
53:21 54:11 56:19
56:20 57:6,8,12,13
57:16 58:11,15
60:11,15 61:1,12
63:13,20 66:12
70:17,18 71:22
72:20 107:13
110:23 111:3,17
116:16 118:3,8,11
paycheck
34:13
payment
29:10,13,24
payments
29:20 30:5 32:2,2
34:23 35:15,18
payroll
27:22 28:1
pays
72:22
PDF
144:22
peanuts
66:4

pedantic
135:4
peer
114:15 115:4 135:2
135:12 136:5,21
peer-reviewed
9:4 114:14 126:12
135:1 140:8
pencil
77:19
pending
5:9 67:13 99:3
people
22:11,13 73:5,13
77:8,11 81:14,17
84:1 85:4 93:18,21
110:6,7,10,12,13
112:13,17 117:8,17
117:24 124:4 125:2
131:19 139:23
percent
42:15,18 48:4 49:12
49:20 57:13 59:8,11
59:14 60:3,4,6 61:4
61:8,13,15,16,23
62:7,11,21,24 63:1
63:16,18,20,24
64:13,16 65:22,22
66:10,11,15 71:5,12
72:3,19 75:1,3
80:17 82:4,19,19
84:12,19,22 85:7,9
85:11,13,14,15,20
86:10 90:13,15,18
90:19 91:6,10,10,15
91:19 92:20,24
93:15,17,21,22 95:5
95:10,11 96:15,15
97:4 120:16,18
124:5 129:22
130:11,13,21,24,24
131:3,6,13,14,15,16
percentage
10:17 59:10 71:21
72:1 73:1 90:8,9
95:4 129:19 136:6,7



136:8,10,11,13
140:12
**percentages**
74:23 75:7 96:18
**perfect**
5:18 78:17 92:9,16
92:23 98:21 114:14
144:14
**perfectly**
54:6 98:22
**perform**
98:17
**performed**
116:3
**performing**
99:22
**period**
9:10 27:22 28:1
63:20 100:10
132:24 136:8
**periods**
81:13
**person**
5:21 20:19 117:10,11
118:7,14 123:4,19
123:19 124:7,8
125:13,21 143:19
143:20
**person's**
117:15 123:22
124:15,16 125:22
126:3,5,7 142:1
**personal**
10:20 12:17 20:11
135:4
**persons**
110:6
**perspective**
67:11
**persuade**
92:7
**Ph.D**
1:8 3:3 5:1 92:10
113:14
**phone**
2:6,11 25:7 86:17

87:4 90:22 99:10,14
99:15
**phonetic**
89:13
**physical**
10:22 22:14 97:4
**picture**
52:17 55:13 66:5,13
66:16
**pictures**
73:17,18
**pieces**
34:13
**pigeonhole**
34:14
**pigeonholes**
29:5 34:15
**pitcher's**
45:2
**place**
108:9 121:6 123:6
145:6,15
**places**
108:5,8 109:5,17,22
129:22
**plaintiff**
1:3 2:8 10:18,24 11:8
11:13,16 19:20
138:5
**plaintiff's**
15:18 16:20 140:5
**plaintiffs**
136:12
**plan**
76:21 77:6,7,12
**planet**
92:12 125:5
**planned**
38:8 40:4 43:14
**planning**
76:13
**plans**
77:11
**play**
137:20
**played**

20:22 21:9,13 99:23
**plays**
117:18
**please**
7:12 12:21 17:19
24:19 30:16 32:8,12
34:24 35:24 38:17
48:17 82:11 85:22
92:19,23 99:6
101:13 103:15
120:19 134:10
**pleasure**
140:10
**plus**
61:11 70:17 71:5,12
72:11,15 124:9
**point**
34:18 67:16 92:4,10
92:18 102:3,16
107:20 112:6
113:12,17,23 115:4
118:4 122:17
128:18,20 129:6
136:8 139:9 141:14
**pointing**
59:17 96:17
**policies**
116:9,17,19
**policy**
56:16 115:5
**pop**
88:19
**popped**
52:18
**population**
90:15 124:6
**portion**
27:6
**pose**
5:15
**position**
23:14 80:16 104:1
**positions**
102:14,21
**possible**
31:24

**Possibly**
53:20
**posting**
101:24 102:2,9,10
**potentially**
42:16 137:19
**poverty**
118:1 119:2
**practical**
130:4 138:2,8,9
**practice**
54:10 89:16,17,19
**prad**
104:1,8
**precise**
97:6
**precisely**
63:1 93:14 95:14
139:1
**preclude**
22:14
**predict**
83:22
**prediction**
85:7,10,11
**prefer**
82:14 87:11
**preference**
89:10
**preliminaries**
6:6
**premise**
137:18
**premiums**
119:8
**prepare**
21:5
**prepared**
20:2
**prescription**
73:9 74:11 79:15
**present**
2:1,13 12:19 21:11
69:19 79:2,3,22
80:21 83:3 98:1
145:7



**presented**
7:24 24:16 117:2
**presents**
140:9
**preserve**
108:14 110:23
**presumably**
40:17 52:23 67:16
**pretend**
23:2
**pretty**
39:12
**prevailed**
57:21
**prevented**
37:19
**previous**
114:23
**previously**
144:6 145:8
**price**
118:11
**principle**
120:21
**print**
8:7
**prior**
43:10 70:21 80:9
  105:22
**probability**
108:6 109:17,23
**probably**
11:24 12:16 112:2
**problem**
95:19 96:4,14
**problems**
139:20
**Procedure**
1:10
**process**
38:13 39:4,11,11,21
  45:14
**produce**
50:7 92:15 123:1,5,7
**produced**
86:3,4 88:11 115:17

135:19,22 137:10
**produces**
22:18
**production**
55:2
**professional**
8:11 140:11 142:5
**professionals**
81:3
**professor**
41:11 42:22 45:20
  53:14,16,17,18
  54:12 60:2,11,16
  61:12 62:15,16,16
  62:19,19 63:13
  64:24 92:8 102:21
  111:11
**professors**
44:4,15 46:9,13 47:3
  52:7,8,22,24 60:20
  61:17,18,18 76:7,10
  78:7,20
**progresses**
7:2
**project**
74:20 75:14 76:3
**projected**
18:14 59:2
**promoted**
14:14 38:8 40:4,16
  41:5,10 43:6,9 57:4
  60:21 65:10 68:7
  100:12
**promotion**
19:15 39:4,18 41:6,9
  41:14 43:13,15
  44:12 54:11 60:12
**promotional**
40:17,24 54:2,10
  56:17 60:18 68:6
**Proper**
109:4
**propose**
139:5
**proposed**
103:6 140:16 143:17

**proposition**
14:8
**protocol**
21:14
**provide**
8:4,8 10:14 38:6 88:8
  104:5
**provided**
15:17 21:3 27:7,18
  31:2 34:17 37:4,6
  37:24 38:12 39:3
  54:7 81:4
**providing**
140:12
**provost**
40:13
**proxy**
63:21
**psychiatrist**
143:14
**psychological**
136:10 143:2
**psychologist**
136:7 139:15 141:14
  143:14
**psychologists**
143:8
**Public**
1:12 146:2
**publication**
9:5 87:23
**publications**
8:12,20,24
**published**
9:1 39:8 86:16
  114:19 115:23
  121:23 128:2
**pulled**
50:19 115:17
**pulling**
89:24
**punched**
62:20
**purchases**
119:8
**Purdue**

35:8
**Purely**
77:22
**purports**
51:11
**purposes**
50:23
**pursuant**
1:9,10
**pursue**
46:3 47:4
**pursuing**
37:20
**put**
6:13 15:13 17:22
  19:21 25:24 26:2,4
  57:1 99:13 114:15
  133:14,16 139:14

---
**Q**

**qualified**
42:24
**quality**
108:14 129:12 130:9
  130:10 138:21
  143:6,7
**quarter**
83:23
**question**
5:15,20 21:16 41:3
  45:18 47:18 67:13
  88:7 92:22 99:3
  124:19 129:20,23
  135:11 141:11
**questions**
144:2,14 145:11,14
**quibbling**
41:13
**quick**
52:10 54:18 65:16
  79:16 90:4
**quickly**
14:1 15:7 109:13
**quote**
48:8 96:3



**R**

**R**
20:24

**race**
117:20

**radiation**
83:18

**range**
65:1 103:7 112:9
114:16,23,24 115:8
121:22 130:14

**rank**
51:12 52:2 53:17

**ranks**
53:14,16

**rare**
143:13,15

**rate**
28:10 44:8 60:11,14
75:4,15,17,18,21,24
84:5,6 93:4,7

**rates**
45:19 53:21

**rating**
135:12 143:14

**reach**
69:2 119:19

**read**
114:22 116:7 131:5
138:14 141:1

**reading**
8:23 59:22 81:12

**real**
75:14,17

**realize**
25:6

**really**
46:3 65:17 107:8
114:18 135:21

**reason**
8:2 14:16 26:2 27:5
27:16 30:23 125:20
135:20 141:24

**reasons**
10:21

**recall**
11:19 12:19 24:1,5
104:10

**receive**
37:2 87:2,10

**received**
33:3 35:7,11

**recognize**
7:15 12:24 14:24
16:4 36:10,12
101:21,23

**recognized**
122:24

**recognizes**
110:3

**recollection**
18:5

**recommend**
120:24 144:18

**record**
6:4,13 14:11 26:18
54:23,24 78:13
98:20 99:14 107:9
144:1 145:13

**records**
27:12 101:5 141:19
141:22,23 143:9

**redline**
77:19

**reduce**
116:10,20 134:24

**reduced**
19:7 42:14 59:16
84:2 106:17 129:10
129:12

**reduces**
124:6

**reducing**
108:6 109:17,22

**reduction**
85:3,20 107:24
128:21 134:13
135:13 137:3

**refer**
20:17 106:20

**reference**

57:10

**referenced**
137:9

**referred**
17:24 145:16

**referring**
16:17 48:14 50:12
121:3

**refers**
21:21 43:15 51:18,22

**refined**
54:7

**reflect**
96:4 131:17

**reflected**
19:14 40:9 41:9,15
41:20

**reflecting**
75:14

**refreshes**
18:5

**regard**
44:15

**regarding**
82:1

**regardless**
60:20

**regular**
28:6

**related**
31:24 32:3,5 35:22
60:19 104:1 116:9

**relating**
104:7

**relationship**
114:5

**relative**
66:8

**relevant**
31:4 34:15 37:7
91:20

**relied**
26:4 32:23 50:3,8
55:12 103:1

**rely**
96:18 99:21 108:15

119:11,14,19,21,21
120:9,14

**relying**
86:9 88:2 139:6

**remain**
111:20

**remained**
80:3

**remaining**
22:3 123:15

**remember**
21:1

**remove**
125:8

**repeat**
9:13 48:11

**rephrase**
5:17 22:11

**report**
7:24 13:13,19,23
14:2 15:2,8 18:21
19:18 21:6 25:9,13
26:1,4 27:3,8,12,15
32:20 34:17,22
37:11 40:3 42:13
44:12 45:17 46:7,10
48:10 50:3,21 52:23
55:12 57:2 58:11,24
59:20 63:2 77:22
79:23 81:10 86:2,14
86:16 87:12,16,18
87:19 94:8 96:22
98:1,16 100:18
104:5 105:20
106:16 108:23
110:20 112:4
115:21 119:18,23
119:24 120:5,14,17
120:19 129:3 131:5
131:22 132:4 137:9
138:17,18 139:6,24

**reported**
52:22 69:4 106:10
113:1 114:8 122:19
130:13

**reporter**



5:20 24:22 32:16
54:16 79:13
**reports**
37:18 52:12 78:15
84:1 100:21 128:10
128:13,13
**repository**
119:16
**represent**
55:20
**representing**
121:21
**reproduce**
120:4
**reproduced**
120:1
**request**
8:4,8 13:3 20:10 25:8
53:1
**requested**
7:13 8:5 12:22 14:21
16:14 17:20 24:20
26:20 30:17 32:13
35:1 36:1 38:18
44:17 45:8 48:18
54:22 84:10 86:7
99:8 101:14 103:16
104:13 108:20
115:12 135:17
136:12 137:7
**requests**
54:17
**required**
72:22
**requires**
109:5
**research**
20:9 50:4 63:5 81:21
82:1
**reserve**
144:18
**resolved**
115:9
**respect**
129:9
**responded**

79:17
**respondent**
138:21
**response**
74:2,3
**rest**
84:13 127:1
**restated**
106:4
**result**
105:21
**resulted**
106:9
**results**
128:2
**resume**
7:17
**retainer**
13:3,10,11,12,18,20
13:20,21 14:2 25:8
**retire**
77:6 85:12
**retirement**
19:2 69:5 71:21 72:2
72:3,5,10,13,16,17
80:1
**returned**
16:20
**review**
39:11 114:15 120:8
128:1 130:7 141:23
**reviewed**
98:17 115:5 135:2,12
136:5,21
**reviews**
37:19 114:23 120:22
122:11,13
**revise**
62:18
**right**
6:2 7:22 8:7,21 9:5
9:16,19 10:10 13:9
13:17 17:5 18:2,4
19:4,7,17 21:6
29:21,22 30:6,9,13
30:21 31:4,9 32:24

33:4,11 34:20 36:21
36:24 38:14 39:5,22
40:22 41:7 42:17
43:8,22,24 44:1
45:16 46:17 48:5
49:21 50:20 52:9
55:20 57:7,17,18,24
58:1 60:22,24,24
61:9 62:17 64:5
68:18,21,24 70:8,12
71:3,6,14 72:21
75:9,11 76:14 78:22
79:2,9,20 80:1,3,4,9
81:5 84:19 85:9,16
86:19 87:24 88:4
90:1,19 92:13,14
93:22 97:24 98:1,6
98:11 100:12,15
101:9 105:18,24
106:18 107:19
108:7,18 109:16
111:9 114:6 116:3
116:10,13,16,21
117:1,2 119:9,12
121:13 122:17
123:24 125:10,14
127:9 128:11,21
129:8,11 130:18
131:4,18 137:15,19
137:20 141:7
143:10
**Rights**
11:6 22:23
**ringing**
90:22
**risk**
114:5 119:8
**risky**
111:3,8,12,15 116:24
117:8,11,12
**RLE**
22:1
**role**
20:22 21:9,13 42:21
60:21 99:24 100:14
117:18 139:1

**roles**
100:22
**room**
20:12
**Rosenbaum**
2:13
**roughly**
42:10 64:18
**routinely**
112:8
**rude**
133:22,24 134:2
**Rule**
25:20,22
**Rules**
1:10
**run**
66:5 80:24
**RVL**
98:13 106:14,21,23
107:12,18,23,24
130:19 134:23
142:4

---

**S**

**S**
3:6 4:1
**safety**
114:2 117:7 119:8
**salaries**
51:12,22 52:7 60:3
**salary**
28:6,10,10 56:11,17
103:6 105:5,17
**save**
8:9
**saved**
109:6
**saw**
50:15 57:8,12
**saying**
41:18 44:11 60:10
73:10 79:18 83:5,24
84:22 85:2 91:14
94:1,7 108:10,11
134:8



**says**
15:4 17:1 33:8,12,23
36:21,24 37:14,18
38:7 47:23 53:4
56:21 60:1 74:1
77:8,10,22 78:6,7,8
78:20 81:16 85:2
93:19,23 95:18
97:20 100:21
102:16 121:15
136:7,9,16 138:2
141:6 144:10
**scale**
27:9 138:16 140:10
141:2 143:7,15
**scales**
143:7
**scan**
83:16
**Scatchell**
2:4 3:5 6:3,7,22 7:6
16:11 23:17 24:2,11
25:12 26:17 32:11
35:4 36:6 45:23
48:24 49:4,6,15,22
55:4,8,14 56:2
67:14 68:12 86:1,24
87:2,6,10,13,17,20
88:8,17,20 89:1,4,8
89:15,18 100:1,4
104:18 107:5,15
135:22 136:1
137:11,15 142:10
142:16 144:5,14,16
144:19,22
**scenarios**
117:1
**schedule**
38:5 39:17,20 41:2
44:5,8
**scheduled**
37:19
**schedules**
44:16
**school**
52:9

**screen**
66:23 67:4
**seal**
146:1
**search**
100:14,20,22 101:4,7
101:12 104:8
**second**
8:16 15:8 39:16 41:9
44:14 46:11,18
47:11 65:9 77:10
90:6 95:22 105:5,11
114:7,7
**Secondly**
77:6
**section**
15:8 37:13 97:24
130:19 131:7
137:22,23
**Security**
72:11,15,22 77:7
**see**
7:1 12:17 14:3,11
15:11 18:2,23 19:18
22:1 26:13,24 27:24
28:3,6,7,13,19,23
29:7,10 30:1 31:6,7
31:10,16,19 32:21
33:6,9,13,19,20,23
34:5 35:8,13 36:19
36:20,24 37:21
38:10 39:1,17 40:12
40:14 46:9,13,16
47:13 48:1,8 49:11
49:13 50:5 52:19
56:8,12 57:4 58:11
59:8 60:5 61:12,15
63:17 64:11 65:3
66:3 67:24 68:5,9
70:20 71:16 72:12
72:12,13,24 73:22
75:19 76:2,3 80:6,9
90:10 92:4,6,9,14
95:1,6,21 96:1,2
99:23 100:6,9 101:1
102:6,10,12,22

103:6,7,20,22 104:2
105:12 109:6,19
110:6,7,15,24 111:5
113:3,14,15 114:9
120:24 121:7,17,24
122:14 124:5,18
126:10 127:13
129:19 130:14,21
133:20 137:22,24
138:6,7,22 140:2
143:5,8,21
**seeking**
57:14
**seen**
25:3,17 27:12 49:3,8
55:5,17 68:2 139:24
140:3
**sees**
110:13
**seizure**
81:15 83:7,14 84:11
**seizures**
83:2
**select**
76:23 95:16
**selected**
95:18 96:11 97:13,14
98:24
**selective**
95:21
**self-report**
129:15 138:20 139:7
139:18,23 140:5,21
140:22 141:19
**self-reported**
130:23 134:16,18,20
134:24
**self-reporting**
135:12 136:21 137:2
137:6 140:23
**self-reports**
138:13 139:3,8 140:3
**send**
13:4 52:17,18 87:11
87:12 88:13 89:7,8
**sending**

52:16 88:23 99:11
**senior**
53:22 112:12
**sense**
15:20 42:3 113:18
114:14 116:5 139:2
**sent**
8:8 14:2 55:22 73:17
87:14 88:24 89:2
103:2
**sentence**
15:10 46:11,18
113:23 127:1
138:14 141:1
**sentences**
5:23 127:24
**September**
8:1 13:6 26:13 27:23
27:23 28:17 64:1
146:3
**sequence**
17:7
**series**
22:20 55:21
**serve**
100:20
**served**
25:11
**service**
28:22 32:2 53:12
**Services**
22:19
**set**
83:17 112:20
**severity**
140:1
**shape**
74:17
**share**
104:1,8
**she'd**
60:13
**she'll**
83:9 134:18
**sheet**
39:9



**short**
5:13 54:21 90:24
143:24
**shorthand**
145:11
**shortly**
13:13
**show**
18:13,18,22 19:1,11
19:11 33:10 42:4,9
50:11 51:12 65:23
73:20 76:22 77:21
80:15 101:5 118:1
128:5 130:13 137:4
**showing**
16:4 18:16 48:20
63:4,11 81:16 91:17
**shown**
71:20 128:6
**shows**
19:6 22:10 94:11,13
**sic**
124:16 138:17
**Sidney**
15:10
**signature**
145:17 146:1
**significant**
58:18,19 114:5
**significantly**
56:24 80:8 96:2
**simply**
21:14 24:15 48:11
119:15
**single**
29:16 58:1 91:7,13
91:15 93:1 94:3,9
94:11,13 96:23
97:17 132:5 133:14
133:17 134:9
**sir**
15:5 42:6 46:15
47:20 50:13 65:6
66:6,6,17 67:22
71:14 73:3 86:17
92:16 95:23 98:2

**short** 99:10,19 100:6
101:9,16,21 103:20
104:15 105:24
108:22 113:22
114:12 115:21,24
116:3 117:13
129:18 131:8 133:2
133:4 137:20
140:15
**sit**
17:5
**sitting**
18:2
**situation**
125:7
**six**
40:24 66:4,13 71:5
79:6
**slash**
59:15,16,17 62:7
**slashes**
51:1,2
**sleep**
84:5
**small**
41:24 46:23 63:14
**smiling**
133:20
**Smith**
1:8 3:3 5:1,7,11 6:9
7:9,10,15 12:24
14:23 16:16 17:22
18:20 24:22 26:22
30:19 32:15 36:3,9
38:21 39:1 45:4
48:20 49:9,21 55:12
55:17 56:8 90:1
104:23 136:4
137:17
**Smith's**
6:4 86:2 87:19 137:9
**so-called**
109:18
**social**
72:11,15,22 77:7
130:4

**society**
108:5,8,10,14 109:5
109:17,22 110:3,13
110:13,15,17,19,23
**solely**
119:21 139:6
**solution**
138:2,8,9
**Somebody's**
79:14
**someone's**
85:17
**somewhat**
111:20
**son**
73:10
**son's**
74:10
**sorry**
12:7 13:11,24 21:8
29:12 32:9 36:10
47:17 53:15 61:17
62:18 65:4,4 69:13
73:12 74:15 78:3
79:1 84:21 90:18
105:13 121:16
122:11 129:6,6
**sort**
144:10
**sought**
46:2
**sound**
73:7
**sounds**
6:2 74:8
**source**
52:21 136:9,11
**sources**
34:23
**spans**
15:3
**speak**
16:10 27:14 102:18
115:18
**speaking**
5:21 14:13 65:20

**short** 75:6 81:12
**specific**
63:22 97:6,8,9 98:3
**specify**
97:5
**speculation**
142:10
**spreadsheet**
50:8
**SRU**
20:21
**SRU/JDK**
20:17
**ss**
145:1
**stadium**
45:3
**staff**
20:8 43:8 63:4 76:14
130:20 132:6
**staff's**
100:19
**stamp**
26:17 36:20
**Stan**
1:8 3:3 5:1
**stand**
20:24
**standing**
81:13
**start**
6:3 7:9 8:19 13:4
18:22 19:6 42:24
43:17 44:13,14
47:18 58:23 59:4
61:22 79:8 102:14
106:14 107:18
**started**
6:12 42:21 43:2 44:1
83:7
**starting**
18:22 61:3 70:10
107:20 128:18,20
**starts**
39:21 80:13
**state**



1:12 77:13 111:5
145:1
**stated**
48:12 141:16
**statement**
32:20 41:19 47:7
76:17 78:17,19
**statements**
30:20 31:6 38:1 43:8
**states**
1:1,11 38:8 96:10
123:23
**statistical**
95:14 107:19,22
108:6 109:17,19,22
112:23 117:4,9,24
118:13 120:11,24
121:23 124:21
125:11 126:7
134:14 137:3
**statistically**
63:19 85:3 114:5
117:10 118:7,14
124:24 128:7
**statistically-based**
121:5
**statistics**
112:7,21 113:13
**statutory**
23:9,11
**stay**
65:21
**stenographer**
145:12
**Stephanie**
20:23 21:9
**Steve**
63:5
**stick**
65:4,8 106:12
**Stipend**
28:13,21
**stipends**
32:1 100:23
**stop**
44:22 77:14 94:7

**stopped**
44:18 142:4
**stopping**
45:6
**street**
108:13 110:5,9,11,16
112:12 116:23
118:15
**stressors**
81:15
**strike**
45:17 47:18 71:17
99:2 100:20 108:4
132:7
**string**
99:21 103:22
**stub**
27:22
**stubs**
26:12,16 27:2,17
29:22
**studies**
108:4 110:22 111:2,8
111:16,19 112:4,21
114:2,2 116:3,8,14
117:12,16 118:1
119:7 121:6,23
122:19
**study**
85:23 91:3 98:8
134:23
**stuff**
88:13
**subjective**
138:13,17,18,19
139:2,7
**subjectivity**
139:12
**submit**
143:2
**substantial**
113:8,9,16
**substantially**
113:1,2,6
**subtract**
123:6 125:17 126:7

127:5,8,10
**subtracted**
127:20
**subtracting**
124:15 125:3
**success**
40:9 44:8 45:19
**successful**
44:11,11,16
**succession**
21:6
**suck**
139:24
**sudden**
25:7
**suffer**
98:10
**suffering**
96:8,10
**suggest**
29:15 114:24 133:16
136:14 139:19
140:4
**suggested**
43:17 97:1,1
**suggesting**
97:16 139:11
**suggestion**
96:7 125:6 138:11,12
**suggests**
136:6 137:1
**Suite**
1:14 2:5,10
**summarized**
42:12
**summary**
32:21 77:21
**super**
5:14 90:4
**supervision**
20:11
**supervisor**
20:22 21:14
**supplements**
57:18
**suppose**
54:10

46:22
**sure**
17:14 29:3 32:3
88:19 98:18 106:22
**survey**
52:20 53:1
**surveyed**
110:6
**sworn**
5:2 145:9
**SYDNEY**
1:3
**symptomatic**
120:22
**symptoms**
97:21 142:15

---

**T**

**T**
3:6 4:1,1
**table**
19:6 22:10,16 42:4,6
42:8,9 57:2 65:23
68:16,23 69:2,15
70:1,6,10,22,23
71:13 77:22 78:2
79:1,3,8,11,21,24
80:4,5,11 88:2,6
89:22 90:6 91:2,17
93:19,22 94:19,23
95:2,11,15,17,24
120:1,9,13 121:3,9
122:5 126:15 129:5
**tables**
18:20,21 69:20 74:19
78:6 79:1,21 81:16
85:16 93:14,18
123:23 131:17,23
**tail**
131:7
**take**
5:19 9:10 10:6 19:13
25:24 33:17 40:8
42:1 46:22 52:10
54:8,18 59:7,9,11
60:14,19,19,23 62:6



67:7 77:18 79:16,20
80:16 82:10,13 90:8
90:12,23 91:18 93:7
93:13 94:17 99:15
100:17 116:20
118:19 126:6,9,15
126:17,18,23 127:6
128:23 130:23
133:21 135:7
142:13 143:23
144:16
**taken**
1:11 5:12 6:15 54:21
90:24 116:9 117:16
118:9 143:24 145:5
145:11
**takes**
39:12
**talk**
26:3 67:20 70:10
77:20,24 114:3
116:4 133:19
**talked**
31:8 67:17 68:17
79:21
**talking**
86:14 91:2 114:1
126:13,14 137:1
139:15
**talks**
113:20 138:6
**tantamount**
93:2
**Taylor**
85:23 86:14 87:18
88:18 91:3 108:16
108:22
**teach**
76:20,21 77:3 85:6
113:12
**teacher**
46:24
**teaching**
76:8,10
**Ted**
119:11 120:1 137:4

137:14 139:5
**telephonically**
2:7
**tell**
6:14 10:16 17:23
29:20,21 38:4 73:8
76:21 83:2,9 90:4
98:10 102:2 109:24
114:18 123:21
131:8 132:2
**telling**
45:11 82:6
**tempt**
138:21
**temptation**
139:23
**tempted**
140:5,6
**ten**
130:24,24
**tenure**
37:20 38:3,5,13 39:4
39:10,18 40:12
43:20 44:4,18,23
45:6,7,14,19 46:3
54:12 56:14,15 68:7
78:22 102:21
104:21
**tenure-track**
42:21,24
**tenured**
11:16,21 38:8 40:4
41:11 76:11 111:11
**term**
30:5,8,8 34:14
**terms**
9:7 70:20
**terrific**
6:12 8:9 13:16
**test**
143:21
**testified**
5:3 9:9,16,20 55:5,6
137:5 141:16 144:7
**testify**
6:16,24 10:2 107:9

134:19
**testifying**
10:18
**testimony**
7:19,21 8:2,4,10 9:7
9:22 10:9 99:12
131:1
**tests**
143:20
**text**
55:13 73:7,10 74:8
**texted**
86:18
**texting**
73:5,13,16 82:5
**thank**
5:7 6:11 7:3 14:8,20
16:5 22:21 25:13
32:11 35:4 36:6
51:2,3 67:14 76:2
82:13 94:16 99:7,16
103:14 133:2,4
134:11 141:9
144:15
**thanks**
65:7 74:1 82:6 87:4
100:4 104:18
**they'd**
60:21
**things**
29:3 51:9
**think**
11:24 12:8,15 14:12
15:13 17:8 43:15
55:12 66:3 69:8
76:18,23 86:3,4
89:11 115:16,24
133:9 134:3 137:1
**third**
78:11 105:14 131:19
**thoughtful**
130:7
**thousand**
65:19,19
**thousands**
5:12

**three**
10:3,6 12:9,14,16
33:22 45:20 54:24
64:16 71:12 73:17
73:18
**three-quarters**
10:24
**tied**
19:18 23:8 125:10
**time**
5:19,21 6:9 8:9 9:9
9:15 14:1 19:1,16
27:8,15 34:18 40:5
42:24 45:7,8 53:23
54:19 69:19 81:13
83:19 100:10 102:4
128:3 138:4 141:14
144:2 145:6,15
**times**
5:12,12 9:20 10:3,6
11:19 12:5,12
**timetable**
39:13 45:14
**timing**
45:11,12
**tipped**
51:9
**Title**
11:5 22:22 23:13,24
106:24
**titled**
130:19
**today**
6:12,16 8:10 9:19
92:15 113:11
**told**
74:22,24 76:13 81:3
81:8 99:11
**tools**
77:18
**tooting**
79:14
**top**
13:20 37:17 59:8
60:1 90:14,15 92:12
112:12



**topic**
7:5 114:4
**total**
13:22 14:6 31:5,6
34:16 47:20 58:6,9
58:20 61:22 68:20
79:6 80:4 101:6
**track**
77:11
**trade**
36:17,17
**trail**
104:5
**trained**
20:8
**training**
64:6 92:11
**transcribe**
5:21
**transplant**
73:11
**treat**
142:14
**treated**
141:15 143:5
**treating**
141:14 142:5
**treatment**
143:20
**treats**
142:8,9
**trial**
6:24 9:13,23 21:24
80:22 99:12,12
134:19
**trier**
76:22 77:15 81:7
130:14 131:1
136:12 139:21
142:23
**triggers**
81:15
**triple**
96:24
**trouble**
81:9,18 90:7,9 93:21

95:9,16 96:5,11,21
97:9,11,13 98:24
**true**
8:12 30:10 39:14
83:11 112:4 145:13
**truncated**
79:22
**try**
81:23 88:13 92:6
**trying**
19:19 66:7,20,22
74:10 87:8 92:3,4,7
105:8 113:12
**turn**
37:10 120:19
**turning**
105:11
**turns**
64:12,16 94:18
**twice**
9:12
**two**
37:5,7 43:9,14 72:15
73:19 76:18 77:7,10
79:6 97:3 98:22
102:21 109:4,24
119:6 122:23 123:4
134:14 135:3
**two-week**
28:1
**type**
25:1
**types**
23:2 25:18 112:7
119:6
**typical**
28:2
**typically**
71:21 144:17
**typo**
46:23

_____
**U**

**U**
4:1
**U-h-l**

20:23
**U.S**
5:9 88:22
**Uh-huh**
80:20,23 88:17
**Uhl**
20:23
**underlined**
132:5
**underlying**
116:14 119:22
**underscore**
55:2 105:5
**undersigned**
145:12,19
**understand**
5:16 19:19 21:17,19
39:10 41:3 43:15
52:14 58:13 65:12
66:9,17 67:4,5 70:5
81:1 98:18 109:11
134:18,20 141:15
**understanding**
14:9 28:9 41:8 43:5
44:13 51:21 53:19
97:17 102:15,17
110:1 134:17,17
**Understood**
43:20 76:2 87:9
**undertake**
142:1
**undertaking**
45:13
**undoubtedly**
27:11
**unhealthy**
83:18
**unit**
52:5
**United**
1:1,10 123:23
**university**
1:5 2:14 5:8 35:8
40:13 42:21 43:3
52:22,24 76:9 92:12
100:24 101:11

102:20 112:10
**University's**
105:1
**unknown**
95:14
**unquote**
48:8
**unrelated**
35:20
**unuseable**
139:10
**unusual**
113:14
**update**
8:8 27:13,14 34:19
**updated**
50:14
**upper**
33:9,11 36:19,21,24
**ups**
85:18 91:20 93:11
**upset**
46:24
**upward**
128:6
**URL**
88:9
**use**
15:14,19 19:23 37:8
60:8 63:5,19,21
64:8 72:1 76:6
95:10 98:4,5 99:14
104:4,7 110:17
113:5 123:10
124:11 126:22
127:2,8,10,11,18
128:4,8,10 136:6
139:6,15
**uses**
97:21 138:3
**usually**
13:3
**utility**
23:14

_____
**V**



**V**
1:8 3:3 5:1
**vacation**
10:7
**validity**
113:21
**value**
19:7 79:2,3 80:21
106:17 107:19,22
108:1,5,11,11,24
109:5,16,16,18,22
110:21 111:13
112:21,23 114:17
115:8 117:3,4,9,14
117:14,18,24 118:2
118:13,19 120:11
120:23 121:6
122:10,12,23,24
123:1,4,4,5,6,8,18
124:14,15,20,21,22
124:23,24 125:11
125:22,23 126:1,2
126:22 127:2,7,11
127:17 128:1,7,16
128:21 129:10
134:13,14 135:13
137:3
**Valued**
137:24
**values**
120:23 121:23
**variability**
85:17 116:4
**variation**
112:13,18 113:8
114:7
**variations**
93:16 112:5 113:9,15
113:19 114:12
116:2
**varies**
113:1,2 130:16
**variety**
33:7 96:18 114:4,11
**various**
10:21 116:3

**vast**
120:8
**Vegas**
9:2
**versus**
5:8 18:13 23:7
**view**
92:10 112:6
**VII**
11:5 22:22 23:13,24
106:24
**vision**
69:16
**vs-**
1:4
**VSL**
107:23 108:3,5
109:21 110:1 112:5
113:1,2,8,21 114:8
116:8 119:11
137:24
**VSLs**
137:18

---

**W**

**W2**
30:12,20,24 31:6,11
33:2 61:5,6
**W2s**
47:13
**Wacker**
1:14 2:5,10
**wage**
10:21,22 19:13,23
24:15 57:1,3,20
58:16 59:1,1 60:16
62:11 64:1 68:16,17
74:20,23 75:2,15,20
119:8
**wages**
19:3,7,12 23:6 31:12
37:14 59:2 68:24
70:11 71:4 75:15
79:4 80:5,6 82:1
84:18 91:14 114:6
**wait**

127:7
**waive**
144:17,19,20
**waived**
145:17
**walk**
26:5
**Wall**
112:12
**want**
6:3 7:4 21:18 26:3,5
33:10 50:13 55:24
56:3 82:10 98:18
106:13 107:9 110:2
124:14,24 125:16
125:18,21 126:17
127:4 129:6 131:24
132:1,4 139:12
140:2,8
**wanted**
67:11 68:7 78:15
144:6
**wanting**
108:13
**wash**
76:1
**wasn't**
47:5 58:14 66:11
67:13 86:2 88:12
**waste**
102:4
**way**
20:2 32:1 45:9 59:9
67:7 78:1 88:12
90:3,18 98:8 103:5
103:10 104:23,23
105:2 110:17 119:6
125:4 131:23
136:14,15,16,18,19
137:2,10
**ways**
34:12 92:7,8 98:21
101:11 108:12
110:4,8,11,14,16
116:23 117:5
136:15,17 139:13

**we'll**
6:13 7:1,1 144:16,21
**we're**
5:8 34:19 49:15 51:8
54:23 60:10 64:12
66:1 70:1 75:13
82:13 90:23 112:22
113:11 123:3,8
125:20 126:14
144:15
**we've**
67:1 75:6 124:22
**wealth**
117:22
**wealthy**
118:9
**web**
50:20
**website**
50:22
**weeds**
65:21
**week**
93:12
**weeks'**
10:6
**weight**
103:3
**well-behaved**
112:20
**well-founded**
137:13
**well-resolved**
115:7
**well-settled**
112:1,3
**well-understood**
115:7
**weren't**
37:7 51:9
**Wermuth**
2:9 3:4 5:6 6:5,8 7:4
7:7,8,11,14 12:21
12:23 14:20,22
16:13,15 17:19,21
23:22 24:6,17,19,21



25:6,15,16 26:16,18
26:21 30:16,18 32:8
32:12,14 34:24 35:2
35:5,6,24 36:2,4,7,8
36:15 38:17,19,22
38:24 46:5 48:17,19
48:22 49:1,2,5,7,17
50:1 54:18,23 55:6
55:9,15 56:5,6
67:15 68:15 78:12
78:14 79:12,14,16
79:19 85:22 86:2,8
86:22 87:1,7,9,12
87:15,18,21 88:7,10
88:23 89:3,5,11,16
89:20,21 90:23 91:1
99:2,6,9,13,18
100:2,5 101:13,15
101:18,20 103:15
103:17 104:12,14
104:16,19 105:14
105:16 107:11,16
107:17 108:19,21
115:11,13,16 132:7
132:10,14,18,21
133:1,11,15,22
134:1,3,7,10,12
135:15,18,23 136:2
136:3 137:8,12,16
142:12,21 143:23
144:1,15,21

**West**
2:5 11:24

**white**
133:5,8

**whopping**
29:8 64:13

**wide**
66:23 67:4 112:5,6
112:13,18 114:7
115:9 116:2

**wife**
140:2,6

**willfully**
92:3

**willing**

111:17 118:3,8

**willingness**
116:15

**wish**
65:21

**witness**
3:2 5:2 16:9,12 23:19
24:4,13 36:14 46:1
49:23 68:14 79:15
79:17 86:6 87:1,3,8
88:15,18,22 98:20
99:4,17 107:7 132:8
132:12,16,19,22
133:13,20,24 134:2
134:6,8,11 142:18
144:17,20 145:5,9
145:15,17 146:1

**witnesses**
138:24

**women**
117:17

**wonderful**
74:17

**word**
46:16,22 56:23 88:18
97:20,21 100:17
113:5,6

**words**
44:24 73:17 94:5

**work**
10:20,23 20:2,3 21:4
21:5 23:1 25:10
59:18,19 62:1,4
65:5,8 76:13 77:12
78:15 80:18 84:12
85:3 104:8 123:1
124:4,8

**worked**
85:5

**workers**
119:9

**workers'**
114:6

**working**
17:12 42:22 43:2
77:9,14 80:24 82:5

82:18,20 83:6 84:9
84:23 85:8,11 86:11
88:12

**world**
113:13

**wouldn't**
30:10 107:9 125:15

**write**
15:10 38:7 40:3
47:15,15,17,22
109:4,15 122:9

**writes**
130:20

**writing**
81:12

**wrong**
51:2 62:20 81:5
92:14 125:4

**wrote**
37:22,23 111:7 113:6
113:7 121:1,2

_____
**X**

**X**
3:1,6 4:1

**x-rays**
83:17

_____
**Y**

**yeah**
6:5 16:2 18:24 24:14
26:7,18 33:16 46:19
46:23 50:17 52:14
52:18 54:18 56:20
59:23 60:1,5 61:14
66:2,19 74:8,15
79:13 80:12 82:7
86:6,12 87:6 88:8
89:11,18 107:8
131:12 138:23
144:19

**year**
8:3 18:18 27:6,9
29:20 34:9,9 39:7
39:12,21,24 40:1,14
40:17 42:11,12

47:16,19,20 52:23
57:16 58:1 61:20
63:9 64:2 65:2,2
70:21,23,23 71:9
72:6 75:3 76:4,23
76:24 77:2,13,19
80:10,11,13,19
82:19 84:13 85:7,12
86:11 89:15 91:7,11
91:14,15,19 92:20
93:1,16,16,22 94:3
94:9,11,13 101:7
102:15 105:18
110:8,8 112:9,11,14
112:14,17 120:22
121:21,24 124:5,7
126:17

**year-by-year**
91:18

**year-projected**
68:17

**year-to-date**
29:6,12

**yearly**
100:23

**years**
7:22 9:1,8 12:11,16
30:20 43:10,14,24
45:20 58:12 60:22
64:6 66:4,13 76:23
80:9 82:23,24 83:24
83:24 85:12,13,14
85:15 91:12,19,23
93:7,10,20 94:12,18
118:19,20 119:2
123:13,14,16,19,22
124:9 128:5,8 129:2
142:5

**Yep**
26:9 28:3 35:5 49:5
56:24 87:9 141:5

**yesterday**
74:13

_____
**Z**

**zero**



21:13 85:15

**0**

**05**
127:6,20
**08**
127:6,8 128:19
**084-004463**
146:9

**1**

**1**
3:8 7:11,16 15:4 19:6
25:8 26:13 27:17
36:21 56:11 57:2
68:16 69:20 70:1
132:2
**1,500**
29:24 35:7
**1,642.20**
35:12
**1.1**
122:22 123:3,7,10,11
124:2,10 126:7
127:5
**1.22**
62:10 63:3
**1.25**
65:22 66:11
**1.3**
127:9
**1.35**
65:22 66:10
**1.8**
63:16
**1:20-cv-7760**
1:4
**10**
3:17 34:24 35:2 80:4
**10,000**
54:10 56:16 66:11
68:7 112:9,14
**10:00**
1:13
**100,000**
113:2

**101**
4:6
**101,296**
62:16
**102,207**
70:18
**103**
4:7
**104**
4:8
**104,000**
19:13
**104,083**
57:4 63:6 65:11
**105**
29:7
**108**
4:9
**1099**
34:23
**11**
3:18 35:24 36:4 80:5
80:11
**11-13-2020**
15:19 19:19
**11-13-22**
17:2
**114,000**
42:10
**115**
4:10
**12**
3:9,19 38:17,21
39:17 40:12 43:22
**121**
2:5
**123**
1:13 2:10
**13**
3:20 15:11 17:6
18:15 48:17,21
65:15 73:23
**135**
4:11
**137**
4:12

**13th**
17:15 18:6
**14**
3:10,21 42:4,7,8 55:1
55:16 65:4,23 67:21
67:24 70:7 74:3
105:4
**14,000**
42:15 43:18 65:15
**14,719.29**
28:19
**144**
3:5
**14th**
13:6
**15**
3:22 55:9 129:5
**15,600**
57:14
**15,623.18**
34:5
**15th**
39:24 40:16
**16**
3:11,23 48:4 49:20
55:11
**160,000**
66:1,4
**17**
3:12 4:4 31:13 41:7
59:13 70:11 120:19
**18**
4:5 31:13 59:13
63:12 64:20 93:19
99:19 119:18,24
120:10 121:3,10
126:15
**1800**
1:14 2:10
**188**
32:10
**18th**
27:24
**19**
4:6 18:22 19:3 40:13
57:2 64:20 101:13

101:17
**191**
32:10
**1964**
11:6
**1980s**
128:2
**1990**
135:4 139:4 140:9
143:2,18
**1998**
115:1
**19th**
55:10
**1st**
39:21 40:22 49:13

**2**

**2**
3:9 12:21,24 25:8,21
25:24 26:8,12 27:3
37:2 68:23 69:3,15
131:13 132:3
**2,500**
13:8,18
**2.71**
90:8
**2.9**
49:12
**2:00**
6:24
**2:30**
106:13
**20**
4:7 5:9 42:13 57:13
64:21 70:12 80:13
93:7,10 94:18
103:15,18 124:9
**200**
110:5
**2000**
120:22
**2001**
114:19
**2002**
114:19 121:14



**2005**
121:12,15,16,21,24
  122:8,13 126:6,8,14
  127:5
**2008**
115:23 120:2 126:9
  126:16 127:3,12,15
  127:16 137:14
  139:5
**2009**
115:24
**2012**
42:23 43:2
**2014**
87:23 88:16 93:20
**2016**
40:7 43:22 50:14
  56:7,11
**2017**
18:23 19:1,7,9,12,13
  30:12,20 38:9 40:4
  40:5,7,10,22 41:5,8
  41:11,15,20,22,23
  42:4 43:16,17,21
  44:13,14 47:13,16
  48:3 56:15,17 59:1
  59:2,14 60:3,6,7,8
  60:14,15 61:2,21
  62:14 63:7,12 65:9
  69:18 70:12 71:19
  83:7
**2017's**
42:1
**2018**
31:15,22 35:11 40:6
  47:16,22 48:3 57:20
  59:5,7,14 60:4,6,7
  60:10,14,15,20 61:1
  61:5,6,22 62:17
  63:14 70:24 83:14
  84:11 86:16 87:23
  100:8,10 101:3,10
  105:21,22,23 106:5
  106:9
**2019**
31:15,18,22 35:8

43:7,13 49:13 58:21
  63:14,16 70:24
  84:10 102:15,22
  103:23 106:10
**2020**
15:11 17:6,15 18:6
  18:15 19:9,17 30:12
  30:21 31:18 47:13
  47:16 63:16 70:12
  71:1 104:21 144:9
**2021**
18:18 30:24 32:20
  33:2,3 63:18 64:9
  64:10 71:1,5 72:7
  72:10
**2022**
7:22 8:1,6 9:8 13:6
  27:6,8,23,24 34:18
  34:19 55:10 63:24
  71:4 82:19 126:19
  126:23
**2023**
1:13 19:1 34:19
  64:15 65:23,24 71:8
  71:19 74:23 75:1,20
  79:22 80:13,16,19
  81:24 82:20 84:19
  85:1,5,8 91:15 93:1
  94:1 146:3
**2024**
80:5,11
**206**
20:14
**2067**
93:1 94:2
**21**
4:8 70:15 96:15
  104:12,15
**21.7**
96:2
**2184**
55:2
**2186**
105:15
**2189**
55:24 56:7

**2191**
55:3 68:3
**21st**
7:22 9:8
**22**
1:13 4:9 26:13,13
  27:17 61:12,15,16
  62:11,13,21,24 64:1
  82:5 108:19 128:19
**22.2**
63:1
**23**
4:10 26:13 115:11,15
**2300**
2:5
**23rd**
28:17
**24**
3:13 4:11 6:15,18
  135:16,18 139:4
**25**
4:12 113:3 137:9
  139:5
**257,415**
131:15
**26**
3:14 25:20 90:15
**26(a)(2)(b)**
25:22
**27**
89:22 96:14
**27.1**
90:18 93:22 95:10
**28**
94:20 95:24 97:23
**28,000**
42:10
**29th**
137:14

**3**

**3**
3:10 14:20,24 18:21
  25:9 26:1 31:4
  32:19 36:24 37:11
  39:6 45:16 46:10

50:2 62:1,4 63:2
  106:12 131:14
**3.2**
42:14 66:5
**3.3**
131:14
**30**
3:15 60:22 94:18
  128:5
**30s**
84:8,8 123:22
**31.5**
97:4
**312**
2:6,11
**31st**
8:6
**32**
3:16 93:15,17
**3439**
135:19,24
**3442**
135:19,24
**35**
3:17 139:2
**35,000**
124:7
**36**
3:18
**38**
3:19 90:18 91:19
**38.55**
80:17 82:19 84:22
  85:7 86:10 90:13,18
  90:18 91:5,10
**382-3100**
2:11

**4**

**4**
3:11 16:16 25:9 37:2
  37:10,17,18 45:17
  46:7,10,14 58:10
  74:19 144:8
**4,329**
72:7,11,13



**4.1**
127:2,8,9,11,16,18
  127:23 128:19,24
**4.4**
121:6,13
**4.8**
122:13,21 123:9
  126:8 127:5,19
**40**
64:6 129:22 130:13
  131:13
**40s**
84:8,9
**42**
15:4
**43,448**
80:6
**45**
123:13,14,16,19,22
**450**
49:1
**47**
60:3
**48**
3:20

**————— 5 —————**

**5**
3:4,12 17:19,22 20:1
  20:13 21:18 25:10
  37:2 58:24 59:23,24
  78:12 79:1,1,3
  112:11 130:18
  137:17,22
**5.4**
126:9 127:6,9,15,18
**5.6**
128:19,24
**5.79**
63:20
**5.9**
64:12 121:20 122:2
  122:16,21 125:17
  126:6 127:5
**50**
85:15 112:17 130:13

130:21 131:3,6,15
  131:16
**50,000**
124:4
**50/50**
10:19
**500**
112:16
**506-5511**
2:6
**55**
3:21,22,23 4:4
**55,642**
71:9
**57**
7:20
**58**
8:16
**5th**
27:23 146:3

**————— 6 —————**

**6**
3:13 24:19,23 25:10
  26:2 36:21,24 37:2
  37:2 63:18,24 74:19
  79:1 131:14
**6.02**
63:18
**60**
84:18,21 91:15
  129:22 130:14
  131:14
**60601**
2:5
**60606**
2:10
**61-and-a-half**
92:20,24
**62**
8:20 84:19 85:19
  93:5
**64**
93:20
**64.7**
95:5

**67**
76:14 77:22 78:1,16
  93:14 94:17
**67.1**
95:11
**68,340**
56:12
**69**
9:22 10:13
**696**
103:19
**698**
103:20

**————— 7 —————**

**7**
3:8,14 26:23 27:20
  31:8 42:9 69:20
  106:16 110:20
  137:22 138:12
**7-12-2018**
102:6,11
**7,000**
13:14,19 14:4,6
  55:10
**7.35**
59:8,11,13,15 60:3,6
  61:4,8,23 62:7
**7.5**
121:6,17
**70**
78:4,16 84:12 124:5
**70.3**
90:15,19
**707**
100:2
**709**
100:3
**713**
101:19
**714**
102:5
**716**
101:19
**717**
35:3,9

**718**
35:3
**719**
32:18
**72**
93:4,6,9,10
**720**
32:18 33:6,6
**720,000**
65:24
**725**
38:23
**73**
77:5
**743,000**
68:20
**743,146**
68:20
**751**
39:16
**752**
38:23
**7760**
5:9
**778**
36:5
**779**
36:5
**78,340**
56:18,24
**79,071**
62:20

**————— 8 —————**

**8**
3:15 30:16,19 70:7,8
  70:10,22 78:9,10
  79:8,21 119:6 129:3
  129:9
**800**
9:9,11,13
**80s**
76:10
**82**
93:6
**827**



104:17
**828**
104:17
**83**
74:20 76:3
**831**
26:24 27:19
**846**
26:24
**85,175**
62:8
**86,000**
42:4 57:12
**86,584.17**
33:20
**87,000**
62:16
**881,000**
66:1

**9**

**9**
3:16 32:8,12,17
57:10 69:9,9 70:15
71:13 79:24 129:9
131:11,14
**9,500**
14:6
**9.8**
72:3,19 73:1
**91,435**
47:22 61:7 65:10
**92**
7:20 9:23 10:13
**95**
120:16,18
**96,000**
63:13
**96,626**
62:19
**97,000**
63:14
**99**
4:5

