**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SYDNEY DILLARD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Case No. 1:20-cv-7760 |
| | ) | |
| **DEPAUL UNIVERSITY,** | ) | Judge John Robert Blakey |
| | ) | |
| **Defendant.** | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S RULE 56.1(a)(3) STATEMENT OF UNDISPUTED MATERIAL FACTS

SYDNEY DILLARD ("Plaintiff"), by her undersigned counsel, Gianna R. Scatchell, Esq., DISPARTI LAW GROUP, P.A., responds as follows to Defendants' Rule 56.1(a)(2) Statement of Material Facts, and states as follows for Plaintiff's Rule 56.1(b)(3) Statement of Additional Facts.

## I.     JURISDICTION AND VENUE

1. This Court has jurisdiction of this matter because the events giving rise to Plaintiff's actionable claims allegedly occurred in this judicial district and DePaul is located in this judicial district. (Tab A, Answer to Second Amended Complaint ("Answer") at ¶3.)

    **RESPONSE: Admit.**

2. The allegations of the Complaint involve events occurring within the venue of this Court. (Tab A, Answer at ¶6.)

    **RESPONSE: Admit.**

3. Plaintiff filed her charge with the Equal Employment Opportunity Commission ("EEOC") on August 13, 2019. (Tab B, Deposition of Sydney Dillard (hereinafter "Dillard Dep.") at 263.)

**RESPONSE: Admit.**

## THE PARTIES

4. Located in Chicago, DePaul is the largest Catholic university in the United States. (Tab A, Answer at ¶10.)

   **RESPONSE: Admit.**

5. Plaintiff Sydney Dillard ("Plaintiff") is an African American Associate Professor with tenure in DePaul's College of Communication, Public Relations and Advertising Program. (Tab A, Answer at ¶9; Tab B, Dillard Dep. at 55.) At the time she filed her Second Amended Complaint, Plaintiff was the only U.S. born African-American tenure-track faculty member in the College of Communication. (Tab A, Answer at ¶12; Tab B, Dillard Dep. at 228.)

   **RESPONSE: Admit.**

## THE UNIVERSITY AND THE COLLEGE OF COMMUNICATION

6. DePaul has 10 colleges. (Tab C, Deposition of Salma Ghanem ("hereinafter "Ghanem Dep") at 6.) DePaul's College of Communication (the "College") is comprised of four Programs, including the Public Relations and Advertising Program ("PRAD"). (Tab B, Dillard Dep. at 55; Tab C, Ghanem Dep. at 32; Tab D, Deposition of Alexandra Murphy (hereinafter "Murphy Dep.") at 77.)

   **RESPONSE: Admit.**

7. Dr. Salma Ghanem (Middle Eastern, born in Egypt) was hired by DePaul as the Dean of the College in 2014. (Tab E, Declaration of Dr. Salma Ghanem (hereinafter "Ghanem Decl.") at ¶¶4-5; Tab C, Ghanem Dep. at 9.) In October 2018, Ghanem

began serving as the Acting Provost. (Tab E, Ghanem Decl. at ¶6; Tab C, Ghanem Dep. at 6, 22-26; Ex. 3 to Ghanem Dep.) In 2019, Dr. Ghanem then began serving as Interim Provost. (Tab E, Ghanem Decl. at ¶7; Tab C, Ghanem Dep. at 6.) Dr. Ghanem has been the Provost of the University since 2021. (Tab C, Ghanem Dep. at 6; Tab E, Ghanem Decl. at ¶3.)

**RESPONSE: Admit.**

8. Dr. Alexandra Murphy is a tenured Professor, who became Acting Dean of the College in October of 2018 and then Interim Dean of the College in 2021. (Tab D, Murphy Dep. at 5-6.) Dr. Murphy became the Dean of the College in 2023. (Tab F, Declaration of Alexandra Murphy (hereinafter "Murphy Decl.") at ¶3.)

**RESPONSE: Admit.**

## DEPAUL'S PROBATIONARY REVIEW AND TENURE REVIEW PROCESSES

9. Faculty employment at DePaul is governed by a Faculty Handbook. (Tab B, Dillard Dep. at 22.) Plaintiff admitted that the Faculty Handbook is periodically updated and that the 2010, 2015, 2016 and 2018 Faculty Handbooks applied to her up through her tenure application in 2018. (Tab B, Dillard Dep. at 22, 32; Exs. 14, 140, 141, 142 to Dillard Dep.)

**RESPONSE: Admit.**

10. A tenure track professor at DePaul typically spends six years in a "probationary period." (Tab B, Dillard Dep. at 19; Tab C, Ghanem Dep. at 13-14; Tab D, Murphy Dep. at 10.) The length of the probationary period is set in the initial faculty contract. (Tab B, Dillard Dep. at 17-19; Ex. 22 to Dillard Dep.; Ex. 140 to Dillard

Dep. at §3.5.2.2; Ex. 141 to Dillard Dep. at §3.2.1; Ex. 14 to Dillard Dep. at §3.2.1; Ex. 142 to Dillard Dep. at §3.2.1.) A faculty member can request to "stop" that probationary period on certain grounds, including for medical reasons or the birth of a child. (Tab B, Dillard Dep. at 50-51, 114.) The Handbook provides that if a faculty member is on a leave for one quarter or longer for any reason (research, medical, FMLA, personal), the year during which the leave occurs is not considered as a year of the probationary service, unless explicitly provided otherwise in writing. (Tab B, Ex. 140 to Dillard Dep. at §3.5.2.2; Ex. 141 to Dillard Dep. at §3.2.2; Ex. 14 to Dillard Dep. at §3.2.2; Ex. 142 to Dillard Dep. at §3.2.2.).

**RESPONSE: Admit.**

11. A faculty member must submit their request for consideration for tenure in the spring of the year prior to the submission of their application. (Tab B, Ex. 141 to Dillard Dep. at §3.9.1; Ex. 14 to Dillard Dep. at §3.9.1; Ex. 142 to Dillard Dep. at §3.9.1.) Requests for early promotions in rank are made only where the candidate's exceptional performance is certified by the Dean of the College and the College Personnel Committee as warranting early application for promotion. (Tab B, Ex. 141 to Dillard Dep. at §3.1.1(m); Ex. 14 to Dillard Dep. at §3.5.1.1(m); Ex. 142 to Dillard Dep. at §3.5.1.1(m).)

**RESPONSE: Admit.**

12. During the probationary period, the faculty member's Program Chair conducts an annual review, designed to provide feedback to the faculty member and to determine merit increases. (Tab B, Dillard Dep. at 35; Ex. 14 to Dillard Dep. at §2.3.4; Ex. 140 to Dillard Dep. at §3.2.1; Ex. 141 to Dillard Dep. at §3.3.1; Ex. 142

4

to Dillard Dep. at §3.3.1.)

  **RESPONSE:** **Admit.**

13. During this probationary period, the faculty member is also subject to formal reviews by tenured faculty within their academic unit, designed to give feedback as the faculty member progresses toward tenure, and to recommend whether to reappoint the faculty member. (Tab B, Dillard Dep. at 36; Ex. 14 to Dillard Dep. at §3.3.1.1; Ex. 140 to Dillard Dep. at §3.2.2; Ex. 141 to Dillard Dep. at §3.3.1.1; Ex. 142 to Dillard Dep. at §3.3.1.1; Tab C, Ghanem Dep. at 16-17.) The formal reviews are conducted at least every two years. (Tab B, Dillard Dep. at 37- 45.) From 2010 to 2015, formal reviews could take place more frequently than every two years "if early evaluations make reappointment questionable." (Tab B, Dillard Dep. at 37; Ex. 140 to Dillard Dep. at §3.2.2.) From 2015 through at least 2018, formal reviews could take place more frequently than every two years "if formal review raises serious concerns about the candidate's potential for attaining promotion or tenure." (Tab B, Dillard Dep. at 36-45; Ex. 141 to Dillard Dep. at §3.3.1.1; Ex. 14 to Dillard Dep. at §3.3.1.1; Ex. 142 to Dillard Dep. at §3.3.1.1; Tab C, Ghanem Dep. at 15.) Faculty members are evaluated on teaching, research and service in these formal reviews. (Tab B, Ex. 140 to Dillard Dep. at §3.2; Ex. 141 to Dillard Dep. at §3.3; Ex. 14 to Dillard Dep. at §3.3; Ex. 142 to Dillard Dep. at §3.3.)

  **RESPONSE: Admit.**

14. Local academic units can implement their own policies and procedures consistent with these University policies. (Tab B, Dillard Dep. at 67.) The College maintains its own guidelines on formal probationary reviews, and tenure and promotion. (Tab

B, Dillard Dep. at 69-70; Exs. 16 and 17 to Dillard Dep.) In the College, formal reviews are conducted by a "Personnel Committee" of tenured faculty who reports to the full tenured faculty body, and together they make a recommendation to the Dean. (Tab B, Dillard Dep. at 36; Ex. 16 to Dillard Dep. at 2; Ex. 17 to Dillard Dep. at 2.) Under the College Guidelines in effect during Plaintiff's last two formal reviews, the faculty member should have at least one area (teaching, research, service) ranked as excellent, with none ranking below very good. (Tab B, Ex. 16 to Dillard Dep. at Dillard_DePaul0195; Ex. 17 to Dillard Dep. at Dillard_DePaul0136.) The ranking of "fair" is below "very good." (Id.)

**RESPONSE: Plaintiff objects to the extent that last "two formal reviews" is impermissibly vague. Plaintiff admits the remainder of #14.**

15. Applications for tenure must be submitted by the candidate in the Fall Quarter of the academic year in which the candidate is applying. (Tab B, Ex. 140 to Dillard Dep. at §3.6.1; Ex. 141 to Dillard Dep. at §3.9; Ex. 14 to Dillard Dep. at §3.9; Ex. 142 to Dillard Dep. at §3.9.) Tenure applications in the College are first reviewed by the Personnel Committee and all tenured faculty within the College, then the Dean of the College, then the University Board on Promotion and Tenure ("UBPT"), and finally the Provost. (Tab B, Dillard Dep. at 57-59; Exs. 93, 98, 124 to Dillard Dep.; Ex. 142 to Dillard Dep. at §§3.5.4, 3.5.6; Tab C, Ghanem Dep. at 13-14; Tab D, Murphy Dep. at 9-13.)

**RESPONSE: Admit.**

**IN-PERSON TEACHING IS AN ESSENTIAL FUNCTION**

16. The Faculty Handbook provides that the "primary function" of the University is

6

instruction, "hence, teaching constitutes the majority of faculty assignments." (Tab B, Dillard Dep. at 38, 43; Ex. 140 to Dillard Dep. at §6.6.3.1; Ex. 141 to Dillard Dep. at §6.6.3.1; Ex. 14 to Dillard Dep. at §6.6.3.1; Ex. 142 to Dillard Dep. at §6.6.3.1.) Plaintiff admitted that teaching is one of her essential job functions, along with research and service. (Tab B, Dillard Dep. at 166-68.) Plaintiff admitted that those essential functions required her to read, write, present in front of students, present in front of colleagues, host meetings and take notes at meetings, among other "myriad of duties." (Tab B, Dillard Dep. at 166, 168.) Plaintiff also admitted that it is important to DePaul that its faculty meet the needs of its students and are excellent teachers. (Tab B, Dillard Dep. at 66-67.)

**RESPONSE: Plaintiff objects to the characterization of this fact to the phrase "primary function of the University is instruction" as an improper characterization. Instruction could take place online or in-person. Plaintiff further objects to the statement that she admits that teaching is "one of her essential job functions" as an impermissible legal question. Plaintiff further objects to the statement "essential functions required her to read, write, present in front of students, present in front of colleagues, host meetings and take notes at meetings, among other 'myriad of duties'" as an improper legal conclusion. Plaintiff further objects to the statement that Plaintiff admitted it is important that the "faculty meet the needs of its students and are excellent teachers" as impermissibly vague.**

17. In 2016, the College implemented a policy on online teaching, which remained in place approximately through 2019. (Tab B, Dillard Dep. at 72; Ex. 18 to Dillard

Dep.) Under that policy, full-time faculty should teach more than half of their annual load as an online course. (Tab B, Dillard Dep. at 72; Ex. 18 to Dillard Dep.) The rationale for the policy is to provide a more consistent presence for colleagues and students. (Tab B, Dillard Dep. at 72; Ex. 18 to Dillard Dep.) The policy also provides that untenured, tenure-track faculty who do not demonstrate very good to excellent teaching in their face-to-face courses in their pre-tenure formal review will be limited in the number of online courses they can teach. (Tab B, Dillard Dep. at 72; Ex. 18 to Dillard Dep.) The rationale for this is that the College cannot guarantee that faculty will be able to teach exclusively online post-tenure. (Tab B, Dillard Dep. at 73; Ex. 18 to Dillard Dep.) Tenured faculty in the College need to be confident that all of its faculty can effectively teach in the face-to-face modality. (Tab B, Dillard Dep. at 73.)

**RESPONSE: Admit.**

## **PLAINTIFF'S HIRE AND PROBATIONARY PERIOD**

18. Plaintiff obtained her Ph.D. from Purdue University in 2012. (Tab B, Dillard Dep. at 10-11.) In 2011, Plaintiff interviewed for a tenure-track position in DePaul's College of Communication, and was hired to start in the 2012-2013 academic year. (Tab B, Dillard Dep. at 11; Ex. 22 to Dillard Dep.) Plaintiff was offered the position of Instructor, with a change in rank to Assistant Professor upon completion of her Ph.D. (Tab B, Dillard Dep. at 17; Exs. 22 and 25 to Dillard Dep.) Plaintiff's starting pay was scheduled to be $66,000, but was increased to $67,000 upon the completion of her Ph.D. (Tab B, Dillard Dep. at 21; Exs. 22 and 23 to Dillard Dep.)

**RESPONSE: Admit.**

19. For her first three contract appointments, for academic years 2012-13, 2013-14 and 2014-15, Plaintiff was notified that she would be eligible for tenure review in the 2017-2018 academic year. (Tab B, Dillard Dep. at 19; Exs. 22 and 25 to Dillard Dep. (at Dillard_DePaul2185-87).) Due to a leave of absence and at Plaintiff's request, DePaul extended Plaintiff's probationary period, such that she became first eligible to apply for tenure in the 2018- 2019 academic year. (Tab B, Dillard Dep. at 50-51; Ex. 25 to Dillard Dep. (at Dillard_DePaul2188).) Specifically, Plaintiff extended her probationary period ("stopped her clock") by one year in November 2014 when she took medical leave for the birth of her child. (Tab B, Dillard Dep. at 50.) Each appointment received and signed by Plaintiff between academic year 2015-16 through 2018-19 informed Plaintiff that she would be eligible for tenure in the 2018-2019 academic year. (Tab B, Ex. 25 to Dillard's Dep. at Dillard_DePaul2188-90.)

   **RESPONSE: Admit.**

20. When Plaintiff was hired, ■■■■■■■■■■■■ was a tenured faculty member serving as Chair of PRAD. (Tab B, Dillard Dep. at 229-30, 413; Tab C, Ghanem Dep. at 73, 96-99; Tab D, Murphy Dep. at 78.) In ■■■■■■ first annual review of Plaintiff, she initially rated Plaintiff's teaching as "unsatisfactory." (Tab F, Murphy Decl. at ¶5, Ex. 1 to Murphy Decl.) ■■■■■■updated that review in the Summer of 2013, noting that Plaintiff's teaching evaluations had improved. (*Id.*) In her 2013-2014 annual review, ■■■■■■ rated Plaintiff's teaching as "Good," but noted that some students expressed concerns about the courses that she suggested Plaintiff address, and she offered assistance to work with Plaintiff in reviewing her teaching evaluations. (Tab

F, Murphy Decl. at ¶8, Ex. 3 to Murphy Decl.)

**RESPONSE: Plaintiff objects to this fact as a mischaracterization of the evidence. When Dr. Dillard was hired, ███████████ was serving as interim program director and graduate director. She did not become chair of PRAD until 2014. She never went through the process of receiving tenure as she was offered it when hired. Dillard Dec. ¶ 5.**

21. SharePoint was a software system the College used for faculty to upload dossiers for the formal reviews and tenure review, so the materials would be accessible to the reviewers. (Tab B, Dillard Dep. at 302-04.) Plaintiff admits that it is important for a faculty member to load required files to SharePoint so that the faculty reviewers can obtain an accurate picture of the candidate's record. (Id. at 304.) The system did not always function well, for Plaintiff or for others, and was not a user-friendly system. (Id.; Tab D, Murphy Dep. at 20.)

**RESPONSE: Admit.**

22. Plaintiff underwent her first full formal review in the Fall of 2013. (Tab F, Murphy Decl. at ¶6, Ex. 2 to Murphy Decl.) In Plaintiff's 2013 first formal review, her faculty reviewers unanimously voted in favor of renewing her contract. (Tab F, Murphy Decl. at ¶6; Ex. 2 to Murphy Decl.) However, the reviewing faculty, including ■■■■■, rated her teaching as "fair," noting, among other concerns, that her "instructor effectiveness" ratings from students were in the 2s and low 3s, below the expected 4 range. (Tab F, Murphy Decl. at ¶¶6, 7; Ex. 2 to Murphy Decl.) The faculty reviewers indicated that they would meet Plaintiff in Winter Quarter 2015 to formally review her progress in the area of teaching only. (Id.) Plaintiff's

appointment was renewed. (Tab B, Ex. 25 to Dillard's Dep. at Dillard_DePaul2187.)

**RESPONSE: Admit.**

23. In her 2015 formal teaching review, conducted in the Winter Quarter of 2015, the Personnel Committee and the entire group of tenured faculty in the College unanimously voted to renew Plaintiff's contract and unanimously voted that Plaintiff was making good to very good progress toward tenure in teaching. (Tab B, Dillard Dep. at 315; Ex. 32 to Dillard Dep.)

**RESPONSE: Admit.**

24. Dr. Ghanem, as the Dean of the College at the time, adopted the recommendation, noted that student evaluations indicated her teaching had improved significantly, and offered Plaintiff a renewed contract. (Tab B, Dillard Dep. at 316; Ex. 33 of Dillard Dep; Tab C, Ghanem Dep. at 78-79.) Dr. Ghanem did not mention Plaintiff's use of SharePoint in this renewal letter. (Tab B, Dillard Dep. at 316.)

**RESPONSE: Admit.**

25. After her 2015 review, and before her 2017 review, Plaintiff received student evaluation teaching scores in the 1's and 2's in a cross-listed, face-to-face course (HTHC 520 and PRAD 595). (Tab B, Dillard Dep. at 280-83; Ex. 30 to Dillard Dep.) Her Spring Quarter 2015 courses, which had better scores, were not available to Plaintiff's reviewers at the time they prepared her March 2015 review because those courses were ongoing at the time of the review. (Tab B, Dillard Dep. at 282-83.)

**RESPONSE: Plaintiff objects to this fact as a mischaracterization of the evidence. The HTHC 520/PRAD 595 cross-listed course represents evaluation scores represent 6 of 184 students surveyed. This represents approximately 3% of the total teaching evaluation scores for Dr. Dillard. PSOF ¶¶12, 15, 17).**

26. Plaintiff was scheduled for her next formal review in the Winter Quarter of 2017. (Tab B, Ex. 36 to Dillard Dep.) Plaintiff was notified that her materials for the review were due on the SharePoint system by January 9, 2017 at 11:59 p.m., and that the deadline was a "hard deadline." (Tab B, Dillard Dep. at 321; Ex. 36 to Dillard Dep.) Plaintiff missed the deadline for submission of her materials. (Tab B, Dillard Dep. at 318, 321; Ex. 36 to Dillard Dep.) When Plaintiff notified the Personnel Chair, ■■■■■■ , he responded that the deadline was "firm" and he would have to review procedure to figure out how to handle the request. (Tab B, Dillard Dep. at 318-20; Ex. 147 to Dillard Dep.) Plaintiff describes this email from ■■■■■■ as "short." (Tab B, Dillard Dep. at 319.) ■■■■■■ later followed up notifying Plaintiff she would have additional time to submit her materials. (Tab B, Dillard Dep. at 322; Ex. 40 to Dillard Dep.) Plaintiff is unaware of any colleague who missed a submission deadline and was treated more favorably. (Tab B, Dillard Dep. at 319.) Another faculty member, ■■■■■■■■■■■■ who missed the deadline was also provided with the same amount of additional time to submit the materials, though that faculty member did not receive the email from ■■■■■■ indicating that he needed to inquire about her request for more time. (Tab B, Dillard Dep. at 319-22, 483-84; Ex. 39 to Dillard Dep; Tab G, Deposition of ■■■■■■■ (hereinafter " at 7, 21, 122; Ex. 21 to Dep.)

**RESPONSE: Admit.**

27. In her 2017 review, the Personnel Committee and tenured faculty again unanimously voted in favor of Plaintiff's retention, but 16 of the 20 reviewing faculty voted that she was not making satisfactory progress toward tenure in the area of teaching. (Tab B, Dillard Dep. at 316-17; Ex. 42 to Dillard Dep. at Dillard_DePaul0429.) The Personnel Committee rated Plaintiff as making "very good" progress toward tenure in teaching, but the full group of Tenured Faculty disagreed, concluding that some aspects of her teaching fell below the standard of very good and should be rated as fair. (Tab B, Ex. 42 to Dillard Dep. at Dillard_DePaul0435.) As a result, they recommended one more formal teaching review in Winter Quarter of 2018, and the majority of tenured faculty echoed the personnel committee's suggestion for Plaintiff to "focus on face to face courses in the next few quarters[.]" (Tab B, Dillard Dep. at 316; Ex. 42 to Dillard Dep. at Dillard_DePaul0435.)

**RESPONSE: Admit.**

28. Former Dean Ghanem adopted the recommendations of the faculty, and renewed Plaintiff's contract for the 2017-18 academic year. (Tab B, Dillard Dep. at 317, 319; Ex. 43 to Plaintiff's Dep.; Tab C, Ghanem Dep. at 80-81; Ex. 9 to Ghanem Dep.) Former Dean Ghanem also agreed with the tenured faculty recommendation that Plaintiff "[focus] on more face to face courses" and the faculty's recommendation for an additional teaching review in Winter Quarter 2018. (Id.) Dean Ghanem also concurred with the personnel recommendation that she focus on meeting deadlines for submitting her materials for review and improving her documentation. (Id.)

Dean Ghanem mentioned SharePoint in ■■■■■■ review letter, as well. (Tab B, Dillard Dep. at 308.)

**RESPONSE: Admit that these are the facts.**

29. Plaintiff testified that she desired to apply for early promotion with tenure, but never told her Dean, any Associate Dean in the College of Communication or the PRAD Chair that she desired to apply early. (Tab B, Dillard Dep. at 53-57.)

    **RESPONSE: Admit.**

30. Plaintiff underwent a formal teaching review in Winter Quarter 2018. (Tab B, Dillard Dep. at 120; Ex. 54 to Dillard Dep.) In that review, the tenured faculty voted unanimously in favor of retention, and unanimously in favor of progress toward tenure in teaching. (Id.) The Personnel Committee rated her teaching in the past year as "excellent," which the tenured faculty endorsed. (Tab B, Dillard Dep. at 120-21; Ex. 54. to Dillard Dep.) Dean Ghanem concurred and congratulated Plaintiff on her productive review period. (Tab G, Ghanem Dep. at 78-83; Ex. 8 to Ghanem Dep.)

    **RESPONSE: Admit.**

31. When Plaintiff applied for tenure in the fall of 2018, the tenured faculty of the College of Communication, the Dean of the College of Communication, the UBPT and the Provost unanimously supported Plaintiff's candidacy for tenure. (Tab B, Dillard Dep. at 57-62; Exs. 93, 98, and 124 to Dillard Dep.) She was granted tenure effective July 1, 2019, at which time she received a $10,000 promotional raise. (Tab B, Dillard Dep. at 61-62; Ex. 124 to Dillard Dep.)

**RESPONSE: Admit.**

## **PLAINTIFF'S MEDICAL ISSUES AND ACCOMMODATIONS**

32.  Plaintiff claims to suffer from disabling seizure and anxiety disorders. (Tab A, Answer at ¶¶33-34; Tab B, Dillard Dep. at 77.) Plaintiff had a predisposition to seizures caused by an abnormality in the left side of the brain's temporal area. (Tab H, Deposition of Richard Cristea, M.D. (hereinafter "Cristea Dep.") at 21, 58, 119.)

**RESPONSE: Plaintiff objects to the statement that she was predisposed to "seizures caused by an abnormality in the left side of the brain's temporal area" as a mischaracterization of Dr. Cristea's testimony. (PSOF ¶83, Ex – G - Dr. Cristea Dep p. 32).**

33. Plaintiff had her first seizure on September 20, 2017. (Tab B, Dillard Dep. at 78, 80; Tab H, Cristea Dep. at 119.) This seizure occurred in her sleep. (Tab B, Dillard Dep. at 80; Tab H, Cristea Dep. at 20; Tab H, Cristea Dep. at 20; Ex. 1 to Cristea Dep. at Dillard_DePaul4559.) During the seizure, Plaintiff fully dislocated one of her shoulders and partially dislocated her other shoulder. (Tab B, Dillard Dep. at 104-05; Tab H, Ex. 1 to Cristea Dep. at Dillard_DePaul4559.) Plaintiff was seen in the emergency room and sent home from the emergency room. (Tab B, Dillard Dep. at 82.)

 **RESPONSE: Admit.**

34. In the Fall Quarter of 2017, Plaintiff was teaching two face-to-face courses: PRAD 244 and Discover Chicago LSP 110 (Honors 110). (Tab B, Dillard Dep. at 103.)

 **RESPONSE: Admit.**

35. Plaintiff's husband called Plaintiff's Program Chair, ■■■■■■ to inform her that Sydney had been hospitalized due to a seizure. (Tab B, Dillard Dep. at 82-84; Ex. 44 to Dillard Dep.; Tab E, Ghanem Decl. at ¶8; Ex. 1 to Ghanem Decl.)

Plaintiff informed ▬▬▬▬▬▬ that she was restricted from driving at that time and that she had been put on a "24-hour hold." (Tab B, Dillard Dep. at 87; Ex. 44 to Dillard Dep.; Tab E, Ghanem Decl. at ¶8; Ex. 1 to Ghanem Decl.) ▬▬▬▬▬▬ coordinated for Plaintiff's classes to be cancelled that day. (Tab B, Dillard Dep. at 84; Ex. 44 to Dillard Dep.; Tab E, Ghanem Decl. at ¶8; Ex. 1 to Ghanem Decl.) Plaintiff requested that one of her classes not be cancelled because Plaintiff had a teaching team that could complete the lecture. (Tab B, Dillard Dep. at 86; Ex. 44 to Dillard Dep.; Tab E, Ghanem Deel. at if 8; Ex. 1 to Ghan em Deel.)

   **RESPONSE: Admit.**

36. ▬▬▬▬▬▬ then notified Dr. Ghanem, the Dean of the College at the time, and informed Dr. Ghanem that she canceled one of Plaintiff's classes. (Tab B, Dillard Dep. at 84, 88; Ex. 44 to Dillard Dep.; Tab E, Ghanem Deel. at if8; Ex. 1 to Ghanem Deel.) On that same day, Dr. Ghanem reached out to Plaintiff, requesting that Plaintiff let her know if there was any way that she could help. (Tab B, Dillard Dep. at 87, 88; Ex. 45 to Dillard Dep.)

   **RESPONSE: Admit.**

37. Two days later, Dr. Ghanem reached out to Plaintiff via text to check in on Plaintiff and see how she was doing. (Tab B, Dillard Dep. at 88; Ex. 10 to Dillard Dep.) Plaintiff responded to the text stating "Each day I feel like I have more energy." (Id.) During this exchange, Plaintiff also expressed concern regarding how her "medical mishap is going to impact" evaluations in the courses she was teaching. (Tab B, Dillard Dep. at 89; Ex. 10 to Dillard Dep.) Dr. Ghanem responded telling Plaintiff not to worry about her medical situation and evaluations. (Tab B, Dillard

16

Dep. at 90; Ex. 10 to Dillard Dep.)

    **RESPONSE: Admit, but immaterial.**

38. After her first seizure, Plaintiff was also texting with her colleague, ■■■■■■ (Tab B, Dillard Dep. at 92, 96; Ex. 9 to Dillard Dep. at Dillard Discove1y Production 002836; Tab G, ■■■■■■ Dep. at 53.) At Plaintiff's request, ■■■■■■ shared information about Plaintiff's medical condition with another colleague, ■■■■■■. (Tab B, Dillard Dep. at 96; Ex. 9 to Dillard Dep. at Dillard Discove1y Production 002836.) She also informed ■■■■■■ that her classes were canceled for the next week, and ■■■■■■ offered to teach her classes. (Tab B, Dillard Dep. at 96-97; Ex. 9 to Dillard Dep. at Dillard Discove1y Production 002836.) Plaintiff responded, "no need to cover my classes. I already have a plan in place." (Tab B, Dillard Dep. at 97; Ex. 9 to Dillard Dep. at Dillard Discovery Production 002837.)

    **RESPONSE: Admit.**

39. Plaintiff had a second seizure on October 7, 2017, again during her sleep and again requiring a hospital visit. (Tab B, Dillard Dep. at 80, 98; Ex. 9 to Dillard Dep. at Dillard Discovery Production 002843.) Plaintiff also fully dislocated her other shoulder and chipped a bone in one shoulder. (Tab B, Dillard Dep. at 105; Ex. 9 to Dillard Dep. at Dillard Discovery Production 002844.)

    **RESPONSE: Admit.**

40. Following her second seizure, then Associate Dean Alexandra Murphy reached out to Plaintiff telling Plaintiff to please let her know if she could be of any help. (Tab B, Dillard Dep. at 90-91; Ex. 46 to Dillard Dep. Tab F, Murphy Decl. at ¶3.) ■■■■■ offered to cover classes for Plaintiff, as opposed to Plaintiff teaching in an

online modality. (Tab B, Dillard Dep. at 100; Ex. 9 to Dillard Dep. at Dillard

Discovery Production 02845.) Plaintiff responded "I don't want to just give up

everything. I'm planning on asking the students which they prefer. I don't think

online will be too stressful. Plus, I need all the cash I can get." (Tab B, Dillard Dep.

at 100; Ex. 9 to Dillard Dep. at Dillard Discovery Production 002845.)

   **RESPONSE: Admit.**

41. Plaintiff also discussed with ■■■■■■ whether she should cancel her classes or

move the class online; her concerns about her teaching evaluation; and what the

process was for going on leave in the middle of the quarter. (Tab B, Dillard Dep. at

106-07, 110-16; Ex. 143 to Dillard Dep.; Tab E, Ghanem Decl. at ¶9; Ex. 2 to

Ghanem Decl.) Plaintiff continued to teach her Discover Chicago course, as it was

almost complete and Plaintiff had the assistance of a teaching team that co-taught a

portion of the lectures. (Tab B, Dillard Dep. at 117-18; Ex. 143 to Dillard Dep.; Tab

E, Ghanem Decl. at ¶9; Ex. 2 to Ghanem Decl.) Following the meeting ■■■■■■■

sent Dr. Ghanem an email discussing the possibility of moving the PRAD 244 class

to online, and also indicating that "[s]everal PRAD faculty has expressed their

willingness to help Sydney whenever there is a need." (Tab B, Dillard Dep. at 116;

Ex. 143 to Dillard Dep.; Tab E, Ghanem Decl. at ¶9; Ex. 2 to Ghanem Decl.)

Plaintiff was allowed to teach her PRAD 244 course in an online modality for the

remainder of the quarter. (Tab B, Dillard Dep. at 116.)

   **RESPONSE: Admit.**

42. Plaintiff also met with both Dr. Ghanem and ■■■■■■■ to discuss the possibility of

extending Plaintiff's tenure clock if she needed to go on leave in the Winter

Quarter. (Tab B, Dillard Dep. at 111.) Dr. Ghanem said Plaintiff "should consider" going on leave after Plaintiff stated that she was worried about her health and her teaching review scheduled for the Winter Quarter, which would also give her more time to work on her teaching for her tenure review. (Tab B, Dillard Dep. at 113-14.) Plaintiff's physician did not recommend that she take a leave of absence in 2017 or take her out of work as disabled in 2017. (Tab B, Dillard Dep. at 111-12.) In 2017, Plaintiff asked ■■■■■ not to reassign her classes. (Tab B, Dillard Dep. at 360.)

**RESPONSE: Admit.**

43. Plaintiff did not report any additional seizures to DePaul throughout the end of the Fall Quarter of 2017 or during the Winter Quarter of 2018. (Tab B, Dillard Dep. at 118, 119, 123.) She contends that her husband witnessed her having additional "shaking" in her sleep. (Tab B, Dillard Dep. at 79-80.) These shaking events are "so minor" that they do "not require that [Plaintiff] need to go to the doctor or the hospital because they are not grand mal seizures." (Tab B, Dillard Dep. at 80.) Plaintiff did not seek a leave of absence in the Fall Quarter of 2017 or Winter Quarter of 2018. (Tab B, Dillard Dep. at 119, 141.)

**RESPONSE: Admit.**

44. In February 2018, Plaintiff reported to her neurologist that her seizures were improving. (Tab B, Dillard Dep. at 127-28; Ex. 12 to Dillard Dep. at Dillard_DePaul 4618-4622, 4648-51; Tab H, Cristea Dep. at 39-40.) Plaintiff also reported that "there does not seem to be any exacerbating factors" related to her seizures. (Tab B, Dillard Dep. at 129-30; Ex. 12 to Dillard Dep. at Dillard_DePaul 4648-51.) On March 8, 2018, Plaintiff told her neurologist that she was lethargic,

and Plaintiff testified that she was experiencing more lightheadedness and dizziness. (Tab B, Dillard Dep. at 132-34; Ex. 12 of Dillard Dep. at Dillard_DePaul 4654-57.) Nevertheless, Plaintiff asked her neurologist to decrease her medication to see if she could "remain seizure free." (Tab B, Dillard Dep. at 134-35; Ex. 12 to Dillard Dep. at Dillard _DePaul 4654-57; Tab H, Cristea Dep. at 56.) Her doctor adjusted her medication down on March 5, 2018. (Tab B, Dillard Dep. at 134-36; Ex. 12 to Dillard Dep. at Dillard_DePaul 4654-57.) On that same visit, Plaintiff's doctor recorded his assessment that Plaintiff was disabled and therefore unable perform her job. (Tab B, Dillard Dep. at 139; Ex. 12 to Dillard Dep. at Dillard_DePaul 4654-57; Tab H, Cristea Dep. at 56-58.)

**RESPONSE: Object as a mischaracterization of the facts of why the medication was adjusted down. Dillard Dec. ¶ 13.**

45. Plaintiff contends that she slept under her desk most days she was on campus during Winter Quarter. (Tab B, Dillard Dep. at 142-43.) Plaintiff had conversations with ■■■■■■■, and Ghanem about sleeping under her desk, but could not recall when. (Tab B, Dillard Dep. at 143-45; Tab E, Ghanem Decl. at ¶9; Ex. 2 to Ghanem Decl.; Tab G, ■■■■■■ Dep. at 87.) In Winter Quarter of 2018, Plaintiff claims that she verbally asked ■■■■■■ to assign some of her courses to ■■■■■■■, and told ■■■■■■ Plaintiff "no" because she was not on leave. (Tab B, Dillard Dep. at 360-61.) On or near March 5, 2018, Plaintiff talked to Dr. Ghanem about taking a leave of absence in the Spring Quarter. (Tab B, Dillard Dep. at 140-41; Ex. 52 to Dillard Dep.)

**RESPONSE: Admit.**

46. Plaintiff applied for and was granted continuous Family Medical Leave Act
    ("FMLA") to start on March 5, 2018 through June 15, 2018. (Tab B, Dillard Dep. at
    150-52; Exs. 55, 57 to Dillard Dep.) Plaintiff returned to work in June of 2018. (Tab
    B, Dillard Dep. at 177.)

    **RESPONSE: Admit.**

47. Plaintiff applied for short-term disability at the same time she applied for FMLA.
    (Tab B, Dillard Dep. at 169.) On April 17, 2018, Liberty initially denied Plaintiff's
    STD claim, concluding that Plaintiff did not meet the definition of "disability"
    under DePaul's STD Plan based on the medical documentation submitted at the
    time indicating that Plaintiff was "seizure free" and had "requested to decrease [her]
    anti-seizure medication." (Tab B, Dillard Dep. at 158; Ex. 60 to Dillard Dep.)
    Plaintiff had a "statistical" seizure, also described as a fainting spell, in April of
    2018, while she was sitting and reading the denial letter. (Tab B, Dillard Dep. at 80-
    81.)

    **RESPONSE: Admit.**

48. Plaintiff successfully appealed the denial and received backpay for the time period
    in question. (Tab B, Dillard Dep. at 175-76; Ex. 65 to Dillard Dep.) Plaintiff's
    appeal included information that post-dated her initial claim for short-term
    disability. (Tab B, Dillard Dep. at 169; Ex. 65 to Dillard Dep.) Specifically,
    Plaintiff's appeal referenced her suffering from "syncope" on April 12, 2018, as
    well as Dr. Cristea increasing Plaintiff's anti-seizure medication on April 17,
    2018—both of which occurred several weeks after Plaintiff submitted her claim for
    short-term disability in March of 2018. (Id.) During the appeal, Plaintiff asked

■■■■■ and Dr. Ghanem to write letters in support. (Tab B, Dillard Dep. at 169; Tab C, Ghanem Dep. at 55; Exs. 6, 17, 20 of Ghanem Dep.) Dr. Ghanem declined because she understood claim decisions were made based on medical records and that policy did not allow for a letter from her. (Tab B, Dillard Dep. at 170; Tab C, Ghanem Dep. at 55-56; Ex. 20 of Ghanem Dep.) ■■■■■■■■■■ declined, explaining she was not permitted to provide such a letter while in an administrative position. (Tab B, Dillard Dep. at 172.) Plaintiff does not contend that Dr. Ghanem or ■■■■■ decisions not to submit letters were based on discrimination. (Tab B, Dillard Dep. at 171.)

**RESPONSE:** **Admit.**

49. Plaintiff returned to work on or about June 2018. (Tab B, Dillard Dep. at 177.) Upon her return to work, Plaintiff submitted an American with Disabilities Act ("ADA") accommodation request with supporting medical documentation from her neurologist. (Tab B, Dillard Dep. at 177-78; Ex. 68 to Dillard Dep.; Tab I, Plaintiff's Responses to Defendant's Requests for Admissions (hereinafter "Admissions") at ¶¶10-13; Exs. 4, 5 of Admissions.) Within the request, Plaintiff's neurologist informed DePaul that Plaintiff had a "neurological condition" but could "work with temporary restrictions of 1) limited focus writing and reading greater than 1 hour, 2) be able to wear sunglasses indoors, 3) the ability to remove herself from situations in which she becomes dizzy due to overstimulation, 4) she may be able to teach online classes, 5) additional time to develop research agenda and publications, 6) may need help with service committee alternate." (Tab B, Dillard Dep. at 179; Ex. 68 to Dillard Dep.) According to Plaintiff's neurologist, he was

"releasing her to attempt to teach online as an initial event," but did not want her in the classroom at this point in time. (Tab H, Cristea Dep. at 81- 82.)

   **RESPONSE: Admit.**

50. Leading up to the Fall Quarter of 2018 and through the Spring Quarter of 2020, Plaintiff had several conversations with Gianna Bellavia-Johnston, DePaul Employee Engagement and EEO Specialist. (Tab B, Dillard Dep. at 180; Exs. 80, 81 to Dillard Dep.; Tab I, Admissions at ¶¶1, 2, 3, 13-22, 25-47; Exs. 5, 6-9, 11-20 of Admissions.)

   **RESPONSE: Admit.**

51. For instance, between June 5, 2018, and June 14, 2018, Plaintiff submitted to Ms. Bellavia-Johnston her ADA Accommodation Request forms, explained that "stress and fatigue" are two "main triggers" for Plaintiff's condition, and provided Ms. Bellavia-Johnston with sample job descriptions for the research assistant and teaching assistant positions that could assist Plaintiff in performing her job. (Tab I, Admissions at ¶¶12-13; Ex. 5 to Admissions.) During this time, Plaintiff and Ms. Bellavia-Johnston discussed accommodations for Plaintiff's teaching responsibilities, with Plaintiff writing "After our conversation yesterday, I found myself a little confused. As you noted that we could move towards the accommodations for teaching, I was wondering how or perhaps why the same urgency couldn't be placed on identifying a research assistant." (Tab I, Admissions at ¶15; Ex. 6 to Admissions at Dillard_DePaul2755.)

   **RESPONSE: Admit.**

52. In late June, 2018, Plaintiff expressed concern that candidates applying for the

research assistant position lacked "strong backgrounds in academic research, statistical analysis, or data collection," after which Ms. Bellavia-Johnston confirmed that DePaul would post a specific position for "research assistant." (Tab I, Admissions at ¶¶17,18; Ex. 7 to Admissions.) At this time, Ms. Bellavia-Johnston also advised that Plaintiff would be receiving resumes to review for the teaching assistant position, and that DePaul would "explore" other options if none of the candidates "fit [Plaintiff's] needs." (Tab I, Admissions at ¶¶17-18; Ex. 7 to Admissions.) On July 17, 2018, Ms. Bellavia-Johnston reached out to Plaintiff inquiring as to the status of Plaintiff's hiring assistants. (Tab I, Admissions at ¶¶19-20; Ex. 8 to Admissions.) Plaintiff thanked Ms. Bellavia-Johnston for checking-in and advised that she was still waiting to hear back from certain candidates, after which Ms. Bellavia-Johnston noted she would "work on formalizing all of [Plaintiff's] accommodations into a letter" to send to Plaintiff the following week. (Tab I, Admissions at ¶¶19-20; Ex. 8 to Admissions.) On June 24, 2018, Plaintiff was notified she could teach one of her Winter Quarter courses in a hybrid online format, to which Plaintiff responded, "That makes sense." (Tab B, Ex. 80 of Dillard Dep. at Dillard Discovery Production 002633.)

**RESPONSE: Admit.**

53. Those interactions resulted in the granting of accommodations. (Tab B, Dillard Dep. at 180; Exs. 80, 81 to Dillard Dep.) Specifically, DePaul offered and Plaintiff accepted a research assistant to support her research related to promotion and tenure during Fall Quarter and a teaching assistant to assist with course preparation in the Fall Quarter for 2018 classes she would be teaching that Fall Quarter. (Tab B,

Dillard Dep. at 182-83; Ex. 81 to Dillard Dep.; Tab I, Admissions at ¶¶21-22; Ex. 9,

10 of Admissions.) In addition, for the Fall Quarter of 2018 and the Winter Quarter

of 2019, Plaintiff was assigned to teach only one of four courses, HON 110, fully

face-to-face, with two other courses being online and one course a hybrid of online

and inperson. (Tab B, Dillard Dep. at 183, 186; Ex. 81 to Dillard Dep.) The HON

110 course taught in person has a team teaching approach with more than one

instructor and it is seven weeks in length versus ten weeks. (Tab B, Dillard Dep. at

183-84.) During the Fall Quarter of 2018 and Winter Quarter of 2019, Plaintiff did

not report any additional seizures to DePaul though she told Dr. Ghanem and Dr.

Murphy she was having "triggers." (Tab B, Dillard Dep. at 184-85.)

**RESPONSE: Plaintiff objects to the phrase "those interactions resulted in the granting of**

**accommodations" as impermissibly vague and mischaracterizing the accommodations that**

**Dr. Cristea ordered. See DSOF #49. Plaintiff admits that she was assigned to teach on one**

**of four courses, but that it went against her Doctor's orders since she was assigned to teach**

**two modalities. See Dillard Dec. ¶8 Plaintiff admits the remainder of this fact.**

**Additionally, HON 110 includes a five day full time (8am – 5pm) immersion teaching**

**week prior to the start of the quarter, this supplements the 3 week difference when**

**compared to typical 10 week courses.**

54. Bellavia-Johnston and Plaintiff conferred again about Plaintiff's need to continue

accommodations in the Spring Quarter of 2019, which again resulted in agreed

upon accommodations. (Tab B, Dillard Dep. at 192; Ex. 106 to Dillard Dep.) In

December 2018, Ms. Bellavia-Johnston discussed an emergency plan with Plaintiff

for the classroom, to include a panic button and a lighter teaching load. (Tab I,

25

Admissions at ¶¶27, 28, 44, 45; Exs. 12, 20 to Admissions.) Plaintiff rejected both

options. (Id.) On January 13, 2019, Plaintiff asked Ms. Bellavia-Johnston for an

update regarding Plaintiff's official accommodations letter for Spring Quarter. (Tab

I, Admissions at ¶¶27-28; Ex. 12 to Admissions.) Ms. Bellavia-Johnston responded

that she was waiting on an update regarding a potential online course, and asked

whether Plaintiff would be interested in teaching this online course during the

Spring Quarter. (Id.) On January 28, 2019, Plaintiff emailed Ms. Bellavia-Johnston

that she would like to proceed with teaching the aforementioned online course, as

the online course "best reach[es] the accommodations noted by [Plaintiff's] medical

provider." (Tab I, Admissions at ¶¶29-30; Ex. 13 to Admissions.) On January 29,

2019, the accommodations offered to and accepted by Plaintiff included teaching

her two Spring Quarter courses, and being given a teaching assistant and research

assistant for Winter Quarter 2019. (Tab B, Dillard Dep. at 192-92; Ex. 106 to

Dillard Dep.)

**RESPONSE: Plaintiff denies that she rejected both options since Depaul told her that it**

**would reach back out by a certain date about accommodations. No one from DePaul ever**

**did, and Dr. Dillard had to reach out and remind them about her accommodation request**

**and it was very close to the beginning of the quarter as an accommodation for more time**

**was something Dr. Dillard had requested and was in her Doctor's note. (Dillard Dec. ¶¶ 8,**

**12). Plaintiff admits the remainder of this fact.**

55. In March 2019, Plaintiff's neurologist provided an updated accommodations letter

to DePaul, stating that Plaintiff "may be able to teach online classes [which] is the

preferred modality." (Tab B, Dillard Dep. at 193; Ex. 113 to Dillard Dep.) The

letter also stated "she can move to face to face lecturing, but requires an assistant as previously documented." (Tab B, Dillard Dep. at 193-94; Ex. 113 to Dillard Dep.)

**RESPONSE: Admit.**

56. In 2019, Bellavia-Johnston again conferred with Plaintiff about her need for accommodations in the 2019-2020 academic year. (Tab B, Dillard Dep. at 194-95; Ex. 128 to Dillard Dep.; Tab I, Admissions at ¶¶29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42; Exs. 13, 14, 15, 16, 17, 18, 19 of Admissions.) Specifically, on January 28, 2019, Plaintiff mentioned to Ms. Bellavia-Johnston that the teaching schedule for the 2019-2020 year was due in late February 2019, and that Plaintiff hoped to have a "mixture" of online and hybrid courses to "assist with the needs of the college and medical accommodations." (Tab I, Admissions at ¶¶29- 30; Ex. 13 to Admissions.) On February 1, 2019, Ms. Bellavia-Johnston emailed Plaintiff to schedule a time to speak regarding Plaintiff's requested accommodations throughout the 2019- 2020 year. (Tab I, Admissions at ¶¶32; Ex. 14 to Admissions.) Ms. Bellavia-Johnston and Plaintiff continued to discuss Plaintiff's accommodations for the 2019-2020 year between February 2019 and May 2019. (Tab I, Admissions at ¶¶33-36; Exs. 15, 16 to Admissions.) On May 22, 2019, Ms. Bellavia-Johnston met and discussed a wide range of accommodations, including in-class support with a student assistant, online and hybrid teaching options, ability to take breaks, wear sunglasses, the ability to turn off lights, including other accommodations. (Tab I, Admissions at ¶¶35, 36; Ex. 16 to Admissions.) During this period of time, Ms. Bellavia- Johnston reminded Plaintiff that, while DePaul is committed to engaging in the full interactive process to ensure Plaintiff can perform

the essential functions of her position, DePaul need not implement the exact

accommodations Plaintiff requests. (Tab I, Admissions at ¶¶33-36; Exs. 15, 16 to

Admissions.) Plaintiff expressed gratitude for Ms. Bellavia-Johnston's reminding

Plaintiff of the nuances of the interactive process, writing "I understand that we

needed to engage in an interactive process to determine how my medical needs can

be addressed in a manner that allows me to perform the essential functions of my

job without imposing undue hardship on the university." (Tab I, Admissions at

¶¶37-38; Ex. 17 to Admissions.)

**RESPONSE: Plaintiff objects to this statement of fact on the grounds that such is**

**argumentative and offers a legal conclusion as the determination of what are "essential job**

**functions" involves a legal conclusion and is subject to the analysis set forth in the ADA**

**regulations at 29 C.F.R. § 1630.2(n) and applicable case law. See Hampton v. Hart, 2011**

**WL 2837407 (N.D. Ill. 2011) ("To the extent that a response by Plaintiff is argumentative or**

**offers only a legal conclusion, the Court will not consider the response."); Greer v. Bd. Of**

**Educ., 267 F.3d 723, 727 (7th Cir. 2001). (Dillard Dec. ¶11, 12).**

57. In June of 2019, DePaul offered and Plaintiff accepted the following

accommodations for the 2019-2020 year: (1) teaching assistant beginning August 1,

2019 through November 26, 2019 to assist with course prep PRAD 595 Content

Creation and, if needed, in-class support; and (2) student assistant for in-class

support during the Winter Quarter on an as-needed basis. (Tab B, Dillard Dep. at

194-95; Ex. 128 to Dillard Dep.) In September 2019, DePaul adjusted Plaintiff's

accommodations to allow Plaintiff's teaching assistant to work an additional 5

hours per week. (Tab I, Admissions at ¶¶42-43; Ex. 19 of Admissions.) For the

entire 2019-2020 academic year, Plaintiff did not teach any fully in-person courses. (Tab B, Dillard Dep. at 195.)

**RESPONSE: Admit.**

58. Plaintiff has not submitted any additional accommodation requests related to her seizure disorder after the 2019-2020 academic year. (Tab B, Dillard Dep. at 197.)

59. Plaintiff has never submitted an accommodation request to DePaul related to her diagnosis of depression and anxiety. (Tab B, Dillard Dep. at 197.)

**RESPONSE: Plaintiff objects that this misstates the facts. Dr. Dillard developed the anxiety and depressive disorder as a comorbidity of her seizure disorder. See Ex. G Dr. Cristea Dep. pp. 120-121 ("We talked a little bit about her cognitive issues started after the first seizure. She developed the following seizure anxiety disorders and the depressive disorder. Patients who have recurrent episodes or recurrent neurological symptoms can commonly develop those disorders."); Ex. G - Dr. Cristea Dep. p. 119 ("Patients with anxiety, generalized anxiety disorders and major depressive disorders have significant sleep disturbances, which can, as I said, lower the seizure threshold.")**

60. Plaintiff has never submitted an accommodation request to DePaul related to her diagnosis of depression and anxiety. (Tab B, Dillard Dep. at 197.)

**Response: See response to #58.**

### PLAINTIFF APPLIES FOR PROGRAM CHAIR OF PRAD

61. Each Program in the College is led by a "Program Chair," who oversees the activities within the program. (Tab D, Murphy Dep. at 77.) Program Chairs serve three-year terms and are elected by the full-time faculty in the program unit upon

29

approval by the Dean. (Tab B, Dillard Dep. at 218-19; Ex. 35 to Dillard Dep.; Tab D, Murphy Dep. at 103.) In 2019, Program Chairs were responsible for the coordination of activities within their respective program areas, and their duties included, but were not limited to curricular review, the annual and merit reviews of faculty, scheduling of courses, hiring part-time faculty, planning and conducting at least two quarterly meetings with faculty, attending and participating in leadership meetings, and serving as the liaison between the Dean of the College and the faculty within their units. (Tab B, Dillard Dep. at 199-200; Ex. 35 to Dillard Dep.; Tab D, Murphy Dep. at 77.) Program Chairs of PRAD receive a $7,000 to $7,500 stipend plus one-twelfth of the incumbent's annual salary. (Tab D, Murphy Dep. at 78.)

    **RESPONSE: Admit**

62. Prior to 2019, PRAD had just two other Chairs. (Tab D, Murphy Dep. at 77-79.) The first Chair was ■■■■■■ faculty member. (Tab B, Dillard Dep. at 229-30; Tab D, Murphy Dep. at 77-79.) When ■■■■■■ left, ■■■■■■ was appointed to finish ■■■■■■ term, and then served her own three-year term. (Tab B, Dillard Dep. at 229-30; Tab D, Murphy Dep. at 78.)

    **RESPONSE: Dr. Mastin was appointed as Program Chair and was not elected under the Program Chair duties, selection, and review process guidelines. The new process was implemented March 2016, after Dr. Mastin. Since the implementation of the election policy, all of the program chairs have been selected, all of whom are non-African American, ran unopposed, and were elected without issue or change in position or election policy. Sydney's case is the only case of a breached policy, which led to a denial of promotion,**

**even though DePaul attempts to frame like the position as not a promotion.**
**Dillard Dec. ¶¶ 2, 5. Plaintiff admits the remaining facts.**

63. In February of 2019, Acting Dean Murphy notified PRAD faculty that ■■■■■■
would be completing her term as Chair of the PRAD program and asked for
nominations. (Tab B, Dillard Dep. at 198-99; Ex. 108 to Dillard Dep.) Acting Dean
Murphy had been in the role of Dean for only about three months, and had never
before presided over the deliberation of a Chair election. (Tab D, Murphy Dep. at
173).

   **RESPONSE: Admit.**


64. Plaintiff nominated herself for the PRAD Chair position. (Tab B, Dillard Dep. at
199.) Plaintiff was also nominated by one other faculty member, ■■■■■■. (Tab B,
Dillard Dep. at 208; Tab D, Murphy Dep. at 82.) All other nominated faculty chose
not to run, and Plaintiff was the only faculty member to accept her nomination.
(Tab B, Dillard Dep. at 203; Tab D, Murphy Dep. at 82.) Plaintiff did not request
accommodation in the duties of the PRAD Chair role from either Dean Murphy or
Ms. Bellavia-Johnston. (Tab B, Dillard Dep. at 201.) By the time of her self-
nomination to this role, Plaintiff had received the support of her faculty colleagues
and her Dean in their votes recommending her for tenure. (Tab B, Dillard Dep. at
222.)

   **RESPONSE: Admit.**

65. Plaintiff met ■■■■■■ with to ask him what he was looking for in a leader. (Tab B,
Dillard Dep. at 208.) ■■■■■■ responded "It's too bad that ■■■■■■ can't be the

program chair." (Tab B, Dillard Dep. at 208-09.) Plaintiff viewed this as a "slap in the face" because ■■■■■■, is not tenure line faculty and does not have a Ph.D., but still "considered the best fit for the position." (Id.)

> **RESPONSE: Admit, but Plaintiff adds that both of these professors are white males and that ■■■■■ did not meet the minimum requirement for the position. Ex. A - Dillard Dec. ¶¶2, 18.**

66. The next step in the process was to have a presentation by the candidate and deliberation and vote by the full-time faculty (including tenure track and non-tenure "term" faculty). (Tab B, Dillard Dep. at 202-05; Tab D, Murphy Dep. at 80-84.) Prior to the vote, at the PRAD faculty meeting, Plaintiff gave a presentation discussing her goals as PRAD Chair, followed by a "Q and A session." (Tab B, Dillard Dep. at 202-03.) Plaintiff was then asked to leave the room while the rest of the faculty deliberated and then voted on her nomination. (Tab B, Dillard Dep. at 203.)

> **RESPONSE: Admit.**

67. During the deliberations, the faculty discussed that a Program Chair needs to be responsive, timely and collaborative. (Tab D, Murphy Dep. at 85-86; Tab G, ■■■■■■ Dep. at 41-42.) Though not explicitly stated, Acting Dean Murphy understood that some faculty may have been implying that Plaintiff did not meet those qualifications. (Tab D, Murphy Dep. at 86- 87.) During the deliberations, faculty members also expressed that they felt rushed to make the vote and expressed that they felt that the position needed to be rethought because the time commitment of the position had grown over time. (Tab D, Murphy Dep. at 85-86; Tab G,

■■■■■■ Dep. at 41-42.)

**RESPONSE: Admit generally, but deny Sydney had received tenure support from both majority of faculty and the Dean when she self-nominated, making her more senior and qualified that when Kelly was first appointed. Faculty also used "I don't know" Sydney as a new criteria and inappropriate measure of Sydney's qualifications. "Knowing" the candidate is NOT a qualification for selection. In fact, Dan Azzaro made a point to express that this same criteria was never applied to Kelly during her election run. Sydney also learned from Dan that he questioned why they were treating Dr. Dillard differently since the faculty did not really "know" Dr. Chu. PSOF ¶66. There has been a significant decrease in student enrollment within the PRAD program (at least 20%) and the PRAD program further lost faculty lines because there were not enough students. Dillard Dec. ¶ 4.**

68. One term faculty member, who is no longer with the University, ■■■■■■, expressed her view that a Program Chair needs to be present and on campus. (Tab D, Murphy Dep. 88-89.) Prior to COVID, PRAD faculty were active and had a lot of evening events, and Acting Dean Murphy understood the implication to be that they did not see Plaintiff at a lot of those events. (Tab D, Murphy Dep. at 88-89.) ■■■■■■ asked a question that was leading toward being "inappropriate" and "started to go into questions of is something wrong," so Acting Dean Murphy told her it was inappropriate and stopped that line of conversation. (Tab D, Murphy Dep. at 93.) Two other faculty members present at the meeting recall ■■■■■■ asking something along the lines of "what does she teach" or "I don't even know what she teaches." (Tab G, ■■■■■■ Dep. at 44; Tab J, Deposition of ■■■■■■ (hereinafter " ■■■■■■.") at 12-13.) Some faculty expressed that they did not know Plaintiff well.

(Tab J, ▪▪▪▪▪. at 16-17.) No one at the meeting mentioned Plaintiff's medical condition. (Tab D, Murphy Dep. at 93.)

> **RESPONSE: Plaintiff objects to the last statement that no one at the meeting mentioned Plaintiff's medical condition as it misstates that facts. No one explicitly mentioned Dr. Dillard's medical condition, but they did mention her being on leave which was related to her disability (Tab C, Murphy Dep. at 88-93.) and sick or ill (Ex. E-DeMoya Dep. at 136:9-12). Plaintiff further objects that she was not present at evening events. Being present and on campus. (Dillard Dec. ¶ 3).**

69. The deliberations lasted at least an hour, during which time one of the faculty members stepped out and suggested to Plaintiff that she wait in her office for the results. (Tab B, Dillard Dep. at 205-06.) In the ensuing vote, Plaintiff's PRAD faculty peers rejected her candidacy by a 13-2 or 13-3 margin. (Tab B, Dillard Dep. at 206; Tab D, Murphy Dep. at 80.) Acting Dean Murphy, who did not vote, accepted the vote because the process in place required the vote and it would have been unfair to stop it, and because she did not want to overturn it and risk setting Plaintiff up for failure because she did not have the confidence of the faculty. (Tab D, Murphy Dep. at 91-92, 97.) Acting Dean Murphy decided the best course of action was to "pause" so that the job and the selection process could be evaluated. (Id. at 97.)

> **RESPONSE: Plaintiff objects to the last statement that Dr. Murphy took a "pause" as it misstates the facts. Dr. Murphy deviated from the Program Chair selection process and review guidelines — continued next page**

**including following step 10 which dictates the process repeats until a new**

**Program Chair is elected. (PSOF ¶58; Ex. D - Dr. Ghandem Dep. Ex. 12)**

70. After the vote, faculty member ■■■■■■ told Plaintiff that she voted for her, but
that the vote was a majority against her nomination and that she was sorry. (Tab B,
Dillard Dep. at 206-08.) ■■■■■■ told Plaintiff that most of the deliberations
focused on the job itself and how it should be changed, rather than Plaintiff's
qualifications. (Id.)

    **RESPONSE: Admit.**

71. A term faculty member, ■■■■■■ told Plaintiff after the vote that ■■■■■■ asked,
"does [Plaintiff] even teach in this program? She's only been here for what, three or
four years, and more than half of that time she was on leave." (Tab B, Dillard Dep.
at 211-12; Tab D, Murphy Dep. at 150.) None of these comments were directed to
Plaintiff's race. (Id.) Plaintiff confirmed with ■■■■■■■■■■■■ and ■■■■■■ that
■■■■■■ made a comment along these lines. (Tab B, Dillard Dep. at 211-15.) In
particular ■■■■■■ told Plaintiff that someone told Bongiovanni she was "not
allowed to say that" (Id.) ■■■■■■ told Plaintiff she did not vote for Plaintiff
because she did not know her very well and felt rushed and unprepared to make a
decision. (Tab B, Dillard Dep. at 214.) ■■■■■■ and ■■■■■■ echoed ■■■■■■'s
reasons for not voting in Plaintiff's favor. (Tab B, Dillard Dep. at 214-16.) ■■■■■■
and ■■■■■■ told Plaintiff that Bongiovanni' s comment made them
"uncomfortable." (Tab B, Dillard Dep. at 214-15.) ■■■■■■ told Plaintiff he
appeared by computer and was having trouble hearing. (Tab B, Dillard Dep. at
218.)

**RESPONSE: Admit.**

72. After the vote, Dillard expressed concerns to Acting Dean Murphy, asking "If you didn't talk about my qualifications, what happened in the meeting?" (Tab B, Dillard Dep. at 222.) During this meeting, Dean Murphy allegedly admitted that the faculty "talked about everything else but [Plaintiff]." (Id.) Acting Dean Murphy also apologized for ■■■■■ comment and told Plaintiff "that should not have happened." (Tab B, Dillard Dep. at 223.) She explained to Plaintiff that she did not select her for the position because "that was the direction that the faculty gave her." (Id.) Acting Dean Murphy also told Plaintiff that the most important and pressing thing was changing the job description. (Id.) Dean Murphy explained that she was going to conduct an audit to look at all the Chair positions in the College. (Tab B, Dillard Dep. at 224.) Plaintiff felt that was unfair because she was excluded from the conversation about how the job should be changed, and believed there was "underlying discriminatory reasons." (Tab B, Dillard Dep. at 223.)

**RESPONSE: Admit.**

73. After that meeting, Plaintiff sent an email to Acting Dean Murphy summarizing their discussion and requesting a meeting with Acting Dean Murphy and the University's Employee Engagement and EEO office. (Tab B, Dillard Dep. at 236-39; Exs. 110, 112 to Dillard Dep.) The University's Employee Engagement and EEO office informed Plaintiff that the office should not take part in the meeting to permit for a fair investigation in the event that Plaintiff would later have a claim. (Tab B, Ex. 112 to Dillard Dep.) Plaintiff did not make a complaint to the EEO office afterward. (Tab B, Dillard Dep. at 236.)

**RESPONSE: Admit.**

74. Acting Dean Murphy asked ■■■■■■ to continue in her role as Chair for an additional year while the College worked out issues that the faculty had expressed with the position. (Tab B, Dillard Dep. at 234; Ex. 110 to Dillard Dep.; Tab D, Murphy Dep. at 98-99.)

    **RESPONSE: Plaintiff objects to the last statement that Dean Murphy that the faculty had expressed issues because "the faculty," includes Dr. Dillard and she was not included in the discussion about concern that were expressed about the position (Ex. C. Murphy Dep. 100:14-20; 105:5-6).**

75. Acting Dean Murphy received feedback from all the Program Chairs in the College to understand their workload. (Tab D, Murphy Dep. at 101-03.) She learned that advising and scheduling were time-sensitive processes and she decided to assign those functions from all four Program areas away from the Chairs and to an Assistant Dean. (Id.)

    **RESPONSE: Admit.**

76. By October 17, 2019, the Chair position across the College was modified, and a new job description was published. (Tab B, Dillard Dep. at 232-33; Tab D, Murphy Dep. at 174.) Before the new job description was finalized, it was circulated for feedback and Plaintiff had the opportunity to weigh in on the description. (Tab B, Dillard Dep. at 234; Tab D, Murphy Dep. at 174.) When the position opened again within the year, Plaintiff did not apply for it. (Tab B, Dillard Dep. at 235-36.)

    **RESPONSE: Admit.**

77. In the Fall Quarter of 2019, Dean Murphy appointed Dr. Dillard to serve as the

Chair of the Term Faculty Review Committee. (Tab F, Murphy Decl. at ¶11.) In 2020, Plaintiff was appointed to serve in the administrative role of PRAD's Academic Graduate Director. (Tab B, Dillard Dep. at 75-77.) That administrative role is for a three-year term and pays a stipend equivalent to one-twelfth of the incumbent's salary. (Id.) Plaintiff considered her appointment to that position a "promotion." (Tab B, Dillard Dep. at 76.)

**RESPONSE: Admit.**

### INTERACTIONS DURING PLAINTIFF'S PROBATIONARY PERIOD

78. DePaul's Faculty Handbooks contains policies prohibiting discrimination. (Tab B, Dillard Dep. at 22, 32; Ex. 14 to Dillard Dep. at §6.2; Ex. 142 to Dillard Dep. at §6.2.) Complaints of discrimination at DePaul were investigated by the Office of Institutional Diversity and Equity (OIDE) in 2017. (Tab C, Ghanem Dep. at 29-30.) By 2018, the investigation function moved to the Human Resources Office. (Tab C, Ghanem Dep. at 23-30; Exs. 3, 5 to Ghanem Dep.) Isabel Diaz is the Director of Employee Relations, and Barbara Schaffer, who investigated complaints of discrimination in 2017, 2018 and 2019, reported to Ms. Diaz. (Tab C, Ghanem Dep. at 23, 30-31.)

**RESPONSE: Admit.**

79. Plaintiff claims that she was subjected to a hostile work environment by supervisors and colleagues based on her race but admits that no one ever openly discussed her race "as a marker or, you know, deciding factor." (Tab B, Dillard Dep. at 328-29.)

**RESPONSE: Admit.**

80. On December 14, 2017, Plaintiff hand-delivered a document entitled "Events of

Potential Concern" to the OIDE. (Tab B, Dillard Dep. at 330-31; Ex. 48 to Dillard Dep.) In the body of the document, Plaintiff never mentioned the words "discrimination" or "hostile work environment," and even wrote to the OIDE that she was "not seeking to open a formal investigation for discrimination or process a complaint[.]" (Tab B, Dillard Dep. at 330-32; Ex. 48 to Dillard Dep.) When Ms. Schaffer of OIDE reached out to discuss the concerns, Plaintiff responded that she was not making allegations of unfair treatment or filing a formal complaint. (Tab B, Dillard Dep. at 332; Ex. 49 to Dillard Dep.)

**RESPONSE:  Plaintiff objects to the last statement as it misstates the facts. (PSOF ¶¶24, 25, and 44).**

81. Plaintiff next submitted an anonymous complaint in the summer of 2018 that she prepared with ■■■■■■, another former colleague in the College who identifies as ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■. (Tab B, Dillard Dep. at 333-34, 415; Ex. 67 to Dillard Dep.) When Ms. Schaffer reached out to the anonymous email address to inquire, Plaintiff responded that neither Ms. Dillard nor ■■■■■■ were comfortable stepping forward. (Tab B, Dillard Dep. at 335; Ex. 75 to Dillard Dep.) Plaintiff is unsure what Ms. Schaffer did to follow up on that concern. (Tab B, Dillard Dep. at 335.)

**RESPONSE: Plaintiff objects to the last statement as it misstates the facts. (PSOF ¶25). Defendant was provided a  discrimination complaint from an  anonymous email source called  depaulemployee@tutunota.com and have no materially supported reason to conclude that Plaintiff and Dr. Calvente were uncomfortable stepping forward OIDE**

contacting either of them. **The record is silent whether DePaul called for any investigation into these allegations..**

82. In October of 2018, Plaintiff then complained directly to former Dean Ghanem, with ■■■■■■ in a meeting that lasted approximately two hours. (Tab B, Dillard Dep. at 335- 37; Ex. 85 to Dillard Dep.; Tab C, Ghanem Dep. at 23-24.) After that meeting, Dr. Ghanem referred Plaintiff's complaint to Ms. Schaffer. (Tab B, Dillard Dep. at 335-36; Ex. 84 to Dillard Dep.; Tab C, Ghanem Dep. at 22-23; Ex. 3 to Ghanem Dep.) Thereafter, Plaintiff met with Ms. Schaffer and Isabel Diaz. (Tab B, Dillard Dep. at 339.) On December 20, 2018, Plaintiff asked Ms. Ortiz and Ms. Schaffer for follow up on the meeting. (Tab B, Dillard Dep. at 340-41; Ex. 97 to Dillard Dep.) Ms. Schaffer responded on January 22, 2019, requesting additional information from Plaintiff. (Tab B, Dillard Dep. at 341-42; Ex. 104 to Dillard Dep.) Plaintiff never responded. (Tab B, Dillard Dep. at 342.)

**RESPONSE: Admit.**

83. Before leaving her post in the College, Dr. Ghanem suggested that Plaintiff continue the conversation from October 2018 with new Acting Dean Murphy. (Tab C, Ghanem Dep. at 129-30; Ex. 53 to Ghanem Dep.) Plaintiff responded that she would talk to Acting Dean Murphy on diversity, inclusion and retention of minority faculty, but that she did not want to discuss the sensitive nature of their prior discussion. (Id.) In May of 2019, Plaintiff and then Interim Dean Murphy met to discuss certain concerns Plaintiff had about treatment she had received, including the PRAD Chair vote. (Tab B, Dillard Dep. at 385-90; Ex. 125 of Dillard Dep.; Tab

D, Murphy Dep. at 175.) They discussed leadership opportunities for Plaintiff, and Dean Murphy shared that she would inquire about funding for the Harvard Women in Education Leadership Program, which such funding was secured. (Tab B, Dillard Dep. at 389-90; Tab D, Murphy Dep. at 174-75.) Dean Murphy did not recall any conversation where Plaintiff explicitly said that she felt discriminated against. (Tab D, Murphy Dep. at 154.)

**RESPONSE: Object as a mischaracterization of the facts. Dillard noted she did not want to discuss the sensitive nature of her meeting with Dr. Ghanem before her discussion with Dr. Murphy. PSOF ¶ 75**

84. Plaintiff contends that Caucasian faculty members were given "one-on-one assistance and coaching regarding their performance on the path to obtaining tenure, and Plaintiff was not." (Tab B, Dillard Dep. at 266-70; Ex. 1 to Dillard Dep at ¶25(a).) She points to ■■■■■■ [last name unknown by Plaintiff] and ■■■■■■, though she admittedly does not have first-hand knowledge of this asse1t ion. (Id.) Both ■■■■■■ and ■■■■■■ resigned before applying for tenure. (Tab F, Murphy Deel. at ¶9.)

**RESPONSE: Admit.**

85. Plaintiff contends that other faculty, including ■■■■■■■■■■■■ and ■■■■■■ were not required to undergo additional teaching reviews even when their teaching scores were "lower." (Tab B, Dillard Dep. at 271-72, 292-93; Ex. 1 to Dillard Dep. at ¶25(d) .) Plaintiff does not recall any evidence that any of these faculty had scores lower than hers in face-to-face courses. (Tab B, Dillard Dep. at 293.) ■■■■■■■■■■■■ never received 1's or 2's on her teaching evaluations. (Tab G, DeMoya Dep. at 150; Tab F, Murphy Decl. at ¶10.) The only areas of ■■■■'s teaching evaluations that were under "2" were in the catego1y of the average number of hours a week outside of class that the students devoted to the class, where the "rating" number is the actual number of hours spent outside class, and not an evaluation of the course per se or of the professor. (Tab B, Ex. 24 to Dillard Dep; Tab F, Murphy Decl. at ¶10.)

**RESPONSE: Plaintiff is without sufficient knowledge to admit or reject based on the fact that the bulk of this response comes from Dr. Murphy's Declaration and not her deposition testimony.**

86. Plaintiff contends that following her 2017 review, in the Fall Qua1ter of 2017, she was required to teach more face-to-face courses than any other non-minority in the College. (Tab B, Dillard Dep. at 286-88; Ex. 1 to Dillard Dep. at ¶20.) She admits that others may have only taught face-to-face courses that quarter, but that they were not "required" to do so, as she was. (Tab B, Dillard Dep. at 289.) Plaintiff complained about this requirement to the Personnel Committee Chair, ■■■■, Acting Dean Murphy, former Dean Ghanem, PRAD Chair ■■■■, and Associate Dean ■■■■, though she did not complain about race discrimination. (Tab B, Dillard

Dep. at 289-91.) After that, according to Plaintiff, she was no longer "required" to teach solely face-to-face. (Tab B, Dillard Dep. at 288.)

**RESPONSE: Admit.**

87. On June 18, 2018, Plaintiff asked her PRAD Chair, ■■■■ if she could chair a search committee for new PRAD faculty. (Tab B, Dillard Dep. at 296-301; Ex. 1 to Dillard Dep. at ¶25(e); Ex. 76 to Dillard Dep.) Instead, Plaintiff was asked to co-chair the search committee with another faculty member, ■■■■, whom Plaintiff contends was "non-qualified" to serve because he was not yet an Assistant Professor. (Tab B, Dillard Dep. at 297-98.) ■■■■ explained to Plaintiff that PRAD assigned co-chairs for the search because there were two open positions. (Tab B, Dillard Dep. at 298-301; Ex. 76 to Dillard Dep.) Admittedly, this co-assignment did not negatively impact her tenure application. (Tab B, Dillard Dep. at 301.)

**RESPONSE: Admit.**

88. Plaintiff claims that the racially hostile work environment also included two "invasive office searches." (Tab B, Dillard Dep. at 342-43; Ex. 1 to Dillard Dep. at ¶18(c).) Early in 2017, after Plaintiff spoke to Dr. Ghanem about her concerns about additional reviews, someone entered her locked office and left an ombudsman pamphlet on her desk. (Tab B, Dillard Dep. at 343.) Papers were moved around in her office on this occasion. (Tab B, Dillard Dep. at 344.) Plaintiff does not know who left her the pamphlet. (Id.)

**RESPONSE: Admit.**

89. The second "invasive office search" occurred in October of 2017. (Tab B, Dillard Dep. at 347.) Plaintiff received an email from Kathleen Browne, former assistant to

the dean, asking her to come to her office to remove a space heater and to move her computer from off a rug in her office. (Tab B, Dillard Dep. at 347; Ex. 47 to Dillard Dep.) The email originated from Donna Voight, an employee unknown to Plaintiff, who wrote that while "performing inspections, I noticed there's a space heater behind the cabinet by the window in this office. The occupant also has a fluffy throw rug under her desk and the computer tower is on it." (Tab B, Dillard Dep. at 348; Ex. 47 to Dillard Dep.) Voight asked that those fire hazards be removed. (Id.) Though Plaintiff does not know who Donna Voight is, she claims that this incident was part of the racially hostile work environment she suffered. (Tab B, Dillard Dep. at 342-43; 349.)

**RESPONSE: Admit.**

90. On another occasion, on or about September 21, 2018, Plaintiff was at a College meeting. (Tab B, Dillard Dep. at 354-55.) During that meeting, former Dean Ghanem spent substantial amount of time talking about new people who had joined the College and people that had left. (Tab B, Dillard Dep. at 355.) One person that Dean Ghanem did not mention was Dr. ■■■■■■■■, ■■■■■■■■ tenure-track faculty member. (Tab B, Dillard Dep. at 355- 56.) ■■■■ did not go up for tenure before she left. (Tab B, Dillard Dep. at 356; Tab C, Ghanem Dep. at 94-96.) When Plaintiff brought this to Dean Ghanem's attention in the October 2018 meeting, Dean Ghanem apologized and indicated that another individual had created the PowerPoint. (Tab B, Dillard Dep. at 358.)

**RESPONSE: Admit.**

91. During the same September 21, 2018 meeting, another faculty member in the

College, ■■■■, thanked his fellow faculty members for helping him during the time
that he was battling cancer. (Tab B, Dillard Dep. at 359.) Some colleagues had
created a food train to drop off pre-packaged meals for him and his wife, and others
helped him out with teaching some of his courses. (Id.) Plaintiff does not know
whether ■■■■ was on leave when he received the course release support. (Tab B,
Dillard Dep. at 361.)

   **RESPONSE: Plaintiff objects to the characterization of this fact. Dr. Baglia**
   **also received service load assistance (Ex. B. Dillard Dep 99:1-5).**

92. Plaintiff claims that other colleagues of hers who obtained tenure had celebrations
organized by their respective chairs (■■■■■■■■ and ■■■■). (Tab B, Dillard Dep.
at 362.) When Plaintiff achieved tenure, ■■■■ tried to plan a celebration meal for
her, but Plaintiff declined, writing "I wouldn't feel comfortable celebrating until
after I've received the official announcement . . . I really don't want to make a big
hoopla out of it." (Tab B, Dillard Dep. at 363-64; Ex. 121 to Dillard Dep.) ■■■■
asked for names of individuals she would want to invite, but Plaintiff never
responded with that information. (Tab B, Dillard Dep. at 364.)

   **RESPONSE: Plaintiff objects to this fact as it mischaracterizes the events listed**
   **in this fact. Dillard's response left the planning up to Dr. Chu when she**
   **responded, "Honestly, I wouldn't feel comfortable celebrating until after I've**
   **received the official announcement, but if you want to put something on**
   **people's schedules for after the expected date, that would be fine.  I really don't**
   **want to make a big hoopla out of it.  Whatever you'd like to do is fine,"  Dr.**
   **Chu stated. "If you have people from other areas you would like to invite, please**

**send their names along," and Dillard responded, "Will do." (Dillard Discovery**

**Production 002540-1). Plaintiff admits the remainder of this fact.**

93. Plaintiff contends that on November 2, 2018, another faculty member, ■■■■■■■■ ■■■■■■■■tried to disqualify a faculty candidate because she had read that students have a hard time understanding the candidate. (Tab B, Dillard Dep. at 371-75.; Tab D, Murphy Dep. at 112.) Plaintiff refers to ■■■■■■■■ as a non-minority, though she does not know whether is ■■■■■■■■ a foreign national. (Tab B, Dillard Dep. at 371-73.) Plaintiff voted against extending the candidate an offer. (Tab B, Dillard Dep. at 376.)

**RESPONSE: Admit.**

94. During this search process, Plaintiff and ■■■■■■■■ had a disagreement regarding the preparation of a document with information about the candidates that needed to go to the Dean. (Tab B, Dillard Dep. at 474-75.) Plaintiff became dizzy during the interaction and decided to leave the room. (Tab B, Dillard Dep. at 475-76.) Plaintiff later tried to arrange a meeting to discuss the incident, but ■■■■■■■■ accused her of "storming out" of the room at the prior meeting. (Tab B, Dillard Dep. at 477.) The two then met with Dean Murphy and ■■■■■■■■ , at which time Dean Murphy explained that what Plaintiff and ■■■■■■■■ understanding of the process for the submission of the document in question was correct. (Tab B, Dillard Dep. at 477-78.) Within follow up emails on the topic, Plaintiff explained that the interactions "triggered" her health episodes. (Tab B, Dillard Dep. at 480.) These

emails were shared to two other faculty members. (Tab B, Dillard Dep. at 480.)

**RESPONSE: Plaintiff objects that this misstates the facts. Dean Murphy explained Dr. Dillard's application of the search process was correct and aligned with the current hiring policy and procedures guidelines and Dr. Uysal was mistaken in her understanding of the hiring process and procedures explained by Dr. Dillard. (Ex. C- Dr. Murphy Dep. 115:20-24).**

## PLAINTIFF REQUESTS A SALARY INCREASE

95. On November 2, 2018, Plaintiff brought to Dean Murphy's attention that she saw online the $70,000-$74,0000 pay range for a PRAD advertising tenure-track faculty position that the College had posted while Plaintiff was co-chairing the search committee for the position. (Tab B, Dillard Dep. at 242.) Plaintiff expressed her concern that she was at the lower end of this range, and as a result, made an oral demand to be provided with retroactive pay. (Tab B, Dillard Dep. 242-45.)

   **RESPONSE: Admit.**

96. At the time of the posting, Plaintiff was earning $71,974.90. (Tab B, Dillard Dep. at 247; Ex. 23 to Dillard Dep.) Plaintiff demanded retroactive pay at the time to a date "where [Plaintiff] was being underpaid from [her] category as an assistant professor." (Tab B, Dillard Dep. at 245.) Plaintiff also discussed pay with her colleague ■■■■■ at the same time. (Tab B, Dillard Dep. at 249.) Plaintiff earned more than ■■■■■, though because she "hired" him, she believe the differential in their pay should have been greater. (Tab B, Dillard Dep. at 249-50.)

   **RESPONSE: Admit.**

97. Effective January 1, 2019, Plaintiff received a 2.9% increase, raising her salary to

$74,062.17. (Tab B, Dillard Dep. at 243; Exs. 23, 96 to Dillard Dep.) Plaintiff believes that the increase was made in response to raising her pay concern. (Tab B, Dillard Dep. at 244.) By July 2019, Plaintiff was making $84,062.17. (Tab B, Dillard Dep. at 248-49; Ex. 23 to Dillard Dep.)

**RESPONSE: Admit.**

98. The University hired ■■■■■ and ■■■■■ into tenure-track positions in PRAD in August 2019 in connection with that posting, offering each a salary of $72,000. (Tab B, Dillard Dep. at 248-49; Tab F, Murphy Decl. at ¶12.) ■■■■■ is an Asian male and ■■■■■ is an Asian female. (Id.)

**RESPONSE: Admit.**

99. Plaintiff also believes that her pay was discriminatory as it relates to ■■■■■ (Caucasian female) and ■■■■■ (Caucasian male), though she admits that they had "thirtysomething- odd years" of experience in the industry. (Tab B, Dillard Dep. at 252-53.) Plaintiff admits that this fact makes those two faculty members "not quite as comparable." (Id.)

**RESPONSE: Admit.**

Respectfully submitted,

By: /s/ *Gianna Scatchell Basile*, esq.
Plaintiff's Attorney

Gianna Scatchell Basile, Esq.
DISPARTI LAW GROUP, P.A.
121 W. Wacker Drive, Suite 2300

Chicago, Illinois 60601
(312) 506-5511 ext. 330
Gia@dispartilaw.com

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that she served this Plaintiff's Motion for Extension of Time to file Plaintiff's Expert Disclosures to all counsel-of-record via this Court's CM/ECF filing system on December 28, 2023, and that such counsels are registered efilers.

By: */s/ Gianna Scatchell Basile*