# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| SYDNEY DILLARD, | |
| Plaintiff, | Case No. 20-cv-7760 |
| v. | |
| DEPAUL UNIVERISTY, | Judge John Robert Blakey |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Dr. Sydney Dillard, filed this suit against Defendant DePaul University for race discrimination and disability discrimination pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (Count I) and § 2000e (Count II), the Americans with Disability Act of 1990, 42 U.S.C. § 12101, and the Equal Pay Act of 1963, 29 U.S.C. § 201 et. seq., and Defendant moves for summary judgment on all claims. For the reasons explained below, this Court grants Defendant's motion [105] in its entirety.

## I.   Factual Background[1]

### a. Administration and Procedures at DePaul University

DePaul University ("DePaul") consists of ten colleges, one of which is DePaul's College of Communication (the "College"). [127] ¶ 6. The College contains four Programs, including the Public Relations and Advertising Program ("PRAD"). *Id.* DePaul maintains an Employee Handbook, which governs faculty employment at DePaul and sets forth DePaul's relevant policies prohibiting discrimination based upon race or disability. *Id.* ¶¶ 9, 78. University administration updates the Handbook periodically, including in 2010, 2015, 2016 and 2018. *Id.* ¶ 9.

A tenure track professor at DePaul typically spends six years in a "probationary period." *Id.* ¶ 10. The Faculty Handbook provides that if a faculty member goes on leave for one or more quarters, the year during which the leave occurs does not count toward the probationary service period, unless otherwise provided in writing. *Id.* During the probationary period, the faculty member's Program Chair conducts an annual review of the faculty member's progress. *Id.* ¶ 12. The tenured faculty of the academic unit also conducts formal reviews of the faculty member's performance. *Id.* ¶ 13. These reviews provide feedback to the faculty member, recommend whether to reappoint the faculty member, and determine any merit increases. *Id.* ¶ 12–13. The criteria evaluated during these reviews include the faculty member's teaching, research, and service. *Id.* These

---

[1] The Court draws the facts from the record, including Plaintiff's operative complaint, Defendants' motion (including the statement of facts and exhibits included therein), and Plaintiff's response (including the exhibits attached thereto).

reviews occur at least every two years, but may happen more frequently if the faculty member's early evaluations raise concerns about her progress towards achieving tenure. *Id.*

At DePaul, academic units may maintain their own policies and procedures, provided they maintain consistency with these University policies. *Id.* ¶ 14. In the College, a "Personnel Committee," comprised of tenured faculty in the College, conducts the formal reviews described above. *Id.* The Committee then reports to the full tenured faculty body, which subsequently provides a recommendation to the Dean concerning the faculty member's progress toward tenure. *Id.* Candidate faculty members applying for tenure must submit applications during the Fall Quarter of the academic year in which they apply. *Id.* ¶ 15. The Personnel Committee reviews the applications, followed by the entirety of the tenured faculty in the College, then the University Board on Promotion and Tenure ("UBPT"), and finally the Provost. *Id.* ¶ 15.

### b. Plaintiff's Employment at DePaul University

Defendant hired Plaintiff in the 2012-2013 academic year for a tenure-track Assistant Professor position in the College, with a base salary of $67,000. *Id.* ¶ 18. At the time she filed her Second Amended Complaint, Plaintiff was the only U.S. born African American tenure-track faculty member in the College of Communication. *Id.* at ¶ 5. For her first three contract appointments, academic years 2012-13, 2013-14 and 2014-15, Defendant notified Plaintiff that she could first become eligible for tenure review in the 2017-2018 academic year. *Id.* at ¶ 19. Due to a leave of absence,

and at Plaintiff's request, Defendant extended Plaintiff's probationary period. *Id.* Consequently, Plaintiff first became eligible to apply for tenure during the 2018-2019 academic year. *Id.*

Plaintiff's first formal review occurred in the Fall of 2013, after which her faculty reviewers unanimously voted to renew her contract. *Id.* at ¶ 22. Plaintiff received a "fair" rating in the category of teaching, and her "instructor effectiveness" ratings from students scored in the 2s and low 3s, below the expected 4 range. *Id.* The faculty reviewers noted that they would meet with Plaintiff in the Winter Quarter of 2015 to formally review her progress in teaching. *Id.*

After her Winter Quarter 2015 formal review, Plaintiff's faculty reviewers again unanimously voted to renew Plaintiff's contract. *Id.* ¶ 23. Both the Personnel Committee and the entirety of the tenured faculty body respectively and unanimously voted that Plaintiff displayed good to very good progress toward tenure in teaching criteria. *Id.*

Plaintiff's next formal review occurred in the Winter Quarter of 2017. *Id.* ¶ 26. Plaintiff missed the deadline to submit her required materials in advance of the review. *Id.* When Plaintiff notified the Personnel Chair, he responded that "he would have to review procedure to figure out how to handle" her request for an extension. *Id.* The Personnel Chair later followed up to notify Plaintiff that she would have additional time to submit her materials. *Id.* Plaintiff does not know of any peer who missed a submission deadline and subsequently received more favorable treatment than her. *Id.*

4

At the formal review, the Personnel Committee and the body of tenured faculty again unanimously voted to renew Plaintiff's contract, but 16 of the 20 reviewing faculty voted that Plaintiff did not show sufficient progress in the area of teaching. *Id.* ¶ 27. Because of this, the faculty recommended an additional formal teaching review in the Winter Quarter of 2018. *Id.* The majority of the faculty agreed with the Personnel Committee's recommendation that Plaintiff "focus on face-to-face courses in the next few quarters." *Id.* That formal review took place as scheduled in the Winter Quarter of 2018. *Id.* ¶ 30. After the review, the tenured faculty unanimously voted to retain Plaintiff on the faculty. *Id.* Additionally, the faculty unanimously agreed that Plaintiff improved to now demonstrating sufficient progress in the teaching criteria. *Id.*

Plaintiff claims that she desired to apply for tenure early, but that she did not inform the Dean, any Associate Dean in the College, or the PRAD Chair of that desire. *Id.* ¶ 29. Instead, she officially applied for tenure in the Fall of 2018, and the tenured faculty of the College, the Dean of the College, the UBPT, and the Provost unanimously supported Plaintiff's candidacy. *Id.* ¶ 31. Plaintiff attained tenure (effective July 1, 2019), and she received a $10,000 promotional raise. *Id.*

### c. Plaintiff's Disability Diagnosis and Accommodations Requests

In 2017, Plaintiff was diagnosed with a neurological condition which leads to seizures. [138] ¶ 79. Plaintiff experienced her first seizure on September 20, 2017. [127] ¶ 33. Plaintiff suffered another seizure on October 7, 2017. *Id.* ¶ 39. Both required Plaintiff's hospitalization. *Id.* After these episodes, Plaintiff discussed

modifications to her class load and tenure timeline with Associate Dean Alexandra Murphy and Dean Salma Ghanem. *Id.* ¶ 41–42. After these discussions, Plaintiff moved one of her classes online and employed the assistance of a teaching team that co-taught a portion of the lectures for another class. *Id.* ¶ 41. Plaintiff did not report any additional seizures to Defendant throughout the rest of Fall Quarter of 2017 or during Winter Quarter of 2018. *Id.* ¶ 43.

On or about March 5, 2018, Plaintiff discussed taking a leave of absence during the Spring Quarter with Dr. Ghanem. *Id.* ¶ 45. Plaintiff applied for and was granted continuous Family Medical Leave Act ("FMLA") from March 5, 2018, to June 15, 2018. *Id.* ¶ 46. Plaintiff simultaneously applied for short-term disability. *Id.* ¶ 47. Although Plaintiff's claim was initially denied, she successfully appealed the denial and received backpay for the relevant period. *Id.* ¶ 48.

Plaintiff returned to work in or about June of 2018. *Id.* ¶ 49. Upon returning to work, Plaintiff submitted an Americans with Disabilities Act ("ADA") accommodation request with supporting medical documentation from her neurologist. *Id.* Leading up to Fall Quarter 2018, Plaintiff engaged in several conversations with Dr. Ghanem and DePaul Employee Engagement and EEO Specialist, Gianna Bellavia-Johnston, concerning disability accommodations. *Id.* ¶ 50. During the Fall Quarter of 2018, Plaintiff received the following accommodations: a research assistant to support her research relating to her preparations for tenure and a teaching assistant to help with course preparation. *Id.* ¶ 53. Additionally,

during the Fall of Quarter of 2018 and the Winter of Quarter of 2019, Plaintiff was assigned to teach one in-person class, one hybrid course, and two online courses. *Id.*

Plaintiff conferred again with Bellavia-Johnston concerning continuing accommodations for the Spring Quarter of 2019. *Id.* ¶ 54. On January 13, 2019, Plaintiff emailed Bellavia-Johnston to ask for an update regarding Plaintiff's accommodations request for the Spring Quarter. *Id.* Bellavia-Johnston responded by asking whether Plaintiff would be interested in teaching a particular online course during the Spring Quarter. *Id.* On January 28, 2019, Plaintiff responded to Bellavia-Johnston stating that she would like to proceed with teaching that course as it "best reaches the accommodations noted by Plaintiff's medical provider." *Id.* By January 29, 2019, Defendant offered Plaintiff the following accommodations: Plaintiff would receive a research assistant and teaching assistant during the Winter Quarter and teach two classes during the Spring Quarter. *Id.* Plaintiff accepted Defendant's accommodations offer. *Id.*

On May 22, 2019, Bellavia-Johnston met with Plaintiff to discuss Plaintiff's requested accommodations for the 2019-2020 academic year. *Id.* ¶ 56. In June 2019, Defendant offered, and Plaintiff accepted, the following accommodations for the 2019-2020 academic year: a teaching assistant from August 1, 2019, through November 26, 2019, to assist with course preparation and in-class support, if needed, and a student assistant for in-class support during the Winter Quarter on an as-needed basis. *Id.* ¶ 57. In September 2019, Defendant adjusted Plaintiff's accommodations to permit Plaintiff's teaching assistant to work five additional hours per week. *Id.* Plaintiff did

not teach any fully in-person classes during the 2019-2020 academic year. *Id.* Plaintiff did not submit additional accommodation requests related to her disability after the 2019-2020 academic year academic year. *Id.* ¶ 58.

### d. PRAD Chair Nomination

In February 2019, then-Acting Dean Murphy notified PRAD faculty that the current Chair of the PRAD program would conclude her service in the position after completing the current term and asked the faculty for nominations to the position. *Id.* ¶ 63. Plaintiff and one other faculty member both nominated Plaintiff for the position. *Id.* ¶ 64. All other nominated faculty members chose not to run, leaving Plaintiff the only faculty member to accept their nomination. *Id.*

The PRAD faculty met to vote on Plaintiff's candidacy. *Id.* ¶ 67. During deliberations, several faculty members expressed that they felt rushed to vote and wanted to redesign the position to reflect increases in the time commitment it required. *Id.* ¶ 67. Additionally, one faculty member stated that the Program Chair needed to be present and on campus. *Id.* ¶ 68. Acting Dean Murphy understood this remark to imply that the faculty member did not see Plaintiff at many faculty events. *Id.* ¶ 68. At least one faculty member commented on Plaintiff's absence from campus. [138] ¶ 58; [127] ¶ 68. Specifically, the faculty member asked "does [Plaintiff] even teach in this program? She's only been here for what, three or four years, and more than half of that time she was on leave." [127] ¶ 71. Acting Dean Murphy told the faculty member that her comment was "inappropriate" and subsequently "stopped that line of conversation." *Id.* ¶ 68.

In the ensuing vote, the PRAD faculty voted to reject Plaintiff's candidacy by either a 13-2 or 13-3 margin. *Id.* ¶ 69. Acting Dean Murphy decided that the best course of action was to stop the selection process and re-consider the position's design. *Id.* Acting Dean Murphy asked the current Program Chair to continue in the role for an additional year while the College re-evaluated the position. *Id.* ¶ 74. By October 17, 2019, the Program Chair position for the College was modified and a new job description published after the faculty, including Plaintiff, received an opportunity to provide feedback on the changes. *Id.* ¶ 76. In the Fall Quarter of 2019, Dean Murphy appointed Plaintiff to serve as the Chair of the Term Faculty Review Committee. *Id.* ¶ 77. In 2020, Plaintiff was also appointed to serve in the administrative role of PRAD's Academic Graduate Director – an appointment which Plaintiff considered a promotion. *Id.*

### e. Other Allegedly Discriminatory Acts

Plaintiff claims that she has faced numerous incidents of disparate, discriminatory treatment during her career with Defendant but admits that no person ever discussed her race as a factor in any of the incidents set forth. *Id.* ¶ 79.

First, Plaintiff claims that, following her Fall Quarter 2017 formal review, University administration required her to teach more in-person courses than any other non-minority in the College. *Id.* ¶ 86. Plaintiff brought a complaint about this to Acting Dean Murphy, former Dean Ghanem, the PRAD Chair, and the Associate Dean of the College. *Id.* After discussions with those individuals, Plaintiff was no longer "required" to teach only in-person classes. *Id.* Next, Plaintiff alleges that she

underwent more teaching reviews than other faculty members, though she does not point to any evidence showing that any of these other faculty members had evaluation scores lower than hers in face-to-face courses. *Id.*

Additionally, Plaintiff claims that on June 18, 2018, she asked the then-current PRAD Chair if she could chair a search committee for new PRAD faculty. *Id.* ¶ 87. The PRAD Chair instead assigned Plaintiff to co-chair a search committee with another faculty member. *Id.* Plaintiff claims this faculty member did not have the qualifications to co-chair the search committee because he was not yet an Assistant Professor. *Id.* The Chair explained to Plaintiff that this committee required co-chairs because the committee needed to fill two open positions. *Id.* Plaintiff admits that this assignment did not negatively impact her tenure application or process. *Id.*

Plaintiff also claims that her office has been searched twice during her employment with Defendant. *Id.* ¶ 88. The first search happened in 2017. *Id.* After Plaintiff spoke with Dr. Ghanem about her concerns regarding additional reviews, someone entered Plaintiff's locked office, moved around papers, and left an ombudsman pamphlet on her desk. *Id.* The second search occurred in October of 2017. Plaintiff received an email from a former assistant to the Dean requesting that Plaintiff come to her office to remove a space heater and move her computer from on top of a rug. *Id.* ¶ 89. The email originated from a different employee, who emailed the assistant that while "performing inspections," the employee observed that the space heater and computer posed fire hazards. *Id.* ¶ 89. The employee requested that those fire hazards be removed. *Id.*

Finally, Plaintiff refers to several other incidents, which she claims contributed to a racially hostile work environment. Plaintiff claims that faculty members assembled a "food train" for a colleague when diagnosed with cancer but did not do so for her when she was diagnosed with her neurological condition. *Id.* ¶ 91. Plaintiff also claims that other colleagues of hers received celebrations for achieving tenure, organized by their respective program chairs, but she did not receive any such celebration. *Id.* ¶ 92. Once Plaintiff attained tenure, the Program Chair reached out to Plaintiff via email to plan a celebration. *Id.* Plaintiff responded that she would not feel comfortable celebrating until after she received an official announcement and that she did not "want to make a big hoopla out of it." *Id.* The Chair replied asking for names of individuals Plaintiff would want to invite, but Plaintiff never replied with a list of names. *Id.*

Plaintiff, along with a colleague, filed an anonymous, formal complaint through Defendant's Office of Institutional Diversity and Equity (OIDE). [138] ¶ 25. The complaint alleged accounts of bullying behavior and microaggressions. *Id.* Plaintiff and her colleague received a follow-up email from an employee at Defendant's OIDE with additional questions regarding the contents of the complaint. *Id.* ¶ 25. In their anonymous reply, Plaintiff and her colleague indicated that they did not feel comfortable coming forward regarding the allegations. Plaintiff is unsure what, if any, additional investigative steps OIDE pursued after that email exchange. [127] ¶ 81.

11

On December 28, 2020, Plaintiff filed the present Complaint before this Court. [1]. Plaintiff filed amended complaints on February 23, 2021, [11], and April 7, 2021. [18]. On October 21, 2021, Defendant filed the present motion for summary judgment. [105], [106].[2]

## II.    Legal Standard

Summary judgment may be properly granted where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict" in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

On a motion for summary judgment, the Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co.*, Inc., 910 F.3d 1016, 1021-22 (7th Cir. 2018). To meet this burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith*

---

[2] The Court notes that Plaintiff's Response to Defendant's Motion exceeds the page limit set forth in Local Rule 7.1. Though the Court may strike briefs which do not comply with Local Rule 7.1's requirements, the Court elects not to do so here in favor of resolving the present motion on the merits. *See Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) ("[W]e have consistently and repeatedly upheld a district court's discretion . . . [concerning] compliance with its local rules . . . .").

*Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of Centralia*, 943 F.3d 826, 832 (7th Cir. 2019). A mere "scintilla of evidence" supporting the non-movant's position does not suffice; rather, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252.

## III. Analysis[3]

### a. Title VII Discrimination Claims[4]

Title VII prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In discrimination cases brought under Title VII, after "a defendant moves for summary judgment, the 'singular question' for the district court is whether the plaintiff has introduced evidence that would 'permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor

---

[3] For purposes of summary judgment, a district court "may properly separate from each other claims based on specific adverse employment actions, retaliation, denial of reasonable accommodation, and hostile work environment." *Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 850 (7th Cir. 2019) Especially because these "claims require proof of different factual circumstances under different legal tests." *Id.* The Court adopts this approach to Plaintiff's claims, separating allegations to the extent they call for separate legal analysis.

[4] The Court notes that Defendant raises an argument asserting that Plaintiff's Title VII race discrimination claim is time barred. *See* Defendant's Memorandum of Law at 9. But Defendant does not sufficiently develop this argument because Defendant does not address whether Plaintiff's allegations constitute "a single course of conduct" which supports "her related hostile work environment claim." [123] at 11 (citations omitted). The Supreme Court has stated that "Title VII's charge-filing requirement is not of jurisdictional cast" because "[f]ederal courts exercise jurisdiction over Title VII actions pursuant to 28 U.S.C. § 1331's grant of general federal-question jurisdiction," and "Title VII's charge-filing provisions 'speak to . . . a party's procedural obligations.'" *Fort Bend Cnty. v. Davis*, 139 S.Ct. 1843, 1850-51 (2019) (quoting *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 512 (2014)). Because the time bar issue does not affect the Court's subject matter jurisdiction, and Court resolves the merits in favor of Defendant on Plaintiff's Title VII claims anyway, the fact that Defendant fails to set forth adequate arguments regarding the time bar issue does not affect the outcome of this matter.

caused the discharge or other adverse employment action.'" *Purtue v. Wisconsin Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020) (quoting *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018)). Regardless of whether "a plaintiff offers direct or circumstantial evidence of discrimination,"[5] in the Seventh Circuit, "'all evidence belongs in a single pile and must be evaluated as a whole.'" *Igasaki v. Illinois Dep't of Financial and Prof. Reg.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016)).

Plaintiffs may prove employment discrimination under Title VII utilizing the familiar burden-shifting framework established in *McDonnell Douglas v. Green.* 411 U.S. 792 (1973). Under the *McDonnell Douglas* standard, a plaintiff must show: (1) they belong to a protected class; (2) they met the employer's legitimate expectations; (3) they suffered an adverse employment action; and (4) another similarly situated employee outside of plaintiff's protected class received better treatment from the employer. *Igasaki*, 988 F.3d at 957 (citing *Marshall v. Indiana Dep't of Correction*, 973 F.3d 789, 791–92 (7th Cir. 2020)). Similarly situated employees are those "whose performance, qualifications, and conduct are comparable in all material respects." *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (citing *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 463 (7th Cir. 2014)).

---

[5] To be sure, "[d]irect evidence—an overt admission of discriminatory intent—is rare, and not at issue where . . . no supervisor admits racial motivation." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016) (citing *Simpson v. Beaver Dam Cmty. Hosps., Inc.*, 780 F.3d 784, 790 (7th Cir. 2015)). Circumstantial evidence, on the other hand, "includes (1) suspicious timing, ambiguous statements (oral or written) or behavior toward, or comments directed at, other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly-situated employees outside the protected class received systematically better treatment; or (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* at 916-17. "Circumstantial evidence 'must point directly to a discriminatory reason for the employer's action.'" *Id.* at 917 (quoting *Simpson*, 780 F.3d at 790).

But after the Seventh Circuit's decision in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016), a plaintiff need not use the *McDonnell Douglas* framework to state a discrimination claim. *Igasaki*, 988 F.3d at 958. Rather, at summary judgment, the question is whether a plaintiff "presented enough evidence to allow a jury to find in his favor." *Id.* (quoting *Vega v. Chicago Park Dist.*, 954 F.3d 996, 1004 (7th Cir. 2020)).

Here, Plaintiff alleges that she was subjected to numerous adverse actions constituting unlawful disparate treatment under Title VII. Specifically, Plaintiff alleges that she: (1) was subjected to additional formal and informal reviews in the process of obtaining tenure; (2) was unfairly passed over for the PRAD Chair position; and (3) received unequal compensation compared to her peers.[6] The Court will address each of these claims in turn.

### i. Additional Formal and Informal Reviews

Plaintiff claims that Defendant subjected her to additional formal and informal reviews while completing the tenure process. But Seventh Circuit precedent clearly holds that "[u]nfair reprimands or negative performance evaluations, unaccompanied by tangible job consequences, do not suffice" to create liability. *Boss*, 816 F.3d at 919. Even "oral or written reprimands received by an employee under an employer's

---

[6] Although Defendant addresses Plaintiff's desire to apply for tenure early as a potential separate adverse action, Plaintiff does not identify this as one of the adverse actions taken by Defendant. In her Response, Plaintiff states that the "adverse actions she faced include being unfairly passed over for the PRAD Program Chair position, going through additional formal and informal reviews for tenure, and receiving unequal pay compared to her peers." [123] at 12. Because Plaintiff develops no arguments related to any additional alleged adverse actions outside of the three listed, the Court will limit its analysis to those argued by Plaintiff and will consider any others forfeited. *See Bass v. Joliet Public School Dist. No. 86*, 746 F.3d 853, 841 n.1 (7th Cir. 2014) ("Without any further analysis or citation to authority, we [may] find [an] argument waived.").

progressive discipline system do not implicate job consequences tangible enough to establish an independent basis for Title VII liability" unless the plaintiff can "point to 'any immediate consequence of the reprimands.'" *Fuller v. McDonough*, 84 F.4th 686, 690 (7th Cir. 2023) (quoting *Oest v. Illinois Dep't of Corr.,* 240 F.3d 605, 613 (7th Cir. 2001), *rev'd on other grounds, Ortiz*, 834 F.3d at 765). These types of consequences include "ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities." *Oest v. Illinois Dep't of Corr.,* 240 F.3d 605, 613 (7th Cir. 2001), *rev'd on other grounds, Ortiz*, 834 F.3d at 765. Negative reprimands or performance reviews, "[w]ithout more," do not meet the requirements for "an adverse action." *Fuller*, 84 F.4th at 690.

Here, Plaintiff offers no evidence linking the additional performance reviews to any employment consequences. Instead, the record demonstrates that the additional reviews bore no negative consequences at all for her employment. The parties do not dispute that Plaintiff achieved tenure by the unanimous consent of the tenured faculty of the College, the Dean of the College, the UBPT, and the Provost. Nor do the parties dispute that Plaintiff achieved tenure when she first became eligible to apply. Therefore, Plaintiff fails to establish that she suffered any actionable adverse employment consequences during the tenure process. Subsequently, Plaintiff cannot establish a prima facia case of discrimination and the Court grants summary judgment on this claim.

### ii. Unfairly Passed Over For the PRAD Chair Position

Plaintiff alleges that she suffered unlawful discrimination when her colleagues declined to elect her for promotion to the PRAD Chair position. Failure to promote constitutes a "separate actionable unlawful employment practice." *Amtrak v. Morgan*, 536 U.S. 101, 114 (2002). One way for a plaintiff to establish a claim for discriminatory failure to promote is "to show: (1) she belongs to a protected class, (2) she applied for and was qualified for the position sought, (3) she was rejected for that position, and (4) the employer granted the promotion to someone outside of the protected group who was not better qualified than the plaintiff." *Ford v. Marion Cnty. Sheriff's Office*, 942 F.3d 839, 858 (7th Cir. 2019).

If a plaintiff can establish these elements, "the burden of production" shifts to the defendant, who must "give non-discriminatory reasons for the promotion decisions." *Id.* In analyzing the defendant's nondiscriminatory explanation, courts "look to 'whether the [defendant] gave an honest explanation of its behavior.'" *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004 (quoting *Debs v. Northeastern Illinois Univ.*, 153 F.3d 390, 396 (7th Cir. 1998)). The plaintiff may then rebut defendant's nondiscriminatory explanation "with evidence of pretext." *Ford*, 942 F.3d at 858. To establish pretext, a plaintiff "must come forward with evidence that at least raises the inference that the offered reason . . . is a 'phony excuse.'" *Hill v. Potter*, 625 F.3d 998, 1004 (7th Cir. 2010) (quoting *Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 561 (7th Cir. 2004)).

17

Alternatively, a plaintiff may survive summary judgment by presenting sufficient evidence which would "permit a reasonable fact-finder to conclude that [the plaintiff] was subjected to an adverse employment action based on a statutorily prohibited factor—here, race.'" *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quoting *McCurry v. Kenco Logistics Servs., LLC,* 942 F.3d 783, 788 (7th Cir. 2019)); *Ortiz,* 834 F.3d at 765.

Here, Plaintiff cannot raise a genuine issue of material fact to preclude summary judgment on her failure to promote claim. Plaintiff admits that no voting member of the full-time faculty made any comments connected to her race. The record demonstrates that the full-time faculty vote on electing a new PRAD Chair functioned as a recommendation to the Acting Dean, the decisionmaker, who had the authority to accept or reject that recommendation. *See* [127] ¶69. Plaintiff does not dispute that the Acting Dean had the authority to accept the recommendation from the full-time faculty – in this case, that Plaintiff not be elevated to the PRAD Chair position (which itself required revisions). Further, Plaintiff admits that the Acting Dean informed Plaintiff that she was going to reexamine features of the PRAD Chair position; the Acting Dean requested that the current Chair continue in her role until those changes were made; the Acting Dean then did, in fact, create a new job description for the PRAD Chair position; Plaintiff, along with the other faculty, had an opportunity to weigh in on the new description before it was finalized; and, after the position re-opened within the year, Plaintiff was asked to re-apply but she elected not to do so. [127] ¶¶ 72, 74, 76, 77.

On these undisputed facts, Plaintiff cannot establish a prima facie case under the burden shifting framework, because she cannot demonstrate that the PRAD Chair position was given to someone outside of her protected class who was less qualified for the position than her. The PRAD Chair position was given, temporarily, to an individual who had held the role for the previous three years. Plaintiff offers no evidence demonstrating that the incumbent Chair was less qualified than her to hold the position, and thus, the record fails to establish a prima facie case under the burden-shifting framework.

Even if Plaintiff could establish a prima facie case, Plaintiff's claim would still fail because she cannot point to any evidence establishing that Defendant's stated nondiscriminatory reasons for denying her the promotion are pretextual. The Acting Dean maintained discretion to either accept or reject the faculty's recommendation regarding Plaintiff's candidacy. Plaintiff offers no evidence showing that the Acting Dean's stated intention to reconsider the position was "phony" or otherwise false. The record clearly attests to the veracity of Defendant's explanation given that the position did, in fact, get redesigned within the year. Further, after the position was redesigned (with the input of the faculty, including Plaintiff), Plaintiff was asked to reapply for the refurbished role. Thus, because the undisputed facts demonstrate the honesty of Defendant's stated nondiscriminatory reasons, Plaintiff's claim fails to survive summary judgment.

Plaintiff's claim fares no better when evaluated under the holistic standard established in *Ortiz*. Although the *Ortiz* standard frees Plaintiff from meeting the

criteria of the burden-shifting framework, Plaintiff must still offer sufficient evidence that would permit a reasonable factfinder to conclude that she suffered an adverse employment action because of her race. Applying the *Ortiz* standard here, none of the facts presented suggest any discriminatory motivation or intent animated the PRAD Chair decision in any way. Quite simply, viewing the evidence as a whole, Plaintiff's claims do not have sufficient evidentiary support to allow a reasonable jury to find in her favor. *See Felder v. Vertex Mod. & Sustainment LLC*, Nos. 23-2280 & 23-2444, 2024 WL 1505503 (7th Cir. Apr. 8, 2024) (affirming summary judgment in favor of the defendant employer when, applying *Ortiz*, the plaintiff failed to refute the defendant's nondiscriminatory explanation and failed to offer evidence showing a causal link between his membership in a protected class and the adverse employment action); *Singmuongthong v. Bowen*, 77 F.4th 503, 511 (7th Cir. 2023) (upholding a grant of summary judgment in favor of the defendant employer when, evaluating the evidence as a whole, the plaintiff failed to refute the defendant's nondiscriminatory explanation and failed to offer any other evidence which could support a finding in his favor).[7] Given that the record remains completely devoid of any evidence suggesting racial animus related to this employment action, Plaintiff fails to provide evidence sufficient to create a genuine issue of material fact under *Ortiz*.

Therefore, Defendant is entitled to summary judgment on this claim as a matter of law.

---

[7] Consistent with this Court's finding, the record also confirms that, within the same year of the PRAD Chair vote, Plaintiff obtained tenure with the unanimous consent of the tenured faculty of the College, the Dean of the College, the UBPT, and the Provost. This action clearly constituted a significant promotion for Plaintiff, thus further weighing against Plaintiff's claims of discriminatory motivation.

### iii. Unequal Compensation

In her Response to Defendant's motion, Plaintiff cites "receiving unequal pay compared to her peers" as one of the adverse actions underlying her Title VII disparate treatment claims. [123] at 12. Plaintiff's Response, however, does not develop any arguments or cite any legal authority regarding wage discrimination, other than one citation to a Supreme Court case discussing hostile work environment claims. *Id.* at 13 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Because Plaintiff does not develop or address this argument in her Response, the Court considers this claim forfeited. *See Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."); *Home Care Providers, Inc. v. Hemmelgarn*, 861 F.3d 615, 625 (7th Cir. 2017) (holding that Plaintiff's failure to include arguments or cite to legal authority regarding one of his claims rendered it waived); *Hoyos v. Ne. Ill. Reg'l Commuter R.R. Corp.*, Case No. 21 C 3647, 2023 2023 WL 5289446 at *32 (N.D. Ill. Aug. 17, 2023) (holding that a passing reference to an argument in briefing, without any further development or citation to legal authority, rendered it waived).

### b. Hostile Work Environment Based on Racial Discrimination Claim

Plaintiff alleges that Defendant subjected her to a hostile work environment in violation of Title VII. To establish this claim, Plaintiff must show that: "(1) the work environment was both subjectively and objectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or

21

pervasive; and (4) there is a basis for employer liability." *Trahanas v. Northwestern Univ.*, 64 F.4th 842, 853 (7th Cir. 2023) (citing *Scaife v. U.S. Dep't of Veterans Affs.*, 49 F.4th 1109, 1115–16 (7th Cir. 2022)). A Title VII violation occurs when "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or persuasive to alter the conditions of the victim's employment and create an abusive working environment." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014). Determining "whether a work environment is hostile requires consideration of factors like the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss*, 816 F.3d at 920 (citing *Alexander*, 739 F.3d at 982). *See also Hobbs v. City of Chi.,* 573 F.3d 454, 463–64 (7th Cir. 2009) ("Retaliatory harassment can rise to the level of a hostile work environment when it is severe enough to cause a significant change in the plaintiff's employment status."). Courts evaluate hostile work environment claims "under a totality of the circumstances approach." *Id.* (internal quotation omitted).[8]

---

[8] Plaintiff's allegations reference allegedly harassing incidents involving both her supervisors and colleagues. Courts apply different standards "in evaluating an employer's liability for a hostile work environment, depending on whether the alleged harasser is the victim's supervisor or coworker." *Boss*, 816 F.3d at 920 (citing *Paschall v. Tube Processing Corp.*, 28 F.4th 805, 813 (7th Cir. 2022)). An employer becomes "strictly liable when a 'supervisor's harassment culminates in a tangible employment action.'" *Id.* (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013)). In contrast, if "the harasser is a coworker, 'the employer is liable only if it was negligent in controlling working conditions.'" *Id.* (quoting *Vance*, 570 U.S. at 424). But, as the Court will show, Plaintiff's allegations do not meet the requirements to raise a genuine issue for trial because none of her allegations involve "objectively offensive" or "severe or pervasive" conduct sufficient to raise a prima facie hostile work environment claim. *Trahanas*, 64 F.4th at 853. Therefore, the Court does need to reach the issue of whether Plaintiff has shown a basis for employer liability, because her allegations fail to meet her initial burden.

Here, Plaintiff fails to present evidence creating a genuine issue for trial regarding her hostile work environment claim. None of the incidents contained in Plaintiff's allegations cross the threshold into the level of "subjective and objectively offensive" conduct the law requires, nor does Plaintiff offer any facts connecting these incidents to "her membership in a protected class." *Trahanas*, 64 F.4th 824 at 853. Plaintiff's allegations include the following incidents:[9]  (1) her colleagues disagreed with her on numerous occasions; (2) colleagues described her demeanor unkindly, using terms including "aggressive," "storming out," and "bully-like"; (3) Plaintiff experienced two intrusions into her office while she was not present; (4) Plaintiff was criticized for failing to submit files into a shared drive system on time; (5) a supervisor left a departing tenure-track African American faculty member off a presentation; (6) she did not receive a meal-train when diagnosed with her illness while another ill colleague did; and (7) her peers did not organize a tenure celebration for her after she failed to provide them with a guest list. [107] ¶¶ 26-28, 88-94.

Given such a record, Plaintiff's allegations do not constitute "severe or pervasive" conduct supporting a hostile work environment claim. *See Poullard v. McDonald*, 829 F.3d 844, 859 (7th Cir. 2016) (holding that "three arguably race-tinged remarks did not rise to the level of severe or pervasive conduct" to survive summary judgment); *Shah v. AbilityLab*, Case No. 21-cv-05734, 2023 WL 6388228 at *7 (N.D. Ill. Sept. 29, 2023) (holding that the plaintiff's allegations, including claims

---

[9] In her Response, Plaintiff refers to additional incidents but does not cite to any paragraphs in the LR 56.1 statements or responses in violation of LR 56.1(g). Accordingly, these incidents are waived and the Court will not consider those allegations in the analysis.

that she had problems accessing a shared drive, that someone behaved "unkindly" toward her, that someone complained about the smell of her food, and that overnight someone moved her belongings to a different desk, did "not plausibly suggest either objectively offensive or 'severe and pervasive' conduct having anything to do with Plaintiff's race or national origin."); *Strickland v. Dart*, No. 19-cv-02621, 2023 WL 2745725 at *14-*18 (N.D. Ill. Mar. 31, 2023) (finding that seven incidents of "condescending, belittling, or offensive" comments which did not reference the plaintiff's race or gender did not rise to the level of "so severe and pervasive" to survive summary judgment). Plaintiff offers no evidence demonstrating any objectively or subjectively offensive conduct, nor does she allege conduct sufficiently severe or pervasive to violate Title VII. Therefore, her claim fails as a matter of law.

### c. ADA Discrimination Claims

#### i. Unfairly Passed Over For The PRAD Chair Position

In her Response, Plaintiff appears to argue a separate failure to promote claim regarding the incident where her colleagues declined to select her for promotion to the PRAD Chair position. [123] at 14. The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability in regard to job application procedures [and] hiring." 42 U.S.C. § 12112(a). Failing to promote "is a discrete act under employment discrimination laws," and thus such an adverse action validly comes within the ADA's scope. *Ford*, 942 F.3d at 858 (recognizing a failure to promote claim brought under the ADA).

To establish a claim under § 12112(a), a plaintiff must show that: (1) they are disabled; (2) they are otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by plaintiff's disability. *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016) (citing *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 286-87 (7th Cir. 2015)). A showing of animus, without more, "does not support a claim of discrimination"; the animus must "have been linked, as a motivating factor, to an adverse employment action." *Arroyo v. Volvo Grp. N. Am., LLC*, 805 F.3d 278, 285 (7th Cir. 2015).

In *Serwatka v. Rockwell Automation Inc.*, the Seventh Circuit held that, unlike other federal employment discrimination statutes authorizing a "mixed-motive" analysis, the ADA requires a "but-for" causation analysis in disparate treatment claims. 591 F.3d 957, 961 (7th Cir. 2010). The court in *Serwatka* acknowledged that the significant 2008 amendments to the ADA, though not at issue in that case, potentially created a different standard but did not resolve the issue. *Id.* at 961 n.1.[10] Because the Seventh Circuit has yet to clarify whether the but-for standard survived the 2008 amendments, and other District Courts continue to apply the but-for standard in the meantime, the Court will do the same here. *See McCann v. Badger Mining Corp.*, 965 F.3d 578, 588 n.46 (7th Cir. 2020) (acknowledging that "question is still technically an 'open' one" in the Seventh Circuit; *Papenfuss v.*

---

[10] As relevant here, the "language prohibiting discrimination 'because of' a disability was amended to prohibit discrimination 'on the basis of' a disability. 42 U.S.C. § 12112(a). Although *Serwatka* was argued after the relevant ADA amendment, the pre-amendment law was in effect at the time of the *Serwatka* defendant's alleged violations. "So [the Seventh Circuit] analyzed that case using the 'because of' and not the 'on the basis of' language that the statute now provides." *Silk v. Bd. of Trs.*, 765 F.3d 698, 706 (7th Cir. 2015).

*Butitta Bros. Auto. Inc.,* Case No: 16 C 50368, 2019 WL 1168107 at *19 (N.D. Ill. Mar. 13, 2019) (discussing the amendments and applying the but-for standard); *Milsap v. City of Chicago*, No. 16 C 4202, 2018 WL 488270, at *6 (N.D. Ill. Jan. 19, 2018) (discussing the amendments and applying the but-for standard).

A plaintiff may survive summary judgment by presenting sufficient evidence which would "permit a reasonable factfinder" to find that the plaintiff suffered "an adverse employment action based on a statutorily prohibited factor." *McCurry v. Kenco Logistics Servs., LLC,* 942 F.3d 783, 788 (7th Cir. 2019); *Ortiz*, 834 F.3d at 765.

Here, Plaintiff's claim under the ADA regarding the PRAD Chair promotion meets the same fate as her claim brought under Title VII. An important factual difference between Plaintiff's ADA and Title VII claims is that, during the faculty deliberations, one voting faculty member mentioned Plaintiff's frequent absence which implicitly alluded to Plaintiff's disability and medical leave. Specifically, the faculty member asked "does [Plaintiff] even teach in this program? She's only been here for what, three or four years, and more than half of that time she was on leave." [107] ¶ 71. Notably, Plaintiff admits that the Acting Dean "stopped that line of conversation" and informed that faculty member that her question "was inappropriate." [127] ¶ 68. Plaintiff also admits she was later informed that other faculty members condemned the comment at the meeting. *Id.* at ¶ 71.

In the PRAD Chair vote, the faculty rejected Plaintiff's candidacy by either a 13-2 or 13-3 margin. [107] ¶ 69. No reasonable jury could conclude that a single comment about her frequent absences, which only tangentially referred to her

disability, infected the entire voting process. Furthermore, this comment did not come from the decision-maker in the employment action. Instead, the comment received direct rebuke from the decisionmaker, who stopped that line of questioning immediately. Plaintiff admits that she was informed by other faculty members that the inappropriate comment made them "uncomfortable" and that they had other reasons for not voting for her, including that "they did not know [Plaintiff] very well and felt rushed and unprepared to make a decision." *Id.* at ¶ 71.

Plaintiff offers no other evidence suggesting that her disability constituted a motivating factor in denying her the PRAD Chair promotion. Therefore, examining the evidence "as a whole," Plaintiff fails to satisfy the causation element required to allow her claim to proceed. *Lewis v. Wilkie*, 909 F.3d 858 (7th Cir. 2018); *Ortiz*, 834 F.3d at 765.

Even if the 2008 amendments to the ADA include a "mixed-motive" theory of liability, and not the but-for standard, Plaintiff's claim still fails. To present a mixed-motive claim, Plaintiff must still come forth with direct or circumstantial evidence of discrimination to show the PRAD Chair promotion decision was the product of both lawful and unlawful motives. *Grigsby v. LaHood*, 628 F.3d 354, 360 (7th Cir. 2010), *see also Serwatka*, 591 F.3d at 958. As noted, Plaintiff lacks evidence of discrimination, only pointing to a single comment which the decisionmaker rebuked. Even if Plaintiff did come forth with evidence of discrimination, Defendant would avoid a finding of liability by showing it would have made the same decision if it had not taken Plaintiff's disability into account. *Id.* Here, there is ample evidence

showing Defendant made its decision based on other concerns. Faculty members stated they felt rushed and unprepared for the promotion process, or that they did not know Plaintiff very well. Because Plaintiff cannot show that she failed to receive the PRAD Chair promotion because of her disability, her claim cannot survive summary judgment.

### ii. Failure to Accommodate

Plaintiff alleges that Defendant violated the ADA by failing to reasonably accommodate her disability. To establish a prima facie case for a failure to accommodate claim under the ADA, a plaintiff must show that: (1) she was a qualified individual with a disability; (2) the defendant employer knew of her disability; and (3) the defendant employer failed to reasonably accommodate the disability. *E.E.O.C. v. AutoZone, Inc.,* 809 F.3d 916, 919 (7th Cir. 2016) (citing *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013)). The employee bears the burden of offering reasonable accommodations, which would allow her to perform the essential functions of her position. *Winfrey v. City of Chicago*, 259 F.3d 610, 614 (7th Cir. 2001).

According to the ADA, a "'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Federal labor regulations "define 'essential functions' generally as 'the fundamental job duties of the employment position the individual with a disability holds or desires.'" *Mlsna v. Union Pacific Railroad Co.*, 975 F.3d 629, 634 (7th Cir. 2020) (quoting 29 C.F.R. § 1630.2(n)). These regulations provide seven non-exhaustive

factors for courts to consider when determining whether a particular job function is "essential":

(i) The employer's judgment as to which functions are essential;

(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;

(iii) The amount of time spent on the job performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).[11]

An "employer's judgment is a factor, and an important one, but it is not necessarily decisive." *Tate v. Dart*, 51 F.4th 789, 794 (7th Cir. 2022). Although "some degree of deference is appropriate" an employer's stated judgments about which "functions are essential may or may not be consistent with the job as actually performed, or perhaps even as set forth in written job descriptions." *Id.* Therefore, courts "usually do not 'second-guess the employer's judgment in describing the essential requirements for the job' . . . [b]ut this deference is not unqualified." *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020) (quoting *DePaoli v. Abbott Labs.,* 140 F.3d 668, 674 (7th Cir. 1998)). Additionally, a "job function also may be considered essential because 'the position exists . . . to perform that function.'"

---

[11] Whether a "function is essential is a question of fact, not law." *Tonyan v. Dunham's Athleisure Corp.*, 966 F.3d 681, 687 (7th Cir. 2020) (citing *Brown v. Smith*, 827 F.3d 609, 613 (7th Cir. 2016)).

*Mlsna v. Union Pacific Railroad Co.*, 975 F.3d 629, 636 (7th Cir. 2020) (quoting 29 C.F.R. § 1630.2(n)(2)(i)).

Under federal labor regulations, the term "reasonable accommodation" refers to those alterations "or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii); *Bruno v. Wells-Armstrong*, 93 F.4th 1049, 1054 (7th Cir. 2024) ("A reasonable accommodation is a measure that enables the employee to 'perform the essential functions of the employment position.'") (quoting 42 U.S.C. § 12111(8)). Courts' "reasonable accommodation evaluation is affected by the essential function analysis." *Mlsna*, 975 F.3d at 637. A disabled employee is "not entitle[d] . . . to the accommodation of his choice," but rather the ADA "entitles him to a reasonable accommodation in view of his limitations and his employer's needs." *Swanson v. Village of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015). Employers are obligated to "provide an accommodation that effectively accommodates the disabled employee's limitations." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 802 (7th Cir. 2005) (citing *US Airways v. Barnett*, 535 U.S. 391, 400 (2002); *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538, 546 (7th Cir. 1995)).

Under obligations imposed by the ADA, employers often engage with the employee "in an 'interactive process' to determine the appropriate accommodation under the circumstances.'" *Igasaki v. Ill. Dep't of Fin. & Prof. Reg.*, 988 F.3d 948, 961 (7th Cir. 2021) (quoting *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir.

2005)).  While "there is no independent cause of action for breakdown of the interactive process under the ADA," an employer may become liable "from these types of allegations" when "'the employer's failure to engage in an interactive process resulted in a failure to identify an appropriate accommodation for the qualified individual.'"  *Id.*  (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000)).

Here, the parties do not contest that Plaintiff is a qualified individual,[12] nor that Defendant was aware of Plaintiff's disability.  Accordingly, this claim turns on whether Defendant failed to reasonably accommodate Plaintiff's disability.  In her Response, Plaintiff argues that her failure to accommodate claim should survive summary judgment because: 1) Defendant fails to establish that in-person teaching forms an essential function of the Assistant Professor position; and 2) Defendant fails to offer evidence demonstrating that allowing Plaintiff to teach her courses entirely online "was an infeasible proposition."  [123] at 28.  To support these arguments, Plaintiff points to three out-of-circuit cases which found that remote work was a

---

[12] The parties dispute whether in-person teaching constitutes an essential function of Plaintiff's position, and therefore contest whether Defendant provided Plaintiff with reasonable accommodations. *See* [106] at 18; [123] at 28-29. Defendant also offers an alternative argument pertaining to Plaintiff's claims arising out of her 2018 accommodations requests. In a footnote, Defendant states that if Plaintiff could not teach any in-person classes at all, she could not be considered a qualified individual because in-person teaching constitutes an essential function of the Assistant Professor position. *See* [106] at 18 n.3. But this alternative argument only applies to Plaintiff's 2018 requests because that is the year that Plaintiff's neurologist stated that she could not teach any in-person classes. *See id.* The Court finds that in-person teaching is an essential function of the Assistant Professor position, the accommodations Defendant provided were reasonable and effective, and accordingly Defendant satisfied its obligations under the ADA for all of Plaintiff's accommodations requests. *See Mlsna*, 975 F.3d at 637 ("[The] reasonable accommodation evaluation is affected by the essential function analysis."). Therefore, because the Court finds in favor of Defendant on this issue, the Court does not need to address this alternative argument which would only apply to part of Plaintiff's claims.

reasonable accommodation. *See id.* at 28-29.[13]   But both arguments fail when confronted with the facts established in the record and Seventh Circuit case law.

First, under the standards set forth by the ADA and federal labor regulations, Defendant successfully establishes that in-person teaching forms an "essential function" of the Assistant Professor position. Plaintiff admits that Defendant maintained the same online teaching policy from 2016-2019, which directed that full-time faculty should not teach more than half of their courseload in an online format. [127] ¶ 17. Defendant asserts that in-person teaching comprises an essential function of Plaintiff's role—an assertion to which the Court gives some, but not total, deference. *See* [106] at 17-18.

Here, Defendant's judgment is supported by other factors set forth in 29 C.F.R. § 1630.2(n)(3).   Specifically, Defendant's in-person teaching policy dictates that Assistant Professors should spend at least 50% of the time dedicated to their courseload teaching in-person. *See* [107] ¶ 17.   Thus, in-person teaching constitutes a significant portion of the time spent on the job for the Assistant Professor position. *See* 29 C.F.R. § 1630(n)(3)(iii).   Also, the record shows that there are significant "consequences of not requiring the incumbent to perform the function," because in-person teaching forms a critical performance criterion used for evaluating tenure-track Assistant Professors.   29 C.F.R. § 1630.2(n)(3)(iv).   Defendant claims, and Plaintiff admits, that the College needs to be "confident that all of its faculty can

---

[13] Obviously, the mere fact that remote work may have constituted a reasonable accommodation in some cases does not make in-person teaching function non-essential in this case or otherwise make the accommodations made here unreasonable.

effectively teach in the face-to-face modality," demonstrating the importance of in-person teaching to the position itself and supporting Defendant's argument that in-person teaching is necessary to ensure competence in overall job performance. [127] ¶ 17.

Finally, and perhaps most dispositively, the fact that "the position exists . . . to perform that function" plainly suggests that in-person teaching forms an essential function of Plaintiff's position. 29 C.F.R. § 1630.2(n)(2)(i). Here, "nobody would argue" against the suggestion that the Assistant Professor position exists to teach classes. *Mlsna*, 975 F.3d at 636.[14] Accordingly, no reasons support departing from the usual position that courts typically refrain from "second-guess[ing] the employer's judgment in describing the essential requirements for the job." *DePaoli v. Abbott Labs.*, 140 F.3d 668, 674 (7th Cir. 1998).

Second, although Plaintiff preferred an accommodation permitting her to teach her entire courseload online, the ADA does entitle Plaintiff to any "accommodation of [her] choice." *Swanson*, 794 F.3d at 827. Plaintiff argues Defendant fails to show that permitting her to teach only online classes "was an infeasible proposition," (referencing subsequent policies enacted by Defendant in response to COVID-19,

---

[14] This case contrasts with the facts in *Mlsna v. Union Pac. R.R. Co.* There, the Seventh Circuit reversed a grant of summary judgment in favor of the defendant railroad because it found that the district court erroneously concluded that the plaintiff presented no genuine issue of material fact regarding whether wearing ear protection was an essential function of the plaintiff's job – a train conductor. 975 F.3d 629, 636 (7th Cir. 2020). Because "nobody would argue the reason the position of conductor exists is to wear hearing protection," the Seventh Circuit held that record presented questions of fact regarding whether the essential function analysis turned on the plaintiff's ability to maintain federal regulation's required level of hearing acuity while in the workplace, or whether it turned on plaintiff's ability to perform his job while wearing defendant's required hearing protection. *Id.*

which occurred after her requests for accommodations). [123] at 28. But this argument is unavailing.

Defendant only needed to provide Plaintiff with "a reasonable accommodation in view of [her] limitations and [Defendant's] needs" to enable her to perform the essential functions of her role. *Swanson*, 794 F.3d at 827. As explained above, Defendant successfully establishes that in-person teaching forms an essential function of Plaintiff's position. Therefore, Defendant would incur liability only if it failed to provide Plaintiff with reasonable accommodations, considering Plaintiff's limitations and Defendant's needs. *See id.*

The record does not reflect any such failure in this case. Here, Plaintiff engaged in numerous conversations with her supervisors and Defendant's EEO Specialist, which resulted in several accommodations to ensure that Plaintiff could still perform in her role. Defendant provided Plaintiff with a research assistant, a teaching assistant, and permitted Plaintiff to teach only one fully in-person class between the 2018-2019 and 2019-2020 academic years. [127] ¶¶ 52, 57. Considering Plaintiff taught a total of twelve classes in this period, this accommodation placed her in-person teaching requirements far below the 50% target outlined in the policy discussed above.

Additionally, Plaintiff offers no evidence showing that the accommodations that she received were ineffective. Instead, the record clearly shows that these accommodations constituted "measures that enable[d]" Plaintiff "to perform the essential functions of the employment position." *Bruno*, 93 F.4th at 1054 (quoting 42

U.S.C. § 12111(8)). During the period she received accommodations, Plaintiff both improved her performance evaluations in the teaching criteria and achieved tenure with the unanimous consent of her peers and superiors. *See supra* Part I.b. Plaintiff's ability to both perform and improve in her role demonstrates that Defendant satisfied its obligation "to provide an accommodation that effectively accommodates the disabled employee's limitations." *Sears, Roebuck & Co.*, 417 F.3d at 802. Thus, accommodations which included partial, but not total, remote work "were entirely reasonable" to account for both Plaintiff's limitations and Defendant's needs. *See Yochim v. Carson*, 935 F.3d 586, 591 (7th Cir. 2019).

*Yochim v. Carson* provides a useful comparison. In that case, the plaintiff brought a failure to accommodate claim against her defendant employer because she sought, but did not receive, workplace accommodations to "telework full-time for one month and later for three to five days per week for six months." *Id.* at 592. The defendant employer instead "offered her a four-day work week, generous leave approval (to ease commuting and attending physical therapy), and other accommodations." *Id.* at 591. In upholding the District Court's grant of summary judgment for the defendant, the Seventh Circuit stated that an "accommodation to telework requires a context-specific inquiry, and a 'general consensus [exists] among courts' that jobs 'often require face-to-face collaboration.'" *Id.* (quoting *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 573 (7th Cir. 2019)). The Court held that because the plaintiff "failed to counter" the defendant's evidence that in-person work constituted an essential part of her position and failed to present any evidence that

would enable a reasonable jury to find that the "accommodations were ineffective," she could not present any genuine issues for trial on her failure to accommodate claim. *Id.* at 591-92. The Court added that the plaintiff's reference to a remote work policy not in effect at the time of the challenged conduct did not change the analysis. *Id.* at 592.

Here, like the plaintiff in *Yochim*, Plaintiff fails to counter Defendant's evidence that in-person teaching forms an essential function of the Assistant Professor position. The record also shows that Defendant did engage in an interactive process with Plaintiff to offer reasonable accommodations that balanced Plaintiff's abilities with Defendant's needs. Although this did not result in Plaintiff receiving her preferred accommodation, that is not the standard Defendant needed to meet. Like in *Yochim*, this is not a case where an "employee's requests for accommodations fell on deaf ears." *Id.* at 591. Instead, the parties here, as in *Yochim*, "engaged in a meaningful back-and-forth" with Plaintiff requesting remote work options and Defendant "presenting her with appropriate alternative accommodations." *Id.* Further, Plaintiff offers no evidence showing that the accommodations she received were ineffective—instead, the record clearly suggests the opposite. Finally, like in *Yochim*, Plaintiff's references to Defendant's COVID-19 remote work policies do nothing to change this analysis because those policies did not exist at the time of the challenged conduct. *Id.* at 592.

Because telework necessitates "a context-specific inquiry" which disfavors a general grant of total remote work, Plaintiff cannot establish that Defendant failed

to provide her with reasonable accommodation where those accommodations included significantly decreasing, but not eliminating, her in-person teaching requirements. *Id.* at 591. *See also Smith v. Austin,* 86 F.4th 815, 822 (7th Cir. 2023) ("[W]e have held that working at home is not a reasonable accommodation as a general matter.") (citation omitted); *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 644 (7th Cir. 2023) ("Working from home has been disfavored in ADA cases 'because most jobs require the kind of teamwork, personal interaction, and supervision that simply cannot be had in a home office situation.'") (quoting *Rauen v. United States Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 896 (7th Cir. 2003); *Bilinsky v. Am. Airlines, Inc.*, 928 F.3d 565, 573 (7th Cir. 2019) ("'[T]here is a general consensus among courts . . . that regular work-site attendance is an essential function of most jobs' . . . [as a] position's nature will often require face-to-face collaboration.") (quoting *Credeur v. Louisiana*, 860 F.3d 785, 793 (5th Cir. 2017)). Additionally, the record presents no evidence that Defendant's lack of engagement with an interactive process resulted in a failure to provide Plaintiff with reasonable accommodations or that Plaintiff failed to receive reasonable accommodations at all.

Thus, Defendant is entitled to summary judgment on this claim.

### d. Hostile Work Environment Based on Disability Discrimination

In the Seventh Circuit, and in other circuits, "a plaintiff may assert a claim for an illegal hostile work environment on the basis of disability under 42 U.S.C. § 12112(a)." *Ford v. Marion Cnt'y Sheriff's Office*, 942 F.3d 839, 851 (7th Cir. 2019). The underlying "legal basis is simple: Congress wrote the ADA using the language of

Title VII, and Title VII recognizes hostile work environment claims." *Id.*  To that end, the Seventh Circuit applies the same test for claims brought under Title VII when analyzing hostile work environment claims brought under the ADA: "to prove a hostile work environment claim, 'the alleged harassment must be both subjectively and objectively so severe and pervasive as to alter the conditions of . . . employment and create an abusive working environment.'" *Lloyd v. Swifty Transp., Inc.,* 552 F.3d 594, 603 (7th Cir. 2009) (quoting *Whittaker v. N. Ill. Univ.,* 424 F.3d 640, 647 (7th Cir. 2005)).

Here, Plaintiff alleges that she was subjected to a hostile work environment because of the statement made by a voting faculty member during the PRAD Chair selection process which referenced her medical leave and alleged lack of presence on campus.  Notably, Plaintiff does not contest that the Acting Dean "stopped that line of conversation" and informed that faculty member that her question "was inappropriate."  [127] ¶ 68.  This isolated statement, which was only incidentally related to her disability, does not rise to the level of conduct "so severe and pervasive" to support a hostile work environment claim.  *Alexander*, 739 F.3d at 982.  The fact that the Acting Dean directly and contemporaneously rebuked that colleague only serves to lessen the severity of this incident.  Further, Plaintiff offers no other allegations to show that the workplace was so "permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or persuasive to alter the conditions of the victim's employment," such that it generated "an abusive working environment."  *Id.*

Therefore, because Plaintiff's only allegation details an isolated incident which included a tangential reference to her disability, and that comment received immediate reprimand from a supervisor, she does not present genuine issue for trial with respect to her hostile work environment claim under the ADA. Subsequently, Plaintiff's claim fails as a matter of law.

### e. Equal Pay Act

Because Plaintiff withdrew her claim under the Equal Pay Act, the Court accordingly grants Defendant's motion for summary judgment on this claim.

## IV. Conclusion

Because the record contains no evidence which would permit any of Plaintiff's claims to survive summary judgment, the Court hereby orders that Defendant's motion is granted in its entirety. The Court directs the Clerk to enter judgment in favor of Defendant on all counts of Plaintiff's Second Amended Complaint.

Dated: February 5, 2026

Entered:

John Robert Blakey
United States District Judge

39